**Exhibit A**



> *"'The recount is almost over, and in this contest for attorney general … it's become apparent that our campaign is going to come up a few votes short,' Obenshain said, noting that he'd already called Herring to offer his congratulations. 'It was a vigorous and hard-fought campaign, but it's over.' Obenshain's concession will end a recount process that began on Nov. 5, when the two candidates were separated by a razor-thin election night margin.* **Herring defeated Obenshain by 165 votes out of more than 2.2 million votes cast**, *according to results certified by the Virginia Virginia Department of Elections on Nov. 25."*
>
> - *Politico*, December 18, 2013, covering Republican Mark Obenshain's whisker thin loss in the Virginia Attorney General's race.

## *Only Americans Should Choose American Leaders*

Citizenship is the most fundamental element of eligibility to vote in American elections. Every state requires voters to be U.S. citizens to vote in state elections.[1] The Virginia Constitution, specifically, delineates that "[e]ach voter shall be a citizen of the United States."[2] Only Americans should choose American leaders. Federal law makes it a crime for an alien to register to vote or to vote in a federal election. Simply put, it is a felony for a non-citizen to register and to cast a ballot.[3] Each time such a crime is perpetrated, whether by accident or willfully, a citizen is effectively disenfranchised.

The right to vote free from dilution by aliens is safeguarded primarily in several places—all of them appear to be failing to prevent aliens from participating in American elections and in the Commonwealth of Virginia. On the front end, federal law requires election officials to use reasonable efforts to identify and remove ineligible registrants from the voter rolls. The Federal voter registration form purports to prevent aliens from registering to vote, but it is an ineffective honor system under which the alien need merely lie to get on the voter rolls. On the back end, federal and state law enforcement officials are entrusted with prosecuting non-citizens who register and vote as a means to deter others from doing the same. Here too, the system is failing because the Obama administration has ignored instance after instance of voter fraud.

---

[1] See U.S. Dept. of Just., Federal Prosecution of Election Offenses 66 (7th ed. 2007), *available at* https://www.justice.gov/sites/default/files/criminal/legacy/2013/09/30/electbook-rvs0807.pdf

[2] Va. Const., Art. II, Sec. 1.

[3] 18 U.S.C. § 1015(f). It is also a felony for an individual to simply "falsely and willfully represent[] himself to be a citizen of the United States." 18 U.S.C § 911.

In practice, none of these so-called safeguards is functioning correctly. Based on voting history records, large numbers of ineligible aliens are registering to vote and casting ballots. They are canceling out the valid votes of American citizens. In some Virginia jurisdictions, the number of people registered to vote exceeds the number of citizens eligible to vote. When the Justice Department has been told of aliens registering to vote and committing federal felonies, nothing is done.

## *Summary of Findings*

An investigation in Virginia by the Public Interest Legal Foundation (PILF) and the Virginia Voter's Alliance (VVA) shows that the cause of this problem is something much worse than simple ineffective governance. Worse still, Virginia state election officials are obstructing access to public records that reveal the extent to which non-citizens are participating in our elections. These obstructionist tactics have led to PILF and VVA obtaining data from only a handful of Virginia counties so far. But the information from a few counties demonstrates a massive problem.

**In our small sample of just eight Virginia counties who responded to our public inspection requests,** *we found 1046 aliens who registered to vote illegally.*

The problem is most certainly exponentially worse because we have no data regarding aliens on the registration rolls for the other 125 Virginia localities. Even in this small sample, when the voting history of this small sample of alien registrants is examined, **nearly 200 verified ballots were cast before they were removed from the rolls. Each one of them is likely a felony.**

Again, this is from just a small sampling of Virginia counties. Each of the aliens we have discovered to have registered or voted has likely committed a felony. Will the Justice Department act now that their names, registration records and dates of voting are herein provided?

Ultimately, the number of illegal votes doesn't matter when the integrity of the process is at stake. Nobody should tolerate voter fraud, whether it comes in bunches as we describe here, happens occasionally, or decides the outcome of an election. Lawlessness in elections is a precursor for lawlessness across our government and culture. The response of law enforcement officials to both single instances of voter fraud and the hundreds of examples documented in this report should be the same: swift, sure and unwavering. No excuses should be made for the lawless who taint the electoral process.

**The most alien votes were cast in 2012, followed by 2008, the year President Obama was elected to his first term.**

In Virginia, like most states, there is no formal program for identifying non-citizen registrants. The Commonwealth formerly arranged to use the Federal Systematic Alien Verification for Entitlements (SAVE) database to detect aliens, but vigorous

use seems to have ended during the administration of Governor Terry McAuliffe. Most discoveries of non-citizens on the registration rolls are accidental or chance. What this means is that the number of registered non-citizens thus far identified by this investigation is just the "tip of the iceberg." The true extent of the problem likely runs in the thousands, if not more. And it is not unique to Virginia.

There is plenty of blame to go around. One culprit, however, is glaringly obvious—federal and state voter registration forms, which ask registrants to affirm their citizenship with nothing more than the check of a box. No documentary proof of citizenship must be shown. It is nothing more than an honor system, one that is unquestionably failing to keep non-citizens from voting. States that have tried to remedy this problem by asking registrants to prove their citizenship with documentary proof have uniformly been stonewalled by litigation brought by our own Department of Justice and legions of attorneys working with left-leaning voter groups committed to keeping ineligible voters on the rolls.

This report demonstrates the serious problem that unelected election officials have refused to address and even conspired to hide. It is our hope that this report will result in swift change and restore confidence in our elections.

## *When an alien completes a voter registration form, they commit a felony.*

This report must begin with the relevant law. It is only with that in mind that the reader can comprehend the gravity of the problem Virginia and other states are facing when it comes to non-citizen participation in our elections. When non-citizens register or actually vote, they violate both state and federal statutes because citizenship is a requirement to vote in both state and federal elections.

The offenses a fraudulent voter might commit when he registers and votes are numerous:

- Virginia Code § 24.2-1004: Criminalizes casting an illegal ballot.
- Title 18, United States Code § 611: Criminalizes voting by illegal aliens in federal elections.
- Title 18, United States Code § 911: Criminalizes representing oneself to be a citizen of the United States.
- Title 18, United States Code § 1015: Criminalizes false statements in order to register to vote or to vote in any Federal, State, or local election.
- Title 52, United States Code § 20511: Criminalizes the fraudulent submission of voter registration applications and the fraudulent casting of ballots.

The United State Attorney General and the law enforcement officers in the Commonwealth of Virginia are, respectively, authorized to prosecute violations of all of these statutes. Given that the integrity of an election is where the consent of the governed is obtained, you would think that federal and state elections officials would treat these crimes with appropriate seriousness. As will be discussed later in this report, that is, however, not the case.

*The National Voter Registration Act and the Help America Vote Act*

The problems in Virginia and other states can be traced as far back as 1993. Within months of assuming the Presidency, Bill Clinton signed into law the National Voter Registration Act ("NVRA")[4], a sweeping piece of legislation that proponents claimed would increase the number of registered voters and participation in our elections. One thing is for sure— it has increased the number of ineligible voters on state voter rolls.

The NVRA, commonly known as "Motor Voter," requires each state to offer voter registration to any individual that applies for a driver's license.[5] This provision of the law requires the applicant to swear to his or her citizenship under penalty of perjury,[6] but does not permit nor deny the state's ability to verify citizenship through formal documentation. Instead, the law provides that the states "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."[7]

Attempts by various states to require registrants to provide documentary proof of citizenship during registration for federal elections have been thwarted by lawsuits brought by left-leaning voter groups and the Department of Justice. *Virginia therefore requires applicants to **merely check a box** in order to "prove" their citizenship status.*



The NVRA also allows individuals to register to vote through the mail using the federal voter registration form (the "Federal Form"), a document that is developed and maintained by a federal agency called the Election Assistance Commission. In 2002, the Help America Vote Act added a citizenship question to the Federal Form.[8] Like Virginia's state registration form, the Federal Form requires only that a registrant check a box to "prove" his or her citizenship. Under the NVRA, state are required to "accept and use" the Federal Form for purposes of registration,[9] but the law does not prevent states from applying their own eligibility requirements.

---

[4] 52 U.S.C. § 20501 *et seq*.

[5] *See* 52 U.S.C. § 20504(a)(1) and (c)(1).

[6] 52 U.S.C. § 20504(c)(2)(C).

[7] 52 U.S.C. § 20504(c)(2)(B)(ii).

[8] 52 U.S.C. § 21083(b)(4)(A)(i).

[9] 52 U.S.C. § 20505(A)(1).

**Voter Registration Application**
Before completing this form, review the General, Application, and State specific instructions.

| Are you a citizen of the United States of America? | ☐ Yes ☐ No | This space for office use only. |
| Will you be 18 years old on or before election day? | ☐ Yes ☐ No | |

**If you checked "No" in response to either of these questions, do not complete form.**
(Please see state-specific instructions for rules regarding eligibility to register prior to age 18.)

The NVRA also imposes voter list maintenance and record keeping obligations. The law does not contain of checklist of required actions, but rather states generally that election officials must "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant or a change in the residence of the registrant."[10] What constitutes a "reasonable effort" is not provided by the statute, which has often made litigation necessary to enforce these list maintenance obligations.

Election officials must also "maintain for at least 2 years" and "make available for public inspection" "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."[11] Like the NVRA's list maintenance provision, the public inspection provision suffers from ambiguity, allowing election officials to deny access to records based on their unilateral determination that certain records are outside the scope of the statute. In one such example, the nonprofit organization Project Vote endured three years of litigation simply to obtain copies of completed voter registration applications requested from the General Registrar of Norfolk, Virginia—records which the Fourth Circuit Court of Appeals ruled were "unmistakably" within the scope of records that election officials must make publicly available for inspection.[12]

PILF has filed four separate lawsuits in 2016 alone to force election officials to allow inspection of their election records. **In Virginia, election officials have opposed transparency and many Virginia counties are not in compliance with federal law regarding our requests and may yet be sued in federal court to obtain requested records.**

The NVRA authorizes the federal Attorney General to enforce the NVRA's mandates, including the statute's list maintenance and public inspection provisions.[13] However, this grant of authority has been sparingly used during the Obama years because officials within the enforcing agency—the Department of Justice Civil Rights Division—are ideologically opposed to enforcing this federal law. Justice Department officials are aware of corrupted voter rolls, but their politics prevent them from doing the right thing.

---

[10] 52 U.S.C. § 20507(a)(4).

[11] 52 U.S.C. § 20507(i).

[12] *Project Vote / Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012).

[13] 52 U.S.C. § 20510(a).

## *Obstruction Begins in Alexandria*

The effort to obscure the number of non-citizens who are registering and voting in Virginia began in the City of Alexandria.

In January 2016, the election integrity group Virginia Voter's Alliance (VVA) contacted Alexandria General Registrar Anna Leider, notifying her that based on implausible registration data, her office appeared to be in violation of the NVRA's mandate that she use reasonable efforts to remove ineligible registrants. **The letter additionally requested access to ten categories of records concerning Ms. Leider's list maintenance programs pursuant to the NVRA's public inspection provision.**

In April 2016, PILF, on behalf of VVA and David Norcross, a private Alexandria citizen, sued Ms. Leider under the NVRA's private right of action, alleging that her office violated the NVRA by refusing to provide inspection of election records and for failing to conduct reasonable list maintenance practices.

After a court hearing where Alexandria said it would make the requested records available, VVA then proceeded to visit Ms. Leider's office to inspect the city's records.

**Among the records uncovered at Ms. Leider's office was a list of registrants who had been purged from the voter rolls because they were determined to not be U.S. citizens. The list includes hundreds of non-citizen registrants**, all of whom had likely committed felonies by registering to vote.

When VVA asked to photocopy the list, Ms. Leider refused, contradicting her statements made to the court**. Her refusal, however, was directed by state election officials. Ms. Leider's attorney later stated that she cannot provide the list because of "guidance" from the Virginia Department of Elections.** The excuse was that the reason for a registrant's cancellation—including by reason of non-citizen status—is confidential, and such information can neither be inspected nor duplicated.

A week later, and over eight months after the initial request was made, Ms. Leider finally capitulated. Her attorney provided VVA with a list, identifying **70 registrants who had been removed from Alexandria's registration lists after they were determined to not be U.S. citizens. These were just the aliens who were caught.**

Records showing the removal of ineligible non-citizen registrants are quintessentially records "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters,"[14] records that must be made available for public inspection under the NVRA. **Yet it took months of negotiations and a federal lawsuit to bring these records to the public's attention.**

---

[14] 52 U.S.C. § 20507(i).

Did any of the non-citizens removed from Alexandria's registration lists cast votes? Ms. Leider wouldn't tell PILF. According to her attorney, that information, too, is "confidential and available only for official use by the Department of Elections and general registrars." As discussed later in this report, some of these individuals have, in fact, participated in Virginia's elections.

## *The Virginia Alien Voter Cover-up Goes Statewide*

Alexandria is not the only jurisdiction that concealed the commission of felonies committed by non-citizen voters in Virginia. Upon the discovery of Alexandria's list of purged non-citizen registrants, **PILF utilized the NVRA's public inspection provision to request similar information from 19 Virginia counties and cities on August 8, 2016.  Nearly all of the counties have failed to comply with their federal obligation to provide transparent list maintenance records to us.**

Requests for a list of non-citizens purged from the voter lists since 2011 were made to the following Virginia counties and cities:

- **Arlington**
- **Albemarle**
- **Bedford**
- **Chesterfield**
- **Fairfax City**
- **Fauquier**
- **Frederick**
- **Falls Church**
- **Loudon**
- **Hampton**
- **Hanover**
- **James City**
- **Lancaster**
- **Manassas**
- **Prince William**
- **Roanoke**
- **Stafford**
- **Rappahannock**
- **York**

The election officials in charge of these jurisdictions were sometimes responsive, at first. **Prince William County provided a list of *433 non-citizens* who had registered to vote in the county, but were then removed after they were determined to not be U.S. citizens.**[15]

---

[15] See Exhibit 1. PILF notes that, on page 1, one registrant appears to be listed twice. However, on page 29, Prince William County lists the "Declared Non-Citizen Total" at 433 individuals.

7

The only indication that any of these potential felons were brought to attention of law enforcement is one communication provided by the county, which indicates that the United States Citizenship and Immigration Services contacted the county's general registrar requesting the voter registration application of one individual— **REDACTED** [16] The discovery was accomplished by chance and not a result of the county's own list maintenance. An additional communication shows that registration material for REDACTED, and one other individual, were then forwarded to the attorney for Prince William County. The communication notes that both individuals voted in the November 2012 General Election.

**The United States Attorney in Virginia has done nothing about the felonies committed by 433 aliens registering in Prince William County alone.**

**Bedford County**, a relatively small rural county in Virginia with only about 60,000 individuals of voting age, also provided a list of 35 non-citizens that had been removed from their voter rolls. Bedford County also provided copies of notices sent to 54 individuals who indicated on their DMV applications that they were not citizens. Upon learning that these individuals were not citizens, the county did not cancel their registrations. Rather, the county sent each individual a Notice of Intent to Cancel,[17] which informed the applicant that although they indicated they were not a citizen on their DMV application, their registration would remain active if they simply signed the notice, affirming they were a citizen. Based on the fact that only 35 non-citizens were removed between 2011 and the present, we can conclude that 19 individuals who swore under penalty of perjury to the DMV that they were not U.S. citizens returned the notice, stating they are a U.S. citizen. Like the initial check box used to register, the affirmation notice is nothing more than an honor system that easily allows non-citizens to remain registered to vote.

One week after providing the list of purged non-citizens, Barbara Gunter, the general registrar for Bedford County, contacted PILF by phone. The Virginia Department of Elections had since contacted Ms. Gunter and told her that she should not have provided us with the list because doing so violates federal law—the Federal Drivers Privacy Protection Act. She asked that PILF delete the list. Obviously we did not delete the list, and as we shall see, providing the records to the public obviously does not violate the federal law the Virginia Department of Elections used to strong-arm local election officials into noncompliance.

> **We received no records showing that election officials had referred any non-citizen voters for investigation or prosecution.**

**Roanoke County** acted similarly. After providing a list of **22 alien registrants**, General Registrar Judith Stokes emailed PILF, asking that we "destroy" the list she had previously provided.[18] Like Bedford County, Ms. Stokes explained that her request originated with the Department of Elections.

---

[16] See Exhibit 2.

[17] An example of this notice is provided in Exhibit 3.

[18] The email is reproduced in its entirety at Exhibit 4 to this report.

This is where production of records required to be released effectively stopped. Over the course of August and September 2016, responses from election officials rolled in, *each one explaining that state election officials had instructed them not to provide lists of non-citizens* who had been removed from Virginia's voter rolls.

The responses were nearly identical and soon it became clear that they were orchestrated by Edgardo Cortes, the Commissioner of the Virginia Department of Elections, and an appointee of Governor McAuliffe. According to numerous county election officials, Commissioner Cortes had issued guidance to them, instructing them not to respond to our requests for records pertaining to non-citizen voters. Some election officials kindly provided us the original communications from Cortes.

The guidance from Commissioner Cortes included these instructions:[19]

> c. ELECT is working on creating a single cancellation report that does not include the reason for cancellation and only releasable information to facilitate your response to these types of requests. We will offer a statewide report to the requesting organization. While there is a VERIS report that provides a list of registrants canceled due to non-citizenship for your administrative use, **you may not provide the information regarding reason for cancellation for non-citizen status** as this information is received from DMV and is covered under the federal Driver's Privacy Protection Act (DPPA). The GR/EB Handbook already indicates that this information is not releasable. The DPPA prohibits the release of covered data. It is not sufficient to simply redact the reason code column from the current VERIS report since it contains only individuals identified by DMV as being potentially non-citizen and cancelled as a result.
> d. The Department will not provide voting history as this is not covered under NVRA. The Code of Virginia establishes who may obtain this information and how in 24.2-406. Only the Department of Elections may provide this information to authorized individuals and entities. We will notify the requestor of this fact and you should respond accordingly to this or any other request for voting history.

This is what a cover-up of alien voting looks like. State election officials are preventing public access not only to records showing the number of non-citizens who have successfully registered to vote, but also records showing how many of them voted prior to being removed from the registration rolls.

---

[19] The email is reproduced in its entirety at Exhibit 5 to this report.

Commissioner Cortes' guidance was distributed statewide on August 19, 2016. Yet not until September 16 did Commissioner Cortes contact PILF. In his correspondence, Commissioner Cortes offered to provide a "customized report" at a cost of $240,[20] a report that he claimed would satisfy our request concerning non-citizens. It wouldn't.

**Commission Cortes refused to provide a list of non-citizens who have been purged from the registration list in each jurisdiction.** He likewise refused to provide the voting history of purged non-citizens, reiterating his position that such information is not subject to release under the NVRA's public inspection provision, but is available only to "qualified entities" under limited circumstances.[21]

## *The Virginia State Board of Election's Excuses to Hide the Scope of Alien Registration*

**The Drivers Privacy Protect Act**

According to the guidance issued to county election officials, Commissioner Cortes states that a list of registrants purged from Virginia's registration lists cannot be provided to the public because such information is protected from release by the federal Driver's Privacy Protection Act (DPPA). This is nonsense.

The DPPA makes it "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted" by one of fourteen exceptions to the prohibition on disclosure.[22] According to Commissioner Cortes, neither general registrars nor the Department of Elections can disclose a list of registrations cancelled by election officials because, according to him, a registrant's citizenship status, as indicated on his driver's license application, is "personal information." Commissioner Cortes is plainly wrong for numerous reasons.

PILF seeks list maintenance records from election officials, not from any other state agency. The DPPA prohibits only the disclosure of "personal information" from a "motor vehicle record." [23] "Motor vehicle record" is defined by the law; it includes "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles."[24] Neither the registrant's citizenship status nor the reason for the registrant's cancelation is "personal information" under the DPPA.

---

[20] This cost was later waived after we informed Commissioner Cortes that the NVRA permits election officials to charge "reasonable costs" for "photocopying" only. 52 U.S.C. § 20507(i)(1). It does not permit election officials to impose costs for time spent producing records.

[21] The email is reproduced in its entirety at Exhibit 6 to this report.

[22] 18 U.S.C. § 2722(a).

[23] 18 U.S.C. § 2722(a).

[24] 18 U.S.C. § 2722(a).

The DPPA prohibits the disclosure of only "personal information" and highly restricted personal information."[25] "Personal information" is defined by the law; it includes "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information."[26] "Highly restricted personal information" is "an individual's photograph or image, social security number, medical or disability information."[27]

List maintenance records pertaining to the removal of aliens from the rolls has nothing to do with a motor vehicle record or any protected personal information or highly restricted personal information.

**Voter History**

Commission Cortes' guidance directed local election officials to conceal records showing the voting history of any individual whose registration was cancelled for reasons of citizenship. According to Commissioner Cortes, documents concerning voting activity are not covered under the NVRA's public inspection provision and can only be disclosed publicly as permitted by Commonwealth law, which permits disclosure, at a reasonable cost, only to a list of qualified entities.[28]

In the end, the State Board could not conceal the extent of alien voting because PILF and VVA worked with a third party with access to voter history to determine which of the aliens who registered to vote, actually voted. Not surprisingly, many ballots were cast by these aliens.

## *The Extent of the Non-citizen Registration in Virginia*

Despite the cover-up orchestrated by state election officials, PILF was successful in procuring additional data concerning non-citizen voter registration in Virginia. It was, however, not easy. Federal law says it should be easy, but Virginia has a great deal to hide when it comes to alien registration and voting.

By way of dozens of phone calls and in-person visits to election offices, we were able to extract additional information from local registrars concerning non-citizen participation in Virginia's elections. Some officials, however, stood firm, refusing to provide us with the requested information. The information we have been able to gather thus far demonstrates what many of us already knew: **non-citizens are registering and voting in our elections.** The obstructionist effort led by state election officials has prevented us from learning how much deeper the problem runs.

---

[25] 18 U.S.C. § 2722(a).

[26] 18 U.S.C. § 2725(3).

[27] 18 U.S.C. § 2725(4).

[28] Va. Code Ann. § 24.2-406.

Below is the number of registrants per jurisdiction that have been removed from the voter rolls since, at most, 2011.



This data is but a minor snapshot of the problem. It represents non-citizen registrants in only 8 of Virginia's 133 voting jurisdictions and includes only those non-citizens that were discovered to have been improperly registered. Because no formal programs exist in Virginia to identify non-citizen registrants, the discovery and removal of these non-citizens is either by accident or because the registrant later indicated to election officials that he or she was not a citizen. The total number of non-citizens that remain registered to vote therefore cannot be completely ascertained. It is, however, likely, that based on discoveries to date, thousands of non-citizens remain registered and eligible to vote throughout the Commonwealth.

At the instruction of Commissioner Cortes, local election officials refused to provide us with records showing the voting history of non-citizens removed from registration lists.

In the 8 jurisdictions that provided us with lists of aliens recently removed from their voter rolls, **we discovered that 31 non-citizens had cast a total of 186 votes between 2005 and 2015. The most alien votes were cast in 2012 followed by 2008, the year President Obama was elected to his first term.**

The bill would have required the clerk of court to "make such information available to local elections officials so that they could cancel the registration of those individuals deemed ineligible to vote. The bill's purpose was clear: prevent ineligible residents from registering and voting in Virginia's elections. **Governor McAuliffe gave essentially no justification for his veto of this commonsense law, stating only that the issue needed "addition study."[29]**

---

[29] http://leg1.state.va.us/cgi-bin/legp504.exe?151+amd+HB1315AG.

It may be no accident that Commissioner Cortes had not done all he could when it comes to transparency about aliens voting in Virginia elections. Before he was picked by Governor McAuliffe, he worked at the Advancement Project, an organization strongly opposed to using citizenship verification tools such as the federal SAVE database.

PILF's request to local election officials asked for *all communications with federal and state law enforcement officials pertaining to non-citizens who had either registered to vote or voted*. **However, we received no records showing that election officials had referred any non-citizen voters for investigation or prosecution.** In fact, some jurisdictions indicated that they do not even review voter history to identify fraudulent votes. Like our other requests, this absence of records is due in part to the obstructionist efforts by Commissioner Cortes, whose guidance to local election officials informed them that communications with law enforcement officials were not records covered by NVRA and therefore did not need to be provided to PILF.

### *Systems Failure*: The Tradition of Ignoring Alien Voter Fraud in Virginia

The lack of action by the Department of Justice and law enforcement officials in Virginia is nothing new. In 2011, members of the Fairfax County Electoral Board alerted the Office of the U.S. Attorney for the Eastern District of Virginia in Alexandria, as well as the Public Integrity Section of the Criminal Division of the Justice Department (which coordinates election crime prosecutions) in Washington, of possible voter fraud by non-citizens.



*1: Source Virginia State Board of Elections election results website.*

The Fairfax County board had discovered 278 registered voters who had represented to the DMV that they were not U.S. citizens. Almost half of them—117—had not only registered to vote, they had in fact voted in state and federal elections. The Department of Justice never followed up, leaving nearly 300 gift-wrapped cases of voter fraud untouched.

13

*Systems Failure*: **Voter registration forms easily permit non-citizens to register and participate in our elections.**

The lack of prosecution of election crimes provides a key deterrent to voter fraud, if it is used. But the existing registration process provides non-citizens with an easy path to the ballot box. As previously explained, the federal voter registration form and the registration forms used by the Commonwealth of Virginia rely on nothing more than an honor system to limit voter registration to citizens of this country. In all cases, these forms include a checkbox at the top of the form, which asks registrants to answer "yes" or "no" to the question "Are you a citizen of the United States?" The registrant must additionally sign the form, under penalty of perjury, attesting to the fact that his or her answer to that question is true and correct. There are no other "safeguards" in place to protect the integrity of the registration process.

As the data demonstrates, this honor system has undeniably failed to prevent non-citizens from registering and voting. PILF's investigation requested that county election officials provide us with copies of voter registration forms used by the non-citizens those election officials later removed from voter rolls.

Prince William County, which provided a list of 433 non-citizens removed from its voter rolls since 2011, **provided us with those registration forms for non-citizens removed since 2015. These forms highlight the failures of our current registration process.**

Prince William County removed a total of 84 non-citizens from its voter rolls in 2015 and 2016.[30] **Of these registrants, 77 checked "yes" on their registration form, attesting, under penalty of perjury, that they were U.S. citizens.** Without any other confirmation, these individuals were registered to vote because Virginia is not using the SAVE database to check all incoming registrations for citizenship status.

However, a "yes" answer is not necessary to secure registration. **Four individuals actually answered "no" to the citizenship question but were registered to vote.**



**One registrant checked neither "yes" nor "no" but was still registered to vote.** The citizen checkbox on federal voter registration forms is failing to keep aliens off American voter rolls.

---

[30] The completed registration applications provided to PILF are available at Exhibit 7. The applications for at least two registrants were not provided by Prince William County.

14



Only two other jurisdictions, Fairfax City and Hanover County, complied with PILF's request to inspect voter registration application forms of the aliens who were detected. In Fairfax City, 20 non-citizens were removed from the rolls since 2011. Of those individuals who were registered to vote, 15 answered "yes" to the citizenship question, **3 answered "no,"** and 2 answered neither "yes" nor "no." In Hanover, which also provide 20 applications of purged non-citizens, 17 answered "yes" to the citizenship question, **2 answered "no,"** and 1 answered neither "yes" nor no."

The answer to this problem seems simple: **require all applicants to provide documentary proof of citizenship at the time of their registration.**

This obviously solution has, however, faced severe opposition by well-funded organizations and our own Department of Justice. Several states, including Alabama, Kansas, and Georgia have tried to safeguard their residents' right to vote by requiring all individuals to prove their citizenship prior to registering to vote.

Virginia Governor Terry McAuliffe is also doing his part to make voting by non-citizens even easier. In April 2015, Governor McAuliffe vetoed legislation[31] that would have required jury commissioners to retain information from individuals not qualified to serve as jurors for reasons that would also disqualify them from voting, such as

- not being a citizen of the United States
- no longer being a resident of the Commonwealth
- being a resident of another county or city in the Commonwealth
- having been convicted of a felony and having not provided evidence that their right to vote has been restored, or
- having been adjudicated incapacitated.

The bill would have required the clerk of court to "make such information available to local elections officials so that they could cancel the registration of those individuals deemed ineligible to vote. The bill's purpose was clear: prevent ineligible residents from registering and voting in Virginia's elections. Governor McAuliffe gave essentially no justification for his veto of this commonsense law, stating only that the issue needed "addition study."[32]

---

[31] House Bill 1315, available at http://leg1.state.va.us/cgi-bin/legp504.exe?151+ful+HB1315ER+pdf.

[32] http://leg1.state.va.us/cgi-bin/legp504.exe?151+amd+HB1315AG.

15

It is unlikely that this report, or any amount of evidence demonstrating the rampant election fraud taking place in Virginia, will convince Governor McAuliffe that additional safeguards to needed to protect the voting rights of his constituents.

## *Systems Failure*: Inviting Aliens to Stay on the Rolls

In one astonishing example, **one non-citizen was invited to remain on the voter rolls even after he had informed election officials he was an alien.** When REDACTED registered to vote in 2007, he checked "yes" in response to the application's citizenship question. In 2010, REDACTED renewed his driver's license and on his application, he checked "no" to the citizenship question. The inconsistencies in REDACTED 's answers alerted election officials that he might not be eligible to vote. His registration, however, was not canceled. Instead, REDACTED was mailed an "Affirmation of Citizenship," which asked REDACTED to affirm, subject to penalty of law, that he was a U.S. citizen. REDACTED signed the form and returned it. In May 2015, REDACTED 's voter registration was cancelled after election officials determined that he was, in fact, not a U.S. citizen.[33]

*What can be done?*

There are several changes that states and the federal government can and should make to prevent non-citizens from registering and voting illegally in state and federal elections:

- The registration process must be changed. The check-box honor system is a failure and is facilitating voter fraud. All states should require anyone who registers to vote to provide documentary proof of U.S. citizenship. In the alternative, states should fully utilize the federal SAVE database which contains the names of aliens who have had contact with the immigration system.

- Congress and state legislatures should require all federal and state courts to notify local election officials when individuals summoned for jury duty from voter registration rolls are excused because they are not United States citizens.

- State legislatures or state elections officials should enact requirements that force local election officials to conduct a systematic review of the voter history of all registrants who were purged from the rolls due to not meeting the requirements of U.S. citizenship.

- The database, known as E-Verify, that is being used by U.S. employers to check the citizenship status of prospective employees should be made available to election officials and administrators of statewide registration databases so that election officials can easily identify registered voters who are not U.S. citizens.

- Law enforcement at both the federal and state level should exercise their authority to prosecute cases of voter fraud. Voter registration and voting history records such as those contained in this report makes prosecution an easy task. Armed with that information,

---

[33] REDACTED 's registration applications are available at Exhibit 8.

    prosecutors would simply have to verify whether or not the individual was a citizen at the time of registration or voting.

*Conclusion*

The problem is real and the solutions are simple. What is happening in Virginia is happening in every other state. Your vote is at risk and elected officials must act. You can help. Please contact your local election officials to ask what they are doing to ensure voter lists are accurate and free of ineligible voters.