UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

League of United Latin American Citizens - )
Richmond Region Council 4614, Eliud )
Bonilla, Luciania Freeman, Abby Jo )
Gearhart, and Jeanne Rosen, )
)
        Plaintiffs, )
)
    v. ) Civil Action No. 1:18cv423 (LO/IDD)
)
PUBLIC INTEREST LEGAL FOUNDATION )
and J. CHRISTIAN ADAMS , )
)
        Defendants. )

---

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS**

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    PROCEDURAL STANDARD ................................................................. 3

III.   FACTUAL ALLEGATIONS ................................................................. 4

IV.   LEGAL ARGUMENT ................................................................. 7

     A.     Plaintiff LULAC – Richmond Does Not Have Standing to Assert the Claims Alleged in the Complaint Under Controlling Fourth Circuit Precedents ................................................................. 7

     B.     Even if the Voting Rights Act Authorized Claims Against Non-Government Parties, Plaintiffs' Allegations Are Insufficient to Establish Any Violation ................................................................. 10

         1.     Section 11(b) of the Voting Rights Act does not authorize "voter intimidation" claims against non-government parties ................ 10

         2.     Publication of the First and Second Reports is not actionable as "voter intimidation" under Section 11(b) of the Voting Rights Act ........ 11

     C.     Plaintiffs' Inflammatory Claim of a "Ku Klux Klan Act" Conspiracy Is Not Supported By Any Allegations of Violations of 42 U.S.C. § 1985(3) ......... 14

         1.     Even if applied to alleged private conspiracies, Section 1985(3) requires factual allegations showing a class-based animus ..................... 15

         2.     LULAC – Richmond and the individual Plaintiffs are not members of any class that is protected under Section 1985(3) ................ 16

         3.     Plaintiffs have failed to plead a conspiracy based on animus directed toward any class that is protected by Section 1985 ................ 17

         4.     Plaintiffs' conclusory allegations of a conspiracy are insufficient to satisfy the plausibility requirements of Iqbal and Twombly ................... 18

     D.     The Allegedly Defamatory Reports Do Not Mention the Individual Plaintiffs By Name and Are Otherwise Not Actionable As a Matter of Virginia Law ................................................................. 20

         1.     Plaintiffs' claims for defamation based on the First Report are barred by the one-year statute of limitations even if otherwise actionable ................................................................. 21

         2.     The Complaint does not allege that Defendants published any statements, defamatory or otherwise, about the individual Plaintiffs ....... 21

         3.     The Reports do not contain any statements about the individual Plaintiffs that are both "false" and defamatory as a matter of law .......... 22

         4.     The Complaint does not allege sufficient facts to establish that Defendants published the Reports with the requisite intent..................... 23

V.     CONCLUSION ................................................................. 25

4815-3967-1911.1

# TABLE OF AUTHORITIES

Defendants, Public Interest Legal Foundation ("PILF") and J. Christian Adams ("Mr. Adams"), by counsel, respectfully state as follows in support of their Rule 12(b)(6) Motion to Dismiss.

## I.    <u>PRELIMINARY STATEMENT</u>

By way of their Complaint, Plaintiffs seek to deprive PILF and Mr. Adams of their First Amendment right to advocate that only citizens of the United States be permitted to vote in elections.  Defendant PILF is a public interest law firm dedicated to the integrity of elections. The President of PILF is Defendant Mr. Adams.  From 2005 to 2010, Mr. Adams served in the Voting Section of the United States Department of Justice where one of his primary roles was to enforce Section 11(b) of the Voting Rights Act.  Consistent with PILF's objective of protecting the right to vote, PILF and the Virginia Voters Alliance ("VVA") undertook an investigation of public voting records in Virginia with a focus on highlighting deficiencies in the voter registration system and official inaction—or even obstruction—when confronted with those deficiencies.

The results of this investigation were reported in two publications at which Plaintiffs' Complaint takes aim.  The first, entitled *Alien Invasion I* (the "First Report"), was published on September 20, 2016.  The second, entitled *Alien Invasion II* (the "Second Report"), was published in May 2017.  The statistics and information contained in the First and Second Reports (collectively, "the Reports") came directly from public voting records.  PILF obtained these public records by exercising its public inspection rights under the National Voter Registration Act ("NVRA").  Although the NVRA requires state election officials to make those records available for public inspection, PILF faced considerable lack of cooperation and obstruction from Virginia elections officials before they finally turned over the records that are the subject of the Reports.

The Reports advocated for more careful government recordkeeping and stronger safeguards to protect the integrity of voter registration. Although the Reports named many government officials, they did not identify by name any of the individual Plaintiffs who now claim to have been "defamed" because the public records referenced in the Reports stated—erroneously—that their names had been removed from the voter registration rolls because they were not U.S. citizens.

According to the Complaint, it is "defamation" if an organization or individual publishes hyperlinks to public records that are later found to contain inaccuracies. This unprecedented application of the law of defamation is one of many ways in which Plaintiffs' Complaint seeks to have this Court ignore the governing law to punish Defendants for expressing views with which Plaintiffs disagree.

The publications attached as exhibits to the Complaint say nothing about the race, national origin, or ethnicity of individuals who—according to public records available from local registrars—are not citizens of the United States and therefore cannot even register to vote, much less vote without committing a felony. Yet the lead plaintiff is an organization by the name of League of Latin American Citizens – Richmond Region Council 4614 ("LULAC – Richmond") "that works to advance the economic condition, educational attainment, political influence, health, housing, and civil rights of the Latino population" of the Richmond area. (Compl. ¶ 12). However worthy, the goals of the LULAC – Richmond and the national organization of which it is part[1] do not give the association standing to assert the claimed violations of the Voting Rights Act and "Ku Klux Klan Act" alleged in the Complaint. On the basis of standing alone, LULAC – Richmond's claims should be dismissed.

---

[1] Ironically, the national League of United Latin American Citizens of which LULAC – Richmond is part initially admitted only U.S. citizens as members. (cite).

4815-3967-1911.1

On the merits, the claims of all Plaintiffs are subject to dismissal as a matter of law. The Voting Rights Act does not afford a right of action against non-government parties. Even if it did, mere publication of the Reports does not rise to the level of "voter intimidation" prohibited by Section 11(b) of the Voting Rights Act.

As for Plaintiffs' alleged violations of the "Ku Klux Klan Act," 42 U.S.C. § 1985(3) is applicable only to government conduct. Even if it applied to alleged private conspiracies, Section 1985(3) requires allegations of animus directed toward certain protected classes that do not include Plaintiffs.

Finally, Plaintiffs' defamation claims are deficient because the Reports at issue do not even name the individual Plaintiffs, much less defame them.

## II.    PROCEDURAL STANDARD

Rule 12(b)(6) requires the Court to accept well-pleaded factual allegations of the Complaint as true. *Young v. City of Mount Rainier*, 238 F.3d 567, 577 (4th Cir. 2001). But the Court should not give any weight to conclusory allegations ungrounded in any assertion of fact. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Moreover, unsupported allegations of conspiracy are insufficient to survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Nor do "a bare assertion of conspiracy" or "a conclusory allegation of agreement" suffice to raise a claim of conspiracy. *Id.* at 556-7. Instead, Plaintiffs must allege sufficiently specific facts to "raise a right to relief above the speculative level," such that the "claim…is plausible on its face." *Id.* at 545, 547. *See also Sarvis v. Judd*, 80 F. Supp. 3d 682, 697 (E.D. Va. 2015) ("*Twombly* and *Iqbal* also make clear that the analytical approach for evaluating Rule 12(b)(6) motions to dismiss requires courts to reject conclusory allegations that amount to mere formulaic recitation of the elements of a claim and to conduct a context-specific analysis to determine whether the well-pleaded factual allegations plausibly suggest an entitlement to

3

relief.") (quotation and citation omitted).

### III.    FACTUAL ALLEGATIONS

The Complaint alleges that Defendants published the First Report on September 20, 2016 to media outlets via press releases and social media postings.  (Compl. ¶ 24).  In May 2017, Defendants published the Second Report, which was "intended to be a sequel" to the First Report.  (*Id.* ¶ 35).  According to the Complaint, PILF and Mr. Adams "conspired with each other" and with VVA to "draft, publish and publicize" the Reports.  (*Id.* ¶ 22).  The Second Report "affirmatively reiterates the accusation … that certain voters in a number of Virginia jurisdictions, including the Richmond area (where Plaintiff LULAC operates), were guilty of committing one felony by registering to vote and likely guilty of committing another felony by actually voting."  (*Id.* ¶ 38).  Both Reports had lengthy appendices of supporting materials, including email correspondence with Virginia election officials and copies of government-produced voter registration documents.

The First Report "asserts the discovery of multiple lists of non-citizen felons" in the following counties: Alexandria,[2] Bedford, Prince William, and Roanoke.  (*Id.* ¶ 28).  Plaintiffs claim that the First Report "accuses the voters named in it of committing multiple, separate felonies, from illegally registering to vote to casting an ineligible ballot."  (*Id.* ¶ 25).  Similarly, Plaintiffs claim that the Second Report "imputes to each of those allegedly illegally registered individuals the commission of multiple felonies."  (*Id.* ¶ 40).

According to the Complaint, the First Report's copies of government-produced voter registration records "provide lists of the alleged felons by name."  (*Id.* ¶ 29).  Prince William County's list of "non-citizens who had registered to vote in the county, but were then removed

---

[2] Plaintiffs mistakenly refer to "lists of non-citizen felons" in the "County" of Alexandria.  The Report actually contains records from the City of Alexandria.  (Compl. Ex. A, at 6).

4815-3967-1911.1

after they were determined to not be U.S. citizens" included Plaintiff Ms. Freeman.  (*Id.* ¶ 29).

The Prince William County list included contact information for each non-citizen identified by

the county, including Ms. Freeman.  (*Id.* ¶ 29).  Ms. Freeman is in fact a citizen and registered to

vote in Prince William County, Virginia.  (*Id.* ¶ 14).  According to the Complaint, she appeared

on the list due to a "paperwork error" caused by a government official who "mistakenly believed

that she was a non-citizen based on a Department of Motor Vehicles from."  (*Id.* ¶ 32).

The exhibits to the Second Report also contained government-produced voter registration

documents that identified hundreds of individuals as non-citizens.  (*Id.* ¶ 41).  The government

documents provided "names, home addresses, and telephone numbers" of these individuals.  (*Id.*

¶ 41).  Plaintiffs claim that the original appendix to the Second Report included government-

produced forms with Social Security numbers until Defendants redacted that information.  (*Id.* ¶

41).  These appendices included government-produced information for Plaintiffs Ms. Freeman,

Mr. Bonilla, Ms. Rosen, and Ms. Gearhart.  (*Id.* ¶ 42).  Mr. Bonilla is a citizen who resided and

voted in Herndon, Virginia from 1999 until 2013.  (*Id.* ¶ 13).  Ms. Gearhart is a citizen and

registered voter of New Kent County, Virginia.  (*Id.* ¶ 15).  Ms. Rosen is a citizen and a

registered voter in York County, Virginia.  (*Id.* ¶ 16).

"The clear implication" of the First Report, Plaintiffs allege, is that the individuals listed

in the attached government reports "should not have registered or voted, and by doing so,

committed felonies under state or federal law."  (*Id.* ¶ 30).  Similarly, Plaintiffs claim that the

Second Report "unequivocally accuses Plaintiffs of having committed a felony under federal and

state law by improperly registering to vote" with "the clear implication" to "an objectively

reasonable reader … that Plaintiffs are also guilty of a second felony by actually voting."  (*Id.* ¶

44).  According to the Complaint, Mr. Adams suggested that those individuals be prosecuted.

This allegation is based on a rhetorical question that Mr. Adams posed to *Breitbart News*: "We name the names of registered voters removed from the rolls for citizenship problems. Will the DOJ prosecute any of them?" (*Id.* ¶ 31).

Before publication of the First Report, Plaintiffs claim, "Virginia elections officials informed Defendants that they were drawing false conclusions from the registrar information and running the significant risk of wrongfully accusing constitutionally eligible voters of committing felony voter fraud." (*Id.* ¶ 33). Between the publication of the First and Second Reports, election officials allegedly informed Defendants of methodological deficiencies in the First Report. These officials provided conflicting information, however, Arlington County registrar Linda Lindberg claimed that certain citizens were erroneously included on the cancellation lists after re-affirming their citizenship, while Commissioner of the State Department of Elections, Edgardo Cortes, stated that such individuals "would no longer appear on this report because they would now be on active status." (Ex. B, at 10).

Plaintiffs allege that "critical media reports made Defendants further aware of the methodological shortcomings" in the First Report after its release. (Compl. ¶ 34). Plaintiffs claim that Defendants know that voters can be removed from the voting rolls "for various reasons—including accidental failures to respond to government inquiries or routine paperwork errors." (*Id.* ¶ 32). According to the Complaint, Defendants "intentionally accused" the people on the lists "of committing felonies by registering to vote and voting." (*Id.* ¶ 33).

Sometime after the publication of the Second Report, Defendants received specific information from the government "that some records were erroneously disclosed by the Commonwealth of Virginia which reflected individuals incorrectly categorized in the official voter registration archive as being 'declared non-citizens.'" (*Id.* ¶ 43). Defendants updated the

body of their report and removed the incorrect portion of the government's records from their supporting exhibits. As a result, the names of Plaintiffs Ms. Gearhart and Ms. Rosen no longer appear in the exhibits to the Second Report. (*Id.* ¶ 43). The Second Report reiterated PILF's goal of improved accuracy in government recordkeeping of voter lists: "PILF's priority is that every eligible citizen remain on the rolls and every ineligible alien be removed from the rolls." (Ex. B, at 10). "Indeed, PILF has never drawn any distinction between aliens and illegal aliens. Neither is entitled to vote." (*Id.*).

## IV.    LEGAL ARGUMENT

### A.    Plaintiff LULAC – Richmond Does Not Have Standing to Assert the Claims Alleged in the Complaint Under Controlling Fourth Circuit Precedents.

Because of the Article III case or controversy requirement, a plaintiff's standing to sue "is the threshold question in every federal case, determining the power of the court to entertain the suit." *Goldstein v. Costco Wholesale Corp.*, 278 F. Supp. 2d 766, 769 (E.D. Va. 2003). As an organization, LULAC-Richmond can establish standing under one of two theories: (1) an organizational theory that enables an organization to bring suit on its own behalf, and (2) a representational theory which allows an organization to sue on behalf of its members. *Id.* at 769; *see also Moseke v. Miller and Smith, Inc.*, 202 F. Supp. 2d 492, 497 (E.D. Va. 2002). In this case, however, LULAC – Richmond has not asserted standing under a representational theory. Rather, the sole basis for LULAC – Richmond's claim of standing is under an organizational theory. LULAC – Richmond would have standing to sue on an organizational basis only if it could demonstrate a "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources – constitut[ing]…more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). In determining whether organizational standing exists, "a court conducts the same

4815-3967-1911.1

inquiry as in the case of an individual, determining if the plaintiff has alleged such a personal stake in the outcome of the matter to warrant his invocation of federal court jurisdiction." *Maryland Highways Contractor's Ass'n, Inc. v. State of Maryland*, 933 F.2d 1246, 1250 (4th Cir. 1991). LULAC – Richmond therefore must demonstrate that "(1) it suffered an 'injury in fact' that is (a) concrete and particularized, (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant, and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Salt Inst. v. Thompson*, 345 F. Supp. 2d 589, 598 (E.D. Va. 2004), *aff'd sub nom. Salt Inst. v. Leavitt*, 440 F.3d 156 (4th Cir. 2006). A mere conflict between a defendant's conduct and the organization's mission is not sufficient to establish Article III standing. *Goldstein v. Costco Wholesale Corp.*, 278 F. Sup. 2d 766, 769-70 (E.D. Va. 2003) (internal citation omitted).

To demonstrate an "injury in fact," LULAC – Richmond cannot simply allege a general harm to its organizational purpose. *Jefferson v. Sch. Bd. of City of Norfolk, Virginia*, 2010 WL 11527350, at *3 (E.D. Va. Nov. 18, 2010), *aff'd sub nom. Jefferson v. Sch. Bd. of City of Norfolk*, 452 F. App'x 356 (4th Cir. 2011) (citing *Maryland Highway Contractors Ass'n, Inc. v. State of Maryland*, 933 F.2d 1246, 1250-51 (4th Cir. 1991)). For example, a setback to an "abstract social interest" like eliminating societal racial discrimination would be insufficient to support Article III standing. *Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 737-38 (D. Md. 2001) (*citing Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

A district court in this circuit has questioned whether voluntary diversion of resources to investigate allegedly discriminatory practices constitutes injury in fact for purposes of Article III standing. *Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 737 (D. Md. 2001). The Fourth Circuit has since held that harm resulting from an organization's "own budgetary

choices" does not constitute injury in fact. *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012). "[D]etermin[ing] that an organization that decides to spend its money on educating members, responding to member inquiries, or undertaking litigation in response to legislation suffers a cognizable injury would be to imply standing for organizations with merely 'abstract concern[s] with a subject that could be affected by an adjudication.'" *Id.* at 675. In this case, the Complaint alleges no facts to show that LULAC – Richmond has suffered a "concrete and demonstrable injury" to its organizational activities, in conjunction with a depletion of resources, that constitutes more than a simple inconvenience to its abstract social interests.

Nor has LULAC – Richmond established that it suffered any injury that is fairly traceable to Defendants' conduct and not the result of the independent action of some third party not before the Court. Plaintiffs provide a selection of comments from online news articles to illustrate their alleged "legitimate concern regarding harassment and physical safety." (Compl. ¶ __). All of the comments were posted under pseudonyms. Plaintiffs do not allege that Defendants made any of these statements themselves. This online commentary and rhetoric is the action of third parties and not fairly traceable to Defendants' publication of government-produced voter lists. In fact, Plaintiffs state that this negative rhetoric existed before the publication of the Reports. According to Plaintiff LULAC – Richmond: "Voters in Latino communities are already subject to scorn and discrimination" as well as rampant propagation or derogatory information and generalizations associating Latinos with gangs. (Compl. ¶ 64). Yet LULAC – Richmond claims that only publication of the Reports compelled it to redirect significant, though indeterminate, resources "to combatting and remedying those harms." (*Id.* ¶ 65). Even if true, this vague allegation is insufficient to meet LULAC – Richmond's burden of proving injury under *Maryland Highway Contractors*.

9

### B. Even if the Voting Rights Act Authorized Claims Against Non-Government Parties, Plaintiffs' Allegations Are Insufficient to Establish Any Violation.

#### 1. Section 11(b) of the Voting Rights Act does not authorize "voter intimidation" claims against non-government parties.

Claims of voter intimidation under Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), are rare.[3] Section 11(b) claims against non-government actors are non-existent.

The Fifteenth Amendment prohibits the states from denying or abridging the right to vote based upon race, color, or previous condition of servitude. U.S. Const. amend. XV. "The VRA, as amended in 1982, was originally enacted to work in tandem with the Fifteenth Amendment to 'rid the country of racial discrimination in voting.'" *Chong Su Yi v. Democratic Nat'l Comm.*, 666 F. App'x 279, 280 (4th Cir. 2016), *reh'g denied* (Jan. 3, 2017).

The Fifteenth Amendment "relates solely to action 'by the United States or by any state,' and does not contemplate wrongful individual acts." *James v. Bowman*, 190 U.S. 127, 135 (1903). More recently, in *City of Boerne v. Flores*, 521 U.S. 507, 525 (1997), the Court affirmed that the limits on congressional power articulated in *James* remain accepted law. The Fourth Circuit does not appear to have addressed the issue of whether Section 11(b) applies non-state action. The Eleventh Circuit, however, has questioned the constitutionality of Section 11(b) as applied to private individuals, and a district court found the section unconstitutional to the extent it regulates private actors. *Nipper v. Smith*, 39 F.3d 1494, 1549 (11th Cir. 1994); *United States v. Harvey*, 250 F. Supp. 219 (__ D. La. 1966). The district court in *Harvey* found that Section 11(b) derived its power from the Fifteenth Amendment and was therefore limited in application to only state action.[4] Plaintiffs have alleged a purely private conspiracy involving the authors of

---

[3] *See U.S. v. Brown*, 494 F. Supp. 2d 440, 477 n.56 (S.D. Miss. 2007) (noting in a voting rights case that the "Government has given little attention to this [11(b)] claim, and states that it has found no case in which plaintiffs have prevailed under this section").

[4] *But see United States v. Simms*, 508 F. Supp. 1179, 1186–87 (W.D. La. 1979) (disagreeing with *Harvey* to find that 11(b) "was enacted as part of Congress' authority to make 'necessary and proper' legislation to their Constitutional

the Reports and have not claimed any government role in the alleged scheme. Even if publication of the Reports rose to the level of "voter intimidation," this purely private conduct is not actionable under Section 11(b).

### 2. Publication of the First and Second Reports is not actionable as "voter intimidation" under Section 11(b) of the Voting Rights Act.

Plaintiffs' Section 11(b) claim, Count 2 of the Complaint, is based on the assertion that the Reports "intimidated, threatened, or coerced, and/or attempted to intimidate, threaten, or coerce" Plaintiffs "from engaging in future voting-related activities." (*Id.* ¶ 70). Incredibly, Plaintiffs allege that the Reports have caused Plaintiffs to experience such a level of fear "that they will not be able to successfully exercise their right to vote in the future" and they will be subjected "to further accusations, false prosecution, harassment, threats to safety, or economic hardship." (*Id.* ¶ 71).

For example, Mr. Bonilla allegedly "fears and expects" that the Reports "will subject him to 'birther' conspiracies." Ms. Freeman allegedly "fears for her physical safety" because her contact information allegedly is publicly available and "fears . . . adverse action against her" in the workplace. Ms. Rosen allegedly "feared that her right to vote would be disputed." Ms. Gearhart allegedly "has chosen not to remove a home security system" because "she fears she will be the target of harassment or violence." (*Id.* ¶ 49). In support of these conjectural, conclusory, and formulaic assertions, Plaintiffs do not allege a single, concrete instance of any direct action by Defendants.

Instead, Plaintiffs rely on "threatening statements" made in the comments sections of "media outlets" that published articles regarding the Reports but are unrelated to Defendants. (*Id.* ¶ 50). While some of the comments cited in the Complaint are admittedly deplorable,

---

power to regulate federal elections under Article I, Section 4 of the Constitution").

Plaintiffs do not and cannot allege that Defendants made, supported, or encouraged these comments.

Section 11(b) of the VRA prohibits any acts that "intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). "Limited precedent on Section 11(b) indicates that, in order to succeed on such a claim, a plaintiff must show both an act of intimidation or attempt to intimidate, and that the act was done with the specific intent to intimidate or attempt to intimidate." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016) (citing *Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985)) (emphasis added); *see also States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967)) ("[S]ection [11](b) essentially requires proof of two ultimate facts:  (1) that there was an intimidation, threat, or coercion, or an attempt to intimidate, threaten or coerce, and (2) that the intimidation was for the purpose of interfering with the right to vote.").

"A 'threat' means the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Damon v. Hukowicz*, 964 F. Supp. 2d 120, 149 (D. Mass. 2013) (discussing threats, intimidation, and coercion in the context of the Massachusetts Civil Rights Act). "'Intimidation' means putting a person in fear for the purpose of compelling or deterring his or her conduct." *Id.*; *see also United States v. McNeal*, 818 F.3d 141, 153 (4th Cir.), *cert. denied sub nom. Stoddard v. United States*, 137 S. Ct. 164 (2016) ("Intimidation means the threat of force."). "'Coercion' means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do." *Damon*, 964 F. Supp. 2d at 149.

Mere publication of the Reports—which are aimed at raising awareness of systematic deficiencies in voter registration in Virginia and of government inaction even when confronted

with those deficiencies—does not rise to the level of "threats, intimidation, and coercion" against Plaintiffs in violation of Section 11(b). *Compare Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016) (rejecting as a threat under Section 11(b) a requirement that a potential voter sign a statement affirming membership in the Republican Party to vote in the Republican primary), *and United States v. Harvey*, 250 F. Supp. 219, 236 (E.D. La. 1966) (holding that evictions were not a form of intimidation, threats, or coercion, where defendants had legitimate reasons for the evictions, defendants offered to re-employ the evicted individuals, and registered voters still worked on the properties), *with United States v. McLeod*, 385 F.2d 734, 740–41 (5th Cir. 1967) ("It is difficult to imagine anything short of physical violence which would have a more chilling effect on a voter registration drive than the pattern of baseless arrests and prosecutions revealed in this record."), *and United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) ("[T]his Court is not blind to the effect of baseless arrests, unjustified prosecutions, unwarranted and illegal injunctions, and any other acts or conduct . . . upon individuals so subjected who are legally seeking to exercise their rights. The inevitable effect of such acts and conduct is to severely discourage, intimidate, threaten and coerce those citizens who are seeking or might otherwise seek to exercise the rights involved."), *and United States v. Beaty*, 288 F.2d 653, 657 (6th Cir. 1961) (entering a preliminary injunction enjoining defendants from evicting or threatening to evict certain individuals in order to interfere with their right to register to vote or to vote and finding that those actions constituted threats, intimidation, or coercion).

Even if Plaintiffs' attenuated allegations somehow could rise to the requisite level of intimidation, threats, or coercion, Plaintiffs have not alleged that Defendants published the Reports with the specific intent to interfere with Plaintiffs' voting rights. Such failure is fatal to their Section 11(b) claim. *Olagues*, 770 F.2d at 804 ("Assuming that the search of voting

records intimidated bilingual voters, such intimidation would satisfy only one part of a two-pronged test for violations of [Section 11(b)]: the voters and organizations were intimidated, but the officials did not intend to intimidate."); *McLeod*, 385 F.2d at 740; *Parson*, 157 F. Supp. 3d at 498; *see also Pincham v. Illinois Judicial Inquiry Bd.*, 681 F. Supp. 1309, 1317 (N.D. Ill. 1988), *aff'd*, 872 F.2d 1341 (7th Cir. 1989) ("[T]here is also no allegation that the defendants *intended* to intimidate, threaten, or coerce [plaintiff]. Allegations . . . of such an intent is an essential element of a[n] [11](b) claim.")

### C. Plaintiffs' Inflammatory Claim of a "Ku Klux Klan Act" Conspiracy Is Not Supported By Any Allegations of Violations of 42 U.S.C. § 1985(3).

Enacted as part of the Civil Rights Act of 1871, 42 U.S.C. § 1985 is sometimes called the "Ku Klux Klan Act" because it was enacted to respond to "widespread violence and acts of terror directed at blacks and their supporters in the postwar South" by the Ku Klux Klan and others. *Harrison v. KVAT Food Management*, 766 F.2d 155, 156-57 (4th Cir. 1985). Section 1985(3) was passed "to fulfill a particular purpose and designed to meet particular conditions." *Id.* at 161. That purpose was to empower African-Americans and their allies by providing equal access to political power, not to suppress political speech. *United Bhd. of Carpenters & Joiners of America, Local 610 v. Scott*, 463 U.S. 825, 835 (1983). Consequently, "Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979). As a result, a court faced with a § 1985(3) claim must first determine whether the purported conspiracy is alleged to have breached "some otherwise defined federal right." *Id.* at 376; *see also Carpenters v. Scott*, 463 U.S. 825, 833 (1983) ("The rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere").

Although Plaintiffs state that their claim arises under the second clause of Section

1985(3), they have actually highlighted the third clause. (Compl. ¶ 53). The third clause, sometimes referred to as the "support or advocacy clause," describes conspiracy to prevent a citizen "from giving his support or advocacy in a legal manner." Exercise of such political support or advocacy is a First Amendment right, which "restrains only official conduct," meaning conduct by the government. As a result, Section 1985(3) does not cover "wholly private conspiracies" that would violate this right. While the Fourth Circuit has recognized a right of action against private conspiracies in violation of the first two clauses of Section 1985(3), collectively referred to as the "equal privileges clause," there does not appear to be any Fourth Circuit authority recognizing such a right for violations of the clause that Plaintiffs cite. The Eighth Circuit, however, has ruled that "the support or advocacy clause" did not cover a private conspiracy to break in to a candidate's campaign headquarters since "a First Amendment claim cannot be actionable … without showing state or government action." *Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004). Plaintiffs do not allege any government component in the alleged conspiracy to intimidate voters from voting or registering to vote. As a result, Plaintiffs have no cause of action under the cited portion, the "support or advocacy clause" of Section 1985(3).

### 1. Even if applied to alleged private conspiracies, Section 1985(3) requires factual allegations showing a class-based animus.

Even if it extended to private conspiracies to violate the "support or advocacy clause," a Section 1985(3) claim would require a showing of class-based animus. To bring any claim under Section 1985, a plaintiff must show: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the

conspiracy. *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016);

*Simmons v. Poe*, 47 F.3d. 1370, 1376 (4th Cir. 1985)

### 2.   LULAC – Richmond and the individual Plaintiffs are not members of any class that is protected under Section 1985(3).

Only "the specific groups and concerns which were involved in the post-Civil War

struggle for civil rights" are protected by Section 1985(3). *Harrison v. KVAT Food Mgmt., Inc.*,

766 F.2d 155, 161 (4th Cir. 1985). Indeed, the Fourth Circuit has expressed strong doubt that

Section 1985 should extend to any classes other than African-Americans, and that in any case,

the protected classes "can extend no further than to those classes of persons who are, so far as the

enforcement of their rights is concerned, in unprotected circumstances similar to those of the

victims of Klan violence." *Buschi v. Kirven*, 775 F.2d 1240, 1258 (4th Cir. 1985) (quotation

marks omitted). Instead, "the class must possess the discrete, insular and immutable

characteristics comparable to those characterizing classes such as race, national origin and sex."

*Id.* at 1257 (4th Cir. 1985) (internal quotations omitted); *see also Bray v. Alexandria Women's*

*Health Clinic*, 506 U.S. 263, 268-269 (1993) (declining to extend § 1985(3) to class of "women

seeking abortion[s]").

The Supreme Court has expressed further doubt that Section 1985(3) should be or was

intended to apply to purely political conspiracies. Indeed, allowing such political warfare

through judicial means:

> would go far toward making the federal courts, by virtue of §
> 1985(3), the monitors of campaign tactics in both state and federal
> elections, a role that the courts should not be quick to assume. If
> [this] submission were accepted, the proscription of § 1985(3)
> would arguably reach the claim that a political party has interfered
> with the freedom of speech of another political party by
> encouraging the heckling of its rival's speakers and the disruption
> of the rival's meetings.

*United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 836 (1983).

Consequently, the Fourth Circuit has concluded that Section 1985(3) does not encompass conspiracies "motivated by economic, political or commercial animus." *Johnson v. Hettleman*, 812 F.2d 1401 (4th Cir. 1987) (affirming district court's dismissal of § 1985(3) claim where plaintiff "alleged no racial or class-based invidious discrimination"). In fact, even use of unlawful conduct in the deprivation of rights does not necessarily entitle a plaintiff to a remedy under Section 1985(3). *Harrison v. KVAT Food Mgmt., Inc.*, 766 F.2d 155, 162 (4th Cir. 1985) (*citing Carpenters v. Scott*, 463 U.S. 825, 836 (1983)).

The Complaint does not allege a single fact to support the claim that Defendants have exhibited animus based on race or any other protected class. Neither the First nor the Second Reports mentions race or protected identifiers. Instead, Defendants simply focused on analyzing the citizenship status of individuals on Virginia voting rolls.

To the extent that Plaintiffs intend to rely on their status as "constitutionally eligible voters" accused "of having committed felony voter fraud" to establish membership in a protected class, they have not defined a class covered by Section 1985. Even if Section 1985 were extended to classes other than African-Americans, those classes must encompass "immutable characteristics comparable to those characterizing classes such as race, national origin and sex." *Buschi v. Kirven*, 775 F.2d 1240, 1257 (4th Cir. 1985) (quotation marks omitted). Citizenship cannot qualify as a protected class under Section 1985(3) since it is not an "immutable characteristic." Non-citizens can qualify for citizenship through a variety of lawful methods which could ultimately allow them to gain voting rights and exit the alleged class. Plaintiffs fail to establish membership in a class protected by Section 1985(3).

### 3. Plaintiffs have failed to plead a conspiracy based on animus directed toward any class that is protected by Section 1985.

Even if Plaintiffs could establish that they were members of a class protected by Section

1985, their claims are still subject to dismissal because they have failed to allege that Defendants formed a conspiracy motivated by a shared animus toward that protected class. Count 1 of the Complaint fails to identify any class-based animus behind the alleged conspiracy to "knowingly accuse constitutionally eligible voters . . . of having committed felony voter fraud with the purpose of intimidating those and other voters in an effort to prevent them from voting or registering to vote." (Compl. ¶ 54). The only common characteristic of the individual plaintiffs, apart from their alleged harms, is their eligibility to vote in Virginia. This is not a protected class under Section 1985(3) and therefore cannot support a claim of class-based animus.

In the case of the organizational plaintiff, LULAC – Richmond, Plaintiffs have pleaded a common non-racial characteristic (national origin) among its members. However, Plaintiffs have not alleged any acts against LULAC – Richmond or its members that were supposedly motivated by racial animus. Instead, Plaintiffs spend several paragraphs describing rhetoric of third parties against Latino voting rights, without identifying a single action by Defendants that targets Latinos or any other protected class. (Compl. ¶¶ 64–65). Furthermore, the Fourth Circuit has stated that mere racial identity of the parties is not sufficient to satisfy the racial animus requirement. *Gooden v. Howard County*, 954 F.2d 960, 969-70 (4th Cir. 1992). Because Plaintiffs have failed to plead any class-based animus as the motivation for the alleged conspiracy, their Section 1985(3) claim is deficient as a matter of law.

### 4. Plaintiffs' conclusory allegations of a conspiracy are insufficient to satisfy the plausibility requirements of *Iqbal* and *Twombly*.

Nor have Plaintiffs failed to allege facts sufficient to establish a conspiracy that satisfies the plausibility standard required by *Twombly* and *Iqbal*. A plaintiff asserting a Section 1985 conspiracy must allege "an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." *Polidi v. Bannon*, 226 F. Supp. 3d 615, 623 (E.D. Va. 2016)

(*quoting Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995)).

The Fourth Circuit has articulated a "relatively stringent standard" for establishing Section 1985 conspiracies and has "specifically rejected § 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts." *Simmons v. Poe*, 47 F.3d 1370, 1377 (4th Cir. 1995). "[R]ecogniz[ing] the danger of litigants' adducing unfounded conspiracy allegations in order to block" summary disposition of weak claims, the Fourth Circuit has instructed that "plaintiffs alleging unlawful intent in conspiracy claims under § 1985(3) ... [must] plead specific facts in a nonconclusory fashion to survive a motion to dismiss." *Gooden v. Howard County, Md.*, 954 F.2d 960, 969-970 (4th Cir. 1992) (internal quotation marks omitted). "Courts have uniformly dismissed actions pursuant to § 1985(3) which contained mere conclusory claims of constitutional deprivations unsupported by factual allegations." *Assa'Ad-Faltas v. Com. of Va.*, 1989 WL 222494, at *2 (E.D. Va. July 26, 1989), *aff'd*, 902 F.2d 1564 (4th Cir. 1990) (quotation marks removed) (dismissing complaint that alleged facts related to actions, but not the conspiracy linking them). Indeed, this Court has previously held that a complaint must plead the circumstances of a Section 1985(3) conspiracy with particularity and that "[t]hese circumstances include the times and places when conspiratorial meetings took place." *Snow v. Cty. of Henrico*, 1990 WL 270198, at *2 (E.D. Va. Dec. 17, 1990), *aff'd*, 927 F.2d 596 (4th Cir. 1991) (holding that individual actions, "with no discussion of meetings, conversations or correspondence" indicating agreement based on racial animus, could not support a claim of conspiracy under Section 1985(3)).

Plaintiffs allege only that Defendants "conspired with each other and with VVA to knowingly accuse constitutionally eligible voters, including Plaintiffs, of having committed felony voter fraud with the purpose of intimidating those and other voters in an effort to prevent

them from voting or registering to vote," without indicating who allegedly conspired with whom. (Compl. ¶ 54). Plaintiffs provide no further information about how the alleged conspiracy originated or progressed. They do not identify an alleged "meeting of the minds" on the part of the alleged conspirators. The stated allegations of conspiracy are therefore conclusory and do not suffice to state a claim. *Sewraz v. Nguyen*, 2011 WL 201487, at *12 (E.D. Va. 2011).

**D.      The Allegedly Defamatory Reports Do Not Mention the Individual Plaintiffs By Name and Are Otherwise Not Actionable As a Matter of Virginia Law.**

The individual Plaintiffs claim that the Reports defamed them merely because their names were included in public records provided by local offices of the Virginia Department of Elections that Defendants attached to the Reports. Plaintiffs' allegations ignore that not a single reference to any potential crime in the Reports ever mentions one of the Plaintiffs by name.

To state a claim for defamation under Virginia law, Plaintiffs must allege "(1) publication about the plaintiff, (2) an actionable statement, and (3) the requisite intent." *Moore v. PYA Monarch, LLC*, 238 F. Supp. 2d 724, 728 (E.D. Va. 2002). "To be actionable, a statement must be both false and defamatory." *Id.* (internal citations and quotations marks omitted). To rise to the level of defamation, the statement cannot be "[m]erely offensive or unpleasant" but instead must "make the plaintiff appear odious, infamous, or ridiculous." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). A statement can be considered defamatory *per se* where it "impute[s] to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished[.]" *Hatfill v. New York Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005) (internal citation and quotation marks omitted). For private individuals, like Plaintiffs, the requisite intent is negligence, *i.e.*, that Defendants "either knew the published statement to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the

publication was based." *Dragulescu v. Virginia Union Univ.*, 223 F. Supp. 3d 499, 508 (E.D. Va. 2016) (internal citation and quotation marks omitted). On its face, the Complaint fails to allege these essential elements.

### 1. Plaintiffs' claims for defamation based on the First Report are barred by the one-year statute of limitations even if otherwise actionable.

To be actionable as defamation, the Reports would have to be "about the plaintiff[s]." *Moore*, 218 F. Supp. 2d at 728. In fact, an objective reading reveals that the central focus of and motivating impetus behind the Reports concerns the "dual challenge" confronting policy makers: "fixing the underlying problem of non-citizens easily registering to vote as well as the stubborn tendency of some election officials to hide and excuse this circumstance." (Second Report, ECF No. 1-2 at 5). To this end, throughout the Reports, PILF directs the reader's attention to a series of public officials: "federal and state law enforcement officials…[who] have repeatedly done nothing" (ECF No. 1-2 at 6); "Governor McAuliffe and the Commonwealth's unelected officials [who] have refused to address and even tried to hide" this serious problem (*id.*); "Edgardo Cortes, the Commissioner of the Virginia Department of Elections… [who] instructed local election officials to stonewall our requests for public information" (*id.* at 11); "two defiant local election officials, Larry Haake…and Susan Reed" (*id.* at 12); Linda Lindberg, who "writes off this whole mess as a scrivener's error" (*id.* at 14); Delegate Mark D. Sickles, who "[d]espite clear evidence that non-citizens are registering and voting in Virginia's elections, [has chosen] to remain willfully ignorant." (*Id.* at 19). In contrast, Plaintiffs' names do not appear in the actual Reports at all.

### 2. The Complaint does not allege that Defendants published any statements, defamatory or otherwise, about the individual Plaintiffs.

Under Virginia law, the statute of limitations for defamation claims is one year from the date of publication. *Brown v. Triton Sec.*, No. 1:04-CV-01544-JCC, 2005 WL 4663731, at *2

(E.D. Va. Mar. 23, 2005) (citing Va. Code Ann. § 8.01-230, - 247.1 (2004)); *see also, Brown v. Am. Broad. Co.*, 704 F.2d 1296, 1304-05 (4th Cir. 1983). The First Report was published on September 30, 2016. Yet Plaintiffs did not file their Complaint until April 12, 2018. As a result, Plaintiffs cannot rely on any allegations derived solely from the First Report to support their claim for defamation.

3. **The Reports do not contain any statements about the individual Plaintiffs that are both "false" and defamatory as a matter of law**.

To constitute "an actionable statement," the publication must be both "false and defamatory." *Moore*, 238 F. Supp. 2d at 728 (emphasis added). Even if the exhibits to the Reports contained "false" information about the Plaintiffs—who account for only four out of hundreds of individuals listed in the public records—Defendants merely attached to the Reports official public records obtained directly from state or local officials. It was not unreasonable for PILF to treat records compiled by state and local governments as records containing accurate information. If anything, Plaintiffs' primary complaint should be directed at the government officials who included allegedly inaccurate information about Plaintiffs even though those officials bear the primary responsibility for ensuring accurate voter rolls.

On their face, the Reports do not "make [Plaintiffs] appear odious, infamous, or ridiculous." *Chapin*, 993 F.2d at 1092. Accordingly, Plaintiffs attempt to allege that the Reports are defamatory *per se*, claiming that Defendants "falsely impute to Plaintiffs the commission of crimes of moral turpitude." (Compl. ¶ 76). Again, nothing in the Reports directly "imputes" anything specifically to Plaintiffs because Plaintiffs' individual names do not appear at all in the Reports. Plaintiffs do not, because they cannot, allege that the Reports impute the commission of a crime directly and identifiably to Plaintiffs. Instead, the Reports accurately restate the federal and state statutes that criminalize voter registration and voting by non-citizens. (Second Report,

4815-3967-1911.1

ECF No. 1-2 at 7).

Furthermore, the nature of the statements in the Report must be evaluated in light of the entire context of the Reports. *See Browning v. Washington Post Co.*, 92 F.3d 1177 (4th Cir. 1996) ("An alleged defamatory statement must be determined from the document or material as a whole, from the beginning to end, and words cannot be singled out as libelous, but rather, the material must be libelous within the context of the entire writing."). Defendants at times qualify the assertions in the Reports: "Each one of them is likely a felony." (*Id.* at 5) (emphasis added). *See also id.* at 10. ("The list included hundreds of non-citizen registrants, all of whom had likely committed felonies by registering to vote.") (emphasis added). The Reports even express concern for how the failures of the system will negatively affect non-citizens: "For those who have truly cast votes because of the mistaken belief that they are eligible to vote, we must ask: why are we content with putting non-citizens in a position to accidentally commit felonies than could result in deportation? Better safeguards during the registration process—as opposed to a checkbox—would actually protect non-citizens." (*Id.* at 19). Defendants went so far as to include as an exhibit to the Reports a letter indicating that the "data on this report is NOT accurate and will be misinterpreted and misrepresented by this organization[,]" leaving the reader to judge the import of the statistics and information included in the Reports. *See* Second Report, Ex. 10, available at https://publicinterestlegal.org/alien-invasion-virginia/. Plaintiffs cannot state a claim based on a defamation *per se* by isolating restatements of federal and state law from the entire context of the Reports, and then alleging that some innuendo of criminality arises regarding the specific and identifiable Plaintiffs. (Compl. ¶ 75).

### 4. The Complaint does not allege sufficient facts to establish that Defendants published the Reports with the requisite intent.

The Complaint does not allege facts to support a finding of the requisite intent on the part

of Defendants. In a cursory manner, Plaintiffs allege that the statements "were made without regard to their truth or falsity" and that "Defendants recklessly and maliciously failed to exercise dure care and diligence before publishing" the statements. (Compl. ¶ 78). However, Plaintiffs make only one concrete factual allegation to support those cursory and formulaic assertions. Specifically, they allege that after the First Report, elections officials informed Defendants that "they were drawing false conclusions from the registrar information and running the significant risk of wrongfully accusing constitutionally eligible voters of committing felony voter fraud." (Compl. ¶ 33).

This allegation does not allege that Defendants knew or had reason to believe that the actual information contained in the public records of state and local officials—the information published in Exhibit 12 to the Second Report—was false. *See Dragulescu*, 223 F. Supp. 3d at 508. Simply put, anyone can "draw[] false conclusions" from accurate information. Defendants reasonably believed that state and local officials had determined the citizenship of individuals properly before declaring them non-citizens and removing them from voter rolls. Moreover, Plaintiffs are aware that as soon as Defendants realized that the names of citizens wrongly appeared in Exhibit 12—because they were wrongly included in the state and local public records—Defendants removed those names. (Compl. ¶ 43).

Plaintiffs also allege, with no factual support, that "Defendants published the defamatory statements with actual malice." (Id. ¶ 79). Plaintiffs apparently included this allegation to seek punitive damages. *See Spencer v. Am. Int'l Grp., Inc*., No. CIV. 3:08CV00591, 2009 WL 47111, at *4 (E.D. Va. Jan. 6, 2009) ("Plaintiff must show that the Defendants acted with actual malice if he wishes to recover punitive damages."). Regardless, Plaintiffs have failed to allege the requisite intent to support a defamation claim.

24

## V. <u>CONCLUSION</u>

LULAC – Richmond does not have standing to pursue any of the claims alleged in the Complaint. Section 11(b) of the Voting Rights Act does not afford a cause of action against non-government entities. Even if it did, Plaintiffs have not alleged the essential elements of a claim for "voter intimidation" under Section 11(b). Notwithstanding Plaintiffs' attempt to smear Defendants by alleging violation of the "Ku Klux Klan Act," their Complaint fail to state any cognizable claims under 42 U.S.C. § 1985(3). Finally, the individual Plaintiffs' defamation claim fail to state any cognizable claim for state common law defamation. Plaintiffs' Complaint therefore should be dismissed in its entirety.

Dated: May 29, 2018

<div style="margin-left: 40%;">

Respectfully submitted,

PUBLIC INTEREST LEGAL FOUNDATION
and J. CHRISTAN ADAMS

By */s/ Michael J. Lockerby*
         Counsel

Michael J. Lockerby (VA Bar No. 24003)
Eli L. Evans (*Pro hac vice* motion forthcoming)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
         T: 202-945-6079
         F: 202-672-5399
         mlockerby@foley.com

William E. Davis (*Pro hac vice* forthcoming)
Ana Romes (*Pro hac vice* forthcoming)
FOLEY & LARDNER LLP
One Biscayne Tower
2 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
         T: 305-482-8404
         F: 305-482-8600
         wdavis@foley.com

</div>

4815-3967-1911.1

aromes@foley.com

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of May, 2018, I electronically filed the foregoing **MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record, including:

Anisa A. Somani, Esq.
Nicole M. Cleminshaw, Esq.
Geoffrey M. Wyatt, Esq.
Sean M. Tepe, Esq., Esq.
Lauren A. Eisenberg, Esq.
Samuel Levo, Esq.
Andrew Hanson, Esq.
1440 New York Avenue, N.W.
Washington, D.C. 20005

Allison Riggs, Esq.
Jacklyn Maffetore, Esq.
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 West Highway 54, Suite 101
Durham, North Carolina 27707

Cameron Kistler, Esq.
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue, N.W. # 163
Washington, D.C. 20006

Larry Schwartztol, Esq.
PROTECT DEMOCRACY PROJECT
10 Ware Street
Cambridge, Massachusetts 02138

Andrew G. Celli, Jr., Esq.
Alanna Kaufman, Esq.
EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue at Rockefeller Center
10th Floor
New York, New York 10020

4815-3967-1911.1

*/s/ Michael J. Lockerby*

Michael J. Lockerby (VA Bar No. 24003)
Eli L. Evans (VA Bar No. 90700)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
    T:  202-945-6079
    F:  202-672-5399
    mlockerby@foley.com


Counsel for Defendants

4815-3967-1911.1