**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| League of United Latin American Citizens – Richmond Region Council 4164, Eliud Bonilla, Luciania Freeman, Abby Jo Gearhart, and Jeanne Rosen, | ) ) ) ) ) |
| Plaintiffs, | ) Civil Action No. 1:18-cv-00423-LO-IDD ) |
| v. | ) ) |
| Public Interest Legal Foundation, an Indiana Corporation, and J. Christian Adams | ) ) ) ) |
| Defendants. | ) ) ) |

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

STATEMENT OF FACTS ............................................................................................ 2

ARGUMENT ............................................................................................................... 4

I.     LULAC-Richmond Has Standing as an Organizational Plaintiff. ....................... 5

       A.     LULAC has organizational standing. ..................................................... 6

       B.     LULAC has representational standing. .................................................. 9

II.    Plaintiffs Have Stated a Claim Under the Ku Klux Klan Act. .......................... 10

       A.     Plaintiffs have pleaded plausible facts showing a conspiracy. ............. 10

       B.     Plaintiffs' claim under the KKK Act does not require state action or class-based animus. ................................................................................. 11

              1.     A support or advocacy claim does not require state action. ..................... 12

              2.     A support or advocacy claim does not require a showing of racial animus. ....................................................................................... 14

III.   Plaintiffs Have Stated a Claim Under Section 11(b) of the Voting Rights Act. ............... 16

       A.     Section 11(b) of the Voting Rights Act reaches conduct by private actors. .......... 16

       B.     Plaintiffs have sufficiently alleged intimidation. ................................. 18

              1.     Plaintiffs have sufficiently pleaded that the *Alien Invasion* Reports were intimidating. ................................................................. 18

              2.     Defendants' arguments that plaintiffs have not sufficiently pleaded intent are wrong. ........................................................... 21

IV.   The Individual Plaintiffs Have Stated a Claim for Defamation. ....................... 24

       A.     Plaintiffs' defamation claims are timely. ............................................ 24

       B.     Plaintiffs have plausibly alleged defamation. ...................................... 25

       C.     Plaintiffs have adequately pleaded that Defendants acted with the requisite intent for defamation. ........................................................... 28

       D.     Defendants are not entitled to immunity under Virginia's anti-SLAPP statute. ................................................................................. 29

CONCLUSION................................................................................................................................30

**CASES**

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) ....................................................................................................13

*Arizona Democratic Party v. Arizona Republican Party*,
No. CV-16-03752-PHX-JJT, 2016 WL 8669978 (D. Ariz. Nov. 4, 2016) ...............10, 12

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................5

*Buchanan v. Consolidated Stores Corp.*,
125 F. Supp. 2d 730 (D. Md. 2001) ..........................................................................7

*Carwile v. Richmond Newspapers, Inc.*,
82 S.E.2d 588 (Va. 1954) .....................................................................................25, 26

*Chong Su Yi v. Democratic National Committee*,
666 F. App'x 279 (4th Cir. 2016) ............................................................................17

*Crawford v. Marion County Election Board*,
553 U.S. 181 (2008) ..................................................................................................8

*Doe v. Cooper*,
842 F.3d 833 (4th Cir. 2016) ...................................................................................22

*Doe v. Roe*,
295 F. Supp. 3d 664 (E.D. Va. 2018) .......................................................................24

*Downing/Salt Pond Partners, L.P. v. R.I.*,
643 F.3d 16 (1st Cir. 2011) .......................................................................................5

*Dragulescu v. Virginia Union University*,
223 F. Supp. 3d 499 (E.D. Va. 2016) .......................................................................24

*E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*,
637 F.3d 435 (4th Cir. 2011) .....................................................................................5

*Equal Rights Center v. AvalonBay Communities, Inc.*,
Civil Action No. AW-05-2626, 2009 WL 1153397 (D. Md. Mar. 23, 2009) ....................7

*Ex parte Yarbrough*,
110 U.S. 651 (1884) ...........................................................................................13, 14, 16

*Federer v. Gephardt*,
363 F.3d 754 (8th Cir. 2004) ...............................................................................14, 16

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
    528 U.S. 167 (2000)........................................................................................9

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)......................................................................................30

*Great American Federal Savings & Loan Association v. Novotny*,
    442 U.S. 366 (1979)......................................................................................12

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971)..................................................................................12, 15

*Hatfill v. New York Times Co.*,
    416 F.3d 320 (4th Cir. 2005) ...................................................................26, 27

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)......................................................................................6, 7

*Hyland v. Raytheon Technical Services Co.*,
    670 S.E.2d 746 (Va. 2009)............................................................................25

*Ingles v. Dively*,
    435 S.E.2d 641 (Va. 1993)............................................................................28

*International Refugee Assistance Project v. Trump*,
    883 F.3d 233 (4th Cir. 2018) ..........................................................................6

*Johnson v. De Grandy*,
    512 U.S. 997 (1994)........................................................................................8

*Kush v. Rutledge*,
    460 U.S. 719 (1983).............................................................................12, 14, 15

*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) .......................................................................6, 7

*League of United Latin American Citizens v. City of Boerne*,
    675 F.3d 433 (5th Cir. 2012) ..........................................................................8

*League of United Latin American Citizens v. Perry*,
    548 U.S. 399 (2006)........................................................................................8

*McCord v. Bailey*,
    636 F.2d 606 (D.C. Cir. 1980) .....................................................................15

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ..........................................................................5

*Nipper v. Smith*,
    39 F.3d 1494 (11th Cir. 1994) ..................................................................17

*North Carolina State Conference of NAACP v. North Carolina State Board of Elections*,
    283 F. Supp. 3d 393 (M.D.N.C. 2017) ........................................................7

*Olagues v. Russoniello*,
    770 F.2d 791 (9th Cir. 1985) ....................................................................22

*Parson v. Alcorn*,
    157 F. Supp. 3d 479 (E.D. Va. 2016) ..................................................22, 23

*Paynes v. Lee*,
    377 F.2d 61 (5th Cir. 1967) ..........................................................14, 19, 20

*Ransome v. O'Bier*,
    No. 3:16-CV-01002, 2017 WL 1437100 (E.D. Va. Apr. 20, 2017) ...............28

*Reno v. Bossier Parish School Board*,
    520 U.S. 471 (1997)..................................................................................23

*Republican Party of North Carolina v. Martin*,
    980 F.2d 943 (4th Cir. 1992) ....................................................................23

*Richmond Newspapers, Inc. v. Lipscomb*,
    362 S.E.2d 32 (Va. 1987)..........................................................................28

*Schnupp v. Smith*,
    457 S.E.2d 42 (Va. 1995)....................................................................25, 26

*Shaheen v. WellPoint Cos.*,
    490 F. App'x 552 (4th Cir. 2012) ..............................................................30

*Smiley v. Holm*,
    285 U.S. 355 (1932)..................................................................................17

*Tafas v. Dudas*,
    511 F. Supp. 2d 652 (E.D. Va. 2007) ..........................................................5

*United Brotherhood of Carpenters & Joiners of America v. Scott*,
    463 U.S. 825 (1983)..................................................................................13

*United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996)....................................................................................9

*United States v. Carmichael*,
    685 F.2d 903 (4th Cir. 1982) ....................................................................17

*United States v. Harvey*,
    250 F. Supp. 219 (E.D. La. 1966) ..................................................17

*United States v. McLeod*,
    385 F.2d 734 (5th Cir. 1967) ......................................................19

*United States v. Nguyen*,
    673 F.3d 1259 (9th Cir. 2012) ....................................................19

*United States v. Original Knights of Ku Klux Klan*,
    250 F. Supp. 330 (E.D. La. 1965) ...............................................20

*United States v. Saunders*,
    68 F.3d 462, 1995 WL 619940 (4th Cir. 1995) (table)..............23, 24

*United States v. Simms*,
    508 F. Supp. 1179 (W.D. La. 1979)......................................16, 17, 18

*Veasey v. Perry*,
    29 F. Supp. 3d 896 (S.D. Tex. 2014) .............................................8

*Via v. Communications Corp. of America*,
    No. 3:17CV00047, 2018 WL 1973287 (W.D. Va. Apr. 26, 2018)...................30

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
    429 U.S. 252 (1977)....................................................................5

*Wachtel v. JTG, Inc.*,
    Civil Action No. 1:17-cv-620, 2017 WL 3498488 (E.D. Va. Aug. 14, 2017) ...................5

*Wikimedia Foundation v. National Security Agency*,
    857 F.3d 193 (4th Cir. 2017) ........................................................6

*Will Nesbitt Realty, LLC v. Jones*,
    CL-2016-14234, 2018 Va. Cir. LEXIS 66 (Va. Cir. Ct. Apr. 30, 2018) .........................29

## STATUTES

42 U.S.C. § 1985(3) ..................................................................... passim

52 U.S.C. § 10101(b) ....................................................................21

52 U.S.C. § 10307(b) ................................................................. passim

Virginia Code § 8.01-223.2 .....................................................29, 30

Virginia Code § 8.01-223.2(A).........................................................30

**RULES**

Federal Rule of Civil Procedure Rule 8(a)(2) ............................................................................4, 5

**OTHER AUTHORITIES**

1965 U.S.C.C.A.N. 2437 ...................................................................................................16

Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. of L. & Soc. Change 173 (2015) ......................................15

H.R. Rep. No. 89-439 ...................................................................................................16, 22

*Merriam-Webster's Collegiate Dictionary* (10th ed. 1999) ........................................19

Sherry A. Swirsky, *Minority Voter Intimidation: The Problem That Won't Go Away*, 11 Temp. Pol. & Civ. Rts. L. Rev. 359 (2001) .................................................22

Virginia's Legislative Information System, SB 1413 Immunity of persons; statements regarding matters of public concern communicated to a third party, http://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1413 (last visited June 12, 2018) ...................................................................................................29

As Defendants tell it, they simply took public voter records identifying individuals who "are not citizens of the United States," (Mot. at 2) and then "accurately restate[d] the federal and state statutes that criminalize voter registration and voting by non-citizens," (*id*. at 24), intending no inference to be drawn from that suggestive juxtaposition. Though Defendants can certainly try to tell that story at trial, those facts are not what the Complaint alleges, so they are legally irrelevant now.

Rather, the Complaint alleges that the records at issue did not purport to be lists of non-citizens who had registered to vote and/or voted illegally *and* that Defendants *knew* this fact about the records they claim to have relied upon on in drafting their reports. The Complaint then goes on to allege that Defendants nonetheless conspired to publish and publicize reports that accused thousands of people, by name (along with personal contact information), of being "non-citizen" "aliens" who registered and/or voted "illegally" in Virginia, despite knowing full well that the evidence did not establish that anyone so named was a non-citizen registrant, a non-citizen voter, or by extension, a felon.

Those well-pleaded allegations properly state claims under the Ku Klux Klan Act and Section 11(b) of the Voting Rights Act of 1965 ("Section 11(b)"), as well as under Virginia defamation law. The Complaint claims violations of these federal voter intimidation laws because it alleges that Defendants, through publication of false and inflammatory accusations of felony voter fraud, have caused Plaintiffs public embarrassment, harm to their reputation, and fear of adverse consequences from exercising their constitutional right to vote. That very same conduct—knowingly and recklessly accusing and implying that eligible voters committed felonies—also constitutes a textbook case of defamation *per se* under Virginia state law. This Court should therefore deny the motion to dismiss the Complaint (ECF No. 33) and permit

Plaintiffs to proceed to discovery.

## STATEMENT OF FACTS

Four private citizens and one community organization bring this suit to halt and seek redress for a campaign of defamation and intimidation to deter constitutionally eligible citizens from exercising their right to vote. (Compl. ¶¶ 2-3.) The Complaint sets forth in detail how Defendants falsely accused individual Plaintiffs of being non-citizens who committed felonies by illegally registering to vote and/or voting. These statements are defamatory because the individual Plaintiffs are United States citizens, and therefore have not committed felonies by registering and voting. (*Id*. ¶¶ 13-16, 47.) And the express and implied threats of criminal prosecution of individuals like Plaintiffs who were labeled "felons" by Defendants are classic forms of voter intimidation. (*E.g.*, *id.* ¶¶ 4, 31, 45, 57.)

In September 2016, Defendants, along with non-party co-conspirator Virginia Voters Alliance ("VVA"), published a report entitled *Alien Invasion in Virginia* (hereinafter "*Alien Invasion I*"). (*Id.* ¶¶ 5, 23.) For this report, Defendants consulted voter records from a "small sample of just eight Virginia counties." (*Id.* ¶¶ 38, 75.) Defendants proclaimed in bold and italic lettering: "***we found 1046 aliens who had registered to vote illegally***" in those counties. (Compl. ¶ 26.) Defendants identified Plaintiff Lucania Freeman as one of these "aliens." She was listed by name, along with her address and phone number, in *Alien Invasion I* as one of the "***433 non-citizens***" in Prince William County who had committed "**felonies**." (*Id.* ¶¶ 28-30.)

In May 2017, Defendants in concert with each other and VVA, published a new report entitled *Alien Invasion II*. (*Id.* ¶¶ 6, 35, 37.) Unlike the more limited scope of *Alien Invasion I*, this report was based on an "expanded . . . investigation" of the "entire Commonwealth." (Compl. ¶ 75, Ex. B at 1.) *Alien Invasion II*, inclusive of its exhibits, was published on the internet and widely promoted through traditional and social media. (Compl. ¶¶ 36, 39.) This

report purported to find thousands more "**illegal registrants**" and nearly 7,500 votes cast by non-citizens, and made clear that "each [vote cast] is a felony."  (*Id.* ¶¶ 6, 38, 40.)  Accusations of non-citizen registration and voting and the commission of felonies appear throughout the report (*id.* ¶ 75); so too do references to the report's exhibits, which contain the names of the supposed non-citizen felons.  *Alien Invasion II* thereby repeated the false accusation concerning Ms. Freeman and added Plaintiffs Eliud Bonilla, Jeanne Rosen and Abby Jo Gearhart to Defendants' lists of illegal registrants and voters.  (*Id.* ¶¶ 41-42, 44.)  Their personal contact information was posted for anyone with an internet connection to view and use.  (*Id.* ¶¶ 41-42.)

Based on warnings from Virginia election officials and critical media analyses, Defendants knew or should have known prior to publishing these reports that the voting records they obtained from various Virginia jurisdictions would not support their accusations of non-citizenship or illegal conduct.  (*Id.* ¶¶ 7, 34, 46.)  Former Virginia Commissioner of Elections, Edgardo Cortes, reportedly explained that Defendants "were uninterested in the context [and] had their own narrative they wanted to tell" about voter fraud.  (*Id.* ¶ 46.)  The fact that Defendants continued their campaign of defamation indicates their aim to intimidate and deter constitutionally eligible persons from voting.

Defendants have engaged in and continue to engage in a variety of threatening and intimidating conduct.  Publicly accusing a person of being a non-citizen and a felon simply for exercising the right to vote is by itself a threatening and intimidating act that would make such a person fearful of voting.  (*Id.* ¶¶ 8-9, 48, 59, 70.)  Defendants have called for the prosecution of these individuals, both in the Reports themselves and in other public statements.  For example, after publication of *Alien Invasion II*, Defendant Adams encouraged law enforcement to "click the links" housing the "700 pages" of exhibits (containing the names and contact information of

Plaintiffs) documenting "felonies piled on top of felonies." (*Id.* ¶ 45; *see also id.* ¶ 31.) Defendants' identification of Plaintiffs has also exposed them to potential harassment by others (e.g., "ballot security" activists) who wish to challenge their right to vote. (*Id.* ¶¶ 9, 58.) Defendants' promotion of their "findings" was "aimed to foment public outrage"—from the provocative "alien invasion" title, to the bolded, italicized findings of "non-citizens" and "felonies," to the "incendiary rhetoric (including lamenting the failure of law enforcement official[s] to prosecute)"—"in an effort to intimidate these voters" from engaging in electoral activity. (*Id.* ¶ 58.) Consistent with their aim of fomenting public outrage, Defendants promoted their "findings" to media outlets that provided an avenue for people to threaten that those identified as engaging in voter fraud should be "shot," "executed," "deported" and/or "imprisoned." (*Id.* ¶ 50.)

Defendants' actions threatened and intimidated the individual Plaintiffs in personally specific ways, all because they choose to exercise their constitutional right to vote. (*Id.* ¶¶ 49, 61-62, 71.) Moreover, organizational "Plaintiff LULAC has devoted and will continue to devote . . . limited organizational resources to ensuring" LULAC's members and the community LULAC represents "are not deterred from participating in the electoral process" as a result of Defendants' allegations of an "alien invasion" and warnings of potential legal consequences for registering to vote or voting. (*Id.* ¶¶ 51, 63-65.) LULAC has been injured by Defendants' conduct. For example, before the Fall 2017 Virginia elections, LULAC delayed implementing an educational program because it had to redirect its resources to combat the allegations of voter fraud by Latino "aliens" perpetuated by the *Alien Invasion* Reports. (*Id.* ¶¶ 64-65.)

## ARGUMENT

Defendants' motion to dismiss pursuant to Rule 12(b)(6) must be considered in combination with Federal Rule of Civil Procedure Rule 8(a)(2), which requires that a complaint

provide "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (alteration in original) (citation omitted). A court "must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (first quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); and then quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)). Although complaints must contain sufficient factual information to "state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570, "a complaint may survive a motion to dismiss 'even if it appears "that a recovery is very remote and unlikely.'"" *Wachtel v. JTG, Inc.*, No. 1:17-cv-620, 2017 WL 3498488, at *2 (E.D. Va. Aug. 14, 2017) (citations omitted).[1]

## I.    <u>LULAC-Richmond Has Standing as an Organizational Plaintiff.</u>

Defendants challenge LULAC's standing to bring this case "[b]ecause of the Article III case or controversy requirement." (Mot. at 7.) But the Court need not address LULAC's standing because the standing of the individual Plaintiffs is undisputed. In other words, the existence of a case or controversy justifying the court entertaining this suit is not in doubt. The Supreme Court has made clear that "[b]ecause of the presence of [such] plaintiff[s] [the Court] need not consider whether the other individual and corporate plaintiffs have standing" to sue.

---

[1] Landmark Legal Foundation has moved for leave to submit an amicus brief in support of Defendants. (ECF Nos. 42-43.) Although Plaintiffs do not oppose an amicus submission, the Court should decline to consider any arguments raised solely in Landmark's amicus brief. *See Downing/Salt Pond Partners, L.P. v. R.I.*, 643 F.3d 16, 28 (1st Cir. 2011) ("'[A]mici may not make up for waiver by a party' . . . and may not introduce a new argument into a case." (citations omitted)); *Tafas v. Dudas*, 511 F. Supp. 2d 652, 661 (E.D. Va. 2007) (court will "not consider any legal issues or arguments therein that were not raised by the parties"). For example, Landmark argues that Defendants' actions were protected by the First Amendment, an argument not made by Defendants.

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977).[2]  And the

Fourth Circuit has recognized the Court's holding that "the presence of one party with standing

is sufficient to satisfy Article III's case-or-controversy requirement."  *Int'l Refugee Assistance*

*Project v. Trump*, 883 F.3d 233, 258 (4th Cir. 2018) (en banc) (citations omitted).

Nonetheless, if the Court were to address the issue, LULAC has adequately pleaded

standing to assert claims under 42 U.S.C. § 1985(3) and Section 11(b).  LULAC can assert and

has asserted standing in two ways: (1) an actual injury to the organization itself (organizational

standing), and (2) injury to its membership (representational standing).

**A.      LULAC has organizational standing.**

LULAC has organizational standing because it has been injured by Defendants' actions.

An organization suffers an injury-in-fact "when a defendant's actions impede its efforts to carry

out its mission."  *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) (citing *Havens Reality Corp.*

*v. Coleman*, 455 U.S. 363, 379 (1982)).  For example, in *Havens*, the seminal case on

organizational standing, the Supreme Court held that a fair housing group had standing to sue a

real estate company engaged in racial steering because defendants "perceptibly impaired [the

organization's] ability to provide counseling and referral services for low and moderate-income

homeseekers," which was part of the fair housing group's mission.  455 U.S. at 379.

LULAC has specifically alleged such impairments to its organizational mission as a

result of Defendants' conduct.  For example, LULAC's mission of advancing "educational

attainment . . . of the Latino population" is impaired when, for example, it has to delay

implementation of a grant program for "middle schools and high schools with high Latino

---

[2] Individualized analysis may be required where different plaintiffs request different forms of
relief, *see Wikimedia Foundation v. NSA*, 857 F.3d 193, 216-17 (4th Cir. 2017), but here all
parties seek the same declaratory and injunctive relief. (Compl. Prayer ¶¶ 2-4.)

populations" to divert resources to combat assertions that "Latinos who vote are doing so illegally." (Compl. ¶¶ 12, 64-65.) Additionally, LULAC's mission of promoting "political participation" of Latinos continues to be directly impaired by Defendants' public assertions that there is an "invasion" of "aliens" who are voting when they should not. (*Id.* ¶¶ 12, 64.) Contrary to Defendants' argument, these are not a "simple inconvenience to its abstract social interests." (Mot. at 9.) Rather, these are "concrete and demonstrable injur[ies] to the organization's activities—with [a] consequent drain on the organization's resources." *Havens*, 455 U.S. at 379; *see also N.C. State Conference of NAACP v. N.C. State Bd. of Elections*, 283 F. Supp. 3d 393, 402 (M.D.N.C. 2017) (finding standing based on allegation that NAACP was "forced to divert its . . . resources away from its core mission and planned voter-mobilization" in order to address "Defendants' unlawful *en masse* voter challenge and purging practices").

Defendants' authorities are easily distinguishable. In *Lane v. Holder*, the court held that an organization lacked standing where its only alleged injury was that its "resources are taxed by inquiries into the operation and consequences of interstate handgun transfer provisions." 703 F.3d at 675 (citation omitted). The court found such "mere expense[s]" were insufficient to confer standing. *Id.* And in *Buchanan v. Consolidated Stores Corp.*, 125 F. Supp. 2d 730, 738 (D. Md. 2001), the court found that the organizational plaintiff, the Equal Rights Center, did "not claim specific harm to its programs or efforts" at all—it only generally alleged that defendants' "no check policy has frustrated its mission 'to eliminate discrimination.'" *Id.* (citation omitted). These cases are inapposite to this one, where LULAC's injury consists of *diversion* of resources and *impairments* of its mission; not simply an increase in expense or abstract frustration.[3]

---

[3] A court in the District of Maryland declined to follow *Buchanan*, siding with three other nearly identical cases finding that the Equal Rights Center did have standing. *Equal Rights Ctr. v. AvalonBay Cmtys., Inc.*, No. AW-05-2626, 2009 WL 1153397, at *5 (D. Md. Mar. 23, 2009).

Defendants' argument that LULAC has not suffered any injury that is "fairly traceable" to Defendants' conduct is based on crediting the allegation that third parties made threatening comments online (Mot. at 9), while ignoring all allegations regarding Defendants' conduct and LULAC's injuries. Not only is Defendants' argument unsupported by any case law, it ignores the allegation that "Plaintiff LULAC has been and continues to be injured *by Defendants' publication of these reports* because it impedes one of LULAC's core goals, the promotion of political participation" by creating a narrative that "Latinos who vote are doing so illegally." (Compl. ¶ 64.) The Complaint also alleges that "the *Alien Invasion* reports" falsely accused Latino voters of committing voter fraud and caused a delay in implementing an educational grant program. (*Id.* ¶¶ 64-65.) Defendants may be allowed to later contest these allegations, but they cannot ignore them.

Finally, numerous courts across the country have found that LULAC has organizational standing to bring voting rights cases. *See, e.g.*, *Veasey v. Perry*, 29 F. Supp. 3d 896, 903 (S.D. Tex. 2014) (LULAC had standing to challenge voter ID law because its mission included "voter registration for people of color and especially Latinos" and that "[i]t will have to divert resources away from . . . registering new voters to instead educate already-registered members" about ensuring they cast adequate ballots); *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) (LULAC had standing to bring claims under Section 2 of the Voting Rights Act); *League of United Latin Am. Citizens v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012) (same). Numerous courts have made similar holdings in voting cases brought by other organizations like LULAC.[4]

---

[4] *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) (organizations had standing to challenge photo identification law); *Johnson v. De Grandy*, 512 U.S. 997 (1994) (State Conference of NAACP Branches had standing to bring voter dilution challenge).

**B.    LULAC has representational standing.**

Defendants' assertion that LULAC avers only organizational standing is wrong.  (Mot. at 7.)  The Complaint specifically alleges that LULAC "has been and continues to be injured, both as an organization and as a representative of its membership."  (Compl. ¶ 72.)  An organization has standing to sue on behalf of its members when (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).[5]

The Complaint pleads that "LULAC's members and the Latino community LULAC represents have been and continue to be intimidated and threatened by Defendants asserting that registering to vote and/or voting constitutes an unlawful 'alien invasion' that should be prosecuted."  (Compl. ¶ 63.)  It further alleges that "members of LULAC . . . will be discouraged from participating in the electoral process as a direct result of Defendants' conduct."  (*Id.*)  Moreover, the interests raised by LULAC's claims are plainly germane to the organization's purpose, which includes advancing the political influence and civil rights of the Latino population of the city of Richmond, Virginia and its surrounding areas.  (Compl. ¶ 12.)  Thus, LULAC also has sufficiently pleaded representational standing.

---

[5] Once the first two prongs are met, the constitutional requirements are satisfied and the third prong is considered a prudential requirement.  Typically, this prong precludes standing where an organization seeks damages on behalf of members, which is inapplicable here.  *United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554-55 (1996).

## II.    **Plaintiffs Have Stated a Claim Under the Ku Klux Klan Act.**

Plaintiffs properly alleged a claim under the "support or advocacy" clause of 42 U.S.C. § 1985(3), which makes it unlawful for "two or more persons" to "conspire" either to (1) "prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy" in a federal election, or to (2) "injure any citizen in person or property on account of such support or advocacy."    In addition, there must be an act in furtherance of the conspiracy by one or more conspirators whereby the plaintiff is injured in person or property. *See* 42 U.S.C § 1985(3); *see generally Ariz. Democratic Party v. Ariz. Republican Party*, No. CV-16-03752-PHX-JJT, 2016 WL 8669978, at *5 & n.4 (D. Ariz. Nov. 4, 2016).

The Complaint alleges those elements.  Specifically, Defendants Adams and PILF conspired with each other and with VVA (a conspiracy of two or more persons) to release and publicize the *Alien Invasion* Reports (the overt acts).  (Compl. ¶¶ 22-23, 54-55.)  Those Reports along with subsequent statements promoting the Reports—which conspirators agreed to publish and publicize knowing that the supporting evidence did not establish that any voter is actually a non-citizen illegal voter (*id.* ¶¶ 4, 22-25, 31-34, 36-37, 46, 56)—satisfy the intimidation and/or injury requirement.  The Complaint alleges how these public statements injured or intimidated the individual Plaintiffs for their support or advocacy in federal elections (*id.* ¶¶ 48-50, 57-62), and LULAC by obstructing its mission and diverting its resources (*id.* ¶¶ 62-64).

Defendants offer three challenges:  (1) that Plaintiffs have not alleged plausible facts supporting a conspiracy; (2) that the support or advocacy clause does not cover purely private action; and (3) that Plaintiffs have not alleged racial animus.  None of these arguments has merit.

### A.    **Plaintiffs have pleaded plausible facts showing a conspiracy.**

Defendants' only challenge to the support or advocacy claim based on the statute's text is that the conspiracy allegations are insufficient because they do not "include the times and places

when conspiratorial meetings took place." (Mot. at 20 (quoting *Snow v. Cty. of Henrico*, Civ. A. No. 3:90cv00509, 1990 WL 270198, at \*2 (E.D. Va. Dec. 17, 1990), *aff'd mem.* 927 F.2d 596 (4th Cir. 1991).) That is not the pleading standard: there is no legal requirement to invariably plead the times, places, and minute details of conspiratorial meetings, particularly where, as here, *the conspiracy is embodied in writing*. *Snow* only indicates that such facts are of the type that plaintiffs *could* allege to plead conspiracy.

Even Defendants recognize that all that must be alleged is "an agreement or a 'meeting of the minds' by defendants." (Mot. at 19 (quoting *Polidi v. Bannon*, 226 F. Supp. 3d 615, 623 (E.D. Va. 2016).) Here, the agreement to act in concert is indisputable because the *Alien Invasion* Reports expressly name PILF and non-party VVA as co-authors, and the Complaint alleges that Defendants agreed with each other and with VVA to develop, publish and promote the Reports. (Compl. ¶¶ 23, 37, 54.) It is not a supposition to allege that Defendants had "an agreement" with each other and their co-conspirator VVA—it is merely a repetition of what Defendants have already told the world on the cover of their Reports. Given these express acknowledgments, the information Defendants demand—times and details of their meetings with VVA—would be entirely superfluous and, in any event, already within Defendants' knowledge and thus unnecessary to provide them with the notice that Rule 8 is intended to afford.

### B. Plaintiffs' claim under the KKK Act does not require state action or class-based animus.

The thrust of Defendants' argument—that Plaintiffs' Section 1985(3) claim requires pleading state action (i.e., "does not cover 'wholly private conspiracies'") and racial or class-based animus—avoids the statutory language of § 1985(3) entirely. (Mot. at 15 (citation omitted); *see also* Mot. at 15-19.) Defendants' proposed requirements do not exist in the statute for claims of a conspiracy in violation of the "support or advocacy clause." Instead, Defendants

attempt to add these extra-textual elements for support or advocacy claims by vaguely invoking legislative purpose (*see id.* at 15), and then proceeding to apply case law interpreting a *different* clause of Section 1985 that outlaws entirely different categories of conspiracies separate and apart from what the "support or advocacy" clause prohibits. That is not the way **any statute**—let alone Section 1985, which prohibits five textually distinct conspiracies—should be interpreted. Indeed, Defendants' approach contradicts precedent rejecting extra-textual, one-size-fits-all approaches to Section 1985. *See, e.g.*, *Kush v. Rutledge*, 460 U.S. 719, 724 (1983). The Court should reject Defendants' extra-textual requirements for a support or advocacy claim.

1.     <u>A support or advocacy claim does not require state action.</u>

Defendants argue that support or advocacy claims under Section 1985(3) require state action and do not reach purely private conduct of the sort alleged here. This argument fails because Defendants are relying on cases that interpreted the *first* clause of Section 1985(3). The correct view, as courts have found, is that support or advocacy claims do not require state action. *See, e.g.*, *Ariz. Democratic Party*, 2016 WL 8669978, at 5 n*4 (rejecting argument that support or advocacy clause claims cannot be asserted against non-state actor because "the plain language of the statute does not require" state action).

Defendants rely on *Great American Federal Savings & Loan Ass'n v. Novotny*, 442 U.S. 366 (1979), and its progeny. (Mot. at 15-16.) Those cases reason that federalism concerns would arise absent a state-action requirement in the first clause of Section 1985(3) because, if that first clause applied "to all tortious, conspiratorial interference with the rights of others," it would create a "general federal tort law." *Griffin v. Breckenridge*, 403 U.S. 88, 101-02 (1971). The Court solved that federalism problem by interpreting the first clause to "provide[] no substantive rights itself" but rather to "merely provide[] a remedy for violation of the rights it designates." *Novotny*, 442 U.S. at 372. Thus, where claims under the first clause concern

conspiracies to deprive individuals of rights that "restrain[] only official conduct," then it is necessary for such plaintiffs to "prove that the state was somehow involved in or affected by the conspiracy." *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 833 (1983).

But Defendants' reliance on *Novotny* is misplaced because it construes the first clause of Section 1985(3), not the support or advocacy clause. Claims brought under the support or advocacy clause do not give rise to the same federalism concerns because such claims are expressly limited to federal elections and not passed pursuant to Congress's powers under the Reconstruction Amendments.[6] Congress has the broad authority under Article I, Section IV of the Constitution (the "Elections Clause") to regulate federal elections. *See Ariz. v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8-9 (2013) ("The [Elections] Clause's substantive scope is broad."). And Congress specifically relied on that Article I authority—and not its authority under the Reconstruction Amendments—to pass the support or advocacy clause. As the Court explained when upholding the later-repealed criminal enforcement provision of the support or advocacy clause, the support or advocacy clause reached private actors precisely because it was not simply enforcing the Reconstruction Amendments:

> The reference to cases . . . under . . . the *fourteenth amendment* . . . [that] relate alone to acts done under state authority can *afford . . . no aid in the present case.* For, *while it may be true that acts which are mere invasions of private rights . . . are not within the scope of that amendment*, it is quite *a different matter* when [C]ongress undertakes to protect the citizen in the exercise of rights conferred by the constitution of the United States, essential to the healthy organization of the government itself.

*Ex parte Yarbrough*, 110 U.S. 651, 665-666 (1884) (emphases added). Thus, as the Fifth Circuit explained in rejecting a state-action requirement for support or advocacy claims, the clause

---

[6] The quote from *Carpenters* on which Defendants also rely (Mot. at 15) concerns judicial monitoring of "*state* and federal elections" through Section 1985(3)'s first clause, 463 U.S. at 836 (emphasis added), not federal elections through the support or advocacy clause.

creates a right for eligible voters to vote in federal elections free of intimidation and harm that is enforceable against private individuals:

> The Fourteenth Amendment is only a protection against the encroachment upon enumerated rights by or with the sanction of a State. *The interference with a Federally protected right to vote is something more and something different.* Moreover it has had the specific attention of *Congress which has provided a specific remedy for interference by private individuals.*
>
> By the . . . Ku Klux Act, *a Federal right was created to recover damages for interfering with Federal voting rights . . . .*

*Paynes v. Lee*, 377 F.2d 61, 63-64 (5th Cir. 1967) (emphases added). For all of these reasons, Defendants' attempt to add a state-action requirement lacks merit.

Defendants contend the Eighth Circuit's decision in *Federer v. Gephardt*, 363 F.3d 754 (8th Cir. 2004), holds that support or advocacy claims must be premised on First Amendment rights, which constrain only state action. But as noted above, *Yarbrough* explains that the constitutional basis of the support or advocacy clause comes from the Election Clause and Article I, Section 2, Clause 1[7]—not the First Amendment. *See* 110 U.S. at 661-63.[8] Moreover, *Federer* is distinguishable on its facts; this case, unlike *Federer*, specifically alleges "a violation or interference with the right to vote." *Federer*, 363 F.3d at 760 n.4.

        2.        <u>A support or advocacy claim does not require a showing of racial animus.</u>

Defendants claim that "[t]o bring *any* claim under § 1985, a plaintiff must show . . . discriminatory animus." (Mot. at 16 (emphasis added).) This is incorrect. *Kush* rejects an

---

[7] "[T]he Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

[8] Furthermore, *Federer* relies on an anachronism. The First Amendment was not incorporated against the states when Section 1985 was enacted in 1871. So under *Federer*'s reading of the statute, a plaintiff would only have a support-or-advocacy claim in 1872 if they were injured by the *federal government*. That cannot be right: the Reconstruction Congress was not concerned about *its* support of the Klan when crafting the rights and remedies in the Klan Act.

animus requirement for the first clause of Section 1985(2), explaining that "the statutory language that provides the textual basis for the 'class-based, invidiously discriminatory animus' requirement simply does not appear in the portion of the statute that applies to this case." 460 U.S. at 726-27. The same reasoning is true here: while *some* of the conspiracies covered by Section 1985 mention class, race, or equal protection, the support or advocacy clause does not.

The requirement of class-based animus arises from statutory language prohibiting conspiracies to deny the equal protection of the laws. *See Kush*, 460 U.S. at 725; *Griffin*, 403 U.S. at 102 ("*The language requiring intent to deprive of equal protection, or equal privileges and immunities*, *means* that there must be some . . . animus behind the conspirators' action."). But that language appears in only a subset of the clauses of Section 1985, and *only* claims arising under clauses with equal-protection language must show class-based animus. *See Kush*, 460 U.S. at 726. The portions of Section 1985 that proscribe conspiracies to interfere with federal functions—including the support or advocacy clauses, which proscribe conspiracies to interfere with federal elections—"contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws." *Id*. at 725. The Supreme Court has accordingly refused to extend the requirement of class-based animus to the portions of Section 1985 that proscribe conspiracies to interfere with federal functions. *See Id*. at 726. So this Court should not impose an animus requirement where the text "does not demand a denial of 'equal protection of the laws.'" *McCord v. Bailey*, 636 F.2d 606, 614 & n.12 (D.C. Cir. 1980); *see* Ben Cady & Tom Glazer, *Voters Strike Back: Litigating Against Modern Voter Intimidation*, 39 N.Y.U. Rev. of L. & Soc. Change 173, 203-04 (2015).

Indeed, Defendants' argument is unsupported by even the cases they cite. With one exception, the cases Defendants cite as imposing a class-based animus requirement on Section

1985 plaintiffs are all cases arising under the portions of Section 1985 that are worded in terms of equal protection, not the portions that proscribe conspiracies to interfere with federal functions. And in the one support or advocacy case that Defendants cite—though flawed in other regards—the court concludes that a plaintiff "is not required to show class-based animus as part of his support and advocacy claim." *Federer*, 363 F.3d at 760.

## III.  Plaintiffs Have Stated a Claim Under Section 11(b) of the Voting Rights Act.

### A.  Section 11(b) of the Voting Rights Act reaches conduct by private actors.

Defendants also contend that state action is required to sustain a claim under Section 11(b). (Mot. at 10-11.) This too is wrong.

The plain language of the statute shows that Section 11(b) was enacted in order to eradicate all forms of voter intimidation, whether conducted by the state or by private parties:

> No person, *whether acting under color of law or otherwise*, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote . . . .

52 U.S.C. § 10307(b) (emphasis added).

The crux of Defendants' argument appears to be that the Voting Rights Act of 1965 ("VRA") was passed pursuant to Congress's powers under the Fifteenth Amendment, so it must require state action. (*See* Mot. at 10-11.) That is not correct. The VRA was also "designed to enforce . . . article I, section 4," the Elections Clause of the Constitution. H.R. Rep. No. 89-439, at 6 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437, 2437. And Section 11(b) is specifically rooted in the Elections Clause. *Id.* at 30-31, 1965 U.S.C.C.A.N. at 2462 ("The power of Congress to reach intimidation *by private individuals* in purely local elections derives from article I, section 4, and the implied power of Congress to protect Federal elections against corrupt influences . . . ." (emphasis added)); *see also United States v. Simms*, 508 F. Supp. 1179, 1186-87 (W.D. La. 1979) (Section 11(b) constitutes "'necessary and proper' legislation to . . .

[the] power to regulate federal elections under Article I, Section 4 of the Constitution").

Congress's ability to regulate federal elections under the Elections Clause extends to laws necessary for "the free, the pure, and the safe exercise" of the elective franchise. *Ex parte Yarbrough*, 110 U.S. at 662; *see also Smiley v. Holm*, 285 U.S. 355, 366 (1932) (stating that the Elections Clause permits Congress to "provide a complete code for congressional elections"). Congress may regulate *any* activity that even *potentially* affects a federal election. *See United States v. Carmichael*, 685 F.2d 903, 908-09 (4th Cir. 1982). Thus, Congress's ability to reach private conduct under the Elections Clause cannot be questioned.[9]

Defendants' authority does not suggest otherwise. *Chong Su Yi v. Democratic Nat'l Comm.*, 666 F. App'x 279 (4th Cir. 2016) (cited in Mot. at 10) merely notes for context in a footnote how the VRA works "in tandem" with the 15th Amendment; it does not hold, or even suggest, the VRA's scope is *limited* to that of the 15th Amendment. *Id.* at 280. *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc), considered a challenge under VRA Section 2, which explicitly applies only to state action, *id.* at 1496, and nowhere in *Nipper* does the "Eleventh Circuit . . . question[] the constitutionality of Section 11(b)." (Mot. at 11.) Defendants' citation is to a two-judge dissent that by definition does not represent the views of the en banc Eleventh Circuit. *See Nipper*, 39 F.3d at 1549 n.2 (Hatchett, J., dissenting). Finally, Defendants' own brief highlights that the court in *United States v. Harvey*, 250 F. Supp. 219, 225-26 (E.D. La. 1966) (cited in Mot. at 11) incorrectly ties Section 11(b) to the 15th Amendment rather than the Elections Clause. *See Simms*, 508 F. Supp. at 1187 ("[T]he Harvey court's reliance upon the

---

[9] DefendantAdams knows that Section 11(b) applies to private actors, because while at the U.S. Department of Justice he attempted to prosecute members of the New Black Panther Party for voter intimidation. *See* J. Christian Adams, *Inside the Black Panther Case*, The Washington Times (June 25, 2010) https://www.washingtontimes.com/news/2010/jun/25/inside-the-black-panther-case-anger-ignorance-and-/.

Fifteenth Amendment is misplaced and this decision is not controlling before this Court."). In more than 50 years, *Harvey* appears to have been cited in only two other cases: *Simms* and the dissent in *Nipper*. In short, there is no state-action requirement in Section 11(b).

**B.      Plaintiffs have sufficiently alleged intimidation.**

Defendants argue that Plaintiffs have not sufficiently alleged intimidation because (1) the Reports—which labeled Plaintiffs "felons"—were not sufficiently intimidating; and (2) Plaintiffs have not pleaded a specific intent to intimidate. (Mot. at 11-14.) These arguments lack merit.

1.      Plaintiffs have sufficiently pleaded that the *Alien Invasion* Reports were intimidating.

Defendants first contend that Plaintiffs have not alleged sufficiently intimidating conduct because Plaintiffs "do not allege a single, concrete instance of any direct action by Defendants." (Mot. at 12.) Defendants' argument is based on a selective reading of the Complaint that focuses on only one allegation regarding online comments made by third parties and ignores all of the allegations as to Defendants' conduct. In any event, Defendants' characterization of the Complaint is immediately undermined by their second argument that "publication of the Reports"—clearly a concrete instance of "direct action" by Defendants—"does not rise to the level of 'threats, intimidation, and coercion' against Plaintiffs in violation of Section 11(b)." (Mot. at 13.) Defendants are wrong. The Complaint details numerous, specific allegations demonstrating how Defendants labeled Plaintiffs as felons and illegal voters, both through publication of the Reports and their subsequent promotion of their contents, and those actions come well within the statutory prohibition.

Section 11(b) states that no person "shall intimidate, threaten, or coerce or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote . . . ." 52 U.S.C. § 10307(b). By its terms, the VRA's prohibition is not limited to any particular actions; rather it

covers any acts that "intimidate, threaten or coerce." *Id.* Courts recognize a range of conduct as intimidating or threatening. Threats of physical harm or criminal prosecution are certainly covered. *See, e.g.*, *United States v. McLeod*, 385 F.2d 734, 747 (5th Cir. 1967) (threats of unwarranted criminal prosecution); *Paynes v. Lee*, 377 F.2d 61, 64 (5th Cir. 1967) (threats of violence). Yet voter intimidation "is not limited to displays or applications of force, but can be achieved through manipulation and suggestion." *United States v. Nguyen*, 673 F.3d 1259, 1265-66 (9th Cir. 2012) (finding letter sent to Hispanic voters warning of incarceration or deportation resulting from illegal voting could have "constituted a tactic of intimidation" under state law voter intimidation provision). Indeed, "intimidation" is defined to include actions that cause a person to become "timid or fearful," which is a fact-intensive question. Intimidate, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1999).

Consistent with the statute's broad scope, the U.S. Department of Justice brought an action against the North Carolina Republican Party under Section 11(b) in 1992. It alleged that the Party had sent thousands of postcards to registered African-American voters stating that giving false information to an election official was "punishable by up to five years in jail." Somani Decl., Ex. A (Complaint, *United States v. N.C. Rep. Party*, 91-161-CIV-5-F, at *12 ¶¶ 43-44 (E.D.N.C Feb. 27, 1992). The Department filed suit against the parties under Section 11(b), challenging the mailing as an act "to intimidate and/or threaten black voters from exercising their right to vote . . . ." *Id.* Defendants entered into a consent decree that prohibited the parties from engaging in such practices, as well as a variety of other "ballot security" measures. Somani Decl., Ex. B (Consent Decree, *United States v. N.C. Rep. Party*, 91-161-CIV-5-F (E.D.N.C Feb. 27, 1992)). If these Republican Party mailings could be considered intimidating or threatening conduct, then Defendants' alleged conduct here—labeling Plaintiffs

felons— would certainly "rise to the level" of stating a claim under Section 11(b).

The Complaint here likewise comes within the broad scope of Section 11(b). It lays out numerous acts of intimidation, threats, and defamation by Defendants that have caused Plaintiffs to fear adverse consequences from exercising their constitutional voting rights. For example, the Complaint alleges intimidation in the form of multiple threats by Defendants of criminal prosecution. The Reports chide the U.S. Attorney for "**do[ing] nothing about the *felonies committed***" by those named in the Report from Prince William County. (Compl. ¶¶ 30, 38.) (Plaintiff Freeman is on this list). Defendant Adams has advocated on multiple occasions for the criminal prosecution of the individuals named in the Reports. (*Id.* ¶¶ 31, 45.) As noted above, threats or "warnings" of criminal prosecution for voting activity have been considered a form of voter intimidation.

The Complaint also alleges threats to and fear for Plaintiffs' physical safety. (*Id.* ¶¶ 49-50.) Threats of violence and physical harm related to voting behavior are unquestionable acts of voter intimidation. *See, e.g.*, *Paynes*, 377 F.2d at 64; *United States v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 334 (E.D. La. 1965). "Defendants aimed to foment public outrage" by "publishing the names and contact information" of registrants and voters and "heavily publicizing the report on TV, radio and online media using incendiary rhetoric." (Compl. ¶ 58.) And it did foment public outrage, as individuals armed with the Reports' defamatory allegations of voter fraud and access to Plaintiffs' contact information have called for the people named in the Reports to be executed, deported and/or imprisoned. (*Id*. ¶ 50.) Whether said directly or through the words of others, the result is the same: fear and concern by Plaintiffs that Defendants' conduct makes them less safe because Defendants have publicly accused them of voter fraud to an audience expressing anti-immigrant animus. (*Id.* ¶ 49.)

Furthermore, the Complaint alleges Defendants intimidated Plaintiffs by publishing defamatory assertions that Plaintiffs are non-citizens and felons. (*Id.* ¶¶ 31, 44, 45, 49.) Plaintiffs fear the false accusations of being non-citizens and felons will cause them a variety of reputational, employment and/or economic harms. (*Id.* ¶¶ 48-51.) At a minimum, Plaintiffs fear that Defendants' defamatory allegations could prevent or hinder them from voting or registering to vote in the future. (*Id.* ¶¶ 49, 71.) The Complaint plainly alleges facts showing that Defendants' intimidation tactics have in fact made Plaintiffs, in personally specific ways, "timid or fearful," which by definition is the object of "intimidation." (Compl. ¶¶ 49, 71.) In short, Plaintiffs have amply alleged intimidation within the meaning of Section 11(b).

2. <u>Defendants' arguments that plaintiffs have not sufficiently pleaded intent are wrong.</u>

Defendants next contend that Plaintiffs have not sufficiently alleged intent or racial animus (Mot. at 14) but this is wrong for two reasons: (1) intent and racial animus are not required; and (2) in any event, the Complaint has sufficient factual allegations of intent.

***First***, as both the text and the legislative history make clear, intent and racial animus are not elements of Section 11(b). The statute makes no mention of a defendant's *mens rea*: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b). By notable contrast, Section 131(b) of the Civil Rights Act of 1957 ("Section 131(b)"), passed just eight years earlier, provides as follows: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person *for the purpose of interfering* with the right of such other person to vote." 52 U.S.C. § 10101(b) (emphasis added). Indeed, in drafting Section 11(b), Congress copied Section 131(b)'s language almost completely, but deliberately excised the intent element

from the prior statute. Such variations in language, especially between bills passed closely in time and on the same subject matter, are presumed to have different meanings. *See Doe v. Cooper*, 842 F.3d 833, 844 (4th Cir. 2016) ("We must presume the legislature's omissions to be intentional.").

The legislative history of Section 11(b) further confirms Congress deliberately omitted intent. Merely eight years after passing Section 131(b), Congress passed the VRA in part to strengthen protections against voter intimidation. *See* Sherry A. Swirsky, *Minority Voter Intimidation: The Problem That Won't Go Away*, 11 Temp. Pol. & Civ. Rts. L. Rev. 359, 373-76 (2001). Attorney General Nicholas Katzenbach, a primary drafter of the VRA, highlighted the "purpose" requirement as a key weakness of Section 131(b), and stated that "[u]nder [the VRA], no subjective 'purpose' need be shown . . . . Defendants [are] deemed to intend the natural consequences of their acts." Somani Decl., Ex. C (Nicholas Katzenbach, Voting Rights, Part 1: Hearings on S. 1564 Before the Senate Comm. on the Judiciary, 89th Cong. 16 (1965)). The House Report fully adopts this view, stating that under Section 11(b) "no subjective purpose or intent need be shown." H.R. Rep No. 89-439, at 30-31 (1965).

Although some prior cases have imposed an intent requirement, *see, e.g.*, *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016) (cited in Mot. at 12), these cases are wrongly decided. *Parson* follows the out-of-circuit *Olagues v. Russoniello*, which evaluated a Section 11(b) claim under the same "two prong" test previously applied by the Fifth Circuit to Section 131(b) claims. 770 F.2d 791, 804 (9th Cir. 1985) (citing *McLeod*, 385 F.2d at 740–41 (a Section 131(b) case)).[10] The conclusory statements in both *Parson* and *Olagues* erroneously ignore both

---

[10] Defendants repeatedly describe *McLeod* as a Section 11(b) case. (Mot. at 12-14.) But the court in *McLeod* only considered Section 131(b); it did not discuss Section 11(b) at all.

the differences in statutory text and the legislative history explaining them.

**Second**, and in any event, Plaintiffs have alleged intent.[11]  Intent may be inferred from the totality of the circumstances and facts alleged in a complaint.  *See Republican Party of N.C. v. Martin*, 980 F.2d 943, 955-56 (4th Cir. 1992) (finding sufficient allegations of discriminatory intent in judicial elections legislation from circumstantial facts alleged).

The Complaint alleges Defendants "intentionally intimidate and threaten" Plaintiffs by knowingly accusing individuals, including Plaintiffs, of being non-citizens committing felonies, despite knowledge that their Reports likely included constitutionally eligible voters.  (Compl. ¶ 32.)  Specifically, Plaintiffs allege that Defendants "intentionally accused" those named in the *Alien Invasion* Reports of committing felonies by registering to vote and voting, despite being warned by election officials they were "drawing false conclusions."  (*Id.* ¶ 33.)  Additionally, Defendants published *Alien Invasion II*, despite critical media reports that "made Defendants further aware of the methodological shortcomings" of their work.  (*Id.* ¶ 34.)  Defendants have repeatedly publicized the *Alien Invasion* reports in settings and websites that have prompted physical threats against those named in the report.  (*Id.* ¶ 50.) "People usually intend the natural consequences of their actions."  *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997).  Therefore, it is eminently plausible for a finder of fact to look at Defendants' continued work producing and publicizing the *Alien Invasion* Reports in the face of these warnings and draw an inference of the specific intent to intimidate Plaintiffs from voting.  *Cf. United States v. Saunders*, 68 F.3d 462, 1995 WL 619940, at *2 (4th Cir. 1995) (table) ("[W]hether or not

---

[11] The only case Defendants cite to that appears to require not just intent but also racial animus in a Section 11(b) case is *Parson*, 157 F. Supp. 3d at 498-99.  *Parson* cites no precedent or rationale for imposing this requirement and it is unclear why the court added additional hurdles not supported by the text or legislative history.

intent . . . existed are questions for the jury."). As such, these facts—though not required—are adequately pleaded.

## IV.    The Individual Plaintiffs Have Stated a Claim for Defamation.

Defendants also seek dismissal of the individual Plaintiffs' defamation claims, blithely asserting that defamation cannot lie where Plaintiffs' names are "included in public records . . . attached to the Report" where the accusations of felony conduct are made.  (Mot. at 21.)  But the facts as alleged more than plausibly state a claim for defamation: the *Alien Invasion* Reports, as a whole, falsely accuse Plaintiffs of being "non-citizens who committed felony voter fraud by registering to vote and/or voting."  (Compl. ¶ 75.)

### A.    Plaintiffs' defamation claims are timely.

Defendants' statute-of-limitations argument addresses only the first Report.  (Mot. at 22.) Defendants effectively concede that *Alien Invasion II*—published in May of 2017 (Compl. ¶ 35), within a year of the Complaint being filed—is not time-barred.  (Mot. at 22.)  This concession is fatal to the timeliness argument leveled against the first Report because, under Virginia law "each successive publication of an old or preexisting defamatory statement gives rise to a new cause of action."  *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499, 508-09 (E.D. Va. 2016); *see also Doe v. Roe*, 295 F. Supp. 3d 664, 671 (E.D. Va. 2018) (finding subsequent communications to third parties by the "same alleged defamer . . . regarding the same defamatory matter" constituted republication that started the statute of limitations running anew).  In publishing *Alien Invasion II*, Defendants affirmatively republished *Alien Invasion I* to a new audience in the form of a summary and a hyperlink to the full report on PILF's website.  (*See* Compl. Ex. B, at 1, 17 n.1.)  This republication, not to mention the additional defamatory statements uttered in promotion of *Alien Invasion II*, gives rise to new causes of action within the statute of limitations.

**B.      Plaintiffs have plausibly alleged defamation.**

As a threshold matter, Defendants do not dispute that falsely labeling a person a felon is actionable; it is defamation *per se*.  *Schnupp v. Smith*, 457 S.E.2d 42, 46 (Va. 1995) (noting that in order to state a claim for defamation *per se*, "it is sufficient '[t]o say that a man committed a felony which he did not commit'") (alteration in original) (quoting *James v. Powell*, 152 S.E. 539, 543 (Va. 1930)).  Instead, Defendants argue that the *Alien Invasion* Reports are neither defamatory nor "about the plaintiff[s]."  (Mot. at 22 (citation omitted).)  This argument fails.

*First*, Defendants contend that there is no defamation because the Reports' text— conveniently excluding the appendices—does not "ever mention[] one of the Plaintiffs by name."  (Mot. at 21; *see also id*. at 24 ("Plaintiffs' individual names do not appear at all in the Reports").)  This argument is exceedingly formalistic, defies common sense, would create a gaping loophole for defamation, and is unsupported by law, including case law cited by Defendants noting that defamatory statements "must be determined from the document or material as a whole, from beginning to end."  (*Id*. at 24.)

As the Virginia Supreme Court explained in *Carwile v. Richmond Newspapers, Inc.*, 82 S.E.2d 588, 592 (Va. 1954), "[i]n order to render words defamatory and actionable it is not necessary that the defamatory charge be in direct terms but it may be made indirectly, and it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory."  *See also Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 751 (Va. 2009) ("[T]he factual portions of an allegedly defamatory statement may not be evaluated . . . in isolation, but must be considered in view of any accompanying opinion and other stated facts.").

The plaintiff in *Carwile* was an attorney who accused a police department of graft.  82 S.E.2d at 589.  After a grand jury declined to indict based on the attorney's allegations, the newspaper defendant reported that city officials would not comment on whether any action

would be taken against the plaintiff in response, while also noting that the State Bar could initiate a proceeding to disbar an attorney for an ethics violation. *Id*. at 589-90. In reversing summary judgment for the newspaper, the court held that while the "language does not in express terms charge the plaintiff with a breach of his professional honor" the "reasonable implication of this . . . [is] that the plaintiff is guilty of unethical and unprofessional conduct." *Id*. at 592.[12]

Similarly, in *Hatfill v. New York Times Co.*, 416 F.3d 320 (4th Cir. 2005), the Fourth Circuit reversed dismissal of a claim under Virginia law for defamation. The New York Times published a series of columns by Nicholas Kristof that criticized the FBI's anthrax mailings investigation and encouraged the FBI to move more aggressively with regard to one suspect, Dr. Steven Hatfill. *Id*. at 324-28. Hatfill brought suit alleging that Kristof's false "identification of [him] as the likely anthrax mailer imputed [to him] homicidal activity" and constituted defamation *per se*. *Id.* at 328. Although the district court dismissed the claim, the Fourth Circuit concluded that the columns were still "capable of defamatory meaning" given that "the unmistakable theme of Kristof's columns [was] that the FBI should investigate Hatfill more vigorously because all the evidence (known to Kristof) pointed to him." *Id*. at 333-34.

Here, the *Alien Invasion* Reports present a much clearer case of alleged defamation *per se* than in *Carwile*, *Schnupp*, or *Hatfill*. After all, the Complaint alleges that the Reports explicitly direct the reader to the attached appendices for the names of the supposed felon aliens. Defendants claimed discovery of "multiple lists of non-citizen felons" and then identified "the alleged felons by name," including Plaintiffs, by virtue of the Reports' appendices. (Compl. ¶¶ 28-29; *see also id*. ¶¶ 38, 40.) For example, both Reports claim "***433 non-citizens* who had**

---

[12] *See also Schnupp*, 457 S.E.2d at 46 ("[T]he reasonable inferences to be drawn from the words used, while not charging a criminal offense in express terms, did impute to [plaintiff] the commission of . . . [an] aiding and abetting [crime].").

**registered to vote**" unlawfully in Prince William County and directed the reader to "[s]ee Exhibit 1." (*Id.* ¶¶ 28-30, 42.) Plaintiff Freeman was named in that exhibit as one of the 433 non-citizens committing felonies. (*Id.*) All four individual Plaintiffs were listed in Exhibit 12 to *Alien Invasion II* as proof of the "non-citizen registrants" that committed "felonies." (*Id.* ¶¶ 38, 42.) Furthermore, after publication, Adams admitted that Defendants "*name the names*" (*id.* ¶ 31) and he directed the public (and law enforcement) to "hundreds of pages of real evidence," referring to the Report appendices, of "*felonies piled on top of felonies*." (*Id.* ¶ 45 (citations omitted).) Thus, the aforementioned false statements plainly impute to Plaintiffs the commission of a crime, which suffices to make out a claim of defamation *per se*.

*Second*, Defendants attempt to recast the Reports as not defamatory nor about the Plaintiffs but rather as a discussion of the challenges "confronting policy makers" and "election officials" and of statutes that criminalize "voting by non-citizens," accompanied by "official public records" that Defendants reasonably "treat[ed] . . . as records containing accurate information." (Mot. at 22, 23, 25.)[13] Defendants' spin on the Reports and their conduct is not a consideration at the motion to dismiss stage, where the Complaints' factual pleading is treated as true and all reasonable inferences are drawn in Plaintiffs' favor. (*See supra* p. 5.) *See also Hatfill*, 416 F.3d at 331 ("In determining whether the words and statements complained of . . . are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." (quoting *Carwile*, 82 S.E.2d at 589)). Defendants will have an opportunity to contest Plaintiffs' allegations at a later stage in this case.

---

[13] While Defendants claim that they have "at times qualif[ied] the[ir] assertions" (Mot. at 24), the Complaint alleges many instances where they have not. (*See* Compl. ¶¶ 26-28, 30, 38, 40, 75.)

**C.** **Plaintiffs have adequately pleaded that Defendants acted with the requisite intent for defamation.**

Defendants do not challenge the allegation that Plaintiffs Freeman, Bonilla, Rosen, and Gearhart are U.S. citizens who were constitutionally eligible to vote (Compl. ¶¶ 13-16) or argue that statements to the contrary would be true. Instead, Defendants argue that the Complaint "does not allege facts" that the allegedly false accusations were made with the "requisite intent." (Mot. at 25.) This argument simply ignores the factual allegations that Defendants made their accusations, at a minimum, negligently.

The parties agree that the requisite intent for defamation involving "private individuals, like Plaintiffs," is negligence (Mot. at 22)—meaning the defendant "either knew [the statement] to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." *Ransome v. O'Bier*, No. 3:16-CV-01002, 2017 WL 1437100, at *9 (E.D. Va. Apr. 20, 2017) (alteration in original) (quoting *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 725 (Va. 1985)). In Virginia, Defendants had a duty to investigate the basis for their charge of felony voter fraud and could not simply rely on the fact that Plaintiffs had been purged from voter rolls. *See Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32, 34-35 (Va. 1987) (holding newspaper failed its duty to investigate the accuracy of its story on plaintiff teacher's fitness by not contacting any of the readily-available students who contradicted the negative accusations in the story); *see also Ingles v. Dively*, 435 S.E.2d 641, 645 (Va. 1993) (plaintiff's reliance on the "opinion and actions of the [prosecutor] neither relieve[d] [the defendant] of his duty to ascertain the truth [of his statements] nor provide[d] a *per se* justification for a negligent failure to do so.").

The Complaint alleges that Defendants were aware that records noting the removal from the voting rolls did not establish a particular voter is a non-citizen and/or legally barred from

voting.  (Compl. ¶¶ 32, 46.)  The Complaint also alleges that Virginia elections officials warned Defendants that the records Defendants obtained from them could not support allegations of voter fraud.  (*Id*. ¶¶ 33-34.)  The Complaint likewise alleges that media reports highlighted the falsity of Defendants accusations with respect to other individuals and, "on information and belief," that Defendants were aware of these reports.  (*Id*. ¶ 34.)  Furthermore, as with the students in *Lipscomb* who disputed the newspaper's reporting, Defendants could have easily contacted Plaintiffs to verify whether they were citizens.  In fact, their contact information was part of the records Defendants used to out so-called "non-citizens."  (*Id*. ¶ 28.)  Thus, by publishing the reports despite knowing of the flaws in their assertions, Defendants were, at a minimum, negligent, which satisfies the intent element for defamation.

### D. Defendants are not entitled to immunity under Virginia's anti-SLAPP statute.

Defendants contend that they are shielded from liability by Virginia's anti-SLAPP statute because the Reports address matters of public concern, namely "the integrity of elections in the United States."  (Mot. at 26.)  This argument fails for a variety of reasons.

*First*, Plaintiffs' cause of action accrued before the amendment to Virginia Code § 8.01-223.2 covering claims of defamation went into effect on July 1, 2017.[14]  Because this provision does not apply retroactively, Defendants cannot rely on its protections.  *See Will Nesbitt Realty, LLC v. Jones*, CL-2016-14234, 2018 Va. Cir. LEXIS 66, at *41-44 (Va. Cir. Ct. Apr. 30, 2018) (holding that the 2017 amendment does not apply retroactively).

*Second*, even if the provision applied retroactively, Defendants have failed to offer any

---

[14] *See* Virginia's Legislative Information System, *SB 1413 Immunity of persons; statements regarding matters of public concern communicated to a third party*, http://lis.virginia.gov/cgi-bin/legp604.exe?171+sum+SB1413 (last visited June 12, 2018) (indicating in the bill history an effective date of July 1, 2017).

controlling or persuasive authority for the proposition that false accusations of voter fraud would constitute "matters of public concern that would be *protected under the First Amendment*." Va. Code § 8.01-223.2 (emphasis added). Not only is Defendants' argument predicated on its self-serving characterization of the Reports ("integrity of elections") rather than Plaintiffs' allegations (falsely accusing Plaintiffs of being non-citizen felons), but it also ignores—even under Defendants' own conception of the Reports—that negligently made defamatory statements about private figures are not *protected under the First Amendment*. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974); *Gazette*, 325 S.E.2d at 724-25.

**Finally**, even assuming *arguendo* that that the statute applies, Plaintiffs have sufficiently alleged that Defendants published the *Alien Invasion* Reports with "actual or constructive knowledge that they [were] false or with reckless disregard for whether they [were] false," which defeats the claim of immunity. Va. Code § 8.01-223.2(A). In fact, the same allegations demonstrating negligence support a showing of constructive knowledge, as well as the more stringent standard of reckless disregard, because those allegations—which must be accepted as true—demonstrate that Defendants knew the elections records could not support their claims of non-citizenship and felony voter fraud, and yet they moved forward with their false accusations. *See supra* p. 3 (citing Compl. ¶¶ 32-34, 46). *See also Shaheen v. WellPoint Cos.*, 490 F. App'x 552, 555-57 (4th Cir. 2012) (holding an "incomplete or nonexistent investigation" can support "reckless disregard for the truth" (citation omitted)); *Via v. Commc'ns Corp. of Am.*, No. 3:17CV00047, 2018 WL 1973287, at *8-9 (W.D. Va. Apr. 26, 2018) (reckless disregard alleged where defendant accused plaintiff of arson despite conflicting reports about fire's source).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss or, to the extent any claims are dismissed, grant Plaintiffs leave to amend.

Dated: June 12, 2018          Respectfully submitted,

_____
/s/
ANISA A. SOMANI (VSB No. 86103)
NICOLE M. CLEMINSHAW (VSB No. 92161)
GEOFFREY M. WYATT (*Pro hac vice*)
SEAN M. TEPE (*Pro hac vice*)
LAUREN A. EISENBERG (*Pro hac vice*)
SAMUEL LEVOR (*Pro hac vice*)
ANDREW HANSON (*Pro hac vice*)
ZACHARY W. MARTIN (*Pro hac vice*)
1440 New York Ave. NW
Washington, DC 20005
Telephone:    (202) 371-7500
Facsimile:     (202) 661-8209
Anisa.Somani@probonolaw.com
Nicole.Cleminshaw@probonolaw.com
Geoffrey.Wyatt@probonolaw.com
Sean.Tepe@probonolaw.com
Lauren.Eisenberg@probonolaw.com
Sam.Levor@probonolaw.com
Andrew.Hanson@probonolaw.com
Zachary.Martin@probonolaw.com


ALLISON RIGGS (*Pro hac vice*)
JACLYN MAFFETORE (*Pro hac vice*)
JEFF LOPERFIDO (*Pro hac vice*)
**SOUTHERN COALITION FOR SOCIAL JUSTICE**
1415 West Highway 54, Suite 101
Durham, NC 27707
Telephone:    (919) 323-3380
Facsimile:     (919) 323-3942
AllisonRiggs@southerncoalition.org
JaclynMaffetore@southerncoalition.org
JeffLoperfido@scsj.org


CAMERON KISTLER (*Pro hac vice*)
**PROTECT DEMOCRACY PROJECT**
2020 Pennsylvania Ave., NW # 163
Washington, DC 20006
Telephone:    (202) 599-0466
Facsimile:     (929) 777-9428
cameron.kistler@protectdemocracy.org

LARRY SCHWARTZTOL (*Pro hac vice*)
**PROTECT DEMOCRACY PROJECT**
10 Ware St.
Cambridge, MA 02138
Telephone: (202)-599-0466
Facsimile: (929)-777-9428
larry.schwartztol@protectdemocracy.org


ANDREW G. CELLI, JR. (*Pro hac vice*)
ALANNA KAUFMAN (*Pro hac vice*)
**EMERY CELLI BRINCKERHOFF & ABADY LLP**
600 Fifth Avenue at Rockefeller Center
10th Floor
New York, New York 10020
Telephone:    (212) 763-5000
Facsimile:    (212) 763-5001
acelli@ecbalaw.com
akaufman@ecbalaw.com


*Attorneys for Plaintiffs League of United Latin American Citizens – Richmond Region Council 4614, Eliud Bonilla, Luciania Freeman, Abby Jo Gearhart, and Jeanne Rosen*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of June, 2018, I have electronically filed the foregoing **Opposition to Defendants' Motion to Dismiss**, and supporting papers, with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record, including:

Michael Lockerby, Esq.
Eli L. Evans, Esq.
**Foley and Lardner LLP**
3000 K St. NW
Washington, DC 20007

William E. Davis, Esq.
Ana Romes, Esq.
**Foley and Lardner LLP**
One Biscayne Tower
2 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131

/s/ Anisa A. Somani
ANISA A. SOMANI (VSB No. 86103)
1440 New York Ave. NW
Washington, DC 20005
Telephone:    (202) 371-7500
Facsimile:    (202) 661-8209
Anisa.Somani@probonolaw.com

*Counsel for Plaintiffs League of United Latin American Citizens –
Richmond Region Council 4614, Eliud Bonilla, Luciania
Freeman, Abby Jo Gearhart, and Jeanne Rosen*