IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS – RICHMOND REGION COUNCIL 4614 ET AL, <br><br> *Plaintiff,* <br><br> v. <br><br> PUBLIC INTEREST LEGAL FOUNDATION ET AL, <br><br> *Defendant.* | Civil No. 1:18-cv-00423 <br><br> Hon. Liam O'Grady |

## MEMORANDUM OPINION & ORDER

Currently before the Court is Defendants' Motion to Dismiss (Dkt. 30; 31). The Court has considered the evidence and the pleadings and heard the parties' oral arguments on June 22, 2018. Dkt. 61. The Court finds good cause to **DENY** the motion.

**I. Background**

On April 12, 2018, Plaintiff League of United Latin American Citizens ("LULAC") and four other individually named Plaintiffs ("Bonilla," "Freeman," "Gearhart," and "Rosen") filed suit against Defendants Public Interest Legal Foundation ("PILF") and J. Christian Adams. Compl. ¶¶ 12-18. Plaintiffs allege that in September 2016, Defendants, in conjunction with non-party Virginia Voters Alliance, published a written report titled *Alien Invasion I* to national media which accused Virginia voters of "committing multiple, separate felonies, from illegally registering to vote to casting an ineligible ballot." Id. at ¶¶ 24-25, 31. Specifically, Plaintiffs allege that Defendants obtained from Virginia county registrars several lists of "[Virginia voter] registrants who had been purged from the voter rolls." Id. at ¶¶ 27, 46. Plaintiffs assert that

1

Defendants published this information, presenting it as evidence of illegal electoral activity in Virginia. Id. at ¶¶ 27-29, 46.

The voter registration lists obtained by Defendant, however, contained registrants who were, in fact, properly voting citizens who had been removed from the voting rolls for various administrative reasons. Id. at ¶ 32. Plaintiffs allege, on information and belief, that Defendants were informed by Virginia election officials "that they were drawing false conclusions from the registrar information and running the significant risk of wrongfully accusing constitutionally eligible voters of committing felony voter fraud." Id. at ¶ 33. Defendants published *Alien Invasion I* anyway. Id.

Plaintiffs allege that even after Virginia election officials repeatedly informed Defendants of the methodological deficiencies of *Alien Invasion I*, Defendants published a sequel, *Alien Invasion II*, in May 2017. Id. at ¶ 35. *Alien Invasion II* "affirmatively reiterates the accusation . . . that certain voters in a number of Virginia jurisdictions . . . were guilty of committing one felony by registering to vote and likely guilty of committing another felony by actually voting." Id. at ¶ 38. Similar to *Alien Invasion I*, "*Alien Invasion II* was published along with a roughly eight-hundred-page appendix containing voter registration forms, which included the names, home addresses, and telephone numbers of the alleged felons." Id. at ¶ 41. Initially, each individually named Plaintiff's personally identifying information was contained in the *Alien Invasion II* appendix. Id. at ¶ 42. Defendants subsequently published a revised version which removed several names from the list. Id. at ¶ 43. Nevertheless, this revision failed to exclude the names and information of Plaintiffs Bonilla and Freeman, who remain in the final version of the report. Id.

Plaintiffs allege multiple harms resulting from Defendants' conduct. Id. at ¶¶ 48-51. Specifically, the individually named Plaintiffs report the detrimental impact of adverse publicity, intimidation, embarrassment, and fear of harassment associated with their participation in the electoral process. Id. Organizational Plaintiff LULAC reports that its "members and the Latino community [it] represents have been and continue to be intimidated and threatened by Defendants asserting that registering to vote and/or voting constitutes an unlawful 'alien invasion' that should be prosecuted." Id. ¶ 63. Plaintiff LULAC also alleges that "[i]nstead of engaging in its ordinary course initiatives, [it] must devote time and resources to combat the false narrative that Latinos who vote are doing so illegally." Id. at ¶ 64.

Plaintiffs allege violations of 42 U.S.C. § 1985(3) and § 11(b) of the Voting Rights Act. The individually named Plaintiffs also allege defamation. In their Motion to Dismiss, Defendants seek to bar LULAC's claims due to lack of standing, and also seek a broad dismissal of the Complaint for Plaintiffs' failure to state a claim. See Dkt. 30; 31.

## II. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 550 (2007). A motion to dismiss pursuant to Rule 12(b)(6) must be considered in combination with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555.

While "detailed factual allegations" are not required, Rule 8 demands that a plaintiff provide more than mere labels and conclusions stating that the plaintiff is entitled to relief. Id.

Because a Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, a district court "must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff." Kensington Volunteer Fire Dep't v. Montgomery County, 684 F.3d 462, 467 (4th Cir. 2012) (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011)).

## III. Analysis

Defendants raise four issues in support of their Motion to Dismiss: (1) Plaintiff LULAC does not have standing to invoke federal jurisdiction; (2) Plaintiffs have failed to state a claim under § 11(b) of the Voting Rights Act; (3) Plaintiffs have failed to state a § 1985(3) claim; and (4) Plaintiffs have failed to state a defamation claim and, regardless, Defendants are entitled to qualified immunity under Virginia's Anti-SLAPP statute. Dkt. 33 at 7-26.

### a. LULAC's Standing

Defendants do not dispute that standing is proper with respect to the individually named Plaintiffs. Rather, Defendants challenge Plaintiff LULAC's standing. Id. at 7-10. However, both the Supreme Court and the Fourth Circuit have held that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement. See Bowsher v. Synar, 478 U.S. 714, 721 (1986); Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 263-64 (1977); Bostic v. Schaefer, 760 F.3d 352, 370 (4th Cir. 2014). Accordingly, the Court ought not inquire into LULAC's organizational standing at this time.[1] The Court notes, however, that

---

[1] The Complaint pleads LULAC's standing under the representational and organizational theories. See Compl. ¶ 72. The Court finds that LULAC lacks standing under the representational theory because it has failed to "establish [that] at least one *identified* member suffered or [will] suffer harm." Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009) (emphasis added). Under the organizational theory, the Court expresses doubt over the traceability and redressability of LULAC's alleged injury. See Friends of the Earth, 204 F.3d 149, 154 (4th Cir. 2000). Further, there is an issue of material fact over whether LULAC has suffered a "concrete and demonstrable injury to [its] activities – with a consequent drain on [its] resources – constituting more than simply a setback to the organization's abstract social interests." See Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982); Goldstein v. Costco Wholesale Corp., 278 F. Supp. 2d 766, 769-70 (E.D. Va. 2003); see also Ass'n for Retarded Citizens v. Dallas County Mental

the "One Good Plaintiff Rule" is often limited to cases where each Plaintiff raises the same legal issues and requests the same type of remedy.[2] See Sierra Club v. El Paso Props., Inc., No. 01-cv-02163, 2007 WL 45985, at *2-3 (D. Colo. Jan. 5, 2007); PSINet, Inc. v. Chapman, 108 F. Supp. 2d 611, 619-20 (W.D. Va. 2000). For this reason, the Court invites further briefing on the matter following discovery, should there be good cause.

### b. Section 11(b) of the Voting Rights Act

Defendants argue that Plaintiffs' § 11(b) claim should fail because (i) Section 11(b) applies only to state actors, (ii) Section 11(b) claims require specific intent and racial animus, and (iii) Plaintiffs fail to sufficiently allege "intimidation" under the meaning of § 11(b). Dkt. 33 at 10-14. For the following reasons, the Court finds these arguments unpersuasive.

#### i. Section 11(b)'s reach to private actors

As to the issue of whether § 11(b) claims can be brought against non-state actors, the statutory text is dispositive. The relevant portion of § 11(b) reads:

> No person, whether acting under color of law *or otherwise*, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote.

52 U.S.C. § 10307(b) (2012) (emphasis added). In statutory interpretation, "words are given their 'ordinary or natural' meaning." Leocal v. Ashcroft, 543 U.S. 1, 8-9 (2004) (quoting Smith v.

---

Health & Mental Retardation Ctr. Bd. of Trustees, 19 F.3d 241, 244 (5th Cir. 1994) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.").

[2] See Aaron-Andrew P. Bruhl, One Good Plaintiff Is Not Enough, 67 DUKE L.J. 481, 497-503 (2017). The Court recognizes the undesirable outcomes of an overbroad application of the "One Good Plaintiff Rule," including improper awards of fees and costs, confusion over preclusive effects of judgments, excessively broad injunctions, and the inhibition of precedent development. Id. at 506.

5

United States, 508 U.S. 223, 228 (1993)). Here, the language "or otherwise" indicates Congressional intent to reach both government and private conduct under § 11(b).

As a counterpoint to the statutory text, Defendants cite Yi v. Democratic Nat'l Comm., 666 F. App'x 279, 280 (4th Cir. 2016), reh'g denied (Jan. 3, 2017) in support of the proposition that the Voting Rights Act ("VRA") derives constitutional authority from the Fifteenth Amendment, which applies only to state actors. See Dkt. 33 at 10. However, as Plaintiffs recognize, "[Yi] merely notes for context in a footnote how the VRA works 'in tandem' with the 15th Amendment; it does not hold, or even suggest, the VRA's scope is limited to that of the 15th Amendment." Dkt. 50 at 17. Defendants also fail to present any binding case law that precludes application of § 11(b) to private conduct. They cite only to a dissent in Nipper v. Smith, 39 F.3d 1494, 1547 (11th Cir. 1994).

By comparison, multiple Supreme Court opinions hold that the Elections Clause broadly authorizes federal regulation of "ballot casting." See Arizona v. Inter Tribal Council of Ariz., Inc., 570 U.S. 1, 8-9 (2013); United States v. Williams, 341 U.S. 70, 77 (1951); Smiley v. Holm, 285 U.S. 355, 366 (1932); Ex parte Yarbrough, 110 U.S. 651, 662 (1884). These holdings point to the Elections Clause – not the Fifteenth Amendment – as the constitutional authority for § 11(b). The plain text of the Elections Clause comports with this reading. See U.S. CONST. art. I, § 4. Accordingly, the Court holds that § 11(b) can reach private conduct.

  ii. Section 11(b)'s requirement of specific intent and racial animus

Defendants also argue that a § 11(b) claim requires a showing of specific intent to intimidate and a showing of racial animus. Dkt. 33 at 10-14. Again, the Court's analysis begins with the statutory text of § 11(b), which makes no reference to either of Defendants' proposed requirements. See 52 U.S.C. § 10307(b) (2012).

A statutory reading that omits "specific intent" and "racial animus" requirements is further buttressed by a comparative statutory analysis of § 11(b) and § 131(b) of the 1957 Civil Rights Act, a similarly-worded statutory provision on voter intimidation that predated § 11(b). Section 131(b) reads:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person *for the purpose of* interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate. . . .

52 U.S.C. § 10101(b) (2012) (emphasis added). The text of § 11(b), unlike § 131(b), plainly omits "for the purpose of," suggesting § 11(b)'s deliberately unqualified reach.

Defendants' reference to nonbinding case law that reads specific intent and racial animus requirements into § 11(b) is also unpersuasive. These cases trace back to United States v. McLeod, which, in fact, adjudicated claims brought under the 1957 Civil Rights Act. 385 F.2d 734, 738 (5th Cir. 1967). Therefore, in the absence of plain statutory text, statutory history, or binding case law to the contrary, the Court does not find that a showing of specific intent or racial animus is required under § 11(b).

### iii. Intimidation within the meaning of § 11(b)

Defendants also allege that their conduct does not rise to the level of intimidation under the meaning of § 11(b). However, Defendants have linked Plaintiffs' names and personal information to a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium. Defendants' suggestion that more is needed to support a finding of intimidation is untenable. See Dkt. 33 at 13-14. This is particularly true at the motion to dismiss stage, where the Court accepts Plaintiffs' well-pleaded facts as true. Plaintiffs have alleged, plausibly, that the *Alien Invasion* reports put them in fear of harassment and interference

with their right to vote. They have alleged intimidation sufficient to support their § 11(b) claim. See Damon v. Hukowitz, 964 F. Supp. 2d 120, 149 (D. Mass. 2013) ("Intimidation means putting a person in fear for the purpose of compelling or deterring his or her conduct.") (internal citations omitted).

### c. Section 1985(3)

Defendants argue that Plaintiffs' § 1985(3) claim must be dismissed because (i) Plaintiffs have made only a bare assertion of conspiracy without providing concrete supporting facts and (ii) Plaintiffs have failed to allege two required elements of a § 1985(3) claim: a state action in violation of an independent right and an action based on a race or class-based invidious discriminatory animus. Dkt. 33 at 15-21. For the following reasons, these arguments also fail.

#### i. Conspiracy

Defendants are correct to note that the Fourth Circuit has rejected § 1985 claims whenever a purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts. See Thomas v. The Salvation Army Southern Territory, 841 F.3d 632, 637 (4th Cir. 2016); Simmons v. Poe, 47 F.3d 1370, 1377 (4th Cir. 1995). Here, however, Plaintiffs *have* sufficiently alleged facts supporting a conspiracy in their Complaint. See Compl. ¶¶ 23, 37, 54. At the motion to dismiss stage, these assertions are sufficient for the claim to survive.

#### ii. Section 1985(3)'s requirement of state action & class-based animus

The parties agree that the first two clauses of Section 1985(3) provide no independent substantive rights and that plaintiffs asserting a claim under those clauses must identify a violation of a separate constitutional right (and typically show state action). See Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 373 (1979). Additionally, plaintiffs making a

claim under the first two clauses of Section 1985(3) must allege that some racial or otherwise class-based invidiously discriminatory animus lay behind the conspirators' action. See Kush v. Rutledge, 103 S.Ct. 1483, 1487 (1983).

The parties disagree about whether it is proper to apply a different standard to the third clause of Section 1985(3), described by Plaintiffs as the "support and advocacy clause." Plaintiffs assert that the requirements identified above apply *only* to the first two clauses of Section 1985(3): those that refer to equal protection of the law. Because Plaintiffs' claim arises under the "support and advocacy" clause, they argue, they need not show a violation of any right other than that arising under the "support and advocacy" clause, nor need they allege that any class-based animus motivated Defendants' actions. Although the case law is not entirely clear, Plaintiffs persuasively argue that their claim arising under the "support and advocacy" clause of Section 1985(3) is subject to a different standard than that which courts have applied to claims arising under Section 1985(3)'s equal protection clauses.

In Griffin v. Breckenridge, 403 U.S. 88 (1971), the Supreme Court considered the pleading standard for the first clause of Section 1985(3) ("conspiring or going in disguise on the highway . . . for the purpose of depriving [persons of equal protection]"). The Court upheld the application of § 1985(3) to purely private conspiracies, and held that plaintiffs must allege a racial or "otherwise class-based, invidiously discriminatory animus" by defendants. Id. at 102-03. Subsequently, the Supreme Court made clear that the second part of 1985(3) does not require class-based, invidiously discriminatory animus because that part arises from a statutory provision without language requiring that conspirators act with intent to deprive their victims of equal protection of the laws. See Kush, 103 S.Ct. at 1487-88 (explaining that the limiting language in Griffin arose under the first clause of § 1985(3) and that "there is no suggestion" that Griffin's

reasoning should apply to "any other portion of § 1985"). The Court explained that the legislative background which gave rise to the equal protection clauses of Section 1985(3) "does not apply to the portions of the statute that prohibit interference with federal officers, federal courts, or federal elections." Id. The refusal to extend Griffin beyond the first clauses of Section 1985(3) was confirmed in Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 267 (1993) ("Our precedents establish that in order to prove a private conspiracy in violation of the first clause of § 1985(3), a plaintiff must [show some racial or class-based animus].") (emphasis added).

In Federer v. Gerhardt, the Eighth Circuit applied this analysis, relying on Kush to hold that "plaintiffs are not required to show class-based animus as part of a support and advocacy claim under the second part of Section 1985(3)." See Federer v. Gephardt, 363 F.3d 754, 760 (8th Cir. 2004); see also McCord v. Bailey, 636 F.2d 606, 614 & n.12 (D.C. Cir. 1980) (finding meaning in the absence of language demanding "equal protection of the laws" in the first clause of Section 1985(2)). Cases from the Fourth Circuit do not necessarily contradict this conclusion, because those cases which have addressed Section 1985(3) claims either focus on the clauses related to equal protection, or do not explicitly distinguish between different portions of Section 1985(3).

For example, in Buschi v. Kirven, 775 F.2d 1240, 1257 (4th Cir. 1985), the Fourth Circuit held that "an action under Section 1985(3) consists of these essential elements: (1) a conspiracy of two or more persons; (2) who are motivated by a specific class-based, invidiously discriminatory animus; (3) to deprive the plaintiff of the equal enjoyment of the rights secured by the law to all; (4) and, which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." However, the court did not

distinguish between the portions of 1985(3), although the third element identified by the court (equal enjoyment) suggests a focus on the first clause of 1985(3).

Similarly, in Deressa v. Gobena, 2006 WL 335629 (E.D. Va. Feb. 13, 2006), the court explained that "to state a claim for a private conspiracy in violation of the first clause of 42 U.S.C. § 1985(3), a plaintiff must allege, *inter alia*, (1) the some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action, and (2) that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment." Id. at *5 (emphasis added). And in Shooting Point, LLC v. Cumming, 238 F. Supp. 2d 729 (E.D. Va. 2002), the court required an allegation that the acts of the defendants were motivated by class-based animus because "section 1985(3) prohibits conspiracies to deprive persons of the equal protection of the law." Id. at 739 (emphasis added). Again, the identification of "equal protection" suggests the court's analysis was focused on the first clause of Section 1985(3).

For these reasons, and for good cause shown, the Court finds that Plaintiffs have stated a claim under the "support and advocacy" clause of Section 1985(3), which unlike the equal protection part of Section 1985(3) does not require allegations of a race or class-based, invidiously discriminatory animus or violation of a separate substantive right.

*d. Defamation*

Under Virginia law, the necessary elements of the tort of defamation are "(1) publication of (2) an actionable statement with (3) the requisite intent." Chapin v. Knight–Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir.1993). To be actionable, a statement "must be both false and defamatory." Id. A written statement is per se defamatory when it alleges that an individual has committed a felony which he or she did not commit. Schnupp v. Smith, 457

S.E.2d 42, 46 (Va. 1995). Regarding the requisite intent requirement, both parties agree that the proper standard here is negligence, meaning that Defendants "either knew [the published statement] to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." Dragulescu v. Virginia Union Univ., 223 F. Supp. 3d 499, 508 (E.D. Va. 2016). In Virginia, a defendant acts negligently in failing to ascertain the facts on which a publication is based when they fail to investigate information that poses a substantial danger or risk of reputational injury to another. Richmond Newspapers, Inc. v. Lipscomb, 234 Va. 277, 288 (1987).

Here, all the elements of Virginia's defamation tort are satisfied. First, *Alien Invasion I* and *Alien Invasion II* were publications which listed Plaintiffs' names in the attached appendices of the reports. Compl. ¶ 42. Second, Defendants imputed felonious conduct to these individuals by inference in the reports. For example, Plaintiffs allege, "[*Alien Invasion I*] states clearly: The United States Attorney in Virginia has done nothing about the felonies committed by 433 aliens registering in Prince William County alone." Id. at ¶ 75 (internal quotation marks omitted). Last, Plaintiffs assert that Defendants cast aside warnings from Virginia elections officials about the falsehood of their reports on two separate occasions. Id. at ¶¶ 33-34. Defendants also fail to show that they conducted even a cursory investigation of the accuracy of the information they obtained from the registrars. Accordingly, Plaintiffs have sufficiently pled that Defendants had constructive knowledge of the falsity of the information.

With all elements met, the Court looks next at the two affirmative defenses raised by Defendants: (1) that Plaintiffs' defamation claims pertaining to *Alien Invasion I* are barred by Virginia's statute of limitations; and (2) that Defendants wield qualified immunity for their statements under Virginia's anti-SLAPP statute.

Virginia's statute of limitations for defamation is one year. Va. Code Ann. § 8.01-247.1 (West). The parties disagree over whether the defamation claims based on *Alien Invasion I*, which was published in September 2016, can be properly raised.[3] As noted in Dragulescu, "each of several communications to a third person by the same defamer is a separate publication," and "each successive publication of an old or preexisting defamatory statement gives rise to a new cause of action under Virginia law." 223 F. Supp. 3d at 508.

Defendants fail to rebut Plaintiffs' assertion that *Alien Invasion II* is effectively a successive publication of an old or preexisting defamatory statement (i.e., *Alien Invasion I*). Given the textual, thematic, and formalistic parallels between the two publications, the Court finds that *Alien Invasion II* qualifies as a "republication" for purposes of Plaintiffs' defamation claim. Accordingly, the limitations period does not bar Plaintiffs' action with respect to either report.

Finally, Defendants' Anti-SLAPP defense also fails because Defendants do not wield qualified immunity due to their constructive knowledge of the falsity of the information pertaining to the named Plaintiffs. The relevant portion of Virginia's Anti-SLAPP statute reads:

> The immunity provided by this section shall not apply to any statements made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false.

Va. Code Ann. § 8.01-223.2 (West). As discussed above, Plaintiffs sufficiently allege Defendants' awareness of the risk of the incorrectness of the voter registration data obtained from the county registrars. Accordingly, Plaintiffs' defamation claim can proceed.

## IV. Conclusion

---

[3] Both parties recognize that Plaintiffs' defamation claim based upon *Alien Invasion II*, which was published in May 2017, is not barred by the limitations period.

For these reasons, and for good cause shown, the Court hereby **DENIES** Defendants' Motion to Dismiss (Dkt. 30; 31). Defendants have fourteen (14) days from the date of this Order to file a responsive pleading.

**IT IS SO ORDERED.**

August 13 2018
Alexandria, Virginia

Liam O'Grady
United States District Judge