**ROIN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS - RICHMOND REGION COUNCIL 4614, ELIUD BONILLA, LUCIANIA FREEMAN, and ABBY JO GEARHART, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:18-cv-00423 (LO/IDD) |
| v. | ) ) | |
| PUBLIC INTEREST LEGAL FOUNDATION and J. CHRISTIAN ADAMS, | ) ) ) ) | |
| Defendants. | ) ) | |

## DECLARATION OF MICHAEL J. LOCKERBY

I, Michael J. Lockerby, hereby declare under penalty of perjury:

1.      I am a partner in the law firm of Foley & Lardner LLP, resident in the firm's Washington, D.C. office.  I have been a member of the Virginia State Bar since 1984, when I began practicing law in Richmond, Virginia as an associate with the law firm of Hunton & Williams, where I later became a partner.  In 2006, I became a partner in the law firm of Foley & Lardner LLP, resident in the firm's Washington, D.C. office.  Along with my colleagues at Foley & Lardner LLP listed as counsel of record in this matter, I represent the Defendants in this litigation, the Public Interest Legal Foundation ("PILF") and J. Christian Adams ("Mr. Adams").

2.      I make this Declaration to provide the Court with the discovery requests, responses, and objections—including correspondence, document production, and deposition testimony—that have led to the filing of Defendants' Motion to Compel Production of Documents and Testimony Relevant to Anti-SLAPP and First Amendment Issues Withheld or

Redacted by Plaintiffs' Counsel (Defendants' Motion to Compel"). In particular, the materials described in and attached to this Declaration, address the following subjects:

a. how Justin Levitt's involvement in this litigation first came to light in discovery;

b. Defendants' subsequent subpoena for documents and testimony served upon Professor Levitt and his employer, Loyola Law School;

c. the extensions of time for objecting and responding to these subpoenas that Defendants granted to counsel for Professor Levitt and Loyola Law School;

d. the objections to these subpoenas that were served—first by counsel for Professor Levitt and Loyola Law School, and later by counsel for the Southern Coalition for Social Justice and the Protect Democracy Project; and

e. the document production and deposition testimony[1] that led to the filing of Defendants' Motion to Compel.

**A. Professor Levitt's Involvement in This Litigation Was First Revealed in the Discovery Responses of Plaintiff Ms. Freeman.**

3. Although not identified in Plaintiffs' Initial Disclosures, Professor Levitt was identified in the written discovery responses of Plaintiff Luciania Freeman. In response to an interrogatory asking "when and how You became aware that Your name was included in the exhibits to either Report," Ms. Freeman responded that "she was first notified of the existence of the report and her name's inclusion in it via an email dated May 30, 2107 from a person named Justin Levitt." Ms. Freeman's subsequent document production included a series of emails to

---

[1] The complete transcript of the April 17, 2019 deposition of Justin M. Levitt is attached as **Exhibit 1** and cited by page and line number as "Levitt Tr." Exhibits to the deposition are cited by exhibit number as "Ex."

Ms. Freeman from Professor Levitt that he acknowledged were "unsolicited" and potentially an "unwelcome intrusion." These include emails from Professor Levitt to Ms. Freeman dated May 30, 2017, June 26, 2017, July 18, 2017, July 19, 2017, August 14, 2017, August 15, 2017, and August 16, 2017. (Freeman Ex. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10) (attached as **Exhibit 2**). Only then did Ms. Freeman agree to provide her contact information to SCSJ. SCSJ began contacting Ms. Freeman on August 23, 2017 but did not have any substantive conversations until October 30, 2017. (Freeman Ex. 14) (attached as **Exhibit 3**). At her deposition, Ms. Freeman testified at length regarding her communications with Professor Levitt before she was ultimately "referred" to SCSJ by Professor Levitt. (Freeman Tr. 32:9-14, 33:1-25, 35:22-25, 36:1-4, 39:10-41:1, 74:24-75:1, 80:8-11) (excerpts attached as **Exhibit 4**.)

**B.    Following Ms. Freeman's Deposition, Defendants Subpoenaed Documents and Deposition Testimony from Professor Levitt and Loyola Law School.**

4.    On March 12, 2019, Defendants served Plaintiffs' counsel—including SCSJ and Protect Democracy—with copies of the Levitt and Loyola Document Subpoenas and the Levitt Deposition Subpoena. The foregoing subpoenas were served on Professor Levitt and Loyola Law School on March 14, 2019. The documents subpoenaed included: "All Communications with and information received from the Southern Coalition for Social Justice, Protect Democracy Project, Emery Celli Brinckerhoff & Abady LLP, and/or Skadden Arps Slate Meagher & Flom, including from attorneys, employees, or staff thereof, relating to Mr. Adams, PILF, the Reports, election law, voter registration, voter fraud, and/or this Litigation."

**C.    PILF and Mr. Adams Granted Professor Levitt and Loyola Law School An Extension For Objecting and Responding to the Document Subpoenas.**

5.    The subpoena called for production of responsive documents by March 29, 2019. I agreed to allow Professor Levitt and Loyola Law School an extension of time for production of documents until April 8, 2019 if their objections were served by March 29, 2019. Based on that

understanding, I confirmed with counsel for Professor Levitt and Loyola Law School that the deposition would proceed as noticed on April 17, 2019. The foregoing understandings were memorialized in the March 29, 2019 email from counsel for Professor Levitt and Loyola Law School attached as **Exhibit 5**, which also set forth the objections to the subpoenas asserted by Professor Levitt and Loyola Law School.

      **D.**      **On April 1, 2019, Counsel for SCSJ and Protect Democracy Claimed the Right to Withhold Subpoenaed Documents on Work Product Grounds.**

      6.      Beginning on April 1, 2019, I had a series of written communications with Thomas E. Gorman, Esq. at the law firm of Keker, Van Nest & Peters LLP in San Francisco. Mr. Gorman stated that he had been retained by SCSJ and Protect Democracy to assert work product objections to the production of Professor Levitt's communications with these law firms. Our written communications that week included the following:

      a.      the April 1, 2019 2:54 p.m. email and correspondence from Mr. Gorman, counsel for SCSJ and Protect Democracy, to me, attached as **Exhibit 6**;

      b.      the April 1, 2019 3:49 p.m. email from me to Mr. Gorman attached as **Exhibit 7**;

      c.      the April 1, 2019 9:45 p.m. email from Mr. Gorman to me attached as **Exhibit 8**;

      d.      the April 2, 2019 9:41 p.m. email from Mr. Gorman to me attached as **Exhibit 9**;

      e.      the April 2, 2019 11:33 p.m. email from me to Mr. Gorman attached as **Exhibit 10**;

f.    the April 3, 2019 11:27 a.m. email from Mr. Gorman to me attached as **Exhibit 11** in which he articulated the basis for the work product claim ("Professor Levitt collaborated with my clients on a few issues related to the pre-filing of this lawsuit.");

g.    the April 4, 2019 7:07 p.m. email from Mr. Gorman to me attached as **Exhibit 12**;

h.    the April 4, 2019 7:40 p.m. email from me to Mr. Gorman attached as **Exhibit 13**;

i.    the April 4, 2019 11:49 p.m. email from me to Mr. Gorman attached as **Exhibit 14**;

j.    the April 5, 2019 10:59 a.m. email from Mr. Gorman to me attached as **Exhibit 15**; and

k.    the April 5, 2019 11:09 a.m. email from me to Mr. Gorman attached as **Exhibit 16**.

7.    Thereafter, on April 5, 2019, Mr. Gorman and I spoke but were unable to resolve the work product claims asserted by Plaintiffs' counsel.  That discussion was followed by the following written communications:

a.    the April 5, 2019 2:01 p.m. email from Mr. Gorman to me attached as **Exhibit 17**;

b.    the April 5, 2019 2:06 p.m. email from me to Mr. Gorman attached as **Exhibit 18**; and

c.    the April 5, 2019 email from Mr. Gorman to me and accompanying privilege log attached as **Exhibit 19**.

**E.** **Professor Levitt's Document Production and Deposition Testimony Reflect a Coordinated PR Effort to Discredit PILF, Mr. Adams, and the Reports.**

8. The document production and deposition testimony of Professor Levitt show the following:

a. Professor Levitt has long had an adversarial relationship with Mr. Adams and PILF and has been monitoring their activities for quite some time.

b. The day after publication of the *Alien Invasion II* report, Professor Levitt began sending hundreds of emails to Virginia voters trying to find someone identified as a non-citizen in the Virginia voter registration rolls who was in fact a citizen and was willing to "talk to reporters" to help "debunk the report." These efforts intensified once Mr. Adams was appointed to the Presidential Commission on Electoral Integrity ("PACEI") in July 2017.

c. Professor Levitt kept others in academia, the news media, and various interest groups apprised on a regular basis of his communications with the Virginia voters with whom he was communicating while privately telling at least one compatriot that some of the Virginia voters that he contacted were non-citizens.

d. Professor Levitt did not have an attorney-client relationship with the Virginia voters whose communications he now asserts were privileged, they did not seek his legal advice, and he did not provide them with legal advice.

e. The communications with Virginia voters that Professor Levitt now claims were privileged were apparently shared with the attorneys at SCSJ and Protect Democracy who now claim work product immunity with respect to these communications.

f. Professor Levitt concedes that Plaintiffs' theory of liability in this case is unprecedented and has shared Plaintiffs' theory in communications with third parties with whom he has no attorney-client privilege or work product immunity.

An expanded discussion of the foregoing evidence follows.

### 1. Professor Levitt's Adversarial Relationship with Mr. Adams, PILF, and PILF Board Member Hans von Spakovsky.

9. Professor Levitt's deposition testimony and various exhibits that were introduced at his April 17, 2019 deposition reveal an adversarial relationship—both personal and professional—between Mr. Adams and Professor Levitt dating back for quite some time. During the time that Professor Levitt served in the Civil Rights Division of the U.S. Department of Justice ("DOJ"), Mr. Adams and a member of PILF's Board of Directors, Hans von Spakovsky, authored a series of articles that were critical of the conduct of Professor Levitt and several of his colleagues at the Department of Justice (Levitt Tr. 55:25-59:8; Ex. 13, 14, 15.).[2] Both before and after his departure from the Department of Justice, Professor Levitt kept track of PILF's activities. For example, on April 11, 2016—while still at the Department of Justice— Professor Levitt forwarded himself various court filings by PILF in the Eastern District of Virginia and the Eastern District of Pennsylvania. (Levitt Tr. 90:2-91:14, Ex. 26). Professor

---

[2] Examples include the May 19, 2014 Heritage Foundation Commentary by Hans A. von Spakovsky and J. Christian Adams entitled "The Con Job on Voting-Rights Cases" attached as **Exhibit 20**; the February 5, 2015 *PJ Media* Article by J. Christian Adams entitled "Obama and Holder Cry Wolf on Voting Rights" attached as **Exhibit 21**; the October 5, 2015 *PJ Media* Article by J. Christian Adams entitled "Former DOJ Head Michael Mukasey Hits Obama's DOJ Voting Section" attached as **Exhibit 22**; and the April 6, 2016 *PJ Media* Article by Hans A. von Spakovsky and J. Christian Adams entitled "Exclusive: Meet the Radical Lawyers the DOJ Hired to Oversee Elections" attached as **Exhibit 23**. Professor Levitt is among the alleged "radical lawyers" to whom the headline in the latter article refers. *See also* the March 11, 2017 *PJ Media* Article by Mr. Adams entitled "Federal Judge Blasts Unprofessional Behavior of Justice Department Lawyers" (https://pjmedia.com/jchristianadams/2017/03/11/federal-judge-blasts-unprofessional-behavior-of-justice-department-lawyers/) attached as **Exhibit 24**.

Levitt's document production included multiple briefs filed by PILF in various courts. These included a U.S. Supreme Court *amicus* brief filed by PILF that presented evidence and argument in support of various propositions, including that "Noncitizens are registering and voting" and that DOJ "has failed to enforce noncitizen voting prohibitions."[3] The Supreme Court brief filed by PILF mentioned Mr. Adams, PILF board member Hans von Spakovsky, and former Ohio Secretary of State Kenneth Blackwell, whom PILF has retained as an expert in this case. (Levitt Tr. 82:11-89:9, Ex. 25).

10. Of various reports that PILF has recently published on the subject of non-citizen voting, the first—*Alien Invasion I*—predated Professor Levitt's departure from the Justice Department the day before Inauguration Day, 2017. Professor Levitt's document production included not only the *Alien Invasion I* and *Alien Invasion II* reports at issue in this litigation but also several of PILF's subsequent publications about noncitizen voting.[4]

---

[3] Brief of the American Civil Rights Union as *Amicus Curiae* in *Kobach v. United States Election Assistance Commission*, No. 14-1164 (April 11, 2015).

[4] The other PILF reports contained in Professor Levitt's document production included the 2016 publication entitled *Aliens & Felons: Thousands on the Voter Rolls in Philadelphia*; the September 11, 2017 publication entitled *Garden State Gotcha: How Opponents of Citizenship Verification for Voting Are Putting New Jersey's Noncitizens at Risk of Deportation* (https://publicinterestlegal.org/files/Garden-State-Gotcha_PILF.pdf), and the August 2018 publication entitled *Safe Spaces: How Sanctuary Cities Are Giving Cover to Noncitizens on the Voter Rolls* (https://publicinterestlegal.org/files/Safe-Spaces_Final.pdf). The documents related to *Garden State Gotcha* that Professor Levitt produced accounted for more than half of his total production.

### 2. **Professor Levitt's Communications with Virginia Voters to Try to "Debunk the Report" and Discredit Mr. Adams, PILF, and PACEI.**

11.     PILF's efforts on behalf of electoral integrity contradict the longstanding position of Professor Levitt and others that non-citizen voting is a "myth." Professor Levitt's document production and deposition testimony show that, when *Alien Invasion II* was published, he and a network of others in academia, various interest groups, and the news media were poised to try to discredit its findings through a coordinated effort of which Professor Levitt's emails to Virginia voters were an integral part. In this regard, the communications with Virginia voters for which SCSJ and Protect Democracy now try to claim work product immunity were—according to Professor Levitt's notes at the time—intended to "debunk the report" and persuade various Virginia voters who had been identified as non-citizens in the records accompanying the report to talk to reporters. (Levitt Tr. 110:4-135:20; Ex. 32, 33). Professor Levitt's communications with Virginia voters and his communications about these communications with others are described in the paragraphs that follow.

12.     PILF's May 2017 *Alien Invasion II* report was embargoed until 11:00 p.m. on May 29, 2017. The morning of May 30, 2017, Professor Levitt began sending hundreds of virtually identical emails to Virginia voters identified in certain public records that comprised one of the exhibits to *Alien Invasion II* report. On May 30, 2017, some of these Virginia voters received an email from Professor Levitt in which he identified himself as "a law professor in Los Angeles," stating that "some of my research concerns elections and voting, and it's in that capacity that I am reaching out." (Levitt Tr. 110:4-135:20; Ex. 32, 33). Professor Levitt's email stated that "there's a fair amount in the report that appears to be flatly incorrect, and it is possible that you have been caught up in a "mistake." (Levitt Tr. 110:4-135:20; Ex. 32, 33).

13.     When these voters had not responded by June 26, 2017, Professor Levitt sent many of these same voters an email "following up once more on my note below" in which he stated in part:

> Your name was mentioned in a recent report distributed by a nonprofit group, implying that you may not be a US citizen. There have been concerns about the accuracy of the report, and it is possible that you have been caught up in a mistake.

(Levitt Tr. 110:4-135:20; Ex. 32, 33).  Professor Levitt's June 26, 2017 email stated that "I am one of several individuals looking into the claims in the report."  According to Professor Levitt's April 17, 2019 deposition testimony, the other "individuals looking into the claims in the report" were reporters.  (Levitt Tr. 100:19-101:4).

14.     Following President Trump's July 10, 2017 appointment of Mr. Adams to PACEI, Professor Levitt renewed his efforts to find Virginia voters to help him debunk the report.  On July 18, 2017, Professor Levitt sent follow-up emails to the Virginia voters he had previously contacted in which he stated: "Several people have contacted me to let me know that the report's information was not accurate, and to find out what they could do about it."  (Levitt Tr. 110:4-135:20; Ex. 32, 33).  Professor Levitt's July 18, 2017 email also stated: "One of the people responsible for the report has just been appointed to a controversial national voting advisory body, and so I'm afraid that the allegations about you may become more prominent."  (Levitt Tr. 110:4-135:20; Ex. 32, 33).

15.     That same day, July 18, 2017, Professor Levitt sent another series of emails to Virginia voters whom he had not previously contacted, stating in pertinent part:

> A nonprofit group recently put out a report about voter registration by noncitizens.  Your information was published in connection with the report, implying that you registered while not a US citizen.

I'm a law professor looking into the report's allegations. Quite a few people have told me already that their information is <u>not</u> correct, and they are understandably quite upset about it. Moreover, one of the people responsible for the report has just been appointed to a national voting advisory body, and so I'm afraid that the report may become even more prominent than it has been.

Specifically, I'm trying to track down the source of the incorrect information in the report. I apologize for being the bearer of unwelcome news, but I'm also hoping that you'd be willing to talk to me for just a bit. (If you're willing, I can send the pages of the report that have to do with your information in particular.)

My faculty webpage is at http://www.lls.edu/faculty/listl-r/levittjustin/, in case you want more information about me, or just want to confirm that this email is not spam.

I know that this is an unusual request, and I apologize for any unwelcome intrusion. I really don't mean to cause any alarm. But if the information in the report is incorrect, I'd like to be of assistance in making that clear, and doing what I can to set things straight. And so if you're willing to talk to me, I'd welcome the chance to talk to you just a bit. I would be happy to keep the conversation confidential if you prefer.

(Levitt Tr. 110:4-135:20; Ex. 32, 33). Professor Levitt sent follow-up emails to these Virginia voters, along with others whom he had contacted, in August and September, 2017. (Levitt Tr. 110:4-135:20; Ex. 32, 33).

16.     By his own admission, Professor Levitt was aware of the list of Virginia voters whose registrations had been "cancelled-declared noncitizens"—sometimes referred to as the "VERIS report."[5]  (Levitt Tr. 93:7-93:12).  This list, attached as Exhibit 1 to the *Alien Invasion II* report, was the basis for the report's claim that "5,556 non-citizens have been removed from the rolls for citizenship problems in 120 of Virginia's 133 voting jurisdictions since 2011."  (Dkt.

---

[5] VERIS is an acronym for the Virginia Election Registration and Information System maintained by the Virginia Department of Elections.

#1-2) (p. 6 of 25).  But Professor Levitt did not use this list to identify the Virginia voters to whom he sent emails.  Instead, he sent the emails to Virginia voters named in records that certain Virginia registrars had provided to PILF in lieu of the "cancellation-declared noncitizen" reports that PILF had previously requested.[6]  Certain registrars had provided these records because the Virginia Department of Elections had directed them not to turn over the "cancellation-declared noncitizen" reports that, under the NVRA, PILF had the right to inspect.  By the time of the *Alien Invasion II* report, the Virginia Department of Elections had finally relented and turned over the "cancellation-declared noncitizen" VERIS report that PILF had previously requested.

17.  Before publishing the VERIS report attached as Exhibit 1 to *Alien Invasion II*, PILF verified its accuracy with the Virginia Commissioner of Elections himself, Edgardo Cortes. By email dated April 4, 2017, Commissioner Cortes wrote PILF as follows:

> This report shows individuals that were cancelled due to self-reported non-citizen status and failed to complete an affirmation of citizenship in the allotted time frame and continue to be in cancelled status.  If an individual was previously cancelled and then subsequently affirmed citizenship and was re-registered, they would no longer appear on this report because they would now be on active status.

(Dkt. # 66-2).  To this day, discovery has revealed only two "false positives" in the VERIS report.  One was Plaintiff Eliud Bonilla, who—although he had previously "self-reported non-citizen status"—had in fact "subsequently affirmed citizenship and was re-registered."  (Bonilla Tr. 41:10-44:14, 45:9-46:11; Bonilla Ex. 6, 7).  The second was Maureen Erickson, who—although the VERIS report showed her living in Guatemala and having had her registration cancelled in Prince William County—was in fact a U.S. citizen and had lawfully re-registered in Loudoun County.  (Cortes Ex. 39, 40).  Commissioner Cortes' successor, Chris Piper—the

---

[6] These records comprised Exhibit 12 to *Alien Invasion II*.

current Virginia Commissioner of Elections—testified on April 19, 2019 that he himself was unaware until *this month* that the VERIS report would contain such false positives—and that no one else could have reasonably known that at the time.[7]  Notwithstanding his own April 4, 2017 email vouching for the VERIS report, Commissioner Cortes later cited the example of Maureen Erickson in correspondence to the Virginia General Assembly to try to discredit the entire *Alien Invasion II* report.  (**Exhibit 25**).  During the time that Professor Levitt was sending hundreds of emails to Virginia voters trying to find someone whom Virginia elections officials had incorrectly declared to be a non-citizen, Professor Levitt and those with whom he was collaborating at the time similarly cited the example of Maureen Erickson to cast doubt about the entire report.[8]  (Levitt Tr. 177:24-179:8; Levitt Ex. 34, 35).

18.    In his email and other communications with Virginia voters, Professor Levitt did not mention the April 4, 2017 email from Commissioner Cortes.  At his April 17, 2019 deposition, Professor Levitt claimed to have been unaware of the April 4, 2017 email from Commissioner Cortes (Levitt Tr. 96:9-98:2)—even though it is quoted in the *Alien Invasion II* report attached as Exhibit B to Plaintiffs' Complaint and reproduced in its entirety as Exhibit 2 to the *Alien Invasion II* report.  (Dkt. #1-2).  Nor did Professor Levitt send his emails to voters named in the "cancellation-declared noncitizen" reports from VERIS.  Instead, Professor Levitt sent his emails to voters identified in records that PILF cited for the following demonstrably true

---

[7] The relevant excerpts of the draft transcript of the Rule 30(b)(6) deposition of the Virginia Department of Elections, along with the relevant document produced contemporaneously at that deposition, are attached as **Exhibit 25.**

[8] The documents produced by Professor Levitt included a June 2, 2016 article from Progress VA (LevLoy-00000018) entitled "Fake 'Voter Fraud' Report Debunked By Woman Featured in Front Page Article" that was marked as Exhibit 35 to his deposition.

proposition: "For the remaining 702 non-citizen registrants, getting on the voter rolls was as easy as checking 'yes' to the citizenship question."[9] (Dkt. #1-2) (p. 17 of 25).

19. At some point in the process, Professor Levitt prepared two sets of notes reflecting his communications with Virginia voters, only one of whom is among the three individual named Plaintiffs. With respect to several of the other voters, Professor Levitt made annotations regarding the individual's willingness to help "debunk the report" and "talk to reporters," including the following:

| Virginia Voter | **Comments in Levitt. Ex. 32** | **Comments in Levitt. Ex. 33** |
|---|---|---|
| "ATG" | "OK with using his name in connection with debunking the report, doesn't want to talk to reporters." | "He's OK with using his name in connection with debunking the report, doesn't yet want to talk to reporters. He's pissed off." |
| "RL" | "OK with using name in connection with debunking report." | "OK with using name in connection with debunking the report." |
| "FL" | "Not OK with using name, OK with describing story." | "Not using name, OK with describing story." |
| "KC" | "OK with using story but not name." | "OK with using story but not name." |
| "MK" | "OK with talking about situation, but not using name." | "OK with talking about situation, but not using name." |
| "BW" | "OK with using name in connection with debunking the report." | "OK with using name in connection with debunking the report." |
| "CW" | "He's OK with using his name in connection with debunking the report." | "He's OK with using his name in connection with debunking the report." |

(Levitt Tr. 110:4-135:20; Ex. 32, 33).

---

[9] Unfortunately, certain local registrars had included in the documents provided to PILF that comprised the original Exhibit 12 to the *Alien Invasion II* report records related to some voters—such as Plaintiff Abby Jo Gearhart and Former Plaintiff Jeanne Rosen—who had previously been declared non-citizens, but later affirmed their citizenship. PILF removed these records as soon as the error was brought to its attention.

20.     Exhibit 33 also contained the following text of the emails that Professor Levitt

sent after Mr. Adams' appointment to PACEI:

> A nonprofit group recently put out a [HYPERLINK
> "https://publicinterestlegal.org/files/Alien-Invasion-II-
> FINAL.pdf"] about voter registration by noncitizens. Your
> information was published in connection with the report, implying
> that you registered while not a US citizen.
>
> I'm a law professor looking into the report's allegations. Quite a
> few people have told me already that their information is not
> correct, and they are understandably quite upset about it.
> Moreover, one of the people responsible for the report has just
> been appointed to a national voting advisory body, and so I'm
> afraid that the report may become even more prominent than it has
> been.
>
> Specifically, I'm trying to track down the source of the incorrect
> information in the report. I apologize for being the bearer of
> unwelcome news, but I'm also hoping that you'd be willing to talk
> to me for just a bit. (If you're willing, I can send the pages of the
> report that have to do with your information in particular.)
>
> My faculty webpage is at http://www.lls.edu/faculty/faculty.listl-
> r/levittjustin in case you want more information about me, or just
> want to confirm that this email is not spam.
>
> I know that this is an unusual request, and I apologize for any
> unwelcome intrusion. I really don't mean to cause any alarm. But
> if the information in the report is incorrect, I'd like to be of
> assistance in making that clear, and doing what I can to set things
> straight. And so if you're willing to talk to me, I'd welcome the
> chance to talk to you just a bit. I would be happy to keep the
> conversation confidential if you prefer.
>
> Thank you very much for your time and consideration.

(Levitt Tr. 129:3-130:8).

21. Professor Levitt also testified as follows with respect to the following statements in the foregoing text:

| Professor Levitt's Statement in Email Text | Professor Levitt's Deposition Testimony |
|---|---|
| "Quite a few people have told me already that their information is <u>not</u> correct, and they are understandably quite upset about it." | Professor Levitt could not recall how many people had told him this when he drafted the email but stands by the statement, while conceding that only one—Luciania Freeman—is among the Plaintiffs in this case.  (Levitt Tr. 130:9-22). |
| "Specifically, I'm trying to track down the source of the incorrect information in the report." | While denying that this was a false statement, Professor Levitt admitted that he never contacted the Virginia Department of Elections, claiming that he "attempted to" contact certain local registrars but cannot recall which ones, and admitted that he never submitted NVRA or FOIA records requests to local registrars.   (Levitt Tr. 130:23-133:5) |

22. During the time that Professor Levitt was trying to find Virginia voters who might be willing to—in his own words—help "debunk the report" and "talk to reporters," he kept various individuals apprised of what he was doing and what he was finding out as he and others worked to obtain news coverage that would discredit the report, Mr. Adams, and the PACEI to which Mr. Adams had been appointed, as set forth in the paragraphs that follow.

### 3. Professor Levitt's Efforts to Publicize His Communications with Voters, and His Private Admissions About What the Voters Said.

23. The list of individuals with whom Professor Levitt had been sharing the progress of his efforts to discredit the *Alien Invasion II* report, Mr. Adams, PILF, and PACEI—including his communications with Virginia voters—was so extensive that, in advance of his deposition, Professor Levitt felt obliged to notify more than 15 people about the fact that these communications had come to light.  These individuals included the following:

a. Rick Hasen, whom Professor Levitt described as a former "colleague at Loyola Law School" and "an individual in the election and voting rights field" who was the subject of critical articles published by Mr. Adams.[10]

b. Rick Pildes, a law professor at NYU and fellow member of Election Law Blog.org to whom Professor Levitt wrote: "I've never attempted to quantify the number of noncitizens on the rolls or those who have voted." Professor Levitt's February 13, 2017 email to Professor Pildes also contained a link to PILF's *Alien Invasion I* report with the comment: "Discussions in this arena tend toward hysteria."[11]

c. "Hako Lines, [phonetic]."

d. Jane Timm, a reporter at NBC News whose email exchanges with Professor Levitt included an August 10, 2017 email from Ms. Timm in which she wrote: "Hi again. Your publicist just tried to send me your way while I was typing this e-mail. Small voting rights world, eh? I'm profiling Christian Adams as a way into the lawsuits-to-purges story. Got time to chat this afternoon or tomorrow?"[12]

e. Pema Levy, a reporter at *Mother Jones* with whom Professor Levitt compared notes about their conversations with Virginia voters mentioned in exhibits to the *Alien Invasion II* report.[13]

---

[10] Levitt Tr. 59:15-60:22.

[11] Levitt Tr. 139:5-141:21, Ex. 34. The first two pages of Levitt Ex. 34 reflecting this email exchange are attached as **Exhibit 26**.

[12] Levitt Tr. 200:16-203:6; Ex. 34. The August 10, 2017 email exchanges with Ms. Timm contained in Levitt Ex. 34 are attached as **Exhibit 27**.

[13] Levitt Tr. 173:16-174:11; Ex. 34. Professor Levitt's email exchanges with Pema Levy are attached as **Exhibit 28.**

f.  Caroline Frederickson, the Executive Director of the American Constitution Society, one of the recipients of an August 7, 2018 email in which Professor Levitt explained the unprecedented theories under which Plaintiffs in this case seek to hold PILF and Mr. Adams responsible for violations of the Voting Rights Act and the Ku Klux Klan Act.[14]

g.  "One of the individuals at *Slate*.  I honestly cannot remember which," Professor Levitt and Rick Hasen exchanged a series of emails beginning July 10, 2017—following Mr. Adams' appointment to PACEI—regarding a potential posting on *Slate* that would discuss Professor Levitt's communications with Virginia voters.[15]

h.  Vanita Gupta, the former Deputy Assistant Attorney General for Civil Rights to whom Professor Levitt reported at the Department of Justice, now President and CEO of the Leadership Conference on Civil and Human Rights.  Following Mr. Adams' appointment to PACEI, Professor Levitt ghostwrote a *New York Times* column for Ms. Gupta—which he characterized as "over the top"—that was originally entitled "On the Eve of the Purges."  That referred to the "myth of voter fraud" and to Mr. Adams' "vigilante frenzy."  Privately, however, Professor Levitt told Ms. Gupta—with respect to the Virginia voters whom he had been contacting—"I know some of them weren't eligible."[16]

i.  "other individuals at Loyola Law School,"

---

[14] Levitt Tr. 208:11-220:2; Ex. 34, 38.

[15] Levitt Tr. 166:10-173:15; Ex. 34.

[16] Levitt Tr. 22:20-24:1, 179:10-191:3; Ex. 34, 39, 40.

j.　"one of the individuals at SKDK," referring to a public relations firm with which Professor Levitt exchanged emails on the subject "NBC News Inquiry: J. Christian Adams Profile," in response to which Professor Levitt volunteered to discuss Mr. Adams. [17]

k.　David Becker, "a former Justice Department official," who was among the recipients of Professor Levitt's August 16, 2017 email regarding "[Voting Facts]: NBC and Justin's comments." (attached as **Exhibit 29**).[18]

l.　Ed Pilkington, a reporter for *The Guardian* who sent Professor Levitt an email on June 15, 2017 stating that "I'm doing some work on the voter suppression group PILF, Public Interest Legal Foundation," "I'm trying to find out more about the group, and its head J Christian Adams," and "I was kindly given your details by Rick Hasen who suggested you would be a great person to talk to." By email dated September 23, 2018, Mr. Pilkington thanked Professor Levitt for his help with "a piece I was putting together on Pilf and its egregious Alien Invasion publications" and included a hyperlink. (Levitt Ex. 34) (emails attached as **Exhibit 30**).

m.　Pam Fessler at NPR News with whom Professor Levitt exchanged emails on February 14, 2019 regarding "noncitizen voter question."[19]

24.　Beginning in May 2017, Professor Levitt kept others in academia, the news media, and interest groups apprised of his efforts to find Virginia voters who would help discredit the report, Mr. Adams, PILF, and PACEI. These communications grew in intensity following Mr. Adams' appointment to PACEI on July 10, 2017.

25.　These communications include the following:

---

[17] Levitt Tr. 200:16-202:18.

[18] Levitt Tr. 204:1-6; Ex. 34.

[19] Levitt Tr. 220:18-222:10; Ex. 34.

a.      On May 30, 2017, Professor Levitt exchanged emails with Cameron Bell, a former colleague at DOJ now with an organization called Demos that has litigation adverse to PILF.  Referencing the *Alien Invasion II* report, Ms. Bell stated: "It definitely threw a wrench in my morning."  By the following day, June 1, 2017, Professor Levitt had already told Ms. Bell about his emails to Virginia voters, stating: "Sadly, no response to my emails just yet."  As of June 1, 2017, Professor Levitt had already told others about his emails to Virginia voters but can't recall to whom he had divulged this information. (Levitt Tr. 136:13-139:4; Ex. 34).[20]

b.      On June 27, 2017, Professor Levitt told Cameron Bell that "I've got a few folks writing me back who are emphatically citizens."  (Levitt Tr. 145:3-146:23; Ex. 34).[21]

c.      On June 29, 2017, Professor Levitt Ms. Bell responded: "Interesting.  Do they want to sue?  A certain lawyer who has a different defamation/challenge case said we should co-counsel again before I leave for DOJ."  The "certain lawyer" to whom Ms. Bell referred was Allison Riggs at SCSJ, counsel for Plaintiffs in this case.  (Levitt Tr. 152:8-153:25; Ex. 34).[22]

d.      On June 29, 2017, Professor Levitt was quoted in a ProPublica online article as being critical of the commission, PACEI, to which Mr. Adams was appointed soon thereafter.  Mr. Adams' appointment to PACEI concerned Professor Levitt, as did

---

[20] The May 30 and June 1, 2017 email exchanges between Professor Levitt and Ms. Bell found in Levitt Ex. 34 are attached as **Exhibit 31**.

[21] The June 27 and June 29, 2017 email exchanges between Professor Levitt and Ms. Bell found in Levitt Ex. 34 and attached as **Exhibit 32**.

[22] Levitt Ex. 38 is attached as **Exhibit 33**.

the appointment of PILF board member Hans von Spakovsky and Kenneth Blackwell, the former Ohio Secretary of State who is serving as an expert witness for Defendants in this case. (Levitt Tr. 154:8-163:13; Ex. 36, 37).

      e.      On July 10, 2017, upon the appointment of Mr. Adams, Professor Levitt tweeted that Mr. Adams had published claims knowing they were unreliable and that "I've spoken to serval of the people named. They're citizens and really upset." (Levitt Tr. 163:14-166:9; Ex. 38).

      f.      On July 10 and 11, 2017, Professor Levitt exchanged emails with Rick Hasen and two individuals at *Slate* about the possibility of a posting on *Slate* about Professor Levitt's communications with Virginia voters. (Levitt Tr. 166:10-173:15; Ex. 34).[23]

      g.      On July 11, 2017, Professor Levitt exchanged emails with *Mother Jones* reporter Pema Levy on the subject "J. Christian Adams Report." (Levitt Tr. 173:16-147:11, Ex. 34).

      h.      On July 12, 2017, Professor Levitt and Mr. Adams exchanged tweets about *Alien Invasion II* report. (Levitt Tr. 175:14-25, Ex. 33). In an email exchange on July 12, 2017, Professor Levitt explained to Cameron Bell what he had been trying to accomplish in his exchange with Mr. Adams: "I'm trying to get what I can get him to say about knowledge and intent; but sadly, I think our Twitter war petered out." (Levitt Tr. 174:20-177:5, Ex. 34).[24]

---

[23] The July 10, and 11, 2017 email exchanges contained within Levitt Ex. 34 are attached as **Exhibit 34**.

[24] Professor Levitt's July 12, 2018 email exchange with Ms. Bell found in Levitt Ex. 34 is attached as **Exhibit 35**.

i.       On August 16, 2017, Professor Levitt posted comments to "Voting Facts@GoogleGroups.com," which Professor Levitt described as "a number of individuals concerned with responding factually and moderately and providing underlying data and context for overcharged claims of many different kinds with respect to election administration."  Professor Levitt's comments that day regarding Mr. Adams and PACEI included the following: "To David [Becker]'s rhetorical point on bad matching leading to law-abiding citizens being accused of fraud, this is where Christian Adams' presence on the commission may be useful because he's discouraging and sloppy in this respect."  (Levitt Tr. 203:7-205:16; Ex. 34)[25]

j.       On August 28, 2017, Professor Levitt posted to the VotingFacts@GoogleGroups.com listserv the email attached as **Exhibit 36** stating:

> Purely FYI, I also spoke to Jane [Timm] for the NBC story, not least because I've spoken to some of the people that Adams falsely labeled criminals.  I've not yet been able to convince those people I've spoken to come forward; there is an effort underway, including some of the people involved in this lawsuit, to do so in a way that highlights Adams' reckless sloppiness.  It's still in the early stages, but I'm happy to keep you appraised as that develops in any way that I can share publicly.

(Lev. Tr. 205:17-207:2; Ex. 34)

26.      Between July 14 and July 18, 2017, Professor Levitt and Vanita Gupta exchanged a series of emails about a column written by Professor Levitt under Ms. Gupta's byline that was eventually published in the *New York Times*.  (Levitt Tr. 179:10-180:19, Ex. 34).[26]  The draft article was critical of PILF, Mr. Adams, and the *Alien Invasion II* report—accusing Mr. Adams

---

[25] The pages of Levitt Ex. 34 that comprise Professor Levitt's August 16, 2017 email are attached as **Exhibit 29.**

[26] These email exchanges from Levitt Ex. 34 are attached as **Exhibit 37**.

of being in a "vigilante frenzy." It was also critical of Messrs. von Spakovsky and Blackwell. With respect to the *Alien Invasion II* report, the draft stated that "J. Christian Adams published personal information about specific people he wrongly accused of committing multiple felonies in a deeply flawed hunt for apparent fraud." Professor Levitt struck the following verbiage that Ms. Gupta had added: "In fact, they were all eligible American voters." He commented as follows: "They weren't all eligible. I know some of them weren't eligible. Indeed, some said they weren't eligible; and I don't actually know how many of them were eligible. I just know some of them weren't eligible because I talked to a few who were eligible." (Levitt Tr. 181:1-191:3, Ex. 39 (attached as **Exhibit 38**).

27.     Professor Levitt's knowledge of facts contrary to public proclamations that non-citizen voting is a "myth" is not limited to Virginia. Professor Levitt's document production was replete with records showing voters in various jurisdictions, including California and Georgia, who had registered to vote even though they were not citizens and then voted in a series of elections—in some cases for as long as a decade—before their registrations were cancelled. (Levitt Tr. 61:16-82:10; Ex. 16, 17, 18, 19, 20, 21, 22, 23, 24). Professor Levitt also conceded that:

> a.     Non-citizens who had previously registered to vote sometimes cancelled their voter registrations voluntarily because their prior voter registration may make it more difficult to obtain permanent residency or citizenship. (Levitt Tr. 72:9-73:11, Ex. 19).

b.  In some states, the courts notify election officials when a potential juror is determined to be a non-citizen.[27]  (Levitt Tr. 73:12-77:6, Ex. 20).

c.  In many states, non-citizens can obtain a driver's license by presenting documents—such as green cards—that could help establish that a registered voter is not a citizen.[28]  (Levitt Tr. 77:8-78:18).

d.  In many states, non-citizens are eligible for and receive certain types of public benefits, but not every state registrar has access to information about the payment of such benefits to non-citizens.[29]  (Levitt Tr. 79:3-80:2).

---

[27] Until the election of Governor McAuliffe, the Virginia Department of Elections Annual List Maintenance Report expressed the intention to do the following: "ELECT will also be issuing a letter to the clerks of the courts in Virginia that, among other things requests that they grant access to the general registrars the list of potential jurors who declare themselves to not be a citizen." (Annual List Maintenance Report, July 1, 2013 – June 30, 2014, attached as **Exhibit 39**).  Thereafter, the foregoing verbiage was deleted from the List Maintenance Report.  *See* Virginia Department of Elections Annual List Maintenance Report, July 1, 2014 – June 30, 2015, attached as **Exhibit 40**.  Governor McAuliffe vetoed legislation that would have required Virginia state courts to retain and provide this information to general registrars. *See* HB 1315, Virginia's Leg. Info. Sys., https://lis.virginia.gov/cgi-bin/legp604.exe?151+sum+HB1315.

[28] By statute, the Virginia DMV is directed to "furnish monthly to the Department of Elections a complete list of all persons who have indicated a noncitizen status to the Department of Motor Vehicles in obtaining a driver's license, commercial driver's license, temporary driver's permit, learner's permit, motorcycle learner's permit, special identification card, or renewal thereof issued pursuant to the provisions of Chapter 3 (§ 46.2-300 et seq.) of Title 46.2. The Department of Elections shall transmit the information from the list to the appropriate general registrars." (Virginia Code § 24.2-410.1(B)).  The Virginia DMV issues driver's licenses to non-citizens upon the presentation of various forms of identification.  (*See* Cortés Dep. Ex. 12, attached as **Exhibit 41**).  Using such documentation, the Virginia Department of Elections could use the Department of Homeland Security SAVE database to identify non-citizens who have registered to vote. (Cortés Tr. 139:23-142:2, attached as **Exhibit 42**).  By statute, the Virginia Department of Elections is directed to do so.  (Virginia Code § 24.2-404(A)(4)).  The states of Colorado, Florida, Kansas, and Texas use the SAVE database for such purposes.  Former Commissioner Cortés and Professor Levitt, however, claim that it is "impossible" to do so. (Cortés Tr. 55:19-56:6; 59:23-60:11; 145:2-12; 283:3-11, attached as **Exhibit 42**; Levitt Tr. 80:3-82:1).

[29] The Virginia Department of Elections and local registrars in Virginia do not have access to such information. (Cortés Tr. 144:13-145:12; 146:14-147:1).

28.     Professor Levitt was familiar with a 2005 GAO Report cited by PILF Board member Hans von Spakovsky for the proposition that up to 3% of 30,000 individuals chosen for jury duty from voter registration rolls in just one U.S. district court over a two-year period were not U.S. citizens but did not know whether that report had since been updated.  (Levitt Tr. 87:9-89:9; Ex. 25).

**4.      Professor Levitt's Assertion of Attorney-Client Privilege
Over Certain Communications With Virginia Voters.**

29.     While asserting that certain communications with Virginia voters were privileged, Professor Levitt testified that he did not have an attorney-client relationship with the Virginia voters whose communication he now asserts were privileged, they did not seek his legal advice, and he did not provide them with legal advice.  (Levitt Tr. 33:25-34:12, 38:15-44:7, 146:24-151:23; Ex. 6).  As previously stated, Professor Levitt's emails to Virginia voters claimed that he was contacting them for the purpose of conducting "research," and his communications with others suggest that he was trying to find Virginia voters who would speak to reporters to help "debunk the report."

**5.      Professor Levitt's Communications with Virginia Voters Were
Apparently Shared with SCSJ and Protect Democracy.**

30.     At his deposition, Professor Levitt was instructed not to answer questions about whether he shared the allegedly "privileged" communications with Plaintiffs' counsel, SCSJ and Protect Democracy.  (Levitt Tr. 110:4-128:19; Ex. 32, 33).  The timing and sequence of the communications with Virginia voters for which Professor Levitt claims attorney-client privilege and the communications with Professor Levitt for which SCSJ and Protect Democracy claim work product immunity are aligned in such a way that it is apparent that Professor Levitt told SCSJ and Protect Democracy everything that the Virginia voters told him.  *Cf.*  Levitt Ex. 5, 6.

**6.** **Professor Levitt's Internet Postings and Emails to Others About Plaintiffs' Legal Theories Under the Voting Rights Act and KKK Act.**

31.    On April 12, 2018—the day this litigation was filed—Professor Levitt received the email attached as **Exhibit 43** from WeAreRALLY.com, a public relations firm, stating:

> Hi.  I hear you talked to Larry Schwartzol [at Protect Democracy] and agreed to do some validating for this case.  Complaint and press release are below.  Suggested Tweets below.  Feel free to make them your own.  And then when all this is done and assuming we don't meet in the streets to protest Mueller's being fired, let's grab lunch sometime soon.

(Levitt Tr. 191:11-193:2; Ex. 41)

32.    On April 19, 2018, Professor Levitt responded by way of the email attached as **Exhibit 43**, stating:

> As I think you know, I'm a giant fan of the case.  I helped round up a few of the initial plaintiffs and hounded Larry [Schwartzol at Protect Democracy] and Allison [Riggs at SCSCJ] enough that I half think they brought the case to get rid of me.  I'm delighted to keep on validating as long as I can.  I hope they roundly kick the ass of the folks on the other side.

(Levitt Tr. 193:3-194:23; Ex. 41)

33.    On April 12, 2018—the day this lawsuit was filed—Professor Levitt posted the series of tweets attached as **Exhibit 44** that began with the sentence "Unwarranted screaming about voter fraud," also claiming: "The defendant in today's suit was repeatedly warned that his info was bad info.  He published anyway."  Professor Levitt also stated:

> I don't know whether wrongly claiming that people have committed felonies in publishing their personal info in the scope of a sloppy and overheated vigilante campaign against voter fraud is better labeled as bullying or doxxing or both.

(Lev. Tr. 208:11-213:1; Ex. 38)

34.    The reference to doxxing was significant in that it explained the novel theory by which Plaintiffs in this case seek to hold PILF and Mr. Adams liable for violation of the Voting

Rights Act and the Ku Klux Klan Act. (Lev. Tr. 208:11-213:1; Ex. 38). Professor Levitt revealed this theory in the August 7, 2018 email attached as **Exhibit 45** to Caroline Frederickson, Executive Director of the American Constitution Society, and Pamela Karlan, a law professor at Stanford Law School, stating:

> I know there was a lot of time and attention paid to how to frame the Klan Act allegation in this suit and the suit against Adams in Virginia. The Klan Act was used in the past for violence or threats of violence and the VRA, Voting Rights Act, added intimidation and coercion that encompasses specific economic threats. Doxxing connects the dots from the targeted public release of private, personal information to the sort of intimidation contemplated by the Klan Act.

At his deposition, Professor Levitt admitted that the foregoing theory of liability is without precedent. (Lev. Tr. 213:2-219:3; Ex. 34).

I hereby declare under penalty of perjury that the foregoing is correct.

_____
Michael J. Lockerby

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 26, 2019, I filed the foregoing DECLARATION OF MICHAEL J. LOCKERBY with the Court using the CM/ECF system, which will send a Notice of Electronic Filing (NEF) to all counsel of record.  In addition, I sent a copy of the foregoing DECLARATION OF MICHAEL J. LOCKERBY by email and U.S. mail to the following:

| | |
|---|---|
| Harold A. Bridges, Esq. | Thomas E. Gorman, Esq. |
| Bridges & Bridges | Keker, Van Nest & Peters LLP |
| 318 Avenue I, #606 | 633 Battery Street |
| Redondo Beach, California 90277 | San Francisco, California 94111-1809 |
| drew@bridges-law.com | tgorman@keker.com |
| | |
| *Counsel for* | *Counsel for* |
| *Justin M. Levitt* | *Southern Coalition for Social Justice* |
| *and Loyola University* | *and The Protect Democracy Project* |

/s/ *Michael J. Lockerby*
Michael J. Lockerby (VSB No. 24003)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone:  202-945-6079
Facsimile:  202-672-5399
Email:  mlockerby@foley.com

Counsel for Defendants