# EXHIBIT 1

## Page 1

UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF VIRGINIA

League of Latin American Citizens )
- Richmond                        )
                                  )
            Plaintiff,            )
                                  )
     vs.       ) No. 1:18-cv-00423
                                  )
Public Interest Legal Foundation  )
and J. Christian Adams            )
                                  )
            Defendant.            )
_____ )


DEPOSITION OF JUSTIN LEVITT taken at 555 South
Flower Street, Thirty-Third Floor, Los
Angeles, California, at 9:14 a.m., Wednesday,
April 17, 2019, before Theresa JoAnn
Phillips-Blackwell, CSR 12700.

## Page 2

1  APPEARANCES OF COUNSEL:
2
3
4  For Plaintiff:
5          DAVID LEBOWITZ, ESQ.
           EMERY CELLI BRINCKERHOFF & ABADY LLP
6          600 Fifth Avenue
           Tenth Floor
7          New York, New York  10020
           (212) 763-5000
8          dlebowitz@ecbalaw.com
9  For Protect Democracy Project and Southern Coalition for
   Social Justice:
10
           THOMAS E. GORMAN, ESQ.
11         KEKER VAN NEST & PETERS LLP
           633 Battery Street
12         San Francisco, California  94111
           (415) 676-2292
13         tgorman@keker.com
14 For Defendant:
15         MICHAEL J. LOCKERBY, ESQ.
           FOLEY & LARDNER LLP
16         3000 K Street, N.W.
           Suite 600
17         Washington, D.C.  20007
           (202) 945-6079
18         mlockerby@foley.com
19 For Deponent Justin Levitt:
20         HAROLD A. BRIDGES, ESQ.
           BRIDGES & BRIDGES
21         318 Avenue I
           Suite 606
22         Redondo Beach, California  90277
           (310) 375-0434
23         drew@bridges-law.com
24 Also Present:  Alex Loverde, videographer
25

## Page 3

1              I N D E X
2
3  DEPONENT        EXAMINED BY        PAGE
4  Justin Levitt   Mr. Lockerby        8
5              EXHIBITS
6
7  DEFENSE                        PAGE
8  1 - Subpoena To Produce Documents,     32
       Information, Or Objects Or To Permit
9      Inspection Of Premises In A Civil
       Action
10
   2 - Subpoena To Produce Documents,     32
11     Information, Or Objects Or To Permit
       Inspection Of Premises In A Civil
12     Action
13 3 - Subpoena To Testify At A Deposition  32
       In A Civil Action
14
   4 - E-Mail Dated March 29, 2019         33
15
   5 - Privilege Log                       34
16
   6 - Privilege Log - Subpoenas To Loyola Law 38
17     School And Justin Levitt
18 7 - Code of Virginia Section 8.01-223.2  45
19 8 - Code of Virginia Section 18.2-451    46
20 9 - Code of Virginia Section 18.2-499    47
21 10 - Code of Virginia Section 18.2-500   48
22 11 - Letter Dated October 17, 2008       48
23 12 - Article Entitled "White House Counsel 51
        Robert Bauer:  Architect of IRS Abuse?"
24
   13 - Article Entitled "Obama and Holder  57
25     Cry Wolf on Voting Rights"

## Page 4

1          I N D E X (Continued)
2              EXHIBITS
3
4  DEFENSE                        PAGE
5  14 - Article Entitled "Exclusive:  Meet  57
        the Radical Lawyers the DOJ Hired to
6       Oversee Elections"
7  15 - Article Entitled "Former DOJ Head   61
        Michael Mukasey Hits Obama's DOJ
8       Voting Section"
9  16 - Letter Dated June 19, 2013          61
10 17 - Letter Dated March 6, 2014          67
11 18 - Letter Dated November 10, 2014      67
12 19 - Form for Canceling Registration in  67
        San Diego County
13
20 - Letter Dated March 23, 2015           67
14
21 - Letter Dated March 28, 2016           67
15
22 - Letter Dated July 6, 2016, from the   68
16    San Francisco Department of Elections;
      Handwritten Letter Dated June 16, 2016
17
23 - Form for Canceling Registration in    68
18    San Diego County
19 24 - Letter Dated September 13, 2016     68
20 25 - Brief of the American Civil Rights  82
        Union as Amicus Curiae in Support of
21      Petitioners
22 26 - E-Mail Dated April 11, 2016, with   89
        Attachments
23
24 27 - Various E-Mails                     98
25 28 - Various E-Mail Strings              99

Page 5

```
 1              I N D E X (Continued)
 2                   EXHIBITS
 3
 4   DEFENSE                              PAGE
 5   29 - Redacted Documents and an E-Mail    102
        Dated July 28, 2017
 6
     30 - Fed. R. Evid. 1006 Summary of Justin  103
 7      Levitt's Email Exchanges with
        Virginia Voters Identified in
 8      PILF/VVA Reports
 9   31 - Spreadsheet Containing Names and     108
        E-Mail Addresses
10
     32 - List of Names and Information on     110
11      Voting History
12   33 - List of Names and Information on     119
        Voting History
13
     34 - Various E-Mails                      136
14
     35 - Article Entitled "Fake 'Voter Fraud'  143
15      Report Debunked by Woman Featured in
        Front Page Article"
16
     36 - Article Entitled "Presidential       154
17      Commission Demands Massive Amounts of
        State Voter Data"
18
     37 - Article Entitled "Trump's voter fraud  161
19      task force may have broken 2 federal
        laws"
20
     38 - Printouts from Twitter              163
21
     39 - Document Entitled "On the Eve of the  181
22      Purges"
23   40 - Article Entitled "Trump's Voter      187
        Suppression Dream Team/The Voter
24      Purges are Coming"
25   41 - Various E-Mails                      191
```

Page 6

```
 1              I N D E X (Continued)
 2                   EXHIBITS
 3
 4   DEFENSE                              PAGE
 5   42 - Article Entitled "President Trump's   195
        Voter Fraud Commission Meets, Smeared
 6      by Deniers"
 7   43 - Various E-Mails                      199
 8
 9
10   INSTRUCTED NOT TO ANSWER
11   PAGE       LINE
12    36         3
      44        22
13   112        10
     112        23
14   113         4
     116        14
15   150        13
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1           (Los Angeles, California; Wednesday, April 17, 2019,
 2              9:14 a.m.)
09:14:00  3
09:14:08  4     THE VIDEOGRAPHER:  Good morning.  My name is
09:14:45  5  Alex Loverde.  I am a videographer associated with a
09:14:47  6  Sound Depo.  The date today is April 17, 2019; and the
09:14:51  7  time is 9:14 a.m.
09:14:53  8     This deposition is taking place at Foley &
09:14:55  9  Lardner in the matter of the League of Latin American
09:14:59 10  Citizens - Richmond versus Public Interest Legal
09:15:01 11  Foundation and J. Christian Adams.  Case number is
09:15:07 12  1:18-cv-00423.  And this is the videotaped deposition of
09:15:11 13  Justin Levitt taken on behalf of the defendant.
09:15:14 14     Will the counsels for all parties please
09:15:15 15  identify themselves.
09:15:17 16     MR. LOCKERBY:  Plaintiffs first.
09:15:20 17     MR. LEBOWITZ:  Sure.  David Lebowitz from Emery
09:15:23 18  Celli Brinckerhoff & Abady for the plaintiffs.
09:15:26 19     MR. GORMAN:  Thomas Gorman from Keker,
09:15:30 20  Van Nest & Peters on behalf of the Protect Democracy
09:15:35 21  Project and the Southern Coalition for Social Justice.
09:15:36 22     MR. BRIDGES:  Harold A. Bridges of Bridges &
09:15:39 23  Bridges for the deponent, Justin Levitt.
09:15:42 24     MR. LOCKERBY:  And Michael J. Lockerby with
09:15:45 25  Foley & Lardner LLP for the defendants.
```

Page 8

```
09:15:47  1     THE VIDEOGRAPHER:  Thank you very much.
09:15:48  2     Will the court reporter please swear in the
09:15:50  3  witness.
09:15:51  4     DEPOSITION OFFICER:  You do solemnly state that
09:15:51  5  the evidence you shall give in this matter shall be the
09:15:51  6  truth, the whole truth, and nothing but the truth, so
09:15:51  7  help you God?
09:16:00  8     THE WITNESS:  I do.
09:16:00  9
09:16:00 10              EXAMINATION
09:16:02 11
09:16:02 12  BY MR. LOCKERBY:
09:16:02 13     Q.  Good morning.  As you know, my name is Mike
09:16:04 14  Lockerby.  Our law firm, Foley & Lardner LLP, represents
09:16:09 15  the defendants in this case, Public Interest Legal
09:16:13 16  Foundation, to which I'll refer as PILF, and J.
09:16:17 17  Christian Adams, to whom I'll refer as Mr. Adams.
09:16:19 18     If I ask you any questions that are ambiguous
09:16:23 19  or that you don't understand, please ask me rephrase
09:16:25 20  them.
09:16:26 21     Also, if at any time you'd like to take a break
09:16:28 22  for any reason, please speak up; and I'll be happy to
09:16:31 23  accommodate you.  However, I would ask that you not
09:16:34 24  request a break while a question is pending.
09:16:37 25     First of all, would you please state your name
```

Page 9

| | |
|---|---|
| 09:16:38 | 1 |

for the record.

A. My name is Justin Michael Levitt.

Q. And, Mr. Levitt, what is your date and place of birth?

A. March 19th, 1970, in Morristown, New Jersey.

Q. And what is your current business and residence address?

A. Business address is Loyola Law School at 919 Albany Street in Los Angeles, California 90015. Personal address is 1339 Silver Lake Boulevard in Los Angeles, California 90026.

Q. And you are, of course, a nonparty to this litigation.

Are you represented by counsel today?

A. I am.

Q. And who is your counsel?

A. Drew Bridges, seated to my right.

Q. Okay. There are two other lawyers in the room besides me and Mr. Bridges. Do you claim any kind of attorney-client relationship with either of them?

A. Not with them, no.

Q. Starting with secondary school, would you briefly describe your educational and employment background.

A. I went to Bridgewater High School West as my

Page 10

high school for four years. I attended Harvard College with a bachelor of arts degree. I don't know whether this counts as educational background or not. I received a Fulbright Fellowship to pursue independent research for a year at the University of Cologne in Germany. Did not receive a degree there. Then received a master's of public administration from what is now the Harvard Kennedy School and a JD degree from Harvard Law School.

Q. In what year did you receive your bachelor's degree from Harvard?

A. 1995.

Q. And in what year did you receive your master's from what's now the Kennedy School?

A. It was a joint degree; so I received the master's and JDs at the same time, 2002.

Q. Following your graduation in 2002, were you employed?

A. I was.

Q. Where?

A. I worked for -- I clerked for a federal judge, the late Judge Stephen Reinhardt of the Ninth Circuit.

Q. Where was that?

A. In Los Angeles.

Q. So that would have been from 2002 to 2003?

Page 11

A. Correct.

Q. And what did you do after that?

A. I went to work for a presidential political campaign.

Q. That was in 2003?

A. Correct.

Q. Which campaign?

A. The Wesley Clark for President campaign.

Q. How long did you work on that campaign?

A. Until the campaign was over. It was rather short.

Q. We know the outcome.

A. I believe it was February of 2014 that he and I parted ways.

Q. 2014?

A. Sorry. 2004. My apologies. 2004.

Q. And what was your position with the Wesley Clark for President campaign?

A. There were several, which may speak to why it was a short campaign. I don't know that I can give them to you in order, but at various points I collected images of the candidate for use in advertising material. I was the political director for various regions of the United States. I assisted with responses to surveys and the like. I was in charge of data targeting for

Page 12

communications. I'm sure there were other responsibilities. They each came with different titles, but they revolved.

Q. And what did you do after you left Wesley Clark's campaign or it left you?

A. I went to work for a partisan nonprofit called America Coming Together.

Q. Where was that located?

A. In Washington, D.C. It's where the headquarters of the organization was located.

Q. And you were working in Washington, D.C.?

A. Correct.

Q. When you say, "partisan nonprofit," what do you mean?

A. It was a 527 organization, a organization organized under Section 527 of the Tax Code supporting a political party but not a particular political candidate.

Q. And what was the mission of America Coming Together as you understood it at the time?

A. To help elect democratic candidates up and down the ballot. So from president down to significantly more down-ballot races.

Q. And what was your position at America Coming Together?

## Page 13

09:22:22 1   A. I was one of the in-house counsel.

09:22:26 2   Q. Was there a particular subject area for which

09:22:32 3   you were responsible?

09:22:36 4   A. Not especially. From time to time I took on

09:22:41 5   different buckets of work, and some of my other counsel

09:22:44 6   took on different buckets of work, but not consistently

09:22:47 7   throughout the course of.

09:22:48 8   Q. Did your duties and responsibilities include

09:22:51 9   voter registration or voter eligibility?

09:22:56 10   A. Not conducting voter registration, but

09:23:01 11   examining the practices of the organization, yes.

09:23:10 12   Q. And did your duties and responsibilities

09:23:18 13   include ensuring that the organization complied with

09:23:22 14   legal requirements for registering voters?

09:23:25 15   A. To -- to the best of my power.

09:23:27 16   Q. How long did you remain at America Coming

09:23:31 17   Together?

09:23:31 18   A. I -- spring of 2005. I believe I left in May.

09:23:40 19   It's possible I left in March or April.

09:23:43 20   Q. And what did you do after that?

09:23:45 21   A. I went to work for a nonpartisan nonprofit in

09:23:49 22   New York called the Brennan Center for Justice at NYU

09:23:54 23   School of Law.

09:23:56 24   Q. How long did you remain at the Brennan Center

09:24:02 25   for Justice?

## Page 14

09:24:02 1   A. With a leave, I was there until June of 2010.

09:24:16 2   And I pause before June because, again, I'm not sure of

09:24:20 3   the month. But mid-2010.

09:24:22 4   Q. What was the mission of the Brennan Center for

09:24:30 5   Justice as you understood it?

09:24:31 6   A. Manifold. To produce research, to advocate for

09:24:39 7   public policy, to assist with legislation and

09:24:48 8   regulation, to communicate about preferred public

09:24:53 9   policy, to litigate when necessary in order to ensure

09:24:57 10   that the structures of American democracy were more

09:25:08 11   vigorous and vibrant.

09:25:09 12   There were several projects at the Brennan

09:25:12 13   Center. Some of them concerned criminal justice. Some

09:25:15 14   of them concerned economic justice. I was working on

09:25:20 15   the project concerning voting rights in elections.

09:25:32 16   Q. And what was your position, or positions, at

09:25:35 17   the Brennan Center?

09:25:36 18   A. Counsel. While I was there I also served as,

09:25:45 19   for at least one year, an assistant adjunct clinical

09:25:52 20   professor of law at NYU School of Law.

09:25:58 21   Q. With respect to voting rights and elections,

09:26:03 22   what were your duties and responsibilities at the

09:26:06 23   Brennan Center?

09:26:09 24   A. To do all of the above tasks. So to conduct

09:26:17 25   research, to advocate, to -- to support legislation,

## Page 15

09:26:22 1   regulation, to litigate when necessary, to communicate

09:26:25 2   about all of those things. On many different parts of

09:26:32 3   the Brennan Center's portfolio, depending on the month,

09:26:40 4   or months, I worked on different aspects of the Brennan

09:26:44 5   Center's work, mostly focusing on eligibility, election

09:26:49 6   administration, and redistricting.

09:26:55 7   Q. Did you author or publish any papers or reports

09:27:00 8   while you were at the Brennan Center?

09:27:01 9   A. I did.

09:27:02 10   Q. Are there any that you specifically recall?

09:27:05 11   A. There is one called "Making the List" on voter

09:27:10 12   registration databases. There was one called "The

09:27:17 13   Citizen's Guide to Redistricting." There was one called

09:27:22 14   "The Truth About Voter Fraud." There were chapters of

09:27:34 15   books and other reports that I authored while I was

09:27:37 16   there that weren't necessarily published by the Brennan

09:27:40 17   Center. And there were many shorter papers that some

09:27:48 18   might call reports and some might not.

09:27:53 19   Q. When was "The Truth About Voter Fraud"

09:27:55 20   published?

09:27:56 21   A. I believe that was 2007, but I'm not certain.

09:28:04 22   Q. Okay. Do you recall what conclusions you

09:28:10 23   expressed in that report?

09:28:11 24   A. Again, many. It attempted to document some of

09:28:17 25   the ways that fraud occurs. It attempted to document

## Page 16

09:28:23 1   some of the ways that claims about fraud may be

09:28:28 2   misstated or overstated. It attempted to document some

09:28:34 3   of the ways in which claims about fraud didn't pan out

09:28:38 4   upon further examination.

09:28:44 5   To the extent there was an overall conclusion,

09:28:48 6   I guess I'd say it is that in the research I conducted,

09:28:56 7   fraud occurred. Different types of fraud occurred at

09:29:00 8   different rates. But that the magnitude of voter fraud

09:29:05 9   was often overstated in both press and popular advocacy.

09:29:10 10   Q. And did you reach any conclusions about the

09:29:14 11   extent to which noncitizens register and vote in U.S.

09:29:19 12   elections?

09:29:19 13   A. I'd characterize them as the same. It happens.

09:29:24 14   There are claims that noncitizens vote that are often

09:29:28 15   inflated or inaccurate. Sometimes in predictable ways.

09:29:34 16   And that the overall degree of perception about the

09:29:41 17   extent to which noncitizens are voting is likely

09:29:45 18   overstated but that it happens.

09:29:47 19   Q. That was your conclusion in 2007 or

09:29:57 20   thereabouts. Is that still your opinion today?

09:29:59 21   A. It is.

09:29:59 22   Q. And you haven't seen anything to make you

09:30:02 23   change your opinion on that subject?

09:30:04 24   A. I have not. I have seen additional instances

09:30:09 25   of noncitizens who have either registered or voted

Page 17

09:30:14  1    unlawfully, and I've seen additional claims that
09:30:18  2    noncitizens have done so.  Some of which are accurate.
09:30:22  3    Many of which are not.
09:30:23  4        Q.  And you yourself have never tried to document
09:30:25  5    the extent to which noncitizens vote or have voted in
09:30:29  6    U.S. elections, have you?
09:30:33  7            MR. BRIDGES:  Objection.  Vague and ambiguous.
09:30:34  8        You may answer, if you understand.
09:30:38  9            THE WITNESS:  I have extended to documents some
09:30:42  10   instances in which noncitizens have voted and some
09:30:45  11   instances in which noncitizens have been claimed to have
09:30:50  12   voted but -- in which the claims were inaccurate.  Yeah.
09:30:59  13   I don't know if I can -- I don't know if I understand
09:31:02  14   the scope of the question beyond that.
09:31:03  15   BY MR. LOCKERBY:
09:31:03  16       Q.  So you've investigated particular instances of
09:31:06  17   non -- alleged noncitizen voting and registration but
09:31:09  18   have not sought to document the extent to which that
09:31:15  19   happens generally.  Would that be fair to say?
09:31:17  20       A.  Correct.
09:31:19  21       Q.  Thank you.
09:31:19  22           When did you take a leave of absence from the
09:31:25  23   Brennan Center?
09:31:27  24       A.  It would have been in the summer -- again, I'm
09:31:34  25   not sure of the month -- of 2008.

Page 18

09:31:36  1        Q.  And what did you do during your leave of
09:31:40  2    absence?
09:31:40  3        A.  I served as the national voter protection
09:31:43  4    counsel for the Obama campaign located at the Democratic
09:31:52  5    National Committee.
09:31:52  6        Q.  And as the national voter protection counsel,
09:32:03  7    to whom did you report?
09:32:04  8        A.  I reported to several individuals.  Kendall
09:32:09  9    Burman was the in-house counsel.  Bob Bauer was the
09:32:16  10   general counsel.  Those were probably my direct
09:32:24  11   reporting relationships.
09:32:28  12       Q.  And what were your duties and responsibilities
09:32:31  13   as national voter protection counsel?
09:32:34  14       A.  To ensure as best I could that if individuals
09:32:37  15   were eligible to vote and wanted to vote, that they
09:32:42  16   could and that it would stick in the jurisdictions that
09:32:46  17   we were targeting.
09:32:47  18       Q.  So what was it you were seeking to protect
09:32:50  19   voters from?
09:32:51  20       A.  Either malfeasance or mistake or both.  Either
09:33:02  21   intentional efforts to keep eligible individuals from
09:33:05  22   voting or facts and circumstances that ended up making
09:33:15  23   it more difficult for eligible individuals to vote,
09:33:20  24   whether intended or not.
09:33:21  25       Q.  What would some examples of those be?

Page 19

09:33:26  1        A.  Of which?
09:33:30  2        Q.  Facts and circumstances that would make it more
09:33:33  3    difficult for eligible voters to vote.
09:33:38  4        A.  There were various rules in various states
09:33:42  5    requiring various forms of identification.  For example,
09:33:45  6    attempting to secure identification for the individuals
09:33:47  7    who were ineligible.  There were various concerns about
09:33:53  8    capacity in various jurisdictions, polling sites not
09:33:58  9    sufficiently large or not sufficiently well-staffed or
09:34:01  10   not sufficiently equipped or not enough polling sites.
09:34:06  11   There were concerns about the scope of preparations for
09:34:09  12   early voting and whether individuals would have to wait
09:34:12  13   on extremely long lines in order to vote when voting
09:34:16  14   hours were available.  There were concerns about voter
09:34:22  15   registration and the improper processing of voter
09:34:31  16   registration forms that might affect eligible voters.
09:34:35  17   There were concerns about either official or unofficial
09:34:39  18   intimidation.
09:34:48  19           That's off the top of my head, but there are
09:34:50  20   there are many more.  I mean, my -- my responsibilities
09:34:53  21   included responding -- both attempting proactively to
09:34:57  22   respond to likely concerns and responding to events as
09:35:06  23   they arose in the real time.
09:35:08  24       Q.  When you referred to "intimidation," what did
09:35:12  25   you mean by "intimidation"?

Page 20

09:35:13  1        A.  There were reports in the past of efforts,
09:35:17  2    sometimes by known actors and sometimes by unknown
09:35:21  3    actors, to mislead voters in a way that would have been
09:35:29  4    frightening or intimidating to many.
09:35:33  5            A notorious example from 2004 involved a flyer
09:35:43  6    distributed in black neighborhoods in Milwaukee
09:35:46  7    purporting to be from the Milwaukee Black Voters League,
09:35:49  8    which I do not believe exists or at least which there is
09:35:52  9    no independent source, actively misstating the rules for
09:35:58  10   voting and threatening individuals with both jail time
09:36:03  11   and having their kids taken away from them if they
09:36:07  12   violated these purported rules, which did not exist.  It
09:36:11  13   seemed to me designed to scare people away from coming
09:36:17  14   to the polls.
09:36:19  15       Q.  That is not something that happened while you
09:36:22  16   were working on the Obama campaign, though?
09:36:25  17       A.  That flyer wasn't dropped in 2004.  There were
09:36:29  18   various reports of, as I remember, similar either
09:36:39  19   misstatements of the law or threatening presences at
09:36:42  20   various polling places.  And leading up to election day
09:36:47  21   there was certainly concern that similar things might
09:36:52  22   happen in 2008.
09:36:53  23       Q.  When you say a "threatening presence at a
09:36:55  24   polling place," what do you consider to be a threatening
09:36:59  25   presence?

Page 21

09:36:59 1    A. There was, as I recall -- and I believe this
09:37:05 2    was 2008, but I honestly can't be sure -- a call to
09:37:14 3    essentially seek -- and I cannot recall exactly how this
09:37:19 4    was framed, but in my memory it is beefy tough guys to
09:37:25 5    stand at inner city precincts in order to make sure that
09:37:31 6    nothing untoward happened.  There are many minority
09:37:37 7    communities in which the presence of beefy tough guys
09:37:41 8    standing and watching the election process can be
09:37:45 9    intimidating.  That doesn't necessarily mean that that
09:37:49 10   activity can or should be stopped, but that can be
09:37:52 11   disheartening to many individuals.
09:37:56 12       There have been reports in the past of
09:38:00 13   individuals standing with weapons outside of polling
09:38:03 14   places even where there is a right to lawfully carry
09:38:09 15   those weapons.  And so where that may not be strictly
09:38:13 16   unlawful, that can be intimidating in many
09:38:16 17   circumstances.
09:38:20 18       And I'm sure that doesn't exhaust the -- the
09:38:23 19   range.  There are reports of people taking pictures of
09:38:26 20   license plates in parking lots.  Even though that
09:38:30 21   activity may be completely lawful, it can be
09:38:34 22   intimidating in some communities for individuals to be
09:38:39 23   roaming parking lots on Election Day taking pictures of
09:38:42 24   license plates.
09:38:47 25       Q. As national voter protection counsel, did you

Page 22

09:38:51 1    seek to keep beefy tough guys a certain distance away
09:38:55 2    from polling places?
09:38:56 3        A. No.  At least not where they were otherwise
09:38:59 4    authorized to be.  But it was part of my job to prepare
09:39:08 5    as best we could within the law in the event that
09:39:12 6    disturbances or other instances of intimidation should
09:39:17 7    happen.
09:39:19 8        Q. When did you return to the Brennan Center from
09:39:28 9    the Obama campaign?
09:39:33 10       A. It would have been the spring of 2009.  I don't
09:39:37 11   recall exactly the month.
09:39:43 12       Q. And then after you left the Brennan Center in
09:39:46 13   June of 2010, what did you do after that?
09:39:51 14       A. I became a professor, a faculty member, at
09:39:55 15   Loyola Law School in Los Angeles.
09:40:01 16       Q. How long did you remain in that role?
09:40:06 17       A. I am still in that role.
09:40:08 18       Q. You've done some other things in between?
09:40:10 19       A. I have.
09:40:10 20       Q. What have you done in between?
09:40:13 21       A. And I should clarify.  It wasn't -- it wasn't
09:40:17 22   in between.  I was on loan from Loyola; so I was still a
09:40:21 23   faculty member at Loyola while I was seconded,
09:40:28 24   essentially, to the federal government.  In 2015,
09:40:33 25   pursuant to an intergovernmental agreement, I went to

Page 23

09:40:37 1    the Civil Rights Division of the Department of Justice.
09:40:44 2        Q. So during the time that you were seconded to
09:41:02 3    the federal government, who was paying your salary?
09:41:05 4    Loyola or the federal government?
09:41:07 5        A. Loyola was paying my salary and being
09:41:10 6    reimbursed by the Department of Justice.
09:41:12 7        Q. And your secondment started in 2015?
09:41:16 8        A. Correct.
09:41:17 9        Q. Did you have a title at the Civil Rights
09:41:21 10   Division of the Department of Justice?
09:41:22 11       A. I was one of the deputy assistant attorneys
09:41:26 12   general in the division.
09:41:31 13       Q. And to whom did you report?
09:41:33 14       A. To Vanita Gupta, who was first the acting
09:41:39 15   assistant attorney general for civil rights and then the
09:41:45 16   principal deputy assistant attorney general for civil
09:41:48 17   rights.  And ultimately, to the attorney general.
09:41:55 18       Q. Was that Loretta Lynch at the time?
09:42:01 19       A. It was.
09:42:05 20       Q. When did your secondment end?
09:42:09 21       A. Inauguration Day.  Rather, the day before
09:42:13 22   Inauguration Day.
09:42:14 23       Q. The day before Inauguration Day?
09:42:18 24       A. 2017.
09:42:19 25       Q. 2017?

Page 24

09:42:20 1        A. Correct.
09:42:20 2        Q. What were your duties and responsibilities
09:42:23 3    while you were seconded to the Department of Justice?
09:42:27 4        A. I was responsible for supporting and
09:42:33 5    supervising some of the work of the Civil Rights
09:42:41 6    Division, focusing primarily on voting rights and on
09:42:45 7    employment discrimination.  That also necessarily meant
09:42:50 8    management of staff and budgetary concerns and other
09:42:55 9    support work, in addition to the substance.
09:43:03 10       Q. And with respect to voting rights, in
09:43:08 11   particular, what initiative, or initiatives, did you
09:43:11 12   undertake while you were a justice?
09:43:15 13       A. I think that the only thing that I'm able to
09:43:19 14   say without waiving a privilege that is due to the
09:43:23 15   department is that -- is the public activity of the
09:43:28 16   Civil Rights Division at the time.  And there were a
09:43:31 17   number of cases, a number of filings, a number of policy
09:43:36 18   documents that came out of the Department of Justice.  I
09:43:40 19   can't talk about initiatives we pursued that did not
09:43:42 20   become public, and I don't know that I could list them
09:43:48 21   all of the initiatives we pursued that did become
09:43:51 22   public.
09:44:01 23       Q. During your tenure at Loyola, what subject or
09:44:05 24   subject matters have you taught?
09:44:08 25       A. I have taught a class on constitutional law --

Page 25

09:44:13  1  several classes on constitutional law.  I have taught
09:44:21  2  classes on criminal procedure.  I have taught classes on
09:44:26  3  election law and voting rights.  While visiting as a
09:44:36  4  faculty member at other law schools still employed by
09:44:41  5  Loyola Law School, I've taught classes on the motives of
09:44:44  6  public actors and an undergraduate class on essentially
09:45:03  7  introduction to law and law and economics.
09:45:16  8       (Telephonic interruption.)
09:45:17  9       THE WITNESS:  I don't think it's for me.
09:45:19  10      MR. LOCKERBY:  Why don't we go off the record
09:45:20  11  for a minute.
09:45:22  12      THE VIDEOGRAPHER:  We're off the record at
09:45:25  13  9:45 a.m.
09:45:26  14      (A recess is taken.)
10:10:10  15      THE VIDEOGRAPHER:  We are back on the record at
10:10:13  16  10:10 a.m.
10:10:15  17  BY MR. LOCKERBY:
10:10:17  18      Q.  Sorry for the interruption.
10:10:19  19      During your career, when did you first become
10:10:23  20  familiar with the individual defendant in this case,
10:10:27  21  J. Christian Adams?
10:10:30  22      A.  I don't know that I know.  I don't recall a
10:10:39  23  moment.
10:10:42  24      Q.  Do you recall how you became familiar with him?
10:10:45  25      A.  No.  I mean, it -- this is -- it's a relatively

Page 26

10:10:56  1  small sphere and relatively small world, and people
10:11:01  2  become acquainted with other people in it.  But I don't
10:11:03  3  recall.
10:11:03  4      Q.  What sphere is that?
10:11:05  5      A.  The sphere of people that work on election law
10:11:08  6  and voting rights.
10:11:10  7      Q.  But you did not overlap with Mr. Adams when he
10:11:13  8  was at the Civil Rights Division of DOJ?
10:11:16  9      A.  I did not.
10:11:17  10      Q.  And you have seen various publications in which
10:11:24  11  he was critical of things that the Department of Justice
10:11:29  12  did during your tenure?
10:11:31  13      A.  Yes.
10:11:31  14      Q.  The two of you don't see eye to eye on some
10:11:36  15  issues.  That would be fair to say; correct?
10:11:38  16      A.  On some issues, that's correct.
10:11:41  17      Q.  Now, the documents that you produced in
10:11:44  18  response to the subpoenas -- we'll look at those in a
10:11:48  19  minute -- include a number of publications of PILF that
10:11:54  20  you've had your deposition; correct?
10:11:56  21      A.  Correct.
10:11:56  22      Q.  And you also had in your possession copies of
10:11:58  23  various pleadings that PILF had filed, not just in the
10:12:04  24  case in which you're testifying, but in other
10:12:06  25  litigation; isn't that right?

Page 27

10:12:08  1      A.  Correct.
10:12:08  2      Q.  And you also have a videotape of a discussion
10:12:15  3  of voting law on television involving Mr. Adams; is that
10:12:21  4  right?
10:12:25  5      A.  I honestly don't know if Mr. Adams was part of
10:12:29  6  that discussion.  The -- I can't recall whether he was
10:12:32  7  on the panel or not.  He may well have been.  I don't
10:12:35  8  remember.
10:12:35  9      Q.  Do you remember any of the panelists who were?
10:12:39  10      A.  I remember that Tom Fitton was leading the
10:12:43  11  discussion.  I remember an individual from Old Dominion
10:12:48  12  University who had conducted a study was on the panel.
10:12:56  13  I'd be guessing at the other members of the panel.
10:13:00  14      Q.  Fair enough.
10:13:01  15      MR. BRIDGES:  Do not guess.
10:13:02  16  BY MR. LOCKERBY:
10:13:02  17      Q.  And the documents you produced also included
10:13:05  18  copies of various reports produced by PILF, in addition
10:13:12  19  to the ones at issue in this case, the Garden State
10:13:16  20  Gotcha report involving New Jersey and Safe Spaces
10:13:19  21  involving sanctuary cities; correct?
10:13:21  22      A.  Correct.
10:13:22  23      Q.  How long have you been following the work of
10:13:27  24  PILF?
10:13:27  25      A.  I don't know that I'd say that I've been

Page 28

10:13:32  1  following the work of PILF.  I have followed some things
10:13:37  2  that PILF has done.  I couldn't tell you how -- I
10:13:48  3  couldn't tell the first thing that I read or downloaded
10:13:50  4  that PILF had done.
10:13:51  5      Q.  And for what purpose have you been following
10:13:55  6  PILF's work?
10:13:57  7      MR. BRIDGES:  Objection.  Misstates testimony.
10:13:58  8  You may answer.
10:13:59  9      THE WITNESS:  Yeah.  Again, I wouldn't say that
10:14:01  10  I have been following PILF's work.  I am interested in
10:14:05  11  election law developments both of law and policy; and so
10:14:10  12  I follow some cases and reports concerning election law,
10:14:17  13  some of PILF's work included.
10:14:19  14  BY MR. LOCKERBY:
10:14:19  15      Q.  How long have you been collecting work that
10:14:23  16  PILF has done either in court or by way of published
10:14:27  17  reports?
10:14:28  18      A.  I couldn't say.  I don't remember -- again,
10:14:31  19  because I'm not following PILF, I don't remember the
10:14:34  20  first thing of theirs that I happened to have saved.  I
10:14:41  21  don't -- I don't consider what I do to be collecting
10:14:45  22  their work.  There are occasional reports or cases or
10:14:50  23  briefs that are of interest that I save, sometimes to
10:14:54  24  read then, sometimes to read later.
10:15:00  25      Q.  In addition to your teaching responsibilities

Page 29

10:15:04 1 at Loyola, do you do any consulting work?
10:15:07 2      A. I do.
10:15:08 3      Q. And do you sometimes represent clients?
10:15:14 4      A. I do.
10:15:15 5      Q. When you represent a client is there any kind
10:15:17 6 of procedure that you go through to represent a client?
10:15:21 7      A. It depends on the client.  It depends on the
10:15:26 8 nature of the representation.
10:15:35 9      Q. When you represent a client do you have an
10:15:39 10 engagement letter?
10:15:48 11      A. I -- I don't believe that I have had an
10:15:53 12 engagement letter in representing a client since I've
10:15:57 13 been at Loyola.  I have had engagement letters in the
10:16:03 14 past.
10:16:03 15      Q. Have you represented a client since --
10:16:06 16      A. I should --
10:16:06 17      Q. I'm sorry.  I didn't mean to cut you off.
10:16:08 18      A. No.  And I'm sorry to interrupt.
10:16:11 19      I should amend that.  I haven't had what I
10:16:14 20 would characterize as a formal engagement letter.  I
10:16:17 21 have exchanged e-mails with clients designating the
10:16:21 22 scope of the engagement, which might well be construed
10:16:25 23 to be an engagement letter in some circumstances.
10:16:28 24      Q. When you represent a client as an attorney, do
10:16:32 25 you at least have some exchange of e-mails setting forth

Page 30

10:16:37 1 the scope of the engagement?
10:16:39 2      A. Sometimes.  Often.
10:16:41 3      Q. Well, would there be any circumstances under
10:16:44 4 which you would not have something setting forth the
10:16:47 5 scope of the engagement?
10:16:49 6      A. Yes.
10:16:50 7      Q. What circumstances would those be?
10:16:53 8      A. I have represented some clients on amicus
10:17:06 9 briefs; and although I know I have had e-mail exchanges
10:17:13 10 with some of the lead amici, I consider myself to
10:17:16 11 represent all of the amici; and I don't believe I have
10:17:19 12 had specific one-on-one e-mail conversations with all of
10:17:22 13 the clients represented in all of those amicus briefs.
10:17:26 14      Q. Except for amicus briefs, have you had some
10:17:29 15 exchange of e-mail or other communications with all of
10:17:32 16 the other clients for which you've provided legal
10:17:36 17 services setting forth the scope of the engagement?
10:17:40 18      A. I don't know.  And the reason I don't know is
10:18:03 19 that some of -- some of the relationships I've had where
10:18:08 20 I have offered legal services have not been
10:18:14 21 representations in court.  They have been providing, for
10:18:19 22 example, legislative or administrative feedback.  And I
10:18:27 23 honestly don't know whether I had an e-mail exchange
10:18:30 24 describing the scope of the feedback that I offer.  And
10:18:34 25 I don't know whether you would call those individuals

Page 31

10:18:36 1 clients or not.
10:18:39 2      Q. But except for the circumstances you've
10:18:42 3 identified, you would have something in writing, with
10:18:46 4 writing including e-mail, setting forth the scope of the
10:18:51 5 engagement with respect to any clients for which you
10:18:54 6 perform legal services; correct?
10:18:59 7      A. I can't think of another example right now
10:19:02 8 where I have not.  It's possible.
10:19:07 9      Q. Are you admitted to practice in California?
10:19:09 10      A. I am.
10:19:10 11      Q. How long have you been admitted to practice in
10:19:13 12 California?
10:19:13 13      A. 2003.  I don't know the month.
10:19:16 14      Q. Are you admitted to practice in any other
10:19:18 15 states?
10:19:19 16      A. Yes.
10:19:19 17      Q. Where?
10:19:20 18      A. I'm admitted in New York, in New Jersey.  I'm
10:19:26 19 currently an inactive member of the bar in Washington,
10:19:33 20 D.C.  And I've been admitted to practice before certain
10:19:36 21 individual tribunals.
10:19:38 22      Q. That would be on a pro hac vice basis?
10:19:41 23      A. Occasionally pro hac.  Sometimes I'm a member
10:19:45 24 of the bar of that court.
10:19:48 25      Q. But you're not admitted to the Virginia State

Page 32

10:19:52 1 Bar, are you?
10:19:53 2      A. No, I am not.
10:19:53 3      Q. And you haven't practiced law in Virginia, have
10:19:57 4 you?
10:19:57 5      A. I have not.
10:20:03 6      MR. LOCKERBY:  I would like to have marked as
10:20:06 7 exhibits the first three subpoenas.  This one will be
10:20:12 8 Exhibit 1.
10:20:26 9      Would you two mind sharing?
10:20:36 10      And let's go ahead, while we're at it, have
10:20:38 11 this one marked as Exhibit 2, please.
10:20:57 12      And finally, I'd like to have this marked as
10:21:00 13 Exhibit 3, please.
10:21:00 14      (Whereupon the documents referred to are marked
10:21:00 15 by the reporter as Defense Exhibits 1, 2, and 3 for
10:21:00 16 identification.)
10:21:00 17 BY MR. LOCKERBY:
10:21:18 18      Q. Okay.  You've been handed what have been marked
10:21:18 19 as Exhibits 1, 2, and 3.  1 is a document subpoena.  And
10:21:41 20 this is directed to you individually.  Exhibit 2 is
10:21:46 21 another document subpoena directed to Loyola Law School.
10:21:51 22 And then Exhibit 3 is a deposition subpoena.
10:21:54 23      You were served with all three of these;
10:21:56 24 correct?
10:21:56 25      A. I was served with two of these.

Page 33

| | |
|---|---|
| 10:22:01 1 | Q. With -- so there was one with which you were |
| 10:22:05 2 | not served; is that right? |
| 10:22:06 3 | A. Correct. |
| 10:22:06 4 | Q. Which one is that? |
| 10:22:07 5 | A. The subpoena to Loyola Law School. |
| 10:22:10 6 | Q. That was actually served on the law school |
| 10:22:12 7 | itself or... |
| 10:22:13 8 | A. That's my understanding. |
| 10:22:15 9 | Q. But in any event, it wasn't served on you? |
| 10:22:18 10 | A. Correct. |
| 10:22:19 11 | Q. And in response to all three subpoenas, you're |
| 10:22:23 12 | being represented by counsel for Loyola; is that right? |
| 10:22:28 13 | A. In response to the subpoenas with which I was |
| 10:22:31 14 | served, I am being represented by counsel for Loyola. |
| 10:22:34 15 | Q. And with respect to the document subpoena to |
| 10:22:38 16 | Loyola, Loyola's counsel is representing Loyola? |
| 10:22:40 17 | MR. BRIDGES: That is correct. |
| 10:22:40 18 | MR. LOCKERBY: Okay. |
| 10:22:42 19 | I'd like to have this marked as Exhibit 4, |
| 10:22:45 20 | please. |
| 10:22:45 21 | (Whereupon the document referred to is marked |
| 10:22:45 22 | by the reporter as Defense Exhibit 4 for |
| 10:22:45 23 | identification.) |
| 10:22:45 24 | BY MR. LOCKERBY: |
| 10:23:06 25 | Q. You've been handed what's been marked as |

Page 34

| | |
|---|---|
| 10:23:09 1 | Exhibit 4, which is dated March 29, 2019, setting forth |
| 10:23:18 2 | objections by both Loyola Law School and you to the |
| 10:23:26 3 | document subpoenas; and there is a reference in the |
| 10:23:34 4 | objection -- several references to the attorney-client |
| 10:23:38 5 | privilege and attorney work product. |
| 10:23:42 6 | Are there documents subpoenaed that you contend |
| 10:23:50 7 | invade an attorney-client privilege that you are |
| 10:23:55 8 | entitled or obligated to assert? |
| 10:23:57 9 | MR. BRIDGES: Yes. |
| 10:23:57 10 | As his counsel, I'll respond to that because we |
| 10:24:01 11 | interposed the objections. |
| 10:24:02 12 | Yes. |
| 10:24:03 13 | MR. LOCKERBY: Okay. |
| 10:24:05 14 | BY MR. LOCKERBY: |
| 10:24:05 15 | Q. And similarly, are there work product |
| 10:24:09 16 | objections that you believe that you can claim |
| 10:24:17 17 | individually or need to claim on behalf of somebody |
| 10:24:20 18 | else? |
| 10:24:20 19 | MR. BRIDGES: Yes. Need to claim on behalf of |
| 10:24:22 20 | somebody else. |
| 10:24:42 21 | MR. LOCKERBY: I'd like to have this marked as |
| 10:24:44 22 | Exhibit 5, please. |
| 10:24:44 23 | (Whereupon the document referred to is marked |
| 10:24:44 24 | by the reporter as Defense Exhibit 5 for |
| 10:25:03 25 | identification.) |

Page 35

| | |
|---|---|
| 10:25:03 1 | BY MR. LOCKERBY: |
| 10:25:03 2 | Q. You've been handed what's been marked as |
| 10:25:07 3 | Exhibit 5, and it says it's a privilege log prepared by |
| 10:25:13 4 | counsel for the Protect Democracy Project and the |
| 10:25:18 5 | Southern Center for Social Justice Re -- I think that |
| 10:25:23 6 | should say Coalition for Social Justice -- Re |
| 10:25:27 7 | Third-Party Subpoenas Issued to Professor Justin Levitt |
| 10:25:30 8 | and Loyola Law School. |
| 10:25:33 9 | Did you see this before it was served on |
| 10:25:36 10 | defendant's counsel? |
| 10:25:41 11 | A. I'm not sure when it was served. I have seen |
| 10:25:44 12 | this log. |
| 10:26:00 13 | Q. And we'll be going through some of the |
| 10:26:02 14 | individual entries in this log as we get to them and -- |
| 10:26:09 15 | in the chronology. But do you have any kind of written |
| 10:26:16 16 | agreement with either the Protect Democracy Project or |
| 10:26:23 17 | the Southern Coalition for Social Justice regarding |
| 10:26:26 18 | representation in this case? |
| 10:26:38 19 | A. I don't know the extent to which e-mails |
| 10:26:42 20 | exchanged would manifest a written agreement of that |
| 10:26:46 21 | kind, so I don't know if I can answer that question. |
| 10:26:51 22 | Q. So in answer to that question, either you or |
| 10:26:55 23 | counsel or some neutral third party would have to look |
| 10:26:58 24 | at the e-mails to see whether they manifest any written |
| 10:27:01 25 | agreement; is that right? |

Page 36

| | |
|---|---|
| 10:27:04 1 | A. I would have to look at the writings to see |
| 10:27:07 2 | whether an -- an agreement were written there, yes. |
| 10:27:19 3 | Q. Do you know anything about the nature of the |
| 10:27:22 4 | attorney work product claim that is being made by two of |
| 10:27:27 5 | the law firms representing plaintiffs in this case, the |
| 10:27:34 6 | Protect Democracy Project and the Southern Coalition for |
| 10:27:37 7 | Social Justice? |
| 10:27:37 8 | MR. BRIDGES: I'm going to object that it's |
| 10:27:38 9 | vague and ambiguous. And also, invades the attorney |
| 10:27:43 10 | work product objection that is interposed because I |
| 10:27:47 11 | think discussing the scope of that project for someone |
| 10:27:52 12 | who is retained as a nonexpert witness or consultant |
| 10:27:57 13 | would also invade that protection. |
| 10:28:01 14 | MR. LOCKERBY: So is that an instruction not to |
| 10:28:03 15 | answer, then? |
| 10:28:04 16 | MR. BRIDGES: It is. |
| 10:28:04 17 | BY MR. LOCKERBY: |
| 10:28:05 18 | Q. Okay. So were you retained as a consultant by |
| 10:28:14 19 | these two law firms? |
| 10:28:26 20 | A. Yes. |
| 10:28:28 21 | Q. When did that happen? |
| 10:28:30 22 | A. I don't recall the date. |
| 10:28:33 23 | Q. So it could have been before or after June 27, |
| 10:28:46 24 | 2017, the first date that appears on the privilege log |
| 10:28:48 25 | that's been marked as Exhibit 5? |

Page 37

10:28:50 1    A. Correct.
10:28:53 2    Q. And you don't know whether that retention is
10:28:56 3  reflected in writing anywhere?
10:28:58 4    A. I do not.
10:29:00 5    Q. And who approached whom about the retention?
10:29:04 6  Did you approach these two law firms, or did they
10:29:08 7  approach you?
10:29:10 8    A. We were in conversation, and so I don't know
10:29:17 9  that I can say who approached whom.
10:29:21 10    Q. In fact -- let me strike that.
10:29:28 11    As of the time that you were first in
10:29:33 12  conversation, as you put it, was the anticipation that
10:29:40 13  there would be litigation filed against the defendants
10:29:42 14  in this case?
10:29:47 15    A. I think the anticipation was that there might
10:29:50 16  be, yes.
10:29:51 17    Q. And, in fact, that's something that, according
10:29:54 18  to documents you produced in this litigation, you were
10:29:58 19  trying to convince the Protect Democracy Project and the
10:30:03 20  Southern Coalition for Social Justice to do; isn't that
10:30:07 21  right?
10:30:07 22    A. I don't know that I would agree with that
10:30:10 23  characterization, no.
10:30:11 24    Q. Would you agree with that characterization if
10:30:14 25  you saw that in something that you wrote?

Page 38

10:30:18 1    MR. BRIDGES: Objection. Argumentative.
10:30:19 2    You may answer.
10:30:22 3    THE WITNESS: Possibly.
10:30:33 4  BY MR. LOCKERBY:
10:30:34 5    Q. Without divulging the substance of any
10:30:38 6  communications, can you state what it is that you were
10:30:44 7  retained to do as a nonexpert witness or consultant?
10:30:54 8    A. I don't know that I can without divulging the
10:31:04 9  substance of the communications.
10:31:05 10    Q. Are you being compensated or have you been
10:31:07 11  compensated for your consulting work?
10:31:12 12    A. I have not. I am not. I should clarify: In
10:31:20 13  this case.
10:31:35 14    MR. LOCKERBY: We'll come back to that later.
10:31:38 15    Meanwhile, I'd like to have marked as Exhibit 6
10:31:44 16  the privilege log for subpoenas to Loyola Law School and
10:31:49 17  Justin Levitt.
10:31:49 18    (Whereupon the document referred to is marked
10:31:49 19  by the reporter as Defense Exhibit 6 for
10:31:49 20  identification.)
10:31:49 21  BY MR. LOCKERBY:
10:32:11 22    Q. You've been handed what's been marked as
10:32:13 23  Exhibit 6, a privilege log for subpoenas to Loyola Law
10:32:17 24  School and Justin Levitt. And if you could turn to the
10:32:25 25  next-to-last page toward the bottom. There are a series

Page 39

10:32:36 1  of entries beginning with March 17, 2019; and all of
10:32:45 2  those communications were with the Bridges law firm in
10:32:52 3  connection with the subpoena; is that right?
10:32:53 4    A. Correct.
10:32:56 5    And I realize now that I should amend a
10:32:59 6  previous answer. I have seen this privilege log.
10:33:03 7    MR. BRIDGES: Referring to Exhibit 6.
10:33:04 8    THE WITNESS: Sorry. Pardon me. Referring to
10:33:06 9  Exhibit 6. I don't know whether I have previously seen
10:33:09 10  Exhibit 5.
10:33:17 11    MR. LOCKERBY: And if you turn -- since this
10:33:19 12  isn't numbered, it's easier just to count from the back,
10:33:23 13  the fourth page from the end.
10:33:27 14    MR. BRIDGES: Of Exhibit 6?
10:33:29 15    MR. LOCKERBY: Of Exhibit 6, yes.
10:33:33 16  BY MR. LOCKERBY:
10:33:33 17    Q. Starting under the September 29, 2018, entry
10:33:38 18  for communication between Justin Levitt and Allison
10:33:42 19  Riggs, there are a series of names. On the bottom of
10:33:49 20  that page, the first entry is August 5th, 2017, for
10:33:54 21  Augustine Tsibi-Gyan. I may be butchering the name,
10:34:00 22  but -- and then continuing on the following page and
10:34:05 23  ending on the page after that on August 10, 2017.
10:34:11 24    Are all of these communications with
10:34:13 25  individuals that you contend are clients of yours?

Page 40

10:34:20 1    A. No.
10:34:34 2    Q. So were any of these individuals clients of
10:34:37 3  yours?
10:34:37 4    A. They may have believed so.
10:34:38 5    Q. Did you lead them to believe that they were
10:34:41 6  clients of yours?
10:34:42 7    A. Not intentionally.
10:34:45 8    Q. What causes you to state that they may have
10:34:50 9  believed they were clients of yours?
10:34:52 10    A. I wrote to them and identified myself as a
10:35:00 11  lawyer and a law professor. And in the course of the
10:35:11 12  conversation, they may have sought legal assistance.
10:35:17 13  And beyond that, I don't know in what capacity they
10:35:20 14  thought I was acting.
10:35:22 15    Q. Since receiving the subpoenas from the
10:35:27 16  defendants in this case, have you contacted any of these
10:35:31 17  individuals to see whether they thought that you had an
10:35:36 18  attorney-client relationship?
10:35:36 19    A. I have not.
10:35:37 20    Q. And did you provide any legal advice to any of
10:35:44 21  these individuals?
10:35:51 22    MR. BRIDGES: I'm going to object. That's
10:35:52 23  vague and ambiguous.
10:35:53 24    You may answer, if you understand.
10:36:03 25    THE WITNESS: Can you clarify what you mean by

## Page 41

10:36:05  1   "legal advice."

10:36:06  2   BY MR. LOCKERBY:

10:36:06  3       Q.  Well, on the privilege log every single entry

10:36:10  4   says, "Communication Re Legal Advice."  So as that term

10:36:14  5   is used on the privilege log, were you providing legal

10:36:19  6   advice?

10:36:19  7       MR. BRIDGES:  Okay.  On that I'm going to

10:36:21  8   object.  And I'm going to respond because, again, my

10:36:24  9   firm interposed that objection.  And if you want to know

10:36:27 10   why that objection was interposed, I will respond.  But

10:36:32 11   the objection was interposed by counsel, not by the

10:36:35 12   client.  So this is not a question about which

10:36:40 13   Mr. Levitt would have relevant information.

10:36:40 14   BY MR. LOCKERBY:

10:36:46 15       Q.  Mr. Levitt, you have a law degree from Harvard.

10:36:49 16       A.  Uh-huh.

10:36:50 17       Q.  You've been a professor of law at Loyola.  Been

10:36:53 18   practicing law for decades now.

10:36:54 19       A.  Correct.

10:36:55 20       Q.  You understand what it means to render legal

10:36:57 21   advice, don't you?

10:36:57 22       A.  I do.

10:36:58 23       Q.  And regardless of who prepared the privilege

10:37:03 24   log, the question is a simple one.  Did you provide

10:37:07 25   legal advice to any of the individuals named on this

## Page 42

10:37:09  1   privilege log?

10:37:10  2       MR. BRIDGES:  Objection.  Argumentative.  And

10:37:13  3   that's not the basis for an attorney-client objection.

10:37:13  4   BY MR. LOCKERBY:

10:37:20  5       Q.  Okay.  Well, there's an objection.

10:37:22  6       Now if you can answer the question, please.

10:37:25  7       A.  I did not -- it depends on what you mean by

10:37:31  8   "legal advice," I think.  So -- and I'm not attempting

10:37:36  9   to be difficult; but depending on what you mean by

10:37:39 10   providing legal advice, the answer may be different.

10:37:42 11       Q.  What does providing legal advice mean to you as

10:37:45 12   a member of the California Bar and a law professor?

10:37:49 13       A.  It could mean the -- an explanation of what the

10:37:56 14   law states or requires.  It could mean an attempt to

10:38:02 15   guide individuals as to their rights and

10:38:07 16   responsibilities under the law.  It could mean a

10:38:12 17   discussion of potential legal remedies that they might

10:38:17 18   pursue.

10:38:19 19       Q.  Did you explain to any of these individuals

10:38:22 20   what the law requires?

10:38:28 21       A.  In some ways.

10:38:30 22       Q.  Did you advise any of these individuals

10:38:34 23   regarding their rights and responsibilities?

10:38:51 24       A.  In some ways.

10:38:52 25       Q.  And did you advise these individuals as to what

## Page 43

10:38:57  1   their potential legal remedies might be?

10:38:59  2       A.  In some ways.

10:39:01  3       Q.  And at the time that you did these things, you

10:39:07  4   had identified yourself to these individuals as a

10:39:11  5   professor who was doing research; isn't that right?

10:39:13  6       A.  Correct.

10:39:14  7       Q.  So how is it that somebody would expect that he

10:39:28  8   or she would have a -- an attorney-client relationship

10:39:31  9   with a law professor in California doing research?

10:39:35 10       MR. BRIDGES:  Objection.  Calls for

10:39:36 11   speculation.

10:39:40 12       THE WITNESS:  I would have said the same thing.

10:39:41 13   I don't know what they anticipated or what they might

10:39:45 14   have thought.

10:39:45 15   BY MR. LOCKERBY:

10:39:46 16       Q.  And you're simply speculating that these

10:39:49 17   individuals might have considered the conversation to be

10:39:55 18   privileged and confidential; isn't that right?

10:39:57 19       A.  I consider it possible.  I -- I'm not

10:40:03 20   speculating that they considered it confidential.  I do

10:40:09 21   not know whether they would have been able to evaluate

10:40:11 22   whether it was privileged.

10:40:12 23       Q.  And not every communication that's confidential

10:40:16 24   is for the purpose of seeking legal advice; isn't that

10:40:16 25   right?

## Page 44

10:40:20  1       A.  Correct.

10:40:20  2       Q.  For example, if you asked an individual whether

10:40:25  3   he or she was willing to talk to a newspaper reporter

10:40:30  4   and the individual said no, that would be an example of

10:40:36  5   a conversation that might be confidential, but not for

10:40:41  6   the purpose of getting legal advice.

10:40:41  7       A.  Correct.

10:41:12  8       Q.  Have you ever done any research into the code

10:41:18  9   of Virginia?

10:41:18 10       A.  Yes.

10:41:19 11       Q.  Can you recall what provisions of the Virginia

10:41:23 12   code you researched?

10:41:27 13       A.  I can recall several.  I can tell you that I

10:41:30 14   cannot recall all of the ones that I've researched.

10:41:33 15       Q.  What are the ones that you can recall?

10:41:41 16       A.  Provisions concerning petitions for ballot

10:41:46 17   access, provisions concerning eligibility to vote,

10:41:56 18   con -- provisions concerning election administration,

10:42:04 19   provisions concerning redistricting.  I don't know -- I

10:42:15 20   cannot recall now whether I have researched provisions

10:42:17 21   concerning campaign finance in Virginia as well.

10:42:23 22       Q.  With respect to those provisions of the

10:42:26 23   Virginia code that you just identified, did you discuss

10:42:29 24   any of them with the individuals named in the privilege

10:42:35 25   log that's been marked as Exhibit 6?

Page 45

10:42:36  1      MR. BRIDGES:  Objection.  That invades the
10:42:39  2  attorney-client privilege as to what the scope of those
10:42:42  3  conversations may have been.  For the same reason we've
10:42:45  4  interposed that objection, I interpose it here.
10:42:48  5      And instruct you not to answer that question as
10:42:49  6  phrased.
10:42:56  7  BY MR. LOCKERBY:
10:42:56  8      Q.  And I assume you're following that instruction?
10:42:58  9      A.  I will follow the instruction of my counsel.
10:43:00 10      MR. LOCKERBY:  I'd like to have this marked as
10:43:02 11  Exhibit 7, please.
10:43:02 12      (Whereupon the document referred to is marked
10:43:02 13  by the reporter as Defense Exhibit 7 for
10:43:16 14  identification.)
10:43:16 15      THE WITNESS:  Thank you.
10:43:16 16  BY MR. LOCKERBY:
10:43:19 17      Q.  You've been handed what's been marked as
10:43:22 18  Exhibit 7, a copy of Virginia Code Section 8.01-223.2.
10:43:33 19      Have you ever reviewed this provision of the
10:43:35 20  code of Virginia?
10:43:36 21      A.  I have not.
10:43:37 22      Q.  Are you familiar with the term "SLAPP statute"
10:43:45 23  or "anti-SLAPP statute"?
10:43:47 24      A.  I am.
10:43:49 25      Q.  What's your understanding of what that is?

Page 46

10:43:51  1      A.  SLAPP generally describes a strategic lawsuit
10:43:56  2  against public participation.  I believe that's the
10:43:58  3  acronym.  And it is a lawsuit filed often in order to
10:44:06  4  deter civic participation on matters of public
10:44:09  5  importance.  Anti-SLAPP statutes occasionally provide
10:44:15  6  sometimes immunity, sometimes particular procedural
10:44:20  7  venues, or -- or pathways to address those sorts of
10:44:25  8  claims.
10:44:26  9      MR. LOCKERBY:  I'd like to have this marked as
10:44:28 10  Exhibit 8, please.
10:44:28 11      (Whereupon the document referred to is marked
10:44:28 12  by the reporter as Defense Exhibit 8 for
10:44:38 13  identification.)
10:44:38 14      MR. BRIDGES:  Oh, I'm sorry.
10:44:39 15      MR. LOCKERBY:  That's all right.
10:44:40 16      MR. BRIDGES:  Thank you.
10:44:49 17      THE WITNESS:  Thank you.
10:44:50 18  BY MR. LOCKERBY:
10:44:52 19      Q.  You've been handed what's been marked as
10:44:54 20  Exhibit 8, which is copy of Virginia Code Section
10:45:00 21  18.2-451.
10:45:03 22      Are you familiar with this provision of the
10:45:04 23  code of Virginia?
10:45:06 24      A.  I am not.
10:45:06 25      Q.  So it's not something you've seen before?

Page 47

10:45:09  1      A.  Correct.
10:45:09  2      Q.  The very first provision has a defense of -- or
10:45:17  3  definition, rather, of "barratry"?
10:45:20  4      A.  Uh-huh.
10:45:20  5      Q.  Is that a term with which you're familiar?
10:45:23  6      A.  Yes.
10:45:24  7      Q.  What's your understanding of what barratry is?
10:45:27  8      A.  Barratry is often defined as I see that it is
10:45:30  9  defined here.  It is a purported restriction on, as it
10:45:40 10  says here, stirring up or fomenting litigation.
10:45:58 11      MR. LOCKERBY:  I'd like to have this marked as
10:46:01 12  Exhibit 9, please.
10:46:01 13      (Whereupon the document referred to is marked
10:46:01 14  by the reporter as Defense Exhibit 9 for
10:46:18 15  identification.)
10:46:18 16      THE WITNESS:  Thank you.
10:46:19 17  BY MR. LOCKERBY:
10:46:25 18      Q.  You've been handed what's been marked as
10:46:27 19  Exhibit 9, a copy of Virginia Code Section 18.2-499.
10:46:40 20      Have you ever seen this provision of the
10:46:40 21  Virginia code?
10:46:41 22      A.  I have not.
10:46:48 23      MR. LOCKERBY:  I'd like to have this marked as
10:46:50 24  Exhibit 10, please.
10:46:50 25  ///

Page 48

10:46:50  1      (Whereupon the document referred to is marked
10:46:50  2  by the reporter as Defense Exhibit 10 for
10:47:05  3  identification.)
10:47:05  4      THE WITNESS:  Thank you.
10:47:06  5  BY MR. LOCKERBY:
10:47:09  6      Q.  You've been handed what's been marked as
10:47:11  7  Exhibit 10, a copy of Virginia Code Section 18.2-500.
10:47:19  8      Have you ever seen this provision of the
10:47:22  9  Virginia code?
10:47:23 10      A.  I have not.
10:47:42 11      MR. LOCKERBY:  I'd like to have this marked as
10:47:43 12  Exhibit 11, please.
10:47:43 13      (Whereupon the document referred to is marked
10:47:43 14  by the reporter as Defense Exhibit 11 for
10:47:58 15  identification.)
10:47:58 16      THE WITNESS:  Thank you.
10:47:59 17  BY MR. LOCKERBY:
10:48:04 18      Q.  You've been handed what's been marked as
10:48:07 19  Exhibit 11, which is an October 17, 2008, letter to the
10:48:17 20  Attorney General of the United States and the acting
10:48:20 21  U.S. Attorney for the District of Connecticut from
10:48:23 22  Robert F. Bauer.
10:48:25 23      Why don't you take a minute, please, to look at
10:48:27 24  this.  I realize this isn't from you.  And then I'll
10:48:30 25  have a few questions about it.

Page 49

| | | |
|---|---|---|
| 10:48:32 | 1 | A. Okay. |
| 10:50:45 | 2 | Q. Have you ever seen this correspondence before? |
| 10:50:48 | 3 | A. Not that I know of. |
| 10:50:49 | 4 | Q. Did you have any role in drafting this |
| 10:50:53 | 5 | correspondence? |
| 10:50:53 | 6 | A. Not to my recollection. |
| 10:50:57 | 7 | Q. Mr. Bauer was the outside general counsel of |
| 10:51:04 | 8 | the Obama campaign during the time that you were |
| 10:51:07 | 9 | national voter protection counsel; correct? |
| 10:51:09 | 10 | A. Correct. |
| 10:51:09 | 11 | Q. Were you aware that he had requested an |
| 10:51:17 | 12 | investigation of -- and I'm quoting now from Page 2 -- |
| 10:51:23 | 13 | "the systematic development and dissemination of |
| 10:51:27 | 14 | unsupported spurious allegations of vote fraud"? |
| 10:51:30 | 15 | MR. BRIDGES: Objection. Vague and ambiguous |
| 10:51:31 | 16 | as to time. |
| 10:51:33 | 17 | MR. LEBOWITZ: Join the objection. |
| 10:51:35 | 18 | MR. GORMAN: Can we have an agreement that an |
| 10:51:38 | 19 | objection for one is good for all so we don't keep |
| 10:51:41 | 20 | repeating ourselves? |
| 10:51:42 | 21 | MR. LOCKERBY: We do. Although I would say |
| 10:51:43 | 22 | that plaintiff's -- counsel for plaintiff's counsel is |
| 10:51:49 | 23 | entitled to object only with respect to claims of work |
| 10:51:53 | 24 | product. |
| 10:51:55 | 25 | MR. GORMAN: To the extent an objection is not |

Page 50

| | | |
|---|---|---|
| 10:51:58 | 1 | applicable to us, I mean -- |
| 10:52:00 | 2 | MR. LOCKERBY: Yes. |
| 10:52:01 | 3 | MR. GORMAN: -- it wouldn't apply. Sure. But |
| 10:52:02 | 4 | I don't want to keep repeating everybody. I just want |
| 10:52:05 | 5 | to make sure all the objections are preserved. |
| 10:52:07 | 6 | MR. LEBOWITZ: I appreciate that. |
| 10:52:08 | 7 | MR. LOCKERBY: But we don't agree that -- I |
| 10:52:09 | 8 | mean, certainly -- we can stipulate that you're part of |
| 10:52:12 | 9 | the amen chorus, but we don't agree that you have |
| 10:52:16 | 10 | standing to object to anything except with respect to |
| 10:52:19 | 11 | the assertion by two of the law firms of work product. |
| 10:52:24 | 12 | But if we have the stipulation, I suppose it doesn't |
| 10:52:26 | 13 | matter. |
| 10:52:29 | 14 | THE WITNESS: Can I ask for the question again, |
| 10:52:31 | 15 | please. |
| 10:52:33 | 16 | MR. LOCKERBY: Yes. |
| 10:52:34 | 17 | If you could read it back, please. |
| 10:52:35 | 18 | (The record is read by the reporter as |
| 10:52:35 | 19 | follows: |
| 10:51:11 | 20 | "Q. Were you aware that he had requested an |
| 10:51:17 | 21 | investigation of -- and I'm quoting now from |
| 10:51:21 | 22 | Page 2 -- 'the systematic development and |
| 10:51:26 | 23 | dissemination of unsupported spurious |
| 10:51:29 | 24 | allegations of vote fraud'?") |
| 10:53:02 | 25 | THE WITNESS: I don't recall whether I was |

Page 51

| | | |
|---|---|---|
| 10:53:05 | 1 | aware before the letter was written. I became aware |
| 10:53:08 | 2 | afterward, yes. |
| 10:53:15 | 3 | BY MR. LOCKERBY: |
| 10:53:15 | 4 | Q. Did you ever discuss that request with anybody |
| 10:53:19 | 5 | else? |
| 10:53:30 | 6 | A. I don't know whether I can answer that without |
| 10:53:33 | 7 | invading a privilege that, again, I can't waive between |
| 10:53:36 | 8 | the organization and myself. Externally, I don't recall |
| 10:53:51 | 9 | whether I have discussed that call for a further |
| 10:53:58 | 10 | investigation with individuals outside of those to whom |
| 10:54:03 | 11 | I owe an attorney-client privilege. |
| 10:54:18 | 12 | MR. LOCKERBY: I'd like to have this marked as |
| 10:54:20 | 13 | Exhibit 12, please. |
| 10:54:20 | 14 | (Whereupon the document referred to is marked |
| 10:54:20 | 15 | by the reporter as Defense Exhibit 12 for |
| 10:54:36 | 16 | identification.) |
| 10:54:36 | 17 | THE WITNESS: Thank you. |
| 10:54:50 | 18 | BY MR. LOCKERBY: |
| 10:54:51 | 19 | Q. Exhibit 12 is a publication by J. Christian |
| 10:54:57 | 20 | Adams dated June 4, 2013, in the PJMedia.com entitled |
| 10:55:06 | 21 | "White House Counsel Robert Bauer, Architect of IRS |
| 10:55:11 | 22 | Abuse," question mark. |
| 10:55:12 | 23 | And on Page 3, top of the page, Mr. Adams |
| 10:55:23 | 24 | writes, "During the 2008 election, while representing |
| 10:55:27 | 25 | the Obama campaign, Bauer sent a threatening letter to |

Page 52

| | | |
|---|---|---|
| 10:55:31 | 1 | the justice department demanding criminal investigations |
| 10:55:34 | 2 | of people who had the audacity to speak" -- and the word |
| 10:55:39 | 3 | "speak" is italicized -- "about voter fraud. Bauer even |
| 10:55:43 | 4 | singled out Sarah Palin in the letter. Anyone who |
| 10:55:46 | 5 | 'developed or disseminated' information about voter |
| 10:55:50 | 6 | fraud to Bauer deserved the heavy boot of a criminal |
| 10:55:53 | 7 | investigation. Read the letter. It reveals a nasty, |
| 10:55:57 | 8 | thuggish, and lawless attitude towards political |
| 10:56:02 | 9 | opposition." |
| 10:56:02 | 10 | Have you ever read this particular article by |
| 10:56:04 | 11 | Mr. Adams before? |
| 10:56:05 | 12 | A. I don't believe that I have. |
| 10:56:07 | 13 | Q. Did you agree with Mr. Bauer that those who |
| 10:56:14 | 14 | made the claim of voter fraud during the 2008 election |
| 10:56:19 | 15 | should be investigated by the justice department? |
| 10:56:22 | 16 | A. I don't believe that that's Mr. Bauer's |
| 10:56:27 | 17 | claim -- that's not how I would characterize Mr. Bauer's |
| 10:56:31 | 18 | statement in his letter, and so I can't say whether I |
| 10:56:34 | 19 | agree or disagree with that characterization. |
| 10:56:37 | 20 | Q. Did you agree with the request, or requests, |
| 10:56:48 | 21 | that Mr. Bauer was making in the letter that was marked |
| 10:56:54 | 22 | as Exhibit 11 to your deposition? |
| 10:57:18 | 23 | A. I can't say whether I agreed with it at the |
| 10:57:21 | 24 | time because, again, I don't know whether I saw this |
| 10:57:23 | 25 | before it was produced. I would agree with part of it |

Page 53

10:57:30   1   now.

10:57:36   2       Q.   Which part of it would you agree with?

10:57:39   3       A.   Involvement by justice department officials in

10:57:44   4   supporting partisan political campaign activity.  I

10:57:49   5   would agree with a call for an investigation into the

10:57:52   6   use of federal government resources to support partisan

10:57:57   7   campaign activity.

10:57:58   8       Q.   Would you agree with investigating people who

10:58:02   9   make allegations of voter fraud?

10:58:05   10      A.   It would depend on the context.

10:58:07   11      Q.   Well, under what circumstances would you

10:58:09   12   advocate criminal investigations of people who allege

10:58:14   13   that there's been voter fraud?

10:58:16   14      A.   If the allegations themselves amounted to

10:58:19   15   potential crimes, then I would support an investigation

10:58:24   16   of those potential crimes.

10:58:25   17      Q.   Under what circumstances do you contend that

10:58:28   18   alleging voter fraud would constitute a crime?

10:58:32   19      A.   If the allegations were undertaken with a

10:58:42   20   specific intent conspiring with others to intimidate

10:58:48   21   individuals from exercising their own First Amendment

10:58:53   22   rights, that would be a conspiracy under the Federal

10:58:56   23   Criminal Code; and I would support an investigation into

10:58:59   24   such conspiracy.

10:59:00   25      Q.   And how would you go about determining whether

Page 54

10:59:04   1   someone had the specific intent to which you've

10:59:07   2   referred?

10:59:08   3       MR. LEBOWITZ:  Objection.  Calls for

10:59:09   4   speculation.

10:59:11   5       THE WITNESS:  Yeah.  That's --

10:59:12   6       MR. BRIDGES:  Join.

10:59:13   7       THE WITNESS:  That's a hypothetical question.

10:59:14   8   I -- I don't know that I can answer in the abstract.

10:59:18   9   BY MR. LOCKERBY:

10:59:19   10      Q.   Your testimony -- I asked you, "Under what

10:59:21   11   circumstances do you contend that alleging voter fraud

10:59:24   12   would constitute a crime?"

10:59:26   13      A.   Uh-huh.

10:59:27   14      Q.   And your answer was, "If the allegations were

10:59:30   15   undertaken with a specific intent conspiring with others

10:59:34   16   to intimidate individuals from exercising their own

10:59:39   17   First Amendment rights, that would be a conspiracy under

10:59:43   18   the Federal Criminal Code; and I would support an

10:59:47   19   investigation into such conspiracy."

10:59:48   20       So my question was, How would -- would you go

10:59:51   21   about determining whether someone had a specific

10:59:54   22   intent --

10:59:57   23       MR. BRIDGES:  Objection.  That calls for

10:59:58   24   speculation.

10:59:58   25   ///

Page 55

10:59:58   1   BY MR. LOCKERBY:

10:59:58   2       Q.   -- conspiring with others to intimidate

11:00:02   3   individuals?

11:00:02   4       MR. BRIDGES:  Objection.  Calls for

11:00:03   5   speculation.

11:00:04   6   BY MR. LOCKERBY:

11:00:05   7       Q.   Okay.  Well, subject to the objection, you can

11:00:06   8   answer.

11:00:06   9       A.   It's highly context-specific, and I don't know

11:00:10   10   that I can answer that in the abstract.

11:00:12   11      Q.   So it's like the classic definition of

11:00:14   12   pornography.  You know it when you see it, but you can't

11:00:19   13   articulate a principled standard?

11:00:21   14      MR. BRIDGES:  Objection.  Argumentative.

11:00:23   15      MR. LEBOWITZ:  Mischaracterizes testimony.

11:00:25   16      THE WITNESS:  That's not what I said.

11:00:26   17      The investigation into criminal intent depends

11:00:30   18   on the facts and circumstances of any given case.  It's

11:00:35   19   not -- it is not merely a matter of knowing it when you

11:00:40   20   see it, but the context actually would set the

11:00:42   21   parameters for an investigation.  All that said, I'm not

11:00:48   22   a criminal prosecutor and -- nor am I a federal criminal

11:00:55   23   investigating agent.

11:01:09   24   BY MR. LOCKERBY:

11:01:10   25      Q.   Now, during the Obama administration, John

Page 56

11:01:16   1   Christian Adams and Hans von Spakovsky wrote a series of

11:01:23   2   articles critical of the voting rights section at the

11:01:26   3   Department of Justice; isn't that right?

11:01:29   4       A.   Of the voting section?

11:01:30   5       Q.   The voting section.

11:01:31   6       A.   I would agree with that characterization, yes.

11:01:36   7       Q.   And you saw at least some of those

11:01:39   8   publications, did you not?

11:01:39   9       A.   Correct.

11:01:40   10      Q.   And are you familiar with Mr. von Spakovsky?

11:03:01   11      A.   Yes.

11:03:01   12      Q.   How are you familiar with him?

11:03:06   13      A.   He also works in the election field.  He's held

11:03:10   14   various positions, including government positions --

11:03:12   15   government positions, at various times.

11:03:16   16      Q.   And is it fair to say that you don't -- you

11:03:25   17   don't agree with Mr. Spakovsky on a number of issues

11:03:28   18   related to election law?

11:03:29   19      A.   On a number of issues.  That's correct.  On

11:03:34   20   some others, we agree.

11:03:38   21      Q.   On what subjects do you agree with Mr. von

11:03:43   22   Spakovsky?

11:03:43   23      A.   I couldn't give you a complete list.  I'm not

11:03:45   24   sure that I know all of his positions.  I know that he

11:03:50   25   correctly feels very strongly about the rights of

Page 57

```
11:03:52   1    military and overseas voters.  I share his concerns.  Or
11:03:58   2    I share -- I shouldn't say that.  I share some of the
11:04:00   3    concerns that he's previously articulated that I know
11:04:04   4    of.
11:04:09   5        MR. LOCKERBY:  I've like to have this marked as
11:04:13   6    Exhibit 13, please.
11:04:13   7        (Whereupon the document referred to is marked
11:04:13   8    by the reporter as Defense Exhibit 13 for
11:04:13   9    identification.)
11:04:13  10    BY MR. LOCKERBY:
11:04:40  11        Q.  Exhibit 13 is a February 5, 2015, PJ Media
11:04:48  12    article by J. Christian Adams on the subject "Obama and
11:04:53  13    Holder Cry Wolf on Voting Rights."
11:04:57  14        Have you ever seen this before?
11:04:58  15        A.  I can't recall.  It's possible.
11:05:09  16        Q.  As of the date of this particular article, had
11:05:15  17    you begun your secondment at DOJ yet?
11:05:19  18        A.  I had not.
11:05:20  19        Q.  So this one was before your tenure?
11:05:22  20        A.  Correct.
11:05:38  21        MR. LOCKERBY:  I'd like to have this marked as
11:05:39  22    Exhibit 14, please.
11:05:39  23        (Whereupon the document referred to is marked
11:05:39  24    by the reporter as Defense Exhibit 14 for
11:05:56  25    identification.)
```

Page 58

```
11:05:56   1        THE WITNESS:  Thank you.
11:06:04   2    BY MR. LOCKERBY:
11:06:05   3        Q.  Exhibit 14 is an April 6, 2016, article by Hans
11:06:14   4    von Spakovsky and J. Christian Adams, again, in PJ
11:06:20   5    Media, entitled "Exclusive:  Meet the Radical Lawyers
11:06:23   6    the DOJ Hired to Oversee Elections."
11:06:26   7        Have you seen this article before?
11:06:27   8        A.  I have.
11:06:29   9        Q.  Were you happy about it?
11:06:37  10        A.  No.
11:06:50  11        Q.  And had you previously been familiar with the
11:06:54  12    publication PJ Media?
11:06:56  13        A.  Yes.
11:06:56  14        Q.  How were you familiar with it?
11:06:59  15        A.  I can't recall when I first became familiar
11:07:04  16    with it.
11:07:07  17        Among other things, the first sentence of this
11:07:12  18    piece refers to a prior series published in PJ Media
11:07:16  19    which I was also aware of.  I don't recall whether I was
11:07:20  20    familiar with them before that series or not.  I may
11:07:24  21    well have been.
11:07:25  22        Q.  That's the reference to the, quote, Hiring of
11:07:30  23    ideologically leftist and partisan lawyers to fill the
11:07:34  24    career ranks of the lawyers in the Department of
11:07:37  25    Justice's civil rights division?
```

Page 59

```
11:07:39   1        A.  I -- I wouldn't agree with that
11:07:41   2    characterization.  It's the Every Single One series that
11:07:44   3    is mentioned in the first sentence.
11:07:46   4        Q.  I was quoting.  I wasn't characterizing.
11:07:48   5        A.  Yeah.  I -- I wouldn't -- when you say, "that's
11:07:54   6    the," those aren't words that I would use.  I am
11:07:58   7    familiar with PJ Media based on the Every Single One
11:08:00   8    series.
11:08:04   9        Q.  Have you seen the discovery request that the
11:08:07  10    plaintiffs have served on defendants in this case?
11:08:10  11        A.  I have not.
11:08:11  12        Q.  Okay.  Were you aware of the fact that they
11:08:13  13    specifically reference PJ Media?
11:08:16  14        A.  I was not.
11:08:34  15        Q.  Are you familiar with an individual named
11:08:37  16    Richard Hasen, H-a-s-e-n?
11:08:41  17        A.  Hasen is how --
11:08:41  18        Q.  Hasen.
11:08:43  19        A.  -- he pronounces his name.
11:08:45  20        Q.  Excuse me.
11:08:46  21        A.  Yes.
11:08:46  22        Q.  How do you know him?
11:08:47  23        A.  He was a colleague at Loyola Law School.  I
11:08:50  24    don't recall when I first became aware of him either,
11:08:54  25    but he's also an individual in the election and voting
```

Page 60

```
11:08:57   1    rights field.
11:08:59   2        Q.  Other than at Loyola, have you worked with him
11:09:04   3    anywhere else?
11:09:07   4        A.  No.  I have assisted him with various things,
11:09:13   5    but I would not say I have worked with him outside of
11:09:16   6    Loyola.
11:09:19   7        Q.  What types of things have you assisted him
11:09:22   8    with?
11:09:25   9        A.  Manuscripts and the like.  Faculty members
11:09:29  10    generally read and provide comment on various
11:09:34  11    publications before they're published.  I have also
11:09:42  12    assisted him with a blog that he runs from time to time.
11:09:45  13    He's asked me if I would maintain the blog in periods
11:09:48  14    when he's away or otherwise engaged.
11:10:26  15        Q.  Have you seen articles that Mr. Adams has
11:10:30  16    published critical of Mr. Hasen?
11:10:34  17        A.  Yes.
11:10:34  18        Q.  And you weren't happy about those either, were
11:10:38  19    you?
11:10:38  20        MR. LEBOWITZ:  Objection.
11:10:39  21        MR. BRIDGES:  Objection.  Vague and ambiguous.
11:11:01  22        THE WITNESS:  I'd have to see the articles.
11:11:02  23        MR. LOCKERBY:  I'd like to have this marked as
11:11:04  24    Exhibit 15, please.
11:11:04  25    ///
```

Page 61

11:11:04  1         (Whereupon the document referred to is marked
11:11:04  2    by the reporter as Defense Exhibit 15 for
11:11:23  3    identification.)
11:11:23  4         THE WITNESS:  Thank you.
11:11:24  5    BY MR. LOCKERBY:
11:11:32  6         Q.  Exhibit 15 is another article published by
11:11:36  7    Mr. Adams and PJ Media, this one dated October 5, 2015,
11:11:43  8    entitled "Former DOJ Head Michael Mukasey Hits Obama's
11:11:48  9    DOJ Voting Section."
11:11:50  10         Do you see this at the time it was published?
11:11:54  11         A.  I can't remember.  It's possible.
11:12:01  12         Q.  And this was published during your tenure at
11:12:05  13    DOJ during the time that you were on secondment;
11:12:05  14    correct?
11:12:10  15         A.  Correct.
11:13:06  16         MR. LOCKERBY:  I'd like to have this marked as
11:13:08  17    Exhibit 16, please.
11:13:08  18         (Whereupon the document referred to is marked
11:13:08  19    by the reporter as Defense Exhibit 16 for
11:13:25  20    identification.)
11:13:25  21         THE WITNESS:  Thank you.
11:13:27  22         MR. LOCKERBY:  Exhibit 16 is a document that
11:13:28  23    you've produced.
11:13:30  24         And just for the record, when we got the
11:13:32  25    documents -- the document production on behalf of Loyola

Page 62

11:13:36  1    and you, the documents were not numbered; and they were
11:13:40  2    all PDFs; and so we've applied numbers to them.
11:13:45  3    Although, apparently, it's possible only to apply one
11:13:48  4    number to a PDF; so there's some fairly lengthy PDFs
11:13:53  5    with only one number.  But I'll identify them for the
11:13:57  6    record, and then I'll have a paralegal circulate a
11:14:01  7    numbered set so everybody has those so it would be
11:14:03  8    somewhat easier to work with.
11:14:05  9    BY MR. LOCKERBY:
11:14:05  10         Q.  But in any event, the prefix that says
11:14:12  11    F-L-I-P-R-O-D and then L-E-V-L-O-Y followed by numbers
11:14:17  12    indicates that this was among the documents that you
11:14:19  13    produced.
11:14:20  14         Now, this particular one is from June 19, 2013,
11:14:28  15    County of San Diego registrar of voters.  And do you see
11:14:34  16    that this correspondence refers to cancelation of an
11:14:38  17    individual's voter registration in San Diego County?
11:14:43  18         A.  It -- it appears to, yes.
11:14:46  19         Q.  And according to this correspondence, the
11:14:54  20    individual registered to vote in 1998 but was not a
11:15:01  21    citizen and had his voter registration cancelled on June
11:15:10  22    19, 2013, on the basis of noncitizenship.
11:15:13  23         Do you see that?
11:15:13  24         A.  I see that's what this is, yes.
11:15:15  25         Q.  And you see it also states that this individual

Page 63

11:15:19  1    voted in 1998, 1999, 2000, 2002, 2003, 2004, 2005, 2006,
11:15:32  2    and 2008?  Do you see that?
11:15:35  3         A.  I see that's reflected here, yes.
11:15:37  4         Q.  And how did this document or documents like
11:15:41  5    this come into your possession?
11:15:43  6         A.  I don't recall.  I would be guessing, and I
11:15:51  7    don't --
11:15:51  8         MR. BRIDGES:  Do not guess.
11:15:52  9         THE WITNESS:  -- want to guess.
11:16:04  10         I don't remember reviewing this document in
11:16:06  11    particular -- the substance of this document in
11:16:11  12    preparing this production.  And so I can only offer an
11:16:19  13    assumption as to where it is, but that's -- I don't want
11:16:22  14    to guess, so I don't know.
11:16:23  15    BY MR. LOCKERBY:
11:16:27  16         Q.  But, in fact, you have a number of other
11:16:29  17    documents like this in your possession; correct?
11:16:33  18         A.  It depends on what you mean by "like this."  So
11:16:36  19    I have a number of different election records, but they
11:16:39  20    reflect different things.
11:16:57  21         Q.  Have you ever written any articles about the
11:16:59  22    extent to which records like the one that's been marked
11:17:04  23    as Exhibit 16 reflect noncitizen voting in California or
11:17:09  24    any other jurisdiction?
11:17:11  25         MR. LEBOWITZ:  Objection.  Vague.  Compound.

Page 64

11:17:14  1         MR. BRIDGES:  Join.
11:17:18  2         THE WITNESS:  I have written pieces, including
11:17:20  3    information about some noncitizen voting, including in
11:17:24  4    California.  I don't -- I would have to look at my
11:17:30  5    publications to see whether I've referenced particular
11:17:32  6    records like this one.
11:17:34  7    BY MR. LOCKERBY:
11:17:35  8         Q.  Do you contend that noncitizen voting is a
11:17:37  9    myth?
11:17:40  10         A.  The fact that -- I contend it exists.  It is --
11:17:50  11    allegations of noncitizen voting are often exaggerated.
11:17:54  12    And so the extent of claimed noncitizen voting may well
11:17:59  13    be.  I don't contend that noncitizen voting itself is a
11:18:03  14    myth.
11:18:04  15         Q.  If a member of the general public wanted to get
11:18:08  16    a copy of the document that's been marked as Exhibit 16,
11:18:13  17    how would he or she go about doing that?
11:18:16  18         MR. BRIDGES:  Objection.  Calls for
11:18:18  19    speculation.
11:18:23  20         THE WITNESS:  Yeah.  I don't know.  It may be
11:18:34  21    that this is a public record under California law; and
11:18:39  22    it may be that it would be available for FOIA or the
11:18:47  23    state equivalent; but without knowing more, I'm not
11:19:04  24    sure.
11:19:05  25         There are also provisions under federal law for

## Page 65

11:19:11   1   collecting registration records or records relating to

11:19:15   2   registration; and so a member of the public, depending

11:19:19   3   on when they were seeking information like this, might

11:19:23   4   turn to that federal law.

11:19:25   5   BY MR. LOCKERBY:

11:19:32   6       Q. And the federal law would apply to this

11:19:36   7   particular document because the correspondence was sent

11:19:40   8   to U.S. Citizenship and Immigration Services; is that

11:19:40   9   right?

11:19:45   10      A. No, that is not correct.

11:19:52   11      Q. How would someone go about obtaining a document

11:19:55   12   like the one that's been marked Exhibit 16 under federal

11:19:59   13   law?

11:19:59   14      MR. LEBOWITZ: Objection. Calls for

11:20:00   15   speculation.

11:20:03   16      MR. BRIDGES: Join.

11:20:03   17      THE WITNESS: The National Voter Registration

11:20:06   18   Act provides for public access to records relating to

11:20:10   19   registration for a certain time period. I don't know

11:20:18   20   whether a member of the public would have to request the

11:20:21   21   documents within that time period in order to gain

11:20:24   22   access.

11:20:30   23   BY MR. LOCKERBY:

11:20:30   24      Q. And is that a request that would have to be

11:20:35   25   made to state officials, federal officials, either, or

## Page 66

11:20:41   1   both?

11:20:42   2      MR. BRIDGES: Objection. Lacks foundation.

11:20:43   3   Calls for speculation.

11:20:50   4      THE WITNESS: I would have to consult the law

11:20:51   5   again. I -- I am sure that that request could be made

11:20:56   6   of -- if timely, state officials or county officials.

11:21:02   7   I'm unsure about whether it could also be made to

11:21:05   8   federal officials.

11:21:15   9      MR. LOCKERBY: Why don't we take a quick break,

11:21:18   10   if this is a good time. I have a series of exhibits

11:21:20   11   that won't take long to go through, but it might be

11:21:23   12   better if I have them all arranged at once.

11:21:25   13      So how much time do people need? Five minutes

11:21:29   14   or...

11:21:29   15      THE WITNESS: A quick restroom break would

11:21:32   16   be --

11:21:32   17      MR. BRIDGES: Five minutes is great.

11:21:34   18      THE VIDEOGRAPHER: We're off the record at

11:21:36   19   11:21 a.m.

11:21:38   20      (A recess is taken.)

11:35:11   21      THE VIDEOGRAPHER: We are back on the record at

11:35:17   22   11:35 a.m.

11:35:20   23      MR. LOCKERBY: Okay. I have a series of

11:35:23   24   documents I'm going to mark. I'm going to ask you some

11:35:27   25   questions about all of them at once just to try and save

## Page 67

11:35:31   1   time and go through them.

11:35:32   2      So, first of all, this will be Exhibit 17.

11:35:32   3      (Whereupon the document referred to is marked

11:35:32   4   by the reporter as Defense Exhibit 17 for

11:35:51   5   identification.)

11:35:51   6      THE WITNESS: Thank you.

11:36:01   7      MR. LOCKERBY: This one will be Exhibit 18.

11:36:01   8      (Whereupon the document referred to is marked

11:36:01   9   by the reporter as Defense Exhibit 18 for

11:36:18   10   identification.)

11:36:18   11      THE WITNESS: Thank you.

11:36:19   12      MR. LOCKERBY: This one will be Exhibit 19.

11:36:19   13      (Whereupon the document referred to is marked

11:36:19   14   by the reporter as Defense Exhibit 19 for

11:36:35   15   identification.)

11:36:35   16      MR. BRIDGES: It's two pages?

11:36:37   17      MR. LOCKERBY: Should be.

11:36:42   18   This one will be Exhibit 20.

11:37:02   19   This one will be Exhibit 21.

11:37:02   20      (Whereupon the documents referred to are marked

11:37:02   21   by the reporter as Defense Exhibits 20 and 21 for

11:37:18   22   identification.)

11:37:18   23      THE WITNESS: Thank you.

11:37:21   24      MR. LOCKERBY: This one will be Exhibit 22.

11:37:21   25   ///

## Page 68

11:37:21   1      (Whereupon the document referred to is marked

11:37:21   2   by the reporter as Defense Exhibit 22 for

11:37:35   3   identification.)

11:37:35   4      THE WITNESS: Thank you.

11:37:37   5      MR. LOCKERBY: This one will be Exhibit 23.

11:37:37   6      (Whereupon the document referred to is marked

11:37:37   7   by the reporter as Defense Exhibit 23 for

11:37:55   8   identification.)

11:37:55   9      THE WITNESS: Thank you.

11:37:56   10      MR. LOCKERBY: And this one will be Exhibit 24.

11:37:56   11      (Whereupon the document referred to is marked

11:37:56   12   by the reporter as Defense Exhibit 24 for

11:38:14   13   identification.)

11:38:14   14      THE WITNESS: Thank you.

11:38:29   15   BY MR. LOCKERBY:

11:38:33   16      Q. All right. You've been handed what's been

11:38:34   17   marked -- or what have been marked as Exhibits 17, 18,

11:38:42   18   19, 20, 21, 22, 23, and 24 to your deposition; and these

11:38:54   19   are all among documents that you produced in response to

11:38:59   20   the subpoena.

11:39:03   21      The first one, Exhibit 17, is also from the

11:39:08   22   San Diego County Registrar of Voters dated March 6,

11:39:17   23   2014.

11:39:17   24      Exhibit 18 is from the San Diego County

11:39:21   25   Registrar of Voters dated November 10, 2014.

Exhibit 19 says on the first page, "Use this form only for canceling registration in San Diego County." And you see it has the name of a voter across the top?
A. Yes.
Q. And it says the voter's place of birth is Tijuana?
A. Yes.
Q. And then the individual says, "I hereby authorize the registrar of voters to cancel this registration for the following reason: Noncitizen."
Do you see that?
A. Yes.
Q. In your experience, is there a reason that someone might want to cancel his or her own voter registration for being a noncitizen?
A. Yes.
MR. BRIDGES: Objection. Calls for speculation.
You may answer.
THE WITNESS: Yes.
BY MR. LOCKERBY:
Q. What reason would that be?
MR. BRIDGES: Same objection.
You may answer.

THE WITNESS: There may be several. Among them, looking only at this Exhibit 19 before me, Mr. or Ms. Rodriguez -- I'm not sure -- appears to have been registered by mistake, declared him or herself not to be a citizen on the registration form, and was nevertheless registered. And so a citizen -- a individual, a noncitizen seen that they had been registered by official mistake, they seek cancelation of their record.
BY MR. LOCKERBY:
Q. How can you tell by this form that the individual was registered by mistake?
A. On the second page of Exhibit 19 -- it's a little bit difficult to read on the facsimile copy here; but above Question 12, over on the bottom right-hand side of the page, there is a question asking, "Are you a citizen of the United States of America," question mark. There are two bubbles next to that: One for yes, one for no.
I can't authenticate this document, but the bubble next to "no" is colored in. And according to procedure in every jurisdiction of which I'm aware, a form should not have been processed. That's not accurate. A form should have been processed, but individual should not have been registered if they indicated that they were not a citizen.

Q. In your experience, are there circumstances in which an individual indicates at the time that he or she registers to vote that he or she is a citizen, is registered, but then later seeks cancelation based on noncitizenship?
A. I have seen examples of that, yes.
Q. And in your experience, are there certain circumstances in which an individual, having previously registered to vote by claiming to be a citizen, would then want to correct the record and state that he or she is not a citizen?
A. Yes.
Q. Why would that be?
MR. LEBOWITZ: Objection.
MR. BRIDGES: Objection. Calls for -- join.
THE WITNESS: So there may be several different reasons. Among them, again, the individual mistake. An individual may have indicated incorrectly that they were a citizen when, in fact, they were not or may have misunderstood the instructions on the registration form and then later come to realize that they filled out the form improperly.
BY MR. LOCKERBY:
Q. Have you ever seen situations in which someone who was registering people to vote provided inaccurate

information that's provide -- that has prompted a noncitizen to register?
A. Yes.
Q. And in your experience, if a --
A. I should -- pardon me. I should clarify.
I have not personally -- you asked whether I had seen. I have not personally seen that happen. I am aware of circumstances in which that has happened.
Q. Okay. And are you aware of circumstances in which a noncitizen decides to seek citizenship and encounters difficulties because the person has previously voted even though not being entitled to do so?
A. Yes.
Q. And under those circumstances, would it make sense for a noncitizen to notify voter registration officials so that hopefully the application for citizenship will be successful?
MR. LEBOWITZ: Objection. Calls for speculation.
MR. BRIDGES: Join.
THE WITNESS: Would that make sense? Yes.
BY MR. LOCKERBY:
Q. And are you aware of circumstances in which that's happened?

Page 73

11:44:39  1   A. I -- I don't know that I'm aware with
11:44:46  2   sufficient detail to say that that's why somebody might
11:44:51  3   have made that particular request.
11:44:51  4   Q. Have you heard that that's happened?
11:44:57  5   A. Probably. I honestly can't say, you know,
11:45:02  6   without pointing to a particular article where
11:45:04  7   somebody's made that claim. But that -- that would not
11:45:06  8   surprise me.
11:45:06  9   Q. And you don't have any basis for disputing that
11:45:09  10  that's happened?
11:45:09  11  A. I do not.
11:45:21  12  Q. I'd like you to look, please, at what's been
11:45:24  13  marked as Exhibit 20. Do you see this says it's a --
11:45:37  14  it's from the DeKalb County, Georgia, Board of
11:45:43  15  Registration and Elections?
11:45:44  16  A. Yes.
11:45:44  17  Q. And it says, "Dear Mr. Currier, According to
11:45:48  18  information you furnished on the jury questionnaire from
11:45:51  19  DeKalb Superior Court, you are not a U.S. citizen. You
11:45:55  20  must be a U.S. citizen to be eligible to register and
11:45:59  21  vote."
11:45:59  22       In your experience, does it sometimes come to
11:46:02  23  light that registered voters, in fact, are not U.S.
11:46:07  24  citizens when they are summoned for jury duty?
11:46:11  25       MR. BRIDGES: Objection. Calls for -- well, as

Page 74

11:46:14  1   phrased, I think it calls for speculation.
11:46:16  2        But you may answer.
11:46:17  3        THE WITNESS: Yeah. It sometimes comes to
11:46:19  4   light that individuals have indicated in response to
11:46:22  5   jury service summons that they are noncitizens. I
11:46:26  6   confess that I don't know whether that is true.
11:46:32  7   BY MR. LOCKERBY:
11:46:34  8   Q. So you're saying you don't know whether the
11:46:38  9   citizen's statement in response to jury summons that he
11:46:42  10  or she is not a U.S. citizen is true? You simply know
11:46:45  11  that some individual summoned for jury duty then state
11:46:50  12  that they're not U.S. citizens?
11:46:52  13  A. Correct.
11:46:53  14       I -- I do want to clarify. I don't know that
11:46:56  15  that's what happened in Exhibit 20. There is an
11:47:00  16  indication on Page 3 that the voter was sent a letter to
11:47:02  17  verify their citizenship and never responded. I don't
11:47:07  18  know whether the individual in Exhibit 20 affirmatively
11:47:12  19  indicated that they were not a citizen.
11:47:14  20  Q. And on the second page of the exhibit, you
11:47:17  21  don't know who wrote, "He is a citizen of Australia, not
11:47:22  22  the U.S."?
11:47:23  23  A. Correct.
11:47:27  24  Q. Are you aware of the fact that in some states,
11:47:31  25  the state courts notify local registrars when someone

Page 75

11:47:36  1   who's summoned for jury duty states that he or she is
11:47:41  2   not a U.S. citizen?
11:47:42  3   A. Yes.
11:47:44  4   Q. Do you know whether that happens in the
11:47:48  5   Commonwealth of Virginia?
11:47:50  6   A. I don't know.
11:47:51  7   Q. Do you believe that that's something that state
11:47:58  8   courts should do? Notify registrars when someone is
11:48:02  9   excused from jury duty on the basis of not being a U.S.
11:48:08  10  citizen?
11:48:08  11  A. I do.
11:48:08  12  Q. Why?
11:48:10  13  A. It should prompt further investigation about
11:48:13  14  whether that individual is actually a noncitizen or not;
11:48:17  15  and if that individual is actually a noncitizen, it
11:48:20  16  should result in, at the least, removal from the voter
11:48:24  17  rolls.
11:48:24  18  Q. If someone has stated under oath that he or she
11:48:31  19  is not a citizen of the United States, what further
11:48:33  20  investigation, in your view, would be required?
11:48:41  21  A. I would think that a registrar would want to
11:48:44  22  confirm that the individual is now currently not a
11:48:49  23  citizen; that is, there may be an investigation to
11:48:55  24  whether status has changed at the time. And there may
11:48:58  25  also be an investigation as to whether the individual

Page 76

11:49:00  1   lied when they said they were not a citizen or were
11:49:02  2   otherwise mistaken when they said they were not a
11:49:05  3   citizen.
11:49:05  4   Q. And how would a registrar be able to verify
11:49:08  5   whether somebody is, in fact, a U.S. citizen?
11:49:12  6        MR. BRIDGES: Objection. Calls for
11:49:13  7   speculation.
11:49:15  8        THE WITNESS: There are several potential
11:49:17  9   avenues. I don't know all of the steps that registrar
11:49:20  10  would, might, or should take. One potential avenue is
11:49:25  11  to contact the individual themselves.
11:49:33  12  BY MR. LOCKERBY:
11:49:34  13  Q. Besides contacting the individual, what else
11:49:36  14  could a registrar do to try to investigate and verify
11:49:41  15  whether an individual is, in fact, not a U.S. citizen?
11:49:46  16       MR. BRIDGES: Objection. Calls for
11:49:46  17  speculation.
11:49:47  18       MR. LEBOWITZ: Join.
11:49:47  19       THE WITNESS: I don't know -- it depends on the
11:49:53  20  jurisdiction -- whether the registrar has access to, for
11:49:58  21  example, motor vehicle or other public records. There
11:50:00  22  are some states in which records track whether
11:50:03  23  individuals presented proof of citizenship upon
11:50:07  24  application for various benefits, including driver's
11:50:11  25  licenses or the like. A registrar with access to that

Page 77

```
11:50:16   1   information could determine whether information
11:50:22   2   revealing the person to be a citizen was provided in
11:50:25   3   some other government benefit database.  That's going to
11:50:32   4   vary based on whether the individuals that -- the
11:50:36   5   government officials have access to that sort of
11:50:39   6   information.
11:50:39   7   BY MR. LOCKERBY:
11:50:40   8       Q.  So in the case of motor vehicle records, in
11:50:43   9   many states someone can obtain a driver's license
11:50:46  10   without being a U.S. citizen; correct?
11:50:48  11       A.  Correct.
11:50:48  12       Q.  And the forms of identification required for a
11:50:53  13   noncitizen to obtain a driver's license could include,
11:50:56  14   you know, for example, what's referred to as a green
11:51:00  15   card?
11:51:00  16       A.  In some states, that's correct.
11:51:02  17       Q.  So if someone has a green card, then that
11:51:06  18   individual is, by definition, not a U.S. citizen?
11:51:12  19       A.  Incorrect.  That individual at the time they
11:51:14  20   presented their green card was not a citizen.
11:51:17  21       Q.  Yeah.  And if the individual registered to vote
11:51:26  22   without being a U.S. citizen, if a state official had
11:51:31  23   access to the identification provided to the Department
11:51:36  24   of Motor Vehicles, a registrar could verify that;
11:51:36  25   correct?
```

Page 78

```
11:51:45   1       A.  A registrar could verify what?  I'm not sure I
11:51:48   2   know how --
11:51:48   3       Q.  Could verify whether the individual registered
11:51:51   4   to vote without being a U.S. citizen.
11:51:56   5       A.  It would depend on the timing.  Maybe it's
11:52:01   6   possible that given the timing of both the motor vehicle
11:52:04   7   record and the registration, that a registrar might have
11:52:08   8   been able to determine that at the time the registration
11:52:10   9   was submitted, an individual was likely not a U.S.
11:52:14  10   citizen.
11:52:14  11           I don't know that it would be possible if there
11:52:20  12   is a time gap for the registrar to prove that the
11:52:25  13   individual was not a citizen by referring to an older
11:52:28  14   motor vehicle record.
11:52:29  15       Q.  And in your experience, not every state
11:52:35  16   provides registrars with access to the type of motor
11:52:39  17   vehicle records that we've been discussing?
11:52:41  18       A.  Correct.
11:52:42  19       Q.  And similarly, in your experience, not every
11:52:46  20   state provides registrars with access to information
11:52:49  21   about whether noncitizens are receiving benefits?
11:52:59  22       MR. BRIDGES:  Objection.  Vague and ambiguous.
11:53:01  23       THE WITNESS:  I think -- yeah.  I think that's
11:53:04  24   correct.  But could you clarify the question.
11:53:05  25   ///
```

Page 79

```
11:53:05   1   BY MR. LOCKERBY:
11:53:06   2       Q.  Okay.  Let me ask it a different way.
11:53:07   3           In your experience, does someone have to be a
11:53:11   4   citizen of the United States in order to receive certain
11:53:15   5   government benefits?  Housing assistance, food
11:53:18   6   assistance, that sort of thing.
11:53:21   7       A.  It depends on the benefit.
11:53:22   8       Q.  There are some benefits for which an individual
11:53:25   9   does not have to be a U.S. citizen; correct?
11:53:27  10       A.  I believe that's correct.
11:53:29  11       Q.  And if a noncitizen is receiving such benefits,
11:53:31  12   the agency responsible for the benefits should have
11:53:34  13   information about whether the individual is a citizen;
11:53:41  14   correct?
11:53:41  15       MR. BRIDGES:  Calls for speculation.
11:53:43  16   Objection.
11:53:46  17       THE WITNESS:  Yeah.  That -- that depends --
11:53:47  18   that's incorrect as a blanket statement.  It depends on
11:53:50  19   what information is collected at the time the individual
11:53:54  20   applied for benefits and what obligations there are to
11:53:57  21   update that information to reflect the continuing
11:53:59  22   adjustment of immigration status.
11:54:03  23   BY MR. LOCKERBY:
11:54:03  24       Q.  And not every state registrar has access to the
11:54:07  25   type of benefit information that you just described; is
```

Page 80

```
11:54:07   1   that right?
11:54:10   2       A.  Correct.
11:54:10   3       Q.  There is also a database maintained by the
11:54:14   4   Department of Homeland Security known as SAVE.
11:54:19   5           Are you familiar with that?
11:54:20   6       A.  I am.
11:54:20   7       Q.  And not every state participates in the SAVE
11:54:24   8   program or uses data available through the SAVE program
11:54:29   9   to verify citizenship of registered voters; is that
11:54:29  10   right?
11:54:32  11       A.  That's correct.
11:54:32  12       Q.  Are you familiar with any states that are using
11:54:39  13   it?
11:54:42  14       A.  I believe that the Department of Homeland
11:54:45  15   Security has indicated that the SAVE database is
11:54:50  16   unsuitable for verifying the current citizenship of
11:54:53  17   individuals in the system.  And so I'm not aware of any
11:54:57  18   state that currently uses that system on a regular
11:55:02  19   basis.  There may be individual law enforcement
11:55:05  20   proceedings that access that database for disposing of
11:55:11  21   certain individual cases, but I'm not -- I'm not aware
11:55:15  22   of a state that more broadly uses that database for that
11:55:18  23   purpose, no.
11:55:18  24       Q.  So you weren't aware that Colorado, Texas,
11:55:21  25   Florida, and Kansas were using the database to verify
```

Page 81

| | | |
|---|---|---|
| 11:55:26 | 1 | whether noncitizens are registered to vote? |
| 11:55:30 | 2 | A. I am not. |
| 11:55:32 | 3 | Q. And you weren't aware -- are you aware of |
| 11:55:38 | 4 | the fact that the information accessible through the |
| 11:55:45 | 5 | SAVE program is information that, for example, a state |
| 11:55:50 | 6 | Department of Motor Vehicles would have, like an alien |
| 11:55:53 | 7 | number? |
| 11:55:53 | 8 | A. It depends on the motor vehicle laws in any |
| 11:55:56 | 9 | particular state. |
| 11:55:58 | 10 | Q. But -- |
| 11:55:59 | 11 | A. I -- across the board, I don't know that all |
| 11:56:02 | 12 | states require an alien number, for example. |
| 11:56:10 | 13 | Q. But do you know that a state requires some |
| 11:56:14 | 14 | form of documentation for a noncitizen to get a driver's |
| 11:56:20 | 15 | license? |
| 11:56:21 | 16 | MR. BRIDGES: Objection. Vague and ambiguous. |
| 11:56:23 | 17 | THE WITNESS: Every state requires some form of |
| 11:56:25 | 18 | documentation to get a driver's license, including |
| 11:56:30 | 19 | noncitizens, yes. |
| 11:56:31 | 20 | BY MR. LOCKERBY: |
| 11:56:32 | 21 | Q. And do you know whether the documentation that |
| 11:56:38 | 22 | a state -- or that states require to get a driver's |
| 11:56:41 | 23 | license contains information that is recorded in the |
| 11:56:45 | 24 | SAVE database? |
| 11:56:46 | 25 | MR. LEBOWITZ: Objection. |

Page 82

| | | |
|---|---|---|
| 11:56:48 | 1 | THE WITNESS: Sometimes, yes. Other times, no. |
| 11:56:55 | 2 | BY MR. LOCKERBY: |
| 11:56:58 | 3 | Q. I'd like you to look, please, at Exhibits 21, |
| 11:57:05 | 4 | 22, 23, and 24, all of which you've produced; and all of |
| 11:57:18 | 5 | these reflect the cancelation of voter registrations in |
| 11:57:23 | 6 | California based on noncitizenship; correct? |
| 11:57:33 | 7 | A. I'd like a moment to take a look at them. |
| 11:58:00 | 8 | These appear to be cancelations of voter |
| 11:58:03 | 9 | registration or indications that registration will be |
| 11:58:06 | 10 | canceled on the basis of noncitizenship, yes. |
| 11:58:33 | 11 | MR. LOCKERBY: I'd like to have this marked as |
| 11:58:35 | 12 | Exhibit 25, please. |
| 11:58:35 | 13 | (Whereupon the document referred to is marked |
| 11:58:35 | 14 | by the reporter as Defense Exhibit 25 for |
| 11:58:53 | 15 | identification.) |
| 11:58:53 | 16 | THE WITNESS: Thank you. |
| 11:58:58 | 17 | MR. GORMAN: What exhibit number is this? |
| 11:59:00 | 18 | Sorry. Twenty-five? |
| 11:59:02 | 19 | MR. LOCKERBY: Should be 25. |
| 11:59:04 | 20 | MR. GORMAN: Yeah. |
| 11:59:07 | 21 | BY MR. LOCKERBY: |
| 11:59:07 | 22 | Q. Exhibit 25 is among the documents that you |
| 11:59:10 | 23 | produced, and we've numbered it 174. It's an amicus |
| 11:59:17 | 24 | brief submitted to the Supreme Court in the case of |
| 11:59:22 | 25 | Kobach -- is that how you pronounce his name? |

Page 83

| | | |
|---|---|---|
| 11:59:23 | 1 | A. Correct. |
| 11:59:23 | 2 | Q. -- versus United States Election Assistance |
| 11:59:27 | 3 | Commission. |
| 11:59:29 | 4 | Have you read this brief before? |
| 11:59:35 | 5 | A. Perhaps. |
| 11:59:35 | 6 | Q. But at least you had it in your files? |
| 11:59:37 | 7 | A. I have it. I -- I wish that I had read |
| 11:59:40 | 8 | everything in my files. I have not. I don't recall |
| 11:59:43 | 9 | whether I've read this particular brief before. |
| 11:59:46 | 10 | Q. And do you see that this brief says it was |
| 11:59:52 | 11 | submitted on behalf of the American Civil Rights Union? |
| 11:59:57 | 12 | A. Yes. |
| 11:59:57 | 13 | Q. And counsel for the American Civil Rights Union |
| 12:00:02 | 14 | was the Public Interest Legal Foundation -- |
| 12:00:04 | 15 | A. Yes. |
| 12:00:04 | 16 | Q. -- one of the defendants in that case. |
| 12:00:08 | 17 | Do you see that? |
| 12:00:11 | 18 | A. I -- I know that the Public Interest Legal |
| 12:00:14 | 19 | Foundation was counsel. I'm -- I'm not aware that they |
| 12:00:17 | 20 | were defendants in this case. |
| 12:00:18 | 21 | Q. Defendants in this case. |
| 12:00:19 | 22 | A. Yes. |
| 12:00:19 | 23 | Q. In the case in which you're testifying. You |
| 12:00:22 | 24 | are aware of that? |
| 12:00:23 | 25 | A. Yes. |

Page 84

| | | |
|---|---|---|
| 12:00:24 | 1 | Q. And if you look at Page 1 of the brief, under |
| 12:00:31 | 2 | "Interests of Amicus," it lists the members of the |
| 12:00:42 | 3 | American Civil Rights Union's board. |
| 12:00:45 | 4 | Do you see that? |
| 12:00:45 | 5 | A. I do. |
| 12:00:46 | 6 | Q. And one of them is Former Ohio Secretary of |
| 12:00:53 | 7 | State J. Kenneth Blackwell. |
| 12:00:55 | 8 | Are you familiar with Mr. Blackwell? |
| 12:00:56 | 9 | A. I am. |
| 12:00:57 | 10 | Q. How are you familiar with him? |
| 12:00:58 | 11 | A. He was the Secretary of State, I believe, in |
| 12:01:03 | 12 | the period including 2004 in Ohio. I'm familiar with |
| 12:01:11 | 13 | many but not all of the Secretaries of State in many of |
| 12:01:15 | 14 | the states. |
| 12:01:16 | 15 | Q. Are you aware that he has been retained as an |
| 12:01:19 | 16 | expert by defendants in this case? |
| 12:01:21 | 17 | A. I was not. |
| 12:01:22 | 18 | Q. And also, at the bottom of Page 1, top of |
| 12:01:29 | 19 | Page 2, it identifies Mr. Adams and Mr. von Spakovsky as |
| 12:01:38 | 20 | members of the board of ACRU. Do you see that? |
| 12:01:41 | 21 | A. I do. |
| 12:01:49 | 22 | Q. When this was filed in the U.S. Supreme Court, |
| 12:01:53 | 23 | had you come on board at the justice department at that |
| 12:01:57 | 24 | time? |
| 12:01:57 | 25 | A. No. |

Page 85

12:01:57 1    Q. So this -- forgive me. I think you probably
12:02:02 2  answered this before. But when exactly did you start?
12:02:05 3    A. It would have been either late August or early
12:02:08 4  September of 2015. I can't recall the exact date.
12:02:11 5    Q. On the top of page -- or on Page 10, there is a
12:02:31 6  heading that says, "The Federal Forum Has Failed to
12:02:36 7  Prevent Noncitizens from Registering to Vote and Casting
12:02:41 8  Ballots."
12:02:42 9    Do you see that?
12:02:43 10   A. I do.
12:02:43 11   Q. And then on the next page, there is a heading
12:02:45 12  on Page 11 entitled "Noncitizens Are Registering and
12:02:52 13  Voting." And you see one of the references on that page
12:02:57 14  is records from Harris County, Texas?
12:03:01 15   A. I -- I see that that's a reference, yes.
12:03:03 16   Q. Yeah. And do you have any basis for disputing
12:03:06 17  that reference?
12:03:07 18   MR. BRIDGES: Objection. Vague and ambiguous.
12:03:10 19   THE WITNESS: The fact that there is a
12:03:11 20  reference in the brief? I -- I do not.
12:03:12 21  BY MR. LOCKERBY:
12:03:13 22   Q. Do you dispute the accuracy of the records
12:03:17 23  referenced here? Do you have any basis for disputing
12:03:19 24  that one way or the other?
12:03:21 25   MR. BRIDGES: Objection. Vague and ambiguous.

Page 86

12:03:24 1    THE WITNESS: Yeah. I -- sitting here, I have
12:03:27 2  no basis to know whether those records are accurate or
12:03:30 3  not or what they purport to be.
12:03:45 4  BY MR. LOCKERBY:
12:03:46 5    Q. On Page 14 -- bottom of Page 14, top of
12:03:51 6  Page 15, there is a quotation to -- quotation of and
12:03:56 7  citation to testimony of Mr. von Spakovsky in which he
12:04:02 8  states, "Obtaining an accurate assessment of the size of
12:04:06 9  this problem is difficult. There is no systematic
12:04:10 10  review of voter registration rolls by most states to
12:04:14 11  find noncitizens. And the relevant federal agencies in
12:04:18 12  direct violation of federal law have either refused to
12:04:21 13  cooperate with those few state election officials who
12:04:24 14  seek to verify the citizenship status of registered
12:04:27 15  voters or put up burdensome red tape to make such
12:04:31 16  verification difficult."
12:04:35 17    Are there any statements by Mr. von Spakovsky
12:04:39 18  in the passage I've just read you with which you agree?
12:04:44 19   A. Yes.
12:04:45 20   Q. Which ones?
12:04:46 21   A. "Obtaining an accurate assessment of the size
12:04:51 22  of this problem is difficult."
12:04:53 23   Q. Any other statements?
12:04:54 24   A. I believe that it is true that, "There is no
12:05:01 25  systematic review of voter registration rolls by most

Page 87

12:05:05 1  states specifically to find noncitizens."
12:05:10 2    Q. Do you agree that federal agencies have refused
12:05:14 3  to cooperate with state election officials that have
12:05:17 4  tried to verify the citizenship of registered voters?
12:05:21 5    A. I do not know the various ways in which the
12:05:28 6  unnamed state officials here have attempted to interact
12:05:31 7  with federal agencies, and so I can't really opine one
12:05:37 8  way or the other.
12:05:37 9    Q. Further up on Page 14 there is a reference to a
12:05:40 10  2005 report from the Government Accountability Office,
12:05:44 11  which, according to this, found that up to 3 percent of
12:05:51 12  the 30,000 individuals chosen for jury duty from voter
12:05:54 13  registration rolls in just one U.S. district court over
12:05:58 14  a 2-year period were not U.S. citizens.
12:06:01 15    Are you familiar with the GAO report cited
12:06:06 16  here?
12:06:06 17    A. I'm generally familiar with that report, yes.
12:06:08 18    Q. And that report is from 2005; right?
12:06:11 19    A. That's correct.
12:06:12 20    Q. Do you know whether that report has been
12:06:14 21  updated at any time since 2005?
12:06:25 22    A. I don't. I know that the GAO has done
12:06:26 23  additional studies since 2005 on the maintenance of
12:06:33 24  voter registration lists. I don't know whether those
12:06:36 25  purport to be an update of this assessment or not.

Page 88

12:06:39 1    Q. And if someone wanted to determine how many
12:06:42 2  individuals chosen for jury duty in federal courts were
12:06:49 3  not seated as jurors based on noncitizenship status, how
12:06:55 4  would a private citizen go about that?
12:06:58 5    MR. BRIDGES: Objection. Calls for
12:06:58 6  speculation.
12:07:00 7    THE WITNESS: Yeah. I -- I don't know. I
12:07:02 8  would have to speculate. I imagine that -- I'm not
12:07:09 9  going to imagine that. I don't know.
12:07:09 10  BY MR. LOCKERBY:
12:07:11 11    Q. If you yourself wanted to do some research as
12:07:22 12  to the number of jurors chosen for jury duty from voter
12:07:25 13  registration rolls were not seated as jurors by federal
12:07:30 14  courts based on being noncitizens, how would you go
12:07:33 15  about that?
12:07:34 16    MR. LEBOWITZ: Objection. Calls for
12:07:35 17  speculation.
12:07:35 18    THE WITNESS: I would -- I would -- if there
12:07:40 19  were a particular district that I were interested in, I
12:07:45 20  would write the -- begin by writing the administrative
12:07:51 21  office of the courts for that district or the court
12:07:53 22  clerk for that district to ask if that information were
12:07:56 23  available. If that information were kept -- and I'm not
12:08:04 24  sure if it is or it is not in the district in
12:08:06 25  question -- I would then examine the public access

Page 89

| | |
|---|---|
| 12:08:13 1 | freedom of information laws in the jurisdiction to |
| 12:08:16 2 | determine whether that information was a public record |
| 12:08:19 3 | to which I had the right of access. |
| 12:08:21 4 | BY MR. LOCKERBY: |
| 12:08:22 5 | Q. But sitting here today, you don't know whether |
| 12:08:24 6 | it's even possible if you could get that information |
| 12:08:27 7 | from any particular U.S. district court, much less the |
| 12:08:32 8 | federal courts, in general? |
| 12:08:34 9 | A. Correct. |
| 12:11:10 10 | THE WITNESS:  Bless you. |
| 12:11:14 11 | MR. BRIDGES:  Bless you. |
| 12:11:15 12 | THE VIDEOGRAPHER:  Thank you. |
| 12:11:19 13 | MR. LOCKERBY:  Let's see.  What exhibit are we |
| 12:11:24 14 | up to now? |
| 12:11:25 15 | MR. BRIDGES:  Twenty-five was the last one. |
| 12:11:26 16 | MR. LOCKERBY:  All right.  I'd like to have |
| 12:11:28 17 | this marked as 25, please. |
| 12:11:30 18 | MR. LEBOWITZ:  The last one -- |
| 12:11:31 19 | MR. BRIDGES:  The last one was 25. |
| 12:11:32 20 | MR. LOCKERBY:  Twenty-five. |
| 12:11:33 21 | Twenty-six. |
| 12:11:33 22 | (Whereupon the document referred to is marked |
| 12:11:33 23 | by the reporter as Defense Exhibit 26 for |
| 12:11:50 24 | identification.) |
| 12:11:50 25 | THE WITNESS:  Thank you. |

Page 90

| | |
|---|---|
| 12:12:07 1 | BY MR. LOCKERBY: |
| 12:12:07 2 | Q. Exhibit 26 is also among the documents that you |
| 12:12:11 3 | produced.  And you see it's an -- says it's an e-mail |
| 12:12:17 4 | from justinmlevitt@gmail.com.  And it says it's to |
| 12:12:27 5 | justinlevitt@lls.edu? |
| 12:12:31 6 | A. Correct. |
| 12:12:31 7 | Q. So you were e-mailing these documents from your |
| 12:12:37 8 | personal e-mail address to your Loyola Law School |
| 12:12:41 9 | address; is that right? |
| 12:12:42 10 | A. Correct. |
| 12:12:42 11 | Q. And the very first attachment is a copy of the |
| 12:12:48 12 | complaint filed by PILF on behalf of the Virginia Voters |
| 12:12:55 13 | Alliance and David Norcross against Anna Leider, or |
| 12:12:59 14 | Leider, the registrar for the City of Alexandria. |
| 12:13:03 15 | Why were you e-mailing yourself a copy of that? |
| 12:13:06 16 | A. I thought this was an interesting case under |
| 12:13:09 17 | Section 8 of the NVRA. |
| 12:13:11 18 | Q. And why did you find it of interest? |
| 12:13:16 19 | A. The availability of election records is |
| 12:13:21 20 | something that isn't particularly frequently litigated; |
| 12:13:29 21 | and so I'm interested in, among other things, cases that |
| 12:13:35 22 | might have the potential to make new law in this area. |
| 12:13:38 23 | These cases are sometimes exceedingly straightforward |
| 12:13:42 24 | but sometimes not.  And so this was -- I wanted to read |
| 12:13:46 25 | more to see whether this was a case that was likely to |

Page 91

| | |
|---|---|
| 12:13:50 1 | be interesting. |
| 12:13:52 2 | Q. And was there anything about that case that you |
| 12:13:54 3 | saw as having the potential to make new law? |
| 12:13:59 4 | A. There is always the potential whenever a |
| 12:14:05 5 | complaint is brought for a court to make new law on it. |
| 12:14:08 6 | And so there was nothing particularly in the complaint |
| 12:14:14 7 | that seemed extraordinary, but I would not anticipate |
| 12:14:18 8 | what a court would do down the road.  There were -- |
| 12:14:29 9 | pardon me.  I had forgotten.  This was not only about |
| 12:14:37 10 | obtaining election records, but also about list |
| 12:14:40 11 | maintenance.  And that is even less frequently |
| 12:14:42 12 | litigated.  And so it was likely that no matter what a |
| 12:14:48 13 | court might do in this area, it would in some way |
| 12:14:52 14 | clarify or refine the existing law. |
| 12:15:26 15 | Q. How did you become aware of the two reports at |
| 12:15:30 16 | issue in this litigation, Alien Invasion I published |
| 12:15:38 17 | September 30, 2016, and Alien Invasion II published in |
| 12:15:42 18 | May of 2017? |
| 12:15:45 19 | A. I don't recall.  They were likely called to my |
| 12:15:55 20 | attention in the press in some way, but I don't recall. |
| 12:15:59 21 | Q. And at some point after the publication of |
| 12:16:21 22 | Alien Invasion II, did you start contacting certain |
| 12:16:25 23 | Virginia voters whose names appeared in one or more of |
| 12:16:30 24 | the exhibits to Alien Invasion II? |
| 12:16:33 25 | A. I did. |

Page 92

| | |
|---|---|
| 12:16:33 1 | Q. Why did you do that? |
| 12:16:36 2 | A. I wanted to find out if the claims were |
| 12:16:43 3 | accurate in the report.  Specifically, I wanted to see |
| 12:16:49 4 | whether I could determine whether the individuals were |
| 12:16:51 5 | citizens or noncitizens. |
| 12:17:01 6 | Q. And why did you want to make that |
| 12:17:03 7 | determination?  For what purpose? |
| 12:17:04 8 | A. I wanted to ascertain the accuracy of the |
| 12:17:08 9 | claims in the report because I research, among other |
| 12:17:13 10 | things, in the area of claims about voter fraud and |
| 12:17:18 11 | their accuracy.  Some of my other research is in the |
| 12:17:25 12 | area of election administration and procedures that |
| 12:17:29 13 | various registrars undertake.  And I wasn't sure if |
| 12:17:32 14 | there was a common thread to how individuals might have |
| 12:17:36 15 | been incorrectly or inaccurately flagged or accurately |
| 12:17:44 16 | or incorrectly flagged.  And so wanted to see if I could |
| 12:17:48 17 | determine from talking to the individuals themselves |
| 12:17:51 18 | whether there was something that had caused them to be |
| 12:17:56 19 | labeled as noncitizens. |
| 12:17:56 20 | Q. Did you communicate with every Virginia voter |
| 12:18:01 21 | identified in -- in exhibit to the report -- |
| 12:18:06 22 | A. No. |
| 12:18:08 23 | Q. -- reports? |
| 12:18:09 24 | How did you determine which ones to communicate |
| 12:18:10 25 | with and which ones not to communicate with? |

Page 93

12:18:14   1      A. Those who had e-mail addresses listed on the
12:18:18   2   registration forms that were -- that were publicized as
12:18:25   3   part of the -- an exhibit to the report, I attempted to
12:18:32   4   contact. Those who did not have e-mail addresses listed
12:18:39   5   particularly in registration forms attached to an
12:18:43   6   exhibit to the report, I did not.
12:18:44   7      Q. But you didn't attempt to contact -- are you
12:18:52   8   familiar with a report attached as an exhibit to Alien
12:18:59   9   Invasion II known as a VERIS report?
12:19:02  10      A. I'm familiar with VERIS reports generally. I
12:19:06  11   would have to see the particular report that you were
12:19:08  12   referring to.
12:19:18  13      Q. So is it your testimony that you contacted
12:19:23  14   every individual for whom you could get an e-mail
12:19:26  15   address? Is that right?
12:19:29  16         MR. LEBOWITZ: Objection. Misstates testimony.
12:19:31  17         MR. BRIDGES: Join.
12:19:33  18         THE WITNESS: I believe -- there may have been
12:19:41  19   some individuals who indicated on their registration
12:19:47  20   forms that they were not citizens, and I don't believe
12:19:51  21   that I attempted to contact them. If -- despite there
12:19:55  22   being an e-mail on the registration form itself. I
12:19:59  23   believe that I contacted every other individual for whom
12:20:05  24   an e-mail address was listed.
12:20:08  25   ///

Page 94

12:20:08   1   BY MR. LOCKERBY:
12:20:08   2      Q. Why did you not attempt to contact individuals
12:20:14   3   who had indicated on their registration forms that they
12:20:19   4   were not citizens?
12:20:20   5      A. In an initial screen of the accuracy of the
12:20:23   6   report, I considered that to be an indication that the
12:20:27   7   individuals were not, in fact, citizens at the time.
12:20:30   8      Q. The report was published in May 2017 and
12:20:44   9   specifically May 27, 2017. How long after its
12:20:53  10   publication were you anticipating litigation regarding
12:20:56  11   the Alien Invasion II?
12:21:01  12         MR. BRIDGES: Would you reread that question to
12:21:03  13   me, please.
12:21:03  14         (The record is read by the reporter as
12:21:03  15   follows:
12:20:34  16         "Q. The report was published in May 2017 and
12:20:44  17   specifically May 27, 2017. How long after its
12:20:53  18   publication were you anticipating litigation
12:20:56  19   regarding the Alien Invasion II?")
12:21:21  20         MR. LOCKERBY: And let me rephrase the question
12:21:23  21   because actually I misstated something.
12:21:25  22   BY MR. LOCKERBY:
12:21:26  23      Q. Alien Invasion II -- the embargoed copies of
12:21:29  24   the report went out on May 26, 2017, and was embargoed
12:21:35  25   until 11:00 p.m., May 29, 2017. So at what point after

Page 95

12:21:41   1   publication of Alien Invasion II did you anticipate
12:21:45   2   litigation?
12:21:46   3      A. I can't recall the exact date.
12:21:50   4      Q. Do you recall how soon after publication of
12:21:55   5   Alien Invasion II you anticipated litigation?
12:22:03   6      A. No.
12:22:04   7      Q. And Virginia voters that you contacted were
12:22:09   8   identified only in exhibits to Alien Invasion II; isn't
12:22:16   9   that right?
12:22:16  10      A. I don't know if those individuals have been
12:22:20  11   identified anywhere else. I contacted them on the basis
12:22:24  12   of their identification in Alien Invasion II. That's
12:22:28  13   correct.
12:22:28  14      Q. And at the time that you originally contacted
12:22:34  15   those individuals, were you anticipating litigation?
12:22:48  16      A. I anticipated that there might be conditions
12:22:51  17   under which litigation might arise. I did not have
12:22:56  18   particular litigation in mind.
12:23:06  19      Q. And had you discussed with others the
12:23:09  20   possibility that litigation might arise at the time you
12:23:13  21   began contacting these Virginia voters?
12:23:17  22      A. I don't believe so.
12:23:22  23      Q. How long after you began contacting Virginia
12:23:27  24   voters did you contemplate that litigation might arise?
12:23:32  25      A. I -- I can't recall.

Page 96

12:23:37   1         MR. LOCKERBY: We can go off the record for a
12:23:38   2   minute.
12:23:39   3         THE VIDEOGRAPHER: We're off the record at
12:23:42   4   12:23 p.m.
12:23:45   5         (A lunch recess is taken.)
01:12:12   6         THE VIDEOGRAPHER: We are back on the record at
01:12:14   7   1:12 p.m.
01:12:14   8   BY MR. LOCKERBY:
01:12:18   9      Q. Mr. Levitt, I'm going to show you a document.
01:12:20  10   I'm not going to mark this as an exhibit, but this
01:12:23  11   is on file with the Court already as Exhibit B to
01:12:27  12   defendant's answer, affirmative defenses, and
01:12:31  13   third-party complaint; and it's numbered PILF Adams
01:12:35  14   14567 through 68.
01:12:57  15      A. Okay.
01:12:59  16      Q. The top portion of this document is an e-mail
01:13:04  17   from Edgardo Cortes, and you see below the body of it he
01:13:08  18   identifies himself as the commissioner of the Virginia
01:13:11  19   Department of Elections.
01:13:12  20      A. I do.
01:13:12  21      Q. Do you know Mr. Cortes?
01:13:14  22      A. No. I know of him, but I do not know him.
01:13:17  23      Q. And this e-mail is dated April 4, 2017, at
01:13:24  24   10:30 a.m. As you see, it's addressed to two
01:13:30  25   individuals at the Public Interest Legal Foundation,

Page 97

01:13:33  1    Bill Johnson and Shawna Powell?

01:13:34  2    A. I see that it's 10:03:30.  I guess --

01:13:36  3    Q. Yeah, 10:03:30 a.m.  You're absolutely right.

01:13:41  4    In the third sentence Mr. Cortes writes, "This

01:13:48  5    report shows individuals that were canceled due to

01:13:53  6    self-reported noncitizen status and failed to complete

01:13:57  7    an affirmation of citizenship in the allotted time frame

01:14:02  8    and continued to be in canceled status.  If an

01:14:06  9    individual was previously canceled and then subsequently

01:14:09  10   affirmed citizenship and was reregistered, they would no

01:14:13  11   longer appear on this report because they would now be

01:14:16  12   on active status."  Do you see that?

01:14:18  13   A. I do.

01:14:19  14   Q. When you contacted various Virginia voters

01:14:26  15   whose names appeared in exhibits to the alien invasion

01:14:30  16   report, or reports, did you let them know about this

01:14:35  17   e-mail from Mr. Cortes?

01:14:36  18   A. I was not aware of this e-mail when I contact

01:14:38  19   them.  I don't believe --

01:14:41  20   Q. When did you become aware of this e-mail?

01:14:43  21   A. I think that the first time I've become aware

01:14:46  22   of this e-mail was when you showed it to me moments ago.

01:14:49  23   Q. Okay.  So as part of your research into the

01:14:55  24   accuracy of the alien invasion reports, you never came

01:14:59  25   across this?

Page 98

01:15:01  1    A. Not that I'm aware of.  It's possible it's one

01:15:12  2    of the exhibits to the report, but I don't know that.

01:15:25  3    Q. I'd like to have marked as Exhibit 27 --

01:15:29  4    MR. BRIDGES:  Twenty-eight.

01:15:32  5    DEPOSITION OFFICER:  Twenty-seven.

01:15:33  6    MR. BRIDGES:  This one was twenty-seven.

01:15:35  7    THE WITNESS:  That's not --

01:15:36  8    MR. LOCKERBY:  I didn't mark that.

01:15:37  9    MR. BRIDGES:  Oh, I'm sorry.

01:15:41  10   MR. LOCKERBY:  Like to have marked as

01:15:43  11   Exhibit 27 a 562-page document that we have numbered 51.

01:15:43  12   (Whereupon the document referred to is marked

01:15:43  13   by the reporter as Defense Exhibit 27 for

01:16:12  14   identification.)

01:16:12  15   THE WITNESS:  Thank you.

01:16:16  16   BY MR. LOCKERBY:

01:16:16  17   Q. Are the e-mails contained in Exhibit 27 some of

01:16:22  18   the communications that you had with Virginia voters

01:16:25  19   identified in exhibits to the alien invasion reports?

01:16:31  20   A. I -- I don't want to confirm every single page.

01:16:35  21   But yes.  It appears, in flipping through, that these

01:16:38  22   are e-mails -- these are some of the e-mails that I have

01:16:41  23   with some of the individuals contained in some of those

01:16:46  24   reports.

01:16:46  25   MR. LOCKERBY:  And I'd like to have this marked

Page 99

01:16:48  1    as Exhibit 28, please.

01:16:48  2    (Whereupon the document referred to is marked

01:16:48  3    by the reporter as Defense Exhibit 28 for

01:17:03  4    identification.)

01:17:03  5    THE WITNESS:  Thank you.

01:17:04  6    MR. BRIDGES:  Thank you.

01:17:05  7    MR. LOCKERBY:  You're welcome.

01:17:12  8    BY MR. LOCKERBY:

01:17:12  9    Q. Exhibit 28 is a series of e-mails that we

01:17:20  10   have -- have had marked as No. 31 from your production.

01:17:27  11   Are these additional e-mails that you exchanged

01:17:30  12   with various Virginia voters identified in the exhibits

01:17:34  13   to the alien invasion reports?

01:18:08  14   A. Yes.

01:18:17  15   Q. And if you look at the very first page, at the

01:18:22  16   bottom you see there is one e-mail that says it was sent

01:18:26  17   on May 30, 2017?

01:18:30  18   A. Yes.

01:18:30  19   Q. And then it continues on the following page?

01:18:35  20   A. Correct.

01:18:44  21   Q. And the wording of that e-mail is similar to

01:18:50  22   what you sent out to numerous voters; isn't that right?

01:18:53  23   A. Correct.

01:18:54  24   Q. And in that e-mail you identified yourself as a

01:18:58  25   law professor doing research; isn't that right?

Page 100

01:19:02  1    A. Correct.

01:19:02  2    Q. And it says, "It's in that capacity that I'm

01:19:06  3    reaching out."  Do you see that?

01:19:08  4    A. I do.

01:19:15  5    Q. And then back on the first page in your

01:19:23  6    June 26, 2017, e-mail, 2:48 p.m., at that point you

01:19:29  7    hadn't heard back from Mr. Weidenhof, or Weidenhof, had

01:19:33  8    you?

01:19:33  9    A. I don't believe that I had, no.

01:19:34  10   Q. And this was a form e-mail that you sent to

01:19:42  11   citizens from whom you hadn't heard back in response to

01:19:46  12   the first report; isn't that right?

01:19:48  13   A. From individuals from whom I had not heard

01:19:51  14   back, correct.

01:19:51  15   Q. Yes.  And again, you state, "I'm a law

01:19:58  16   professor.  I spend much of my time researching election

01:20:02  17   issues."  Do you see that?

01:20:03  18   A. Yes.

01:20:03  19   Q. And you said, "I am one of several individuals

01:20:07  20   looking into the claims in the report."

01:20:10  21   Other than you, who else was looking into the

01:20:12  22   claims in the report, as far as you knew, as of June 26,

01:20:19  23   2017?

01:20:19  24   A. As far as I knew, there were several reporters

01:20:24  25   who had asked about some of the claims in the report.  I

Page 101

| | | |
|---|---|---|
| 01:20:27 | 1 | did not know if there were others. And I can't recall |
| 01:20:32 | 2 | the particular reporters. It's possible that I had |
| 01:20:40 | 3 | already had conversations with some of the counsel in |
| 01:20:52 | 4 | this case at that time, but I do not know the dates. |
| 01:20:54 | 5 | Q. And as far as you knew, the counsel were not |
| 01:21:04 | 6 | contacting Virginia voters at that point, were they? |
| 01:21:09 | 7 | MR. GORMAN: Objection to the extent that |
| 01:21:10 | 8 | question asks you to reveal confidential work product |
| 01:21:10 | 9 | exchanged with Protect Democracy Project and the |
| 01:21:16 | 10 | Southern Coalition for Social Justice. |
| 01:21:17 | 11 | MR. BRIDGES: Also, calls for speculation. |
| 01:21:20 | 12 | Lacks foundation. |
| 01:21:22 | 13 | Subject to my objections and the admonition of |
| 01:21:26 | 14 | counsel with respect to their work product, you may |
| 01:21:29 | 15 | respond. |
| 01:21:29 | 16 | THE WITNESS: I -- I don't know if I can |
| 01:21:31 | 17 | respond -- I don't know if there is anything to which I |
| 01:21:34 | 18 | can respond that would not involve revealing work |
| 01:21:36 | 19 | product of counsel. |
| 01:21:38 | 20 | BY MR. LOCKERBY: |
| 01:21:38 | 21 | Q. And the work product you're talking about is |
| 01:21:40 | 22 | not your own work product. It's the work product of the |
| 01:21:45 | 23 | Southern Coalition For Social Justice and the Protect |
| 01:21:48 | 24 | Democracy Project; is that right? |
| 01:21:53 | 25 | A. In your question, yes, that's correct. |

Page 102

| | | |
|---|---|---|
| 01:22:03 | 1 | MR. LOCKERBY: I'd like to have this marked as |
| 01:22:06 | 2 | Exhibit 29, please. |
| 01:22:06 | 3 | (Whereupon the document referred to is marked |
| 01:22:06 | 4 | by the reporter as Defense Exhibit 29 for |
| 01:22:22 | 5 | identification.) |
| 01:22:22 | 6 | THE WITNESS: Thank you. |
| 01:22:25 | 7 | BY MR. LOCKERBY: |
| 01:22:26 | 8 | Q. Exhibit 29 is another document that you |
| 01:22:30 | 9 | produced that we've marked as No. 4. And if you could |
| 01:22:35 | 10 | look at the last page. Do you see there is an e-mail |
| 01:22:41 | 11 | exchange dated Tuesday, July 18, 2017? |
| 01:22:44 | 12 | A. Yes. |
| 01:22:45 | 13 | Q. And the top portion of the e-mail exchange is |
| 01:22:51 | 14 | redacted. Do you see that? |
| 01:22:53 | 15 | A. I do. |
| 01:22:53 | 16 | Q. Was this another e-mail exchange that you had |
| 01:22:59 | 17 | with a Virginia voter identified in exhibits to the |
| 01:23:07 | 18 | alien invasion reports? |
| 01:23:10 | 19 | A. The final page is, yes. |
| 01:23:12 | 20 | Q. Yes. I'm simply asking about the final page. |
| 01:23:15 | 21 | A. Yes. |
| 01:23:15 | 22 | Q. I'd like to have this marked as Exhibit 30, |
| 01:23:52 | 23 | please. Exhibit 30 is a document that we've prepared |
| 01:24:20 | 24 | entitled "Federal Evidence Rule 1006 Summary of Justin |
| 01:24:24 | 25 | Levitt's E-Mail Exchanges with Virginia Voters |

Page 103

| | | |
|---|---|---|
| 01:24:29 | 1 | identified in PILF/VVA Reports." And I realize you |
| 01:24:32 | 2 | haven't seen this before -- |
| 01:24:35 | 3 | A. Correct. |
| 01:24:35 | 4 | Q. -- because you didn't prepare it. But the |
| 01:24:39 | 5 | documents that we've looked at already from which this |
| 01:24:44 | 6 | was prepared are not necessarily all of your |
| 01:24:47 | 7 | communications with Virginia voters identified in the |
| 01:24:52 | 8 | reports; correct? |
| 01:24:52 | 9 | (Whereupon the document referred to is marked |
| 01:24:52 | 10 | by the reporter as Defense Exhibit 30 for |
| 01:24:52 | 11 | identification.) |
| 01:24:53 | 12 | A. Because I don't know -- |
| 01:24:54 | 13 | MR. BRIDGES: Objection. Vague and ambiguous. |
| 01:24:57 | 14 | You may answer, if you understand the question. |
| 01:24:59 | 15 | THE WITNESS: I understand the question. |
| 01:25:00 | 16 | I don't know how you prepared this, so I don't |
| 01:25:03 | 17 | know that I can answer. |
| 01:25:03 | 18 | BY MR. LOCKERBY: |
| 01:25:04 | 19 | Q. Well, you do know that Exhibits 27, 28, and 29 |
| 01:25:10 | 20 | do not contain all of your communications with Virginia |
| 01:25:14 | 21 | voters about the reports. That you do know; correct? |
| 01:25:18 | 22 | A. Correct. |
| 01:25:23 | 23 | Q. Thank you. |
| 01:25:28 | 24 | And one of the purposes of your communications |
| 01:25:35 | 25 | with the voters identified in Exhibits 27, 28, 29, and |

Page 104

| | | |
|---|---|---|
| 01:25:42 | 1 | 30 was to try to discredit Christian Adams; isn't that |
| 01:25:42 | 2 | right? |
| 01:25:49 | 3 | A. No. |
| 01:25:49 | 4 | MR. LEBOWITZ: Objection. |
| 01:25:49 | 5 | THE WITNESS: No. |
| 01:25:50 | 6 | BY MR. LOCKERBY: |
| 01:25:50 | 7 | Q. So you weren't trying to discredit him? |
| 01:25:52 | 8 | A. No. |
| 01:25:53 | 9 | Q. In fact, you were also trying to discredit |
| 01:25:57 | 10 | PILF; isn't that right? |
| 01:26:00 | 11 | MR. LEBOWITZ: Objection. |
| 01:26:01 | 12 | THE WITNESS: I can't answer also because I |
| 01:26:02 | 13 | wasn't trying to discredit Mr. Adams; and I would also |
| 01:26:05 | 14 | answer, no, I was not trying to discredit PILF. |
| 01:26:08 | 15 | BY MR. LOCKERBY: |
| 01:26:08 | 16 | Q. So is it your testimony that you're not trying |
| 01:26:11 | 17 | to discredit the presidential advisory commission on |
| 01:26:15 | 18 | election integrity, to which Mr. Adams was appointed? |
| 01:26:18 | 19 | A. I -- I don't know what I understand what you |
| 01:26:35 | 20 | mean by "trying to discredit" in that question. I |
| 01:26:41 | 21 | thought that some of the individuals appointed to the |
| 01:26:45 | 22 | commission and some of the commission's methods were not |
| 01:26:48 | 23 | worthy of crediting. I don't know -- I don't know that |
| 01:26:53 | 24 | I can answer your question other than that. |
| 01:26:56 | 25 | Q. Starting in May of 2017, you summarized what |

Page 105

01:27:03  1    certain Virginia voters had told you in a series of
01:27:07  2    tweets, e-mails, and blog posts; isn't that right?
01:27:11  3        A. Correct.
01:27:12  4        Q. And in connection with the research that you
01:27:15  5    claim to be performing, you discovered some Virginia
01:27:20  6    voters who had not been U.S. citizens at the time they
01:27:24  7    registered to vote; isn't that right?
01:27:27  8        A. Yes.
01:27:30  9        Q. And, in fact, you told Vanita Gupta that,
01:27:34 10    didn't you?
01:27:35 11        A. I don't recall whether I did or not.  I may
01:27:38 12    have.
01:27:38 13        Q. And similarly, in connection with the research
01:27:42 14    that you claim to be performing, you discovered Virginia
01:27:47 15    voters who were not U.S. citizens at the time they had
01:27:51 16    cast certain ballots; isn't that right?
01:27:54 17        A. If we're talking about the research for this
01:28:02 18    report, I don't recall whether I know the voting history
01:28:06 19    of the individuals named in this report; and so I don't
01:28:08 20    know whether they cast ballots or not.
01:28:14 21        I don't recall ever seeing their voting
01:28:16 22    history.  I might have in the course of the research,
01:28:18 23    but I don't remember.
01:28:19 24        Q. Well -- but you did talk with some Virginia
01:28:22 25    voters who were noncitizens; right?

Page 106

01:28:30  1        A. I don't know.
01:28:45  2        Q. Did you -- did you ever publish your findings
01:28:49  3    that certain Virginia voters who were not U.S. citizens
01:28:56  4    -- or that certain Virginia voters had registered to
01:28:59  5    vote at a time when they were not U.S. citizens?
01:29:01  6        A. I did not publish findings about this report or
01:29:09  7    about Virginia noncitizens voting at all, and so I don't
01:29:17  8    consider that I came to conclusive findings one way or
01:29:21  9    another.
01:29:28 10        Q. You have commented publicly on the alien
01:29:34 11    invasion reports; isn't that right?
01:29:36 12        A. I have.
01:29:37 13        Q. And in your public comments have you told --
01:29:40 14    have you stated that some of the people identified as
01:29:45 15    noncitizens in those reports, in fact, were noncitizens?
01:29:51 16        A. I don't remember.  I may have.
01:29:57 17        Q. Sitting here today, you can't think of any
01:30:00 18    instance in which you did that; correct?
01:30:06 19        A. I can't think of any instance in -- in which
01:30:09 20    those comments have become public.  I can recall
01:30:13 21    occasions on which I spoke to reporters about that.  I
01:30:19 22    don't recall whether that made it into the final story
01:30:22 23    or not, so I don't know whether that was ever published.
01:30:25 24        Q. When you say you spoke to voters about that,
01:30:30 25    what's the "that" to which you're referring?

Page 107

01:30:33  1        MR. BRIDGES:  Objection.  Misstates testimony.
02:42:18  2        THE WITNESS:  I said that I spoke to reporters
02:42:20  3    about that.
02:42:34  4    BY MR. LOCKERBY:
02:42:35  5        Q. In your answer to my prior question, you
02:42:39  6    stated, "I can recall occasions on which I spoke to
02:42:42  7    reporters about that.  I don't recall whether that made
02:42:47  8    it into the final story or not, so I don't know whether
02:42:50  9    that was ever published."  I see.  When you say you
02:42:54 10    spoke to reporters about that, what is the that to which
02:42:58 11    you were referring?
02:42:59 12        A. The predicate of your question which I
02:43:03 13    understood to be whether I had -- the fact that certain
02:43:10 14    individuals listed in the report were noncitizens when
02:43:13 15    they registered to vote.
02:43:16 16        DEPOSITION OFFICER:  Counsel, I need break.  My
02:43:18 17    computer froze.
02:43:19 18        MR. LOCKERBY:  Okay.
02:43:20 19        THE VIDEOGRAPHER:  We're off the record at
02:43:23 20    1:31 p.m.
01:36:21 21        (A recess is taken.)
01:36:21 22        THE VIDEOGRAPHER:  We are back on the record at
01:36:24 23    1:36 p.m.
01:36:26 24        MR. LOCKERBY:  I'm sorry.  If you could please
01:36:29 25    read the last portion before we went off, that would be

Page 108

01:36:32  1    helpful.
01:36:36  2        DEPOSITION OFFICER:  I can't.  I have to open
01:36:37  3    up a file.
01:36:39  4        MR. LOCKERBY:  But you did it after we were
01:36:41  5    done with the question and answer; correct?
01:36:47  6        DEPOSITION OFFICER:  I took it down.  I just
01:36:48  7    can't open up the file right now.
01:36:51  8        MR. LOCKERBY:  That's fine.  That's fine.
01:36:52  9    I'd like to have this marked as Exhibit 31,
01:36:55 10    please.
01:37:13 11        Did I give you two copies of that by mistake?
01:37:13 12        (Whereupon the document referred to is marked
01:37:13 13    by the reporter as Defense Exhibit 31 for
01:37:16 14    identification.)
01:37:16 15        THE WITNESS:  Yes.
01:37:16 16        MR. LOCKERBY:  Thank you.
01:37:18 17        THE WITNESS:  You bet.
01:37:19 18    BY MR. LOCKERBY:
01:37:22 19        Q. Exhibit 31 has been marked by us as Document
01:37:29 20    16-1 through 16-7.  This is a spreadsheet that you
01:37:36 21    yourself created regarding your communications with
01:37:41 22    Virginia voters; correct?
01:37:43 23        A. Correct.
01:37:44 24        Q. And the column e-mail indicates whether you, in
01:37:55 25    fact, sent an e-mail to that particular voter; isn't

Page 109

01:37:57  1    that right?
01:37:58  2        A. Correct.
01:37:58  3        Q. And was the text of the original e-mail the
01:38:10  4    same as the May 30, 2017, e-mail that we looked at
01:38:17  5    earlier as part of Exhibit 28?
01:38:34  6        It was on the second page of Exhibit 28.
01:38:38  7        A. Thank you.
01:38:41  8        The initial e-mail to, I believe, each
01:38:45  9    individual would have been approximately the same. I
01:38:53 10    did -- something may have occurred to me when I sent the
01:38:54 11    first e-mail. And so after sending a few, I modified
01:38:58 12    the text, approximately. It's also possible that I
01:39:02 13    didn't e-mail all of these people at the same time, and
01:39:05 14    so I might -- events in the world might have changed.
01:39:10 15    Some of the e-mails reference different current events.
01:39:13 16        So I can't swear that every single one of the
01:39:15 17    e-mails to every single one of these people was
01:39:18 18    initially the same, but they were certainly similar.
01:39:24 19        MR. GORMAN: Can we get clarification. Was
01:39:26 20    this document created in anticipation of litigation?
01:39:30 21        MR. LOCKERBY: I'm going to object. That's --
01:39:37 22    I'm asking questions at this point, and that's not an
01:39:42 23    objection. That's simply a gratuitous question.
01:39:47 24        MR. GORMAN: I just want to make sure this
01:39:49 25    document is not a privilege or subject to a claim of

Page 110

01:39:52  1    work product immunity.
01:39:54  2        MR. LOCKERBY: You have other ways of doing
01:39:56  3    that.
01:39:57  4        I'd like to have this marked as Exhibit 32,
01:40:17  5    please.
01:40:17  6        (Whereupon the document referred to is marked
01:40:17  7    by the reporter as Defense Exhibit 32 for
01:40:17  8    identification.)
01:40:27  9    BY MR. LOCKERBY:
01:40:27 10        Q. Exhibit 32 is a document that we've numbered
01:40:30 11    13, and these are notes that reflected your
01:40:35 12    communications with certain Virginia voters; isn't --
01:40:38 13    isn't that right?
01:40:45 14        A. Yes.
01:40:48 15        Q. And at the time of these communications, your
01:40:50 16    purpose in contacting them was to try to debunk the
01:40:55 17    Alien Invasion reports; isn't that right?
01:40:58 18        A. No.
01:40:58 19        Q. Well, if you look under the name Raza Latif,
01:41:04 20    you see you've written, "Okay with using name in
01:41:07 21    connection with debunking the report"?
01:41:09 22        A. Correct.
01:41:09 23        Q. Those were your words; right?
01:41:12 24        A. Correct.
01:41:12 25        Q. And then similarly, if you look under the name

Page 111

01:41:15  1    of Augustine Tsibu-Gyan, you've written, "Okay with
01:41:21  2    using his name in connection with debunking the report.
01:41:26  3    Doesn't want to talk to reporters."
01:41:28  4        Those were your words; correct?
01:41:30  5        A. Correct.
01:41:43  6        Q. And then under Wagner Walendy you wrote, "Gave
01:41:48  7    him Allison's contact."
01:41:49  8        You gave him Allison Riggs' contact
01:41:53  9    information; isn't that right?
01:41:55 10        A. Correct.
01:41:56 11        Q. And you never provided any legal advice to
01:42:04 12    Wagner Walendy yourself, did you?
01:42:07 13        MR. BRIDGES: Objection. I'll withdraw that.
01:42:11 14    You're not asking for the substance of communication.
01:42:29 15        THE WITNESS: I may have offered some advice
01:42:31 16    that he would have construed as legal advice, but I do
01:42:34 17    not know.
01:42:37 18        MR. GORMAN: I've got to object.
01:42:39 19        Based on the contents of this document, it
01:42:41 20    appears that it contains references to communications
01:42:45 21    with the Protect Democracy Project and the Southern
01:42:50 22    Coalition for Social Justice in anticipation of
01:42:51 23    litigation. I think this is work product protected.
01:42:53 24        MR. LOCKERBY: On its -- I'm not going to
01:42:56 25    debate the issue with you. On its face, it reflects

Page 112

01:43:00  1    only communications with Virginia voters.
01:43:02  2        MR. GORMAN: It reflects communications with
01:43:05  3    the Southern Coalition for Social Justice.
01:43:09  4        MR. LOCKERBY: Understand your position.
01:43:16  5        Under --
01:43:17  6        MR. GORMAN: I object to any further
01:43:19  7    questioning about this document.
01:43:20  8        MR. LOCKERBY: You've noted your objection.
01:43:21  9    BY MR. LOCKERBY:
01:43:22 10        Q. Under the heading Kimone Campbell at the
01:43:25 11    bottom, you've written, "May be interested in further
01:43:30 12    action. Wants to review further. Okay with using story
01:43:34 13    but not name."
01:43:38 14        The reference to "using story but not name" --
01:43:40 15    that was for purposes of reporters; correct?
01:43:43 16        MR. BRIDGES: Objection.
01:43:45 17        Based on Mr. Gorman's objection and asserting
01:43:49 18    that it's subject to his work product -- or his client's
01:43:51 19    work product, you're not the holder of that.
01:43:54 20        I'm going to have to instruct you not to answer
01:43:55 21    based on his objection.
01:44:05 22    BY MR. LOCKERBY:
01:44:05 23        Q. Under Fabian Lopez you've written, "Not okay
01:44:10 24    with using name. Okay with describing story."
01:44:18 25        Did Mr. Lopez tell you that?

Page 113

01:44:21  1     MR. BRIDGES:  Same objection.  Same
01:44:25  2  instruction.
01:44:29  3  BY MR. LOCKERBY:
01:44:30  4     Q.  Under the name Mary Kanani, at the bottom
01:44:36  5  you've written, "Registered now.  Okay with talking
01:44:39  6  about situation but not using name."
01:44:44  7     Again, you were talking with Mary Kanani about
01:44:48  8  possibly publicizing her situation but not using her
01:44:53  9  name in litigation; isn't that right?
01:44:56  10    MR. BRIDGES:  Same objection.  Same
01:44:58  11  instruction.
01:45:08  12    MR. GORMAN:  Counsel, there's been an objection
01:45:09  13  to work product; and you're continuing to question him
01:45:11  14  about this document.  I mean, it's not every line of the
01:45:13  15  document; but there are lines in this document that
01:45:16  16  contain references to communication with plaintiff's
01:45:20  17  counsel.
01:45:21  18    MR. LOCKERBY:  I haven't asked about any of
01:45:23  19  those, but I'm not going to --
01:45:23  20    MR. GORMAN:  You specifically did ask about
01:45:25  21  those.
01:45:25  22  BY MR. LOCKERBY:
01:45:27  23    Q.  Under the name Luciania Freeman, where you
01:45:34  24  write, "May be okay with using name but scared," that
01:45:37  25  notation reflects a communication with Lucinia Freeman,

Page 114

01:45:43  1  not with the Southern Coalition for Social Justice or
01:45:49  2  the Protect Democracy Project, does it?
01:45:52  3     A.  That reflects a communication with Lucinia
01:45:57  4  Freeman.  That is correct.
01:46:01  5     Q.  And that communication with Lucinia Freeman
01:46:04  6  did not reflect the work product of any lawyers at the
01:46:12  7  Southern Coalition for Social Justice or the Protect
01:46:16  8  Democracy Project, did it?
01:46:17  9     A.  Correct.
01:46:25  10    Q.  Moving back up the page.
01:46:33  11    Under Mary Kanani, when you wrote, "Okay with
01:46:37  12  talking about situation but not using name," that
01:46:40  13  statement reflected your communications with Mary
01:46:44  14  Kanani, not your communications with attorneys at the
01:46:47  15  Southern Coalition for Social Justice or the Protect
01:46:51  16  Democracy Project; isn't that true?
01:46:54  17    A.  Correct.
01:46:57  18    MR. GORMAN:  Mr. Lockerby, I don't think you
01:47:00  19  understand my point.  You have sentences in here that
01:47:01  20  refer to communications with my clients in anticipation
01:47:04  21  of litigation.  The document contains information that
01:47:08  22  is work product protected, and you're continuing to ask
01:47:10  23  about it.
01:47:11  24    MR. LOCKERBY:  I'm not, actually.  The
01:47:12  25  questions I'm asking him have nothing to do with work

Page 115

01:47:15  1  product --
01:47:15  2     MR. GORMAN:  Well, then --
01:47:15  3     MR. LOCKERBY:  -- testimony.
01:47:16  4     MR. GORMAN:  -- just put the document away and
01:47:17  5  ask him about his communications with these individuals.
01:47:19  6     MR. LOCKERBY:  I'm not putting the document
01:47:20  7  away.
01:47:21  8  BY MR. LOCKERBY:
01:47:22  9     Q.  Under Fabian Lopez, where you've written, "Not
01:47:26  10  okay with using name," that statement reflected your
01:47:34  11  communications with Fabian Lopez, not your
01:47:37  12  communications with attorneys at the Southern Coalition
01:47:41  13  for Social Justice or the Protect Democracy Project;
01:47:46  14  isn't that right?
01:47:46  15    A.  Correct.
01:47:51  16    Q.  And then on the page before, under Kimone
01:47:55  17  Campbell, where you've written at the bottom, "May be
01:47:59  18  interested in further action.  Wants to review further.
01:48:02  19  Okay with using story but not name," that statement --
01:48:05  20  or those two sentences reflect your communications with
01:48:15  21  Kimone Campbell, not with attorneys at the Southern
01:48:20  22  Coalition for Social Justice or the Protect Democracy
01:48:22  23  Project; isn't that right?
01:48:23  24    A.  One of those statements reflects potential
01:48:31  25  legal advice that a client may have anticipated, and so

Page 116

01:48:34  1  I don't feel comfortable answering that question
01:48:37  2  without --
01:48:37  3     Q.  Okay.
01:48:39  4     MR. GORMAN:  The witness has just testified
01:48:40  5  this document contains information that may be
01:48:43  6  attorney-client privilege, and you're continuing to ask
01:48:46  7  about it.
01:48:46  8     MR. LOCKERBY:  Under Kimone --
01:48:47  9     MR. GORMAN:  This document should clawed back.
01:48:49  10  This is outrageous.
01:48:50  11    MR. LOCKERBY:  What is outrageous is your
01:48:52  12  interference in the deposition.
01:48:53  13  BY MR. LOCKERBY:
01:48:54  14    Q.  Under Kimone Campbell, the statement down at
01:48:58  15  the bottom, the very last sentence -- or two sentences
01:49:03  16  at the bottom, those reflect your communications with
01:49:07  17  Kimone Campbell, not with attorneys for the Southern
01:49:12  18  Coalition for Social Justice or the Protect Democracy
01:49:15  19  Project; isn't that right?
01:49:15  20    MR. BRIDGES:  Based upon your recollection, I'm
01:49:18  21  objecting that that invades the attorney-client
01:49:21  22  privilege.
01:49:21  23    On that basis, I'm instructing you not to
01:49:23  24  answer.
01:49:23  25    And we will, on that basis, be making a request

Page 117

01:49:27  1   to claw back this document for redaction, if no other
01:49:31  2   purpose.
01:49:31  3        You're so advised.
01:49:43  4        MR. LOCKERBY:  Well, what we're going to have
01:49:45  5   to do with that is that's an issue that we're going to
01:49:48  6   have to have a federal judge review these in camera and
01:49:52  7   make that -- that determination.  But we can talk about
01:49:54  8   that.
01:49:55  9        MR. GORMAN:  You're refusing to turn back the
01:49:57  10  document?  He's -- he's made a clawback request.
01:50:01  11       MR. LOCKERBY:  I'm refusing at this time.  I'm
01:50:04  12  suggesting that rather than engaging in self-help on
01:50:08  13  either side -- don't laugh at me.
01:50:09  14       MR. GORMAN:  I'm just --
01:50:10  15       MR. LOCKERBY:  Do not -- you need to show --
01:50:13  16  you need to act properly during this deposition.
01:50:17  17       I'm saying that that's information that
01:50:19  18  needs to be made by a judge, and it's not going to be
01:50:23  19  made by me.  It's not going to be made by you.
01:50:26  20       MR. BRIDGES:  My understanding is -- correct me
01:50:28  21  if I'm wrong -- there is a protective order in this
01:50:30  22  case.
01:50:30  23       MR. LOCKERBY:  There is.
01:50:30  24       MR. BRIDGES:  And the protective order has a
01:50:31  25  clawback provision in it; correct?

Page 118

01:50:33  1        MR. LOCKERBY:  It does.
01:50:34  2        MR. BRIDGES:  And does that protective order
01:50:36  3   activate such that when the clawback request is made,
01:50:40  4   the document is supposed to be returned pending a
01:50:43  5   resolution of that action or challenge --
01:50:44  6        MR. LOCKERBY:  It may well say that.  And if
01:50:46  7   it's --
01:50:46  8        MR. BRIDGES:  -- based -- I'm sorry.  Let me
01:50:48  9   finish.
01:50:48  10       MR. LOCKERBY:  Absolutely.
01:50:48  11       MR. BRIDGES:  And based upon that, I am making
01:50:50  12  the request that copies of this document be returned to
01:50:54  13  me at this time pursuant to that protective order
01:50:56  14  subject, of course, to you doing whatever you like under
01:50:59  15  that protective order to reobtain a copy of that
01:51:01  16  document.
01:51:01  17       MR. LOCKERBY:  Okay.  If it says that, that's
01:51:04  18  what we'll do.  I don't have it in front of me.  And
01:51:06  19  if -- I could give you every copy in front of me right
01:51:11  20  now, and that would not address your request because
01:51:14  21  there are other copies out there.  During a break, we'll
01:51:17  22  look at the protective order; but either way, this is an
01:51:20  23  issue that -- it will need to be taken up with the
01:51:24  24  federal court.
01:51:54  25       I'd like to have this marked as Exhibit 33,

Page 119

01:51:57  1   please.
01:51:57  2        And just anticipating the objection, there are
01:52:01  3   pages of Exhibit 33 that are the same as Exhibit 32.  So
01:52:06  4   I understand you have the same objections.  There are
01:52:08  5   other pages that are different, and you may not have the
01:52:11  6   same objections.  And I'm going to ask about those.
01:52:11  7        (Whereupon the document referred to is marked
01:52:11  8   by the reporter as Defense Exhibit 33 for
01:52:14  9   identification.)
01:52:14  10       MR. BRIDGES:  Let me look at this.  Perhaps we
01:52:17  11  should separate that because you put it together in this
01:52:19  12  form.
01:52:20  13       MR. LOCKERBY:  No.  Actually, I didn't put it
01:52:21  14  together in this form.  This is how it was produced.
01:52:37  15       MR. GORMAN:  Yeah.  I object.  This document
01:52:40  16  reflects confidential communications with Southern
01:52:43  17  Coalition for Social Justice at a minimum.
01:52:45  18       MR. LOCKERBY:  I think it would be helpful to
01:52:47  19  have counsel identify on the record which pages of this
01:52:52  20  document supposedly reflect confidential communications
01:52:56  21  with Southern Coalition for Social Justice.
01:53:02  22       MR. GORMAN:  There are references to an
01:53:04  23  attorney and to communications with attorney at the
01:53:06  24  Southern Coalition for Social Justice.
01:53:09  25       MR. LOCKERBY:  My question was, What pages and

Page 120

01:53:12  1   lines of this --
01:53:12  2        MR. GORMAN:  That information -- the
01:53:13  3   information is work product protected.  It's throughout
01:53:17  4   the document.  I mean, it's -- it's not a significant
01:53:26  5   number of redactions.  It --
01:53:28  6        MR. LOCKERBY:  Well, it is in view of the fact
01:53:30  7   these documents were produced a while ago, that counsel
01:53:35  8   for Southern Coalition for Social Justice and the
01:53:39  9   Protect Democracy Project were late as it was in
01:53:41  10  asserting the objection.  Plenty of time to withhold or
01:53:46  11  redact documents.  And clearly, not all of this has --
01:53:52  12  in fact, most of it has nothing to do with
01:53:55  13  communications with Southern Coalition for Social
01:53:59  14  Justice and the Protect Democracy Project.
01:54:01  15       We're on a very tight discovery deadline in
01:54:03  16  this case; and most of this has to do with facts, not
01:54:10  17  attorney mental impressions or communications relevant
01:54:13  18  to the claims and defenses.  And our discovery of the
01:54:17  19  facts is being obstructed here.  There is nothing work
01:54:21  20  product about saying that someone who's native born and
01:54:25  21  has a passport, birth certificate, for example.
01:54:28  22       MR. GORMAN:  Yeah.  No.  So let me -- let me
01:54:31  23  just see if I can propose something.  Because you're
01:54:35  24  right.  There are -- there are references in this
01:54:37  25  document that I do not claim any work product protection

Page 121

```
01:54:41   1   over.
01:54:41   2          We could -- you could proceed with questioning.
01:54:44   3   We could decline to enter this document into the record
01:54:52   4   and provide you with a redacted version that deletes the
01:54:54   5   few words on each page that I believe reflect
01:54:57   6   confidential communications with Southern Coalition for
01:54:57   7   Social Justice.
01:55:02   8          If you're asking about facts that aren't work
01:55:05   9   product protected, then it won't affect the exhibit.
01:55:07  10          MR. LOCKERBY:  Well, the problem is we're here
01:55:10  11   today for a deposition in a case in which discovery
01:55:13  12   ends --
01:55:14  13          MR. GORMAN:  No.  I'm saying you can ask the
01:55:16  14   questions right now.  We just wouldn't enter the exhibit
01:55:18  15   in until it's been properly redacted.
01:55:22  16          MR. LOCKERBY:  Well, which parts of the exhibit
01:55:26  17   is it the position of Southern Coalition for Social
01:55:29  18   Justice and the Protect Democracy Project that I'm not
01:55:32  19   supposed to ask questions about?
01:55:33  20          MR. GORMAN:  There are references to an
01:55:35  21   attorney whose first name is Alesha.  That's what I see
01:55:38  22   immediately.
01:55:43  23          MR. LOCKERBY:  On the first page it says,
01:55:46  24   "Contacted Alesha."
01:55:46  25          MR. GORMAN:  That's right.
```

Page 122

```
01:55:47   1          MR. LOCKERBY:  The fact that he contacted
01:55:48   2   Alesha is not work product.
01:55:50   3          MR. GORMAN:  The fact that he contacts Alesha
01:55:52   4   about that particular individual is.
01:55:54   5          MR. LOCKERBY:  It doesn't say that.
01:56:10   6          MR. BRIDGES:  I think the suggestion Mr. Gorman
01:56:12   7   proposes makes sense.  You can proceed with your
01:56:14   8   questioning.
01:56:14   9          The only thing I would add is there is one
01:56:17  10   sentence on here that's been identified for me which may
01:56:19  11   indicate a response to an inquiry, and that we are going
01:56:23  12   to assert attorney-client privilege to.  I will not
01:56:25  13   allow him to testify to that, and I would redact it.
01:56:28  14   There may be others.
01:56:29  15          But keep in mind we produced in short order
01:56:32  16   thousands of pages of documents, and we did so with the
01:56:35  17   intention of allowing you to ask questions until such
01:56:39  18   time as an attorney-client question may have arisen or a
01:56:44  19   request for legal advice, and then we brought the
01:56:47  20   curtain down.
01:56:48  21          So it surprises me not that there is a line or
01:56:49  22   two in here that needs to be redacted.  I assume that
01:56:53  23   was the intention of the parties by putting a clawback
01:56:55  24   provision in the protective order.  We know what happens
01:56:58  25   in these sort of cases.
```

Page 123

```
01:56:59   1          So I will say on behalf of my client that we're
01:57:03   2   willing to accept the proffer of Mr. Gorman to allow you
01:57:08   3   to ask questions; but we would want, then, to further
01:57:11   4   redact the documents.  I will not allow him to answer
01:57:14   5   questions that I think implicate a question which may
01:57:18   6   have called for an attorney-client privilege.
01:57:20   7          But in the main, most of this document is not
01:57:23   8   going to be affected by that, which is why you got it in
01:57:26   9   the first place.  So that's just my -- my point in
01:57:29  10   response to Mr. Gorman's offer because he speaks for his
01:57:32  11   clients with respect to their work product.
01:57:34  12          MR. LOCKERBY:  Rather than engaging in a
01:57:36  13   guessing game, let me suggest that we go off the record;
01:57:39  14   and then Mr. Gorman or whoever else needs to address
01:57:48  15   this can look at Exhibits 32 and 33 and let me know
01:57:53  16   which lines of these should be redacted; and I won't at
01:57:59  17   this time ask any questions about the portions for which
01:58:02  18   you're seeking redaction.  That would be the most
01:58:05  19   efficient way to address this.  Then we can substitute
01:58:09  20   redacted copies later.
01:58:12  21          MR. GORMAN:  So I believe I've already
01:58:13  22   identified the references just to an individual by the
01:58:17  23   name of Alesha.
01:58:22  24          MR. LOCKERBY:  On exhibit -- I have Exhibit 32
01:58:25  25   in front of me.  Under Raza Latif, I take it that you
```

Page 124

```
01:58:35   1   want to redact the sentence that that says --
01:58:40   2          DEPOSITION OFFICER:  Do you want this on the
01:58:41   3   record?
01:58:42   4          MR. LOCKERBY:  I was try -- suggesting to doing
01:58:45   5   it off the record; but apparently, they want to do it
01:58:50   6   some other way.
01:58:50   7          MR. BRIDGES:  I'm willing to go off the record
01:58:53   8   to have this discussion.
01:58:54   9          MR. GORMAN:  I just don't think we need to.
01:58:56  10   It's the same issue for me, which is, the
01:58:58  11   references to an attorney named Alesha.  And I believe
01:59:00  12   there was at least some testimony about an inquiry from
01:59:05  13   an individual where there was an attorney-client
01:59:07  14   objection.  But that's not my objection.
01:59:10  15          MR. LOCKERBY:  All right.  On the first page of
01:59:10  16   Exhibit 32, we would redact -- you're proposing to
01:59:14  17   redact, "Gave Alesha contact info" --
01:59:17  18          MR. GORMAN:  Can we not --
01:59:19  19          MR. LOCKERBY:  -- "and contacted Alesha."
01:59:20  20          MR. GORMAN:  The point is, is that it's work
01:59:20  21   product protected and redact it.  We're not putting
01:59:22  22   these comments on the record.
01:59:24  23          MR. LOCKERBY:  Okay.  Then let's go off the
01:59:26  24   record, and why don't you mark up Exhibits 32 and 33
01:59:30  25   with what you claim should be redacted, and I'll ask
```

Page 125

01:59:33   1    questions about the rest of it.  I suggested doing it
01:59:36   2    off the record.  You wanted to do it on the record.
01:59:39   3    Then I did it on the record, and you wanted to do it off
01:59:41   4    the record.  So we'll go off the record, and take as
01:59:44   5    much time as you like, and we'll come back when you're
01:59:46   6    done.
01:59:48   7          MR. GORMAN:  That's fine with me.
01:59:51   8          THE VIDEOGRAPHER:  We're off the record at
01:59:52   9    1:59 p.m.
01:59:54  10          (A recess is taken.)
02:36:48  11          THE VIDEOGRAPHER:  We are back on the record at
02:36:51  12    2:36 p.m.
02:36:54  13          MR. LOCKERBY:  While we were off the record,
02:36:56  14    counsel for plaintiffs, counsel for plaintiff's counsel,
02:37:03  15    and counsel for Loyola and Mr. Levitt conferred and have
02:37:10  16    come up with redacted versions of Exhibits 32, 33, which
02:37:15  17    we will use as the official deposition exhibits.  And we
02:37:22  18    will make sure that the originals get clawed back in
02:37:26  19    accordance with protective order until such time as the
02:37:29  20    Court resolves any issues about the claims of work
02:37:34  21    product and attorney-client privilege.
02:37:36  22          Is that -- anything else we need to say on
02:37:39  23    that?
02:37:40  24          MR. GORMAN:  Yeah.  And there was an agreement
02:37:42  25    that to the extent any of those now redacted portions

Page 126

02:37:46   1    were read into the record, that the objections were
02:37:49   2    timely asserted.  It's not a waiver for them to stay on
02:37:52   3    the transcript or on the video.
02:37:53   4          MR. BRIDGES:  So stipulated.
02:37:55   5          MR. LOCKERBY:  Agreed.
02:37:57   6    BY MR. LOCKERBY:
02:37:59   7          Q.  If you can look back, please, at Exhibit 32
02:38:02   8    under the name Kimone Campbell.  Kimone Campbell told
02:38:12   9    you, "Okay with using story that I made"; correct?
02:38:15  10          A.  Correct.
02:38:15  11          Q.  And if someone was not okay with having his or
02:38:24  12    her name used, then that individual obviously cannot be
02:38:29  13    a party to litigation; correct?
02:38:35  14          A.  So I'm not going to discuss what individuals
02:38:39  15    thought about whether they were going to be parties to
02:38:41  16    litigation or not.  That was not the purpose for my
02:38:44  17    making that comment in these documents, and so I don't
02:38:49  18    think I can answer your question.
02:38:50  19          Q.  Fair enough.
02:38:50  20          So you were talking to these individuals about
02:38:55  21    publicizing the fact that they were, in fact, citizens?
02:39:01  22          A.  I was inquiring whether they would be willing
02:39:06  23    to or interested in publicize that, yes.
02:39:09  24          Q.  And then similarly, on the second page of
02:39:17  25    Exhibit 32, under Fabian Lopez you've written, "Not okay

Page 127

02:39:24   1    with using name.  Okay with describing story."
02:39:27   2          Is that consistent with what Fabian Lopez told
02:39:31   3    you?
02:39:31   4          A.  Yes.
02:39:31   5          Q.  And under Mary Kanani, last line before the
02:39:40   6    redaction, she told you, "Okay with talking about
02:39:44   7    situation but not using name"; correct?
02:39:47   8          A.  Correct.
02:39:47   9          Q.  And under Luciania Freeman, where you've
02:39:55  10    written, "May be okay with using name but scared,"
02:39:57  11    that's consistent with what she told you; correct?
02:40:00  12          A.  Correct.
02:40:03  13          Q.  Under Bobby Woods you've written, quote, Okay
02:40:07  14    with using name in connection with debunking the report.
02:40:12  15          You discussed with Mr. Woods possibly using his
02:40:15  16    name to debunk the report; isn't that right?
02:40:19  17          A.  Yes.  I don't recall who brought up debunking
02:40:26  18    the report, but yes.
02:40:28  19          Q.  And debunking the report is a phrase that you
02:40:33  20    use -- one, two, three -- four times in Exhibit 32;
02:40:33  21    correct?
02:40:41  22          A.  Correct.
02:40:42  23          Q.  And similarly, under Cameron Weidenhof, you've
02:40:48  24    written, quote, He's okay with using his name in
02:40:51  25    connection with debunking the report, close quote.

Page 128

02:40:54   1          That's what you wrote; correct?
02:40:56   2          A.  Correct.
02:40:56   3          Q.  And now if you could look, please, at
02:41:07   4    Exhibit 33.  And in Exhibit 33 the first three pages
02:41:19   5    address the same voters as identified in Exhibit 32;
02:41:28   6    isn't that right?
02:41:30   7          A.  Yes.
02:41:36   8          MR. GORMAN:  Just a point of clarification.  I
02:41:38   9    don't think that's --
02:41:40  10          MR. LOCKERBY:  They're in a different order.
02:41:41  11          MR. GORMAN:  Different order?  Okay.
02:41:44  12    BY MR. LOCKERBY:
02:41:44  13          Q.  Address the same voters; correct?
02:41:45  14          A.  Correct.
02:41:46  15          Q.  And then if you look on the fourth page, there
02:41:51  16    are -- one, two, three, four -- five additional
02:41:56  17    individuals that were not named in the Exhibit 32; is
02:41:56  18    that right?
02:42:13  19          A.  Yes.
02:42:22  20          Q.  Under the name Gracia Gadju there are a series
02:42:28  21    of questions.  Was that series of questions that you
02:42:35  22    intended to ask if you spoke with these people or in
02:42:38  23    e-mails?  What was the purpose of that series of
02:42:41  24    questions?
02:42:41  25          A.  Yes.  That's correct.  This was a series of

Page 129

02:42:43  1    questions to ascertain the facts of what happened, to
02:42:49  2    the best of their knowledge.
02:42:54  3        Q.  And below that series of questions, there's
02:42:59  4    something that begins with the line, "Question from
02:43:02  5    researcher about your name and voter registration
02:43:06  6    report."
02:43:07  7        Was that the subject line for an e-mail to send
02:43:09  8    to Virginia voters?
02:43:11  9        A.  Yes.
02:43:11 10        Q.  Do you know approximately when you drafted this
02:43:24 11    e-mail?
02:43:27 12        A.  I don't.  I know that it was after speaking
02:43:32 13    with some voters and before speaking with others, but I
02:43:35 14    don't know further than that.  I know that it was also
02:43:41 15    after one of the individuals responsible for the report
02:43:45 16    had been appointed to a national voting advisory body.
02:43:49 17    So I can tell you when it's after, but I don't know
02:43:51 18    about when it was.
02:43:52 19        Q.  In that paragraph you say, "One of the people
02:43:59 20    responsible for the report has just been appointed to a
02:44:02 21    national voting advisory body."
02:44:04 22        Were you referring to Mr. Adams?
02:44:06 23        A.  I was.
02:44:06 24        Q.  And were you referring to the Presidential
02:44:10 25    Advisory Commission on Electoral Integrity?

Page 130

02:44:12  1        A.  Yes.
02:44:13  2        Q.  And when was that commission established, if
02:44:17  3    you recall?
02:44:18  4        A.  I don't recall exactly.
02:44:19  5        Q.  But whenever it was, this e-mail was drafted --
02:44:26  6    or the text of this e-mail was drafted after the
02:44:29  7    commission was set up?
02:44:30  8        A.  Correct.
02:44:30  9        Q.  And you also wrote, "Quite a few people have
02:44:38 10    told me already that their information is not correct,
02:44:40 11    and they're understandably quite upset about it."
02:44:44 12        A.  Correct.
02:44:44 13        Q.  As of the date you drafted this e-mail,
02:44:48 14    whenever it was, how many people told you that the
02:44:52 15    information was not correct and that they were upset?
02:44:55 16        A.  I don't recall exactly, but I -- I
02:45:00 17    characterized that as quite a few, and I would -- I
02:45:03 18    would stand by that.
02:45:09 19        Q.  Of the quite a few that you referenced, only
02:45:16 20    one, Luciania Freeman, became a plaintiff in this case;
02:45:16 21    correct?
02:45:21 22        A.  That's my understanding.
02:45:22 23        Q.  In the paragraph that begins with the word
02:45:28 24    "specifically," you write, "I'm trying to track down the
02:45:32 25    source of the incorrect information in the report."

Page 131

02:45:35  1        That was a false statement, wasn't it?
02:45:39  2        A.  No.
02:45:40  3        Q.  You weren't trying to track down the source of
02:45:42  4    the incorrect information.  You knew the source, didn't
02:45:45  5    you?
02:45:46  6        A.  No.
02:45:47  7        Q.  In fact, the information regarding these
02:45:53  8    individuals was in records that were attached as
02:45:57  9    exhibits to the Alien Invasion reports; isn't that true?
02:46:03 10        A.  There was information about the individuals,
02:46:08 11    yes.  The incorrect information in the report was the
02:46:14 12    information declaring that these individuals had been
02:46:18 13    noncitizens when they registered.
02:46:27 14        Q.  So did you think that the individuals that you
02:46:30 15    were contacting were the source of the incorrect
02:46:36 16    information in the report?
02:46:40 17        A.  I did not know, which was why I was contacting
02:46:42 18    them.  I knew that some of the information in the report
02:46:57 19    had been incorrect, and I did not know whether there was
02:47:00 20    a systemic reason for that.
02:47:02 21        Q.  Well, in fact, if you wanted to find out why
02:47:09 22    there was supposedly incorrect information in the
02:47:12 23    report, wouldn't the best source have been either the
02:47:15 24    state department of elections in Virginia, the local
02:47:17 25    registrar, or the authors and publishers of the report?

Page 132

02:47:23  1        MR. BRIDGES:  Objection.
02:47:23  2        BY MR. LOCKERBY:
02:47:23  3        Q.  Wouldn't they be the best sources?
02:47:25  4        MR. BRIDGES:  Objection.  Argumentative.
02:47:26  5        THE WITNESS:  Not necessarily.  They would have
02:47:30  6    been additional sources, but not necessarily.
02:47:32  7        BY MR. LOCKERBY:
02:47:32  8        Q.  Did you ever contact the Virginia Department of
02:47:36  9    Elections to find out what information the department of
02:47:40 10    elections had provided to PILF?
02:47:44 11        A.  No.
02:47:46 12        Q.  Did you ever contact any registrars in the
02:47:50 13    Commonwealth of Virginia to find out what information
02:47:53 14    the registrars had provided to PILF?
02:47:55 15        A.  I attempted to, yes.
02:47:57 16        Q.  What did you do to attempt to contact the
02:48:00 17    registrars?
02:48:01 18        A.  I called the registrar's list of numbers and
02:48:06 19    indicated that I would be interested in speaking with
02:48:09 20    them.
02:48:10 21        Q.  Did they speak with you?
02:48:11 22        A.  I called not all of the registrars.  Several
02:48:13 23    registrars.
02:48:15 24        Q.  Which ones did you call?
02:48:16 25        A.  I don't remember precisely.  I don't remember

Page 133

1   precisely.

2      Q. Did you ever submit or have submitted on your

3   behalf either a FOIA request or an NVRA request to any

4   of the Virginia registrars?

5      A. No.

6      Q. And did you ever ask anyone at PILF the source

7   of what you call the incorrect information in the

8   report?

9      A. No. I did ask why they had published incorrect

10  information, but I did not ask the source of that

11  incorrect information.

12     Q. In the next paragraph you add a link to your

13  faculty Web page at Loyola Law School; is that right?

14     A. Correct.

15     Q. And that was consistent with your statement a

16  couple paragraphs above that, quote, I'm a law professor

17  looking into the report's allegations, close quote;

18  correct?

19     A. Correct.

20     Q. In the paragraph that begins with the words "I

21  know," you go on in the third sentence to state, "But if

22  the information in the report is incorrect, I'd like to

23  be of assistance in making that clear and doing what I

24  can to set things straight."

25     What is it that -- what kind of assistance did

Page 134

1   you have in mind to make clear that there was incorrect

2  information in the report?

3     A. If the individual were so inclined to publicize

4  the fact that the information related to the individual

5  was incorrect. Beyond that, I wanted to inquire of

6  individuals what they cared to do, if anything. And I

7  don't know that I can speak further without violating

8  either their privilege or privilege of counsel in this

9  matter.

10     Q. Well, if the information in the report was

11  incorrect, wouldn't the best way of helping them to be

12  to correct the report so that it was no longer

13  incorrect?

14     A. Potentially. That would not remedy the

15  incorrect statements made about them and put out into

16  the public. That would not fully remedy incorrect

17  statements made about them and put out to the public.

18     Q. When you contacted these hundreds of

19  individuals in the Commonwealth of Virginia, did you

20  find any who had already heard about the report and the

21  references to them in the report?

22     A. I -- I don't know that I agree with the

23  premise. I -- I contacted hundreds, but I did not hear

24  back from hundreds. I don't believe so.

25     Q. Did you tell any of these individuals that the

Page 135

1   Southern Coalition for Social Justice would be putting

2  out a press release mentioning the report and the fact

3  that various individuals had supposedly been incorrectly

4  identified as noncitizens in the reports?

5     MR. LEBOWITZ: Objection. Lacks foundation.

6     THE WITNESS: Yeah. I -- I don't know that I

7  knew that a press release was forthcoming.

8  BY MR. LOCKERBY:

9     Q. But you have seen press releases put out by the

10  Southern Coalition for Social Justice about this

11  complaint and developments in this case, have you not?

12     A. I believe so. I don't recall whether I had

13  conversations with these individuals --

14     Q. At the time --

15     A. -- leading up to the press release.

16     Q. And at the time you had the conversations with

17  these individuals, did you know that the Southern

18  Coalition for Social Justice was contemplating putting

19  out press releases about this litigation?

20     A. No.

21     MR. LOCKERBY: I'd like to have this marked as

22  Exhibit 34, please.

23     Sorry, guys. We're back to sharing.

24  ///

25  ///

Page 136

1     (Whereupon the document referred to is marked

2  by the reporter as Defense Exhibit 34 for

3  identification.)

4     MR. GORMAN: That's fine.

5     MR. LOCKERBY: Actually, I spoke too soon.

6  BY MR. LOCKERBY:

7     Q. Exhibit 34 is a multipage document because it

8  was produced that way. We've numbered all these

9  different pages as -- because it was one PDF, as No. 12.

10  And I'd like you to look first, please, at the Pages 3

11  through 6 of the PDF.

12     A. Okay.

13     Q. And you see there is some e-mail exchanges with

14  Cameron Bell?

15     A. Yes.

16     Q. And Cameron Bell at the time was a lawyer at

17  the U.S. Department of Justice; correct?

18     A. I don't know when she started.

19     Q. You know at some point she was a lawyer at the

20  U.S. Department of Justice?

21     A. Actually, I'll respond to the earlier question.

22  I know that she was not at this point.

23     Q. Where was she at that point?

24     A. At that point she was working for an

25  organization called Demos.

## Page 137

02:55:58 1   Q. What is Demos?

02:55:59 2   A. It's a nonpartisan, nonprofit organization.

02:56:08 3   Q. The subject matter of the e-mail at the top

02:56:19 4   of -- I guess it's the third page, Tuesday, May 30,

02:56:26 5   2017, 4:07 p.m. is "Welp."

02:56:30 6   A. Correct.

02:56:31 7   Q. What did you understand that to mean?

02:56:33 8   A. I wrote it. That's an expression of dismay.

02:56:45 9   Q. What were you expressing dismay over?

02:56:48 10   A. I believe --

02:57:01 11   MR. BRIDGES: Don't guess.

02:57:02 12   THE WITNESS: Yeah. I don't know.

02:57:05 13   BY MR. LOCKERBY:

02:57:06 14   Q. Well, below, May 30, 2017, 3:29 p.m., Cameron

02:57:12 15   Bell's writing, "Does this make up for the aliens voting

02:57:17 16   report?"

02:57:18 17   What did you understand her to be referring to

02:57:20 18   there?

02:57:25 19   A. I believe that's a hyperlink, and so I'd have

02:57:28 20   to see the hyperlink to know.

02:57:42 21   Q. On the second page of this -- of this e-mail

02:57:45 22   chain, it says, "On Tuesday, May 30, 2017, at 10:44 a.m.

02:57:52 23   Justin Levitt wrote: 'Condolences on the news this

02:57:56 24   morning.'"

02:57:58 25   What were you offering condolences on?

## Page 138

02:58:01 1   A. That's -- that's what I can't remember.

02:58:03 2   Q. If you look at the e-mail chain that begins on

02:58:25 3   the very next page, Thursday, June 1st, 2017, 3:50 p.m.,

02:58:32 4   also on the subject "Welp," you've written, "Blech.

02:58:36 5   Sadly no response to my e-mails just yet."

02:58:40 6   The e-mails you're referring to were the

02:58:43 7   e-mails to Virginia voters identified in the exhibits to

02:58:49 8   the alien invasion reports; correct?

02:58:51 9   A. Correct.

02:58:59 10   Q. What had you told Ms. Bell about those e-mails

02:59:02 11   as of June 1st, 2017?

02:59:08 12   A. I believe that I had mentioned that I was

02:59:14 13   contacting some of the voters in the report in order to

02:59:18 14   find out whether they were correctly identified as

02:59:25 15   noncitizens who had unlawfully registered to vote.

02:59:29 16   Q. And other than Cameron Bell, who else had you

02:59:34 17   told as of June 1st, 2017, that you were contacting

02:59:38 18   various voters identified in the report?

02:59:40 19   A. I cannot remember. I don't know.

02:59:48 20   Q. But Ms. Bell wasn't the only person you told

02:59:51 21   that to --

02:59:52 22   A. Correct.

02:59:52 23   Q. -- is that right?

02:59:53 24   You told reporters that, too, hadn't you?

02:59:56 25   A. I don't remember whether I had told reporters

## Page 139

03:00:01 1   before actually receiving contact from them. I don't

03:00:05 2   know. I told reporters at some point that I had

03:00:08 3   contacted voters, yes. I don't know whether I had told

03:00:11 4   them by June 1st.

03:00:27 5   Q. Then if you could turn back, please, to the

03:00:30 6   first two pages of -- the Exhibit 34.

03:00:33 7   A. Uh-huh.

03:00:35 8   Q. At the top it's an e-mail dated Monday,

03:00:43 9   February 13, 2017, to Rick Pildes?

03:00:48 10   A. Correct.

03:00:49 11   Q. Who is Rick Pildes?

03:00:51 12   A. He's a law professor at NYU School of Law.

03:00:55 13   Q. And when you wrote, "Very much off list," what

03:00:58 14   did you mean by that?

03:00:59 15   A. He wrote his initial e-mail to a Listserv of

03:01:07 16   various and sundry people interested in election law. I

03:01:13 17   replied to him off list.

03:01:24 18   Q. In his original e-mail there is a reference to

03:01:30 19   an ElectionLawBlog.org. Is that the Listserv, or is it

03:01:36 20   a different mail address?

03:01:37 21   A. It's related to that. So the blog is a blog.

03:01:41 22   It is publicly available. There is a related Listserv

03:01:45 23   that receives information from the blog but also

03:01:49 24   comments on things that are in the blog.

03:01:51 25   Q. And does the Listserv have a name, as far as

## Page 140

03:01:54 1   you know?

03:01:55 2   A. If it's called anything, it's called The

03:01:58 3   Election Law Listserv. I believe there is an invitation

03:02:04 4   on the blog to join the Listserv.

03:02:10 5   Q. In the third paragraph you write, "I've never

03:02:16 6   attempted to quantify the number of noncitizens on the

03:02:20 7   rolls or those who have voted."

03:02:24 8   That was a true statement as of February 13,

03:02:29 9   2017; correct?

03:02:35 10   A. Sorry. You said the third paragraph? I

03:02:37 11   don't -- I don't --

03:02:38 12   Q. It's the one that begins with the sentence,

03:02:42 13   "This is one reason."

03:02:42 14   A. Ah, yes. Sorry.

03:02:43 15   Q. Yeah.

03:02:45 16   A. Small paragraphs.

03:02:46 17   Correct.

03:02:48 18   Q. And at no time since February 13, 2017, have

03:02:55 19   you ever attempted to quantify the number of noncitizens

03:02:58 20   on the rolls or those who have voted; isn't that right?

03:03:01 21   A. Correct.

03:03:22 22   Q. In that same paragraph, at the end you wrote,

03:03:26 23   "One place to start would be to look for registration

03:03:29 24   forms of individuals who themselves checked the box

03:03:35 25   saying that they were not a citizen. Clerical errors

## Page 141

03:03:39  1    sometimes lead to registration of these individuals.
03:03:41  2    See Page 14 here.  But that's certainly a lower bound."
03:03:45  3         Is it true that the number of individuals who
03:03:49  4    check the box saying that they're not a citizen on a
03:03:52  5    voter registration application would be a lower bound of
03:03:56  6    the number of noncitizens on the roles?
03:03:58  7         A.  Yes.
03:03:58  8         Q.  In the last paragraph --
03:04:09  9         A.  I should correct myself.  It is possible but
03:04:14 10    unlikely that some of those indications were themselves
03:04:18 11    mistakes.  And so it is possible that the lower bound is
03:04:22 12    actually lower than that number.
03:04:27 13         Q.  In the final paragraph you write that,
03:04:30 14    "Discussions in this arena tend toward hysteria."
03:04:37 15         What were you referring to there?
03:04:39 16         A.  Discussions in the arena of whether there
03:04:45 17    are -- whether noncitizens register or vote and various
03:04:51 18    discussions in -- over various years.
03:05:03 19         Q.  And you had a link to a document in the e-mail.
03:05:05 20    Was the link to one of the alien invasion reports?
03:05:08 21         A.  I believe so.
03:05:26 22         Q.  And to the extent that the alien invasion
03:05:29 23    reports included NVRA records or records obtained
03:05:34 24    pursuant to the NVRA, do you know whether the redactions
03:05:37 25    were done by state and local officials or by PILF?

## Page 142

03:05:42  1         A.  I have no idea who performed the redactions on
03:05:45  2    any of the documents in the report.
03:05:46  3         Q.  And you don't know whether any registrars in
03:05:50  4    the Commonwealth of Virginia sent out reports in
03:05:54  5    response to NVRA requests without redacting certain
03:05:58  6    information?
03:05:58  7         A.  I don't.
03:06:00  8         Q.  So you don't know whether PILF was responsible
03:06:03  9    for that, do you?
03:06:05 10         MR. BRIDGES:  Objection.
03:06:06 11         MR. LEBOWITZ:  Objection.
03:06:08 12         MR. BRIDGES:  Vague and ambiguous as to "that."
03:06:11 13         THE WITNESS:  And I have a further question
03:06:12 14    about "responsible."  To the extent that PILF published
03:06:16 15    information, I hold them responsible for publishing that
03:06:19 16    information.  I don't -- I don't know who's responsible
03:06:25 17    for what information was transmitted on what forms in
03:06:27 18    the process.
03:06:32 19    BY MR. LOCKERBY:
03:06:32 20         Q.  You understand that records obtained pursuant
03:06:37 21    to the NVRA are a matter of public record; correct?
03:06:42 22         MR. LEBOWITZ:  Objection.  Vague.
03:06:43 23         THE WITNESS:  Correct.
03:06:43 24    BY MR. LOCKERBY:
03:06:43 25         Q.  Anyone could obtain the records that PILF

## Page 143

03:06:46  1    obtained by making an NVRA request; isn't that true?
03:06:50  2         MR. BRIDGES:  Objection.  Lacks foundation.
03:06:51  3    Calls for speculation.
03:06:52  4         THE WITNESS:  To the extent that there were
03:06:55  5    timely requests, I understand that any individual could
03:06:59  6    have had a federal right to obtain those records and at
03:07:01  7    the appropriate time, yes.
03:07:18  8         MR. LOCKERBY:  I'd like to have this marked as
03:07:19  9    Exhibit 35, please.
03:07:19 10         (Whereupon the document referred to is marked
03:07:19 11    by the reporter as Defense Exhibit 35 for
03:07:36 12    identification.)
03:07:36 13         THE WITNESS:  Thank you.
03:07:49 14    BY MR. LOCKERBY:
03:07:49 15         Q.  Exhibit 35 is entitled "Fake Voter Fraud Report
03:07:56 16    Debunked By Woman Featured in Front Page Article."
03:08:06 17         And this is something we've numbered No. 18.
03:08:11 18         How did this come to your attention?
03:08:14 19         A.  I don't recall.
03:08:29 20         Q.  Did you provide any information to Progress
03:08:32 21    Virginia for use in this posting?
03:08:37 22         A.  I don't believe so.
03:08:47 23         Q.  Do you know whether the individual who is the
03:08:50 24    subject of this article was, in fact, identified in a
03:08:54 25    list of voters canceled due to noncitizen status

## Page 144

03:08:57  1    provided by the Virginia Department of Elections?
03:09:08  2         THE WITNESS:  Can I ask you to read the
03:09:09  3    question back for me.
03:09:10  4         (The record is read by the reporter as
03:09:10  5    follows:
03:08:47  6    "Q.  Do you know whether the individual who is
03:08:49  7    the subject of this article was, in fact,
03:08:52  8    identified in a list of voters canceled due to
03:09:00  9    noncitizen status provided by the Virginia
03:09:00 10    Department of Elections?")
03:09:34 11         MR. LEBOWITZ:  I'll object to the form as
03:09:35 12    lacking foundation.
03:09:38 13         THE WITNESS:  Yeah.  And that was -- that was
03:09:39 14    what was causing my hesitation, is that I know there
03:09:44 15    have been various representations about what information
03:09:53 16    provided that is the subject of the Alien Invasion
03:09:53 17    report purports to show.
03:09:55 18         I believe that Ms. Erickson [phonetic] was
03:10:00 19    included in the list of individuals documented in that
03:10:02 20    report.  I'm going to be hesitant to characterize
03:10:06 21    information sent by Virginia to PILF, which they
03:10:15 22    themselves appear to have disclaimed.
03:10:21 23    BY MR. LOCKERBY:
03:10:21 24         Q.  The "they" to which you're referring, is that
03:10:25 25    the Virginia Department of Elections?

Page 145

A. Either the Virginia Department of Elections or one or more registrars in Virginia. Official sources. I confess I don't remember whether it was state officials or county officials.

Q. If you could look back, please -- I think it should still be over there. It wasn't marked as an exhibit. It's PILF Adams 15467 --

A. Yes.

Q. -- where the commissioner of the Virginia Department of Elections writes, "This report shows individuals that were canceled due to self-reported noncitizen status and failed to complete an affirmation of citizenship in the allotted time frame and continued to be a canceled status. If an individual was previously canceled and then subsequently affirmed citizenship and was reregistered, they would no longer appear on this report because they would now be on active status."

Is this an example of a disclaimer to which you were referring?

A. That wasn't the disclaimer that I -- to which I was specifically referring, no.

Q. Okay. Have you had communications with Anna Scholl of Progress Virginia?

A. I don't believe so. It is possible that I have

Page 146

spoken to her in some context, but I don't -- I don't remember.

Q. I'd like you to look back, please, at what was marked as Exhibit 34 and, in particular, at the 15th page, which is a June 27, 2017, e-mail from you to Cameron Bell.

A. Yes.

Q. When you wrote to Cameron Bell, "I've got a few folks writing me back now who are emphatically citizens," were you telling her about the results of your communications with Virginia voters?

A. Yes.

Q. Why were you telling Ms. Bell about what these voters were writing back to you?

A. She expressed interest in whether this report was accurate or not.

Q. And as of June 27, 2017, who, other than Ms. Bell, had you told that you were hearing from voters identified in the reports who, in fact, were citizens?

A. I -- I can't recall. At some point I publicized that. And so at some point the answer is whoever -- whoever happened to be listening. But I can't recall.

Q. Could you look back, please, at what's been marked as exhibit -- of course, now it's disappeared

Page 147

from over here. I think it's Exhibit 6.

A. Okay. Is that the privilege log?

Q. Yes.

MR. BRIDGES: Which privilege log?

THE WITNESS: Sorry. Mine.

BY MR. LOCKERBY:

Q. And if you look at the last four pages of the privilege log --

A. Okay.

Q. -- and specifically -- I guess this would be the third one from the end. There is a -- a June 27, 2017, e-mail exchange with Augustine Tsibu-Gyan with an e-mail from her to you and one from you to her. There were prior e-mail communications with this individual that have not been withheld or redacted on grounds of attorney-client privilege; correct?

A. Correct.

Q. And when is it that you contend you entered into an attorney-client relationship with Augustine Tsibu-Gyan?

MR. BRIDGES: Objection. Misstates the record. Assumes facts not established. Lacks foundation.

Subject to that and without waiving any attorney-client communication, you can respond to the question, if you can.

Page 148

THE WITNESS: I don't know whether we have entered that relationship or not.

BY MR. LOCKERBY:

Q. So you don't know whether you ever entered into an attorney-client relationship with Augustine Tsibu-Gyan; is that right?

A. I don't know whether one was ever established. That's correct.

Q. As of June 27, 2017, had Augustine Tsibu-Gyan sought your advice about Virginia law?

MR. BRIDGES: Specifically about Virginia law?

MR. LOCKERBY: Yes.

THE WITNESS: Are we asking as of that date or as of the day before that date?

BY MR. LOCKERBY:

Q. On or before June 27, 2017, did Augustine Tsibu-Gyan seek your advice about Virginia law?

A. So if a attorney-client privilege was established, discussing whether or not that occurred might, in fact, invade the attorney-client privilege. And so I don't believe I can answer that without waiving the privilege that isn't mine to waive.

Q. Did something happen on August 27, 2017, that caused you to conclude that you might have an attorney-client relationship with Augustine Tsibu-Gyan?

## Page 149

A. Yes.

Q. What happened?

A. I cannot answer that question without invading the privilege that's not mine to waive.

Q. Did you ever tell Augustine Tsibu-Gyan that you would be sharing things that she told you with third parties?

MR. BRIDGES: Objection. Attorney-client privilege.

If you can answer that without invading the client privilege, you may do so. Otherwise, so indicate and do not respond.

THE WITNESS: Without invading the privilege on any date before there would have been a privilege if a privilege -- if a relationship was established, I did not. Or at least not to my knowledge.

BY MR. LOCKERBY:

Q. On this same privilege log there are two e-mails with Raza Latif dated June 27, 2017. And this communication with Raza Latif was the result of prior e-mails that you sent this individual identifying yourself as a law professor doing research; is that right?

A. Correct.

Q. Do you contend that you entered into an

## Page 150

attorney-client relationship with Raza Latif?

A. The same answer. I -- I don't know whether a relationship has been entered into or not.

MR. BRIDGES: I'd also note for the record that an attorney-client relationship is not necessary to the invocation of the attorney-client privilege.

BY MR. LOCKERBY:

Q. Was Raza Latif seeking legal advice from you?

A. Don't believe I can answer that question without invading the privilege. A -- at -- well, no. That I -- I believe I can answer.

At some point, yes.

Q. Did you provide legal advice to Raza Latif?

A. That, I believe I cannot answer without --

MR. BRIDGES: Yes. You should not respond to that question.

Objection. Attorney-client privilege.

BY MR. LOCKERBY:

Q. And, in fact, you shared with Allison Riggs what Raza Latif and Augustine Tsibu-Gyan told you that same day, June 27, 2017; isn't that right?

A. That is not a question I can answer without waiving two privileges to which I am not entitled to waive.

Q. Well, if you could look, please, at Exhibit 5,

## Page 151

Entry No. 1.

A. Okay.

Q. Do you see that's dated June 27, 2017?

A. I do.

Q. And that's an e-mail from you to Allison Riggs; isn't that right?

A. It is.

Q. And the privilege description is, "Communication Between Counsel Re Information Gathered in Investigation Into Anticipated Claims."

That's what it says; right?

A. That is what it says. That's correct.

Q. And that very day you had spoken with Augustine Tsibu-Gyan and Raza Latif; isn't that right?

A. That is correct.

Q. I'd like you to look back, please, at Exhibit 34.

A. Okay. Lest I put these away, will we be returning to the privilege log?

Q. We will be, yes.

MR. BRIDGES: Okay.

BY MR. LOCKERBY:

Q. We'll never escape the privilege log.

Exhibit 34. If you could look, please, at Pages 16 through 17, which are a June 29, 2017, e-mail

## Page 152

exchange between you and Cameron Bell.

A. Okay.

MR. BRIDGES: What's the date of the exchange that you're referring to?

MR. LOCKERBY: June 29, 2017.

MR. BRIDGES: Okay.

BY MR. LOCKERBY:

Q. And you see on -- down below there's the June 27, 2017, e-mail from you to Cameron Bell that we looked at earlier. And then above that, on June 29, 2017, 6:40 p.m., she writes -- after the first sentence, she writes, "Interesting. Do they want to sue? A certain lawyer who has a different defamation/challenge case said we should co-counsel again before I leave for DOJ. Of course, this could ruin my life goal of never being in a state court; and Allison specifically said she never wanted to work opposing PILF people again (understandably), so there's that."

And then right about that you've responded, on June 29, 2017, 11:52 p.m., "Already talked to Allison about it."

What did you talk to Allison Riggs at that point that you were telling Cameron Bell about?

A. I cannot answer that question without waiving a privilege that's not mine to waive.

Page 153

| | | |
|---|---|---|
| 03:27:57 | 1 | Q. Did you ever have any oral conversations with |
| 03:28:00 | 2 | Cameron Bell -- |
| 03:28:02 | 3 | A. Yes. |
| 03:28:03 | 4 | Q. -- around this time? |
| 03:28:04 | 5 | A. I don't -- I don't recall. I don't know. |
| 03:28:14 | 6 | Q. And when Cameron Bell said, "A certain lawyer |
| 03:28:17 | 7 | who has a different defamation/challenge case said we |
| 03:28:23 | 8 | should co-counsel again before I leave for DOJ," who was |
| 03:28:26 | 9 | the certain lawyer to whom you understood her to be |
| 03:28:28 | 10 | referring? |
| 03:28:29 | 11 | A. I understood her to be referring to Allison |
| 03:28:37 | 12 | Riggs. |
| 03:28:37 | 13 | Q. And then Cameron Bell goes on to write, "And |
| 03:28:40 | 14 | Allison specifically said she never wanted to work |
| 03:28:44 | 15 | opposing PILF people again (understandably), so there's |
| 03:28:49 | 16 | that." |
| 03:28:52 | 17 | Did you understand what Cameron Bell was |
| 03:28:56 | 18 | referring to there about Allison Riggs not wanting to |
| 03:28:59 | 19 | work opposing PILF people again? |
| 03:29:01 | 20 | A. I -- I understood her to be saying exactly |
| 03:29:04 | 21 | that. |
| 03:29:07 | 22 | Q. Did you have any independent understanding as |
| 03:29:10 | 23 | to why Ms. Riggs didn't want to work opposing PILF |
| 03:29:14 | 24 | people? |
| 03:29:14 | 25 | A. No. |

Page 154

| | | |
|---|---|---|
| 03:29:15 | 1 | Q. No? |
| 03:30:37 | 2 | MR. BRIDGES: Usually, when the last box comes |
| 03:30:40 | 3 | off a chair, it's a good thing. |
| 03:30:42 | 4 | MR. LOCKERBY: It's not. It means nothing. |
| 03:30:45 | 5 | We're going back and forth. |
| 03:30:47 | 6 | And what's the next exhibit number? |
| 03:30:50 | 7 | DEPOSITION OFFICER: Thirty-six. |
| 03:30:50 | 8 | MR. LOCKERBY: I'd like to have this marked as |
| 03:30:52 | 9 | Exhibit 36, please. |
| 03:30:52 | 10 | (Whereupon the document referred to is marked |
| 03:30:52 | 11 | by the reporter as Defense Exhibit 36 for |
| 03:31:07 | 12 | identification.) |
| 03:31:07 | 13 | THE WITNESS: Thank you. |
| 03:31:16 | 14 | BY MR. LOCKERBY: |
| 03:31:16 | 15 | Q. Exhibit 36 is a June 29, 2017, ProPublica |
| 03:31:23 | 16 | article, "Presidential Commission Demands Massive |
| 03:31:27 | 17 | Amounts of State Voter Data." |
| 03:31:28 | 18 | Have you seen this before? |
| 03:31:29 | 19 | A. Yes. |
| 03:31:30 | 20 | Q. And, in fact, you're quoted in here; right? |
| 03:31:32 | 21 | A. I believe that I am. |
| 03:31:33 | 22 | Q. I'd like you to look, please, at the second |
| 03:32:08 | 23 | page, where you're quoted as saying, "'You'd think there |
| 03:32:13 | 24 | would want to be a lot of thought behind security and |
| 03:32:16 | 25 | access protocols for a national voter file before you up |

Page 155

| | | |
|---|---|---|
| 03:32:20 | 1 | and created one,' said Justin Levitt, a professor at |
| 03:32:25 | 2 | Loyola University School of Law and former Department of |
| 03:32:29 | 3 | Justice civil rights official. 'This is asking to |
| 03:32:31 | 4 | create a national voter file in two weeks.'" |
| 03:32:40 | 5 | Were you correctly quoted in this article? |
| 03:32:43 | 6 | A. My affiliation is not quite accurate, but |
| 03:32:46 | 7 | this -- I can't recall exactly what I said, but this |
| 03:32:49 | 8 | sounds like an accurate quote. |
| 03:32:51 | 9 | Q. Did you object to the creation of a national |
| 03:33:01 | 10 | voter file or simply the speed with which this |
| 03:33:04 | 11 | presidential commission was seeking to do it? |
| 03:33:07 | 12 | MR. BRIDGES: Objection. |
| 03:33:08 | 13 | Are you asking if that's what he said, or are |
| 03:33:10 | 14 | you asking him now? |
| 03:33:11 | 15 | MR. LOCKERBY: I'm asking him a different |
| 03:33:13 | 16 | question. What he said speaks for itself. |
| 03:33:17 | 17 | MR. BRIDGES: You said, "Did"; so I understood |
| 03:33:20 | 18 | you to be talking in the past tense. |
| 03:33:23 | 19 | BY MR. LOCKERBY: |
| 03:33:23 | 20 | Q. At the time did you object to the creation of a |
| 03:33:28 | 21 | national voter file or the speed with which the |
| 03:33:31 | 22 | presidential commission would be setting it up? |
| 03:33:33 | 23 | A. I have had -- still have -- reservations about |
| 03:33:40 | 24 | creating a national voter file. I don't know that those |
| 03:33:44 | 25 | reservations couldn't be overcome in the right |

Page 156

| | | |
|---|---|---|
| 03:33:47 | 1 | circumstances. I objected to the speed, the context, |
| 03:33:54 | 2 | the lack of security protocols, and other aspects of |
| 03:34:00 | 3 | creating this file at that time. |
| 03:34:04 | 4 | Q. It's now been almost two years, so at this |
| 03:34:09 | 5 | point would it -- would you still object to creating a |
| 03:34:13 | 6 | national voter file? And if so, why? |
| 03:34:17 | 7 | A. I -- I don't actually see what the two-year |
| 03:34:24 | 8 | window between then and now is. I would want there to |
| 03:34:30 | 9 | be a lot of thought put in once the decision was made to |
| 03:34:34 | 10 | go ahead with respect to how, before it was implemented. |
| 03:34:34 | 11 | So starting ten years from now and taking two weeks to |
| 03:34:39 | 12 | do it, I would have exactly the same reservations. |
| 03:34:46 | 13 | I'll give the same answer. I have some |
| 03:34:49 | 14 | reservations about creating a national voter file. I |
| 03:34:51 | 15 | don't know that those reservations couldn't be overcome |
| 03:34:54 | 16 | with the right care and in the right circumstances. |
| 03:34:57 | 17 | I -- I don't have a public position on whether I think a |
| 03:35:00 | 18 | national voter file in the abstract is a good idea or a |
| 03:35:04 | 19 | bad idea. |
| 03:35:12 | 20 | For that matter, I don't have a private |
| 03:35:14 | 21 | position whether a national voter file in the abstract |
| 03:35:18 | 22 | is a good idea or a bad idea. |
| 03:35:20 | 23 | Q. You saved yourself one question. |
| 03:35:24 | 24 | If a decision had been made back in June of |
| 03:35:32 | 25 | 2017 to establish a national voter file and if the |

## Page 157

```
03:35:38   1    federal government followed through on that, how long do
03:35:42   2    you think that process should take?
03:35:49   3         A.  There is an awful lot baked into "should."  And
03:35:52   4    if it were pulled together in an inapposite context or
03:36:00   5    without the right security procedures, then my answer is
03:36:02   6    it should not happen.
03:36:06   7         I don't have an opinion on if you could
03:36:08   8    overcome my reservations to the creation of one, how
03:36:13   9    long it would take to construct that adequately.  That
03:36:23  10    would depend on a lot of other contextual factors that
03:36:27  11    just require me to speculate.
03:36:28  12         Q.  What are your reservations about creating a
03:36:33  13    national voter file?
03:36:34  14         A.  I would have reservations about the security of
03:36:38  15    the file.  I would have reservations about related the
03:36:43  16    ease of tampering with the voter file.  I'd have
03:36:52  17    reservations about the extent to which those security
03:36:56  18    concerns actually facilitated local changes in the
03:37:00  19    national voter file; that is, if there were one national
03:37:11  20    voter file, I don't know how often it would be updated
03:37:13  21    or renewed and whether having a national voter file with
03:37:17  22    all of the security concerns that would entail would
03:37:21  23    limit local updates.
03:37:29  24         Q.  When you referenced an inapposite --
03:37:29  25         A.  I don't --
```

## Page 158

```
03:37:32   1         Q.  I'm sorry.  I didn't mean to cut you off.
03:37:34   2         A.  I'm happy to go on to the next question.
03:37:36   3         I -- I don't know that I've exhausted my
03:37:37   4    concerns with one of -- policy question I've not
03:37:41   5    thought a lot about.
03:37:42   6         Q.  When you referenced an inapposite context for
03:37:49   7    creating a national voter file, what did you mean by
03:37:53   8    "an inapposite context"?
03:37:56   9         A.  I did not have great confidence that a file
03:38:00  10    constructed by this incarnation of the Presidential
03:38:04  11    Advisory Commission would be using the voter file to
03:38:09  12    acquire, analyze, or release data that was accurate.
03:38:16  13         Q.  So was your concern about the people who were
03:38:19  14    on the commission?
03:38:20  15         A.  And the procedures that the -- people who were
03:38:24  16    on the commission, some of the mission statements of the
03:38:32  17    commission, and the procedures that the commission had
03:38:34  18    used to go forward to date.
03:38:36  19         Q.  And specifically whom were you concerned about
03:38:40  20    who was on the commission?
03:38:42  21         A.  I don't recall all of the commissioners.  I had
03:38:46  22    concerns about the -- the reliability and accuracy of
03:38:52  23    analysis by the chair -- the co-chair, Mr. Kobach.  I
03:39:00  24    don't recall at this point whether Mr. von Spakovsky or
03:39:07  25    Mr. Adams were on the commission.  So I honestly don't
```

## Page 159

```
03:39:10   1    know whether I had concerns about them at this point.  I
03:39:14   2    had concerns that the commission was not set up in a way
03:39:16   3    that was bipartisan or consistent with the Federal
03:39:22   4    Advisory Committee Act.
03:39:24   5         And so independent of the particular personnel,
03:39:30   6    I did not think the composition of the commission led to
03:39:34   7    its producing a trustable report.  I don't recall if
03:39:42   8    there were others on the commission who -- I don't
03:39:46   9    recall the timeline of who was appointed to the
03:39:48  10    commission when, and so I don't recall if there were
03:39:51  11    others on the commission that would have given me pause
03:39:53  12    at this point.
03:39:53  13         Q.  At some point Christian Adams was appointed to
03:39:57  14    the commission?
03:39:58  15         A.  Correct.
03:39:58  16         Q.  And that concerns you, did it not?
03:40:00  17         A.  In this context, it did.
03:40:02  18         Q.  And at some point Hans von Spakovsky was
03:40:06  19    appointed to the position; and that concerns you too,
03:40:08  20    didn't it?
03:40:09  21         A.  In this context, it did.
03:40:10  22         Q.  And at some point Kenneth Blackwell was
03:40:13  23    appointed to the commission; is that right?
03:40:15  24         A.  Yes.
03:40:15  25         Q.  And that concerned you too?
```

## Page 160

```
03:40:18   1         A.  Differently.  And I don't know whether I would
03:40:27   2    be concerned by Secretary Blackwell in the abstract.
03:40:32   3         Q.  What concerns did you have about Secretary
03:40:35   4    Blackwell being on the commission?
03:40:38   5         MR. BRIDGES:  Objection.  Misstates his
03:40:40   6    testimony.
03:40:41   7         You may answer.
03:40:42   8         THE WITNESS:  Yeah.  I don't -- to be clear, I
03:40:45   9    don't know that my concerns -- I don't know that I would
03:40:49  10    have been concerned about him on the commission in the
03:40:53  11    abstract.  In conjunction with the other appointments to
03:40:56  12    the commission and in the context of the procedures the
03:41:01  13    commission was undertaking and the nature of its
03:41:06  14    appointment, I had concern that he would be promoting
03:41:17  15    some policies with which I disagreed.
03:41:22  16    BY MR. LOCKERBY:
03:41:23  17         Q.  What policies were you concerned that Kenneth
03:41:27  18    Blackwell might promote with which you would disagree?
03:41:30  19         A.  I don't know that I had -- I don't know that
03:41:35  20    there were specific instances that I was particularly
03:41:38  21    afraid of.  I know that he had taken positions in the
03:41:44  22    past -- pardon me -- some I agreed with, but some that I
03:41:48  23    emphatically did not agree with.
03:41:50  24         There was one instance in which he later
03:41:54  25    reversed course but determined to reject voter
```

Page 161

03:41:57   1   registration forms submitted on a certain paper weight
03:42:00   2   that I thought had the risk of disenfranchising voters
03:42:04   3   who had submitted those registration forms. That, to
03:42:12   4   me, indicated an orientation toward administration that
03:42:16   5   was not always concerned with the rights of eligible
03:42:19   6   voters. And again, in this particular context, I
03:42:24   7   thought the commission might give more voice to those
03:42:30   8   inclinations.
03:42:39   9          MR. LOCKERBY: I'd like to have this marked as
03:42:41   10   Exhibit 37, please.
03:42:41   11          (Whereupon the document referred to is marked
03:42:41   12   by the reporter as Defense Exhibit 37 for
03:42:59   13   identification.)
03:42:59   14          THE WITNESS: Thank you.
03:43:05   15   BY MR. LOCKERBY:
03:43:06   16      Q. Exhibit 37 is an article dated July 6, 2017,
03:43:16   17   from Vice News.
03:43:17   18          Are you familiar with that publication?
03:43:18   19      A. I am.
03:43:20   20      Q. And the headline is "Trump's Voter Fraud Task
03:43:25   21   Force May Have Broken 2 Federal Laws."
03:43:29   22          And you see that you're quoted in here?
03:43:31   23      A. I am. That -- it was not a question. I am,
03:43:36   24   period.
03:43:50   25      Q. And on the second page you're quoted as -- or

Page 162

03:43:56   1   paraphrased, at least, as explaining that the Federal
03:44:01   2   Privacy Act prohibits the federal government from
03:44:03   3   collecting records of individuals' party affiliation or
03:44:07   4   voting history.
03:44:11   5          Is that a statement you had made to the author
03:44:13   6   of this article?
03:44:14   7      A. That's a summary. I think it is an -- the
03:44:30   8   quote actually accurately reflects what the Privacy Act
03:44:33   9   states -- the quote on the next sentence. And so I
03:44:36   10   don't think that the Privacy Act prohibits the federal
03:44:41   11   government from collecting such records. I think that
03:44:43   12   it prohibits them from maintaining a record describing
03:44:48   13   how an individual exercises rights guaranteed by the
03:44:51   14   First Amendment unless expressly authorized by statute
03:44:54   15   or by the individual about whom the record is maintained
03:44:57   16   or unless pertinent to and within the scope of an
03:44:59   17   authorized law enforcement activity.
03:45:01   18          So the first sentence is, as is common in news
03:45:05   19   reports, a summary that does not contain all of the
03:45:10   20   caveats in the actual law.
03:45:13   21      Q. Are the -- are there statutes that authorize
03:45:17   22   maintaining records of individuals' party affiliation?
03:45:24   23      A. The Privacy Act allows the federal government
03:45:29   24   to maintain records of individuals' party affiliation in
03:45:35   25   certain circumstances.

Page 163

03:45:36   1      Q. And are there statutes that authorize
03:45:41   2   maintaining records of individuals' voting history?
03:45:46   3      A. The Privacy Act authorizes federal government
03:45:50   4   maintaining voting records of individuals' voting
03:45:53   5   history, again, under certain circumstances, yes.
03:46:05   6      Q. There is also a reference in this article to
03:46:10   7   the Paperwork Reduction Act. Is that a statute that you
03:46:14   8   discussed with the reporter who drafted this article?
03:46:17   9      A. I believe so, yes. I will point out the
03:46:39   10   article seems to be -- the printout seems to be missing
03:46:43   11   some content.
03:46:44   12          MR. LOCKERBY: It does seem to be. You're
03:46:46   13   right. Thank you.
03:46:58   14          I'd like to have this marked as Exhibit 38,
03:47:49   15   please.
03:47:49   16          (Whereupon the document referred to is marked
03:47:49   17   by the reporter as Defense Exhibit 38 for
03:48:05   18   identification.)
03:48:05   19          THE WITNESS: Thank you.
03:48:11   20   BY MR. LOCKERBY:
03:48:11   21      Q. Exhibit 38 is a document -- multipage document
03:48:15   22   produced by you. Again, since it was a single PDF,
03:48:19   23   we've identified it with one number, 33. And I'd like
03:48:25   24   you to look, please, at Page 24 of the PDF. It includes
03:48:34   25   some Tweets by you on July 10, 2017.

Page 164

03:48:46   1          MR. LEBOWITZ: I'm sorry.
03:48:47   2          THE WITNESS: Okay.
03:48:47   3          MR. LEBOWITZ: Which page did you say?
03:48:50   4          MR. LOCKERBY: Well, the pages are not
03:48:51   5   numbered.
03:48:52   6          MR. LEBOWITZ: I know, but --
03:48:53   7          MR. LOCKERBY: It should be the 24th page.
03:48:56   8          MR. LEBOWITZ: Twenty-fourth.
03:49:39   9   BY MR. LOCKERBY:
03:49:39   10      Q. Have you found it?
03:49:40   11      A. I did. I think so.
03:49:51   12      Q. And you see there is a Tweet by you -- well,
03:49:59   13   first of all, right above that, it says, "Breaking:
03:50:05   14   Trump names two new people, J. Christian Adams of
03:50:11   15   Virginia and Alan Lamar King of Alabama, to the Election
03:50:15   16   Integrity Commission."
03:50:17   17          Do you see that?
03:50:17   18      A. I do.
03:50:18   19      Q. And below that you've written, JCA is prez/GC
03:50:21   20   of organization publishing claims (knowing they're
03:50:24   21   unreliable) that individuals (with names, home address,
03:50:27   22   phone) committed felonies.
03:50:31   23          What was the factual basis for your statement
03:50:35   24   that Mr. Adams had published claims knowing that they
03:50:40   25   were unreliable?

Page 165

03:50:41  1       A.  A -- at least one -- I honestly can't remember
03:50:49  2   whether there was more than one.  There may have been
03:50:51  3   more than one -- document attached to the Alien Invasion
03:50:56  4   report.  I believe -- if there were two, they were both
03:51:04  5   from local registrars.  I believe at least one was from
03:51:07  6   the local registrar -- indicated that the information
03:51:13  7   that Mr. Adams had received did not say what he
03:51:17  8   apparently thought that it said, pointing out from the
03:51:27  9   record holder -- from the official holder of the records
03:51:31 10   that the records might not have, in fact, identified
03:51:36 11   noncitizens.  And the fact that these letters or e-mails
03:51:44 12   were attached to the report meant that the organization,
03:51:48 13   the PILF that had produced the report, had seen and read
03:51:52 14   the letters.
03:51:54 15       Q.  And what you just stated was your
03:51:58 16   characterization of what a local registrar said; right?
03:52:00 17       A.  That's correct.
03:52:01 18       Q.  And whatever the registrar said is reflective
03:52:03 19   in what the registrar said?
03:52:05 20       A.  Also correct.
03:52:07 21       Q.  And you were not referring to the e-mail from
03:52:12 22   the Virginia Commissioner of Elections that we've looked
03:52:15 23   at earlier in this deposition; correct?
03:52:17 24       A.  Correct.
03:52:17 25       Q.  Down below there is another Tweet by you that

Page 166

03:52:35  1   says, "I've spoken to several of the people named.
03:52:39  2   They're citizens and really upset."
03:52:42  3       Were those the people identified in Exhibits 32
03:52:46  4   and 33 previously?
03:52:50  5       A.  Yes.
03:52:50  6       Q.  Are these Tweets by you -- or were they at the
03:53:09  7   time -- publicly accessible to anyone who wanted to look
03:53:12  8   at them?
03:53:13  9       A.  Yes.
03:53:13 10       Q.  I'd like you to look, please, at -- back at
03:53:47 11   Exhibit 34.
03:53:48 12       A.  Okay.
03:53:48 13       Q.  And, in particular, the July 10 and July 11,
03:53:57 14   2017, e-mail exchanges with Rick Hasen.
03:54:02 15       A.  Happen to have page numbers?  They're
03:54:06 16   consecutive, aren't they?
03:54:08 17       Q.  They're not numbered, is the problem.
03:54:10 18       A.  Right.
03:54:10 19       Q.  By my count -- and this was derived from the
03:54:15 20   PDF, so it was easier.  It starts on Page 18.
03:54:18 21       A.  I think I found a string.  It starts with
03:54:22 22   5:57 p.m. -- or at least the top e-mail on the page is
03:54:26 23   at 5:57 p.m.  That might help identify.
03:54:29 24       Q.  Yes, that is it.
03:54:31 25       A.  Okay.

Page 167

03:54:32  1       Q.  Was the e-mail from Mr. Hasen at 5:48 p.m. in
03:55:04  2   response to Tweets that you had sent previously about
03:55:08  3   having spoken with people identified in the Alien
03:55:12  4   Invasion reports?
03:55:12  5       A.  I believe so.
03:55:14  6       Q.  And when he said, "I'd love an ELB post," did
03:55:19  7   you understand him to be referring to Election Law Blog
03:55:24  8   post?
03:55:24  9       A.  I did.
03:55:24 10       Q.  And up above, at 5:57 p.m., you've written, "I
03:55:40 11   can't give any individual information just yet on the
03:55:43 12   individuals I've heard from, which is why I haven't
03:55:46 13   posted on it before."
03:55:50 14       What was it that prompted you to mention it on
03:55:55 15   July 10, 2017?
03:55:58 16       A.  I believe it was Mr. Adams' appointment to a
03:56:02 17   prominent national commission to investigate, among
03:56:06 18   other things, the extent of voter fraud.
03:56:10 19       Q.  And then later that evening you agreed that you
03:56:15 20   would post something about the fact that you had spoken
03:56:18 21   with individuals identified in the Alien Invasion
03:56:23 22   report; isn't that right?
03:56:38 23       A.  Yes.
03:56:40 24       Q.  And that would include the July 10, 2017,
03:56:45 25   e-mail at 6:13 p.m. from you to Mr. Hasen?

Page 168

03:56:50  1       A.  That suggests that I'm -- I'm going to hope to
03:56:54  2   type up a blog later.  I -- I have lots of aspirations,
03:57:00  3   so that's why I was turning the pages to see whether I
03:57:02  4   had actually done so.
03:57:03  5       Q.  And if you turn the pages and look at the
03:57:06  6   10:42 p.m. e-mail from you to Mr. Hasen, you lived up to
03:57:11  7   your aspiration and sent him something that evening;
03:57:15  8   isn't that right?
03:57:15  9       A.  Correct.
03:57:16 10       Q.  And then on July 11, 2017, 7:11 a.m., the very
03:57:38 11   next morning, you were exchanging e-mails with Mr. Hasen
03:57:42 12   about the possibility of putting something like this on
03:57:47 13   Slate.  Do you see that?
03:57:48 14       A.  I do.
03:58:19 15       Q.  And if you turn the page to Tuesday, July 11,
03:58:25 16   2017, 9:45 a.m., you're sending e-mails to Josh Levin
03:58:27 17   and Jeremy Stahl.  Who are they?
03:58:29 18       A.  They are -- at least one of them is an editor
03:58:33 19   at Slate -- or was at the time.  I confess that I don't
03:58:38 20   know the -- the other one was working at Slate.  I don't
03:58:41 21   know the title.
03:58:42 22       Q.  And then if you look at the 10:27 a.m. e-mail
03:59:15 23   that same day, Tuesday, July 11, 2017, Mr. Levin at
03:59:20 24   Slate is sending you back some proposed edits to your
03:59:25 25   posting; isn't that right?

## Page 169

03:59:26  1    A. Correct.

03:59:27  2    Q. And then you respond to him on Tuesday,

03:59:37  3  July 11, 2017, at 10:30 a.m.; is that right?

03:59:42  4    A. 10:38, I believe.

03:59:43  5    Q. 10:38 a.m., yes.

03:59:46  6    A. Yes.

03:59:46  7    Q. And you've written back in numbered

03:59:57  8  Paragraph 1, "You're right that the paragraph on the

04:00:01  9  actual flag and cancel process is squirrelly, and that's

04:00:06 10  because I'm only interpreting from the letter cited in

04:00:10 11  the piece itself."

04:00:11 12    What did you mean by that?

04:00:12 13    A. I meant that I did not want to go into great

04:00:17 14  detail on characterizing the process by which

04:00:21 15  individuals are flagged for noncitizenship and then

04:00:26 16  removed from the rolls if they don't respond because I

04:00:30 17  wanted to confirm that process with the registrar.  I

04:00:35 18  was -- I interpreted how that process worked from --

04:00:40 19  from one of the letters mentioned as an attachment to

04:00:44 20  the report.  And so I was less particular with details

04:00:49 21  in that particular section of the post than I might have

04:00:52 22  otherwise.

04:00:53 23    Q. And as of July 11, 2017, you've never -- or you

04:01:00 24  hadn't confirmed with the registrar how that process

04:01:04 25  worked?

## Page 170

04:01:04  1    A. Correct.

04:01:05  2    Q. And as of today, April 17, 2019, you haven't

04:01:10  3  confirmed with the registrar who sent that e-mail how

04:01:14  4  the process works?

04:01:15  5    A. Correct.

04:01:16  6    Q. In Paragraph 2 you write, "You're also entirely

04:01:31  7  right that the specific stories of the individual would

04:01:34  8  make the piece much more powerful.  I've spoken with

04:01:37  9  them; but while I've got authorization to mention their

04:01:40 10  situations generically, I don't yet have authorization

04:01:44 11  to tell their stories; and so I can't elaborate further

04:01:49 12  just yet."

04:01:51 13    Which individuals were you referring to as of

04:01:55 14  July 11, 2017?

04:01:57 15    A. Several individuals who were identified in the

04:02:04 16  Alien Invasion report whom I had contacted who were

04:02:09 17  falsely identified as noncitizens when they registered

04:02:14 18  to vote. I don't know that I know exactly which

04:02:17 19  individuals but individuals with whom I had spoken who

04:02:20 20  were not noncitizens when they registered.

04:02:29 21    Q. And then in the third paragraph, you wrote in

04:02:31 22  the opening graph, "I'm loath to characterize Adams more

04:02:35 23  generally.  There is no love lost between us,"

04:02:38 24  et cetera.

04:02:38 25    That's what you write.

## Page 171

04:02:40  1    A. Correct.

04:02:41  2    Q. And then --

04:02:42  3    A. The "et cetera" is meaningful, but yes.

04:02:44  4    Q. You think it's meaningful that part of his

04:02:51  5  motif is unwarranted character assassination of others,

04:02:56  6  so I'd really rather let the facts speak for themselves.

04:03:00  7    Is that what you're talking about?

04:03:01  8    A. Correct.

04:03:01  9    Q. And so you don't think it's character

04:03:04 10  assassination to say that Mr. Adams published these

04:03:08 11  reports knowing that were inaccurate or incorrect?

04:03:16 12    A. I said that he published the reports knowing

04:03:18 13  they were unreliable.

04:03:20 14    Q. Yeah.

04:03:21 15    A. And that the reports were, in fact, inaccurate

04:03:23 16  or incorrect.

04:03:24 17    Q. And were you worried about claims for

04:03:27 18  defamation when you said that publicly?

04:03:29 19    A. No.  I believe that to be true.

04:03:31 20    Q. So because you believe it to be true, that

04:03:34 21  means it is true?

04:03:35 22    MR. BRIDGES:  Objection.  Argumentative.  And

04:03:43 23  assumes facts not established.  And misstates his

04:03:43 24  testimony.

04:03:44 25    You may answer again, if you have a different

## Page 172

04:03:47  1  answer.

04:03:49  2    THE WITNESS:  Can I hear the question again.

04:03:50  3    (The record is read by the reporter as

04:03:50  4  follows:

04:03:31  5    "Q.  So because you believe it to be true, that

04:03:34  6  means it is true?")

04:03:59  7    THE WITNESS:  No.

04:04:01  8  BY MR. LOCKERBY:

04:04:02  9    Q. Then if you look at the July 11, 2017, e-mail,

04:04:07 10  11:54 a.m., from you to Josh Levin --

04:04:15 11    A. Okay.

04:04:15 12    Q. -- he had written you back saying, "I'm less

04:04:18 13  concerned about 3.  If we can get to where I want to get

04:04:22 14  on 1 and 2, then I'd be happy to run the piece.

04:04:26 15  Thanks."

04:04:26 16    You wrote back, "Got it.  Okay.  If 1 and 2 are

04:04:30 17  understandably the crux of the matter, I think it's

04:04:32 18  better to hold off for now.  If I can get more clarity

04:04:39 19  on either end, I'll happily resubmit.  Thanks again for

04:04:39 20  the time."

04:04:39 21    You see that?

04:04:40 22    A. Yes.

04:04:40 23    Q. And you never were able to resolve Items 1 and

04:04:50 24  2 below, were you?

04:04:51 25    A. Correct.

Page 173

04:05:15  1      Q.  And so then on July 11, 2017, at 11:56 a.m.,
04:05:20  2  you told Mr. Hasen that Slate, quote, doesn't want it
04:05:29  3  without more info than I can give them right now.
04:05:32  4      Do you see that?
04:05:32  5      A.  I do.
04:05:49  6      Q.  And then at 12:07 p.m., you responded to an
04:05:56  7  e-mail from Mr. Hasen that he suggested posting what
04:06:00  8  you had written on the Election Law Blog.
04:06:03  9      Do you see that?
04:06:04  10     A.  I do.
04:06:04  11     Q.  And, in fact, did you post it on the Election
04:06:08  12  Law Blog?
04:06:08  13     A.  I don't -- I don't recall.  I don't believe so,
04:06:16  14  but I honestly don't recall.
04:06:15  15     Those posts are all publicly available.
04:06:28  16     Q.  And then if you look at the July 11, 2017,
04:06:34  17  e-mail from you to Perma [sic] Levy on the subject
04:06:37  18  "J. Christian Adams Report."
04:06:40  19     Perma Levy was a reporter at Mother Jones at
04:06:46  20  the time; right?
04:06:46  21     A.  Perma, I believe.
04:06:47  22     But yes.
04:06:48  23     Q.  Perma.  You're absolutely right.  Thank you.
04:06:50  24     And Perma Levy is saying, I saw on Twitter that
04:07:00  25  you indicated you had spoken with some of the people

Page 174

04:07:02  1  mentioned in the report.  I've been, quote, calling a
04:07:07  2  lot of people and haven't had much luck getting through.
04:07:10  3  If you feel okay letting me know which people you've
04:07:14  4  talked to, I'd love to try to reach out to them and see
04:07:17  5  if they'd talk to me.
04:07:19  6     Did you, in fact, let Perma Levy know with which
04:07:24  7  individuals you had been in contact?
04:07:25  8     A.  I don't believe so.  I should say, not
04:07:34  9  specifically by name.  I may have told her that I
04:07:37  10  reached out to those whose e-mail addresses were listed
04:07:40  11  in the documents attached to the report.
04:07:52  12     Q.  And then that same day, according to the
04:07:59  13  privilege log that is marked as Exhibit 5, you had
04:08:04  14  communications with Allison Riggs.  That's Entries No. 2
04:08:10  15  and 3.  Is that right?
04:08:14  16     A.  Correct.  No.  Sorry.  That's not correct.  It
04:08:16  17  was not the same day.  My apologies.
04:08:22  18     Q.  It was the following day, July 12, 2017?
04:08:25  19     A.  Correct.
04:08:27  20     Q.  And then if you look back at Exhibit 34, the
04:08:33  21  e-mail from you to Cameron Bell on July 12, 2017, at
04:08:41  22  5:47 p.m., you write, "Believe it or not, it's not just
04:08:56  23  pique.  I'm trying to see what I can get him to say
04:08:58  24  about knowledge and intent."
04:09:04  25     A.  Correct.

Page 175

04:09:09  1      Q.  And the "him" to whom you were referring was
04:09:14  2  Christian Adams; isn't that right?
04:09:17  3      A.  Correct.
04:09:53  4      DEPOSITION OFFICER:  Counsel, whenever you get
04:09:55  5  to a good point, can we get a comfort break?
04:09:57  6      MR. LOCKERBY:  Yes.  Absolutely.  This actually
04:10:01  7  would be a good time.
04:10:01  8      THE VIDEOGRAPHER:  We're off the record at
04:10:03  9  4:09 p.m.
04:10:03  10     (A recess is taken.)
04:19:58  11     THE VIDEOGRAPHER:  We are back on the record at
04:19:59  12  4:19 p.m.
04:20:01  13  BY MR. LOCKERBY:
04:20:08  14     Q.  All right.  There is an e-mail we were looking
04:20:11  15  at from you to Cameron Bell, July 12, 2017, 5:47 p.m.
04:20:23  16  And you wrote, "Believe it or not, it's not just pique.
04:20:27  17  I'm trying to get what I can get him to say about
04:20:31  18  knowledge and intent; but sadly, I think our Twitter war
04:20:34  19  petered out."
04:20:36  20     Now, the "him" to which you're referring was
04:20:40  21  Christian Adams; right?
04:20:42  22     A.  Correct.
04:20:42  23     Q.  And you had exchanged a series of Tweets with
04:20:51  24  Mr. Adams earlier that day; isn't that right?
04:20:54  25     A.  Correct.

Page 176

04:20:54  1      Q.  And knowledge and intent are elements of a
04:21:02  2  defamation claim; correct?
04:21:05  3      A.  I understand that they are, yes.
04:21:07  4      Q.  Yeah.  And you were trying to get Mr. Adams to
04:21:10  5  provide some evidence in his Tweets that might help
04:21:15  6  establish the knowledge and intent elements of a
04:21:18  7  defamation claim; isn't that right?
04:21:21  8      A.  I don't actually know that I had a legal case
04:21:26  9  in mind.
04:21:30  10     Q.  What else would knowledge and intent be
04:21:33  11  relevant to other than a legal case?
04:21:36  12     A.  To whether he expressed the intent that he was
04:21:45  13  publishing false information about people claiming that
04:21:51  14  they had committed felonies and that's -- given
04:21:53  15  particularly his appointment to a national commission,
04:22:00  16  national investigatory body, I thought that would be
04:22:04  17  relevant in a quite a few circumstances.
04:22:07  18     Q.  So that was for the other purposes, not
04:22:12  19  potential litigation?
04:22:17  20     A.  I don't know that I had the litigation in mind.
04:22:17  21  I can't recall at the time exactly why I would have done
04:22:20  22  that.  You asked whether I did that in order to
04:22:26  23  establish elements of a claim, and I said I don't know
04:22:32  24  that I had that in mind.
04:22:33  25     Q.  Okay.  Is that something that the Southern

Page 177

04:22:39  1  Coalition for Social Justice or the Protect Democracy
04:22:40  2  Project suggested that you do?
04:22:42  3      A. I don't think I can answer that question one
04:22:47  4  way or another without invading someone else's work
04:22:50  5  product that I'm not at liberty to waive.
04:22:53  6      Q. On the page before that one, there is an e-mail
04:22:57  7  from you, Wednesday, July 12, 2017, at 12:18 a.m., on
04:23:04  8  the subject "J. Christian Adams."
04:23:08  9      Who was Tova?
04:23:10  10     A. Tova is Tova Wang. She's another colleague
04:23:19  11  involved in election administration and voting. She --
04:23:24  12  I believe she works for The Century Foundation, but I'm
04:23:27  13  not sure where she worked on July of 2017.
04:24:15  14     Q. As part of the July 12, 2017, 5:47 p.m. e-mail
04:24:23  15  exchange with Cameron Bell, earlier there is a July 10,
04:24:36  16  2017, 5:56 p.m. e-mail from her to you. And you see she
04:24:44  17  says, "And I told Pema to call you first. She really
04:24:48  18  wanted me to call JCA a racist, but I wouldn't."
04:24:53  19     Do you see that?
04:24:54  20     A. I do.
04:24:55  21     Q. Did Pema ever say anything that suggested to
04:25:09  22  you that she wanted you to call Mr. Adams a racist?
04:25:13  23     A. She did not. Not that I recall, in any event.
04:25:33  24     Q. And then if you turn a few pages -- and there
04:25:40  25  are some e-mails beginning with one Thursday, July 13,

Page 178

04:25:45  1  2017, 9:28 a.m. to John Donnelly at DPCC.
04:25:53  2      Who is Mr. Donnelly?
04:25:55  3      A. He, as best I know, is involved with the Senate
04:26:01  4  Democratic Policy and Communications Committee. I don't
04:26:04  5  know what position he holds there.
04:26:08  6      Q. And the event that he had written to you about
04:26:19  7  was an event to draw attention to the President's
04:26:24  8  Election Integrity Commission and voting rights issues.
04:26:27  9      Do you see that?
04:26:27  10     A. That's -- yes. I see that stated here.
04:26:31  11     Q. And in response, one of the items you sent him,
04:26:34  12  the top of the page, was the article about Ms. Erickson,
04:26:41  13  the alleged noncitizen Guatemala --
04:26:44  14     A. Correct.
04:26:44  15     Q. -- is that right?
04:26:45  16     A. Correct.
04:26:45  17     Q. So did you think that was responsive to what he
04:26:50  18  was asking you about?
04:26:51  19     A. I did.
04:26:52  20     Q. And then on the next page, you also sent
04:26:58  21  Mr. Donnelly, what you said were e-mails from Virginia
04:27:03  22  registrars about Christian Adams' noncitizen report?
04:27:06  23     A. Correct.
04:27:07  24     Q. And you believe that these e-mails would
04:27:18  25  reflect poorly not just on Mr. Adams, but on the

Page 179

04:27:22  1  Presidential Advisory Commission on Electoral Integrity;
04:27:26  2  isn't that right?
04:27:32  3      MR. LEBOWITZ: Objection. Vague.
04:27:35  4      THE WITNESS: I believe they -- they do reflect
04:27:35  5  poorly on Mr. Adams. And also, to the extent that
04:27:42  6  Mr. Adams' methodology was a methodology considered by
04:27:48  7  the commission, that it would further reflect poorly on
04:27:50  8  the commission, yes.
04:27:52  9  BY MR. LOCKERBY:
04:27:54  10     Q. And if you turn a few more pages, there's an
04:27:56  11  e-mail exchange July 14, 2017, at 9:17 a.m. with Vanita
04:28:05  12  Gupta with an attachment, "On the Eve Of The Purges,
04:28:11  13  docx."
04:28:11  14     Do you see that?
04:28:11  15     A. I do.
04:28:12  16     Q. And you had previously discussed drafting
04:28:21  17  something on the subject "On the Eve Of The Purges";
04:28:26  18  isn't that right?
04:28:28  19     A. Correct.
04:28:28  20     Q. And what was the purpose of that, as you
04:28:30  21  understood it?
04:28:32  22     A. It was -- as I understood it, Ms. Gupta wanted
04:28:36  23  to discuss and describe what she perceived as some of
04:28:43  24  the dangers of the commission and/or their aftermath for
04:28:49  25  publication in an op-ed.

Page 180

04:28:56  1      Q. And you were doing a first draft for her; is
04:28:56  2  that right?
04:29:00  3      A. Correct.
04:29:00  4      Q. And when you said, "It's over the top," what
04:29:04  5  did you mean by that?
04:29:05  6      A. I meant that I was attempting to capture a
04:29:14  7  particularly vigorous tone. Not a tone that I
04:29:18  8  personally would have used, but one that I thought she
04:29:23  9  might welcome.
04:29:24  10     Q. And then if you look further, do you see you
04:29:43  11  had some additional e-mail exchanges with Ms. Gupta on
04:29:50  12  July 18, 2017?
04:29:59  13     A. Sounds right.
04:30:00  14     Q. And ultimately, this "On the Eve Of The Purges"
04:30:09  15  document was published in The New York Times; is that
04:30:11  16  right?
04:30:12  17     A. Correct. I should say, I don't recall what the
04:30:27  18  title of the ultimate document published was; but the
04:30:31  19  op-ed reflected here was ultimately published.
04:31:14  20     MR. LOCKERBY: I'd like to have this marked as
04:31:15  21  exhibit -- what are we up to now?
04:31:20  22     DEPOSITION OFFICER: Thirty-nine.
04:31:21  23     MR. LOCKERBY: -- 39, please.
04:31:21  24  ///
04:31:21  25  ///

Page 181

04:31:21   1        (Whereupon the document referred to is marked
04:31:21   2   by the reporter as Defense Exhibit 39 for
04:31:22   3   identification.)
04:31:22   4        MR. BRIDGES:  Are we done with 34?
04:31:26   5        MR. LOCKERBY:  We'll be going back to it.
04:31:28   6   Because it has so many dates in the one PDF, it's one
04:31:33   7   that I don't think we'll ever get away from.
04:31:50   8   BY MR. LOCKERBY:
04:31:51   9        Q.  Was Exhibit 39 the draft "On the Eve of the
04:31:56  10   Purges" document that you sent to Ms. Gupta?
04:32:01  11        A.  I believe so.
04:32:03  12        Q.  There is a reference in the third paragraph to
04:32:13  13   the myth of voter fraud.  What did you mean by that?
04:32:20  14        A.  Recall that this is a draft for someone else.
04:32:27  15   So what I meant by that was the perception that voter
04:32:34  16   fraud is rampant or widespread or affecting national
04:32:41  17   elections in significant degrees.
04:32:43  18        Q.  And how does making sure that only living
04:32:51  19   citizens of the United States vote once suppress the
04:32:56  20   vote of those who are entitled to vote?
04:33:00  21        A.  I --
04:33:06  22        MR. LEBOWITZ:  Objection.  Form.
04:33:07  23   Argumentative.
04:33:08  24        THE WITNESS:  Yeah.  But one doesn't
04:33:10  25   necessarily entail the other, but there are certainly

Page 182

04:33:14   1   efforts that could involve one that would also entail
04:33:16   2   the other.  And to be clear, I don't believe I ever said
04:33:21   3   that it did.  So the "how" question assumes a premise
04:33:26   4   I'm not sure I agree with in every circumstance.
04:33:29   5   BY MR. LOCKERBY:
04:33:32   6        Q.  You have a statement in here that Kobach had
04:33:35   7   blocked an unspecified number of voters from registering
04:33:41   8   before the 2016 election and that he'd done so
04:33:45   9   illegally.
04:33:46  10        What was the basis for those allegations?
04:33:48  11        A.  That referred to an attempt to unlawfully
04:33:56  12   require proof of citizenship from individuals for whom
04:34:03  13   there was no other indication of ineligibility before
04:34:06  14   individuals were able to register to vote in Kansas.  A
04:34:13  15   court later struck down that particular provision.
04:34:17  16        Q.  And then you claim in this draft that
04:34:22  17   Mr. Blackwell illegally rejected registration forms
04:34:27  18   because they were printed on paper he thought was too
04:34:31  19   thin?
04:34:32  20        A.  Correct.
04:34:32  21        Q.  And then with respect to John Christian Adams,
04:34:40  22   you refer to a vigilante frenzy.  What's the vigilante
04:34:47  23   frenzy that you're referring to there?
04:34:48  24        A.  The publication of personal information,
04:34:52  25   including sensitive personal data, about individuals

Page 183

04:34:57   1   falsely accused of feloniously registering while
04:35:01   2   noncitizens.
04:35:02   3        Q.  So one of the acts of vigilante frenzy was the
04:35:09   4   publication of information about individuals; is that
04:35:09   5   right?
04:35:13   6        A.  Yes.
04:35:13   7        Q.  And --
04:35:14   8        A.  The publication of individuals falsely accused
04:35:18   9   of committing crimes.
04:35:21  10        Q.  Well, I'm trying to break this down into pieces
04:35:25  11   so I don't, you know, prompt an objection that I'm
04:35:29  12   asking a compound question.
04:35:30  13        A.  Sure.
04:35:30  14        Q.  One act of vigilante frenzy of which you're
04:35:37  15   accusing Mr. Adams was the publication of information
04:35:44  16   contained in records that are available for public
04:35:48  17   inspection under the NVRA; is that right?
04:35:50  18        MR. LEBOWITZ:  Objection.  Mischaracterizes
04:35:52  19   testimony.
04:35:54  20        MR. BRIDGES:  Misstates the testimony.  And
04:35:56  21   misstatement in the exhibit.
04:35:59  22        THE WITNESS:  Does all of those things.  And
04:36:01  23   remember, this is also written in someone else's voice;
04:36:05  24   so to the extent you say I am accusing, I don't know
04:36:12  25   that I would agree with that.  But that's part of why I

Page 184

04:36:23   1   answered your previous question in full because the
04:36:25   2   context matters.
04:36:28   3        The simple adoption of republication of records
04:36:34   4   may or may not be permissible or have a -- have a moral
04:36:45   5   flavor attached to them depending on the context.  And
04:36:50   6   I, in particular, was pointing out the publication of
04:36:53   7   this personal information in the context of accusing
04:36:57   8   them incorrectly of having committed felonies.
04:37:00   9   BY MR. LOCKERBY:
04:37:02  10        Q.  Is the mere publication of records that are
04:37:06  11   available for public inspection under the NVRA improper,
04:37:11  12   in your view?
04:37:12  13        A.  It depends on the context.
04:37:15  14        Q.  So it's okay for some people to publish records
04:37:19  15   obtained pursuant to the NVRA, but not others.  Is
04:37:19  16   that --
04:37:19  17        MR. BRIDGES:  Objection.
04:37:19  18   BY MR. LOCKERBY:
04:37:25  19        Q.  -- what you're saying?
04:37:26  20        MR. BRIDGES:  Objection.  Misstates testimony.
04:37:27  21   Argumentative.
04:37:27  22        THE WITNESS:  It's not actually what I said.  I
04:37:31  23   said it depends on the context.  If I say the following
04:37:35  24   person is a child molester and then I publish that
04:37:39  25   person's information, that may have a very different

Page 185

04:37:42   1   flavor from simply publishing that person's information
04:37:45   2   without other contextual information.
04:37:48   3   BY MR. LOCKERBY:
04:37:49   4       Q.  Is the mere publication of records available
04:37:53   5   for inspection under the NVA -- NVRA improper, in your
04:37:58   6   view?
04:37:58   7       A.  It depends on the context.
04:38:01   8       Q.  Is the mere publication of records available
04:38:17   9   for public inspection under the NVRA an act of vigilante
04:38:23   10  frenzy?
04:38:24   11      A.  It depends on the context.
04:38:25   12      Q.  What is a vigilante frenzy anyway?
04:38:27   13          MR. BRIDGES:  Objection.  Argumentative.
04:38:29   14      I'm not a party to this action, but I've talked
04:38:31   15  about how long it's gone on.  And could you explain to
04:38:34   16  me how this is even marginally relevant to the issues in
04:38:37   17  the lawsuit.  Isn't a court going to determine whether
04:38:39   18  something's lawful or unlawful?  And whether this
04:38:43   19  deponent or any other deponent thinks that something's
04:38:46   20  wrong or inappropriate or a vigilante frenzy, how's it
04:38:51   21  got anything to do with the lawsuit?
04:38:53   22          MR. LOCKERBY:  Well, the lawsuit's complicated;
04:38:55   23  but I can tell you that our client has an anti-SLAPP
04:38:59   24  defense and also defenses that the plaintiffs in this
04:39:05   25  case are seeking an interpretation of the Voting Rights

Page 186

04:39:09   1   Act and the Ku Klux Klan Act for the improper purpose of
04:39:13   2   silencing the expression of views with which they dis --
04:39:18   3   which not necessarily the plaintiffs, but certain groups
04:39:21   4   disagree and that also have the purpose and effect of
04:39:27   5   chilling their First Amendment rights to petition the
04:39:30   6   government.  And so that's among the many issues that
04:39:37   7   the line of questioning is relevant to.
04:39:41   8           MR. BRIDGES:  Assuming all that to be true and
04:39:43   9   without denigrating my client, what's his view have to
04:39:47   10  do with any of whether that's true, untrue, a legal
04:39:50   11  defense, not a legal defense, whether a civil violation
04:39:54   12  has been committed, whether a felony's been committed?
04:39:57   13  He's just a law professor.  What difference does it make
04:40:00   14  what he thinks about it or whether he calls it a
04:40:01   15  vigilante frenzy?
04:40:03   16          MR. LOCKERBY:  Well, your client is not just a
04:40:04   17  law professor.  Your client is a law professor without
04:40:09   18  whose involvement we wouldn't be sitting here because
04:40:11   19  the evidence is overwhelming that he took it upon
04:40:13   20  himself, either on his own or at the behest of others,
04:40:19   21  to engage in, among other things, barratry, whether it's
04:40:23   22  illegal barratry or not, to procure plaintiffs for this
04:40:29   23  litigation for the purpose of trying to suppress the
04:40:33   24  expression of views with -- with which certain
04:40:36   25  organizations, including the Southern Coalition for

Page 187

04:40:40   1   Social Justice and the Protect Democracy Project,
04:40:44   2   disagree.
04:40:44   3           MR. LEBOWITZ:  May I --
04:40:45   4           MR. BRIDGES:  Make all those arguments --
04:40:45   5           MR. LEBOWITZ:  May I suggest that if you need
04:40:47   6   to characterize what the evidence does or does not show
04:40:50   7   in your view or discuss what his testimony is relevant
04:40:53   8   to or what you anticipate will show, that you do it
04:40:56   9   outside the presentation of the witness to the extent
04:40:57   10  you need to do that.
04:40:58   11          MR. LOCKERBY:  Well, my preference would be not
04:41:00   12  to discuss it at all.  I'd rather just get the
04:41:02   13  deposition done.
04:41:03   14          MR. BRIDGES:  And that's what I'd like to do,
04:41:04   15  too; and my point is I think we're spending a lot of
04:41:06   16  time making arguments to the Court in front of the
04:41:09   17  witness and asking him questions that are arguments to
04:41:13   18  the Court.  So please -- please keep that in mind that
04:41:18   19  there is a relevance barometer here.
04:41:23   20          MR. LOCKERBY:  There is.
04:41:27   21      I'd like to have this marked as Exhibit 40,
04:41:31   22  please.
04:41:31   23          (Whereupon the document referred to is marked
04:41:31   24  by the reporter as Defense Exhibit 40 for
04:41:47   25  identification.)

Page 188

04:41:47   1           THE WITNESS:  Thank you.
04:41:48   2   BY MR. LOCKERBY:
04:41:54   3       Q.  Exhibit 40 is another version of what was
04:41:59   4   originally titled "On the Eve Of The Purges" with a
04:42:03   5   markup by Vanita Gupta and then your comments in the
04:42:06   6   margin; is that right?
04:42:09   7       A.  Correct.
04:42:10   8       Q.  And if you look on the second page, do you see
04:42:42   9   there is a sentence that says, "J. Christian Adams
04:42:47   10  published personal information about specific people he
04:42:50   11  wrongly accused of committing multiple felonies in a
04:42:55   12  deeply flawed hunt for apparent fraud."
04:42:58   13      Do you see that?
04:42:58   14      A.  I do.
04:42:59   15      Q.  And the underlying words -- the phrases are
04:43:03   16  words that you were proposing adding; is that right?
04:43:07   17      A.  I believe so.
04:43:08   18      Q.  And then the words and phrases and sentences
04:43:14   19  that are stricken through, that is verbiage that you
04:43:18   20  were proposing removing; isn't that right?
04:43:20   21      A.  Correct.
04:43:23   22      Q.  And one thing that you struck in its entirety
04:43:25   23  was the statement, "In fact, they were all eligible
04:43:28   24  American voters."
04:43:29   25      Do you see that?

Page 189

04:43:29  1    A. Correct.

04:43:30  2    Q. And that was your comment, JL10, that reads,

04:43:38  3  "They weren't all eligible. I know some of them weren't

04:43:42  4  eligible. Indeed, some said they weren't eligible; and

04:43:46  5  I don't actually know how many of them were eligible. I

04:43:50  6  just know some of them weren't eligible because I talked

04:43:55  7  to a few who were eligible."

04:43:57  8        Those were your words; right?

04:43:58  9    A. Correct.

04:43:58 10    Q. And that was a true statement; correct?

04:44:00 11    A. Yes.

04:44:00 12    Q. And -- and when you said, "Some said they

04:44:05 13  weren't eligible," which voters were you referring to

04:44:07 14  there?

04:44:08 15    A. Voters who had marked down on the forms

04:44:11 16  themselves, "I am not a citizen," or had otherwise

04:44:15 17  indicated on the forms themselves that they were not

04:44:19 18  otherwise eligible to vote.

04:44:20 19    Q. No. But this says, "Indeed, some said they

04:44:24 20  weren't eligible."

04:44:24 21    A. Correct.

04:44:25 22    Q. Some of them actually told you they weren't

04:44:27 23  eligible; isn't that right?

04:44:29 24    A. No. Not to my knowledge. I would have to

04:44:31 25  refresh.

Page 190

04:44:32  1    Q. What would you have to do to refresh?

04:44:35  2    A. I would have to take a look at my notes about

04:44:38  3  the individuals with whom I spoke.

04:44:41  4    Q. And would those notes include communications

04:44:45  5  with the Southern Coalition for Social Justice and the

04:44:49  6  Protect Democracy Project, potentially?

04:44:51  7    A. Not anymore. I -- I'm referring to the

04:44:56  8  exhibits that have been redacted.

04:44:59  9    Q. But there are other communications with the

04:45:04 10  Southern Coalition for Social Justice and the Protect

04:45:08 11  Democracy Project that have not only been redacted, but

04:45:10 12  not produced altogether; correct?

04:45:17 13    A. Yes. I'm only going to -- I want to add, the

04:45:21 14  fact that you asked "but" implies that that's related to

04:45:24 15  the prior sentence; and I don't believe those two things

04:45:27 16  are related. There are, in fact, other communications

04:45:30 17  with the Southern Coalition for Social Justice and

04:45:33 18  Protect Democracy Project that I have not produced. I

04:45:38 19  don't believe that is related to the question you asked

04:45:41 20  before that.

04:45:48 21    Q. Did you tell the Southern Coalition for Social

04:45:53 22  Justice or the Protect Democracy Project which voters

04:45:59 23  said they weren't eligible?

04:46:08 24    A. I don't know whether I can answer that question

04:46:11 25  without waiving a privilege that's not mine.

Page 191

04:46:13  1    Q. Okay.

04:46:23  2    A. I don't know whether I can answer one way or

04:46:25  3  another.

04:48:17  4        MR. LOCKERBY: I'd like to have this marked as

04:48:19  5  Exhibit 41, please.

04:48:19  6        (Whereupon the document referred to is marked

04:48:19  7  by the reporter as Defense Exhibit 41 for

04:48:36  8  identification.)

04:48:36  9        THE WITNESS: Thank you.

04:48:36 10  BY MR. LOCKERBY:

04:48:55 11    Q. Exhibit 41 is a document you produced. It was

04:48:59 12  produced as a single PDF. We've numbered it No. 34.

04:49:13 13  But this consists of e-mail exchanges that you had with

04:49:15 14  the Southern Coalition for Social Justice and the

04:49:18 15  Protect Democracy Project for which there's been no

04:49:23 16  assertion of work product except with respect to the

04:49:27 17  redacted sections; is that right?

04:49:30 18    A. Correct.

04:49:30 19    Q. And if you look, there's an e-mail on Thursday,

04:50:02 20  April 12, 2018, from Lara Bergthold to you at 9:06 a.m.?

04:50:08 21    A. Correct.

04:50:09 22    Q. And that was on Thursday -- Thursday, April 12,

04:50:17 23  2018, was the date on which this lawsuit was filed; is

04:50:17 24  that right?

04:50:21 25    A. I believe that's correct.

Page 192

04:50:22  1    Q. Ms. Bergthold writes, "Hi. I hear you talked

04:50:33  2  to Larry Schwartzol and agreed to do some validating for

04:50:39  3  this case. Complaint and press release are below.

04:50:43  4  Suggested Tweets below. Feel free to make them your

04:50:45  5  own. And then when all this is done and assuming we

04:50:49  6  don't meet in the streets to protest Mueller's being

04:50:52  7  fired, let's grab lunch sometime soon."

04:51:01  8        Did you understand that -- well, first of all,

04:51:01  9  did you know Lara Bergthold before this date and time?

04:51:01 10    A. Yes.

04:51:02 11    Q. How did you know her?

04:51:02 12    A. We had worked together in a number of

04:51:11 13  capacities, including on Wesley Clark's very short

04:51:13 14  presidential race.

04:51:13 15    Q. This says she is with a organization called

04:51:18 16  WeAreRALLY.com. What is that?

04:51:19 17    A. I believe that RALLY is a multifaceted public

04:51:26 18  engagement and occasionally public relations firm.

04:51:31 19  WeAreRALLY.com is their the Web address, but I believe

04:51:37 20  the organization is called RALLY.

04:51:41 21    Q. And was RALLY retained to help publicize the

04:51:52 22  LULAC of Richmond versus PILF case?

04:51:52 23    A. I don't know. That's my understanding, but I

04:51:55 24  don't know.

04:51:55 25    Q. Have you yourself ever spoken with anyone at

Page 193

04:52:00  1    LULAC of Richmond?
04:52:02  2         A.  No.
04:52:03  3         Q.  If you turn the page, you see there is a
04:52:08  4    response from you to Ms. Bergthold on Thursday,
04:52:12  5    April 19, 2018?
04:52:16  6         A.  Yes.
04:52:17  7         Q.  In the first paragraph you write, "As I think
04:52:28  8    you know, I'm a giant fan of the case.  I helped round
04:52:34  9    up a few of the initial plaintiffs and hounded Larry and
04:52:38  10   Allison enough that I half think they brought the case
04:52:42  11   to get rid of me.  I'm delighted to keep on validating
04:52:47  12   as long as I can.  I hope they roundly kick the ass of
04:52:51  13   the folks on the other side."
04:52:53  14        First of all, which of the initial plaintiffs
04:52:56  15   had you helped round up?
04:52:57  16        A.  Yeah.  That turns out to be an inaccurate
04:53:01  17   statement.  I believe that the only plaintiff that I
04:53:07  18   spoke with before they signed on to the case was
04:53:12  19   Ms. Freeman.
04:53:16  20        Q.  And when you wrote that you, quote, hounded
04:53:19  21   Larry and Allison enough that I half think they brought
04:53:23  22   the case to get rid of me, the Larry was Larry
04:53:23  23   Schwartzol --
04:53:27  24        A.  It was.
04:53:28  25        Q.  -- of Protect Democracy Project?

Page 194

04:53:29  1         A.  Correct.
04:53:29  2         Q.  And Allison was Allison Riggs of the Southern
04:53:35  3    Coalition for Social Justice?
04:53:35  4         A.  Correct.
04:53:36  5         Q.  And what did you mean when you said that you
04:53:41  6    "hounded them enough that I half think they brought the
04:53:45  7    case to get rid of me"?
04:53:46  8         A.  That's an -- a very -- a misinformed or
04:53:52  9    misfired attempt to be funny.  It conveys the fact that
04:53:59  10   we spoke quite a bit.  But I actually would not stand
04:54:03  11   behind that characterization as a truthful one.
04:54:07  12        Q.  And when you referred to "validated," what did
04:54:12  13   you mean?
04:54:12  14        A.  In -- in my experience, validating generally
04:54:18  15   means talking about the merits of the case when
04:54:23  16   reporters ask.  And so that's what I meant by that.  I
04:54:35  17   should say validating in this context means talking
04:54:38  18   about the merits of the case when a reporter asks.
04:54:41  19   That's not been obviously what it means all the time.
04:54:45  20        Q.  And then when you said, "I hope they roundly
04:54:52  21   kick the ass of the folks on the other side," were you
04:54:57  22   referring to PILF and Mr. Adams?
04:55:32  23        A.  I was.
04:55:32  24        Q.  There's an e-mail to you from Larry Schwartzol
04:55:36  25   on Monday, August 13, 2018, at 3:26 p.m., where

Page 195

04:55:45  1    Mr. Schwartzol writes, "I thought you'd want to know
04:55:50  2    that we just beat MTD in our case against Adams."
04:55:55  3         Do you see that?
04:55:56  4         A.  I do.
04:55:56  5         Q.  And there is a link to a press release on the
04:56:01  6    Protect Democracy Web site.  Do you see that?
04:56:04  7         A.  I do.
04:56:04  8         Q.  And then Mr. Schwartzol writes, "Needless to
04:56:08  9    say, we welcome amplification, comment, et cetera."
04:56:12  10        What did you understand him to mean by that?
04:56:14  11        A.  Similar to validation in this context.  I
04:56:20  12   understood that to mean that he would welcome my posting
04:56:24  13   on, talking about, or talking to reporters about the
04:56:32  14   development.
04:56:33  15        Q.  And did you, in fact, do that?
04:56:36  16        A.  I don't actually remember.  I don't remember.
04:57:27  17        MR. LOCKERBY:  I'd like to have this marked as
04:57:29  18   Exhibit 41, please.
04:57:34  19        MR. BRIDGES:  I think you said this one was
04:57:37  20   marked 41.
04:57:38  21        DEPOSITION OFFICER:  Yes.
04:57:38  22        MR. LOCKERBY:  I did?  Okay.  I'm sorry.  This
04:57:40  23   would obviously be 42.
04:57:57  24        Did I give one of you two cop -- I gave you two
04:58:00  25   copies.

Page 196

04:58:00  1         (Whereupon the document referred to is marked
04:58:00  2    by the reporter as Defense Exhibit 42 for
04:58:03  3    identification.)
04:58:03  4         THE WITNESS:  Thank you.
04:58:17  5    BY MR. LOCKERBY:
04:58:18  6         Q.  Exhibit 42 is a PJ Media article by Mr. Adams
04:58:23  7    dated July 20, 2017, entitled "President Trump's Voter
04:58:33  8    Fraud Commission Meets, Smeared By Deniers."
04:58:37  9         Do you see that?
04:58:38  10        A.  I do.
04:58:38  11        Q.  Have you seen this article before?
04:58:40  12        A.  I don't believe I have.  It's possible, but I'm
04:58:44  13   not sure.
04:58:44  14        Q.  And on the second page do you see there is a
04:58:48  15   reproduction that says it's a Brennan Center graphic?
04:58:54  16        A.  I -- I see that that's there, yes.
04:58:57  17        Q.  And do you see it refers to President Trump's
04:59:02  18   four horsemen and voter suppression?
04:59:06  19        A.  I see that's what it says.
04:59:06  20        Q.  And it has pictures of Mr. Adams, Ken
04:59:11  21   Blackwell, Chris Kobach, and Hans von Spakovsky, as well
04:59:17  22   as President Trump; is that right?
04:59:17  23        A.  I see that's what's there.  That's correct.
04:59:23  24        Q.  Have you ever seen any of the Tweets that are
04:59:38  25   reproduced on Pages 4 and 5?

Page 197

04:59:51  1    A.  No.  And some of them are disgusting.
05:00:03  2    Q.  And then if you look at Page 6, you see there's
a Twitter graphic posted by Ken Blackwell that says,
05:00:12  3
05:00:15  4    "The fearless foursome.  We don't believe in voters
05:00:18  5    without borders"?
05:00:19  6    A.  I see that's how it's identified, yes.
05:00:22  7    Q.  And then if there is a reference to
05:00:24  8    you.  It says, "But there are also the high-minded
05:00:27  9    slurs.  Consider Justin Levitt.  This leftist academic
05:00:33 10    (I repeat myself) is known as the smartest man in
05:00:38 11    California.  If you didn't know he was, he'll remind
05:00:41 12    you."
05:00:41 13        You see your picture under that?
05:00:43 14    A.  I do.
05:00:48 15    Q.  And he goes on to write, on Page 7, underneath
05:00:56 16    your photo, "Levitt is part of the academic crowd that
05:01:01 17    pushes the voter-fraud-is-a-myth narrative to the legacy
05:01:06 18    media.  Levitt doesn't like anyone talking about aliens
05:01:11 19    getting on the voter rolls.  When the Public Interest
05:01:14 20    Legal Foundation documented over 5,500 voter
05:01:18 21    registrations canceled for citizenship problems, Levitt
05:01:22 22    went to work.  See, he was at the justice department
05:01:26 23    during the Obama administration and was part of the
05:01:30 24    neglect that led to corrupted roles.  Because some of
05:01:33 25    the people who were removed in Virginia were eventually

Page 198

05:01:36  1    put back on the rolls, he thinks the whole report can be
05:01:40  2    ignored."
05:01:42  3        The next paragraph -- I realize you probably
05:01:46  4    don't agree with any or many of the statements in
05:01:48  5    that --
05:01:48  6        MR. BRIDGES:  Is -- is there a question
05:01:50  7    pending?
05:01:51  8        MR. LOCKERBY:  There is about to be a question,
05:01:54  9    yes.
05:01:54 10    BY MR. LOCKERBY:
05:01:54 11    Q.  In the following paragraph Mr. Adams writes,
05:01:59 12    "The problem is that governments shouldn't be removing
05:02:02 13    citizens from the rolls as noncitizens any more than
05:02:06 14    governments should be putting noncitizens on the rolls."
05:02:10 15        Is that a statement with which you agree?
05:02:13 16    A.  That -- that one sentence is a statement with
05:02:15 17    which I heartily agree, yes.
05:02:18 18    Q.  And below that there is a statement that says,
05:02:25 19    Our report called any improper removal of citizens,
05:02:29 20    quote, a serious problem with less maintenance in the
05:02:33 21    commonwealth.  Legitimate voters should not be removed
05:02:37 22    from the rolls for not being citizens.  If this explains
05:02:41 23    5,550-plus instances of removal for citizenship defects,
05:02:47 24    then that circumstance is also appalling.
05:02:50 25        Do you agree with that statement?

Page 199

05:02:53  1    A.  I certainly agree that legitimate voters should
05:02:56  2    not be removed from the rolls for not being citizens.
05:03:00  3    It's my understanding that if there were more than 5,000
05:03:09  4    instances of removal, they were not removed for long.
05:03:12  5    And I'm not sure that I would characterize them as
05:03:16  6    having been removed from the rolls.  That's part of the
05:03:20  7    actual procedures that I wanted to get clear with the
05:03:23  8    state before commenting further that -- that we
05:03:25  9    discussed earlier in the deposition.
05:03:27 10        So I agree with the notion that legitimate
05:03:32 11    voters should not be removed from the rolls for not
05:03:35 12    being citizens.  The rest of that paragraph contains a
05:03:38 13    few premises that I don't -- I don't know whether
05:03:40 14    they're correct or not.
05:04:53 15        MR. LOCKERBY:  I'd like to have this marked as
05:04:55 16    Exhibit 43, please.
05:04:55 17        (Whereupon the document referred to is marked
05:04:55 18    by the reporter as Defense Exhibit 43 for
05:05:12 19    identification.)
05:05:12 20        THE WITNESS:  Thank you.
05:05:21 21    BY MR. LOCKERBY:
05:05:25 22    Q.  Exhibit 43 is another document that you
05:05:32 23    produced in -- again, it was a PDF and it had multiple
05:05:37 24    documents in it.  We've numbered it 6.  And the first
05:05:42 25    page is a May 30, 2017, e-mail.  I wanted to direct your

Page 200

05:05:48  1    attention to an e-mail regarding the Trump Election
05:05:55  2    Commission dated July 21, 2017.
05:06:03  3    A.  Okay.
05:06:25  4    Q.  Who is Gerald Kent, to whom you sent this
05:06:28  5    e-mail?
05:06:28  6    A.  I believe he's a friend of my father's, but I
05:06:37  7    am not entirely sure.
05:06:41  8    Q.  And the subject line of the e-mail is, "Trump
05:06:45  9    Election Commission Already Under Fire Holds First
05:06:47 10    Meeting, The New York Times."
05:06:50 11        Do you see that?
05:06:51 12    A.  I do.
05:06:52 13    Q.  And in response, you didn't comment on The New
05:07:02 14    York Times article at all, did you?
05:07:03 15    A.  I did not.
05:07:49 16    Q.  Okay.  I'd like to have you turn back now,
05:07:52 17    please, Exhibit 34 once again.
05:07:57 18    A.  Okay.
05:07:57 19    Q.  And there should be in there an August 10,
05:08:08 20    2017, e-mail or series of e-mails from you to Jane Timm
05:08:15 21    at NBC Universal.
05:08:17 22    A.  Yes.
05:08:19 23        MR. LEBOWITZ:  Which exhibit is this?  Sorry.
05:08:22 24        THE WITNESS:  It's the larger --
05:08:23 25        MR. LEBOWITZ:  Thirty-four?

Page 201

05:08:25  1      THE WITNESS:  Thirty-four.
05:08:26  2      MR. LOCKERBY:  Yes.
05:08:34  3      MR. GORMAN:  What date?
05:08:35  4      MR. LOCKERBY:  August 10 --
05:08:36  5      THE WITNESS:  August -- sorry.
05:08:40  6      MR. LOCKERBY:  -- 2017.
05:09:01  7      MR. GORMAN:  Just so we're on the same page,
05:09:03  8   you're talking 10:06 a.m., 10:09 a.m., or 10:33 a.m.?
05:09:08  9      MR. LOCKERBY:  Let's start with the one --
05:09:10 10      MR. GORMAN:  Or 9:50, actually.
05:09:12 11      MR. LOCKERBY:  10:20 -- I see what you're
05:09:13 12   saying.
05:09:15 13      MR. GORMAN:  That's a different thread.
05:09:28 14      MR. LOCKERBY:  The 10:06 a.m. would be first.
05:09:33 15      MR. GORMAN:  Thank you.
05:09:34 16      MR. LOCKERBY:  You're welcome.
05:09:51 17   BY MR. LOCKERBY:
05:09:51 18      Q.  So the 10:06 a.m. e-mail is from you to Emily
05:09:58 19   Samsel.  Who is she?
05:10:00 20      A.  She, I believe, works at a public relations and
05:10:12 21   holding and messaging firm called SKDKnickerbocker.
05:10:19 22      Q.  And the subject line is "NBC News Inquiry:
05:10:24 23   J. Christian Adams Profile."  Do you see that?
05:10:27 24      A.  Correct.
05:10:28 25      Q.  Do you have any understanding as to why Emily

Page 202

05:10:31  1   Samsel would be contacting you about discussing
05:10:36  2   J. Christian Adams with NBC news?
05:10:40  3      A.  I believe -- I -- I had spoken to her about
05:10:47  4   several other election-related developments that year
05:10:52  5   and before, and I believe she sent an inquiry out to a
05:11:01  6   broader group -- she wasn't sending an e-mail out to me
05:11:06  7   in particular -- about whether anybody wished to
05:11:10  8   comment.
05:11:11  9      Q.  And you responded that you wished to comment
05:11:23 10   about J. Christian Adams?
05:11:25 11      A.  I said that I could -- that I would be
05:11:28 12   available.
05:11:28 13      Q.  And did you, in fact, discuss Christian Adams
05:11:33 14   with NBC News?
05:11:34 15      A.  I did.
05:11:37 16      Q.  And that's something you were volunteering to
05:11:40 17   do here?
05:11:41 18      A.  Yes.
05:11:41 19      Q.  And then if you look at the e-mail August 10,
05:12:00 20   2017, 10:29 a.m., from you to Jane Timm, Ms. Timm had
05:12:11 21   written at 10:13 a.m., "Hi again.  Your publicist just
05:12:16 22   tried to send me your way while I was typing this
05:12:21 23   e-mail.  Small voting rights world, eh?  I'm profiling
05:12:26 24   Christian Adams as a way into the lawsuits-to-purges
05:12:29 25   story.  Got time to chat this afternoon or tomorrow?"

Page 203

05:12:36  1      To whom did you understand her to be referring
05:12:39  2   when she referred to "your publicist"?
05:12:42  3      A.  I understood her to be referring to Emily
05:12:45  4   Samsel, who is not my publicist.
05:12:49  5      Q.  Who is your publicist?
05:12:50  6      A.  I am not fancy enough for a publicist still.
05:13:05  7      Q.  And then if you turn a few pages, there's an
05:13:16  8   August 16, 2017, e-mail posting.  Do you see that?
05:13:23  9      A.  I do.
05:13:24 10      Q.  And that was copied to a voting fax and
05:13:31 11   GoogleGroups.com.  What is that e-mail address?
05:13:33 12      A.  I did not set it up.  I understand it to be a
05:13:39 13   number of individuals concerned with responding
05:13:49 14   factually and moderately and providing underlying data
05:13:58 15   and context for overcharged claims of many different
05:14:06 16   kinds with respect to election administration.
05:14:14 17      Q.  Does it address undercharged claims?
05:14:18 18      A.  It welcomes undercharged claims.  The -- as I
05:14:21 19   understand it, part of the orientation of the group is
05:14:25 20   to supply real data and the facts that are known.  And
05:14:34 21   undercharged claims actually respond to real data and
05:14:38 22   the facts that are known.
05:14:47 23      Q.  And who is Charles Stewart?
05:14:51 24      A.  He's a professor of political science -- he
05:14:55 25   holds a fancier title than that -- at MIT.

Page 204

05:15:00  1      Q.  David Becker.  Who is he?
05:15:01  2      A.  He is a former Department of Justice official.
05:15:06  3   He now has, I believe, a consulting entity on its own.
05:15:12  4   He helped to establish a multistate consortium --
05:15:19  5   bipartisan multistate consortium for comparing voter
05:15:23  6   registration rolls.
05:15:27  7      Q.  And who is Adam Ambrogi -- Ambrogi?
05:15:32  8      A.  Adam Ambrogi is, I believe, a program
05:15:35  9   officer -- I may get his title wrong as well -- with an
05:15:38 10   entity called the Democracy Fund, a funding entity.
05:15:43 11      Q.  And Jean Bordewich.  Who is that?
05:15:46 12      A.  I believe she is -- I don't know her title,
05:15:48 13   actually.  I shouldn't speculate.  She is with
05:15:51 14   Hewlett -- the Hewlett Foundation.
05:15:53 15      Q.  And then Josh Dorner?
05:15:55 16      A.  I believe he's with SKDKnickerbocker, the
05:16:01 17   public relations firm that I mentioned before.
05:16:07 18      Q.  On the fourth bullet point on this page, you
05:16:11 19   write, "To David's rhetorical point on bad matching
05:16:15 20   leading to law-abiding citizens being accused of fraud,
05:16:19 21   this is where Christian Adams' presence on the
05:16:23 22   commission may be useful because he's discouraging and
05:16:25 23   sloppy in this respect."
05:16:30 24      When you said that Christian Adams' presence on
05:16:32 25   the commission may be useful, the commission to which

Page 205

05:16:35  1    you were referring was the Presidential Advisory
05:16:39  2    Commission on Electoral Integrity?
05:16:41  3        A. Correct.
05:16:41  4        Q. And why did you believe that Mr. Adams'
05:16:43  5    presence on the commission may be useful?
05:16:47  6        A. It shone a particular spotlight on some of the
05:16:56  7    discouragingly sloppy methodology of the commission to
05:16:59  8    date. The commission had taken a number of what I
05:17:06  9    perceive to be missteps, and I was not particularly
05:17:12  10   impressed with the way they were going about their
05:17:15  11   business.
05:17:30  12       Q. And so you thought his presence would help
05:17:33  13   discredit the commission?
05:17:33  14       A. No. I thought that his presence would help
05:17:36  15   spotlight some of the sloppy methodology that others on
05:17:39  16   the commission had already proven capable of.
05:17:53  17       Q. If you turn, please, to the August 28, 2017,
05:17:58  18   e-mail.
05:18:04  19       MR. BRIDGES: August 20 or 28?
05:18:07  20       MR. LOCKERBY: 28th.
05:18:08  21       THE WITNESS: Okay.
05:18:12  22   BY MR. LOCKERBY:
05:18:12  23       Q. This e-mail was posted to the entire voting
05:18:17  24   facts Listserv; correct?
05:18:20  25       A. Correct.

Page 206

05:18:21  1        Q. And you've written, "Purely FYI, I also spoke
05:18:35  2    to Jane for the NBC story, not least because I've spoken
05:18:39  3    to some of the people that Adams falsely labeled
05:18:43  4    criminals. I've not yet been able to convince those
05:18:45  5    people I've spoken to to come forward; but there is an
05:18:49  6    effort underway, including some of the people involved
05:18:52  7    in this lawsuit, to do so in a way that highlights
05:18:57  8    Adams' reckless sloppiness. It's still in the early
05:19:01  9    stages, but I'm happy to keep you appraised as that
05:19:04  10   develops in any way that I can share publicly."
05:19:09  11       How many people, roughly, got this posting? Do
05:19:13  12   you know?
05:19:13  13       A. I don't know.
05:19:19  14       Q. And when you refer to "some of the people
05:19:20  15   involved in this lawsuit" in this posting, what was this
05:19:29  16   lawsuit to which you're referring?
05:19:31  17       A. I don't recall. I don't recall. I need to see
05:19:36  18   the hyperlink to know.
05:19:38  19       Q. And when you said, "there is an effort underway
05:19:41  20   to do so in a way that highlights Adams' reckless
05:19:46  21   sloppiness," what was the effort underway to which you
05:19:49  22   were referring?
05:19:50  23       A. I don't know that I can answer that question
05:19:52  24   without violating privilege that I do not hold.
05:20:03  25       Q. But that effort was for the purpose of

Page 207

05:20:04  1    highlighting what you called Adams' reckless sloppiness?
05:20:08  2        A. Correct.
05:20:43  3        MR. LOCKERBY: If we could take a short break,
05:20:44  4    I think I could wrap things up fairly quickly after
05:20:47  5    that.
05:20:47  6        MR. BRIDGES: Okay.
05:20:48  7        THE VIDEOGRAPHER: We're off the record at
05:20:49  8    5:20 p.m.
05:20:51  9        (A recess is taken.)
05:35:53  10       THE VIDEOGRAPHER: We're back on the record at
05:35:55  11   5:35 p.m.
05:35:56  12   BY MR. LOCKERBY:
05:36:05  13       Q. In addition to the Alien Invasion reports that
05:36:11  14   are the basis of this lawsuit, there are two other
05:36:15  15   reports by PILF, copies of which are in your document
05:36:19  16   production. And, in fact, one of them, Garden State
05:36:25  17   Gotcha, accounts for more than half of the volume of
05:36:28  18   documents that you produced.
05:36:31  19       Did you attempt to verify the accuracy of the
05:36:34  20   statements in Garden State Gotcha?
05:36:37  21       A. I did not.
05:36:38  22       Q. I'm going to show you and counsel one of the
05:36:49  23   documents that was produced in connection with Garden
05:36:53  24   State Gotcha and ask whether you recognize it; and if
05:36:56  25   you do, then I'll have it marked as an exhibit.

Page 208

05:37:25  1        It says it's a sample response to a letter from
05:37:28  2    Public Interest Legal Foundation.
05:37:31  3        A. Yes.
05:37:31  4        Q. Do you recognize this?
05:37:33  5        A. I do not.
05:37:33  6        Q. So you didn't draft this sample response?
05:37:36  7        A. No.
05:37:38  8        MR. LOCKERBY: I'm not going to mark it as an
05:37:40  9    exhibit.
05:37:40  10   BY MR. LOCKERBY:
05:37:41  11       Q. Now, if we could turn back once again, please,
05:37:45  12   to Exhibit 28 -- I'm sorry -- 38.
05:37:53  13       A. Okay.
05:38:11  14       MR. BRIDGES: The one with the puzzle parts on
05:38:13  15   the bottom.
05:38:29  16   BY MR. LOCKERBY:
05:38:29  17       Q. And on the 60th page of this document, there
05:38:35  18   are a series of Tweets dated April 12, 2018.
05:38:43  19       A. I found a series of Tweets. So that I don't
05:38:46  20   have to count pages --
05:38:47  21       Q. At the top there is one by you that begins with
05:38:52  22   the sentence, "Unwarranted screaming about voter fraud."
05:38:55  23       A. Okay.
05:38:58  24       Q. And these Tweets were posted by you the day
05:39:08  25   that the complaint against PILF and Mr. Adams was filed;

### Page 209

```
05:39:08  1    correct?
05:39:15  2        A.  Correct.
05:39:15  3        Q.  And in the Tweet -- the first Tweet, when
05:39:23  4    you're referring to "voter fraud vigilantes," were you
05:39:27  5    referring to PILF and Mr. Adams?
05:39:35  6        A.  Not solely, but yes.
05:39:36  7        Q.  And when you said, "The specific people
05:39:41  8    targeted pay the price," were you referring to the
05:39:46  9    plaintiffs in this case?
05:39:46  10       A.  Not individually -- the plaintiffs, among
05:39:49  11   others, yes.
05:39:50  12       Q.  And as of April 12, 2018, what price had the
05:39:57  13   specific people targeted paid?
05:40:00  14       MR. BRIDGES:  Object.  That assumes facts.
05:40:03  15   Lacks foundation.
05:40:04  16       If you want to ask him what he meant, you can
05:40:07  17   ask him; but I -- that -- subject to that objection, you
05:40:11  18   may respond, if you have a response.
05:40:14  19       THE WITNESS:  I -- I don't know what they would
05:40:17  20   say and certainly can't speak for them.  I know that
05:40:23  21   they're -- the information of people in the report was
05:40:28  22   publicly disclosed.  It was claimed that they had
05:40:33  23   unlawfully registered while noncitizens.
05:40:38  24       In several cases -- sloppy cases, the
05:40:43  25   individuals involved were citizens.  Their personal
```

### Page 210

```
05:40:50  1    information, including their address, their dates of
05:40:55  2    birth.  I believe I -- I'm not sure -- in some cases
05:41:03  3    signatures.  I'm sure in some cases full social security
05:41:06  4    numbers.  In some cases part social security numbers.  I
05:41:11  5    think I've mentioned home address were all produced in a
05:41:17  6    public document alongside the allegation that they had
05:41:19  7    committed felonies.  And that information was and may
05:41:26  8    still be -- I'm not sure whether it's still up online --
05:41:30  9    available for anyone to find.  At least some of the
05:41:34  10   individuals with whom I had spoken were upset and/or
05:41:42  11   afraid as a result.  So that was at least one price that
05:41:52  12   I thought they might have paid, but I don't know what
05:41:57  13   they would have said.
05:41:59  14   BY MR. LOCKERBY:
05:41:59  15       Q.  That was your statement of what price you
05:42:05  16   thought they had paid?
05:42:05  17       A.  At least by that point already, yes, I
05:42:09  18   understood that the -- that individual -- that it was at
05:42:19  19   least possible for individuals to take further action
05:42:22  20   based on the incorrect allegations in the report that
05:42:26  21   might lead to a further price.
05:42:30  22       Q.  And when you say in your Tweet, 11:57 a.m.,
05:42:37  23   April 12, 2018, "The defendant in today's suit was
05:42:42  24   repeatedly warned that his info was bad info.  He
05:42:48  25   published anyway," are the repeated warnings to which
```

### Page 211

```
05:42:51  1    you're referring e-mails from registrars that say what
05:42:55  2    they say?
05:42:55  3        A.  Yes.  That I believe are linked in the Tweet
05:43:01  4    itself.
05:43:04  5        Q.  And then when you tweeted in 5 out of 7, "I
05:43:09  6    talked to some of these citizens who were wrongly
05:43:14  7    attacked.  They were furious, and I don't blame them one
05:43:17  8    bit," are those the citizens who are identified in
05:43:23  9    what's been marked as Exhibit 32 and 33 to your
05:43:27  10   deposition?
05:43:35  11       A.  Yes.  Some of them, yes.
05:43:41  12       Q.  And then in No. 6 out of 7, you state, "I don't
05:43:51  13   know whether wrongly claiming that people have committed
05:43:57  14   felonies in publishing their personal info in the scope
05:44:01  15   of a sloppy and overheated vigilante campaign against
05:44:07  16   voter fraud is better labeled as bullying or doxxing or
05:44:12  17   both."
05:44:12  18       Now, the reference to doxxing, that was part of
05:44:19  19   your theory of how the Ku Klux Klan Act might be used as
05:44:23  20   cause of action in this case against Mr. Adams or PILF;
05:44:28  21   isn't that right?
05:44:28  22       MR. BRIDGES:  Objection.  Assumes facts not
05:44:30  23   established.  Lacks foundation.  And I don't know to the
05:44:35  24   extent it might interfere with others' work product.
05:44:40  25       But with those objections and if you can do so
```

### Page 212

```
05:44:43  1    without -- you can respond without disclosing
05:44:48  2    information for which you're not the holder of a
05:44:51  3    privilege, please reply.
05:44:53  4        THE WITNESS:  I can tell you what I meant by
05:44:55  5    "doxxing" in this Tweet.  I cannot reveal discussions in
05:45:00  6    or around any filings in this case without violating
05:45:03  7    somebody else's privilege that I do not hold.
05:45:06  8    BY MR. LOCKERBY:
05:45:06  9        Q.  Well, in fact, you have already revealed the
05:45:08  10   theory of doxxing as used in this case to third parties;
05:45:13  11   isn't that true?
05:45:13  12       A.  I -- A, I don't know to what you're referring
05:45:19  13   to; but B, I don't believe that I have discussed any
05:45:25  14   relevance to this case.
05:45:29  15       Q.  Well, let's look -- I'm sorry.  I didn't mean
05:45:32  16   to cut you off.
05:45:34  17       A.  So I don't know that I can answer your
05:45:36  18   question.  I don't -- if you're talking about the theory
05:45:39  19   of doxxing, I can tell you what I think about the theory
05:45:42  20   of doxxing.  If you're asking what I've discussed in
05:45:45  21   particular context with attorneys in this case, I can't
05:45:48  22   answer that.  And if you're discuss -- if you're talking
05:45:51  23   about what I've discussed in particular context with
05:45:53  24   third parties about this case, I -- I don't know that I
05:45:58  25   have.  But if I -- if there's a document that you're
```

Page 213

```
05:46:00    1    referring to, I'm not sure what you're referring to.
05:46:03    2        Q.  Take a look, please, at -- we'll be coming to
05:46:07    3    back to Exhibit 38, but look at Exhibit 34.  It's the
05:46:15    4    hundred and twenty -- 20th and 121st page; but it's
05:46:19    5    easier to find if you look at the August 7, 2018,
05:46:24    6    e-mail --
05:46:25    7        A.  Okay.
05:46:26    8        Q.  -- to Caroline Fredrickson and to Pamela
05:46:30    9    Karlan, "Re the Clan Act."
05:46:41   10        A.  Yes.
05:46:41   11        Q.  Who are Caroline Fredrickson and Pamela Karlan?
05:46:54   12        A.  Caroline Fredrickson I believe is the executive
05:46:58   13    director of the American Constitution Society.  Pamela
05:47:01   14    Karlan is a law professor at Stanford Law School.
05:47:05   15        Q.  And as far as you know, do either of those
05:47:08   16    organizations or individuals claim some kind of work
05:47:15   17    product protection over your communications with them?
05:47:19   18        A.  No.
05:47:27   19        Q.  And in the first paragraph you're referring to
05:47:32   20    the case of Cockrum versus Trump For President.
05:47:36   21        Do you see that?
05:47:36   22        A.  I do.
05:47:37   23        Q.  And you have a parenthetical, "Counsel on the
05:47:44   24    case were from Protect Democracy, Altshuler Berzon,
05:47:49   25    Keker Van Nest, and Richard Primus from Michigan Law."
```

Page 214

```
05:47:54    1        Do you see that?
05:47:54    2        A.  I do.
05:47:55    3        Q.  And then in the second paragraph, you write,
05:48:02    4    "For what it's worth" -- using an acronym -- "I know
05:48:05    5    there was a lot of time and attention paid to how to
05:48:10    6    frame the Klan Act allegation in this suit and the
05:48:13    7    suit against Adams in Virginia.  The Klan Act was used in the
05:48:19    8    past for violence or threats of violence and the VRA,
05:48:25    9    Voting Rights Act, added intimidation and coercion that
05:48:31   10    encompasses specific economic threats.  Doxxing connects
05:48:35   11    the dots from the targeted public release of private,
05:48:39   12    personal information to the sort of intimidation
05:48:44   13    contemplated by the Klan Act."
05:48:46   14        Do you see that?
05:48:46   15        A.  I do.
05:48:47   16        Q.  And that statement about doxxing explains the
05:48:57   17    theory by which the plaintiffs in the case in which
05:49:01   18    you're testifying seek to hold PILF and Mr. Adams liable
05:49:06   19    for violation of the Ku Klux Klan act; isn't that right?
05:49:09   20        MR. BRIDGES:  I'm going to object to that
05:49:10   21    question as phrased because I think it gets into -- if
05:49:14   22    it gets into protected attorney work product
05:49:18   23    conversations.  If you want to rephrase it and ask him
05:49:21   24    what he means about it here, I won't -- I won't include
05:49:24   25    that objection.  But I think as phrased, it invades
```

Page 215

```
05:49:30    1    communications that may be the work product of others
05:49:33    2    that he doesn't hold the privilege for.
05:49:35    3        MR. LEBOWITZ:  Then to the extent it's not, it
05:49:37    4    calls for speculation.
05:49:39    5        THE WITNESS:  Well, and I -- and I'm -- I am --
05:49:42    6    I'll add one.  I'm confused.  I'm not sure whether
05:49:44    7    you're asking about my interpretation of the public
05:49:46    8    documents that have been filed or about my conversations
05:49:49    9    with attorneys.  And so I -- I guess I don't know what
05:49:53   10    you mean by the question.
05:49:56   11    BY MR. LOCKERBY:
05:49:58   12        Q.  So you don't understand the question?  Is that
05:50:00   13    your testimony?
05:50:02   14        A.  Yes.
05:50:02   15        Q.  First of all, at the beginning of the
05:50:10   16    paragraph, you write, "I know there was a lot of time
05:50:13   17    and attention paid to how to frame the Klan Act
05:50:16   18    allegations in this suit and the suit against Adams in
05:50:19   19    Virginia."
05:50:20   20        How do you know that there was a lot of time
05:50:22   21    and attention paid to how to frame the Klan Act
05:50:25   22    allegations against Adams in Virginia?
05:50:27   23        A.  That would require my violating privilege that
05:50:33   24    I do not hold.
05:50:34   25        Q.  Well, you know that.  I'm not asking --
```

Page 216

```
05:50:38    1        A.  You asked how I know that.
05:50:39    2        Q.  -- the substance.
05:50:40    3        But you know that by virtue of your discussions
05:50:43    4    with the Southern Coalition for Social Justice and the
05:50:48    5    Protect Democracy Project; is that right?
05:50:49    6        A.  I'm not going to talk about the content of
05:50:51    7    conversations I had that might violate the privilege I
05:50:54    8    do not hold.
05:50:56    9        Q.  The theory of liability against PILF and
05:51:04   10    Mr. Adams under the Klan Act is -- in this litigation is
05:51:10   11    as described in that third sentence.  Quote, Doxxing
05:51:15   12    connects the dots from the targeted public release of
05:51:20   13    private, personal information to the sort of
05:51:23   14    intimidation contemplated by the Klan Act; is that
05:51:23   15    right?
05:51:28   16        A.  That is my impression of the claims that have
05:51:31   17    been made publicly and my understanding of the -- the
05:51:46   18    Klan Act claim that has been made in this case, but I do
05:51:51   19    not speak for counsel about what their theory of the
05:51:54   20    case is.
05:51:59   21        Q.  And you knew that as of April 12, 2018, the day
05:52:06   22    the complaint was filed, when you said in the Tweet
05:52:10   23    that's been marked as part of -- it is part of
05:52:14   24    Exhibit 38, that you didn't know whether it was better
05:52:17   25    labeled as bullying or doxxing or both?
```

Page 217

05:52:21   1        A.  If you're asking about whether I knew that that
05:52:24   2   would be the theory of the case, I would have to refresh
05:52:27   3   my recollection about what's in the complaint.  But that
05:52:36   4   statement in the Tweet doesn't refer to a legal theory.
05:52:43   5   So the question is a little bit hard to follow; but I
05:52:48   6   think the answer is no, that's incorrect.  But if
05:52:50   7   you're -- but I think you were asking about my knowledge
05:52:53   8   on a particular date in question, and so I'd have to
05:52:56   9   actually --
05:52:56  10        MR. BRIDGES:  I think that means --
05:52:56  11        THE WITNESS:  -- check --
05:52:58  12        MR. BRIDGES:  -- you're speculating, so...
05:52:59  13        MR. LOCKERBY:  Well, I think that the witness
05:53:01  14   should be allowed to answer without coaching.
05:53:05  15        MR. BRIDGES:  Well, when he's guessing at your
05:53:07  16   question, he's speculating.
05:53:08  17        THE WITNESS:  Can you read the question back,
05:53:10  18   please.  I apologize.
05:53:12  19        MR. LOCKERBY:  It's not appropriate for counsel
05:53:14  20   to advise the witness how to answer.  Counsel can simply
05:53:19  21   object to questions.
05:53:25  22        DEPOSITION OFFICER:  Should I read it back?
05:53:26  23        THE WITNESS:  I'd like to make sure I'm
05:53:28  24   answering the question that was actually asked.
05:53:29  25        (The record is read by the reporter as

Page 218

05:53:29   1   follows:
05:51:59   2        "Q.  And you knew that as of April 12, 2018,
05:52:05   3        the day the complaint was filed, when you said
05:52:10   4        in the Tweet that's been marked as part of --
05:52:13   5        it is part of Exhibit 38, that you didn't know
05:52:16   6        whether it was better labeled as bullying or
05:52:20   7        doxxing or both?")
05:53:53   8        THE WITNESS:  So to the extent the question
05:54:00   9   presumes that the Tweet refers to the legal theory of
05:54:03  10   the case, that is incorrect.  To the extent the question
05:54:07  11   asks about my knowledge of the legal theory of the case,
05:54:10  12   I need to review the complaint in order to answer your
05:54:13  13   question.
05:54:14  14   BY MR. LOCKERBY:
05:54:14  15        Q.  Are you aware of any case in which doxxing has
05:54:20  16   been successfully invoked as a basis for holding a
05:54:24  17   defendant liable for violation of what's known as the
05:54:28  18   Ku Klux Klan Act?
05:54:29  19        A.  Not yet.
05:54:33  20        Q.  And you're aware of only two cases in which
05:54:36  21   it's been attempted; isn't that right?
05:54:39  22        A.  That's correct.
05:54:41  23        Q.  One is a case against the Trump For President
05:54:45  24   Campaign?
05:54:46  25        A.  Correct.

Page 219

05:54:46   1        Q.  And one is the case in which you're testifying
05:54:48   2   today?
05:54:50   3        A.  Correct.
05:54:52   4        Q.  Have you ever advocated publicly for such an
05:54:57   5   interpretation of the Ku Klux Klan Act other than in the
05:55:02   6   e-mail that we just looked at?
05:55:05   7        MR. BRIDGES:  I'll object to that
05:55:09   8   mischaracterization of the evidence.
05:55:11   9        Subject to that, you may answer.
05:55:12  10        THE WITNESS:  Yeah.  I don't know that that
05:55:14  11   e-mail is advocating for.
05:55:16  12   BY MR. LOCKERBY:
05:55:17  13        Q.  I'll strike the reference to the e-mail.
05:55:19  14        Have you ever advocated publicly for such an
05:55:23  15   interpretation of the Ku Klux Klan Act?
05:55:26  16        A.  I don't believe I have.
05:55:26  17        Q.  Have you seen others advocate for such an
05:55:29  18   interpretation?
05:55:30  19        A.  This is where I'd have to refer to the legal
05:55:33  20   briefs but -- filed in both the Cockrum case and -- and
05:55:38  21   this case.  Outside of that, I don't know.  I don't
05:55:49  22   recall.
05:55:49  23        Q.  Were the plaintiffs in the Cockrum case
05:55:52  24   successful?
05:55:53  25        A.  Not yet, is my understanding.  I understand

Page 220

05:55:57   1   that the case is still continuing.  I don't know if
05:56:02   2   that's accurate or not.
05:56:03   3        Q.  What did you do to prepare to testify today?
05:56:10   4        A.  I collected the documents requested by the
05:56:17   5   subpoena.  I had conversation with my counsel.  That's
05:56:31   6   essentially it.
05:56:33   7        Q.  Have you had communications with plaintiff's
05:56:36   8   counsel about your deposition today?
05:56:39   9        A.  Only the fact that I was having one.
05:56:43  10        Q.  Have you had communications with counsel for
05:56:47  11   plaintiff's counsel -- at least counsel for some of
05:56:51  12   plaintiff's counsel about your deposition testimony
05:56:53  13   today?
05:56:55  14        A.  I'm not even sure we even had conversations
05:56:58  15   about the fact that I was having one.  Only about the
05:57:01  16   fact of when -- if I even did that.  And I'm not -- I
05:57:04  17   can't honestly say if I did.
05:57:05  18        Q.  Have you spoken with anyone other than counsel
05:57:07  19   about your deposition today?
05:57:09  20        A.  Yes.
05:57:10  21        Q.  With whom have you spoken about it?
05:57:13  22        A.  A few of the individuals named in documents
05:57:18  23   provided via subpoena.
05:57:20  24        Q.  And what individuals are those?
05:57:24  25        A.  I don't recall all of them.  I don't recall all

Page 221

05:57:38  1    of them.  I can name those that I remember, if that's
05:57:43  2    useful.
05:57:44  3        Q.  That would be.
05:57:48  4        A.  Rick Hasen, Pildes, Hako Lines [phonetic], Jane
05:58:02  5    Timm, Pema Levy.
05:58:08  6        Q.  I'm sorry.  What was the last one?
05:58:10  7        A.  Pema Levy.
05:58:18  8        Caroline Fredrickson, Cameron Bell.  One of the
05:58:45  9    individuals at Slate.  I honestly can't remember which.
05:59:11 10    Vanita Gupta, other individuals at Loyola Law School,
05:59:39 11    one of the individuals at SKDK, David Becker, David
05:59:57 12    Graham, Ed Pilkington.
06:00:05 13        I think that's it.  There may be others.
06:00:11 14        Q.  Have you posted any --
06:00:12 15        A.  Pam Fessler.
06:00:16 16        Q.  I'm sorry.  I didn't mean to cut you off.
06:00:19 17        A.  Pam Fessler.  There may be others.
06:00:21 18        Q.  Have you posted anything on Twitter about your
06:00:27 19    deposition?
06:00:27 20        A.  I have not.
06:00:28 21        Q.  Have you sent any e-mails to the Listserv about
06:00:32 22    your deposition?
06:00:32 23        A.  I have not.
06:00:33 24        Q.  What did you discuss with Mr. Hasen about your
06:00:36 25    deposition?

Page 222

06:00:37  1        A.  I can make this easier for you.  I discussed
06:00:39  2    the same thing with each of them.  That I would be
06:00:42  3    having a deposition, that pursuant to that I might have
06:00:48  4    to disclose documents in which they were named.
06:00:53  5        Q.  Why did you notify all the individuals or
06:00:58  6    entities that you've named about that fact?
06:01:02  7        A.  One of the individuals involved in this case
06:01:09  8    has in the past publicly produced documents in a matter
06:01:17  9    leading to embarrassment, and I wanted to notify these
06:01:21 10    individuals that the documents were being turned over.
06:01:26 11        Q.  Was there anything in these documents that you
06:01:28 12    thought would lead to embarrassment?
06:01:32 13        A.  I don't know.
06:01:34 14        Q.  What had been publicly produced before that had
06:01:37 15    led to embarrassment?
06:01:39 16        A.  Some -- some of the registration forms that
06:01:49 17    have been produced led to the embarrassment of the
06:01:52 18    individuals named in those registration forms.  In some
06:01:55 19    other cases I know that résumés and the like had been
06:02:01 20    collected in public records requests or litigation, and
06:02:05 21    the contents had been disclosed in a way that produced
06:02:09 22    embarrassment.
06:02:10 23        Q.  Did you consider that embarrassment to be
06:02:12 24    doxxing?
06:02:13 25        A.  No.  I did not consider embarrassment to be

Page 223

06:02:18  1    doxxing.  The release of some of the information in --
06:02:31  2    in some of the exhibits, including the individual
06:02:34  3    personally identifiable information, along with the
06:02:38  4    assertion that individuals had committed crimes, could
06:02:45  5    in some circumstances be considered doxxing.  But I'm
06:02:49  6    not sure.
06:02:50  7        MR. LOCKERBY:  I have no further questions at
06:02:52  8    this time.  Depending upon how various -- when and how
06:02:57  9    various claims of attorney-client privilege and work
06:03:01 10    product immunity are resolved -- not agreeing that this
06:03:06 11    is over.  I realize that your counsel, plaintiff's
06:03:09 12    counsel, counsel for some of plaintiff's counsel would
06:03:13 13    have a different view; but we don't need to argue about
06:03:15 14    that at this point.
06:03:17 15        THE WITNESS:  Thank you.
06:03:17 16        MR. LOCKERBY:  You have the right to review the
06:03:20 17    transcript of your deposition and correct any errors
06:03:22 18    before it becomes part of the record.
06:03:24 19        Would you like to do so?
06:03:25 20        THE WITNESS:  I would.
06:03:28 21        MR. LOCKERBY:  Thank you.
06:03:30 22        THE WITNESS:  Thank you.
06:03:30 23        DEPOSITION OFFICER:  Would you like to order a
06:03:32 24    copy?
06:03:32 25        MR. LEBOWITZ:  Yes, please.

Page 224

06:03:34  1        THE VIDEOGRAPHER:  This is the end of the
06:03:36  2    deposition of Justin Levitt, Volume I.  The date is
06:03:39  3    April 17, 2019.  The time is 6:03 p.m.
06:03:45  4        And we're off the record.
06:03:46  5        (Deposition session concluded at 6:03 p.m.)
         6                    -oOo-
         7
         8
         9
        10
        11
        12
        13
        14
        15
        16
        17
        18
        19
        20
        21
        22
        23
        24
        25

## Page 225

1    I have read the foregoing and by signing hereafter,
2    approve same.
3
4    Dated _____.
5
     _____
6         (Signature of Deponent)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 226

1         DEPOSITION OFFICER'S CERTIFICATE
2
3    STATE OF CALIFORNIA    }
                           } ss.
4    COUNTY OF LOS ANGELES }
5
6         I, THERESA JOANN PHILLIPS-BLACKWELL, hereby
7    certify:
8         I am a duly qualified Certified Shorthand
9    Reporter in the State of California, holder of
10   Certificate Number CSR 12700 issued by the Court
11   Reporters Board of California and which is in full force
12   and effect.  (Fed. R Civ. P. 28(a)).
13        I am authorized to administer oaths or
14   affirmations pursuant to California Code of Civil
15   Procedure, Section 2093(b) and prior to being examined,
16   the witness was first duly sworn by me.  (Fed. R. Civ.
17   P. 28(a), 30(f)(1)).
18        I am not a relative or employee or attorney or
19   counsel of any of the parties, nor am I a relative or of
20   such attorney or counsel, nor am I financially
21   interested in this action.  (Fed. R. Civ. P. 28).
22        I am the deposition officer that
23   stenographically recorded the testimony in the foregoing
24   deposition and the foregoing transcript is a true record
25              ///

## Page 227

1    of the testimony given by the witness.  (Fed. R. Civ. P.
2    30(f)(1)).
3         Before Completion of the deposition, review of
4    the transcript { X } was { } was not requested.  If
5    requested, any changes made by the deponent (and
6    provided to the reporter) during the period allowed, are
7    appended hereto.  (Fed. R. Civ. P. 30(e)).
8
9    Dated: April 19, 2019
10
11
12        _____
13
14
15
16
17
18
19
20
21
22
23
24
25

**A**

**a.m (29)**
1:16 7:2,7 25:13
25:16 66:19
66:22 96:24
97:3 137:22
168:10,16,22
169:3,5
172:10 173:1
177:7 178:1
179:11 191:20
201:8,8,8,14
201:18 202:20
202:21 210:22
**Abady (2)**
2:5 7:18
**able (7)**
24:13 43:21
76:4 78:8
172:23 182:14
206:4
**absence (2)**
17:22 18:2
**absolutely (4)**
97:3 118:10
173:23 175:6
**abstract (6)**
54:8 55:10
156:18,21
160:2,11
**Abuse (2)**
3:23 51:22
**academic (2)**
197:9,16
**accept (1)**
123:2
**access (14)**
44:17 65:18,22
76:20,25 77:5
77:23 78:16
78:20 79:24
80:20 88:25
89:3 154:25
**accessible (2)**
81:4 166:7
**accommodate...**
8:23
**Accountabilit...**
87:10
**accounts (1)**
207:17
**accuracy (7)**
85:22 92:8,11
94:5 97:24
158:22 207:19
**accurate (11)**
17:2 70:23 86:2
86:8,21 92:3

146:16 155:6
155:8 158:12
220:2
**accurately (2)**
92:15 162:8
**accused (4)**
183:1,8 188:11
204:20
**accusing (3)**
183:15,24 184:7
**acquainted (1)**
26:2
**acquire (1)**
158:12
**acronym (2)**
46:3 214:4
**ACRU (1)**
84:20
**act (28)**
65:18 117:16
159:4 162:2,8
162:10,23
163:3,7
183:14 185:9
186:1,1
211:19 213:9
214:6,7,9,13
214:19 215:17
215:21 216:10
216:14,18
218:18 219:5
219:15
**acting (3)**
23:14 40:14
48:20
**action (10)**
3:9,12,13
112:12 115:18
118:5 185:14
210:19 211:20
226:21
**activate (1)**
118:3
**active (2)**
97:12 145:18
**actively (1)**
20:9
**activity (6)**
21:10,21 24:15
53:4,7 162:17
**actors (3)**
20:2,3 25:6
**acts (1)**
183:3
**actual (3)**
162:20 169:9
199:7
**Adam (2)**

204:7,8
**Adams (61)**
1:9 7:11 8:17,17
25:21 26:7
27:3,5 51:20
51:23 52:11
56:1 57:12
58:4 60:15
61:7 84:19
96:13 104:1
104:13,18
129:22 145:7
158:25 159:13
164:14,24
165:7 170:22
171:10 173:18
175:2,21,24
176:4 177:8
177:22 178:25
179:5 182:21
183:15 188:9
194:22 195:2
196:6,20
198:11 201:23
202:2,10,13
202:24 206:3
208:25 209:5
211:20 214:7
214:18 215:18
215:22 216:10
**Adams' (9)**
167:16 178:22
179:6 204:21
204:24 205:4
206:8,20
207:1
**add (4)**
122:9 133:12
190:13 215:6
**added (1)**
214:9
**adding (1)**
188:16
**addition (4)**
24:9 27:18
28:25 207:13
**additional (7)**
16:24 17:1
87:23 99:11
128:16 132:6
180:11
**address (20)**
9:7,8,10 46:7
90:8,9 93:15
93:24 118:20
123:14,19
128:5,13
139:20 164:21

192:19 203:11
203:17 210:1
210:5
**addressed (1)**
96:24
**addresses (4)**
5:9 93:1,4
174:10
**adequately (1)**
157:9
**adjunct (1)**
14:19
**adjustment (1)**
79:22
**administer (1)**
226:13
**administratio...**
10:7 15:6 44:18
55:25 92:12
161:4 177:11
197:23 203:16
**administrativ...**
30:22 88:20
**admitted (6)**
31:9,11,14,18
31:20,25
**admonition (1)**
101:13
**adoption (1)**
184:3
**advertising (1)**
11:22
**advice (20)**
40:20 41:1,4,6
41:21,25 42:8
42:10,11
43:24 44:6
111:11,15,16
115:25 122:19
148:10,17
150:8,13
**advise (3)**
42:22,25 217:20
**advised (1)**
117:3
**advisory (8)**
104:17 129:16
129:21,25
158:11 159:4
179:1 205:1
**advocacy (1)**
16:9
**advocate (4)**
14:6,25 53:12
219:17
**advocated (2)**
219:4,14
**advocating (1)**

219:11
**affect (2)**
19:16 121:9
**affiliation (4)**
155:6 162:3,22
162:24
**affirmation (2)**
97:7 145:12
**affirmations (1)**
226:14
**affirmative (1)**
96:12
**affirmatively ...**
74:18
**affirmed (2)**
97:10 145:15
**afraid (2)**
160:21 210:11
**aftermath (1)**
179:24
**afternoon (1)**
202:25
**afterward (1)**
51:2
**agencies (3)**
86:11 87:2,7
**agency (1)**
79:12
**agent (1)**
55:23
**ago (2)**
97:22 120:7
**agree (28)**
37:22,24 50:7,9
52:13,19,20
52:25 53:2,5,8
56:6,17,20,21
59:1 86:18
87:2 134:22
160:23 182:4
183:25 198:4
198:15,17,25
199:1,10
**agreed (5)**
52:23 126:5
160:22 167:19
192:2
**agreeing (1)**
223:10
**agreement (7)**
22:25 35:16,20
35:25 36:2
49:18 125:24
**Ah (1)**
140:14
**ahead (2)**
32:10 156:10
**Alabama (1)**

164:15
**Alan (1)**
164:15
**Albany (1)**
9:9
**Alesha (8)**
121:21,24 122:2
122:3 123:23
124:11,17,19
**Alex (2)**
2:24 7:5
**Alexandria (1)**
90:14
**alien (31)**
81:6,12 91:16
91:17,22,24
93:8 94:11,19
94:23 95:1,5,8
95:12 97:15
97:24 98:19
99:13 102:18
106:10 110:17
131:9 138:8
141:20,22
144:16 165:3
167:3,21
170:16 207:13
**aliens (2)**
137:15 197:18
**allegation (2)**
210:6 214:6
**allegations (12)**
49:14 50:24
53:9,14,19
54:14 64:11
133:17 182:10
210:20 215:18
215:22
**allege (1)**
53:12
**alleged (2)**
17:17 178:13
**alleging (2)**
53:18 54:11
**Alliance (1)**
90:13
**Allison (15)**
39:18 111:8
150:19 151:5
152:16,20,22
153:11,14,18
174:14 193:10
193:21 194:2
194:2
**Allison's (1)**
111:7
**allotted (2)**
97:7 145:13

**allow (3)**
122:13 123:2,4
**allowed (2)**
217:14 227:6
**allowing (1)**
122:17
**allows (1)**
162:23
**alongside (1)**
210:6
**altogether (1)**
190:12
**Altshuler (1)**
213:24
**ambiguous (12)**
8:18 17:7 36:9
40:23 49:15
60:21 78:22
81:16 85:18
85:25 103:13
142:12
**Ambrogi (3)**
204:7,7,8
**amen (1)**
50:9
**amend (2)**
29:19 39:5
**Amendment (4)**
53:21 54:17
162:14 186:5
**America (5)**
12:7,19,24
13:16 70:16
**American (9)**
1:5 4:20 7:9
14:10 83:11
83:13 84:3
188:24 213:13
**amici (2)**
30:10,11
**amicus (6)**
4:20 30:8,13,14
82:23 84:2
**amounted (1)**
53:14
**Amounts (2)**
5:17 154:17
**amplification ...**
195:9
**analysis (1)**
158:23
**analyze (1)**
158:12
**and/or (2)**
179:24 210:10
**Angeles (7)**
1:16 7:1 9:9,11
10:24 22:15

226:4
**Anna (2)**
90:13 145:23
**answer (58)**
6:10 17:8 28:8
35:21,22
36:15 38:2
39:6 40:24
42:6,10 45:5
51:6 54:8,14
55:8,10 69:20
69:25 74:2
96:12 103:14
103:17 104:12
104:14,24
107:5 108:5
112:20 116:24
123:4 126:18
146:21 148:21
149:3,10
150:2,9,11,14
150:22 152:24
156:13 157:5
160:7 171:25
172:1 177:3
190:24 191:2
206:23 212:17
212:22 217:6
217:14,20
218:12 219:9
**answered (2)**
85:2 184:1
**answering (2)**
116:1 217:24
**anti-SLAPP (3)**
45:23 46:5
185:23
**anticipate (3)**
91:7 95:1 187:8
**anticipated (5)**
43:13 95:5,16
115:25 151:10
**anticipating (4)**
94:10,18 95:15
119:2
**anticipation (5)**
37:12,15 109:20
111:22 114:20
**anybody (2)**
51:4 202:7
**anymore (1)**
190:7
**anyway (2)**
185:12 210:25
**apologies (2)**
11:16 174:17
**apologize (1)**
217:18

**appalling (1)**
198:24
**apparent (1)**
188:12
**apparently (3)**
62:3 124:5
165:8
**appear (4)**
82:8 97:11
144:22 145:17
**APPEARAN...**
2:1
**appeared (2)**
91:23 97:15
**appears (5)**
36:24 62:18
70:3 98:21
111:20
**appended (1)**
227:7
**applicable (1)**
50:1
**application (3)**
72:17 76:24
141:5
**applied (2)**
62:2 79:20
**apply (3)**
50:3 62:3 65:6
**appointed (8)**
104:18,21
129:16,20
159:9,13,19
159:23
**appointment (...**
160:14 167:16
176:15
**appointments...**
160:11
**appraised (1)**
206:9
**appreciate (1)**
50:6
**approach (2)**
37:6,7
**approached (2)**
37:5,9
**appropriate (2)**
143:7 217:19
**approve (1)**
225:2
**approximatel...**
109:9,12 129:10
**April (18)**
1:17 4:22 7:1,6
13:19 58:3
96:23 170:2
191:20,22

193:5 208:18
209:12 210:23
216:21 218:2
224:3 227:9
**Architect (2)**
3:23 51:21
**area (5)**
13:2 90:22
91:13 92:10
92:12
**arena (2)**
141:14,16
**argue (1)**
223:13
**Argumentativ...**
38:1 42:2 55:14
132:4 171:22
181:23 184:21
185:13
**arguments (3)**
187:4,16,17
**arisen (1)**
122:18
**arose (1)**
19:23
**arranged (1)**
66:12
**article (31)**
3:23,24 4:5,7
5:14,15,16,18
5:23 6:5 52:10
57:12,16 58:3
58:7 61:6 73:6
143:16,24
144:7 154:16
155:5 161:16
162:6 163:6,8
163:10 178:12
196:6,11
200:14
**articles (4)**
56:2 60:15,22
63:21
**articulate (1)**
55:13
**articulated (1)**
57:3
**arts (1)**
10:2
**ascertain (2)**
92:8 129:1
**asked (11)**
44:2 54:10
60:13 72:6
100:25 113:18
176:22 190:14
190:19 216:1
217:24

**asking (19)**
70:15 102:20
109:22 111:14
114:25 121:8
148:13 155:3
155:13,14,15
178:18 183:12
187:17 212:20
215:7,25
217:1,7
**asks (3)**
101:8 194:18
218:11
**aspects (2)**
15:4 156:2
**aspiration (1)**
168:7
**aspirations (1)**
168:2
**ass (2)**
193:12 194:21
**assassination ...**
171:5,10
**assert (2)**
34:8 122:12
**asserted (1)**
126:2
**asserting (2)**
112:17 120:10
**assertion (3)**
50:11 191:16
223:4
**assessment (3)**
86:8,21 87:25
**assist (1)**
14:7
**assistance (6)**
40:12 79:5,6
83:2 133:23
133:25
**assistant (4)**
14:19 23:11,15
23:16
**assisted (4)**
11:24 60:4,7,12
**associated (1)**
7:5
**assume (2)**
45:8 122:22
**assumes (5)**
147:22 171:23
182:3 209:14
211:22
**assuming (2)**
186:8 192:5
**assumption (1)**
63:13
**attached (7)**

93:5,8 131:8
165:3,12
174:11 184:5
**attachment (3)**
90:11 169:19
179:12
**Attachments (...**
4:22
**attacked (1)**
211:7
**attempt (7)**
42:14 93:7 94:2
132:16 182:11
194:9 207:19
**attempted (10)**
15:24,25 16:2
87:6 93:3,21
132:15 140:6
140:19 218:21
**attempting (4)**
19:6,21 42:8
180:6
**attended (1)**
10:1
**attention (7)**
91:20 143:18
178:7 200:1
214:5 215:17
215:21
**attitude (1)**
52:8
**attorney (17)**
23:15,16,17
29:24 34:5
36:4,9 48:20
48:21 119:23
119:23 120:17
121:21 124:11
214:22 226:18
226:20
**attorney-clien...**
9:20 34:4,7
40:18 42:3
43:8 45:2
51:11 116:6
116:21 122:12
122:18 123:6
124:13 125:21
147:16,19,24
148:5,18,20
148:25 149:8
150:1,5,6,17
223:9
**attorneys (7)**
23:11 114:14
115:12,21
116:17 212:21
215:9

**audacity (1)**
52:2
**August (13)**
39:20,23 85:3
148:23 194:25
200:19 201:4
201:5 202:19
203:8 205:17
205:19 213:5
**Augustine (11)**
39:21 111:1
147:12,19
148:5,9,16,25
149:5 150:20
151:13
**Australia (1)**
74:21
**authenticate (1)**
70:19
**author (2)**
15:7 162:5
**authored (1)**
15:15
**authorization ...**
170:9,10
**authorize (3)**
69:10 162:21
163:1
**authorized (4)**
22:4 162:14,17
226:13
**authorizes (1)**
163:3
**authors (1)**
131:25
**availability (1)**
90:19
**available (12)**
19:14 64:22
80:8 88:23
139:22 173:15
183:16 184:11
185:4,8
202:12 210:9
**avenue (3)**
2:6,21 76:10
**avenues (1)**
76:9
**aware (28)**
49:11 50:20
51:1,1 58:19
59:12,24
70:21 72:8,9
72:24 73:1
74:24 80:17
80:21,24 81:3
81:3 83:19,24
84:15 91:15

97:18,20,21
98:1 218:15
218:20
**awful (1)**
157:3

———
**B**
**B (2)**
96:11 212:13
**bachelor (1)**
10:2
**bachelor's (1)**
10:10
**back (46)**
25:15 38:14
39:12 50:17
66:21 96:6
100:5,7,11,14
107:22 114:10
116:9 117:1,9
125:5,11,18
126:7 134:24
135:23 139:5
144:3 145:5
146:3,9,14,24
151:16 154:5
156:24 166:10
168:24 169:7
172:12,16
174:20 175:11
181:5 198:1
200:16 207:10
208:11 213:3
217:17,22
**background (2)**
9:24 10:3
**bad (4)**
156:19,22
204:19 210:24
**baked (1)**
157:3
**ballot (2)**
12:22 44:16
**ballots (3)**
85:8 105:16,20
**bar (4)**
31:19,24 32:1
42:12
**barometer (1)**
187:19
**barratry (5)**
47:3,7,8 186:21
186:22
**based (13)**
59:7 71:4 77:4
82:6 88:3,14
111:19 112:17
112:21 116:20

118:8,11
210:20
**basis (17)**
31:22 42:3
62:22 73:9
75:9 80:19
82:10 85:16
85:23 86:2
95:11 116:23
116:25 164:23
182:10 207:14
218:16
**Battery (1)**
2:11
**Bauer (10)**
3:23 18:9 48:22
49:7 51:21,25
52:3,6,13,21
**Bauer's (2)**
52:16,17
**Beach (1)**
2:22
**beat (1)**
195:2
**Becker (2)**
204:1 221:11
**beefy (3)**
21:4,7 22:1
**began (2)**
95:21,23
**beginning (3)**
39:1 177:25
215:15
**begins (6)**
129:4 130:23
133:20 138:2
140:12 208:21
**begun (1)**
57:17
**behalf (9)**
7:13,20 34:17
34:19 61:25
83:11 90:12
123:1 133:3
**behest (1)**
186:20
**believe (84)**
11:13 13:18
15:21 20:8
21:1 29:11
30:11 34:16
40:5 46:2
52:12,16 75:7
79:10 80:14
84:11 86:24
93:18,20,23
95:22 97:19
100:9 109:8

121:5 123:21
124:11 134:24
135:12 137:10
137:19 138:12
140:3 141:21
143:22 144:18
145:25 148:21
150:9,11,14
154:21 163:9
165:4,5 167:5
167:16 169:4
171:19,20
172:5 173:13
173:21 174:8
174:22 175:16
177:12 178:24
179:4 181:11
182:2 188:17
190:15,19
191:25 192:17
192:19 193:17
196:12 197:4
200:6 201:20
202:3,5 204:3
204:8,12,16
205:4 210:2
211:3 212:13
213:12 219:16
**believed (2)**
40:4,9
**Bell (20)**
136:14,16
138:10,16,20
146:6,8,13,18
152:1,9,23
153:2,6,13,17
174:21 175:15
177:15 221:8
**Bell's (1)**
137:15
**benefit (3)**
77:3 79:7,25
**benefits (7)**
76:24 78:21
79:5,8,11,12
79:20
**Bergthold (4)**
191:20 192:1,9
193:4
**Berzon (1)**
213:24
**best (8)**
13:15 18:14
22:5 129:2
131:23 132:3
134:11 178:3
**bet (1)**
108:17

better (5)
66:12 172:18
211:16 216:24
218:6
**beyond (3)**
17:14 40:13
134:5
**Bill (1)**
97:1
**bipartisan (2)**
159:3 204:5
**birth (4)**
9:4 69:6 120:21
210:2
**bit (4)**
70:13 194:10
211:8 217:5
**black (2)**
20:6,7
**Blackwell (9)**
84:7,8 159:22
160:2,4,18
182:17 196:21
197:3
**blame (1)**
211:7
**blanket (1)**
79:18
**Blech (1)**
138:4
**Bless (2)**
89:10,11
**blocked (1)**
182:7
**blog (12)**
60:12,13 105:2
139:21,21,23
139:24 140:4
167:7 168:2
173:8,12
**board (6)**
73:14 81:11
84:3,20,23
226:11
**Bob (1)**
18:9
**Bobby (1)**
127:13
**body (4)**
96:17 129:16,21
176:16
**books (1)**
15:15
**boot (1)**
52:6
**borders (1)**
197:5
**Bordewich (1)**

204:11
**born (1)**
120:20
**bottom (12)**
38:25 39:19
70:14 84:18
86:5 99:16
112:11 113:4
115:17 116:15
116:16 208:15
**Boulevard (1)**
9:10
**bound (3)**
141:2,5,11
**box (3)**
140:24 141:4
154:2
**break (9)**
8:21,24 66:9,15
107:16 118:21
175:5 183:10
207:3
**Breaking (1)**
164:13
**Brennan (14)**
13:22,24 14:4
14:12,17,23
15:3,4,8,16
17:23 22:8,12
196:15
**Bridges (120)**
2:20,20,20 7:22
7:22,22,23
9:17,19 17:7
27:15 28:7
33:17 34:9,19
36:8,16 38:1
39:2,7,14
40:22 41:7
42:2 43:10
45:1 46:14,16
49:15 54:6,23
55:4,14 60:21
63:8 64:1,18
65:16 66:2,17
67:16 69:18
69:24 71:15
72:21 73:25
76:6,16 78:22
79:15 81:16
85:18,25 88:5
89:11,15,19
93:17 94:12
98:4,6,9 99:6
101:11 103:13
107:1 111:13
112:16 113:1
113:10 116:20

117:20,24
118:2,8,11
119:10 122:6
124:7 126:4
132:1,4
137:11 142:10
142:12 143:2
147:4,21
148:11 149:8
150:4,15
151:21 152:3
152:6 154:2
155:12,17
160:5 171:22
181:4 183:20
184:17,20
185:13 186:8
187:4,14
195:19 198:6
205:19 207:6
208:14 209:14
211:22 214:20
217:10,12,15
219:7
**Bridgewater (1)**
9:25
**brief (7)**
4:20 82:24 83:4
83:9,10 84:1
85:20
**briefly (1)**
9:23
**briefs (5)**
28:23 30:9,13
30:14 219:20
**Brinckerhoff ...**
2:5 7:18
**broader (1)**
202:6
**broadly (1)**
80:22
**broken (2)**
5:19 161:21
**brought (6)**
91:5 122:19
127:17 193:10
193:21 194:6
**bubble (1)**
70:20
**bubbles (1)**
70:17
**buckets (2)**
13:5,6
**budgetary (1)**
24:8
**bullet (1)**
204:18
**bullying (3)**

211:16 216:25
218:6
**burdensome (1)**
86:15
**Burman (1)**
18:9
**business (3)**
9:6,8 205:11
**butchering (1)**
39:21

**_____C_____**

**California (19)**
1:16 2:12,22 7:1
9:9,11 31:9,12
42:12 43:9
63:23 64:4,21
82:6 197:11
226:3,9,11,14
**call (10)**
15:18 21:2
30:25 51:9
53:5 132:24
133:7 177:17
177:18,22
**called (18)**
12:6 13:22
15:11,12,13
91:19 123:6
132:18,22
136:25 140:2
140:2 192:15
192:20 198:19
201:21 204:10
207:1
**calling (1)**
174:1
**calls (21)**
43:10 54:3,23
55:4 64:18
65:14 66:3
69:18 71:15
72:19 73:25
74:1 76:6,16
79:15 88:5,16
101:11 143:3
186:14 215:4
**camera (1)**
117:6
**Cameron (18)**
127:23 136:14
136:16 137:14
138:16 146:6
146:8 152:1,9
152:23 153:2
153:6,13,17
174:21 175:15
177:15 221:8

**campaign (18)**
11:4,7,8,9,10,18
11:20 12:5
18:4 20:16
22:9 44:21
49:8 51:25
53:4,7 211:15
218:24
**Campbell (7)**
112:10 115:17
115:21 116:14
116:17 126:8
126:8
**cancel (3)**
69:10,15 169:9
**cancelation (4)**
62:16 70:8 71:4
82:5
**cancelations (1)**
82:8
**canceled (11)**
62:21 82:10
97:5,8,9
143:25 144:8
145:11,14,15
197:21
**canceling (3)**
4:12,17 69:2
**candidate (2)**
11:22 12:18
**candidates (1)**
12:21
**capable (1)**
205:16
**capacities (1)**
192:13
**capacity (3)**
19:8 40:13
100:2
**capture (1)**
180:6
**card (3)**
77:15,17,20
**care (1)**
156:16
**cared (1)**
134:6
**career (2)**
25:19 58:24
**Caroline (4)**
213:8,11,12
221:8
**carry (1)**
21:14
**case (66)**
7:11 8:15 25:20
26:24 27:19
35:18 36:5

37:14 38:13
40:16 55:18
59:10 77:8
82:24 83:16
83:20,21,23
84:16 90:16
90:25 91:2
101:4 117:22
120:16 121:11
130:20 135:11
152:14 153:7
176:8,11
185:25 192:3
192:22 193:8
193:10,18,22
194:7,15,18
195:2 209:9
211:20 212:6
212:10,14,21
212:24 213:20
213:24 214:17
216:18,20
217:2 218:10
218:11,15,23
219:1,20,21
219:23 220:1
222:7
**cases (14)**
24:17 28:12,22
80:21 90:21
90:23 122:25
209:24,24
210:2,3,4
218:20 222:19
**cast (2)**
105:16,20
**Casting (1)**
85:7
**cause (1)**
211:20
**caused (2)**
92:18 148:24
**causes (1)**
40:8
**causing (1)**
144:14
**caveats (1)**
162:20
**Celli (2)**
2:5 7:18
**Center (13)**
13:22,24 14:4
14:13,17,23
15:8,17 17:23
22:8,12 35:5
196:15
**Center's (2)**
15:3,5

**Century (1)**
177:12
**certain (23)**
15:21 22:1
31:20 65:19
71:7 79:4
80:21 91:22
105:1,16
106:3,4
107:13 110:12
142:5 152:13
153:6,9 161:1
162:25 163:5
186:3,24
**certainly (7)**
20:21 50:8
109:18 141:2
181:25 199:1
209:20
**certificate (3)**
120:21 226:1,10
**Certified (1)**
226:8
**certify (1)**
226:7
**cetera (3)**
170:24 171:3
195:9
**chain (2)**
137:22 138:2
**chair (2)**
154:3 158:23
**challenge (1)**
118:5
**change (1)**
16:23
**changed (2)**
75:24 109:14
**changes (2)**
157:18 227:5
**chapters (1)**
15:14
**character (2)**
171:5,9
**characterizati...**
37:23,24 52:19
56:6 59:2
165:16 194:11
**characterize (7)**
16:13 29:20
52:17 144:20
170:22 187:6
199:5
**characterized...**
130:17
**characterizin...**
59:4 169:14
**charge (1)**

11:25
**Charles (1)**
203:23
**chat (1)**
202:25
**check (2)**
141:4 217:11
**checked (1)**
140:24
**child (1)**
184:24
**chilling (1)**
186:5
**chorus (1)**
50:9
**chosen (3)**
87:12 88:2,12
**Chris (1)**
196:21
**Christian (25)**
1:9 7:11 8:17
25:21 51:19
56:1 57:12
58:4 104:1
159:13 164:14
173:18 175:2
175:21 177:8
178:22 182:21
188:9 201:23
202:2,10,13
202:24 204:21
204:24
**chronology (1)**
35:15
**Circuit (1)**
10:22
**circulate (1)**
62:6
**circumstance ...**
182:4 198:24
**circumstance...**
18:22 19:2
21:17 29:23
30:3,7 31:2
53:11,17
54:11 55:18
71:1,8 72:8,9
72:15,24
156:1,16
162:25 163:5
176:17 223:5
**citation (1)**
86:7
**cited (2)**
87:15 169:10
**cities (1)**
27:21
**citizen (37)**

62:21 70:5,6
70:16,25 71:3
71:9,11,19
73:19,20
74:10,19,21
75:2,10,19,23
76:1,3,5,15
77:2,10,18,20
77:22 78:4,10
78:13 79:4,9
79:13 88:4
140:25 141:4
189:16
**citizen's (2)**
15:13 74:9
**citizens (28)**
1:5 7:10 73:24
74:12 87:14
92:5 93:20
94:4,7 100:11
105:6,15
106:3,5
126:21 146:10
146:19 166:2
181:19 198:13
198:19,22
199:2,12
204:20 209:25
211:6,8
**citizenship (16)**
65:8 72:10,18
74:17 76:23
80:9,16 86:14
87:4 97:7,10
145:13,16
182:12 197:21
198:23
**city (2)**
21:5 90:14
**Civ (5)**
226:12,16,21
227:1,7
**civic (1)**
46:4
**civil (18)**
3:9,11,13 4:20
23:1,9,15,16
24:5,16 26:8
58:25 83:11
83:13 84:3
155:3 186:11
226:14
**claim (19)**
9:19 34:16,17
34:19 36:4
52:14,17 73:7
105:5,14
109:25 120:25

124:25 176:2
176:7,23
182:16 213:16
216:18
**claimed (3)**
17:11 64:12
209:22
**claiming (3)**
71:9 176:13
211:13
**claims (25)**
16:1,3,14 17:1
17:12 46:8
49:23 92:2,9
92:10 100:20
100:22,25
120:18 125:20
151:10 164:20
164:24 171:17
203:15,17,18
203:21 216:16
223:9
**Clan (1)**
213:9
**clarification (2)**
109:19 128:8
**clarify (7)**
22:21 38:12
40:25 72:5
74:14 78:24
91:14
**clarity (1)**
172:18
**Clark (2)**
11:8,18
**Clark's (2)**
12:5 192:13
**class (2)**
24:25 25:6
**classes (4)**
25:1,2,2,5
**classic (1)**
55:11
**claw (1)**
117:1
**clawback (4)**
117:10,25 118:3
122:23
**clawed (2)**
116:9 125:18
**clear (5)**
133:23 134:1
160:8 182:2
199:7
**clearly (1)**
120:11
**Clerical (1)**
140:25

**clerk (1)**
88:22
**clerked (1)**
10:21
**client (15)**
29:5,6,7,9,12,15
29:24 41:12
115:25 123:1
149:11 185:23
186:9,16,17
**client's (1)**
112:18
**clients (14)**
29:3,21 30:8,13
30:16 31:1,5
39:25 40:2,6,9
114:20 123:11
**clinical (1)**
14:19
**close (2)**
127:25 133:17
**co-chair (1)**
158:23
**co-counsel (1)**
152:14 153:8
**coaching (1)**
217:14
**Coalition (35)**
2:9 7:21 35:6,17
36:6 37:20
101:10,23
111:22 112:3
114:1,7,15
115:12,22
116:18 119:17
119:21,24
120:8,13
121:6,17
135:1,10,18
177:1 186:25
190:5,10,17
190:21 191:14
194:3 216:4
**Cockrum (3)**
213:20 219:20
219:23
**code (19)**
3:18,19,20,21
12:16 44:8,12
44:23 45:18
45:20 46:20
46:23 47:19
47:21 48:7,9
53:23 54:18
226:14
**coercion (1)**
214:9

**colleague (2)**
59:23 177:10
**collected (4)**
11:21 79:19
220:4 222:20
**collecting (5)**
28:15,21 65:1
162:3,11
**College (1)**
10:1
**Cologne (1)**
10:5
**Colorado (1)**
80:24
**colored (1)**
70:20
**column (1)**
108:24
**come (9)**
38:14 63:5
71:21 73:22
84:23 125:5
125:16 143:18
206:5
**comes (2)**
74:3 154:2
**comfort (1)**
175:5
**comfortable (1)**
116:1
**coming (7)**
5:24 12:7,19,24
13:16 20:13
213:2
**comment (7)**
60:10 126:17
189:2 195:9
200:13 202:8
202:9
**commented (1)**
106:10
**commenting (1)**
199:8
**comments (5)**
106:13,20
124:22 139:24
188:5
**commission (...**
5:17 6:5 83:3
104:17,22
129:25 130:2
130:7 154:16
155:11,22
158:11,14,16
158:17,17,20
158:25 159:2
159:6,8,10,11
159:14,23

160:4,10,12
160:13 161:7
164:16 167:17
176:15 178:8
179:1,7,8,24
196:8 200:2,9
204:22,25,25
205:2,5,7,8,13
205:16
**commission's ...**
104:22
**commissioner...**
96:18 145:9
165:22
**commissioner...**
158:21
**committed (8)**
164:22 176:14
184:8 186:12
186:12 210:7
211:13 223:4
**Committee (3)**
18:5 159:4
178:4
**committing (2)**
183:9 188:11
**common (2)**
92:14 162:18
**commonwealt...**
75:5 132:13
134:19 142:4
198:21
**communicate ...**
14:8 15:1 92:20
92:24,25
**communicatio...**
39:18 41:4
43:23 111:14
113:16,25
114:3,5
147:24 149:20
151:9
**communicatio...**
12:1 30:15 38:6
38:9 39:2,24
98:18 103:7
103:20,24
108:21 110:12
110:15 111:20
112:1,2
114:13,14,20
115:5,11,12
115:20 116:16
119:16,20,23
120:13,17
121:6 145:23
146:11 147:14
174:14 178:4

190:4,9,16
213:17 215:1
220:7,10
**communities (...**
21:7,22
**comparing (1)**
204:5
**compensated ...**
38:10,11
**complaint (11)**
90:12 91:5,6
96:13 135:11
192:3 208:25
216:22 217:3
218:3,12
**complete (3)**
56:23 97:6
145:12
**completely (1)**
21:21
**Completion (1)**
227:3
**complicated (1)**
185:22
**complied (1)**
13:13
**composition (1)**
159:6
**compound (2)**
63:25 183:12
**computer (1)**
107:17
**con (1)**
44:18
**concern (3)**
20:21 158:13
160:14
**concerned (10)**
14:13,14 158:19
159:25 160:2
160:10,17
161:5 172:13
203:13
**concerning (7)**
14:15 28:12
44:16,17,18
44:19,21
**concerns (18)**
19:7,11,14,17
19:22 24:8
57:1,3 157:18
157:22 158:4
158:22 159:1
159:2,16,19
160:3,9
**conclude (1)**
148:24
**concluded (1)**

224:5
**conclusion (2)**
16:5,19
**conclusions (2)**
15:22 16:10
**conclusive (1)**
106:8
**conditions (1)**
95:16
**condolences (2)**
137:23,25
**conduct (1)**
14:24
**conducted (2)**
16:6 27:12
**conducting (1)**
13:10
**conferred (1)**
125:15
**confess (3)**
74:6 145:3
168:19
**confidence (1)**
158:9
**confidential (8)**
43:18,20,23
44:5 101:8
119:16,20
121:6
**confirm (3)**
75:22 98:20
169:17
**confirmed (2)**
169:24 170:3
**confused (1)**
215:6
**conjunction (1)**
160:11
**Connecticut (1)**
48:21
**connection (8)**
39:3 105:4,13
110:21 111:2
127:14,25
207:23
**connects (2)**
214:10 216:12
**consecutive (1)**
166:16
**consider (8)**
20:24 28:21
30:10 43:19
106:8 197:9
222:23,25
**considered (5)**
43:17,20 94:6
179:6 223:5
**consistent (4)**

127:2,11 133:15
159:3
**consistently (1)**
13:6
**consists (1)**
191:13
**consortium (2)**
204:4,5
**conspiracy (4)**
53:22,24 54:17
54:19
**conspiring (3)**
53:20 54:15
55:2
**constitute (2)**
53:18 54:12
**Constitution (1)**
213:13
**constitutional...**
24:25 25:1
**construct (1)**
157:9
**constructed (1)**
158:10
**construed (2)**
29:22 111:16
**consult (1)**
66:4
**consultant (3)**
36:12,18 38:7
**consulting (3)**
29:1 38:11
204:3
**contact (14)**
76:11 93:4,7,21
94:2 97:18
111:7,8
124:17 132:8
132:12,16
139:1 174:7
**contacted (14)**
40:16 93:13,23
95:7,11,14
97:14 121:24
122:1 124:19
134:18,23
139:3 170:16
**contacting (11)**
76:13 91:22
95:21,23
101:6 110:16
131:15,17
138:13,17
202:1
**contacts (1)**
122:3
**contain (3)**
103:20 113:16

162:19
**contained (3)**
98:17,23 183:16
**Containing (1)**
5:9
**contains (5)**
81:23 111:20
114:21 116:5
199:12
**contemplate (1)**
95:24
**contemplated ...**
214:13 216:14
**contemplatin...**
135:18
**contend (9)**
34:6 39:25
53:17 54:11
64:8,10,13
147:18 149:25
**content (2)**
163:11 216:6
**contents (2)**
111:19 222:21
**context (23)**
53:10 55:20
146:1 156:1
157:4 158:6,8
159:17,21
160:12 161:6
184:2,5,7,13
184:23 185:7
185:11 194:17
195:11 203:15
212:21,23
**context-specif...**
55:9
**contextual (2)**
157:10 185:2
**continued (5)**
4:1 5:1 6:1 97:8
145:13
**continues (1)**
99:19
**continuing (6)**
39:22 79:21
113:13 114:22
116:6 220:1
**conversation (...**
37:8,12 40:12
43:17 44:5
220:5
**conversations...**
30:12 45:3
101:3 135:13
135:16 153:1
214:23 215:8
216:7 220:14

**conveys (1)**
194:9
**convince (2)**
37:19 206:4
**cooperate (2)**
86:13 87:3
**cop (1)**
195:24
**copied (1)**
203:10
**copies (9)**
26:22 27:18
94:23 108:11
118:12,21
123:20 195:25
207:15
**copy (11)**
45:18 46:20
47:19 48:7
64:16 70:13
90:11,15
118:15,19
223:24
**correct (176)**
11:1,6 12:12
17:20 23:8
24:1 26:15,16
26:20,21 27:1
27:21,22 31:6
32:24 33:3,10
33:17 37:1
39:4 41:19
43:6 44:1,7
47:1 49:9,10
56:9,19 57:20
61:14,15
63:17 65:10
71:10 74:13
74:23 77:10
77:11,16,25
78:18,24 79:9
79:10,14 80:2
80:11 82:6
83:1 87:19
89:9 90:6,10
95:13 99:20
99:23 100:1
100:14 101:25
103:3,8,21,22
105:3 106:18
108:5,22,23
109:2 110:22
110:24 111:4
111:5,10
112:15 114:4
114:9,17
115:15 117:20
117:25 126:9

126:10,13
127:7,8,11,12
127:21,22
128:1,2,13,14
128:19,25
130:8,10,12
130:15,21
133:14,18,19
134:12 136:17
137:6 138:8,9
138:22 139:10
140:9,17,21
141:9 142:21
142:23 147:16
147:17 148:8
149:24 151:12
151:15 159:15
165:17,20,23
165:24 168:9
169:1 170:1,5
171:1,8
172:25 174:16
174:16,19,25
175:3,22,25
176:2 178:14
178:16,23
179:19 180:3
180:17 182:20
188:7,21
189:1,9,10,21
190:12 191:18
191:21,25
194:1,4
196:23 199:14
201:24 205:3
205:24,25
207:2 209:1,2
218:22,25
219:3 223:17
**correctly (3)**
56:25 138:14
155:5
**corresponden...**
49:2,5 62:16,19
65:7
**corrupted (1)**
197:24
**Cortes (4)**
96:17,21 97:4
97:17
**counsel (63)**
2:1 3:23 9:14,16
13:1,5 14:18
18:4,6,9,10,13
21:25 33:12
33:14,16
34:10 35:4,10
35:23 41:11

45:9 49:7,9,22
49:22 51:21
83:13,19
101:3,5,14,19
107:16 113:12
113:17 119:19
120:7 125:14
125:14,14,15
134:8 151:9
175:4 207:22
213:23 216:19
217:19,20
220:5,8,10,11
220:11,12,18
223:11,12,12
223:12 226:19
226:20
**counsels (1)**
7:14
**count (3)**
39:12 166:19
208:20
**counts (1)**
10:3
**county (12)**
4:12,18 62:15
62:17 66:6
68:22,24 69:3
73:14 85:14
145:4 226:4
**couple (1)**
133:16
**course (8)**
9:12 13:7 40:11
105:22 118:14
146:25 152:15
160:25
**court (23)**
1:1 8:2 28:16
30:21 31:24
73:19 82:24
84:22 87:13
88:21 89:7
91:5,8,13
96:11 118:24
125:20 152:16
182:15 185:17
187:16,18
226:10
**courts (6)**
74:25 75:8 88:2
88:14,21 89:8
**create (1)**
155:4
**created (3)**
108:21 109:20
155:1
**creating (6)**

155:24 156:3
156:5,14
157:12 158:7
**creation (3)**
155:9,20 157:8
**crediting (1)**
104:23
**crime (2)**
53:18 54:12
**crimes (4)**
53:15,16 183:9
223:4
**criminal (10)**
14:13 25:2 52:1
52:6 53:12,23
54:18 55:17
55:22,22
**criminals (1)**
206:4
**critical (3)**
26:11 56:2
60:16
**crowd (1)**
197:16
**crux (1)**
172:17
**Cry (2)**
3:25 57:13
**CSR (2)**
1:18 226:10
**Curiae (1)**
4:20
**current (3)**
9:6 80:16
109:15
**currently (3)**
31:19 75:22
80:18
**Currier (1)**
73:17
**curtain (1)**
122:20
**cut (4)**
29:17 158:1
212:16 221:16

_____

**D**

**D (4)**
3:1 4:1 5:1 6:1
**D.C (3)**
2:17 12:9,11
31:20
**dangers (1)**
179:24
**data (9)**
5:17 11:25 80:8
154:17 158:12
182:25 203:14

**203:**20,21
**database (7)**
77:3 80:3,15,20
80:22,25
81:24
**databases (1)**
15:12
**date (19)**
7:6 9:3 36:22,24
57:16 85:4
95:3 130:13
148:13,14
149:14 152:3
158:18 191:23
192:9 201:3
205:8 217:8
224:2
**dated (28)**
3:14,22 4:9,10
4:11,13,14,15
4:16,19,22 5:5
34:1 51:20
61:7 68:22,25
96:23 102:11
139:8 149:19
151:3 161:16
196:7 200:2
208:18 225:4
227:9
**dates (3)**
101:4 181:6
210:1
**David (6)**
2:5 7:17 90:13
204:1 221:11
221:11
**David's (1)**
204:19
**day (18)**
20:20 21:23
23:21,21,22
23:23,23
148:14 150:21
151:13 168:23
174:12,17,18
175:24 208:24
216:21 218:3
**deadline (1)**
120:15
**Dear (1)**
73:17
**debate (1)**
111:25
**debunk (2)**
110:16 127:16
**Debunked (2)**
5:15 143:16
**debunking (6)**

**110:**21 111:2
127:14,17,19
127:25
**decades (1)**
41:18
**decides (1)**
72:10
**decision (2)**
156:9,24
**declared (1)**
70:4
**declaring (1)**
131:12
**decline (1)**
121:3
**deeply (1)**
188:12
**defamation (3)**
171:18 176:2,7
**defamation/c...**
152:13 153:7
**defects (1)**
198:23
**defendant (6)**
1:10 2:14 7:13
25:20 210:23
218:17
**defendant's (2)**
35:10 96:12
**defendants (9)**
7:25 8:15 37:13
40:16 59:10
83:16,20,21
84:16
**defense (48)**
3:7 4:4 5:4 6:4
32:15 33:22
34:24 38:19
45:13 46:12
47:2,14 48:2
48:14 51:15
57:8,24 61:2
61:19 67:4,9
67:14,21 68:2
68:7,12 82:14
89:23 98:13
99:3 102:4
103:10 108:13
110:7 119:8
136:2 143:11
154:11 161:12
163:17 181:2
185:24 186:11
186:11 187:24
191:7 196:2
199:18
**defenses (3)**
96:12 120:18

**185:**24
**defined (2)**
47:8,9
**definition (3)**
47:3 55:11
77:18
**degree (7)**
10:2,6,8,11,15
16:16 41:15
**degrees (1)**
181:17
**DeKalb (2)**
73:14,19
**deletes (1)**
121:4
**delighted (1)**
193:11
**demanding (1)**
52:1
**Demands (2)**
5:17 154:16
**democracy (31)**
2:9 7:20 14:10
35:4,16 36:6
37:19 101:9
101:24 111:21
114:2,8,16
115:13,22
116:18 120:9
120:14 121:18
177:1 187:1
190:6,11,18
190:22 191:15
193:25 195:6
204:10 213:24
216:5
**democratic (3)**
12:21 18:4
178:4
**Demos (2)**
136:25 137:1
**Deniers (2)**
6:6 196:8
**denigrating (1)**
186:9
**department (...**
4:16 23:1,6,10
24:3,15,18
26:11 52:1,15
53:3 56:3
58:24 77:23
80:4,14 81:6
84:23 96:19
131:24 132:8
132:9 136:17
136:20 144:1
144:10,25
145:1,10

**155:**2 197:22
204:2
**depend (3)**
53:10 78:5
157:10
**depending (5)**
15:3 42:9 65:2
184:5 223:8
**depends (14)**
29:7,7 42:7
55:17 63:18
76:19 79:7,17
79:18 81:8
184:13,23
185:7,11
**Depo (1)**
7:6
**deponent (7)**
2:19 3:3 7:23
185:19,19
225:6 227:5
**deposition (42)**
1:14 3:13 7:8,12
8:4 26:20
32:22 52:22
68:18 98:5
107:16 108:2
108:6 116:12
117:16 121:11
124:2 125:17
154:7 165:23
175:4 180:22
187:13 195:21
199:9 211:10
217:22 220:8
220:12,19
221:19,22,25
222:3 223:17
223:23 224:2
224:5 226:1
226:22,24
227:3
**deputy (2)**
23:11,16
**derived (1)**
166:19
**describe (2)**
9:23 179:23
**described (2)**
79:25 216:11
**describes (1)**
46:1
**describing (4)**
30:24 112:24
127:1 162:12
**description (1)**
151:8
**deserved (1)**

**52:**6
**designating (1)**
29:21
**designed (1)**
20:13
**despite (1)**
93:21
**detail (2)**
73:2 169:14
**details (1)**
169:20
**deter (1)**
46:4
**determination...**
92:7 117:7,17
**determine (8)**
77:1 78:8 88:1
89:2 92:4,17
92:24 185:17
**determined (1)**
160:25
**determining (2)**
53:25 54:21
**developed (1)**
52:5
**development (...**
49:13 50:22
195:14
**developments...**
28:11 135:11
202:4
**develops (1)**
206:10
**Diego (7)**
4:12,18 62:15
62:17 68:22
68:24 69:2
**difference (1)**
186:13
**different (26)**
12:2 13:5,6 15:2
15:4 16:7,8
42:10 63:19
63:20 71:16
79:2 109:15
119:5 128:10
128:11 136:9
139:20 152:13
153:7 155:15
171:25 184:25
201:13 203:15
223:13
**Differently (1)**
160:1
**difficult (7)**
18:23 19:3 42:9
70:13 86:9,16
86:22

86:22
**difficulties (1)**
72:11
**direct (3)**
18:10 86:12
199:25
**directed (1)**
32:20,21
**director (2)**
11:23 213:13
**dis (1)**
186:2
**disagree (4)**
52:19 160:18
186:4 187:2
**disagreed (1)**
160:15
**disappeared (1)**
146:25
**disclaimed (1)**
144:22
**disclaimer (2)**
145:19,21
**disclose (1)**
222:4
**disclosed (2)**
209:22 222:21
**disclosing (1)**
212:1
**discouraging ...**
204:22
**discouragingl...**
205:7
**discovered (2)**
105:5,14
**discovery (4)**
59:9 120:15,18
121:11
**discredit (8)**
104:1,7,9,13,14
104:17,20
205:13
**discriminatio...**
24:7
**discuss (9)**
44:23 51:4
126:14 179:23
187:7,12
202:13 212:22
221:24
**discussed (10)**
51:9 95:19
127:15 163:8
179:16 199:9
212:13,20,23
222:1
**discussing (4)**
36:11 78:17

148:19 202:1
**discussion (5)**
27:2,6,11 42:17
124:8
**discussions (5)**
141:14,16,18
212:5 216:3
**disenfranchisi...**
161:2
**disgusting (1)**
197:1
**disheartening...**
21:11
**dismay (2)**
137:8,9
**disposing (1)**
80:20
**dispute (1)**
85:22
**disputing (3)**
73:9 85:16,23
**disseminated'...**
52:5
**dissemination...**
49:13 50:23
**distance (1)**
22:1
**distributed (1)**
20:6
**district (9)**
1:1,3 48:21
87:13 88:19
88:21,22,24
89:7
**disturbances (...**
22:6
**division (7)**
23:1,10,12 24:6
24:16 26:8
58:25
**divulging (2)**
38:5,8
**dlebowitz@ec...**
2:8
**document (101)**
5:21 15:24,25
16:2 17:4,18
32:19,21
33:15,21 34:3
34:23 38:18
45:12 46:11
47:13 48:1,13
51:14 57:7,23
61:1,18,22,25
63:4,10,11
64:16 65:7,11
67:3,8,13 68:1
68:6,11 70:19

82:13 89:22
96:9,16 98:11
98:12 99:2
102:3,8,23
103:9 108:12
108:19 109:20
109:25 110:6
110:10 111:19
112:7 113:14
113:15,15
114:21 115:4
115:6 116:5,9
117:1,10
118:4,12,16
119:7,15,20
120:4,25
121:3 123:7
136:1,7
141:19 143:10
154:10 161:11
163:16,21,21
165:3 180:15
180:18 181:1
181:10 187:23
191:6,11
196:1 199:17
199:22 207:15
208:17 210:6
212:25
**documentatio...**
81:14,18,21
**documented (2)**
144:19 197:20
**documents (40)**
3:8,10 5:5 17:9
24:18 26:17
27:17 32:14
34:6 37:18
61:25 62:1,12
63:4,17 65:21
66:24 67:20
68:19 82:22
90:2,7 103:5
120:7,11
122:16 123:4
126:17 142:2
174:11 199:24
207:18,23
215:8 220:4
220:22 222:4
222:8,10,11
**docx (1)**
179:13
**doing (11)**
43:5,9 64:17
99:25 110:2
118:14 124:4
125:1 133:23

149:22 180:1
**DOJ (11)**
4:5,7,7 26:8
57:17 58:6
61:8,9,13
152:15 153:8
**Dominion (1)**
27:11
**Donnelly (3)**
178:1,2,21
**Dorner (1)**
204:15
**dots (2)**
214:11 216:12
**down-ballot (1)**
12:23
**downloaded (1)**
28:3
**doxxing (15)**
211:16,18 212:5
212:10,19,20
214:10,16
216:11,25
218:7,15
222:24 223:1
223:5
**DPCC (1)**
178:1
**draft (5)**
180:1 181:9,14
182:16 208:6
**drafted (5)**
129:10 130:5,6
130:13 163:8
**drafting (2)**
49:4 179:16
**draw (1)**
178:7
**Dream (1)**
5:23
**Drew (1)**
9:17
**drew@bridge...**
2:23
**driver's (6)**
76:24 77:9,13
81:14,18,22
**dropped (1)**
20:17
**due (5)**
24:14 97:5
143:25 144:8
145:11
**duly (2)**
226:8,16
**duties (5)**
13:8,12 14:22
18:12 24:2

**duty (7)**
73:24 74:11
75:1,9 87:12
88:2,12

_____

E

**E (5)**
2:10 3:1 4:1 5:1
6:1
**e-mail (98)**
3:14 4:22,24 5:5
5:9 30:9,12,15
30:23 31:4
90:3,8 93:1,4
93:14,22,24
96:16,23
97:17,18,20
97:22 99:16
99:21,24
100:6,10
102:10,13,16
102:25 108:24
108:25 109:3
109:4,8,11,13
129:7,11
130:5,6,13
136:13 137:3
137:21 138:2
139:8,15,18
141:19 146:5
147:12,13,14
151:5,25
152:9 165:21
166:14,22
167:1,25
168:6,22
170:3 172:9
173:7,17
174:10,21
175:14 177:6
177:14,16
179:11 180:11
191:13,19
194:24 199:25
200:1,5,8,20
201:18 202:6
202:19,23
203:8,11
205:18,23
213:6 219:6
219:11,13
**e-mailing (2)**
90:7,15
**e-mails (32)**
4:23 5:13,25 6:7
29:21,25
35:19,24
98:17,22,22

99:9,11 105:2
109:15,17
128:23 138:5
138:6,7,10
149:19,21
165:11 168:11
168:16 177:25
178:21,24
200:20 211:1
221:21
**earlier (7)**
109:5 136:21
165:10 165:23
175:24 177:15
199:9
**early (3)**
19:12 85:3
206:8
**ease (1)**
157:16
**easier (5)**
39:12 62:8
166:20 213:5
222:1
**EASTERN (1)**
1:3
**economic (2)**
14:14 214:10
**economics (1)**
25:7
**Ed (1)**
221:12
**Edgardo (1)**
96:17
**editor (1)**
168:18
**edits (1)**
168:24
**educational (2)**
9:23 10:3
**effect (2)**
186:4 226:12
**efficient (1)**
123:19
**effort (4)**
206:6,19,21,25
**efforts (3)**
18:21 20:1
182:1
**eh (1)**
202:23
**either (23)**
9:20 16:25
18:20,20
19:17 20:18
28:16 35:16
35:22 59:24
60:18 65:25

85:3 86:12
117:13 118:22
131:23 133:3
134:8 145:1
172:19 186:20
213:15
**elaborate (1)**
170:11
**ELB (1)**
167:6
**elect (1)**
12:21
**election (35)**
15:5 20:20 21:8
21:23 25:3
26:5 28:11,12
44:18 51:24
52:14 56:13
56:18 59:25
63:19 83:2
86:13 87:3
90:19 91:10
92:12 100:16
104:18 139:16
140:3 164:15
167:7 173:8
173:11 177:11
178:8 182:8
200:1,9
203:16
**election-relate...**
202:4
**ElectionLaw...**
139:19
**elections (19)**
4:6,16 14:15,21
16:12 17:6
58:6 73:15
96:19 131:24
132:9,10
144:1,10,25
145:1,10
165:22 181:17
**Electoral (3)**
129:25 179:1
205:2
**elements (3)**
176:1,6,23
**eligibility (3)**
13:9 15:5 44:17
**eligible (19)**
18:15,21,23
19:3,16 73:20
161:5 188:23
189:3,4,4,5,6
189:7,13,18
189:20,23
190:23

**else's (3)**
177:4 183:23
212:7
**Email (1)**
5:7
**embargoed (2)**
94:23,24
**embarrassme...**
222:9,12,15,17
222:22,23,25
**Emery (2)**
2:5 7:17
**Emily (3)**
201:18,25 203:3
**emphatically ...**
146:9 160:23
**employed (2)**
10:18 25:4
**employee (1)**
226:18
**employment (2)**
9:23 24:7
**encompasses (...**
214:10
**encounters (1)**
72:11
**ended (1)**
18:22
**ends (1)**
121:12
**enforcement (2)**
80:19 162:17
**engage (1)**
186:21
**engaged (1)**
60:14
**engagement (...**
29:10,12,13,20
29:22,23 30:1
30:5,17 31:5
192:18
**engaging (2)**
117:12 123:12
**ensure (2)**
14:9 18:14
**ensuring (1)**
13:13
**entail (3)**
157:22 181:25
182:1
**enter (2)**
121:3,14
**entered (5)**
147:18 148:2,4
149:25 150:3
**entire (1)**
205:23
**entirely (2)**

170:6 200:7
**entirety (1)**
188:22
**entities (1)**
222:6
**entitled (22)**
3:23,24 4:5,7
5:14,16,18,21
5:23 6:5 34:8
49:23 51:20
58:5 61:8
72:12 85:12
102:24 143:15
150:23 181:20
196:7
**entity (3)**
204:3,10,10
**entries (3)**
35:14 39:1
174:14
**entry (4)**
39:17,20 41:3
151:1
**equipped (1)**
19:10
**equivalent (1)**
64:23
**Erickson (2)**
144:18 178:12
**errors (2)**
140:25 223:17
**escape (1)**
151:23
**especially (1)**
13:4
**ESQ (4)**
2:5,10,15,20
**essentially (4)**
21:3 22:24 25:6
220:6
**establish (4)**
156:25 176:6,23
204:4
**established (7)**
130:2 147:22
148:7,19
149:15 171:23
211:23
**et (3)**
170:24 171:3
195:9
**evaluate (1)**
43:21
**Eve (6)**
5:21 179:12,17
180:14 181:9
188:4
**evening (2)**

167:19 168:7
**event (6)**
22:5 33:9 62:10
177:23 178:6
178:7
**events (3)**
19:22 109:14,15
**eventually (1)**
197:25
**everybody (2)**
50:4 62:7
**Evid (1)**
5:6
**evidence (6)**
8:5 102:24
176:5 186:19
187:6 219:8
**exact (2)**
85:4 95:3
**exactly (10)**
21:3 22:11 85:2
130:4,16
153:20 155:7
156:12 170:18
176:21
**exaggerated (1)**
64:11
**examination (2)**
8:10 16:4
**examine (1)**
88:25
**examined (2)**
3:3 226:15
**examining (1)**
13:11
**example (12)**
19:5 20:5 30:22
31:7 44:2,4
76:21 77:14
81:5,12
120:21 145:19
**examples (2)**
18:25 71:6
**exceedingly (1)**
90:23
**exchange (11)**
29:25 30:15,23
102:11,13,16
147:12 152:1
152:3 177:15
179:11
**exchanged (5)**
29:21 35:20
99:11 101:9
175:23
**exchanges (7)**
5:7 30:9 102:25
136:13 166:14

180:11 191:13
**exchanging (1)**
168:11
**Exclusive (2)**
4:5 58:5
**Excuse (1)**
59:20
**excused (1)**
75:9
**executive (1)**
213:12
**exercises (1)**
162:13
**exercising (2)**
53:21 54:16
**exhaust (1)**
21:18
**exhausted (1)**
158:3
**exhibit (182)**
32:8,11,13,20
32:22 33:19
33:22 34:1,22
34:24 35:3
36:25 38:15
38:19,23 39:7
39:9,10,14,15
44:25 45:11
45:13,18
46:10,12,20
47:12,14,19
47:24 48:2,7
48:12,14,19
51:13,15,19
52:22 57:6,8
57:11,22,24
58:3 60:24
61:2,6,17,19
61:22 63:23
64:16 65:12
67:2,4,7,9,12
67:14,18,19
67:24 68:2,5,7
68:10,12,21
68:24 69:1
70:2,12 73:13
74:15,18,20
82:12,14,17
82:22 89:13
89:23 90:2
92:21 93:3,6,8
96:10,11 98:3
98:11,13,17
99:1,3,9 102:2
102:4,8,22,23
103:10 108:9
108:13,19
109:5,6 110:4

110:7,10
118:25 119:3
119:3,8 121:9
121:14,16
123:24,24
124:16 126:7
126:25 127:20
128:4,4,5,17
135:22 136:2
136:7 139:6
143:9,11,15
145:7 146:4
146:25 147:1
150:25 151:17
151:24 154:6
154:9,11,15
161:10,12,16
163:14,17,21
166:11 174:13
174:20 180:21
181:2,9
183:21 187:21
187:24 188:3
191:5,7,11
195:18 196:2
196:6 199:16
199:18,22
200:17,23
207:25 208:9
208:12 211:9
213:3,3
216:24 218:5
**exhibits (29)**
3:5 4:2 5:2 6:2
32:7,15,19
66:10 67:21
68:17 82:3
91:24 95:8
97:15 98:2,19
99:12 102:17
103:19,25
123:15 124:24
125:16,17
131:9 138:7
166:3 190:8
223:2
**exist (1)**
20:12
**existing (1)**
91:14
**exists (2)**
20:8 64:10
**expect (1)**
43:7
**experience (9)**
69:14 71:1,7
72:4 73:22
78:15,19 79:3

194:14
**expert (1)**
84:16
**explain (2)**
42:19 185:15
**explaining (1)**
162:1
**explains (2)**
198:22 214:16
**explanation (1)**
42:13
**expressed (3)**
15:23 146:15
176:12
**expressing (1)**
137:9
**expression (3)**
137:8 186:2,24
**expressly (1)**
162:14
**extended (1)**
17:9
**extent (23)**
16:5,11,17 17:5
17:18 35:19
49:25 63:22
64:12 101:7
125:25 141:22
142:14 143:4
157:17 167:18
179:5 183:24
187:9 211:24
215:3 218:8
218:10
**Externally (1)**
51:8
**extraordinary...**
91:7
**extremely (1)**
19:13
**eye (2)**
26:14,14

**F**

**F (1)**
48:22
**F-L-I-P-R-O-...**
62:11
**Fabian (5)**
112:23 115:9,11
126:25 127:2
**face (1)**
111:25
**facilitated (1)**
157:18
**facsimile (1)**
70:13
**fact (52)**

37:10,17 59:12
63:16 64:10
71:19 73:23
74:24 76:5,15
81:4 85:19
94:7 104:9
105:9 106:15
107:13 108:25
120:6,12
122:1,3
126:21,21
131:7,21
134:4 135:2
143:24 144:7
146:19 148:20
150:19 154:20
165:10,11
167:20 171:15
173:11 174:6
188:23 190:14
190:16 194:9
195:15 202:13
207:16 212:9
220:9,15,16
222:6
**factors (1)**
157:10
**facts (15)**
18:22 19:2
55:18 120:16
120:19 121:8
129:1 147:22
171:6,23
203:20,22
205:24 209:14
211:22
**factual (1)**
164:23
**factually (1)**
203:14
**faculty (5)**
22:14,23 25:4
60:9 133:13
**failed (3)**
85:6 97:6
145:12
**fair (5)**
17:19 26:15
27:14 56:16
126:19
**fairly (2)**
62:4 207:4
**Fake (2)**
5:14 143:15
**false (2)**
131:1 176:13
**falsely (4)**
170:17 183:1,8

206:3
**familiar (23)**
25:20,24 45:22
46:22 47:5
56:10,12
58:11,14,15
58:20 59:7,15
80:5,12 84:8
84:10,12
87:15,17 93:8
93:10 161:18
**fan (1)**
193:8
**fancier (1)**
203:25
**fancy (1)**
203:6
**far (5)**
100:22,24 101:5
139:25 213:15
**father's (1)**
200:6
**fax (1)**
203:10
**fearless (1)**
197:4
**Featured (2)**
5:15 143:16
**February (5)**
11:13 57:11
139:9 140:8
140:18
**Fed (6)**
5:6 226:12,16
226:21 227:1
227:7
**federal (35)**
5:19 10:21
22:24 23:3,4
53:6,22 54:18
55:22 64:25
65:4,6,12,25
66:8 85:6
86:11,12 87:2
87:7 88:2,13
89:8 102:24
117:6 118:24
143:6 157:1
159:3 161:21
162:1,2,10,23
163:3
**feedback (2)**
30:22,24
**feel (3)**
116:1 174:3
192:4
**feels (1)**
56:25
**findings (3)**

**Fellowship (1)**
10:4
**felonies (6)**
164:22 176:14
184:8 188:11
210:7 211:14
**feloniously (1)**
183:1
**felony's (1)**
186:12
**Fessler (2)**
221:15,17
**field (2)**
56:13 60:1
**Fifth (1)**
2:6
**file (23)**
96:11 108:3,7
154:25 155:4
155:10,21,24
156:3,6,14,18
156:21,25
157:13,15,16
157:19,20,21
158:7,9,11
**filed (11)**
26:23 37:13
46:3 84:22
90:12 191:23
208:25 215:8
216:22 218:3
219:20
**files (2)**
83:6,8
**filings (2)**
24:17 212:6
**fill (1)**
58:23
**filled (1)**
71:21
**final (5)**
102:19,20
106:22 107:8
141:13
**finally (1)**
32:12
**finance (1)**
44:21
**financially (1)**
226:20
**find (11)**
86:11 87:1
90:18 92:2
131:21 132:9
132:13 134:20
138:14 210:9
213:5

106:2,6,8
**fine (4)**
108:8,8 125:7
136:4
**finish (1)**
118:9
**Fire (1)**
200:9
**fired (1)**
192:7
**firm (6)**
8:14 39:2 41:9
192:18 201:21
204:17
**firms (4)**
36:5,19 37:6
50:11
**first (50)**
7:16 8:25 23:14
25:19 28:3,20
32:7 36:24
37:11 39:20
47:2 53:21
54:17 58:15
58:17 59:3,24
67:2 68:21
69:1 90:11
97:21 99:15
100:5,12
109:11 121:21
121:23 123:9
124:15 128:4
136:10 139:6
152:11 162:14
162:18 164:13
177:17 180:1
186:5 192:8
193:7,14
199:24 200:9
201:14 209:3
213:19 215:15
226:16
**Fitton (1)**
27:10
**five (3)**
66:13,17 128:16
**flag (1)**
169:9
**flagged (3)**
92:15,16 169:15
**flavor (2)**
184:5 185:1
**flawed (1)**
188:12
**flipping (1)**
98:21
**Floor (2)**
1:15 2:6

**Florida (1)**
80:25
**Flower (1)**
1:15
**flyer (2)**
20:5,17
**focusing (2)**
15:5 24:6
**FOIA (2)**
64:22 133:3
**Foley (4)**
2:15 7:8,25 8:14
**folks (3)**
146:9 193:13
194:21
**follow (3)**
28:12 45:9
217:5
**followed (3)**
28:1 62:11
157:1
**following (13)**
10:17 27:23
28:1,5,10,19
39:22 45:8
69:11 99:19
174:18 184:23
198:11
**follows (5)**
50:19 94:15
144:5 172:4
218:1
**fomenting (1)**
47:10
**food (1)**
79:5
**force (3)**
5:19 161:21
226:11
**foregoing (3)**
225:1 226:23,24
**forgive (1)**
85:1
**forgotten (1)**
91:9
**form (17)**
4:12,17 69:2
70:5,10,22,23
71:20,22
81:14,17
93:22 100:10
119:12,14
144:11 181:22
**formal (1)**
29:20
**former (5)**
4:7 61:8 84:6
155:2 204:2

forms (16)
19:5,16 77:12
93:2,5,20 94:3
140:24 142:17
161:1,3
182:17 189:15
189:17 222:16
222:18
forth (6)
29:25 30:4,17
31:4 34:1
154:5
forthcoming (1)
135:7
Forum (1)
85:6
forward (2)
158:18 206:5
found (4)
87:11 164:10
166:21 208:19
foundation (18)
1:8 7:11 8:16
66:2 83:14,19
96:25 101:12
135:5 143:2
144:12 147:22
177:12 197:20
204:14 208:2
209:15 211:23
four (5)
10:1 127:20
128:16 147:7
196:18
foursome (1)
197:4
fourth (3)
39:13 128:15
204:18
frame (5)
97:7 145:13
214:6 215:17
215:21
framed (1)
21:4
Francisco (2)
2:12 4:16
fraud (30)
5:18 6:5 15:14
15:19,25 16:11
16:3,7,7,8
49:14 52:3,6
52:14 53:9,13
53:18 54:11
92:10 143:15
161:20 167:18
181:13,16
188:12 196:8

204:20 208:22
209:4 211:16
fraud' (2)
5:14 50:24
Fredrickson (4)
213:8,11,12
221:8
free (1)
192:4
freedom (1)
89:1
Freeman (7)
113:23,25 114:4
114:5 127:9
130:20 193:19
frenzy (8)
182:22,23 183:3
183:14 185:10
185:12,20
186:15
frequently (2)
90:20 91:11
friend (1)
200:6
frightening (1)
20:4
front (6)
5:15 118:18,19
123:25 143:16
187:16
froze (1)
107:17
Fulbright (1)
10:4
full (3)
184:1 210:3
226:11
fully (1)
134:16
Fund (1)
204:10
funding (1)
204:10
funny (1)
194:9
furious (1)
211:7
furnished (1)
73:18
further (21)
16:4 51:9 75:13
75:19 87:9
112:6,11,12
115:18,18
123:3 129:14
134:7 142:13
170:11 179:7
180:10 199:8

210:19,21
223:7
FYI (1)
206:1

---
G
---
Gadju (1)
128:20
gain (1)
65:21
game (1)
123:13
GAO (2)
87:15,22
gap (1)
78:12
Garden (4)
27:19 207:16,20
207:23
Gathered (1)
151:9
general (9)
18:10 23:12,15
23:16,17
48:20 49:7
64:15 89:8
generally (7)
17:19 46:1
60:10 87:17
93:10 170:23
194:14
generically (1)
170:10
Georgia (1)
73:14
Gerald (1)
200:4
Germany (1)
10:6
getting (3)
44:6 174:2
197:19
giant (1)
193:8
give (10)
8:5 11:20 56:23
108:11 118:19
156:13 161:7
167:11 173:3
195:24
given (5)
55:18 78:6
159:11 176:14
227:1
go (21)
25:10 29:6
32:10 53:25
54:20 64:17

65:11 66:11
67:1 88:4,14
96:1 123:13
124:7,23
125:4 133:21
156:10 158:2
158:18 169:13
goal (1)
152:15
God (1)
8:7
goes (2)
153:13 197:15
going (35)
35:13 36:8
40:22 41:7,8
66:24,24 77:3
88:9 96:9,10
109:21 111:24
112:20 113:19
117:4,5,18,19
119:6 122:11
123:8 126:14
126:15 144:20
154:5 168:1
181:5 185:17
190:13 205:10
207:22 208:8
214:20 216:6
good (9)
7:4 8:13 49:19
66:10 154:3
156:18,22
175:5,7
GoogleGroup...
203:11
Gorman (48)
2:10 7:19,19
49:18,25 50:3
82:17,20
101:7 109:19
109:24 111:18
112:2,6
113:12,20
114:18 115:2
115:4 116:4,9
117:9,14
119:15,22
120:2,22
121:13,20,25
122:3,6 123:2
123:14,21
124:9,18,20
125:7,24
128:8,11
136:4 201:3,7
201:10,13,15
Gorman's (2)

112:17 123:10
Gotcha (4)
27:20 207:17,20
207:24
government (...
22:24 23:3,4
53:6 56:14,15
77:3,5 79:5
87:10 157:1
162:2,11,23
163:3 186:6
governments ...
198:12,14
grab (1)
192:7
Gracia (1)
128:20
graduation (1)
10:17
Graham (1)
221:12
graph (1)
170:22
graphic (2)
196:15 197:3
gratuitous (1)
109:23
great (3)
66:17 158:9
169:13
green (3)
77:14,17,20
grounds (1)
147:15
group (2)
202:6 203:19
groups (1)
186:3
guaranteed (1)
162:13
Guatemala (1)
178:13
guess (10)
16:6 27:15 63:8
63:9,14 97:2
137:4,11
147:10 215:9
guessing (4)
27:13 63:6
123:13 217:15
guide (2)
15:13 42:15
Gupta (8)
23:14 105:9
179:12,22
180:11 181:10
188:5 221:10
guys (4)

21:4,7 22:1
135:23

---
H
---
H-a-s-e-n (1)
59:16
hac (2)
31:22,23
Hako (1)
221:4
half (4)
193:10,21 194:6
207:17
handed (10)
32:18 33:25
35:2 38:22
45:17 46:19
47:18 48:6,18
68:16
Handwritten ...
4:16
Hans (4)
56:1 58:3
159:18 196:21
happen (7)
20:22 22:7
36:21 72:7
148:23 157:6
166:15
happened (11)
20:15 21:6
28:20 72:8,25
73:4,10 74:15
129:1 146:22
149:2
happens (5)
16:13,18 17:19
75:4 122:24
happily (1)
172:19
happy (6)
8:22 58:9 60:18
158:2 172:14
206:9
hard (1)
217:5
Harold (2)
2:20 7:22
Harris (1)
85:14
Harvard (5)
10:1,8,8,11
41:15
Hasen (13)
59:16,17,18
60:16 166:14
167:1,25
168:6,11

173:2,7 221:4
221:24
**he'll (1)**
197:11
**head (3)**
4:7 19:19 61:8
**heading (3)**
85:6,11 112:10
**headline (1)**
161:20
**headquarters ...**
12:10
**hear (3)**
134:23 172:2
192:1
**heard (6)**
73:4 100:7,11
100:13 134:20
167:12
**hearing (1)**
146:18
**heartily (1)**
198:17
**heavy (1)**
52:6
**held (1)**
56:13
**help (7)**
8:7 12:21
166:23 176:5
192:21 205:12
205:14
**helped (3)**
193:8,15 204:4
**helpful (2)**
108:1 119:18
**helping (1)**
134:11
**hereto (1)**
227:7
**hesitant (1)**
144:20
**hesitation (1)**
144:14
**Hewlett (2)**
204:14,14
**Hi (2)**
192:1 202:21
**high (2)**
9:25 10:1
**high-minded (...**
197:8
**highlighting (1)**
207:1
**highlights (2)**
206:7,20
**highly (1)**
55:9

**Hired (2)**
4:5 58:6
**Hiring (1)**
58:22
**history (7)**
5:11,12 105:18
105:22 162:4
163:2,5
**Hits (2)**
4:7 61:8
**hold (8)**
142:15 172:18
206:24 212:7
214:18 215:2
215:24 216:8
**holder (7)**
3:24 57:13
112:19 165:9
165:9 212:2
226:9
**holding (2)**
201:21 218:16
**holds (3)**
178:5 200:9
203:25
**home (2)**
164:21 210:5
**Homeland (2)**
80:4,14
**honestly (9)**
21:2 27:5 30:23
73:5 158:25
165:1 173:14
220:17 221:9
**hope (3)**
168:1 193:12
194:20
**hopefully (1)**
72:17
**horsemen (1)**
196:18
**hounded (3)**
193:9,20 194:6
**hours (1)**
19:14
**House (2)**
3:23 51:21
**Housing (1)**
79:5
**how's (1)**
185:20
**hundred (1)**
213:4
**hundreds (3)**
134:18,23,24
**hunt (1)**
188:12
**hyperlink (3)**

137:19,20
206:18
**hypothetical (1)**
54:7
**hysteria (1)**
141:14

---

**I**

**idea (5)**
142:1 156:18,19
156:22,22
**identifiable (1)**
223:3
**identification ...**
19:5,6 32:16
33:23 34:25
38:20 45:14
46:13 47:15
48:3,15 51:16
57:9,25 61:3
61:20 67:5,10
67:15,22 68:3
68:8,13 77:12
77:23 82:15
89:24 95:12
98:14 99:4
102:5 103:11
108:14 110:8
119:9 136:3
143:12 154:12
161:13 163:18
181:3 187:25
191:8 196:3
199:19
**identified (35)**
5:7 31:3 40:10
43:4 44:23
92:21 95:8,11
98:19 99:12
99:24 102:17
103:1,7,25
106:14 122:10
123:22 128:5
135:4 138:7
138:14,18
143:24 144:8
146:19 163:23
165:10 166:3
167:3,21
170:15,17
197:6 211:8
**identifies (2)**
84:19 96:18
**identify (4)**
7:15 62:5
119:19 166:23
**identifying (1)**
149:21

**ideologically (1)**
58:23
**ignored (1)**
198:2
**II (11)**
91:17,22,24
93:9 94:11,19
94:23 95:1,5,8
95:12
**illegal (1)**
186:22
**illegally (2)**
182:9,17
**images (1)**
11:22
**imagine (2)**
88:8,9
**immediately (1)**
121:22
**immigration (2)**
65:8 79:22
**immunity (3)**
46:6 110:1
223:10
**implemented ...**
156:10
**implicate (1)**
123:5
**implies (1)**
190:14
**importance (1)**
46:5
**impressed (1)**
205:10
**impression (1)**
216:16
**impressions (1)**
120:17
**improper (5)**
19:15 184:11
185:5 186:1
198:19
**improperly (1)**
71:22
**in-house (2)**
13:1 18:9
**inaccurate (6)**
16:15 17:12
71:25 171:11
171:15 193:16
**inaccurately (1)**
92:15
**inactive (1)**
31:19
**inapposite (4)**
157:4,24 158:6
158:8
**inappropriate...**

185:20
**Inauguration ...**
23:21,22,23
**incarnation (1)**
158:10
**inclinations (1)**
161:8
**inclined (1)**
134:3
**include (7)**
13:8,13 26:19
77:13 167:24
190:4 214:24
**included (5)**
19:21 27:17
28:13 141:23
144:19
**includes (1)**
163:24
**including (13)**
31:4 56:14 64:2
64:3 76:24
81:18 84:12
182:25 186:25
192:13 206:6
210:1 223:2
**incorrect (23)**
77:19 79:18
130:25 131:4
131:11,15,19
131:22 133:7
133:9,11,22
134:1,5,11,13
134:15,16
171:11,16
210:20 217:6
218:10
**incorrectly (5)**
71:18 92:15,16
135:3 184:8
**independent (4)**
10:4 20:9
153:22 159:5
**indicate (2)**
122:11 149:11
**indicated (12)**
70:25 71:18
74:4,19 80:15
93:19 94:3
132:19 161:4
165:6 173:25
189:17
**indicates (3)**
62:12 71:2
108:24
**indication (3)**
74:16 94:6
182:13

**indications (2)**
82:9 141:10
**individual (60)**
25:20 27:11
31:21 35:14
44:2,4 59:15
59:25 62:20
62:25 69:9
70:6,11,24
71:2,8,17,18
74:11,18
75:14,15,22
75:25 76:11
76:13,15
77:18,19,21
78:3,9,13 79:8
79:13,19
80:19,21
93:14,23 97:9
109:9 122:4
123:22 124:13
126:12 134:3
134:4 143:5
143:23 144:6
145:14 147:14
149:21 162:13
162:15 167:11
170:7 210:18
223:2
**individual's (1)**
62:17
**individually (3)**
32:20 34:17
209:10
**individuals (99)**
18:8,14,21,23
19:6,12 20:10
21:11,13,22
30:25 39:25
40:2,17,21
42:19,22,25
43:4,17 44:24
51:10 53:21
54:16 55:3
74:4 76:23
77:4 80:17
87:12 88:2
92:4,14,17
93:19 94:2,7
95:10,15
96:25 97:5
98:23 100:13
100:19 104:21
105:19 107:14
115:5 126:14
126:20 128:17
129:15 131:8

131:10,12,14
134:6,19,25
135:3,13,17
140:24 141:1
141:3 144:19
145:11 164:21
167:12,21
169:15 170:13
170:15,19,19
174:7 182:12
182:14,25
183:4,8 190:3
203:13 209:25
210:10,19
213:16 220:22
220:24 221:9
221:10,11
222:5,7,10,18
223:4
**individuals' (5)**
162:3,22,24
163:2,4
**ineligibility (1)**
182:13
**ineligible (1)**
19:7
**inflated (1)**
16:15
**info (5)**
124:17 173:3
210:24,24
211:14
**information (...**
3:8,11 5:10,12
41:13 52:5
64:3 65:3 72:1
73:18 77:1,1,6
79:19,21,25
81:4,5,23
88:22,23 89:1
89:2,6 111:9
114:21 116:5
120:2,3
130:10,15,25
131:4,7,10,11
131:12,16,18
131:22 132:9
132:13 133:7
133:10,11,22
134:2,4,10
139:23 142:6
142:15,16,17
143:20 144:15
144:21 151:9
165:6 167:11
176:13 182:24
183:4,15

184:7,25
185:1,2
188:10 209:21
210:1,7 212:2
214:12 216:13
223:1,3
**initial (5)**
94:5 109:8
139:15 193:9
193:14
**initially (1)**
109:18
**initiative (1)**
24:11
**initiatives (3)**
24:11,19,21
**inner (1)**
21:5
**inquire (1)**
134:5
**inquiring (1)**
126:22
**inquiry (4)**
122:11 124:12
201:22 202:5
**inspection (6)**
3:9,11 183:17
184:11 185:5
185:9
**instance (3)**
106:18,19
160:24
**instances (8)**
16:24 17:10,11
17:16 22:6
160:20 198:23
199:4
**instruct (2)**
45:5 112:20
**INSTRUCTE...**
6:10
**instructing (1)**
116:23
**instruction (5)**
36:14 45:8,9
113:2,11
**instructions (1)**
71:20
**integrity (6)**
104:18 129:25
164:16 178:8
179:1 205:2
**intended (2)**
18:24 128:22
**intent (11)**
53:20 54:1,15
54:22 55:17
174:24 175:18

176:1,6,10,12
**intention (1)**
122:17,23
**intentional (1)**
18:21
**intentionally (1)**
40:7
**interact (1)**
87:6
**interest (11)**
1:8 7:10 8:15
28:23 83:14
83:18 90:18
96:25 146:15
197:19 208:2
**interested (9)**
28:10 88:19
90:21 112:11
115:18 126:23
132:19 139:16
226:21
**interesting (3)**
90:16 91:1
152:12
**Interests (1)**
84:2
**interfere (1)**
211:24
**interference (1)**
116:12
**intergovernm...**
22:25
**interpose (1)**
45:4
**interposed (6)**
34:11 36:10
41:9,10,11
45:4
**interpretation...**
185:25 215:7
219:5,15,18
**interpreted (1)**
169:18
**interpreting (1)**
169:10
**interrupt (1)**
29:18
**interruption (2)**
25:8,18
**intimidate (3)**
53:20 54:16
55:2
**intimidating (4)**
20:4 21:9,16,22
**intimidation (7)**
19:18,24,25
22:6 214:9,12
216:14

**introduction (1)**
25:7
**invade (3)**
34:7 36:13
148:20
**invades (4)**
36:9 45:1
116:21 214:25
**invading (6)**
51:7 149:3,10
149:13 150:10
177:4
**invasion (29)**
91:16,17,22,24
93:9 94:11,19
94:23 95:1,5,8
95:12 97:15
97:24 98:19
99:13 102:18
106:11 110:17
131:9 138:8
141:20,22
144:16 165:3
167:4,21
170:16 207:13
**investigate (2)**
76:14 167:17
**investigated (2)**
17:16 52:15
**investigating (...**
53:8 55:23
**investigation (...**
49:12 50:21
51:10 52:7
53:5,15,23
54:19 55:17
55:21 75:13
75:20,23,25
151:10
**investigations...**
52:1 53:12
**investigatory ...**
176:16
**invitation (1)**
140:3
**invocation (1)**
150:6
**invoked (1)**
218:16
**involve (2)**
101:18 182:1
**involved (7)**
20:5 177:11
178:3 206:6
206:15 209:25
222:7
**involvement (2)**
53:3 186:18

**involving (3)**
27:3,20,21
**IRS (2)**
3:23 51:21
**issue (6)**
27:19 91:16
111:25 117:5
118:23 124:10
**issued (2)**
35:7 226:10
**issues (9)**
26:15,16 56:17
56:19 100:17
125:20 178:8
185:16 186:6
**italicized (1)**
52:3
**items (2)**
172:23 178:11

_____

**J**

**J (17)**
1:9 2:15 7:11,24
8:16 25:21
51:19 57:12
58:4 84:7
164:14 173:18
177:8 188:9
201:23 202:2
202:10
**jail (1)**
20:10
**Jane (4)**
200:20 202:20
206:2 221:4
**JCA (2)**
164:19 177:18
**JD (1)**
10:8
**JDs (1)**
10:16
**Jean (1)**
204:11
**Jeremy (1)**
168:17
**Jersey (3)**
9:5 27:20 31:18
**JL10 (1)**
189:2
**JoAnn (2)**
1:17 226:6
**job (1)**
22:4
**John (3)**
55:25 178:1
182:21
**Johnson (1)**
97:1

**join (9)**
49:17 54:6 64:1
65:16 71:15
72:21 76:18
93:17 140:4
**joint (1)**
10:15
**Jones (1)**
173:19
**Josh (3)**
168:16 172:10
204:15
**judge (4)**
10:21,22 117:6
117:18
**July (30)**
4:15 5:5 102:11
161:16 163:25
166:13,13
167:15,24
168:10,15,23
169:3,23
170:14 172:9
173:1,16
174:18,21
175:15 177:7
177:13,14,15
177:25 179:11
180:12 196:7
200:2
**June (30)**
4:9,16 14:1,2
22:13 36:23
51:20 62:14
62:21 100:6
100:22 138:3
138:11,17
139:4 146:5
146:17 147:11
148:9,16
149:19 150:21
151:3,25
152:5,9,10,20
154:15 156:24
**jurisdiction (4)**
63:24 70:21
76:20 89:1
**jurisdictions (2)**
18:16 19:8
**jurors (3)**
88:3,12,13
**jury (58)**
73:18,24 74:5,9
74:11 75:1,9
87:12 88:2,12
**justice (58)**
2:9 7:21 13:22
13:25 14:5,13

14:14 23:1,6
23:10 24:3,12
24:18 26:11
35:5,6,17 36:7
37:20 52:1,15
53:3 56:3
84:23 101:10
101:23 111:22
112:3 114:1,7
114:15 115:13
115:22 116:18
119:17,21,24
120:8,14
121:7,18
135:1,10,18
136:17,20
155:3 177:1
187:1 190:5
190:10,17,22
191:14 194:3
197:22 204:2
216:4
**Justice's (1)**
58:25
**Justin (17)**
1:14 2:19 3:4,17
5:6 7:13,23
9:2 35:7 38:17
38:24 39:18
102:24 137:23
155:1 197:9
224:2
**justinlevitt@l...**
90:5
**justinmlevitt...**
90:4

**K**

**K (1)**
2:16
**Kanani (5)**
113:4,7 114:11
114:14 127:5
**Kansas (2)**
80:25 182:14
**Karlan (3)**
213:9,11,14
**keep (8)**
18:21 22:1
49:19 50:4
122:15 187:18
193:11 206:9
**Keker (3)**
2:11 7:19
213:25
**Ken (2)**
196:20 197:3
**Kendall (1)**

18:8
**Kennedy (2)**
10:8,14
**Kenneth (3)**
84:7 159:22
160:17
**Kent (1)**
200:4
**kept (1)**
88:23
**kick (2)**
193:12 194:21
**kids (1)**
20:11
**Kimone (8)**
112:10 115:16
115:21 116:8
116:14,17
126:8,8
**kind (6)**
9:19 29:5 35:15
35:21 133:25
213:16
**kinds (1)**
203:16
**King (1)**
164:15
**Klan (14)**
186:1 211:19
214:6,7,13,19
215:17,21
216:10,14,18
218:18 219:5
219:15
**Klux (6)**
186:1 211:19
214:19 218:18
219:5,15
**knew (9)**
100:22,24 101:5
131:4,18
135:7 216:21
217:1 218:2
**know (195)**
8:13 10:2 11:12
11:20 17:13
17:13 24:20
25:22,22 27:5
27:25 30:9,18
30:18,23,25
31:13 35:19
35:21 36:3
37:2,8,22 38:8
39:9 40:13
41:9 43:13,21
44:19 49:3
51:6 52:24
54:8 55:9,12

56:24,24 57:3
59:22 63:14
64:20 65:19
73:1,5 74:6,8
74:10,14,18
74:21 75:4,6
76:9,19 77:14
78:2,11 81:11
81:13,21
83:18 86:2
87:5,20,22,24
88:7,9 89:5
95:10 96:21
96:22,22
97:16 98:2
101:1,4,16,17
103:12,16,17
103:19,21
104:19,23,23
105:18,20
106:1,23
107:8 111:17
122:24 123:15
129:10,12,14
129:14,17
131:17,19
133:21 134:7
134:22 135:6
135:17 136:18
136:19,22
137:12,20
138:19 139:2
139:3 140:1
141:24 142:3
142:8,16
143:23 144:6
144:14 148:1
148:4,7 150:2
153:5 155:24
156:15 157:20
158:3 159:1
160:1,9,9,19
160:19,21
164:6 168:20
168:21 170:18
170:18 174:3
174:6 176:8
176:20,23
178:3,5
183:11,24
189:3,5,6
190:24 191:2
192:9,11,23
192:24 193:8
195:1 197:11
199:13 204:12
206:12,13,18
206:23 209:19

209:20 210:12
211:13,23
212:12,17,24
213:15 214:4
215:9,16,20
215:25 216:1
216:3,24
218:5 219:10
219:21 220:1
222:13,19
**knowing (6)**
55:19 64:23
164:20,24
171:11,12
**knowledge (10)**
129:2 149:16
174:24 175:18
176:1,6,10
189:24 217:7
218:11
**known (7)**
20:2 80:4 93:9
197:10 203:20
203:22 218:17
**Kobach (4)**
82:25 158:23
182:6 196:21
**Ku (6)**
186:1 211:19
214:19 218:18
219:5,15

**L**

**L-E-V-L-O-Y...**
62:11
**labeled (5)**
92:19 206:3
211:16 216:25
218:6
**lack (1)**
156:2
**lacking (1)**
144:12
**Lacks (7)**
66:2 101:12
135:5 143:2
147:22 209:15
211:23
**Lake (1)**
9:10
**Lamar (1)**
164:15
**Lara (2)**
191:20 192:9
**Lardner (4)**
2:15 7:9,25 8:14
**large (1)**
19:9

**larger (1)**
200:24
**Larry (6)**
192:2 193:9,21
193:22,22
194:24
**late (3)**
10:22 85:3
120:9
**Latif (9)**
110:19 123:25
149:19,20
150:1,8,13,20
151:14
**Latin (2)**
1:5 7:9
**laugh (1)**
117:13
**law (84)**
3:16 8:14 9:8
10:8 13:23
14:20,20
20:19 22:5,15
24:25 25:1,3,4
25:5,7,7 26:5
27:3 28:11,11
28:12 32:3,21
33:5,6 34:2
35:8 36:5,19
37:6 38:16,23
39:2 40:11
41:15,17,18
42:12,14,16
42:20 43:9
50:11 56:18
59:23 64:21
64:25 65:4,6
65:13 66:4
80:19 86:12
90:8,22 91:3,5
91:14 99:25
100:15 133:13
133:16 139:12
139:12,16
140:3 148:10
148:11,17
149:22 155:2
162:17,20
167:7 173:8
173:12 186:13
186:17,17
213:14,14,25
221:10
**law-abiding (1)**
204:20
**lawful (2)**
21:21 185:18
**lawfully (1)**

21:14
**lawless (1)**
52:8
**laws (4)**
5:19 81:8 89:1
161:21
**lawsuit (9)**
46:1,3 185:17
185:21 191:23
206:7,15,16
207:14
**lawsuit's (1)**
185:22
**lawsuits-to-pu...**
202:24
**lawyer (6)**
40:11 136:16,19
152:13 153:6
153:9
**lawyers (6)**
4:5 9:18 58:5,23
58:24 114:6
**lead (5)**
30:10 40:5
141:1 210:21
222:12
**leading (5)**
20:20 27:10
135:15 204:20
222:9
**League (3)**
1:5 7:9 20:7
**leave (5)**
14:1 17:22 18:1
152:14 153:8
**Lebowitz (36)**
2:5 7:17,17
49:17 50:6
54:3 55:15
60:20 63:25
65:14 71:14
72:19 76:18
81:25 88:16
89:18 93:16
104:4,11
135:5 142:11
142:22 144:11
164:1,3,6,8
179:3 181:22
183:18 187:3
187:5 200:23
200:25 215:3
223:25
**led (4)**
159:6 197:24
222:15,17
**left (5)**
12:4,5 13:18,19

22:12
**leftist (2)**
58:23 197:9
**legacy (1)**
197:17
**legal (40)**
1:8 7:10 8:15
13:14 30:16
30:20 31:6
40:12,20 41:1
41:4,5,20,25
42:8,10,11,17
43:1,24 44:6
83:14,18
96:25 111:11
111:16 115:25
122:19 150:8
150:13 176:8
176:11 186:10
186:11 197:20
208:2 217:4
218:9,11
219:19
**legislation (2)**
14:7,25
**legislative (1)**
30:22
**legitimate (3)**
198:21 199:1,10
**Leider (2)**
90:13,14
**lengthy (1)**
62:4
**Lest (1)**
151:18
**let's (6)**
32:10 89:13
124:23 192:7
201:9 212:15
**letter (23)**
3:22 4:9,10,11
4:13,14,15,16
4:19 29:10,12
29:20,23
48:19 51:1,25
52:4,7,18,21
74:16 169:10
208:1
**letters (4)**
29:13 165:11,14
169:19
**letting (1)**
174:3
**Levin (3)**
168:16,23
172:10
**Levitt (23)**
1:14 2:19 3:4,17

7:13,23 9:2,3
35:7 38:17,24
39:18 41:13
41:15 96:9
125:15 137:23
155:1 197:9
197:16,18,21
224:2
**Levitt's (2)**
5:7 102:25
**Levy (6)**
173:17,19,24
174:6 221:5,7
**liability (1)**
216:9
**liable (2)**
214:18 218:17
**liberty (1)**
177:5
**license (7)**
21:20,24 77:9
77:13 81:15
81:18,23
**licenses (1)**
76:25
**lied (1)**
76:1
**life (1)**
152:15
**light (2)**
73:23 74:4
**limit (1)**
157:23
**line (9)**
6:11 113:14
122:21 127:5
129:4,7 186:7
200:8 201:22
**lines (5)**
19:13 113:15
120:1 123:16
221:4
**link (4)**
133:12 141:19
141:20 195:5
**linked (1)**
211:3
**list (12)**
5:10,12 15:11
24:20 56:23
91:10 132:18
139:13,17
143:25 144:8
144:19
**listed (5)**
93:1,4,24
107:14 174:10
**listening (1)**

146:22
**lists (2)**
84:2 87:24
**Listserv (8)**
139:15,19,22,25
140:3,4
205:24 221:21
**litigate (2)**
14:9 15:1
**litigated (2)**
90:20 91:12
**litigation (27)**
9:13 26:25
37:13,18
47:10 91:16
94:10,18 95:2
95:5,15,17,18
95:20,24
109:20 111:23
113:9 114:21
126:13,16
135:19 176:19
176:20 186:23
216:10 222:20
**little (2)**
70:13 217:5
**lived (1)**
168:6
**living (1)**
181:18
**LLP (5)**
2:5,11,15 7:25
8:14
**loan (1)**
22:22
**loath (1)**
170:22
**local (8)**
74:25 131:24
141:25 157:18
157:23 165:5
165:6,16
**located (3)**
12:8,10 18:4
**Lockerby (256)**
2:15 3:4 7:16,24
7:24 8:12,14
17:15 25:10
25:17 27:16
28:14 32:6,17
33:18,24
34:13,14,21
35:1 36:14,17
38:4,14,21
39:11,15,16
41:2,14 42:4
43:15 45:7,10
45:16 46:9,15

46:18 47:11
47:17,23 48:5
48:11,17
49:21 50:2,7
50:16 51:3,12
51:18 54:9
55:1,6,24 57:5
57:10,21 58:2
60:23 61:5,16
61:22 62:9
63:15 64:7
65:5,23 66:9
66:23 67:7,12
67:17,24 68:5
68:10,15
69:22 70:9
71:23 72:23
74:7 76:12
77:7 79:1,23
81:20 82:2,11
82:19,21
85:21 86:4
88:10 89:4,13
89:16,20 90:1
94:1,20,22
96:1,8 98:8,10
98:16,25 99:7
99:8 101:20
102:1,7
103:18 104:6
104:15 107:4
107:18,24
108:4,8,16,18
109:21 110:2
110:9 111:24
112:4,8,9,22
113:3,18,24
114:18,24
115:3,6,8
116:8,11,13
117:4,11,15
117:23 118:1
118:6,10,17
119:13,18,25
120:6 121:10
121:16,23
122:1,5
123:12,24
124:4,15,19
124:23 125:13
126:5,6
128:10,12
132:2,7 135:8
135:21 136:5
136:6 137:13
142:19,24
143:8,14
144:23 147:6

148:3,12,15
149:17 150:7
150:18 151:22
152:5,7 154:4
154:8,14
155:15,19
160:16 161:9
161:15 163:12
163:20 164:4
164:7,9 172:8
175:6,13
179:9 180:20
180:23 181:5
181:8 182:5
184:9,18
185:3,22
186:16 187:11
187:20 188:2
191:4,10
195:17,22
196:5 198:8
198:10 199:15
199:21 201:2
201:4,6,9,11
201:14,16,17
205:20,22
207:3,12
208:8,10,16
210:14 212:8
215:11 217:13
217:19 218:14
219:12 223:7
223:16,21
**log (21)**
3:15,16 35:3,12
35:14 36:24
38:16,23 39:6
41:3,5,24 42:1
44:25 147:2,4
147:8 149:18
151:19,23
174:13
**long (17)**
11:9 13:16,24
19:13 22:16
27:23 28:15
31:11 66:11
94:9,17 95:23
157:1,9
185:15 193:12
199:4
**longer (3)**
97:11 134:12
145:16
**look (48)**
26:18 35:23
36:1 48:23
64:4 73:12

82:3,7 84:1
99:15 102:10
110:19,25
118:22 119:10
123:15 126:7
128:3,15
136:10 138:2
140:23 145:5
146:3,24
147:7 150:25
151:16,24
154:22 163:24
166:7,10
168:5,22
172:9 173:16
174:20 180:10
188:8 190:2
191:19 197:2
202:19 212:15
213:2,3,5
**looked (5)**
103:5 109:4
152:10 165:22
219:6
**looking (5)**
70:2 100:20,21
133:17 175:14
**Lopez (6)**
112:23,25 115:9
115:11 126:25
127:2
**Loretta (1)**
23:18
**Los (7)**
1:15 7:1 9:9,11
10:24 22:15
226:4
**lost (1)**
170:23
**lot (10)**
154:24 156:9
157:3,10
158:5 174:2
187:15 214:5
215:16,20
**lots (3)**
21:20,23 168:2
**love (3)**
167:6 170:23
174:4
**Loverde (2)**
2:24 7:5
**lower (4)**
141:2,5,11,12
**Loyola (31)**
3:16 9:8 22:15
22:22,23 23:4
23:5 24:23

25:5 29:1,13
32:21 33:5,12
33:14,16,16
34:2 35:8
38:16,23
41:17 59:23
60:2,6 61:25
90:8 125:15
133:13 155:2
221:10
**Loyola's (1)**
33:16
**Luciania (6)**
113:23,25 114:3
114:5 127:9
130:20
**luck (1)**
174:2
**LULAC (2)**
192:22 193:1
**lunch (2)**
96:5 192:7
**Lynch (1)**
23:18

———————
**M**
**magnitude (1)**
16:8
**mail (1)**
139:20
**main (1)**
123:7
**maintain (2)**
60:13 162:24
**maintained (2)**
80:3 162:15
**maintaining (4)**
162:12,22 163:2
163:4
**maintenance (...**
87:23 91:11
198:20
**making (10)**
15:11 18:22
52:21 116:25
118:11 126:17
133:23 143:1
181:18 187:16
**malfeasance (1)**
18:20
**man (1)**
197:10
**management ...**
24:8
**manifest (2)**
35:20,24
**Manifold (1)**
14:6

**Manuscripts (1)**
60:9
**March (9)**
3:14 4:10,13,14
9:5 13:19 34:1
39:1 68:22
**margin (1)**
188:6
**marginally (1)**
185:16
**mark (7)**
51:22 66:24
70:16 96:10
98:8 124:24
208:8
**marked (107)**
32:6,11,12,14
32:18 33:19
33:21,25
34:21,23 35:2
36:25 38:15
38:18,22
44:25 45:10
45:12,17 46:9
46:11,19
47:11,13,18
47:23 48:1,6
48:11,13,18
51:12,14
52:21 57:5,7
57:21,23
60:23 61:1,16
61:18 63:22
64:16 65:12
67:3,8,13,20
68:1,6,11,17
68:17 73:13
82:11,13
89:17,22 98:3
98:10,12,25
99:2,10 102:1
102:3,9,22
103:9 108:9
108:12,19
110:4,6
118:25 119:7
135:21 136:1
143:8,10
145:6 146:4
146:25 154:8
154:10 161:9
161:11 163:14
163:16 174:13
180:20 181:1
187:21,23
189:15 191:4
191:6 195:17
195:20 196:1

199:15,17
207:25 211:9
216:23 218:4
**markup (1)**
188:5
**Mary (5)**
113:4,7 114:11
114:13 127:5
**Massive (2)**
5:17 154:16
**master's (3)**
10:7,13,16
**matching (1)**
204:19
**material (1)**
11:22
**matter (11)**
7:9 8:5 50:13
55:19 91:12
134:9 137:3
142:21 156:20
172:17 222:8
**matters (3)**
24:24 46:4
184:2
**mean (33)**
12:14 19:20,25
21:9 25:25
29:17 40:25
42:7,9,11,13
42:14,16 50:1
50:8 63:18
104:20 113:14
120:4 137:7
139:14 158:1
158:7 169:12
180:5 181:13
194:5,13
195:10,12
212:15 215:10
221:16
**meaningful (2)**
171:3,4
**means (9)**
41:20 154:4
171:21 172:6
194:15,17,19
214:24 217:10
**meant (8)**
24:7 165:12
169:13 180:6
181:15 194:16
209:16 212:4
**media (9)**
57:11 58:5,12
58:18 59:7,13
61:7 196:6
197:18

**meet (2)**
4:5 58:5 192:6
**Meeting (1)**
200:10
**Meets (2)**
6:5 196:8
**member (9)**
22:14,23 25:4
31:19,23
42:12 64:15
65:2,20
**members (4)**
27:13 60:9 84:2
84:20
**memory (1)**
21:4
**mental (1)**
120:17
**mention (2)**
167:14 170:9
**mentioned (6)**
59:3 138:12
169:19 174:1
204:17 210:5
**mentioning (1)**
135:2
**mere (3)**
184:10 185:4,8
**merely (1)**
55:19
**merits (2)**
194:15,18
**messaging (1)**
201:21
**methodology ...**
179:6,6 205:7
205:15
**methods (1)**
104:22
**Michael (5)**
2:15 4:7 7:24
9:2 61:8
**Michigan (1)**
213:25
**mid-2010 (1)**
14:3
**Mike (1)**
8:13
**military (1)**
57:1
**Milwaukee (2)**
20:6,7
**mind (8)**
32:9 95:18
122:15 134:1
176:9,20,24
187:18
**mine (5)**

147:5 148:22
149:4 152:25
190:25
**minimum (1)**
119:17
**minority (1)**
21:6
**minute (4)**
25:11 26:19
48:23 96:2
**minutes (2)**
66:13,17
**mischaracteri...**
219:8
**Mischaracteri...**
55:15 183:18
**misfired (1)**
194:9
**misinformed (...**
194:8
**mislead (1)**
20:3
**missing (1)**
163:10
**mission (3)**
12:19 14:4
158:16
**misstated (2)**
16:2 94:21
**misstatement ...**
183:21
**misstatements...**
20:19
**misstates (8)**
28:7 93:16
107:1 147:21
160:5 171:23
183:20 184:20
**misstating (1)**
20:9
**missteps (1)**
205:9
**mistake (6)**
18:20 70:4,8,11
71:17 108:11
**mistaken (1)**
76:2
**mistakes (1)**
141:11
**misunderstoo...**
71:20
**MIT (1)**
203:25
**mlockerby@f...**
2:18
**moderately (1)**
203:14
**modified (1)**

109:11
**molester (1)**
184:24
**moment (2)**
25:23 82:7
**moments (1)**
97:22
**Monday (2)**
139:8 194:25
**month (5)**
14:3 15:3 17:25
22:11 31:13
**months (1)**
15:4
**moral (1)**
184:4
**morning (3)**
7:4 8:13 168:11
**morning.' (1)**
137:24
**Morristown (1)**
9:5
**Mother (1)**
173:19
**motif (1)**
171:5
**motives (1)**
25:5
**motor (8)**
76:21 77:8,24
78:6,14,16
81:6,8
**Moving (1)**
114:10
**MTD (1)**
195:2
**Mueller's (1)**
192:6
**Mukasey (2)**
4:7 61:8
**multifaceted (1)**
192:17
**multipage (2)**
136:7 163:21
**multiple (2)**
188:11 199:23
**multistate (2)**
204:4,5
**myth (3)**
64:9,14 181:13

———————
**N**
**N (4)**
3:1 4:1 5:1 6:1
**N.W (1)**
2:16
**name (38)**
7:4 8:13,25 9:2

39:21 59:19
69:3 82:25
110:19,20,25
111:2 112:13
112:14,24
113:4,6,9,23
113:24 114:12
115:10,19
121:21 123:23
126:8,12
127:1,7,10,14
127:16,24
128:20 129:5
139:25 174:9
221:1
**named (11)**
41:25 44:24
59:15 105:19
124:11 128:17
166:1 220:22
222:4,6,18
**names (8)**
5:9,10,12 39:19
91:23 97:15
164:14,21
**narrative (1)**
197:17
**nasty (1)**
52:7
**national (28)**
18:3,5,6,13
21:25 49:9
65:17 129:16
129:21 154:25
155:4,9,21,24
156:6,14,18
156:21,25
157:13,19,19
157:21 158:7
167:17 176:15
176:16 181:16
**native (1)**
120:20
**nature (3)**
29:8 36:3
160:13
**NBC (5)**
200:21 201:22
202:2,14
206:2
**necessarily (8)**
15:16 21:9 24:7
103:6 132:5,6
181:25 186:3
**necessary (3)**
14:9 15:1 150:5
**need (14)**
34:17,19 66:13

107:16 117:15
117:16 118:23
124:9 125:22
187:5,10
206:17 218:12
223:13
**Needless (1)**
195:8
**needs (3)**
117:18 122:22
123:14
**neglect (1)**
197:24
**neighborhood...**
20:6
**Nest (3)**
2:11 7:20
213:25
**neutral (1)**
35:23
**never (11)**
17:4 74:17
97:24 111:11
140:5 151:23
152:15,17
153:14 169:23
172:23
**nevertheless (1)**
70:5
**new (14)**
2:7,7 9:5 13:22
27:20 31:18
31:18 90:22
91:3,5 164:14
180:15 200:10
200:13
**news (6)**
137:23 161:17
162:18 201:22
202:2,14
**newspaper (1)**
44:3
**next-to-last (1)**
38:25
**Ninth (1)**
10:22
**non (1)**
17:17
**noncitizen (24)**
17:17 63:23
64:3,8,11,12
64:13 69:11
69:16 70:7
72:2,10,16
75:14,15
77:13 79:11
81:14 97:6
143:25 144:9

145:12 178:13
178:22
**noncitizens (38)**
16:11,14,17,25
17:2,5,10,11
74:5 78:21
81:1,19 85:7
85:12 86:11
87:1 88:14
92:5,19
105:25 106:7
106:15,15
107:14 131:13
135:4 138:15
140:6,19
141:6,17
165:11 170:17
170:20 183:2
198:13,14
209:23
**noncitizenshi...**
62:22 71:5 82:6
82:10 88:3
169:15
**nonexpert (2)**
36:12 38:7
**nonpartisan (2)**
13:21 137:2
**nonparty (1)**
9:12
**nonprofit (4)**
12:6,13 13:21
137:2
**Norcross (1)**
90:13
**notation (1)**
113:25
**note (1)**
150:4
**noted (1)**
112:8
**notes (3)**
110:11 190:2,4
**notify (5)**
72:16 74:25
75:8 222:5,9
**notion (1)**
199:10
**notorious (1)**
20:5
**November (2)**
4:11 68:25
**number (28)**
7:11 24:17,17
24:17 26:19
56:17,19 62:4
62:5 63:16,19
81:7,12 82:17

88:12 120:5
140:6,19
141:3,6,12
154:6 163:23
182:7 192:12
203:13 205:8
226:10
**numbered (14)**
39:12 62:1,7
82:23 96:13
98:11 110:10
136:8 143:17
164:5 166:17
169:7 191:12
199:24
**numbers (6)**
62:2,11 132:18
166:15 210:4
210:4
**numerous (1)**
99:22
**NVA (1)**
185:5
**NVRA (12)**
90:17 133:3
141:23,24
142:5,21
143:1 183:17
184:11,15
185:5,9
**NYU (3)**
13:22 14:20
139:12

_____

**O**

**oath (1)**
75:18
**oaths (1)**
226:13
**Obama (9)**
3:24 18:4 20:16
22:9 49:8
51:25 55:25
57:12 197:23
**Obama's (2)**
4:7 61:8
**object (17)**
36:8 40:22 41:8
49:23 50:10
109:21 111:18
112:6 119:15
144:11 155:9
155:20 156:5
209:14 214:20
217:21 219:7
**objected (1)**
156:1
**objecting (1)**

116:21
**objection (87)**
17:7 28:7 34:4
36:10 38:1
41:9,10,11
42:2,3,5 43:10
45:1,4 49:15
49:17,19,25
54:3,23 55:4,7
55:14 60:20
60:21 63:25
64:18 65:14
66:2 69:18,24
71:14,15
72:19 73:25
76:6,16 78:22
79:16 81:16
81:25 85:18
85:25 88:5,16
93:16 101:7
103:13 104:4
104:11 107:1
109:23 111:13
112:8,16,17
112:21 113:1
113:10,12
119:2 120:10
124:14,14
132:1,4 135:5
142:10,11,22
143:2 147:21
149:8 150:17
155:12 160:5
171:22 179:3
181:22 183:11
183:18 184:17
184:20 185:13
209:17 211:22
214:25
**objections (9)**
34:2,11,16 50:5
101:13 119:4
119:6 126:1
211:25
**Objects (2)**
3:8,11
**obligated (1)**
34:8
**obligations (1)**
79:20
**obstructed (1)**
120:19
**obtain (4)**
77:9,13 142:25
143:6
**obtained (4)**
141:23 142:20
143:1 184:15

**obtaining (4)**
65:11 86:8,21
91:10
**obviously (3)**
126:12 194:19
195:23
**occasional (1)**
28:22
**occasionally (3)**
31:23 46:5
192:18
**occasions (2)**
106:21 107:6
**occurred (4)**
16:7,7 109:10
148:19
**occurs (1)**
15:25
**October (3)**
3:22 48:19 61:7
**offer (3)**
30:24 63:12
123:10
**offered (2)**
30:20 111:15
**offering (1)**
137:25
**office (2)**
87:10 88:21
**officer (14)**
8:4 98:5 107:16
108:2,6 124:2
154:7 175:4
180:22 195:21
204:9 217:22
223:23 226:22
**OFFICER'S (1)**
226:1
**official (8)**
19:17 70:8
77:22 125:17
145:2 155:3
165:9 204:2
**officials (14)**
53:3 65:25,25
66:6,6,8 72:17
77:5 86:13
87:3,6 141:25
145:4,4
**Oh (2)**
46:14 98:9
**Ohio (2)**
84:6,12
**okay (66)**
9:18 15:22
32:18 33:18
34:13 36:18
41:7 42:5 49:1

55:7 59:12
66:23 72:9
79:2 96:15
97:23 107:18
110:20 111:1
112:12,23,24
113:5,24
114:11 115:10
115:19 116:3
118:17 124:23
126:9,11,25
127:1,6,10,13
127:24 128:11
136:12 145:23
147:2,9 151:2
151:18,21
152:2,6 164:2
166:12,25
172:11,16
174:3 176:25
184:14 191:1
195:22 200:3
200:16,18
205:21 207:6
208:13,23
213:7
**Old (1)**
27:11
**older (1)**
78:13
**once (6)**
66:12,25 156:9
181:19 200:17
208:11
**one-on-one (1)**
30:12
**one,' (1)**
155:1
**ones (7)**
27:19 44:14,15
86:20 92:24
92:25 132:24
**online (1)**
210:8
**oOo- (1)**
224:6
**op-ed (2)**
179:25 180:19
**open (2)**
108:2,7
**opening (1)**
170:22
**opine (1)**
87:7
**opinion (3)**
16:20,23 157:7
**opposing (4)**
152:17 153:15

153:19,23
**opposition (1)**
52:9
**oral (1)**
153:1
**order (22)**
11:21 14:9
19:13 21:5
46:3 65:21
79:4 117:21
117:24 118:2
118:13,15,22
122:15,24
125:19 128:10
128:11 138:13
176:22 218:12
223:23
**organization (...**
12:10,15,15
13:11,13 51:8
136:25 137:2
164:20 165:12
192:15,20
**organizations ...**
186:25 213:16
**organized (1)**
12:16
**orientation (2)**
161:4 203:19
**original (2)**
109:3 139:18
**originally (2)**
95:14 188:4
**originals (1)**
125:18
**others' (1)**
211:24
**outcome (1)**
11:12
**outrageous (2)**
116:10,11
**outside (6)**
21:13 49:7
51:10 60:5
187:9 219:21
**overall (2)**
16:5,16
**overcharged (1)**
203:15
**overcome (3)**
155:25 156:15
157:8
**overheated (1)**
211:15
**overlap (1)**
26:7
**overseas (1)**
57:1

**Oversee (2)**
4:6 58:6
**overstated (3)**
16:2,9,18
**overwhelming...**
186:19
**owe (1)**
51:11

——————————
**P**
**P (5)**
226:12,17,21
227:1,7
**p.m (31)**
94:25 96:4,7
100:6 107:20
107:23 125:9
125:12 137:5
137:14 138:3
152:11,20
166:22,23
167:1,10,25
168:6 173:6
174:22 175:9
175:12,15
177:14,16
194:25 207:8
207:11 224:3
224:5
**page (77)**
3:3,7 4:4 5:4,15
6:4,11 38:25
39:13,20,22
39:23 49:12
50:22 51:23
51:23 69:1
70:12,15
74:16,20 84:1
84:18,19 85:5
85:5,11,12,13
86:5,5,6 87:9
98:20 99:15
99:19 100:5
102:10,19,20
109:6 114:10
115:16 121:5
121:23 124:15
126:24 128:15
133:13 137:4
137:21 138:3
141:2 143:16
146:5 154:23
161:25 163:24
164:3,7
166:15,20,22
168:15 177:6
178:12,20
188:8 193:3

196:14 197:2
197:15 199:25
201:7 204:18
208:17 213:4
**pages (20)**
67:16 119:3,5
119:19,25
122:16 128:4
136:9,10
139:6 147:7
151:25 164:4
168:3,5
177:24 179:10
196:25 203:7
208:20
**paid (6)**
209:13 210:12
210:16 214:5
215:17,21
**Palin (1)**
52:4
**Pam (2)**
221:15,17
**Pamela (3)**
213:8,11,13
**pan (1)**
16:3
**panel (3)**
27:7,12,13
**panelists (1)**
27:9
**paper (2)**
161:1 182:18
**papers (2)**
15:7,17
**Paperwork (1)**
163:7
**paragraph (21)**
129:19 130:23
133:12,20
140:5,10,22
141:8,13
169:8,8 170:6
170:21 181:12
193:7 198:3
198:11 199:12
213:19 214:3
215:16
**paragraphs (2)**
133:16 140:16
**paralegal (1)**
62:6
**parameters (1)**
55:21
**paraphrased (...**
162:1
**pardon (4)**
39:8 72:5 91:9

160:22
**parenthetical ...**
213:23
**parking (2)**
21:20,23
**part (22)**
22:4 27:5 50:8
52:25 53:2
93:3 97:23
109:5 171:4
177:14 183:25
197:16,23
199:6 203:19
210:4 211:18
216:23,23
218:4,5
223:18
**parted (1)**
11:14
**participates (1)**
80:7
**participation ...**
46:2,4
**particular (35)**
12:17 13:2
17:16 24:11
46:6 52:10
57:16 62:14
63:11 64:5
65:7 73:3,6
81:9 83:9
88:19 89:7
93:11 95:18
101:2 108:25
122:4 146:4
159:5 161:6
166:13 169:20
169:21 182:15
184:6 202:7
205:6 212:21
212:23 217:8
**particularly (7)**
90:20 91:6 93:5
160:20 176:15
180:7 205:9
**parties (7)**
7:14 122:23
126:15 149:7
212:10,24
226:19
**partisan (5)**
12:6,13 53:4,6
58:23
**parts (3)**
15:2 121:16
208:14
**party (7)**
12:17 35:23

126:13 162:3
162:22,24
185:14
**passage (1)**
86:18
**passport (1)**
120:21
**pathways (1)**
46:7
**pause (2)**
14:2 159:11
**pay (1)**
209:8
**paying (2)**
23:3,5
**PDF (9)**
62:4 136:9,11
163:22,24
166:20 181:6
191:12 199:23
**PDFs (2)**
62:2,4
**Pema (8)**
173:21,23,24
174:6 177:17
177:21 221:5
221:7
**pending (3)**
8:24 118:4
198:7
**people (44)**
20:13 21:19
26:1,2,5 52:2
53:8,12 66:13
71:25 106:14
109:13,17
128:22 129:19
130:9,14
139:16 152:17
153:15,19,24
158:13,15
164:14 166:1
166:3 167:3
173:25 174:2
174:3 176:13
184:14 188:10
197:25 206:3
206:5,6,11,14
209:7,13,21
211:13
**perceive (1)**
205:9
**perceived (1)**
179:23
**percent (1)**
87:11
**perception (2)**
16:16 181:15

**perform (1)**
31:6
**performed (1)**
142:1
**performing (2)**
105:5,14
**period (6)**
65:19,21 84:12
87:14 161:24
227:6
**periods (1)**
60:13
**Perma (2)**
173:17,19
**permissible (1)**
184:4
**Permit (2)**
3:8,11
**person (4)**
72:11 77:2
138:20 184:24
**person's (2)**
184:25 185:1
**personal (10)**
9:10 90:8
182:24,25
184:7 188:10
209:25 211:14
214:12 216:13
**personally (4)**
72:6,7 180:8
223:3
**personnel (1)**
159:5
**pertinent (1)**
162:16
**petered (1)**
175:19
**Peters (2)**
2:11 7:20
**petition (1)**
186:5
**Petitioners (1)**
4:21
**petitions (1)**
44:16
**Phillips-Black...**
1:18 226:6
**phone (1)**
164:22
**phonetic (2)**
144:18 221:4
**photo (1)**
197:16
**phrase (1)**
127:19
**phrased (4)**
45:6 74:1

214:21,25
**phrases (2)**
188:15,18
**picture (1)**
197:13
**pictures (3)**
21:19,23 196:20
**piece (4)**
58:18 169:11
170:8 172:14
**pieces (2)**
64:2 183:10
**Pildes (3)**
139:9,11 221:4
**PILF (36)**
8:16 26:19,23
27:18,24 28:1
28:2,4,16,19
90:12 96:13
104:10,14
132:10,14
133:6 141:25
142:8,14,25
144:21 145:7
152:17 153:15
153:19,23
165:13 192:22
194:22 207:15
208:25 209:5
211:20 214:18
216:9
**PILF's (3)**
28:6,10,13
**PILF/VVA (2)**
5:8 103:1
**Pilkington (1)**
221:12
**pique (2)**
174:23 175:16
**PJ (8)**
57:11 58:4,12
58:18 59:7,13
61:7 196:6
**PJMedia.com...**
51:20
**place (6)**
7:8 9:3 20:24
69:6 123:9
140:23
**places (3)**
20:20 21:14
22:2
**plaintiff (4)**
1:6 2:4 130:20
193:17
**plaintiff's (9)**
49:22,22 113:16
125:14 220:7

220:11,12
223:11,12
**plaintiffs (14)**
7:16,18 36:5
59:10 125:14
185:24 186:3
186:22 193:9
193:14 209:9
209:10 214:17
219:23
**plates (2)**
21:20,24
**pleadings (1)**
26:23
**please (67)**
7:14 8:2,19,22
8:25 32:11,13
33:20 34:22
42:6 45:11
46:10 47:12
47:24 48:12
48:23 50:15
50:17 51:13
57:6,22 60:24
61:17 73:12
82:3,12 89:17
94:13 99:1
102:2,23
107:24 108:10
110:5 119:1
126:7 128:3
135:22 136:10
139:5 143:9
145:5 146:3
146:24 150:25
151:16,24
154:9,22
161:10 163:15
163:24 166:10
180:23 187:18
187:18,22
191:5 195:18
199:16 200:17
205:17 208:11
212:3 213:2
217:18 223:25
**Plenty (1)**
120:10
**point (32)**
91:21 94:25
100:6 101:6
109:22 114:19
123:9 124:20
128:8 136:19
136:22,23,24
139:2 146:20
146:21 150:12
152:23 156:5

158:24 159:1
159:12,13,18
159:22 163:9
175:5 187:15
204:18,19
210:17 223:14
**pointing (3)**
73:6 165:8
184:6
**points (1)**
11:21
**policies (2)**
160:15,17
**policy (6)**
14:7,9 24:17
28:11 158:4
178:4
**political (7)**
11:3,23 12:17
12:17 52:8
53:4 203:24
**polling (6)**
19:8,10 20:20
20:24 21:13
22:2
**polls (1)**
20:14
**poorly (3)**
178:25 179:5,7
**popular (1)**
16:9
**pornography ...**
55:12
**portfolio (1)**
15:3
**portion (3)**
96:16 102:13
107:25
**portions (2)**
123:17 125:25
**position (9)**
11:17 12:24
14:16 112:4
121:17 156:17
156:21 159:19
178:5
**positions (6)**
14:16 56:14,14
56:15,24
160:21
**possession (3)**
26:22 63:5,17
**possibility (2)**
95:20 168:12
**possible (17)**
13:19 31:8
43:19 57:15
61:11 62:3

78:6,11 89:6
98:1 101:2
109:12 141:9
141:11 145:25
196:12 210:19
**possibly (3)**
38:3 113:8
127:15
**post (5)**
167:6,8,20
169:21 173:11
**posted (6)**
167:13 197:3
205:23 208:24
221:14,18
**posting (7)**
143:21 168:25
173:7 195:12
203:8 206:11
206:15
**posts (2)**
105:2 173:15
**potential (11)**
42:17 43:1
53:15,16 76:8
76:10 90:22
91:3,4 115:24
176:19
**potentially (2)**
134:14 190:6
**Powell (1)**
97:1
**power (1)**
13:15
**powerful (1)**
170:8
**practice (4)**
31:9,11,14,20
**practiced (1)**
32:3
**practices (1)**
13:11
**practicing (1)**
41:18
**precincts (1)**
21:5
**precisely (2)**
132:25 133:1
**predicate (1)**
107:12
**predictable (1)**
16:15
**preference (1)**
187:11
**preferred (1)**
14:8
**prefix (1)**
62:10

**premise (2)**
134:23 182:3
**premises (3)**
3:9,11 199:13
**preparations ...**
19:11
**prepare (3)**
22:4 103:4
220:3
**prepared (7)**
35:3 41:23
102:23 103:6
103:16
**preparing (1)**
63:12
**presence (8)**
20:23,25 21:7
204:21,24
205:5,12,14
**presences (1)**
20:19
**Present (1)**
2:24
**presentation (1)**
187:9
**presented (2)**
76:23 77:20
**preserved (1)**
50:5
**president (9)**
6:5 11:8,18
12:22 196:7
196:17,22
213:20 218:23
**President's (1)**
178:7
**presidential (...**
5:16 11:3
104:17 129:24
154:16 155:11
155:22 158:10
179:1 192:14
205:1
**press (9)**
16:9 91:20
135:2,7,9,15
135:19 192:3
195:5
**presumes (1)**
218:9
**Prevent (1)**
85:7
**previous (2)**
39:6 184:1
**previously (10)**
39:9 57:3 58:11
71:8 72:12
97:9 145:15

166:4 167:2
179:16
**prez/GC (1)**
164:19
**price (5)**
209:8,12 210:11
210:15,21
**primarily (1)**
24:6
**Primus (1)**
213:25
**principal (1)**
23:16
**principled (1)**
55:13
**printed (1)**
182:18
**printout (1)**
163:10
**Printouts (1)**
5:20
**prior (6)**
58:18 107:5
147:14 149:20
190:15 226:15
**Privacy (5)**
162:2,8,10,23
163:3
**private (4)**
88:4 156:20
214:11 216:13
**privilege (56)**
3:15,16 24:14
34:5,7 35:3
36:24 38:16
38:23 39:6
41:3,5,23 42:1
44:24 45:2
51:7,11
109:25 116:6
116:22 122:12
123:6 125:21
134:8,8 147:2
147:4,8,16
148:18,20,22
149:4,9,11,13
149:14,15,18
150:6,10,17
151:8,19,23
152:25 174:13
190:25 206:24
212:3,7 215:2
215:23 216:7
223:9
**privileged (2)**
43:18,22
**privileges (1)**
150:23

**pro (2)**
31:22,23
**proactively (1)**
19:21
**probably (4)**
18:10 73:5 85:1
198:3
**problem (6)**
86:9,22 121:10
166:17 198:12
198:20
**problems (1)**
197:21
**procedural (1)**
46:6
**procedure (4)**
25:2 29:6 70:21
226:15
**procedures (6)**
92:12 157:5
158:15,17
160:12 199:7
**proceed (2)**
121:2 122:7
**proceedings (1)**
80:20
**process (9)**
21:8 142:18
157:2 169:9
169:14,17,18
169:24 170:4
**processed (2)**
70:22,23
**processing (1)**
19:15
**procure (1)**
186:22
**produce (3)**
3:8,10 14:6
**produced (30)**
26:17 27:17,18
37:18 52:25
61:23 62:13
68:19 82:4,23
90:3 102:9
119:14 120:7
122:15 136:8
163:22 165:13
190:12,18
191:11,12
199:23 207:18
207:23 210:5
222:8,14,17
222:21
**producing (1)**
159:7
**product (35)**
34:5,15 36:4,10

49:24 50:11
101:8,14,19
101:21,22,22
110:1 111:23
112:18,19
113:13 114:6
114:22 115:1
120:3,20,25
121:9 122:2
123:11 124:21
125:21 177:5
191:16 211:24
213:17 214:22
215:1 223:10
**production (4)**
61:25 63:12
99:10 207:16
**professor (19)**
14:20 22:14
35:7 40:11
41:17 42:12
43:5,9 99:25
100:16 133:16
139:12 149:22
155:1 186:13
186:17,17
203:24 213:14
**proffer (1)**
123:2
**Profile (1)**
201:23
**profiling (1)**
202:23
**program (4)**
80:8,8 81:5
204:8
**Progress (2)**
143:20 145:24
**prohibits (3)**
162:2,10,12
**project (29)**
2:9 7:21 14:15
35:4,16 36:6
36:11 37:19
101:9,24
111:21 114:2
114:21 214:22
115:13,23
116:19 120:9
120:14 121:18
177:2 187:1
190:6,11,18
190:2 191:15
193:25 216:5
**projects (1)**
14:12
**prominent (1)**
167:17

**promote (1)**
160:18
**promoting (1)**
160:14
**prompt (2)**
75:13 183:11
**prompted (2)**
72:1 167:14
**pronounce (1)**
82:25
**pronounces (1)**
59:19
**proof (2)**
76:23 182:12
**properly (2)**
117:16 121:15
**propose (1)**
120:23
**proposed (1)**
168:24
**proposes (1)**
122:7
**proposing (3)**
124:16 188:16
188:20
**ProPublica (1)**
154:15
**prosecutor (1)**
55:22
**protect (30)**
2:9 7:20 18:18
35:4,16 36:6
37:19 101:9
101:23 111:21
114:2,7,15
115:13,22
116:18 120:9
120:14 121:18
177:1 187:1
190:6,10,18
190:22 191:15
193:25 195:6
213:24 216:5
**protected (6)**
111:23 114:22
120:3 121:9
124:21 214:22
**protection (8)**
18:3,6,13 21:25
36:13 49:9
120:25 213:17
**protective (8)**
117:21,24 118:2
118:13,15,22
122:24 125:19
**protest (1)**
192:6
**protocols (2)**

154:25 156:2
**prove (1)**
78:12
**proven (1)**
205:16
**provide (9)**
40:20 41:24
46:5 60:10
72:1 121:4
143:20 150:13
176:5
**provided (12)**
30:16 71:25
77:2,23
111:11 132:10
132:14 144:1
144:9,16
220:23 227:6
**provides (3)**
65:18 78:16,20
**providing (5)**
30:21 41:5
42:10,11
203:14
**provision (8)**
45:19 46:22
47:2,20 48:8
117:25 122:24
182:15
**provisions (8)**
44:11,16,17,18
44:19,20,22
64:25
**public (43)**
1:8 7:10 8:15
10:7 14:7,8
24:15,20,22
25:6 46:2,4
64:15,21 65:2
65:18,20
76:21 83:14
83:18 88:25
89:2 96:25
106:13,20
134:16,17
142:21 156:17
183:16 184:11
185:9 192:17
192:18 197:19
201:20 204:17
208:2 210:6
214:11 215:7
216:12 222:20
**publication (17)**
51:19 58:12
91:21 94:10
94:18 95:1,4
161:18 179:25

182:24 183:4
183:8,15
184:6,10
185:4,8
**publications (5)**
26:10,19 56:8
60:11 64:5
**publicist (5)**
202:21 203:2,4
203:5,6
**publicize (3)**
126:23 134:3
192:21
**publicized (2)**
93:2 146:21
**publicizing (2)**
113:8 126:21
**publicly (12)**
106:10 139:22
166:7 171:18
173:15 206:10
209:22 216:17
219:4,14
222:8,14
**publish (5)**
15:7 106:2,6
184:14,24
**published (25)**
15:16,20 28:16
58:18 60:11
60:16 61:6,10
61:12 91:16
91:17 94:8,16
106:23 107:9
133:9 142:14
164:24 171:10
171:12 180:15
180:18,19
188:10 210:25
**publishers (1)**
131:25
**publishing (5)**
142:15 164:20
176:13 185:1
211:14
**pulled (1)**
157:4
**Purely (1)**
206:1
**Purges (7)**
5:22,24 179:12
179:17 180:14
181:10 188:4
**purport (2)**
86:3 87:25
**purported (2)**
20:12 47:9
**purporting (1)**

20:7
**purports (1)**
144:17
**purpose (14)**
28:5 43:24 44:6
80:23 92:7
110:16 117:2
126:16 128:23
179:20 186:1
186:4,23
206:25
**purposes (3)**
103:24 112:15
176:18
**pursuant (7)**
22:25 118:13
141:24 142:20
184:15 222:3
226:14
**pursue (2)**
10:4 42:18
**pursued (2)**
24:19,21
**pushes (1)**
197:17
**put (11)**
37:12 86:15
115:4 119:11
119:13 134:15
134:17 135:9
151:18 156:9
198:1
**putting (7)**
115:6 122:23
124:21 135:1
135:18 168:12
198:14
**puzzle (1)**
208:14

**Q**

**qualified (1)**
226:8
**quantify (2)**
140:6,19
**question (72)**
8:24 17:14
35:21,22
41:12,24 42:6
45:5 50:14
51:22 54:7,20
70:14,15,16
78:24 88:25
94:12,20
101:8,25
103:14,15
104:20,24
107:5,12

108:5 109:23
113:13 116:1
119:25 122:18
123:5 126:18
129:4 136:21
142:13 144:3
147:25 149:3
150:9,16,22
152:24 155:16
156:23 158:2
158:4 161:23
172:2 177:3
182:3 183:12
184:1 190:19
190:24 198:6
198:8 206:23
212:18 214:21
215:10,12
217:5,8,16,17
217:24 218:8
218:10,13
**questioning (4)**
112:7 121:2
122:8 186:7
**questionnaire...**
73:18
**questions (20)**
8:18 48:25
66:25 109:22
114:25 121:14
121:19 122:17
123:3,5,17
125:1 128:21
128:21,24
129:1,3
187:17 217:21
223:7
**quick (2)**
66:9,15
**quickly (1)**
207:4
**quite (7)**
130:9,11,17,19
155:6 176:17
194:10
**quotation (2)**
86:6,6
**quote (14)**
58:22 127:13,24
127:25 133:16
133:17 155:8
162:8,9 173:2
174:1 193:20
198:20 216:11
**quoted (5)**
154:20,23 155:5
161:22,25
**quoting (3)**

49:12 50:21
59:4

**R**

**R (6)**
5:6 226:12,16
226:21 227:1
227:7
**race (1)**
192:14
**races (1)**
12:23
**racist (2)**
177:18,22
**Radical (2)**
4:5 58:5
**RALLY (3)**
192:17,20,21
**rampant (1)**
181:16
**range (1)**
21:19
**ranks (1)**
58:24
**rates (1)**
16:8
**Raza (9)**
110:19 123:25
149:19,20
150:1,8,13,20
151:14
**reach (2)**
16:10 174:4
**reached (1)**
174:10
**reaching (1)**
100:3
**read (25)**
28:3,24,24
50:17,18 52:7
52:10 60:10
70:13 83:4,7,9
86:18 90:24
94:14 107:25
126:1 144:2,4
165:13 172:3
217:17,22,25
225:1
**reads (1)**
189:2
**real (3)**
19:23 203:20,21
**realize (6)**
39:5 48:24
71:21 103:1
198:3 223:11
**really (4)**
87:7 166:2

171:6 177:17
**reason (8)**
8:22 30:18 45:3
69:11,14,23
131:20 140:13
**reasons (1)**
71:17
**recall (63)**
15:10,22 21:1,3
22:11 25:22
25:24 26:3
27:6 36:22
44:11,13,14
44:15,20
50:25 51:8
57:15 58:15
58:19 59:24
63:6 83:8 85:4
91:19,20 95:3
95:4,25 101:1
105:11,18,21
106:20,22
107:6,7
127:17 130:3
130:4,16
135:12 143:19
146:20,23
153:5 155:7
158:21,24
159:7,9,10
173:13,14
176:21 177:23
180:17 181:14
206:17,17
219:22 220:25
220:25
**receive (4)**
10:6,10,13 79:4
**received (4)**
10:4,6,15 165:7
**receives (1)**
139:23
**receiving (4)**
40:15 78:21
79:11 139:1
**recess (7)**
25:14 66:20
96:5 107:21
125:10 175:10
207:9
**reckless (3)**
206:8,20 207:1
**recognize (2)**
207:24 208:4
**recollection (3)**
49:6 116:20
217:3
**record (54)**

9:1 25:10,12,15
50:18 61:24
62:6 64:21
66:18,21 70:8
71:10 78:7,14
89:2 94:14
96:1,3,6
107:19,22
119:19 121:3
123:13 124:3
124:5,7,22,24
125:2,2,3,4,4
125:8,11,13
126:1 142:21
144:4 147:21
150:4 162:12
162:15 165:9
172:3 175:8
175:11 207:7
207:10 217:25
223:18 224:4
226:24
**recorded (2)**
81:23 226:23
**records (36)**
63:19,22 64:6
65:1,1,18
76:21,22 77:8
78:17 85:14
85:22 86:2
90:19 91:10
131:8 141:23
141:23 142:20
142:25 143:6
162:3,11,22
162:24 163:2
163:4 165:9
165:10 183:16
184:3,10,14
185:4,8
222:20
**red (1)**
86:15
**redact (7)**
120:11 122:13
123:4 124:1
124:16,17,21
**redacted (14)**
5:5 102:14
121:4,15
122:22 123:16
123:20 124:25
125:16,25
147:15 190:8
190:11 191:17
**redacting (1)**
142:5
**redaction (3)**

117:1 123:18
127:6
**redactions (3)**
120:5 141:24
142:1
**redistricting (3)**
15:6,13 44:19
**Redondo (1)**
2:22
**Reduction (1)**
163:7
**refer (7)**
8:16,17 114:20
182:22 206:14
217:4 219:19
**reference (15)**
34:3 58:22
59:13 85:15
85:17,20 87:9
109:15 112:14
139:18 163:6
181:12 197:7
211:18 219:13
**referenced (5)**
64:5 85:23
130:19 157:24
158:6
**references (10)**
34:4 85:13
111:20 113:16
119:22 120:24
121:20 123:22
124:11 134:21
**referred (46)**
19:24 32:14
33:21 34:23
38:18 45:12
46:11 47:13
48:1,13 51:14
54:2 57:7,23
61:1,18 67:3,8
67:13,20 68:1
68:6,11 77:14
82:13 89:22
98:12 99:2
102:3 103:9
108:12 110:6
119:7 136:1
143:10 154:10
161:11 163:16
181:1 182:11
187:23 191:6
194:12 196:1
199:17 203:2
**referring (40)**
39:7,8 78:13
93:12 106:25
107:11 129:22

129:24 137:17
138:6 141:15
144:24 145:20
145:22 152:4
153:10,11,18
165:21 167:7
170:13 175:1
175:20 182:23
189:13 190:7
194:22 203:1
203:3 205:1
206:16,22
209:4,5,8
211:1 212:12
213:1,1,19
**refers (4)**
58:18 62:16
196:17 218:9
**refine (1)**
91:14
**reflect (12)**
63:20,23 79:21
82:5 114:6
115:20 116:16
119:20 121:5
178:25 179:4
179:7
**reflected (6)**
37:3 63:3
110:11 114:13
115:10 180:19
**reflective (1)**
165:18
**reflects (7)**
111:25 112:2
113:25 114:3
115:24 119:16
162:8
**refresh (3)**
189:25 190:1
217:2
**refused (2)**
86:12 87:2
**refusing (2)**
117:9,11
**regarding (7)**
35:17 42:23
94:10,19
108:21 131:7
200:1
**regardless (1)**
41:23
**regions (1)**
11:23
**register (5)**
16:11 72:2
73:20 141:17
182:14

**registered (25)**
16:25 62:20
70:4,6,7,11,24
71:4,9 73:23
77:21 78:3
80:9 81:1
86:14 87:4
105:7 106:4
107:15 113:5
131:13 138:15
170:17,20
209:23
**registering (6)**
13:14 71:25
85:7,12 182:7
183:1
**registers (1)**
71:3
**registrar (24)**
62:15 68:22,25
69:10 75:21
76:4,9,14,20
76:25 77:24
78:1,7,12
79:24 90:14
131:25 165:6
165:16,18,19
169:17,24
170:3
**registrar's (1)**
132:18
**registrars (16)**
74:25 75:8
78:16,20
92:13 132:12
132:14,17,22
132:23 133:4
142:3 145:2
165:5 178:22
211:1
**registration (...**
4:12,17 13:9,10
15:12 17:17
19:15,16
62:17,21 65:1
65:2,17,19
69:2,11,16
70:5 71:20
72:16 73:15
78:7,8 82:9,9
86:10,25
87:13,24
88:13 93:2,5
93:19,22 94:3
129:5 140:23
141:1,5 161:1
161:3 182:17
204:6 222:16

222:18
**registrations (2)**
82:5 197:21
**regular (1)**
80:18
**regulation (2)**
14:8 15:1
**reimbursed (1)**
23:6
**Reinhardt (1)**
10:22
**reject (1)**
160:25
**rejected (1)**
182:17
**related (8)**
56:18 134:4
139:21,22
157:15 190:14
190:16,19
**relating (2)**
65:1,18
**relations (3)**
192:18 201:20
204:17
**relationship (...**
9:20 40:18 43:8
147:19 148:2
148:5,25
149:15 150:1
150:3,5
**relationships ...**
18:11 30:19
**relative (2)**
226:18,19
**relatively (2)**
25:25 26:1
**release (9)**
135:2,7,15
158:12 192:3
195:5 214:11
216:12 223:1
**releases (2)**
135:9,19
**relevance (2)**
187:19 212:14
**relevant (8)**
41:13 86:11
120:17 176:11
176:17 185:16
186:7 187:7
**reliability (1)**
158:22
**remain (3)**
13:16,24 22:16
**remedies (2)**
42:17 43:1
**remedy (2)**

134:14,16
**remember (24)**
20:18 27:8,9,10
27:11 28:18
28:19 61:11
63:10 105:23
106:16 132:25
132:25 138:1
138:19,25
145:3 146:2
165:1 183:23
195:16,16
221:1,9
**remind (1)**
197:11
**removal (4)**
75:16 198:19,23
199:4
**removed (7)**
169:16 197:25
198:21 199:2
199:4,6,11
**removing (2)**
188:20 198:12
**render (1)**
41:20
**renewed (1)**
157:21
**reobtain (1)**
118:15
**repeat (1)**
197:10
**repeated (1)**
210:25
**repeatedly (1)**
210:24
**repeating (2)**
49:20 50:4
**rephrase (3)**
8:19 94:20
214:23
**replied (1)**
139:17
**reply (1)**
212:3
**report (83)**
5:15 15:23 18:7
23:13 27:20
87:10,15,17
87:18,20 92:3
92:9,21 93:3,6
93:8,9,11 94:6
94:8,16,24
97:5,11,16
98:2 100:12
100:20,22,25
105:18,19
106:6 107:14

110:21 111:2
127:14,16,18
127:19,25
129:6,15,20
130:25 131:11
131:16,18,23
131:25 133:8
133:22 134:2
134:10,12,20
134:21 135:2
137:16 138:13
138:18 142:2
143:15 144:17
144:20 145:10
145:17 146:15
159:7 165:4
165:12,13
167:22 169:20
170:16 173:18
174:1,11
178:22 198:1
198:19 209:21
210:20
**report's (1)**
133:17
**reported (1)**
18:8
**reporter (52)**
8:2 32:15 33:22
34:24 38:19
44:3 45:13
46:12 47:14
48:2,14 50:18
51:15 57:8,24
61:2,19 67:4,9
67:14,21 68:2
68:7,12 82:14
89:23 94:14
98:13 99:3
102:4 103:10
108:13 110:7
119:8 136:2
143:11 144:4
154:11 161:12
163:8,17
172:3 173:19
181:2 187:24
191:7 194:18
196:2 199:18
217:25 226:9
227:6
**reporters (14)**
100:24 101:2
106:21 107:2
107:7,10
111:3 112:15
138:24,25
139:2 194:16

195:13 226:11
**reporting (1)**
18:11
**reports (41)**
5:8 15:7,15,18
20:1,18 21:12
21:19 27:18
28:12,17,22
91:15 92:23
93:10 97:16
97:24 98:19
98:24 99:13
102:18 103:1
103:8,21
106:11,15
110:17 131:9
135:4 138:8
141:20,23
142:4 146:19
162:19 167:4
171:11,12,15
207:13,15
**represent (6)**
29:3,5,6,9,24
30:11
**representatio...**
29:8 35:18
**representation...**
30:21 144:15
**represented (6)**
9:14 29:15 30:8
30:13 33:12
33:14
**representing (4)**
29:12 33:16
36:5 51:24
**represents (1)**
8:14
**reproduced (1)**
196:25
**reproduction ...**
196:15
**republication ...**
184:3
**request (17)**
8:24 51:4 52:20
59:9 65:20,24
66:5 73:3
116:25 117:10
118:3,12,20
122:19 133:3
133:3 143:1
**requested (5)**
49:11 50:20
220:4 227:4,5
**requests (4)**
52:20 142:5
143:5 222:20

**require (5)**
81:12,22 157:11
182:12 215:23
**required (2)**
75:20 77:12
**requirements ...**
13:14
**requires (4)**
42:14,20 81:13
81:17
**requiring (1)**
19:5
**reread (1)**
94:12
**reregistered (2)**
97:10 145:16
**research (17)**
10:5 14:6,25
16:6 43:5,9
44:8 88:11
92:9,11 97:23
99:25 105:4
105:13,17,22
149:22
**researched (3)**
44:12,14,20
**researcher (1)**
129:5
**researching (1)**
100:16
**reservations (...**
155:23,25
156:12,14,15
157:8,12,14
157:15,17
**residence (1)**
9:6
**resolution (1)**
118:5
**resolve (1)**
172:23
**resolved (1)**
223:10
**resolves (1)**
125:20
**resources (1)**
53:6
**respect (14)**
14:21 24:10
31:5 33:15
44:22 49:23
50:10 101:14
123:11 156:10
182:21 191:16
203:16 204:23
**respond (16)**
19:22 34:10
41:8,10

101:15,17,18
136:21 147:24
149:12 150:15
169:2,16
203:21 209:18
212:1
**responded (4)**
74:17 152:19
173:6 202:9
**responding (3)**
19:21,22 203:13
**response (18)**
26:18 33:11,13
68:19 74:4,9
100:11 122:11
123:10 138:5
142:5 167:2
178:11 193:4
200:13 208:1
208:6 209:18
**responses (1)**
11:24
**responsibilitie...**
12:2 13:8,12
14:22 18:12
19:20 24:2
28:25 42:16
42:23
**responsible (9)**
13:3 24:4 79:12
129:15,20
142:8,14,15
142:16
**responsive (1)**
178:17
**rest (2)**
125:1 199:12
**restriction (1)**
47:9
**restroom (1)**
66:15
**resubmit (1)**
172:19
**result (3)**
75:16 149:20
210:11
**results (1)**
146:10
**résumés (1)**
222:19
**retained (5)**
36:12,18 38:7
84:15 192:21
**retention (2)**
37:2,5
**return (1)**
22:8
**returned (2)**

118:4,12
**returning (1)**
151:19
**reveal (2)**
101:8 212:5
**revealed (1)**
212:9
**revealing (2)**
77:2 101:18
**reveals (1)**
52:7
**reversed (1)**
160:25
**review (8)**
86:10,25 112:12
115:18 117:6
218:12 223:16
227:3
**reviewed (1)**
45:19
**reviewing (1)**
63:10
**revolved (1)**
12:3
**rhetorical (1)**
204:19
**Richard (2)**
59:16 213:25
**Richmond (4)**
1:5 7:10 192:22
193:1
**Rick (4)**
139:9,11 166:14
221:4
**rid (3)**
193:11,22 194:7
**Riggs (9)**
39:19 150:19
151:5 152:22
153:12,18,23
174:14 194:2
**Riggs' (1)**
111:8
**right (113)**
9:17 21:14
26:25 27:4
31:7 33:2,12
35:25 37:21
39:3 43:5,18
43:25 46:15
56:3 65:9
68:16 80:1,10
87:18 89:3,16
90:9 93:15
95:9 97:3
99:22,25
100:12 101:24
104:2,10

105:2,7,16,25
106:11 108:7
109:1 110:13
110:17,23
111:9 113:9
115:14,23
116:19 118:19
120:24 121:14
121:25 124:15
127:16 128:6
128:18 133:13
138:23 140:20
143:6 148:6
149:23 150:21
151:6,11,14
152:19 154:20
155:25 156:16
156:16 157:5
159:23 163:13
164:13 165:16
166:18 167:22
168:8,25
169:3,8 170:7
173:3,20,23
174:15 175:2
175:14,21,24
176:7 178:15
179:2,18
180:2,13,16
183:5,17
188:6,16,20
189:8,23
191:17,24
196:22 211:21
214:19 216:5
216:15 218:21
223:16
**right-hand (1)**
70:14
**rights (35)**
3:25 4:20 14:15
14:21 23:1,9
23:15,17 24:5
24:6,10,16
25:3 26:6,8
42:15,23
53:22 54:17
56:2,25 57:13
58:25 60:1
83:11,13 84:3
155:3 161:5
162:13 178:8
185:25 186:5
202:23 214:9
**risk (1)**
161:2
**road (1)**
91:8

**roaming (1)**
21:23
**Robert (3)**
3:23 48:22
51:21
**Rodriguez (1)**
70:3
**role (3)**
22:16,17 49:4
**roles (2)**
141:6 197:24
**rolls (17)**
75:17 86:10,25
87:13 88:13
140:7,20
169:16 197:19
198:1,13,14
198:22 199:2
199:6,11
204:6
**room (1)**
9:18
**roughly (1)**
206:11
**round (2)**
193:8,15
**roundly (2)**
193:12 194:20
**ruin (1)**
152:15
**Rule (1)**
102:24
**rules (3)**
19:4 20:9,12
**run (1)**
172:14
**runs (1)**
60:12

_____
        **S**
**sadly (2)**
138:5 175:18
**Safe (1)**
27:20
**salary (2)**
23:3,5
**sample (2)**
208:1,6
**Samsel (3)**
201:19 202:1
203:4
**San (9)**
2:12 4:12,16,18
62:15,17
68:22,24 69:2
**sanctuary (1)**
27:21
**Sarah (1)**

52:4
**save (8)**
28:23 66:25
80:4,7,8,15
81:5,24
**saved (2)**
28:20 156:23
**saw (5)**
37:25 52:24
56:7 91:3
173:24
**saying (12)**
74:8 117:17
120:20 121:13
140:25 141:4
153:20 154:23
172:12 173:24
184:19 201:12
**says (33)**
35:3 41:4 47:10
62:10 69:1,6,9
73:13,17
83:10 85:6
90:3,4 99:16
100:2 118:17
121:23 124:1
137:22 151:11
151:12 164:13
166:1 177:17
188:9 189:19
192:15 196:15
196:19 197:3
197:8 198:18
208:1
**scare (1)**
20:13
**scared (2)**
113:24 127:10
**Scholl (1)**
145:24
**school (26)**
3:17 9:8,22,25
10:1,8,9,14
13:23 14:20
22:15 25:5
32:21 33:5,6
34:2 35:8
38:16,24
59:23 90:8
133:13 139:12
155:2 213:14
221:10
**schools (1)**
25:4
**Schwartzol (5)**
192:2 193:23
194:24 195:1
195:8

**science (1)**
203:24
**scope (12)**
17:14 19:11
29:22 30:1,5
30:17,24 31:4
36:11 45:2
162:16 211:14
**screaming (1)**
208:22
**screen (1)**
94:5
**seated (3)**
9:17 88:3,13
**second (10)**
70:12 74:20
109:6 126:24
137:21 154:22
161:25 188:8
196:14 214:3
**secondary (1)**
9:22
**seconded (3)**
22:23 23:2 24:3
**secondment (4)**
23:7,20 57:17
61:13
**Secretaries (1)**
84:13
**Secretary (4)**
84:6,11 160:2,3
**section (17)**
3:18,19,20,21
4:8 12:16
45:18 46:20
47:19 48:7
56:2,4,5 61:9
90:17 169:21
226:15
**sections (1)**
191:17
**secure (1)**
19:6
**security (10)**
80:4,15 154:24
156:2 157:5
157:14,17,22
210:3,4
**see (92)**
26:14 35:9,24
36:1 40:17
47:8 55:12,20
60:22 61:10
62:15,23,24
62:25 63:2,3
64:5 69:3,12
73:13 83:10
83:17 84:4,20

85:9,13,15
89:13 90:3,25
92:3,16 93:11
96:17,24 97:2
97:12 99:16
100:3,17
102:10,14
107:9 110:20
120:23 121:21
136:13 137:20
141:2 151:3
152:8 156:7
161:22 164:12
164:17 168:3
168:13 172:21
173:4,9 174:4
174:23 177:16
177:19 178:9
178:10 179:14
180:10 188:8
188:13,25
193:3 195:3,6
196:9,14,16
196:17,19,23
197:2,6,13,22
200:11 201:11
201:23 203:8
206:17 213:21
214:1,14
**seeing (1)**
105:21
**seek (7)**
21:3 22:1 70:8
72:10 86:14
148:17 214:18
**seeking (7)**
18:18 43:24
65:3 123:18
150:8 155:11
185:25
**seeks (1)**
71:4
**seen (27)**
16:22,24 17:1
26:10 35:11
39:6,9 46:25
47:20 48:8
49:2 57:14
58:7 59:9
60:15 70:7
71:6,24 72:7,7
103:2 135:9
154:18 165:13
196:11,24
219:17
**self-help (1)**
117:12
**self-reported ...**

97:6 145:11
**Senate (1)**
178:3
**send (2)**
129:7 202:22
**sending (4)**
109:11 168:16
168:24 202:6
**sense (3)**
72:16,22 122:7
**sensitive (1)**
182:25
**sent (20)**
51:25 65:7
74:16 99:16
99:22 100:10
108:25 109:10
142:4 144:21
149:21 167:2
168:7 170:3
178:11,20
181:10 200:4
202:5 221:21
**sentence (16)**
58:17 59:3 97:4
116:15 122:10
124:1 133:21
140:12 152:11
162:9,18
188:9 190:15
198:16 208:22
216:11
**sentences (4)**
114:19 115:20
116:15 188:18
**separate (1)**
119:11
**September (4)**
4:19 39:17 85:4
91:17
**series (20)**
38:25 39:19
56:1 58:18,20
59:2,8 66:10
66:23 99:9
105:1 128:20
128:21,23,25
129:3 175:23
200:20 208:18
208:19
**serious (1)**
198:20
**served (11)**
14:18 18:3
32:23,25 33:2
33:6,9,14 35:9
35:11 59:10
**service (1)**

74:5
**services (4)**
30:17,20 31:6
65:8
**session (1)**
224:5
**set (6)**
55:20 62:7
130:7 133:24
159:2 203:12
**setting (6)**
29:25 30:4,17
31:4 34:1
155:22
**share (4)**
57:1,2,2 206:10
**shared (1)**
150:19
**sharing (3)**
32:9 135:23
149:6
**Shawna (1)**
97:1
**shone (1)**
205:6
**short (5)**
11:11,20 122:15
192:13 207:3
**shorter (1)**
15:17
**Shorthand (1)**
226:8
**show (6)**
96:9 117:15
144:17 187:6
187:8 207:22
**showed (1)**
97:22
**shows (2)**
97:5 145:10
**sic (1)**
173:17
**side (4)**
70:15 117:13
193:13 194:21
**Signature (1)**
225:6
**signatures (1)**
210:3
**signed (1)**
193:18
**significant (2)**
120:4 181:17
**significantly (1)**
12:22
**signing (1)**
225:1
**silencing (1)**

186:2
**Silver (1)**
9:10
**similar (5)**
20:18,21 99:21
109:18 195:11
**similarly (6)**
34:15 78:19
105:13 110:25
126:24 127:23
**simple (2)**
41:24 184:3
**simply (7)**
43:16 74:10
102:20 109:23
155:10 185:1
217:20
**single (8)**
41:3 59:2,7
98:20 109:16
109:17 163:22
191:12
**singled (1)**
52:4
**site (1)**
195:6
**sites (2)**
19:8,10
**sitting (4)**
86:1 89:5
106:17 186:18
**situation (4)**
113:6,8 114:12
127:7
**situations (2)**
71:24 170:10
**size (2)**
86:8,21
**SKDK (1)**
221:11
**SKDKnicker...**
201:21 204:16
**SLAPP (2)**
45:22 46:1
**Slate (6)**
168:13,19,20,24
173:2 221:9
**sloppiness (3)**
206:8,21 207:1
**sloppy (5)**
204:23 205:7,15
209:24 211:15
**slurs (1)**
197:9
**small (4)**
26:1,1 140:16
202:23
**smartest (1)**

197:10
**Smeared (2)**
6:5 196:8
**social (38)**
2:9 7:21 35:5,6
35:17 36:7
37:20 101:10
101:23 111:22
112:3 114:1,7
114:15 115:13
115:22 116:18
119:17,21,24
120:8,13
121:7,17
135:1,10,18
177:1 187:1
190:5,10,17
190:21 191:14
194:3 210:3,4
216:4
**Society (1)**
213:13
**solely (1)**
209:6
**solemnly (1)**
8:4
**somebody (6)**
34:17,20 43:7
73:2 76:5
212:7
**somebody's (1)**
73:7
**something's (2)**
185:18,19
**somewhat (1)**
62:8
**soon (3)**
95:4 136:5
192:7
**sorry (24)**
11:16 25:18
29:17,18 39:8
46:14 82:18
98:9 107:24
118:8 135:23
140:10,14
147:5 158:1
164:1 174:16
195:22 200:23
201:5 208:12
212:15 221:6
221:16
**sort (5)**
77:5 79:6
122:25 214:12
216:13
**sorts (1)**
46:7

**sought (3)**
17:18 40:12
148:10
**Sound (1)**
7:6
**sounds (2)**
155:8 180:13
**source (8)**
20:9 130:25
131:3,4,15,23
133:6,10
**sources (3)**
132:3,6 145:2
**South (1)**
1:14
**Southern (35)**
2:9 7:21 35:5,17
36:6 37:20
101:10,23
111:21 112:3
114:1,7,15
115:12,21
116:17 119:16
119:21,24
120:8,13
121:6,17
135:1,10,17
176:25 186:25
190:5,10,17
190:21 191:14
194:2 216:4
**Spaces (1)**
27:20
**Spakovsky (11)**
56:1,10,17,22
58:4 84:19
86:7,17
158:24 159:18
196:21
**speak (9)**
8:22 11:19 52:2
52:3 132:21
134:7 171:6
209:20 216:19
**speaking (3)**
129:12,13
132:19
**speaks (2)**
123:10 155:16
**specific (11)**
30:12 53:20
54:1,15,21
160:20 170:7
188:10 209:7
209:13 214:10
**specifically (15)**
15:10 59:13
87:1 92:3 94:9

94:17 113:20
130:24 145:22
147:10 148:11
152:16 153:14
158:19 174:9
**speculate (3)**
88:8 157:11
204:13
**speculating (4)**
43:16,20 217:12
217:16
**speculation (18)**
43:11 54:4,24
55:5 64:19
65:15 66:3
69:19 72:20
74:1 76:7,17
79:15 88:6,17
101:11 143:3
215:4
**speed (3)**
155:10,21 156:1
**spend (1)**
100:16
**spending (1)**
187:15
**sphere (3)**
26:1,4,5
**spoke (11)**
106:21,24 107:2
107:6,10
128:22 136:5
190:3 193:18
194:10 206:1
**spoken (15)**
146:1 151:13
166:1 167:3
167:20 170:8
170:19 173:25
192:25 202:3
206:2,5
210:10 220:18
220:21
**spotlight (2)**
205:6,15
**spreadsheet (2)**
5:9 108:20
**spring (2)**
13:18 22:10
**spurious (2)**
49:14 50:23
**squirrelly (1)**
169:9
**ss (1)**
226:3
**staff (1)**
24:8
**stages (1)**

206:9
**Stahl (1)**
168:17
**stand (3)**
21:5 130:18
194:10
**standard (1)**
55:13
**standing (3)**
21:8,13 50:10
**Stanford (1)**
213:14
**start (4)**
85:2 91:22
140:23 201:9
**started (2)**
23:7 136:18
**starting (4)**
9:22 39:17
104:25 156:11
**starts (2)**
166:20,21
**state (46)**
5:17 8:4,25
27:19 31:25
38:6 40:8
64:23 65:25
66:6 71:10
74:11,25 75:7
77:22 78:15
78:20 79:24
80:7,18,22
81:5,9,13,17
81:22 84:7,11
84:13 86:13
87:3,6 100:15
131:24 133:21
141:25 145:3
152:16 154:17
199:8 207:16
207:20,24
211:12 226:3
226:9
**stated (5)**
75:18 106:14
107:6 165:15
178:10
**statement (23)**
52:18 74:9
79:18 114:13
115:10,19
116:14 131:1
133:15 140:8
162:5 164:23
182:6 188:23
189:10 193:17
198:15,16,18
198:25 210:15

214:16 217:4
**statements (8)**
86:17,23 115:24
134:15,17
158:16 198:4
207:20
**states (25)**
1:1 11:24 19:4
31:15 42:14
48:20 62:25
70:16 74:24
75:1,19 76:22
77:9,16 79:4
80:12 81:12
81:22 83:2
84:14 86:8,10
87:1 162:9
181:19
**status (12)**
75:24 79:22
86:14 88:3
97:6,8,12
143:25 144:9
145:12,14,18
**statute (4)**
45:22,23 162:14
163:7
**statutes (3)**
46:5 162:21
163:1
**stay (1)**
126:2
**stenographica...**
226:23
**Stephen (1)**
10:22
**steps (1)**
76:9
**Stewart (1)**
203:23
**stick (1)**
18:16
**stipulate (1)**
50:8
**stipulated (1)**
126:4
**stipulation (1)**
50:12
**stirring (1)**
47:10
**stopped (1)**
21:10
**stories (2)**
170:7,11
**story (10)**
106:22 107:8
112:12,14,24
115:19 126:9

127:1 202:25
206:2
**straight (1)**
133:24
**straightforwa...**
90:23
**strategic (1)**
46:1
**Street (4)**
1:15 2:11,16 9:9
**streets (1)**
192:6
**stricken (1)**
188:19
**strictly (1)**
21:15
**strike (2)**
37:10 219:13
**string (1)**
166:21
**Strings (1)**
4:24
**strongly (1)**
56:25
**struck (2)**
182:15 188:22
**structures (1)**
14:10
**studies (1)**
87:23
**study (1)**
27:12
**subject (24)**
13:2 16:23
24:23,24 55:7
57:12 101:13
109:25 112:18
118:14 129:7
137:3 138:4
143:24 144:7
144:16 147:23
173:17 177:8
179:17 200:8
201:22 209:17
219:9
**subjects (1)**
56:21
**submit (1)**
133:2
**submitted (6)**
78:9 82:24
83:11 133:2
161:1,3
**subpoena (12)**
3:8,10,13 32:19
32:21,22 33:5
33:15 39:3
68:20 220:5

220:23
**subpoenaed (1)**
34:6
**subpoenas (10)**
3:16 26:18 32:7
33:11,13 34:3
35:7 38:16,23
40:15
**subsequently ...**
97:9 145:15
**substance (6)**
24:9 38:5,9
63:11 111:14
216:2
**substitute (1)**
123:19
**successful (2)**
72:18 219:24
**successfully (1)**
218:16
**sue (1)**
152:12
**sufficient (1)**
73:2
**sufficiently (3)**
19:9,9,10
**suggest (2)**
123:13 187:5
**suggested (5)**
125:1 173:7
177:2,21
192:4
**suggesting (2)**
117:12 124:4
**suggestion (1)**
122:6
**suggests (1)**
168:1
**suit (5)**
210:23 214:6,6
215:18,18
**Suite (2)**
2:16,21
**summarized (1)**
104:25
**summary (4)**
5:6 102:24
162:7,19
**summer (1)**
17:24
**summoned (3)**
73:24 74:11
75:1
**summons (2)**
74:5,9
**sundry (1)**
139:16
**Superior (1)**

73:19
**supervising (1)**
24:5
**supply (1)**
203:20
**support (7)**
4:20 14:25 24:9
53:6,15,23
54:18
**supporting (3)**
12:16 24:4 53:4
**suppose (1)**
50:12
**supposed (2)**
118:4 121:19
**supposedly (3)**
119:20 131:22
135:3
**suppress (2)**
181:19 186:23
**suppression (2)**
5:23 196:18
**Supreme (2)**
82:24 84:22
**sure (34)**
7:17 12:1 14:2
17:25 21:2,5
21:18 35:11
50:3,5 56:24
64:24 66:5
70:3 78:1
88:24 92:13
109:24 125:18
177:13 181:18
182:4 183:13
196:13 199:5
200:7 210:2,3
210:8 213:1
215:6 217:23
220:14 223:6
**surprise (1)**
73:8
**surprises (1)**
122:21
**surveys (1)**
11:24
**swear (2)**
8:2 109:16
**sworn (1)**
226:16
**system (2)**
80:17,18
**systematic (4)**
49:13 50:22
86:9,25
**systemic (1)**
131:20

**T**
**take (15)**
8:21 17:22
48:23 66:9,11
76:10 82:7
123:25 125:4
157:2,9 190:2
207:3 210:19
213:2
**taken (13)**
1:14 7:13 20:11
25:14 66:20
96:5 107:21
118:23 125:10
160:21 175:10
205:8 207:9
**talk (8)**
24:19 44:3
105:24 111:3
117:7 152:22
174:5 216:6
**talked (6)**
152:20 174:4
185:14 189:6
192:1 211:6
**talking (13)**
92:17 101:21
105:17 113:5
113:7 114:12
126:20 127:6
155:18 171:7
194:15,17
195:13,13
197:18 201:8
212:18,22
**tampering (1)**
157:16
**tape (1)**
86:15
**targeted (4)**
209:8,13 214:11
216:12
**targeting (2)**
11:25 18:17
**task (2)**
5:19 161:20
**tasks (1)**
14:24
**taught (5)**
24:24,25 25:1,2
25:5
**Tax (1)**
12:16
**teaching (1)**
28:25
**Team/The (1)**
5:23
**Telephonic (1)**

25:8
**television (1)**
27:3
**tell (13)**
28:2,3 44:13
70:10 112:25
129:17 134:25
149:5 170:11
185:23 190:21
212:4,19
**telling (3)**
146:10,13
152:23
**ten (1)**
156:11
**tend (1)**
141:14
**tense (1)**
155:18
**Tenth (1)**
2:6
**tenure (4)**
24:23 26:12
57:19 61:12
**term (3)**
41:4 45:22 47:5
**testified (1)**
116:4
**testify (3)**
3:13 122:13
220:3
**testifying (4)**
26:24 83:23
214:18 219:1
**testimony (20)**
28:7 54:10
55:15 86:7
93:13,16
104:16 107:1
115:3 124:12
160:6 171:24
183:19,20
184:20 187:7
215:13 220:12
226:23 227:1
**Texas (2)**
80:24 85:14
**text (3)**
109:3,12 130:6
**tgorman@ke...**
2:13
**Thank (42)**
8:1 17:21 45:15
46:16,17
47:16 48:4,16
51:17 58:1
61:4,21 67:6
67:11,23 68:4

68:9,14 82:16
89:12,25
98:15 99:5,6
102:6 103:23
108:16 109:7
143:13 154:13
161:14 163:13
163:19 173:23
188:1 191:9
196:4 199:20
201:15 223:15
223:21,22
**Thanks (2)**
172:15,19
**theirs (1)**
28:20
**theory (11)**
211:19 212:10
212:18,19
214:17 216:9
216:19 217:2
217:4 218:9
218:21
**thereabouts (1)**
16:20
**Theresa (2)**
1:17 226:6
**they'd (1)**
174:5
**thin (1)**
182:19
**thing (9)**
24:13 28:3,20
43:12 79:6
122:9 154:3
188:22 222:2
**things (20)**
15:2 20:21
22:18 26:11
28:1 43:3
58:17 60:4,7
63:20 90:21
92:10 133:24
139:24 149:6
167:18 183:22
186:21 190:15
207:4
**think (58)**
24:13 25:9 31:7
35:5 36:11
37:15 42:8
74:1 75:21
78:23,23 85:1
97:21 106:17
106:19 111:23
114:18 119:18
122:6 123:5
124:9 126:18

128:9 131:14
145:5 147:1
154:23 156:17
157:2 159:6
162:7,10,11
164:11 166:21
171:4,9
172:17 175:18
177:3 178:17
181:7 187:15
193:7,10,21
194:6 195:19
207:4 210:5
212:19 214:21
214:25 217:6
217:7,10,13
221:13
**thinks (3)**
185:19 186:14
198:1
**third (13)**
35:23 97:4
133:21 137:4
140:5,10
147:11 149:6
170:21 181:12
212:10,24
216:11
**third-party (2)**
35:7 96:13
**Thirty-four (2)**
200:25 201:1
**Thirty-nine (1)**
180:22
**Thirty-six (1)**
154:7
**Thirty-Third ...**
1:15
**Thomas (2)**
2:10 7:19
**thought (21)**
40:14,17 43:14
90:16 104:21
126:15 154:24
156:9 158:5
161:2,7 165:8
176:16 180:8
182:18 195:1
205:12,14
210:12,16
222:12
**thousands (1)**
122:16
**thread (2)**
92:14 201:13
**threatening (5)**
20:10,19,23,24
51:25

**threats (2)**
214:8,10
**three (6)**
32:7,23 33:11
127:20 128:4
128:16
**thuggish (1)**
52:8
**Thursday (6)**
138:3 177:25
191:19,22,22
193:4
**tight (1)**
120:15
**Tijuana (1)**
69:7
**time (76)**
7:7 8:21 10:16
12:20 13:4,4
19:23 20:10
23:2,18 24:16
37:11 43:3
49:8,16 52:24
60:12,12
61:10,13
65:19,21
66:10,13 67:1
71:2 75:24
77:19 78:8,12
79:19 84:24
87:21 94:7
95:14,20 97:7
97:21 100:16
101:4 105:6
105:15 106:5
109:13 110:15
117:11 118:13
120:10 122:18
123:17 125:5
125:19 135:14
135:16 136:16
140:18 143:7
145:13 153:4
155:20 156:3
166:7 168:19
172:20 173:20
175:7 176:21
187:16 192:9
194:19 202:25
214:5 215:16
215:20 223:8
224:3
**timeline (1)**
159:9
**timely (3)**
66:6 126:2
143:5
**times (6)**

56:15 82:1
127:20 180:15
200:10,14
**timing (2)**
78:5,6
**Timm (4)**
200:20 202:20
202:20 221:5
**title (6)**
23:9 168:21
180:18 203:25
204:9,12
**titled (1)**
188:4
**titles (1)**
12:2
**today (12)**
7:6 9:14 16:20
89:5 106:17
121:11 170:2
219:2 220:3,8
220:13,19
**today's (1)**
210:23
**told (23)**
105:1,9 106:13
126:8 127:2,6
127:11 130:10
130:14 138:10
138:17,20,24
138:25 139:2
139:3 146:18
149:6 150:20
173:2 174:9
177:17 189:22
**Tom (1)**
27:10
**tomorrow (1)**
202:25
**tone (2)**
180:7,7
**top (14)**
19:19 51:23
69:4 84:18
85:5 86:5
96:16 102:13
137:3 139:8
166:22 178:12
180:4 208:21
**tough (3)**
21:4,7 22:1
**Tova (3)**
177:9,10,10
**track (3)**
76:22 130:24
131:3
**transcript (4)**
126:3 223:17

226:24 227:4
**transmitted (1)**
142:17
**tribunals (1)**
31:21
**tried (3)**
17:4 87:4
202:22
**true (18)**
74:6,10 86:24
114:16 131:9
140:8 141:3
143:1 171:19
171:20,21
172:5,6 186:8
186:10 189:10
212:11 226:24
**Trump (6)**
164:14 196:22
200:1,8
213:20 218:23
**Trump's (6)**
5:18,23 6:5
161:20 196:7
196:17
**trustable (1)**
159:7
**truth (5)**
8:6,6,6 15:14,19
**truthful (1)**
194:11
**try (6)**
66:25 76:14
104:1 110:16
124:4 174:4
**trying (14)**
37:19 104:7,9
104:13,14,16
104:20 130:24
131:3 174:23
175:17 176:4
183:10 186:23
**Tsibi-Gyan (1)**
39:21
**Tsibu-Gyan (...**
111:1 147:12,20
148:6,9,17,25
149:5 150:20
151:14
**Tuesday (6)**
102:11 137:4,22
168:15,23
169:2
**turn (14)**
38:24 39:11
65:4 117:9
139:5 168:5
168:15 177:24

179:10 193:3
200:16 203:7
205:17 208:11
**turned (1)**
222:10
**turning (1)**
168:3
**turns (1)**
193:16
**Tweet (11)**
164:12 165:25
209:3,3
210:22 211:3
212:5 216:22
217:4 218:4,9
**tweeted (1)**
211:5
**tweets (11)**
105:2 163:25
166:6 167:2
175:23 176:5
192:4 196:24
208:18,19,24
**twenty (1)**
213:4
**Twenty-eight ...**
98:4
**Twenty-five (3)**
82:18 89:15,20
**Twenty-fourt...**
164:8
**twenty-seven ...**
98:5,6
**Twenty-six (1)**
89:21
**Twitter (5)**
5:20 173:24
175:18 197:3
221:18
**two (31)**
9:18 26:14 32:9
32:25 36:4,19
37:6 50:11
67:16 70:17
91:15 96:24
108:11 115:20
116:15 122:22
127:20 128:16
139:6 149:18
150:23 155:4
156:4,11
164:14 165:4
190:15 195:24
195:24 207:14
218:20
**two-year (1)**
156:7
**type (3)**

78:16 79:25
168:2
**types (2)**
16:7 60:7
**typing (1)**
202:22

———————
**U**
**U.S (30)**
16:11 17:6
48:21 65:8
73:19,20,23
74:10,12,22
75:2,9 76:5,15
77:10,18,22
78:4,9 79:9
84:22 87:13
87:14 89:7
105:6,15
106:3,5
136:17,20
**Uh-huh (4)**
41:16 47:4
54:13 139:7
**ultimate (1)**
180:18
**ultimately (3)**
23:17 180:14,19
**undercharged...**
203:17,18,21
**undergraduat...**
25:6
**underlying (2)**
188:15 203:14
**underneath (1)**
197:15
**understand (25)**
8:19 17:8,13
40:24 41:20
103:14,15
104:19 112:4
114:19 119:4
137:7,17
142:20 143:5
153:17 167:7
176:3 192:8
195:10 203:1
203:12,19
215:12 219:25
**understandab...**
130:11 152:18
153:15 172:17
**understandin...**
33:8 45:25 47:7
117:20 130:22
153:22 192:23
199:3 201:25
216:17 219:25

**understood (12)**
12:20 14:5
107:13 153:9
153:11,20
155:17 179:21
179:22 195:12
203:3 210:18
**undertake (2)**
24:12 92:13
**undertaken (2)**
53:19 54:15
**undertaking (1)**
160:13
**underway (3)**
206:6,19,21
**Union (3)**
4:20 83:11,13
**Union's (1)**
84:3
**United (8)**
1:1 11:24 48:20
70:16 75:19
79:4 83:2
181:19
**Universal (1)**
200:21
**University (3)**
10:5 27:12
155:2
**unknown (1)**
20:2
**unlawful (2)**
21:16 185:18
**unlawfully (4)**
17:1 138:15
182:11 209:23
**unnamed (1)**
87:6
**unofficial (1)**
19:17
**unreliable (3)**
164:21,25
171:13
**unspecified (1)**
182:7
**unsuitable (1)**
80:16
**unsupported (...**
49:14 50:23
**unsure (1)**
66:7
**untoward (1)**
21:6
**untrue (1)**
186:10
**unwarranted ...**
171:5 208:22
**update (2)**

79:21 87:25
**updated (2)**
87:21 157:20
**updates (1)**
157:23
**upset (4)**
130:11,15 166:2
210:10
**use (7)**
11:22 53:6 59:6
69:1 125:17
127:20 143:21
**useful (4)**
204:22,25 205:5
221:2
**uses (3)**
80:8,18,22
**Usually (1)**
154:2

———————
**V**
**vague (14)**
17:7 36:9 40:23
49:15 60:21
63:25 78:22
81:16 85:18
85:25 103:13
142:12,22
179:3
**validated (1)**
194:12
**validating (4)**
192:2 193:11
194:14,17
**validation (1)**
195:11
**Van (3)**
2:11 7:20
213:25
**Vanita (5)**
23:14 105:9
179:11 188:5
221:10
**various (34)**
4:23,24 5:13,25
6:7 11:21,23
19:4,4,5,7,8
20:18,20
26:10,23
27:18 56:14
56:15 60:4,10
76:24 87:5
92:13 97:14
99:12 135:3
138:18 139:16
141:17,18
144:15 223:8
223:9

**vary (1)**
77:4
**vehicle (6)**
76:21 77:8 78:6
78:14,17 81:8
**Vehicles (2)**
77:24 81:6
**venues (1)**
46:7
**verbiage (1)**
188:19
**verification (1)**
86:16
**verify (11)**
74:17 76:4,14
77:24 78:1,3
80:9,25 86:14
87:4 207:19
**verifying (1)**
80:16
**VERIS (2)**
93:9,10
**version (2)**
121:4 188:3
**versions (1)**
125:16
**versus (4)**
7:10 83:2
192:22 213:20
**vibrant (1)**
14:11
**vice (2)**
31:22 161:17
**video (1)**
126:3
**videographer ...**
2:24 7:4,5 8:1
25:12,15
66:18,21
89:12 96:3,6
107:19,22
125:8,11
175:8,11
207:7,10
224:1
**videotape (1)**
27:2
**videotaped (1)**
7:12
**view (7)**
75:20 120:6
184:12 185:6
186:9 187:7
223:13
**views (2)**
186:2,24
**vigilante (9)**
182:22,22 183:3

183:14 185:9
185:12,20
186:15 211:15
**vigilantes (1)**
209:4
**vigorous (2)**
14:11 180:7
**violate (1)**
216:7
**violated (1)**
20:12
**violating (4)**
134:7 206:24
212:6 215:23
**violation (4)**
86:12 186:11
214:19 218:17
**violence (2)**
214:8,8
**Virginia (74)**
1:3 3:18,19,20
3:21 5:7 31:25
32:3 44:9,11
44:21,23
45:18,20
46:20,23
47:19,21 48:7
48:9 75:5
90:12 91:23
92:20 95:7,21
95:23 96:18
97:14 98:18
99:12 101:6
102:17,25
103:7,20
105:1,5,14,24
106:3,4,7
108:22 110:12
112:1 129:8
131:24 132:8
132:13 133:4
134:19 138:7
142:4 143:21
144:1,9,21,25
145:1,2,9,24
146:11 148:10
148:11,17
164:15 165:22
178:21 197:25
214:7 215:19
215:22
**virtue (1)**
216:3
**visiting (1)**
25:3
**voice (2)**
161:7 183:23
**volume (2)**

207:17 224:2
**volunteering (1)**
202:16
**von (10)**
56:1,10,21 58:4
84:19 86:7,17
158:24 159:18
196:21
**vote (31)**
16:11,14 17:5
18:15,15,23
19:3,13 44:17
49:14 50:24
62:20 71:3,9
71:25 73:21
77:21 78:4
81:1 85:7
105:7 106:5
107:15 138:15
141:17 170:18
181:19,20,20
182:14 189:18
**voted (8)**
16:25 17:5,10
17:12 63:1
72:12 140:7
140:20
**voter (80)**
5:14,17,18,23
5:23 6:5 13:9
13:9,10 15:11
15:14,19 16:8
18:3,6,13
19:14,15
21:25 49:9
52:3,5,14 53:9
53:13,18
54:11 62:17
62:21 65:17
69:3,15 72:16
74:16 75:16
82:5,8 86:10
86:25 87:12
87:24 88:12
92:10,20
102:17 108:25
129:5 141:5
143:15 154:17
154:25 155:4
155:10,21,24
156:6,14,18
156:21,25
157:13,16,19
157:20,21
158:7,11
160:25 161:20
167:18 181:13
181:15 196:7

196:18 197:19
197:20 204:5
208:22 209:4
211:16
**voter's (1)**
69:6
**voter-fraud-is...**
197:17
**voters (64)**
5:7 13:14 18:19
19:3,16 20:3,7
57:1 62:15
68:22,25
69:10 73:23
80:9 86:15
87:4 90:12
91:23 95:7,21
95:24 97:14
98:18 99:12
99:22 101:6
102:25 103:7
103:21,25
105:1,6,15,25
106:3,4,24
108:22 110:12
112:1 128:5
128:13 129:8
129:13 138:7
138:13,18
139:3 143:25
144:8 146:11
146:14,18
161:2,6 182:7
188:24 189:13
189:15 190:22
197:4 198:21
199:1,11
**voting (47)**
3:25 4:8 5:11,12
14:15,21
16:17 17:17
18:22 19:12
19:13 20:10
24:6,10 25:3
26:6 27:3 56:2
56:4,5 57:13
59:25 61:9
63:23 64:3,8
64:11,12,13
85:13 105:18
105:21 106:7
129:16,21
137:15 162:4
163:2,4,4
177:11 178:8
185:25 202:23
203:10 205:23
214:9

**VRA (1)**
214:8
**vs (1)**
1:7

_____
**W**
**Wagner (2)**
111:6,12
**wait (1)**
19:12
**waive (6)**
51:7 148:22
149:4 150:24
152:25 177:5
**waiver (1)**
126:2
**waiving (6)**
24:14 147:23
148:21 150:23
152:24 190:25
**Walendy (2)**
111:6,12
**Wang (1)**
177:10
**want (28)**
41:9 50:4,4 63:9
63:13 69:15
71:10 74:14
75:21 92:6
98:20 109:24
111:3 123:3
124:1,2,5
152:12 153:23
154:24 156:8
169:13 172:13
173:2 190:13
195:1 209:16
214:23
**wanted (23)**
18:15 64:15
88:1,11 90:24
92:2,3,8,16
125:2,3
131:21 134:5
152:17 153:14
166:7 169:17
177:18,22
179:22 199:7
199:25 222:9
**wanting (1)**
153:18
**Wants (2)**
112:12 115:18
**war (1)**
175:18
**warned (1)**
210:24
**warnings (1)**

210:25
**Washington (4)**
2:17 12:9,11
31:19
**wasn't (12)**
20:17 22:21,21
33:9 59:4
92:13 104:13
131:1 138:20
145:6,21
202:6
**watching (1)**
21:8
**way (23)**
20:3 28:16 79:2
85:24 87:8
91:13,20
106:8 118:22
123:19 124:6
134:11 136:8
159:2 177:4
191:2 202:22
202:24 205:10
206:7,10,20
222:21
**ways (10)**
11:14 15:25
16:1,3,15
42:21,24 43:2
87:5 110:2
**we'll (11)**
26:18 35:13
38:14 118:18
118:21 125:4
125:5 151:23
181:5,7 213:2
**we're (21)**
25:12 32:10
66:18 96:3
105:17 107:19
117:4,5
120:15 121:10
123:1 124:21
154:5 175:8
187:15 201:7
207:7,10
224:4
**we've (14)**
45:3 62:2 78:17
82:23 102:9
102:23 103:5
110:10 136:8
143:17 163:23
165:22 191:12
199:24
**weapons (2)**
21:13,15

**WeAreRALL...**
192:16,19
**Web (3)**
133:13 192:19
195:6
**Wednesday (3)**
1:16 7:1 177:7
**weeks (1)**
156:11
**weeks.' (1)**
155:4
**Weidenhof (3)**
100:7,7 127:23
**weight (1)**
161:1
**welcome (5)**
99:7 180:9
195:9,12
201:16
**welcomes (1)**
203:18
**well-staffed (1)**
19:9
**Welp (2)**
137:5 138:4
**went (8)**
9:25 11:3 12:6
13:21 22:25
94:24 107:25
197:22
**weren't (14)**
15:16 60:18
80:24 81:3
104:7 131:3
189:3,3,4,6,13
189:20,22
190:23
**Wesley (4)**
11:8,17 12:4
192:13
**West (1)**
9:25
**White (2)**
3:23 51:21
**widespread (1)**
181:16
**willing (4)**
44:3 123:2
124:7 126:22
**window (1)**
156:8
**wish (1)**
83:7
**wished (2)**
202:7,9
**withdraw (1)**
111:13
**withheld (1)**

147:15
**withhold (1)**
120:10
**witness (119)**
8:3,8 17:9 25:9
28:9 36:12
38:3,7 39:8
40:25 43:12
45:15 46:17
47:16 48:4,16
50:14,25
51:17 54:5,7
55:16 58:1
60:22 61:4,21
63:9 64:2,20
65:17 66:4,15
67:6,11,23
68:4,9,14
69:21 70:1
71:16 72:22
74:3 76:8,19
78:23 79:17
81:17 82:1,16
85:19 86:1
88:7,18 89:10
89:25 93:18
98:7,15 99:5
101:16 102:6
103:15 104:5
104:12 107:2
108:15,17
111:15 116:4
132:5 135:6
137:12 142:13
142:23 143:4
143:13 144:2
144:13 147:5
148:1,13
149:13 154:13
160:8 161:14
163:19 164:2
172:2,7 179:4
181:24 183:22
184:22 187:9
187:17 188:1
191:9 196:4
199:20 200:24
201:1,5
205:21 209:19
212:4 215:5
217:11,13,17
217:20,23
218:8 219:10
223:15,20,22
226:16 227:1
**Wolf (2)**
3:25 57:13
**Woman (2)**

5:15 143:16
**Woods (2)**
127:13,15
**word (2)**
52:2 130:23
**wording (1)**
99:21
**words (9)**
59:6 110:23
111:4 121:5
133:20 188:15
188:16,18
189:8
**work (60)**
11:3,9 12:6 13:5
13:6,21 15:5
24:5,9 26:5
27:23 28:1,6
28:10,13,15
28:22 29:1
34:5,15 36:4
36:10 38:11
49:23 50:11
62:8 101:8,14
101:18,21,22
101:22 110:1
111:23 112:18
112:19 113:13
114:6,22,25
120:3,19,25
121:8 122:2
123:11 124:20
125:20 152:17
153:14,19,23
177:4 191:16
197:22 211:24
213:16 214:22
215:1 223:9
**worked (8)**
10:21 15:4 60:2
60:5 169:18
169:25 177:13
192:12
**working (5)**
12:11 14:14
20:16 136:24
168:20
**works (4)**
56:13 170:4
177:12 201:20
**world (3)**
26:1 109:14
202:23
**worried (1)**
171:17
**worth (1)**
214:4
**worthy (1)**

104:23
**wouldn't (10)**
28:9 50:3 59:1,5
121:14 131:23
132:3 134:11
177:18 186:18
**wrap (1)**
207:4
**write (14)**
88:20 113:24
130:24 140:5
141:13 153:13
170:6,25
174:22 193:7
197:15 204:19
214:3 215:16
**writes (9)**
51:24 97:4
145:10 152:11
152:12 192:1
195:1,8
198:11
**writing (7)**
31:3,4 37:3
88:20 137:15
146:9,14
**writings (1)**
36:1
**written (28)**
35:15,20,24
36:2 51:1
63:21 64:2
110:20 111:1
112:11,23
113:5 115:9
115:17 126:25
127:10,13,24
138:4 164:19
167:10 169:7
172:12 173:8
178:6 183:23
202:21 206:1
**wrong (3)**
117:21 185:20
204:9
**wrongly (3)**
188:11 211:6,13
**wrote (18)**
37:25 40:10
56:1 74:21
111:6 114:11
128:1 130:9
137:8,23
139:13,15
140:22 146:8
170:21 172:16
175:16 193:20

**X**

**X (5)**
3:1 4:1 5:1 6:1
227:4

**Y**

**yeah (27)**
17:12 28:9 54:5
59:5 64:20
74:3 77:21
78:23 79:17
82:20 85:16
86:1 88:7 97:3
119:15 120:22
125:24 135:6
137:12 140:15
144:13 160:8
171:14 176:4
181:24 193:16
219:10
**year (5)**
10:5,10,13
14:19 202:4
**years (4)**
10:1 141:18
156:4,11
**York (7)**
2:7,7 13:22
31:18 180:15
200:10,14

**Z**

**0**

**1**

**1 (12)**
3:8 32:8,15,19
32:19 84:1,18
151:1 169:8
172:14,16,23
**1:12 (1)**
96:7
**1:18-cv-00423...**
1:7 7:12
**1:31 (1)**
107:20
**1:36 (1)**
107:23
**1:59 (1)**
125:9
**10 (17)**
3:21 4:11 6:13
39:23 47:24
48:2,7 68:25
85:5 163:25
166:13 167:15
167:24 177:15

200:19 201:4
202:19
**10:03:30 (2)**
97:2,3
**10:06 (3)**
201:8,14,18
**10:09 (1)**
201:8
**10:10 (1)**
25:16
**10:13 (1)**
202:21
**10:20 (1)**
201:11
**10:27 (1)**
168:22
**10:29 (1)**
202:20
**10:30 (2)**
96:24 169:3
**10:33 (1)**
201:8
**10:38 (2)**
169:4,5
**10:42 (1)**
168:6
**10:44 (1)**
137:22
**10020 (1)**
2:7
**1006 (2)**
5:6 102:24
**102 (1)**
5:5
**103 (1)**
5:6
**108 (1)**
5:9
**11 (17)**
3:22 4:22 48:12
48:14,19
52:22 85:12
166:13 168:10
168:15,23
169:3,23
170:14 172:9
173:1,16
**11:00 (1)**
94:25
**11:21 (1)**
66:19
**11:35 (1)**
66:22
**11:52 (1)**
152:20
**11:54 (1)**
172:10
**11:56 (1)**

173:1
**11:57** (1)
210:22
**110** (1)
5:10
**112** (2)
6:13,13
**113** (1)
6:14
**116** (1)
6:14
**119** (1)
5:12
**12** (18)
3:23 51:13,15
51:19 70:14
136:9 174:18
174:21 175:15
177:7,14
191:20,22
208:18 209:12
210:23 216:21
218:2
**12:07** (1)
173:6
**12:18** (1)
177:7
**12:23** (1)
96:4
**121st** (1)
213:4
**12700** (2)
1:18 226:10
**13** (12)
3:24 4:19 6:15
57:6,8,11
110:11 139:9
140:8,18
177:25 194:25
**1339** (1)
9:10
**136** (1)
5:13
**14** (10)
4:5 6:14 57:22
57:24 58:3
86:5,5 87:9
141:2 179:11
**143** (1)
5:14
**14567** (1)
96:14
**15** (5)
4:7 60:24 61:2,6
86:6
**150** (1)
6:15
**154** (1)

5:16
**15467** (1)
145:7
**15th** (1)
146:4
**16** (10)
4:9,16 61:17,19
61:22 63:23
64:16 65:12
151:25 203:8
**16-1** (1)
108:20
**16-7** (1)
108:20
**161** (1)
5:18
**163** (1)
5:20
**17** (14)
1:17 3:22 4:10
7:1,6 39:1
48:19 67:2,4
68:17,21
151:25 170:2
224:3
**174** (1)
82:23
**18** (9)
4:11 67:7,9
68:17,24
102:11 143:17
166:20 180:12
**18.2-451** (2)
3:19 46:21
**18.2-499** (2)
3:20 47:19
**18.2-500** (2)
3:21 48:7
**181** (1)
5:21
**187** (1)
5:23
**19** (12)
4:9,12 62:14,22
67:12,14
68:18 69:1
70:2,12 193:5
227:9
**191** (1)
5:25
**195** (1)
6:5
**1970** (1)
9:5
**199** (1)
6:7
**1995** (1)
10:12

**1998** (2)
62:20 63:1
**1999** (1)
63:1
**19th** (1)
9:5
**1st** (4)
138:3,11,17
139:4

———————
**2**
———————
**2** (15)
3:10 5:19 32:11
32:15,19,20
49:12 50:22
84:19 161:21
170:6 172:14
172:16,24
174:14
**2-year** (1)
87:14
**2:36** (1)
125:12
**2:48** (1)
100:6
**20** (9)
4:13 67:18,21
68:18 73:13
74:15,18
196:7 205:19
**2000** (1)
63:1
**20007** (1)
2:17
**2002** (4)
10:16,17,25
63:1
**2003** (4)
10:25 11:5
31:13 63:1
**2004** (6)
11:16,16 20:5
20:17 63:1
84:12
**2005** (6)
13:18 63:1
87:10,18,21
87:23
**2006** (1)
63:1
**2007** (2)
15:21 16:19
**2008** (8)
3:22 17:25
20:22 21:2
48:19 51:24
52:14 63:2
**2009** (1)

22:10
**2010** (2)
14:1 22:13
**2013** (4)
4:9 51:20 62:14
62:22
**2014** (6)
4:10,11 11:13
11:15 68:23
68:25
**2015** (6)
4:13 22:24 23:7
57:11 61:7
85:4
**2016** (8)
4:14,15,16,19
4:22 58:3
91:17 182:8
**2017** (77)
5:5 23:24,25
36:24 39:20
39:23 91:18
94:8,9,16,17
94:24,25
96:23 99:17
100:6,23
102:11 104:25
109:4 137:5
137:14,22
138:3,11,17
139:9 140:9
140:18 146:5
146:17 147:12
148:9,16,23
149:19 150:21
151:3,25
152:5,9,11,20
154:15 156:25
161:16 163:25
166:14 167:15
167:24 168:10
168:16,23
169:3,23
170:14 172:9
173:1,16
174:18,21
175:15 177:7
177:13,14,16
178:1 179:11
180:12 196:7
199:25 200:2
200:20 201:6
202:20 203:8
205:17
**2018** (11)
39:17 191:20,23
193:5 194:25
208:18 209:12

210:23 213:5
216:21 218:2
**2019** (9)
1:17 3:14 7:1,6
34:1 39:1
170:2 224:3
227:9
**202** (1)
2:17
**2093(b)** (1)
226:15
**20th** (1)
213:4
**21** (6)
4:14 67:19,21
68:18 82:3
200:2
**212** (1)
2:7
**22** (6)
4:15 6:12 67:24
68:2,18 82:4
**23** (7)
4:13,17 6:13
68:5,7,18 82:4
**24** (6)
4:19 68:10,12
68:18 82:4
163:24
**24th** (1)
164:7
**25** (7)
4:20 82:12,14
82:19,22
89:17,19
**26** (6)
4:22 89:23 90:2
94:24 100:6
100:22
**27** (20)
4:23 36:23 94:9
94:17 98:3,11
98:13,17
103:19,25
146:5,17
147:11 148:9
148:16,23
149:19 150:21
151:3 152:9
**28** (14)
4:14,24 5:5 99:1
99:3,9 103:19
103:25 109:5
109:6 205:17
205:19 208:12
226:21
**28(a)** (1)
226:17

**28(a))** (1)
226:12
**28th** (1)
205:20
**29** (15)
3:14 5:5 34:1
39:17 94:25
102:2,4,8
103:19,25
151:25 152:5
152:10,20
154:15

———————
**3**
———————
**3** (12)
3:13 6:12 32:13
32:15,19,22
51:23 74:16
87:11 136:10
172:13 174:15
**3:26** (1)
194:25
**3:29** (1)
137:14
**3:50** (1)
138:3
**30** (12)
5:6 91:17 99:17
102:22,23
103:10 104:1
109:4 137:4
137:14,22
199:25
**30(e)** (1)
227:7
**30(f)(1))** (2)
226:17 227:2
**30,000** (1)
87:12
**3000** (1)
2:16
**31** (5)
5:9 99:10 108:9
108:13,19
**310** (1)
2:22
**318** (1)
2:21
**32** (20)
3:8,10,13 5:10
110:4,7,10
119:3 123:15
123:24 124:16
124:24 125:16
126:7,25
127:20 128:5
128:17 166:3
211:9

**33 (13)**
3:14 5:12
  118:25 119:3
  119:8 123:15
  124:24 125:16
  128:4,4
  163:23 166:4
  211:9
**34 (15)**
3:15 5:13
  135:22 136:2
  136:7 139:6
  146:4 151:17
  151:24 166:11
  174:20 181:4
  191:12 200:17
  213:3
**35 (4)**
5:14 143:9,11
  143:15
**36 (5)**
5:16 6:12 154:9
  154:11,15
**37 (4)**
5:18 161:10,12
  161:16
**375-0434 (1)**
2:22
**38 (9)**
3:16 5:20
  163:14,17,21
  208:12 213:3
  216:24 218:5
**39 (4)**
5:21 180:23
  181:2,9

_____ 4 _____

**4 (9)**
3:14 6:14 33:19
  33:22 34:1
  51:20 96:23
  102:9 196:25
**4:07 (1)**
137:5
**4:09 (1)**
175:9
**4:19 (1)**
175:12
**40 (4)**
5:23 187:21,24
  188:3
**41 (6)**
5:25 191:5,7,11
  195:18,20
**415 (1)**
2:12
**42 (4)**

6:5 195:23
  196:2,6
**43 (4)**
6:7 199:16,18
  199:22
**44 (1)**
6:12
**45 (1)**
3:18
**46 (1)**
3:19
**47 (1)**
3:20
**48 (2)**
3:21,22

_____ 5 _____

**5 (12)**
3:15 34:22,24
  35:3 36:25
  39:10 57:11
  61:7 150:25
  174:13 196:25
  211:5
**5,000 (1)**
199:3
**5,500 (1)**
197:20
**5,550-plus (1)**
198:23
**5:20 (1)**
207:8
**5:35 (1)**
207:11
**5:47 (3)**
174:22 175:15
  177:14
**5:48 (1)**
167:1
**5:56 (1)**
177:16
**5:57 (3)**
166:22,23
  167:10
**51 (2)**
3:23 98:11
**527 (2)**
12:15,16
**555 (1)**
1:14
**562-page (1)**
98:11
**57 (2)**
3:24 4:5
**5th (1)**
39:20

_____ 6 _____

**6 (19)**
3:16 4:10,15
  38:15,19,23
  39:7,9,14,15
  44:25 58:3
  68:22 136:11
  147:1 161:16
  197:2 199:24
  211:12
**6:03 (2)**
224:3,5
**6:13 (1)**
167:25
**6:40 (1)**
152:11
**600 (2)**
2:6,16
**606 (1)**
2:21
**60th (1)**
208:17
**61 (2)**
4:7,9
**633 (1)**
2:11
**67 (5)**
4:10,11,12,13
  4:14
**676-2292 (1)**
2:12
**68 (4)**
4:15,17,19
  96:14

_____ 7 _____

**7 (8)**
3:18 45:11,13
  45:18 197:15
  211:5,12
  213:5
**7:11 (1)**
168:10
**763-5000 (1)**
2:7

_____ 8 _____

**8 (6)**
3:4,19 46:10,12
  46:20 90:17
**8.01-223.2 (2)**
3:18 45:18
**82 (1)**
4:20
**89 (1)**
4:22

_____ 9 _____

**9 (4)**

3:20 47:12,14
  47:19
**9:06 (1)**
191:20
**9:14 (3)**
1:16 7:2,7
**9:17 (1)**
179:11
**9:28 (1)**
178:1
**9:45 (2)**
25:13 168:16
**9:50 (1)**
201:10
**90015 (1)**
9:9
**90026 (1)**
9:11
**90277 (1)**
2:22
**919 (1)**
9:8
**94111 (1)**
2:12
**945-6079 (1)**
2:17
**98 (1)**
4:23
**99 (1)**
4:24