# EXHIBIT M

1                IMPORTANT NOTICE

2

3        You have requested an unedited,

4   uncertified rough-draft transcript.  This

5   rough-draft transcript has been requested in

6   the form of either a realtime hookup via

7   computer and/or an ASCII file delivered

8   after the close of proceedings.  It contains

9   the raw output from the Court Reporter's

10  stenotype machine, translated into English

11  by the Court Reporter's computer, without

12  the benefit of editing and proofreading.

13        This Certified Court Reporter makes no

14  representations regarding the accuracy and

15  completeness of said transcript.  This draft

16  is unedited and may contain untranslated

17  steno, mistranslated text, misspelled words

18  and/or nonsensical word combinations.  This

19  will be corrected on the final certified

20  transcript.

21        This draft transcript is provided only

22  for purpose of augmenting counsel's notes

23  and may not be cited in any court proceeding

24  or distributed to any other parties.

25

## Page 2

1    THE VIDEOGRAPHER:  This is the start
2  of tape labeled number 1 of the videotaped
3  deposition of Hans von Spakovsky, in the
4  matter of League of United Latin American
5  Citizens, et al. v. Public Interest Legal
6  Foundation, et al., in the United States
7  District Court for the Eastern District of
8  Virginia, Alexandria Division, Case Number
9  1:18-cv-423-LO-IDD.
10    This deposition is being held at 1440
11  New York Avenue, Northwest, Suite 1100,
12  Washington, D.C., on May 9, 2019, at
13  approximately 7:59.
14    My name is David Chroniger from TSG
15  Reporting, Inc., and I am your legal video
16  specialist.  Your court reporter is John
17  Harmonson in association with TSG Reporting.
18    Will counsel please introduce
19  yourselves.
20    (Whereupon, counsel placed their
21  appearances on the video record.)
22    HANS VON SPAKOVSKY,
23  after having been first duly sworn or affirmed,
24  was examined and did testify under oath as
25  follows:

## Page 3

1    EXAMINATION
2  BY MS. RIGGS:
3    Q.   Good morning, sir.
4    A.   Good morning.
5    Q.   Can you please state your full name
6  for the record?
7    A.   Hans Anatol von Spakovsky.
8    Q.   And can you spell is?
9    A.   Hans, H-a-n-s, Anatol, A-n-a-t-o-l,
10  von, that's a small v, S-p-a-k-o-v-s-k-y.
11    Q.   Thank you.
12    Mr. von Spakovsky, have you had your
13  deposition taken before?
14    A.   Yes.
15    Q.   Approximately how many times?
16    A.   I know I've had it taken once.  I
17  can't remember -- I can't remember if I had it
18  taken back when I was a corporate counsel; that
19  was many years ago.
20    Q.   Okay.  And when was the last time you
21  recall having your deposition taken?
22    A.   About a year and a half ago.
23    Q.   So 2017-ish?
24    A.   I believe so.
25    Q.   Okay.  Since it's been a little bit

## Page 4

1  and you haven't had your deposition taken
2  extensively, I would like to just briefly review
3  some of the ground rules for the deposition if
4  you don't mind.  For the court reporter's sake,
5  please answer any questions verbally and don't
6  nod or shake your head; he can't capture that on
7  the transcript.  Do you understand?
8    A.   I do.
9    Q.   I would like for us to do our best not
10  to speak over each other.  So I will endeavor to
11  wait until you finish answering your question
12  before I ask my next question.  And if you can
13  afford me the same courtesy, I would be very much
14  obliged.  Do you understand?
15    A.   I do.
16    Q.   If you don't understand the question,
17  please don't hesitate to ask me to restate it or
18  if you zone out for a second and miss part of it,
19  I would be happy to, just ask, if you will.
20    If you don't answer -- if you answer a
21  question, I'll assume you understand the
22  question.  Is that fair?
23    A.   I understand your answer.
24    Q.   You understand what I'm representing
25  my assumption will be?

## Page 5

1    A.   I understand what your assumptions
2  are.
3    Q.   Okay.  You can take -- we can take a
4  break at any time.  Don't hesitate to ask if you
5  need to walk around or use the facilities.  My
6  only request is that if there is a pending
7  question, you answer the question before we take
8  a break.  Do you understand?
9    A.   I do.
10    Q.   Do you understand that you're under
11  oath and subject to perjury for any false or
12  misleading testimony today?
13    A.   Yes.
14    Q.   Is there any reason you may not be
15  able to answer questions truthfully or completely
16  today?
17    A.   No.
18    Q.   What did you do to prepare for this
19  deposition?
20    A.   I spoke with my counsel.
21    Q.   Your counsel who is here with you
22  today?
23    A.   That's correct.
24    Q.   Did you speak with any other
25  attorneys?

1 pages of documents you ultimately produced in
2 this matter?
3     A.   No.  I simply made -- printed them out
4 and sent them to my counsel.
5     Q.   If I represented to you that your
6 total production in this case numbered only 132
7 pages, would that surprise you?
8     A.   I --
9         MR. DRISCOLL:  Objection.
10        Go ahead.
11        THE WITNESS:  I mean, I don't -- I
12 don't -- I didn't count up the pages.
13 BY MS. RIGGS:
14    Q.   And then will you look on page 2 of
15 Exhibit 4 with me.  Your response to Request
16 10 says:  "Mr. von Spakovsky does not possess
17 non-privileged communications or documents about
18 the instant litigation."
19        Did I read that correctly?
20    A.   Yes.
21    Q.   And do you possess privileged
22 communications or documents about the instant
23 litigation?
24        MR. DRISCOLL:  Objection.
25        Go ahead and answer.

1        THE WITNESS:  What do you mean,
2     privileged documents about the litigation?
3 BY MS. RIGGS:
4     Q.   Well --
5     A.   Do you mean -- do you mean analysis of
6 the litigation or something like that?
7     Q.   I mean -- you're an attorney, right?
8     A.   I am.
9     Q.   So any document to which an applicable
10 privilege would apply.  Do you have any of those?
11    A.   If you're talking about documents
12 related directly to the litigation, I mean all
13 I -- all I may have gotten were copies of the
14 pleadings and the objection letters, things like
15 that.  I don't have anything else that I'm aware
16 of.
17    Q.   And those wouldn't be privileged
18 documents, correct?
19    A.   I don't believe so.
20    Q.   Do you have any documents that you
21 believe to be attorney-client privilege
22 protected?
23        MR. DRISCOLL:  Objection.
24        Go ahead and answer.
25        THE WITNESS:  I would assume that any

1     communications between myself as a member of
2     the board and our general counsel or the
3     other lawyers would be privileged.
4 BY MS. RIGGS:
5     Q.   Who is the general counsel?
6     A.   Christian Adams.
7     Q.   And who are the other lawyers?
8     A.   Noel Johnson, Kaylan Phillips.
9     Q.   So when you were doing your search, if
10 there was an e-mail between you and any of the
11 PILF lawyers, you would have considered that
12 covered by the attorney-client privilege?
13    A.   Yes.
14    Q.   Would you have produced those to your
15 attorney?
16    A.   I did not do so.
17    Q.   What about an attorney work product?
18 Did you have any documents that were -- that you
19 believe to be covered by attorney work product
20 privilege?
21    A.   Not that I recall.
22    Q.   Did you have any documents that you
23 believed were covered by a First Amendment
24 privilege?
25    A.   Well, that covers -- I do a lot of

1 writing, so I'm sure there's all kinds of
2 materials that I -- where I write that are
3 generally covered by the First Amendment.  I
4 don't know if there is anything specific related
5 to this litigation.
6     Q.   Nothing that you withheld because you
7 believed producing would violate a First
8 Amendment privilege that you enjoyed?
9     A.   Not that I recall.
10    Q.   And just so I understand, the extent
11 you had e-mails with anyone at PILF who was not
12 an attorney, did you withhold those on the basis
13 of an attorney-client privilege?
14        MR. DRISCOLL:  Objection.
15        Go ahead and answer.
16        THE WITNESS:  I don't recall seeing
17     any e-mails about any of the alien reports
18     to anyone that was not a lawyer at Public
19     Interest Legal Foundation.
20 BY MS. RIGGS:
21    Q.   What about e-mails with other members
22 of PILF's board?  Would you consider those
23 covered by the attorney-client privilege?
24    A.   I -- I'm not an expert on that.  I
25 don't know.

1    Q.  Did you find any e-mails between
2  yourself and other members of PILF's board
3  relating to any of the requests for documents?
4    A.  Not -- not that I recall.
5    Q.  Did you produce a privilege log that
6  documented any e-mails between you, Mr. Adams, or
7  any other attorneys at PILF regarding the
8  responses -- sorry, the request for documents?
9    A.  No.
10    Q.  You did not produce a privilege log?
11    A.  No.
12    Q.  Do you remember approximately how many
13  e-mails that you found that were responsive that
14  you withheld?
15    A.  No.
16    Q.  Can you ballpark it?  Like more than
17  ten?
18    A.  No, I don't recall.
19    Q.  Did you review every document before
20  it was produced to plaintiffs' counsel?
21    A.  Yes.
22    Q.  And do you recall that in what I will
23  represent to you is 132 pages of documents, you
24  produced not one single e-mail?
25    A.  I assume that's correct.

1    Q.  Can you explain to me why you as a
2  member of PILF's board of directors failed to
3  cease any automatic deletion of potentially
4  relevant e-mails as of when this case was filed
5  on April 12, 2018?
6    MR. DRISCOLL:  Objection.
7    MR. LOCKERBY:  Objection.
8    MR. DRISCOLL:  You can go ahead and
9  answer, if you can.
10    THE WITNESS:  I -- I don't know.  I
11  don't recall getting any -- knowing that I
12  needed to do that.
13  BY MS. RIGGS:
14    Q.  As a member of the board, were you
15  notified when this litigation was filed against
16  PILF?
17    A.  I believe so.
18    Q.  And who would you have been notified
19  by?
20    A.  I -- I'm sure it would have been our
21  general counsel, although I don't recall the
22  actual notice.
23    Q.  And you were never provided what's
24  known as a litigation hold letter?
25    A.  Not that I recall.

1    Q.  And you were never provided any verbal
2  instructions not to delete any documents or
3  e-mails that might relate to this litigation?
4    A.  I don't recall.
5    Q.  And you would agree with me that if
6  you had been told not to delete things in April
7  of 2018, you would have had e-mails dating back
8  at least to late 2016 that wouldn't have been
9  deleted yet under Heritage's deletion policy,
10  correct?
11    MR. LOCKERBY:  Object to the form.
12    MR. DRISCOLL:  Objection.
13    You can go ahead and answer.
14    THE WITNESS:  I don't know.
15  BY MS. RIGGS:
16    Q.  As of April 2018, in your Heritage
17  e-mail account there would have been e-mails
18  dating back to late 2016 because the automatic
19  deletions don't happen until 18 months, correct?
20    A.  I believe that's correct.
21    Q.  When you performed your first search
22  at some point in early 2019 after you received
23  your subpoena for documents per Heritage's
24  retention policy, you would have only had e-mails
25  dating back to late 2017.  Is that correct?

1    A.  Yes.
2    MS. RIGGS:  I'm going to hand you --
3  well, the court reporter is going to mark as
4  Exhibit 5 a document.
5    (Exhibit 5 marked for identification
6  and attached hereto.)
7  BY MS. RIGGS:
8    Q.  Mr. von Spakovsky, I will represent to
9  you that this is the 2017 990 form for The
10  Heritage Foundation.
11    Have you seen this document before?
12    A.  I have not.
13    Q.  You were not responsible for producing
14  it?
15    A.  No.
16    Q.  Will you turn with me to page 6.  The
17  numbers are very small at the bottom right-hand
18  corner.  So it will say 6 of 17.
19    A.  Okay, I'm on page 6.
20    Q.  Okay.  Do you see Section B that's
21  called "Policies"?
22    A.  Yes.
23    Q.  And if you look at number 14, it says:
24  "Did the organization have a written document
25  retention and destruction policy?"