# EXHIBIT O

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

- - - - - - - - - - - - - - - - -x

LEAGUE OF UNITED LATIN AMERICAN    :

CITIZENS - RICHMOND REGION         :

COUNCIL 4614, ELIUD BONILLA,       :

LUCIANIA FREEMAN, and ABBY JO      :

GEARHART,                          :

          Plaintiffs,      :   CIVIL ACTION NO.

v.                                 :   1:18-cv-00423

PUBLIC INTEREST LEGAL FOUNDATION   :   (LO/IDD)

and J. CHRISTIAN ADAMS,            :

         Defendants.      :

- - - - - - - - - - - - - - - - -x


Videotaped Deposition of STEVEN ALBERTSON

Washington, D.C.

Tuesday, May 14, 2019

11:04 a.m.


Job No.:  451690

Pages 1 through 185

Reported by:  Cassandra E. Ellis, RPR

1

```
 1                  Are you familiar with this

 2    report?

 3        A     Yes, I've seen it before.

 4        Q     And similarly, behind Exhibit

 5    B, there's a report dated May 2017,

 6    entitled:  Alien Invasion II, The Sequel

 7    to the Discovery and Coverup of

 8    Non-Citizen Registration and Voting in

 9    Virginia.

10                  Are you familiar with this

11    report, as well?

12        A     I have seen it before.

13        Q     Did you have any role in

14    gathering information for use in

15    publication of either or both of these

16    two reports?

17        A     To be honest, I have not

18    thoroughly examined the reports, nor did

19    I at the time of their publication.  But

20    I -- so I'm not sure exactly what,

21    directly, I might have helped gather

22    showed up in these reports.

23                  It's my understanding that the

24    information that I helped gather provided

25    some basis for content of these reports.
```

```
 1    I'm not trying to parse the words too
 2    closely, but I don't want to say that
 3    there's a one for one what I helped
 4    showed up here.  I just don't know that
 5    that's the case.
 6        Q    And how was it that you came to
 7    help gather information for these
 8    reports?
 9        A    As I recall, a mutual friend of
10    ours, that is between my -- me and
11    Mr. Adams, informed me of Mr. Adams'
12    activities, thought I might be
13    interested, and I thought it sounded like
14    a worthwhile project, where in my role as
15    an activist and my personal life I
16    probably knew a lot of people who would
17    like to be involved, to the extent that
18    they could be volunteer contributors to
19    the effort.
20            And that's really what my -- my
21    role was, was to facilitate involvement
22    of people in various parts of the
23    Commonwealth.  I would say, ultimately,
24    four or five different people.
25        Q    And what did the four or five
```

1    people that you contacted, along with
2    you, yourself, do as part of this effort?
3        A     So I didn't do any of the,
4    shall we call it, fieldwork.  And the
5    fieldwork involved -- at least I don't
6    recall having done any of it -- the
7    fieldwork involved sending a volunteer
8    out to a local registrar's office, with
9    some sort of a script or set of
10   instructions on what to request from a
11   local registrar, and then, if the
12   registrar complied, how to handle the
13   response.  And if the registrar didn't
14   comply what to report back to -- to me to
15   pass along to PILF.
16       Q     At the time that you became
17   involved in this effort did you have any
18   understanding as to why it was necessary
19   to actually send people to the
20   registrar's offices in the first place?
21       A     I'm sure I had a better
22   understanding of it then than I do now.
23   I'm a busy individual, and I have not
24   gotten fully up to speed on all of the
25   issues surrounding this.

1          But as I recall, there was --
2     and this is based purely on what
3     Mr. Adams had told me -- was that under
4     the National Voter Registration Act there
5     were certain records relating to
6     maintenance of the voter rolls that were
7     susceptible to public disclosure upon
8     request.  And there were some county's
9     registrars who were complying with such
10     requests, and others that were not, and
11     that volunteers were needed to go out and
12     sort of punctuate that in the counties
13     where the registrars had not complied
14     with the request.
15          Q     Once Alien Invasion I, which is
16     Exhibit A to the complaint, and Alien
17     Invasion II, which is Exhibit B to the
18     complaint, were published were you
19     involved in any activities intended to
20     publicize the findings of the report?
21          A     Yes.  At the time I was
22     involved with a right-leaning political
23     blog website called thebullelephant.com,
24     and I helped get the report published
25     there.  And I think there were a couple

1     of commentaries that -- that also got

2     published in relation to the -- to the

3     report or the reports.

4          Q     And after one or both reports

5     was or were published did you have any

6     communications with state or federal

7     prosecutors in Virginia about the

8     possibility of investigating and perhaps

9     prosecuting non-citizens who had

10    registered to vote or voted?

11         A     No.  No.  I certainly

12    speculated about that possibility, on the

13    state level, but I think there were two

14    or three times I may have mentioned it,

15    and -- in speaking to Christian, and

16    Christian rejected my ideas and -- and

17    said he had a plan mapped out at the

18    federal level.

19              So my speculation never went

20    beyond that.  And, of course, I can't

21    speak for what anyone else may have done,

22    but --

23         Q     And what did you understand the

24    purpose of the Alien Invasion I and Alien

25    Invasion II reports to be?

1     Q     And you never heard anything
2    about that during your work on this
3    project?
4     A     No.  My work was very limited
5    to sending a few folks into the field for
6    an afternoon or two, and then reporting
7    back their findings.  I don't recall
8    having any other part, and I didn't write
9    the report or -- or -- in fact, I still
10   haven't read all the way through the
11   report, so not sure what else is out
12   there, but from my perspective my role
13   was just helping to gather a few public
14   records.
15    Q     And the public records that you
16   were trying to gather you understood
17   would show what?
18    A     So I understood, from my own
19   registrar, and my own clerk of court, in
20   my home county of Stafford, that the
21   records involved reports that were
22   generated by the clerk of court to inform
23   the registrar when members of the jury
24   pool, who, themselves, have been drawn
25   from registered voters, indicated that

1     the progression.  And the recipients here

2     are the other contributors to The Bull

3     Elephant, that's what they -- that Google

4     group list is.

5               MR. LOCKERBY:  I'd like to

6          have this marked as Exhibit 30,

7          please.

8               (Exhibit No. 30 was marked

9          for identification.)

10    BY MR. LOCKERBY:

11         Q     Exhibit 30 is a May 31, 2017

12    e-mail exchange, at least at the top,

13    between you and Christian Adams.

14               And was this in response to a

15    media contact to you about getting

16    Christian Adams on our radio show?

17         A     Yes.

18               MR. LOCKERBY:  I'd like to

19          have this marked as Exhibit 31,

20          please.

21               (Exhibit No. 31 was marked

22          for identification.)

23    BY MR. LOCKERBY:

24         Q     At the top of the first page of

25    Exhibit 31 there's an e-mail from you,

1     dated December 14, 2017, that reads:

2     Please see the attached e-mail

3     correspondence between Perkins Coie and

4     Edgardo Cortes and Liz Howard.  I assume

5     it is pretty safe to say that Edgardo and

6     Liz didn't exhibit this closeness with

7     our side of the aisle.  Please let me

8     know your thoughts.

9               What were you referring to

10    there?

11        A     I don't know what the

12    attachment said, but this was in the

13    context of a recount of the 2017 House of

14    Delegates races where some of my friends

15    had asked me to get involved because I

16    could navigate these things, and knew

17    players and so forth, to help with the

18    effort and the recount.

19              MR. LOCKERBY:  I'd like to

20         have this marked as Exhibit 32,

21         please.

22              (Exhibit No. 32 was marked

23         for identification.)

24    BY MR. LOCKERBY:

25        Q     Exhibit 32 says it's a FOIA

1   request, dated January 24, 2019, from

2   Andrew C. Hanson, whose office address is

3   listed as 1440 New York Avenue,

4   Northwest, Washington, D.C.

5           That's the address of Skadden,

6   Arps; correct?

7       A   It's been asked and answered,

8   but yes.

9       Q   And down below there's a

10  request for all written communications

11  with a number of people, one of whom is

12  you; correct?

13      A   That's correct.

14      Q   When did you become aware that

15  Skadden, Arps was submitting FOIA

16  requests for written communications that

17  various registrars had had with you?

18      A   I don't recall.

19      Q   But you did become aware of

20  that at some point in time?

21      A   Well, eventually, yes, sometime

22  this year.

23      Q   And, in fact, this one, because

24  it has the letter prefix, prefix SA,

25  indicates that it's among the documents

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

1    you produced; correct?

2        A     That's what you represented to

3    me.

4             MR. LOCKERBY:  I'd like to

5        have this marked as Exhibit 33,

6        please.

7             (Exhibit No. 33 was marked

8        for identification.)

9    BY MR. LOCKERBY:

10       Q     Exhibit 33 is another January

11   24, 2019 FOIA request from Andrew Hanson,

12   that references to you -- references you

13   directed to the Albemarle County FOIA

14   officer.

15            Were you previously aware of

16   this?

17       A     No, I don't think so.

18       Q     What did you do to prepare for

19   your deposition today?

20       A     I gathered materials in

21   response to the document portion of the

22   subpoena and consulted with my attorneys.

23       Q     Other than counsel have you

24   spoken with anyone else regarding your

25   deposition?

```
 1        A     My wife, my mother, just

 2     letting them know what I was doing today,

 3     in a deposition.  But I've not spoken to

 4     anyone about the substance or the whole

 5     situation.

 6              MR. LOCKERBY:  Great.  Well,

 7        thank you.  I have no further

 8        questions.

 9              THE WITNESS:  Okay.

10              MR. LOCKERBY:  Do you want

11        to --

12              MR. SCHWARTZTOL:  We're

13        going to have questions.  If we

14        can take about 10 minutes, it

15        might help me to see if there are

16        things I might cross off my list.

17              MR. LOCKERBY:  Okay.

18              MR. SCHWARTZTOL:  And I

19        might do a better job of not

20        introducing as new exhibits

21        documents that have already been

22        produced.

23              MR. LOCKERBY:  Do you want

24        to move over here?

25              MR. SCHWARTZTOL:  In the
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

```
 1      course of the 10 minutes I'll

 2      switch positions.

 3           MR. LOCKERBY:  Okay.

 4           THE VIDEOGRAPHER:  The time

 5      is now 1:46 p.m.  We're off the

 6      record.

 7           (Recess.)

 8           THE VIDEOGRAPHER:  The time

 9      is now 1:59 p.m.  We are back on

10      the record.

11                EXAMINATION

12  BY MR. SCHWARTZTOL:

13      Q    Good afternoon, Mr. Albertson.

14  We met, briefly, this morning, but my

15  name is Larry Schwartztol.  I'm one of

16  the attorneys for the plaintiffs in this

17  case.

18           You understand that you're

19  still under oath; correct?

20      A    Correct.

21      Q    Okay.  And at the beginning of

22  the deposition Mr. Lockerby went over

23  some general ground rules for how the

24  deposition works and keeping the

25  transcript clean.  You understand that
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

1    all of those still apply; correct?

    2        A    Correct.

    3        Q    Okay.  When was the last time

    4    you corresponded with Mr. Adams?

    5        A    I don't specifically recall,

    6    but it's been quite awhile.

    7        Q    Okay.  Did you have any

    8    correspondence with him discussing this

    9    deposition?

   10        A    No.

   11        Q    Okay.  And have you had any

   12    direct communications with the attorneys

   13    representing Mr. Adams or PILF in this

   14    matter?

   15        A    No.

   16        Q    Okay.

   17        A    And I say that not concerning

   18    this matter, I have had some direct

   19    interactions with a couple of the lawyers

   20    who are on the matter, but I only

   21    discovered that they were on this matter

   22    when I actually looked at the pleadings

   23    --

   24        Q    Got it.

   25        A    -- last week.

```
 1        Q       Did you have any conversations
 2   with those lawyers --
 3        A       No.
 4        Q       -- about this matter?
 5        A       No.
 6        Q       Okay.  Since 2016 have you, as
 7   an attorney, represented any clients
 8   outside your capacity as an attorney at
 9   Skadden, Arps?
10        A       I'm sorry, can you repeat that?
11        Q       Sure.  Since 2016 have you had
12   any occasion to represent, as an
13   attorney, any clients whom you
14   represented outside your capacity as a
15   Skadden, Arps attorney?
16        A       No.  That's not something we're
17   allowed to do.
18        Q       Okay.  Have you ever
19   represented Mr. Adams as an attorney?
20        A       No.
21        Q       Have you ever represented PILF
22   as its attorney?
23        A       No.
24        Q       At Skadden is there a process
25   for initiating a new client matter?
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

```
 1        A      Absolutely.

 2        Q      How does that process work?

 3        A      It's -- it's a very involved

 4   process that involves the -- the

 5   conducting research into potential

 6   conflicts, going before a client and

 7   engagement review committee, issuing an

 8   engagement letter, and so forth.

 9        Q      Have you ever initiated that

10   process for purposes of representing

11   Mr. Adams?

12        A      Oh, absolutely not.

13        Q      Have you ever initiated that

14   process for purposes of representing

15   PILF?

16        A      No.

17        Q      Are you aware of any other

18   attorneys at Skadden, Arps who have ever

19   represented Mr. Adams?

20        A      No.

21        Q      Are you aware of any other

22   attorneys at Skadden, Arps who have ever

23   represented PILF?

24        A      No.

25        Q      Do you think you'd know if
```

86

1     there were other --

2          A     I can infer by the fact that

3     we're representing the plaintiffs that

4     there was a conflicts check done and that

5     there would have been no conflict with

6     Mr. Adams or PILF because no such

7     representation existed.

8          Q     Okay.  So you have said a

9     little bit earlier in the day about the

10    work that you did in connection with the

11    Alien Invasion reports, back in 2016, and

12    I wanted to just ask you a few questions

13    about the timeline on which that took

14    place.

15         A     Certainly I'll do my best.

16         Q     Great.  So let me begin by --

17    and I should confess, I've lost track of

18    what number exhibit we're on.

19              MR. KISTLER:  34.

20              MR. SCHWARTZTOL:  34?

21              (Exhibit No. 34 was marked

22         for identification).

23              MR. SCHWARTZTOL:  Now the

24         court reporter will give you what

25         will be marked as Exhibit 34.

1    BY MR. SCHWARTZTOL:

2        Q        And let me -- so actually let

3    me first apologize, despite having taken

4    some time to cross-reference exhibits

5    that have already been introduced this is

6    an exhibit that has already been

7    introduced.  So we can keep it marked as

8    Exhibit 34 and I will also just represent

9    to you that this was -- it's the same

10   document as Exhibit 12 that you

11   previously answered some questions about

12   earlier in the day.

13       A        Okay.

14       Q        Okay.  So

15   ███████████@Gmail.com, the e-mail

16   address that appears on the top e-mail of

17   this chain, that's your e-mail address;

18   correct?

19       A        That's correct.

20       Q        Anyone else send e-mails from

21   that address?

22       A        No.

23       Q        So safe to assume on all these

24   documents the e-mails that come from or

25   sent to ███████████@Gmail.com, those

1    are your e-mails; correct?

2         A    Correct.

3         Q    Okay.  You say in the e-mail

4    sent at 2:13 p.m., on September 9th, that

5    you know Christian and have worked with

6    him before, you're referring to

7    Mr. Adams, the defendant in this case; is

8    that correct?

9         A    That's correct.

10        Q    In what context have you worked

11   with him before?

12        A    I was afraid you might ask me

13   that.  I -- I'm having difficulty

14   remembering, but I don't think -- when I

15   did remember this, as I was preparing,

16   that it really wasn't something that I

17   had worked with him before, it was a --

18   we had shared notes on something fairly

19   minor, before.  And it had to do, I

20   think, with some issue relating to the

21   electronic signing of voter applications,

22   voter registration applications in

23   Virginia, and how the change that had

24   come from the State Board of Elections

25   with regard to that had apparently

1    circumvented the typical rules-making

2    process.  That's my best recollection.  I

3    don't think we did any work, per se; it

4    was just a, hey, what do you think of

5    this, kind of thing.

6         Q    Do you remember what year that

7    would have been?

8         A    That would have been 2015.

9         Q    Okay.  So prior to this e-mail

10   exchange had you corresponded in any way

11   with Mr. Adams about the Alien Invasion

12   report?

13        A    I'm pretty sure I did not.  But

14   again, if you showed me something, I

15   wouldn't be surprised.  But I'm pretty

16   sure this -- this is what started it.

17        Q    Sure.  You can't think of any

18   correspondence --

19        A    Correct.

20        Q    -- right now?  Okay.

21             MR. SCHWARTZTOL:  Okay.  I

22        am going to give you a new

23        document, going to give you what

24        will be marked as Exhibit 35.

25             (Exhibit No. 35 was marked

```
 1          for identification.)

 2              MR. LOCKERBY:  There's no

 3          video on the internet feed.

 4              THE VIDEOGRAPHER:  The time

 5          is now 2:07 p.m.  We're off the

 6          record.

 7              (Technical issues.)

 8              THE VIDEOGRAPHER:  The time

 9          is now 2:10 p.m.  We are back on

10          the record.

11  BY MR. SCHWARTZTOL:

12          Q    This chain of e-mails includes

13      e-mails from the e-mail address

14      ███████████@Skadden.com, is it safe

15      to assume that's your e-mail address?

16          A    Correct.

17          Q    Okay.  And same questions as

18      before, does anyone else write e-mails

19      using that e-mail address?

20          A    No.

21          Q    Okay.  So the e-mails from that

22      address, those are your e-mails?

23          A    Certainly not that I'm aware

24      of, unless the Russians are also hacking

25      this process, also.
```

91

```
 1    is in reference to?

 2         A     No.  Do I need to read this and

 3    make a surmise?

 4         Q     Feel free to read the document,

 5    if you need to, to answer the question.

 6    But my question is just whether looking

 7    at that exchange of e-mails you know what

 8    that refers to?

 9         A     I have no idea, no.

10              MR. SCHWARTZTOL:  Okay.

11         Great.  Okay.  I'm going to give

12         you Exhibit 39, which is the

13         transcript of the deposition of

14         Mr. Adams in his capacity as a

15         Rule 30(b)(6) designee of PILF in

16         this lawsuit.

17              (Exhibit No. 39 was marked

18         for identification.)

19    BY MR. SCHWARTZTOL:

20         Q     Do you know what a 30(b)(6)

21    deposition is?

22         A     Yes.

23         Q     Okay.  And is it your

24    understanding that when a witness is

25    designated pursuant to Rule 30(b)(6)
```

100

1    they're supposed to study the records of

2    the organization on whose behalf they're

3    testifying and generally seek to give

4    truthful testimony?

5        A    That's my understanding.

6        Q    Okay.  Have you ever seen this

7    document before?

8        A    No.

9        Q    Okay.  Let me ask you to turn

10   to page 78, line 13.

11       A    So physical page 78 or --

12       Q    Transcript page 78.

13            MR. KISTLER:  It's physical

14       page 21.

15            THE WITNESS:  Okay.

16   BY MR. SCHWARTZTOL:

17       Q    Okay.  So starting at line 13,

18   you see that Mr. Adams is being

19   questioned about a document bearing the

20   Bates number PILF Adams 0046537 through

21   0046538?

22       A    Yes.

23       Q    And could you just take a look

24   at the -- the previous exhibit, Exhibit

25   38, and confirm that that document bears

```
1    that same Bates number -- or excuse me,

2    two exhibits back, Exhibit 37.

3          A     Can you reread the Bates number

4    for me?  Yeah, I think that's Exhibit 38.

5          Q     38, yes, excuse me.

6          A     Yes.  Those -- that's the Bates

7    number that we have for Exhibit 38.

8          Q     Great.  Okay.  So let me refer

9    you to page 80, line 20 of the deposition

10   transcript, and ask you to read from that

11   line --

12         A     What -- what -- what page?

13   Sorry.

14         Q     Page 80, line 20.

15         A     Yeah?  Okay.

16         Q     And let me ask you to read from

17   there through page 82, line two.  And

18   just let me know when you're done.

19         A     Okay.  So line 20, Q, okay, now

20   when you --

21         Q     You don't need to read out

22   loud.  I'm going to ask you some

23   questions about this exchange.

24         A     Very good.

25         Q     Just wanted to give you a
```

```
 1    minute to --

 2         A     I have it on video now.

 3               Wow.  Wow.  So I'm at the

 4    bottom of page 82.

 5         Q     Okay.  Mr. Albertson, I

 6    gathered from your response while reading

 7    that that you were surprised to read that

 8    testimony?

 9         A     I am surprised, and -- and,

10    frankly, disappointed.

11         Q     Can you please tell me why

12    you're surprised and disappointed?

13         A     Because it was always

14    represented to Mister -- and this is the

15    first time I have seen this -- it was

16    always represented by me, to Mr. Adams,

17    it was very clear that this was being

18    done in my personal capacity, not on

19    behalf of my law firm.  It was very

20    abundantly clear, obvious, that's number

21    one.

22               Number two, I had nothing to do

23    with the effort in Prince William,

24    absolutely nothing to do, and -- and as

25    far as I know, it looks like he's just
```

1    making it up that somebody from Skadden

2    had something to do with that.

3         Number three, there were

4    Skadden, Arps e-mails, from Skadden, Arps

5    lawyers, plural.  Again, to my knowledge

6    there was no one else from Skadden, Arps.

7    This appears to me to be Mr. Adams

8    grasping at straws and -- and just making

9    stuff up, defamatory, honestly, about my

10   law firm, simply because of something I

11   did in my personal capacity, as a

12   well-established activist in Virginia

13   politics, fully apart and aside from my

14   work at Skadden, Arps.

15        Q    Thank you, Mr. Albertson, and I

16   have to say, because we're going to talk

17   about some other excerpts in this

18   transcript, I think you may continue to

19   feel surprised and disappointed by -- by

20   some of the testimony, but I'll --

21             MR. LOCKERBY:  I'm going to

22        object to the gratuitous comment,

23        which is not a question.

24             MR. SCHWARTZTOL:  Okay.

25   ///

1   BY MR. SCHWARTZTOL:

2       Q      So just to put a fine point on

3   the testimony you just gave, the document

4   in which Mr. Adams refers to the notion

5   that David Norcross says:  We hit pay

6   dirt.

7       A      Can I stop and -- I -- I'd like

8   to amend my previous answer, if that's

9   okay with you?

10      Q      Sure.

11      A      The -- the other thing, where

12  Mr. Adams says, on page 81, well, you

13  know you don't need a retention letter to

14  have a client.  And in this particular

15  instance I had assumed that Skadden, Arps

16  was assisting.  He has absolutely no

17  basis other than some e-mails that came

18  from a Skadden, Arps e-mail account on

19  which -- to -- to -- to state that.

20          There was never any meeting of

21  the minds, there was never any provision

22  of legal advice in an attorney-client

23  sense, absolutely none, none.

24          Please resume your question.

25      Q      And is it safe to conclude

1     further, Mr. Albertson, that because the

2     e-mail that references having hit pay

3     dirt was exchanged in August of 2016, and

4     references documents that were obtained,

5     in light of the fact that you didn't

6     begin this project until September of

7     2016 that it's not possible that you

8     could have been providing assistance in

9     obtaining the records from Prince William

10    County?

11         A     That's correct.

12         Q     Okay.  So to the best of your

13    understanding, in the testimony that you

14    just reviewed, was Mr. Al -- excuse me --

15    was Mr. Adams testifying untruthfully?

16         A     Yes.

17         Q     Let me direct your attention to

18    page 85, line four.  Please read from

19    line four on that page to line 19.  Just

20    let me know when you're done.

21         A     I'm done.

22         Q     Do you have any reaction to

23    that testimony?

24         A     It's a lie, for the reasons

25    that we've just previously established.

```
1    I was not involved with this.  He had no
2    basis on which to suggest that Skadden
3    was involved in prying this data loose
4    from Prince William County, none, at all,
5    zero.
6        Q    Let me ask you to look at page
7    88, line four.
8        A    In fact, he would have had zero
9    reason to suggest that I had anything to
10   do with it, much less Skadden, Arps.
11            Can you please repeat your
12   question?
13       Q    Sure.  Well, let me -- let me
14   ask you to elaborate on the last
15   statement you just made.  Why would he
16   have no reason to believe that you had
17   any role in what's described there?
18       A    Because I hadn't had any
19   contact with him on this whole subject
20   until the following month, much less been
21   involved early enough to, quote, unquote,
22   hit pay dirt in August.
23       Q    Let me ask you to look at page
24   88, line four, and to read from line four
25   on page 88 through page 91, line one.
```

1    And again, just let me know when you're

2    done.

3         A      391, you say?

4         Q      Yes, sir, 91, page one --

5    excuse me, page 91, line one.  Are you

6    done?

7         A      Yes.

8         Q      Do you have a reaction to that

9    testimony?

10        A      Same as the last one,

11   there's -- there's absolutely no basis

12   for this.

13        Q      In the testimony that you --

14        A      And it's just -- he wants to

15   say Skadden, Arps, when he knows that's

16   not true.  And he also knows it's true

17   that it's not me.  There's no basis for

18   this.

19        Q      And so in this testimony that

20   you just reviewed, to the best of your

21   knowledge, Mr. Adams is testifying

22   untruthfully; is that correct?

23        A      Yes.

24        Q      A few lines down on page 91,

25   let me ask you to read lines 12 through

1    21.  Please tell me when you're done.

2         A    Okay.

3         Q    Okay.  So he refers here to

4    your law firm's lawyer at Skadden, Arps

5    also organized an effort to collect

6    documents from those recalcitrant --

7    recalcitrant counties to try to duplicate

8    the success he enjoyed in Prince William

9    County in getting the documents to PILF?

10        A    Correct.

11        Q    When he refers to a lawyer who

12   organized an effort to collect documents

13   from a recalcitrant counties is it

14   possible he is, in fact, referring to you

15   there?

16        A    I --

17             MR. LOCKERBY:  Objection to

18        the form.

19        A    I'm assuming that -- and to be

20   most charitable, he's conflating some

21   sort of a memory of the effort that I

22   undertook to get some volunteers in some

23   other counties.  So I assume that's what

24   he means there.

25             But to say that it is to try to

1   duplicate the success he enjoyed in

2   Prince William County in getting the

3   documents to PILF is made up.

4        Q    Because you weren't involved in

5   those efforts; correct?

6        A    Correct.

7        Q    Okay.  That's all on the

8   deposition transcript, all the questions

9   I'll be asking you on that transcript.

10            So you did, at some point, come

11  to do some work with Mr. Adams in

12  connection with the Alien Invasion

13  report; correct?

14       A    Yes.

15       Q    Tell me about the role you

16  played.

17            THE WITNESS:  I want to read

18       this later.

19            MS. MURPHY:  I know.

20            THE WITNESS:  The role I

21       played in -- in what, I'm sorry?

22  BY MR. SCHWARTZTOL:

23       Q    In connection with the

24  preparation of the Alien Invasion report?

25       A    No.  I just helped him gather

```
 1      A    No.  I'm sorry, I wish I could

 2   give you a more solid answer.  But I'll

 3   also draw your attention to the fact that

 4   the sentence after that which you just

 5   quoted says:  Our, sic, report now

 6   assumes they got no more data from them.

 7           Again, I think you could

 8   probably read that either way.  I have no

 9   recollection of providing data.  I'm not

10   just going to -- I can't rule out that I

11   did.

12      Q    Understood.  Thanks.

13           MR. SCHWARTZTOL:  And I'm going

14   to show you another document.  Are we on

15   42?

16           THE VIDEOGRAPHER:  Yes.

17           MR. SCHWARTZTOL:  42, okay.

18           (Exhibit No. 42 was marked

19       for identification.)

20   BY MR. SCHWARTZTOL:

21      Q    Give you a minute to read the

22   exchanges of e-mails, here.  Just let me

23   know when you're done.

24      A    Okay.

25      Q    Who is Jordan Labiosa?
```

1       A      He is a local activist in Craig

       2    County, Southwest Virginia, whom I had

       3    sought assistance from in finding a way

       4    to make the data actionable.

       5       Q      Would you describe Mr. Labiosa

       6    as a liberal Democrat?

       7       A      No.

       8       Q      Why not?

       9       A      Because he is a pretty staunch

      10    Libertarian conservative.

      11       Q      Okay.  What does Mr. Labiosa

      12    tell you about the run list that you sent

      13    him?

      14       A      He was uncomfortable with

      15    proceeding with the project because one

      16    of the individuals on the list was

      17    somebody that he had been close to or

      18    pictured on Facebook with and had

      19    participated in previous elections.

      20       Q      And could you read out loud

      21    your response to him?

      22       A      Is it possible your friend is

      23    one of the accidentals, i.e., those who

      24    are citizens but had trouble with the

      25    forms?  It's looking like that's 10 to 15

1    percent of what we have and many of those

2    have been reinstated.  Not looking to

3    take action against those folks, of

4    course.

5        Q    When you refer to the 10 to 15

6    percent of what we have, who is the we

7    that you're referring to?

8        A    I'm assuming the reference

9    there is to the effort, the joint PILF

10   grassroots kind of effort to -- to gather

11   this data.

12       Q    What was your basis for that 10

13   to 15 percent estimate?

14       A    I believe that was something I

15   would have gotten from Mr. Adams.

16       Q    Can you think of any other

17   potential basis for your estimate as to

18   the rate of accidentals within that list?

19       A    Well, I have no other -- I

20   would not have gotten any information on

21   the data from any other source that --

22   that -- that I can recall.  The only

23   other information I got about this, and I

24   think I mentioned or alluded to this

25   earlier, was my own clerk of court and

```
 1    general registrar in Stafford County had

 2    both indicated to me their faith that the

 3    data were, you know, accurate.

 4              It was never posited, you know,

 5    could somebody have mistakenly checked

 6    the box.  My -- I think they would have

 7    been incredulous at the thought.  But

 8    I'm, you know, just speculating there.

 9              But those are the only folks

10    that I talked to about, until Jordan,

11    about whether or not there was somebody

12    on the list that shouldn't have been, as

13    I recall.

14        Q    Do you have any basis for

15    knowing that the rate of accidentals on

16    that list would not have been higher than

17    15 percent?

18        A    No.

19        Q    Did anyone at PILF give you any

20    guidance on how to reduce the percentage

21    of accidentals on any of these lists?

22              MR. LOCKERBY:  Object to the

23        form.

24        A    Not that I recall.

25        Q    Did you provide any guidance
```