# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| League of United Latin American Citizens – Richmond Region Council 4614, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:18-cv-00423-LO-IDD |
| PUBLIC INTEREST LEGAL FOUNDATION, an Indiana Corporation, and J. CHRISTIAN ADAMS, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO
LIABILITY ON PLAINTIFFS' DEFAMATION CLAIMS AND
DEFENDANTS' AFFIRMATIVE DEFENSES UNDER THE FIRST AMENDMENT AND
<u>VIRGINIA'S IMMUNITY PROVISION</u>**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .................................................................................................1

STATEMENT OF UNDISPUTED FACTS ..........................................................3

     A.    The Individual Plaintiffs Are United States Citizens.................................3

     B.    Defendants Published Actionable Statements Regarding Individual
          Plaintiffs..................................................................................................3

     C.    Defendants Knew That They Had No Basis For Their Accusations .....................7

ARGUMENT ........................................................................................................15

I.    Plaintiffs Are Entitled To Summary Judgment On Their Defamation Claim
    Because They Have Established All Of The Elements Of That Claim. ...........................15

     A.    The Defendants Published The Statements At Issue. ...........................16

     B.    Defendants' Statements Were Defamatory Per Se Because They Were
          False And Because They Accused Plaintiffs Of Multiple Felonies.......................17

     C.    Undisputed Facts Demonstrate That Defendants Were *At Least* Negligent
          In Publishing The False Statements. ........................................................18

II.    The Court Should Grant Summary Judgment On Defendants' Affirmative
    Defenses Under The First Amendment And Virginia's Immunity Provision. ..................25

     A.    The Court Should Grant Summary Judgment For Plaintiffs On The First
          Amendment Defenses To Their State And Federal Claims..................................25

          1.    Defendants have no First Amendment defense to Plaintiffs' state-
               law defamation claim. ................................................................25

          2.    Defendants have no First Amendment defense to Plaintiffs' federal
               claims under § 11(b) of the Voting Rights Act and the Ku Klux
               Klan Act's support-or-advocacy clause. ....................................27

     B.    The Court Should Grant Summary Judgment For Plaintiffs On
          Defendants' Affirmative Defense Under Virginia's Immunity Provision............28

CONCLUSION....................................................................................................30

# **TABLE OF AUTHORITIES**

**Cases**                                                                                                                     **Page(s)**

*American Life League, Inc. v. Reno,*
    47 F.3d 642 (4th Cir. 1995) .................................................................................. 27

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)............................................................................................. 15

*Ashby v. Faison & Associates, Inc.,*
    440 S.E.2d 603 (Va. 1994)................................................................................... 30

*Askew v. Collins,*
    722 S.E.2d 249 (Va. 2012)..............................................................................19, 24

*Berner v. Mills,*
    579 S.E.2d 159 (Va. 2003) .................................................................................. 30

*Brown v. Triton Security, Inc.,*
    No. 1:04-CV-01544-JCC, 2005 WL 4663731 (E.D. Va. Mar. 23, 2005)......................... 16

*Burson v. Freeman,*
    504 U.S. 191 (1992)............................................................................................. 28

*Food Lion, Inc. v. Melton,*
    458 S.E.2d 580 (Va. 1995) .................................................................................. 19

*Gazette, Inc. v. Harris,*
    325 S.E.2d 713 (Va. 1985)............................................................... 16, 19, 20, 26

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974).......................................................................................25, 26

*Gilmore v. Jones,*
    370 F. Supp. 3d 630 (W.D. Va. 2019) ................................................................. 16

*Grim v. Rahe, Inc.,*
    434 S.E.2d 888 (Va. 1993).................................................................................. 30

*Hatfill v. New York Times Co.,*
    532 F.3d 312 (4th Cir. 2008) ............................................................................... 26

*Horne v. WTVR, LLC,*
    No. 3:16-cv-0000092-JAG, 2017 WL 1330200 (E.D. Va. Apr. 6, 2017) ....................... 25

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ...................................................................................................... 28

*National Federation of the Blind v. FTC*,
    420 F.3d 331 (4th Cir. 2005) ........................................................................................ 28

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ................................................................................................. 25, 26

*Smithfield Foods, Inc. v. United Food & Commercial Workers International Union*,
    593 F. Supp. 2d 840 (E.D. Va. 2008) ..................................................................... 29-30

*Suntrust Mortgage, Inc. v. United Guaranty Residential Insurance Co. of North Carolina*,
    508 F. App'x 243 (4th Cir. 2013) ................................................................................. 27

*Taylor v. Commonwealth*,
    604 S.E.2d 103 (Va. Ct. App. 2004) ........................................................................... 29

*Tolman v. Doe*,
    988 F. Supp. 582 (E.D. Va. 1997) ........................................................................... 15-16

*United States v. O'Brien*,
    391 U.S. 367 (1968) ................................................................................................. 27-28

*United States v. Godley*,
    136 F. Supp. 3d 724 (W.D.N.C. 2015) ........................................................................ 15

*Will Nesbitt Realty, LLC v. Jones*,
    No. CL-2016-14232, 2018 WL 2035956 (Va. Cir. Ct. Apr. 30, 2018) .......................... 29

*Wisconsin v. Mitchell*,
    508 U.S. 476 (1993) ...................................................................................................... 27

## **Statutes, Rules and Other Authority**

Fed. R. Civ. P. 56(a) ........................................................................................................ 15, 18

Va. Code Ann. § 8.01-223.2 ........................................................................................ 1, 28, 29

Va. Code Ann. § 24.2-410.1 .................................................................................................... 7

Va. Code Ann. § 24.2-427 ....................................................................................................... 7

**<u>INTRODUCTION</u>**

The Court should grant summary judgment in part in favor of Plaintiffs on their defamation claim and against Defendants on their affirmative defenses under the First Amendment and Virginia's Immunity Provision, Virginia Code Annotated Section 8.01-223.2.

Plaintiffs are private citizens and a community organization who have brought suit to vindicate their rights under Virginia defamation law and federal voting rights laws against Defendants, the Public Interest Legal Foundation ("PILF") and its President and General Counsel, J. Christian Adams.  In 2016 and 2017, along with non-party co-conspirator Virginia Voters Alliance ("VVA"), Defendants published *Alien Invasion in Virginia* in two volumes (*Alien Invasion I* and *II*).  These reports claim to have uncovered massive voting fraud in Virginia, attaching long lists of registrants and forms submitted by Virginia voters—including the individual Plaintiffs—that include their names and addresses (and in some cases emails and phone numbers), and accusing each person on those lists of committing "felonies" for registering to vote or voting.

These claims were false.  The undisputed and indisputable facts show that Plaintiffs (and many other individuals on those lists) are and were at all relevant times U.S. citizens who lawfully registered to vote and voted.  Worse still, the evidence shows that Defendants were aware that the lists on which they were relying were not intended to serve as authoritative lists of non-citizens—that, in fact, Defendants were repeatedly warned by the very registrars from whom they had sought these lists in their effort to compile their reports.  The undisputed evidence further demonstrates that Defendants plowed ahead anyway, seeking headlines at the *Drudge Report* and other media outlets in an attempt to advance their personal agendas, with callous disregard for the falsity of their assertions.

On this record, Plaintiffs are entitled to summary judgment on their defamation claims and as to Defendants' affirmative defenses under the First Amendment and Virginia's Immunity Provision as a matter of law.

*First*, Defendants have defamed the individual Plaintiffs as a matter of law. The publication of false statements is undisputed: the *Alien Invasion* reports were published and falsely accuse Plaintiffs of being felons—which is defamation per se. And the publication of these false statements was, at the very least, negligent—which is all that is required under Virginia law. The evidence shows that Defendants were repeatedly warned prior to publication that the lists on which they were relying were not conclusive records of citizenship status, yet Defendants took no steps to verify their assertions that everyone on them was a felon. To the contrary, they adopted an express policy of ***not*** contacting the individuals to make such inquiries. Even today—after Defendants have admitted that Plaintiffs have committed no crime— Defendants continue to maintain these defamatory publications as to two of the three individual Plaintiffs on their website and refer new viewers to them through press releases and other new publications of the same false statements.

*Second*, Defendants' affirmative defenses fail as a matter of law for many of the same reasons. False statements of fact have no constitutional value, and therefore all Plaintiffs have to do to defeat Defendants' First Amendment defenses is establish that Defendants were negligent in publishing false statements about Plaintiffs. Defendants' affirmative defense under Virginia's Immunity Provision likewise fails because that provision does not retroactively apply to this case, and even if it did, it would not protect claims made with constructive knowledge of their falsity, as is the case here.

For all these reasons, the Court should grant Plaintiffs partial summary judgment.

## STATEMENT OF UNDISPUTED FACTS

### A.    The Individual Plaintiffs Are United States Citizens.

1.     Plaintiff Eliud Bonilla is a current resident of Maryland who resided and voted in Herndon, Virginia from 2000 until 2013.  Mr. Bonilla is a citizen born in Brooklyn, New York. (Parties' Joint Written Stipulation of Undisputed Facts ("Stipulation of Undisputed Facts") ¶ 2, May 17, 2019 (ECF No. 155) (attached as Ex. A to Decl. of Nicole Cleminshaw ("Cleminshaw Decl.") filed concurrently herewith).)

2.     Plaintiff Luciania Freeman is a resident of Woodbridge, Virginia and a registered voter of Prince William County, Virginia.  Ms. Freeman is a citizen born in Fayetteville, North Carolina.  (*Id*. ¶ 3.)

3.     Plaintiff Abby Jo Gearhart is a resident of Barhamsville, Virginia and a registered voter of New Kent County, Virginia.  Ms. Gearhart is a citizen born in Newport News, Virginia. (*Id*. ¶ 4.)

4.     Defendant PILF is a 501(c)(3) organization incorporated in the State of Indiana (*id*. ¶ 5), of which Defendant J. Christian Adams is President and General Counsel (*id.* ¶ 6).

### B.    Defendants Published Actionable Statements Regarding Individual Plaintiffs.

5.     On September 30, 2016, Defendants and VVA jointly published *Alien Invasion in Virginia: The Discovery and Coverup of Noncitizen Registration and Voting* ("*Alien Invasion I*").  (*Id*. ¶ 7; *see also Alien Invasion I* (attached as Ex. B to Cleminshaw Decl.).)

6.     *Alien Invasion I* states:  "**The United States Attorney in Virginia has done nothing about the felonies committed by 433 aliens registering in Prince William County alone**."  (*Alien Invasion I* at 8 (emphasis in original).)

7.      The "433 aliens" in Prince William County refers to the individuals listed in Exhibit 1 to *Alien Invasion I* and includes Ms. Freeman. (Dep. of Noel Johnson ("Johnson Dep.") 78:13-80:25, April 12, 2019 (attached as Ex. C to Cleminshaw Decl.); Dep. of PILF 30(b)(6) Designee J. Christian Adams ("PILF 30(b)(6) Dep.") 122:12-125:6, Apr. 18, 2019 (attached as Ex. D to Cleminshaw Decl.).)

8.      Ms. Freeman's name, along with an address, appears in Exhibit 1 to *Alien Invasion I*.  (*Alien Invasion I*, Ex. 1 at 26; *see also* PILF 30(b)(6) Dep. 125:7-17)  Ms. Freeman's name, address, email address, and telephone number appear in Exhibit 7 to *Alien Invasion I*. (*Alien Invasion I*, Ex. 7 at 48; *see also* Johnson Dep. 82:2-23.)

9.      *Alien Invasion I* states "**we found 1046 aliens who registered to vote illegally**." (*Alien Invasion I* at 2 (emphasis in original).)  The "1046 aliens" refers to individuals that include Ms. Freeman.  (Johnson Dep. 80:23-81:4; PILF 30(b)(6) Dep. 126:13-127:5.)

10.      In May 2017, Defendants and VVA jointly published *Alien Invasion II:  The Sequel to the Discovery and Cover-up of Noncitizen Registration and Voting in Virginia* ("*Alien Invasion II*").  (Stipulation of Undisputed Facts ¶ 10; *see also Alien Invasion II* (attached as Ex. E to Cleminshaw Decl.).)

11.      *Alien Invasion II* reports finding "**5,556 non-citizens**" removed from voter rolls and states that "**of these illegal registrants, 1,852 cast nearly 7,500 ballots in elections dating back to 1988**."  (*Alien Invasion II* at 1, 2 (emphases in original).)

12.      *Alien Invasion II* was intended to be a "sequel" to *Alien Invasion I*.  (*Alien Invasion II*; Defs.' Answer, Affirmative Defenses, & Third-Party Compl. ("Defs.' Answer") at 25, Aug. 27, 2018 (ECF No. 66).)  *Alien Invasion II* makes extensive reference to *Alien Invasion I* and includes a link to *Alien Invasion I* in its endnotes.  (*See Alien Invasion II*.)

13.     "5,556 non-citizens" and "illegal registrants" refers to the individuals listed in Exhibit 1 to *Alien Invasion II*, which includes Ms. Freeman and Mr. Bonilla.  (*Id.* at 2 & n.5; Johnson Dep. 91:12-24; 93:22-94:20; PILF 30(b)(6) Dep. 170:23-172:16.)

14.     Ms. Freeman and Mr. Bonilla's names and addresses appear in Exhibit 1 to *Alien Invasion II*.  (*Alien Invasion II,* Ex. 1 at 258, 100 (naming Ms. Freeman and Mr. Bonilla, respectively).)  Ms. Freeman's name, address, email address, and telephone number appear in Exhibit 12 to *Alien Invasion II*.  (*Alien Invasion II*, Ex. 12.)  Mr. Bonilla's name, address, and telephone number also appear in Exhibit 12.  (*Id.*; *see also* PILF 30(b)(6) Dep. 181:23-182:18.)

15.     *Alien Invasion II* tracks *Alien Invasion I* by repeating that the "**Department of Justice so far has done nothing about the felonies committed by 433 suspected aliens registered in Prince William County alone**."  (*Alien Invasion II* at 6 (emphasis in original).)  Ms. Freeman is still listed as one of the "433" who committed "felonies."

16.     Between approximately May 30, 2017 and November 3, 2017, Exhibit 12 to *Alien Invasion II* also included Plaintiff Gearhart, then known as Abby Jo Focht, as well as her address and phone number.  (Stipulation of Undisputed Facts ¶ 13; *see also* Johnson Dep. 121:23-122:9, 125:17-24, 204:22-206:1; Johnson Dep. Ex. 29 (attached as Ex. F to Cleminshaw Decl.).)

17.     Both *Alien Invasion I* and *Alien Invasion II*, along with their exhibits, were posted and made available on PILF's website, www.publicinterestlegal.org.  (Stipulation of Undisputed Facts ¶¶ 7, 10; Defs.' Answer at 19.)  They remain available on the website.[1]  According to a

---

[1]     For *Alien Invasion I*, see https://publicinterestlegal.org/blog/report-ineligible-aliens-registering-vote-casting-ballots/ and https://publicinterestlegal.org/files/Report_Alien-Invasion-in-Virginia.pdf; for *Alien Invasion II*, see https://publicinterestlegal.org/blog/alien-invasion-ii-sequel-discovery-cover-non-citizen-registration-voting-virginia/, https://publicinterestlegal.org/files/Alien-Invasion-II-FINAL.pdf and https://publicinterestlegal.org/alien-invasion-virginia/.

PILF email, more than 70,000 individuals viewed the Defendants' defamatory *Alien Invasion II* report in the course of just one 24-hour period following a television appearance by Defendant Adams.  (*See* Email from Public Interest Legal Newsletter to Kaylan Phillips, PILF (May 31, 2017 4:00 PM) (marked as PILF-ADAMS-0037281) (attached as Ex. G to Cleminshaw Decl.).)

18.    Defendants publicized the *Alien Invasion* Reports through, among other avenues, press releases, Twitter, Facebook, TV interviews, radio interviews, and online media outlets like Breitbart.com.  (Defs.' Answer at 8, 19; PILF 30(b)(6) Dep. Ex. 5 (attached as Ex. H to Cleminshaw Decl.); Dep. of J. Christian Adams ("Adams Dep.") 22:15-21, 23:21-24, 26:9-18, 26:4-17, 26:22-27:6, 33:20-36:11, Apr. 22, 2019 (attached as Ex. I to Cleminshaw Decl.).)  For example, Defendants issued a press-release associated with *Alien Invasion II* trumpeting the removal of 5,556 non-citizens of whom supposedly "[o]ne [t]hird . . . voted illegally" and who, together supposedly cast "7,474 illegal ballots."  (Dep. of Steven Albertson ("Albertson Dep.") Ex. 47, May 14, 2019 (attached as Ex. J to Cleminshaw Decl.).)

19.    Defendants continue to publicize the reports.  On May 1, 2019, PILF published a post on its website entitled *PILF to Congress: U.S. Lacks Safeguards from Noncitizen Voter Registration*, which asserts that PILF has issued reports that have identified "ineligible noncitizens" who have registered to vote in various states, including Virginia, with a link to PILF's *Alien Invasion* page.  Public Interest Legal Foundation, *PILF to Congress: U.S. Lacks Safeguards from Noncitizen Voter Registration* (May 1, 2019) (attached as Ex. K to Cleminshaw Decl.), https://publicinterestlegal.org/blog/pilf-to-congress-u-s-lacks-safeguards-from-noncitizen-voter-registration/.

20.     For each Plaintiff, Defendants possessed copies of their voter registration applications showing that each Plaintiff had affirmed that they were U.S. citizens.  (PILF 30(b)(6) Dep. 136:22-138:21, 181:17-183:6; Johnson Dep. 116:20-24, 118:5-8.)

21.     Despite having Plaintiffs' contact information, Defendants did not attempt to contact Plaintiffs to confirm their citizenship status prior to publishing the Reports.  (Dep. of Eliud Bonilla 164:15-25, Mar. 8, 2019 (attached as Ex. L to Cleminshaw Decl.); Dep. of Abby Jo Gearhart 95:22-96:9, Mar. 15, 2019 (attached as Ex. M to Cleminshaw Decl.); Dep. of Luciania Freeman 159:1-160:17, Mar. 13, 2019 (attached as Ex. N to Cleminshaw Decl.); Johnson Dep. 83:11-19, 96:8-14-99:2.)  In fact, Adams instituted a "corporate policy" under which PILF "would not" reach out to any of the individuals listed in the *Alien Invasion* reports.  (PILF 30(b)(6) Dep. 184:7-185:16.)

### C.     Defendants Knew That They Had No Basis For Their Accusations.

22.     The *Alien Invasion* reports rely on a specific type of voter registration cancellation list, titled "Cancellation - Declared Non-Citizen," that is generated from the Virginia Election & Registration Information System ("VERIS") [hereinafter the "VERIS Report"].  (Johnson Dep. 79:5-21; 91:12-92:24.)

23.     A VERIS Report lists individuals whose voter registrations were cancelled because they purportedly indicated non-citizenship on a Department of Motor Vehicles form, were mailed a Notice of Intent to Cancel indicating that their voting registration would be cancelled unless they affirmed their citizenship, and failed to return a completed Affirmation of Citizenship within a 14-day timeframe.  *See* Va. Code Ann. §§ 24.2-410.1, 24.2-427. Defendants were aware of the general outline of this process.  (*See*, *e.g.*, Johnson Dep. Ex. 4 (attached as Ex. O to Cleminshaw Decl.).)  The Notice of Intent to Cancel allows for the possibility that information provided by the DMV is wrong:  "If the information is incorrect and

you are a citizen of the United States, please complete the Affirmation of Citizenship form and return it using the enclosed envelope." (*See*, *e.g.*, *id.* at 4-299 (containing examples of notices).)

24.     Defendants saw a copy of the VERIS Report when they went to inspect voter registration records of the City of Alexandria Registrar on July 25, 2016.  (PILF 30(b)(6) Dep. 44:4-15; 49:5-17; Dep. of VVA 30(b)(6) Designee Reagan George ("VVA 30(b)(6) Dep.") 51:25-52:9, 54:22-55:16, Mar. 15, 2019 (attached as Ex. P to Cleminshaw Decl.).)  Counsel for Alexandria City Registrar Anna Leider provided the same list to Mr. Johnson, who forwarded it to Mr. Adams, via email in September.  (PILF 30(b)(6) Dep. Ex. 6 (attached as Ex. Q to Cleminshaw Decl.); PILF 30(b)(6) Dep. 54:1-55:2; VVA (30)(b)(6) Dep. 70:1-10.)

25.     In August 2016, after seeing the list generated by the VERIS system and prior to *Alien Invasion I*, PILF sent letters to 19 Virginia elections registrars asking for "[d]ocuments regarding all registrants who were identified as ***potentially*** not satisfying the citizenship requirements for registration."  (PILF 30(b)(6) Dep. Ex. 7 (emphasis added) (attached as Ex. R to Cleminshaw Decl.); PILF 30(b)(6) Dep. 58:8-20, 59:16-60:25, 67:25-68:5; *see also, e.g.*, Johnson Dep. Ex. 2, at 4 (letter to Prince William County) (attached as Ex. S to Cleminshaw Decl.); PILF 30(b)(6) Dep. Ex. 8, at 3-48 (similar letters to other counties) (attached as Ex. T to Cleminshaw Decl.).)

26.     Defendant Adams edited this letter to registrars by deleting draft language seeking records of "individuals who ha[d] been purged . . . because the individual ***was not a citizen*** of the United States" and replacing it with the "***potentially*** not satisfying" language.  (PILF 30(b)(6) Dep. 59:16-60:25 (emphasis added); PILF 30(b)(6) Dep. Ex. 7 (emphasis added).)

27.     Defendant Adams testified that he was "aware of the general nature of false-positives" in voter registration cancellation records.  (PILF 30(b)(6) Dep. 283:24-284:14.)

28.     Prior to the publication of *Alien Invasion I*, and in response to the August letter requesting individuals identified as "potentially not satisfying" citizenship requirements, the Bedford County Registrar provided Defendants, among other records, with a VERIS Report for Bedford County containing the names of 35 individuals whose registrations were cancelled under the "declared non-citizen" cancel type.  (Johnson Dep. 56:23-57:8; Johnson Dep. Ex. 4.)

29.     *Alien Invasion I* states that Bedford County "provided a list of 35 non-citizens." (*Alien Invasion I* at 8; Johnson Dep. 57:9-15.)  *Alien Invasion I* does not mention that the Bedford County Registrar also informed Defendants, before *Alien Invasion I* was published, that 18 of those 35 individuals had re-registered.  (Johnson Dep. 66:2-8, 66:14-67:2).

30.     Prior to *Alien Invasion I*, Defendants were aware that the VERIS Report "contains only individuals identified by DMV as being potentially non-citizen and cancelled as a result." (Dep. of Clarabelle Wheeler Ex. 8, Apr. 8, 2019 (attached as Ex. U to Cleminshaw Decl.).)

31.     The Virginia Department of Elections ("VDOE") does not conduct an investigation to confirm the citizenship of canceled registrants and the VDOE does not adjudicate, one way or another, any cancelled registrant's citizenship status.  (Dep. of Edgardo Cortes ("Cortes Dep.") 246:20-247:12, Apr. 10, 2019 (attached as Ex. V to Cleminshaw Decl.).)

32.     Mr. Cortes, the Commissioner of VDOE when the *Alien Invasion* Reports were published, explained that he would never represent that an individual who was included on the VERIS report was, in fact, a non-citizen because the VERIS report "is not indicative of the fact that those individuals are non-citizens.  It's indicative of the fact that they were removed for failure to respond to the [Registrar's cancellation letter]."  (*Id.* 249:8-250:4.)  Mr. Cortes testified that the VERIS report "should not be used to make a blanket statement that an individual is not a [U.S.] citizen."  (*Id.* 251:2-4.)

9

33.     It is not uncommon that "an individual would . . . be cancelled, register at a later date, and then a new record would be created.  So, therefore, they would still appear on [the VERIS report of voters cancelled for declared non-citizen status] . . . but a new voter registration would be created for that individual."  (Deposition of VDOE 30(b)(6) Designee Christopher Piper ("VDOE 30(b)(6) Piper Dep.") 188:22-189:5, Apr. 19, 2019 (attached as Ex. W to Cleminshaw Decl.).)

34.     On October 4, 2016, Steven Albertson, a PILF volunteer, wrote an email stating that some number of people listed in *Alien Invasion I* were "accidentals (i.e. those who are citizens but had trouble with the forms)[.]  It's looking like that's 10-15% of what we have, and many of those have been reinstated."  (Albertson Dep. Ex. 42 (attached as Ex. X to Cleminshaw Decl.); Albertson Dep. 18:17-25, 124:18-126:4 (attached as Ex. Y to Cleminshaw Decl.).)

35.     On August 18, 2016, Barbara Gunter, the Bedford County Registrar, provided Defendants with a VERIS report of individuals canceled for suspected citizenship defects.  The email also included the registrar's correspondence with suspected non-citizens.  In cases where the canceled voter subsequently re-registered, that fact was noted by hand on the correspondence.  (*See* Johnson Dep. Ex. 4.)  While Exhibit 1 of *Alien Invasion II* includes those individuals indicated to have re-registered, neither Exhibit 1 nor the body of the report indicates that those individuals had re-registered.

36.     On November 22, 2016, York County Registrar Walt Latham provided Defendants with correspondence with registrants suspected of not meeting the citizenship requirements.  Included in this correspondence was the affirmation of citizenship executed by plaintiff Abby Jo Gearhart (then known as Abby Jo Focht) in response to York County's notice

of intent to cancel her registration. (Johnson Dep. Ex. 15 (attached as Ex. Z to Cleminshaw

Decl.); Johnson Dep. 122:13-124:13.)

37.     On February 1, 2017, Mr. Latham provided Defendants with the requested VERIS

report for York County, containing the names of 26 individuals.  (PILF 30(b)(6) Dep. Ex. 17

(attached as Ex. AA to Cleminshaw Decl.); PILF 30(b)(6) Dep. 230:20- 231:20.)  The following

day, the York County Registrar informed Defendants that 12 of those 26 individuals had re-

registered and provided the subsequent applications of those 12 people.  (PILF 30(b)(6) Dep.

233:5-8; PILF 30(b)(6) Dep. Ex. 17.)  While Exhibit 1 to *Alien Invasion II* includes each of the

12 people that were identified as re-registered, neither Exhibit 1 nor the body of *Alien Invasion II*

mentions that the York County Registrar informed Defendants that 12 of 26 individuals had re-

registered.  (*Alien Invasion II*, Ex. 1 at 309-12; PILF 30(b)(6) Dep. 235:8-18.)

38.     On February 7, 2017, Alex Ables, the Fauquier County Registrar, provided

Defendants with a list of fifteen "voters appearing on the [VERIS] report [who] have submitted a

new voter registration application subsequent to their record being flagged as a potential non-

citizen."  (PILF 30(b)(6) Dep. Ex. 19 (attached as Ex. BB to Cleminshaw Decl.).)  Many of the

individuals that Mr. Ables identified as having re-registered nevertheless appeared in Exhibit 1.

(*Alien Invasion II*, Ex. 1 at 139-42.)

39.     On February 15, 2017, Dianna Moorman, the James City County Registrar,

produced the VERIS report for James City County requested by PILF, but explained that "many

of these simply were because they failed to check the 'Are you a US citizen' box on the voter

registration application, not because they were actually a non-citizen, and have since reregistered

with an acceptable completed application." (PILF 30(b)(6) Dep. Ex. 15 (attached as Ex. CC to

Cleminshaw Decl.); PILF 30(b)(6) Dep. 213:15-214:11.)

40.     The following day, February 16, Ms. Moorman provided Defendants with a spreadsheet indicating that 30 of the 51 individuals listed in the VERIS report had affirmed their citizenship and re-registered.  (PILF 30(b)(6) Dep. Ex. 16 (attached as Ex. DD to Cleminshaw Decl.); PILF 30(b)(6) Dep. 216:15-219:8.)  Nevertheless, Exhibit 1 to *Alien Invasion II* included the names of the individuals who had re-registered.  (*Alien Invasion II*, Ex. 1 at 180-85.)  PILF did not publish the spreadsheet from Ms. Moorman with *Alien Invasion II.*  (PILF 30(b)(6) Dep. 224:22-225:1.)

41.     In a letter dated February 9, 2017, Defendants were informed by Rappahannock County Registrar Kim McKiernan that the VERIS report Defendants had requested "[contains] false positives." (PILF 30(b)(6) Dep. Ex. 20 (attached as Ex. EE to Cleminshaw Decl.).)  She explained that in many cases, "voters miss checking the tiny box indicating they are citizens." (*Id.*)  Ms. McKiernan also wrote: "I remain concerned about your potential misinterpretation of the reports and your propensity to misrepresent those results to our voters." (*Id.*)

42.     Defendants were aware as of February 1, 2017, of an email by Linda Lindberg, Arlington County Registrar, in which she wrote that the "data on this [PILF-requested VERIS] report is NOT accurate and will be misinterpreted and misrepresented by this organization, as they have done with the data previously received." (PILF 30(b)(6) Dep. Ex. 21 (attached as Ex. FF to Cleminshaw Decl.); *see also* PILF 30(b)(6) Dep. 257:22-258:6.)  Ms. Lindberg also explained in this email that the VERIS report would list a voter as cancelled "despite the voter having subsequently affirmed his citizenship."  (PILF 30(b)(6) Dep. Ex. 21.)  Adams acknowledged that he received this information.  (*See* PILF 30(b)(6) Dep. 246:6-247:1.)

43.     Defendants were aware on February 1, 2017, of an email by Larry Haake, Chesterfield County Registrar, stating:  "Ms. Lindberg is correct that they are consciously

misrepresenting the data they received from us." (PILF 30(b)(6) Dep. Ex. 22 (attached as Ex. GG to Cleminshaw Decl.); *see also* PILF Dep. 263:2-8; 266:14-16.)  Mr. Haake also wrote in this email that PILF is "fully aware the particular report they want is misrepresentative of the truth but the truth is clearly not what they want."  (PILF 30(b)(6) Dep. Ex. 22.)

44.     In an email dated March 30, 2017 from Stephen Hunt, Chairman of the Fairfax County Electoral Board, to Mr. George and PILF Board of Directors member Hans von Spakovsky, Mr. Hunt stated that something "in the DMV system is causing misidentification of US citizens as non-citizens."  (Dep. of Hans von Spakovsky Ex. 13, May 9, 2019 (attached as Ex. HH to Cleminshaw Decl.).)  Mr. Hunt explained that "[m]any of the people who were identified as a non-citizen have verified their citizenship" and warned that he "would be a little cautious in using the [DMV] numbers as the number of non-citizens who have voted."  (*Id.*)

45.     Defendants were aware of the potential for "false positives" in the VERIS report—meaning people who were actually U.S. citizens despite appearing in the report.  Upon review of the VDOE-supplied VERIS report, Noel Johnson identified a "George Washington Jr." in the report and Mr. Adams responded:  "If false positive they will use this one against us." (Johnson Dep. Ex. 27 (attached as Ex. II to Cleminshaw Decl.); Johnson Dep. 190:18-191:15; PILF 30(b)(6) Dep. 284:4-5.)

46.     Defendants were aware that on May 25, 2017, PILF volunteer Keith Damon, referring to the VDOE-supplied VERIS Report, shared his "concern[] that just accepting all of the people on the list as actual non-citizens might not be correct."  (PILF 30(b)(6) Dep. Ex. 24, at 5 (attached as Ex. JJ to Cleminshaw Decl.).)  Mr. Damon explained how he investigated some of the "non-hispanic" names listed on the VERIS report, including a Carol Dodson and a Bryan Bennett, and "wonder[ed] if this is really a list of actual non-citizens."  (*Id.*)  Mr. Damon also

wrote that the VERIS report potentially includes citizens whose registrations were cancelled or "dropped before [they] realize[] that [they were] incorrectly dropped" and who subsequently re-register.  (*Id.* at 1.)

47.     On August 15, 2018, Mr. Adams circulated his edits to a report called Safe Spaces: How Sanctuary Cities Are Giving Cover to Noncitizens on the Voting Rolls.  (Johnson Dep. Ex. 36 (attached as Ex. KK to Cleminshaw Decl.).)  In the report's section regarding Virginia, Mr. Adams made an edit where he struck "noncitizens previously registered and voting therein" and replaced it with "registrants cancelled for citizenship reasons."  (*Id.*; *see also* Adams Dep. 261:6-262:9.)  In a comment to this edit, Mr. Adams wrote:  "How is it after we are involved in litigation that we are still referring to these Virginia cases as, quote, noncitizens?  It defies explanation.  On numerous occasions in numerous places I have explicitly said their registration is removed for citizen defects or registrants canceled for reasons of noncitizenship.  We have to use the actual terms and not make assumptions they are necessarily aliens.  The continuing improper terminology contribute[d] to us losing the motion to dismiss because the court ruled that these subsequent statements were republications within the statute of limitations."  (*Id.* 262:10-263:7 (quoting Johnson Dep. Ex. 36) (referring to instant lawsuit).)  Indeed, even before publishing the *Alien Invasion* reports, Mr. Adams discussed the need to "present[] . . . as mere facts that these people registered . . . and that alien registration is a crime" without express accusations of a crime "as that could be libelous."  (Email from J. Christian Adams, PILF, to Reagan George, VVA, & Noel Johnson, PILF (Sept. 24, 2016 9:02 AM) (marked as PILF-ADAMS-0014090) (attached as Ex. LL to Cleminshaw Decl.).)

### ARGUMENT

All of the individual Plaintiffs are entitled to summary judgment as to their claim for

defamation and all Plaintiffs are entitled to summary judgment on Defendants' affirmative

defenses under the First Amendment and Virginia's Immunity Provision.

Summary judgment should be granted when "there is no genuine dispute of material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant

bears the "initial responsibility of informing the district court of the basis for its motion . . . ."

*United States v. Godley*, 136 F. Supp. 3d 724, 731 (W.D.N.C. 2015) (citation omitted).

Once it has done so, the burden shifts to the nonmoving part to "set forth specific facts

showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986) (citation omitted).  It may not rest "upon mere allegation[s] or denials" in its

pleadings or by offering a mere "scintilla" of evidence.  *Id.* at 252, 256.  Rather, the relevant

question is whether the evidence is sufficiently conflicting "such that a ***reasonable*** jury could

return a verdict for the non-moving party."  *Id.* at 248 (emphasis added).

Here, specific record evidence proves each element of Plaintiffs' claim for defamation,

and rebuts any potentially applicable affirmative defenses under the First Amendment or

Virginia's Immunity Provision.  Accordingly, the Court should grant summary judgment.

**I.      PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR
        DEFAMATION CLAIM BECAUSE THEY HAVE ESTABLISHED ALL OF THE
        ELEMENTS OF THAT CLAIM.**

To prevail on a claim for defamation, Plaintiffs must demonstrate " (1) publication of (2)

an actionable statement [and] (3)" that the Defendants acted with the requisite intent, i.e., that

they were at least negligent as to the truth of their statements.  (Mem. Op. & Order ("MTD

Order") at 11, Aug. 13, 2018 (ECF No. 63) (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d

1087 (4th Cir. 1993) (interpreting Virginia law)).)  A defamation plaintiff that can put forth facts

showing that there is no genuine dispute of material fact is entitled to summary judgment, just like any other litigant. *See, e.g., Tolman v. Doe*, 988 F. Supp. 582, 587 (E.D. Va. 1997) (granting summary judgment to defamation plaintiff because defendant offered nothing more than "speculative inferences" and "unsupported conclusions"). Here, incontrovertible evidence proves each of the elements, entitling the individual Plaintiffs to summary judgment.

A.      **The Defendants Published The Statements At Issue.**

Defendants concede that the *Alien Invasion* Reports and their appendices were published within the meaning of the definition of defamation. (*See, e.g.*, Defs.' Answer at 19 (Defendants admitting they published *Alien Invasion I* to national media via press releases and postings on Facebook and Twitter); *id.* at 20 (admitting that *Alien Invasion I* was "published"); *id.* at 25 ("[d]efendants admit that they published the [s]econd [Alien Invasion] [r]eport"); Stipulation of Undisputed Facts ¶ 10.)

This is no surprise. Publication, for purposes of common-law defamation, requires nothing more than dissemination to a single person in a non-privileged setting. *See, e.g., Brown v. Triton Sec., Inc.*, No. 1:04-CV-01544-JCC, 2005 WL 4663731, at *2 (E.D. Va. Mar. 23, 2005). Public posting of an offending statement meets this standard. *See, e.g., Gazette, Inc. v. Harris*, 325 S.E.2d 713, 743 (Va. 1985) (affirming defamation verdict based on advertisement in student newspaper). Thus, it is beyond dispute that the publication requirement is met for any statement that is "published online for third parties to view and digest." *Gilmore v. Jones*, 370 F. Supp. 3d 630, 666 (W.D. Va. 2019).

Defendants "published" the *Alien Invasion* reports, appendices—including the appendices that identified the individual Plaintiffs by name and address—and press releases widely and repeatedly, and indeed continue to do so. The reports, appendices, and press releases were, and still are, available at the PILF website, and according to a PILF email, have been

viewed extensively following television promotion of the reports.  (*See supra* ¶ 17.)  Thus, as a

matter of law, the defamatory statements were—and as to Plaintiffs Bonilla and Freeman

continue to be—published.

**B.      Defendants' Statements Were Defamatory Per Se Because They Were
False And Because They Accused Plaintiffs Of Multiple Felonies.**

Defendants' statements in the *Alien Invasion* reports and their appendices, which accuse

all of the individual Plaintiffs of being "illegal registrants" and having committed "felonies"

were both false and defamatory per se.

"A written statement is per se defamatory when it alleges that an individual has

committed a felony which he or she did not commit."  (MTD Order at 11.)  Defendants'

accusations did precisely that.  Both *Alien Invasion* reports make the accusations of felonious

conduct explicit.  *Alien Invasion II* explains that "it is a felony for a non-citizen to register."

(*Alien Invasion II* at 2.)  Then, in a section entitled "felonies upon felonies," it accuses each of

the supposed non-citizen registrants PILF had identified, including Mr. Bonilla, Ms. Freeman,

and Ms. Gearhart, of "violat[ing] state and federal law" and demands a "swift, sure, and

unwavering" response from law enforcement and prosecutors.  (*See Alien Invasion II* at 3 (citing

18 U.S.C. §§ 611, 911, 1015, 52 U.S.C. § 20511, Va. Code § 24.2-1004); *see also*, *e.g.*, *id.* at 4

(referencing "felonies committed by 433 suspected aliens in Prince William County," including

Ms. Freeman).)  *Alien Invasion I* also provides a list of the individuals that, in its words, "likely

committed a felony"— a list that includes Ms. Freeman.  (*See Alien Invasion I*, Ex. 1; *see also*

PILF 30(b)(6) Dep. 125:18-126:7 (Adams agreeing that "Ms. Freeman is one of what PILF calls,

quote, 1,046 aliens who registered to vote ***illegally***" (emphasis added)).)  The press releases

associated with the *Alien Invasion* reports were, if anything, even more explicit.  The press

release announcing the publication of *Alien Invasion II* for example, refers over and over to

"illegal ballots" cast without appropriate "legal consequences."  (Albertson Dep. Ex. 47.)

It is undisputed that these allegations were false as to the individual Plaintiffs.  Mr.

Bonilla, Ms. Freeman, and Ms. Gearhart are all United States citizens by birth and were, at the

time they were accused, all eligible to vote in the Commonwealth of Virginia. Defendants agree

and have stipulated as much.  (*See* Stipulated Statement of Undisputed Materials Facts at 2, 3, 4.)

To the extent that Defendants argue that they leveled no direct accusations against

Plaintiffs because they are mentioned by name only in the appendices to the reports, rather than

the text of the reports themselves, the Court has already rejected this argument at the motion-to-

dismiss stage.  (*See* MTD Order at 12 (finding that plaintiffs had stated a claim by alleging that

"Defendants had imputed felonious conduct to these individuals *by inference*" (emphasis

added)).

In short, "there is no genuine dispute" that Defendants' statements about the individual

Plaintiffs were both false and defamatory per se under Virginia law; upon demonstration of a

culpable mental state, Plaintiffs are entitled to "judgment as a matter of law."  Fed. R. Civ. P.

56(a).

**C.**      **Undisputed Facts Demonstrate That Defendants Were *At Least*
           Negligent In Publishing The False Statements.**

Plaintiffs need only prove negligence to be entitled to summary judgment.  And no

reasonable jury could conclude that Defendants were not negligent.  Indeed, the undisputed

evidence shows that Defendants were repeatedly made aware that there was a significant risk that

they would falsely accuse citizens of being non-citizens who had committed felonies—and

willfully ignored that risk and declared that everyone listed was an "illegal registrant" (*Alien*

18

*Invasion II* at 2), many of whom who cast "illegal ballots" (*see* Albertson Dep. Ex. 47).  This reckless and malicious conduct far exceeds the requirements of Virginia defamation law.

    ***First***, the requisite showing is negligence.  The Court has already held as much and Defendants have never contended otherwise.  *See* MTD Order at 12 ("Regarding the requisite intent requirement, both parties agree that the proper standard here is negligence . . . .").  Because the individual Plaintiffs are all private individuals, Defendants are liable for negligent publications so long as "substantial danger to [plaintiffs'] reputation [was] apparent" to a reasonable publisher.  *Gazette*, 325 S.E.2d at 725.[2]  Here, such danger was plainly apparent.  Defendants' defamatory *Alien Invasion* reports accused each of the individual Plaintiffs of committing felony voter fraud.  (*Alien Invasion I* at 1; *Alien Invasion II* at 2.)  The danger such statements pose to the reputations of the individuals accused of being felons would be apparent to a reasonable publisher for essentially the same reasons that they are defamatory per se.  *See Food Lion, Inc. v. Melton*, 468 S.E.2d 580, 584 (Va. 1995) ("[A]n allegedly defamatory statement that imputes commission of a crime . . . makes substantial danger to reputation apparent, [and] a negligence standard applies.").

    ***Second***, the record shows that the negligence standard is met as a matter of law because undisputed facts demonstrate that Defendants possessed sufficient information that, ***at the very minimum*** gave them reason to doubt that the plaintiffs were actually ineligible to vote.  As the Court explained in ruling on the motion to dismiss, the negligence standard is met whenever the defendants "'either knew the published statement to be false or . . . lacked reasonable grounds'" to believe it was true, "'or acted negligently in failing to ascertain the facts on which the

---

[2]       The question whether a substantial danger to reputation is apparent is a question for the Court to resolve, not for the jury.  *Gazette*, 325 S.E.2d at 729.

publication was based.'"  (MTD Order at 12 (quoting *Dragulescu v. Virginia Union Univ.*, 223 F. Supp. 3d 499 (E.D. Va. 2016)).) *See also*, *e.g.*, *Gazette*, 325 S.E. 2d at 725; *Askew v. Collins*, 722 S.E.2d 249, 251 (Va. 2012) (verdict rendered for plaintiff based on "evidence that . . . at a minimum . . . [defendant] lacked reasonable grounds for [her statement] or otherwise negligently failed to ascertain facts in support of" it).

As this standard and the cases applying it make clear, actual knowledge of falsity is not required; it suffices that a defendant fails to undertake a sufficiently diligent investigation prior to publishing the actionably false claim.  In *Gazette*, for example, the court affirmed a series of jury verdicts in favor of defamation plaintiffs.  In one of the consolidated cases, the defendant newspaper published a "Public Record" section, which summarized local public records including cases heard in the local criminal court.  *Gazette*, 325 S.E.2d at 729.  The reporter compiled the article by reviewing docket sheets, but could not understand many of the abbreviations used on the docket.  *See id.* at 729-30.  Neither the reporter nor his editor took steps to verify the report.  *See id.* at 730  This, the court held, was enough to sustain a finding of negligence.  Moreover, the defendants' negligence was not "excused merely because the court record was copied almost verbatim, and the format of the publication did not deviate substantially from the form of the docket page."  *Id.*

Here the evidence of the Defendants' actual or constructive knowledge that their statements were false is far stronger than that in *Gazette*.  The evidence establishes not just lack of adequate investigation, but actual knowledge that the claims Defendants published were false.  Defendants' conduct reveals that at the outset of their investigation they were aware that the VERIS reports they were seeking (and that would ultimately form the basis for the *Alien Invasion* reports) were not proof of lack of citizenship.  Defendants acknowledged as much in the

form letters that they sent out, which asked not for lists of confirmed non-citizens but registrants "who were identified as ***potentially*** not satisfying the citizenship requirements for registration." (*See supra* ¶ 25.)  That Defendants later claimed in published reports that the same lists were definitive evidence of non-citizen voting alone shows of negligence at the very least, and suffices to entitle the Plaintiffs to summary judgment on their defamation claim.

Moreover, several government officials from different jurisdictions repeatedly warned Defendants that the lists they received contained eligible voters who had simply made an error on a government form.  Several registrars explained that many of the people listed on the VERIS reports were U.S. citizens, several of whom had subsequently reaffirmed their citizenship and had re-registered to vote.  (*See supra* ¶¶ 35-41.)  Many of the registrars, including Walt Latham, Alex Ables, and Barbara Gunter, even identified for PILF ***which specific*** voters had re-affirmed their citizenship.  (See *supra* ¶¶ 35-38.)  Others, such as Rappahannock County Registrar Kim McKiernan and James City County Registrar Diana Moorman took the time to explain why so many eligible citizen voters could end up on the VERIS cancellation reports.  (*See supra* ¶¶ 39-41.)  In addition to these direct messages, Defendants were forwarded emails documenting a conversation among elections officials lamenting PILF's misuse of data.  In it, Arlington Director of Elections Linda Lindberg also explained in detail why registered citizen voters could appear on the cancelation lists.  (*See supra* ¶ 42.)[3]

Moreover, Defendants' associates have ***admitted to actual knowledge*** that many of the people included in the lists were eligible citizen voters.  For example, PILF volunteer Keith Damon explained to Defendants that he had investigated some of the names on the list and that it

---

[3]     Rather than consider whether the opinions of expert election administrators might merit consideration, Defendants ignored their critiques, instead contorting them as evidence of a fabricated "cover-up" of non-citizen voting by officials.  (*See Alien Invasion II* at 8, 10.)

likely included citizens who were "incorrectly dropped" from the voter rolls.  (*See supra* ¶ 46.)
And PILF volunteer Steve Albertson suggested that "10-15%" of the names PILF obtained and
published were "citizens who had trouble with the forms" (*supra* ¶ 34), and at his deposition,
stated that Adams had given him the 10-15% figure (*see* Albertson Dep. 126:12-15).

Not only did Defendants ignore the general fact that the cancellation lists they received
included many eligible citizen voters, they defamed specific individuals whom they had been
told reaffirmed their citizenship and had been adjudged eligible to vote.  Most particularly
relevant here, Latham sent PILF the affirmation of citizenship executed by Plaintiff Abby Jo
Focht (now Abby Jo Gearhart), after and in response to receiving notice that she had been
identified as a possible non-citizen.  (*See supra* ¶ 36.)[4]  Nevertheless, she was included among
the purported fraudulent voters in *Alien Invasion II*.  Moreover, as mentioned, several registrars
identified other specific cancelled registrants who subsequently reaffirmed their citizenship.  Yet,
each and every one of the individuals identified by Registrar Gunter and Registrar Latham as
having subsequently affirmed their citizenship and re-registered to vote, as well as many of those
identified by Registrar Ables, also nevertheless appeared on the list of supposed fraudulent
voters appended to *Alien Invasion II*.  Notably, the possibility that a significant number of the
individuals that the Defendants smeared as fraudulent voters were, in fact, citizens voting legally,
was openly discussed among the Defendants and their co-conspirators.  As discussed above, for

---

[4]     Even after the plaintiffs filed suit, Mr. Bonilla and Ms. Freeman's names remain
published on the internet and defamed as fraudulent voters.  And, as mentioned, PILF put out a
press release linking to the defamatory reports as recently as May 2019.

example, Keith Damon warned Reagan George, who then copied Mr. Adams, that many of the

individuals the *Alien Invasion* reports would tar in fact appeared to be eligible citizen voters.[5]

Despite repeated warnings and expressed acknowledgment that their lists included

eligible citizen voters, Defendants not only went ahead with publication, but also failed to

undertake any investigation before doing so.  For instance, according to Noel Johnson,

Defendants did not contact anyone named in the reports, including the Plaintiffs, to determine

whether they were American citizens or to understand their explanation for having their voter

registration canceled.  (*See, e.g.*, Johnson Dep. 83:10-22, 96:8-14, 98:21-99:2, 192:22-193:5.)

Doing so would, apparently, have been contrary to a "policy" that Mr. Adams imposed.  (PILF

30(b)(6) Dep. 184:7-15, 185:12-16.)[6]

Indeed, when indications of the need for investigation arose, PILF and Adams ***actively***

***turned a blind eye***.  To take just one example, after being warned by Keith Damon about the

inaccuracy of the data that he sought to publish, Mr. Adams was unfazed.  He blamed state

---

[5]     Defendants will likely attempt to manufacture a genuine dispute of material fact by pointing to an email from Edgardo Cortes, in which he states that "[i]f an individual was previously canceled and then subsequently affirmed citizenship and was re-registered, they would no longer appear on" the VERIS Report that PILF received and publicized.  (Defs.' Answer Ex. B.)  In most cases, this is untrue.  (*See* VDOE 30(b)(6) Piper Dep. 188:22-189:5.)  In any event, in light of the mountains of warnings provided to Defendants, a single email from Mr. Cortes does not suffice to produce a jury question on Defendants' actual or constructive knowledge.  That is so because a list of people whose registration was canceled and who failed to re-register is not the same thing as a list of genuine non-citizens.  Eligible citizen voters might not have re-registered for any number of reasons, not least that they may not even be aware that their registration had been canceled until they show up at a polling place, perhaps years later.  And, Mr. Cortes testified that he made this fact clear to PILF.  (*See* Cortes Dep. 267:25-268:17.)

[6]     It appears that Defendants failed to clarify the meaning of the lists on which they based their accusations with ***anyone***.  Despite extensive communication with former Virginia Board of Elections Secretary Don Palmer, Adams did not recall ever asking him about the meaning of the VERIS reports PILF received and published.  (*See* PILF 30(b)(6) Dep. 177:11-15.)  Nor did he ask Cameron Quinn, another statewide former statewide elections chief, or Hans von Spakovsky, a self-declared elections "expert" on PILF's Board of Directors.  (*See id.* 177:16-178:9.)

procedures for any "false positives" and suggested that PILF would push forward with naming eligible voters as fraudulent registrants because it was "imperative" to expose "glitches" in Virginia's registration system.  (*See* PILF 30(b)(6) Dep. Ex. 24, at 1.)  PILF employee Logan Churchwell, too, seemed to relish the possibility of falsely labeling citizen registrants as fraudulent voters, suggesting that they could "convert pushback into official confusion" and arguing that "[t]he fog of war favors the aggressor . . . ."  (*Id.*)

Finally, with respect to the individual Plaintiffs Bonilla and Freeman, Defendants labeled them "non-citizens," "illegal registrants" and people who committed "felonies" despite having evidence that they swore to being citizens of the United States.  (*See generally Alien Invasion II*; *see also supra* ¶ 13.)  At best, Defendants had conflicting information in Plaintiffs' appearance on VERIS Reports while possessing their voter registration forms indicating citizenship.  Under the circumstances, Defendants should have investigated prior to publishing, but they did not, even though they had the contact information to facilitate that investigation.  *See*, *e.g.*, *Askew*, 722 S.E. at 486 (noting that the negligence standard is met by "failing to ascertain facts on which the publication is based" (citation omitted)).  And with respect to Plaintiff Gearhart, the evidence is conclusive that she was wrongly labeled a "non-citizen" in *Alien Invasion II* who committed a felony by being a non-citizen registrant.  (*See supra* ¶¶ 3, 16, 36.)

In short, the evidence is clear and uncontroverted.  PILF and Adams were told time and time again that many of the thousands of people they ultimately accused of voter fraud were eligible U.S. citizens doing nothing more than excising their right to vote.  They not only failed to heed these warnings, they failed to even investigate them (as Virginia law requires).  Plaintiffs are entitled to summary judgment on their defamation claims.

II.   **THE COURT SHOULD GRANT SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSES UNDER THE FIRST AMENDMENT AND VIRGINIA'S IMMUNITY PROVISION.**

A.   **The Court Should Grant Summary Judgment For Plaintiffs On The First Amendment Defenses To Their State And Federal Claims.**

Defendants claim that Plaintiffs' claims infringe Defendants' First Amendment "right to 'speak, write, and publish' on issues of election integrity."  (Defs.' Answer at 55-56 (citation omitted).)[7]  Although their Answer raises this defense only against Plaintiffs' defamation claim (*id.*), they have also suggested that they seek to raise a similar defense against Plaintiffs' federal claims, though Defendants have never articulated the contours of that defense.  The defense fails as a matter of law as to Plaintiffs' (1) defamation and (2) federal voter intimidation claims.

1.   Defendants have no First Amendment defense to Plaintiffs' state-law defamation claim.

Defendants' First Amendment defenses presuppose that their false and defamatory statements are protected by a constitutional privilege merely because they write on a matter of purported public concern—"election integrity."  That assumption is wrong.  The First Amendment does not protect false statements, and in a case like this one involving Plaintiffs who are not public figures, negligently made false statement suffice to defeat a First Amendment defense.

It is well established that private persons like Plaintiffs may establish liability for defamation notwithstanding the First Amendment's protections so long as the underlying state defamation law requires proof of some degree of fault—e.g., at least negligence.  *Gertz v. Robert*

---

[7]   Plaintiffs relatedly assert defenses styled as "fair report" and "fair comment" privileges. (Defs.' Answer at 56.)  These defenses are plainly rooted in the First Amendment, and they are plainly subject to summary judgment as well.  *See Horne v. WTVR, LLC*, No. 3:16-cv-0000092-JAG, 2017 WL 1330200 (E.D. Va. Apr. 6, 2017) (television station not entitled to fair report privilege when it added its own commentary to school district statement to imply plaintiff committed a crime).  Thus, this motion addresses all three defenses.

*Welch, Inc.*, 418 U.S. 323, 340 (1974).[8]  That is the case here.  Under Virginia law, a negligence standard applies when the content of a "defamatory statement makes substantial danger to reputation apparent."  *Gazette*, 325 S.E.2d at 725.[9]

Defendants have argued that they enjoy a First Amendment right to engage in speech regarding illegal voting.  But *Gertz* rejects the view that speakers have a constitutional privilege to negligently defame private persons so long as the subject of the defamatory statement is a matter of "public or general interest."  418 U.S. at 346.  Instead, *Gertz* instructs that the constitutional balance weighs in favor of a defamation plaintiff provided that a defendant acted negligently in publishing false statements—for example, by failing "to investigate or to check the accuracy of a false statement."  *Hatfill v. New York Times Co.*, 532 F.3d 312, 317 (4th Cir. 2008) (applying *Gertz* standard).  That is because "there is no constitutional value" in false and defamatory statements of fact about private persons, as "[n]either the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues."  *Gertz*, 418 U.S. at 340 (quoting *Sullivan*, 376 U.S. at 270).

As a result, Defendants' First Amendment defenses to Plaintiffs' defamation claim fail as a matter of law for the same reason that Plaintiffs are entitled to summary judgment on the defamation claim:  there are no genuine disputes of material fact that this Court needs to resolve before concluding that Defendants were—at the very least—negligent as a matter of law in

---

[8]     *Gertz* explained that the First Amendment imposes the higher reckless-or-knowing-falsity standard enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), on defamation plaintiffs who qualify as "public officials" or "public persons," *Gertz*, 418 U.S. at 345, 351, but there is not even a scintilla of evidence that would support treating any individual Plaintiff as such here.  The individual Plaintiffs are not public officials, nor are they public persons, *see id.* at 351-52.

[9]     As discussed in Part I above, that standard is met here because Defendants have accused Plaintiffs of committing felonies.

accusing Plaintiffs of committing multiple felonies.  (*See supra* Part I.)  Accordingly, the Court

should grant partial summary judgment that the Defendants have no First Amendment defense to

Plaintiffs' state-law defamation claim.

> 2.     <u>Defendants have no First Amendment defense to Plaintiffs' federal claims
> under § 11(b) of the Voting Rights Act and the Ku Klux Klan Act's
> support-or-advocacy clause.</u>

Defendants have suggested at times—though critically not in their Answer—that Section

11(b) of the Voting Rights Act and the support-or-advocacy clause of the Klan Act might be

unconstitutional as applied because Defendants were supposedly engaged in political speech.

Plaintiffs are also entitled to partial summary judgment on any such defense.

As a threshold matter, Defendants have waived any First Amendment defense to the

federal claims by failing to plead it prior to the summary-judgment stage of these proceedings.

*Suntrust Mortg. v. United Guar. Residential Ins. Co. of N.C.*, 508 F. App'x 243, 252 (4th Cir.

2013) ("[F]ailure to plead an affirmative defense as required by Federal Rule 8(c) results in the

waiver of that defense and its exclusion from the case . . . ." (second alteration in original)

(citation omitted)).  Because it was not pled, Plaintiffs had little ability to develop a response to

this formless defense during discovery and are left to aim at shadowy arguments at summary

judgment, to their great prejudice.  For this reason alone, the Court should grant summary

judgment on any such defense.

In any event, any such defense would fail as a matter of law.  The voter-intimidation

provisions of the Voting Rights Act and Klan Act regulate conduct and only incidentally burden

speech, and are therefore subject only to the lower level of constitutional scrutiny for "content-

neutral regulation[s] of conduct."  *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); *Am. Life

League, Inc. v. Reno*, 47 F.3d 642, 650 & n.2 (4th Cir. 1995) (holding that voter-intimidation ban

was a viewpoint- and content-neutral regulation of conduct).  As such, they pass constitutional

muster if they "further[] an important or substantial governmental interest . . . unrelated to the suppression of free expression" and "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1967).  Both statutes easily pass that test because they seek to protect free and fair elections, which is not only a substantial but in fact a compelling interest, *see Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion), that is sufficiently important to overcome incidental burdens on expression, *see John Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010); *cf. Nat'l Fed. of the Blind v. FTC*, 420 F.3d 331, 340 (4th Cir. 2005) ("[A] proffered government interest . . . is more compelling when the interest itself is the basis of a constitutional right.").

For all these reasons, Defendants' First Amendment defenses—whatever their scope—fail as a matter of law, entitling Plaintiffs to partial summary judgment as to those defenses.

**B.     The Court Should Grant Summary Judgment For Plaintiffs On Defendants' Affirmative Defense Under Virginia's Immunity Provision.**

Defendants also interpose an affirmative defense under Virginia's Immunity Provision, (*see* Defs.' Answer at 54-55), which shields persons from civil liability for a defamation claim that is based solely on the publication of statements regarding "matters of public concern that would be protected under the First Amendment."  Va. Code Ann. § 8.01-223.2.  The defense fails as a matter of law for three reasons, each independently entitling Plaintiffs to summary judgment.

***First***, as previously discussed, the defamatory statements in this case were not about "matters of public concern . . . protected under the First Amendment."  *Id*.  Rather, they were false and injurious statements of fact, not opinion, entitled to no First Amendment protection

whatsoever under these circumstances.  *See supra* Part II.A.1).  Accordingly, those statements

fail to meet the threshold requirement for protection under the Immunity Provision.

      **Second**, the Immunity Provision does not apply retroactively here.  Before July 1, 2017,

the Immunity Provision did not cover defamation claims, only tortious-interference claims.

*Alien Invasion I* and *II* were published in September 2016 and May 2017, respectively.

Accordingly, the Immunity Provision cannot apply here and cannot shield the Defendants from

liability—**unless** the amendment operates retroactively.  But it does not.  Virginia courts are

"guided by the fundamental principles of statutory construction that retroactive laws are not

favored, and that a statute is always construed to operate prospectively unless a contrary

legislative intent is manifest." *Berner v. Mills*, 579 S.E.2d 159, 161 (Va. 2003). New laws—and

amendments to existing ones—"will apply only to future cases unless there is something in the

very nature of the case, or in the language of the new provision, which shows that the new law

was intended to have a retrospective effect." *Taylor v. Commonwealth*, 604 S.E.2d 103, 106

(Va. Ct. App. 2004).  Here, "the amended version of [the Immunity Provision] contains no

language—much less clear, explicit, and unequivocal language—indicating that its provisions

should be applied retroactively." *Id.*  Indeed, the lack of any such language, coupled with the

strong presumption against retroactivity, recently led a Virginia trial court to conclude that the

Immunity Provision's 2017 amendment cannot be granted retroactive effect. *See Will Nesbitt*

*Realty, LLC v. Jones*, No. CL-2016-14234, 2018 WL 2035956, letter op. at \*15-16 (Va. Cir. Ct.

Apr. 30, 2018).  Accordingly, the Provision does not apply here.

      **Third**, even if the Immunity Provision were applicable here, it could not benefit these

Defendants. The undisputed facts establish as a matter of law that Defendants made their

statements with **at least** "constructive" knowledge that they were false.  *See* Va. Code Ann. §

8.01-223.2.  In this context, "constructive" knowledge includes negligently made false statements—such as the sort of statements Defendants made here.

The Immunity Provision "is to be applied according to its plain language." *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 593 F. Supp. 2d 840, 847 (E.D. Va. 2008).  No Virginia case construes the Immunity Provision's "constructive knowledge" term.  But "constructive knowledge" means "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Constructive Knowledge*, BLACK'S LAW DICTIONARY (10th ed. 2014).  The term appears often in premises-liability cases, where the applicable negligence standard asks "whether the Defendants had actual or *constructive* notice, that is, whether they knew *or should have known*, of" the dangerous condition that caused injury.  *Ashby v. Faison & Assocs., Inc.*, 440 S.E.2d 603, 605 (Va. 1994) (emphasis added). "[C]onstructive knowledge" is thus a recognized means of "establish[ing] a prima facie case of negligence." *Grim v. Rahe, Inc.*, 434 S.E.2d 888, 889-90 (Va. 1993).

For all the reasons already set forth in detail in Part I, above, the evidence establishes beyond any reasonable dispute that Defendants at least acted with negligence in making false statements about Plaintiffs—indeed, in light of the repeated warnings Defendants received and their internal acknowledgments that the lists they were trumpeting as evidence that non-citizens were voting in fact proved no such thing, the evidence would satisfy the higher standards of reckless indifference or actual knowledge.  Accordingly, the Court should grant partial summary for Plaintiffs on Defendants' affirmative defense under the Immunity Provision.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for partial summary judgment as to Plaintiffs' defamation claim and as to Defendants' affirmative defenses under the First Amendment and Virginia's Immunity Provision.

Dated: June 14, 2019                      Respectfully submitted,


                                          */s/ Nicole M. Cleminshaw*
                                          NICOLE M. CLEMINSHAW (VSB No. 92161)
                                          ANISA A. SOMANI (VSB No. 86103)
                                          CHRISTOPHER S. HERLIHY (VSB No. 93558)
                                          GEOFFREY M. WYATT (*Pro hac vice*)
                                          SEAN M. TEPE (*Pro hac vice*)
                                          ANDREW HANSON (*Pro hac vice*)
                                          ZACHARY W. MARTIN (*Pro hac vice*)
                                          JOHN R. THORNBURGH II (*Pro hac vice*)
                                          1440 New York Ave. NW
                                          Washington, DC 20005
                                          Telephone:    (202) 371-7588
                                          Facsimile:    (202) 393-5760
                                          Nicole.Cleminshaw@probonolaw.com
                                          Anisa.Somani@probonolaw.com
                                          Christopher.Herlihy@probonolaw.com
                                          Geoffrey.Wyatt@probonolaw.com
                                          Sean.Tepe@probonolaw.com
                                          Andrew.Hanson@probonolaw.com
                                          Zachary.Martin@probonolaw.com
                                          John.Thornburgh@probonolaw.com

                                          ALLISON RIGGS (*Pro hac vice*)
                                          JACLYN MAFFETORE (*Pro hac vice*)
                                          JEFFREY LOPERFIDO (*Pro hac vice*)
                                          **SOUTHERN COALITION FOR SOCIAL JUSTICE**
                                          1415 West Highway 54, Suite 101
                                          Durham, NC 27707
                                          Telephone:    (919) 323-3380
                                          Facsimile:    (919) 323-3942
                                          AllisonRiggs@southerncoalition.org
                                          JaclynMaffetore@southerncoalition.org
                                          JeffLoperfido@scsj.org

                                          CAMERON KISTLER (*Pro hac vice*)
                                          GENEVIEVE NADEAU (*Pro hac vice*)
                                          JAMILA BENKATO (*Pro hac vice*)
                                          **PROTECT DEMOCRACY PROJECT**
                                          2020 Pennsylvania Ave., NW # 163
                                          Washington, DC 20006
                                          Telephone:    (202) 599-0466
                                          Facsimile:    (929) 777-9428
                                          cameron.kistler@protectdemocracy.org

genevieve.nadeau@protectdemocracy.org
jamila.benkato@ protectdemocracy.org

LARRY SCHWARTZTOL (*Pro hac vice*)
**PROTECT DEMOCRACY PROJECT**
125 Walnut St., Suite 202
Watertown, MA 02472
Telephone: (202)-599-0466
Facsimile: (929)-777-9428
larry.schwartztol@protectdemocracy.org

ANDREW G. CELLI, JR. (*Pro hac vice*)
ALANNA KAUFMAN (*Pro hac vice*)
DAVID LEBOWITZ (*Pro hac vice*)
**EMERY CELLI BRINCKERHOFF & ABADY LLP**
600 Fifth Avenue at Rockefeller Center
10th Floor
New York, New York 10020
Telephone:    (212) 763-5000
Facsimile:    (212) 763-5001
acelli@ecbalaw.com
akaufman@ecbalaw.com
dlebowitz@ecbalaw.com

*Attorneys for Plaintiffs League of United Latin American Citizens – Richmond Region Council 4614, Eliud Bonilla, Luciania Freeman, and Abby Jo Gearhart*

### CERTIFICATE OF SERVICE

I, Nicole M. Cleminshaw, hereby certify that on June 14, 2019, I electronically filed the

foregoing Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment

using the CM/ECF system, which shall send notification of such filing (NEF) to the following

counsel of record:

Michael J. Lockerby, Esq.
Foley & Lardner LLP
3000 K Street, N.W. | Suite 600
Washington, DC 20007
mlockerby@foley.com

*Counsel for Defendants*

Matthew E. Kelley, Esq.
Ballard Spahr LLP
1909 K Street, NW | 12th Floor
Washington, DC 20006
kelleym@ballardspahr.com

*Counsel for Defendant J. Christian Adams*

/s/ Nicole M. Cleminshaw
NICOLE M. CLEMINSHAW (VSB No. 92161)
1440 New York Ave. NW
Washington, DC 20005
Telephone:     (202) 371-7509
Facsimile:      (202) 661-8209
Nicole.Cleminshaw@probonolaw.com

*Counsel for Plaintiffs League of United Latin*
*American Citizens – Richmond Region Council*
*4614, Eliud Bonilla, Luciana Freeman, Abby Jo*
*Gearhart*