# EXHIBIT C

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                ALEXANDRIA DIVISION

4

5    _____

                                    )

6    LEAGUE OF UNITED LATIN         )

     AMERICAN CITIZENS - RICHMOND )

7    REGION COUNCIL 4614, et al., )     Civil Action

                                    )

8         Plaintiffs,              )     No. 1:18cv-00423

                                    )          (LO/IDD)

9    vs.                            )

                                    )

10   PUBLIC INTEREST LEGAL          )

     FOUNDATION, et al.,            )

11                                  )

12        Defendants.              )

     _____)

13

14

15

16        VIDEOTAPED DEPOSITION OF NOEL JOHNSON

17                Washington, DC

18                April 12, 2019

19

20

21

22

23

24   Reported by:  John L. Harmonson, RPR

25   Job No. 158968

Page 2

1

2

3

4

5                                April 12, 2019

6                                9:01 a.m.

7

8

9          Videotaped Deposition of NOEL JOHNSON, held

10    at the offices of Skadden, Arps, Slate, Meagher &

11    Flom LLP, 1440 New York Avenue, N.W., Washington,

12    D.C., pursuant to the Federal Rules of Civil

13    Procedure, subject to such stipulations as may be

14    recited herein or attached hereto, before John L.

15    Harmonson, a Registered Professional Reporter and

16    Notary Public of the District of Columbia, who

17    officiated in administering the oath to the

18    witness.

19

20

21

22

23

24

25

1              A P P E A R A N C E S

2

3    On behalf of the Plaintiffs:

4         SKADDEN, ARPS, SLATE, MEAGHER & FLOM

5         1440 New York Avenue, NW

6         Washington, DC  20005

7         BY:  SEAN TEPE, ESQ.

8              ANDREW HANSON, ESQ.

9

10

11   On behalf of the Defendants:

12        FOLEY & LARDNER

13        3000 K Street, NW

14        Washington, DC  20007

15        BY:  MICHAEL LOCKERBY, ESQ.

16

17

18   ALSO PRESENT:

19        J. CHRISTIAN ADAMS

20        NAM NGO, Legal Video Specialist

21

22

23

24

25

1              EXAMINATION INDEX

2  WITNESS                              PAGE

3  NOEL JOHNSON

4    Examination by Mr. Tepe            10

5    Examination by Mr. Lockerby        247

6    Examination by Mr. Tepe            275

7    Examination by Mr. Lockerby        287

8                  * * *

9

10              EXHIBIT INDEX

11  EXHIBIT NO.                         PAGE

12  Exhibit 1  . . . . . . . . . . . . .  28

13    LinkedIn profile

14  Exhibit 2  . . . . . . . . . . . . .  31

15    E-mail string; PILF-ADAMS-0009064

16  Exhibit 3  . . . . . . . . . . . . .  46

17    E-mail string; PILF-ADAMS-0046537

18  Exhibit 4  . . . . . . . . . . . . .  49

19    E-mail string; PILF-ADAMS-0008775

20  Exhibit 5  . . . . . . . . . . . . .  67

21    E-mail string; PILF-ADAMS-0008775

22  Exhibit 6  . . . . . . . . . . . . .  69

23    E-mail; PILF-ADAMS-0014107

24  Exhibit 7  . . . . . . . . . . . . .  70

25    E-mail; PILF-ADAMS-0005621

1             EXHIBIT INDEX (Cont.'d)

2                                           PAGE

3    Exhibit 8  . . . . . . . . . . . . . .    71

4      E-mail; PILF-ADAMS-0005601

5    Exhibit 9  . . . . . . . . . . . . . .    72

6      E-mail string; PILF-ADAMS-0004985

7    Exhibit 10  . . . . . . . . . . . . . .   75

8      Alien Invasion I

9    Exhibit 11  . . . . . . . . . . . . . .   85

10     Alien Invasion II

11   Exhibit 12  . . . . . . . . . . . . . .   99

12     E-mail; PILF-ADAMS-0000996

13   Exhibit 13  . . . . . . . . . . . . . .   118

14     E-mail; PILF-ADAMS-0013234

15   Exhibit 14  . . . . . . . . . . . . . .   121

16     E-mail string; PILF-ADAMS-0013148

17   Exhibit 15  . . . . . . . . . . . . . .   122

18     E-mail string; PILF-ADAMS-0013118

19   Exhibit 16  . . . . . . . . . . . . . .   128

20     E-mail string; PILF-ADAMS-0000210

21   Exhibit 17  . . . . . . . . . . . . . .   143

22     E-mail string; PILF-ADAMS-0000782

23   Exhibit 18  . . . . . . . . . . . . . .   148

24     E-mail string; PILF-ADAMS-0000732

25

1                 EXHIBIT INDEX (Cont.'d)

2                                                  PAGE

3    Exhibit 19  . . . . . . . . . . . . . . .    150

4       E-mail string; PILF-ADAMS-0013405

5    Exhibit 20  . . . . . . . . . . . . . . .    154

6       E-mail; PILF-ADAMS-0003261

7    Exhibit 21  . . . . . . . . . . . . . . .    156

8       E-mail string; PILF-ADAMS-0007468

9    Exhibit 22  . . . . . . . . . . . . . . .    163

10      E-mail string; PILF-ADAMS-0013638

11   Exhibit 23  . . . . . . . . . . . . . . .    165

12      E-mail; PILF-ADAMS-0005600

13   Exhibit 24  . . . . . . . . . . . . . . .    167

14      E-mail string; PILF-ADAMS-0044022

15   Exhibit 25  . . . . . . . . . . . . . . .    171

16      E-mail string; PILF-ADAMS-0000770

17   Exhibit 26  . . . . . . . . . . . . . . .    181

18      E-mail string; PILF-ADAMS-0037501

19   Exhibit 27  . . . . . . . . . . . . . . .    187

20      E-mail string; PILF-ADAMS-0001979

21   Exhibit 28  . . . . . . . . . . . . . . .    195

22      E-mail string; PILF-ADAMS-0009322

23   Exhibit 29  . . . . . . . . . . . . . . .    204

24      E-mail string; PILF-ADAMS-0017930

25

1              EXHIBIT INDEX (Cont.'d)

2                                              PAGE

3    Exhibit 30 . . . . . . . . . . . . . . .    206

4      Printout from PILF website

5    Exhibit 31 . . . . . . . . . . . . . . .    212

6      E-mail string; PILF-ADAMS-0011327

7    Exhibit 32 . . . . . . . . . . . . . . .    214

8      E-mail string; PILF-ADAMS-0004883

9    Exhibit 33 . . . . . . . . . . . . . . .    220

10     E-mail string; PILF-ADAMS-0009399

11   Exhibit 34 . . . . . . . . . . . . . . .    223

12     E-mail string; PILF-ADAMS-0047358

13   Exhibit 35 . . . . . . . . . . . . . . .    225

14     E-mail; PILF-ADAMS-0051869

15   Exhibit 36 . . . . . . . . . . . . . . .    228

16     E-mail; PILF-ADAMS-0000250

17   Exhibit 37 . . . . . . . . . . . . . . .    232

18     E-mail string; PILF-ADAMS-0039701

19   Exhibit 38 . . . . . . . . . . . . . . .    237

20     E-mail; PILF-ADAMS-0016737

21   Exhibit 39 . . . . . . . . . . . . . . .    239

22     E-mail string; PILF-ADAMS-0005276

23   Exhibit 40 . . . . . . . . . . . . . . .    241

24     E-mail string; PILF-ADAMS-0005129

25

1                    EXHIBITS (Cont.'d)

2                                                  PAGE

3     Exhibit 41  . . . . . . . . . . . . . . .   253

4        E-mail; PILF-ADAMS-0008709

5

6                PREVIOUSLY MARKED EXHIBITS

7     VVA 26  . . . . . . . . . . . . . . . . .   134

8     VVA 27  . . . . . . . . . . . . . . . . .   137

9     VVA 39  . . . . . . . . . . . . . . . . .   245

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1  --------------------------------------------------
2              P R O C E E D I N G S
3                     9:01 a.m.
4  --------------------------------------------------
5           THE VIDEOGRAPHER:  This is the start
6      of tape labeled number 1 of the videotaped
7      deposition of Noel Johnson, in the matter of
8      League of United Latin American Citizens, et
9      al. v. Public Interest Legal Foundation, et
10     al., in the United States District Court for
11     the Eastern District of Virginia, Case
12     Number 1:18cv423.
13          This deposition is being held at 1440
14     New York Avenue, Northwest, Washington, D.C.
15     20005, on April 12, 2019, at approximately
16     9:01 a.m.
17          My name is Nam Ngo from TSG Reporting,
18     and I'm the legal video specialist.  The
19     court reporter is John Harmonson in
20     association with TSG Reporting.
21          Will counsel please introduce
22     yourself.
23          (Whereupon, counsel placed their
24     appearances on the video record.)
25  //
```

1   Whereupon,

2                    NOEL JOHNSON,

3   after having been first duly sworn or affirmed,

4   was examined and did testify under oath as

5   follows:

6              MR. TEPE:  And for the record,

7        Mr. Christian Adams is also here attending

8        the deposition.

9                    EXAMINATION

10  BY MR. TEPE:

11        Q.    Mr. Johnson, can you state your full

12  name for the record.

13        A.    Noel Henry Johnson.

14        Q.    Have you been deposed before?

15        A.    No.

16        Q.    Have you testified under oath before?

17        A.    Yes.

18        Q.    In what capacity?

19        A.    It was a car accident involving

20  someone else.

21        Q.    When was this?

22        A.    Around 2003.

23        Q.    So this was at a trial?

24        A.    It was not a trial.  It was a brief

25  hearing.  I'm not sure of the nature of the

1    proceeding, but I was asked a question.

2        Q.    Have you testified under oath in any

3    other proceedings?

4        A.    Not that I recall, no.

5        Q.    You understand you're under oath

6    today?

7        A.    I do.

8        Q.    Is there any reason why you cannot

9    give truthful and accurate testimony today?

10       A.    No.

11       Q.    Before we get underway, and

12   particularly since you haven't been deposed

13   before, and I assume your counsel, Mr. Lockerby,

14   has gone through some of the ground rules, but

15   just to make sure we're on the same page I'll go

16   through some of those.

17            The first thing is please provide

18   verbal responses, no nodding.  Is that okay?

19       A.    That's okay.

20       Q.    All right.  And if you can wait until

21   I finish the question so we're not talking over

22   each other.  Can you do that?

23       A.    I can.

24       Q.    Counsel may object to some of my

25   questions, but you must answer unless you're

1    specifically instructed not to answer.  Okay?

2        A.    Okay.

3        Q.    If you are confused by my question,

4    I'm more than happy to restate it.  Just let me

5    know.  Okay?

6        A.    Okay.

7        Q.    And I usually go about 60 to 90

8    minutes before sort of taking a break, but if at

9    any time you want to take a break, just let me

10   know.  The only thing I ask is that if I have a

11   question pending, you answer the question and

12   then we can take a break.  Okay?

13       A.    Okay.

14       Q.    Did you do anything to prepare for

15   today's deposition?

16       A.    Yes.

17       Q.    What did you do?

18       A.    I met with my attorney.

19       Q.    Who is that?

20       A.    Mr. Lockerby.

21       Q.    Did you meet with anyone else?

22       A.    No.

23       Q.    So to prepare for today's deposition,

24   you met with Mr. Lockerby and no one else?

25       A.    Correct.

1    Q.    When did you meet with Mr. Lockerby?

2    A.    Yesterday.

3    Q.    And for how long?

4    A.    It was all day.

5    Q.    Did you look at documents?

6    A.    I did.

7    Q.    Did any of those documents refresh

8  your recollection of the matters involved in this

9  case?

10   A.    Yes.

11   Q.    What documents were those?

12   A.    I don't have a specific recollection

13 of every document.

14   Q.    But there were a number?

15   A.    What do you mean by number?

16   Q.    More than one?

17   A.    More than one, yes.

18   Q.    Did you talk to anyone else about your

19 deposition today other than Mr. Lockerby?

20   A.    Yes.

21   Q.    Who?

22   A.    I told my wife it was happening.

23   Q.    Anyone else?

24   A.    I probably told others at my office it

25 was happening.

Page 14

1    Q.    Did you talk to Mr. Adams about your

2    testimony?

3    A.    Yes.

4    Q.    And what did you discuss?

5    A.    Well, not about my testimony, no.

6    Q.    Did you talk to Mr. Adams about the

7    fact that you were being deposed today?

8    A.    Yes.

9    Q.    And in that regard, what did you

10   discuss?

11   A.    We had -- we briefly discussed the

12   testimony -- or the deposition of Clara Belle

13   Wheeler.

14   Q.    And what did you discuss there?

15   A.    He mentioned that she was not

16   represented by counsel.  He mentioned -- I'm not

17   recalling exactly what he mentioned other than

18   that.

19   Q.    Did Mr. Adams mention that he was in

20   attendance at the Clara Belle Wheeler deposition?

21   A.    Yes.

22   Q.    Did he tell you about anything that

23   happened in that deposition?

24   A.    Yes.

25   Q.    What did he tell you about?

1    A.    I think he mentioned some of the line

2  of questioning that they gave, that she was

3  asked.

4    Q.    Did he explain why he was telling you

5  this?

6    A.    No.

7    Q.    Did you ask for this information?

8    A.    No.

9    Q.    And you don't recall what he told you?

10    A.    I'm not recalling what he told me.

11  Sorry.  He mentioned that they had asked her

12  questions about who -- who she associates with.

13    Q.    Other than Mr. Adams telling you

14  certain things about what transpired at the

15  Wheeler deposition, was there anything else that

16  Mr. Adams told you in preparation for today's

17  deposition?

18    A.    Yes.

19    Q.    And what was that?

20    A.    We discussed some of the questions

21  that were asked by Ms. Riggs of Edgardo Cortes.

22    Q.    Such as?

23    A.    Her line of questioning regarding the

24  process at DMV for citizenship verification; the

25  process for creating the VERIS reports that

1   reflect noncitizen cancellations.

2       Q.    Anything else?

3       A.    Not that I recall.

4       Q.    So it's not the case that in

5   preparation for today's deposition you only spoke

6   with Mr. Lockerby, correct?

7            MR. LOCKERBY:  Object to the form.

8       Misstates the witness's testimony.

9   BY MR. TEPE:

10      Q.    You can clarify.

11      A.    Please repeat the question.

12      Q.    So it's not the case that in

13  preparation for today's deposition you only spoke

14  with Mr. Lockerby, correct?

15      A.    I guess it depends on how you define

16  "preparation."  If you could define "preparation"

17  for me, I can answer the question.

18      Q.    If I have to define "preparation" then

19  I think I'm going to have to extend the length of

20  this deposition today.

21           MR. LOCKERBY:  And I'm going to object

22      to the form of the question.

23           MR. TEPE:  Because it wasn't a

24      question.

25  BY MR. TEPE:

1    Q.    Well, when I asked -- also I asked if

2    you had talked to anyone else about today's

3    deposition.  You didn't actually volunteer that

4    you had conversations with Mr. Adams.  Is that

5    correct?

6    A.    I did eventually.

7    Q.    Eventually?

8    A.    Right.

9    Q.    When I use the word "you" today, I'm

10    going to be referring to you as a person.  If

11    there is any question as to whether or not I'm

12    referring to you or PILF, just let me know.  I'll

13    try and say when I'm talking about PILF, I'll

14    mention PILF.

15         Now, what is PILF?

16    A.    It's a legal foundation.

17    Q.    Public Interest Legal Foundation?

18    A.    Correct.

19    Q.    And is that your current employer?

20    A.    Yes.

21    Q.    What is your title at PILF?

22    A.    I don't have an official title.  I go

23    by litigation counsel.

24    Q.    How long have you been at PILF?

25    A.    Around June of 2012.  But at that time

Page 18

1    it was known as ActRight Legal Foundation.

2         Q.    What are your responsibilities as

3    litigation counsel?

4         A.    I do research, education, and

5    litigation.

6         Q.    Can you describe what research you do

7    in your capacity as litigation counsel?

8              MR. LOCKERBY:  I'm just going to

9         object to the extent that the question seeks

10        to invade the attorney-client privilege.  If

11        the question is about general types of

12        research, I would have no instruction not to

13        answer.  However, if the question seeks to

14        determine specific research that Mr. Johnson

15        has undertaken for specific clients, I would

16        instruct him not to answer.

17             THE WITNESS:  Generally speaking, I

18        review election and voter registration data.

19        I research laws in various states and at the

20        federal level.  Other issues related to

21        elections and election laws.

22   BY MR. TEPE:

23        Q.    I should have asked before, where do

24   you work in terms of geographic location?

25        A.    Indianapolis, Indiana.

1    Q.    And PILF is an Indianapolis, Indiana,

2    organization.  Is that right?

3    A.    Correct.

4    Q.    But Mr. Adams works in Virginia.  Is

5    that right?

6    A.    Yes.

7    Q.    How do you I guess transact business

8    with Mr. Adams in Virginia and PILF in Indiana?

9    A.    Can you define what you mean by

10   "transact business"?

11   Q.    How do you accomplish your daily

12   tasks?

13   A.    With Mr. Adams?

14   Q.    Uh-huh.

15   A.    We use e-mail or speak on the

16   telephone.

17   Q.    So then in terms of written product,

18   e-mail is the main way that you transact business

19   with Mr. Adams?

20   A.    Yes.

21   Q.    You had mentioned research, education

22   and litigation.  Generally speaking, what is the

23   education aspect of your responsibilities?

24   A.    I have helped produce reports.  I have

25   written material for the media.

1      Q.    What do you mean, you have written

2   material for the media?

3      A.    Op-eds, for example.

4      Q.    And what kind of reports have you

5   written?

6      A.    Reports showing -- touching on voter

7   registration matters.

8      Q.    Such as the Alien Invasion reports?

9      A.    That would be one example.

10      Q.    You said litigation.  Can you describe

11   that aspect of your job?

12      A.    I act as an attorney for the

13   foundation and for foundation clients.

14      Q.    Who are foundation clients?

15         MR. LOCKERBY:  I'll object to the form

16      to the extent it seeks the identity of

17      clients whose identity is not publicly

18      known.

19         MR. TEPE:  Fair enough.

20         THE WITNESS:  Can you better explain

21      what you're asking?

22   BY MR. TEPE:

23      Q.    Well, you said you act as an attorney

24   for foundation clients, and then I asked who are

25   the foundation clients.

1      A.     They're the clients we represent.

2      Q.     But who are they?

3      A.     Their identity?

4      Q.     Yes.

5             MR. LOCKERBY:  I'm going to object to

6      the relevancy of this.  To the extent that

7      the identity of certain clients is a matter

8      of public record is reflected in public

9      filings, I'm not instructing the witness not

10     to answer.  However, to the extent that the

11     identity of clients is not publicly known, I

12     am instructing the witness not to answer.

13            THE WITNESS:  All I know is I can

14     recall the Virginia Voters Alliance.  David

15     Norcross.  The American Civil Rights Union.

16  BY MR. TEPE:

17     Q.     Any others coming to mind?

18     A.     We have been a client ourselves, the

19  foundation.

20     Q.     How many -- Strike that.

21            Do you appear in court on behalf of

22  your clients or the foundation?

23     A.     Yes.

24     Q.     And how many cases do you have as an

25  active docket?

Page 22

1    A.    That I am counsel of record?

2    Q.    Correct.

3    A.    Right now I can think of two.

4    Q.    Do you oversee the work of others as
5  litigation counsel?

6    A.    What do you mean by "oversee"?

7    Q.    Manage.

8    A.    I have no subordinates if that's what
9  you're asking.

10    Q.    That's not what I'm asking.  I'm
11  saying do you manage other individuals at PILF as
12  part of your responsibilities?

13    A.    I'm not in a management position of
14  anyone else that I would say.

15    Q.    But does it depend on the project?  On
16  certain projects you're sort of coordinating and
17  managing those projects?

18    A.    I would say that I have supervisory
19  responsibility on the cases of which I am counsel
20  of record.  Others may do work that I review.

21    Q.    And do you have supervisory
22  responsibility for certain reports that you're
23  drafting?

24    A.    I have, yes.

25    Q.    Have you ever made media appearances

1   on behalf of PILF?

2       A.    Yes.

3       Q.    Can you recall what those media

4   appearances are -- or were, should I say?

5       A.    Yes.

6       Q.    What are they?

7       A.    I recall a radio appearance I did in

8   Wisconsin related to a voter ID lawsuit in I

9   think 2015.

10          I can recall an appearance on the Bret

11  Baier show in I believe 2017.

12          I don't recall any others.

13      Q.    And that appearance on Bret Baier,

14  PILF depended on you to discuss the findings of

15  Alien Invasion II.  Is that right?

16      A.    I discussed some of the findings of

17  Alien Invasion II in that interview, yes.

18      Q.    And am I correct that PILF has trusted

19  you to provide testimony to government bodies on

20  its behalf?

21      A.    Yes, I've done that.

22      Q.    What bodies?

23      A.    I have appeared before the Privileges

24  and Elections Commission in the Virginia general

25  assembly; I think it was a joint session.  And I

1    appeared before a committee in Pennsylvania,

2    although I cannot recall the name.

3         Q.    Have you appeared before other

4    committees?

5         A.    Not that I recall.

6         Q.    I think you mentioned you supervised

7    the preparation of the Alien Invasion reports.

8    Is that right?

9         A.    Yes.

10        Q.    You drafted those reports?

11        A.    The drafting was a collective effort.

12        Q.    You wrote the first draft?

13        A.    Yes.

14        Q.    And you oversaw sort of finalization

15   of the product?

16        A.    Yes.

17        Q.    And PILF relied on you to have

18   correspondence with Virginia election officials,

19   correct?

20        A.    Correct.

21        Q.    If I asked you to describe the Public

22   Interest Legal Foundation, how would you describe

23   it?

24        A.    Are you asking me to describe it?

25        Q.    I said how would you describe it.

1      A.    I would describe it as a 501(c)(3)

2  corporation that focuses on election integrity

3  and the preservation of the constitutional

4  framework under which states and the federal

5  government share control of elections.

6      Q.    Would you describe it as nonpartisan?

7      A.    Yes.

8      Q.    Why?

9      A.    Because it is.

10     Q.    That's kind of conclusory.  So

11  again --

12           MR. LOCKERBY:  Object to the form.

13      Actually, there was no question to object

14      to.  It was a gratuitous comment.

15  BY MR. TEPE:

16     Q.    All right.  So I asked would you

17  describe PILF as nonpartisan, and you answered

18  yes.

19     A.    I did.

20     Q.    And what is the basis for you saying

21  that PILF is nonpartisan?

22     A.    We do not act in a partisan manner.

23     Q.    Can you answer that question without

24  using the word "partisan"?

25     A.    Our activities have been reviewed by

Page 26

1    the Internal Revenue Service, and we have been

2    approved as a 501(c)(3) legal foundation.  One of

3    those requirments is that we do not act in a

4    partisan manner.

5        Q.    And when you say "We do not act in a

6    partisan manner," what do you mean by that?

7        A.    We do not intervene in political

8    campaigns on the side of one partisan interest

9    over another.

10       Q.    What do you mean, "We do not intervene

11   in political campaigns"?

12       A.    We do not advocate the election or

13   defeat of an identified candidate.

14       Q.    You don't publicly advocate for the

15   election or defeat of a particular candidate,

16   correct?

17            MR. LOCKERBY:  Object to the form of

18        the question.

19            THE WITNESS:  Correct.

20   BY MR. TEPE:

21       Q.    But you privately support the election

22   or defeat of particular candidates, correct?

23            MR. LOCKERBY:  Object to the form of

24        the question.  Also it's undefined as to

25        whether "you" means Mr. Johnson or PILF.

1          MR. TEPE:  Fair enough.

2    BY MR. TEPE:

3        Q.    But PILF privately supports the

4    election or defeat of particular candidates,

5    correct?

6        A.    No, I wouldn't say that.

7        Q.    PILF works with political parties,

8    correct?

9          MR. LOCKERBY:  Object to the form.

10         THE WITNESS:  Define "works with."

11   BY MR. TEPE:

12       Q.    You don't know what "works with"

13   means?

14         MR. LOCKERBY:  I'm going to object to

15         form.  It's vague.  It's not clear as to

16         whether the question is directed to PILF

17         having clients that are political parties or

18         something else.

19   BY MR. TEPE:

20       Q.    PILF coordinates with political

21   parties on certain activities, yes?

22         MR. LOCKERBY:  Object to the form.

23         THE WITNESS:  No, I don't recall us

24         coordinating with a political party on

25         certain activities.

Page 28

1    BY MR. TEPE:

2         Q.    You had mentioned before, I think,

3    that PILF was once known as ActRight Legal

4    Foundation.

5         A.    I did mention that.

6         Q.    And do you recall when PILF changed

7    its name from ActRight Legal Foundation to Public

8    Interest Legal Foundation?

9         A.    I don't recall the exact date.

10             (Exhibit 1 marked for identification

11        and attached hereto.)

12             MR. TEPE:  The court reporter has

13        marked as Exhibit 1 a document.

14   BY MR. TEPE:

15        Q.    Do you recognize this?

16        A.    It looks like my LinkedIn profile.

17        Q.    And your profile has you working for

18   ActRight Legal Foundation from 2012 to the

19   present, right?

20        A.    That's what the document says.

21        Q.    Is there any distinction between

22   ActRight Legal Foundation and Public Interest

23   Legal Foundation in your mind?

24        A.    Yes.

25        Q.    And what's that distinction?

1     A.     At the time the name was changed we

2  had some change in focus of our organizational

3  mission, I'll call it.

4     Q.     And what was that change in focus?

5     A.     With ActRight Legal Foundation we were

6  a little more -- we were a little broader in our

7  focus on matters of public interest, and along

8  with the name change came more of a focus on

9  election integrity and those types of matters.

10    Q.     Many of the same people who worked for

11 ActRight Legal Foundation currently work for

12 Public Interest Legal Foundation, correct?

13    A.     Some of them do.

14    Q.     Yourself is one?

15    A.     I am one.

16    Q.     Who else?

17    A.     Kaylan Phillips.  Shawna Powell.  I

18 believe those are the only employees who have --

19    Q.     What about Mr. Vanderhulst?

20    A.     No.

21    Q.     Some of the board members are the

22 same?

23    A.     Yes.

24    Q.     And in what kind of work did ActRight

25 Legal Foundation engage in?

1      A.    I would describe it as a number of

2  matters including free speech, religious freedom.

3  Those are the only two that I can recall

4  generally speaking.  Other constitutional rights.

5      Q.    Was ActRight Legal Foundation involved

6  in, generally speaking, conservative causes?

7            MR. LOCKERBY:  Object to the form.

8            THE WITNESS:  You might say that,

9      yeah.

10 BY MR. TEPE:

11     Q.    According to your profile, before

12 working for ActRight Legal Foundation you worked

13 as an attorney for the Bopp Law Firm.

14     A.    Correct.

15     Q.    What kind of law did the Bopp Law Firm

16 practice in at that time?

17     A.    Campaign finance and First Amendment.

18     Q.    It was also conservative focused --

19            MR. LOCKERBY:  Objection.

20 BY MR. TEPE:

21     Q.    -- in its political leanings?

22     A.    I don't consider the First Amendment

23 to be a conservative viewpoint, if that's what

24 you're asking.

25     Q.    It's not what I'm asking.

1     A.    I think some might characterize it

2   that way, but I don't think defense of the First

3   Amendment is conservative or liberal, if that's

4   what you mean.

5     Q.    No, I'm just asking questions.

6         MR. TEPE:  Can we go off the record?

7         THE VIDEOGRAPHER:  We are going off

8     the record.  The time is 9:29 a.m.

9         (Off the record.)

10        THE VIDEOGRAPHER:  We are back on the

11    record.  The time is 9:30 a.m.

12        (Exhibit 2 marked for identification

13    and attached hereto.)

14  BY MR. TEPE:

15    Q.    The court reporter is handing you a

16  document marked Exhibit 2.

17        Do you recognize this document?

18    A.    Is it the whole stack or just the top

19  page?

20    Q.    The whole stack.

21    A.    Yes, I've seen this before.

22    Q.    This is an e-mail that begins with an

23  e-mail from Rizwana Ahmad with the Prince William

24  County election office.  Is that right?

25    A.    The bottom e-mail on the first page,

1  that's correct.

2      Q.    And he sent this e-mail on August 16,

3  2016, to PILF.  Is that right?

4      A.    Correct.

5      Q.    And was this sent to PILF's general

6  e-mail mailbox?

7      A.    It looks like it was sent to the

8  contact e-mail at the foundation.

9      Q.    And then you forwarded that on to some

10 other folks at PILF, correct?

11     A.    Correct.

12     Q.    Let me direct your attention to one of

13 the attachments to the e-mail.  If you go to the

14 document with the Bates number 9067.

15          Do you recognize this document?

16     A.    I've seen it before.

17     Q.    And it's a letter drafted to the

18 Prince William registrar.  Is that correct?

19     A.    It does say it's to the general

20 registrar, Michele White, and that it was

21 received by the Prince William County registrar

22 and elections office.

23     Q.    So date of this letter is August 8th?

24     A.    Yes.

25     Q.    It's signed by Shawna Powell.  Is that

1    right?

2        A.    Yes.

3        Q.    And she's the secretary of PILF?

4        A.    Yes.

5        Q.    And that's like an officer position,

6    correct?

7        A.    I believe so.

8        Q.    You were involved in the drafting of

9    this letter, correct?

10       A.    I think I was, yes.

11       Q.    So the letter starts by saying:  "I am

12   writing on behalf of the Public Interest Legal

13   Foundation to request inspection of records

14   related to your office's voter list maintenance

15   obligations under the National Voter Registration

16   Act of 1993."

17            Do you see that?

18       A.    I see that.

19       Q.    And the National Voter Registration

20   Act is commonly known as the NVRA?

21       A.    Yes.

22       Q.    And two paragraphs below that the

23   letter explains:  "The NVRA requires your office

24   to make available for public inspection all

25   records concerning the implementation of programs

Page 34

1  and activities conducted for the purpose of

2  ensuring the accuracy and currency of official

3  lists of eligible voters."  Correct?

4       A.    That's what the -- that's what this

5  letter says, yes.

6       Q.    And then pursuant to this section of

7  the NVRA, PILF makes a records request of Prince

8  William County, correct?

9       A.    Correct.

10      Q.    And the first request is for, quote,

11  documents regarding all registrants who are

12  identified as potentially not satisfying the

13  citizenship requirements for registration.

14  Correct?

15      A.    That's part of the first sentence,

16  yes.

17      Q.    It goes on "from any information

18  source including the Department of Motor Vehicles

19  and the State Board of Elections."  Correct?

20      A.    Correct.

21      Q.    This request doesn't ask for who were

22  determined by Prince William County to be

23  noncitizens, does it?

24           MR. LOCKERBY:  Object to the form.

25       The document speaks for itself.

1        THE WITNESS:  I think that's one thing

2    that is responsive to this request.

3  BY MR. TEPE:

4        Q.    That wasn't the question I was asking.

5  I was asking this request does not seek a list of

6  registrants who were determined by Prince William

7  County to be noncitizens, does it?

8        MR. LOCKERBY:  Objection; asked and

9    answered.

10       THE WITNESS:  I think it does.

11 BY MR. TEPE:

12       Q.    How so?

13       A.    A record showing those that they

14 determined not to be citizens would be responsive

15 to the request.

16       Q.    And so would a list of individuals

17 who, as is stated here in the record, are

18 potentially not satisfying the citizenship

19 requirements.  True?

20       A.    That would also be responsive, I

21 think, yes.

22       Q.    Where did the idea for this request

23 come from?

24       A.    I don't recall.

25       Q.    Well, you drafted this letter,

Page 36

1    correct, a version of it at least?

2         A.    Again, I think I did.

3         Q.    Do you recall why you were drafting

4    this letter?

5         A.    To obtain the records we requested.

6         Q.    And why were you seeking these

7    records?

8         A.    We were exploring the extent of

9    noncitizen registration in Virginia.

10        Q.    Were you looking for a particular

11   record?

12        A.    At this time, I'm not sure.  We were

13   looking for the records that are described or

14   that are requested, whatever the registrar may

15   have.

16        Q.    Similar letters were sent to other

17   jurisdictions in Virginia, correct?

18        A.    Correct.

19        Q.    If you flip to the previous two pages

20   with the number on the bottom of 9065.  Do you

21   see that?

22        A.    I see it.

23        Q.    And this is a letter back from the

24   Prince William County Office of Elections in

25   response to your PILF's August 8th letter,

1    correct?

2         A.    That's what it says, yes.

3         Q.    And in the second paragraph it says:

4    "You have requested the inspection of records

5    related to voter maintenance, especially those

6    identified as potentially not satisfying the

7    citizenship requirements for registration."

8    Correct?

9         A.    Correct.

10        Q.    And the end of that, that's PILF's

11   language from the previous August 8th letter,

12   correct?

13        A.    Yeah.  It's not verbatim but it's --

14        Q.    But you used the same "potentially not

15   satisfying the citizenship requirements"?

16        A.    It does, yes.

17        Q.    And then in the next paragraph Prince

18   William states:  "In response to your information

19   request, I am providing a PDF of Prince William

20   cancellation - declared noncitizen list dating

21   back from January 1, 2011, to the present date."

22   Is that right?

23        A.    Correct.

24        Q.    Is there anything in this letter that

25   states that people in the list that they were

Page 38

1    providing were determined by Prince William

2    County to not be U.S. citizens?

3              MR. LOCKERBY:  Object to the form.

4         The document speaks for itself.

5              THE WITNESS:  Yes.

6    BY MR. TEPE:

7         Q.    Where is that language?

8         A.    The second paragraph says that she is

9    providing a PDF of Prince William County

10   cancellation - declared noncitizen.

11        Q.    No.  I asked -- my question was is

12   there anything in this letter that states that

13   people in the list that they were providing,

14   which is what you just mentioned, were determined

15   by Prince William County to not be U.S. citizens?

16             MR. LOCKERBY:  Object to the form.

17        Asked and answered.  The fact that counsel

18        doesn't like the answer doesn't mean he is

19        entitled to ask the question over and over

20        again.

21   BY MR. TEPE:

22        Q.    You can answer.

23        A.    Yes.  It says declared noncitizen.

24        Q.    Declared by whom?

25        A.    The letter does not say.

1    Q.    So you have made some interpretations

2    as to what this list shows, correct?

3         MR. LOCKERBY:  Object to the form.

4         THE WITNESS:  The letter -- the

5         language speaks for itself.  They were

6         declared noncitizen.

7    BY MR. TEPE:

8    Q.    Again, the question was declared by

9    whom?  Not Prince William County, correct?

10         MR. LOCKERBY:  Object to the form.

11         THE WITNESS:  It does not say that

12         Prince William County did not declare them,

13         no.

14    BY MR. TEPE:

15    Q.    And it doesn't say that Prince William

16    County did declare them noncitizens, does it?

17    A.    Well, it does say declared noncitizen.

18    Q.    Right.

19    A.    It being a record of Prince William

20    County, yes, I would interpret that to mean

21    Prince William County or the registrant

22    themselves have declared them a noncitizen.

23    Either way --

24    Q.    And do you know how they did this

25    declaration?

1    A.    I'm not sure of the question you're

2    asking.

3    Q.    Well, you just said that you're

4    interpreting from the three words -- or actually

5    it's two words, "declared noncitizen," that

6    Prince William County made a determination that

7    these individuals on the list were noncitizens.

8    And I'm asking you, to your knowledge, how did

9    they go about making this determination?

10   A.    Well, what I said was either Prince

11   William County or the registrant themselves who

12   appears in the list has made the declaration.

13   Q.    And I'm asking you again, how did they

14   go about doing that?

15   A.    As I understand it, the way the list

16   is compiled, it is a list of people who indicated

17   at the DMV that they are not a citizen, under

18   oath.  The DMV compiles a list of those

19   individuals, transmits it to the Department of

20   Elections, who then transmits it to the county

21   election offices.  Their registrations are then

22   canceled based on either a declaration under oath

23   by the registrants themselves.

24   Q.    Under this process, isn't it correct

25   that the registrants who are canceled can provide

1  an affirmation that says actually yes, I am truly

2  a citizen?

3      A.    I believe the law requires the county

4  election official to send them an affirmation for

5  them to sign.

6      Q.    Right.  And if they receive that

7  affirmation within two weeks, then they're not

8  canceled from the rolls?

9          MR. LOCKERBY:  Object to the form of

10         the question.

11         THE WITNESS:  If who receives it in

12         two weeks?

13  BY MR. TEPE:

14     Q.    The registrar.

15     A.    I understand if it is returned by the

16  registrant with a signature declaring --

17  affirming that they are in fact a citizen, the

18  registrar is not supposed to cancel their

19  registration.

20     Q.    And in the process that you just

21  outlined, there was no investigation by Prince

22  William County into whether or not these people

23  are citizens.  Is that right?

24         MR. LOCKERBY:  Object to the form.

25         THE WITNESS:  The investigation would

1       be reviewing the list sent to them by the

2       Department of Elections of all people who

3       indicated at the Department of Motor

4       Vehicles under oath that they are not a

5       citizen.  So yes, they have investigated the

6       matter.

7   BY MR. TEPE:

8       Q.   So they receive a list and then they

9   send out a mailer, correct?

10      MR. LOCKERBY:  Object to the form.

11      Asked and answered.  Misstates the witness's

12      prior testimony.

13      THE WITNESS:  If by "mailer" you mean

14      the affirmation of citizenship, then that is

15      sent -- supposed to be sent to everyone on

16      that list.

17  BY MR. TEPE:

18      Q.   And -- now, how do you get onto the

19  voter registration rolls to begin with?

20      A.   Where?

21      Q.   In Virginia.

22      A.   There are a number of ways, as I

23  understand it.

24      Q.   You have to file -- fill out a voter

25  registration application, correct?

1     A.    I'm not completely familiar with the

2  law, but yes, I believe that's one way.

3     Q.    How else do you get onto the voter

4  rolls in Virginia?

5     A.    I don't know of any other way.

6     Q.    And so when you fill out that voter

7  registration application, there is a question as

8  to whether or not you are a U.S. citizen,

9  correct?

10    A.    There is supposed to be, yes.

11    Q.    And there is -- to your knowledge,

12 there is one?

13    A.    Yes.

14    Q.    And so those individuals who check

15 "Yes" are supposed to then, assuming the rest of

16 the application is fine, go on the voter rolls,

17 correct?

18    A.    If they are otherwise eligible, yes.

19    Q.    And that affirmation of citizenship at

20 the beginning is also under oath, correct?

21    A.    Correct.

22    Q.    But then as you understand it and as

23 you just described, there is at some point some

24 contrary information about citizenship that is

25 provided to the DMV that is then transmitted to

Page 44

1    election officials that triggers this notice of

2    potential cancellation.  Is that right?

3         A.    The process you described sounds

4    right, yes.

5         Q.    So let's just briefly look at the PDF

6    that Prince William County sent a couple of pages

7    later.  Do you see that?

8         A.    Starting on 9070?

9         Q.    Correct.

10        A.    Yes, I'm there.

11        Q.    And this is a form that has listed at

12   the top "Cancellation - Declared Noncitizen"

13   underneath Prince William County, correct?

14        A.    Correct.

15        Q.    And there is a list of individuals

16   with their home addresses.  Is that right?

17        A.    Correct.

18        Q.    Their voter registration ID?

19        A.    Correct.

20        Q.    A date of cancellation?

21        A.    Correct.

22        Q.    And a column called "Canceled Type"?

23        A.    Correct.

24        Q.    And that's where it says declared

25   noncitizen, right?

1    A.    It says that under "Canceled Type" as

2 well as two other places.

3    Q.    And there are other cancel types in

4 the records maintained by Virginia election

5 officials, correct?

6    A.    Correct.

7    Q.    There's like mentally incapacitated,

8 correct?

9    A.    That's one type, yes.

10    Q.    Are you aware of some other types of

11 cancellations?

12    A.    Yes.

13    Q.    What are some of the other ones?

14    A.    Deceased.  They are canceled if they

15 die.

16         They are canceled if they move out of

17 the jurisdiction.

18         I believe they're canceled if they

19 request cancellation.

20    Q.    So there are a variety of cancel

21 types?

22    A.    Yes.

23    Q.    And on this list from Prince William

24 County there are 433 names.  Is that right?

25    A.    On page 9098 it says that declared

Page 46

1   noncitizen total is 433.  But I did not count the

2   number of names.

3        Q.   And it's for the period January 1,

4   2011, through August 16, 2016.  Is that right?

5        A.   That's what it purports to be.

6        Q.   When PILF received this list from

7   Prince William County, do you recall if people at

8   PILF were happy?

9             MR. LOCKERBY:  Object to the form of

10       the question.

11            THE WITNESS:  I don't recall.

12   BY MR. TEPE:

13       Q.   Do you recall anyone saying in

14   response that "You hit pay dirt"?

15       A.   I can't say for sure if I recall that,

16   no.

17            (Exhibit 3 marked for identification

18       and attached hereto.)

19            THE WITNESS:  Are you all done with

20       this one?

21   BY MR. TEPE:

22       Q.   I think so.  You can put it aside.

23            The court reporter has handed you a

24   document marked as Exhibit 3 with the Bates

25   number 46537.  Do you see that?

1      A.    I see that.

2      Q.    Do you recognize this document?

3      A.    I don't recognize it, but I think I've

4  seen it before.

5      Q.    Okay.  But this is an e-mail from

6  Public Interest Legal Foundation, correct, this

7  e-mail chain?

8      A.    Yes.

9      Q.    And it shows that from the previous

10  e-mail from Prince William County, that was

11  forwarded by you to a number of folks at PILF,

12  correct?  On August 16th?

13      A.    At 4:42?

14      Q.    Correct.

15      A.    Yes, I see that.

16      Q.    And then at the top of the chain

17  Mr. Adams responds to you, copying some other

18  folks at PILF on the same day at 6:05 p.m.:  "As

19  you saw, David Norcross said we hit pay dirt."

20            Do you see that?

21      A.    I see that.

22      Q.    Who is David Norcross?

23      A.    He's currently a foundation board

24  member.

25      Q.    Was he on the board at this time?

Page 48

1      A.    I don't believe so.

2      Q.    Do you recall Mr. Norcross saying "We

3   hit pay dirt"?

4      A.    I don't recall him saying that.

5      Q.    Do you recall a conversation with

6   Mr. Norcross between the time that Prince William

7   County sent over these records at 3:13 p.m. and

8   the time of this e-mail at 6:05 p.m.?

9      A.    I don't recall that conversation.

10     Q.    What did you understand, when you saw

11  this e-mail, David Norcross to be saying?

12          MR. LOCKERBY:  Object to the form.  I

13     would ask that it be identified on the

14     record where the e-mail from David Norcross

15     is in this document.

16          THE WITNESS:  I don't recall David

17     Norcross saying that previously in a

18     conversation with me.

19  BY MR. TEPE:

20     Q.    But Mr. Adams did write here:  "As you

21  saw, David Norcross said we've hit pay dirt."

22  Correct?

23     A.    I see that, yes.

24     Q.    Do you have any reason to believe that

25  Mr. Adams was incorrect?

1          A.     No.

2          Q.     You don't know what Norcross meant by

3     saying "We've hit pay dirt"?

4          A.     I don't know what he meant, no.

5          Q.     Were other people at PILF pleased with

6     receiving this record from Prince William County?

7          A.     I'm not recalling any expressions of

8     pleasure.

9          Q.     Were you happy?

10         A.     I was happy that they responded to our

11    records request, yes.

12         Q.     You had mentioned earlier that the

13    August 8th letter that we saw had been sent to

14    other jurisdictions, correct?

15         A.     I believe so, yeah.

16         Q.     And other jurisdictions, at least some

17    of them, provided responses, correct?

18         A.     They did, yes.

19                (Exhibit 4 marked for identification

20         and attached hereto.)

21    BY MR. TEPE:

22         Q.     The court reporter has marked for

23    identification this document as Exhibit 4 with

24    the Bates number beginning 8775.  Do you see

25    that?

A. I see it.

Q. Do you recognize this document?

A. I do.

Q. What do you recognize it to be?

A. It's an e-mail chain including a conversation with the general registrar in Bedford County, Virginia, and a subsequent e-mail between members of the foundation. At least the top e-mail.

Q. So let's begin with the initial e-mail. It's an e-mail from Barbara Gunter, correct?

A. I see that, yes.

Q. Director of elections, general registrar for Bedford County, Virginia?

A. Correct.

Q. And she says -- and this is dated August 18th. She says: "I am responding to a letter dated August 8, 2016, from Shawna Powell, secretary of PILF." Right?

A. Correct.

Q. She then states: "Her letter requests information pertaining to registrants identified as potentially not satisfying the citizenship requirements for registration." Correct?

1        A.     I see that.  That's correct.

2        Q.     And then in her e-mail she lists

3   basically the descriptions of the documents that

4   she's sending over, correct?

5        A.     Correct.

6        Q.     Let's look at one of these documents.

7   If you go to the Bates number 8777.  It's a

8   notice of intent to cancel.

9        A.     I see it.

10       Q.     And is this the notification that you

11  were referring to earlier in your testimony after

12  receiving some information from the DMV?

13       A.     Yes.

14       Q.     And so it states here:  "We have

15  received" -- it's addressed to an individual

16  voter, correct?

17       A.     Correct.

18       Q.     It says:  "We have received

19  information that you indicated on a recent DMV

20  application that you were not a citizen of the

21  United States.  If the information provided was

22  correct, you are not eligible to register to

23  vote."

24            You see that, right?

25       A.     I see that.

Page 52

1      Q.    It continues:  "If the information is

2  incorrect and you are a citizen of the United

3  States, please complete the affirmation of

4  citizenship form and return it using the enclosed

5  envelope."

6           Do you see that?

7      A.    I see it.

8      Q.    So you would agree that election

9  officials contemplate mistakes being made on the

10  DMV application, correct?

11           MR. LOCKERBY:  Object to the form.

12           THE WITNESS:  I think the record

13      speaks for itself.  I don't know what the

14      registrar herself was thinking.

15  BY MR. TEPE:

16      Q.    Well, you would interpret providing

17  this option to provide an affirmation of

18  citizenship that perhaps the information from the

19  DMV is not accurate, correct?

20      A.    Right.  It's asking the recipient if

21  the information they provided at DMV is correct.

22      Q.    And it might not be correct at the

23  DMV?

24      A.    It's a possibility that it's not

25  correct.

1      Q.    Because why else would you provide

2   this option if there wasn't that possibility,

3   correct?

4           MR. LOCKERBY:  Object to the form.

5           THE WITNESS:  Well, this is a

6       requirement of the law.  I don't know the

7       purpose behind it.

8   BY MR. TEPE:

9      Q.    It then says:  "If you do not respond

10  within 14 days, you will be removed from the list

11  of registered voters."  Correct?

12     A.    It says that, correct.

13     Q.    And that's what we had discussed

14  before.  You said that there will be a period of

15  time that if you don't get the affirmation in,

16  you'll be canceled, correct?

17     A.    Correct.

18     Q.    Now, Ms. Gunter also provided PILF

19  with voter registration cancellation notices sent

20  to individual voters, correct?

21     A.    Could you identify them for me?

22     Q.    Yeah.  Let's go to -- we'll go to

23  8838.

24     A.    Okay, I see that.

25     Q.    So the previous document we looked at

1   was a notice of intent to cancel, right?

2        A.    Correct.

3        Q.    And the process we just processed, if

4   you don't get the affirmation in within 14 days,

5   the registrar can then cancel the voter from the

6   rolls, correct?

7        A.    If the notice of intent -- or the

8   affirmation is not returned in 14 days, the

9   registrar can cancel them.

10       Q.    And this has a title of "Voter

11  Registration Cancellation Notice," correct?

12       A.    Correct.

13       Q.    And this was -- this particular one

14  was directed to Kevin Christopher Moser?

15       A.    Correct.

16       Q.    And the voter registration notice

17  states that this office has canceled Mr. Moser's

18  voter registration, correct?

19       A.    Yes.

20       Q.    And it states that this action was

21  taken because Mr. Moser, quote, failed to timely

22  respond to a request to affirm United States

23  citizenship within 14 days as allowed by the Code

24  of Virginia, correct?

25       A.    That's not all it says but that is

1  language in this notice.

2       Q.    Well, it provides the code cite,

3  right?

4       A.    Well, you didn't read "on the basis of

5  official notification from the Virginia

6  Department of Elections."

7       Q.    That "you have failed to timely

8  respond to a request to affirm United States

9  citizenship"?

10      A.    It says that, yes.

11      Q.    Now, do you see the handwritten

12  notation in the upper right-hand corner?

13      A.    Yes.

14      Q.    It says "reregistered" I think

15  September -- the handwriting is a little vague --

16  September 29 of 2011.

17      A.    That's what it looks like, yes.

18      Q.    So it's possible for voters whose

19  registrations were canceled to reregister,

20  correct?

21      A.    Yes.

22      Q.    And if you go back to the cover e-mail

23  from Ms. Gunter, she states -- if you go to, I

24  guess, number 3.

25      A.    I see number 3.

1        Q.    She states in the last sentence:  "I

2    have noted on the voter cancellation forms if the

3    voter responded after the 14-day window and

4    reregistered either in Bedford County or some

5    other locality."  Correct?

6        A.    That's what it says, yes.

7        Q.    Do you have any basis to believe that

8    Mr. Moser didn't reregister?

9        A.    I don't have any basis to believe that

10   he didn't reregister.

11       Q.    And when he reregistered, he would

12   have had to affirm his U.S. citizenship, correct?

13       A.    That's a requirement that he do that.

14   I have no basis to believe that he did or did

15   not.

16            MR. LOCKERBY:  When we get to a

17       convenient stopping point, could we take a

18       break?  Among other things we owe an answer

19       on something.  We need to confirm that.

20            MR. TEPE:  Yeah, we'll take a break in

21       a short little while.

22   BY MR. TEPE:

23       Q.    One of the other records that

24   Ms. Gunter provided is a copy of that

25   cancellation report, correct?  If you go to

Page 57

1    document with the Bates 8933.

2         A.    I'm looking at that page.

3         Q.    And this is the same type of report

4    that Prince William County provided, correct?

5         A.    It is.

6         Q.    And it lists 35 people, correct?

7         A.    Right.  The total at the bottom of the

8    list says 35.

9         Q.    And this number 35 made it into Alien

10   Invasion I, correct?  Do you recall?

11        A.    When you say "made it in," what do you

12   mean?

13        Q.    It was referenced in Alien Invasion I,

14   correct?

15        A.    Yes, it was.

16        Q.    I'm going to hand you another version

17   of this exhibit because I would like you to mark

18   it up.  Do you have a pen?

19        A.    I can get one.

20        Q.    I'm trying to find the right page to

21   direct you to.

22              Can you take a look at that document

23   and confirm for me that's a copy -- another copy

24   of Exhibit 4?

25              I tell you what, why don't you go in

Page 58

1    the exhibit that's already been marked to that

2    Bates number which is for Mr. Lee's notice.  Do

3    you see that?

4         A.    8832?

5         Q.    8832, correct.

6               Now, in the new document that I just

7    handed you, why don't you flip to the

8    cancellation report that we were just looking at.

9               MR. LOCKERBY:  What's the Bates number

10        on that?

11              MR. TEPE:  I believe it's 8933.

12   BY MR. TEPE:

13        Q.    I'm going to ask you to check off some

14   of the names in that cancellation list.  Okay?

15        A.    Okay.

16        Q.    All right.  So we're going to flip

17   through in Exhibit 4 these voter registration

18   cancellation notices.

19              So the first one here we see under --

20   on Bates 8832 is for Mr. Lee.  Is that right?

21        A.    Yes.

22        Q.    There is a handwritten notation that

23   he reregistered, correct?

24        A.    Yes.

25        Q.    Do you want to check off his name?

1   Just put a little checkmark in front of his name

2   on the document.

3        A.    (Witness complies.)

4        Q.    And let's flip through a few pages to

5   8838.  You see Mr. Moser, correct?

6        A.    I see his name on this page.

7        Q.    And a handwritten notation that he

8   reregistered, correct?

9        A.    I see that.

10        Q.    Can you check off his name on the

11   cancellations.

12        A.    (Witness complies.)

13        Q.    We're going to go really through this

14   whole attachment doing the same thing.  So if you

15   would flip through to the next person that you

16   see as having reregistered.  I see Jon Guida.

17        A.    I see his name.

18             MR. LOCKERBY:  What's the Bates number

19        on that?

20             MR. TEPE:  8847.

21   BY MR. TEPE:

22        Q.    Do you see the handwritten notation

23   that he reregistered, correct?

24        A.    Yes.

25        Q.    Do you want to check off his name on

Page 60

1    the cancellation list?

2         A.    (Witness complies.)

3         Q.    A couple of pages later, 8850,

4    Michelle Cabaniss.  Do you see the notation that

5    she reregistered?

6         A.    Yes.

7         Q.    Do you want to check off her name?

8         A.    (Witness complies.)

9         Q.    A few pages later, 8856, Michael

10   Harmon.

11        A.    I see his name.

12        Q.    And a notation that he reregistered,

13   correct?

14        A.    Yes.

15        Q.    Do you want to check off his name on

16   the cancellation list?

17        A.    (Witness complies.)

18        Q.    8859.  Patricia Scoville.  Do you see

19   the notation that she --

20        A.    I see her name.

21        Q.    -- that she reregistered?

22        A.    Yes.

23        Q.    Do you want to check her name off?

24        A.    (Witness complies.)

25        Q.    A couple of pages later, 8862, Billy

1    Agee.  You see a notation that he reregistered,

2    correct?

3         A.    Yes.

4         Q.    Could you please check his name.

5         A.    (Witness complies.)

6         Q.    A few pages later, 8865.  Marie

7    Toussaint.

8         A.    I see her name.

9         Q.    And it indicates in a handwritten

10   notation that she reregistered, correct?

11        A.    Yes.

12        Q.    Check her name off.

13        A.    (Witness complies.)

14        Q.    Go to 8871.  Justin Dunkley.  Do you

15   see that?

16        A.    I see his name.

17        Q.    And on the cancellation notice is a

18   handwritten notation that Mr. Dunkley

19   reregistered, correct?

20        A.    Yes.

21        Q.    Do you mind checking his name off.

22        A.    (Witness complies.)

23        Q.    8874.  Teresa Wright.  Do you see

24   that?

25        A.    Yes.

Page 62

1      Q.    The notation is that she reregistered,

2  correct?

3      A.    Correct.

4      Q.    Do you want to check her name off?

5      A.    (Witness complies.)

6      Q.    8877.  Phillip McGuire?

7      A.    I see his name.

8      Q.    A notation that he reregistered,

9  correct?

10     A.    Yes.

11     Q.    Check his name off.

12     A.    (Witness complies.)

13     Q.    A couple of pages later, 8880.

14  Mr. Tomlinson.  Do you see his name?

15     A.    I see his name.

16     Q.    And a notation that he reregistered?

17     A.    Correct.

18     Q.    Do you want to check his name off?

19     A.    (Witness complies.)

20     Q.    A few pages later, 8883.  Michael

21  Huddleston, II?

22     A.    I see his name.

23     Q.    You notice that he -- a notation that

24  he reregistered, correct?

25     A.    Correct.

1    Q.    You can check his name off.

2    A.    (Witness complies.)

3    Q.    Go to 8889.  Scott Wilson.  Do you see

4  his name?

5    A.    I see his name.

6    Q.    And a handwritten notation that he

7  reregistered, correct?

8    A.    Correct.

9    Q.    Can you check his name off?

10   A.    (Witness complies.)

11   Q.    A couple of pages later, 8892.  Evelyn

12 Garcia.

13   A.    I see her name.

14   Q.    A notation that she reregistered?

15   A.    Yes.

16   Q.    Check her name off, please.

17   A.    (Witness complies.)

18   Q.    If you go to 8898.  Peggy Musselman.

19   A.    I see her name.

20   Q.    A notation that she reregistered?

21   A.    Correct.

22   Q.    Can you check her name off, please?

23   A.    (Witness complies.)

24   Q.    8901.  James Moore.

25   A.    I see his name.

1          Q.    And on the cancellation notice, a

2    handwritten notation that he reregistered,

3    correct?

4          A.    Correct.

5          Q.    Can you check his name off?

6          A.    (Witness complies.)

7          Q.    Can you go to 8924.  Benjamin Fisher.

8          A.    I see his name.

9          Q.    And also the handwritten notation that

10   Mr. Fisher reregistered, correct?

11         A.    Correct.

12         Q.    Can you check his name off?

13         A.    (Witness complies.)

14         Q.    Okay.  So let's look at the

15   cancellation list that you used in Alien Invasion

16   I.  You have Mr. Douglas checked off, correct?

17         A.    I placed an X next to his name.

18         Q.    Moser?

19         A.    Correct.

20         Q.    Guida?

21         A.    Yes.

22         Q.    Cabaniss?

23         A.    Yes.

24         Q.    Harmon?

25         A.    Yes.

1    Q.    Scoville?

2    A.    Yes.

3    Q.    Agee?

4    A.    Yes.

5    Q.    Toussaint?

6    A.    Yes.

7    Q.    Dunkley?

8    A.    Yes.

9    Q.    Wright?

10   A.    Yes.

11   Q.    McGuire?

12   A.    Yes.

13   Q.    Tomlinson?

14   A.    Yes.

15   Q.    Huddleson?

16   A.    Yes.

17   Q.    Wilson?

18   A.    Yes.

19   Q.    Garcia?

20   A.    Yes.

21   Q.    Musselman?

22   A.    Yes.

23   Q.    Moore?

24   A.    Yes.

25   Q.    Fisher?

```
1        A.     Yes.

2        Q.     How many names is that?

3        A.     Would you like me to count them?

4        Q.     Please.

5        A.     I believe that's 18 by my count.

6        Q.     It's a little bit more than half of

7   the total of 35 on the list, correct?

8        A.     That math adds up.

9        Q.     So as of this date of August 18, 2016,

10  PILF was aware that 35 of these individuals had

11  reregistered, correct?

12       A.     No, not 35.

13       Q.     I'm sorry.  Let me try that again.

14              So as of this date, August 18, 2016,

15  PILF was aware that 18 of these individuals had

16  reregistered, correct?

17       A.     There's -- right, there is the

18  designations on these cancellation notices that

19  they reregistered.

20       Q.     And you have no basis to believe that

21  those notations are incorrect, correct?

22       A.     No.

23       Q.     Did you -- Strike that.

24              In Alien Invasion I, was there any

25  notation that the 35 people referenced in that
```

Page 67

1    report, of that 35, 18 had reregistered?

2         A.    I don't think so.

3              MR. TEPE:  We can go off the record.

4              MR. LOCKERBY:  Great.  Thank you.

5              THE VIDEOGRAPHER:  We are going off

6         the record.  The time is 10:18 a.m.

7              (Recess taken.)

8              THE VIDEOGRAPHER:  We are back on the

9         record.  The time is 10:40 a.m.

10   BY MR. TEPE:

11        Q.    Mr. Johnson, just a housekeeping item.

12   The document we just marked up, can you

13   reassemble that?

14        A.    I think this was it.

15        Q.    Yeah.

16        A.    Now I'm confused.  That's in the

17   previous exhibit.

18        Q.    Yeah, that's right.  That's got your

19   notations, right?  Yes.  Okay.

20              MR. TEPE:  All right.  So we're going

21        to mark this -- I believe we're up to

22        Exhibit 5.

23              (Exhibit 5 marked for identification

24        and attached hereto.)

25   BY MR. TEPE:

1    Q.    Earlier you testified, Mr. Johnson,

2    that you are kind of responsible for overseeing

3    the production of the Alien Invasion reports,

4    correct?

5    A.    Correct.

6    Q.    Who came up with the idea to write

7    this report, specifically Alien Invasion I?

8    A.    I think the idea for a report was

9    Mr. Adams'.

10    Q.    Who decided to call the report Alien

11    Invasion?

12    A.    I think Mr. Adams suggested the name,

13    but I'm not 100 percent sure.

14    Q.    Was PILF trying to suggest that

15    Virginia was being invaded?

16        MR. LOCKERBY:  Object to the form.

17        THE WITNESS:  No.

18    BY MR. TEPE:

19    Q.    Do you know the thinking behind

20    calling the report Alien Invasion?

21        MR. LOCKERBY:  Object to the form.

22        THE WITNESS:  It was satire.

23    BY MR. TEPE:

24    Q.    How do you know?

25    A.    That's my recollection of the process

1    by which it was created.

2        Q.    Did Mr. Adams tell you that this was a

3    satirical title?

4        A.    Specifically in that language, no.

5        Q.    So PILF was trying to use the term

6    "invasion" but not actually suggest an invasion?

7            MR. LOCKERBY:  Object to the form.

8            THE WITNESS:  Not a literal invasion

9        as you would understand that word typically.

10   BY MR. TEPE:

11       Q.    You wrote the first draft of Alien

12   Invasion I, correct?

13       A.    Correct.

14       Q.    Do you recall how long it took you to

15   draft the report from the first draft to

16   publication?

17       A.    I don't recall.

18            (Exhibit 6 marked for identification

19       and attached hereto.)

20   BY MR. TEPE:

21       Q.    The court reporter has just marked as

22   Exhibit 6 a document.  Do you recognize it?

23       A.    I've seen it before, yes.

24       Q.    And what is it?

25       A.    The first page is an e-mail that I

1  sent to myself on September 23, 2016.

2      Q.    And there is an attachment -- two

3  attachments, correct?

4      A.    There are two attachments.

5      Q.    One is a draft, a first draft it looks

6  like, of the Alien Invasion, correct?

7      A.    It looks like a draft, yes.

8      Q.    And then the second document that says

9  "Notes for report."

10     A.    Correct.

11     Q.    So would you agree, then, that you

12  started drafting the report roughly around

13  September 23rd?

14     A.    Yes, that sounds right.

15     Q.    And did you send drafts of this for

16  review to Mr. Adams?

17     A.    Yes.

18          (Exhibit 7 marked for identification

19          and attached hereto.)

20  BY MR. TEPE:

21     Q.    The court reporter has marked Exhibit

22  7.  I should note the Bates number is 5621.

23          Do you recognize this document?

24     A.    I've seen it before.

25     Q.    What do you recognize it to be?

Page 71

1    A.    It's an e-mail from myself to

2 Mr. Adams attaching a draft of the -- I believe

3 the Alien Invasion I report.

4    Q.    This is dated September 29, 2016,

5 correct?

6    A.    Correct.

7    Q.    And this is how you would normally

8 exchange sort of your business records with

9 Mr. Adams, would be by e-mail because he was in

10 Virginia and you were in Indiana, correct?

11         MR. LOCKERBY:  Object to the form.

12         THE WITNESS:  Correct.

13 BY MR. TEPE:

14    Q.    And then you say here:  "Christian,

15 here is a draft of the Virginia report with what

16 we know so far."

17         Do you see that?

18    A.    I see that, yes.

19    Q.    And this -- this was presumably

20 followed by later drafts to Mr. Adams?

21    A.    I don't know if there were later

22 drafts, but there could have been.

23         (Exhibit 8 marked for identification

24     and attached hereto.)

25 BY MR. TEPE:

1          Q.    The court reporter has marked as

2     Exhibit 8 a document with the Bates number 5601.

3               Do you see that?

4          A.    I see that.

5          Q.    Do you recognize this document?

6          A.    I think I've seen it before.

7          Q.    It's another draft report that you

8     sent to Mr. Adams?

9          A.    It's an e-mail attaching a draft, it

10    looks like, yes.

11         Q.    And this is dated September 29th,

12    correct?

13         A.    Correct.

14               (Exhibit 9 marked for identification

15         and attached hereto.)

16               THE WITNESS:  Should I keep these

17         exhibits in front of me?

18               MR. TEPE:  Yeah, you can put them to

19         the side, whichever, but yes.

20    BY MR. TEPE:

21         Q.    The court reporter has marked as

22    Exhibit 9 a document with the Bates number ending

23    4985.  Do you see that?

24         A.    I see that.

25         Q.    Do you recognize this document?

1     A.    It's an e-mail written by me, at least

2   one of them is.

3     Q.    So this is a near final draft of the

4   Alien Invasion report that you circulated

5   internally.  Is that right?

6     A.    It looks that way, yes.

7     Q.    And this is on September 30th, right,

8   2016?

9     A.    The e-mail is dated September 30th.

10    Q.    The e-mail chain begins with Mr. Adams

11  sending an e-mail to you and Ms. Phillips and

12  Mr. Vanderhulst and the subject line says "Have

13  report up on Sunday."

14    A.    I see that.

15    Q.    What was he talking about there?

16    A.    I believe he --

17    Q.    What did you understand him to be

18  talking about there?

19    A.    That it needed to be uploaded to our

20  website by Sunday.

21    Q.    And why did it have to be uploaded to

22  your website by Sunday?

23    A.    Based on what he wrote in the e-mail,

24  because he was appearing on Fox.

25    Q.    On Fox News?

Page 74

1     A.    That's how I understood that, yes.

2     Q.    So then it took you roughly a week to

3   pull together the Alien Invasion I report.  Is

4   that right?

5          MR. LOCKERBY:  Object to the form.

6          THE WITNESS:  Well, Exhibit 6 includes

7      a draft that has already been written.  I

8      don't know how long before that I started

9      writing.  So it was likely longer than a

10     week but...

11  BY MR. TEPE:

12    Q.    Maybe eight days, nine days?

13    A.    I can't say for sure.

14    Q.    Now, you recall that when Alien

15  Invasion I was published, some jurisdictions had

16  provided you records and other jurisdictions had

17  not provided you records, correct?

18    A.    Correct.

19    Q.    Do you know why PILF didn't wait for

20  the additional records to come in before

21  publishing?

22    A.    I do not recall.

23    Q.    Was PILF trying to get Alien Invasion

24  I published before the 2016 elections in

25  November?

1        A.     I don't recall.

2               (Exhibit 10 marked for identification

3        and attached hereto.)

4    BY MR. TEPE:

5        Q.     The court reporter has just marked and

6    handed to you Exhibit 10.

7               Do you recognize this document?

8        A.     Yes.

9        Q.     What does it appear to be?

10       A.     It appears to be a copy of Alien

11   Invasion in Virginia.

12       Q.     For the record, we'll state that we

13   pulled this off of PILF's website as being the

14   published version of Alien Invasion I.

15              Do you want to flip through it?  Does

16   this look like the full report that PILF

17   published?

18       A.     It looks like it, although I don't

19   know entirely how many exhibits we had.  But it

20   looks like it's the complete report.

21       Q.     So the title is "Alien Invasion in

22   Virginia:  The Discovery and Cover-up of

23   Noncitizen Registration and Voting."  Correct?

24       A.     Correct.

25       Q.     On the top of the cover is Public

1    Interest Legal Foundation's logo.  Is that right?

2         A.    That's right.

3         Q.    And on the bottom is Virginia Voters

4    Alliance's logo.  Is that correct?

5         A.    Correct.

6         Q.    And PILF published this in

7    coordination with Virginia Voters Alliance,

8    right?

9         A.    Correct.

10        Q.    And it's dated September 30, 2016?

11        A.    Correct.

12        Q.    Let me direct you to page 2 of the

13   report.

14        A.    I'm looking at that page.

15        Q.    In the second paragraph under "Summary

16   of Findings" -- do you see that?

17        A.    The bolded paragraph?

18        Q.    Correct.  In bold it says:  "In our

19   small sample of just eight Virginia counties who

20   responded to our public inspection requests, we

21   found 1046 aliens who registered to vote

22   illegally."

23              Do you see that?

24        A.    I see that sentence.

25        Q.    Now, the 1046, does that come from the

1    cancellation reports that we had been looking at

2    earlier in your testimony?

3         A.    I believe so, yes.

4         Q.    We had looked at the cancellation

5    report that Prince William County had provided,

6    right?

7         A.    We did look at that.

8         Q.    And one for Bedford County?

9         A.    Correct.

10        Q.    And so that 1046 includes the numbers

11   of people listed in those reports?

12        A.    Not only those reports.

13        Q.    Right.  And so if you go to page 12 of

14   the report, there is a chart.  Do you see it says

15   noncitizens on the rolls in eight counties?

16        A.    Yes.

17        Q.    And this totals up to 1046, right?

18        A.    It should.  At the time the math was

19   done, it totaled 1046.

20        Q.    Would the math change between now and

21   then?

22        A.    No.

23        Q.    So Prince William is listed as 443

24   noncitizens.  Is that right?

25        A.    Correct.

1     Q.    And that's the number we saw in the

2  report that we looked at in the previous exhibit

3  or one of the earlier exhibits, correct?

4     A.    The total listed at the bottom of the

5  report.

6     Q.    Right.  And then Bedford County, 35?

7     A.    I see that.

8     Q.    And that was the number listed in the

9  report that we just looked at before the break,

10 correct?

11    A.    The total listed at the bottom,

12 correct.

13    Q.    If you go to page 7, at the bottom of

14 the page it says in bold:  "Prince William County

15 provided a list of 433 noncitizens who had

16 registered to vote in the county but were then

17 removed after they were determined to not be U.S.

18 citizens."

19          Do you see that?

20    A.    I see that.

21    Q.    And the phrase "433 noncitizens" is

22 not just bolded but it's also italicized,

23 correct?

24    A.    Correct.

25    Q.    And this sentence has a footnote

1  number 15 hanging off it, correct?

2       A.    Correct.

3       Q.    It says "see Exhibit 1"?

4       A.    Correct.

5       Q.    So this is directing the reader to

6  look at Exhibit 1 for the 433 noncitizens in

7  Prince William County, correct?

8       A.    It's directing the reader to the VERIS

9  report for Prince William County.

10      Q.    And I think that's the first time

11  you've used that term.  The cancellation report

12  that we were looking at is also sometimes called

13  the VERIS report?

14      A.    Correct.

15      Q.    That's because it is a report printed

16  off the VERIS system?

17      A.    Yes.

18      Q.    And the VERIS system is, I guess, a

19  software database that Virginia uses for its

20  records?

21      A.    That's my understanding.

22      Q.    So let's go to Exhibit 1 if you don't

23  mind, and I believe that's -- well, it says

24  Exhibit 1, page 1 of 29.  Do you see that?

25      A.    I think I'm on the same page as you,

1   yes.

2        Q.    This is the cancellation report from

3   Prince William County, right?

4        A.    Correct.

5        Q.    And this is the report that you got

6   from Prince William County that we looked at

7   earlier, correct?

8        A.    Yes.

9        Q.    Now, just go back to page 8 of the

10  report.   The second paragraph in bold states:

11  "The United States attorney in Virginia has done

12  nothing about the felonies committed by 433

13  aliens registering in Prince William County

14  alone."

15            Do you see that?

16       A.    I see that.

17       Q.    And this is again referring to the

18  people who were listed in Exhibit 1, correct?

19       A.    Correct.

20       Q.    If you go back to Exhibit 1 and flip

21  to page 26 of 29.

22       A.    I'm looking at page 26.

23       Q.    Do you see about five names down the

24  name Luciania Freeman?

25       A.    I see that.

1    Q.    So Ms. Freeman is one of the 1046

2   aliens noted on page 2 of Alien Invasion,

3   correct?

4        A.    Correct.

5        Q.    And that's the 1046 aliens who

6   registered to vote illegally according to page 2

7   of the Alien Invasion report, correct?

8        A.    Right.  The 1046 refers to the

9   individuals who are contained in the reports

10  provided by the election officials.

11       Q.    Right.  And you stated on page 2 there

12  were 1046 aliens who registered to vote

13  illegally, correct?

14       A.    Correct.

15       Q.    If you go to page 14 of the report,

16  the report states that Prince William County

17  provided voter registration applications for the

18  people listed on the VERIS report, correct?

19       A.    Well, it says they provided us

20  registration forms for those people removed since

21  2015.

22       Q.    Okay, correct.  You are correct.

23            So Prince William had the voter

24  registration applications for 84 of the 433?

25       A.    That sounds right based on what's on

1    this page.

2         Q.    And footnote 30 says that the

3    registration applications that were provided to

4    PILF are available in Exhibit 7.   Is that right?

5         A.    That's what footnote 30 says.

6         Q.    So these are the registration forms

7    for the what you call, or what PILF states is the

8    84 noncitizens provided by Prince William County.

9    Is that right?

10        A.    That's what footnote 30 is referring

11   to, yes.

12        Q.    Now let's go to Exhibit 7, page 48 out

13   of 84.   Exhibit 7.

14        A.    I'm looking at page 48.

15        Q.    And what is reflected on page 48?

16        A.    It appears to be an application for

17   voter registration.

18        Q.    For?

19        A.    Completed by Luciania Freeman.

20        Q.    It's got her home address, correct?

21        A.    Correct.

22        Q.    Daytime telephone number, correct?

23        A.    Correct.

24        Q.    And on the form she checked "Yes" to

25   the question "Are you a citizen of the United

1    States of America?"   Correct?

2         A.    Correct.

3         Q.    So regardless of how her name ended up

4    on the VERIS report, as of the time PILF

5    published Alien Invasion I, PILF had evidence of

6    her attesting to her citizenship, correct?

7              MR. LOCKERBY:   Object to the form.

8              THE WITNESS:   We possessed this page,

9         yes.

10   BY MR. TEPE:

11        Q.    Did you personally ever try to contact

12   Ms. Freeman to ask about her election records?

13        A.    No.

14        Q.    Did you personally try to contact

15   Ms. Freeman at all?

16        A.    No.

17        Q.    Are you aware of anyone at PILF trying

18   to contact Ms. Freeman at all?

19        A.    I'm not aware.

20        Q.    Did you contact any of the other 432

21   people identified by -- identified in Exhibit 1?

22        A.    I don't believe so, no.

23        Q.    Are you aware of anyone at PILF

24   contacting the 432 individuals other than

25   Ms. Freeman identified in Exhibit 1?

1        A.    I'm not aware of that.

2        Q.    Let's go to page 8 of the report.

3        A.    I'm looking at page 8.

4        Q.    On page 8 there is a reference to

5   Bedford County.

6        A.    I see that.

7        Q.    It says:  "Bedford County, a

8   relatively small rural county in Virginia with

9   only 60,000 individuals of voting age, also

10  provided a list of 35 noncitizens that have been

11  removed from their voter rolls."

12            Do you see that?

13       A.    I see that.

14       Q.    Is there any notation in here that

15  PILF had information that 18 of those 35 had

16  reregistered to vote?

17       A.    I don't see that in here, no.

18       Q.    You can put this document aside.

19            Now, PILF followed up with a second

20  Alien Invasion report, correct?

21       A.    We published a second Alien Invasion

22  report.

23       Q.    So the first one was published around

24  September 30th of 2016, correct?

25       A.    Correct.

1    Q.    Do you recall when the second one was

2  published?

3    A.    I think May of 2017.

4        (Exhibit 11 marked for identification

5    and attached hereto.)

6  BY MR. TEPE:

7    Q.    The court reporter has marked as

8  Exhibit Number 9 --

9        THE REPORTER:  11.

10  BY MR. TEPE:

11    Q.    Exhibit 11.  Do you recognize this

12  large document?

13    A.    It appears to be a copy of the Alien

14  Invasion II report and the exhibits cited

15  therein.

16    Q.    And again for the record, this is a

17  copy of the Alien Invasion II report that we

18  printed off from PILF's website.  Is that what it

19  appears to be?

20    A.    It does.

21    Q.    And also just for the record, Alien

22  Invasion II was published with three different

23  versions of Exhibit 12, correct?

24    A.    I don't recall all three versions, no.

25    Q.    Well, do you recall when Alien

1   Invasion II was first published on PILF's website

2   there was one version of Exhibit 12 that

3   contained Social Security numbers that had not

4   yet been redacted?

5        A.    Yes.  That was brought to our

6   attention.

7        Q.    And once that was brought to PILF's

8   attention, PILF published a second version of

9   Exhibit 12 with those Social Security numbers

10  redacted, correct?

11       A.    That sounds right.

12       Q.    This exhibit in front of you uses that

13  version of Exhibit 12.

14       A.    I'll have to take your word for it.  I

15  haven't looked at Exhibit 12.

16       Q.    And then there was a third version

17  that removed some voter registration applications

18  from Exhibit 12.  Do you recall that?

19       A.    Yes.

20       Q.    So just for the record, we're using

21  the second version in that exhibit.

22       A.    Okay.

23       Q.    Okay.  So the cover of the Alien

24  Invasion report says:  "Alien Invasion II:  The

25  Sequel to the Discovery and Cover-up of

1   Noncitizen Registration and Voting in Virginia."

2   Do you see that?

3        A.    I see that.

4        Q.    Also on the cover it says "Welcome to

5   Virginia.  Virginia is for Aliens."

6        A.    I see that.

7        Q.    And that's a takeoff on the old

8   Virginia slogan "Virginia is for Lovers," right?

9        A.    Yes.

10        Q.    The inside cover of Alien Invasion II

11   again has the logo of Public Interest Legal

12   Foundation, correct?

13        A.    Yes.

14        Q.    And the logo of the Virginia Voters

15   Alliance, correct?

16        A.    Correct.

17        Q.    And it's dated May 2017?

18        A.    Correct.

19        Q.    And so this sequel was also published

20   in conjunction with VVA, correct?

21        A.    Correct.

22        Q.    If you go to page 1 of the report, it

23   begins with a reference back to your findings in

24   Alien Invasion I.  Is that right?

25        A.    That's right.

1      Q.    It states in the first paragraph:

2   "Our investigation revealed that in these eight

3   Virginia localities more than 1000 noncitizens

4   had recently been removed from the voter rolls."

5           Do you see that?

6      A.    Yes, I do.

7      Q.    It says:  "In this small sample,

8   nearly 200 verified ballots were cast prior to

9   official removal.  Each one of them is likely a

10  felony."

11          Do you see that?

12     A.    I see that.

13     Q.    And then the report states that PILF

14  had done a more statewide look at the records in

15  Virginia, correct?

16     A.    I think it speaks for itself, but

17  that's what we did.

18     Q.    And on the third paragraph here on

19  page 1:  "As a result" -- it states:  "As a

20  result, the number of registrants removed from

21  voter rolls for citizenship problems during the

22  last few election cycles grew to over 5500."

23          Do you see that?

24     A.    I see that.

25     Q.    "Of these illegal registrants, 1852

1   cast nearly 7500 ballots in elections dating back

2   to 1988."

3            Do you see that?

4        A.    I see that.

5        Q.    And so I understand the phrase

6   "illegal registrants" is referring to the over

7   5500 individuals, correct?

8        A.    That's the logical inference from

9   their inclusion on the VERIS reports.

10       Q.    Well, no, I'm just asking about the

11  sentence.  When you say of these illegal

12  registrants, 1852 cast a number of ballots,

13  you're saying --

14       A.    These refers to 5500 in the preceding

15  sentence.

16       Q.    So illegal registrants refers to over

17  5500, right?

18       A.    Correct.

19       Q.    On page 2, under "Summary of

20  Findings," the second paragraph, it states:  "The

21  numbers are alarming:  5556 noncitizens have been

22  removed from the voter rolls for citizenship

23  problems in 120 of Virginia's 133 voting

24  jurisdictions since 2011."

25            Do you see that?

Page 90

1        A.    I see that.

2        Q.    And beneath this paragraph is a

3    graphic.

4        A.    I see that.

5        Q.    It says 5556 noncitizen registrations.

6        A.    I see that.

7        Q.    And 7474 votes cast by noncitizens.

8    Do you see that?

9        A.    I see that too.

10        Q.    How did PILF identify the 1852 out of

11    5556 having voted?

12        A.    PILF did not identify them.

13        Q.    Then how is it in your report?

14        A.    Someone else identified them.

15        Q.    Who identified them?

16        A.    The Virginia Voters Alliance.

17        Q.    So Virginia Voters Alliance performed

18    this analysis that yielded the 1852 number?

19        A.    Yes, with PILF's assistance.

20        Q.    I'm sorry, there's a siren in the

21    background.  Can you say it again?

22        A.    With the foundation's assistance.

23        Q.    PILF's assistance?

24        A.    Yes.

25        Q.    Did VVA work with anyone else in

1    calculating this number of 1852?

2         A.    I believe they did.

3         Q.    Did they work with a political action

4    committee?  Is that right?

5         A.    I believe one of the entities is a

6    political action committee.

7         Q.    And that's Middle Resolution PAC?

8         A.    That sounds right.

9         Q.    Are there other entities that VVA

10   worked with?

11        A.    Not that I'm aware.

12        Q.    The 5556 number comes from a statewide

13   VERIS report received by PILF.  Is that right?

14        A.    It may come from more than one, but it

15   is a statewide report.

16        Q.    I'm not sure I understand your answer.

17        A.    We received more than one statewide

18   VERIS report.

19        Q.    Okay.  You're saying that you received

20   multiple statewide VERIS reports?

21        A.    Yes.

22        Q.    Well, one of them is published in

23   Exhibit 1 to Alien Invasion II, correct?

24        A.    I believe that's correct.

25        Q.    When you said "the other report," were

1    you referring to the custom report that the

2    Virginia Department of Elections sent over?

3         A.    No.

4         Q.    What are you referring to?  Oh, I'm

5    sorry.  You're referring to the fact that there

6    was one report for a certain time period and then

7    a second report for a more recent time period.

8    Is that right?

9         A.    Correct.

10        Q.    And so both of them together are

11   what's published in Exhibit 1, correct?

12        A.    I believe so.  I haven't looked at

13   Exhibit 1 right now.

14        Q.    You can feel free.  I think the date

15   ranges are on the top of the pages.  Right?

16        A.    Yes, it looks like there are two

17   reports from separate time periods in Exhibit 1.

18        Q.    And so the VERIS report that you just

19   looked at as Exhibit 1 is the same type of report

20   that was used in Exhibit 1 in the Alien Invasion

21   I, correct?

22             MR. LOCKERBY:  Object to the form.

23             THE WITNESS:  If you mean if it's also

24        a VERIS-generated report, yes.

25   BY MR. TEPE:

1      Q.    There are differences, such as the

2  time period covered, correct?

3      A.    Yes, that would be one difference.

4      Q.    And when the report was generated,

5  that would be another difference?

6      A.    Yes.

7      Q.    Is there another difference you're

8  aware of?

9      A.    The number of jurisdictions included

10  in the report is different.

11      Q.    Right.  So in Alien Invasion I,

12  Exhibit 1 was just Prince William County that you

13  had published, correct?

14      A.    I believe so, yes.

15      Q.    And in Alien Invasion II, you

16  published all of the jurisdictions that had names

17  listed in the cancellation report, which was

18  about 120 out of --

19      A.    Yes.

20      Q.    -- 133, if I recall correctly.

21      A.    Yes.

22      Q.    Please go to page 100 of 486.

23      A.    In Exhibit 1?

24      Q.    Exhibit 1.

25      A.    I'm looking at page 100.

Page 94

1        Q.      Do you see the name Eliud Bonilla at
2    the bottom?
3        A.      I see that.
4        Q.      Do you see his home address listed?
5        A.      I see an address listed.  I don't know
6    if it's his home address.
7        Q.      And Mr. Bonilla is one of the 5556
8    noncitizens noted in the Alien Invasion II
9    summary of findings, right?
10       A.      Yes.
11       Q.      Now go to page 258 of 486.
12       A.      I'm looking at page 258.
13       Q.      Do you see the name Luciania Freeman?
14       A.      I do.
15       Q.      And an address for her?
16       A.      I see an address.
17       Q.      So Ms. Freeman is one of the 5556
18   noncitizens noted in the Alien Invasion II
19   summary of findings, correct?
20       A.      Yes.
21       Q.      PILF had the voter registration
22   application for Mr. Bonilla, correct?
23       A.      I don't recall if we did.
24       Q.      If you go to page 217 -- it should be
25   tabbed -- of Exhibit 12.

1      A.    Is it one of these other tabs?

2      Q.    Yeah, it might be.  It would be

3  Exhibit 12.

4      A.    Okay.

5            MR. LOCKERBY:  Can we get a Bates

6      number for identification?  The copy I'm

7      looking at does not have page numbers on it.

8            MR. TEPE:  I guess it's PILF 50.

9            THE WITNESS:  I see that.

10  BY MR. TEPE:

11     Q.    Okay.  So this is a voter registration

12  application for Mr. Bonilla.  Is that right?

13     A.    It appears to be.

14     Q.    It's got an address listed, right?

15     A.    Yes.

16     Q.    A telephone number?

17     A.    Yes.

18     Q.    And he checked the box "Yes" to "Are

19  you a citizen of the United States of America?"

20  Correct?

21     A.    Yes.

22     Q.    So at the time that PILF published

23  Alien Invasion II, PILF had at least one document

24  indicating Mr. Bonilla was claiming U.S.

25  citizenship, correct?

1    A.    We had this document in our

2    possession, yes.

3    Q.    And PILF had another document, the

4    VERIS report, indicating his registration had

5    been canceled, correct?

6    A.    The VERIS report indicated his

7    registration was canceled.

8    Q.    Before publishing Alien Invasion II,

9    did you try to contact Mr. Bonilla to ask about

10   these different documents?

11   A.    No.

12   Q.    To your knowledge, did anyone at PILF

13   try to contact Mr. Bonilla?

14   A.    Not to my knowledge.

15   Q.    His phone number is right there,

16   correct?

17   A.    It's on this document, yes.

18   Q.    You had the voter registration

19   application for Ms. Freeman as well, correct?

20   A.    We do have it, yes.

21   Q.    And it's in that set in front of you,

22   correct, enclosed in Exhibit 12, right?

23   A.    I don't think I've seen it yet but...

24   Q.    I think it might be the next tab in

25   your pile.  Right there, near the bottom.

1       A.    Yes, the application for registration

2  for Luciania Freeman is in this exhibit.

3       Q.    With her home address, or an address?

4       A.    It includes an address.

5       Q.    And telephone number?

6       A.    Yes.

7       Q.    And she marked "Yes" to the question

8  "Are you a citizen of the United States of

9  America?"

10      A.    Yes.

11      Q.    So you would agree at the time PILF

12 published Alien Invasion II, it had at least one

13 document indicating Ms. Freeman was claiming U.S.

14 citizenship, correct?

15      A.    We had this document in our

16 possession, correct.

17      Q.    And PILF had another document of the

18 VERIS report indicating her registration had been

19 canceled, correct?

20           MR. LOCKERBY:   Object to the form.

21           THE WITNESS:   Her name was included in

22      the VERIS report, yes.

23           MR. TEPE:   What's the objection,

24      counsel?

25           MR. LOCKERBY:   The objection is the

1          question is misleading.  It assumes that

2          this document does not say "canceled -

3          declared noncitizen" on it.  By using the

4          phrase "another document" it misstates the

5          record and the evidence.

6    BY MR. TEPE:

7          Q.    So you would agree at the time PILF

8    published Alien Invasion II, it had at least one

9    document indicating Ms. Freeman was claiming U.S.

10   citizenship, correct?

11         A.    This document was in our possession.

12         Q.    Her voter registration application,

13   correct?

14         A.    Yes.

15         Q.    Now, you also had another document

16   published in Exhibit 1 to Alien Invasion II that

17   indicated her voter registration had been

18   canceled, correct?

19         A.    The VERIS report indicated her voter

20   registration had been canceled.

21         Q.    Before publishing Alien Invasion II,

22   did you try to contact Ms. Freeman to ask about

23   these two different documents?

24         A.    No.

25         Q.    To your knowledge, did anyone at PILF

1    try to contact Ms. Freeman?

2         A.    No.

3         Q.    You had uploaded all these exhibits to

4    PILF's website, correct?

5         A.    I did not, I don't believe.  I don't

6    recall if I did.

7              (Exhibit 12 marked for identification

8         and attached hereto.)

9    BY MR. TEPE:

10        Q.    I believe this is marked as Exhibit

11   12.

12        A.    It is.

13        Q.    With a Bates number ending in 996?

14        A.    Correct.

15        Q.    Does this refresh your recollection as

16   to whether you uploaded exhibits to PILF's

17   website for Alien Invasion II?

18        A.    It does say:  "I have all the exhibits

19   uploaded to the website and ready to go."

20        Q.    Now, uploading all of these exhibits

21   to PILF's website effectively allowed anyone in

22   the world with Internet access to see the names

23   of the people listed in the exhibits to Alien

24   Invasion II, correct?

25        A.    Once the pages were made live, that's

1    correct.

2         Q.    See their home addresses, correct?

3         A.    I'm sorry, can you repeat the

4    question?

5              MR. TEPE:  Strike that.

6    BY MR. TEPE:

7         Q.    Were there discussions at PILF

8    regarding whether to publish these records on the

9    Internet?

10        A.    By "these records" you mean what?

11        Q.    The records that were included as

12   exhibits to Alien Invasion II.

13        A.    We had discussions, yes.

14        Q.    What do you recall about those

15   discussions?

16        A.    I recall that with the Alien Invasion

17   I report we did not publish all the records

18   referenced in the report.

19        Q.    So in Alien Invasion I you had

20   published the VERIS report for Prince William

21   County but not the VERIS report for Bedford

22   County, for example?

23        A.    For example, correct.

24        Q.    But in Alien Invasion II you published

25   the VERIS report for 120-some-odd jurisdictions?

1    A.    Correct.

2    Q.    Was there a discussion that you recall

3  as to whether or not PILF should publish on the

4  Internet the VERIS report?

5    A.    I do not recall that discussion.

6    Q.    Was PILF trying to make it easy for

7  law enforcement -- Strike that.

8         By publishing these exhibits online,

9  was PILF trying to make it easy for law

10 enforcement to prosecute people?

11   A.    I don't recall that being discussed as

12 a reason to publish them online.

13   Q.    Do you recall that being discussed as

14 a reason to have Alien Invasion reports

15 published?

16   A.    When you say "published," do you mean

17 printed somewhere other than online?

18   Q.    No.  Just published generally, whether

19 it's in print, online.

20   A.    I recall that being discussed.

21   Q.    Do you recall Mr. Adams telling you,

22 "Remember, this was intended to be a turnkey

23 prosecution for officials.  I can hand them the

24 report and they can virtually get a grand jury

25 indictment."  Do you recall that?

1      A.    Vaguely.

2      Q.    In the report Alien Invasion II, PILF

3   advocated using the exhibits to Alien Invasion II

4   to prosecute individuals, correct?

5      A.    I recall that we advocated for

6   enforcement of the law.

7      Q.    And specifically prosecution of people

8   in the records that PILF was publishing, correct?

9      A.    I don't recall that as you're

10  characterizing it, no.

11     Q.    Let's go to page 16 of Alien Invasion

12  II.

13     A.    Is that in the same exhibit?

14     Q.    It's the bigger one.

15     A.    But Exhibit 12, is that a copy of the

16  report?  Or do you want me to use Exhibit 11?

17     Q.    Exhibit 12.

18     A.    This is Exhibit 11.

19     Q.    Or Exhibit 11.

20     A.    Page 16?

21     Q.    Correct.

22     A.    I'm looking at page 16.

23     Q.    Page 16 shows a number of

24  recommendations that PILF was making based on its

25  findings, correct?

1      A.     I think the page speaks for itself.

2      Q.     So it says at the top "Recommendations

3  and Solutions," correct?

4      A.     Yes.

5      Q.     And then one of the recommendations on

6  the right-hand side, the last checked box, the

7  checkmark says:  "Law enforcement at both the

8  federal and state level should exercise their

9  authority to prosecute cases of voter fraud.

10  Voter registration and voting history records

11  such as those contained in this report make

12  prosecution an easy task."

13           Do you see that?

14      A.     I see that.

15      Q.     And then if you go to page 3 of the

16  report, the third paragraph on the left-hand

17  side, second sentence, it says:  "The response of

18  law enforcement officials to both single

19  instances of voter fraud and the hundreds of

20  examples documented in this report should be the

21  same: swift, sure and unwavering."

22           Do you see that?

23      A.     I see that.

24      Q.     Do you understand that to be swift

25  prosecution of the hundreds of examples

Page 104

1   documented in this report?

2       A.   I understand it to mean the response

3   of law enforcement.  That is what it is

4   modifying.

5       Q.   Response of law enforcement should be

6   swift, correct?

7       A.   That's what it means, yes.

8       Q.   It should be unwavering, correct?

9       A.   Unwavering also modifies response.

10      Q.   And what kind of response was PILF

11  advocating there?

12      A.   Further investigation.

13      Q.   And potentially prosecution?

14      A.   If after the investigation there was

15  grounds to prosecute, then, yes.

16      Q.   Well, why wouldn't there be grounds to

17  prosecute if you had 5556 noncitizens who had

18  registered to vote illegally?

19      A.   I'm not a law enforcement official.

20  There may be a number of reasons they do not

21  prosecute.

22      Q.   Well, putting aside maybe a

23  discretionary decision whether to prosecute

24  people, you are confident that the 5556 people

25  listed in Exhibit 1 to Alien Invasion II are

1    noncitizens, right?

2         A.    We reported the contents of the

3    official records provided by the government.

4         Q.    Right.  And in your report you call

5    them 5556 noncitizens, correct?

6              MR. LOCKERBY:  Object to form.

7              THE WITNESS:  I believe the report

8         uses that language, yes.

9    BY MR. TEPE:

10        Q.    So part of PILF's purpose in

11   publishing Alien Invasion II was to see some

12   people be prosecuted, correct?

13             MR. LOCKERBY:  Object to the form.

14             THE WITNESS:  No, I would not agree

15        with that.

16   BY MR. TEPE:

17        Q.    That was not a purpose of publishing

18   Alien Invasion II, was to see some people be

19   prosecuted?

20        A.    One of the purposes was to investigate

21   whether there should be prosecution.  This was

22   evidence we intended for them to use in their

23   investigation.

24        Q.    Well, I believe you recalled earlier

25   Mr. Adams telling you that Alien Invasion was

1    intended to be a turnkey prosecution for

2    officials.  Hand them the report and they could

3    virtually go get a grand jury indictment,

4    correct?

5              MR. LOCKERBY:  Object to the form.

6         The question misstates the witness's prior

7         testimony.  The transcript reflects what he

8         said.  And on its face the question has been

9         asked and answered, if it is a question.

10             THE WITNESS:  If there is a question,

11        I ask that it be repeated.

12   BY MR. TEPE:

13        Q.    Was publishing Alien Invasion II --

14   Strike that.

15             Was one purpose of publishing Alien

16   Invasion II to get at least some people

17   prosecuted --

18             MR. LOCKERBY:  Objection.

19   BY MR. TEPE:

20        Q.    -- by law enforcement?

21             MR. LOCKERBY:  Objection; asked and

22        answered.

23             THE WITNESS:  If there were grounds

24        for prosecution?

25   BY MR. TEPE:

1      Q.    Yes.

2      A.    Yes.

3      Q.    Now, PILF also recognized that one of

4  the goals of prosecution is to change the

5  behavior of those who are not directly

6  prosecuted, correct?

7            MR. LOCKERBY:  Object to the form.

8            THE WITNESS:  Please repeat the

9  question.

10 BY MR. TEPE:

11     Q.    PILF also recognized that one of the

12 goals in prosecution generally is to change the

13 behavior of those who are not directly

14 prosecuted, correct?

15     A.    I guess I don't know who you're

16 referring to when you say "those not directly

17 prosecuted."

18     Q.    Okay.  Let's go to page 2 of the

19 report.

20     A.    I'm looking at page 2.

21     Q.    Under the header "The Stakes," fourth

22 paragraph down, the report states:  "Even worse,

23 federal and state law enforcement officials who

24 are entrusted with prosecuting noncitizens who

25 register and vote as a means to deter others from

1   doing the same have repeatedly done nothing when

2   provided with solid evidence of noncitizen

3   participation in the electoral system."

4         Do you see that?

5   A.    I see that.

6   Q.    Is it fair to say that PILF believed

7   that part of the reason why you prosecute is to

8   deter others from engaging in the same conduct?

9   A.    If by "others" you mean those who

10  would intend to break the law, then enforcement

11  of the law has a deterrent effect on those

12  people.  That is the theory, at least.

13  Q.    Do you believe that investigating

14  those accused of breaking the law could influence

15  the behavior of others accused of breaking the

16  law?

17        MR. LOCKERBY:  Object to the form of

18        the question.

19        THE WITNESS:  It depends on who is

20        doing the investigating and who's doing the

21        accusing.

22  BY MR. TEPE:

23  Q.    But it's possible?

24  A.    I would agree it's possible.

25  Q.    PILF could have simply handed the data

1    it collected from election officials to

2    prosecutors confidentially, correct?

3         A.    We could have.

4         Q.    Instead, PILF decided to publish

5    people's names for all the world to see, correct?

6              MR. LOCKERBY:  Object to the form.

7              THE WITNESS:  No, I disagree with "all

8         the world."

9    BY MR. TEPE:

10        Q.    Well, PILF decided to publish people's

11   names on the Internet, correct?

12             MR. LOCKERBY:  Objection.

13             THE WITNESS:  We published people's

14        names on the Internet.

15   BY MR. TEPE:

16        Q.    As opposed to just simply handing over

17   those names to prosecutors confidentially,

18   correct?

19        A.    It was not an either/or.

20        Q.    Well, those were two options, publish

21   it on the Internet or hand it over to

22   prosecutors, correct?  Those are two options?

23        A.    Those are two possible options, yes.

24        Q.    Are you aware of other options?

25        A.    Yes.

1    Q.    Such as?

2    A.    We could have printed it and

3  distributed it about town.

4    Q.    Okay.  Any other options?

5    A.    It could have been mailed to a select

6  number of people.  There's probably many more

7  options of what we could have done with a printed

8  document.

9    Q.    And you could have also not handed the

10  documents over to prosecutors, correct?  That was

11  an option?

12    A.    Not giving it to prosecutors was an

13  option?

14    Q.    Right.

15    A.    That was an option.

16    Q.    Not publishing it on the Internet was

17  an option?

18    A.    That was an option.

19    Q.    So why -- why did PILF decide to

20  publish these records on the Internet?  Do you

21  know?

22    A.    I do not recall discussions as to why

23  it should be published on the Internet.

24    Q.    So PILF published the names and

25  addresses of thousands of people, and you don't

1    know why they did it?

2            MR. LOCKERBY:  Object to the form.

3            THE WITNESS:  No, I said I don't

4        recall discussions as to why it was

5        published on the Internet.

6    BY MR. TEPE:

7        Q.    Okay.  So you don't recall

8    discussions, but you know why PILF did it?

9        A.    I know that it was done.  I don't

10   recall discussing the reason why it was done.

11   Nor do I know the reason it was necessarily done.

12       Q.    So you uploaded for publication on the

13   Internet the names and addresses of over 5000

14   people and you don't know why?

15           MR. LOCKERBY:  Object to the form.

16       Asked and answered.

17           THE WITNESS:  Again, I don't -- I

18       don't recall having a discussion as to this

19       is why we need to publish this on the site,

20       no.

21   BY MR. TEPE:

22       Q.    Now, we had discussed earlier that

23   PILF had voter registration applications for many

24   people, correct?

25       A.    You're referring to the applications?

1      Q.    Published in Exhibit 12 to Alien

2    Invasion II, correct.

3      A.    We possessed the registration

4    applications contained in Exhibit 12.

5      Q.    There's 764 applications?

6      A.    I don't know the exact number.

7      Q.    Did you personally review these

8    applications?

9      A.    I did review some of them.

10     Q.    What was the purpose for collecting

11   these voter registration applications?

12     A.    One reason was to observe what answer

13   the registrant gave to the citizenship question.

14     Q.    Which box they checked, correct?

15     A.    "Yes" or "No," correct.

16     Q.    And so some registrants on these

17   applications checked "No," correct?

18     A.    We found some of them checked "No" to

19   that question, yes.

20     Q.    And there were a few registration

21   applications in which no box was checked?

22     A.    That sounds right, correct.

23     Q.    But the vast majority of voter

24   registrations had the citizenship question

25   answered yes, correct?

1        A.      Correct.

2        Q.      PILF didn't limit its Alien Invasion

3  II report to just those people who had answered

4  no to the citizenship question, correct?

5        A.      Correct.

6        Q.      Let's go to page 13 of the Alien

7  Invasion II report.

8        A.      13?  Did you say page 13?

9        Q.      Yeah.  I'm sorry.  Yes, I did.

10        A.      Okay, I'm looking at page 13.

11        Q.      On the right-hand side, third

12  paragraph from the bottom, it begins:  "In the 16

13  jurisdictions surveyed, PILF reviewed 764 voter

14  registration applications submitted by applicants

15  who were later removed for lacking U.S.

16  citizenship."

17              Do you see that?

18        A.      I see that sentence.

19        Q.      And then two paragraphs down it refers

20  to 702 noncitizen registrants getting on the

21  voter rolls for checking "Yes" to the citizenship

22  question, correct?

23        A.      That's what the paragraph refers to,

24  yes.

25        Q.      And then the footnote 69, that refers

Page 114

1   the reader to Exhibit 12.  Is that right?

2       A.    Footnote 69 refers to Exhibit 12.

3       Q.    So of the 764 voter registration

4   applications reviewed by PILF, 702 answered "Yes"

5   to the citizenship question, correct?

6       A.    That's what's indicated on this page.

7       Q.    But PILF in its report calls these 702

8   registrants noncitizens, correct?  On the bottom

9   of page 13.

10      A.    I think the paragraph speaks for

11  itself.

12      Q.    It says 702 noncitizen registrants,

13  correct?

14      A.    The last paragraph does, yes.

15      Q.    And you had the phone numbers for

16  these 702 registrants, correct?

17      A.    I don't know if we had phone numbers

18  for all of them.

19      Q.    But for many of them you did because

20  it's part of the voter registration application,

21  correct?

22      A.    I can't say that we had many either

23  without looking at them.

24      Q.    Well, flip through.

25      A.    All 702?

1      Q.    I mean, if you have a real doubt that

2    the voter registration applications contained

3    people's phone numbers, I guess so.

4      A.    I don't have a basis for believing

5    it's required information.

6      Q.    That wasn't the question.  The

7    question was:  Isn't it true that for probably

8    most if not all of the 702 applicants that are

9    named as noncitizens in the report, you had their

10   phone numbers, correct?

11     A.    Again, I'm not willing to say that I

12   had them without looking at them.

13           MR. LOCKERBY:  Object to the form.

14       "Most" is undefined.

15           THE WITNESS:  I'm happy to look

16       through all 702 if you would like me to.

17   BY MR. TEPE:

18     Q.    You appear to be in real doubt as to

19   whether or not you had people's phone numbers.

20   So if you want to flip through it.

21           MR. LOCKERBY:  Objection.  Now counsel

22       is arguing with the witness.  Does the

23       question about most still stand, or has it

24       been withdrawn?

25           MR. TEPE:  It still stands.

1          THE WITNESS:  Then my answer is I do

2      not recall how many applications contained a

3      phone number.

4  BY MR. TEPE:

5      Q.    It's right in front of you.  Do you

6  want to check?

7      A.    No.

8      Q.    Why not?

9      A.    If you're giving me the option, then I

10  would rather not look at them.

11      Q.    Why don't you go to page 96.  I

12  believe it's flagged.

13      A.    Page 96 of what?

14      Q.    Of Exhibit 12.

15      A.    I don't believe they have page

16  numbers.

17      Q.    It should be flagged.  We're looking

18  for the application of Abby Sharpe Focht.

19      A.    I believe I'm looking at it.

20      Q.    Ms. Focht, who, for the record, is now

21  known as Gearhart, checked "Yes" to the question

22  "Are you a citizen of the United States?"

23  Correct?

24      A.    Yes.

25      Q.    Now, when you published her voter

1    registration application as part of Exhibit 12,

2    PILF knew that her application had not been

3    canceled, correct?

4         MR. LOCKERBY:  Object to the form.

5         MR. TEPE:  Strike that.

6    BY MR. TEPE:

7         Q.    When PILF published Alien Invasion II

8    and specifically Ms. Focht's application as part

9    of Exhibit 12, PILF was aware that her voter

10   registration had not been canceled, correct?

11        MR. LOCKERBY:  Object to the form of

12        the question.  Not only does it assume facts

13        not in evidence but counsel is required to

14        have a good faith basis for asking a

15        question when in fact the sworn testimony of

16        Ms. Gearhart is that her registration was

17        canceled at one point.

18        MR. TEPE:  Okay.

19   BY MR. TEPE:

20        Q.    PILF was aware when it published Alien

21   Invasion II that Ms. Focht, now Gearhart, knew

22   that she had affirmed under oath her citizenship,

23   correct?

24        MR. LOCKERBY:  Objection.  The

25        question is vague as to time period.

1    BY MR. TEPE:

2         Q.    Any time period.

3         A.    We possessed her voter registration

4    application.

5         Q.    And you also possessed her affirmation

6    of citizenship, correct?

7         A.    We did, but I cannot say that I was

8    aware of it.

9         Q.    You can put that to the side for the

10   moment.

11              (Exhibit 13 marked for identification

12        and attached hereto.)

13   BY MR. TEPE:

14        Q.    The court reporter has marked as

15   Exhibit 13 a document with the beginning Bates

16   number of 13234.

17        A.    I see that.

18        Q.    Do you recognize this document?

19        A.    I've seen it before.

20        Q.    What do you recognize it to be?

21        A.    It's an e-mail from

22   waltlatham@yorkcounty.gov written to me and

23   Shawna Powell.

24        Q.    And it's dated November 22, 2016?

25        A.    The top e-mail is.  I'm sorry, the

Page 119

1    first page of Exhibit 13 is.

2         Q.    It's only one e-mail, correct?

3         A.    Yes.

4         Q.    Now, do you recall that for a period

5    of time the Virginia Department of Elections took

6    the position that it could not hand over the

7    VERIS reports based on their interpretation of

8    the federal statute?

9         A.    Yes, they took that position.

10        Q.    And at this point in time, November of

11   2016, York County was taking the same position,

12   that it could not hand over the VERIS reports

13   themselves, correct?

14        A.    They were abiding by instructions from

15   the Department of Elections not to produce the

16   information requested, or at least the VERIS

17   report.

18        Q.    And so in lieu of that, Mr. Latham,

19   the general registrar of York County, sent copies

20   of correspondence with voters to you, correct?

21        A.    This e-mail says that he sent -- he

22   has attached a batch of letters sent to voters

23   who indicated that they were not citizens.

24        Q.    Right.  These are copies of the

25   notices of intent to cancel and affirmation of

1    citizenship forms and voter registration

2    cancellation notices, correct?

3         A.    Those appear to be documents that are

4    attached to this e-mail.

5         Q.    If you go to Bates number 13324.  Do

6    you see that?

7         A.    I see that.

8         Q.    This is a notice of intent to cancel

9    directed to Abby Sharpe Focht.  Is that right?

10        A.    Correct.

11        Q.    And it's dated April 13, 2012?

12        A.    That's the date on it.

13        Q.    And included with that mailing was an

14   affirmation of citizenship form for her to

15   complete, correct?

16        A.    That's the next page after the notice

17   of intent to cancel.

18        Q.    And in the notice of intent to cancel

19   from Mr. Latham to Ms. Focht it says:  "Please

20   complete the affirmation of citizenship form and

21   return it using the enclosed envelope."  Right?

22        A.    That's what the notice of intent to

23   cancel says.

24        Q.    And it says:  "If you do not respond

25   within 14 days, you will be removed from the list

1    of registered voters."  Correct?

2         A.    Yes.

3               (Exhibit 14 marked for identification

4         and attached hereto.)

5    BY MR. TEPE:

6         Q.    What has been marked as Exhibit 14

7    begins with Bates number 13148.

8         A.    I see that.

9         Q.    Do you recognize this document?

10        A.    It's another e-mail from Walt Latham

11   to me and Shawna Powell.

12        Q.    Same day, November 22nd?

13        A.    Of 2016.

14        Q.    And in the subject line it says:

15   "York County Va - files requested - batch 3 of

16   4."  Correct?

17        A.    That's the top e-mail of this page,

18   yes.

19        Q.    So he was sending you a bunch of

20   records in four different e-mails.  Is that

21   right?

22        A.    Yes.

23        Q.    And in this third batch you were sent

24   the voter registration application of Ms. Focht.

25   Is that right?

1          A.     I have to look at the -- And what was

2     attached?

3          Q.     13185.

4          A.     13185 appears to be the application of

5     Ms. Focht.

6          Q.     And this was the application that was

7     published in Exhibit 12 to Alien Invasion II,

8     correct?

9          A.     It appears to be the same, yes.

10               (Exhibit 15 marked for identification

11         and attached hereto.)

12    BY MR. TEPE:

13         Q.     The court reporter has marked as

14    Exhibit 15 a document with the Bates number

15    13118.  Do you see that?

16         A.     I see that.

17         Q.     Do you recognize this document?

18         A.     I've seen it before.

19         Q.     And it's the fourth e-mail of four

20    from Mr. Latham on November 22nd?

21         A.     That looks right.

22         Q.     And he states here:  "And, finally,

23    here are the responses from voters to our

24    letters."

25               Do you see that?

1        A.      I see that.

2        Q.      Do you understand that to mean that

3   these were the responses to the notices of intent

4   to cancel?

5        A.      I don't know what I thought it meant

6   at the time it was received.

7        Q.      But you understand that now?

8        A.      I understand that to be true now.

9        Q.      If you go to the attachment to this

10  e-mail, not very far in, Bates number 13121.

11       A.      I see that.

12       Q.      What do you recognize this to be?

13       A.      This looks like an affirmation of

14  citizenship from Ms. Focht.

15       Q.      And do you see the "received" stamp at

16  the bottom?

17       A.      I do.

18       Q.      It says "Received April 23, 2012"?

19       A.      I see that.

20       Q.      It was received within two weeks of

21  the notice of intent to cancel going out,

22  correct?

23       A.      I don't recall the date the notice

24  went out.

25       Q.      Well, go back to the earlier exhibit,

1     Exhibit 13.

2         A.    Which page?

3         Q.    I believe it's 13324.  So the date on

4     the intent to cancel was April 13th, right?

5         A.    I see that, yes.

6         Q.    And York County received it on, it

7     would appear, April 23rd, correct?  Based on the

8     stamp on her affirmation of citizenship form.

9         A.    Yes, her affirmation of citizenship,

10    it says received April 23, 2012.

11        Q.    That was within two weeks of the

12    intent to cancel going out?

13        A.    According to these dates, yes.

14        Q.    At this time, when Alien Invasion II

15    was published, what was PILF's basis for saying

16    that Ms. Focht was a noncitizen?

17        A.    I believe her application was

18    inadvertently included in Exhibit 12.

19        Q.    And that was PILF's mistake, correct?

20            MR. LOCKERBY:  Object to the form.

21            THE WITNESS:  We are the ones who

22        initially included it in Exhibit 12.

23    BY MR. TEPE:

24        Q.    So at the time Alien Invasion II was

25    published you had two things, right?  You had her

Page 125

1    voter registration application, correct?

2         A.    It had been sent to us, correct.

3         Q.    And you had her affirmation of

4    citizenship, correct?

5         A.    It had also been included in an e-mail

6    from Mr. Latham.

7         Q.    And they both indicated citizenship,

8    correct?

9         A.    I would have to look back at her

10   application to know if she checked "Yes" to that

11   question.

12        Q.    We just looked at that.  That was

13   13324.  13185, Exhibit 14.

14        A.    131 --

15        Q.    85.

16        A.    Yes, she answered the question "Yes."

17        Q.    So the two documents that PILF had

18   when it published Alien Invasion II indicated

19   citizenship for Ms. Focht, right?

20        A.    We -- we had these two documents.

21        Q.    You included one of those documents,

22   her registration, in Exhibit 12, correct?

23        A.    Her application for voter registration

24   was initially included in Exhibit 12.

25        Q.    And Exhibit 12 contained voter

1   registration applications that PILF said were

2   noncitizens, correct?

3           MR. LOCKERBY:  Object to the form.

4           THE WITNESS:  Only based on our

5       understanding of what was -- should have

6       been included in there.  Again, her

7       application was -- the inclusion of her

8       application was inadvertent.

9   BY MR. TEPE:

10      Q.   And that was an inadvertent mistake by

11  PILF, correct?

12          MR. LOCKERBY:  Object to the form.

13          THE WITNESS:  Again, I said it was

14      inadvertent, yes.

15  BY MR. TEPE:

16      Q.   And it was a mistake by PILF, correct?

17      A.   The foundation is the one who included

18  it.  Yes.

19      Q.   It wasn't the fault or an error by the

20  Virginia Department of Elections, correct?

21      A.   Well, I believe there was a subsequent

22  e-mail from Mr. Latham in which he explained that

23  he had included correspondence from voters who

24  later affirmed their citizenship.  He never

25  mentioned that he had included registration

1    applications of those same voters.

2         Q.    My question was:  Isn't it true that

3    the inclusion of Ms. Focht's voter registration

4    application in Exhibit 12 of Alien Invasion II

5    was not the fault of the Virginia Department of

6    Elections?

7              MR. LOCKERBY:  Object to the form.

8         Asked and answered.

9              THE WITNESS:  They were not sent to us

10        by the Virginia Department of Elections, no.

11   BY MR. TEPE:

12        Q.    But PILF blamed the Virginia

13   Department of Elections for Ms. Focht's

14   application getting into Exhibit 12.  Isn't that

15   right?

16             MR. LOCKERBY:  Object to the form.

17             THE WITNESS:  I'm not aware of that

18        accusation.

19             MR. TEPE:  Do you want to take a

20        break?

21             MR. LOCKERBY:  This is probably a good

22        time.

23             MR. TEPE:  Why don't we go off the

24        record.

25             THE VIDEOGRAPHER:  We are going off

Page 128

1           the record.  The time is 12:07 p.m.

2                 (Recess taken.)

3                 THE VIDEOGRAPHER:  We are back on the

4           record.  The time is 12:18 p.m.

5     BY MR. TEPE:

6           Q.    Still on the topic of Alien Invasion

7     II, Mr. Johnson, let's discuss an individual who

8     troubled you even before Alien Invasion II was

9     published.  Do you know who I'm referring to?

10          A.    No.

11          Q.    Do you want to go to page 10 of Alien

12    Invasion II?

13          A.    I'm on page 10.

14          Q.    At the very top left there is an

15    individual named Maureen H. Erickson mentioned in

16    the report.

17          A.    I see that.

18          Q.    Now, before she was mentioned in Alien

19    Invasion II, you thought she might be a citizen.

20    Is that right?

21          A.    I don't recall that.

22                (Exhibit 16 marked for identification

23          and attached hereto.)

24    BY MR. TEPE:

25          Q.    The court reporter has handed you

Page 129

1    what's been marked as Exhibit 16, Bates number

2    210.  Do you see that?

3         A.    I see it.

4         Q.    Do you recognize this document?

5         A.    I have seen this before, yes.

6         Q.    And it is an e-mail discussing Maureen

7    Erickson, correct?

8         A.    Some of it appears to discuss her,

9    yes.

10        Q.    So this e-mail chain is dated June 19,

11   2017, right?

12        A.    Yes.

13        Q.    So that was just two and a half weeks

14   after Alien Invasion II was published, right?

15        A.    That sounds about the right amount of

16   time.

17        Q.    And I understand there was an article

18   that -- in the media that pointed out that

19   Maureen Erickson was a U.S. citizen, correct?

20        A.    Yes.  I think I remember the article

21   that her husband or father had informed the

22   media -- they claimed that she was a U.S.

23   citizen, yes.

24        Q.    Do you have any basis to dispute that

25   claim?

1    A.    Other than her inclusion on the VERIS

2  report, no.

3    Q.    That her registration had at one time

4  been canceled?

5    A.    Under the designation declared

6  noncitizen, yes.  Other than that, I have no

7  reason to.

8    Q.    On June 19th you wrote with regard to

9  Ms. Erickson:  "It troubled me too."

10    Do you see that?

11    A.    I see that.

12    Q.    What troubled you?

13    A.    I think it troubled me that I could

14  not verify the requirements of UOCAVA.

15    Q.    What is UOCAVA?

16    A.    The Uniformed and Overseas Citizens

17  Voter Act.  I'm not sure what the other letters

18  mean.

19    Q.    So just taking a step back, on the

20  VERIS report for Prince William County there was

21  a Guatemalan address, correct?

22    A.    I think we determined it was in

23  Guatemala, yes.

24    Q.    But just because someone is residing

25  abroad doesn't mean that they can't, if they're

1  citizens, vote in U.S. elections, correct?

2      A.    Correct.

3      Q.    Now, why did PILF highlight her in the

4  text of Alien Invasion II?  Do you recall?

5      A.    I believe it was because of the

6  indication that she resided at a foreign address,

7  which was unique to her among those on the list.

8      Q.    But at the time, you knew that just

9  residing at a foreign address didn't necessarily

10 indicate one way or another about citizenship,

11 right?

12     A.    Correct.

13     Q.    In your e-mail you said:  "If it

14 wasn't her, it would be someone else they could

15 dig up that was actually a citizen."

16           Do you see that?

17     A.    I see that.

18     Q.    What did you mean by that?

19     A.    I believe I was predicting that the

20 reports would come under scrutiny and that there

21 would be an effort to try to verify that someone

22 on these lists was actually a citizen.  Which is

23 what happened.

24     Q.    At the time you understood that there

25 was a chance that some of the people identified

1   in Alien Invasion II were in fact citizens,

2   correct?

3        A.    Well, I was referring to the claim

4   that Maureen Erickson was a citizen.

5        Q.    No, I understand.  I'm asking a

6   different question, which is at the time Alien

7   Invasion II was published you recognized that

8   some of those people on the list are citizens,

9   right?

10       A.    That's my understanding now.  I

11  understand that when they were canceled, they

12  were canceled for citizenship reasons, and they

13  could have since then become citizens.

14       Q.    But certainly on June 19th you

15  recognized that, if it wasn't Maureen Erickson,

16  there would be someone else on the list published

17  with Alien Invasion II that would actually be a

18  citizen?

19            MR. LOCKERBY:  Object to the form.

20            THE WITNESS:  I think I was

21       speculating that could be a possibility,

22       yes.

23  BY MR. TEPE:

24       Q.    And in fact, you had knowledge of --

25  Strike that.

1          So before Alien Invasion II was

2   published, you knew that people listed in the

3   exhibits to Alien Invasion II had reregistered

4   after their registration had been canceled,

5   correct?

6       A.   I don't recall having that knowledge

7   at the time necessarily.  I recognize now that

8   there's notations on them suggesting that they

9   reregistered.

10      Q.   And specifically today we looked at

11  Bedford County as an example, right?

12      A.   We did, yes.

13      Q.   Are you -- is it your testimony that

14  you didn't look at the records sent to you to

15  verify that these people had not reregistered?

16          MR. LOCKERBY:  Objection; misstates

17      the witness's testimony.

18          THE WITNESS:  I'm not following the

19      question.

20  BY MR. TEPE:

21      Q.   So before Alien Invasion II was

22  published, you possessed information that people

23  listed in the exhibits to Alien Invasion II had

24  reregistered after their registration had been

25  canceled, correct?

1        A.    Yes.

2        Q.    And before Alien Invasion II was

3   published, you had information that people listed

4   in the exhibits to Alien Invasion II had affirmed

5   their citizenship under oath, correct?

6        A.    Yes, we had documents showing that

7   they checked "Yes" to the citizenship question at

8   some point in time.

9        Q.    And before Alien Invasion II was

10  published, you had information indicating that

11  what Alien Invasion II calls 5556 noncitizens

12  includes people who are likely citizens?

13       A.    No, I disagree with the

14  characterization.  And I don't know what "likely"

15  means.

16       Q.    Why was Alien Invasion II published in

17  May of 2017 as opposed to some other time?

18       A.    I don't recall.

19       Q.    Isn't it the case that there was some

20  urgency to get the report published in May of

21  2017?

22       A.    I might recall an e-mail to that

23  effect, but I don't know what the urgency was.

24       Q.    The court reporter has handed you a

25  document that was previously marked as VVA

1    Deposition Exhibit 26.

2         A.    I see that.

3         Q.    And it has the Bates number 1233.  Do

4    you see that?

5         A.    I do.

6         Q.    Do you recognize this document?

7         A.    Yes, I've seen it before.

8         Q.    It's an e-mail that you sent on

9    May 17, 2017, to Reagan George.  Do you see that?

10        A.    Yes, I do see that.

11        Q.    Copying Logan Churchwell?

12        A.    Yes, I see that.

13        Q.    Who is also at PILF, right?

14        A.    He is.

15        Q.    You wrote to Mr. George:  "I don't

16   mean to beat a dead horse but some issues on our

17   end have us needing to get our report out ASAP.

18   Whatever you can do to press this urgency with

19   the people running the voter history, that would

20   be appreciated."

21             Do you see that?

22        A.    I see that.

23        Q.    Do you recall having conversations

24   with Mr. George about this urgency?

25        A.    I vaguely recall this e-mail.  It

1   suggests that I had told him about it before, but

2   I don't recall anything specific.

3        Q.    Well, you say:  "I don't mean to beat

4   a dead horse."  Usually that expression is used

5   when you've told someone something before,

6   correct?

7        A.    Right.  That's what I mean by it

8   suggests I mentioned this to him before.

9        Q.    And you have no basis to say that you

10  didn't tell him that there was some urgency to

11  getting Alien Invasion II published?

12       A.    No, nothing to suggest I did not

13  mention this before.

14       Q.    Was the reason Alien Invasion II was

15  published in May of 2017 related to the fact that

16  Mr. Adams wanted to piggyback on President

17  Trump's announcement of the Voter Fraud

18  Commission?

19            MR. LOCKERBY:  Object to the form.

20            THE WITNESS:  Right.  The phrasing is

21       a little vague.  I do recall something about

22       the timing.  I don't remember why

23       specifically.

24  BY MR. TEPE:

25       Q.    The court reporter has handed over a

1    document that's been previously marked as VVA

2    Deposition Exhibit 27.

3          A.    I see that.

4          Q.    Do you recognize this document?

5          A.    Only vaguely.

6          Q.    At the bottom of the document, meaning

7    the first e-mail, the e-mail from Reagan George

8    on May 17, 2017, to a Steve and a Nancy.  Do you

9    see that?

10         A.    On May 17th?

11         Q.    Yes.

12         A.    Yes, I see that.

13         Q.    Do you know who Steve and Nancy are?

14         A.    I mean, I'm familiar with them because

15   of some of these correspondence, but I do not

16   recall who they are specifically.

17         Q.    Well, Mr. George here writes:

18   "Christian is wanting to get their article

19   written ASAP to piggyback on Trump's announcement

20   of the Voter Fraud Commission."

21               Do you see that?

22         A.    I see that.

23         Q.    Do you recall telling Mr. George that

24   this was the reason why PILF wanted to get Alien

25   Invasion II written ASAP?

1          MR. LOCKERBY:  Object to the form of

2     the question.

3          THE WITNESS:  I don't recall telling

4     Mr. George that that was the reason for the

5     urgency.

6  BY MR. TEPE:

7     Q.    Do you recall telling Mr. George that

8  there was some other reason for the urgency?

9     A.    No.

10    Q.    Do you recall having any

11 conversations, not with Mr. George but with

12 others at PILF, about the urgency to get Alien

13 Invasion II published?

14    A.    I don't recall having those

15 conversations.  Other than the fact that Logan

16 Churchwell was included on this previous exhibit

17 with Mr. George.

18    Q.    How did you receive the records that

19 you used from -- Strike that.

20         How did you receive the records that

21 election officials sent to you and that were used

22 in Alien Invasion II?

23    A.    Some of them were received in the

24 mail, and I think some of them were received via

25 e-mail.  It's possible but I don't -- it's

1    possible that some registrars gave us removable

2    media that included records, but I couldn't say

3    for sure.

4         Q.    And they would have mailed that out to

5    you?

6         A.    That would have also been mailed.

7         Q.    So none of the records you relied on

8    for Alien Invasion II came from people visiting

9    the jurisdictions and collecting records,

10   correct?

11        A.    No, I think some of them were

12   collected in person.

13        Q.    Which ones?

14        A.    I don't recall the specific

15   jurisdictions.

16        Q.    Well, Alien Invasion -- excuse me,

17   Exhibit 1 to Alien Invasion II came by e-mail

18   from the Virginia Department of Elections,

19   correct?

20        A.    Yes.

21        Q.    And the other bulk of records that you

22   used for Alien Invasion II are contained in

23   Exhibit 12, correct?  The voter registration

24   applications?

25        A.    Exhibit 12 was the registration

Page 140

1    applications.

2        Q.    And how did PILF come to obtain those

3    records?

4        A.    I believe individual registrars sent

5    us VERIS reports that pertained to their specific

6    jurisdictions, and we then asked the registrars

7    for applications for anyone included on those

8    lists in a subsequent request.

9            MR. TEPE:  Break for lunch?

10           THE WITNESS:  Sure.

11           MR. LOCKERBY:  Works for me.

12           THE VIDEOGRAPHER:  We are going off

13       the record.  The time is 12:46 p.m.

14           (Recess taken.)

15

16

17

18

19

20

21

22

23

24

25

1    ------------------------------------------------

2                    AFTERNOON SESSION

3                       1:17 p.m.

4    ------------------------------------------------

5              THE VIDEOGRAPHER:  We are back on the

6         record.  The time is 1:17 p.m.

7    BY MR. TEPE:

8         Q.    Mr. Johnson, you understand you're

9    still under oath, correct?

10        A.    I do understand that.

11        Q.    Have you ever discussed the Alien

12   Invasion reports with a prosecutor?

13        A.    I have not, no.

14        Q.    Have you ever discussed with a

15   prosecutor the subject of a noncitizen voting

16   generally?

17        A.    I don't believe so, no.

18        Q.    Have you ever discussed the outreach

19   to Virginia prosecutors with other PILF

20   personnel?

21        A.    I don't recall.

22        Q.    You may have?

23        A.    I may have.

24        Q.    Now, in Alien Invasion II, as we saw

25   earlier in your testimony, PILF recommended

1    prosecution of noncitizen registrants, correct?

2            MR. LOCKERBY:  Object to the form.

3            THE WITNESS:  I believe my testimony

4        was that we recommended a response from law

5        enforcement officials.  And that response

6        included investigation and, if grounds

7        existed, for prosecution.

8    BY MR. TEPE:

9        Q.    And we also discussed that PILF

10   thought that voter registration and voting

11   history records such as those contained in Alien

12   Invasion II made prosecution an easy task,

13   correct?

14       A.    Is that a quote from the report?

15       Q.    If you want to refresh your

16   recollection, you can go to page 16 of Alien

17   Invasion II.

18       A.    Yes, it sounds like you're quoting the

19   last paragraph next to the last checkmark on page

20   60.

21       Q.    And this was one of the

22   recommendations?

23       A.    It's in the recommendation section,

24   yes.

25       Q.    And to make that task even easier,

1   PILF actually sent records to prosecutors,

2   correct?

3          A.    I believe so, yes.

4                (Exhibit 17 marked for identification

5          and attached hereto.)

6   BY MR. TEPE:

7          Q.    The court reporter has just handed you

8   what's been marked as Exhibit 17 with the

9   beginning Bates number 782.

10               Do you see that?

11         A.    I see that.

12         Q.    Do you recognize this document?

13         A.    I've seen it before, yes.

14         Q.    The first page is an e-mail from you

15  to Mr. Adams and others entitled -- or the

16  subject line is "Mailing list," correct?

17         A.    Yes.

18         Q.    And this is May 26, 2017?

19         A.    Yes.

20         Q.    So this is just a few days before

21  Alien Invasion II was published, correct?

22         A.    Yes.

23         Q.    And you write:  "Here is the mailing

24  list.  It should have everyone on the list you

25  sent and the people we discussed this morning."

1          Do you see that?

2     A.    I see that.

3     Q.    And there is also a proposed cover

4  letter attached, correct?

5     A.    Right.  It's not in the exhibit, but

6  it looks like it's attached to the e-mail.

7     Q.    You don't have a copy of the -- it's

8  the last page.

9     A.    Oh, last page?

10    Q.    Yes.

11    A.    Yes, I see that now.

12    Q.    This is a draft of a letter that would

13 go to the individuals listed in the mailing list,

14 correct?

15    A.    It appears to be, yes.

16    Q.    The first sentence of the draft letter

17 says:  "Some people claim there is no voter

18 fraud.  The enclosed report refutes that claim."

19          Do you see that?

20    A.    I see that.

21    Q.    Before Alien Invasion II was

22 published, did you believe that noncitizen voter

23 fraud was a problem?

24    A.    Before Alien II was published?

25    Q.    Yes.

1      A.    Yes, I did.

2      Q.    And was one of the motivations of

3   engaging in the project that resulted in Alien

4   Invasion I and Alien Invasion II seeking to find

5   proof of voter fraud?

6      A.    I would characterize that as one of

7   the motivations.  Maybe not just proof but the

8   extent of voter fraud.

9      Q.    That there was a significant amount of

10  it existing, correct?

11     A.    Well, we were exploring what the

12  extent was.

13     Q.    So this e-mail attaches a list, a

14  mailing list, correct?  Why don't we take a look

15  at that.

16     A.    It does say that a mailing list is

17  attached.

18     Q.    And in fact, a mailing list was

19  attached, correct?

20     A.    Yes.

21     Q.    So let's just go through this list.

22  The top of the list, there are a bunch of members

23  of the general assembly on the mailing list.  Is

24  that right?

25     A.    I don't have a copy of the list.  It

1    simply says produced in native format.

2            MR. TEPE:   Okay.   Why don't we just

3        briefly go off the record.

4            THE VIDEOGRAPHER:   We are going off

5        the record.   The time is 1:24 p.m.

6            (Off the record.)

7            THE VIDEOGRAPHER:   We are back on the

8        record.   The time is 1:30 p.m.

9    BY MR. TEPE:

10       Q.   Okay.   So just to begin, we're looking

11   at Exhibit 17, Bates 782, correct, on the front

12   page?

13       A.   782 on the front page of the exhibit?

14       Q.   Yes.   So this is Exhibit 17.

15       A.   Yes.

16       Q.   An e-mail from you to Mr. Adams and

17   others attaching a mailing list, correct?

18       A.   Correct.

19       Q.   And this is May 26, 2017?

20       A.   Yes.

21       Q.   This is a few days before Alien

22   Invasion II was published, correct?

23       A.   Yes.

24       Q.   And so this is a list of people that

25   PILF was planning on sending copies of the Alien

1    Invasion II report to, correct?

2         A.    I believe so, yeah.

3         Q.    If you take a look at the mailing

4    list, on the third page of the mailing list there

5    are a number of commonwealth attorneys listed.

6    Do you see that?

7         A.    I see that.

8         Q.    There is also the U.S. attorney for

9    the Eastern District of Virginia, correct?

10        A.    I see that, yeah.

11        Q.    The U.S. attorney for the Western

12   District of Virginia, correct?

13        A.    I see that.

14        Q.    The deputy assistant attorney general

15   of the United States?

16        A.    I see that.

17        Q.    And they were sent a copy of the

18   complete Alien Invasion report?

19        A.    I don't have personal knowledge that

20   they were sent one.  No, I don't.

21        Q.    Do you have personal knowledge that

22   they were sent at least a portion of the Alien

23   Invasion II report?

24        A.    What I mean is I didn't handle the

25   mailings, so I don't have knowledge if it's

1    complete or incomplete.

2        Q.    Okay.  But certainly you were aware of

3    the plan to send to prosecutors the Alien

4    Invasion II report, correct?

5        A.    Yes.

6        Q.    Who was in charge of the mailing?  Do

7    you recall?

8        A.    I believe Shawna Powell.

9        Q.    Are you aware of whether or not any

10   commonwealth attorneys responded to a mailing?

11       A.    I don't recall any responses, or

12   having seen any.

13       Q.    Do you recall follow-up phone calls

14   that PILF made to prosecutors?

15       A.    I do not recall any phone calls.

16       Q.    Do you recall follow-up e-mails with

17   prosecutors regarding the Alien Invasion II?

18       A.    I don't recall seeing any e-mails

19   from -- that included any prosecutors.

20            (Exhibit 18 marked for identification

21       and attached hereto.)

22   BY MR. TEPE:

23       Q.    The court reporter has just handed you

24   an exhibit that's been marked Exhibit 18 with the

25   Bates number 7382.  Do you see that?

1        A.      I see that.

2        Q.      Do you recognize this document?

3        A.      I have seen this before.

4        Q.      This is an e-mail from you dated

5   June 27, 2017, correct?

6        A.      The top e-mail is, yes.

7        Q.      And it's to Ms. Powell, Mr. Adams and

8   Mr. Churchwell, correct?

9        A.      Correct.

10        Q.      And does it appear to be a draft

11   e-mail from Shawna Powell to the Newport News

12   commonwealth attorney?

13        A.      It does, yes.

14        Q.      And in this letter -- it seems to be

15   the e-mail is in the form of a letter.  Is that

16   fair?

17        A.      Yes, the body of the e-mail.

18        Q.      The draft e-mail?

19        A.      The draft e-mail was in the form of a

20   letter.

21        Q.      And the draft e-mail says:  "Dear

22   Mr. Gywnn, thank you for speaking with me on the

23   phone yesterday.  Per our conversation, I have

24   attached the list of noncitizens removed for

25   citizen issues from Newport News' voter rolls

1    from January 1, 2011, to May 22, 2017."

2             Do you see that?

3        A.    I see that.

4        Q.    Does this document refresh your

5    recollection that there were phone calls with at

6    least one commonwealth attorney?

7        A.    I don't -- again do not recall having

8    heard about this when it happened.  But it

9    does -- it is an e-mail I've seen before.

10       Q.    Do you know who was making phone calls

11   from PILF to commonwealth attorneys?

12       A.    The specific one seems to indicate

13   that Shawna at least spoke with the attorney in

14   Newport News.

15       Q.    Do you know of anyone else having

16   phone calls with commonwealth attorneys?

17       A.    One -- I recall an e-mail discussing a

18   meeting that Mr. Adams intended to have with a

19   commonwealth attorney or a U.S. attorney.  Other

20   communications like this, I do not recall.

21             (Exhibit 19 marked for identification

22        and attached hereto.)

23   BY MR. TEPE:

24       Q.    The court reporter has marked as

25   Exhibit 19 a document with Bates number 13405.

Page 151

1           Do you see that?

2      A.    I see that.

3      Q.    You just previously testified that you

4 recall discussing a meeting Mr. Adams intended to

5 have with either a commonwealth attorney or a

6 U.S. attorney, correct?

7      A.    I did say that, yes.

8      Q.    Taking a look at this document, does

9 this refresh your recollection?

10     A.    Looking at this, I think this is the

11 e-mail that I was remembering.

12     Q.    Okay.  So let's start with the e-mail

13 at the bottom, November 21st.  It's on the second

14 page.  November 21, 2016, at 9:30 a.m., an e-mail

15 from Mr. Adams.  Do you see that?

16     A.    I see that.

17     Q.    He says:  "The list of alien name

18 printouts not in our report.  Remember, we did

19 not put them all in as I recall.  Also voter

20 history, voter names if you have them.  I'm

21 talking to U.S. attorney in charge of prosecuting

22 them early afternoon.  Do so as soon as possible.

23 Thanks, very important."

24           Do you see that?

25     A.    I see that.

1       Q.     And then you respond at 9:42 a.m., the

2   same day to Mr. Adams saying you will look ASAP.

3   Do you see that?

4       A.     I see that.

5       Q.     So as I understand, Mr. Adams is

6   looking for the names of the people who were used

7   to support Alien Invasion I, correct?

8       A.     Yes, I believe that's what he's asking

9   for.

10      Q.     And then in the e-mail above that he

11  specifies that "I'm meeting with EDVA US

12  attorney's office."  Do you see that?

13      A.     I do see that.

14      Q.     And then you respond:  "Gotcha.  I'll

15  send what we have and check with Reagan on

16  names."

17             Do you see that?

18      A.     I see that.

19      Q.     That's Reagan George?

20      A.     That's what Reagan refers to.

21      Q.     And then Mr. Adams responds:  "I'm

22  more worried about getting the other counties we

23  have alien removal lists from.  That's an ASAP

24  project.  The report did not include them."

25             Do you see that?

Page 153

1      A.    I see that.

2      Q.    So am I understanding this correctly

3  that in Alien Invasion I, some of the records

4  were included and some were not, correct?

5      A.    Records meaning VERIS reports?

6      Q.    As an example, yes.

7      A.    Yes.

8      Q.    So as we discussed earlier, Alien

9  Invasion I had a VERIS report from Prince William

10  County but not the other counties?

11      A.    Correct.

12      Q.    And so is this Mr. Adams here asking

13  for the records for the other counties?

14          MR. LOCKERBY:  Object to the form.

15          THE WITNESS:  That's how I understood

16      this, yes.

17  BY MR. TEPE:

18      Q.    That's how you understood it?

19      A.    (Nodding head.)

20      Q.    And then also was he requesting the

21  analysis that would match these registrants with

22  voter history?

23      A.    That's what it sounds like, yes.

24      Q.    And then Mr. Adams wrote:  "Remember,

25  this was intended to be a turnkey prosecution for

1    officials.  I could hand them the report and they

2    could virtually get a grand jury indictment."

3              Do you see that?

4        A.    I see that.

5        Q.    Do you recall whether or not you

6    provided the lists and records requested by

7    Mr. Adams?

8        A.    I don't recall if I did.  I don't know

9    why I would not have, though.

10       Q.    Do you recall following up with

11   Mr. George about this?

12       A.    I don't recall that either.

13             (Exhibit 20 marked for identification

14       and attached hereto.)

15   BY MR. TEPE:

16       Q.    The court reporter has handed you

17   what's been marked as Exhibit 20 with Bates

18   number 3261.

19             Do you recognize this document?

20       A.    I've seen this before, I think, yeah.

21       Q.    This is an e-mail from you to

22   Mr. George on November 21st at 9:48 a.m.

23       A.    Yes.

24       Q.    And so this was just a few minutes

25   after Mr. Adams had e-mailed his request that we

1    saw in the previous exhibit?  9:30 p.m.

2         A.    Yes, that sounds right.  It looks

3    right.

4         Q.    The first e-mail.

5         A.    This one?

6               MR. HANSON:  The second page.

7               THE WITNESS:  Yeah, that's after the

8         first e-mail from Mr. Adams.

9    BY MR. TEPE:

10        Q.    So you got the e-mail from Mr. Adams

11   at 9:30 requesting this information, right?

12        A.    Right.

13        Q.    And then 18 minutes later you follow

14   up with Mr. George, correct?

15        A.    Yes.

16        Q.    And you wrote:  "Reagan, Christian is

17   meeting with U.S. attorney's office today.  Need

18   info ASAP."

19               Do you see that?

20        A.    I see that.

21        Q.    Do you recall getting information from

22   Mr. George?

23        A.    I don't recall if I got it from him or

24   not.

25        Q.    Would your answer be the same as to

Page 156

1   what I asked before, that you don't recall but

2   you have no reason to believe that you would not

3   have provided Mr. Adams with the information he

4   requested?

5       A.    Not necessarily.  I can only speak to

6   what I might have done.  I don't know about

7   Mr. George's responsiveness.

8       Q.    Right.  But you would -- if you were

9   the one receiving it, you would know that, right?

10      A.    If I did receive it, then I would have

11  sent it to Christian.

12      Q.    Do you know if Mr. Adams met with this

13  EDVA U.S. attorney prosecutor?

14      A.    I don't recall if he did or not.

15      Q.    Are you aware of any other instances

16  in which Mr. Adams may have met with law

17  enforcement to discuss the Alien Invasion

18  reports?

19      A.    I don't recall other instances.

20      Q.    Are you aware of any instances in

21  which someone else affiliated with PILF other

22  than Mr. Adams met with law enforcement to

23  discuss the Alien Invasion reports?

24      A.    No.

25              (Exhibit 21 marked for identification

1        and attached hereto.)

2   BY MR. TEPE:

3        Q.    The court reporter has just handed you

4   a document that's been marked as Exhibit 21 with

5   the Bates number 7468.

6              Do you recognize this document?

7        A.    Vaguely.

8        Q.    What do you recognize it to be?

9        A.    It's an e-mail between myself and

10  Logan Churchwell regarding -- the subject says

11  Alabama letter.

12       Q.    Is that a shorthand for a letter that

13  was to be sent to Attorney General Sessions?

14       A.    It looks like it was.

15       Q.    So this e-mail is dated October 11,

16  2018, correct?

17       A.    Yes.

18       Q.    And attached to that letter is an

19  edited version of a PILF press release, correct?

20       A.    Yes.

21       Q.    Now, this letter -- excuse me.  Strike

22  that.

23              This press release states, this draft

24  press release states:  "Public Interest Legal

25  Foundation today praised a congressional letter

1   directed to U.S. Attorney Jeff Sessions urging

2   that federal prosecutors dedicate resources to

3   investigation and pursue noncitizens casting

4   ballots."

5           Do you see that?

6       A.    I see that.

7       Q.    This letter was signed by 23 members

8   of Congress.  Do you see that?

9       A.    I see that.

10      Q.    And then two paragraphs below that the

11  press release states:  "The letter marks

12  particular concern for 'sanctuary' cities and

13  counties which 'already refuse to cooperate with

14  federal immigration authorities' and could

15  tolerate 'false claims of citizenship being made

16  during voter registration.'"

17          Do you see that?

18      A.    I see that.

19      Q.    "The letter" -- continuing on the

20  press release:  "The letter references the Public

21  Interest Legal Foundation's August 2018 report

22  'Safe Spaces:  How Sanctuary Cities Are Giving

23  Cover to Noncitizens on the Voter Rolls' which

24  documented over 3100 incidences of noncitizen

25  registration."

1          Do you see that?

2     A.    I see that.

3     Q.    Do you know how Congress -- these

4  Congress members, these 23 members of Congress in

5  their letter came to obtain the Safe Spaces

6  report of PILF?

7     A.    I'm not familiar with how they might

8  have.

9     Q.    Are you aware of whether or not PILF

10  worked with members of Congress on their letter

11  to Attorney General Sessions?

12     A.    I'm not familiar.  I don't recall if

13  they did or not.

14     Q.    And then in the next paragraph the

15  press release states:  "'The Foundation

16  appreciates Rep. Mo Brooks' leadership in

17  Congress and his efforts to keep this matter on

18  the minds of DOJ leadership,' PILF Communications

19  and Research Director Logan Churchwell said."

20          Do you see that?

21     A.    I see that.

22     Q.    The quote continues:  "We can't

23  underestimate the deterrent power that

24  prosecution carries here.  The Foundation will be

25  providing new investigative leads to U.S.

1    Attorneys in the weeks ahead."

2              Do you see that?

3        A.    I do see that.

4        Q.    Are you aware of the new investigative

5    leads to U.S. attorneys that is referenced here

6    in this press release?

7        A.    I believe I'm familiar with one

8    instance.

9        Q.    What instance is that?

10       A.    I believe Mr. Churchwell transmitted a

11   list of potential noncitizens to the U.S.

12   attorney's office in Texas.  I think El Paso

13   specifically.

14       Q.    Are you aware of any additional

15   communications with U.S. attorneys with respect

16   to individuals residing in Virginia?

17       A.    No, I'm not familiar.

18       Q.    The sentence that says "We can't

19   underestimate the current power that prosecution

20   carries here."

21             Do you see that?

22       A.    I do.

23       Q.    Do you agree with that statement?

24       A.    I agree that prosecution carries with

25   it the power to deter future crime.

1      Q.    Would you agree that prosecution --

2 Strike that.

3           Would you agree with the statement

4 that investigation by prosecutors would carry

5 with it deterrent power?

6      A.    Not in and of itself.

7      Q.    Why is that?

8      A.    Well, investigations are often not

9 public whereas prosecutions typically are.  You

10 usually can't be deterred by something you don't

11 know about.

12     Q.    Any other basis?

13     A.    I can't think of any.

14     Q.    Your answer said investigations are

15 often not public whereas prosecutions typically

16 are.  Is that right?

17     A.    I believe that was my testimony.

18     Q.    So if an investigation was publicized,

19 do you believe that would have some deterrent

20 value?

21     A.    Yeah, it could.

22     Q.    Do you believe that if people were

23 accused publicly of engaging in illegal conduct,

24 that that could potentially deter other people

25 from engaging in conduct similar to that alleged?

1    A.    Well, it depends on who is doing the

2    accusing.

3    Q.    How so?

4    A.    If law enforcement was to accuse

5    someone of a crime, that would carry more weight

6    than if, say, I did it personally.  The deterrent

7    effect would be, I think, greater if the

8    accusation came from someone with the power to

9    investigate or prosecute.

10   Q.    You can put that document aside.

11         Were you involved in efforts to

12   promote the Alien Invasion reports?

13   A.    Yes.

14   Q.    What was your role in that?

15   A.    Well, I appeared before the Privileges

16   and Elections Committee of the Virginia general

17   assembly, and I believe I mentioned an appearance

18   on the Bret Baier show.

19   Q.    Do you recall other activities that

20   you engaged in to promote the Alien Invasion

21   reports?

22   A.    I don't recall any other promotion,

23   no.

24   Q.    Who was in charge of the effort to

25   promote the Alien Invasion reports at PILF?

Page 163

1     A.     To various -- to varying degrees it

2   was a group effort.

3     Q.     Was anyone in charge of that effort?

4     A.     The second Alien Invasion report when

5   it was published, we had hired Logan Churchwell

6   as our communications director.  He did most of

7   the promotion, to my knowledge, of the second

8   report in addition to Mr. Adams, whatever

9   appearances he may have done.  But I would not

10  say someone was in charge.

11    Q.     But there was an effort to widely

12  disseminate the Alien Invasion reports, correct?

13           MR. LOCKERBY:  Object to the form.

14           THE WITNESS:  There was an effort to

15           disseminate, yes.

16  BY MR. TEPE:

17    Q.     So with respect to Alien Invasion I,

18  do you recall PILF issuing a press release?

19    A.     I do.

20           (Exhibit 22 marked for identification

21           and attached hereto.)

22  BY MR. TEPE:

23    Q.     The court reporter has handed you

24  Exhibit 22 with the Bates 13683.

25           Do you recognize this document?

1    A.    I think I've seen it, but I don't -- I

2  don't remember having seen it.

3    Q.    The first e-mail appears to be an

4  e-mail press release dated October 4, 2016.  Is

5  that right?

6    A.    Yes.

7    Q.    And was this sent to a media list that

8  PILF keeps?

9    A.    It was sent to a media list.  I don't

10  know who the recipients were based on looking at

11  this.

12    Q.    The subject line says "1000 plus

13  noncitizens discovered on voter rolls in

14  Virginia."  Is that right?

15    A.    Yes.

16    Q.    And then when you turn the page over,

17  the press release begins:  "A Public Interest

18  Legal Foundation investigation has uncovered over

19  1000 noncitizens who have registered to vote in

20  just eight of Virginia's 132 voting

21  jurisdictions."

22        Do you see that?

23    A.    I see that.

24    Q.    It continues:  "These ineligible

25  voters have cast nearly 200 ballots in American

1    elections.  Each fraudulent registration and vote

2    is a potential felony."

3           Do you see that?

4    A.    I do see that.

5    Q.    And so sending a press release to

6    media was one activity engaged in by PILF to

7    publicize Alien Invasion I, correct?

8    A.    Yes.

9    Q.    And weren't there appearances on TV as

10   well to promote Alien Invasion I?

11   A.    I'm not recalling any specifically.

12   Q.    Do you recall Alien Invasion I being

13   unveiled on TV exclusively with Fox & Friends?

14   A.    Vaguely.  I recall from an earlier

15   e-mail you showed me that Christian mentioned an

16   appearance on Fox.

17           (Exhibit 23 marked for identification

18           and attached hereto.)

19           MR. TEPE:  The court reporter has just

20           marked and handed to the witness what has

21           been marked as Exhibit 23, a document with

22           Bates number 5600.

23   BY MR. TEPE:

24   Q.    Do you see that?

25   A.    I see that.

1      Q.    And what does it appear to be?

2      A.    It's an e-mail at the top from me to

3  Christian copying Reagan George and Shawna

4  Powell.  And the e-mail below that is an e-mail

5  from Mr. Adams, I believe, to -- it doesn't say

6  who it's to.

7      Q.    But presumably it's to you since

8  you're responding to it, correct?

9      A.    Yes.

10     Q.    And this e-mail is dated September

11  30th from Mr. Adams?

12     A.    Yes.

13     Q.    And Mr. Adams writes:  "I need to get

14  the Fox News producers a near final version of

15  the report in the early afternoon.  I will be on

16  Fox & Friends in the a.m. to talk about it."

17           Do you see that?

18     A.    I see that.

19     Q.    Then it continues:  "Realize the most

20  important thing is the summary."

21           Did you talk about the summary of the

22  Alien Invasion II report?

23     A.    I think that's what he's referring to.

24     Q.    "Nobody there will read past that so

25  the summary has to look good and easy to read and

1    avoid any legalese."

2              Do you see that?

3        A.    I see that.

4        Q.    Then you respond:  "Understood.  We'll

5    talk and I'll have it to you by then."

6              Do you recall any other television

7    appearances by Mr. Adams in promoting the Alien

8    Invasion I report?

9        A.    I do not recall any.

10       Q.    But there -- do you recall doing a

11   phone interview with a radio station to promote

12   Alien Invasion I?

13       A.    Me?

14       Q.    Yes.

15       A.    Vaguely.

16            (Exhibit 24 marked for identification

17       and attached hereto.)

18            MR. TEPE:  The court reporter has just

19       handed the witness a document marked

20       Exhibit 24 with Bates number 44022.

21   BY MR. TEPE:

22       Q.    Do you recognize this document?

23       A.    I don't recall this document.

24       Q.    It does show, though, an e-mail

25   Mr. Adams sent to you on October 3, 2016, yes?

1       A.      Yes.

2       Q.      And the subject line is "KTRH Radio

3    Texas interview request."

4       A.      Yes.

5       Q.      And Mr. Adams wrote:  "Noel, please do

6    it."

7               Is that him asking you to do the

8    interview with KTRH Radio in Houston, Texas?

9       A.      It appears to be, yes.

10      Q.      And then he followed up:  "Remember,

11   short phrases, non-legalese."

12              Do you see that?

13      A.      I do see that.

14      Q.      What did you understand him to mean by

15   that?

16      A.      To speak in terms that nonlawyers

17   would understand.

18      Q.      And what does that mean, nonlawyers

19   would understand?

20      A.      Don't use legal terms of art.

21      Q.      Such as?

22      A.      Perhaps language from the statutes

23   involved.  I don't know.  I don't recall what he

24   meant by that or whether I had anything in mind.

25      Q.      What else did PILF do to promote Alien

1    Invasion I?

2         A.    You're talking about other than what

3    you have presented to me so far?

4         Q.    These are just examples.  What do you

5    recall other than some television, some radio, a

6    press release?

7         A.    We printed -- well, I'm not sure.

8    Nothing is coming to mind other than those things

9    you mentioned.

10        Q.    Anything on Twitter?

11        A.    We likely posted on Twitter.

12        Q.    Facebook?

13        A.    And Facebook.

14        Q.    Did you interview -- I should say did

15   PILF do interviews to various print publications?

16        A.    It's likely, although I'm not

17   remembering any of them specifically.

18        Q.    Does -- to your knowledge, does PILF

19   do anything to attract a number of visits to the

20   PILF website?

21        A.    It's been some time since I've looked

22   at it, but at one point in time whomever hosted

23   our website had a feature where we could see

24   visitor numbers.

25        Q.    Who at PILF has access to this

1  information about the number of visitors to

2  PILF's website?

3      A.    It's likely that Travis Phillips would

4  have access to that information.

5      Q.    Who is Travis Phillips?

6      A.    He's someone who consults with us on

7  computer and IT matters.

8      Q.    Is he a PILF employee?

9      A.    I think he's an independent contractor

10  but I'm not entirely sure.

11     Q.    Was he working with PILF at the time

12  Alien Invasion I was published?

13     A.    Yes.

14     Q.    And so to your knowledge, he would be

15  the individual best able to answer any questions

16  about the number of visitors to PILF's website?

17         MR. LOCKERBY:  Object to the form.

18     Calls for speculation.

19         THE WITNESS:  He would be the person

20     who could most easily access that

21     information, but I don't know what knowledge

22     he has of it as a universe.

23  BY MR. TEPE:

24     Q.    Do you recall PILF engaging in similar

25  promotional efforts to publicize the Alien

1    Invasion II report?

2         A.    I do.

3         Q.    So there were appearances on TV?

4         A.    There were.

5         Q.    Radio appearances?

6         A.    Likely, although I can't recall the

7    specifics.

8         Q.    Interviews to print media?

9         A.    Same answer.

10        Q.    Twitter?

11        A.    Yes.

12        Q.    Facebook?

13        A.    Yes.

14        Q.    Press releases?

15        A.    Yes.

16        Q.    Do you recall Mr. Adams going on

17   Tucker Carlson's Fox News show with the rollout

18   of Alien Invasion II?

19        A.    I have some recollection, yes.

20             (Exhibit 25 marked for identification

21        and attached hereto.)

22   BY MR. TEPE:

23        Q.    The court reporter has just handed you

24   a document marked Exhibit 25 with Bates number

25   770.

Page 172

1             Do you see that?

2        A.    I do see that.

3        Q.    Do you recognize this?

4        A.    I have seen this before.

5        Q.    You're at the top of the e-mail chain.

6    Is that right?

7        A.    Yes.

8        Q.    But the e-mail chain begins, does it

9    not, with an e-mail from Mr. Adams to Tucker

10   Carlson?

11       A.    Yes.

12       Q.    At his Gmail address.  Is that right?

13       A.    Tucker's Gmail address?

14       Q.    Yes.

15       A.    Yes.

16       Q.    It's dated May 26, 2017?

17       A.    Yes.

18       Q.    And Mr. Adams said:  "Tucker, embargo

19   release on a report we are putting out Tuesday."

20             Do you see that?

21       A.    Yes.

22       Q.    And then it lists some key findings

23   and bullet points.  Is that right?

24       A.    I see those, yeah.

25       Q.    And then someone by the name of Kelly

Page 173

1    McNally responds to Mr. Adams later that day,

2    correct?

3         A.    Yes.

4         Q.    She's the senior booker for Tucker

5    Carlson Tonight?

6         A.    That's what it says in her signature

7    line.

8         Q.    And she wrote:  "I want to reach out

9    to see if you are available on Tuesday to join

10   Tucker on this report."

11             Do you see that?

12        A.    Yes.

13        Q.    And then Mr. Adams responds yes.  Do

14   you see that?

15        A.    Yes.

16        Q.    And then it appears he forwards this

17   to you.  Would you agree with that?

18        A.    Yes.

19        Q.    So on May 26 at 5:51 p.m. he asks:

20   "Can you get me a few pages of just the screen

21   captures of some 'No' check boxes?"

22             Do you see that?

23        A.    I see that.

24        Q.    What is he referring to there?  Do you

25   know?

1      A.    He's referring to copies of

2   applications for voter registration on which the

3   applicant marked the citizenship question "No."

4      Q.    Now, do you recall when we were

5   talking about the voter registration applications

6   included with Alien Invasion II only a fraction

7   of those had "No" marked in the check box, right?

8      A.    Yes.

9      Q.    But those are the ones that Mr. Adams

10  wants copies of, correct?

11         MR. LOCKERBY:  Object to the form of

12      the question.  Lack of foundation.

13         THE WITNESS:  He's asking for copies,

14      screen captures of applications on which the

15      applicant checked "No."

16  BY MR. TEPE:

17     Q.    And he says:  "Pick ones with

18  outlandish foreign names, particularly Middle

19  Eastern if they exist."

20         Do you see that?

21     A.    I see that.

22     Q.    Do you know why he was asking for such

23  names?

24     A.    No.  He didn't tell me.

25     Q.    Do you have an understanding or a

1    belief -- Strike that.

2            Do you have a belief as to why he was

3    asking for such names?

4        A.    No.

5            MR. LOCKERBY:  Object to the form of

6        the question.  Lack of foundation.  Calls

7        for opinion testimony by a lay witness.

8            THE WITNESS:  No, I don't.

9    BY MR. TEPE:

10       Q.    His e-mail continues:  "The more

11   outlandish the handwriting the better.  The more

12   obviously foreign the better."

13           Do you see that?

14       A.    I see that.

15       Q.    What did you understand him to be

16   asking there?

17           MR. LOCKERBY:  Object to the form.

18           MR. TEPE:  What's the basis for your

19       objection?

20           MR. LOCKERBY:  For one thing, there's

21       no -- you're asking him what you understood

22       him to be asking for.  There is no question

23       there.

24           MR. TEPE:  I don't understand.

25           MR. LOCKERBY:  There is also lack of

1     foundation.  Again, it calls for opinion

2     testimony.

3             MR. TEPE:  What's the lack of

4     foundation?  He said that he received this

5     e-mail.  I'm asking about an e-mail he

6     received from Mr. Adams.

7             MR. LOCKERBY:  Well, he doesn't know

8     what the author of the e-mail intended.

9             MR. TEPE:  I'm not asking those

10    questions.

11            MR. LOCKERBY:  I'm just going to

12    object to form.  Pardon me?

13            MR. TEPE:  I'm not asking for his --

14    what Mr. Adams was asking.  I'm asking for

15    his interpretation and understanding of what

16    Mr. Adams was asking.

17            I mean, if there is a foundational

18    problem with my question, I want to fix it.

19    So that's what I'm trying to understand.

20            MR. LOCKERBY:  It might help if we had

21    the question read back at this point.

22    BY MR. TEPE:

23    Q.    Okay.  So on May 26, 2017, Mr. Adams

24    sent you an e-mail at 5:51 p.m., correct?

25    A.    Yes.

1       Q.     And he asked you a question saying:

2  "Can you get me a few pages of just the screen

3  captures of some 'No' check boxes?"

4              Do you see that?

5       A.     I see that.

6       Q.     And I believe your testimony before

7  was that this was in reference to the voter

8  registration applications that you had in which

9  applicants had checked "No" in the citizenship

10 box.

11      A.     Yes.

12      Q.     And we had established that of those

13 764 voter registration applications, PILF had

14 reviewed only I think 40-something that had "No"

15 check boxes marked, correct?

16      A.     I don't know if that number is correct

17 but...

18      Q.     The numbers in Alien Invasion II.

19      A.     But again, I don't know if the 46 or

20 47 --

21      Q.     Those are a small number of the 764,

22 correct?

23      A.     Yes.  Only a fraction of them were

24 "No" check boxes.

25      Q.     But those were the ones that Mr. Adams

1   wanted to send to Tucker Carlson's people,

2   correct?

3        A.    Yes.

4        Q.    And then in asking this question,

5   Mr. Adams instructed you:  "Pick ones with

6   outlandish foreign names, particularly Middle

7   Eastern if they exist."

8             Do you see that?

9        A.    I see that.

10       Q.    And he said:  "The more outlandish the

11  handwriting the better, the more obviously

12  foreign the better."

13            Do you see that?

14       A.    I see that.

15       Q.    What is your understanding as to why

16  he was asking for foreign names?

17       A.    My answer was I don't know.  He did

18  not tell me.

19       Q.    So you have no understanding as to why

20  he was making that request?

21       A.    Those are the ones he wanted.

22       Q.    And you have no understanding as to

23  why he wanted those particular names?

24       A.    No, I do not recall why.

25       Q.    He said:  "Ideally they will have

1   voted, but I don't know if you can find that.

2   The degree of outlandishness in the name is just

3   as important as whether they voted."

4           Do you see that?

5       A.   I see that.

6       Q.   "They just need a half dozen or so.

7   Find the best ones.  Crazy names.  I assume I

8   don't need to explain this in further detail."

9           Do you see that?

10      A.   I see that.

11      Q.   Did he need to explain this in further

12  detail to you?

13      A.   Apparently not.

14      Q.   Because you understood what he meant

15  by providing crazy names?

16      A.   Well, I understood what he was asking

17  for.  My understanding wasn't necessarily based

18  on the phrase "crazy names."

19      Q.   You responded:  "I can dig those out."

20  Correct?

21      A.   I did.

22      Q.   Do you recall what crazy names you dug

23  out?

24      A.   I did not dig them out.

25      Q.   Who did?

1      A.    I believe Logan Churchwell handled

2    this request.

3      Q.    Do you recall the names that he picked

4    out?

5      A.    I think there is an e-mail in which he

6    transmits them, but I don't recall the names.

7      Q.    Were the crazy names that Mr. Adams

8    was requesting, do you believe that they were

9    reflective or representative of all the names

10   listed in the records attached to Alien Invasion

11   II?

12           MR. LOCKERBY:  Object to the form.

13           THE WITNESS:  I don't have the

14       knowledge to answer that because I don't

15       remember what the names were.

16   BY MR. TEPE:

17      Q.    You can put that document aside.

18           Alien Invasion II was released the

19   Tuesday after Memorial Day, correct?

20      A.    That sounds right based on the time

21   period.

22      Q.    And it was more advantageous to

23   release the report the Tuesday after Memorial

24   Day.  Do you agree?

25           MR. LOCKERBY:  Object to the form.

1          THE WITNESS:  I don't know in which

2      way that would be more advantageous.

3  BY MR. TEPE:

4      Q.    Well, do you think it would be more

5  advantageous to release the report the Tuesday

6  after Memorial Day or on Memorial Day?

7      A.    Advantageous how?

8      Q.    In terms of enabling other people to

9  see the release of Alien Invasion II.

10     A.    In my opinion, I think that releasing

11 something on a major holiday would be less

12 advantageous if your goal was to increase

13 viewership.

14     Q.    And PILF's goal was to increase the

15 number of people who viewed the Alien Invasion II

16 report, right?

17     A.    I would say that was one of our goals.

18          (Exhibit 26 marked for identification

19     and attached hereto.)

20 BY MR. TEPE:

21     Q.    The court reporter has handed you

22 what's been marked as Exhibit 26, a document with

23 Bates number 37501.

24          Do you see that?

25     A.    I see that.

Page 182

1        Q.    Do you recognize this document?

2        A.    I do.

3        Q.    What do you recognize it to be?

4        A.    It's an e-mail between -- well, among

5   PILF employees and some others.

6        Q.    This e-mail chain is dated October 2,

7   2016.  Is that right?

8        A.    Yes.

9        Q.    And it begins with an e-mail from

10  Mr. Adams, the subject line "Congratulations

11  everyone."  Do you see that?

12       A.    I do.

13       Q.    And he says:  "Great lesson how to

14  generate, create, organize and weaponize

15  narrative."  And then there is a screenshot of

16  the Drudge Report home page.  Is that right?

17       A.    Right.

18       Q.    And on the Drudge Report he linked to

19  an article reporting on the Alien Invasion I

20  report, right?

21       A.    Yes.

22       Q.    It says:  "Report:  1000 plus illegal

23  voters in Virginia..."  Correct?

24       A.    I see that, yes.

25       Q.    Do you have an understanding as to

1    what Mr. Adams was saying by "Great lesson how to

2    generate, create, organize and weaponize

3    narrative"?

4         A.   I think he meant that this shows that

5    our promotion of the report was effective in that

6    it was or appeared on the Drudge Report.

7         Q.   Well, more than that, in the e-mail

8    above Mr. Adams says:  "Noel, remember our

9    conversation on how important it was to cross the

10   1000 mark."

11             Do you see that?

12        A.   I see that.

13        Q.   Do you remember that conversation?

14        A.   Yes, vaguely.

15        Q.   And what do you recall?

16        A.   Discussing that when we received the

17   records from Alexandria, that it put the total

18   of -- I think the total cancellations from the

19   VERIS reports above 1000.

20        Q.   Why did you answer the total

21   cancellations from the VERIS reports instead of

22   the total number of noncitizens?

23             MR. LOCKERBY:  Object to the form.

24        Argumentative and it assumes facts not in

25        evidence.

1          THE WITNESS:  Because the numbers came

2      from the VERIS reports.

3  BY MR. TEPE:

4      Q.    And you called --

5      A.    The number of --

6      Q.    -- them noncitizens?

7          MR. LOCKERBY:  Objection.

8          THE WITNESS:  Say that again.

9  BY MR. TEPE:

10     Q.    And PILF called them noncitizens,

11  correct?

12         MR. LOCKERBY:  Objection.  The

13     documents speak for themselves.

14         THE WITNESS:  Yes, we've been over

15     what the reports say by now.

16  BY MR. TEPE:

17     Q.    Was Mr. Adams telling you in your

18  conversation with him that if you get to higher

19  numbers you're more likely to get media

20  attention?

21         MR. LOCKERBY:  Object to the form.

22         THE WITNESS:  I think that was part of

23     what he was saying.

24  BY MR. TEPE:

25     Q.    And then he wrote here to you:  "Good

Page 185

1   example why below and it shows in Drudge

2   headline.  It was an important psychological

3   frontier crossed."

4           Do you see that?

5       A.   I see that.

6       Q.   And by that do you understand him

7   saying by crossing the 1000 mark, that was an

8   important psychological frontier crossed?

9       A.   That's what it says.

10      Q.   And then you responded:  "Amen.  Great

11  headline."

12      A.   Yes.

13      Q.   You can put that document aside.

14          Would you agree that being able to get

15  higher numbers of purported noncitizens was

16  important to PILF?

17      A.   I think it's what we expected to find.

18      Q.   That's not what I asked.  Would you

19  agree that people -- Strike that.

20          Would you agree that being able to get

21  higher numbers of purported noncitizens was

22  important to PILF?

23          MR. LOCKERBY:  Objection; asked and

24      answered.

25          THE WITNESS:  Yes.

Page 186

1   BY MR. TEPE:

2       Q.    You said that you expected to find

3   high numbers of purported noncitizens on the

4   voter rolls.  Am I understanding you correctly?

5       A.    Yes.

6       Q.    What was the basis of that

7   expectation?

8       A.    I believe we were aware of a smaller

9   investigation that had been done in Alexandria on

10  this very same issue, and based on that small

11  example we extrapolated statewide.  We figured

12  the number would be quite high.

13      Q.    So what you're saying is if the

14  numbers that you received from Alexandria were

15  accurate and you extrapolated that statewide, you

16  would expect to find high numbers of purported

17  noncitizens.  Is that what you're saying?

18      A.    That's what I'm saying.

19      Q.    Now, you wanted to get above 5000

20  purported noncitizens, correct?

21          MR. LOCKERBY:  Object to the form.

22          THE WITNESS:  At some point in time I

23      believe that became notable.

24  BY MR. TEPE:

25      Q.    Notable for the same reasons 1000 was

Page 187

1    notable?

2        A.    I'm not sure we established those

3    reasons.

4        Q.    Well, we just discussed how it was

5    notable to Mr. Adams that by crossing the 1000

6    threshold for Alien Invasion I, PILF was able to

7    get prominent placement on the Drudge Report,

8    correct?

9        A.    Right.

10       Q.    And so for the same reasons, would you

11   agree that if PILF were able to eclipse the 5000

12   mark that too would be helpful to PILF's ability

13   to reach viewers of its report?

14       A.    Yes.

15             (Exhibit 27 marked for identification

16       and attached hereto.)

17   BY MR. TEPE:

18       Q.    The court reporter has just marked as

19   Exhibit 27 a document with the Bates number 1979.

20             Do you recognize this document?

21       A.    I've seen this before, yes.

22       Q.    Now, I believe you had testified

23   earlier that there were two statewide VERIS

24   reports applied to PILF by the Virginia

25   Department of Elections, correct?

1    A.    They gave us two reports, each for a

2    different period of time.

3    Q.    Correct.  And is this e-mail

4    reflecting the second report that you received?

5    No, strike that.  I'm sorry.

6          So this is -- the first e-mail is an

7    e-mail from the commissioner of the Virginia

8    Department of Elections March 28th, right?

9    A.    It looks that way, yes.

10   Q.    I'm sorry?

11   A.    Yes, it looks that way.  Yes.

12   Q.    And then that got up to a total of

13   4967 on the list, the VERIS report that you sent

14   over, right?

15   A.    4976.

16   Q.    You said good luck to eclipse the 5000

17   mark, correct?

18   A.    That's what the e-mail says.

19   Q.    That's what you said in your e-mail?

20   A.    Yes.

21   Q.    Why?

22   A.    I suppose because 5000 was a clean

23   number and larger number.  The more people that

24   appeared on these lists the higher the likelihood

25   that we might accomplish some of the reforms for

1    which we were advocating.

2         Q.    Such as?

3         A.    Such as changes to the federal

4    registration form or changes to data sharing,

5    better safeguards up front to prevent ineligible

6    people from registering.

7         Q.    So higher numbers would help PILF

8    accomplish the policy objectives that it had,

9    correct?

10        A.    Right.  If there is a higher number,

11   then it would draw more attention to the problem.

12        Q.    So just going back, when you received

13   the e-mail from Mr. Cortes, the statewide VERIS

14   report, this was for the period January 1, 2011,

15   through March 20, 2017.  Do you see that?

16        A.    I see that.

17        Q.    Okay.  And then so the second report

18   that you got was from March 21st through sometime

19   in May, right?

20        A.    Yeah.  I'll take your word for those

21   dates, but that sounds right.

22        Q.    And then you wrote back -- or actually

23   you forwarded this e-mail from Mr. Cortes to

24   Mr. Adams, Mr. Churchwell, and you said:  "At

25   long last the VERIS report from Cortes."

1    A.    Correct.

2    Q.    What did you mean by "at long last"?

3    A.    We had been trying to get this report

4  from him for a long time, and he finally provided

5  it.

6    Q.    This was the report that PILF wanted

7  to obtain, correct?

8    A.    Well, getting it from the State meant

9  that we could get all the jurisdictions at once.

10  So...

11    Q.    But whether it came from the

12  jurisdictions individually or the State, PILF

13  wanted this particular report, correct?

14    A.    Correct.  We wanted a VERIS report for

15  all jurisdictions in Virginia.  The only person

16  who had the ability to generate that I believe

17  was Mr. Cortes.

18    Q.    So you received that e-mail from

19  Mr. Cortes at 1:25 p.m., correct, on March 28th?

20    A.    Yes.

21    Q.    And by 1:57 p.m. you joked:  "Already

22  nabbed a descendant of George Washington"?

23    A.    Yes.

24    Q.    And you pasted a copy of a VERIS

25  report entry for a George Washington, Jr.  Is

1    that right?

2          A.      Yes.

3          Q.      And Mr. Adams responded:  "If false

4    positive, they will use this one against us."  Do

5    you see that?

6          A.      Yes.

7          Q.      And did you understand Mr. Adams by

8    saying "false positive" to mean someone who was

9    actually a citizen?

10          A.      I don't know what I understood at the

11   time.  That's one possibility, yes.

12          Q.      That's one possibility?

13          A.      Yes.

14          Q.      What's another possibility?

15          A.      I can't think of any others.

16          Q.      So it's fair to say that as of March

17   28, 2017, PILF recognized that the records that

18   they just received from the State of Virginia

19   possibly had citizens on the list?

20               MR. LOCKERBY:  Object to the form.

21               THE WITNESS:  No, I don't think we had

22          any way of -- to verify whether those people

23          were citizens.

24   BY MR. TEPE:

25          Q.      Well, you had phone numbers for

1    hundreds of people, right?

2         A.    I don't know about hundreds, but there

3    were phone numbers on some of the applications.

4         Q.    Right.  The applications that you

5    didn't want to look at before to determine how

6    many had phone numbers, right?

7              MR. LOCKERBY:  Object to the form.

8              THE WITNESS:  The applications you did

9         not ask me to look at, yes.

10   BY MR. TEPE:

11        Q.    No, I offered.  I said if you're not

12   sure how many of those applications have phone

13   numbers, please go right ahead and look, correct?

14             MR. LOCKERBY:  Object to the form.

15        Counsel is arguing with the witness.

16        Counsel could have asked the witness a

17        direct question directing him to look at

18        them.  Instead the question was "Would you

19        like to?"  Understandably the witness said

20        no.  No one likes to read through hundreds

21        of documents voluntarily.

22   BY MR. TEPE:

23        Q.    You had the phone numbers for at least

24   some of the people you had listed in the Alien

25   Invasion II.  Would you agree with that?

1    A.    Yes.

2    Q.    And PILF didn't call a single one of

3    those people, correct?

4    A.    Not to my knowledge.

5    Q.    You can put that document aside.

6         In October of 2017, PILF received a

7    letter from a U.S. citizen who complained about

8    being included in the Alien Invasion II report,

9    correct?

10    A.    Well, I would have to see the letter

11    to know if that date is correct.

12    Q.    Well, if you don't recall what the

13    date was, you do recall that PILF received a

14    letter from a U.S. citizen who complained about

15    being included in the Alien Invasion II report,

16    right?

17    A.    Well, I think the letter you're

18    referring to included the claim that the author

19    was a U.S. citizen.  Again, I don't have that

20    letter in front of me.

21    Q.    Do you recall that that was a Jean

22    Rosen?

23    A.    I recall the foundation received a

24    letter from Ms. Rosen.

25    Q.    Also PILF received along with that

Page 194

1    letter copies of her passport?

2        A.    That sounds right.

3        Q.    But you still considered her to just

4    be making a claim to citizenship?

5             MR. LOCKERBY:  Object to the form.

6             THE WITNESS:  That is what I recalled

7        ten seconds ago.

8    BY MR. TEPE:

9        Q.    Do you have a belief as to Ms. Rosen's

10   citizenship?

11            MR. LOCKERBY:  Object to the form.

12       Calls for opinion testimony from a lay

13       witness, and Ms. Rosen's citizenship is not

14       a belief.

15   BY MR. TEPE:

16       Q.    The question again is do you have a

17   belief?  It's a "yes" or "no" question.  Do you

18   have a belief as to Ms. Rosen's citizenship?

19       A.    Do I have a belief?

20       Q.    Yes.

21       A.    Yes.

22       Q.    And what is that belief?

23       A.    I have no reason to doubt her claim

24   that she's a citizen based on what she's provided

25   to us.

Page 195

1        Q.    And Ms. Rosen's voter registration

2   application was included in Exhibit 12 to the

3   Alien Invasion II initially, correct?

4        A.    Yes, inadvertently included.

5        Q.    And we had discussed earlier that

6   there was one version, that's the version that's

7   sitting in front of you, in which there are a

8   number of voter registration applications that

9   were subsequently pulled out, correct?

10        A.    Yes.

11              (Exhibit 28 marked for identification

12        and attached hereto.)

13   BY MR. TEPE:

14        Q.    The court reporter has marked what is

15   Exhibit 28, a document with the Bates number

16   9322.

17        A.    Yeah, I see that.

18        Q.    Do you recognize this document?

19        A.    Yes, I've seen this before, or most of

20   it I believe.

21        Q.    It begins on October 11, 2017, an

22   e-mail from Shawna Powell to you and

23   Mr. Churchwell.  Do you see that?

24        A.    I see that.

25        Q.    She wrote:  "See attached letter from

1    Jean Rosen regarding her name being used in the

2    VVA report."

3            Do you see that?

4        A.    Yes.

5        Q.    And then Mr. Adams responded to that,

6    asking you to do a nasty cease and desist

7    letter -- Strike that.

8            Mr. Adams responded to you the same

9    day with what he felt was the most important

10   takeaway from the letter.  Is that right?

11       A.    That's what it says, yes.

12       Q.    And the most important takeaway from

13   the letter, according to Mr. Adams, is that

14   Ms. Rosen had received a phone call from the

15   Southern Coalition for Southern Justice.  Is that

16   right?

17       A.    Social Justice, yes.

18       Q.    Social Justice, I'm sorry.

19            And then Mr. Adams asked you to do a,

20   quote, nasty cease and desist letter, close

21   quote, to SCSJ, correct?

22       A.    Yes, that's what he asked.

23       Q.    And the purpose of this letter was to

24   get SCSJ to stop talking to people who had been

25   listed in the Alien Invasion II report, correct?

1          MR. LOCKERBY:  Object to the form of

2     the question.

3          THE WITNESS:  That's not how I

4     understood it.

5  BY MR. TEPE:

6     Q.   Oh, you were okay with SCSJ speaking

7  to registrants listed in Alien Invasion II?

8     A.   No.  I meant your characterization of

9  what Mr. Adams was concerned with.

10    Q.   Well, what was Mr. Adams concerned

11 with?

12    A.   Not just that they were talking to

13 them, but that they were telling them certain

14 things about what we had done with their records

15 and names.

16    Q.   Like publishing them?

17         MR. LOCKERBY:  Object to the form.

18         THE WITNESS:  No.  I believe -- I

19    believe he was concerned with the fact that

20    they were calling people at random and

21    telling them that we had said that they had

22    committed crimes or things like that.

23 BY MR. TEPE:

24    Q.   Well, you don't actually know what

25 SCSJ told people that they spoke to, correct?

1      A.    Yes, I do, because Jean Rosen put it

2  in her letter.

3      Q.    Other than Ms. Rosen, are you aware of

4  the contents of communications between SCSJ and

5  people listed in the Alien Invasion II report?

6      A.    Specifically words they used?  No, I'm

7  not familiar.

8      Q.    Well, you're not familiar with any

9  language that they used in those communications,

10  correct?

11     A.    I'm familiar with what Jean Rosen said

12  she was told.

13     Q.    Right.  And I'm asking you about what

14  SCSJ spoke to with other people other than

15  Ms. Rosen.

16     A.    When you say "other people," people on

17  the VERIS reports?

18     Q.    People who were listed in the exhibits

19  to Alien Invasion II.

20     A.    No, I'm not privy to those

21  conversations.

22     Q.    Mr. Adams instructed you to defend the

23  report.  That's the Alien Invasion II report,

24  correct?

25     A.    I see that in his e-mail.

1    Q.    And he said:  "Make it clear the fault

2    is Virginia's."  Close quote.  I'm sorry.  "Make

3    it clear the fault of Virginia's."  Is that

4    correct?

5    A.    That's what it says.

6    Q.    And you, in a later e-mail, said that

7    you did a search for Exhibit 1 for Rosen and came

8    up with nothing.

9    A.    I did say that in this, yes.

10    Q.    So Ms. Rosen was another example along

11    with Ms. Gearhart of PILF including her voter

12    registration application in Exhibit 12 that

13    shouldn't have been there, correct?

14    A.    Yes.  The inclusion was inadvertent.

15         MR. LOCKERBY:  I'm going to object to

16         the form of the question, especially the

17         statement "shouldn't have been included."

18         Exhibit 12 is a footnote to a portion -- is

19         referenced in a footnote to a portion of the

20         report.

21         MR. TEPE:  I appreciate the speaking

22         objection.  I will --

23         MR. LOCKERBY:  I don't appreciate the

24         gratuitous comments about the objections.

25         MR. TEPE:  Well, I don't appreciate

Page 200

1          the speaking objections.

2               MR. LOCKERBY:  You said you appreciate

3          it and then you said you don't appreciate

4          it.  Those two are mutually exclusive.

5     BY MR. TEPE:

6          Q.    Ms. Rosen was one of the people

7     included in Exhibit 12 to Alien Invasion II,

8     correct?

9          A.    Her application for voter registration

10    was included inadvertently.

11         Q.    The same thing with Ms. Gearhart.  Her

12    registration application was included

13    inadvertently, as you would call it, in Exhibit

14    12?

15              MR. LOCKERBY:  Object to the form.

16              THE WITNESS:  Yes, under her previous

17         name.

18    BY MR. TEPE:

19         Q.    Now, at 3:09 p.m. you write:  "Her

20    application was provided to us," Exhibit 12,

21    which is not in the cancellation list, which is

22    Exhibit 1.  Correct?

23         A.    Right.

24         Q.    And then you wrote:  "Another layer of

25    error on ELECT's behalf."

1            Who is ELECT?

2       A.    The Department of Elections.

3       Q.    But that's not correct.  It wasn't an

4  error on the Virginia Department of Elections,

5  correct?

6       A.    I don't know completely their role,

7  but I would not say that it was directly an error

8  on their behalf.

9       Q.    Are you saying it was indirectly their

10 error?

11      A.    No.  In terms of the correspondence

12 that was sent to Ms. Rosen, I wasn't aware of who

13 had sent her that correspondence.

14      Q.    What are you talking about,

15 correspondence sent to Ms. Rosen?

16      A.    I believe she had been sent

17 correspondence from some election officials

18 regarding her citizenship.

19      Q.    Are you talking about a notice of

20 intent to cancel?

21      A.    Yes.

22      Q.    But Ms. Rosen's registration was not

23 canceled, correct?

24           MR. LOCKERBY:  Object to the form.

25      Assumes facts not in evidence and in fact is

Page 202

1       contrary to the evidence.

2            MR. TEPE:  Again --

3            THE WITNESS:  I'm not sure --

4            MR. TEPE:  You can object to form and

5       not testify.

6            MR. LOCKERBY:  I didn't testify.

7            MR. TEPE:  You just did testify.

8            MR. LOCKERBY:  I objected.

9            MR. TEPE:  You just testified to what

10      you believe to be facts in evidence.

11           MR. LOCKERBY:  Counsel has an

12      obligation not to ask questions for which

13      there is no factual basis.  And in fact

14      there is evidence that at one point

15      Ms. Rosen's registration was canceled.  The

16      entire -- the premise of the question is

17      wrong.  And by simply objecting that it

18      assumes facts not in evidence, that is not

19      testimony.

20 BY MR. TEPE:

21      Q.   Mr. Johnson, in your e-mail dated

22 October 11th at 3:09 p.m. you say with respect to

23 Ms. Rosen, she's not in the cancellation list,

24 correct?

25      A.   Yes.

1      Q.    And the cancellation list was Exhibit

2   1 to Alien Invasion II, correct?

3      A.    Yes.

4      Q.    Her application was provided and

5   published as part of Exhibit 12, correct?

6      A.    Yes.

7      Q.    At the date that Alien Invasion II was

8   published, did PILF have any basis to believe

9   that her registration had been canceled?

10     A.    I think we believed that the inclusion

11  of her application indicated that she was someone

12  who had been canceled previously.

13     Q.    But as we saw with the correspondence

14  with Mr. Latham from York County, he sent you

15  copies of notices of intent to cancel, correct?

16     A.    Yes.

17     Q.    He also sent you copies of

18  affirmations of citizenship, correct?

19     A.    Correct.

20     Q.    And it's Mr. Latham's correspondence

21  with PILF that was the basis for the records that

22  were included, at least with respect to York

23  County individuals, in Exhibit 12, correct?

24     A.    I believe that Mr. Latham -- what I

25  believe Mr. Latham had sent us was a VERIS report

1    of everyone who had been canceled for citizenship

2    reasons and copies of their applications.

3        Q.   On November -- November, the e-mail

4    chain, remember there were four e-mails in

5    November?

6        A.   Yes.

7        Q.   Mr. Latham didn't send any VERIS

8    report, correct?

9        A.   No, not on that day.

10       Q.   And Ms. Rosen didn't appear on any

11   VERIS report that was sent to PILF, correct?

12       A.   Not that I'm aware of.

13       Q.   Do you recall how many voter

14   registration applications PILF pulled from

15   Exhibit 12?

16       A.   Not -- not the exact number.

17       Q.   Does 51 sound right?

18       A.   That sounds right.

19            (Exhibit 29 marked for identification

20       and attached hereto.)

21   BY MR. TEPE:

22       Q.   The court reporter has handed you

23   what's been marked Exhibit 29 with Bates number

24   17930.  Do you see that?

25       A.   I see that.

1      Q.    This is a long e-mail chain involving
2  complaints that PILF had received from people
3  listed in Alien Invasion II.  Is that right?
4      A.    Could you repeat that again?
5      Q.    I'm saying this is a long e-mail chain
6  involving complaints that PILF -- this is a long
7  e-mail chain involving a discussion about
8  complaints PILF had received from people listed
9  in the Alien Invasion report, correct?
10      A.    At least one complaint, Ms. Rosen's.
11      Q.    I really just want to ask you one
12  thing.  On the first page, Ms. Powell's e-mail
13  November 3, 2017, at 11:36 a.m., do you see that?
14      A.    And 48 seconds, yes.
15      Q.    She says:  "I just talked to Noel and
16  he thinks we should err on the side of caution
17  and pull all 51 voter apps from Exhibit 12.  Do
18  you have issue with that?"
19            Do you see that?
20      A.    Yes.
21      Q.    Do you recall having a conversation
22  with Ms. Powell in which you expressed that
23  opinion?
24      A.    Yes, I do.
25      Q.    I'm sorry, yes?

1      A.     Yes, I do.

2      Q.     You can put that document aside.

3             Now, when PILF pulled those 51 voter

4    registration applications, they replaced Exhibit

5    12 on the website with a new version, correct?

6    Exhibit 12.

7      A.     Right, a new version that excluded

8    those 51 apps.

9             (Exhibit 30 marked for identification

10           and attached hereto.)

11   BY MR. TEPE:

12     Q.     The court reporter has just marked as

13   Exhibit 30 a document.

14            Do you recognize this document?

15     A.     It looks like a printout of a page of

16   our website.

17     Q.     And in particular, this is the page

18   that houses the exhibits to Alien Invasion II?

19     A.     That's right.

20     Q.     And unfortunately the printout doesn't

21   have the date.  Sometimes it does.  I'll

22   represent that this was printed out yesterday.

23     A.     Okay.

24     Q.     If you go to the second page, there is

25   an asterisk after Exhibit 12.

1      A.     Yeah, I see that.

2      Q.     Voter application is revised, then an

3   asterisk?

4      A.     Yes.

5      Q.     And then the asterisk below says:

6   "Exhibit 12 was updated after the discovery that

7   some records were erroneously disclosed by the

8   Commonwealth of Virginia which reflected

9   individuals incorrectly categorized in the

10  official voter registration archives as being

11  declared noncitizens.  Those records were

12  removed."

13          Do you see that?

14     A.     I see that.

15     Q.     That statement is incorrect, isn't it?

16     A.     I think it reflected our belief at the

17  time.  It is -- it might be imprecise.

18     Q.     It might be?

19     A.     I believe at the time it was written

20  we believed that the applications we had received

21  belonged to those whose registrations had been

22  canceled under the category declared noncitizen,

23  which is why the -- why the language after the

24  asterisk says what it says.

25     Q.     Well, we just looked at an exhibit in

1    which you wrote that Ms. Rosen was not listed in

2    the cancellation report, correct?

3         A.    Correct.

4         Q.    And that's the only report or record

5    that PILF received from the Virginia Department

6    of Elections that it used in Alien Invasion II,

7    correct?

8         A.    I'm sorry.  Repeat that question.

9         Q.    The only record that PILF received

10   from the Virginia Department of Elections which

11   it used in Alien Invasion II was the VERIS

12   report, correct?

13        A.    I believe so, yes.

14        Q.    And in the exhibit we just looked at

15   you stated that Ms. Rosen's name was not in the

16   VERIS report that was Exhibit 1 to Alien Invasion

17   II, correct?

18        A.    Correct.

19        Q.    And also Ms. Focht, now Gearhart, her

20   name was not listed there either?

21        A.    Correct.

22        Q.    The voter registration applications

23   that you received did not come from the Virginia

24   Department of Elections, correct?

25        A.    Correct.

1      Q.    Those come from the local

2  jurisdictions, correct?

3      A.    Correct.

4      Q.    So it is not correct that PILF

5  received, quote, "some records that were

6  erroneously disclosed by the Commonwealth of

7  Virginia," close quote?

8          MR. LOCKERBY:  Object to the form of

9      the question.

10          THE WITNESS:  Insofar as each

11      jurisdiction makes up the Commonwealth of

12      Virginia, it is correct.  It does not say

13      the Department of Elections.  It is a

14      commonwealth, after all.

15  BY MR. TEPE:

16      Q.    So the reader is supposed to

17  understand from this sentence that when you say

18  Commonwealth of Virginia you meant York County?

19      A.    No, they would not understand York

20  County from this language.  But they would

21  understand that they were disclosed by someone in

22  the commonwealth.

23      Q.    And you said that these records

24  reflected individuals incorrectly categorized in

25  the official voter registration archive as being

1    declared noncitizens.  Do you see that?

2         A.    I see that.

3         Q.    That's not correct either?

4               MR. LOCKERBY:  Object to the form.

5               THE WITNESS:  Is that a question?

6    BY MR. TEPE:

7         Q.    Yes.

8         A.    What is the question?

9         Q.    Isn't it true that the statement here

10   that the exhibits -- the voter registration --

11   Strike that.

12              Isn't it true that the voter

13   registration records that were previously in

14   Exhibit 12 were not individuals incorrectly

15   characterized by the official voter registration

16   archive as being declared noncitizens?  Is that

17   correct?

18        A.    Again, it's imprecise.  It is -- it

19   was -- my understanding now is that the records

20   we had received, which included Ms. Rosen and

21   Ms. Gearhart's application, were records

22   belonging to people whose registrations had been

23   canceled for citizenship reasons.  It may be

24   imprecise to say they were categorized in the

25   official voter registration archive as being

1   declared noncitizens, with "declared noncitizens"

2   being in quotations.

3        Q.    Because she wasn't actually on that

4   list that --

5             MR. LOCKERBY:  Object to the form.

6   BY MR. TEPE:

7        Q.    -- that used the term "declared

8   noncitizen"?

9             MR. LOCKERBY:  Reference to that list

10       is unclear.

11            THE WITNESS:  Who is "she"?

12  BY MR. TEPE:

13       Q.    Ms. Rosen.

14       A.    She was not on the VERIS reports we

15  received.

16       Q.    And I believe none of the other 50

17  people whose applications were pulled from

18  Exhibit 12, correct?

19       A.    That's my understanding.

20       Q.    Do you believe this disclaimer on

21  PILF's website should be changed?

22            MR. LOCKERBY:  Object to the form.

23            THE WITNESS:  I think it could be more

24       precise.

25  BY MR. TEPE:

1      Q.    How so?

2      A.    I think it might say that -- perhaps

3  reflect our understanding as what the records we

4  received indicated rather than they were

5  categorized in the official archive.

6      Q.    After the complaint in this

7  litigation, the litigation that you're sitting

8  here today for, after that complaint was filed,

9  do you recall Mr. Vanderhulst commenting that he

10  was surprised the lawsuit hadn't happened sooner?

11      A.    I think I recall that, yes.

12      Q.    A lawsuit or an IRS complaint or

13  something?

14          MR. LOCKERBY:  Object to the form.

15          THE WITNESS:  The communication sounds

16      familiar.

17          MR. LOCKERBY:  Would this be a good

18      time to take a break before we launch into

19      other exhibits?

20          MR. TEPE:  It will be real quick.

21          (Exhibit 31 marked for identification

22      and attached hereto.)

23  BY MR. TEPE:

24      Q.    The court reporter has just marked as

25  Exhibit 31 an e-mail with the Bates 11327.

1          Do you see that?

2     A.    Yes.

3     Q.    And what do you recognize this to be?

4     A.    The correspondence from

5 Mr. Vanderhulst you were just describing.

6          MR. TEPE:  You can put that document

7     aside and we can take a break.

8          THE VIDEOGRAPHER:  We are going off

9     the record.  The time is 2:59 p.m.

10         (Recess taken.)

11         THE VIDEOGRAPHER:  We are back on the

12    record.  The time is 3:13 p.m.

13 BY MR. TEPE:

14    Q.    Mr. Johnson, do you know who Chris

15 Marston is?

16    A.    I do.

17    Q.    Who is he?

18    A.    I believe he is with the Republican

19 Party of Virginia.

20    Q.    Do you recall him helping you appear

21 before the Privileges and Elections Committee

22 after publication of Alien Invasion I?

23    A.    I remember some communications with

24 him preceding that.  I don't recall his -- what

25 you refer to as helping.  I don't remember it

Page 214

1    like that.  But...

2              (Exhibit 32 marked for identification

3        and attached hereto.)

4    BY MR. TEPE:

5        Q.    The court reporter has just handed you

6    what's been marked as Exhibit 32, a document with

7    Bates number 4883.  Do you see that?

8        A.    I see that.

9        Q.    Do you recognize this document?

10       A.    Yeah, I've seen it before.

11       Q.    And it's an e-mail chain from October

12   of 2016.  And it concerns in part testimony that

13   you were going to provide to the general

14   assembly.  Is that right?

15       A.    Yes.

16       Q.    But the e-mail begins on October 8th

17   with an e-mail from Mr. Marston to Mr. Adams with

18   the subject line "jury questionnaires."

19       A.    I see that.

20       Q.    And he writes to Christian:  "You're

21   doing great work on the noncitizens on the voter

22   rolls.  Keep up the pressure."

23              Do you see that?

24       A.    Yes.

25       Q.    "I'm trying to round up allies.  We've

1   got a joint House session committee meeting next

2   week on election readiness and the registration

3   list.  I'm working to be sure we get them briefed

4   up on your report and the issue."

5          Do you see that?

6   A.    I see that there.

7   Q.    And is that referring to the committee

8   meeting that you ultimately testified to?

9   A.    Yes, I think that's what he's

10  referring to.

11  Q.    He also said:  "I know you FOIA'd the

12  Alexandria clerk for any communications with the

13  registrar or EB regarding request for jury duty."

14         Do you see that?

15  A.    Yes.

16  Q.    "Have you ever FOIA'd to actually get

17  the disqualification list with the reasons for

18  disqualification?"

19         Do you see that?

20  A.    I see that he says that, yes.

21  Q.    And then he says:  "If we did that, we

22  could go challenge registrations before the books

23  closed."

24         Do you see that?

25  A.    Yes.

1      Q.    "I wondered if you've already done it

2    and already checked out the law and likely

3    responses."

4      A.    I see that.

5      Q.    Do you know what he's talking about

6    with respect to a FOIA to the Alexandria clerk?

7      A.    I believe I do, yes.

8      Q.    And what do you understand that to be?

9      A.    At some point in time we sent FOIA

10   requests to various jury clerks asking for data

11   regarding people who disqualified themselves for

12   jury duty.

13     Q.    What do you mean by disqualified

14   themselves for jury duty?

15     A.    As I understand it, when you are asked

16   to appear on a jury you're expected to answer

17   certain questions, and depending on how you

18   answer them, you may be disqualified from serving

19   on a jury.  And some of those reasons are --

20   would also disqualify you from registering to

21   vote.

22     Q.    Was PILF looking for the

23   disqualification list for jury duty?

24     A.    I believe we asked for records that

25   would reflect people who excused themselves from

1  jury duty.  I don't know if we specifically asked

2  for a list.

3      Q.    Who would know if you actually asked

4  for a list of those disqualified from jury duty?

5      A.    Well, I think there are records of the

6  requests themselves that have been produced to

7  you.

8      Q.    Have you had personally any

9  discussions with Chris Marston about jury

10 questionnaire data?

11     A.    Just me and him?

12     Q.    Yes.

13     A.    Not that I recall.

14     Q.    What about with you, him and other

15 people involved?

16     A.    Nothing specific is coming to mind,

17 but I can't say that there aren't communications.

18     Q.    So if I understand your testimony,

19 there may be communications involving Chris

20 Marston, yourself and others with respect to

21 obtaining jury disqualification lists?

22     A.    There may be.  The exhibit you just

23 showed me contains a chain in which it's being

24 discussed, so whether there are others like this

25 I can't say for sure.

1      Q.    Again, the first paragraph of

2  Mr. Marston's e-mail to Mr. Adams talks about,

3  I'm assuming, Alien Invasion I.  Would you agree

4  with that?

5      A.    Based on the timing, I think that's

6  what he's referring to.

7      Q.    "Make sure we get them" -- I'm

8  assuming the general assembly folks -- "briefed

9  up on your report."

10          Do you see that?

11     A.    Yeah.  It sounds like he's referring

12  to the joint House/Senate committee.

13     Q.    So he's working to be sure that the

14  joint House/Senate committee members are briefed

15  on your report.  Is that report the Alien

16  Invasion I report?

17     A.    I think that's what he's referring to,

18  yes.

19     Q.    Do you know why Mr. Marston was trying

20  to brief members of the joint House/Senate

21  committee on the Alien Invasion I report?

22     A.    I don't.

23     Q.    You can put this document aside.

24          Earlier you testified that, generally

25  speaking, you were supervising the effort to

1    produce and publish the Alien Invasion reports,

2    correct?

3            MR. LOCKERBY:  Object to the form.

4            MR. TEPE:  What's the basis for the

5        objection?

6            MR. LOCKERBY:  It's been asked and

7        answered.

8            MR. TEPE:  It's just a segue question.

9            MR. LOCKERBY:  Well, it's still

10       inappropriate.  The transcript reflects what

11       he said.

12           THE WITNESS:  I can't say that's my

13       exact testimony.  That sounds right.

14   BY MR. TEPE:

15       Q.    There was an effort to collect records

16   from individual localities for the first Alien

17   Invasion report, correct?

18       A.    Jurisdictions.

19       Q.    Jurisdictions?

20       A.    Yes.

21       Q.    As well as for the second Alien

22   Invasion report, correct?

23       A.    Yes.

24       Q.    Now, PILF coordinated its efforts to

25   collect these election records from these

Page 220

1    jurisdictions with the Republican Party of

2    Virginia, correct?

3            MR. LOCKERBY:  Object to the form.

4            MR. TEPE:  What's the basis for the

5        objection?

6            MR. LOCKERBY:  It's vague, including

7        the use of the term "coordinate."

8            THE WITNESS:  I would not say we

9        coordinated our collection of records with

10       them.  I have some recollection of them

11       having requested similar records.

12   BY MR. TEPE:

13       Q.   And their requests for similar records

14   was suggested by Mr. Adams, correct?

15       A.   I don't know if that's true or not.

16           (Exhibit 33 marked for identification

17       and attached hereto.)

18   BY MR. TEPE:

19       Q.   The court reporter has handed you a

20   document marked as Exhibit 33 with the Bates

21   number 9399.

22           Do you recognize this document?

23       A.   I think I've seen it before.

24       Q.   It's an e-mail chain that begins with

25   an e-mail from Shawna Powell dated November 16,

1  2016 to you.  Is that right?

2      A.    Yes.

3      Q.    The subject line is "VA Stafford and

4  Roanoke"?

5      A.    Correct.

6      Q.    Is this referencing the effort to

7  collect records from Stafford and Roanoke

8  Counties for the Alien Invasion II report?

9      A.    Yes, I believe so.

10      Q.    Ms. Powell writes:  "Regarding

11  Stafford, called 11/16 to F/U..."  Is that follow

12  up, do you think?

13      A.    I hope so.

14      Q.    "...on the e-mail sent 11/15.  Greg

15  Riddlemoser stated that RPV," Republican Party of

16  Virginia, "came to his office and went through

17  all the records so he considers this matter done.

18  I explained we are not working with RPV; however,

19  he stated that they" -- "said that they were

20  working with them."

21          Do you see that?

22      A.    I see that.

23      Q.    You forwarded this to Mr. Adams, and

24  you asked:  "Any reason RPV would have asked for

25  the same records?"

1             Do you see that?

2        A.    Yes.

3        Q.    And Mr. Adams wrote back:  "Yes.  I

4   suggested it.  I believe swarming is better than

5   lone attacks.  That's how the left plays."

6             Do you see that?

7        A.    I see that.

8        Q.    Do you recall having any follow-up

9   conversation with Mr. Adams regarding his

10  suggestion to the Republican Party of Virginia?

11       A.    No, I don't recall any further

12  communications.

13       Q.    Is it your understanding that making a

14  request of jurisdictions for election records are

15  attacks?

16       A.    No.

17       Q.    Are you aware of other instances

18  besides Stafford in which the Republican Party of

19  Virginia was asking for the same records that

20  PILF was asking for?

21       A.    No, I don't recall any.  Or have

22  knowledge of any.

23       Q.    You can put that document aside.

24             Do you recall Mr. Adams reaching out

25  to the Republican Party of Virginia to get

1    addresses of Virginia congressional district

2    chairs for the Republican Party to send copies of

3    the Alien Invasion II report?

4         A.    I do not recall that.

5              (Exhibit 34 marked for identification

6         and attached hereto.)

7    BY MR. TEPE:

8         Q.    The reporter just handed you what's

9    been marked as Exhibit 34, a document with the

10   Bates number 475358.

11             Do you see that?

12        A.    Yes.

13        Q.    Do you recognize this document?

14        A.    Only vaguely.

15        Q.    At the bottom Mr. Adams wrote on

16   May 26, 2017:  "Chris, we want to snail mail a

17   copy of the Alien 2.0 report to the Virginia

18   congressional district chairs."

19             Do you see that?

20        A.    Uh-huh.

21        Q.    Was that a yes?

22        A.    Yes.

23        Q.    And these are -- do you know what

24   Virginia congressional district chairs are?

25        A.    I believe it's the party chairs in

1    each congressional district.

2        Q.    And then he responded:  "Attached are

3    the RPV leadership roster.  The district chairs

4    are at the top."

5             Do you see that?

6        A.    He attached it.

7        Q.    And then this is forwarded to you?

8        A.    Oh, I see.  Yes, it was forwarded to

9    me and two other people.

10       Q.    Do you recall the mailing list that we

11   looked at earlier that Virginia congressional

12   district chairs were included on the mailing

13   list?

14       A.    I do.

15       Q.    Did you mail Alien Invasion II to

16   Democratic Party of Virginia officials?

17       A.    Are you asking me?

18       Q.    Did PILF mail, to your knowledge,

19   Alien Invasion II to Democratic --

20       A.    I don't recall whether we did.

21       Q.    PILF is barred from endorsing a

22   political party or candidate.  Is that right?

23             MR. LOCKERBY:  Object to the form.

24             THE WITNESS:  I think the IRS rules

25        prohibit partisan intervention, and that

1      might include endorsement.

2   BY MR. TEPE:

3      Q.    But in your reports you try and tiptoe

4   around that, correct?

5           MR. LOCKERBY:  Object to the form of

6        the question.

7           THE WITNESS:  I'm not sure I

8        understand the question.

9           (Exhibit 35 marked for identification

10       and attached hereto.)

11  BY MR. TEPE:

12     Q.    The court reporter has marked what is

13  Exhibit 35, a document with Bates number 51869.

14          Do you see that?

15     A.    Yes.

16     Q.    Do you recognize this document?

17     A.    Yeah, I think I've seen this.

18     Q.    It appears to be a draft of Alien

19  Invasion II, is that right, attached to this

20  e-mail?

21     A.    Yes, it's a draft.

22     Q.    So you e-mailed Mr. Adams and

23  Mr. Churchwell a draft on April 28, 2017.  Is

24  that right?

25     A.    Yes.

Page 226

1       Q.    You wrote:  "One thing to keep in

2  mind, there is a new section on upcoming

3  elections in Virginia.  We can't endorse any

4  candidate or party, so I attempted to tiptoe

5  around it.  McAuliffe is not a candidate, as you

6  probably know, so he's fair game."

7            Do you see that?

8       A.    I see that.

9       Q.    What did you mean by this paragraph?

10           MR. LOCKERBY:  Object to the form.

11           THE WITNESS:  I believe we wanted to

12      mention the effect that ineligible

13      registration and voting can have on

14      elections.  Knowing that we couldn't endorse

15      candidates or parties, it required us to

16      steer clear of that while informing the

17      reader that there were elections on the

18      horizon in Virginia.

19  BY MR. TEPE:

20      Q.    Was, to your knowledge, PILF trying to

21  have an impact on the 2017 Virginia elections?

22           MR. LOCKERBY:  Object to the form.

23           THE WITNESS:  No.

24  BY MR. TEPE:

25      Q.    Do you recall in PILF's effort to

1   obtain I believe the VERIS reports, PILF sued the

2   registrars of Chesterfield and Manassas?

3        A.    I do recall that, yes.

4        Q.    Do you recall if any amici appeared in

5   favor of PILF's position?

6        A.    Yes, I do recall.

7        Q.    So who was an amici you're recalling?

8        A.    I believe a brief was filed by the

9   Republican Party of Virginia, or a more local

10  chapter of it; I'm not sure which one.

11       Q.    Did you work on a report called Safe

12  Spaces?

13       A.    I did.

14       Q.    Just generally, what was the purpose

15  of issuing the Safe Spaces report?

16       A.    To educate about the impact of

17  sanctuary policies on voter registration and

18  voting.  Sanctuary city policies.

19       Q.    And what did PILF believe to be the

20  impact of sanctuary city policies on voter

21  registration?

22       A.    We investigated whether sanctuary city

23  policies had an impact on the prevalence of

24  registration by ineligible noncitizens.

25       Q.    Well, did you examine the impact or

Page 228

1    simply report on the number of purported

2    noncitizens registered in sanctuary city

3    locations?

4              MR. LOCKERBY:  Object to the form.

5              THE WITNESS:  That was part of the

6         report, was the data.

7    BY MR. TEPE:

8         Q.    Safe Spaces was published by PILF

9    after this lawsuit was filed.  Is that correct?

10        A.    I believe that's correct.

11              (Exhibit 36 marked for identification

12        and attached hereto.)

13   BY MR. TEPE:

14        Q.    The court reporter has marked what is

15   Exhibit 36, a document with the Bates number

16   beginning 250.

17              Do you see that?

18        A.    I see that.

19        Q.    Do you recognize this document?

20        A.    Yeah, it looks like an e-mail and a

21   draft copy of the Safe Spaces report.

22        Q.    And so Mr. Adams e-mailed on August

23   15, 2018, a draft of his edits to the report.  Is

24   that correct?

25        A.    Yes.

1      Q.    That was sent to you and

2  Mr. Churchwell?

3      A.    Correct.

4      Q.    And just flipping through the report,

5  there are a bunch of comments with CA and then a

6  number in the comment bubble.  Do you see that?

7      A.    I see those.

8      Q.    Does that refer to Christian Adams?

9      A.    Yes.

10      Q.    Can you flip to the Bates-numbered

11  page 268.

12      A.    I'm looking at 268.

13      Q.    There is a paragraph second from the

14  top that originally read before edits:  "Virginia

15  currently contains three sanctuary jurisdictions,

16  all of which disclosed records of noncitizens

17  previously registered and voting there."

18            Did I read the initial draft correct?

19      A.    I think the last word says therein,

20  but yes, that is correct.

21      Q.    Therein.

22            Mr. Adams crossed that out and

23  replaced "noncitizens previously registered and

24  voting therein" to "registrants canceled for

25  citizenship defects."

1          Do you see that?

2     A.    I see that.

3     Q.    Do you know why he made that edit?

4          MR. LOCKERBY:  Object to the form.

5     Lack of foundation.

6 BY MR. TEPE:

7     Q.    Let's go -- hanging off this edit is a

8 comment, comment number 18.  Do you see that?

9     A.    I do.

10    Q.    And Mr. Adams appears to have written:

11 "How is it that after we are involved in

12 litigation that we are still referring to these

13 Virginia cases as 'noncitizens'?  It defies

14 explanation.  On numerous occasions and in

15 numerous places I have explicitly said they are

16 registrations removed for citizenship defects or

17 registrants canceled for reasons of

18 noncitizenship.  We have to use the actual terms

19 and not make assumptions they are necessarily

20 aliens.  The continuing improper terminology

21 contributed to us losing the motion to dismiss

22 because the court ruled that these subsequent

23 statements were re-publications with a statute of

24 limitations."

25          Did I read that comment correctly?

1    A.    Yes, you did.

2    Q.    Would you agree with Mr. Adams that

3  calling the individuals listed on the records

4  that you published in Alien Invasion II as

5  noncitizens was improper terminology?

6         MR. LOCKERBY:  Object to the form.

7         THE WITNESS:  Well, at the time

8         Mr. Adams wrote this comment, as you have

9         mentioned, this lawsuit had begun in which

10        it was in dispute -- or the terminology used

11        was part of the basis for the complaint.  I

12        think that is what Mr. Adams is concerned

13        about here.  His comment otherwise speaks

14        for itself.

15  BY MR. TEPE:

16   Q.    The numbers that are listed here for

17  Fairfax County, Chesterfield County, Arlington

18  County, do these come from VERIS reports?

19   A.    Yes, they do.

20   Q.    Were they updated reports that you

21  received from jurisdictions?

22   A.    I believe they were, yes.

23   Q.    And in the final publication of Safe

24  Spaces, PILF doesn't call the individuals

25  identified on the VERIS reports noncitizens,

Page 232

1    correct?

2         A.    I don't believe so.

3         Q.    You can put that document aside.

4               (Exhibit 37 marked for identification

5         and attached hereto.)

6    BY MR. TEPE:

7         Q.    The court reporter has just marked and

8    handed you what is Exhibit 37 with Bates number

9    3971.

10              Do you see that?

11        A.    I do see that.

12        Q.    What do you recognize this document to

13   be?

14        A.    It looks like an e-mail attaching a

15   copy of my written testimony before the

16   Privileges and Elections Committee of the

17   Virginia general assembly.

18        Q.    Why did you testify before this

19   committee?

20        A.    I believe Mr. Adams was unavailable

21   and asked me to go.

22        Q.    Why did anyone from PILF testify

23   before this committee?

24        A.    I believe we were invited to it.

25        Q.    And do you know why PILF was invited

1   to it?

2        A.    I think our research was germane to

3   the purpose of the hearing.

4        Q.    Do you recall questions arising during

5   the hearing from members of the committee

6   questioning the assertions in Alien Invasion I?

7        A.    I recall some comments in that regard,

8   yes.

9        Q.    And do you recall these committee

10  members stating that certain individuals listed

11  in Alien Invasion I were not noncitizens?

12       A.    I'm not sure if that's an accurate

13  recitation of what was stated, but I remember

14  something along those lines.

15       Q.    Well, what do you recall?

16       A.    I recall a committeewoman I believe

17  claiming that she knew of certain individuals

18  listed in the report that were not removed for

19  citizenship reasons.

20       Q.    Did you follow up with this

21  committeewoman?

22       A.    I don't believe so.

23       Q.    Why not?

24       A.    I don't recall.

25       Q.    Is it fair to say that she was

1   suggesting that there was some inaccuracy in

2   Alien Invasion I?

3        A.    I think more directly she was

4   asserting that there was some inaccuracy in the

5   VERIS report attached to the report.

6        Q.    That you relied on in Alien Invasion

7   I, correct?

8        A.    Correct.

9        Q.    But you don't recall PILF following up

10  with the committeewoman regarding her concerns?

11       A.    No, I don't recall that.

12       Q.    Is there anything else that you recall

13  from that committee hearing?

14       A.    Yes.

15       Q.    What do you recall?

16       A.    I recall that Reagan George gave

17  testimony.  I recall that Edgardo Cortes gave

18  testimony.  Various general registrars in the

19  commonwealth gave testimony.  I recall there were

20  other members of the public that gave testimony.

21       Q.    Do you recall if Mr. George had any

22  prepared testimony?

23       A.    Yes, he did.

24       Q.    Do you have a copy of that testimony?

25       A.    Yes, I think he provided us with one.

1          Q.    Do you know if PILF still has a copy

2     of that?

3          A.    I believe that we do.

4          MR. TEPE:  Counsel, I don't believe

5     we've received that.

6          MR. LOCKERBY:  Pardon me?

7          MR. TEPE:  I don't believe we have

8     received this testimony of Mr. George that

9     Mr. Johnson suggested may be in PILF's

10    possession.

11         MR. LOCKERBY:  I don't know whether

12    we've produced it or whether in fact PILF

13    has it or whether it's responsive, but we

14    can look.

15         MR. TEPE:  I'm just noting it for the

16    follow-up.

17    BY MR. TEPE:

18         Q.    Do you recall the content of

19    Mr. George's testimony by chance?

20         A.    No, I don't remember the specifics.

21         Q.    Do you recall the content of any of

22    the registrars' testimony?

23         A.    Yes.

24         Q.    What do you recall?

25         A.    I recall that Larry Haake testified

Page 236

1  and that he, I believe, addressed sort of the

2  subject matter of the Alien Invasion report

3  insofar as the registration of noncitizens.

4      Q.   Do you recall anything else

5  specifically?

6      A.   No.

7          MR. TEPE:  Do you want to go off the

8      record for five minutes?

9          MR. LOCKERBY:  Sure, absolutely.

10         THE VIDEOGRAPHER:  We are going off

11     the record.  The time is 3:54 p.m.

12         (Recess taken.)

13         THE VIDEOGRAPHER:  We are back on the

14     record.  The time is 4:00 p.m.

15  BY MR. TEPE:

16     Q.   Mr. Johnson, before the Virginia

17  Department of Elections sent PILF statewide VERIS

18  reports, the Virginia Department of Elections

19  sent you a different report generated from VERIS.

20  Is that correct?

21     A.   They sent us a different report.  They

22  did not tell us how it was generated, so I cannot

23  say it was generated from VERIS.

24     Q.   And sometimes that's referred to as

25  the custom report?

1    A.    Yes, that's how Mr. Cortes referred to

2  it.

3          (Exhibit 38 marked for identification

4    and attached hereto.)

5  BY MR. TEPE:

6    Q.    The court reporter has just handed

7  over what's been marked as Exhibit 38, a document

8  beginning Bates number 16737.

9          Do you recognize this document?

10    A.    This looks like the e-mail from

11  Mr. Cortes transmitting the so-called custom

12  report along with a copy of that report.

13    Q.    And so on September 30, 2016,

14  Mr. Cortes e-mails you and Ms. Powell, correct?

15    A.    Yes.

16    Q.    And he begins his e-mail by stating:

17  "On September 16, 2016, the Department of

18  Elections offered to create a customized report

19  containing information available in our statewide

20  voter registration system related to

21  correspondence sent to potential noncitizens by

22  local general registrars."

23          Do you see that?

24    A.    I do.

25    Q.    The statewide voter registration

1   system, that's VERIS, correct?

2        A.    That's how I understand it.

3        Q.    And then below he lists the fields

4   that are included in the attached report,

5   correct?

6        A.    Correct.

7        Q.    And a number of these fields are the

8   same fields that appear in what we've been

9   calling the VERIS report before, correct?

10        A.    Some of the information is the same,

11   yes.

12        Q.    Right.  And that's the cancellation

13   report that's been published in the Alien

14   Invasion reports, correct?

15        A.    The VERIS report is, yes.

16        Q.    Right.  And so both the VERIS report

17   and this custom report contains a registrant's

18   last name, right?

19        A.    Yes.

20        Q.    First name?

21        A.    Yes.

22        Q.    Voter registration ID?

23        A.    If you mean voter ID number.

24        Q.    Yes.

25        A.    Yes.

1      Q.    Registration address?

2      A.    Yes.

3      Q.    One difference is that the custom

4 report has a field for current registration

5 status?

6      A.    Yes.

7      Q.    But the VERIS reports that were

8 published in the Alien Invasion reports don't

9 have that field, correct?

10     A.    Correct.

11     Q.    And then two other fields listed here

12 are the date noncitizen correspondence was sent

13 and the date that they had for a response being

14 received, if at all?

15     A.    Yes.

16     Q.    Now, your first reaction to receiving

17 this report was that it was incredibly helpful --

18 excuse me, incredibly useful.  Is that right?

19     A.    I don't recall what my immediate

20 reaction was.

21          (Exhibit 39 marked for identification

22     and attached hereto.)

23 BY MR. TEPE:

24     Q.    The court reporter has marked as

25 Exhibit 39 a document with the Bates number 5276.

1   Do you see that?

2       A.      I see it.

3       Q.      Do you recognize this document?

4       A.      Yes, I've seen this before.

5       Q.      And so this is an e-mail from you

6   forwarding the September 30 e-mail and custom

7   report sent by Mr. Cortes?

8       A.      Correct.

9       Q.      And you sent this to Mr. Adams?

10      A.      Yes.

11      Q.      And you wrote:  "The data, however,

12  looks incredibly useful."

13              Do you see that?

14      A.      Yes.

15      Q.      "If I'm reading this correctly, I

16  don't see how this is any different than the

17  lists we asked for originally."

18              Do you see that?

19      A.      Yes.

20      Q.      And the lists you had asked for

21  originally was the VERIS report --

22      A.      Yes.

23      Q.      -- that was published in Alien

24  Invasion I and Alien Invasion II?

25      A.      Yes.

1    Q.    "Some registrations" -- the e-mail of

2  yours continues:  "Some registrations indicated

3  the voters active but most note as canceled."

4          Do you see that?

5    A.    Yes.

6    Q.    Did PILF end up accepting this report

7  from Mr. Cortes as being sufficient to satisfy

8  your requests?

9    A.    No, we did not.

10   Q.    Here you say that the data looks

11 incredibly useful.  Did you change your mind?

12   A.    I don't recall if I changed my mind.

13   Q.    Fair enough.

14         You wrote here:  "I don't see how this

15 is any different than the lists we asked for

16 originally."

17         Did you change your mind as to that

18 statement?

19   A.    I did.

20   Q.    Now, do you recall PILF rejecting

21 Mr. Cortes' custom report as being insufficient

22 to satisfy your requests?

23   A.    I believe we informed him that it did

24 not satisfy our request for the VERIS report.

25         (Exhibit 40 marked for identification

1        and attached hereto.)

2   BY MR. TEPE:

3        Q.    The court reporter has handed you a

4   document marked as Exhibit 40, Bates number 5129.

5              Do you see that?

6        A.    Sorry, 5129?

7        Q.    Correct.

8        A.    Yes.

9        Q.    Okay.  And do you recognize this

10  document?

11       A.    Yes, I've seen this before.

12       Q.    This is a response from you to

13  Mr. Cortes' September 30 e-mail with the custom

14  report, correct?

15       A.    Yes, it's a response to his e-mail.

16       Q.    So Mr. Cortes e-mailed you at

17  4:27 p.m.

18       A.    Yes.

19       Q.    You sent -- in the previous exhibit

20  you forwarded that report at 4:42 p.m. on the

21  same day.

22       A.    Correct.

23       Q.    And then at 6:09 p.m. you responded to

24  Mr. Cortes, correct?

25       A.    6:09, yes.

1   Q.   And you wrote:  "Mr. Cortes, we are in

2   receipt of your report.  This report, however,

3   does not satisfy our requests to the county

4   registrars.  We requested lists of registrants

5   who were removed from the voter rolls because

6   they were determined to be noncitizens.  Your

7   report indicates only that the listed individuals

8   were mailed citizenship confirmation notices.  It

9   does not indicate that they were removed for

10  citizenship reasons."

11          Do you see that?

12  A.   Yes.

13  Q.   Now, in the second sentence where you

14  said "We requested lists of registrants who were

15  removed from the voter rolls because they were

16  determined to be noncitizens," that's not exactly

17  what your original request to the jurisdictions

18  was, right?

19          MR. LOCKERBY:  Object to the form.

20          THE WITNESS:  Well, I think that that

21      would -- by this point in time he was aware

22      that that's what we were requesting.

23  BY MR. TEPE:

24  Q.   What makes you say that?

25  A.   I believe at this time he had

Page 244

1    instructed county registrars not to provide us

2    with the VERIS reports because he knew that's

3    what we wanted.

4        Q.    The VERIS reports?

5        A.    Right.

6        Q.    The VERIS reports that do not have a

7    determination as to whether or not someone is a

8    citizen, correct?

9             MR. LOCKERBY:  Object to the form.

10            THE WITNESS:  Well, I wouldn't agree

11       with that, and we've been over the fact they

12       say declared noncitizen on them.  But we

13       don't have to go through that again.

14   BY MR. TEPE:

15       Q.    That is the phrase used in the column

16   called "Cancel Type," right?

17       A.    Correct.

18       Q.    But essentially what PILF wanted was

19   that particular VERIS report, right?

20       A.    We wanted the statewide VERIS report.

21       Q.    Right.  That had the column with the

22   cancel type that said declared noncitizen?

23       A.    Correct.

24       Q.    That's what PILF wanted?

25       A.    Yes.

1      Q.     You can put that document aside.

2      A.     Both of them?

3      Q.     Yes.

4             MR. TEPE:  The witness has been handed

5      a document that's been previously marked as

6      VVA Deposition Exhibit 39.

7  BY MR. TEPE:

8      Q.     Do you recognize this document?

9      A.     I have seen it before.

10     Q.     It's got the Bates number of 1408.

11 This document begins with an e-mail from

12 Mr. Cortes, March 28, 2017.

13     A.     Correct.

14     Q.     Attaching a statewide VERIS report as

15 PILF requested.  Is that right?

16     A.     Correct.

17     Q.     And then you responded thanking him

18 for the report and noting that there appears to

19 be 15 jurisdictions missing.  Do you see that?

20     A.     I see that.

21     Q.     And then Mr. Cortes on April 4th

22 responds to your question about the missing

23 jurisdictions.  Is that right?

24     A.     Yes.

25     Q.     And then you forward -- you forward

Page 246

1    Mr. Cortes' response on April 4th to Mr. Adams,

2    copying Mr. Churchwell, right?

3         A.    Correct.

4         Q.    And you wrote:  "Response from

5    Mr. Cortes" -- Strike that.

6              "Response from Cortes on the missing

7    reports.  Those counties have not canceled a

8    single person for citizenship reasons in six-plus

9    years.  Otherwise he just confirms what we

10   already knew.  The report includes only people

11   who were flagged, then sent an affirmation and

12   did not return."

13             Did I read that correctly?

14        A.    Yes.

15        Q.    And this is with reference to the

16   VERIS report, or one of the VERIS reports that

17   was published in Alien Invasion II, right?

18        A.    Yes.

19             MR. TEPE:  You can put that document

20        aside.

21             Subject to any questions that your

22        counsel has, I'm done.

23             MR. LOCKERBY:  All right.  I will have

24        a few.  Just a few.

25   //

1               EXAMINATION

2    BY MR. LOCKERBY:

3         Q.    Mr. Johnson, I would like you to look

4    back, please, at what was marked as Exhibit 4 to

5    your deposition.

6         A.    I have Exhibit 4 in front of me.

7         Q.    On the very first page you write:

8    "Response from Bedford County, 35 people removed

9    for being noncitizens.  Interestingly, they also

10   provide copies of notices sent to all individuals

11   who indicated to the DMV that they were

12   noncitizens.  Each person was sent a notice

13   asking them to confirm their citizenship.  That

14   list contains 54 people.

15            "So 19 people indicated they were

16   citizens in response to the notice after

17   indicating they were noncitizens at the DMV.

18   Those people were kept on the rolls.  Hard to

19   believe all 19 people simply made a mistake at

20   the DMV."

21            First of all, is it sometimes the case

22   that individuals become naturalized citizens at

23   some point after initially registering to vote?

24            MR. TEPE:  Objection to form.

25       Leading.

1                 THE WITNESS:  Yes, that happens.

2      BY MR. LOCKERBY:

3           Q.    And if someone subsequently affirms

4      citizenship after being sent a notice of

5      cancellation, is that still an honor system in

6      Virginia as you understand it?  In other words,

7      the registrar takes the voter's word for it?

8                 MR. TEPE:  Objection to form.

9           Leading.

10                THE WITNESS:  That's how I understand

11          it.

12     BY MR. LOCKERBY:

13          Q.    And does the subsequent affirmation of

14     citizenship change the fact that the person

15     previously stated under oath that he or she was

16     not a citizen?

17                MR. TEPE:  Objection; leading.

18                THE WITNESS:  No, it does not change

19          that.

20     BY MR. LOCKERBY:

21          Q.    As you understand the process, does

22     the fact that someone reregistered after

23     affirming citizenship represent any kind of

24     adjudication by the Department of Elections that

25     the individual is in fact a citizen of the United

Page 249

1    States?

2              MR. TEPE:  Objection; leading.

3              THE WITNESS:  No.

4    BY MR. LOCKERBY:

5        Q.    As far as you know, does the fact that

6    someone reregisters after completing an

7    affirmation of citizenship constitute an

8    adjudication by a local registrar that any

9    particular voter is in fact a citizen of the

10   United States?

11             MR. TEPE:  Objection; leading.

12             THE WITNESS:  No.

13   BY MR. LOCKERBY:

14       Q.    Is it your understanding that federal

15   or state prosecutors would have access to

16   information about voter registrations and voting

17   history that PILF does not?

18             MR. TEPE:  Objection; leading.  Lacks

19        foundation.

20             THE WITNESS:  Can you repeat the

21        question?

22   BY MR. LOCKERBY:

23       Q.    Let me ask you a different question.

24             Have you ever heard of the SAVE

25   program database that is maintained by the

Page 250

1    Department of Homeland Security?

2        A.    Yes.

3        Q.    Does PILF have access to the contents

4    of that database?

5        A.    No.

6        Q.    Is it your understanding that someone

7    who is not a United States citizen but falls in

8    one of several categories can obtain a driver's

9    license in the Commonwealth of Virginia?

10           MR. TEPE:  Objection; form.

11           THE WITNESS:  Yes, that's my

12       understanding.

13   BY MR. LOCKERBY:

14       Q.    And is it also your understanding that

15   a noncitizen who does so will sometimes

16   prevent -- present certain types of

17   documentation, for example what's currently

18   referred to or commonly referred to as a green

19   card?

20           MR. TEPE:  Objection to form.

21           THE WITNESS:  Yes, that's my

22       understanding.

23   BY MR. LOCKERBY:

24       Q.    Does PILF have access to documentation

25   used by noncitizens to obtain driver's licenses

1   in the Commonwealth of Virginia?

2          MR. TEPE:  Objection to form.

3          THE WITNESS:  No, we don't.

4   BY MR. LOCKERBY:

5      Q.   Do you know whether federal or state

6   prosecutors would have access to that?

7          MR. TEPE:  Objection to form.

8          THE WITNESS:  My guess is that they

9      would.

10  BY MR. LOCKERBY:

11     Q.   I would like you to look, please, at

12  what was previously marked as Exhibit 7.

13     A.   You might have to give me your copy if

14  that's possible because I'm not sure where it

15  ended up.  What is Exhibit 7?

16     Q.   I'll just give you a copy of it.

17         MR. TEPE:  You didn't mark it up, did

18     you?

19         MR. LOCKERBY:  I wrote "Exhibit 7" on

20     it, and the answers to my questions.

21         MR. TEPE:  Thank you.

22  BY MR. LOCKERBY:

23     Q.   What is the date on Exhibit 7?

24     A.   September 29 of 2016.

25     Q.   And did Exhibit 7 contain a draft of

1    what eventually became the Alien Invasion I

2    report?

3         A.    Yes, it does.

4         Q.    And from memory, you don't recall how

5    long before the date of Exhibit 7 you began

6    drafting what became the Alien Invasion I report,

7    do you?

8              MR. TEPE:  Objection to form.

9         Misstates his testimony.

10             THE WITNESS:  I do not recall how long

11        before this exhibit, or before September

12        29th, I started drafting what became Alien

13        Invasion I.

14             MR. LOCKERBY:  I would like to have

15        this marked as Exhibit 42, I believe.

16             THE REPORTER:  41.

17             MR. LOCKERBY:  Just for the record,

18        what is Exhibit 41?  Because I had marked an

19        April 4, 2017, document by hand as Exhibit

20        41.  I want to make sure.

21             MR. TEPE:  That one already has the

22        VVA 39.

23             MR. LOCKERBY:  So we just used the

24        same number as before?

25             MR. TEPE:  Yeah.

1          MR. LOCKERBY:  Got it.  So this will

2     be 41.

3          (Exhibit 41 marked for identification

4     and attached hereto.)

5  BY MR. LOCKERBY:

6     Q.   Is the first page of Exhibit 41 an

7  e-mail that you sent on August 22, 2016?

8     A.   Yes.

9     Q.   And then there is an attachment.  And

10  what is the attachment?

11    A.   According to the e-mail, it's an info

12  sheet on our correspondence with various Virginia

13  counties regarding our efforts to get lists of

14  noncitizens on the voter rolls.

15    Q.   Did you use this information sheet in

16  any way to develop what later became Alien

17  Invasion I?

18          MR. TEPE:  Objection to form.

19          THE WITNESS:  I believe some of the

20     material was used in the report.

21  BY MR. LOCKERBY:

22    Q.   I would like you to look now, please,

23  at what was previously marked as Exhibit 10 to

24  your deposition.  If it helps, it's the Alien

25  Invasion I report dated September 30, 2016.

1        A.    I still can't find it.

2        Q.    All right.  If you can't find it, we

3   may need to take a break so you can find it.

4              Is that it upside-down, perhaps?

5        A.    There we go, thank you.  Okay, I'm

6   looking at Exhibit 10.

7        Q.    And within Exhibit 10 there is an

8   Exhibit 7 to the report, and I want you to look,

9   please, at page 48 of 84 within Exhibit 7.

10       A.    Okay, I'm looking at that page.

11       Q.    And that is a voter registration for

12  Luciania Freeman.  Is that right?

13       A.    That is right.

14       Q.    And on this particular voter

15  registration she's checked the box "Yes" in

16  response to the question "Are you a citizen of

17  the United States?"

18       A.    Yes, she has.

19       Q.    And underneath her signature there is

20  a date that says September 26, 2008, correct?

21       A.    I see that.

22       Q.    And then if you look down at the

23  bottom of the page, what does that say?  There is

24  some handwriting that is stamped there.

25       A.    It says, "Canceled - declared

1  noncitizen August 12, 2015."

2      Q.    And was that notation on this document

3  when you received it from Prince William County?

4      A.    I believe it was, yes.

5      Q.    I would like you to look, please, now

6  at Alien Invasion II, which is the mother of all

7  deposition exhibits.

8      A.    Okay.  It's Exhibit 11?

9      Q.    Exhibit 11, yes.  Thank you.

10     A.    Okay, I have that in front of me.

11     Q.    There is a page of this document that

12  has a tab on it, or at least it did on mine, that

13  is a report that says up top "Commonwealth of

14  Virginia Department of Elections Cancellation -

15  Declared Noncitizen, 059 Fairfax County."  Can

16  you find that?

17     A.    Is that page 99 of 486?

18     Q.    The one I'm looking at actually is

19  page 100 of 486.

20     A.    I'm looking at page 100.

21     Q.    And do you see Eliud Bonilla's name on

22  that?

23     A.    I do.  It's at the bottom.

24     Q.    And under the cancel type, what does

25  it say there?

Page 256

1      A.    It says declared noncitizen.

2      Q.    And the date of this report is

3 March 20, 2017.  That's what it says in the upper

4 right-hand corner.  Is that right?

5      A.    That's right.

6            MR. TEPE:  Objection to form.

7            MR. LOCKERBY:  And what's the basis

8      for the objection?

9            MR. TEPE:  You said the date of the

10      report.  The date of the report is actually

11      at the bottom.

12 BY MR. LOCKERBY:

13      Q.    If you look at -- in the upper

14 right-hand corner, it says start date 1/1/2011.

15 Is that right?

16      A.    Yes.

17      Q.    And do you see an end date that says

18 3/2/2017?

19      A.    Yes, I do.

20      Q.    And then at the bottom it says

21 generated on 3/23/2017.  Do you see that?

22      A.    I see that.

23      Q.    Now, before PILF published Alien

24 Invasion II, did you inquire of Commissioner

25 Cortes of what the significance was of someone

1    being listed on this report that says

2    "cancellation - declared noncitizen"?

3              MR. TEPE:  Objection to form.  Vague.

4              THE WITNESS:  I believe he volunteered

5         that information in an e-mail.

6    BY MR. LOCKERBY:

7         Q.    Do you recall receiving an e-mail from

8    Commissioner Cortes on that subject?

9              MR. TEPE:  Objection to form.  Vague.

10             THE WITNESS:  Yes, I do.

11   BY MR. LOCKERBY:

12        Q.    I'm going to show you a document that

13   has been filed in the Eastern District of

14   Virginia in this case as Docket Number 66-2.

15   It's one page.

16             MR. LOCKERBY:  If you would like, we

17        can take a break and I can get it right now.

18        It's Exhibit B to PILF's answer, but I don't

19        have a hard copy.

20             MR. TEPE:  What is it?

21             MR. LOCKERBY:  It's an e-mail from

22        Edgardo Cortes to Noel Johnson and Shawna

23        Powell dated April 4, 2017.

24             MR. TEPE:  Is it what's already here?

25             MR. LOCKERBY:  No.  It's a different

Page 258

1      e-mail that same date.

2            MR. TEPE:  Yeah, if we can get a copy.

3            MR. LOCKERBY:  Why don't we all e-mail

4      it to Andrew and we can take a short break

5      and get a copy.

6            MR. TEPE:  Appreciate that.

7            THE VIDEOGRAPHER:  We are going off

8      the record.  The time is 4:33 p.m.

9            (Recess taken.)

10           THE VIDEOGRAPHER:  We are back on the

11     record.  The time is 4:33 p.m.

12  BY MR. LOCKERBY:

13     Q.    VVA Exhibit 39, the April 4, 2017,

14  10:04 a.m. e-mail from Mr. Cortes in the third

15  sentence it says:  "This report shows individuals

16  that were canceled due to self-reported as

17  noncitizen status and failed to complete an

18  affirmation of citizenship in the allotted time

19  frame and continued to be in canceled status.  If

20  an individual was previously canceled and then

21  subsequently affirmed citizenship and was

22  reregistered, they would no longer appear on this

23  report because they would now be on active

24  status."

25            What was your understanding of that

1   communication from Mr. Cortes?

2           MR. TEPE:  Objection.  Calls for a

3       narrative.  Vague.

4           THE WITNESS:  My understanding was

5       that the statewide VERIS report that he sent

6       us, if an individual appeared on that

7       report, they were on that report due to

8       their self-reported noncitizen status and

9       failed to complete an affirmation of

10      citizenship in the allotted time frame, and

11      that anyone listed on that report continued

12      to be in canceled status.

13  BY MR. LOCKERBY:

14      Q.   So based on that e-mail, what, if

15  anything, did you conclude with respect to Eliud

16  Bonilla who is identified on page 100 of 486 of

17  Exhibit 7 to the Alien Invasion report?

18          MR. TEPE:  Objection to form.

19      Foundation.

20          THE WITNESS:  He was -- by his

21      inclusion in this list, he was subject to

22      that explanation that Mr. Cortes gave,

23      namely that he had self-reported his

24      noncitizen status, failed to complete an

25      affirmation of citizenship in the allotted

1       time frame, and continued to be in canceled

2       status.

3    BY MR. LOCKERBY:

4       Q.    Elsewhere within the VERIS report

5    that's part of Exhibit 11 to your deposition

6    there should be a tab that has Luciania Freeman's

7    name on it.  I believe it's on page 258 of 486.

8       A.    Is that the very last tab?

9       Q.    I don't think that it is.

10      A.    You said the application of Luciania

11   Freeman?

12      Q.    No, it's not an application of

13   Luciania Freeman.  It is part of the VERIS

14   report.

15      A.    Sorry.  Page 258?

16      Q.    Page 258 of 486.  Are you with me?

17      A.    I'm looking at 258.  Yes.

18      Q.    Based on Mr. Cortes' e-mail to you on

19   Tuesday, April 4, 2017, what, if anything, did

20   you conclude about the fact that Luciania Freeman

21   was listed on that particular page?

22           MR. TEPE:  Objection to form.

23      Foundation.

24           THE WITNESS:  That her inclusion on

25      this list meant she was subject to the

Case 1:18-cv-00423-LO-IDD   Document 181-4   Filed 06/14/19   Page 262 of 292 PageID# 6637

Page 261

1    explanation Mr. Cortes gave, namely that she

2    was someone who self-reported her

3    noncitizenship status, failed to complete an

4    affirmation of citizenship in the allotted

5    time frame, and continued to be in canceled

6    status.

7  BY MR. LOCKERBY:

8    Q.    Later on in Exhibit 11 there is

9  another tab that is on a document that has the

10 number PILF 00050 in the bottom right-hand

11 corner.

12   A.    Okay, I'm looking at that page.

13   Q.    And on this particular document

14 Mr. Bonilla has checked the box "Yes," "Are you a

15 citizen of the United States?"  Do you see that?

16   A.    Yes.

17   Q.    But on the same page it does say

18 canceled - declared noncitizen 5/3/2012.  Is that

19 right?

20   A.    Yes, that language appears directly

21 below his signature.

22   Q.    And then if you look at another tabbed

23 page within Exhibit 11 -- this one unfortunately

24 does not have a number on it.  It's a voter

25 application -- a voter registration application

TSG Reporting - Worldwide    877-702-9580

1   for Luciania Freeman.

2        A.    Yes, I'm looking at that page.

3        Q.    And on this voter application back in

4   2008, Ms. Freeman has checked the box "Yes" to

5   "Are you a citizen of the United States?"  Do you

6   see that?

7             MR. TEPE:  Did we already go through

8        this?

9             MR. LOCKERBY:  We did, yes.  I'm

10       setting a predicate.  It's a segue question.

11            MR. TEPE:  So it's okay now, a segue

12       question.

13            THE WITNESS:  She checked the box

14       "Yes," I'm a United States citizen.

15  BY MR. LOCKERBY:

16       Q.    But at the bottom of the page it says

17  "canceled - declared noncitizen August 12, 2015,"

18  correct?

19            MR. TEPE:  Asked and answered.

20            THE WITNESS:  Yes, it does.

21  BY MR. LOCKERBY:

22       Q.    To be registered in the commonwealth

23  of Virginia, as you understood it, a voter had to

24  have checked the box "Yes" when registering to

25  vote, correct?

1      A.    I believe that's a requirement.  But

2  in practice that's not always what happened.  By

3  that I mean some people that checked "No" were

4  still registered to vote.

5      Q.    But by and large, the majority of

6  voters that later showed up as canceled

7  noncitizen had originally checked the box "Yes."

8  Isn't that right?

9      A.    Yes.

10     Q.    And the fact that a voter checked the

11  box "Yes" did not mean the voter necessarily was

12  a citizen of the United States.  Is that right?

13          MR. TEPE:  Objection to form.  Lacks

14      foundation.

15          THE WITNESS:  That's my understanding.

16  BY MR. LOCKERBY:

17     Q.    If you look in Alien Invasion II, the

18  body of the report that's been marked as Exhibit

19  11 itself, at the bottom of page 13, do you see

20  there is a footnote 69?

21     A.    I see that.

22     Q.    And then if you look after the

23  conclusion of the report -- I said footnote.

24  It's actually technically end note.  End note 69

25  says the voter registration applications are

1   produced in Exhibit 12.

2            Do you see that?

3      A.    I see that.

4      Q.    And then if you read the sentence

5   before the end note, it says:  "For the remaining

6   702 noncitizen registrants getting on the voter

7   rolls was as easy as checking yes to the

8   citizenship question."

9            That's what it says, right?

10     A.    That's what it says.

11     Q.    And it doesn't say that the registrant

12  was not telling the truth when he or she checked

13  the box "Yes," does it?

14           MR. TEPE:  Objection to form.

15  Leading.

16           THE WITNESS:  It does not say that.

17  BY MR. LOCKERBY:

18     Q.    And in fact was it true that for the

19  remaining 702 noncitizen registrants getting on

20  the voter rolls was as easy as checking "Yes" to

21  the citizenship question?

22           MR. TEPE:  Objection to form.

23           THE WITNESS:  That is true.

24  BY MR. LOCKERBY:

25     Q.    I would like you to look, please, at

1    what's been marked as Exhibit 31 to your

2    deposition.

3         A.    Okay, I'm looking at Exhibit 31.

4         Q.    At the bottom of Exhibit 31 there is

5    an e-mail from a Tierney Sneed of Talking Points

6    Memo.  Do you know who she is?

7         A.    I don't know who she is.

8         Q.    Do you know anything about this

9    publication Talking Points Memo that she says she

10   works for or with?

11             MR. LOCKERBY:  Objection to form.

12             THE WITNESS:  I only know that it's a

13        website.

14   BY MR. LOCKERBY:

15        Q.    And as of Ms. Sneed's e-mail, had PILF

16   itself actually seen the lawsuit in which you're

17   now testifying?

18             MR. TEPE:  Objection to form.

19             THE WITNESS:  Had we seen the

20        complaint at the time of this e-mail?

21   BY MR. LOCKERBY:

22        Q.    Yes, sir.

23        A.    No.

24        Q.    In fact, she mentions a lawsuit being

25   filed in federal court today.  Do you see that?

Page 266

1      A.    I see that.

2      Q.    So you don't have any idea how this

3  alleged reporter obtained the complaint or had

4  caught wind of it, or wing of it as she put it,

5  before it was filed, do you?

6           MR. TEPE:  Objection to form.

7           THE WITNESS:  I don't know.

8  BY MR. LOCKERBY:

9      Q.    Now, at the top of the page

10 Mr. Vanderhulst mentions that he was surprised it

11 hasn't happened sooner, a lawsuit or an IRS

12 complaint or something.

13          Have you yourself ever worked

14 representing clients in connection with

15 tax-exempt status?

16          MR. TEPE:  Objection to form.  Outside

17     the scope of the deposition.

18          THE WITNESS:  Yes, I have.

19 BY MR. LOCKERBY:

20     Q.    And have you worked on litigation in

21 which an entity's tax-exempt status has been,

22 shall we say, held up at the IRS?

23          MR. TEPE:  Objection to form.

24     Leading.  Outside the scope.

25          THE WITNESS:  Yes, I have.

1    BY MR. LOCKERBY:

2         Q.    Well, I certainly wouldn't want to

3    lead you, so let me rephrase the question.

4              Have you worked on litigation

5    involving -- or when you worked on litigation

6    involving tax-exempt status, what was the nature

7    of that litigation?

8              MR. TEPE:  Objection to the form.

9         Outside the scope.

10             THE WITNESS:  It involved an entity

11        that was targeted by the IRS in a so-called

12        IRS targeting scandal involving Lois Lerner

13        and others.

14   BY MR. LOCKERBY:

15        Q.    And what was or were the entity or

16   entities that were part of the IRS targeting

17   scandal, as you use that term?

18             MR. TEPE:  Objection; outside the

19        scope.

20             THE WITNESS:  Could you rephrase the

21        question?

22   BY MR. LOCKERBY:

23        Q.    What entity or entities had allegedly

24   been targeted by the IRS?

25             MR. TEPE:  Same objection.

Page 268

1           THE WITNESS:  We represented an

2       organization called True the Vote.

3   BY MR. LOCKERBY:

4       Q.    And who were the defendants in that

5   litigation?

6       A.    The IRS, the commissioner of the IRS,

7   Lois Lerner and various IRS employees, and the

8   chief counsel for the IRS.

9       Q.    And what was the nature of the

10  allegations in that litigation?

11          MR. TEPE:  Objection; outside the

12      scope.

13          THE WITNESS:  Our client alleged that

14      her constitutional rights were violated in

15      the processing of her tax-exempt status.

16      The organization she headed, I should say.

17  BY MR. LOCKERBY:

18      Q.    And were there any congressional

19  investigations in connection with what you refer

20  to as the IRS scandal?

21      A.    Yes, there were.

22      Q.    Were there any reports issued by the

23  U.S. Congress in connection with that?

24      A.    Yes, there were.

25      Q.    And what report or reports were those,

Page 269

1    if you call?

2        A.    Well, I recall a report issued by the

3    inspector general for tax administration.

4            MR. TEPE:   I'm going to make a running

5        objection to this line of questioning.

6    BY MR. LOCKERBY:

7        Q.    And in view of that experience, would

8    you yourself have been surprised if there had

9    been some kind of complaint with the IRS

10   involving PILF?

11       A.    No, I would not have been surprised.

12       Q.    Would you have been surprised or were

13   you surprised that there might be a lawsuit

14   against PILF resulting from publication of the

15   Alien Invasion reports?

16           MR. TEPE:   Objection to form.

17       Speculation.

18           THE WITNESS:   I was surprised that

19       there was a lawsuit.

20   BY MR. LOCKERBY:

21       Q.    When you received this e-mail from

22   Logan Churchwell at 10:06 a.m., Thursday, April

23   12, 2018, you replied five minutes later

24   according to this.   Right?

25       A.    Correct.

Case 1:18-cv-00423-LO-IDD   Document 181-4   Filed 06/14/19   Page 271 of 292 PageID# 6646

1    Q.    And you wrote, quote:  "Allison Riggs

2  is lead counsel you think?"

3          What do you mean by that?

4    A.    I knew Allison Riggs to be involved

5  with the Southern Coalition for Social Justice,

6  who we knew had contacted at least Ms. Rosen

7  about her name or her records being included in

8  the Alien Invasion appendix.

9    Q.    And in fact, when you saw the

10  complaint, did you see Allison Riggs' name and

11  organization's name as being among the

12  plaintiffs?

13    A.    I believe so.

14          MR. TEPE:  Objection to form.

15  Misstates the complaint.

16  BY MR. LOCKERBY:

17    Q.    As of April 12, 2018, were you aware

18  of the involvement of Justin Levitt contacting

19  individuals identified in the exhibits to the

20  Alien Invasion reports?

21          MR. TEPE:  Objection to form.

22          THE WITNESS:  As of what date?

23  BY MR. LOCKERBY:

24    Q.    April 12, 2018.

25    A.    I was not aware of Mr. Levitt's

1    involvement at that time.

2        Q.    When did you become aware of

3    Mr. Levitt's involvement?

4            MR. TEPE:  Objection to form.

5            THE WITNESS:  Through production of

6        discoverable material as a result of this

7        lawsuit.

8    BY MR. LOCKERBY:

9        Q.    If you could look back, please, at

10   what was marked as Exhibit 13 to your deposition.

11   While you're at it, perhaps if you could pull

12   Exhibit 14 and Exhibit 15 as well.

13       A.    I'm looking at Exhibit 13.

14       Q.    And Exhibits 13, 14 and 15 are e-mails

15   from the registrar of York County, correct?

16       A.    Correct.

17       Q.    And the date of all three e-mails is

18   November 22, 2016.  Is that right?

19       A.    Correct.

20       Q.    And as of the date of these e-mails,

21   had PILF received reports from the VERIS system

22   from the Department of Elections or any

23   jurisdiction in the Commonwealth of Virginia?

24            MR. TEPE:  Objection to form.

25            THE WITNESS:  Yes, some jurisdictions

Page 272

1          had provided VERIS reports, but not the

2          Department of Elections.

3    BY MR. LOCKERBY:

4          Q.    And the Department of Elections had

5    previously advised registrars not to provide the

6    records that PILF was requesting.  Is that right?

7                MR. TEPE:  Objection; form.

8                THE WITNESS:  Correct.

9    BY MR. LOCKERBY:

10         Q.    And as of November 22, 2016, did you

11   understand York County to be complying with the

12   Department of Elections' directive not to provide

13   a list of voters canceled because of a

14   declaration of noncitizenship?

15               MR. TEPE:  Objection to form.

16               THE WITNESS:  That's what he states in

17         one of his e-mails.

18   BY MR. LOCKERBY:

19         Q.    Did you have any understanding as to

20   whether the documents being provided by York

21   County were responsive to the request that PILF

22   had previously made to York County and other

23   jurisdictions?

24               MR. TEPE:  Objection to form.

25               THE WITNESS:  Yes.  It was my

Page 273

1        understanding that the records he was

2        providing were responsive to our request.

3   BY MR. LOCKERBY:

4        Q.    I would like you to look now, please,

5   at Exhibit 17.

6        A.    I'm looking at Exhibit 17.

7        Q.    And the date is May 17, 2017.  Is that

8   right?

9        A.    May 26, 2017.

10       Q.    What's the --

11             Can you look, please, at the document

12   that's marked VVA Deposition Exhibit 26, which is

13   dated May 17, 2017.  I can simply show it to you

14   if you can't find it.  It might speed things up.

15             That was an e-mail from you back in

16   May 2017, correct?

17       A.    Yes.

18       Q.    And as of the date of the e-mail, had

19   PILF previously hoped to publish Alien Invasion

20   II before May of 2017?

21             MR. TEPE:  Objection; foundation.

22             THE WITNESS:  I don't recall.

23   BY MR. LOCKERBY:

24       Q.    I would like you to look now, please,

25   at what's previously been marked as Exhibit 38.

1      A.    I'm looking at Exhibit 38.

2      Q.    And you see there is a column in

3  Exhibit 38 that says "Registration Status."

4      A.    I see that.

5      Q.    And it says either -- it says canceled

6  or active or inactive.  Is that right?

7      A.    I see entries marked with each of

8  those, yes.

9      Q.    And from this document, could you tell

10 which voters had had their registrations canceled

11 based on noncitizen status?

12     A.    No.

13           MR. TEPE:  Objection; form.

14           THE WITNESS:  No, I cannot tell.

15 BY MR. LOCKERBY:

16     Q.    Had PILF requested information about

17 voters whose registrations had been canceled

18 because they were dead or moved to Nebraska or

19 anything like that?

20           MR. TEPE:  Objection to form.

21           THE WITNESS:  No.

22 BY MR. LOCKERBY:

23     Q.    What reasons for cancellation was

24 PILF's request directed to?

25     A.    For reasons of non-United States

Page 275

1    citizenship.

2         MR. LOCKERBY:  All right.  Thank you.

3    I have no further questions.

4                    EXAMINATION

5    BY MR. TEPE:

6         Q.   Mr. Johnson, the document you were

7    just looking at that was marked as Exhibit 38.

8         A.   I have it in front of me.

9         Q.   The cover e-mail of Mr. Cortes states

10   that the spreadsheet that was attached which

11   notes whether or not someone has a canceled

12   registration status pertains to those voters who

13   were sent correspondence on potential

14   noncitizenship by local registrars.  Is that

15   right?

16        MR. LOCKERBY:  Object to the form.

17        MR. TEPE:  What's the basis?

18        MR. LOCKERBY:  Pardon me?

19        MR. TEPE:  What's the basis?

20        MR. LOCKERBY:  The document speaks for

21        itself.

22        MR. TEPE:  Let me start again.

23   BY MR. TEPE:

24        Q.   Mr. Lockerby was asking you a couple

25   of questions about Exhibit 38, correct?

1      A.     Yes.

2      Q.     And he asked you about the

3 registration status column.  Is that right?

4      A.     He did.

5      Q.     And he suggested that this report

6 wouldn't tell you the reason for someone's

7 cancellation.  Is that correct?

8           MR. LOCKERBY:  Objection.

9           THE WITNESS:  I stated that the report

10          does not tell me the reason for the

11          cancellation.

12 BY MR. TEPE:

13     Q.     Now, if you go to the cover e-mail of

14 Mr. Cortes --

15     A.     I'm looking at it.

16     Q.     He tells you that those individuals

17 listed were sent correspondence concerning their

18 citizenship status.  Is that right?

19     A.     Is there a particular sentence you're

20 referring to?

21     Q.     Yeah.  The first sentence.  "On

22 September 16, the Department of Elections offered

23 to create a customized report containing

24 information available in our statewide voter

25 registration system related to correspondence

1   sent to potential noncitizens by local general

2   registrars."

3          Do you see that?

4      A.    I see that.

5      Q.    And one of the fields is the date the

6   correspondence regarding potential noncitizenship

7   was sent, right?

8      A.    That's one of the fields.

9      Q.    And one of the fields is the date the

10  response -- whether or not the person responded

11  to correspondence.  Is that right?

12     A.    Correct.

13     Q.    So this is not a report regarding

14  individuals who were canceled because of felony

15  status, correct?

16          MR. LOCKERBY:  Object to the form of

17      the question.  The document speaks for

18      itself and it's contrary to evidence in the

19      record.

20          MR. TEPE:  I don't appreciate your

21      interpretation of evidence in the record.

22          MR. LOCKERBY:  Actually it's not my

23      interpretation.  It's the sworn testimony of

24      Edgardo Cortes, commissioner of the Virginia

25      Department of Elections.

1          MR. TEPE:  It is your interpretation

2      of the testimony of Edgardo Cortes, and I

3      appreciate you declining from your speaking

4      objections.

5          THE WITNESS:  Nothing in the attached

6      report gives a reason any one of those

7      individuals was canceled.

8  BY MR. TEPE:

9      Q.    So my question was this is not a

10  report regarding individuals who are canceled

11  because of felony status, correct?  That was my

12  question.  Right?

13      A.    I don't know if any of these

14  individuals were canceled for felony status.

15      Q.    Right.  Because Mr. Cortes didn't send

16  you a report generated based on citizenship -- he

17  did not send you a report based on felony status,

18  correct?

19          MR. LOCKERBY:  Object to the form.

20          THE WITNESS:  Again, I think what he

21      says is in the report.  It speaks for

22      itself.

23  BY MR. TEPE:

24      Q.    He sent you a report that lists people

25  who were sent correspondence about potential

1    noncitizenship, correct?

2          A.    Correct.

3          Q.    And the report provides current

4    registration status for those individuals,

5    correct?

6          A.    Correct.

7          Q.    Some were in active status, right?

8          A.    Yes.

9          Q.    And some were in canceled status?

10         A.    Correct.

11         Q.    But all of these individuals were sent

12   correspondence regarding their citizenship,

13   correct?

14         A.    That's what Mr. Cortes says, yes.

15         Q.    Now, am I understanding your testimony

16   that this report was not sufficient because

17   possibly some of these individuals who were

18   canceled for failure to provide an affirmation of

19   citizenship later died?

20         A.    That's one of the possible reasons

21   that it's not sufficient.  It's also not what we

22   asked for.

23         Q.    You asked for documents pertaining to

24   individuals who were canceled due to potential

25   noncitizenship, correct?

1      A.    At this point in time Mr. Cortes knew

2  we were asking for the VERIS reports because he

3  instructed his county officials not to give us

4  those reports.

5      Q.    Right.  And you testified earlier that

6  you wanted those VERIS reports, correct?

7      A.    Yes.

8      Q.    Right.  And you wanted those VERIS

9  reports because they had the notation "declared

10  noncitizen" on it, correct?

11     A.    That, and that they were generated

12  from the VERIS system.

13     Q.    Right.  But having a report generated

14  from the VERIS system wasn't sufficient for

15  PILF's purposes, correct?  Because he generated a

16  custom report which you rejected, correct?

17     A.    We --

18         MR. LOCKERBY:  Objection; asked and

19     answered repeatedly.

20         THE WITNESS:  We did not reject this

21     report.  We said it was not sufficient to

22     satisfy our records request.

23  BY MR. TEPE:

24     Q.    Because PILF wanted reports that said

25  "declared noncitizenship" on it, correct?

1          MR. LOCKERBY:  Object to the form.

2          THE WITNESS:  The reports we wanted

3     said "declared noncitizenship" on them, yes.

4  BY MR. TEPE:

5     Q.    And these were reports of voter

6  registration cancellation, correct?

7     A.    Yes.

8     Q.    These were not reports adjudicating

9  people's citizenship, correct?

10         MR. LOCKERBY:  Object to the form.

11    Asked and answered repeatedly now.

12         THE WITNESS:  Again, the way that they

13    are compiled means, according to Mr. Cortes,

14    that the individual stated under oath that

15    they are not a citizen.

16  BY MR. TEPE:

17    Q.    And also these records were compiled

18  after citizens stated under oath that they were a

19  citizen by getting onto the voter registration

20  application -- voter rolls, correct?

21    A.    Can you repeat the question?

22    Q.    And these records were also compiled

23  after citizens stated under oath that they were

24  U.S. citizens in order to get on the voter rolls,

25  correct?

1       A.    At some point in time they were added

2   to the voter rolls.  I don't know if each one of

3   them indicated at that time they were a citizen.

4       Q.    Well, you had looked at 764 voter

5   registration applications, correct?

6       A.    Yes.

7       Q.    And 702 of those had the applicants

8   checking "Yes," they were a citizen.

9       A.    Yes.

10      Q.    And so do you not believe they're

11  checking that they are U.S. citizens?

12      A.    Well, I can see that on the

13  application that they checked "Yes," if that's

14  what you're asking.

15      Q.    But you said before that certain

16  people, to your knowledge, got onto the VERIS

17  reports because they checked "No," they were not

18  a citizen, and you made the emphasis that it was

19  under oath, correct?

20      A.    Well, they didn't get onto the VERIS

21  report.  They got onto the voter roll.

22      Q.    No.  My question was you testified

23  earlier that people at the DMV checked "No" with

24  regard to citizenship, correct?

25      A.    Yes.

1    Q.    And that's how they got onto the VERIS

2    reports, correct?

3    A.    People that were already on the voter

4    roll subsequently checked "No"?  That may be one

5    way that they are flagged as noncitizens, yes,

6    sir.

7    Q.    So these individuals had checked "Yes"

8    to get on the rolls, and then potentially checked

9    "No" at the DMV, which triggered a cancellation?

10    A.    Yeah, that's a possible process.  Yes.

11    Q.    And the State of Virginia has not

12    adjudicated whether or not these individuals are

13    citizens, correct?

14    A.    Right.  As far as I understand it, the

15    list is compiled based on the sworn statements of

16    the applicant.

17    Q.    Is it the case that you want to

18    believe that these individuals are not citizens?

19    A.    No.  The records reflect what they

20    reflect.

21    Q.    Right.  And so you had records

22    reflecting in one case citizenship and in one

23    case potentially noncitizenship, correct?

24    A.    Yes, there could be that case.

25    Q.    And in that case you don't know if

1   these individuals are or are not citizens,

2   correct?

3        A.    I can take them at their word for what

4   they say on the form.

5        Q.    Which form?

6        A.    What do you mean, which form?

7        Q.    You have two forms, one saying

8   citizenship, one potentially saying

9   noncitizenship.  Which one are you taking them at

10  their word for?

11       A.    Well, the subsequent registration is

12  the more recent in time.

13       Q.    So you were choosing to believe that

14  form over another form?

15       A.    I'm not choosing to believe anything.

16       Q.    You're not?

17       A.    The Department of Elections or the

18  county registrar is the one who makes that

19  determination.

20       Q.    And all they do is actually just send

21  a notice of intent to cancel to voters who they

22  have conflicting information about and then tell

23  people to affirm their citizenship if they are in

24  fact citizens, correct?

25       A.    Well, not every case is going to have

1    conflicting information.  Like I said, we have

2    people who checked "No" on their original

3    application and still registered to vote.

4         Q.    And Alien Invasion II is not limited

5    to those people, correct?

6         A.    No.

7         Q.    Alien Invasion II calls 5562 people

8    noncitizens even though you have information that

9    at least 702 of them had said yes, they're a

10   citizen, correct?

11        A.    No.  It's based on their inclusion in

12   the VERIS report that says "declared noncitizen"

13   next to their name.

14        Q.    Right.  And so that is the report that

15   you want to believe, correct?

16             MR. LOCKERBY:  Object to the form.

17             THE WITNESS:  It's the report on which

18        the report relies, yes.

19   BY MR. TEPE:

20        Q.    And so you never called Luciania

21   Freeman even though you had records indicating

22   that she checked "Yes," that she was a citizen,

23   correct?

24        A.    We never called Luciania Freeman.

25        Q.    And you never called Eliud Bonilla,

1  correct?

2       A.    Not to my knowledge.

3       Q.    And yet you called them in Alien

4  Invasion II noncitizens, correct?

5            MR. LOCKERBY:  Objection.

6            THE WITNESS:  They are -- they are

7       included in the report under all of the data

8       that is in there.  They are two of those

9       people.

10           THE VIDEOGRAPHER:  Excuse me, counsel.

11      Your mic.

12 BY MR. TEPE:

13      Q.    Mr. Lockerby asked you questions about

14 what was marked as VVA Deposition Exhibit 39.

15      A.    He did.

16      Q.    You asked Mr. Cortes a question at

17 3:01 p.m. on March 28th.

18      A.    My e-mail on that day includes a

19 question, yes.

20      Q.    You didn't ask Mr. Cortes for a

21 definition of what declared noncitizen means, did

22 you?

23      A.    No, not in that e-mail.

24      Q.    Did Mr. von Spakovsky -- Strike that.

25            Who is Hans von Spakovsky?

1      A.     He is a board member of the

2   foundation.

3      Q.     To your recollection, did he opine on

4   the content of either of the Alien Invasion

5   reports before they were published?

6      A.     I believe he did, yes.

7           MR. TEPE:  Nothing further from me.

8                    EXAMINATION

9   BY MR. LOCKERBY:

10     Q.     Just briefly, if the Commonwealth of

11  Virginia wanted to determine which sworn

12  statement is true where voters checked "Yes" on

13  one form, I am a United States citizen, but "No"

14  on a DMV form, I'm not a United States citizen,

15  does the Commonwealth of Virginia, as far as you

16  know, have some documents that would help it make

17  that determination?

18           MR. TEPE:  Objection to form.

19      Foundation.

20           THE WITNESS:  The DMV could have

21      documents presented with a driver's license

22      application that would show whether the

23      person was a noncitizen, such as a copy of a

24      green card.

25  BY MR. LOCKERBY:

Page 288

1      Q.    And again, those are documents to

2   which you, PILF, had access?

3      A.    Correct.

4         MR. LOCKERBY:  Thank you.  I have no

5      further questions.

6         THE VIDEOGRAPHER:  This marks the end

7      of the deposition of Noel Johnson.  We are

8      going off the record.  The time is 5:15 p.m.

9         (Deposition adjourned at 5:15 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3       I, NOEL JOHNSON, have read or have had the

 4  foregoing testimony read to me and hereby certify

 5  that it is a true and correct transcription of my

 6  testimony with the exception of any attached

 7  corrections or changes.

 8

 9

10  _____

11  NOEL JOHNSON

12  [ ] No corrections

13  [ ] Correction sheet(s) enclosed

14

15       SUBSCRIBED AND SWORN TO BEFORE ME, the

16  undersigned authority, by the witness, NOEL

17  JOHNSON, on this the _____ day of

18  _____, _____.

19

20

21

22

23

24

25
```

Page 290

1          C E R T I F I C A T E

2

3    DISTRICT OF COLUMBIA

4          I, JOHN L. HARMONSON, a Notary Public

5    within and for the District of Columbia, do

6    hereby certify:

7          That NOEL JOHNSON, the witness

8    whose deposition is hereinbefore set forth, was

9    duly sworn or affirmed by me and that such

10   deposition is a true record of the testimony

11   given by such witness.

12         That if the foregoing pertains to a

13   federal case, before completion of the

14   proceedings, review and signature of the

15   transcript [x] was [ ] was not requested.

16         I further certify that I am not related

17   to any of the parties to this action by blood or

18   marriage; and that I am in no way interested in

19   the outcome of this matter.

20         IN WITNESS WHEREOF, I have hereunto set

21   my hand this 24th day of April, 2019.

22
                     *John L. Harmonson*

23         _____

24         JOHN L. HARMONSON, RPR

           My commission expires: 11/14/20

25

1                      ERRATA SHEET

2   Case Name:

3   Deposition Date:

4   Deponent:

5   Pg.  No. Now Reads        Should Read  Reason

6   ____ ____ _____      _____  _____

7   ____ ____ _____      _____  _____

8   ____ ____ _____      _____  _____

9   ____ ____ _____      _____  _____

10  ____ ____ _____      _____  _____

11  ____ ____ _____      _____  _____

12  ____ ____ _____      _____  _____

13  ____ ____ _____      _____  _____

14  ____ ____ _____      _____  _____

15  ____ ____ _____      _____  _____

16  ____ ____ _____      _____  _____

17  ____ ____ _____      _____  _____

18  ____ ____ _____      _____  _____

19  ____ ____ _____      _____  _____

20

                              _____

21                            Signature of Deponent

22  SUBSCRIBED AND SWORN BEFORE ME

23  THIS ____ DAY OF _____, 2019.

24  _____

25  (Notary Public)  MY COMMISSION EXPIRES:_____