# EXHIBIT D

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3                 Alexandria Division

4

5  --------------------------------x

6  LEAGUE OF UNITED LATIN AMERICAN      Civil Action No.

7  CITIZENS - RICHMOND REGION COUNCIL    1:18-cv-00423

8  4614, et al.,

9        Plaintiffs,

10  v.

11  PUBLIC INTEREST LEGAL FOUNDATION,

12  an Indiana Corporation, and

13  J. CHRISTIAN ADAMS,

14        Defendants.

15  --------------------------------x

16

17

18        VIDEOTAPED DEPOSITION OF 30(b)(6) DESIGNEE

19                J. CHRISTIAN ADAMS

20                Washington, D.C.

21              Thursday, April 18, 2019

22

23

24

25    Job No. 158969

Page 2

1

2

3

4

5                          Thursday, April 18, 2019

6                                9:16 a.m.

7

8

9

10

11            The following is the transcript of the

12    videotaped deposition of 30(b)(6) designee J.

13    Christian Adams held at the offices of Skadden, Arps,

14    Slate, Meagher & Flom LLP, 1440 New York Avenue, NW,

15    Washington, DC 20005.

16

17

18

19    Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

20

21    Registered Diplomate Reporter, Nationally Certified

22    Realtime Reporter, Registered Merit Reporter,

23    Registered Professional Reporter, Certified Shorthand

24    Reporter, in and for the State of California, Notary

25    Public, within and for the District of Columbia

1      A P P E A R A N C E S:

2

3              Skadden, Arps, Slate, Meagher & Flom

4              On Behalf of Plaintiffs

5              BY:   Sean Tepe, Esq.

6              BY:   Andrew Hanson, Esq.

7              1440 New York Avenue, NW

8              Washington, DC 20005

9

10

11             Foley & Lardner

12             On Behalf of Defendants

13             BY:   William Davis, Esq.

14             2 South Biscayne Boulevard

15             Miami, Florida 33131

16

17

18

19

20      Also present:

21             David Chroniger, Legal Video Specialist

22

23

24

25

1                INDEX OF EXAMINATION

2

3   EXAMINATION OF 30(b)(6) DESIGNEE       Page

4           J. CHRISTIAN ADAMS

5           BY MR. TEPE              6

6           BY MR. DAVIS            --

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2            VIDEO SPECIALIST:  This is the start of

3    tape labeled number 1 of the videotaped deposition of

4    J. Christian Adams, 30(b)(6) for Public Interest

5    Legal Foundation, in the matter of League of United

6    Latin American Citizens, et al. v. Public Interest

7    Foundation, et al., in the United States District

8    Court, for the Eastern District of Virginia,

9    Alexandria Division, case number 1:18-CV-423.

10           This deposition is being held at 1440 New York

11   Avenue, Suite 1100, northwest, Washington, D.C., on

12   April 18th, 2019, at approximately 9:16.

13           My name is David Chroniger from TSG Reporting,

14   Inc., and I'm the legal video specialist.  The court

15   reporter is Laura Kinkade in association with TSG

16   Reporting.

17           Will counsel please introduce yourselves.

18               MR. TEPE:  Sean Tepe, pro bono attorney

19   for Plaintiffs.

20               MR. DAVIS:  William Davis on behalf of the

21   Public Interest Legal Foundation and Christian Adams

22   with the law firm of Foley & Lardner.

23               VIDEO SPECIALIST:  Will the court reporter

24   please swear in the witness.

25   //

1                    J. CHRISTIAN ADAMS,

2           having been first duly sworn, was

3     thereafter examined and testified as follows:

4                      EXAMINATION

5     BY MR. TEPE:

6           Q.  Good morning, Mr. Adams.

7           A.  Good morning.

8           Q.  Can you state your name for the record?

9           A.  John Christian Adams.

10          Q.  Have you been deposed before?

11          A.  Yes.

12          Q.  How many times?

13          A.  I don't recall exactly how many, at least

14     four.

15          Q.  And what kind of cases were those?

16          A.  What kind of cases?  I don't remember what

17     the first one was.  The second one was Shirley

18     Sherrod vs. Andrew Breitbart in DC/DC.  The third one

19     was Austyn Crites vs. Fox News in D/Nevada.

20          Q.  By "D/Nevada" you mean District of Nevada?

21          A.  Correct.

22          Q.  You're under oath today, yes?

23          A.  Correct.

24          Q.  Is there any reason why you cannot provide

25     truthful and accurate testimony today?

1      A.  Not that I'm aware of.

2      Q.  Since you've been deposed before, I

3  probably don't need to go through the ground rules,

4  but just in case, if there's anytime you need a

5  break, just let me know, as long as, you know, I'm

6  not in the middle of something, we can try and

7  accommodate you.  Okay?

8      A.  I will not ask you to take a break after

9  you ask a question.

10      Q.  And you'll wait to finish my question so

11  we're not talking over each other?

12      A.  I will try.

13      Q.  Excellent.  Counsel may object, but, as

14  you know, you still need to answer the question

15  unless he instructs you not to answer.

16      A.  Understood.

17      Q.  Okay.  Are you testifying today on behalf

18  of the Public Interest Legal Foundation?

19      A.  Yes.

20      Q.  Also known as PILF?

21      A.  Correct.

22      Q.  And PILF is here pursuant to a deposition

23  notice, which the court reporter is going to mark for

24  you.

25                      (PILF Exhibit 1 marked for

1      identification: Plaintiffs' Amended

2      Rule 30(b)(6) Notice to Take

3      Deposition of Public Interest Legal

4      Foundation)

5      MR. TEPE:  The court reporter has marked

6  as PILF Exhibit 1 a document.

7      Q.  Mr. Adams, do you want to take a look at

8  that?  Do you recognize it?

9      A.  I see the document.

10     Q.  Do you recognize it?

11     A.  Yes.

12     Q.  What do you recognize it to be?

13     A.  It speaks for itself.  It says it's a

14  notice.

15     Q.  And it says it's a Notice of Deposition of

16  Public Interest Legal Foundation, correct?

17     A.  It speaks for itself.  It's what it says.

18     Q.  Do you mind turning to the exhibit to the

19  notice, in particular, the topics for examination

20  starting on page 9.

21     Are you prepared to speak and testify on

22  behalf of PILF on these six topics today?

23     A.  Yes.

24     Q.  Did you do anything to prepare for today's

25  deposition?

1          A.   Yes.

2          Q.   What did you do?

3          A.   Reviewed documents, met with my attorneys.

4          Q.   How long did you meet with your attorneys?

5          A.   Days.

6          Q.   How many hours?

7          A.   Don't remember.

8          Q.   Okay.  More than eight?

9          A.   Yes.

10         Q.   Okay.  Who did you meet with?

11         A.   My attorneys.

12         Q.   I understand.  What are your attorneys'

13    names?

14         A.   You have the counsel of record in this

15    case.

16         Q.   Yeah, but I don't know who you met with.

17         A.   Well, one of them is sitting here.

18         Q.   That's Mr. Davis?

19         A.   Correct.

20         Q.   Okay.

21         A.   Look at the counsel of record, and you

22    will have a list of people who I relied on to prepare

23    for this deposition.

24         Q.   I'm sorry.  Mr. Adams, I'm asking just a

25    very simple question.

1      A.  And I just answered it.

2      Q.  I asked the question, which was, who did

3  you meet with.

4      A.  And I answered it.  I said, if you look at

5  the list of attorneys who are counsel of record in

6  this case, you will see the names of the people who I

7  met with to prepare for this deposition.

8      Q.  You met with Ana Romes?

9      A.  Effectively, yes.

10      Q.  "Effectively," what does that mean?

11      A.  By telephone.

12      Q.  Okay.  And how long did you meet with

13  Ms. Romes?

14      A.  Days.

15      Q.  You met with her days?

16      A.  Correct.

17      Q.  How many documents did you look at?

18      A.  Tens of thousands.

19      Q.  So you looked at a lot more documents than

20  you produced in this case.

21      A.  Let me fix my answer.  I looked at tens of

22  thousands of pages.  I cannot tell you how many of

23  those are subsets to equal a document, but in

24  aggregate I reviewed tens of thousands of pages.

25      Q.  Okay.  Unless I specify otherwise, when I

1   say "you" today, I'll be referring to PILF, since

2   you're here on behalf of PILF.  Okay?

3        A.  Correct.

4        Q.  Okay.  And but if there's anytime that's a

5   little bit of confusion, just let me know and I'll

6   try and clarify.  Because what I'll try and do is, if

7   I'm speaking about you as a person, I'll just say

8   "you as Mr. Adams."

9        A.  Understood.

10       Q.  Okay.  PILF used to be called ActRight

11  Legal Foundation, correct?

12       A.  Yes.

13       Q.  It was incorporated in Indiana in 2012?

14       A.  If you have a document that will help me

15  refresh my recollection, I'd like to review it

16  because I can't remember the exact date.

17       Q.  When did ActRight Legal Foundation change

18  its name to PILF, do you recall?

19       A.  I do not, but if you have a document that

20  would help me refresh my recollection I'd be happy to

21  review it.

22       Q.  Prior to the name change, do you know what

23  ActRight Legal Foundation's mission was?

24       A.  Essentially, but if you have a document

25  with more specific information I'm happy to review

1    it.

2                    (PILF Exhibit 2 marked for

3              identification: ActRight Legal

4              Foundation letter dated 7/17/2014

5              PILF-ADAMS-0020792 - 20858)

6              MR. DAVIS:  I assume this is Exhibit 2?

7              MR. TEPE:  Yes.  The court reporter has

8    just marked what is PILF Exhibit 2, a document.

9         Q.  Mr. Adams, have you seen this document

10   before?

11        A.  I don't have a specific recollection of

12   reviewing this document.

13        Q.  Okay.  Well, it's a letter from ActRight

14   Compliance Services, LLC to the Alaska Department of

15   Law dated July 17th, 2014; is that right?

16        A.  That's what it says.

17        Q.  And correct me if I'm wrong, but it

18   appears to be a filing that ActRight Legal Foundation

19   made to be considered a charitable organization in

20   Alaska; is that right?

21        A.  I won't disagree with that.

22        Q.  Okay.  Well, if you turn to the document

23   with the Bates number 20798 at the bottom --

24        A.  20798?

25        Q.  Yes.  It has a Mission Statement for

1    ActRight Legal Foundation.

2          A.   Mm-hmm.

3          Q.   Does this refresh your recollection as to

4    what the mission was of the ActRight Legal

5    Foundation?

6          A.   It would help do that.  It speaks for

7    itself.

8          Q.   It says:

9                ActRight Legal Foundation is a

10               501(c)(3) law firm that provides a

11               wide range of legal services to

12               individuals and nonprofit

13               organizations in the exercise of

14               their fundamental civil and

15               constitutional rights, with

16               particular emphasis on protecting

17               and defending their right to the

18               free exercise of religious beliefs,

19               First Amendment rights of free

20               speech and association, voting

21               rights, property rights, and other

22               constitutional rights of due process

23               and equal protection.

24          As you testified earlier, ActRight Legal

25    Foundation changed its name to the Public Interest

1   Legal Foundation, correct?

2       A.   I think I testified to that, but you may

3   have asked me a question that contained that

4   information.   I can't remember which one it was.

5       Q.   So in the change from ARLF to PILF, did

6   the mission of the organization change to your

7   knowledge?

8       A.   Well, if you have -- if you're asking me

9   to compare precisely what the mission statements are

10  of the two organizations, to the extent you're asking

11  me to do that, if you have a document that lets me do

12  that here, I'd be happy to look at it to refresh my

13  recollection.

14      Q.   What's your position with PILF?

15      A.   I'm the president and general counsel.

16      Q.   And for how long have you had that

17  position?

18      A.   Approximately four years.

19      Q.   So when did you first start working for

20  PILF?

21      A.   Well, I'm not sure exactly when, if you

22  have a document that would refresh my recollection,

23  but it's approximately four years ago.   That was my

24  answer.

25      Q.   When you started working for PILF, was it

1   called PILF or was it still the ActRight Legal

2   Foundation?

3        A.  I don't remember that.  And you're asking

4   me in my personal capacity.

5        Q.  Well, no, I'm asking as the 30(b)(6)

6   witness, when did the president of PILF --

7        A.  Okay.

8        Q.  -- begin working there?

9        A.  My answer is the same as the last two

10  times I answered it.  The third time I'm answering it

11  is approximately four years ago.  If you have a

12  document that will refresh my recollection, I'll be

13  more than happy to look at it.

14                    (PILF Exhibit 3 marked for

15                    identification: Filing re charitable

16                    organization status

17                    PILF-ADAMS-0021095 - 0021147)

18       Q.  The court reporter has handed you what's

19  been marked as PILF Exhibit 3, a document with a

20  beginning Bates number of 21095.

21       Mr. Adams, is this another filing to a state

22  with regard to PILF's charitable organization status?

23       A.  It appears that that's what that is.

24       Q.  And then if you turn to the page that's

25  marked 21104, it says you were elected November 18th,

1    2014; is that right?

2           A.   That's what the page says.

3           Q.   And you don't recall whether or not you

4    joined when the organization was called PILF or ARLF;

5    is that correct?

6           A.   Well, I think I've answered that question,

7    and I said, if you have a document that would help

8    refresh my recollection, and to the extent this

9    Exhibit 3 refreshes my recollection, it would

10   indicate that at least on -- what you need to show me

11   is a name change document to get your answer.  If you

12   did that, we'd be past this line of inquiry and move

13   on to the next one.

14                      (PILF Exhibit 4 marked for

15                      identification: Email correspondence

16                      from (topmost) CMitchell sent

17                      3/30/2016 with attachment

18                      PILF-ADAMS-0018345 - 0018373)

19           MR. TEPE:  The court reporter has marked

20   and handed the witness an Exhibit PILF 4 with the

21   Bates number 18345.

22           Q.   Do you recognize this document?

23           A.   This appears to be an email with corporate

24   records attached.

25           Q.   So I'll direct your attention to the email

1   from Ms. Powell dated March 29th, 2016 to yourself

2   and a variety of other individuals, including your

3   counsel here.

4        Please find Thursday's board meeting agenda

5   below, and then there's an agenda for a Public

6   Interest Legal Foundation board meeting, correct?

7        A.   It appears to have that.

8        Q.   One of the documents attached to this

9   email is minutes to a Board of Directors meeting

10  dated February 27th, 2015.  Do you see that?

11       A.   Yes.

12       Q.   And one of the minute items, second

13  sub-bullet says, "new programs and expanded mission,

14  permanent voting integrity and redistricting

15  presented by J. Christian Adams."  Do you see that?

16       A.   It says that.

17       Q.   Do you recall presenting a new program and

18  expanded mission to these individuals at the board

19  meeting?

20       A.   I have no recollection in contradiction to

21  this part of the minutes.

22       Q.   Okay.  So the previous document indicated

23  that you were elected president in November of 2014,

24  correct?

25       A.   Wait.  Which document are you referring

1    to?  What exhibit number?

2         Q.  Exhibit 3.

3         A.  Okay.  Okay.  What is your question?

4         Q.  My question is, just so I understand the

5    timing here, you were elected president of PILF in

6    November of 2014, correct?

7         A.  Well, that's what the document says.

8         Q.  And your recollection would not dispute

9    that?

10        A.  I don't have any recollection right now as

11   I sit here contrary to that date.

12        Q.  Okay.  When you joined PILF, did you join

13   as the president, or did you have a position other

14   than president before that time?

15        A.  I don't remember.

16        Q.  You don't remember?

17        A.  Nope.

18        Q.  What did you do before you, Mr. Adams,

19   before being president of PILF?

20        A.  I was an attorney.

21        Q.  Where?

22        A.  In practice, private practice in Virginia.

23        Q.  And did you work for a law firm?

24        A.  Sometimes, sometimes not.  When you say

25   "work for," I did cases with law firms.  Sometimes I

1    did them myself; sometimes I did them with other

2    lawyers.

3         Q.   And were you working for a nonprofit

4    organization at the time before you joined PILF?

5         A.   No.

6         Q.   So you were a solo practitioner?

7         A.   You could, yes, put it that way.

8         Q.   What -- prior to joining PILF, what was

9    the last organization with which you were employed?

10        A.   United States Department of Justice.

11        Q.   And when was that?

12        A.   I'm sorry?

13        Q.   And when was that?

14        A.   Did you say "what" or "when"?

15        Q.   When.  I'm sorry.

16        A.   2005 to 2010.

17        Q.   So from 2010 to November of 2014 you were

18   a solo practitioner?

19        A.   Okay.  This is outside the scope of the

20   30(b)(6).  This is about me personally.  We can get

21   to that next week.

22        Q.   I appreciate your notifying when you

23   believe that things are outside the scope of the

24   30(b)(6).  I'm still allowed to ask that question.

25   So if you wouldn't mind --

1        MR. DAVIS:  I'm taking this that you are

2    doing this as a predicate and foundation to ask

3    further questions.

4        MR. TEPE:  Yes.

5        MR. DAVIS:  Okay.  I'll allow it to the

6    extent that it's foundational to a 30(b)(6)

7    deposition.

8        MR. TEPE:  Even during the 30(b)(6) I

9    believe I can ask questions in a 30(b)(1) capacity.

10        MR. DAVIS:  I'm not going to debate that.

11        MR. TEPE:  I understand.  I'm just trying

12    to get through this.

13        MR. DAVIS:  Understood.

14    A.   What was your question?

15    Q.   My question was from 2010 to 2014, you

16    were a solo practitioner; is that your testimony?

17    A.   Well, no, not solo.  I mean, I was in

18    private practice.

19    Q.   Okay.  So were you practicing in

20    partnership with someone else?

21    A.   Sometimes.

22    Q.   Was there a name of this entity?

23    A.   Election Law Center PLLC.

24    Q.   Ah, okay.  So were there any other

25    employees of Election Law Center PLLC?

1    A.  Intermittently, yes.  Again, this is

2  outside of the scope of the 30(b)(6).

3    Q.  And so did you come to what was known as

4  ActRight Legal Foundation with a goal of changing the

5  organization to focus on voting rights issues?

6    A.  I don't understand the question.

7    Q.  Why did you join PILF?

8    A.  I don't remember.

9    Q.  You don't remember why you joined PILF?

10    A.  This is outside the scope of the

11  30(b)(6) --

12    Q.  Okay.

13    A.  -- and I didn't prepare for it.  So I

14  don't remember that.

15    Q.  Okay.  Well, maybe between now and Monday

16  when we depose you in your personal capacity you'll

17  know why you joined the organization that you're

18  president of.

19    A.  That's supposed to be how it works.

20    Q.  So these minutes from February 27th of

21  2015, there's a bullet called "board business."  Do

22  you see that?

23    A.  I see it says that.

24    Q.  "Name change discussed, Hans von Spakovsky

25  makes motion to change the name of the corporation to

1    Public Interest Legal Foundation."  Do you see that?

2         A.   That's what it says.

3         Q.   And it was approved unanimously, right?

4         A.   That's what it says.

5         Q.   And so why was this motion made?  Do you

6    recall?

7         A.   Do not.  If you have a document that would

8    help refresh my recollection, I'd be more than happy

9    to look at it.

10        Q.   No, I'm just, I'm just, you know, asking

11   you questions that I would think you would know as

12   president of PILF.

13        A.   Why would you think that?

14        Q.   What are your -- what are the day-to-day

15   activities of the president of PILF?

16        A.   There's a variety of them.  When you say

17   "activities," what sort of activities are you

18   referring to?

19        Q.   Well, I asked a broad question so that you

20   can tell me what are your activities.

21        A.   Anything that one who manages a law firm

22   would do, which is to supervise lawyers, approve

23   expenditures.  If you have a specific area that you

24   want to ask about, I'm more than happy to address it.

25        Q.   Do you decide what cases, legal cases, the

1   organization takes on?

2          A.   I have a significant role in that.

3          Q.   And what is that significant role?

4          A.   To decide cases that the legal

5   organization takes on.

6          Q.   So you do decide the cases, the legal

7   cases, that the organization takes on.

8          A.   That's not what I testified to.  You're

9   asking the question a second time, and I'll tell you

10  what I said the first time.  I have a significant

11  role in deciding what cases the organization takes

12  on.

13         Q.   And who ultimately decides what cases the

14  organization takes on?

15         A.   There is no single person who ultimately

16  decides that.

17         Q.   Is it the board's decision?

18         A.   I just answered the question.  There's no

19  single person or entity that decides that.

20         Q.   So the board -- the board doesn't make

21  this decision; is that your testimony?  It's a very

22  simple question.

23         A.   I wouldn't disagree with that.

24         Q.   So the board does not make the decision

25  which cases the organization takes on.

1        A.   I've already answered that question.

2        Q.   The answer is yes.

3        A.   That's not what my answer was.  You can

4    read the transcript.  My answer was I wouldn't

5    disagree with that.

6        Q.   And why wouldn't you disagree with that?

7        A.   Because empirically that reflects reality.

8        Q.   So the reality, then, is that PILF's board

9    does not decide what cases the organization takes on.

10       A.   That's the third time you've asked that

11   question, and I've answered it twice.

12       Q.   Why don't you answer it a third time.

13       A.   Because that's not how depositions work,

14   and you know that.  You have your answer in the

15   record twice.

16       Q.   It's not a very clear answer as to what

17   I'm trying to get to.

18       A.   You may not like it, but it's the answer,

19   and I'm not going to answer it a third time.

20       Q.   As PILF's president, do you decide what

21   public statements are released to the public?

22       A.   I have a significant role in deciding what

23   statements are released to the public.

24       Q.   Can you explain that significant role?

25       A.   What is the particular question about it?

1    I don't know how else to explain I have a significant

2    role in what statements are released to the public.

3    That's the second time I've answered the question.

4         Q.   Who else has a role in deciding what

5    statements are released to the public?

6         A.   Logan Churchwell.

7         Q.   Anyone else?

8         A.   Lawyers who work on the particular matter.

9         Q.   Anyone else?

10        A.   Largely speaking, no, but there may be a

11   contrary example to what I just testified to.  If you

12   have a document that would refresh my recollection, I

13   would be happy to look at it.

14        Q.   So the ultimate decision as to whether or

15   not a statement is made is yours; is that right?

16        A.   I could stop a statement from being made,

17   correct.

18        Q.   And when you don't stop a statement from

19   being made, that is based on your decision, correct?

20        A.   I would not agree with the idea that I

21   have assented to every single statement that PILF has

22   made to the media.  I would very much disagree with

23   that.  There may be a time where I was sick, there

24   may be a time that I was traveling, or there may be

25   other times I was incapacitated, such as sitting in a

1   deposition or taking a deposition, where I would not

2   have had the opportunity to review all statements

3   released to the media.

4        I do not have any specific recollection about

5   when those times may or may not have occurred, but,

6   if you have a document that would refresh my

7   recollection, I'd be happy to look at it.

8        Q.   How are your -- strike that.

9        Your position is president and general

10  counsel, correct?

11       A.   I'm sorry?

12       Q.   Your position is president and general

13  counsel?

14       A.   I've answered that once already.  I have.

15  I mean, the transcript speaks for itself.  If you

16  want to ask it for the next seven hours, we can just

17  answer it for seven hours, but I've answered that

18  question.

19       Q.   It's a simple segue question to my next

20  question, which is, how does the role of president

21  and general counsel differ, if at all?

22       A.   Well, "general counsel" is a term used to

23  describe a lawyer's role.  "President" is a term used

24  to describe an organizational head.  Not all general

25  counsels are presidents and not all presidents are

1    general counsels in most nonprofit organizations.

2         Q.  So how does your role as both president

3    and general counsel differ?

4         A.  Well, I think I just answered that, but

5    I'll clarify in case I didn't.  The president is the

6    organizational head, and the general counsel is a

7    legal term relating to legal matters.

8         A president has authority as to which water

9    cooler company to use to stock an office, and a

10   general counsel, for example, would have authority

11   regarding legal matters.  If I was just the general

12   counsel and not the president, I might not have a say

13   in the vendor we use to get water jugs.

14        Q.  In 2016 you represented an organization

15   called the Virginia Voters Alliance in a lawsuit

16   against the registrar of the City of Alexandria,

17   correct?

18        A.  I did -- or we did, I suppose.

19        MR. DAVIS:  You're using the

20   "organizational you."

21        MR. TEPE:  Yes.  Correct.

22        Q.  And how did you, PILF, come to represent

23   VVA in this litigation?

24        A.  How did we come to represent them?  I

25   don't understand your question.

1     Q.  Did they --

2     A.  There's lots of ways that that could be

3 answered.  I'm not sure what you're asking.

4         MR. DAVIS:  And I would caution the

5 witness in answering the question be cognizant of the

6 attorney-client privilege between PILF and VVA.

7     Q.  Well, did PILF approach VVA with a case to

8 file?

9     A.  I have no recollection as to the answer to

10 that question.  If you have a document to refresh my

11 recollection, I'd be happy to look at it and to see

12 if I can answer it.

13     Q.  So VVA alleged that Alexandria was in

14 violation of the National Voter Registration Act,

15 yes?

16     A.  Show me a complaint and I'll be able to

17 answer your question better.  I'm not going to --

18 that's not within the scope of the 30(b)(6), for one,

19 and if you have a document that would help me answer

20 that question, I'd be happy to look at it.

21     Q.  So you don't recall that VVA alleged

22 Alexandria was in violation of the National Voter

23 Registration Act?

24     A.  I recall it's not within the scope of the

25 30(b)(6).

1        Q.  I can still ask the question.

2        A.  Well, you have.

3        Q.  And you haven't answered it.

4        A.  That's correct.  Show me a complaint and

5    I'll answer it.

6        Q.  That's not how this works, Mr. Adams.

7        A.  Yes, it is.

8        Q.  No, you do not get to dictate what

9    documents I get to show you.  I ask questions, and

10   you either, you know, have a recollection or --

11       A.  He has the complaint right there.  That

12   will be helpful.

13       Q.  He actually doesn't have the complaint,

14   so -- but I appreciate you trying to narrate the

15   actions of my co-counsel.

16       A.  Oh, that's the 30(b)(6) deposition.

17       Q.  It's the 30(b)(6) topic.

18       A.  Well, if you have the complaint, I'll be

19   happy to answer questions about it.

20       Q.  Okay.  So can you go to, let's say, on

21   page 9, Topic No. 2.  It states your activities and

22   communications relating to purported noncitizen

23   registration and voting in Virginia, correct?

24       A.  There's more.

25       Q.  Yes, but that's -- these are subsets,

¹ including, by way of example only, the conception,

² research, records collection and analysis, writing,

³ revising, editing, publication, and/or promotion of

⁴ the Alien Invasion Reports and drafts thereof, as

⁵ well as your work on these or similar issues with the

⁶ Virginia Voters Alliance and/or other organizations

⁷ or individuals.

⁸      Are you prepared to testify on this topic?

⁹      A.  I am, but the question you asked doesn't

¹⁰ relate to paragraph 2.

¹¹      Q.  I am asking a question with regard to your

¹² representation of VVA in its lawsuit against the City

¹³ of Alexandria under the NVRA, correct?

¹⁴      A.  That didn't relate to noncitizen

¹⁵ registration and voting in Virginia.  It's not within

¹⁶ the scope of paragraph 2.  And you know it.  You just

¹⁷ wrote it badly.

¹⁸                (PILF Exhibit 5 marked for

¹⁹                identification: PILF letter dated

²⁰                1/14/2016

²¹                PILF-ADAMS-0027092 - 0027094)

²²           MR. DAVIS:  Do you have one for me?

²³           MR. TEPE:  Certainly.

²⁴      Q.  Mr. Adams, the court reporter has just

²⁵ handed you an exhibit that's been marked as PILF 5

1     with the Bates number 27092.

2          Do you see this document?

3          A.  I have Exhibit 5.

4          Q.  Okay.  It is a letter to Anna Leider, the

5     registrar of Alexandria, correct?

6          A.  She is the addressee.

7          Q.  And the date is January 14, 2016, correct?

8          A.  That's what it says.

9          Q.  And it's from Shawna Powell, secretary of

10    the Public Interest Legal Foundation, correct?

11         A.  That's what it says.

12         Q.  Okay.  And your organization states:

13              "I am writing on behalf of the

14              Public Interest Legal Foundation to

15              notify you that your city is in

16              apparent violation of Section 8 of

17              the National Voter Registration Act

18              based on our research."

19         Do you see that?

20         A.  No.  Where is that?

21         Q.  That's the first paragraph.

22         A.  Okay.  Got it.

23         Q.  Okay.  And your recollection of the NVRA

24    is it that, before you can actually sue a

25    jurisdiction, you need to provide notice?  Is that

1    right?

2         A.   I wouldn't disagree with you.

3         Q.   Because the answer is yes.

4         A.   Well, that's not what I said.

5         Q.   Oh, I know it's not what you said.

6         A.   So the answer is not yes.  The answer is I

7    would not disagree with you.

8         Q.   And why wouldn't you disagree with me?

9         A.   Because I have no basis to disagree with

10   you.

11        Q.   And in paragraph five it says, "in short,

12   your city has more voters on the registration rolls

13   than it has eligible living citizen voters."  Do you

14   see that?

15        A.   Right.

16        Q.   Okay.  And so that's the crux of the

17   complaint that PILF had with the registrar of

18   Alexandria; is that right?

19        A.   I would disagree with that.  That is not

20   the crux of the complaint.  You might want to distill

21   it to that, but that's not what I believe.

22        Q.   Okay.  Then what do you believe to be the

23   crux of the complaint?

24        A.   There's no crux.  There's a variety of

25   issues.

1      Q.  Okay.  And what are those issues?

2      A.  I'm not going to get into that because

3  it's part -- first of all, it's not within the scope

4  of paragraph two, which deals with noncitizen

5  registration voting, something not mentioned in this

6  notice letter, Exhibit 5, and it relates to

7  privileged information.  My assessment of that

8  litigation is privileged.

9      Q.  I'm not asking for your assessment of that

10  litigation.

11      A.  Well, you asked what the crux of it was.

12      Q.  I'm going to direct your attention to the

13  second page, where, as part of your allegation that

14  Alexandria is in apparent violation of the NVRA, you

15  asked for certain records; is that right?

16      A.  Are you talking about -- there's a page

17  missing.  Oh, you have two-sided.  Okay.  The second

18  page.

19      Q.  Yes.

20      A.  "Could provide," right, okay.

21      Q.  In particular, if the public available

22  information --

23      A.  Right.

24      Q.  -- cited above is no longer accurate, it

25  would be helpful if you could provide --

1        A.   Right.

2        Q.   -- and then there's a list --

3        A.   (a) through (j).

4        (Clarification by reporter.)

5        Q.   And one of the things you asked for is,

6    under item (b):

7             "Records your office obtained or

8             received from the Alexandria Circuit

9             Court clerk, United States District

10            Court clerks, or other sources

11            regarding individuals who are

12            ineligible to serve on juries

13            because of a lack of American

14            citizenship," among other things.

15       Correct?

16       A.   That's what the exhibit says.

17       Q.   Right.  And so as part of your concerns

18   with regard to Alexandria's compliance with the NVRA,

19   you were asking for records with regard to lack of

20   citizenship.

21       A.   The document will speak for itself on

22   that.

23       Q.   Okay.  So the answer is yes.

24       A.   The document says that, yes.

25       Q.   Now --

1           (VVA Exhibit 5 previously

2       marked for identification and

3       referenced herein: VVA letter dated

4       1/25/2016 to A Leider)

5       MR. TEPE:  I'm handing the witness what

6   has been previously marked as VVA Deposition Exhibit

7   5.

8       A.  But it's VVA 5.

9       Q.  Yes.

10      A.  Right.

11      Q.  Previously been marked as VVA 5.

12      This is a letter from Reagan George, president

13  of the Virginia Voters Alliance, dated January 25th,

14  2016 to Ms. Leider, registrar of Alexandria, correct?

15      A.  That's what it says.

16      Q.  This letter is identical, it would appear,

17  to the letter that PILF sent on January 14th,

18  correct?

19      A.  I don't know.  I haven't reviewed it.  I

20  didn't -- this was not part of documents that I

21  reviewed in preparing for this deposition, so I don't

22  know if it's -- what was your word you used,

23  "identical"?

24      Q.  Yes.

25      A.  I don't know that.

1     Q.  You did end up representing VVA in a

2   lawsuit against the City of Alexandria, correct?

3     A.  If you look at the complaint, we've

4   already asked and answered that.

5     Q.  And so the answer is yes, you did that.

6     A.  For the third time, the answer is the

7   complaint shows we did that.

8     Q.  Now the complaint or the assertion made in

9   both letters is that the City of Alexandria has more

10   voters on the registration rolls than it has eligible

11   living citizen voters, correct?

12     A.  I don't know.  Show me the complaint and

13   I'll answer your question.  That's probably the fifth

14   time I've asked for it.  I can't answer questions

15   about what the complaint says without seeing it.

16         MR. DAVIS:  The question is whether or not

17   the letters say it.

18     Q.  Correct, the assertion in the letter.

19     A.  Okay.  The letter -- if you direct me to

20   where -- I mean, it speaks for itself, so I'm not

21   going to dispute what it says.

22     Q.  The fifth paragraph.

23     A.  That's what it says.

24     Q.  Right.  And in the third paragraph it

25   says, "voter rolls across America contain substantial

1    numbers of ineligible voters."  Do you see that?

2         A.   That's what it --

3              MR. DAVIS:  You're referring to VVA 5?

4              MR. TEPE:  Correct.

5         A.   That's what it says.

6         Q.   And then that same sentence or clause is

7    beginning the third paragraph in PILF's letter, which

8    was marked as PILF Exhibit 5, correct?

9         A.   It does say the same thing.

10        Q.   So at the -- at this time, in January

11   2016, PILF believed that voter rolls across America

12   contained substantial numbers of ineligible voters;

13   is that true?

14        A.   At -- yes.

15        Q.   And was PILF seeking to establish that

16   proposition when it made this complaint to

17   Alexandria?

18        A.   I don't understand the question.  Seeking

19   to establish the proposition?  That proposition has

20   already been established.

21        Q.   Okay.  So my question is:  When you, PILF,

22   wrote to the registrar of Alexandria that voter rolls

23   across America contained substantial numbers of

24   ineligible voters, were you seeking to establish that

25   in the City of Alexandria their voter rolls also

1    contained substantial numbers of ineligible voters?

2         A.  No.

3         Q.  You were not trying to establish that?

4         A.  I answered that.

5         Q.  Okay.  What were you trying to establish

6    in this letter to the City of Alexandria?

7         A.  I wasn't trying to establish anything.

8    This is a notice letter.  You don't establish

9    anything in a notice letter.

10        Q.  Well, you've made assertions in your

11   notice letter, correct?

12        A.  That's not establishing anything.  Pick a

13   better verb and I'll answer the question.  We weren't

14   trying to establish anything.  We were trying to send

15   a notice letter.  That's the answer.

16        Q.  And you say in your notice letter your

17   city has more voters on the registration rolls than

18   it has eligible living citizen voters, correct?

19        A.  That's what the letter says.

20        Q.  That's what the letter says.  And the

21   letter doesn't actually say how many more voters are

22   on the registration rolls than the City of Alexandria

23   has eligible living citizen voters, right?

24        A.  The letter speaks for itself.

25        Q.  It doesn't say you have ten more people

1    than are eligible to vote, correct?

2         A.   My answer is the same.

3         Q.   The letter doesn't say that Alexandria has

4    20 more people.

5         A.   The answer is the same.

6         Q.   Okay.  Do you recall Alexandria responding

7    to either one of these seemingly identical letters?

8         A.   I'm not going to accept the premise that

9    they're identical.

10        MR. DAVIS:  Object to the form of the

11   question.

12        Q.   I understand, but did Ms. Leider or Leider

13   respond to your letter?

14        A.   Well, in what way?  I don't understand the

15   question.  I mean, you know there was litigation, so

16   obviously there was a response.  If you have a

17   particular document you want to show me, then I'm

18   happy to review it.

19              (VVA Exhibit 6 previously

20          marked for identification and

21          referenced herein: Office of Voter

22          Registration and Elections letter

23          dated 2/9/2016 to R George)

24        Q.   I've handed to you, sir, what has been

25   marked as, previously, as VVA Deposition Exhibit 6.

1    Do you see that?

2             A.   Right.

3             Q.   It is a letter from Ms. Leider to Reagan

4    George responding to his letter that we just looked

5    at; is that correct?

6             A.   That's what it appears to be.

7             Q.   Okay.  And Ms. Leider says to VVA, "I

8    think your conclusion that Alexandria has more voters

9    on its registration rolls than it has eligible living

10   citizen voters can be based on old or faulty data."

11   Do you see that?

12            A.   That's what it says.

13            Q.   And she goes on to say, "currently about

14   65 percent of Alexandria's voting age population is

15   registered to vote," right?

16            A.   That's what it says.

17            Q.   Right.  And then in the second-to-last

18   paragraph, if you turn the page, thank you, it says:

19                 "It is difficult to address the

20                 concerns raised in your letter

21                 without additional information about

22                 the specific reports and information

23                 you relied on to reach your

24                 conclusions.  For example, was there

25                 a particular chart or dataset in the

1           2014 EAC Report that supports your

2           claims?"

3      Do you see that?

4      A.   It says that.

5      Q.   Okay.  And so is it -- is it fair to say

6  that PILF and VVA had made an assertion about the

7  City of Alexandria's voting rolls, correct?

8      A.   Wait.  What was your question?

9      Q.   Sort of a foundational question.  So we've

10 established that VVA and PILF made an assertion with

11 regard to the City of Alexandria's voter rolls,

12 correct?

13     A.   I wouldn't disagree with that.

14     Q.   Okay.  And those letters that we just

15 looked at, one from PILF, one for VVA, did not say

16 how many more people PILF or VVA thought were on the

17 rolls than were eligible; is that right?

18     A.   We've been through that.  I have answered

19 that.  As a matter of fact, that was one of the

20 moments where I said we could be here all day, as you

21 were adding numbers to that, and I said I've already

22 answered that.

23     Q.   And then Ms. Leider disputes your

24 characterization that Alexandria has more voters on

25 its registration rolls than it has eligible living

Page 42

1    citizens, correct?

2         A.   That's your assessment.   I think that

3    that's a fair assessment.

4         Q.   Now --

5         A.   It's incorrect, by the way.   She's wrong.

6    She makes a fundamental mistake in her dispute.

7         Q.   So the disagreement that you just

8    manifested in your answer is the same disagreement

9    that prompted PILF to sue the City of Alexandria on

10   behalf of VVA; is that right?

11        A.   I'm not going to answer that question.

12   It's privileged.   Sorry.

13             MR. DAVIS:   I was getting to that

14   instruction.   Be cognizant, to the extent you can

15   answer it, answer it, but be cognizant of the

16   attorney-client relationship with VVA.

17        Q.   I'll ask it differently.   The dispute

18   between VVA and PILF was not resolved, correct?

19        A.   It was not resolved -- it was resolved

20   actually, yes.

21        Q.   At this time.

22        A.   Oh, at this time.

23        Q.   Yes.

24        A.   That wasn't in your question.

25             MR. DAVIS:   "This time" being the date of

1    the letters?

2              MR. TEPE:   Right.

3         A.   I would not disagree that on February

4    10th, 2016 the dispute was not resolved.

5         Q.   Okay.  And that led to VVA suing the City

6    of Alexandria in April of 2016, correct?

7         A.   The dispute was not resolved in February

8    of 2016 nor was it resolved prior to the filing of

9    the lawsuit.  If you have the complaint that will

10   show me dates, I will be happy to be more specific in

11   my answer.

12        Q.   And PILF represented VVA in this

13   particular lawsuit, correct?

14        A.   I've answered that question, yes, a number

15   of times.

16        Q.   And VVA's lawsuit was dismissed, correct?

17        A.   Without prejudice.

18        Q.   And VVA never refiled its lawsuit against

19   the City of Alexandria.

20        A.   That is a matter of public record.

21        Q.   And the answer is yes?

22        A.   VVA never refiled its lawsuit is a matter

23   of public record.

24        Q.   And PILF, by itself, as its own separate

25   entity, has not filed a lawsuit against the City of

1  Alexandria since the VVA suit was dismissed without

2  prejudice, correct?

3       A.  Correct.

4       Q.  Now after the dismissal, you went to the

5  registrar's office to inspect various documents with

6  regard to the city's lists -- voter roll list

7  maintenance practices; is that right?

8       A.  When you say "you," who are you referring

9  to?

10      Q.  You, Mr. Adams.

11      A.  We can talk about that next week, but a

12 representative from PILF was there.  I was that

13 representative.

14      Q.  Who else was there with you?

15      A.  Reagan George and Keith Damon.

16      Q.  Anyone else?

17      A.  Ann Leider.

18      Q.  Okay.  No, I'm saying with you.

19      A.  Oh.  No.

20      Q.  Okay.  Do you recall on what date you went

21 to the City of Alexandria's offices to have this

22 inspection of their records?

23      A.  If you have a document that would refresh

24 my recollection, I'd be happy to look at it.

25                (VVA Exhibit 7 previously

1          marked for identification and

2          referenced herein: Thompson McMullan

3          letter dated 8/10/2016

4          PILF-ADAMS-0000637 - 0000641)

5     Q.   Handing the witness what has been marked

6   as VVA Deposition 7, do you recognize this document,

7   sir?

8     A.   I don't, but I don't disagree that the

9   answer to your question is probably contained in

10  here.

11    Q.   Right.  So this is a letter from the

12  attorney for the City of Alexandria, William Tunner;

13  is that right?

14    A.   It's a letter that states the date of the

15  inspection was July 25th, 2016.

16    Q.   So recollection refreshed.

17    A.   Recollection refreshed.

18    Q.   Okay.  And you went there on the 25th, and

19  an attorney for the League of Women Voters wanted to

20  attend the inspection at the same time too; is that

21  right?

22    A.   I don't remember a lot about that.  There

23  was somebody there, but that's the extent of my

24  recollection.

25    Q.   Do you recall taking the position that you

1  did not want to inspect the records with this other

2  party present?

3        A.  I don't, but that would have been a

4  perfectly reasonable one had I taken it.

5        Q.  Why is that?

6        A.  Because it was a third party.  It was

7  perfectly reasonable to not conduct our

8  attorney-client relationship and inspection in front

9  of third parties.

10       Q.  But you said Ms. Leider was there, so

11  there's no privilege in that meeting.

12       A.  Right, but there is privilege when I go

13  and take the client aside and speak.

14       Q.  Right.  So how is that different than, you

15  know, you taking the client aside and speaking when

16  Ms. Leider --

17       A.  Because Ms. Leider would leave the room.

18       Q.  Excuse me.  If I can finish my question.

19       A.  Go ahead.

20       Q.  How is that different from when Ms. Leider

21  is there and some other third party is there?

22       A.  Because we were being followed by the

23  other third party, and Ms. Leider would respect our

24  confidences whereas this third party would not.

25       Q.  Well, was there an example of this party

1    not respecting your confidences?

2         A.  I just said so.

3         Q.  No, no, no.  Was there an example of that

4    party not respecting your confidences?

5         A.  Yes.  I just said so.

6         Q.  Okay.  What happened?

7         A.  My recollection was that we couldn't speak

8    freely between each other, and Ms. Leider was

9    respectful of that relationship whereas the third

10   party was not.

11        Q.  So there was an instance, it's your

12   testimony, that you went off to the side of the room

13   and this other attorney or third party would actually

14   follow you and not allow you to have a private

15   conversation?  That's your testimony?

16        A.  My testimony is that the third party would

17   not respect our confidences.

18        Q.  Yes, and I just asked you, did the

19   situation that I just described happen?

20        A.  I don't remember the situation you just

21   described.

22        Q.  Well, how else -- okay.

23        A.  We weren't able to speak freely around

24   each other with a third party there.  That's my

25   testimony.

1      Q.   Yeah, and I'm trying to understand why.

2      A.   Because the third party could hear.

3      Q.   But Anna Leider could hear.

4      A.   Anna Leider wasn't always there.

5      Q.   Okay.  So why couldn't you just --

6      A.   Because this wasn't the third party's

7  request.  This was our request.  It was our

8  inspection.

9      Q.   These are public records, right?

10     A.   That's funny.

11     Q.   Well, that's --

12     A.   We had to litigate to get them, so right.

13     Q.   Well, right, that's your position, these

14  are public records, right?

15     A.   That's our position, correct.

16     Q.   That's your position, right.  So if these

17  are public records and this is an inspection, why

18  can't some other party be there during the

19  inspection?

20     A.   I don't have a view of that, generally

21  speaking.  Specifically speaking, in this instance,

22  the third party is not respecting our confidences.

23  I've answered that question now four times.

24     Q.   So regardless of the reason, this other

25  party left and did not stay for your inspection.

1          A.   I hope so.   That's my recollection.

2          Q.   Ms. Leider assembled the requested records

3     in a room; is that right?

4          A.   It was in a separate room.

5          Q.   And during the inspection you saw records

6     for registration, voter registration cancellations;

7     is that right?

8          A.   There was a wide variety of records there.

9     I am sure that there were records for voter

10    registration cancellations.

11         Q.   And were there records there indicating

12    voter registration cancellations based on a failure

13    to affirm citizenship?

14         A.   No.   There were records there relating to

15    noncitizenship that said declared noncitizens, not

16    failure to affirm, it was declared noncitizen

17    cancellations.

18         Q.   Okay.

19         A.   There's a difference.

20         Q.   And did this report have a name?

21         A.   It may have.   If you have it and want to

22    show me to refresh my recollection to get the

23    specific name, I'd be more than happy to do that.

24         Q.   Well, there's a report that you're

25    evidently thinking of very specifically, and I want

1    to know what's the term that you use in describing

2    this report.

3            A.   Well, the term that I use would be

4    consistent with what the report says, and if you have

5    it for me to look at, I'd be more than happy to take

6    a look at it.

7            Q.   And so you did see a report that, as you

8    described, was a list of cancellations using the

9    declared noncitizen nomenclature, correct?

10           A.   Well, the nomenclature is usually what the

11   actual document says.  It's not nomenclature; it's

12   what it says.

13           Q.   You wanted to make a copy of that report,

14   correct?

15           A.   Absolutely.  And do you want to know why?

16           Q.   And you were not able to make a copy of

17   that report --

18           A.   That's not correct.

19           Q.   -- on that day.

20           A.   That's not correct.  We were able to make

21   a copy of the report.  The problem was we were denied

22   access to make a copy of the report.  There's a

23   difference between ability and denial, and in this

24   particular instance we were denied access to making a

25   copy of that report.

1      Q.  Right, because the City of Alexandria was

2   not sure if, pursuant to law, you had the right to

3   view -- to copy -- certain of that information; is

4   that right?  That's their position.

5      A.  That -- if you have a document that would

6   be more specific in refreshing my recollection, I

7   would be happy to look at it.  My general

8   recollection is, which may be wrong, was that the

9   city general registrar had some measure of

10  trepidation about providing that report without

11  talking to other people.

12     Q.  Correct.

13     A.  But -- I'm sorry.

14     Q.  Well, I think, if you look at the August

15  10th letter, which is VVA Exhibit 7 --

16     A.  Okay.

17     Q.  -- confirms your recollection, is that

18  correct --

19     A.  Well --

20     Q.  -- that you had requested a category of

21  documents, you were unable to take copies of them at

22  that time based on a position as to, you know,

23  whether or not you could do so, right?

24     A.  Right, a position which was later proved

25  to be incorrect, and --

Page 52

1          Q.   Understood, but I'm talking about this
2     time.
3          A.   At that time that was her -- VVA
4     Deposition Exhibit 7 refreshes my recollection that
5     there was a measure of trepidation that the GR in
6     Alexandria was receiving ultimately incorrect
7     direction that she could not provide us a copy of the
8     documents.
9                    (PILF Exhibit 6 marked for
10                    identification: Email correspondence
11                    from (topmost) N Johnson dated
12                    9/13/2016 with attachment
13                    PILF-ADAMS-0003265 - 0003277)
14               MR. TEPE:   The court reporter has marked
15     and handed to the witness what has been noted as PILF
16     Exhibit 6.
17          Q.   Do you see that?
18          A.   There's a PILF Exhibit 6 in front of me.
19          Q.   Yes.   And do you recognize this document?
20          A.   I've seen this document before.
21          Q.   Okay.   And so the document begins with
22     email correspondence between the City of Alexandria's
23     attorney, William Tunner, correct, and Noel Johnson?
24          A.   I don't know.   Hold on.   Tunner to
25     Johnson, page 2 of the document.

Page 53

1    Q.   Yeah.   Who is Noel Johnson?

2    A.   He's an attorney that you deposed a week

3    ago sitting in this chair at PILF.

4    Q.   So there's some back and forth, and,

5    ultimately, you are forwarded this correspondence by

6    Noel Johnson on September 13th, 2016, correct?

7    A.   It appears that I was forwarded this.   If

8    you're saying this correspondence --

9    Q.   I'll --

10   A.   -- yeah, I wasn't part of it, you're

11   right.

12   Q.   Yes.

13   A.   And it wasn't until -- September 13, 2006

14   was the first time I was forwarded the declared

15   noncitizen cancellation list from Alexandria.

16   Q.   Right.   Okay.   So I was going to get

17   there.

18   So on September 13th, 2016 Noel Johnson

19   forwards you the information that he received from

20   the City of Alexandria, correct?

21   A.   Wait a minute.   I think you've asked that,

22   and I answered it, but now I'm confused by what

23   you're asking.

24   Q.   Well, I'm just trying to take it step by

25   step and you're jumping ahead of me.

1      And so the first step is, Tuesday, September

2   13th, Noel Johnson forwards you information from the

3   attorney for the City of Alexandria, correct?

4      A.   And it appears that information is

5   referenced in the attachment that says

6   noncitizen.PDF, mentalincapacity.PDF, so it appears

7   that there was an attachment to this email exchange.

8      Q.   Exactly.   And so I want to ask you to turn

9   to that attachment.

10      A.   I've turned to it.

11      Q.   It is an attachment to a document that

12   says, Cancellation - Declared Non-Citizen, Alexandria

13   City.   Do you see that?

14      A.   Yes.

15      Q.   For a period of time from January 1st,

16   2012 to September 13th, 2016.

17      A.   That's what it says.

18      Q.   Is this the document that you were

19   referring to seeing in the inspection in Alexandria

20   on July 25th?

21      A.   It probably is.   I mean, I could be proven

22   wrong about that, but it probably was.

23      Q.   And this is the record that you wanted

24   from Alexandria; is that right?

25      A.   I don't understand what you mean.

1      Q.   Well, you requested this record, right?

2      A.   Okay.   This is the record we requested.

3      Q.   Okay.

4      A.   This is the record we requested in --

5   trying to remember the exhibit number -- January of

6   2016.  Let's see what date this is.  September 13th,

7   2016.

8      Q.   Where in the letter in January of 2016 do

9   you request this record?

10      A.   Well, that was your characterization of

11   our paragraph (b), sub-(b) on page 2.

12      Q.   Well, I think the transcript will speak

13   for itself, but can you point to me anywhere in

14   January -- this January letter -- which either the

15   VVA dated January 25th or the PILF letter January

16   14th to ask for this specific record?

17      A.   I thought we engaged in this exercise

18   already when you instructed me that paragraph (b) in

19   your view would seem to satisfy that request for the

20   noncitizen list.  At the time I didn't disagree with

21   your characterization.

22      Q.   Okay.  My question right now is:  Can you

23   point to me anywhere, any language in either of these

24   two letters, January 14th from PILF or January 25th

25   from VVA, that calls for this specific record?

Page 56

1      A.   Yes.

2      Q.   Okay.  Where is it?

3      A.   (j).

4      Q.   (j). (j) states, "all list maintenance

5   records, including federal voter registration forms

6   containing citizenship eligibility questionnaires for

7   the last 22 months."  And you're saying that this

8   specific record was called for by item (j)?

9      A.   Because it's a list maintenance record,

10   including federal voter registration forms containing

11   citizenship eligibility questionnaires list is just a

12   subset of all the maintenance records.  So (j) is an

13   omnibus request.

14      Q.   Fair enough.  Thank you.

15      MR. DAVIS:  When you get to a point, I

16   would like to take a quick bathroom break.

17      Q.   So going back to the -- well, I guess

18   we're looking at the January records request, you had

19   items (a) through (j), correct?  Right?

20      A.   Yeah.

21      Q.   And that's ten categories of information,

22   right?

23      A.   I guess.  I mean, the document speaks for

24   itself.

25      Q.   And then now after the inspection in July,

1    did you focus your request from Alexandria on this

2    particular document, which is PILF Exhibit 6?

3         A.   We focused our request on all the

4    requested documents from our document inspection that

5    we wanted.

6         Q.   Okay.  And so is this -- this is one of

7    the documents you wanted.

8         A.   Oh, very much so.

9         Q.   Okay.  And then --

10        MR. TEPE:  We can go off the record.

11        VIDEO SPECIALIST:  We're off the record,

12   10:22.

13        (Proceedings recessed)

14        VIDEO SPECIALIST:  We're back on the

15   record, 10:30.

16   BY MR. TEPE:

17        Q.   Did seeing the list -- strike that.

18             (PILF Exhibit 7 marked for

19             identification: Email correspondence

20             from (topmost) C Adams sent 8/5/2016

21             PILF-ADAMS-0000654 - 657)

22        MR. TEPE:  The court reporter has marked

23   as PILF Exhibit 7 a document Bates number 654.

24        Q.   Mr. Adams, do you recognize this?

25        A.   I have seen this before.

1    Q.  And so there's an email dated August 5th,

2    2016 from you to Shawna Powell copying Noel Johnson,

3    correct?

4    A.  That's what it says.

5    Q.  Attached to it is a marked-up draft of a

6    letter; is that correct?

7    A.  Yes.

8    Q.  And this is a letter from PILF to -- or a

9    planned letter -- from PILF to a bunch of election

10   jurisdictions; is that right?

11   A.  Well, you say "a bunch," but you can count

12   the number, but I won't disagree that that's what it

13   generally is, with the exception of potentially one,

14   two, three, four, five, six, seven, eight ... 19

15   jurisdictions.

16   Q.  Nineteen jurisdictions.  Okay.  And these

17   are edits that you made to this letter, correct?

18   A.  If you say so.  I'm -- well, I mean, it

19   would stand to reason the way this is presented to me

20   that these were my edits, yes.

21   Q.  So it's a marked-up document, and in your

22   email to Ms. Powell you say, okay, here you go,

23   revised.

24   A.  Right, but that doesn't necessarily answer

25   the question if they're my edits.  It might have been

1    somebody else gave them to me.   There's a good chance

2    they're my edits.   There's some chance they're not.

3         Q.   But someone at PILF edited this for sure.

4         A.   Almost certainly, yes.

5         Q.   So this is a letter, again, making a

6    request for inspection of records relating to voter

7    list maintenance obligations under the National Voter

8    Registration Act.

9         A.   It is.

10        Q.   Okay.   And you in this letter, draft

11   letter, you request four things; is that correct?

12        A.   It's what it shows.

13        Q.   And --

14        A.   I can tell you what they are, if you'd

15   like.

16        Q.   I want to direct your attention to item 2,

17   specifically the language that is struck.   Do you

18   agree -- do you see a list of all individuals?   Do

19   you see that that's been deleted?

20        A.   Right.

21        Q.   It says:

22             "A list of all individuals who have

23             been purged from your jurisdiction's

24             voter registration lists in the last

25             two years because the individual was

1           not a citizen of the United States

2           of America, along with the date on

3           which each purged individual last

4           voted."

5       Okay.  So someone at PILF, presumably you,

6   struck that language, correct?

7           A.   Correct.

8           Q.   Okay.

9           A.   That's what the document shows.

10          Q.   And the document also shows that, instead

11  of that language, it appears you went with the

12  language that is here under number 1.

13          A.   Number 1 is a revision to the document.

14          Q.   Right.  And so a revision of that

15  language, correct, that says document -- the revised

16  language says:

17          "Documents regarding all registrants

18          who are identified as potentially

19          not satisfying the citizenship

20          requirements for registration from

21          any information source,

22          including"....

23      And then it lists a couple of things, correct?

24          A.   That's what the edit shows.

25          Q.   All right.

Page 61

1           (Johnson Exhibit 2

2           previously marked for identification

3           and referenced herein: Email

4           correspondence from (topmost) N

5           Johnson sent 8/16/2016 with

6           attachments

7           PILF-ADAMS-0009064 - 9135)

8           MR. TEPE:   The witness is being handed an

9    exhibit that was previously marked as Johnson 2.

10          Q.   And I really just want to have you confirm

11   that the draft letter that we were looking at in PILF

12   Exhibit 7, a copy of that is here in Johnson Exhibit

13   2, starting on page Bates number 9067; is that right?

14          A.   It appears to be.

15          Q.   And so this particular letter is to the

16   registrar for Prince William County, correct?

17          A.   That's what it says.

18          Q.   Dated August 8th, 2016, and it has that

19   same language in the request number 1, right,

20   documents regarding all registrants who are

21   identified as potentially not satisfying the

22   citizenship requirements, right?

23          A.   I mean, I haven't done a document compare,

24   but I have no reason to, looking at it with the

25   amount of time I have, to disagree.

1        Q.   This request does not seek a list of

2   people canceled because the individual was in fact

3   not a citizen of the United States, does it.

4        A.   No, I would disagree with that.   And the

5   reason I would disagree with that is because of a

6   variety of information that came to our attention

7   regarding these VERIS reports directly from election

8   officials.

9        For example, Ann Leider at Alexandria City

10  told me very directly and very specifically that the

11  individuals on this list were noncitizens, and she

12  told me very specifically and very directly that they

13  had testified or affirmed under oath, I should say,

14  under penalty of perjury, that they were noncitizens,

15  and that's how they ended up on this list.

16       After I learned that from the Alexandria

17  general registrar, I had conversations with other

18  elected officials -- I'm sorry, other election

19  officials -- who corroborated Ann Leider's statements

20  to me that, if you are on this list, Cancellation -

21  Declared Non-Citizen, you were a noncitizen who had,

22  under oath, under penalty of perjury, asserted that

23  they were a noncitizen, and then the state engaged in

24  a follow-up process to give them the opportunity to

25  withdraw that under-oath assertion that they were a

1    noncitizen.

2         So I would disagree with the characterization

3    that paragraph 1 does not ask for this information.

4         Q.   Who were the other officials that you say

5    corroborated Ms. Leider's --

6         A.   Multiple -- I'm sorry -- multiple

7    discussions with other general registrars.

8         Q.   Who?

9         A.   Well, when I spoke with other general

10   registrars around the state, they gave me an account

11   entirely consistent with Ann Leider's.  I spoke with

12   former general registrars in Virginia who validated

13   Ann Leider's assertion that, when you showed up on

14   the Cancellation - Declared Non-Citizen list, you did

15   so because you declared yourself that you were a

16   noncitizen, under oath, under penalty of perjury,

17   with the state, then, making a subsequent secondary

18   declaration based on their inquiries that you were

19   also a noncitizen.  There was no ambiguity about

20   this -- none.

21        Q.   Okay.  My question was who?

22        A.   Well --

23        Q.   Who did you speak with?

24        A.   I spoke with Ann Leider, other general

25   registrars.

1          Q.   Who?

2          A.   Other general registrars, such as Cameron

3     Quinn --

4          Q.   Cameron Quinn.

5          A.   -- Fairfax County general registrar.  I

6     spoke with former state election directors in

7     Virginia.

8          Q.   Who?

9          A.   Cameron Quinn was a state election

10    director.  I spoke with Don Palmer.  All of these

11    individuals confirmed, without any equivocation or

12    contradiction, that when you are on the declared

13    noncitizen list you were a noncitizen.

14         Q.   Anyone else?

15         A.   Yeah, there were others.  I can't remember

16    all of them, but there's multiple, and I heard the

17    exact same version over and over and over again

18    without any ambiguity.

19         And, as a matter of fact, if you look at the

20    exhibit --

21         Q.   There's no question.

22         A.   The question is still pending.

23         Q.   No, there is no question pending.

24         MR. DAVIS:  Yeah, let's --

25         A.   Right.

1    Q.   Okay.  So but it is, as you just

2    testified, in the draft letter, which is PILF Exhibit

3    7, the language seeking a list of all individuals who

4    have been purged from your jurisdiction's voting

5    registration lists in the last two years because the

6    individual was not a citizen of the United States of

7    America was struck, correct?

8    A.   Okay.  I don't see where you are.

9    Q.   Okay.  It's what we covered --

10   A.   You're on the draft -- what exhibit

11   number?

12   Q.   PILF Exhibit 7.

13   A.   7 ...

14   Q.   The draft letter.

15   A.   Okay.

16   Q.   The language that we had looked at that

17   had been struck.

18   A.   Right.  We didn't need that language

19   anymore because numerous election officials had told

20   us, former general registrars -- excuse me, I made

21   that mistake again -- former election officials --

22   had told us that, when you were on the canceled

23   declared noncitizen, that was determinative, that

24   somebody -- that the voter had testified, under oath,

25   under penalty of perjury, in the DMV process that

Page 66

1    they were noncitizens, and that the state did a

2    subsequent or the county did a subsequent follow-up

3    to validate that under-oath assertion.

4         So our focus changed, because every election

5    official who I spoke with told us that there was no

6    ambiguity about these people being noncitizens.

7         And so, yes indeed, we narrowed our focus to

8    something far more useful, which is the broader

9    inquiry of all of the documents, not just this

10   particular document.

11        And, as a matter of fact, if you look at Billy

12   Tunner's email to us in -- I'm not sure it's

13   marked -- it's VVA Deposition Exhibit 7 -- actually

14   that's not it.  It's the forwarding email that you

15   asked me about.

16        Mr. Tunner, who is the lawyer for Ann

17   Leider -- it's Deposition Exhibit 7 -- I'm sorry,

18   that's not it.  It's a Tunner email you sent -- or

19   you asked me about.  Mr. Tunner very specifically

20   says these are individuals determined to be

21   noncitizens, and he's an attorney for the Alexandria

22   general registrar.

23        Q.  He was just quoting back language that you

24   guys had used, correct?

25        A.  Well, he was, but that's good enough,

1    isn't it now.  And not only that, he's quoting

2    language back that his client had said to me.  So

3    it's a double verification.  He was quoting language

4    that his client said to me that these were

5    noncitizens, who happened to be, by the way, the

6    client was the general registrar of the City of

7    Alexandria.

8         Q.  Okay.  So you struck language seeking a

9    list of individuals who had been purged because the

10   individual was not a citizen of the United States and

11   replaced that with language seeking documents

12   regarding all registrants who are identified as

13   potentially not satisfying the citizenship

14   requirements, correct?

15        A.  That's what it says, and we did that

16   because we wanted a wider and more systematic and

17   thorough examination of the entire citizenship

18   process that obviously we discovered in the summer of

19   '16 had significant flaws that --

20        Q.  Okay.

21        A.  Can I finish?  -- that was allowing

22   noncitizens.  So the change was made to have a

23   broader inquiry to get a more holistic assessment of

24   the problems in the Commonwealth.

25        Q.  And so this letter that was edited on

Page 68

1    August 5th -- looking at PILF Exhibit 7 -- came less

2    than two weeks after the inspection on July 25th in

3    Alexandria, correct?

4         A.   I mean, the dates speak for themselves on

5    the document.

6              (PILF Exhibit 8 marked for

7              identification: Email correspondence

8              from (topmost) N Johnson sent

9              8/17/2016 with attachment

10             PILF-ADAMS-0008942 - 0008989)

11             MR. TEPE:  The court reporter has marked

12   as PILF Exhibit 8 a document with the Bates number

13   8942.

14        Q.   Do you see that?

15        A.   Exhibit 8, yeah.

16        Q.   And attached to this email is a series of

17   letters to other jurisdictions similar to the one

18   that we just looked at in PILF Exhibit 7, right?

19        A.   Well, give me a moment, please.  Yeah, I

20   don't see anything other than that attached on 8.

21        Q.   And all of these requests contain the same

22   language for request number 1, documents regarding

23   all registrants who were identified as potentially

24   not satisfying the citizenship requirements for

25   registration.

1       A.   Okay.  I'd have to go through and do it

2   all -- I will tell you that I assume it does, but at

3   this point we were doing a more holistic, thorough

4   examination of what was going wrong in Virginia as

5   opposed to the earlier simple request for a list of

6   names.

7       By this point we had evolved to trying to

8   determine what the root cause was of these

9   noncitizens getting on the rolls, and so it would be

10  consistent with that change in focus that the August

11  8th letter had the more holistic request.  But I

12  could go through and verify every one, if you want me

13  to.

14      Q.   So if I understand your testimony,

15  changing the request from a list of noncitizens of

16  the United States to a list of registrants who were

17  identified as potentially not satisfying the

18  citizenship requirements is a more holistic request?

19      A.   That's part of it.  The "potentially"

20  wasn't the important part.

21      Q.   I'm sorry?

22      A.   I said that's -- my answer was that's part

23  of it, but the word "potentially" was not the

24  important part of the request, who were identified as

25  potentially not satisfying.  The word "potentially"

1    is largely irrelevant.

2         What is more relevant is the broader inquiry

3    as to what's going wrong in Virginia, what causes

4    this to happen, what do you do about it when you

5    discover there's a problem.

6         We were trying, rather than just getting a

7    list of people who were noncitizens who were removed,

8    we were attempting to take the temperature of what's

9    -- and to actually get a lot more than temperature --

10   we were trying to get all sorts of vitals, if you

11   will, as to what the broader problem was in the

12   state.  And you do that by looking at all the

13   documents associated with it.

14        At this point we had heard from, as I said

15   earlier, a number of election officials who were

16   guiding us as to what the best approach was as far as

17   asking for documents, and I already testified as to

18   who they were.

19        Q.  And so if I understand what you're saying,

20   in order to figure out -- strike that.

21        To answer the question of whether or not there

22   are noncitizens turning up on the registration

23   lists --

24        A.  Well, that question is already answered.

25        Q.  I'm in the middle of my question.

1      A.   Oh, I'm sorry.  I thought you asked one.

2      Q.   No.  So to answer the question of whether

3  or not there are noncitizens turning up on the voting

4  rolls, you felt it was necessary to not rely on a

5  single document or list but to look at the greater

6  context of how these people were showing up and

7  whether or not they were --

8      A.   No -- sorry.

9      Q.   -- and whether or not, you know, they

10  should be on that list.

11      A.   I disagree with your premise.  The

12  question as to whether noncitizens were showing up on

13  the voter rolls had already been answered.  It had

14  been answered by the face of this document.  It had

15  been answered by election officials in Alexandria who

16  told me these were noncitizens who were on the rolls.

17  It had been answered by other former Virginia

18  election officials who told me noncitizens were on

19  the rolls.  So I question your premise.

20      What we were trying to do is to figure out why

21  it was happening, not if it was happening.  If had

22  already been established.  There are noncitizens on

23  this list.

24      Q.   Okay.  And so are you saying that all

25  those people are noncitizens?

1    A.  I'm saying there are noncitizens on this

2    list.  I didn't have the ability to figure out if

3    there aren't noncitizens on this list.  But when

4    election officials told me these are noncitizens, it

5    is inherently reliable, and my next question is why

6    is this happening.

7    Q.  Okay.  So just so I understand your

8    testimony, at this time in -- I guess we're in August

9    of 2016 -- well --

10   A.  You are.  You're in August of 2016.

11   Q.  Well, the exhibit we were looking at,

12   which is PILF Exhibit 7 -- is that right, the one

13   with the list that you were just pointing at?

14   A.  The Alexandria list of noncitizens,

15   declared noncitizens, Exhibit 6, was produced, it

16   appears, on September 13, 2016.

17   Q.  Okay.  So just in terms of the timeline,

18   you hadn't in August received that list from

19   Alexandria, correct?

20   A.  I had seen the list.

21   Q.  You had seen --

22   A.  And I had a discussion with both the

23   general registrar in Alexandria about what the list

24   meant as well as other election officials around the

25   Commonwealth as to what the list meant.

1    So I had very much had a great deal of

2    familiarity prior to August of 2016 about Exhibit 6,

3    declared noncitizen list.

4    Q.  Okay.  So I think -- so just in terms of

5    the timeline, you hadn't in August received the list

6    from Alexandria, correct?

7    A.  I disagree with that.  I had held it in my

8    hand.  I had held it in my hand on July 25th, 2016,

9    and I had very carefully looked at it and had

10   discussions about the list of declared noncitizens

11   from Alexandria with the general registrar of

12   Alexandria.

13   Q.  So you see this list and the inspection,

14   and then that causes you to make requests of other

15   jurisdictions, correct?

16   A.  That's incorrect.  I saw this list in the

17   inspection and had a discussion with the general

18   registrar of the City of Alexandria about it.

19   What caused us to make the subsequent

20   inspections was something you left out and I

21   testified about very clearly, and that was my

22   intervening discussions with multiple election

23   officials, former and current, in the Commonwealth

24   about what this list in Exhibit 6, Alexandria City

25   declared noncitizen, meant and how it was generated

Page 74

1   and the inherent reliability of the list.

2        Q.   Okay.

3        A.   And those conversations confirmed my

4   previous understanding, and that led to the August

5   8th mailings going out.

6        Q.   Okay.  So I'm just trying to understand

7   your testimony.  Is your testimony that between July

8   25th, when you had the inspection in Alexandria --

9   and August, was it 4th, that draft letter -- you had

10  conversations with former election officials.

11       A.   And current.  You left that out of your

12  question.

13       Q.   I'm sorry.  And in PILF Exhibit 7 it's

14  August 5th.

15       A.   Yeah.

16       Q.   So between July 25th and August 5th you

17  had conversations with Ann Leider and Don Palmer and

18  Cameron Quinn with regard to the reliability of the

19  Cancellation - Declared Non-Citizen list.

20       A.   No, my discussions predated January -- or

21  July 25th, among some of those, but were related to

22  this very issue.  I had been in ongoing discussions

23  with other election officials around the Commonwealth

24  regarding this problem.

25            After I saw the list of Exhibit 6, Alexandria

1   declared noncitizens, I had subsequent conversations

2   with a variety of individuals, among those you

3   included, but probably also Clara Belle Wheeler.

4       So there was a variety of individuals, both

5   before and after obtaining the list in Exhibit 6,

6   where I was gaining an understanding of what the

7   problem was and what this list meant.  It wasn't just

8   two weeks, if that's your question.

9       Q.  So is it your testimony that you were

10  aware of this specific list before the inspection on

11  July 25th?

12      A.  I was aware that there was available a

13  list of people who had been declared noncitizens

14  prior to my inspection on July 25th.

15      Q.  Okay.  And how did you come to that

16  awareness?

17      A.  Because a variety of election officials,

18  both former and current, told me that there were

19  records related to this line of inquiry that were

20  available, if they were asked for.

21      Q.  Did they tell you this via email?

22      A.  I don't remember.

23      Q.  Did they tell you this via letter?

24      A.  Prob -- it was certainly not letter, no.

25  It would have been written records.

1    Q.  So this would be a conversation that you

2    had?

3    A.  For sure there would have been

4    conversations.

5    Q.  Okay.  And when did these conversations

6    take place?

7    A.  I don't remember specifically.

8    Q.  And who did they take place with?

9    A.  I already answered that question.

10   Q.  No, these conversations that alerted you

11   to the specific declared noncitizens --

12   A.  It wasn't this specific -- okay.  I'm

13   sorry.

14   Q.  Okay.  So my question is, were you aware

15   of this specific record, the Cancellation - Declared

16   Non-Citizen record, were you aware of this record

17   before the inspection on July 25th?

18   A.  I was aware that such similar records,

19   substantially similar records as the one produced in

20   Exhibit 6, existed if they were asked for, yes, from

21   election officials around the Commonwealth because of

22   my conversations with them.

23   Q.  Right.  And who specifically --

24   A.  I've answered that question.

25   Q.  So Cameron Quinn specifically told you

1   that this kind of record existed.

2        A.   I gave you a list of some of the people

3   that I spoke with in an ongoing effort to learn about

4   this issue.  Cameron Quinn was one person that I've

5   had conversations with about noncitizen records.

6        Q.   Understood.  And my question is, did

7   Ms. Quinn tell you that this is -- that this type of

8   record existed before July 25th?

9        A.   I don't have a specific recollection of

10  that.  Remember, Cameron Quinn was the general

11  registrar for the largest county in the state -- in

12  the Commonwealth, and she very much told me that

13  there were written records detailing noncitizens that

14  were available for the asking, yes.

15       Q.   Did anyone else besides Ms. Quinn?

16       A.   I've answered that.  Don Palmer and I had

17  discussions about the availability of noncitizen

18  cancellation records.  Don Palmer was the state

19  election director for the Commonwealth of Virginia,

20  and I found his assessments to be inherently

21  reliable.  There were others.

22       Q.   But right now only Palmer and Quinn are

23  those that you can recall?

24       A.   No, that's not my testimony.  I've told

25  you two other names.  Ann Leider is one, Don Palmer,

1    Cameron Quinn, Clara Belle Wheeler.  Hans van

2    Spakovsky was an election official in Virginia.  He

3    talked about the presence of noncitizen records.

4         So those are five election officials who I

5    relied on -- and more that I can't remember -- prior

6    to the letter of August 8th, 2016 going out.  None of

7    them offered any contradictory information.

8                        (Johnson Exhibit 3

9                    previously marked for identification

10                   and referenced herein: Email

11                   correspondence from (topmost) C

12                   Adams sent 8/16/2016

13                   PILF-ADAMS-0046537 - 0046538)

14              MR. TEPE:  The witness has been handed

15    what's been previously marked as Johnson Exhibit 3.

16         Q.  Do you recognize this document?

17         A.  I think I have seen this document before.

18         Q.  So this is an email that begins with an

19    email from Prince William County dated August 16th to

20    Public Interest Legal Foundation; is that correct?

21         A.  Right.

22         Q.  And this is or that was the response to

23    your records request, correct?

24         A.  Well --

25         Q.  Your August --

1      A.  -- partially, right.  It was not entirely

2  the response to our records request.

3      Q.  Okay.  But it was -- it was a response,

4  right?

5      A.  Well, it was forwarding records, but they

6  weren't just responding to our records request.  They

7  were also responding to the work of your law firm in

8  getting these records.

9      Q.  Okay.  I'm just asking a simple

10  question --

11     A.  Well, I'm answering the truth.

12     Q.  -- about the document here.  So Ahmad,

13  Rizwana Ahmad, sends to Public Interest Legal

14  Foundation, "Secretary Powell, in an effort to submit

15  a timely response, I wanted to contact you via

16  email," correct?

17     A.  That's what it says.

18     Q.  Okay.  And then Noel Johnson forwards that

19  to you and copies Kaylan Phillips and Joseph

20  Vanderhulst, correct?

21     A.  That's what it says.

22     Q.  And those are people who also work at

23  PILF, right?

24     A.  They -- yes.

25     Q.  Okay.  And what was forwarded was the -- a

Page 80

1   copy of the cancellation list that we had previously

2   looked at, the declared noncitizen cancellation list,

3   right?

4        A.  The Prince William version of Exhibit 6.

5        Q.  Correct.  And then at the top you

6   responded on August 16th at 6:05 p.m., "As you saw,

7   David Norcross said we've hit paydirt."  Do you see

8   that?

9        A.  I do.

10        Q.  Okay.  Who is David Norcross?

11        A.  He's a board member.

12        Q.  But at this time he wasn't.

13        A.  He was not.

14        Q.  Right.  And at this time, in August of

15   2016, who was David Norcross?

16        A.  He was a client.

17        Q.  He was one of the plaintiffs in the VVA

18   lawsuit against the City of Alexandria?

19        A.  Right.

20        Q.  Okay.  Now when you said, "As you saw,

21   David Norcross said we've hit paydirt," was this a

22   conversation that you had with Mr. Norcross?

23        A.  I did.  I was thoroughly happy that your

24   law firm had helped us acquire these documents

25   through the good work of one of your lawyers there

1    and had made contact with Prince William County, did

2    a lot of good work to help us get these documents

3    through the work of Skadden Arps.

4         Q.   Okay.  You realize that you're under oath,

5    correct?

6         A.   I do.

7         Q.   Right.  And what evidence do you have that

8    Skadden Arps, as a law firm, had any involvement in

9    this records request?

10        A.   Well, there were Skadden Arps emails from

11   Skadden Arps lawyers, conversations with Skadden Arps

12   lawyers that I had, and those emails were not -- not

13   ambiguous.  And Skadden Arps lawyers were assisting

14   in this project.  Are you not aware of this?

15        Q.   Can you provide a copy of the retention

16   letter in which you retained Skadden Arps?

17        A.   Well, you know that you don't need a

18   retention letter to have a client.  In fact there's

19   plenty of cases where lawyers and clients don't have

20   retention letters.  And in this particular instance I

21   had assumed that Skadden Arps was assisting in

22   collecting this information because they did a very

23   good job at it.  And it wasn't just to collect the

24   information; it was the dissemination of the

25   information, the media relations.  So there was a

Page 82

1    whole range of activities that your law firm was very

2    helpful with.

3        Q.   Okay.  So this email, though, doesn't

4    mention anything about Skadden Arps, does it.

5        A.   Others do.

6        Q.   I understand, I understand, I'm asking a

7    question about this email.

8        (Clarification by reporter.)

9        A.   This email does not mention your law

10   firm's assistance on its face.

11       Q.   Okay.  So can you take a look at Johnson

12   2?

13       A.   Johnson 2?

14       Q.   Yes.

15       A.   I'm not sure I've seen -- oh, wait.

16   Sorry.

17       Q.   So this is the underlying email to Johnson

18   3, which we were just looking at.  It shows the email

19   of Rizwana Ahmad on August 16th, correct?

20       A.   Right.

21       Q.   Okay.  And attached to that email included

22   the original request from PILF dated August 8th,

23   2016, correct?

24       A.   August ...

25       Q.   Yes, August 8th, 2016, one of the

Page 83

1      attachments.

2           A.   Right.   It was an August 8th letter.

3           Q.   Right.   So this is an August 8th letter

4      from PILF, correct, asking for certain records.

5           A.   Right.

6           Q.   And then the previous attachment, if you

7      go to the page ending in 9065, it's a letter from

8      Prince William County's Registrar Michele White,

9      right?

10          A.   It's August 16th on the document.

11          Q.   Okay.   And Michele White says, Dear

12     Secretary Powell, I am -- and this is dated August

13     16th, right?   I'm sorry.

14          "I am in receipt of your letter dated August

15     8th, which reached Prince William County Office of

16     Elections on August 12th."   Do you see that?

17          A.   It does say that.

18          Q.   "You have requested inspection of records

19     related to voter list maintenance, especially those

20     identified as potentially not satisfying the

21     citizenship requirements registration as of 2011."

22     Do you see that?

23          A.   It does say that.

24          Q.   Okay.   And then in the third paragraph it

25     says, "in response to your information request, I am

Page 84

1    providing a PDF of Prince William County Cancellation

2    - Declared Non-Citizen list dating back to January

3    1st of 2011 to the present day."  Do you see that?

4         A.  It says that.

5         Q.  Okay.  And she included one of these

6    cancellation lists, the Prince William version of it,

7    correct?

8         A.  It's in there, declared noncitizen in

9    Exhibit 2 Johnson.

10        Q.  Right.  Nowhere in this letter from

11   Ms. White does she say that she is responding to a

12   request of Skadden Arps, correct?

13        A.  The letter doesn't tell the whole story.

14   There's much more to this --

15        Q.  My question -- my question, sir, is,

16   nowhere in this letter from Ms. White does she say

17   that she is responding to a request to Skadden Arps,

18   correct?

19        A.  It is true that this letter does not

20   contain the entire story of what happened.

21        Q.  So if we can go back to Johnson 3.  About

22   less than three hours after receiving the email from

23   Rizwana Ahmad of Prince William County, you wrote,

24   "as you saw, David Norcross said we've hit paydirt."

25        A.  Right.

1    Q.   And this is a conversation that you had

2    with him, right?

3    A.   Yes.

4    Q.   What did he mean -- strike that.

5    What was your understanding of him saying --

6    the meaning of him saying "paydirt"?

7    A.   I think there was an awareness, and I'm

8    not positive about this, that he was aware of the

9    role of Skadden Arps in the collection of this data

10   in this project, and the fact that we had received

11   information from Prince William County very quickly

12   with the assistance of Skadden Arps led to a

13   celebratory tone because of the ability to obtain

14   information from a county, a very large county, that

15   had received instructions from the state, by the way,

16   a very important fact, not to provide this

17   information to us, yet it seemed that the role of

18   Skadden Arps was able to pry loose this information,

19   and so we hit paydirt, and it was a celebratory tone.

20   Q.   Okay.  So we just looked at a letter from

21   PILF to Prince William County, correct?

22   A.   I'm sorry.  What was that?

23   Q.   We looked at a letter from PILF --

24   A.   The August 8th letter in Johnson 2.

25   Q.   Right.  And this is an email that --

Page 86

1    excuse me -- this is a letter, August 8th, from

2    Secretary Powell, correct?  She's the secretary at

3    PILF?

4         A.  Yeah.

5         Q.  It copies Edgardo Cortes, right?

6         A.  Does it?  I don't see that.  If you

7    can direct me to -- oh, the letter itself?

8         Q.  The letter itself.

9         A.  It does.

10        Q.  Okay.  There's no mention of Skadden Arps

11   on this letter.

12        A.  Well, there's not, but it was delivered to

13   Skadden Arps, and the letter was provided to Skadden

14   Arps' lawyer in his effort to obtain the information.

15        And I can explain how that occurred and why

16   that occurred in greater detail, but, no, you're

17   correct, it doesn't say Skadden Arps on the letter

18   because it didn't need to.

19        Q.  Okay.  And then behind the letter is a

20   copy of looks like an envelope, right?

21        A.  Yep.

22        Q.  Yeah.  And so the envelope says Public

23   Interest Legal Foundation in the sender in the upper

24   left-hand corner?

25        A.  Right.

1       Q.  It came from Indianapolis, right?

2       A.  That's what it says.

3       Q.  Right.  And that's where, other than you,

4  that's where the folks at PILF work, right?

5       A.  More or less.

6       Q.  Okay.  And it's addressed to the General

7  Registrar Michele White, Prince William County,

8  right?

9       A.  That's what it says.

10       Q.  Okay.  So this request didn't come from

11  Skadden Arps.

12       A.  This request did not, but other requests

13  did.

14       Q.  Okay.  Well, I'm talking about this

15  request.

16       A.  I understand that.  This one did not come

17  from Skadden Arps.

18       (Clarification by reporter.)

19       Q.  And so this request came from PILF and

20  it's dated August 8th.  We looked at the letter,

21  right?

22       A.  I think we've been through this, but, if

23  you want to do it again, yes, August 8th.

24       Q.  And Skadden Arps is not referenced at all

25  in this letter, correct?

1        A.   Nor would it be because the help provided

2   by Skadden Arps was apart from the written

3   communication.

4        Q.   And so this letter, I believe your

5   testimony is, yes, this letter does not contain any

6   reference to Skadden Arps, correct?

7        A.   None of the document Johnson 2, as far as

8   I know, references Skadden Arps.  As my previous

9   testimony was, those were other documents that do.

10       Q.   And so the letter responding to your

11   August 8th request from Ms. White on August 16th has

12   no reference to Skadden Arps, correct?

13       A.   As I said a moment ago in my testimony,

14   nothing in Johnson 2 mentions Skadden Arps.

15       Q.   So I think your earlier testimony said

16   that, when you got this list, this cancellation list

17   from Prince William County, there was a celebratory

18   reaction to it, right?

19       A.   The celebratory reaction was because we

20   would no longer have to fight to obtain documents

21   because of the nice or, I'm sorry, the help of

22   Skadden Arps allowed us to get documents that we

23   thought we were going to have to fight to get.

24   That's a fact.

25       Q.   Okay.  Right.  And I understand you want

1  to just keep on putting the word "Skadden Arps"

2  into --

3       A.  No, I want to answer your question

4  truthfully.

5       Q.  -- into your answer.  And so my question

6  was, at PILF, okay, I think your earlier testimony

7  said that, when PILF received this list, this

8  cancellation list from Prince William County, there

9  was a celebratory reaction to it, correct?

10      A.  Because Skadden Arps helped us pry out

11 documents which we didn't think we would be able to

12 get without litigation.

13      Q.  And this email here, Johnson 3, says, "as

14 you saw, David Norcross said, we've hit paydirt,"

15 right?

16      A.  I've testified previously that that's what

17 Exhibit 3 says.

18      Q.  Right.  And that was, I think, part of the

19 celebratory reaction, correct?

20      A.  The entire celebration was based on the

21 fact that we got documents that we thought we were

22 going to have to go to federal court to get, but your

23 law firm helped us get them by communicating directly

24 with the friendly registrar in Prince William County

25 to pry loose these documents.

Page 90

1          It is entirely based on the role of your law
2     firm and our celebration that we would not have to go
3     to federal court because a great service was given to
4     us.  Thank you.
5          Q.  Entirely based by Skadden Arps.
6          A.  No, largely based.
7          Q.  Okay.  Well, you said entirely based,
8     didn't you?
9          A.  Our joy was entirely based on the fact
10    that we would not have to go to federal court to pry
11    loose these documents that were under instructions
12    from the state not to give us.
13         Q.  You said it is --
14         A.  May I finish, please?
15         Q.  Certainly.
16         A.  But when your lawyer called, when someone
17    working at your law firm called the Prince William
18    County registrar and at least told me that that's
19    what was done, these documents suddenly appeared
20    despite instructions from the Commonwealth not to
21    give them to us, and we were extremely celebratory.
22    We hit paydirt.
23         Q.  And it's your testimony that the documents
24    from Prince William County that we just looked at in
25    response to a request of PILF was entirely based on

Page 91

1    the role of Skadden Arps.

2           A.   Well, I can look around the state at the

3    empirical results --

4           Q.   That's your testimony?

5           A.   Well, no, it's not.  I'm going to answer

6    --

7           Q.   You're going to change your earlier

8    testimony.

9           A.   No, I'm not.  I'm going to explain to you

10   why --

11          (Clarification by reporter.)

12          A.   I will tell you where I -- why -- what

13   justifies that statement.  Other counties continued

14   to follow the instructions of the Commonwealth and

15   refused to give us the documents.  That's one of the

16   reasons that your law firm's lawyer at Skadden Arps

17   also organized an effort to collect documents from

18   those recalcitrant counties to try to duplicate the

19   success he enjoyed in Prince William County in

20   getting the documents to PILF.

21          So our reason for celebration was almost

22   entirely over the fact that we didn't have to sue

23   Prince William like we did Alexandria, Chesterfield

24   and Manassas.  Because of the success in obtaining

25   the documents, we hit paydirt.

Page 92

1          Q.  PILF used the records that they were

2     collecting, including these cancellation reports that

3     we were just looking at, for a report called "Alien

4     Invasion in Virginia," correct?

5          A.  Okay.  I'm sorry.  We used the records in

6     document 6 or -- I'm sorry.  Which one are you asking

7     about?

8          Q.  Well, you used -- I was asking a more

9     general question, which is, you used these

10    cancellation reports, we've looked at one from Prince

11    William and one from Alexandria, correct?  We've

12    looked at those two, right?

13         A.  Right, right.

14         Q.  You, PILF, used those records for a report

15    called Alien Invasion in Virginia, right?

16         A.  Yes, but there were other records besides

17    the two you just referenced.

18         Q.  I understand.

19         A.  Okay.  Some of which, once again --

20         Q.  No, there's no question pending.  Thank

21    you.

22         So let's talk about that report.  Who came up

23    with the idea to write Alien Invasion in Virginia?

24         A.  Well, I don't think there's any single

25    person who came up with it.  I think it's an ongoing

1   process, as you've heard my testimony, an awareness

2   among people who are election officials, former

3   election officials, about a defect in Virginia's

4   citizenship voter rolls, citizenship -- noncitizens

5   on the rolls.  And I think that there was a broad

6   understanding that there were problems, and it wasn't

7   just one single individual.  It was rather a group of

8   experts who decided that we needed data on that.  In

9   fact --

10          Q.  Okay.

11          A.  -- that was clear to everybody involved.

12          Q.  All right.  So who decided to write Alien

13  Invasion in Virginia?

14          A.  Well, I've sort of answered that.  There's

15  no single person.  It was a collaborative corporate

16  effort to rely on the role of experts outside of

17  PILF, rely on empirical data that we had been

18  collecting.  Rather than litigate over this, it was a

19  desire to educate about it --

20          Q.  Okay.

21          A.  -- and to fix the problem.

22          Q.  So there was a collective determination

23  within PILF to write Alien Invasion in Virginia.

24          A.  I think that's a fair characterization of

25  my testimony.

1      Q.  Who came up with the title "Alien Invasion

2   in Virginia"?

3      A.  I can't remember.  It's probably one of

4   the lawyers who was trying to be satirical.  You

5   know, it relates to The War of the Worlds,

6   H.G. Wells, as kind of a spoof.

7      Q.  But --

8      A.  Sorry?

9      Q.  I'm sorry.  I didn't want to interrupt.

10     A.  Well, no, go ahead.

11     Q.  But you don't recall who decided --

12     A.  Well, it may very well have been Noel.  It

13  was probably a collaborative effort that they

14  presented to me, and I remember receiving a

15  collective recommendation.

16     Q.  Okay.  And you said "Noel."  That's Noel

17  Johnson?

18     A.  No, no, I said it was collaborative is

19  what I said.

20     Q.  Oh, I'm sorry.  Okay.  I thought you said

21  Noel.

22     Was PILF trying to suggest that Virginia was

23  being invaded by noncitizens?

24     A.  Yeah, that's really funny.  I mean, come

25  on.  As I said earlier, it's satire.  It's humor.

1    It's an effort to use a well-known cultural reference

2    beginning with the H.G. Wells novel through the

3    movies of the '50s about flying saucers.  It is

4    something that universally pretty much everybody that

5    I've seen has laughed at it and gotten the joke, and

6    I think as a cultural reference, not something that

7    is implying that there's an actual invasion taking

8    place, and I think most people get that.

9         Q.  Mr. Johnson was in charge of pulling

10   together the first Alien Invasion report; is that

11   right?

12        A.  That was his testimony.

13        Q.  And that's your testimony as well.

14        A.  I don't have any reason to disagree with

15   it.

16        Q.  Well, you're the PILF 30(b)(6) witness.

17        A.  And I'm not disagreeing with it.  I think

18   that Noel organized the layouts, the text.  He had

19   certainly help from others, but Noel certainly was

20   leading the --

21        Q.  Charge?

22        A.  -- charge.

23                  (Johnson Exhibit 7

24             previously marked for identification

25             and referenced herein: Email

Page 96

1          correspondence from (topmost) N

2          Johnson sent 9/29/2016 with

3          attachment

4          PILF-ADAMS-0005621 - 0005636)

5      Q.   Handing you what's been called -- not

6   called -- but marked as Johnson Exhibit 7, do you

7   recognize this document?

8      A.   It looks to me like an email from Noel

9   Johnson just to me, and I've seen it before.

10     Q.   It's dated September 29th, 2016?

11     A.   September -- yes.

12     Q.   And says, subject line, "Draft Virginia

13  Report."

14     A.   That's what it says.

15     Q.   "Christian," in the body, "Christian, here

16  is a draft of the Virginia report with what we know

17  so far."

18     A.   That's what it says.

19     Q.   This is the first draft that was sent to

20  you for review; is that right?

21     A.   I don't think so, but it might be, but I

22  would be surprised that this would be the first -- it

23  looks very polished at this point, but I don't know.

24     Q.   Sure.  Let me ask you this.  You are the

25  president of PILF, but you work in Virginia, correct?

1          A.   Correct.

2          Q.   Okay.   And then the whole rest of the

3     staff works in Indianapolis, Indiana, correct?

4          A.   Right, but we visit each other.   I fly out

5     there; they fly out here.

6          Q.   Understood.   In terms of sharing work

7     product, you primarily rely on email; is that right?

8          A.   Primarily, not exclusively.

9          Q.   Understood, but primarily.

10          A.   Primarily, not exclusively.

11          Q.   Okay.

12          A.   And I do have some recollection actually

13     of this not being the first time I saw this, because

14     I had awareness that we would -- we would talk about

15     things prior to this.

16          Q.   And if there was any drafts of the report

17     that were exchanged in person, that would have been

18     produced, right?

19          A.   If they still existed, and there's a

20     chance they might not still exist.   There's always a

21     chance that there were records that were no longer in

22     existence that we could not produce.

23          Q.   Looking at a document that was previously

24     marked as Johnson 6, do you see that?

25                         (Johnson Exhibit 6

Page 98

1           previously marked for identification

2           and referenced herein: Email

3           correspondence from (topmost) N

4           Johnson sent 9/23/2016

5           PILF-ADAMS-0014107 - 0014113)

6      A.   Well, I see Johnson 6, and it looks like

7   you're now dealing with a September 23rd draft, which

8   is different than September 29th.

9      Q.   Indeed it is different.  And so in this

10  Johnson Exhibit 6, it's an email from Noel Johnson to

11  himself dated September 23rd, right?

12     A.   Right.  Well, it's strange.  It's to

13  himself.  Okay.  I've probably seen this.

14     Q.   And then -- and then the draft here is,

15  would you say, preliminary?  It's only got one, two,

16  three, four, five pages to it.

17     A.   No, I wouldn't say that.  I'd say it's

18  earlier.  Remember, this was not, ultimately, a very

19  long report.  I don't have -- well, I probably do

20  have -- I don't know.  You probably have a final.

21     Q.   We'll get to it.

22     A.   Okay.  Well, I don't think the final

23  version is exactly voluminous.  So it looks to me --

24  I would disagree with the characterization of

25  preliminary.  I would very much disagree.  I think

Page 99

1   that this is something that probably is a substantial

2   portion of the way to completion at this point on

3   September 23rd.

4        Q.   Okay.   So this draft that Johnson emailed

5   to himself and that he testified to last week as

6   being, you know, an initial draft, was sent to

7   himself on September 23rd, right?

8        A.   I don't -- I don't know.   This document

9   was sent to himself on September 23rd.   Once again, I

10  would quibble with the characterization of an initial

11  draft.   If that's his testimony, it will speak for

12  itself.

13       Q.   Right.   Are you, sitting here today, are

14  you aware of any earlier draft?

15       A.   Yes.   I'm aware that he --

16       Q.   Of Alien Invasion report.   Sorry.

17       A.   Can I finish, please?

18       Q.   I just want to clarify the question.

19       A.   I'm aware of Alien Invasion I being worked

20  on well before September 23rd.

21       Q.   Okay.   My question is:   Are you aware of a

22  draft Alien Invasion report prior to September 23rd?

23       A.   I'm aware that he was working on the

24  document prior to September 23rd, yes, I am.   I'm not

25  aware of a specific document that is in the turnover

1      that relates to that.

2           Q.   Okay.

3           A.   Those are two different things.

4           Q.   And then the first draft that is emailed

5      to you is this one on September 29th at 4:56 p.m.,

6      and that was previously marked as Johnson 7.

7           A.   I can't testify with certainty if this is

8      the first time I saw a draft.  This is a draft of the

9      report as it stood on September 29th.

10          Q.   The question was that this is the first

11     draft that was emailed to you, correct?

12          A.   I don't know.

13          Q.   Okay.

14          A.   I just -- I can't testify to that.  There

15     could have been something earlier.

16          Q.   But you're not aware of any.

17          A.   As I sit here right now, I'm not aware of

18     any.  If you have a document to show me, I'm happy to

19     take a look at it to refresh my recollection.  Plus,

20     I'm aware of the fact that this had been worked on a

21     lot earlier than this.

22                    (Johnson Exhibit 8

23                previously marked for identification

24                and referenced herein: Email

25                correspondence from (topmost) N

1           Johnson sent 9/29/2016 with

2           attachment

3           PILF-ADAMS-0005601 - 0005620)

4      Q.   This is a document that's been previously

5   marked as Johnson 8, and it's an email from -- it's

6   Bates numbered 5601.  Do you recognize this?

7      A.   This is to me ... I mean, I've seen this

8   document.

9      Q.   Okay.  And so this is an email from

10  Mr. Johnson to you, "Subject: Virginia Report -- USE

11  THIS ONE."  "Sorry, I sent an older version.  Use

12  this one."  That's what he says, right?

13     A.   Which only adds to the confusion as to

14  which is which.

15     Q.   Right, but this is -- this is the second

16  email that you received from Mr. Johnson with a draft

17  of the report?

18     A.   Well, I'm not saying that.  I just

19  testified earlier there may be others that I'm not

20  aware of --

21     Q.   Okay.

22     A.   -- that were sent earlier.  As a matter of

23  fact, I have some recollection of much earlier emails

24  regarding this report.

25     Q.   Okay.  But you can't, sitting here today,

1     in preparing for today's deposition, you can't point

2     to a specific draft earlier than --

3          A.   That's why I said, if you have something

4     to refresh my recollection, I'd be happy to look at

5     it, but I have some recollection of an earlier draft

6     before September 29th and September 23rd.

7                    (PILF Exhibit 9 marked for

8                    identification: Email correspondence

9                    from (topmost) C Adams sent

10                   9/29/2016 with attachment

11                   PILF-ADAMS-0014015 - 0014033)

12         MR. TEPE:  The court reporter is marking

13    as PILF Exhibit 9 a document that is Bates-stamped

14    14015.

15         Q.   Do you see this?

16         A.   I do.

17         Q.   Okay.  Do you recognize this to be another

18    draft of the Alien Invasion in Virginia report?

19         A.   Well, this is my edit to it.

20         Q.   Right.  So you are responding to Noel

21    Johnson on September 29th at 9:02 p.m., right?

22         A.   That's what the document says.

23         Q.   And you wrote, "okay, my first pass.

24    Please keep filling in.  I am going to send to Don,

25    Reagan and Hans and ask for fast fast comments.  I'll

1    copy you."  Do you see that?

2         A.  I see that.

3         Q.  Okay.  So would you agree that these

4    appear to be edits from you to the draft -- one of

5    the drafts -- that was sent to you about, I don't

6    know, four hours earlier?

7         A.  I wouldn't disagree with that

8    characterization.  It appears to be that.

9         Q.  Who is Don?

10        A.  Don Palmer.

11        Q.  So you sent a draft of the report to Don

12   for comment?

13        A.  Correct.

14        Q.  Who is Reagan?

15        A.  Reagan George.

16        Q.  Sorry.  Reagan George.  He was the

17   president of VVA?

18        A.  Correct.

19        Q.  And Hans, that's Hans von Spakovsky?

20        A.  Correct.

21                 (PILF Exhibit 10 marked for

22                 identification: Email correspondence

23                 from (topmost) D Palmer sent

24                 9/30/2016 with attachment

25                 PILF-ADAMS-0013933 - 0013951)

Page 104

1        MR. TEPE:  The court reporter has just

2   marked as PILF Exhibit 10, a document with Bates

3   number 13933.

4        Q.  Do you recognize this?

5        A.  Yes.

6        Q.  Do you recognize it to be the comments of

7   Don Palmer back to you on the Alien Invasion draft?

8        A.  Comments back to me ... yes.  Yes, I do.

9   Well, that's not entirely accurate.  Some of the

10  comments are mine.  Some of the comments are Don's.

11  So it's a mixture of my comments and Don's comments,

12  and it would not be correct to say that they are all

13  Don's.

14        Q.  Okay.  Let's look at -- what's the basis

15  for that statement just to make sure we're on the

16  same page?

17        A.  Well, if you turn to Bates number 13936,

18  you will see on the right-hand side of the page,

19  Commented [DP2], that's Don Palmer, Commented [CA],

20  that's Christian Adams.

21        Q.  Okay.  So it would appear that he overlaid

22  some comments on a draft that you had already

23  commented on.

24        A.  The former statewide election director and

25  I were working collaboratively on this draft, that's

Page 105

1    correct.

2                    (PILF Exhibit 11 marked for

3               identification: Email correspondence

4               from (topmost) N Johnson sent

5               9/30/2016 with attachment

6               PILF-ADAMS-0005444 - 0005586)

7               MR. TEPE:  I apologize for the size of the

8    table.

9               MR. DAVIS:  That's all right.

10              MR. TEPE:  Okay.  The court reporter has

11   just marked as PILF Exhibit 11 a document with Bates

12   number ending in 5444.

13        Q.  Do you recognize this document?

14        A.  It is -- it says attached is report.  So

15   this is probably Alien I with exhibits -- the paper

16   exhibits were linked to, generally speaking, to the

17   report.

18        Q.  So on September 30th at 2:21 p.m.

19   Mr. Johnson emailed another version of the report to

20   you and copied Reagan George, Mr. von Spakovsky,

21   Ms. Phillips, Ms. Powell -- I think that's it --

22   right?

23        A.  That's what it appears to say.

24        Q.  Christian, attached is -- in the body it

25   says, "Christian, attached is the report with

Page 106

1    exhibits ready for Fox.  We'll keep working on

2    additional stylization edits."  Do you see that?

3         A.  I do.

4         Q.  So we're getting close to a final draft

5    here?

6         A.  Well, it says what it says, that they're

7    going to keep working on stylization edits.

8         Q.  Right.

9         A.  And standing by, Kaylan is, if edits are

10   needed.  So it looks to me like we're getting close

11   to a final draft.

12                    (PILF Exhibit 12 marked for

13                    identification: Email correspondence

14                    from (topmost) C Adams sent

15                    9/30/2016 with attachment

16                    PILF-ADAMS-0013698 - 0013718)

17            MR. TEPE:  The court reporter has just

18   marked as PILF Exhibit 12 a document with Bates

19   number 13698.

20        Q.  Do you see that?

21        A.  I see Exhibit 12.  I haven't had a chance

22   to read it.

23        Q.  I'm not going to ask any real questions

24   about this right now.

25        A.  All right.

1      Q.  I just wanted you to testify for the

2    record that this is a draft of the Alien Invasion

3    report reflecting your edits.  Is that correct?

4      A.  Well, it looks to me like on September

5    30th, 2016 at 3:20 p.m. I was still in the process of

6    giving commentary to the report.

7      Q.  Okay.  And then the attachment is Alien

8    Invasion, Virginia Report, "jca edit."

9      A.  That's what the document says.

10     Q.  Indicating that this was edits from you.

11     A.  Correct, that's what the annotation would

12   infer.

13              (PILF Exhibit 13 marked for

14              identification: Email correspondence

15              from (topmost) N Johnson sent

16              9/30/2016 with attachment

17              PILF-ADAMS-0005278 - 0005421)

18              MR. TEPE:  The court reporter has marked

19   as PILF Exhibit 13 a document with Bates number 5278.

20     Q.  Do you recognize this?

21     A.  This is yet another version of Alien I,

22   4:39 p.m. on November 30 -- I'm sorry -- September

23   30, according to the document.

24     Q.  And so Noel Johnson says, "Christian,

25   attached is the updated full report with your edits."

Page 108

1      A.   That's what the email says.

2      Q.   You can put that aside.

3                 (Johnson Exhibit 9

4           previously marked for identification

5           and referenced herein: Email

6           correspondence from (topmost) N

7           Johnson sent 9/30/2016 with

8           attachment

9           PILF-ADAMS-0004985 - 0005128)

10      Q.   The court reporter has -- this has been

11   previously marked as Johnson Exhibit 9, document

12   Bates number 4985.

13      Do you recognize this?

14      A.   I think we talked about this earlier.

15   Hold on.  I might have this exact same --

16      Q.   I think it's different.

17      MR. DAVIS:  It's a different one.

18      A.   Okay.  I see it.

19      Q.   So this is an email from Mr. Johnson dated

20   September 30th at 6:10 p.m.?

21      A.   That's what it says.

22      Q.   And, well, actually let me start at the

23   bottom.  The first email is an email from you,

24   September 30th, at 6:05 p.m., right?

25      A.   That's -- yes.

1       Q.   And the subject line is, and this is to

2   Johnson, Phillips and Vanderhulst, correct?

3       A.   Correct.

4       Q.   The subject line:  "Have report up by

5   Sunday."

6       A.   That's what it says.

7       Q.   "Just occurred to me, we need the report

8   on the website before I am on Fox.  Not by much, but

9   some."  When were you going to be on Fox?

10      A.   I don't remember exactly.  If you have a

11  document that would refresh my recollection, I can

12  answer that question with specificity.

13      Q.   Was it going to be Saturday morning?  This

14  is Friday.

15      A.   I don't know.  I just told you, if you

16  have a document -- I don't know is the answer to that

17  question.

18      Q.   Okay.  And then Ms. Phillips says in

19  response to your request to have the report up on the

20  website by the time you're on Fox, "I can set it to

21  publish at a specific time, whatever time is best."

22  Do you see that?

23      A.   I see that.

24      Q.   And then Mr. Johnson at 6:10 p.m. says,

25  "This is the latest.  There were some additional last

1    minute changes."  But these are some tweaks to the

2    Alien Invasion report, correct?

3         A.   That's what it says.

4         Q.   Other than the exhibits that we looked at,

5    are you aware of any other drafts of the Alien

6    Invasion report that were exchanged amongst you and

7    the rest of the PILF team?

8         A.   Oh, heavens, I'm not aware of it, as I sit

9    here, but I wouldn't preclude it.

10        Q.   Understood.  But my question is are you --

11   can you point to any other specific drafts?

12        A.   Well, none are sitting in front of me, but

13   I'm almost certain that there were drafts that were

14   being exchanged among other people on the team that I

15   never saw -- it didn't reach my level, if you will,

16   yet -- that they would have been sending to each

17   other.  So the answer is probably there are.

18        Q.   But you can't point to any specific drafts

19   exchanged between you and the PILF team other than

20   the ones we've looked at.

21        A.   Well, I testified earlier that I have some

22   recollection there actually was a draft that I saw

23   and made comments about prior to September 23rd.  I

24   have some recollection of that.

25             Do I have a document in front of me?  No.  I

1    wish I did, but I don't.  If you have one, I'm happy

2    to look at it.  If there's something that you have

3    that you want me to testify about, rather than just

4    from memory, I'm happy to do that.

5         Q.  No, we don't.

6         A.  I can't testify about it from memory.

7         Q.  Okay.  When PILF published -- you still

8    have Exhibit Johnson 9 in front of you?

9         A.  Yes.

10        Q.  The date on the Alien Invasion report is

11   September 30th, right?  On the cover.

12        A.  Are you asking me about the cover or the

13   email?

14        Q.  The cover of the report.

15        A.  It says September 30th, 2016.

16        Q.  As of this time, you had received some --

17   you had received records from some jurisdictions that

18   you had requested but not from other jurisdictions;

19   is that right?

20        A.  Well, this gets us back into the

21   discussion of the helpfulness of your law firm.  The

22   answer is yes.

23        Q.  Actually --

24        A.  The ones that Skadden Arps lawyer was

25   helping with tended to be the ones that we got

1    responses from.  There were jurisdictions we had not

2    received responses from and there were jurisdictions

3    we did receive responses, including the one I

4    testified about in Prince William.

5         Q.  Okay.  So my question was a simple one.

6    As of this time, September 30th, you had received

7    records from some jurisdictions that you had

8    requested but not from other jurisdictions; is that

9    right?

10        A.  That's my testimony.

11        Q.  Did you contemplate waiting for the other

12   jurisdictions to publish?

13        A.  We had waited a very long time for this

14   information already.  We had waited months --

15   frankly, almost a year -- and there was no benefit to

16   waiting.

17        Q.  PILF was trying to get this report

18   published prior to the 2016 election; is that right?

19        A.  During the 2016 elections, as with every

20   election, people talk about elections, they talk

21   about the machinery of elections.  After the

22   elections, people don't care so much.

23        So it's important to put information in front

24   of the public and to speak about elections when

25   elections are taking place, because it's been my

1    experience that is when individuals care most about

2    elections.

3        That experience is backed up by seeing what

4    almost every single nonprofit organization in this

5    field does, and that's ramp up their activities

6    during election season, whether it's the ACLU, it's

7    the League of Women Voters, whether it's PILF.  We

8    tend to do most of our work during elections to talk

9    about elections.

10       Q.  So the answer is yes, PILF was trying to

11   get this report published prior to the 2016

12   elections.

13       A.  The answer is yes for the reasons I spoke,

14   not anything less than that.

15       Q.  Understood.

16               (PILF Exhibit 14 marked for

17               identification: Email correspondence

18               from (topmost) N Johnson sent

19               6/28/2016 with attachment

20               PILF-ADAMS-0007211 - 0007214)

21       MR. TEPE:  The court reporter has marked

22   as Exhibit, PILF Exhibit 14, a document with the

23   number 7211.

24       Q.  Do you recognize this document?

25       A.  I'm seeing it now.  I've probably seen it

Page 114

1       at some point.

2            Q.  This is an email dated June 28th, 2016

3       from Noel Johnson to Kaylan Phillips, correct?

4            A.  That's what it says.

5            Q.  And attached to it is a email that would

6       be sent out from PILF to others; is that right?

7            A.  This is a fundraising email that would be

8       sent out to others.

9            Q.  So this is -- I'm sorry.  So this is a

10      fundraising email, which makes sense.  There's

11      buttons to say "Donate Now."

12           A.  That's the basis for me concluding that

13      it's a fundraising email.

14           Q.  And in the second paragraph this

15      fundraising email says, "The Foundation is leading

16      the charge to stop the attempts by Obama, his Justice

17      Department, and the radical left to allow lawlessness

18      to flourish in the 2016 elections"; is that right?

19           A.  That's what it says.

20           Q.  Who is the radical left?

21           A.  Well, organizations and donors who oppose

22      efforts to remove citizenship from the rolls --

23      noncitizens from the rolls -- would certainly qualify

24      as part of the radical left, because most Americans

25      agree that noncitizens shouldn't be on the rolls.

1       So that's one category that would constitute

2    the radical left as anybody who is opposed to doing

3    things to remove aliens from the voter rolls.

4       Q.  And then on the, I think, the fifth

5    paragraph --

6       A.  One, two, three, four, five.

7       Q.  -- in the last sentence, it says, "too

8    much" -- do you see that?

9       A.  I do see that.

10       Q.  "Too much is at stake this year to allow

11    the votes of illegal aliens determine the results of

12    any election in 2016."

13       A.  What's your question?

14       Q.  Is that what it says there?

15       A.  That's what it says.

16       Q.  And then in the next paragraph, "we've

17    already filed cases to clean up the rolls in Clark

18    County, Missouri," some other jurisdictions, and the

19    last one is Alexandria, Virginia, right?

20       A.  Right.

21       Q.  Is this referring to the lawsuit against

22    the registrar of Alexandria?

23       A.  Yes.

24       Q.  City of Alexandria.  Okay.  And then I

25    think five paragraphs down this email says, "the hard

1    left hates citizen verification laws because they

2    stop noncitizens from voting."  Do you see that?

3         A.   That's what it says.

4         Q.   Okay.  Do you believe that there are,

5    well, the left, whoever that may be, want noncitizens

6    to vote in federal elections?

7         A.   Oh, I know they do.  There's no question

8    about that.  Because one reason I know they do is

9    because I was testifying at a House Judiciary

10   Committee just a few months ago in Congress, and one

11   of the members of the House Judiciary Committee told

12   me that he believes that noncitizens should be voting

13   in federal elections.  He is a local Congressman by

14   the name of Raskin.

15        So there's no question about that, not only is

16   that opinion, which I share, personally as well as

17   corporately, true, because some of these members of

18   the hard left who happen to be members of Congress

19   say so.

20        Q.   Okay.  So that's Democratic Congressman

21   Raskin you're referring to?

22        A.   That is who I'm referring to.  In fact he

23   introduced legislation to allow it.

24             MR. TEPE:  Might be a good time to take a

25   break before we jump into something else.

1          MR. DAVIS:  Okay.  Are you talking about a

2     lunch break?

3          MR. TEPE:  I think it's too early for

4     lunch.

5          MR. DAVIS:  That's fine.

6          VIDEO SPECIALIST:  We are off the record,

7     11:52.

8        (Proceedings recessed)

9          VIDEO SPECIALIST:  We are back on the

10    record, 12:03.

11                    (Johnson Exhibit 10

12               previously marked for identification

13               and referenced herein: Alien

14               Invasion in Virginia | The discovery

15               and coverup of noncitizen

16               registration and voting | September

17               30, 2016 with attachments)

18          MR. TEPE:  I've handed the witness what

19    has been previously marked as Johnson Exhibit 10.

20       Q.  Do you recognize this document?

21       A.  This is a version of Alien Invasion,

22    Johnson 10.

23       Q.  Do you recognize it to be the final

24    published report of Alien Invasion in Virginia?

25       A.  I don't, but if you're asserting to me

1    that's what it is, I'll make that assumption.

2         Q.   Okay.   Yes.   It was pulled off the web,

3    PILF's Internet site.

4         Okay.   Starting with the cover, it says "Alien

5    Invasion in Virginia," "The discovery and coverup of

6    noncitizen registration and voting," correct?

7         A.   It does say that.

8         Q.   And this was a joint report of PILF and

9    VVA; is that right?

10        A.   It was.

11        Q.   And the logos of both entities are on the

12   front cover, correct?

13        A.   They are.

14        Q.   Dated September 30th, correct?

15        A.   That's what it says.

16        Q.   2016.   If I can direct your attention to

17   the Summary of Findings on page 2.   In the second

18   paragraph in bold the report states, "In our small

19   sample of just eight Virginia counties who responded

20   to our public inspection requests, we found 1,046

21   aliens who registered to vote illegally"; is that

22   right?

23        A.   That's what it says.

24        Q.   Now when you say the small sample of just

25   eight Virginia counties, these are the counties that

1   responded to your records request, right?

2          A.   These would have been the counties that

3   gave us records, as we've had back and forth before,

4   wasn't just in response to our records request, but

5   these were the eight counties that gave us records.

6          Q.   And the number 1,046, does that come from

7   the cancellation reports that we had looked at

8   earlier?

9          A.   It's probably a tabulation from the

10  cancellation reports.

11         Q.   Right.  So if you go to page 12, there's a

12  chart.

13         A.   Page 12 has a list.

14         Q.   The header of the chart is "Noncitizens On

15  the Rolls in Eight Counties"?

16         A.   No, that's not the header of the chart.

17  Oh, I'm sorry, I'm looking at page 12 of the exhibit.

18         What did you want me to look at?  I'm sorry.

19         Q.   Page 12 of the report.

20         A.   Got it.  Okay.  I'm at page 12 of Johnson

21  10.

22         Q.   Right, which is the Alien Invasion report,

23  the file copy.

24         A.   It hasn't been marked differently, so I'm

25  calling it Johnson 10.

1      Q.   Sure.  And so on page 12 it says,

2    "Noncitizens on the Rolls in Eight Counties."  Do you

3    see that chart?

4      A.   Yes, I see that chart.

5      Q.   And then it has TOTAL 1046?

6      A.   It says that.

7      Q.   Right.  And it lists Prince William (433)?

8      A.   It says that.

9      Q.   Alexandria (70)?

10     A.   It says that.

11     Q.   Okay.  And so this is, as I think you just

12   testified, a tabulation of the people listed on the

13   cancellation reports that we looked at earlier.

14     A.   Well, what I testified was that it is most

15   likely a tabulation.  I'm leaving open the

16   possibility that the math is wrong.

17     Q.   And why would the math be wrong?

18     A.   Because I'm very poor at doing addition.

19     Q.   Okay.

20     A.   But I didn't do the addition.

21     Q.   Mr. Johnson did the addition?

22     A.   He did, but, again, I'm -- I have

23   confidence in Mr. Johnson adding things up correctly,

24   but it's a tabulation.

25     Q.   And then if you go to page 7 --

1        A.   Of the report or --

2        Q.   -- of the report, of the report.  At the

3    bottom it states, in bold -- are you there?

4        A.   I am.

5        Q.   Prince William County provided a list of

6    433 noncitizens who had registered to vote in the

7    county, but were then removed after they were

8    determined to not be citizens.  Do you see that?

9        A.   Yes.  This is consistent with my

10   understanding from election officials, including Ann

11   Leider and others, that, if they were on the list,

12   they were determined to not be U.S. citizens.

13       Q.   Okay.  I'm just asking if that's what the

14   report states.

15       A.   It does state that.

16       Q.   Okay.  And then where the sentence ends,

17   it has a footnote, footnote 15.  Do you see that?

18       A.   Well, I do.  And this may be why I was

19   describing to you my willingness to entertain the

20   possibility of off tabulation, and footnote 15

21   indicates that somebody is listed twice -- possibly

22   listed twice.

23       Q.   Okay.  All right.  So but the statement,

24   "Prince William County provided a list of 433

25   noncitizens who had registered to vote in the county,

Page 122

1    but were then removed after they were determined to

2    not be U.S. citizens," has a citation to footnote 15,

3    correct?

4         A.  Well, something relating --

5         Q.  And then --

6         A.  You asked the question, "correct?"  Can I

7    answer?

8         Q.  I wasn't finished.

9         A.  Okay.  Well, correct, question mark, so it

10   will be compound.  I'm sorry.  I was answering your

11   question.

12        Q.  So "Prince William County provided a list

13   of 433 noncitizens who had registered to vote in the

14   county, but were then removed after they were

15   determined to not be U.S. citizens," that statement

16   has off it footnote 15, correct?

17        A.  Correct.

18        Q.  And then footnote 15 says, "see Exhibit

19   1," correct?

20        A.  It says that.

21        Q.  Okay.  Now if you turn to Exhibit 1, that

22   is the cancellation report from Prince William

23   County, correct?

24        A.  That, I mean, essentially, yes.

25        Q.  And if you look at -- this is the same

1    document that we saw earlier that was supplied by

2    Ms. White in Exhibit Johnson 2, correct?

3         A.   Well, I don't know.  Let me go back and

4    look at Johnson 2.

5         As relates to Prince William, the answer would

6    appear to be yes.  Without me going through every

7    single page, if that's your position, or your

8    assertion, if you're representing to me it's the

9    same, then, yes, I'll make that assumption.

10        Q.   And go back to page 8 of the report.

11        A.   The report itself?

12        Q.   That's right.

13        A.   Okay.

14        Q.   So on page 8, also in bold, second

15   paragraph, "the United States attorney in Virginia

16   has done nothing about the felonies committed by 433

17   aliens registering in Prince William County alone."

18   Do you see that?

19        A.   I see that.

20        Q.   Okay.  Now the felonies committed by the

21   433 aliens registering in Prince William County alone

22   is a reference to the people listed in Exhibit 1 that

23   we just looked at.

24        A.   I don't want to agree with that.

25        Q.   Are there a different 433 aliens

Page 124

1    registering in Prince William County?

2         A.   There probably are, yes.

3         Q.   Okay.  But I'm asking you about your

4    report here.  "The United States Attorney of Virginia

5    has done nothing about the felonies committed by the

6    433 aliens registering in Prince William County

7    alone," that statement is referencing the statement

8    two paragraphs before where you said, PILF said

9    Prince William County provided a list of 433

10   noncitizens, correct?

11        A.   Well, remember, though, there's that

12   problem with multiple registration -- or the multiple

13   listing.

14        Q.   Okay.  So maybe it's 432.

15        A.   Or 434, I'm not sure.

16        Q.   Okay.  But that's a reference to the same

17   list that we see in Exhibit 1, correct?

18        A.   Well, it's an accurate statement.

19        Q.   That is a reference to the list in Exhibit

20   1, correct?

21        A.   Correct.

22        Q.   If you go back to the exhibit, Exhibit 1,

23   and go to page 26 of 29, are you there?

24        A.   26?

25        Q.   Page 26 of 29.

1        A.   Okay.

2        Q.   Do you see that?

3        A.   Yeah.

4        Q.   Do you see the individual "Luciania

5   Freeman"?

6        A.   Her name is there.

7        Q.   And her home address?

8        A.   Well, I don't know if that's her home

9   address.   That's the public record of where she --

10        Q.   Right.

11        A.   I don't know if it's her home address.

12   Can I finish?   I don't know if it's her home address.

13   That is taken from the registration record.

14        Q.   And so there's an address there for

15   Ms. Freeman.

16        A.   There's an address there for Ms. Freeman,

17   correct.

18        Q.   Okay.   And so Ms. Freeman is one of what

19   PILF calls the, quote, 1,046 aliens who registered to

20   vote illegally, correct?

21        A.   Well, that's based on the context of all

22   the information we had obtained from election

23   officials, including, for example, the attorney for

24   the City of Alexandria that told us that that's what

25   these lists represented.

1    Q.  Okay.

2    A.  So it does say that with a basis.

3    Q.  Okay.   I'm not asking about the basis.

4    A.  All right.

5    Q.  I'm just trying to make sure that you

6    agree that --

7    A.  That it says that, yes.

8    Q.  -- okay, that Ms. Freeman is one of what

9    PILF called the 1,046 aliens.

10   A.  No, I don't agree with that.  I agree that

11   she is in the exhibit and I agree that the report

12   says what it says.

13   Q.  Right.  And so just to make sure we're on

14   the same page here, this exhibit where Ms. Freeman is

15   listed is part of what makes up the 1,046 aliens who

16   have registered to vote illegally as stated in the

17   Alien Invasion report, correct?

18   A.  If the numbers match, it's linking to that

19   exhibit.

20   Q.  Well, it's linking to this exhibit

21   regardless, right?  Ms. Freeman is one of the people

22   that --

23   A.  Her name is on the exhibit.

24   Q.  Right, that allows you to say in your

25   report 1,046, right?  She's one of the 1,046, right?

1    A.   If the numbers match, correct.

2    Q.   Okay.  It could be 1,045.

3    A.   Right, right.

4    Q.   Okay.  But she is in that batch.

5    A.   She is listed in that report.

6    Q.   If you go to page 14 of the report -- are

you there?

8    A.   I'm there.

9    Q.   Okay.  About midway through the page, the

report states that Prince William provided the

registration applications for a subset of the 433

people listed on the cancellation report.

13    A.   I don't see that.  What paragraph number?

I'm sorry.

15    Q.   It's really just by reading the third and

fourth paragraph.

17    A.   One, two, three, four ... Prince William.

Okay.  I don't see the word "subset."  I'm sorry.

19    Q.   That was my word.  So Prince William

County provided a list 433 names on it, right?

21    A.   A list of 433 ... okay.  It says that.

22    Q.   You asked for voter registration forms --

23    A.   Okay.

24    Q.   -- for these people, correct?

25    A.   Yes.

1      Q.   Okay.   They had those forms for people

2  starting from 2015, right?

3      A.   Okay.   I see where -- yes, since 2015.

4      Q.   Right.   So you looked at voter

5  registration applications for 84 of the 433 listed.

6      A.   Well, I -- the company did.

7      Q.   Right.   And you're here on behalf of the

8  company.

9      A.   Right.

10     Q.   So that's what I meant by subset.

11     A.   Are they included in the exhibit that you

12  can point me to?

13     Q.   Well, yeah, so we can get to that.   So

14  where it says here, Prince William County removed a

15  total of 84 noncitizens, do you see that --

16     A.   I see it says that.

17     Q.   -- beginning of the fourth paragraph?

18  Okay.   So it says here, "Prince William County

19  removed a total of 84 noncitizens from its voter

20  rolls in 2015 and 2016," and then cites to footnote

21  30, correct?

22     A.   Heavens.   It cites to footnote 30.

23     Q.   And footnote 30 states, "the completed

24  registration applications provided to PILF are

25  available at Exhibit 7."

Page 129

1          A.   Okay.  Exhibit 7.  Yes, it says that.

2          Q.   Okay.  So let's go to Exhibit 7.  In

3    particular, go to page 48 of 84.

4          A.   48?

5          Q.   Of 84.

6          A.   Okay.  This is not a complete photocopy.

7    I can't read all of it.

8          Q.   Well, it's redacted.

9          A.   No, it's not just redacted; it's cut off.

10         MR. DAVIS:  There's on the bottom of this

11   exhibit looks like some form of a legend that ends in

12   2015, but it's not clear.

13         A.   Let the record reflect I'm pointing to

14   words on the bottom of the page that appear to say

15   something August 2, 2015 but are not legible to the

16   witness.

17         Q.   Okay.  Just the photocopy is a little

18   faint.  Why don't we just go off the record and see

19   if we can get a --

20         VIDEO SPECIALIST:  We're off the record,

21   12:19.

22     (Proceedings recessed)

23         VIDEO SPECIALIST:  We're on the record,

24   12:36.

25   BY MR. TEPE:

1      Q.   So, Mr. Adams, let's go to Exhibit 7, in

2   particular, go to page 48 of 84.  Do you have that in

3   front of you?

4      A.   I do.

5      Q.   Okay.  This is a copy of a voter

6   registration application for Luciania Freeman; is

7   that right?

8      A.   It's part of one.  There's a portion that

9   appears to be cut off on the far right that would

10   show the date of registration, but it's probably 95

11   percent of one.

12      Q.   Right, but that's how it appears in your

13   Exhibit 7 --

14      A.   Okay.

15      Q.   -- to the PILF report, correct?

16      A.   I don't know, but I'm not quibbling.  I'm

17   just telling you this is about 95 percent of one.

18      Q.   All right.

19      A.   It's also -- but it's not just voter

20   registration, though, so let me amend my answer

21   because it's not fully correct.

22          It's a record that was provided to PILF that

23   also includes a notation that Luciania Freeman was

24   canceled because she was declared a noncitizen on

25   August 12, 2015.  That is also part of the record.

1    It's not just the voter application.  It is an

2    additional government record related to her

3    registration, a list maintenance record.

4         Q.  Okay.  I'm going to strike that as

5    nonresponsive.

6         A.  Well, but --

7         Q.  But we'll get there.

8         A.  I know you'll get there, but --

9         Q.  Mr. Adams, I get to ask the questions.

10   Okay?

11        A.  Right, right, right.

12             MR. DAVIS:  Can we go ahead and mark that

13   as an exhibit, though?

14             MR. TEPE:  We can just put it in as, you

15   know, just a brighter photocopy of the Johnson

16   exhibit.

17             MR. DAVIS:  All I want is, when I leave

18   here today, that to be part of the record.

19             MR. TEPE:  Oh, yeah, no, we'll stick it

20   in.  You can swap it out.

21             MR. DAVIS:  Okay.

22             MR. TEPE:  I mean, it's just a photocopy

23   issue of, you know, the fact that we photocopied

24   Johnson 7, which itself is a copy of what came off

25   the website.

1          MR. DAVIS:  Okay.  Fair enough.

2     BY MR. TEPE:

3          Q.  So let me sort of start again.

4          MR. DAVIS:  Just so the record is clear, I

5     oppose the motion to strike as nonresponsive.

6          Q.  So, Mr. Adams, Exhibit 7 to the first

7     Alien Invasion report, page 48 of 84, there is 95, to

8     use your terminology, percent of the voter

9     registration application of Luciania Freeman

10    represented, correct?

11         A.  Ninety-five percent of the voter

12    registration application or thereabouts --

13         Q.  Okay.  So --

14         A.  -- is contained on this page in addition

15    to other information that's part of this record.

16    This record is not the voter registration

17    application.

18         Q.  Okay.  So, Mr. Adams, so this is part of

19    PILF's exhibit, right?

20         A.  This was part of PILF's exhibit.

21         Q.  Okay.  And you were provided at your

22    request voter registration applications, correct --

23         A.  We were --

24         Q.  -- from Prince William County?

25         A.  We were provided some voter registration

1    applications; however, we didn't get those.  What we

2    got was a derivative document, by and large, and this

3    is one of them.

4         There was both a voter registration

5    application and a determination about that particular

6    voter.  This was not just the voter registration

7    application.  And that's an important distinction.

8         Q.  Okay.  Mr. Adams, let's focus on the

9    questions that are asked.  Okay?

10        A.  I did.

11        Q.  So you made a request of Prince William

12   County for records, documents, regarding individuals

13   who potentially did not satisfy the requirements for

14   citizenship, correct?  We looked at that.

15        A.  That was part of the request, correct.

16        Q.  Right.  And you also asked for the voter

17   registration applications for those individuals who

18   had been canceled, correct?

19        A.  Partially correct.  Canceled as declared

20   noncitizens.

21        Q.  Understood, but you asked for voter

22   registration applications for those individuals who

23   were listed.

24        A.  Right.

25        Q.  Okay.  And what came back to you and what

1    PILF published here in Exhibit 7 is what we're

2    looking at today, correct?

3         A.  That's what we're looking at today, but,

4    again, I want to emphasize that this is not a voter

5    registration application document.  This is a

6    derivative list maintenance document from a voter

7    registration application.

8         Q.  It's a photocopy of.

9         A.  There's a difference, and that's not the

10   only difference.

11        Q.  Okay.  Can we focus on the questions that

12   I'm asking, or we're going to be here all day.

13        A.  Well, no, we'll be here seven hours.

14        Q.  Okay.  And so, Mr. Adams, this is a copy

15   of Luciania Freeman's voter registration application,

16   correct?

17        A.  No, it is not.

18        Q.  Okay.  What's missing?

19        A.  There's nothing -- well, part of it is

20   missing, namely, the date on the right.

21        Q.  Okay.

22        A.  But also it's not just something that's

23   missing; it's something that's added.  This is a copy

24   of the derivative list maintenance document.

25        Q.  Okay.  We're not talking about what's

1    added, okay, Mr. Adams?

2         A.  You asked me if this was a copy and you

3    cut me off from the answer.

4         Q.  I said what is missing.  My question was

5    what is missing.  So I want you to focus on answering

6    the question asked.  My question was, what is

7    missing?

8         A.  A portion of the right-hand side of the

9    original voter registration application is missing.

10        Q.  Okay.  Is there anything else missing?

11        A.  There's nothing else missing as it appears

12    to me right now.

13        Q.  Okay.  So on this application copy that we

14    have in front of us, it's Luciania Freeman, correct?

15             MR. DAVIS:  Object to the form of the

16    question.

17             MR. TEPE:  What's the basis?

18             MR. DAVIS:  You're characterizing it as an

19    application copy.  I think the witness has testified

20    that it's something derivative from an application

21    copy, and I think there's a distinction that's

22    important.

23             MR. TEPE:  Okay.  Then what's the

24    distinction?  Because Mr. Adams just testified that

25    there was nothing else missing from the copy of the

1    voter registration application.

2         A.  Is that a question to me?

3              MR. DAVIS:  But he asked -- he added that

4    there was something added to it --

5              MR. TEPE:  I know.

6              MR. DAVIS:  -- which makes it a derivative

7    document, not the original registration application.

8              MR. TEPE:  Yes.  It's obviously not the

9    original.  It's a copy.  So, so, so -- all right.

10        Q.  Mr. Adams, I know you're very much itching

11   to talk about the bottom portion of this page, but

12   let's take it one step at a time.

13        The top portion, do you see a form?

14        A.  I see a partial copy of a form that is

15   included in a derivative list maintenance document.

16        Q.  Okay.  And so I want to ask you questions

17   about that form.  Okay?

18        A.  You want to ask me about a part of this

19   document.

20        Q.  Yes.

21        A.  Okay.

22        Q.  And so the form at the top is a copy of

23   Ms. Freeman's voter registration application,

24   correct?

25        A.  Partially.

1          Q.   Okay.   Because on the right-hand side

2     there is a little bit missing, such as the last phone

3     number -- digit of her phone number and the last

4     digit of the date that she signed the form, correct?

5          A.   That is missing on the right-hand side of

6     the portion of the derivative list maintenance

7     document.

8          Q.   Okay.   And so on this form it lists

9     Ms. Freeman's -- an address for Ms. Freeman, correct?

10         A.   It lists an address for Ms. Freeman.

11         Q.   Right.   It also lists an email address,

12    correct?

13         A.   It lists an email address.

14         Q.   It's got a date of birth or a year of

15    birth, I should say.

16         A.   Well, it doesn't have a date of birth.

17         Q.   I just corrected that.

18         A.   I'm answering the question.   You didn't

19    strike it.   And it has a year of birth.

20         Q.   And it has most of her phone number.

21         A.   It has -- the public record has her phone

22    number, yes.

23         Q.   Right.   Okay.   And in the upper left-hand

24    corner the question, "are you a citizen of the

25    United States of America," do you see that question?

1        A.   Yes.

2        Q.   And she checked yes, according to this
3   document, correct?

4        A.   Before she was declared a noncitizen, yes.

5        Q.   Okay.   So the answer is yes, she checked
6   yes, right?

7        A.   She did check yes.

8        Q.   And her signature is on -- down at the
9   bottom of the form, correct?   She signed it?

10       A.   She did sign it.

11       Q.   And the registration statement above her
12   signature says, "I swear/affirm, under felony penalty
13   for making willfully false material statements or
14   entries, that the information provided on this form
15   is true," correct?

16       A.   That's what it says.

17       Q.   Okay.   So when she signed this form, she
18   was swearing that she was a citizen of the
19   United States.

20       A.   All people who sign this form do that,
21   including her.

22       Q.   Okay.   Now at some point later would you
23   agree her registration was canceled, correct?

24       A.   At some point later she signed a similar
25   form that swore under oath that she was not a

1    citizen.

2         Q.   Okay.  Do you have a copy of that form?

3         A.   I will eventually in this case.  We've

4    asked for it in third-party discovery.  And you can't

5    get canceled in Virginia unless you sign a form from

6    DMV swearing under oath, just like here, that you're

7    not a citizen.

8         Q.   So your understanding of how her name

9    appeared at this time -- we're talking about at this

10   time --

11        MR. DAVIS:  What time?

12        Q.   The time of the Alien Invasion I, so

13   September 30th, 2016 -- that when Ms. Freeman appears

14   in Exhibit -- in the Prince William County

15   cancellation list that you have republished at

16   Exhibit 1, it was because she provided some

17   information at the DMV that was contrary information

18   with regard to her citizenship.

19        A.   That is a gross shortcoming of the

20   information she provided.  It is much more robust.

21        She provided a sworn statement under felony

22   penalty for making a willfully material -- willfully

23   false material statement the information provided in

24   this form is correct, and she would have marked no to

25   the question she is not a citizen, and she would have

1    executed the felony perjury attestation.  And that's

2    precisely why the canceled declared noncitizen

3    notation appears on this record.

4         Q.  Right, so -- there's a handwritten --

5         A.  That's my understanding, to answer your

6    question.

7         Q.  Thank you.  So at the bottom -- so you

8    have the form at the top of this page, which is,

9    again, page 48 of 84 of Exhibit 7.  There's a

10   handwritten notation, right?  That's what you're

11   referring to?

12        A.  No, that's not what I'm referring to.  I'm

13   referring to a whole host of other information

14   besides this --

15        Q.  Okay.  All right.

16        A.  -- that is on the document.

17        Q.  Right.  So on the document there's a

18   handwritten notation that says what?

19        A.  "Canceled declared noncitizen August 12th,

20   2015."

21        Q.  Right.  Okay.  And that matches what's

22   here in Exhibit 1 in the Prince William cancellation

23   report, right?

24        A.  The two documents corroborate each other.

25        Q.  Okay.  But it's referring to the same

1   thing, that she was canceled, that same canceled

2   date, right?

3          A.   And the existence -- they corroborate each

4   other, that's correct.

5          Q.   So August 12th, 2015.

6          A.   They corroborate each other.

7          Q.   Okay.  So it's the same information.

8          A.   Corroborating it -- each other.

9          Q.   Why do you say "corroborating it"?

10         A.   Because there's two government documents

11  that are saying the same thing, that this woman is a

12  noncitizen.

13         Q.   No, it says that she was canceled.

14         A.   No, it says declared noncitizen.

15         Q.   Right.

16         A.   That document says declared noncitizen.

17  Two documents are in agreement that Luciania Freeman

18  was declared a noncitizen as well as the context of

19  discussing this with other election officials.

20         Q.   Okay.  But we're talking about the

21  information that PILF had with regard to Ms. Freeman.

22         A.   Which includes the context of discussions

23  with other election officials about how to interpret

24  these documents.  You cannot separate them.

25         Q.   I'm just asking questions.

Page 142

1      A.   Well --

2      Q.   So the question here, then, is:  At the

3  time that Alien Invasion I was published, PILF knew

4  only two things about Ms. Freeman, right?

5      A.   Wrong.  Let me tell you something else.

6  You asked me a question.  One of the other things --

7          MR. DAVIS:  Let him finish the question.

8      A.   Okay.  Right.

9          MR. DAVIS:  Let him finish the question,

10  and then you can --

11      A.   Right.

12      Q.   -- one, that she had registered to vote

13  affirming under penalty of felony that she was a

14  citizen of the United States.

15      A.   That's one of many things, more than two.

16      Q.   PILF also knew, with regard to Ms. Freeman

17  specifically, that her name appeared in the

18  Cancellation - Declared Non-Citizen report from

19  Prince William County.

20      A.   That's one of multiple things.

21      Q.   What else did you know about Ms. Freeman's

22  citizenship?

23      A.   We had an extraordinary amount of

24  information derived from conversations with multiple

25  Virginia election officials as to the meaning -- as

1   how to interpret this information.

2        For example, since you asked me what else,

3   I'll give you one of many examples.  The email from

4   the lawyer for the Alexandria registrar literally

5   says these people were removed because they were

6   determined to be not a U.S. citizen.

7        It goes far beyond simply looking at the forms

8   itself.  It was a broad holistic understanding of how

9   to interpret these documents and was informed by

10  multiple conversations with elected officials in

11  Virginia -- election officials in Virginia.

12       So it wasn't just these two documents read in

13  isolation; it was a holistic understanding of the

14  process.

15       Q.  Okay.  And the correspondence that you

16  were just referring to was the attorney for

17  Alexandria, correct?

18       A.  That was one of many conversations --

19       Q.  I'm just trying --

20       A.  -- that informed this holistic

21  understanding of how to interpret those two pieces of

22  information.

23       Q.  Okay.  I understand.  So that was the

24  attorney for Alexandria, right?

25       A.  That was one, yes.

Page 144

1        Q.  Okay.  And Ms. Freeman was a resident of

2  Prince William County.

3        A.  Doesn't make any difference.  It's the

4  interpretation of how the state process works.

5        The attorney for an election official was

6  telling us, among many other people, that if you're

7  on this list, you testified under oath under penalty

8  of perjury that you weren't a citizen, the state had

9  a follow-up procedure and this particular registrant

10  never attested that they were a citizen.

11        So the registrant has a role in this process

12  also of failing to affirm citizenship.  So all of

13  these things holistically informed the interpretation

14  of the two narrow documents you wanted me to focus

15  on.

16        Q.  Okay.  And, again, with respect to

17  Luciania Freeman specifically, you had this document

18  that we're looking at as page 48 of 84 in Exhibit 7,

19  right?  And you had page 26 of 29 in Exhibit 1.

20        A.  I stand by my previous answer.

21        Q.  That's the only --

22        MR. DAVIS:  Objection, asked and answered.

23        Q.  That's the only information that you had

24  specifically about Ms. Freeman.

25        A.  I stand by my previous answer again.

1      Q.  Do you have other information about

2 Ms. Freeman?

3      A.  Yes.

4      Q.  At this time?

5      A.  Yes, how her name appeared on the list of

6 noncitizen cancellation that I have testified to four

7 questions ago.  That was about Ms. Freeman, because

8 it related to how she got on the list and informed

9 whether or not we could rely on government documents

10 that we viewed to be inherently reliable.

11      Q.  Okay.

12      A.  And so my answer is the same as it was

13 four questions ago.

14      Q.  Okay.  So your understanding is that

15 Ms. Freeman swore under felony penalty that she was a

16 United States citizen at one time and then swore the

17 opposite another time.

18      A.  I've testified --

19          MR. DAVIS:  Objection, asked and answered.

20      A.  I've testified to that.  Stand by my

21 earlier answer.

22      Q.  Did PILF attempt to reach out to

23 Ms. Freeman to clarify the conflicting responses to

24 the citizenship question?

25      A.  We would never do that.

1        Q.   Why is that?

2        A.   You would never reach out to individual

3    voters in this context and talk to her.  We have no

4    way of verifying that.  There's no way to verify

5    whether or not she's a citizen.  We don't have those

6    tools -- only law enforcement does.

7        Q.   My question was, did PILF attempt to reach

8    out to Ms. Freeman to clarify the conflicting

9    responses, as you understood it, to the citizenship

10   question?

11       A.   I've answered that question.  I stand by

12   my answer.

13       Q.   The answer is no, you --

14       A.   The answer is what I said, not no.  The

15   answer is --

16       Q.   Oh, so you did -- you did reach out to

17   Ms. Freeman?

18       A.   The answer is what I said.

19       Q.   Did you or did you not reach out to

20   Ms. Freeman?

21       A.   I've answered the question.

22       Q.   Did you or did you not reach out to

23   Ms. Freeman?

24       A.   I've answered the question.

25       Q.   No, you have not.  It's a simple yes or

1    no.

2          A.   I stand by what I testified to.

3          Q.   Which is no, you did not?

4          A.   The record --

5          Q.   You did not reach out to Ms. Freeman,

6    correct?

7          A.   What I testified to is in the transcript

8    probably by now about 20 lines above what you're

9    reading.

10         Q.   And I'm asking you to clarify that record

11   because you seem resistant.  The question, again, is:

12   Isn't it correct that you did not reach out to

13   Ms. Freeman period?

14         A.   I don't have a different answer for you.

15         Q.   You had an address for her, correct?

16         A.   I said I don't have -- there's an address

17   on the form.

18         Q.   And you had an email address, correct?

19         A.   Asked and answered.

20         Q.   And you have most of a phone number for

21   her, correct?

22         A.   I already testified to that.

23         Q.   And you never reached out to Ms. Freeman,

24   correct?

25         A.   I've already answered that and testified

1    to it.  It's probably about 50 lines behind this

2    line.

3         Q.  And the answer is no, you never did.

4         A.  I've asked and answered that.  I've

5    answered that repeatedly now.  I've told you that

6    I've already testified to that.

7         Q.  Yes, so when I first asked, you answered,

8    not really directly, you said, we would never do

9    that.  That was your answer.

10        A.  That was your opinion or my testimony, not

11   really directly?  Is that your opinion or was that my

12   actual testimony?

13        Q.  My question many lines ago was:

14        Did PILF attempt to reach out to Ms. Freeman

15   to clarify the conflicting responses to the

16   citizenship question?

17        Answer.  We would never do that.

18        A.  Stand by my testimony.

19        Q.  So the answer is no, you never did.

20        A.  I've answered the question.

21        Q.  Why won't you say what you did or did not

22   do?

23        A.  Because I did.

24        Q.  You reached out to Ms. Freeman.

25        A.  I testified what we did.  I'm not going to

1    answer it again.

2         Q.  You reached out to Ms. Freeman.  Did you

3    call her?

4         A.  I've answered this question.

5         Q.  Did you -- did you email her?

6         A.  I've answered the question.

7         Q.  You actually haven't.  I'm asking very,

8    very simple questions.

9         Did you send her a letter to clarify her

10   responses?

11        A.  To what?

12        Q.  To clarify her responses.

13        A.  How could we clarify her responses?  That

14   makes no sense.  I don't understand the question.

15        Q.  My question is:  Did you reach out to her?

16   And you -- did you call her?

17        A.  I testified -- I can't see what my

18   testimony was.  I stand by --

19        Q.  You said we would never do that.

20        A.  That's the 30(b)(6) answer.

21        Q.  You said, we would never reach out to

22   individual voters in this context and talk to her.

23   What's "this context"?

24        A.  The one you're asking about.

25        Q.  Well, no, you're the one who said --

Page 150

1          A.  You have the answer.

2          Q.  No, you said, in this context, and I'm

3     trying to understand your answer.  You said, we would

4     never reach out to individual voters in this context.

5     What's the context that you're referring to?

6          A.  Your question.  In other words, I was

7     responding to your question.

8          Q.  What is the context that you're referring

9     to, my question?

10         A.  Your question.

11         Q.  Okay.  So in the context of where PILF has

12    one document suggesting that she answered that she is

13    a citizen of the United States and another document

14    suggesting that she answered that she's not a citizen

15    of the United States, under that context, you would

16    never reach out to clarify, which is correct?

17         A.  That's a false context because that's not

18    what the situation was.

19         Q.  Well, that's -- that's why I'm asking you

20    to answer, and what is the context?

21         A.  I've testified to all of the other

22    information we had about these documents that you're

23    ignoring in your question related to how to interpret

24    the documents.

25              So your question is a false hypothetical that

Page 151

1    did not exist in this circumstance.  There was much

2    more than two documents.  And I've answered that

3    question at least once.

4         Q.  Okay.  So in this context you would never

5    reach out to Ms. Freeman.  That's your testimony.

6         A.  That's -- my testimony is what it is in

7    the previous question.  I stand by it.

8         Q.  And in fact you never did reach out to

9    her, correct?

10        A.  I don't know.  I don't know if there was

11   any communication with her ultimately.  I have no

12   idea, as I sit here right now.

13        Q.  Are you trying to suggest the absence of

14   evidence is evidence?

15        A.  I'm not trying to suggest anything except

16   tell you the truth.

17        Q.  So you're not aware of any outreach to

18   Ms. Freeman, correct?

19        A.  As I sit here right now, I'm not.

20             MR. TEPE:  Lunch?

21             MR. DAVIS:  Sure.

22             VIDEO SPECIALIST:  We're off the record,

23   1:00.

24             (Proceedings recessed)

25

Page 152

1                       AFTERNOON SESSION

2              VIDEO SPECIALIST:  We are on the record,

3      1:37.

4      BY MR. TEPE:

5              Q.  Mr. Adams, you understand we're still

6      under oath.

7              A.  Yes.

8              Q.  So before we took a break for lunch, we

9      were looking at the Alien Invasion I report.  I'm

10     just -- sort of a segue.

11             Now in that report you had cited records from,

12     was it, eight counties/jurisdictions?

13             A.  May I look?  I just don't remember.

14             Q.  Roughly, if it's not exactly eight.  I

15     think those are the ones you reached out to, but ...

16             A.  Nineteen.

17             Q.  That's what you reached out to.

18             A.  Oh, I'm sorry.  Right.  Okay.  I --

19     looking for the graph ... eight.

20             Q.  Okay.  And I think in your testimony

21     before you made reference to a fact that there was a

22     disagreement between PILF and election officials as

23     to whether or not certain information on the

24     Cancellation - Declared Non-Citizen report was

25     releasable or protected under the Drivers Privacy

1    Protection Act, right?

2          A.   That is a broad generalization that I will

3    not quibble with.   There's lots of different aspects

4    of that, but, generally speaking, yes.

5          Q.   Okay.  And but ultimately you did get

6    records for almost all of the jurisdictions in

7    Virginia.

8          A.   Ultimately we got records for all of the

9    jurisdictions in Virginia by virtue of the

10   Commonwealth of Virginia providing us a statewide

11   cancellation noncitizen report.

12         Q.   Okay.  All right.  So after there was a --

13   this disagreement that you didn't quibble with,

14   broadly speaking, was litigated in court, correct,

15   and a court decided that the DPPA did not protect the

16   information that you were seeking, correct?

17         A.   Yes.

18         Q.   Okay.  And so after that court ruling,

19   you, PILF, continued to seek from the other

20   jurisdictions this Cancellation - Declared

21   Non-Citizen report.

22         A.   I'm sorry.  I didn't hear the first word

23   you asked.  It might have been after or before, I

24   don't know which.  I'm sorry.

25         Q.   So after that court ruling, so once you

1    got the court ruling, you went back to the various

2    jurisdictions and were asking for this, this report,

3    this cancellation report, right?

4         A.  I'm not sure.  I know that we

5    reinvigorated our efforts to obtain the statewide

6    report.  If there's a document that helps me remember

7    what we did with the counties and the local

8    jurisdictions, it would be helpful.

9         I have some recollection of also attempting to

10   get information from counties, but I don't have a

11   specific recollection.  At that point the state had

12   lost, essentially, their argument that they were

13   pushing in federal court, and we were, therefore,

14   seeking the state list.

15        Q.  Okay.  I think we will get into some of

16   those individual jurisdiction requests a little bit

17   later, but between Alien Invasion I and Alien

18   Invasion II, it's fair to say you got more records.

19        A.  For sure.

20        Q.  Okay.  And you published what I've been

21   calling -- actually it's the title of your report --

22   Alien Invasion II, correct?

23        A.  Eventually, yes.

24        Q.  Okay.  Why don't we take a look at that.

25                    (Johnson Exhibit 11

1          previously marked for identification

2          and referenced herein: Alien

3          Invasion II)

4     A.   Is this two of the same or one of the

5     same?

6          MR. TEPE:  That's a good question.  Maybe

7     it's two.  No, it's one.  The exhibit copy is

8     single-sided.  The counsel copy is double-sided.

9          Okay.  And that was previously marked Johnson

10    11.

11         So the witness has been handed what has been

12    previously marked as Johnson Exhibit 11.

13    Q.   Do you recognize that document?

14    A.   Well, it appears to be, without going

15    through what appears to be hundreds of pages, Alien

16    Invasion II report.

17    Q.   Okay.  And that is, for the record, a copy

18    that we pulled off PILF's website.  Take a look at

19    it.

20         On the cover it says, "Alien Invasion II,"

21    "The Sequel to the Discovery and Cover-up of

22    Noncitizen Registration Voting in Virginia," correct?

23    A.   That's what it says.

24    Q.   And then on the inside cover it has,

25    again, the PILF and VVA logo.

1      A.   Yes.

2      Q.   Okay.  And this was, again, a joint

project of those two organizations, right?

4      A.   Yes.

5      Q.   And then it's dated May 2017.

6      A.   Yes, it says that.

7      Q.   And then the Table of Contents is next,

and some of the headings on the Table of Contents are

"Introduction," "The Stakes," "Summary of Findings."

There's a header called "Felonies Upon Felonies,"

correct?

12     A.   All of those are in the Table of Contents

in the document.

14     Q.   "The Extent of Noncitizen Registration in

Virginia"?

16     A.   Yep, that's there.

17     Q.   "Can Noncitizens Affect Election

Outcomes," yes?

19     A.   That's there.

20     Q.   Who is to "Blame for Noncitizen

Registration and Voting"?

22     A.   That's all there.

23     Q.   Let's turn to page 1 of the report.  On

page 1, in the Introduction, Alien Invasion II begins

with a reference back to your findings in Alien

1    Invasion I, correct?

2          A.   That's what it says.

3          Q.   And then it says in the first paragraph,

4    "Our investigation revealed that in these eight

5    Virginia localities more than 1,000 noncitizens had

6    recently been removed from the voter rolls."  Do you

7    see that?

8          A.   That's what it says.

9          Q.   And in this small sample nearly 200

10   verified ballots were cast prior to official removal,

11   each one of them is likely a felony.  Do you see

12   that?

13         A.   I see that.

14         Q.   And then the report here mentions that you

15   were able to get data on a statewide basis, right?

16         A.   I don't see that, but you can -- can you

17   direct me to that, if you want me to say that that's

18   what it says.

19         Q.   Well, right underneath the image of the

20   first Alien Invasion report, it says "this report

21   details the statewide problem of registered voters."

22         A.   I see that it says that.

23         Q.   Okay.  And then it says, in the third

24   paragraph, that you expanded your investigation to

25   the entire Commonwealth, right?

1        A.   It says that.

2        Q.   Right.  And then it says, quote, as a

3   result -- presumably of the statewide investigation,

4   right -- the number of registrants removed from voter

5   rolls for citizenship problems during the last few

6   election cycles grew to over 5,500.

7        A.   Okay.  You dropped something into the

8   record that was not in the sentence, but I would

9   otherwise agree with what it says apart from the part

10  you added.

11       Q.   Oh, the presumably statewide

12  investigation?

13       A.   Yeah.  It doesn't say that.

14       Q.   Right.  But the "as a result" is referring

15  back to the statewide investigation, right?  As a

16  result of that statewide investigation, the number of

17  registrants removed grew to over 5,500.

18       A.   Well, more or less, I mean, I wouldn't

19  disagree with you.  There's a little more to it than

20  what you put in your question.

21       Q.   Right.  But there's more jurisdictions and

22  now a longer list of people.

23       A.   We have more information.

24       Q.   Right.  And then it says, quote, "of these

25  illegal registrants, 1,852 cast nearly 7,500 ballots

1    in elections dating back to 1988."  Do you see that?

2         A.   It says that.

3         Q.   And the illegal registrants is referring

4    to the over 5,500 number; is that right?

5         A.   I don't think so, but -- right, right.

6    It's referring to the noncitizen cancellation list.

7         Q.   Right, and the 5,500.  So, basically, what

8    it's saying is that, of those 5,500 illegal

9    registrants, 1,852 cast nearly 7,500 ballots.  That's

10   what you're saying, right?

11        A.   No.  I mean, it says what it says.

12        Q.   Okay.  And then on page 2 in the Summary

13   of Findings, the second paragraph, it states, in

14   bold, "the numbers are alarming.  5,556 noncitizens

15   have been removed from the voter rolls for

16   citizenship problems in 120 of Virginia's 133 voting

17   jurisdictions since 2011."  Do you see that?

18        A.   I do see it says that.

19        Q.   And then in 102 of these jurisdictions,

20   1,852 individuals cast 7,474 ballots before election

21   officials canceled their registrations.

22        A.   It says that.

23        Q.   And then underneath this paragraph there's

24   a little graphic that says 5,556 noncitizen

25   registrations, right?

Page 160

1          A.   There is a graphic that says that.

2          Q.   And underneath that it says 7 -- another

3     graphic says 7,474 votes cast by noncitizens, right?

4          A.   There is a graphic that says that.

5          Q.   Okay.  Now did VVA do the analysis that is

6     the basis for the 1,852 individuals having voted?

7          A.   Partially did the analysis, not entirely.

8          Q.   Who else did the analysis?

9          A.   PILF.

10         Q.   And VVA worked with a Political Action

11    Committee on this analysis, right?

12         A.   I don't know.

13         Q.   You don't know?

14         A.   I did not know, no.  Now from reading

15    documents in this case I have more information than I

16    did in May of 2017.

17         Q.   But you certainly -- what you're saying is

18    you're aware now that VVA worked with a PAC called

19    Middle Resolution?

20         A.   I currently have knowledge that that

21    occurred.

22         Q.   On page 3 there's a header called

23    "Felonies Upon Felonies."

24         A.   I see that.

25         Q.   And it states here, "When noncitizens who

1   register actually vote, they violate both state and

2   federal statutes because citizenship is a requirement

3   to vote in both state and federal elections," right?

4        A.   That's what it says.

5        Q.   Okay.  And so this is -- this is

6   indicating that the 5,556 noncitizens that you've

7   identified in the Summary of Findings -- or at least

8   referenced, if not identified -- committed felonies,

9   correct?

10       A.   I would strongly disagree with that.  I

11  think that this is a statement of law on page 3.

12  Felonies Upon Felonies is a legal section that

13  contains accurate, factual information about various

14  state and federal statutes and makes absolutely no

15  reference to the individuals or data that you just

16  referred to in your question.

17       Q.   Correct.  There's no direct reference, but

18  what -- the point that you're making here in the

19  section Felonies Upon Felonies is that, if you have

20  noncitizens who register or actually vote, they have

21  committed a felony, correct?

22       A.   Well, it says that, but it isn't making

23  reference to anybody other than a recitation of what

24  the law is --

25       Q.   Right.

Page 162

1          A.   -- without any dispute or controversy.

2     This is the law.

3          Q.   Right.  And elsewhere in this report you

4     identified by name the 5,556 noncitizens, correct?

5          A.   No, we don't actually.

6          Q.   Well, aren't they listed in Exhibit 1?

7          A.   They're listed at a link to government

8     records, but they aren't in this report.  They're in

9     an attachment, but they're not named in this report

10    that was distributed.

11         Q.   Right.

12         A.   You need to understand that this was

13    distributed by paper and the names are not in that.

14         Q.   So the second paragraph of the Summary of

15    Findings that we just had looked at on page 2 --

16         A.   Page 2.  Okay.

17         Q.   -- the numbers are alarming, that sentence

18    that we read --

19         A.   I see that sentence.

20         Q.   -- and refers to the 5,556 noncitizens,

21    right?  And then there's a reference to an endnote

22    number 5.

23         A.   Endnote number 5, there's a 5, yeah,

24    superscript.

25         Q.   And in endnote number 5, if you go to

1    that, it says that the cancellation reports for all

2    120 counties are available at Exhibit 1 at the link

3    provided on page 1 of this report?

4         A.  Right, but they weren't in the report.

5    That's an important distinction, because most of the

6    distribution of this report or a large amount of it

7    was by paper.  We didn't include the exhibits.

8         Q.  Okay.  So on the Internet, you had your

9    report here, right?

10        A.  Right.

11        Q.  Okay.  And you had a link on page 1 of the

12   report to the exhibits, correct?

13        A.  No, we didn't.  We had a link on page 2 to

14   a footnote to take you to a link on an unnumbered

15   page in the end notes that would ultimately get you

16   there.  So it was not -- it was a number of steps.

17        Q.  Okay.  But there was -- you were linking

18   from the report to the exhibits.

19        A.  It was possible to read the government

20   documents based on information you got in footnote 5,

21   although there's no link, strangely, I'm just

22   realizing this.  Footnote 5, that we would have

23   distributed in paper copy, would actually not allow

24   somebody to find the reports, as a matter of fact.

25        Q.  Okay.  But I'm asking about how it was set

Page 164

1    up on the web.

2           A.  Well, that's different, but you asked me

3    about the paper first.  You asked me about the

4    report.

5           Q.  Yes.

6           A.  So I'm answering about the report.

7           Q.  Yes, and the report is -- can be printed

8    in paper, right?

9           A.  It was printed in paper but not the

10   exhibits.

11          Q.  But it was published on the Internet,

12   correct?  Alien Invasion I was --

13          A.  There was an electronic publication of

14   this report that is distinct from the paper

15   publication.

16          Q.  Well, it's the same publication.

17          A.  Not really actually.

18          Q.  Oh, so there are two different versions?

19          A.  Yes.

20          Q.  Okay.  So what were the material

21   differences between Alien Invasion I, excuse me,

22   Alien Invasion II in paper form and Alien Invasion II

23   in electronic form on PILF's website?

24          A.  The paper form provided no way for people

25   to pursue link endnote 5.

Page 165

1      Q.  Okay.  But my question is about how it was

2   published on the Internet.

3      A.  Sure.

4      Q.  Okay?  And so if you have an electronic

5   copy of PILF's report downloaded from PILF's --

6   available on PILF's website, it links to the

7   exhibits, correct?

8      A.  Well, this is -- I mean, it probably does,

9   but I can't say with absolute certainty because this

10  is a paper copy.  There is a link here.  All of the

11  raw data and records can be researched at a broad

12  page, but it's -- it's a different type of link than

13  to the direct ... Exhibit 1.

14     Q.  And at endnote 5 you refer the reader to

15  Exhibit 1 for the reports that underlie the 5,556

16  noncitizens.

17     A.  Right.  It refers to that in the

18  footnote -- in the endnote.

19     Q.  And you can also take, if you had a paper

20  copy, the link that is the web address here on page

21  1, put that in your browser and get to the report

22  online, correct?

23     A.  Which report?

24     Q.  The Alien Invasion II report.

25     A.  No, that's not correct.  I'm sorry.

1    That's just not correct.  I don't mean to be

2    argumentative, but that's not accurate.

3         What you can get to is a page that has a

4    variety of links about raw data, and then you have

5    to, once again, choose another link.  It's not a link

6    to the Alien Invasion report.  It says, all the raw

7    data and records obtained in our research into alien

8    registration voting can be obtained at, and then

9    that's a landing page.

10        Q.  Right.

11        A.  And then you have more choices at that

12   landing page.

13        Q.  Okay.  And so but if you go to this

14   landing page, which is listed here on page 1, it says

15   here all the raw data and records obtained -- can be

16   obtained at this link, correct?

17        A.  Eventually you can obtain it, correct, but

18   this is not a direct link to the -- you originally

19   were asking about the exhibits, and I'm answering you

20   that no, they can't be obtained, if you click that

21   link.  You have more steps to do.

22        Q.  Okay.  So you have to click on the link

23   that says Exhibit 1.

24        A.  Correct.  You have to click on two links

25   to get there.

1   Q.  You have to click on two links, okay.  And

2   Alien Invasion II here tells you how to reach those

3   records.

4   A.  Where are you referring?

5   Q.  Well, I'm just saying, Alien Invasion II

6   says we've got 5,556 noncitizens, and then, you know,

7   hanging off that is endnote 5, and endnote 5 says go

8   to Exhibit 1, right?

9   A.  Okay.  This is really confusing, so bear

10  with me.  Endnote 5, cancellation reports for all 120

11  counties are available at Exhibit 1.

12  Q.  At the link provided.

13  A.  At the link provided on page 1.  Okay.  So

14  go back to page 1.  That's the landing page.

15  Q.  Right.  And that's how you're able to

16  access, as it says here, if you want to access

17  Exhibit 1, it's at the link provided on page 1 of the

18  report.

19  A.  Right.  I'm not disputing the fact that

20  the documents are ultimately available

21  electronically.  How you get there is a difference

22  with how you're describing it from your initial

23  question.

24  Q.  Okay.  So with all that discussion of

25  linking, I think we're all on the same page that the

1    number 5,556 comes from the records that you

2    published in Exhibit 1 to Alien Invasion II, correct?

3         A.   Yeah, once again, I assume that the tally

4    is correct, that the people tallying it had the

5    number correct.  I have confidence they did.

6         Q.   Okay.  And the cancellation reports that

7    are housed in Exhibit 1 is the same type of report

8    that was provided by the localities that you used for

9    Alien Invasion I, correct?

10        A.   I'm sorry.  I don't understand the

11   question.

12        Q.   The cancellation reports are in Exhibit 1

13   to Alien Invasion II, correct?

14        A.   Mm-hmm.

15        Q.   So it's statewide, right?

16        A.   Well --

17        Q.   Except for a few jurisdictions that --

18        A.   -- it's not statewide.  It's listed by

19   county.  So, no, I'm sorry, I don't want to be

20   argumentative, but it's not statewide.  It's Augusta

21   County, Accomack County.  We don't have a statewide

22   report.  We have a report provided by the state that

23   relates to individual counties.

24        Q.   Okay.  So you have a report, Cancellation

25   - Declared Non-Citizen report, that you received from

1    the Virginia Department of Elections, correct?

2        A.  Correct.

3        Q.  Okay.  And within that document is

4    listings of individuals who were canceled based on

5    their county, correct?

6        A.  Right.

7        Q.  Yes.  And so all I'm asking is this record

8    that's reflected in Exhibit 1 to Alien Invasion II is

9    the same type of report that you had obtained from

10   localities and included in Alien Invasion I.

11       A.  Right.  Well, to the extent that they are

12   both the list of people who were declared by either

13   election officials or the registrants or both that

14   they were noncitizens.

15       Q.  Well, the records reflect what they

16   reflect, but, basically, what I'm just saying is it's

17   the same type of report.

18       A.  It's a declared noncitizen report.

19       Q.  Right.  The only difference between, you

20   know, what you see in Exhibit 1 to Alien Invasion I

21   and Exhibit 1 to Alien Invasion II is more counties

22   in Alien Invasion II, right, more jurisdictions?

23       A.  Right.

24       Q.  Right?  And a longer time period covered.

25       A.  Hmm, I didn't realize that.  I want to

1    answer your question if you give me time to look at

2    Alien I.

3         Q.   Sure.

4         A.   Okay.  Well, right, it's a longer time

5    period by virtue of the fact that it was March of '17

6    instead of August of '16.  It all started going back

7    to New Year's Day in '11.

8         Q.   And then I think if you maybe flip towards

9    the back of Exhibit 1, isn't there an extra couple of

10   months that brings you to maybe May, or am I --

11        A.   I don't think so.  It says March 20th,

12   2017, but maybe there's a -- oh, wait, there's --

13   there are some from, I don't know, maybe those are

14   supplemental.

15        Q.   I think so.

16        A.   But, yeah, some go to May, some go to

17   March.  Alien I went to August.

18        Q.   Okay.  So essentially same type of report,

19   just more counties, different time period.

20        A.   Right.

21        Q.   Okay.  Eliud Bonilla is listed in Exhibit

22   1 to Exhibit -- strike that.  Start again.

23             Eliud Bonilla is listed in Exhibit 1 to Alien

24   Invasion II, correct?

25             A.   Did we --

1    Q.  Does that refresh your recollection?

2    A.  Yeah, I just --

3    Q.  Okay.  Do you recognize the name Eliud

4    Bonilla?

5    A.  Right.

6    Q.  He's one of the plaintiffs in this case.

7    A.  Right, right.

8    Q.  So if you go to page 100 of 486.

9        MR. DAVIS:  He's on Alien II.

10   A.  Okay.

11       MR. DAVIS:  What page did you say?

12       MR. TEPE:  100 of 486.

13   A.  Right.  You've marked it with a

14   highlighter.

15       Q.  So it's got his name and an address for

16   him, correct?

17   A.  It has his name and an address.

18       Q.  And this is under the Fairfax County list,

19   correct?

20   A.  Correct.

21       Q.  Okay.  So Mr. Bonilla is one of the 5,556

22   noncitizens referenced in the Summary of Findings on

23   page 2; is that right?

24   A.  Well, it doesn't mention his name.

25       Q.  No, I understand.  It's kind of the same

1    questions I was asking with respect to Alien Invasion

2    I.

3           A.   The numbers are alarming.   5,556

4    noncitizens have been removed from the voter rolls

5    for citizenship problems in 120 Virginia's

6    jurisdictions.   That 5,556 is going to relate to the

7    tally that's in exhibit -- in the exhibit.

8           Q.   Okay.   And so Mr. Bonilla is part of that

9    tally of 5,556.

10          A.   Right.

11          Q.   Okay.   And if you go to page 258 of 486,

12   you see Luciania Freeman's name, correct?

13          A.   Yes.

14          Q.   And so she is also one of the 5,556

15   noncitizens tallied on page 2 of the report.

16          A.   Yes.

17          Q.   And for Alien Invasion II, am I correct

18   that PILF reviewed hundreds of voter registration

19   applications, right?

20          A.   Well, I don't know about hundreds, but if

21   it says that --

22          Q.   Let's go to page 13 of the report body.

23          A.   13?

24          Q.   13.

25          A.   It's entitled "Who is to Blame For

Page 173

1  Noncitizenship Registration Voting."  Is that the

2  page?

3       Q.  That is the page.  And then I'm going to

4  direct you to the bottom right corner, if you would

5  just maybe take a look at the bottom three

6  paragraphs.

7       A.  Right.

8       Q.  So as I understand it, PILF looked at 764

9  voter registration applications, correct?

10       A.  That's what it says in the report.

11       Q.  It says -- and so you surveyed, it says

12  here, "in the 16 jurisdictions surveyed, PILF

13  reviewed 764 voter registration applications

14  submitted by applicants who were later removed for

15  lacking U.S. citizenship," correct?

16       A.  That's what it says.

17       Q.  Okay.  And so this is 7 -- what you're

18  saying here is that this is 764 of, what, the five

19  thousand plus?

20       A.  It probably means that those were the only

21  ones we could get the underlying forms for, which

22  probably means, if our request asked for the

23  underlying forms, the other four thousand, the

24  counties were noncompliant in giving them to us.

25       Q.  Well, isn't it your recollection that the

1    voter registration applications for going back a

2    number of years were not kept on file?

3        A.   It varies --

4        Q.   Okay.

5        A.   -- county to county.

6        Q.   And so for 702 of those 764 applications

7    reviewed by PILF, the registration application said

8    that the applicant said that they were a citizen,

9    correct?

10       A.   They couldn't have gotten on the rolls

11   otherwise, although some did, but you have to say

12   something in the citizenship checkbox.

13       Q.   Right.  And so at the bottom here it says,

14   for the remaining 702 noncitizen registrants, they

15   checked yes in the citizenship question, right?

16       A.   That's what it says.

17       Q.   So if they checked yes that they were a

18   citizen, why did you call them 702 noncitizens?

19       A.   Because that's what the state said they

20   were.  That's what the local election officials said

21   they were.  And this is a long answer, by the way.

22       The voter themselves said it; otherwise, they

23   would have been removed because they swore under oath

24   on some document, according to the election officials

25   that I spoke with, that they swore under oath that

1    they were not a U.S. citizen in a more recent

2    document that would be an admission against interest.

3         Q.  Okay.  So -- I didn't mean to cut you off.

4         A.  Go ahead.

5         Q.  So what you're saying is, it's the same

6    thing as what we discussed with Alien Invasion I.

7    There was -- they got on the rolls because they

8    clicked yes for the most part that they were a

9    citizen, right, 702 of them did that you looked at,

10   right?

11        A.  Yeah.

12        Q.  Okay.  And then you also have their names

13   appearing in this cancellation report, right?

14        A.  Their names appeared in the cancellation

15   report, or else we wouldn't have tallied them up in

16   part of the tally.

17        Q.  Okay.  Other than the fact that they

18   appeared in this cancellation report, was there any

19   other basis for you to call them noncitizens?

20        A.  I stand by my earlier answer.  We

21   discussed this at length involving all of my

22   discussions with election officials and various other

23   administrative procedures.  That formed the basis to

24   make these sorts of statements.

25        Q.  Okay.  And so -- and just to make sure I

1    understand, that was based on conversations that you

2    had with Don Palmer?

3         A.   Look, we -- I don't want to be

4    argumentative about this, but I've answered that

5    three or four different ways or times, I should

6    say --

7         Q.   No, I understand.

8         A.   -- earlier today.

9         Q.   And I'm not --

10        A.   And I stand by that answer.

11        Q.   Okay.  I understand.  But just for clarity

12   of the record, you say I already said X, and I want

13   to just make sure that, when we're talking about this

14   record here (indicating), which is -- which was

15   published as Exhibit 1 to Alien Invasion II, the only

16   other basis for calling these people noncitizens

17   besides this record is are those conversations that

18   you talked about earlier today.

19        A.   No, I disagree completely with that

20   statement.  A world of experience goes into this

21   area: a large amount of discussions with election

22   officials, experienced review in voting rolls,

23   litigation in other places, experience in other parts

24   of the country, information received from

25   statisticians.  Lots of things go into the assessment

1  that, if these people have been declared noncitizens

2  by the state, by the local election officials, and by

3  themselves, I might add, then there is a basis to

4  make the statements in the report.  And I stand by my

5  earlier testimony on that.

6       Q.  Are any of these communications that you

7  had with Don Palmer memorialized in email?

8       A.  Yes.

9       Q.  Okay.

10      A.  You showed me one of them earlier today.

11      Q.  No, I'm -- let me re-ask my question.  Is

12  there any communications in email in which you asked

13  Don Palmer to say what does declared noncitizen mean

14  in the cancellation report?

15      A.  I don't recall that.  I don't remember.

16      Q.  Okay.  Was there any email correspondence

17  between you and Mr. von Spakovsky in which you asked

18  him what does declared noncitizen mean in this

19  cancellation report?

20      A.  Probably not.

21      Q.  Is there any email that you engaged in

22  with Cameron Quinn in which you asked the question

23  what does declared noncitizen mean in the

24  cancellation report?

25      A.  None that I saw in complying with

1    discovery responses.

2         Q.   Are you aware of any other written

3    communication involving these former election

4    officials that you mentioned this morning --

5         A.   I'm sorry.

6         Q.   -- in which you asked, you know, what does

7    declared noncitizen mean?

8         A.   None that I saw in preparing discovery

9    responses.

10        Q.   And so these conversations were only oral.

11             MR. DAVIS:   I'm sorry.   I didn't hear

12   that.

13        Q.   These conversations were only oral.

14   There's no written --

15        A.   No, I would disagree with that.   I think

16   they were certainly oral, but they weren't only oral.

17        Q.   Okay.   Well, that's what -- I'm trying to

18   identify, find, you know, a written document in which

19   you asked one of these individuals to explain what

20   declared noncitizen means.

21        A.   What's the question?

22        Q.   Are there such documents?

23        A.   None that I saw in preparation for

24   discovery responses.   If there had been, they would

25   have been turned over.

1       Q.  If you go to Exhibit 12 of the report,

2   and, in particular, I'll direct you to page 217 of

3   Exhibit 12.

4       A.  Oh.  Right.  It's 11.

5       Q.  It might be tabbed.  It's on the

6   right-hand side.  You see a bunch of tabs?

7       A.  But for the record we're talking Johnson

8   11, right?

9       Q.  Johnson 11 is the final Alien Invasion II

10  report.

11      A.  Right, but you called it Exhibit 12.

12      Q.  I'm saying Exhibit 12 to the Alien

13  Invasion --

14      A.  Oh, I see.  Okay.

15      Q.  And we tabbed the pages, since it is a

16  lengthy document in front of you.

17      A.  What number?

18      Q.  Look on the bottom of your stack there.

19  Do you see another tab?

20          MR. DAVIS:  Are we in the realm of

21  applications?

22          MR. TEPE:  Yes.

23          MR. DAVIS:  Maybe the name of the

24  applicant would be helpful too.

25      Q.  All right.

Page 180

1     A.   There's no page number on this, though.

2          MR. DAVIS:   There's no page number on mine

3     either.

4          MR. TEPE:   Understood.

5     Q.   So now that you've kind of turned over the

6     large volume of paper in front of you, we were

7     talking about the applications reviewed by PILF,

8     correct?  Right?

9     A.   We're talking about it now, yes.

10    Q.   Okay.  And so the 764 applications

11    reviewed by PILF were included in Exhibit 12 to Alien

12    Invasion II, right?

13    A.   I presume all of them are included, yes.

14    Q.   Okay.  All right.  And so now we're

15    looking at Exhibit 12.  And I'm looking for -- one of

16    the tabs should be for Mr. Bonilla.

17    A.   You told me to go to the last tab and I've

18    done so, and it's for somebody named Abby Sharpe

19    Focht.

20    Q.   All right.  Bonilla is probably the

21    second-to-last tab.  I'm sorry.

22    A.   No, it's Jeanne Rosen.

23    Q.   All right.

24    A.   Do you want me to stay with Rosen?

25    Q.   There should be a number at the bottom,

1    PILF 50 --

2         A.  Look (indicating).

3         Q.  -- of the one we're looking for.

4    Understood.  No?

5         A.  No.  I'm sorry.  It's just not there.

6    This is another tabbed document.

7         Q.  Yes, I understand.  So if you look in the

8    other Redweld, what's the tab there?

9              MR. DAVIS:  I think, if it's the same, the

10   tab is on the face of 49.  If you flip it over, it's

11   Bonilla, which is 50.  Just the tab is on the other

12   side.

13             MR. TEPE:  Okay.

14        A.  Freeman, right?

15        Q.  Okay.  Well, we can --

16        A.  That's the last one.  I'm sorry.

17        Q.  That's fine.  So you have published, just

18   like with Alien Invasion I, the voter registration

19   application of Luciania Freeman, right?

20        A.  Here's Bonilla.

21        Q.  All right.  So we'll start with Freeman.

22        A.  Right.

23        Q.  Freeman, just like with Alien Invasion I,

24   you published in Exhibit 12 here to Alien Invasion II

25   her voter registration application, correct?

1     A.   Didn't we cover this?

2     Q.   Yes.   And I'm just confirming, asking you

3  to confirm, that she was published in Exhibit 12, her

4  voter registration application was published in

5  Exhibit 12.

6     A.   Right, it's in this document.

7     Q.   Okay.   You just noticed Eliud Bonilla's

8  voter registration application, okay?   Let's go to

9  him.

10     Do you see Eliud Bonilla's voter registration

11  application there?

12     A.   Yes.

13     Q.   And it has an address for him, correct?

14     A.   It has an address for him?   I'm sorry?

15     Q.   It has an address for him?

16     A.   Right.

17     Q.   And it has a phone number for him?

18     A.   It does.

19     Q.   And it has in the upper left-hand corner

20  him checking yes to the question "are you a citizen

21  of the United States of America," right?

22     A.   It is.

23     Q.   And he signed this under felony penalty

24  for making willfully false material statements,

25  correct?   He swore to this under felony penalty.

Page 183

1          A.   Right.

2          Q.   Okay.  So at the time Alien Invasion II

3    was published, PILF had two pieces of documentary

4    records about Eliud Bonilla, correct?  You had the

5    copy of the voter registration application, right?

6          A.   Yes.  I just said that.

7          Q.   And then you also had his name listed in

8    the cancellation report for Fairfax County, correct?

9          A.   No, it wasn't a generic cancellation

10   report.  It was a noncitizen -- declared noncitizen

11   report.

12         Q.   Understood.

13         A.   There are generic cancellation reports,

14   and I just want the record to be clear, he wasn't

15   listed on a generic non -- cancellation report.

16         Q.   Okay.  And but it's the report that you

17   published in Exhibit 1.  So you had his appearance in

18   two documentary pieces of evidence published by PILF,

19   one in Exhibit 1 and one in Exhibit 12, right?

20         A.   Right.

21         Q.   One of those pieces of evidence, one

22   document, shows him saying, yes, I'm a citizen of the

23   United States, correct?  That's what we just looked

24   at in Exhibit 12.

25         A.   Yeah.  I think I answered you.  It does.

1      Q.  And then you had the cancellation report.

2      A.  Where's that?

3      Q.  That was Exhibit 1 where you saw Bonilla's

4  name there, correct?

5      A.  I mean, that was probably my testimony.  I

6  stand by it.  I'm sure it's there.

7      Q.  Before publishing Alien Invasion II, did

8  PILF reach out to Mr. Bonilla to ask about these two

9  pieces of documentary evidence?

10      A.  As a corporate policy, we would not have

11  done that.

12      Q.  What's the corporate policy?

13      A.  That we don't contact registrants or

14  individuals because we have no utility in doing so.

15  We can't verify anything.

16      Q.  So the answer is you did not.

17      A.  Well, that's a different question.  I

18  don't have any recollection as to whether or not we

19  contacted Eliud Bonilla.

20      Q.  You have no basis for saying that PILF

21  did, correct?

22      A.  It would be contrary to policy if we did,

23  but that's not the same thing as saying that we

24  didn't.

25      Q.  Okay.  But you're not aware of any

1    outreach to Mr. Bonilla.

2              A.   My testimony is I don't know.   I'm not

3    aware of any.

4              Q.   Is this policy written down somewhere?

5              A.   Nope.

6              Q.   Who made this policy?

7              A.   Me.

8              Q.   When did you make it?

9              A.   When we were doing the project.

10             Q.   Which project?

11             A.   The ones we've been talking about, Alien I

12   and II.

13             Q.   So it was a policy made orally by you not

14   to reach out to any individual listed in the Alien

15   Invasion reports.

16             A.   That's my testimony.

17             Q.   And, for clarity, when I say "listed," I

18   mean anyone appearing in Exhibit 1 to Alien Invasion

19   II, or Exhibit 12 to Alien Invasion II.  I just want

20   to clarify.

21             A.   Okay.  I'm sorry.  Could you repeat that?

22             Q.   Okay.  So my question was, so it was a

23   policy made orally by you not to reach out to any

24   individual listed in the Alien Invasion reports.

25             A.   Well, a quibble, just a touch, with the

1    term "reach out."  We were -- the policy was more

2    specific than reach out.  It was we're not to contact

3    individuals listed in the government documents.

4         Q.   Okay.  And by "the government documents,"

5    we're talking about the people who appeared in

6    Exhibit 1 and Exhibit 12.

7         A.   Correct.

8         Q.   And what was the rationale behind this

9    oral policy?

10        A.   That there was no utility in contacting

11   them because we had no means to verify what they

12   said.  All it would be is an exercise in futility

13   with possible negative ramifications associated with

14   it.

15        Had we done something like that, I can only

16   imagine and speculate that your complaint might have

17   had different paragraphs but still been filed, that

18   contact with these individuals would be

19   misinterpreted or otherwise misrepresented.

20        And so, given the fact that there was no way

21   for us to verify anything that they might have told

22   us in these conversations, we did not communicate

23   with these individuals.  There was a better way to

24   solve the problem of noncitizens on the rolls than us

25   talking to individuals.

1      The better way to solve the problem was to

2   provide law enforcement officials who had the means

3   to access the relevant data without the voter even

4   knowing, without the voter even knowing this was

5   going on, to verify whether or not they were

6   citizens.

7      Q.  Well, if you could provide the information

8   to law enforcement, what was the point of publishing

9   everyone's names and contact information?

10      A.  Well, because those were -- that was the

11   Congress's decision, not ours.  Congress made the

12   decision this is public information, not PILF, and --

13   can I finish?  Then you can ask me a question.

14      Q.  Go ahead.

15      A.  No, go ahead.

16      Q.  No, I didn't want to interrupt.  Go ahead.

17      A.  But you did.

18      Q.  And I apologize.

19      A.  All right.  Congress made the decision

20   this is public information, not PILF.  And this has

21   been thoroughly litigated in the Eastern District of

22   Virginia.  It went to the Fourth Circuit.  We relied

23   on applicable case law as to what was public

24   information and what was not public information.

25      We followed those court rulings.  In fact, we

Page 188

1    went beyond them.  We may have redacted some things

2    we didn't need to, which is unfortunate in my view,

3    because I think it's important that we not be accused

4    of misrepresenting what the government documents say.

5         And so I think it's important to have the

6    government documents containing public information

7    available for the public.  These are government

8    documents that anybody can get.  They aren't private.

9    Our purpose was to have a thorough report that could

10   not be questioned for making up conclusions about

11   numbers.

12        Q.  Congress didn't publish the cancellation

13   reports on the Internet, did it?

14        A.  Congress made a determination that

15   cancellation reports are public information.

16        Q.  Congress did not publish the cancellation

17   reports on the Internet, correct?

18        A.  Of course they didn't, but they said that

19   this is public information.

20        Q.  PILF published the cancellation reports on

21   the Internet, correct?

22        A.  In reliance to judicial precedent in the

23   Fourth Circuit, Congressional intent, transparency

24   issues.  There's a variety of public policy issues

25   that informed our decision to publish this, none of

Page 189

1    which, by the way, are the theories of your case, but

2    the fact that Congress determined these to be public

3    records.

4         Q.  And no one forced PILF to publish these

5    cancellation reports on the Internet, correct?

6         A.  What difference does that make?  That's, I

7    mean -- we had a First Amendment right to

8    republish -- we have a First Amendment right to

9    publish public information that Congress has

10   determined to be public in order to petition the

11   government about failures in the system, and that's

12   exactly what we did and why we did it.

13        Q.  And it was your choice to publish this

14   information on the Internet.

15        A.  Because we had a First Amendment right to

16   that Congress bolstered with their decision very

17   clearly to make this public information, and the

18   Fourth Circuit's decision to back that up and give us

19   this broad First Amendment right to publish

20   government documents related to an important issue

21   like voting.

22        And, by the way, we uncovered a huge problem

23   here -- two huge problems -- both aliens on the rolls

24   and the government canceling citizens.  And that's

25   exactly why Congress gave this broad right to the

1   public to get this information, disseminate this

2   information, and speak about this information.

3        Q.   Okay.  So my question was, yes or no, it

4   was PILF's choice to publish this information on the

5   Internet.

6        A.   Not entirely.  We were given the right by

7   Congress to get the information.  They chose to pass

8   a statute that gave us that right, to exercise that

9   right under the First Amendment, and we ultimately

10  chose to exercise our First Amendment rights to get

11  government information and publish it.

12       Q.   And so it was PILF's choice to put this

13  information on the Internet, when, as you testified

14  before, you could have just handed it to law

15  enforcement who could, as you said, I think, quietly

16  look into verifying these issues.

17       A.   I've answered the question.

18       Q.   And the answer is yes?

19       A.   The answer is what I said.

20       Q.   The answer is PILF made a decision, for

21  whatever rationale or reasons, PILF made a decision

22  to publish these cancellation reports on the

23  Internet, correct?

24       A.   These cancellation reports were published

25  on the Internet.

1    Q.  One of the other voter registration
2    applications that PILF published was for Abby Jo
3    Focht, who is now known as Abby Jo Gearhart; is that
4    correct?
5    A.  If you could direct me to --
6    Q.  I think you hit on --
7    A.  The last one?  I seem to recall that.  If
8    we need to get it directly, you're going to have to
9    give me a second.
10   Q.  If you see the bottom of that stack there,
11   the bottom tab, is that Focht?
12   A.  Jeanne Rosen.
13   Q.  Okay.
14   MR. DAVIS:  Probably a green tab.
15   A.  Is it tab -- wait.  There's one more.
16   That's Rosen.  There's no tabs there.  This is
17   Bonilla.  This is Freeman.
18   MR. TEPE:  Bill, do you have it?
19   MR. DAVIS:  I have one here, yeah.  Do you
20   want to just use this one?
21   Q.  Yeah, Mr. Adams, if you don't mind.
22   A.  I had it a minute ago.
23   MR. DAVIS:  Here, let me have that and
24   I'll find it.
25   MR. HANSON:  It's the fourth green tab --

1      MR. DAVIS:  I've got it.

2      A.  No, four is not it.  I'm sorry.

3      Q.  The application in front of you is for

4  Abby Focht, right?

5      A.  Right.

6      Q.  Okay.  Same questions as before.  There's

7  an address there, correct, for her?

8      A.  There's an address.

9      Q.  Phone number?

10     A.  Yes.

11     Q.  Okay.  She also had checked, "are you a

12  citizen of the United States of America," yes,

13  correct?

14     A.  She did that, yes.

15     Q.  And so with respect to Ms. Focht, you had

16  the same amount of information about her as you did

17  about -- actually strike that.

18     So can you find Ms. Focht's name in the

19  cancellation list?

20     A.  Well, for starters, it might be on the

21  face of this document, but this is a bad copy, and

22  there's a notation here that I can't read on this

23  document.  So putting that aside, do you want --

24     Q.  It's a received stamp, right?

25     A.  Okay.  Putting that aside, do you want me

Page 193

1    to hunt for what?

2         Q.   Okay.   Does her name appear anywhere in

3    Exhibit 1 to Alien Invasion II?

4         A.   I suspect you know the answer to that, and

5    I might not.

6         Q.   The answer is no.

7         A.   Okay.

8         Q.   Okay.   And so Ms. Focht -- PILF had no

9    basis for saying that Ms. Focht is a noncitizen,

10   correct?

11        A.   I don't think she was -- I'm sorry.

12             MR. DAVIS:   Just so -- this exhibit does

13   have some sort of a legend on the bottom right that's

14   not legible, but -- and it may be no more than a

15   receipt.

16             MR. TEPE:   Right, I think it's just a

17   received date.

18        Q.   Mr. Adams, the question is, you understand

19   that her application was posted as part of Exhibit 12

20   to Alien Invasion II, correct?

21        A.   Well, that's interesting, because she

22   wasn't part of the tally.   I think we can agree on

23   that.   Because we've had a lot of testimony here that

24   the tally number was based only on the statewide

25   VERIS reports.   So that would certainly take her

1  outside of all the characterization that you were

2  asking about relating to felonies.

3       But my understanding is, is that she was

4  inadvertent -- first of all, she was given to us by

5  York, I think, as a responsive document request -- a

6  response to a document request -- that York gave to

7  us in response to our request.  She was inadvertently

8  posted.  And my understanding is, within moments of

9  being informed of this, her name was removed.  And it

10 was an inadvertent inclusion.

11      Q.  Okay.  So I think you're referring to the

12 fact that PILF removed her application and those of

13 50 others at one point after publication on the

14 Internet.

15      A.  Right.  These applications were given to

16 us by the registrars responsive to our request.  They

17 were included in the full disclosure of responsive

18 documents, right.  How they were characterized is

19 subject to dispute.  And as soon as we heard that she

20 should not have been given to us by the government

21 official, we removed the document.

22      Q.  Okay.  Now PILF advocated using the

23 exhibits to Alien Invasion II to prosecute

24 individuals, correct?

25      A.  That's an oversimplification.

1      Q.  Okay.  Let's go to page 16 of the report.

2      A.  16?

3      Q.  16.  There are a few recommendations at

4   the end of your written report, right,

5   Recommendations and Solutions at the top?

6      A.  Right.

7      Q.  Okay.  And one of those recommendations is

8   last checkbox here on the right-hand side, "law

9   enforcement at both the federal and state levels

10  should exercise their authority to prosecute cases of

11  voter fraud," right?  Do you see that?

12     A.  Right, but I don't think that answers your

13  question.

14     Q.  "Voter registration and voting history

15  records such as those contained in this report make

16  prosecution an easy task," correct?

17     A.  Right.

18     Q.  Okay.  And so PILF was advocating that law

19  enforcement look at the records to attach to Alien

20  Invasion II and engage in prosecutorial activity,

21  correct?

22     A.  No.

23     Q.  No?

24     A.  No.  I think you misunderstand all of

25  this.  What PILF was advocating is that prosecutors,

1   A, start taking voter fraud seriously, which we say,

2   and, two -- and, believe me, we have a lot of

3   experience with this because in some places they take

4   it seriously and in some places they don't.

5       And in this particular case we were advocating

6   investigative activity where prosecutors,

7   particularly the Justice Department, would have

8   access to original records that we did not have and

9   could make determinations as to which, if any, of

10  these were crimes without the voter even having any

11  awareness that it was occurring.

12      And that's what we've been advocating and will

13  continue to advocate.  Because the way the Justice

14  Department works is you can have an investigation to

15  get to the bottom of this problem without any contact

16  of the voter whatsoever.

17      Q.  Well, if you -- you've identified five

18  thousand -- in Alien Invasion II, 5,556 noncitizens,

19  correct?

20      A.  Well, that's what the state did.  We

21  didn't.  They identified it.

22      Q.  Well, no, they didn't identify 5,556

23  noncitizens.  They gave you a list.

24      A.  No, but it was a list of noncitizens.

25      Q.  It was a list of people canceled.

1     A.  No, you're misstating a vast amount of

2   records.

3     (Clarification by reporter.)

4     Q.  It says right here, Cancellation --

5   Declared Noncitizen.

6     A.  Right.

7     Q.  Right?  There's a column that says "cancel

8   date," right?

9     A.  Right.  And there's a heading that says

10  "noncitizen."

11    Q.  And then there is a "cancel type," right?

12    A.  Noncitizen.

13    Q.  Right, it says "declared noncitizen."  So

14  this is a list of cancellations --

15    A.  Of noncitizens.

16    Q.  -- of people.

17    A.  Noncitizens.

18    Q.  And so what you're saying is all these

19  people are noncitizens.

20    A.  No, that's what the state was saying,

21  election officials who we consulted with in relation

22  to the preparation of this report.

23    For example, as I indicated, Ann Leider of --

24  the Alexandria general registrar, told us these are

25  noncitizens who admitted they were noncitizens under

1    oath in a subsequent filing.

2         Q.  Well, then --

3         A.  So --

4         Q.  Okay.  But if these are noncitizens and

5    you're so confident of that, then why would

6    prosecutors have to investigate?

7         A.  Of course -- well, first of all, your

8    question, "so confident," I don't understand what you

9    mean by that.  I'm confident that there's fertile

10   territory here for investigators to commence

11   investigative activities.  Why would they have to do

12   it?  Let me answer your question.

13        You don't simply walk into a prosecutorial

14   posture and file charges based on our report.  That's

15   absurd.  I referred to it as virtually turnkey.  That

16   "virtually" meant something.  It meant a lot.

17        And what it meant was that the U.S. Attorney's

18   Office could take this list -- and I guarantee you

19   there's noncitizens in here, and I guarantee you that

20   at some point some are going to be prosecuted.

21        And you take the list of potential noncitizens

22   and you start running your traps internally at DOJ,

23   you start doing the legwork, the hard work that goes

24   into it to take the tips that we have given to the

25   government about what we believe to be a serious

1    problem, and you work the cases up internally.  And

2    you eventually, eventually go to a grand jury with

3    cases that you have determined are foolproof and

4    ironclad.

5         Sometimes you get admissions on Immigration

6    and Naturalization forms under question 12, and you

7    take those cases, and those are the ones you pursue.

8    You don't start knocking on doors.  And DOJ would

9    never do that.  And I have experience and knowledge

10   in that area to know that the voters would be

11   protected by false-positives in the state reports.

12   And I relied on that experience and knowledge to know

13   that they would not endure the sorts of nonsense that

14   some might argue these reports triggered.

15        They aren't going to have willy-nilly

16   prosecutions.  There's a process in place, a careful

17   process, that the Justice Department prosecutors will

18   use before the voter even knows what's happening.

19   And I have firsthand awareness of that because of my

20   time at the Justice Department.

21        Q.  You called this a list of potential

22   noncitizens, correct?

23        A.  I'm sorry?

24        Q.  In your lengthy answer, you referred to

25   this as a list of potential noncitizens, right?

1      A.   I said there are certainly noncitizens on

2    this list.  There's no question about that --

3      Q.   Okay.

4      A.   -- that this list contains the names of

5    noncitizens who should be prosecuted for registering

6    and voting in the Commonwealth of Virginia.  There's

7    no doubt about it --

8      Q.   Okay.

9      A.   -- and ...

10     Q.   And so -- and so this list (indicating)

11   that was published as Exhibit 1 is a list of

12   potential noncitizens.

13     A.   Well, I'm not disputing the fact that you

14   have alleged in your complaint that Mr. Bonilla is a

15   citizen.  I'm not going to sit here and make those

16   sorts of ridiculous assertions.  He says he's a

17   citizen.  I assume he said it under oath at his

18   deposition, and I'm not going to contest that.  So

19   there's obviously somebody on the list that's a

20   non -- that's a citizen.

21     Q.   In your answer explaining why prosecutors

22   would have to do an investigation, you said, "and you

23   take the list of potential noncitizens and you start

24   running your traps internally at DOJ."

25     A.   I misspoke.  The list of declared

1    noncitizens.

2         Q.  Okay.  And so the question remains, if

3    these are confirmed noncitizens, why does DOJ have to

4    go through all this effort?

5         A.  Because we live in America, and one of the

6    great things about our country is we have process and

7    we have the right to speak, we have the right to

8    associate, we have the right to petition.  And people

9    who are noncitizens on the rolls have a right to have

10   a process involved.  We don't knock doors down and

11   drag people away.  We have investigators, like I used

12   to do when I was at the Justice Department, look at

13   cases carefully, get the records from DHS.  They have

14   a wealth of information at DHS to determine whether

15   or not these names are in fact citizens, information

16   I didn't have, information PILF didn't have.

17        Q.  And -- go ahead.

18        A.  Go ahead.

19        Q.  And speaking of process, as you understand

20   it, when someone at the DMV perhaps marks "no" in the

21   checkbox for "are you a U.S. citizen," okay, that

22   triggers a process by the DMV and the Department of

23   Elections, right?

24        A.  No -- well, somewhat.  You're partially

25   correct.  And I assume you're talking about a voter

1    registration application.  You didn't say that in

2    your question, but I assume that's correct.

3         Q.  No, people have already -- people have

4    already -- they are already on the rolls.

5         A.  Yeah, then you don't understand how this

6    works.

7         Q.  Okay.  So let me -- let me ask the

8    questions to figure that out.  Okay.

9         So Ms. Freeman, take her as an example, she

10    had already registered to vote, okay.

11         A.  I accept your premise.

12         Q.  Okay.  And then, as you understand it,

13    this declared noncitizen cancellation list is

14    triggered by some contrary information being

15    indicated at the DMV, right?

16         A.  You're underplaying the contrary

17    information.  Let's talk about what that is.

18         Q.  Okay.  No, you already said that's someone

19    saying no, right, in the checkbox?

20         A.  No, you're totally minimizing this.  What

21    it is, is somebody going back to DMV for any point of

22    contact with the division -- the Department of Motor

23    Vehicles.  On the screen is the same original voter

24    registration application they got in the first place.

25         Up pops do you want to register to vote again,

1   and that individual facing these questions a second

2   time says, to the citizenship question, under oath,

3   are you a citizen, they say no.  That's how everybody

4   got on this list, is they made an under-oath

5   affirmation at some point that they were not a

6   citizen.

7        Q.  After making an under-oath affirmation

8   that they were a citizen.

9        A.  Most recent is most valid, and admissions

10  against interest carry more weight than the previous

11  one.

12       Q.  Okay.  So --

13       A.  Wait, there's more.  Then the state -- go

14  ahead.

15       Q.  So then if someone reregistered by

16  affirming their citizenship, then that is the most

17  valid, right, under your construction?

18       A.  Not necessarily -- there's a lot of

19  different contrary examples.

20       Q.  So which is it?

21       A.  It's not a binary choice.

22       (Clarification by reporter.)

23       Q.  You said that the second affirmation -- I

24  should say the second answer at the motor vehicles,

25  the most recent is most valid, that's what you said,

1    right?

2         A.  There's much more to it than just that.

3    You are -- there's a context here.  I did say that,

4    but there's a whole context here.

5         Q.  No, I understand that you sort of want to

6    dress it up, but --

7         A.  And that's argumentative.

8         MR. DAVIS:  Objection.  This is getting

9    argumentative.

10         Q.  But you said the most recent is most

11    valid, so in trying to --

12         A.  In context --

13         Q.  So in trying to understand that, in trying

14    to understand that, if someone reregisters after

15    being canceled, that would be the most recent in the

16    timeline of events, correct?

17         A.  Not always.

18         Q.  Okay.  So you have a registration, a

19    cancellation, and a reregistration, right, in that

20    order, right?

21         A.  Well, but there could have been --

22         (Clarification by reporter.)

23         Q.  Can you follow me --

24         A.  Whoa, whoa, whoa.

25         Q.  Can you follow me?

1          A.   Yeah, I follow what you're getting at.

2     You don't understand some things --

3          Q.   I'm asking a question here.

4          A.   Yeah.

5          Q.   Right.  And so under that timeline of

6     events, the most recent is valid, and that would be

7     their reregistration, correct?

8          A.   Nope.

9          Q.   Why not?

10          A.   Because the most recent doesn't always

11     address what the citizenship state was in the prior

12     two moments.  You are wrong in your assumption.  That

13     is not what I testified to, and your hypothetical is

14     invalid.  You don't understand how it works.

15          Q.   I know, you keep on telling me I don't

16     understand, but, you know, that's why I'm asking

17     these questions and to get at what it is.  And so why

18     is it, in my hypothetical, why is it the most recent

19     is not valid?  Why is --

20          A.   Depends what the most recent is.  If the

21     most recent is registration with an affirmation yes,

22     there could have been an intervening naturalization.

23     Your hypothetical completely omitted that,

24     deliberately I suspect.

25          And there could have been an intervening

1    naturalization in that context, and often there is,

2    by the way.  That is why people get off the rolls is

3    because DHS has question 12 that says have you ever

4    registered to vote.

5         And so all of these folks seeking to

6    naturalize are suddenly alerted to the problem they

7    have been on the voter rolls.  That's how we're

8    finding this all over the country.

9         So what happens is they -- they take

10   themselves off the rolls or they're canceled as a

11   noncitizen.  Then they naturalize and they

12   reregister.  But that third registration in your

13   hypothetical does not have relevance necessarily to

14   the question of their citizenship during the first

15   two registrations because of the intervening

16   naturalization.

17        Q.  But still your reports are on PILF's

18   Internet website, correct?

19        A.  Okay.  You've asked me a different topic

20   now?  I'm sorry.  Reports are on the website?

21        Q.  Yes.  The Alien Invasion II report is

22   still on PILF's website.

23        A.  I answered that.

24        Q.  Right?  It's still on it today, right?

25        A.  I don't know.

1      Q.  You don't know?

2      A.  Nope, I do not know if it's still on it

3  today.  We could break and I can login.  It probably

4  is, but I can't say that with certainty because I

5  haven't checked.

6      I prepared a lot of ways for this deposition,

7  but going to check on whether or not the report is

8  still posted is not one of them.

9      Q.  Well, you didn't tell anyone to take it

10 down, did you?

11     A.  I didn't, but that wouldn't necessarily

12 mean it wouldn't be taken down.  But I don't know if

13 it's on the website.  I will assume for the purposes

14 of your question that it is.

15     Q.  And so you're still calling people who may

16 in fact be citizens noncitizens, correct?

17     A.  Look, if you want -- if you want us to

18 take it down, make an offer.

19     Q.  Okay.  This is sort of a deposition here,

20 and so I'm asking you questions.

21     A.  And I answered it.

22     Q.  And the question is:  Is it the case that

23 you are calling people who may in fact be citizens

24 noncitizens as of today on your website?

25     A.  As it relates to the three plaintiffs in

1    this case, no, that's not accurate.  As it relates to

2    two plaintiffs in this case, quite possibly.  As

3    relates to the third plaintiff, that was cured long

4    ago.

5          Q.  Okay.  Can you specify who you're

6    referring to in your answer?

7          A.  Well, I think Abby -- help me here -- Abby

8    Jo --

9          Q.  Gearhart.

10         A.  -- Gearhart, that's long since been taken

11   down.

12         Q.  Right, she's been taken down.

13         A.  So one of the plaintiffs --

14         Q.  Okay.

15         A.  One of -- okay.  You asked the question;

16   let me answer it.

17         One of the plaintiffs, their name is no longer

18   anywhere on the website.

19         Q.  And then --

20         A.  And that happened instantly.

21         Q.  And then Bonilla and Freeman, they're

22   still on the website?

23         A.  The government documents listing them as

24   noncitizens are probably still posted.  I have not

25   checked that.  You asked me if I know, and I don't.

1      Q.  But -- and you still take the position

2    that they're noncitizens; is that -- is that fair?

3      A.  I still take the position that the

4    government document says what it says.  I still take

5    the position -- and I testified about this earlier --

6    that Bonilla testified under oath that he is a

7    citizen.

8      Q.  So just to make sure we're on the same

9    page here, it is your belief sitting here today that

10   there are citizens listed in Exhibit 1 to the Alien

11   Invasion II report posted on your website, correct?

12     A.  Bonilla has testified under oath he is a

13   citizen, and I have no reason to doubt him, and the

14   government document listing him as a noncitizen is

15   still posted because that in itself is a problem that

16   the government is removing citizens from the voter

17   rolls.

18     Q.  Okay.  So Mr. Bonilla, even though you are

19   not challenging his citizenship, his citizenship

20   testimony under oath, is still listed in Exhibit 1,

21   which, according to your report, is a list of 5,556

22   noncitizens.

23     A.  You've asked and answered -- I've answered

24   this question a lot, different ways, always the same.

25     Q.  So he's being still put in PILF's 5,556

1    noncitizen bucket, correct?

2         A.   I've asked and answered that question.

3         Q.   The answer is yes?

4         A.   Do you want me to say it over and over

5    again?

6         Q.   I have not asked that particular question

7    at all until just now.

8         A.   Okay.  Let me try to resolve this.  Mr. --

9    the exhibit containing Mr. Bonilla's name is still

10   posted at the website most likely, though I have not

11   checked it today.

12        Q.   And so since he is still posted on the

13   website in Exhibit 1, Exhibit 1 is where you have the

14   list of what PILF calls 5,556 noncitizens, then it is

15   still PILF's position as of today that Mr. Bonilla is

16   a noncitizen.

17        A.   Let me try to -- no, let me try to answer

18   this once and for all so it's very clear.  The Alien

19   I and II are both posted.  Most likely still, I can

20   check during a break, and the attachments are still

21   posted.  I don't know how else to answer that

22   question.

23        Q.   And so you are still calling Mr. Bonilla a

24   noncitizen.

25             MR. DAVIS:  Objection to form.

1      A.   I'm not calling him anything.

2      Q.   True.  Alien Invasion II is, correct?

3      A.   I just testified that the reports are up

4  there.  They speak for themselves.  I don't have

5  anything else to add.

6      Q.   So you have Alien Invasion II in front of

7  you.  I want you to maybe put it all in one stack,

8  but then pull out Exhibit 1.  Because you might want

9  to have Exhibit 1 handy -- or not.

10  Alien Invasion II was published May 2017,

11  right?

12      A.   I think so.

13      Q.   In February of 2017, PILF was told

14  explicitly by James City County registrar that the

15  people listed in the cancellation report -- which

16  sometimes people call the VERIS report, correct?

17      A.   I call it the declared noncitizen report.

18      Q.   Okay.  Well, PILF was told explicitly by

19  the James City County registrar that the people

20  listed in that cancellation report were not

21  necessarily noncitizens, correct?

22      A.   I don't know.  If you have a document to

23  refresh my recollection, I'd be happy to look at it.

24      Q.   So you don't recall --

25      A.   I don't recall right now.  If you have a

Page 212

1    document to refresh my recollection, I'm happy to

2    look at it.

3                    (PILF Exhibit 15 marked for

4            identification: Email correspondence

5            from (topmost) D Moorman sent

6            2/15/2017 with attachment

7            PILF-ADAMS-0013464 - 0013471)

8            MR. TEPE:  The court reporter has handed

9    the witness what's been marked as PILF Exhibit 15,

10   Bates number 13464.

11           Q.  Do you recognize this document?

12           A.  I don't remember reviewing this for this

13   deposition, but I see it in front of me.

14           Q.  Okay.  So it begins with an email from

15   Noel Johnson dated February 15th, 2017 to Dianna

16   Moorman.  Do you see that?

17           A.  I see that.

18           Q.  You can tell from the document that Dianna

19   Moorman was the general registrar of James City

20   County?

21           A.  Right.

22           Q.  Okay.  And this email from Mr. Johnson may

23   refresh your recollection.  So apparently James City

24   was asked in August of 2016 for records under the

25   NVRA, specifically the cancellation report, correct?

1          A.   Okay.   All the counties -- I think James

2     City was on the list.   All the counties on that one

3     list in Alien I were asked for this, and I can

4     double-check to make sure.

5          Q.   No need, because --

6          A.   It was.   I just double-checked.

7          Q.   Okay.

8          A.   James City is on the list.

9          Q.   James City was asked, and then they didn't

10    provide the records because, presumably, they were

11    following the position that they couldn't provide it

12    because the information was protected under the

13    MPPA -- the DPPA, excuse me.

14         A.   I'm sorry.   What was the question?

15         Q.   So PILF made a request for the

16    cancellation report in August.   As of this date,

17    February, you hadn't gotten it, correct?

18         A.   It probably -- that's obviously --

19         Q.   Right.   And so here Mr. Johnson asks for

20    it again, and then Ms. Moorman responds the same day,

21    February 15th, correct?

22         A.   Right.

23         Q.   And she attaches the requested report of

24    James City County, right?

25         A.   Right.

1    Q.   And then she says:

2         Please note that many of these

3         simply were because they failed to

4         check the 'are you a U.S. citizen

5         box' on the voter registration

6         application, not because they are

7         actually a noncitizen, and have

8         since reregistered with an

9         acceptable completed application.

10   Do you see that?

11   A.   I do, but that's meaningless.

12   Q.   Your testimony is that what the registrar

13   of James City County told you is the fact that the

14   people on the list that she is providing are not

15   necessarily noncitizens is meaningless, that's your

16   testimony?

17   A.   That's part of my testimony.  The entire

18   whole of my testimony is that, based on this concern,

19   I believe, we contacted the state election director

20   in regards to these concerns.  And we asked the state

21   election director both for the state report and

22   whether or not the state report had individuals of

23   the nature that Ms. Moorman was describing.

24        And the state election director very clearly

25   alleviated our concerns that Ms. Moorman raised that

1   the information provided by the state would not

2   include such individuals.

3        Q.   Okay.  So --

4        A.   As a matter of fact, we acted on it.

5                  (PILF Exhibit 16 marked for

6             identification: Email correspondence

7             from (topmost) D Moorman sent

8             2/16/2017 with attachment

9             PILF-ADAMS-0013091 - 0013109)

10            MR. TEPE:  The witness has been handed

11   what's been marked as Exhibit 16 with the Bates

12   number 13091.

13        Q.   Do you see that?  So this is a

14   continuation of the correspondence between

15   Mr. Johnson and Ms. Moorman, correct?

16        A.   A continuation ... do you have -- do you

17   have the full communication?

18        Q.   I said it's a continuation.  We just

19   looked at a document where Ms. Moorman tells PILF

20   that the people on the list may not be noncitizens,

21   right?  We just looked at that document.

22        A.   Okay.  I have -- yes, I have Exhibit 16.

23        Q.   That's not the question.  The question is:

24   Ms. Moorman told PILF that, please note, many of

25   these simply were because they failed to check the

1    "are you a citizen box" on the voter registration

2    application, not because they are actually

3    noncitizens.

4          A.  Well, first of all, it's not -- okay.

5          Q.  Excuse me.  I'm asking a question.  All

6    right?  And so you see that right there --

7          A.  I see --

8          Q.  -- correct?

9          A.  I see it says that.

10         Q.  Okay.  Mr. Johnson responds two minutes

11   later saying, thank you, and then asks for additional

12   records including the voter registration

13   applications, right?

14         A.  It says that.

15         Q.  Okay.  And then Ms. Moorman responds later

16   that day -- actually the next day, on February

17   16th -- saying, "Good afternoon.  I have attached a

18   spreadsheet with the 51 names, including current

19   registration status and full voting history of each

20   individual."  Okay.  So that's attached, correct?

21         A.  There's a document attached.

22         Q.  Okay.  Let's look at that document.  It

23   appears to be a copy of the cancellation report in an

24   Excel spreadsheet with some additional columns,

25   correct?

1    A.  Right.

2    Q.  And so I want to direct your attention to

3 the voter registration status column.  Do you see

4 that?

5    A.  Voter registration status, got it.

6    Q.  Right.  And so the first person is Tierra

7 Gregory, now registered in Richmond City.  Do you see

8 that?

9    A.  Right.

10    Q.  And then underneath that is Deborah Watts,

11 reregistered in JCC.  That's James City County,

12 right?

13    A.  I don't know.

14    Q.  You don't know?

15    A.  I don't.

16    Q.  Okay.  So you're not sure if JCC refers to

17 James City County?

18    A.  That was the answer I just gave you.

19    Q.  Okay.  Even though she told you that --

20 all right.  I'll move on.

21    So can you count up how many times in this

22 document PILF was informed that people had

23 reregistered in JCC?

24    A.  No, I can't, because we asked the state

25 election director.

1    Q.  You can't answer my question?

2    A.  Well, because the answer is zero.

3    Q.  No, no, no.  It's right in front of you.

4  I'm sorry.  Maybe this is getting confusing.

5       But the spreadsheet in front of you, PILF was

6  provided with the registration status of these

7  individuals, correct?

8    A.  Right, in this document it is, but --

9    Q.  But so just bear with me.  And so my

10  question is, can you count how many times -- how many

11  individuals had reregistered in JCC?

12    A.  Well, ultimately, the answer is zero

13  because the state -- we asked the state specifically

14  this question, and we said to the state, how many

15  people on your cancellation list reregistered, and

16  the state said zero.

17    Q.  Okay.

18    A.  So this information became irrelevant.

19    Q.  Okay.  So I guess I'll have to count for

20  you.  So one, two, three --

21    A.  Well, that's what it says in the document.

22    Q.  -- seven, eight, nine, ten, 11, 12 --

23  (counting) ... 19, is that what I got?  I think I

24  might have missed one.

25       I believe there's 20 of the 51 people listed

1   here, PILF was told they reregistered in James City

2   County, correct?

3          A.   By the -- by the local election official,

4   which was later contradicted by the state.

5          Q.   And -- and this list also says that ten

6   people of the 51 had reregistered in other

7   jurisdictions, correct?

8          A.   I mean, the document speaks for itself.

9          Q.   And so PILF was aware, as of February

10   16th, 2017, before Alien Invasion II was published,

11   that 30 of the 51 people on the VERIS report or this

12   cancellation list had reregistered.

13          A.   That is not correct.

14          Q.   No, no --

15          A.   Can I answer your question, please?

16          Q.   Okay.  Sure.

17          A.   PILF was aware that this local registrar

18   thought that, and that is precisely why you go to the

19   state to find out what the accurate information is,

20   and that's exactly what we did.

21          We went to the state and asked the question,

22   give us a list of noncitizen cancellations for all

23   the jurisdictions and tell us whether or not they

24   reregistered.

25          The state affirmatively answered us and said

1   nobody on our list reregistered.  It contradicted

2   what a local official may have said, and, frankly,

3   under HAVA and Help America Vote Act, the state

4   election officials, the chief election official for

5   the state who is in charge of list maintenance.

6        So, no, I would disagree with you that we had

7   information they reregistered, because that

8   information was later directly contradicted by the

9   state director of elections.

10       Q.   Okay.  Can you point me to the document in

11  which you asked the Virginia Department of Elections

12  for a list of noncitizen cancellations for all the

13  jurisdictions and tell us whether or not they

14  reregistered?

15       A.   I'm sure you have it in your binder.  I

16  cannot point it to you right now.

17       Q.   Neither can I.

18       A.   Well, we most certainly did ask.  And we

19  asked the -- we asked the state election director for

20  the list of noncitizen cancellations, and we followed

21  up by asking, did anybody on this list reregister,

22  and the answer, in writing, was no.

23       And the only list we relied on is what the

24  state gave us and guaranteed that there were no

25  reregistrations on it.  So this James City

1    information was -- was contradicted or superseded by

2    direction from the state election director.

3         Q.  It would be terrific if when we see you

4    again on Monday you identify this, this question.

5         A.  Well, we put it -- we published it in the

6    Alien II.  We directly give the response in Alien II

7    to our inquiry where the state election director

8    specifically says the people on the noncitizen

9    cancellation list I gave you did not reregister.

10        This was on our radar.  We took prudent steps

11   to be sure that it didn't include reregistrations,

12   and the state election director responded in writing

13   and we republished his -- his email and we relied on

14   it.

15        Q.  Yeah, again, you know, perhaps you can

16   identify that document on Monday, because I'm not

17   aware of it existing.

18        A.  Well, I've seen it, and I've seen it in

19   discovery responses.

20        Q.  So as of this date PILF was on notice that

21   30 people had reregistered, correct?

22        MR. DAVIS:  Objection to form,

23   mischaracterizes the testimony.

24        Q.  PILF was aware from James City County, had

25   information from James City County, that 30 of the 51

Page 222

1    people on the cancellation report had reregistered,

2    correct?

3         A.   Incorrect.

4         Q.   The document you were just looking at --

5         A.   Is incorrect.

6         Q.   -- had information on it.

7         A.   It's incorrect.

8         Q.   Right.

9         A.   Incorrect information.

10        Q.   And --

11        A.   And the basis for me to say it was

12   incorrect is because the state election director said

13   that nobody on the list we published was

14   reregistered.

15        Q.   Each of these 30 individuals who are

16   listed in the exhibit in front of you were included

17   in Exhibit 1 to Alien Invasion II, correct?

18        A.   I don't know.

19        Q.   Why don't you go check.

20        A.   I can't find it.  Do you have a page

21   number?

22        Q.   You know, it's -- this is -- it's right

23   there in the stack.

24        A.   Well, if you'll indulge me, I'll go

25   through it.

1        Q.   Maybe you can take a look at the break,

2    but if you do, you will see that each of these 30

3    individuals who James City told PILF had reregistered

4    were included in Exhibit 1.

5        A.   Because the state election director

6    contradicted the information of James City or

7    Ms. Moorman.  That's exactly why, because the state

8    election director, very explicitly, without any

9    ambiguity, told us, upon our request, that none of

10   these individuals reregistered.

11       And, I'm sorry, rock beats scissors.  When a

12   chief election official of a state who, under the

13   Help America Vote Act, is the designated list

14   maintenance officer for the state, tells you that

15   they didn't reregister, you have to conclude that the

16   state election director is correct and the email of

17   February 15th must be incorrect.

18       Q.   So you never actually -- PILF never

19   actually compared the list that you got from James

20   City County to the list of cancellations you got from

21   the Department of Elections.

22       A.   I don't know the answer to that question.

23       Q.   Well, if you had, you would have raised

24   the fact that there are people who the jurisdiction

25   says reregistered on your list.  You would have

1   raised that with the Virginia Department of

2   Elections, wouldn't you?

3       A.  We raised the issue with the Virginia

4   Department of Elections about the potential of

5   reregistration on the list that they were giving us,

6   and the Virginia Department of Elections very

7   explicitly, as republished in Alien II, gave us the

8   answer that they did based on that inquiry we made.

9   We took prudent steps to go straight to the top --

10      Q.  Okay.

11      A.  -- to get -- to get the answer from the

12  chief election official whether or not this was an

13  issue, and he said it wasn't.

14      Q.  So, again, if you can identify the

15  specific correspondence which overruled James City

16  County, that would be terrific.

17      A.  It's been provided to you.  I think you

18  even asked -- in previous depositions your co-counsel

19  were asking questions about the document.  That's

20  another place I've seen it.  So I know that it's

21  there.

22      Q.  Yeah.  So PILF didn't publish the

23  spreadsheet that is contained here from James City

24  County with Alien Invasion II, correct?

25      A.  Speaks for itself.  I don't believe it's

1    an exhibit.

2         Q.   Yeah.   And PILF didn't include a notation

3    in Alien Invasion II regarding the fact that you had

4    some information indicating reregistrations and some

5    information apparently saying they were in canceled

6    status.

7         A.   It's not apparently.   You've -- it's not

8    apparently.   The state election director provided

9    extraordinarily crystal-clear responses on this

10   question, and we relied on those responses.   They

11   were consistent with a variety of other information

12   and experience, and we have to rely on the state

13   election director.   If they --

14        Look, it boils down to this.   If the state

15   election director had had a different answer, Alien

16   II wouldn't have been published, more than likely, or

17   it would have been published differently.

18        Q.   Why?   Because Alien Invasion I was

19   published, and you already knew that the lists

20   contained people who had reregistered.

21        A.   That's not true.

22        Q.   Yes.

23        A.   That's not --

24        Q.   You were here for Mr. Johnson's

25   deposition, weren't you?

Page 226

1          A.   Alien II relied on the state election

2     director telling us this wasn't a problem.

3          Q.   And Alien Invasion I --

4          A.   We didn't ask for Alien I -- we didn't ask

5     the state election director in Alien I.

6          Q.   Alien Invasion I -- you were here when

7     Mr. Johnson testified -- you were here, right?

8          A.   Right, and that deals with --

9          Q.   And in that deposition even before Alien

10    Invasion I PILF knew that people who had registered

11    to vote remained on the cancellation reports,

12    correct?

13         A.   People who -- they had all reregistered to

14    vote at some point.

15         Q.   People who had reregistered to vote --

16         (Clarification by reporter.)

17         Q.   I will ask it again.  Even before Alien

18    Invasion I, PILF knew that people who had

19    reregistered to vote remained on the cancellation

20    reports, correct?

21         A.   And that was a naturalization issue,

22    and the only --

23         Q.   Did you check with all those people and

24    confirm that?

25              MR. DAVIS:  Let him answer.  Let him

1  finish his answer.

2      Q.  Fair enough.  Go ahead.

3      A.  Okay.  Your question was were there people

4  on the report that later reregistered.  That does not

5  speak to the question necessarily of whether or not

6  there were noncitizens on the rolls.  You can

7  subsequently reregister to vote once you naturalize.

8      And so during Alien II, we specifically asked

9  the state, are any of the names that you're giving us

10  on the noncitizen cancellation report, do they

11  contain anybody who later reregistered.  So it's even

12  a more robust analysis in Alien II.

13      Q.  Okay.  So I know you want to talk about

14  things other than my questions.

15      A.  I answered your question.

16      Q.  But my question was, was this:  Before

17  Alien Invasion I was published, PILF knew that people

18  who had reregistered to vote remained at least on the

19  Bedford County cancellation report, correct?

20      A.  And my answer to you before is the same as

21  it is now, that the prospect of naturalization could

22  explain that phenomena, and by the time you got to

23  Alien II we went and we asked the state election

24  director about this possibility.

25      Q.  You asked the state election director

Page 228

1    about naturalization?

2         A.  No, about people reregistering.

3         Q.  Yeah, again, I don't see that

4    correspondence.

5         A.  You know it exists because it's been

6    turned over in discovery and your co-counsel has

7    asked questions about it during depositions.

8         Q.  Right, but that document is different from

9    the one you're describing.  That's why I'm a bit

10   flummoxed.

11        A.  No, it's not.

12        Q.  But here -- back to my questions.

13   Mr. Johnson confirmed that Bedford County informed

14   PILF that 18 of 35 people listed in the cancellation

15   report they supplied had reregistered, right?

16        A.  I don't know.

17        Q.  You were here.

18        A.  I don't have the transcript in front of

19   me.  If you want to show me the transcript --

20        Q.  It was just last week.

21        A.  Doesn't mean I remember everything about

22   it.

23        Q.  He marked it off.  He was making

24   checkmarks and saying like, yes, this person, you

25   know, we have information --

1      A.   I wasn't here for the whole deposition,

2   and you know that.

3      Q.   Yeah, no, this -- I think you were here

4   for this part.  But, nonetheless, you're supposed to

5   be prepared today, correct?

6      A.   But not about his deposition I'm not, and

7   you're asking me questions about it.

8      Q.   Part of his deposition is part of, you

9   know, the record of what PILF knew, right, because he

10  was testifying about what PILF knew at the time.

11     A.   Is there a question?

12     Q.   I'll withdraw it.

13     But if you look at the transcript, since you

14  seem unsure, Mr. Johnson did confirm that Bedford

15  County informed PILF that 18 of the 35 people listed

16  in the Bedford County cancellation report had

17  reregistered.

18          MR. DAVIS:  Is there a question there?

19     A.   Is there a question?

20     Q.   Isn't that true?

21     A.   I don't know.  I'd need to see the

22  transcript.

23     Q.   Do you want to look at the markup that we

24  did?

25     A.   If it's that important and you want to

1    show it to me, I'm happy to answer whatever questions

2    you have for me.

3        Q.  Well, I think the record in the Johnson

4    deposition probably stands on its own.  So let's talk

5    about some other jurisdictions.

6        We covered Bedford County with Mr. Johnson.

7    We just talked about James City.  In February of

8    2017, the York County registrar informed PILF that

9    currently registered people, then currently

10   registered people appeared listed in the cancellation

11   reports, correct?

12       A.  I don't know.  If you have a document to

13   refresh my recollection, I'd be happy to take a look

14   at it.

15                  (PILF Exhibit 17 marked for

16                  identification: Email correspondence

17                  from (topmost) W Latham sent

18                  2/2/2017 with attachment

19                  PILF-ADAMS-0016622 - 0016642)

20       Q.  The court reporter has handed you what's

21   been marked as Exhibit 17, a document with Bates

22   number 16622.  Do you recognize this document?

23       A.  I see it here.

24       Q.  Okay.  And so in this document Walt

25   Latham, the general registrar of York County -- you

1  can see that's the second email in the chain dated

2  February 1st -- sent a copy of the cancellation

3  report that you requested.

4        A.   He sent -- it seems to be attached to this

5  email.   It says start date 1/01.   It's the declared

6  noncitizen cancellation report.

7        Q.   Okay.   Mr. Adams, can you stay with me?

8  So my question is --

9        A.   Yes, I can stay with you.

10        Q.   -- Mr. Latham emailed Mr. Johnson on

11  February 1st saying, "based on the Order you

12  forwarded to me, I have attached a copy of the report

13  you requested."   That's the cancellation report,

14  right?

15        A.   I think I just answered you.

16        Q.   And then Mr. Johnson responds, "Would you

17  be able to send me the voter registration

18  applications for all 26 people on the attached

19  report?"  You see that, right?

20        A.   He says that, yes.

21        Q.   Okay.   And then at the top what's attached

22  to this email is a copy of the cancellation report

23  with notations of those who reregistered, right?

24        A.   There's no attachment to this.   There's

25  notations.

1      Q.  In the attachment there are notations,

2  handwritten notations, correct?

3      A.  Right.

4      Q.  Right.  And so if you look at the cover

5  email, Mr. Latham is explaining that, please find

6  attached to this email copies of all the

7  registrations for people who were canceled and then

8  reregistered, right?

9      And so what he's doing here is indicating in

10  this cancellation in handwriting he is noting the

11  people who had reregistered, correct?

12      A.  That's what the documents purport to say.

13      Q.  Right.  One example, Karen Askin, it says

14  that she reregistered June 9th, 2011, right?

15      A.  Well, the VERIS report doesn't say that.

16  There's somebody wrote that in pencil --

17      Q.  Right.

18      A.  -- or pen.

19      Q.  And that's --

20      A.  That's not part of the official VERIS

21  report.

22      Q.  Well, this is -- this is what the York

23  County registrar -- the information that the York

24  County registrar provided.

25      A.  I'm aware that the source of this is the

1    York County registrar.

2         Q.   Right.

3         A.   That does not necessarily speak to the

4    validity of the reregistration.

5         Q.   Okay.   So he identified 12 people as

6    having reregistered.

7         A.   He made handwritten notations saying a

8    certain number of people, probably 12, reregistered.

9         Q.   Right.  And all 12 of these individuals

10   who had reregistered, according to this document from

11   the York County registrar, were included in Exhibit 1

12   to Alien Invasion II, correct?

13        A.   I don't know about that.  And if they

14   were, once again, it's because we spoke with or we

15   communicated with the state election director, and

16   just like in the last county we discussed on this

17   topic, the state election director contradicted the

18   local election official to the extent that it

19   involved these names.  And my previous testimony

20   stands on that issue here as it did there.

21        Q.   And PILF didn't include in Alien Invasion

22   II a copy of this handwritten or, excuse me,

23   hand-marked cancellation report, correct?

24        A.   Not after it was contradicted by the state

25   election official --

1      Q.  And no --

2      A.  -- to the extent it was.

3      Q.  No state election official contradicted

4  what Mr. Latham had put here, correct?

5      A.  The state election official contradicted

6  that anything we published in Alien II involved

7  people who later reregistered, yes, the state

8  election official directly contradicted that idea.

9      Q.  Certainly the state election official --

10  strike that.

11      And PILF didn't include a notation in Alien

12  Invasion II to let the reader know that you had been

13  provided information from York County that a number

14  of the people listed in your Exhibit 1 had

15  reregistered.

16      A.  Actually we did -- not in York County

17  specifically, but generally we absolutely did

18  confront this issue head on.  We had more than a

19  notation.  Your answer was did we address it.  I'll

20  answer it -- your question was.  We in fact did

21  address this head on, and we did.

22      Q.  No, my question, sir, was -- and PILF did

23  not include a notation in Alien Invasion II to let

24  the reader know that you had been provided

25  information from York County that a number of the

1    people listed in your Exhibit 1 had reregistered.

2         A.  We did better.  We provided --

3         Q.  The answer is no, you didn't.

4         A.  We did.

5         Q.  No, I asked a very, very specific

6    question.

7         A.  We provided --

8         Q.  You did not include a notation in Alien

9    Invasion II to let the reader know that, hey, York

10   County tells us that a lot of these people listed had

11   reregistered.  That doesn't appear in Alien Invasion

12   II.

13        A.  We didn't provide a notation about a lot

14   of things that were irrelevant in Alien II, and,

15   after the state election director contradicted this

16   information or provided us better information, there

17   was no need to include a notation because it was

18   irrelevant.

19        Q.  And you were personally informed of

20   Mr. Latham's information about reregistrations,

21   correct?

22        A.  Who are you asking this question of?

23        Q.  You, Mr. Adams.

24        A.  I don't believe so, but if you have a

25   document to refresh my recollection, please let me

1    see it.

2                    (PILF Exhibit 18 marked for

3              identification: Email correspondence

4              from (topmost) N Johnson sent

5              2/2/2017 with attachment

6              PILF-ADAMS-0009178 - 0009197)

7         Q.   The court reporter has handed you what's

8    been marked as Exhibit 18, a document with the number

9    9178.  Do you see that?

10        A.   Right.  Now you're asking me a question

11   about what I was personally informed of?

12        Q.   Let's -- I will ask the questions, sir.

13   And so my question is:  Do you see this document?

14        A.   I see the document.

15        Q.   Okay.  And so on February 2nd Noel Johnson

16   sends you and Mr. George an email in which he

17   includes the notations of York County, correct?

18   That's attached.

19        A.   Well, it's more complicated than this.

20        Q.   He attached -- Mr. Johnson attached the

21   document that we just looked at from York County, yes

22   or no?

23        A.   The document speaks for itself.  He

24   attached a document.

25        Q.   And Noel Johnson said he sent back,

1    referring to Mr. Latham, the hand notated

2    cancellation report that indicates that some people

3    who were removed were then reregistered, sometimes in

4    different jurisdictions, correct?  This is

5    information that you had at the time.

6         A.   It is a small piece of York County

7    information we had at the time, and the rest of it is

8    relevant as to the validity of this particular

9    communication.

10        Q.   So the answer is yes, you had this

11   information.

12        A.   The document speaks for itself.

13        Q.   And the --

14        A.   It's obviously not being contested, that

15   this is information --

16        Q.   It's not so obvious when you don't

17   actually want to answer yes or no questions --

18        A.   I'll explain.  If you want to know the

19   answer, I'll tell you the answer, and that's your law

20   firm's lawyer was involved with collection of data

21   from York County, as I recall.  And so there would

22   have been communications between your law firm and

23   York County that are not in front of us in this that

24   would weigh on the validity of this information.

25             MR. TEPE:  Let's take a break.

Page 238

1      VIDEO SPECIALIST:  We are off the record,

2    3:30.

3         (Proceedings recessed)

4         VIDEO SPECIALIST:  We are on the record,

5    3:43.

6    BY MR. TEPE:

7         Q.  Mr. Adams, in February of 2017, also the

8    Fauquier County registrar provided a list of people

9    appearing on the VERIS report who had reregistered,

10   correct?

11        A.  I don't know.  If you have a document you

12   can show me, I can talk about it.

13                   (PILF Exhibit 19 marked for

14                   identification: Email correspondence

15                   from (topmost) N Johnson sent

16                   2/7/2017

17                   PILF-ADAMS-0009170 - 0009172)

18        Q.  The court reporter has just marked as

19   Exhibit 19 a document with the Bates number 9170.

20        Do you recognize this document?

21        A.  I see Exhibit 19.

22        Q.  Okay.  And this is -- begins with an email

23   from Alex Ables on February 1st to Noel Johnson,

24   correct?

25        A.  Right.

1      Q.   And it's responding to PILF's request for

2   records that were sent over on August 8, 2016, right?

3      A.   Now that's curious because it has --

4   right, right, right.

5      Q.   So that's the first email.  He sends over

6   the cancellation report that you requested, do you

7   see that in the response, "please see attached"?

8      A.   It's not on here.

9      Q.   Oh, I understand, because this is the

10   first email, right, in the chain.

11      A.   Right.  All I'm testifying about is item

12   number 1 is not on here.  It just talks about it.

13      Q.   Exactly.

14      A.   Okay.

15      Q.   And so on February 1st Ables provides his

16   response to PILF's request, correct?  That's what's

17   reflected here.

18      A.   Right.

19      Q.   And then on February 7th Mr. Ables follows

20   up with an email to Noel Johnson, do you see that, at

21   8:44 a.m.?  Bottom of the first page, do you see

22   that?

23      A.   Right.  I'm reading it.

24      Q.   And Mr. Ables says that on the previous

25   report he sent on February 1st some of these

1    individuals have submitted new voter registration

2    applications and have been reregistered, right?

3         A.   I mean, yeah, the document says that.

4         Q.   Right.  And so what he actually says is,

5    "please note that the below listed voters appearing

6    on the report have submitted a new voter registration

7    application subsequent to their record being flagged

8    as a potential noncitizen."  Do you see that?

9         A.   It does say that.

10        Q.   Right.  And then you have a list of names

11   and their reregistration dates.

12        A.   No, that's not what it says.  It says

13   their registration date.  The reregistration and

14   registration dates are two different things.

15        Registration date I would interpret to mean

16   the original registration date, and the subsequent

17   would be a reregistration date, and some of these

18   dates confirm my suspicions that that's what he

19   means.

20        Q.   Okay.  So, again, Mr. Ables says, "please

21   note that the below listed voters appearing on the

22   cancellation report submitted a new voter

23   registration application," do you see that,

24   "subsequent to their record being flagged as a

25   potential noncitizen"?  Do you see that?

1        A.   It says that.

2        Q.   Right.   So these are people who were

3   registered originally, flagged, and then submitted

4   new voter registration applications, correct?

5        A.   That's what it says they are.

6        Q.   Okay.   And so that is these people, he's

7   telling you, had reregistered.

8        A.   Well, it says they have submitted new

9   voter registration application.

10       Q.   Right.

11       A.   That's what it says.

12       Q.   Right.

13       A.   It doesn't say whether that was accepted

14   or not.   It just says they submitted one.

15       Q.   You didn't -- you didn't -- no one from

16   PILF asked to clarify that, did they?   They

17   understood -- they understood that he was providing

18   you with information about people who had appeared on

19   the cancellation report but who had reregistered.

20            MR. DAVIS:   Objection to form.

21       A.   It was compound.   Which one of the two do

22   you want me to answer?

23       Q.   PILF understood that Mr. Ables was

24   providing a list of people who had appeared on the

25   cancellation report that he had sent on May 1st but

1   who had reregistered, correct?

2       A.   But that's not what it says.  It says

3   submitted a new voter registration application.  You

4   would be making an assumption to say that they

5   reregistered, but it doesn't say that they

6   reregistered.  There's a difference.

7       Q.   Okay.  What's that difference?

8       A.   One can submit a new voter registration

9   application without actually being registered.  It

10  happens all the time all over the country in election

11  offices.  That's the difference.

12      Q.   Okay.

13      A.   I'm just reading what it says.

14      Q.   And so regardless of reregister or new

15  voter registration application, PILF was made aware

16  February 7th that people being listed on the

17  cancellation report for Fauquier County were

18  registered to vote.

19          MR. DAVIS:  Objection to form.

20      A.   That's not what this -- right, you're

21  mischaracterizing the evidence.  What it says is,

22  some of the noncitizen cancellations later tried to

23  get back on the rolls despite being canceled as a

24  noncitizen.  It doesn't say anything more than that.

25      Q.   So, so your interpretation of this is that

1    Mr. Ables went out of his way to let you know that

2    people on the cancellation list had submitted a new

3    voter registration application subsequent to their

4    being flagged and just leaves it to you guys to guess

5    as to whether or not these applications were

6    accepted?

7         A.   Mr. Ables is one of the, shall we say, he

8    is one of the registrars in the state that is

9    concerned about noncitizen -- noncitizens attempting

10   to register to vote.  It would not surprise me in the

11   slightest that Mr. Ables was alerting us to the fact

12   that people who are canceled as noncitizens are still

13   trying to get on the rolls.  That would be an

14   extraordinarily relevant piece of information.

15        Q.   And I'm not asking for your speculation as

16   to what Mr. Ables is alerting you to.  I'm asking

17   you, is it your -- strike that.

18        So based on this email, you will not agree

19   that PILF was provided information that people on the

20   cancellation report for Fauquier County had included

21   the names of people like Mitchell -- Mitchell

22   Alerding as having reregistered.

23        A.   Look, this document specifically

24   references attachments.  If you have those

25   attachments to show me, I will be glad to reassess my

1    conclusions, but the fact is that this document

2    doesn't say what you originally asked me and assumed

3    it did.

4         The fact that somebody was --

5         Q.  No question is pending.  Thank you.

6         Now PILF received a letter from Rappahannock

7    County Director of Elections expressing her concern

8    with PILF's use of election records, correct?

9         A.  If you have a letter to show me, I can

10   testify to refresh my recollection, please.

11                    (PILF Exhibit 20 marked for

12                    identification: Letter from Kim

13                    McKiernan, VREO with attachment

14                    PILF-ADAMS-0019100 - 0019105)

15        Q.  So before you look at that, can you

16   just -- before you look at that, sir, it's your

17   testimony that you have no recollection of the

18   registrar of Rappahannock County taking issue with

19   how you were using --

20        A.  Oh, I certainly do have a recollection of

21   oral communications with the registrar of

22   Rappahannock County, but you didn't ask me about

23   that.  You asked me about a letter.

24        Q.  Okay.  So you have no recollection of a

25   letter from the registrar of Rappahannock County

1    taking issue with your use of Virginia election

2    records.  You have no recollection of that?

3         A.  Not as I sit here right now, but you've

4    refreshed it, and this went to Ms. Powell.

5         Q.  Well, you're here as the 30(b)(6) witness.

6         A.  Correct.  I've reviewed 52,000 pages of

7    documents.

8         Q.  And you spent supposedly days --

9         A.  It wasn't supposedly; it was literally.

10        Q.  And so let's look at one of these records

11   that, you know, was in the hands of PILF at this time

12   in February.

13        A.  I have Exhibit 20.

14        Q.  Okay.  So I'm going to direct your

15   attention to the third paragraph.  In the middle she

16   says -- I think we're on the same page.  She's

17   referring to the cancellation records, right?

18        A.  I'm sorry?  She was what?

19        Q.  She's referring to the cancellation

20   records in this paragraph.

21        A.  I don't know.  Attachment C?  Attachment C

22   is not in Exhibit 20.

23        Q.  Sure it is.

24        A.  This (indicating)?

25        Q.  It's labeled Attachment C.  But okay --

1    A.  You will find the report I requested ...

2    this is not the report, which goes straight to the

3    point of my assessment of the registrar of

4    Rappahannock, as she did not understand very much

5    about what we were asking for.

6    Q.  Oh, okay.  All right.  But she did tell

7    you in the middle of this paragraph, "in many

8    instances, voters miss checking the tiny box

9    indicating they are citizens."  Do you see that?

10    A.  I see it, but she also --

11    Q.  Okay.  My question was, do you see that?

12    Yes.

13    A.  In many instances, "voters mix checking

14    the tiny box indicating they are citizens."  I see

15    that.

16    Q.  Yes.  And then she says, "in this

17    instance, we are required to deny their registrations

18    or cancel them, if they are registered."  Do you see

19    that?

20    A.  I see that written.

21    Q.  Okay.  And then she explains, "We send a

22    letter notifying them of the cancellation and the

23    reason and in the majority of instances they provide

24    valid photo ID/proof of citizenship and their

25    registration is reactivated."  Do you see that?

1          A.   It says that.

2          Q.   Yes.   Okay.

3          A.   She was wrong about that, by the way.

4          Q.   Well, how do you know what people share

5     with her when they reregister?

6          A.   Well, she was incorrect when -- she

7     started the paragraph with an incorrect statement,

8     unfortunately.   She says, as you were informed by the

9     Department of Elections, this report is not all

10    inclusive and there are false-positives.

11          That statement is absolutely incorrect.   We

12    weren't informed by the Department of Elections.   And

13    so that question raises some questions about some

14    other things based on my experience speaking with

15    this individual about her awareness of what was

16    actually happening in the administration of

17    elections.

18          It went to her credibility.   I'm not saying

19    she is incredible, I'm not saying she is dishonest,

20    but she didn't understand everything that was

21    happening and she didn't understand our request.

22          Q.   She's the registrar of Rappahannock

23    County.

24          A.   Correct.

25          Q.   Right.

1       A.   Well, I think unless there's a change --

2       Q.   You're not the registrar of Rappahannock

3 County.

4       A.   You know the answer to that.

5       Q.   Right.  And so she says, with respect to

6 the cancellation report, the last sentence in this

7 paragraph, "this report only shows the cancellation

8 and insinuates that hundreds or thousands of

9 noncitizens have voted when you don't have the whole

10 history of the voters you are referencing statewide."

11 Do you see that sentence?

12      A.   It says that.

13      Q.   Right.  I'm going to guess you disagree

14 with that.

15      A.   Well, because I had a very long

16 conversation with her in the months preceding this

17 where it was quite clear to me that she was gravely

18 mistaken about what we were looking for and what our

19 purposes were.  She was extremely animated about the

20 idea that we were on the hunt for illegal aliens, and

21 that couldn't be the furthest thing from the truth,

22 and --

23      Q.   You were on the hunt for aliens.

24      A.   No, I said illegal aliens.  There's a huge

25 difference between the two of them.

1    Q.  Exactly.  You were on the hunt for aliens,

2  not necessarily illegal aliens.

3    A.  Correct.  And we were documenting alien

4  registration, and she thought that we were making an

5  effort to have illegal aliens deported from

6  Rappahannock County, at which point she informed me

7  they didn't have any there.

8    Q.  But that's not what she says here.  She

9  says, referring to the cancellation report, this

10  report only shows the cancellations, and you are

11  insinuating that hundreds or thousands of noncitizens

12  have voted when you don't have the whole history.

13  She's not talking about illegal aliens.  She is

14  talking about noncitizens --

15    A.  Right, but she is talking about a related

16  issue that echoed what she had told me in person

17  about the purposes of our report and what she thought

18  of it personally, and it was quite clear to me that

19  she didn't understand what we were asking for, and we

20  had to continually ask her for the information.

21    Q.  So you more or less dismissed what she had

22  to say to you.

23    A.  No, that's not what I'm testifying about.

24    Q.  She also said, "I remained concerned about

25  your potential misinterpretation of the reports and

Page 250

1    your propensity to misrepresent those results to our

2    voters."

3         A.   That gets back to what she --

4         Q.   She says that, right?

5         A.   Right, and it's wrong.

6         Q.   Okay.  Now my question is, while you are

7    sitting here saying that she doesn't understand, she

8    and this letter are saying that you are

9    misinterpreting the reports, the cancellation

10   reports, correct?  That's what you interpret her

11   statement to mean.

12        A.   She did, and that's one of the reasons we

13   sought guidance from the state Department of

14   Elections about what she was saying.

15        Q.   Okay.  Can you -- can you point to where

16   you asked the Virginia Department of Elections to

17   opine on this particular statement of Ms. McKiernan?

18        A.   First of all, her concern was part of the

19   reason that we contacted the state Department of

20   Elections regarding these concerns.  We took action

21   in part based on the possibility that a reregistered

22   voter was on the list that the state department would

23   provide us.

24        And so, no, I can't point to you to the

25   document that the registrar of Rappahannock has

1    cited, and I did not pit the registrar of

2    Rappahannock against the state election director in

3    any document.  That document pitting the two of them

4    together does not exist.

5         Q.  So the answer is no, you didn't ask the

6    Department of Elections to opine on the accuracy of

7    Ms. McKiernan's statements here?

8         A.  The answer is yes, we in fact did, but

9    it's not -- it doesn't --

10        Q.  But it's not actually -- you know, you

11   didn't actually say, hey, Department of Elections, I

12   got this letter from Ms. McKiernan, will you opine on

13   it.

14        A.  I've asked --

15        Q.  The answer is no, you didn't do that.

16        A.  I've told you the document pitting the two

17   of them together does not exist.  That's my

18   testimony.

19        Q.  Ms. McKiernan is not the only registrar to

20   express concern that PILF was misinterpreting and

21   misrepresenting elections records, correct?

22        A.  If you have more instances of this, I'm

23   happy to look at them.

24        Q.  My question is, you have no recollection?

25        A.  I would need my recollection refreshed.

Page 252

1   If you have a document that will help me do that, I'm

2   happy to talk about it.

3          Q.   So you don't actually remember information

4   that was passed to you from registrars taking issue

5   with how your reports were misinterpreting and

6   misrepresenting the records?

7          A.   Well, of course, if you've read Alien

8   Invasion reports, you know we squarely confronted one

9   of them, and that's the Arlington registrar.  And we

10  cite that actually in the report her quibbling with

11  the reports that she is providing and threatening to

12  produce a derivative report that is not what we asked

13  for.

14         And so she took issue with it, and we

15  published her written issues directly in the Alien

16  Invasion reports.  We did more than have awareness of

17  it; we actually repeated it in the reports.

18         Q.   And there were other jurisdictions that

19  expressed concern with your misrepresentation of

20  election results.

21         A.   Well, I disagree with the premise that it

22  was misrepresented.  I think we represented exactly

23  what it was, and that's declared noncitizen.  You

24  disagree with that.  I disagree with your

25  interpretation of that.

1      Now if you have a document that would refresh

2   my recollection about others, I'm happy to look at

3   it.

4                    (PILF Exhibit 21 marked for

5                    identification: Email correspondence

6                    from (topmost) C Adams dated

7                    2/1/2017

8                    PILF-ADAMS-0006337 - 0006340)

9         MR. TEPE:   The court reporter has marked

10  as Exhibit 21 a document with the Bates number 6337.

11       Q.   So PILF was aware, as of January 31st,

12  2017, that the registrar for Arlington, Linda

13  Lindberg, had expressed the view that the

14  cancellation report that you were relying on for your

15  report and which you relied upon for Alien Invasion I

16  was not accurate, correct?

17       A.   She didn't express this view to us.

18       Q.   Well --

19       A.   She never took the time to write us a

20  letter or raise the credibility of her complaint by

21  actually delivering it to us.

22       So, no, I would take issue with the idea that

23  she raised this to us.  She didn't -- she apparently

24  didn't think it was serious enough to raise to us.

25       Q.   So, again, Mr. Adams, the question was,

1     PILF was aware -- and I'm going to change the

2     question.

3          PILF was aware as of February 1st that the

4     registrar of Arlington, Linda Lindberg, had expressed

5     the view that the cancellation report that you were

6     relying on for Alien Invasion I was not accurate,

7     correct?

8          A.   She expressed those views to other people.

9          Q.   Which was then shared with you.  So PILF

10    was aware of her views.

11         A.   We were aware of her privately expressed

12    views.  There was a difference between a privately

13    expressed view in my mind and one that she is talking

14    about on a -- on a Listserv versus one that she has

15    the courage to memorialize and send to us.  That she

16    never did.

17         Q.   Okay.  But you were, nonetheless, aware.

18         A.   I'm aware of a private discussion she had

19    or at least a relatively small number of recipient

20    discussion that did not include anybody at PILF.

21         Q.   Okay.  So the document in front of you is

22    an email from Linda Lindberg to the GRLIST.  Do you

23    see that?

24         A.   I see Exhibit 21.

25         Q.   That wasn't my question.

1      A.   I see it.  I don't know how else to answer

2  it.  I see the document.

3      Q.   You can answer the question I'm asking.

4  So Ms. Lindberg sent an email on January 31st to the

5  GRLIST, correct?

6      A.   That's what document 21 purports to show.

7  I --

8      Q.   And the GRLIST, that is a list that allows

9  the registrars and Virginia state election officials

10  to communicate with each other, correct?

11      A.   That is what the GRLIST is, as I

12  understand it.

13      Q.   Okay.  And someone on that GRLIST forwards

14  you Ms. Lindberg's email between January 31st at

15  12:37 p.m. and February 1st at 4:01 p.m., correct?

16      A.   I'm not sure.

17      Q.   Really?

18      A.   You left out the possibility that somebody

19  had it forwarded to them who wasn't on the GRLIST and

20  they forwarded it to me.  Your question was it was

21  forwarded by somebody on the GRLIST.

22      Q.   Yeah.  And so your answer is convenient

23  because, when you took this email that had come into

24  your possession and forwarded it to Noel Johnson, you

25  had deleted the intervening transmission information,

Page 256

1    correct?

2          A.   I protect all of my sources who are either

3    on the GRLIST or friends with people who are on the

4    GRLIST.

5          Q.   Right.  So the answer is yes, you deleted

6    that information so that Mr. Johnson wouldn't know

7    your source.

8          A.   Absolutely.

9          Q.   Right.  But your source is Ms. Clara Belle

10   Wheeler, right?

11         A.   I don't know.

12         Q.   You don't know?

13         A.   Not on this particular one.  I have many

14   sources.

15         Q.   Oh, okay.  But how can -- how can we, you

16   know, determine that since you delete the

17   information?

18         A.   You can't.

19         Q.   Right.  So we actually can't test the

20   veracity of your testimony.

21         A.   What part do you want to test?  I

22   described to you how I delete that information to

23   protect people who give me the information.

24         Q.   Right.

25         A.   It's not unusual or illegal or otherwise

1    problematic.  It's what happens all over this town

2    every day.

3         Q.  And so in this instance you don't know if

4    it was Ms. Wheeler who sent you this.

5         A.  I cannot remember in this instance, no, I

6    can't.  And if it was, it wouldn't make any

7    difference.  It's public information.

8         Q.  That's true.  And so it's information that

9    you were aware of on February 1st, 2017, correct?

10        A.  It's information that on February 1st,

11   2017 I forwarded to Noel Johnson and would,

12   therefore, be aware of.

13        Q.  So when Ms. Lindberg was emailing the

14   GRLIST and she said, please be aware that the data on

15   this report is not accurate, as of February 1st you

16   too were aware that the data on this cancellation

17   report is not accurate.

18             MR. DAVIS:  Objection to form.

19        Q.  Correct?

20        A.  I too was aware the data were not

21   accurate?

22        Q.  You were aware of Ms. Lindberg's statement

23   as of February 1st, correct, where she says, please

24   be aware that the data on this report is not

25   accurate, you were aware of that, right?

1    A.   I had received this communication.

2    Q.   And she continues, "and will be

3  misinterpreted and misrepresented by this

4  organization, as they have already done with the data

5  previously received."  Do you see that statement?

6    A.   She's wrong.

7    Q.   Okay.  But she's referring to PILF,

8  correct?

9    A.   Yes, and she's incorrect in her

10  assessment.

11    Q.   Okay.  She's the registrar of Arlington,

12  correct?

13    A.   Doesn't mean she's always right.

14    Q.   Okay.  Are you the registrar of Arlington?

15    A.   No, but I know a lot more about this than

16  she does.

17    Q.   Okay.  And so she says that you will have

18  two records if someone reregisters, right?

19    A.   She wanted to make a derivative record

20  that was nonresponsive to our request.

21    Q.   Right, because --

22    A.   And she discusses that.

23    (Clarification by reporter.)

24    Q.   And you only wanted the record that listed

25  cancellations, correct?

1      A.   That's not correct.   We only wanted the

2   record that we asked for, which was noncitizen

3   cancellations.

4      Q.   Exactly.

5      A.   She wanted to hide information about how

6   many noncitizen cancellations there were and did not

7   factor in whatsoever the possibility of intervening

8   naturalization.

9      It's the recurring problem of intervening

10   naturalization.   And that's, again, one of the

11   reasons we went to the state election director to ask

12   for a document that would account for these concerns,

13   which we later did and which we later quoted in

14   Alien II.

15      Q.   Okay.   And so she says, "this group has

16   and will interpret the fact that there may be voting

17   credit on the canceled record as 'illegal aliens'

18   registering and voting, despite the voter having

19   subsequently affirmed his citizenship."   Do you see

20   that?

21      A.   It further undermines her credibility,

22   because she refers to them as illegal aliens.

23      Q.   Okay.

24      A.   And that's precisely one of the areas

25   where I began to conclude that she had an agenda that

Page 260

1  did not include complying with our document request.

2       Q.  And she says, "I'm working through my

3  report and I've found so far every canceled record

4  that has voter credit, there is a more recent, active

5  or inactive voter record available," correct?

6       A.  Read the next sentence, because that's the

7  important one that relates to the previous one.  It

8  says, "I am going to delete or otherwise notate these

9  names from my report, either by deleting the rows

10  from the Excel version or marking them on the

11  report."  Of course, she did neither.  And you aren't

12  allowed to delete election records that are part of

13  an NVRA request.

14       Q.  Right, and so -- and so she is saying PILF

15  is going to misrepresent this data, right?  She says

16  that.

17       A.  It's an indication to me that she was not

18  acting in good faith in compliance with our records

19  request.

20       Q.  And so she knows that the cancellation

21  record is not all-encompassing and that people have

22  affirmed citizenship.  She says that.

23       A.  And that's precisely why we went to the

24  State Board of Elections to ask about that.

25       Q.  And so she is trying to give you an answer

Page 261

1    that's more accurate, not less accurate.

2         A.   That's not correct.  She is trying to give

3    us an answer that's less accurate, because somebody

4    could be canceled as a noncitizen correctly and

5    validly and later reregister as a naturalized

6    citizen, and that would hide the fact -- if I may

7    finish, please -- that would hide the fact that there

8    is a defect in the system of administrating elections

9    in this Commonwealth that is rampant and problematic

10   and we're trying to fix.

11        And so it has nothing to do with trying to get

12   a report that says one thing that we didn't ask for.

13   It has to do with documenting a particular problem.

14                      (PILF Exhibit 22 marked for

15                      identification: Email correspondence

16                      from (topmost) N Johnson sent

17                      2/1/2017

18                      PILF-ADAMS-0009200 - 0009202)

19        Q.   The court reporter has handed you what's

20   been marked as Exhibit 22 with the Bates number 9200.

21   Do you see that?

22        A.   9200, right.

23        Q.   And I want to direct your attention to the

24   email of Larry Haake on February 1st.  And on

25   February 1st he wrote to the GRLIST, "I would

1    encourage all to take the PILF request very

2    seriously."  And by "the PILF request," this was a

3    renewal of your request for the cancellation records,

4    right?

5         A.  I'm sorry.  I was reading it.  I was

6    trying to find where he refers to that.

7         Q.  Okay.  So in the first sentence he says,

8    "I would encourage you all to take the PILF request

9    very seriously."  Do you see that sentence?

10        A.  I see it.

11        Q.  Okay.  And the PILF request that he's

12   referring to is the renewal of PILF's request for the

13   cancellation, noncitizen cancellation report, right?

14        A.  I think it's probably the August 8th

15   request.

16        Q.  Okay.  Which is asking for that record --

17        A.  It's asking -- right.

18        Q.  -- the cancellation record.  And Linda

19   Lindberg is correct that they are consciously

20   misrepresenting the data they are receiving from us.

21        A.  It sounds very conspiratorial, doesn't it.

22   It's not accurate.

23        Q.  Okay.  There's no question pending other

24   than that.

25        A.  I thought there was.  Well, you didn't ask

1    one, so --

2         Q.   Exactly.   And so Linda Lindberg is correct

3    that they are consciously misrepresenting the data

4    they are receiving from us.   Do you see that?

5         A.   Yes.

6         Q.   And the "they" here is PILF, correct?

7         A.   I don't know, but it would seem to be a

8    reasonable context.

9         Q.   Right.   And he says, "clearly, they have

10   no legitimate purpose in what they are doing."

11        A.   Yeah.

12        Q.   "But neither of these facts are legitimate

13   legal reasons to ignore them."   That's what he says,

14   right?

15        A.   That's what he says.

16        Q.   Now in the third paragraph he's referring

17   to the lawsuit that you filed against his county,

18   Chesterfield County, right?

19        A.   I don't know.   There's been -- there were

20   a couple.

21        Q.   So Larry Haake, he's -- he was the

22   registrar of Chesterfield County, right?

23        A.   Right, but there were two other lawsuits.

24   I assume that that's what he means, but I wish he had

25   been more clear for me to answer that.

1    Q.   And so he says, "during the course of the

2    lawsuit, the PILF lawyer lied about the data

3    Commission Cortes mentioned they were provided in

4    September, denying that they received any data."

5    Okay?

6         Now what he's referring to is, is a report

7    that the Virginia Department of Elections had offered

8    PILF in September, right?

9    A.   Yeah, but nobody lied.  No, he's not

10   referring to that.  He's offering -- he's referring

11   to a report that was nonresponsive to what we asked

12   for.

13   Q.   I understand, but he is referring to a

14   report that was offered by the Department of

15   Elections to PILF, right?

16   A.   That did not comport with the requested

17   information that PILF requested.

18   Q.   Okay.  And, let's see, he says in the last

19   sentence, "they are fully aware the particular report

20   they want is misrepresentative of the actual truth,

21   but the truth is clearly not what they want."

22   A.   And your question is?

23   Q.   My question is, when he says "the

24   particular report," he's referring to the VERIS

25   cancellation report, correct?

1      A.  I don't know, but I --

2      Q.  That was the report that you wanted,

3  right?

4      A.  They are fully aware the particular report

5  they want ... yeah, but he's wrong about that.  He is

6  squarely wrong about all of this.

7      Larry Haake is a pretty well-known hothead

8  among election officials.  He is no longer in office.

9  And he says things and has a reputation for saying

10  things that are not always meant to reflect reality

11  but rather are meant to vent, and this is full of

12  things that are not exactly -- they are not even

13  close to being accurate, as a matter of fact, and he

14  knows it probably.

15      Q.  He was the Chesterfield -- he was the

16  registrar of Chesterfield County before he retired,

17  right?

18      A.  Not anymore he's not.

19      Q.  Exactly.  My question, sir, is, he was the

20  registrar of Chesterfield County before he retired.

21      A.  Here he's purporting to be a mind reader

22  of PILF's motivation, so he's not a very skilled --

23  he was the Chesterfield registrar, that's correct.

24      Q.  Okay.  So the answer to my question was

25  yes.

1      A.  He was the Chesterfield registrar.  That's

2  not subject to dispute.

3      Q.  Well, then why couldn't you just say yes?

4      A.  I did say yes.

5      Q.  No, you talked about mind readers.

6      So now that we're all on the same page that

7  Mr. Haake was the registrar of Chesterfield County

8  before he retired, my question then now is to you,

9  are you the registrar of Chesterfield County?

10     A.  Really?

11     Q.  Have you been a registrar of any county in

12  Virginia?

13     A.  No.

14     Q.  So you get a copy of this email from Mr.

15  Haake to the GRLIST, right?

16     A.  At some point, yes.

17     Q.  Right, because on February 1st you

18  email -- you forward this internal GRLIST

19  communication to Mr. Johnson and Mr. von Spakovsky,

20  correct?

21     A.  Where is that -- yes.

22     Q.  And you say, "again, do not act on this

23  intel yet.  Very important to keep this intel I am

24  getting secret."

25     A.  Right.

1        Q.  Right.  And so was this email or, I should

2    say, this Listserv communication forwarded to you by

3    Ms. Wheeler?

4        A.  I don't remember.  This was in 2000 --

5    this was over two years ago.

6        Q.  And why was it very important to keep this

7    intel secret?

8        A.  Because he's -- your question is why is it

9    important to keep this intel secret?

10        Q.  Right.

11        A.  Right?

12        Q.  Right.

13        A.  I'm going to answer you.  Larry Haake says

14    a number of things in the email of February 1st that

15    are brazenly wrong, possibly indicative of his lack

16    of fitness to be in this position, and

17    misrepresenting a wide variety of obvious factual

18    information that he should not be doing.

19        I know Larry Haake and I've known him for a

20    while, and for him to say things like this that are

21    so patently false, so entirely inflammatory, really

22    raises questions as to whether he should continue in

23    the position of general registrar.

24        Q.  And so that's something you wanted to keep

25    secret?

Page 268

1      A.   On February 1st at 3:55 the answer was

2   yes.

3      Q.   Prior to Alien Invasion II, PILF was also

4   made aware that the Virginia Department of Elections

5   had determined that the data from the DMV regarding

6   individuals who self-identified as noncitizens were

7   overinclusive, correct?

8      A.   I don't think so, but if you have a

9   document that refreshes my recollection, I'd

10   appreciate it because I didn't quite understand your

11   question either.

12      Q.   Prior to Alien Invasion II, PILF was also

13   made aware that the Virginia Department of Elections

14   had determined that the data from the DMV regarding

15   individuals who self-identified as noncitizens was

16   overinclusive.

17      A.   The data of individuals who

18   self-identified as noncitizens ... I don't think

19   that's possible that it could be overinclusive if

20   it's data -- basically, you would be saying that

21   we're reporting the self-identifications -- we're

22   creating fiction.  That doesn't make any sense.

23      If it's overreporting self-identified citizen

24   checkbox noes, no, I don't know about that.  That

25   would mean that they have a data problem in their

1    computer system that's creating no checkboxes that

2    were never made.

3             Q.  PILF was aware that DMV was reporting out

4    individuals who also provided no response to the

5    citizenship question, correct?

6             A.  No response, yes or no, that's your

7    question.

8             Q.  Yes.  PILF was aware of that.

9             A.  No, I don't know.  If you have a document,

10   I'd like to see it.  I don't remember right now.

11                    (PILF Exhibit 23 marked for

12                    identification: Email correspondence

13                    from (topmost)

14                    a@electionlawcenter.com sent

15                    5/20/2017

16                    PILF-ADAMS-0000043 - 0000044)

17            Q.  The court reporter has marked as Exhibit

18   23 --

19            A.  Ah.

20            Q.  -- a document Bates number 43.

21            A.  Right.

22            Q.  And so this is an email from Mr. Cortes,

23   who was the Virginia Department of Elections

24   commissioner, correct?

25            A.  No.  This is an email from Clara Belle

1    Wheeler, who is telling me that she did not

2    understand this garbled mess.

3         Q.  No, no, no, Mr. Adams.  Mr. Adams, the

4    first email in the chain.

5         A.  Oh, the bottom?

6         Q.  Yes.

7         A.  Okay.

8         Q.  So Mr. Cortes sends an email to the GRLIST

9    May 19th, right?

10        A.  Okay.

11        Q.  May 19th?

12        A.  May 19th, 2017.

13        Q.  And this is -- this is before Alien

14   Invasion II was published, right?  Sir?

15        A.  What?

16        Q.  This was before Alien Invasion II was

17   published, correct, May 19th?

18        A.  Right.

19        Q.  Yes.  And Mr. Cortes's message was

20   forwarded to you by Clara Belle Wheeler, correct?

21        A.  Correct.

22        Q.  And so she is on the GRLIST and she sent

23   this to you, right?

24        A.  I don't know.  She forwarded it -- once

25   again, it may be that she's getting this email from a

1    third party.  I don't know.

2         Q.  Yes, you don't know.

3         A.  I don't know.

4         Q.  You don't know.  You're just speculating.

5         A.  No, I don't know.

6         Q.  And so Mr. Cortes refers to a review of

7    its data files -- I'm looking at the second

8    sentence -- "as I described in a prior email, the

9    Department began a post-election review of its data

10   files and identified several files that were not

11   properly loaded into VERIS."  Do you see that?

12        A.  This -- okay.

13        Q.  Do you see that?

14        A.  Right.

15        Q.  Okay.  "As part of this review and working

16   in conjunction with our partners at DMV, it was

17   discovered that some of the list provided by DMV

18   regarding individuals who self-identified as

19   noncitizens were overinclusive."  You see that,

20   right?

21        A.  This relates --

22        Q.  And then he says, he writes, "while the

23   files did contain the individuals that responded no

24   to the citizenship question, the files also contained

25   individuals that provided no response to the

1    question," correct?  That's what he says here.

2         A.  This doesn't have anything to do with the

3    reports.

4         Q.  Okay.  And so the reports, the

5    noncitizenship reports, that you included as Exhibit

6    1 --

7         A.  No, you're wrong about that.  You're wrong

8    about that.  This relates to an issue that was

9    raised --

10        Q.  I'm wrong about a question I haven't even

11   been able to ask?

12        A.  Go ahead.  I'm sorry.

13        Q.  Okay.  So Exhibit 1 to Alien Invasion II,

14   the declared noncitizen cancellation report, right?

15   Are you with me?

16        A.  Go ahead.

17        Q.  That is a report that is generated based

18   on information that comes from the DMV, correct?

19        A.  In part.  Not this particular issue, no,

20   not even in part.  It's absolutely no relationship.

21        Q.  Okay.  So you will agree with me that the

22   process is, as we've talked about a number of times

23   today, people who are on the rolls, right, they go to

24   the DMV, and then they perhaps provide some contrary

25   information about citizenship at the DMV, correct?

1    Are you with me so far?

2           A.   Go ahead.

3           Q.   That -- those are situations that occur,

4    right?  You get contrary information --

5           A.   Contrary information from what?

6           Q.   Right, on citizenship.  They say no in the

7    checkbox, right?

8           A.   That's not contrary; it's a they say no.

9           Q.   Okay.  And before they were on the rolls

10   because they had said yes.

11          A.   Go ahead.

12          Q.   Okay.  So DMV sends this information to

13   the Department of Elections to see if the person who

14   had indicated no in the checkbox is on the rolls,

15   correct?

16          A.   DMV sends the data to -- the Department of

17   Elections has access to the data is the better way of

18   characterizing that.

19          Q.   Okay.  And then for those people who

20   there's a match, they're registered, they get sent a

21   letter, correct?

22          A.   A match -- when they self-identify as a

23   noncitizen, they -- there's a follow-up process.

24          Q.   Right.  And so the follow-up process is

25   DMV sends this information.  DOE, Department of

1    Elections, looks at it, says, yes, this person who

2    had indicated they're not a citizen, they're

3    registered.  And so now we have a conflict.

4         A.  Right.

5         Q.  So the next step in the process is to send

6    out a notice of what's called the Notice of Intent to

7    Cancel, correct?

8         A.  Right.

9         Q.  Right.  And in the Notice of Intent to

10   Cancel the voter is informed that they had received

11   some information about their lack of citizenship from

12   the DMV, correct?

13        A.  Right.

14        Q.  And then if that is incorrect, they should

15   respond by filling out an affirmation of citizenship,

16   right?

17        A.  If they're a citizen.

18        Q.  If they're a citizen, right?  That's why I

19   said, if the information that came from the DMV is

20   wrong and they are a citizen, they should submit that

21   affirmation of citizenship, correct?

22        A.  Right.

23        Q.  Okay.  And they have two weeks to do it,

24   correct, before the state can cancel them, right?

25        A.  Right.

1       Q.   Okay.  What this document is indicating is

2   that the information, the data, that is coming from

3   DMV is including people who didn't check the box at

4   all.

5       A.   Wrong.  What I tried to explain to you

6   earlier is that this related to an isolated period of

7   time just prior to the 2016 election.  It was not all

8   of those years associated with the VERIS reports.

9   That's what I tried to explain to you.

10       This was a very insulated and limited defect

11   that affected the DMV data around the time period of

12   the 2016 election where the Department of Elections

13   took down their citizenship verification protocols

14   ahead of the 2016 election.  That incensed a lot of

15   members of various county electoral boards, the

16   Republican member of the state board.  And there was

17   a whole line of inquiry about why this was no longer

18   showing up in the hoppers.

19       And so it was not a omnibus problem going back

20   years.  It was an isolated in time problem.  That's

21   my understanding of it.

22       You'll see that Clara Belle refers to this as

23   a garbled mess.  I would not disagree with that

24   characterization.  And there's a lot of questions

25   about what was really going wrong with the data.

1     So, no, I would disagree with you that this

2     was something that affected all of the data going

3     back multiple years.  My understanding is it's an

4     isolated issue.

5          Q.  Okay.  But there was a period of time in

6     which, according to this, you would agree, DMV was

7     reporting out information to the Department of

8     Elections indicating people had indicated

9     noncitizenship when in fact they had provided no

10    response at all.

11         A.  A very short period of time that would not

12    have affected these reports.  That's my

13    understanding.

14         Q.  Now is it true that you were troubled by

15    the inclusion of an individual in Alien Invasion II?

16         A.  Troubled?

17              MR. DAVIS:  Objection to the form.

18         Q.  Troubled.

19         A.  Yeah, I don't understand the question.

20         Q.  You were troubled, weren't you, before

21    Alien Invasion II was published by an individual who

22    was called out by name in that report?

23         A.  I don't know.  I might have been.  If you

24    have something to show me, we can move this along

25    quicker if you would show it to me.

1              (Johnson Exhibit 16

2              previously marked for identification

3              and referenced herein: Email

4              correspondence to (topmost) C Adams

5              sent 6/19/2017 PILF-ADAMS-0000210)

6       Q.   Handing the witness what has been

7    previously marked as Johnson Exhibit 16.

8       On page 10 of Alien Invasion II you

9    highlighted Maureen Erickson, correct?

10      A.   This doesn't have any ... we're

11   discussing -- there's some -- looks like a Washington

12   Times article -- yeah, because this is Dinnan -- and

13   it talks about somebody named Maureen Erickson.

14      Q.   Yeah, Maureen Erickson is called out in

15   page 10 of Alien Invasion II, right?

16      A.   I'm sorry?

17      Q.   Maureen Erickson, she was called out by

18   name on page 10 of Alien Invasion II.  You know that.

19   You certainly haven't forgotten that, have you?  I

20   mean, there's a whole story written about it in the

21   Washington Times.

22      A.   It says Maureen Erickson.

23      Q.   Yeah.  And so this story in the Washington

24   Times highlights the fact that, well, Maureen

25   Erickson is actually a citizen, right?

1      A.   I think there's a story in the Times about

2   that.   That's what I'm referring to.

3      Q.   Yeah.   And, and you certainly haven't

4   forgotten the fact that you call out Maureen Erickson

5   as a person who is a noncitizen, a person who resided

6   at a foreign address, correct?

7      A.   I don't see that on here.

8      Q.   Yeah.

9      A.   Are you talking about Exhibit 16?

10      Q.   Sir, do you recall the content of Alien

11   Invasion II?

12      A.   I'm sorry.   I thought you were asking

13   about Exhibit 16.

14      Q.   Sir, do you recall the content of your

15   report?

16      A.   Right, right, yes.

17      Q.   And on page 10 --

18      A.   Okay.   We're back to that.   Okay.

19      Q.   On page 10 you highlight Maureen Erickson,

20   yes?

21      A.   Her name is there on page 10.

22      Q.   Right.   And she is one of the 5,556 people

23   that PILF identified as a noncitizen in Exhibit 1.

24      A.   She's in the report because she was in the

25   state declared noncitizen report.

1      Q.   Right.   And but even before Alien Invasion

2    II was published, you were troubled by the

3    possibility that she was in fact a citizen, correct?

4      A.   That's not correct.

5      Q.   Okay.   So then let's look at this email of

6    yours of June 19th.   Do you see that?

7      A.   Right.

8      Q.   Right.   So you respond to -- you send an

9    email to Mr. Johnson, Mr. Churchwell, with regard to

10   the Washington Times story, correct?

11     A.   I do, on June 19th, two weeks after the

12   publication of the report.

13     Q.   And you say, and you have -- you say the

14   case troubled me because I looked, I assume you meant

15   it looked, like a UOCAVA registration to me.   Do you

16   see that?

17     A.   Well, I'm not going to speculate what I

18   was trying to write.   I probably -- that probably is

19   an autocorrect or something, I don't know, but I'm

20   referring to the Washington Times article.

21     Q.   Right.

22     A.   Maureen Erickson has a Guatemala address,

23   and for her to say that she's a citizen, because I

24   think they talked to her -- do you have the Times

25   article?   If you can show me, I can give you more of

1    the basis for why I wrote this, but I only have a

2    snippet here.  And after reading the Times article,

3    it looks to me like she could have been a UOCAVA

4    voter.

5         Q.  Right.  And so the snippet that you quote

6    from the Times article here is, "Maureen was born in

7    the U.S. to U.S. citizens and has voted ever since

8    she was 18."

9         A.  But that's not the whole Times article.

10   There's other information in the article that's

11   relevant to my conclusion below that she might have

12   been a UOCAVA voter.

13        Q.  And so but you were troubled by this

14   before Alien Invasion II was published, right?

15        A.  No, I wasn't.  I was troubled by it when I

16   read the Washington Times article.

17        Q.  Okay.  So before Alien Invasion II was

18   published, you were confident Maureen Erickson was a

19   noncitizen.

20        A.  I had no view about Maureen Erickson

21   personally.  Maureen Erickson appeared in the report

22   because she had been canceled as a noncitizen by the

23   Virginia election officials, and --

24        Q.  But she hadn't --

25        (Clarification by reporter.)

1     Q.  She hadn't been canceled as a noncitizen.

2  She had been canceled because of an indication of

3  noncitizenship coming from the DMV, and she did not

4  affirm citizenship within two weeks, right?

5     A.  You left out an important word.  She was

6  declared noncitizen by the state election officials.

7  Declared noncitizen report, her name appeared.

8  That's why I was confident that she was a noncitizen.

9     Q.  Because you choose to believe the checkbox

10  on the DMV paperwork but not the checkbox on the

11  original voter registration application, correct?

12     A.  Nope, that's not correct.  What I choose

13  to believe is what the government documents say, what

14  I have spoken with multiple election officials about,

15  about the inherent reliability of those government

16  documents, and a wide variety of other information

17  that leads me to conclude that one can have a degree

18  of confidence in those government documents.

19     What troubled me was the story that she was a

20  missionary U.S. citizen.  We want to get this right.

21  And I think what's troubling about it is that the

22  state appears to be canceling noncitizens, something

23  we didn't think could be possible in the summer of

24  2016.  And, frankly, needs to be addressed, and so

25  far, as I see it, the defendants are the only one

Page 282

1      addressing it.

2                     (Johnson Exhibit 27

3                previously marked for identification

4                and referenced herein: Email

5                correspondence from (topmost) N

6                Johnson sent 3/28/2017

7                PILF-ADAMS-0001979 - 0001980)

8                MR. TEPE:   The witness has been handed a

9      document that's been previously marked as Johnson 27,

10     Bates number 1979.

11          Q.   The email chain begins with an email from

12     Edgardo Cortes on March 28th, correct?   Correct?

13          A.   I'm sorry.   What was the question?

14          Q.   The question was the email chain begins

15     with an email from Edgardo Cortes on March 28th,

16     correct?

17          A.   Right, right.

18          Q.   And this is him sending over the

19     cancellation reports, the statewide cancellation

20     report, correct, that you had requested?

21          A.   No, this was him sending over the report

22     we had requested months before, which was the

23     declared noncitizen reports.

24          Q.   Right.   We're talking about the same

25     thing.   And so --

1        A.   I'm calling it what it is.   That's what it

2   says in the document.

3        Q.   And so the -- so he sends that over at

4   1:25 p.m., and then at 1:57 p.m. Mr. Johnson sends an

5   email to you, Mr. Churchwell and Shawna Powell.   Do

6   you see that?

7        A.   Right.

8        Q.   And he copies the image of one of the

9   entries from the cancellation report that you just

10   got.

11       A.   Right.

12       Q.   Right.   And this entry was for a George

13   Washington, Junior, right?

14       A.   Right.

15       Q.   Yes.   And he said, "already nabbed

16   descendant of George Washington."   That's what

17   Mr. Johnson says, right?

18       A.   Yes.

19       Q.   Did you interpret him to be making a joke?

20       A.   Absolutely.

21       Q.   Right.   And then you say in response, "if

22   false-positive, they will use this one against us."

23       A.   That's what it says.

24       Q.   Right.   And then so at this time you were

25   aware of the notion that there were people on here

1    who were citizens, right?

2           A.   No.   That's absolutely not true.

3           Q.   Then why would you say it was

4    false-positive?

5           A.   I was aware of the general nature of

6    false-positives in doing this kind of research.

7           Q.   Right, and a false-positive is someone who

8    is on the cancellation list who is actually a

9    citizen, right?

10          A.   Right.   And there's a difference between a

11   generalized awareness of a false-positive versus

12   specific information relating to the potential

13   false-positives on the list.   There's a very big

14   difference between those two things.

15          Q.   So are you saying that you didn't know

16   whether or not George Washington, Junior was a

17   citizen or noncitizen?

18          A.   I was following up on this, since you

19   asked, I was following up on the joke that Noel

20   Johnson made that, in the unlikely event that this

21   was a false-positive, it will certainly be one used

22   against us because it is George Washington from

23   Fredericksburg, which, if you -- actually it's

24   Woodford, Virginia, Fredericksburg Turnpike -- it

25   would certainly be one that will create some degree

1   of laughter that the person was falsely reported as a

2   noncitizen.

3        Q.  You had his address here, right?

4        A.  It says Fredericksburg Turnpike, Woodford,

5   Virginia.

6        Q.  You didn't follow up with him to see if he

7   was or was not a citizen, correct?

8        A.  Well, this goes back to my previous

9   testimony that we had a policy of not contacting

10  these people because we had no way to verify.  They

11  could say they were a citizen and they could not tell

12  the truth.  They could not -- there's a variety of

13  reasons why that would have been a futile exercise.

14       Q.  Okay.

15                 (PILF Exhibit 24 marked for

16                 identification: Email correspondence

17                 from (topmost) L Churchwell sent

18                 5/25/2017

19                 PILF-ADAMS-0000241 - 0000246)

20       Q.  The court reporter has marked an exhibit

21  as 24, a document with the Bates number 241.

22       The email chain begins with an email from

23  Keith Damon to Reagan George.  Do you see that?

24       A.  Not yet, but let me go ...

25       Q.  Keith Damon was assisting Reagan George

1    with going through the cancellation records, correct?

2         A.   That's what the email appears to show.

3         Q.   And he writes to Mr. George, "I've decided

4    to look at the records of some of the people on the

5    list.  I just randomly picked non-Hispanic surnames

6    living in single family homes in Fairfax County."

7    "Based upon this analysis," I now wonder if this

8    really -- "if this is really a list of actual

9    noncitizens or rather a list of people who, via the

10   DMV, apparently indicated they are noncitizens

11   regardless of their true status.  In other words,

12   while the list is real, does it really prove that the

13   people on the list are noncitizens."  Do you see

14   that?

15        A.   That's what it says.

16        Q.   And he cites two people in particular as

17   examples, correct?

18        A.   That's on the email.

19        Q.   Right.  Mr. George responds on May 25th,

20   2017 by copying you, correct?

21        A.   Right.

22        Q.   And Mr. George said, "there is no way for

23   you and I, or, for that matter, Christian, to

24   investigate all of these identified noncitizens.

25   They have all been removed from VERIS because they

1    self-declared to the DMV, a government agency, that

2    this was their status," right?

3         A.  It says that.

4         Q.  And then he said, you know, if they don't

5    understand the question, or they were trying to make

6    a political statement, or they were coerced into

7    registering in the first place, it's not our job to

8    determine.  Do you see that?

9         A.  I see that.

10        Q.  Right.  So you were aware at the time

11   before Alien Invasion II was published that certainly

12   one of the folks working on it was concerned about

13   whether or not these people were in fact noncitizens.

14        A.  One of the first working on it being whom?

15        Q.  Mr. Damon.

16        A.  He actually said there's no way to tell.

17   You didn't read the whole email.  Mr. Damon was

18   concerned, and, after all of these emails were

19   exchanged, what you don't have is the description of

20   the conversation I had with Mr. Damon where his

21   concerns were alleviated, and we both concluded that

22   his concerns were alleviated, that this is the best

23   information there is, the state stands by it, calls

24   it declared noncitizen.  So Mr. Damon retracted much

25   of his concerns after we talked through these issues.

1        Q.   You wrote on May 25th, on the first page,

2    it says:

3              "Keith, it's the best data

4              available.  If the fact a registrant

5              was a citizen, their own system

6              reported otherwise and kicked them

7              off the rolls.  Nobody has better

8              data than we do.  If there are

9              false-positives, it's state data and

10             procedures that made them

11             false-positives."

12        Do you see that?

13        A.   I do.

14        Q.   And so that's what you were just

15   testifying.  It's the best data you have.

16        A.   No, that's not what I was just testifying

17   about.  You're mischaracterizing my testimony.

18        What I testified about previously was that I

19   had a conversation with Mr. Damon after these emails,

20   and there was an understanding that there was no way

21   for us to ultimately verify the citizenship of each

22   of these individuals, and that the state has taken

23   the drastic step of removing them from the voter

24   rolls as noncitizens.  And that fact has a great deal

25   of weight, both in the reliability of the

1   information, but also in the processes and whether or

2   not the state needs to improve those processes.

3       As you know, we filed a lawsuit against the

4   state to get them to improve those processes --

5       Q.  So --

6       A.  -- one, which, by the way, you opposed, or

7   at least your clients did.

8       Q.  I don't know what you're referring to

9   there, but it's not responsive to the question.

10      So Mr. Damon, before you had responded to him,

11  had said, "I raise this issue, not to express my own

12  willingness to participate, but rather to express my

13  concern that conclusions reached might be

14  challenged."  Do you see that?

15      A.  No, I don't.  Where is it?

16      Q.  It's the second paragraph of Mr. Damon's

17  email at 5:23 p.m.

18      A.  5:23, okay, I see it.

19      Q.  Right.

20      A.  Shall I continue to read?  Is there a

21  question?

22      Q.  He raises a concern about those who were

23  dropped or canceled who subsequently affirmed their

24  citizenship.  Okay?  Generally speaking, that was a

25  concern of his.

1      A.   It speaks for itself.  He also, for

2  inventorying his views, he says he's interested that

3  Edgardo Cortes states that people who were dropped

4  and subsequently affirmed will not be on the list,

5  which would appear to negate my concerns.  That was a

6  conclusion ultimately reached by Mr. Damon --

7      Q.   Right.

8      A.   -- as it relates to this issue.

9      Q.   And Mr. Damon also raises the fact that

10  the current reports that he was working on, like the

11  current one which has deletions as late as April

12  27th, it might reflect a period when the person has

13  been dropped before he realizes that he was

14  incorrectly dropped.

15      A.   No, that's not -- first of all, that's a

16  tiny fraction given the time issue, that that would

17  have been a very recent event, and these go back to

18  2011.  So it's not -- it doesn't have a lot of

19  possible people who fall in that category.

20      Q.   Okay.

21      A.   That's the first problem with that.

22      Q.   Right, but -- but he does identify a

23  population of people on the cancellation reports that

24  you published, namely, those people who were canceled

25  right before the reports were generated and given to

1  PILF, those individuals may just not have had the

2  opportunity to respond to the notice of intent to

3  cancel and affirm their citizenship, correct?

4          A.  So you're referring to two weeks worth of

5  names, that's all.  And so we can calculate that

6  number.  My guess is it's probably in the single

7  digits.

8          Q.  But the two weeks, after two weeks, they

9  get canceled, and then a lot of times registrants,

10  you would agree, do not reregister and affirm their

11  citizenship until after they're already canceled,

12  right?

13          A.  That's irrelevant to the question of

14  whether there was a substantial basis to report that

15  these people had been canceled for declared

16  noncitizens.  There are people who naturalize and

17  later reregister.  I will grant you that.

18          Q.  But it would be incorrect to call them a

19  noncitizen.

20          A.  No, it wouldn't, because the report says

21  declared noncitizens.  Under state law they were

22  declared noncitizens period.

23          Q.  So that is correct, that is the cancel

24  type listed in the column, right?

25          A.  It's more than just the cancel type.  It's

1    what happened.  It's the document's title.  It's what

2    the state did.

3         When you take somebody off the voter rolls,

4    that's a weighty thing.  When you remove somebody's

5    active registration, that is a serious matter, and

6    the inference of taking that action is that there was

7    validity to it.

8         You don't just take somebody off the voter

9    rolls without a process.  And the state was taking

10   people off the voter rolls, and we interpreted that

11   process as having validity or else they wouldn't be

12   doing it.

13        Now, as I sit here today, we have since

14   learned that the state was taking people off the

15   voter rolls who were citizens, your client apparently

16   being one of them.  And that's why we filed a lawsuit

17   against the state to get them to fix this, by the

18   way, a filing which you opposed when we made it.  You

19   attempted to prevent us from filing it as part of

20   this action.

21        So we made an effort to fix this problem,

22   which you opposed.  And that was responsive.

23        Q.  I think, Mr. Adams, you are referring to

24   the fact that you were trying to shift the blame for

25   the things alleged in our complaint to the Virginia

Page 293

1    Department of Elections and plead them when there was

2    no legal basis.  Is that what you're talking about?

3         A.  You really think that's what I'm talking

4    about?  That's not -- that's an argumentative

5    question.

6         Q.  Okay.  So you said that, under state law,

7    people were declared noncitizens period.  What state

8    law are you referring to?

9         A.  I don't know.

10        Q.  You don't know.

11        A.  Nope.  If you want to get me the Virginia

12   code book, the Election Code, I'll tell you exactly

13   what it was, but it's the state procedures relating

14   to noncitizenship cancellation.  They were declared

15   noncitizens and removed from the rolls.  This

16   isn't -- this isn't subject to interpretation.

17   That's what the document says.

18        Q.  And nowhere does that document say that

19   the state of Virginia had adjudicated its own

20   citizenship, correct?

21        MR. DAVIS:  Objection to form.

22        A.  Actually there are documents that say

23   that.

24        Q.  No, the document that you're referring to,

25   the procedures that you're referring to, does not say

1   that Virginia has adjudicated in fact people's

2   citizenship.

3          A.   That's not true.  There are documents that

4   say that.

5          Q.   That's not what I'm asking, sir.

6          A.   I answered your question.

7          Q.   I'm not asking about documents.  I'm not

8   asking about --

9          A.   Oh, I'm sorry.

10         Q.   No, you understand --

11         A.   No, I didn't.

12         Q.   -- precisely, because I've asked it now

13   twice, and this will be the third time.

14         I'm asking you, you said that there was a

15   state law, and then you refer -- I asked about what

16   state law, and then you referred to the procedures of

17   the Virginia Department of Elections, right?

18         And then I'm saying in those procedures there

19   is nothing that states that the Virginia Department

20   of Elections is adjudicating in fact someone's

21   citizenship.

22         A.   I would disagree with that, but we can --

23   we can talk about the procedures, if you want to pull

24   them out, but, as I sit here right now, I disagree

25   with that.  And I disagree with it because of things

Page 295

1     that have been said to me by two former state

2     election directors for the Commonwealth of Virginia.

3              MR. DAVIS:  I'm going to object to this

4     line of questioning anyway.  I think it's getting

5     into legal interpretation.

6              MR. TEPE:  Why don't we just take a short

7     break.

8              MR. DAVIS:  Sure.

9              VIDEO SPECIALIST:  We are off the record,

10    5:01.

11        (Proceedings recessed)

12             VIDEO SPECIALIST:  We are back on the

13    record, 5:04.

14    BY MR. TEPE:

15        Q.  Mr. Adams, in Alien Invasion II you had

16    advocated for law enforcement to prosecute

17    individuals such as the ones listed in Alien Invasion

18    II, correct?

19        A.  That's not accurate.  I didn't advocate or

20    the company did not advocate for specific individuals

21    to be prosecuted.

22        Q.  Right.

23        A.  As I previously testified, which I'm happy

24    to do it all over again, subject to my attorney

25    making an objection on asked and answered, we did not

1   advocate for prosecution of named individuals.  We

2   advocated for the law enforcement officials to take

3   investigative steps that, if warranted, would lead to

4   prosecution.  There is a very large difference

5   between the two of those.

6        Q.  After Alien Invasion II was published,

7   PILF mailed the report to a number of prosecutors,

8   correct?

9        A.  Well --

10       Q.  You don't remember?

11       A.  Well, I'm trying to decide whether to

12  include in my answer all the parties who mailed the

13  report to prosecutors and talked to prosecutors.

14       But for now I'll say, yes, PILF was one of the

15  parties that mailed reports to prosecutors and talked

16  to prosecutors.

17       Q.  And that's all my question asked for.

18       A.  Mm-hmm.

19       Q.  So I appreciate you staying with the

20  question asked.

21                      (Johnson Exhibit 17

22                      previously marked for identification

23                      and referenced herein: Email

24                      correspondence from (topmost) N

25                      Johnson sent 5/26/2017 with

1      attachment

2      PILF-ADAMS-0000782 - 0000784)

3      Q.  So handing you what has been marked

4  previously as Johnson Exhibit 17.

5      A.  I have the document.

6      Q.  And so this is a mailing list that

7  Mr. Johnson forwarded on May 26th, 2017 to yourself

8  and others, correct?

9      A.  May 26th to Johnson, to Adams, Churchwell,

10  Powell, yes.

11      Q.  Right.  And among the people listed are a

12  number of Commonwealth attorneys, correct, about 20?

13      A.  Seventeen, 18, 19 -- I think it's 19.

14      Q.  As well as a U.S. attorney for Eastern

15  District of Virginia?

16      A.  Yes.

17      Q.  U.S. attorney for the Western District of

18  Virginia, correct?  That's right underneath

19  Commonwealth attorney.  You don't have to go far.

20      A.  Right, Rick Mountcastle.

21      Q.  And the deputy assistant attorney general

22  John Gore, right?

23      A.  Correct.

24      Q.  Who is this Eric Drieband?

25      A.  He is the assistant attorney general for

1    civil rights.

2         Q.  So you mailed the report out to all those

3    Commonwealth attorneys, correct?

4         A.  The company mailed the report to those

5    Commonwealth attorneys.

6         Q.  And that included the names of the

7    individuals?

8         A.  No, it did not.

9         Q.  No, just the report?

10        A.  Yes.

11        Q.  That tells people how to obtain the list.

12        A.  There's a difference.

13        Q.  I understand.

14        A.  It did not include the names.  The mailing

15   did not include the names of the individuals in any

16   of the exhibits.

17        Q.  No Commonwealth attorney contacted PILF to

18   follow up; is that right?

19        A.  I don't believe so.

20        Q.  Do you recall a Commonwealth attorney --

21        A.  I just answered the question.  I don't

22   believe any called us.

23        Q.  Okay.  And then when that happened, when

24   no Commonwealth attorney contacted PILF, you directed

25   PILF personnel to follow up with the Commonwealth

1    attorneys, correct?

2         A.   No, I think there were intervening events.

3    It wasn't -- it wasn't that simple.

4                   (PILF Exhibit 25 marked for

5                   identification: Email correspondence

6                   from (topmost) S Powell sent

7                   7/5/2017

8                   PILF-ADAMS-0000022 - 0000028)

9         Q.   The court reporter has just marked as

10   Exhibit 25 a document with Bates number 22.  Do you

11   recognize this document?

12        A.   I've reviewed this document.

13        Q.   Okay.  And so this email chain begins with

14   an email from you on June 23rd; is that right?

15        A.   It starts June 23, right.

16        Q.   And the subject line is "follow-up in

17   Virginia," you emailed Ms. Powell and Mr. Churchwell,

18   right?

19        A.   Right.

20        Q.   And you wrote, "It's been weeks.  Could

21   you two do a sweep of Commonwealth attorneys in

22   Virginia and ask them a few questions."  Right?

23        A.   Right.

24        Q.   Right.  One of those, did you get our

25   report, did you need anything else, who is the lawyer

1    in your office working on what we sent, have they

2    gotten the list of voters from your county.  Because

3    you also sent them the list of voters from your

4    county.

5        A.  I've testified no.  This refers to them

6    getting the list from their election officials.  I've

7    already testified to you once that we didn't send the

8    list of voters.  You've asked me twice now.

9        Q.  But you did instruct your team to follow

10   up with Commonwealth attorneys, correct?

11       A.  Well, my team included the lawyer from

12   Skadden Arps, so --

13       Q.  No, no, no.

14       A.  Yes, yes, yes.

15       Q.  Sir, sir, okay, let me -- strike that.

16       So you emailed Shawna Powell and Logan

17   Churchwell, right?

18       A.  In this particular communication.  Your

19   question was about the team.

20       Q.  Right.

21       A.  And my answer was --

22       Q.  And my --

23       A.  Can I finish, please?

24       Q.  And my question was poor, so I'm

25   withdrawing it because I meant by "team" Ms. Powell

Page 301

1    and Mr. Churchwell.  And so it is --

2         A.  Withdrawn.  I understand.

3         Q.  Right.  And it is the case, as Ms. Powell

4    indicates on July 5th -- it's the top email -- that

5    she is going to send the Alien Invasion PDF and

6    county specific list to all CAs we haven't yet

7    communicated with.  Do you see that?

8         A.  No.  I'm sorry.  What page are you on?

9    This is --

10        Q.  The first page, Shawna Powell, Logan

11   Churchwell, July 5th, "tomorrow I'm going to send the

12   alien PDF and county specific list to all CAs we

13   haven't yet communicated with," correct?

14        A.  Right.

15        Q.  Right.  And so it is true that PILF sent

16   lists of individuals that were published in the Alien

17   Invasion II report to prosecutors, correct?

18        A.  I don't remember reviewing a document in

19   preparation for this that shows that.

20        Q.  Well, perhaps you should have.

21        A.  Well, perhaps it doesn't exist.  That's

22   the other possibility.  In fact, the fact that I

23   don't remember reviewing it would create an inference

24   that it doesn't exist, but, if you have it --

25        Q.  98(a).

Page 302

1          (Johnson Exhibit 18

2          previously marked for identification

3          and referenced herein: Email

4          correspondence from (topmost) N

5          Johnson sent 6/27/2017

6          PILF-ADAMS-0000732 - 0000733)

7     A.   Very good.

8     Q.   Does this refresh your recollection?

9     A.   It does.  Well, this is a draft, and this

10    predates this other email.  So I'm not sure that

11    you're talking about the same things.  This relates

12    to Newport News.

13    Q.   So are you seriously, you know, disputing

14    the notion that PILF sent lists of individuals

15    published in Alien Invasion II to Commonwealth

16    attorneys?  Yes or no.

17    A.   I'm not seriously disputing it, but I am

18    disputing it, because I'd like to see some more

19    documents.

20    Q.   Because you didn't prepare for it today.

21    A.   That's not accurate.  There's a lot of

22    documents here.  And you'd speed it up, if you would

23    just show me the document in the first place, and we

24    can talk about it.

25    Q.   Well, Topic No. 4 to the 30(b)(6)

1     deposition notice that you said that you were

2     prepared to testify on --

3               MR. DAVIS:  What did you just hand the

4     witness?  And this is marked as an exhibit?

5                     (PILF Exhibit 26 marked for

6                     identification: Email correspondence

7                     from (topmost) S Powell sent

8                     7/5/2017 with attachment

9                     PILF-ADAMS-0000045 - 0000087)

10              THE REPORTER:  This will be 26.

11        Q.  The court reporter has marked as Exhibit

12    26 a document with Bates number 45.  It is an email

13    from Shawna Powell to Jim Plowman, who is

14    Commonwealth attorney in Loudoun, correct?

15        A.  That's what it says.

16        Q.  Right.  And in this email on July 5th from

17    Ms. Powell, which you were copied on, it says,

18    "attached you'll find a report regarding noncitizen

19    registration and voting in Virginia.  Also, I have

20    attached the list of noncitizens removed for

21    citizenship defects from Loudoun County's voter

22    rolls."  So this refreshes your recollection --

23        A.  Right.

24        Q.  -- that you, PILF, were sending lists of

25    individuals listed in Alien Invasion II to

1    Commonwealth attorneys.

2         A.   Right.

3         Q.   Right.  And you sent it to a number of

4    jurisdictions, correct?

5         A.   I think we just did a document -- we

6    discussed one where you listed those jurisdictions,

7    or you provided me a document that listed a variety

8    of jurisdictions.

9         As a matter of fact, you've provided me a

10   number of documents that listed multiple

11   jurisdictions, Johnson 17, and we've already talked

12   about those -- or talked about some of them.

13                    (PILF Exhibit 27 marked for

14                    identification: Email correspondence

15                    from (topmost) S Powell sent

16                    6/30/2017 with attachment

17                    PILF-ADAMS-0050984 - 0051022)

18        Q.   The court reporter is marking as Exhibit

19   27 an email to the Chesapeake Commonwealth's

20   attorney's office, right?

21        A.   Correct.

22        Q.   A copy of the report and the voter roll

23   cancellation list published in Alien Invasion II?

24        A.   No, that's not what it includes.

25        Q.   It says, "I have attached the list of

1    noncitizens removed for citizenship defects from

2    Chesapeake's voter rolls."

3         A.   That's what the letter says, but you

4    said -- what it includes as an attachment is the

5    Cancellation - Declared Non-Citizen list --

6         Q.   Right.

7         A.   -- from the Department of Elections.

8         Q.   Right.  And this is -- this is what was

9    published in Alien Invasion II, correct?

10        A.   Well, it almost certainly was, but you

11   didn't ask that until just now.

12                    (PILF Exhibit 28 marked for

13                    identification: Email correspondence

14                    from (topmost) S Coplon sent

15                    6/30/2017

16                    PILF-ADAMS-0017960 - 0017961)

17        Q.   The court reporter has marked as Exhibit

18   28 the email with the Bates number 17960, and this is

19   actually a response from a Susie Coplon of the

20   Commonwealth attorney's office for Norfolk; is that

21   right?

22        A.   Right.

23        Q.   And in this email she is thanking you for

24   sending over the Alien Invasion report and the list

25   of noncitizens removed for citizenship defects from

1    Norfolk's voter rolls for a period of time, correct?

2         A.   That's right.

3         Q.   Okay.  You can put that aside.

4                   (PILF Exhibit 29 marked for

5              identification: Email correspondence

6              from (topmost) M Herring sent

7              7/7/2017

8              PILF-ADAMS-0017951 - 0017952)

9         Q.   And here is an email that's been marked as

10   Exhibit 29 with the Bates number 17951.  Do you see

11   that?

12        A.   Yes.

13        Q.   And this is an email response from Michael

14   Herring, Commonwealth attorney from Richmond City; is

15   that right?

16        A.   Right.

17        Q.   Acknowledging you sending over the Alien

18   Invasion II report and the list of individuals

19   removed from Richmond City's voter rolls, correct?

20        A.   No, it's not the list of people removed

21   from Richmond City's voter rolls.

22        Q.   "I have attached the list of noncitizens

23   removed for citizenship defects from Richmond City's

24   voter rolls."

25        A.   Well, you left that part out in your

1    characterization --

2         Q.  Well, what other list are you sending?

3    Because this is what you published in Alien Invasion

4    II.

5         A.  You said these were people removed from

6    the voter rolls.  There's a difference between -- you

7    aren't asking a precise question.

8                   (PILF Exhibit 30 marked for

9                   identification: Email correspondence

10                  from (topmost) S Powell sent

11                  7/6/2017 with attachment

12                  PILF-ADAMS-0050275 - 0050848)

13        Q.  The court reporter has marked as Exhibit

14   30 a document beginning with Bates number 50275.

15        Do you see that?  It's an email from Shawna

16   Powell to Logan Churchwell.

17        A.  I see it.

18        Q.  And she says, "Logan, here is my list of

19   CAs."  That's Commonwealth attorneys, correct?

20        A.  Right.

21        Q.  "I'll follow up with them all again when I

22   return from vacation."

23        A.  That's what it says.

24        Q.  All right.  You can put that aside.

25        A.  Put it aside, did you say?

1          Q.  Put it aside, yes.

2          Have you personally met with any Commonwealth

3     attorneys regarding Alien Invasion II?

4          A.  I don't believe I have.

5          Q.  Have you met with any federal prosecutors

6     with regard to Alien Invasion II?

7          A.  Yes.

8          Q.  What --

9          A.  Well, I'm not sure, since you've

10    compressed it to II, I don't know if it's just II or

11    I or ... perhaps.  I mean, maybe you can rephrase the

12    question.

13         Q.  Have you met with any federal prosecutors

14    with regard to Alien Invasion II?

15         A.  Okay.  I cannot recall if it was related

16    to II, but it might have been II and it might have

17    been I and II.

18                    (PILF Exhibit 31 marked for

19                    identification: Email correspondence

20                    from (topmost) M Lytle sent

21                    5/30/2017

22                    PILF-ADAMS-0052723 - 0052724)

23         Q.  What's been marked as Exhibit 31 is a

24    document with the Bates number 52721.  For the

25    record, this document was produced to us last night.

1       This is an email from you dated May 30th, at

2   the beginning of the chain, to Mark Lytle; is that

3   right?

4       A.  The pronunciation is Lytle.

5       Q.  Lytle, L-Y-T-L-E.  Who is Mark Lytle?

6       A.  I -- I cannot remember what the state is

7   regarding the privilege agreement and whether or not

8   this was in the agreement.

9       Q.  Yes, it was.

10      MR. DAVIS:  This is okay.

11      A.  Right.  Okay.  And your question was?

12      Q.  You emailed Mark Lytle on May 30th,

13  correct?

14      A.  May 30th, that's what the document says.

15      Q.  And the subject line is "Report"?

16      A.  It is.

17      Q.  And there's a link to PJ Media article

18  that you drafted about the Alien Invasion II report,

19  correct?

20      A.  Well, in my personal capacity I drafted a

21  PJ Media article.  So the use of the word "you" would

22  bleed into corporate issues, but, yes, that is an

23  article that I in my personal capacity drafted.

24      Q.  Okay.  And then Mr. Lytle asked, "When are

25  you free for lunch?"  And then you set, basically, a

1    date and location, correct?

2            A.   Well, we set a date.  To answer your

3    question about location, I'm not sure we actually --

4            Q.   Okay.  Did you --

5            A.   -- did.

6            Q.   Did you meet with Mr. Lytle and talk about

7    the Alien Invasion II report?

8            A.   Well, again, you keep asking about

9    Alien II.

10           Q.   Well, this is -- this is May 30th.

11           A.   Right, but it could have also been

12   Alien I.  I just don't remember.  It could have been

13   both.

14           Q.   Okay.

15           A.   But so --

16           Q.   Did you meet with him and discuss your

17   Alien Invasion reports?

18           A.   Yes.

19           Q.   Did you provide him lists of individuals

20   that were included in either of the Alien Invasion

21   reports?

22           A.   Could I talk to my attorney for two

23   minutes?

24           Q.   Go off the record?

25           A.   Go off the record?

1      Q.  Actually --

2      A.  I don't have an answer for you.

3      Q.  I have a question that's pending.

4      A.  I know you do, but I don't have an answer

5   for you.

6      Q.  Okay.  You can talk to your attorney.

7   We'll go off the record.

8          VIDEO SPECIALIST:  We are off the record,

9   5:24.

10         (Proceedings recessed)

11         VIDEO SPECIALIST:  We are on the record,

12   5:28.

13   BY MR. TEPE:

14     Q.  Mr. Adams, the question pending before you

15   asked to go talk to your attorney was, did you

16   provide Mr. Lytle lists of individuals that were

17   included in either of the invasion reports?

18     A.  The answer is yes.  And the reason I asked

19   to talk to my attorneys is I was unaware of the

20   particulars of the privilege agreement that you had.

21     Q.  Fair enough.  What else did you discuss

22   with Mr. Lytle?

23     A.  Well, we discussed a wide range of things,

24   including how people get on the voter rolls who are

25   not citizens, my analysis of what the defects are in

1    the system, as we currently understood them at that

2    time, avenues that could be explored at the DOJ to

3    enforce federal laws related to noncitizen voting,

4    the investigative procedures that would be utilized

5    by the department to look into these issues, the

6    nature of the administrative procedures that resulted

7    in noncitizens getting on the rolls.  There was a

8    wide variety of issues.

9         Q.  And you advocated to him that some of the

10   individuals listed in Alien Invasion reports be

11   prosecuted.

12        A.  No.  What I advocated -- no.  See you --

13   there's a recurring mischaracterization of the

14   evidence in your question.

15        Q.  It's a question.  You can dispute it, if

16   you want.

17        A.  Well, it's an incorrect one.  What I

18   advocated to him was the department undertake a

19   thorough review of this information, considering the

20   fact that they were well-placed to overcome the

21   shortcomings that a private organization faced in

22   trying to get to the bottom of this problem.

23        The department and the administration broadly

24   had access to immigration records, citizenship

25   applications, DHS files, INS files.  They could

1  quickly and easily obtain voter records from the

2  Commonwealth election officials, all done relatively

3  surreptitiously without the voters even being aware

4  of the process.

5       And, frankly, I was somewhat relieved that --

6  I believed that there is a genuine way to do this

7  that protects voting rights and protects everybody

8  involved.

9       Q.  Did you tell Mr. Lytle that, despite your

10 report saying there's 5,556 noncitizens, that

11 actually some number of them are actually citizens?

12      A.  Right.  What I said to him is that the

13 usual suspects who don't want anybody talking about

14 noncitizens on the voter rolls are very incensed and

15 animated about this report.  It's in -- responsive to

16 your question.

17      Q.  No, it's not.  It's totally not

18 responsive.

19      A.  Well, if I might have the opportunity to

20 get to it.

21      And I said, so what you're going to find is

22 there may be some people who are ultimately citizens,

23 but you will have the ability to determine that in

24 ways that nobody else will.  And I explained why it

25 was that people dislike this report because it was

1    the first step at trying to analyze what the problem

2    is.

3         Q.   Right, because the individuals listed in

4    Exhibit 1 are not actual lists of noncitizens; it's a

5    list of people who were canceled from voter rolls for

6    potentially not being noncitizens.

7         A.   No, you're --

8         MR. DAVIS:  Stop a second.  I'm going to

9    object.  It's argumentative and repetitive.

10        A.   And also inaccurate.  That is not

11   accurate.  The list of people in Exhibit 1 are

12   declared noncitizens by the Commonwealth and for all

13   the other reasons that I testified throughout this

14   deposition could be relied on as declared

15   noncitizens.

16        Q.   So the answer is yes, you did tell Mr.

17   Lytle that some of the people listed are likely

18   citizens, correct?

19        A.   No, that's not what I said nor did I

20   testify to that.  What I said was --

21        Q.   Okay.  Let me ask you --

22        A.   Can I answer the question?  I'm sorry.

23        What I said was that there were potential of

24   noncitizens here, but they would be able to easily

25   overcome false-positives because of the vast array of

1    data they had available.

2         Q.  So you told Mr. Lytle that the individuals

3    listed in Alien Invasion II, Exhibit 1, are

4    potentially -- includes potentially citizens.

5         A.  But more likely they are noncitizens.

6         Q.  Did you also tell him that you've --

7    strike that.

8         Did you meet with any other federal

9    prosecutors besides Mr. Lytle?

10        A.  I did not have a meeting with other

11   federal prosecutors, at least none that I remember

12   sitting here right now.

13                  (PILF Exhibit 32 marked for

14              identification: Email correspondence

15              from (topmost) C Adams sent

16              11/3/2016 PILF-ADAMS-0046297)

17        Q.  This is a document marked as Exhibit 32,

18   Bates number 46297.  It's an email you sent on

19   November 3rd, 2016, correct, to Ms. Powell?

20        A.  Right.

21        Q.  And here you're looking for a copy of

22   Alien Invasion I, right?

23        A.  Yes.

24        Q.  And you say, "I want to put it in the

25   hands of the DOJ lawyer who would prosecute these

1    people, and is a friend of mine."  Do you see that?

2         A.   I see that.

3         Q.   Who is your friend?

4         A.   Mr. Lytle.

5         Q.   Okay.  And so did you meet with him in

6    November of 2016?

7         A.   I don't believe so.  I might have.

8         Q.   And --

9         A.   Well, wait, strike that answer.

10        There is a high degree of probability that I

11   had conversations with Mr. Lytle in November of '16.

12        Q.   A high degree of probability that you did

13   have conversations with Ms. Lytle --

14        A.   Mister.

15        Q.   -- Mr. Lytle in November, right?

16        A.   Correct.

17                   (PILF Exhibit 33 marked for

18                   identification: Email correspondence

19                   from (topmost) S Powell sent

20                   11/21/2016 with attachment

21                   PILF-ADAMS-0013344 - 0013404)

22        Q.   This has been marked as Exhibit 33.  At

23   the end of this email you say, "I am talking to U.S.

24   attorney in charge of prosecuting them early

25   afternoon do so as soon as possible.  Thanks.  Very

1  important."  Do you see that?

2       A.  Exhibit 33 is consistent with the

3  testimony I just gave, and in fact refreshes my

4  recollection that I was talking to Mr. Lytle.

5       Q.  Right.  So you had a meeting with

6  Mr. Lytle in November of 2016, right?

7       A.  It doesn't say that, does it?  If it does,

8  please direct me to that.

9       Q.  Well, it says in the middle, "I'm meeting

10  with EDVA USA office," 9:55 a.m.

11       A.  I'm not meeting with -- right.  Right, but

12  that -- that refers to a future event.

13       Q.  And so you were asking for the list of

14  records, excuse me, the records with the list of

15  individuals who had been canceled, correct, for that

16  meeting?

17       A.  No, I was asking for the list of declared

18  noncitizens for that meeting.  Remember, the list of

19  cancellations is much larger than just noncitizen

20  cancellations.

21       Q.  Do you recall any other meetings with

22  federal prosecutors other than the one after Alien

23  Invasion II and the one in November after Alien

24  Invasion I?

25       A.  Well, okay, there is a high degree of

1    probability that I spoke with Mr. Lytle throughout

2    that entire period.

3         Q.  So there's a bunch of communications

4    you've had with Mr. Lytle.

5         A.  I would say so, yes.

6                   (PILF Exhibit 34 marked for

7                   identification: Email correspondence

8                   from (topmost) N Johnson sent

9                   9/30/2016 PILF-ADAMS-0005422)

10        Q.  Did you meet with or correspond with any

11   other -- strike that.

12        Did you have communications with any other

13   federal prosecutor other than Mr. Lytle about Alien

14   Invasion reports?

15        A.  Well, depends on how you define

16   prosecutor.  An AUSA, no.

17        Q.  The court reporter is handing you what's

18   been marked as 34, Exhibit 34.  It's a document with

19   the Bates number 5422.  I want to direct --

20        A.  Okay.

21        Q.  I want to direct your attention to your

22   email of September 30th at 3:21 p.m.

23        A.  What is this?  It says "Adams Philly

24   edit."

25        Q.  The one, two, three, four ... fourth

1    paragraph.

2         A.   Right.

3         Q.   Right, and this is September 30.  You're

4    referring to the Alien Invasion I report, right?

5         A.   Well, I don't think anything was out yet.

6         Q.   Right, because this is -- this is

7    September 30.  You were still editing it at this

8    time.

9         A.   Correct.

10        Q.   Right.  And you said, Johnson says,

11   "Thanks.  I will give it another proof and send the

12   full PDF back," right?

13        A.   Right.

14        Q.   And then in the fourth paragraph of the

15   underlying email you said, "I notice there are no

16   names of the matches," and that's --

17        A.   This doesn't refer to Virginia.

18        Q.   Okay.  In this paragraph you refer to "I

19   am going to deliver this to a good friend who does

20   the public corruption prosecutions at EDVA for DOJ."

21        A.   That's what it says.

22        Q.   "I can give him the list separately."

23        A.   It says that.

24        Q.   Right.  So this is the Alien Invasion

25   report, correct, Alien Invasion I?  That's what you

Page 320

1    were working on that day.

2         A.  Well, hold on.  Let me read this.

3         I'm going to deliver this to a good friend ...

4    this probably would refer to Alien Invasion I after

5    it was published.

6         Q.  Right.  And so what you were discussing

7    here is how the report itself, what you were

8    publishing, did not match names of people who were

9    canceled with those who -- with their voter history

10   essentially, right?

11        A.  I don't think it says that.  Where do you

12   see that?

13        Q.  It says --

14        A.  I notice there are no names of the

15   matches.  That's about True the Vote ...

16        Q.  No, Mr. Adams, you're saying here, "that's

17   good and bad.  Good because it insulates us from a

18   personalized false-positive.  Bad because it makes it

19   harder to move the report as a self-contained

20   prosecution guide."

21        A.  Right.

22        Q.  And then you say, "I am going to deliver

23   this to a good friend," right?

24        A.  Okay.  This is referring to -- now that

25   I've had a chance to look at this -- this refers to

1      the voter history matches.

2              Q.  Exactly.  That's what I said.

3              A.  Okay.

4              Q.  And so your intention was for Alien

5      Invasion -- the Alien Invasion reports to be

6      self-contained prosecution guides, right?

7              A.  That's an overstatement of what we

8      intended.  Let me -- I've testified to this a couple

9      of times during this deposition.  Let me explain what

10     this means, if that's what you're asking.  Is that

11     the pending question?

12             Q.  The pending question is, your intention

13     was for Alien Invasion reports to be self-contained

14     prosecution guides, using the language you use here

15     in this email.

16             A.  No.

17             Q.  No?  That wasn't your intention?

18             A.  I just answered that.

19             Q.  Okay.  How much money did PILF raise as a

20     result of solicitations using the Alien Invasion I

21     reports?

22             A.  Let the -- you have someone coming in.

23             Q.  You can answer the question.

24             A.  Next to nothing, as far as I know.

25             Q.  You did frequently refer to Alien Invasion

1    I in your fundraising correspondence, correct?

2         A.   I don't know about what you mean by

3    "frequently."  More than once?  Yes.  Frequently?

4    Vague.  If you have a number to attach to your

5    question, I can attempt to answer it.

6         Q.   Well, my question is:  How many times did

7    you refer to the Alien Invasion reports in

8    fundraising solicitations?

9                   (PILF Exhibit 35 marked for

10                  identification: Email correspondence

11                  from (topmost) Public Interest Legal

12                  sent 9/11/2017

13                  PILF-ADAMS-0017882 - 0017886

14                  PILF-ADAMS-0049764 - 0049765)

15        MR. DAVIS:  Can I get a copy of that?

16        Q.   Mr. Adams, how many times?

17        A.   I'm waiting for my counsel to get a copy.

18   You didn't give him a copy.  I'm letting him see it.

19        Okay.  Probably about a dozen, maybe more.  It

20   was totally ineffective, though, because we didn't

21   seem to raise any money related to the Alien Invasion

22   reports that I can credit.

23        Q.   But that is an example of a fundraising

24   solicitation.  This is Exhibit 35.

25        A.   That is an example of a failed attempt at

1    fundraising off of the Alien Invasion reports.

2        Strike that answer.  It's not.  It's relating

3    to New Jersey.  "Report:  Noncitizens discovered in

4    New Jersey voter registration system."  That's

5    Exhibit 35.

6        Q.  Right.  And on Exhibit 35 on the third

7    page, "Garden State Gotcha follows PILF's previous

8    work to quantify the number of voters canceled for

9    citizenship defects in Virginia.  The Public Interest

10   Legal Foundation found more than 5,500 cases."  And

11   there's a link there to the report, correct?

12       A.  Twenty-five words on a four-page document

13   refer to that -- 26, if you count the next paragraph.

14                    (PILF Exhibit 36 marked for

15                    identification: Email correspondence

16                    from (topmost) C Adams sent

17                    11/30/2017

18                    PILF-ADAMS-0017707 - 0017710)

19       Q.  What I've handed -- what's been handed to

20   you now as Exhibit 36 is a document with the Bates

21   number 177707.  This is another fundraising

22   solicitation, correct?

23       A.  Right.  This is -- Exhibit 36 is a

24   fundraising solicitation.

25       Q.  And on the second page of this

Page 324

1    solicitation you refer to your work on Virginia,

2    correct?  You say this work revealed more than 5,500

3    cases of alien registrants, right?

4        A.  Yes.

5        Q.  You can put that document aside.

6                    (PILF Exhibit 37 marked for

7                    identification: Email correspondence

8                    from (topmost) C Adams sent

9                    12/20/2017

10                   PILF-ADAMS-0017698 - 0017702)

11       Q.  The court reporter has marked as Exhibit

12   37 an email chain, Bates number 17698.  This is from

13   December of 2017.  Do you see that?

14       A.  I have Exhibit 37.

15       Q.  And as part of the email solicitation,

16   there is a reference, a bullet to the May 2017 Alien

17   Invasion report, correct?

18       A.  Give me a moment to read this, please.

19       Okay.  On the third page it first mentions

20   the --

21       Q.  Well, it's --

22       A.  -- the Virginia --

23       Q.  The first two pages are just sort of email

24   traffic, right?  And on the first page of the actual

25   solicitation there is a bullet that says that PILF

1    found 5,556 voters removed by the Commonwealth of

2    Virginia as, quote, noncitizens.

3         A.  Yes, that's accurate.

4         Q.  Right?  "This research followed an initial

5    October 2016 sampling that yielded one thousand

6    noncitizens," right?

7         A.  That's accurate.

8         Q.  And there are links to both those reports

9    there, right?

10        A.  I'm not sure if that's what the links are.

11   There appears to be a hyperlink, but it doesn't

12   necessarily go to the report.  It could go to an

13   article about the report.  There's a variety of other

14   possibilities.  I didn't study all the hyperlinks in

15   the 52,000 pages.

16                    (PILF Exhibit 38 marked for

17              identification: Email correspondence

18              from (topmost) C Adams sent

19              8/27/2018

20              PILF-ADAMS-0018554 - 0018558)

21        Q.  The court reporter has marked as Exhibit

22   38 a document with the Bates number 18554.  This is

23   another email solicitation, correct?  It's dated

24   August 27, 2018.

25        A.  Right.

1      Q.  And it talks about the release of Safe

2   Spaces, right?

3      A.  "Today PILF leased Safe Spaces," right.

4      Q.  And at the end of it, it says, "Safe

5   Spaces follows the Foundation's previous reports

6   studying noncitizen voter participation in Allegheny

7   County, Pennsylvania, New Jersey and Virginia," and

8   there's a hyperlink on Virginia, correct?

9      A.  That's what it says.

10      VIDEO SPECIALIST:  Excuse me, gentlemen.

11   We've hit seven hours.  I don't know if we have to

12   have a hard stop.

13      Q.  PILF also --

14      MR. DAVIS:  This is the last question

15   we're going to entertain.  You got a seven-hour rule.

16      MR. TEPE:  Yes, and also the rule is that

17   the witness is supposed to be prepared to answer

18   questions.

19      MR. DAVIS:  And also we would expect the

20   attorney not to ask repetitive and argumentative

21   questions.  So we can take that up at another date,

22   but we're done for today.

23      MR. TEPE:  Okay.

24      Q.  How much money has PILF raised through

25   solicitations invoking the lawsuit brought by

Page 327

1   Plaintiffs in this case?

2        A.   Next to nothing.

3             MR. TEPE:  We're going to keep this

4   deposition open.  Bill, we can talk about it

5   afterwards, but that's --

6             MR. DAVIS:  Our point is it's done, but,

7   you know, we can address that at the appropriate time

8   and in the appropriate forum.

9             MR. TEPE:  Do you have any questions?

10            MR. DAVIS:  I do not.

11            MR. TEPE:  Okay.

12            MR. DAVIS:  And we will read.

13       Q.   Oh, there is actually one other issue.

14   Mr. Adams, if you don't mind --

15       A.   Do you want to ask me another question?

16            MR. DAVIS:  Are we on the record?

17            VIDEO SPECIALIST:  I haven't turned it

18   off.

19            MR. DAVIS:  We should be off the record.

20       Q.   Okay.  No, there's one question for the

21   record, because there was a question asked that we

22   didn't get a direct answer on.

23       Mr. Adams, you have no engagement or retention

24   letter with Skadden Arps, correct?

25       A.   I've asked and answered.

1        MR. DAVIS:  "You" being PILF?

2        MR. TEPE:  PILF or Mr. Adams.

3        MR. DAVIS:  I think he has asked and

4   answered that.

5        MR. TEPE:  No, he didn't actually provide

6   --

7        MR. DAVIS:  He said there's no written

8   engagement letter.

9     Q.   Is that your answer?

10    A.   That's my answer.

11       MR. TEPE:  Thank you.  We can go off.

12       VIDEO SPECIALIST:  We're off the record,

13   5:51.

14   //

15       (The deposition of 30(b)(6) designee J.

16   Christian Adams adjourned at 5:51 p.m.)

17   //

18

19

20

21

22

23

24

25

1                    ACKNOWLEDGMENT OF DEPONENT

2

3              I, J. Christian Adams, as PILF 30(b)(6)

4       designee, do hereby acknowledge that I have read and

5       examined the foregoing testimony and that the same is

6       a true, correct and complete transcription of the

7       testimony given by me, with the exception of the

8       noted corrections, if any, appearing on the attached

9       errata page(s).

10       _____        _____

11        DATE              J. Christian Adams

12

13

14       Subscribed and sworn to before me this _____ day of

15       _____, 20_____   .

16       _____ (Notary Public)

17       My Commission expires: _____

18

19

20

21       [SEAL]

22

23

24

25

Page 330

1                    C E R T I F I C A T E

2

3          I, LINDA S. KINKADE, Registered Diplomate

4    Reporter, Certified Realtime Reporter, Registered

5    Merit Reporter, Certified Shorthand Reporter, and

6    Notary Public, do hereby certify that prior to the

7    commencement of examination the deponent herein was

8    duly sworn by me to testify truthfully under penalty

9    of perjury.

10         I FURTHER CERTIFY that the foregoing is a true

11   and accurate transcript of the proceedings as

12   reported by me stenographically to the best of my

13   ability.

14         I FURTHER CERTIFY that I am neither counsel

15   for nor related to nor employed by any of the parties

16   to this case and have no interest, financial or

17   otherwise, in its outcome.

18         IN WITNESS WHEREOF, I have hereunto set my

19   hand and affixed my notarial seal this 21st day of

20   April 2019.

21         My commission expires:  July 31, 2022

22

            _Linda S. Kinkade_
23   _____

24   LINDA S. KINKADE

     NOTARY PUBLIC IN AND FOR

25   THE DISTRICT OF COLUMBIA

```
1                    E X H I B I T S

2

3    PILF EXHIBITS      DESCRIPTION                    PAGE

4    PILF Exhibit 1    Plaintiffs' Amended Rule .......   7

5                      30(b)(6) Notice to Take

6                      Deposition of Public Interest

7                      Legal Foundation

8    PILF Exhibit 2    ActRight Legal Foundation ......  12

9                      letter dated 7/17/2014

10                     PILF-ADAMS-0020792 - 20858

11   PILF Exhibit 3    Filing re charitable ..........  15

12                     organization status

13                     PILF-ADAMS-0021095 - 0021147

14   PILF Exhibit 4    Email correspondence from ......  16

15                     (topmost) CMitchell sent

16                     3/30/2016 with attachment

17                     PILF-ADAMS-0018345 - 0018373

18   PILF Exhibit 5    PILF letter dated 1/14/2016 ....  30

19                     PILF-ADAMS-0027092 - 0027094

20   PILF Exhibit 6    Email correspondence from ......  52

21                     (topmost) N Johnson dated

22                     9/13/2016 with attachment

23                     PILF-ADAMS-0003265 - 0003277

24

25
```

Page 332

| 1 | PILF Exhibit 7 | Email correspondence from ..... 57 |
| 2 | | (topmost) C Adams sent |
| 3 | | 8/5/2016 |
| 4 | | PILF-ADAMS-0000654 - 657 |
| 5 | PILF Exhibit 8 | Email correspondence from ..... 68 |
| 6 | | (topmost) N Johnson sent |
| 7 | | 8/17/2016 with attachment |
| 8 | | PILF-ADAMS-0008942 - 0008989 |
| 9 | PILF Exhibit 9 | Email correspondence from ..... 102 |
| 10 | | (topmost) C Adams sent |
| 11 | | 9/29/2016 with attachment |
| 12 | | PILF-ADAMS-0014015 - 0014033 |
| 13 | PILF Exhibit 10 | Email correspondence from ..... 103 |
| 14 | | (topmost) D Palmer sent |
| 15 | | 9/30/2016 with attachment |
| 16 | | PILF-ADAMS-0013933 - 0013951 |
| 17 | PILF Exhibit 11 | Email correspondence from ..... 105 |
| 18 | | (topmost) N Johnson sent |
| 19 | | 9/30/2016 with attachment |
| 20 | | PILF-ADAMS-0005444 - 0005586 |
| 21 | PILF Exhibit 12 | Email correspondence from ..... 106 |
| 22 | | (topmost) C Adams sent |
| 23 | | 9/30/2016 with attachment |
| 24 | | PILF-ADAMS-0013698 - 0013718 |
| 25 | | |

Page 333

1    PILF Exhibit 13    Email correspondence from ..... 107

2                       (topmost) N Johnson sent

3                       9/30/2016 with attachment

4                       PILF-ADAMS-0005278 - 0005421

5    PILF Exhibit 14    Email correspondence from ..... 113

6                       (topmost) N Johnson sent

7                       6/28/2016 with attachment

8                       PILF-ADAMS-0007211 - 0007214

9    PILF Exhibit 15    Email correspondence from ..... 212

10                      (topmost) D Moorman sent

11                      2/15/2017 with attachment

12                      PILF-ADAMS-0013464 - 0013471

13   PILF Exhibit 16    Email correspondence from ..... 215

14                      (topmost) D Moorman sent

15                      2/16/2017 with attachment

16                      PILF-ADAMS-0013091 - 0013109

17   PILF Exhibit 17    Email correspondence from ..... 230

18                      (topmost) W Latham sent

19                      2/2/2017 with attachment

20                      PILF-ADAMS-0016622 - 0016642

21   PILF Exhibit 18    Email correspondence from ..... 236

22                      (topmost) N Johnson sent

23                      2/2/2017 with attachment

24                      PILF-ADAMS-0009178 - 0009197

25

Page 334

1  PILF Exhibit 19    Email correspondence from ..... 238
2                     (topmost) N Johnson sent
3                     2/7/2017
4                     PILF-ADAMS-0009170 - 0009172
5  PILF Exhibit 20    Letter from Kim McKiernan, .... 244
6                     VREO with attachment
7                     PILF-ADAMS-0019100 - 0019105
8  PILF Exhibit 21    Email correspondence from ..... 253
9                     (topmost) C Adams dated
10                     2/1/2017
11                     PILF-ADAMS-0006337 - 0006340
12  PILF Exhibit 22    Email correspondence from ..... 261
13                     (topmost) N Johnson sent
14                     2/1/2017
15                     PILF-ADAMS-0009200 -0009202
16  PILF Exhibit 23    Email correspondence from ..... 269
17                     (topmost)
18                     a@electionlawcenter.com sent
19                     5/20/2017
20                     PILF-ADAMS-0000043 - 0000044
21  PILF Exhibit 24    Email correspondence from ..... 285
22                     (topmost) L Churchwell sent
23                     5/25/2017
24                     PILF-ADAMS-0000241 - 0000246
25

```
 1    PILF Exhibit 25    Email correspondence from ..... 299
 2                       (topmost) S Powell sent
 3                       7/5/2017
 4                       PILF-ADAMS-0000022 - 0000028
 5    PILF Exhibit 26    Email correspondence from ..... 303
 6                       (topmost) S Powell sent
 7                       7/5/2017 with attachment
 8                       PILF-ADAMS-0000045 - 0000087
 9    PILF Exhibit 27    Email correspondence from ..... 304
10                       (topmost) S Powell sent
11                       6/30/2017 with attachment
12                       PILF-ADAMS-0050984 - 0051022
13    PILF Exhibit 28    Email correspondence from ..... 305
14                       (topmost) S Coplon sent
15                       6/30/2017
16                       PILF-ADAMS-0017960 - 0017961
17    PILF Exhibit 29    Email correspondence from ..... 306
18                       (topmost) M Herring sent
19                       7/7/2017
20                       PILF-ADAMS-0017951 - 0017952
21    PILF Exhibit 30    Email correspondence from ..... 307
22                       (topmost) S Powell sent
23                       7/6/2017 with attachment
24                       PILF-ADAMS-0050275 - 0050848
25
```

Page 336

1   PILF Exhibit 31   Email correspondence from ..... 308

2                     (topmost) M Lytle sent

3                     5/30/2017

4                     PILF-ADAMS-0052723 - 0052724

5   PILF Exhibit 32   Email correspondence from ...... 315

6                     (topmost) C Adams sent

7                     11/3/2016

8                     PILF-ADAMS-0046297

9   PILF Exhibit 33   Email correspondence from ...... 316

10                    (topmost) S Powell sent

11                    11/21/2016 with attachment

12                    PILF-ADAMS-0013344 - 0013404

13  PILF Exhibit 34   Email correspondence from ...... 318

14                    (topmost) N Johnson sent

15                    9/30/2016

16                    PILF-ADAMS-0005422

17  PILF Exhibit 35   Email correspondence from ...... 322

18                    (topmost) Public Interest

19                    Legal sent 9/11/2017

20                    PILF-ADAMS-0017882 - 0017886

21                    PILF-ADAMS-0049764 - 0049765

22  PILF Exhibit 36   Email correspondence from ...... 323

23                    (topmost) C Adams sent

24                    11/30/2017

25                    PILF-ADAMS-0017707 - 0017710

1    PILF Exhibit 37   Email correspondence from ......  324

2                      (topmost) C Adams sent

3                      12/20/2017

4                      PILF-ADAMS-0017698 - 0017702

5    PILF Exhibit 38   Email correspondence from ......  325

6                      (topmost) C Adams sent

7                      8/27/2018

8                      PILF-ADAMS-0018554 - 0018558

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 338

1                    E X H I B I T S (continued)

2    JOHNSON EXHIBITS    DESCRIPTION                    PAGE

3    Johnson Exhibit 2   Email correspondence from      61

4                        (topmost) N Johnson sent

5                        8/16/2016 with attachments

6                        PILF-ADAMS-0009064 - 9135

7    Johnson Exhibit 3   Email correspondence from      78

8                        (topmost) C Adams sent

9                        8/16/2016

10                       PILF-ADAMS-0046537 - 0046538

11   Johnson Exhibit 6   Email correspondence from      98

12                       (topmost) N Johnson sent

13                       9/23/2016

14                       PILF-ADAMS-0014107 - 0014113

15   Johnson Exhibit 7   Email correspondence from      95

16                       (topmost) N Johnson sent

17                       9/29/2016 with attachment

18                       PILF-ADAMS-0005621 - 0005636

19   Johnson Exhibit 8   Email correspondence from      100

20                       (topmost) N Johnson sent

21                       9/29/2016 with attachment

22                       PILF-ADAMS-0005601 - 0005620

23

24

25

                                                      Page 339

1    Johnson Exhibit 9    Email correspondence from    108
2                         (topmost) N Johnson sent
3                         9/30/2016 with attachment
4                         PILF-ADAMS-0004985 - 0005128
5    Johnson Exhibit 10   Alien Invasion in Virginia |  117
6                         The discovery and coverup of
7                         noncitizen registration and
8                         voting | September 30, 2016
9                         with attachments
10   Johnson Exhibit 11   Alien Invasion II            154
11   Johnson Exhibit 16   Email correspondence to      277
12                        (topmost) C Adams sent
13                        6/19/2017
14                        PILF-ADAMS-0000210
15   Johnson Exhibit 17   Email correspondence from    296
16                        (topmost) N Johnson sent
17                        5/26/2017 with attachment
18                        PILF-ADAMS-0000782 - 0000784
19   Johnson Exhibit 18   Email correspondence from    302
20                        (topmost) N Johnson sent
21                        6/27/2017
22                        PILF-ADAMS-0000732 - 0000733
23
24
25

Page 340

1    Johnson Exhibit 27   Email correspondence from      282

2                         (topmost) N Johnson sent

3                         3/28/2017

4                         PILF-ADAMS-0001979 - 0001980

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 341

```
1              E X H I B I T S (continued)

2    VVA EXHIBITS      DESCRIPTION                PAGE

3    VVA Exhibit 5     VVA letter dated 1/25/2016 to    35

4                      A Leider

5    VVA Exhibit 6     Office of Voter Registration     39

6                      and Elections letter dated

7                      2/9/2016 to R George

8    VVA Exhibit 7     Thompson McMullan letter dated   44

9                      8/10/2016

10                     PILF-ADAMS-0000637 - 0000641

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    WITNESS ERRATA SHEET

2    REF. NO. 158969                Page 1 of _____

3    NAME OF CASE: LULAC vs. PILF

4    DATE OF DEPOSITION: Thursday, April 18, 2019

5    PLEASE INSERT REASON FOR CHANGE:

6              1.  To clarify the record.

             2.  To conform to the facts.

7              3.  To correct a transcription error.

8    Page          Line          Reason No.

9    From _____ to _____

10   Page          Line          Reason No. _____

11   From _____ to _____

12   Page          Line          Reason No.

13   From _____ to _____

14   Page          Line          Reason No.

15   From _____ to _____

16   Page          Line          Reason No.

17   From _____ to _____

18   Page          Line          Reason No.

19   From _____ to _____

20

21

22   SIGNED: _____ DATE: _____

23   (Signature of J. Christian Adams)

24

25