# EXHIBIT I

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF VIRGINIA

3               Alexandria Division

4

5    ---------------------------------x

6    LEAGUE OF UNITED LATIN AMERICAN      Civil Action No.

7    CITIZENS - RICHMOND REGION COUNCIL   1:18-cv-00423

8    4614, et al.,

9         Plaintiffs,

10   v.

11   PUBLIC INTEREST LEGAL FOUNDATION,

12   an Indiana Corporation, and

13   J. CHRISTIAN ADAMS,

14        Defendants.

15   ---------------------------------x

16

17

18        VIDEOTAPED DEPOSITION OF J. CHRISTIAN ADAMS

19                Washington, D.C.

20             Monday,  April 22, 2019

21

22

23

24

25      Job No. 158970

Page 2

1

2

3

4

5

6                    Monday,  April 22, 2019

7                         9:11 a.m.

8

9

10

11

12         The following is the transcript of the

13   videotaped deposition of J. CHRISTIAN ADAMS held at

14   the offices of Skadden, Arps, Slate, Meagher & Flom

15   LLP, 1440 New York Avenue, NW, Washington, DC 20005.

16

17

18

19   Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

20   Registered Diplomate Reporter, Nationally Certified

21   Realtime Reporter, Registered Merit Reporter,

22   Registered Professional Reporter, Certified Shorthand

23   Reporter, in and for the State of California, Notary

24   Public, within and for the District of Columbia

25

1    A P P E A R A N C E S:

2

3            Skadden, Arps, Slate, Meagher & Flom

4            On Behalf of Plaintiffs

5            BY:   Sean Tepe, Esq.

6            BY:   Nicole Cleminshaw, Esq.

7            1440 New York Avenue, NW

8            Washington, DC 20005

9

10

11           Foley & Lardner

12           On Behalf of Defendants

13           BY:   Michael Lockerby, Esq.

14           BY:   Eli Evans, Esq.

15           3000 K Street, NW

16           Washington, DC 20007

17

18

19

20

21   Also present:

22          David Chroniger, Legal Video Specialist

23

24

25

1                   INDEX OF EXAMINATION

2

3    EXAMINATION OF J. CHRISTIAN ADAMS              PAGE

4            BY MR. TEPE                           5

5            BY MR. LOCKERBY                        --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S

2          VIDEO SPECIALIST:  This is the start of

3    tape labeled number 1 of the videotaped deposition of

4    J. Christian Adams, in the matter League of the

5    United Latin American Citizens v. Public Interest

6    Foundation, et al., in the court, United States

7    District Court, for the Eastern District of Virginia,

8    case number 1:18-CV-000423.

9          This deposition is being held at 1440 New York

10   Avenue, northwest, Suite 1100, Washington, D.C., on

11   April 21st, 2019 --

12          THE REPORTER:  22nd.

13          VIDEO SPECIALIST:  -- 22nd, sorry -- at

14   approximately 9:11.  My name is David Chroniger from

15   TSG Reporting, Inc., and I'm the legal video

16   specialist.  The court reporter is Linda Kinkade in

17   association with TSG Reporting.

18          Will counsel please introduce yourselves.

19          MR. TEPE:  Sean Tepe, pro bono counsel for

20   Plaintiffs.  I am joined by my colleague Nicole

21   Cleminshaw.

22          MR. LOCKERBY:  Mike Lockerby with Foley &

23   Lardner LLP representing the Defendants.

24          VIDEO SPECIALIST:  Will the court reporter

25   please swear in the witness.

1          J. CHRISTIAN ADAMS,

2          having been first duly sworn, was

3     thereafter examined and testified as follows:

4                    EXAMINATION

5     BY MR. TEPE:

6          Q.  Good morning.

7          A.  Good morning.

8          Q.  Can you state your name for the record?

9          A.  J. Christian Adams.

10         Q.  You're under oath today, yes?

11         A.  Yes.

12         Q.  And is there any reason why you cannot

13    give truthful and accurate testimony today?

14         A.  Not that I'm aware of.

15         Q.  Did you do anything to prepare for today's

16    deposition?

17         A.  Yes.

18         Q.  What did you do?

19         A.  Reviewed documents, talked to my

20    attorneys.

21         Q.  Did you talk to anyone else than your

22    attorneys in preparation for today?

23         A.  No.

24         MR. LOCKERBY:  I just want to clarify

25    something on the record.  Today, of course, is

1   Mr. Adams' individual deposition.  I know there were

2   some issues on Friday, or Thursday rather, about the

3   length of the 30(b)(6), and we would have no

4   objection to Plaintiff's counsel completing the

5   30(b)(6) in excess of seven hours as long as the

6   aggregate number of hours for both didn't exceed 14

7   hours.

8             MR. TEPE:  I appreciate that.  I think

9   that would be fine, as long as we can just cover

10  everything in the two days allotted, we should have

11  no problem.  All right.  Thank you.

12       Q.  Mr. Adams, in previous testimony you

13  testified that you had multiple conversations with

14  Mark Lytle of the United States Attorney's Office in

15  the Eastern District of Virginia; is that correct?

16            MR. LOCKERBY:  Object to the form.

17            MR. TEPE:  What's the objection?

18            MR. LOCKERBY:  Objection to the form.

19  It's been asked and answered and misstates the

20  witness's prior testimony.

21            MR. TEPE:  Well, the witness can clarify.

22       Q.  You did testify that you had multiple

23  conversations with Mr. Lytle, correct?

24       A.  I mean, if you have a transcript to show

25  me, I wouldn't disagree with the fact that I had

Page 8

1    multiple conversations.  I would also point you back

2    to my original testimony for any specifics.

3         Q.  I understand, but let's just, you know,

4    the simple question is you had multiple conversations

5    with Mr. Lytle.

6         A.  Again, my --

7         Q.  Yes or no?

8         A.  I did, and I believe I testified about

9    that already.

10        Q.  Okay.  How many conversations did you

11   have?

12        A.  Don't remember.

13        Q.  Were they all in person, these

14   conversations?

15        A.  No.

16        Q.  Some were over the phone?

17        A.  Possibly.

18        Q.  Do you have any recollection of talking to

19   him over the phone about -- and, again, we're talking

20   about conversations that you had with Mr. Lytle with

21   regard to the Alien Invasion reports.

22        A.  Right.  I have some recollection of that,

23   but I can't be sure.

24        Q.  Okay.  So you recall at least, I think,

25   two in-person meetings with Mr. Lytle?

1        A.  Well, no, I said I recall two in-person
2    conversations with Mr. Lytle.  That's what you asked.
3        Q.  Okay.  So there's two in-person
4    conversations and potentially some phone calls.
5        A.  Well, at least.  There may be more.
6        Q.  More than --
7        A.  Two.
8        Q.  -- in-person conversations?
9        A.  Right.
10       Q.  Okay.  So how many in-person
11   conversations?
12       A.  I don't know.  I testified to that
13   already.
14       Q.  And then -- and so, in addition to
15   potentially more than two in-person conversations,
16   there may have been some phone conversations with
17   Mr. Lytle with regard to the Alien Invasion reports?
18       A.  I've already testified to that.
19       Q.  That's a yes.
20       A.  I did, I testified to that already.  I
21   gave you an answer.
22       Q.  The answer is yes.
23       A.  I don't know.  I'd need to see what my
24   previous answer was, but it's consistent with that.
25   There may have been phone conversations, but I

1    testified to that already.

2         Q.  Have you had conversations with other

3    members of the Department of Justice with regard to

4    the Alien Invasion reports?

5         A.  Probably, but I don't remember

6    specifically those conversations.

7         Q.  If you had such conversations, who would

8    they have been with?

9         A.  That's speculating.  I don't know.

10        Q.  So it's your testimony today that you

11   believe that you probably had conversations with

12   members of the Justice Department, besides Mr. Lytle,

13   with regard to the Alien Invasion reports, but you do

14   not recall the specifics of those conversations.

15        MR. LOCKERBY:  Object to the form.

16        Q.  Is that true?

17        A.  I think I've already testified to that.

18        Q.  No.  I'm trying to ask questions to

19   establish what your testimony is.  You cannot just go

20   back and say I've already testified to it.

21        MR. LOCKERBY:  Objection, the transcript

22   reflects what his testimony is.  It's not proper to

23   ask questions about what the transcript reflects.

24        MR. TEPE:  And I'm not trying to do that.

25   What I'm trying to do is ask simple questions that

1    Mr. Adams seems not inclined to want to answer.

2         Q.  So, my question again, is it your

3    testimony that you believe you probably had

4    conversations with members of the Justice Department

5    besides Mr. Lytle with regard to the Alien Invasion

6    reports, but you do not recall the specifics of such

7    conversations?

8         A.  That's correct.

9         Q.  What makes you say that you probably had

10   such conversations?

11        A.  Because I would have been extremely

12   enthusiastic about having the Justice Department

13   finally enforce the law related to noncitizen

14   registration and voting, and would have been highly

15   inclined to have those conversations with members of

16   the Justice Department, because the previous

17   administration had failed to enforce the law, and,

18   therefore, I would have had a motive to have those

19   conversations.  Can I remember the specific

20   conversations?  No.

21        Q.  Thank you.  Have you had conversations

22   with any other members of the federal law enforcement

23   community other than members of the Justice

24   Department and Mr. Lytle with regard to the Alien

25   Invasion reports?

1      A.  How do you define "federal law enforcement

2   community"?  How broadly?

3      Q.  As broad as possible.  Federal employee,

4   federal law enforcement.

5      A.  Well, that's a different question.

6   Federal employee is different than federal law

7   enforcement.  So I'm asking, what is your question?

8   How broadly do you find this -- do you define federal

9   law enforcement?

10     Q.  Well, let's start the most broad as

11  possible.  Have you had conversations with federal

12  employees regarding the Alien Invasion reports other

13  than Mr. Lytle and probably other members of the

14  Justice Department?

15     A.  Right, and I don't have a specific

16  recollection of that.

17     Q.  Are you aware of any investigation by

18  federal law enforcement into those listed in the

19  Alien Invasion reports?

20     A.  One would not be made aware of such

21  things.

22     Q.  That's not responsive to my question.

23     Are you aware of any investigation by federal

24  law enforcement into those listed in the Alien

25  Invasion reports?

1       A.   The federal investigative agencies do not

2  make third parties aware of investigations.

3       Q.   Again, that is not responsive to my

4  question.  Are you, Mr. Adams, aware of any

5  investigation by federal law enforcement into those

6  listed in the Alien Invasion reports?

7       A.   Because federal law enforcement agencies

8  do not make a practice of alerting the public,

9  generally speaking, about the existence of

10  investigations, I have not been made aware of any

11  investigations.

12       Q.   So when you had conversations with

13  Mr. Lytle, he did not give any indication as to what

14  he would do with that information?

15       A.   That's not what I testified to.  That's

16  not accurate.

17       Q.   Okay.  So Mr. Lytle did give you

18  indications as to what he would do with the

19  information.

20       A.   I already knew what he would do with the

21  information by virtue of formerly working at the

22  Justice Department.  And the Justice Department has a

23  very rigorous protocol for looking at evidence that

24  third parties give to people at the Justice

25  Department that includes preliminary reviews,

1    substantive reviews, requests for data from other

2    agencies.

3         And so I didn't need to have the conversation

4    with Mr. Lytle, because I knew that, when Mr. Lytle

5    was alerted to a problem like this, which is a

6    serious one, at least most people take seriously, and

7    I knew the attorney general took seriously, and I

8    knew the president took seriously, that Mr. Lytle

9    would do what I used to do at the Justice Department

10   when I was an attorney there and initiate a series of

11   steps that would take a look at the issue.

12        And so I didn't need to get feedback from

13   Mr. Lytle because I knew what you do when you're a

14   Justice Department lawyer.

15        Q.  Did Mr. Lytle give you any indication as

16   to what he would do with the information, yes or no?

17        A.  I answered that question.

18        Q.  No.  Did Mr. Lytle give you any indication

19   as to what he would do with that information?

20        A.  I don't remember.

21        Q.  With your enthusiasm for prosecution, you

22   would --

23        A.  That's not what I testified to.

24        Q.  Excuse me, sir.

25        A.  That's not what I testified to.

1      Q.   Sir, sir, I have not finished my question.

2      A.   Right.

3      Q.   You testified earlier that you would have

4  been extremely enthusiastic about having the Justice

5  Department finally enforce the law.

6      Given that, you don't recall whether or not

7  Mr. Lytle gave you any indication of what he would do

8  with the information you provided?

9      MR. LOCKERBY:   Object to the form of the

10  question.

11      A.   Right.   And I never said a word about

12  enthusiasm for prosecution in this deposition.   What

13  I said was enthusiasm for enforcing the law.   And

14  that comes in many forms, many of which you have

15  omitted in your question.

16      One could be to take action to clean up the

17  voter rolls, which is not prosecution.   Another could

18  be taking a look at why Virginia is canceling

19  citizens or noncitizens from the rolls improperly.

20  Another could be a NVRA action, another could be a

21  prosecution.

22      So when I said enforce the law, I was talking

23  about a broad array of possibilities.   If there was a

24  noncitizen on the voter rolls, then I would have had

25  enthusiasm for prosecution of that individual,

1   because they would have been violating multiple

2   federal felonies, and I don't think anybody would

3   disagree with that position, at least not seriously.

4        Q.  So it is your testimony today that you

5   don't remember if Mr. Lytle gave you any indication

6   as to what he would do with the information that you

7   provided to him with regard to the Alien Invasion

8   reports?

9             MR. LOCKERBY:  Object to the form.

10       A.  I think I've already answered that

11  question.

12       Q.  That's your testimony.

13       A.  I think I testified to this.

14       Q.  And that's --

15       A.  My testimony is what it was when I gave

16  it.

17       Q.  The Public Interest Legal Foundation

18  promoted the Alien Invasion reports, correct?

19            MR. LOCKERBY:  Object to the form.

20       A.  The Public Interest Legal Foundation

21  promoted it ... I don't understand what you mean.

22       Q.  Do you understand what the word

23  "promotion" means?

24       A.  Promotion could mean a variety of things,

25  and in this context it particularly could mean a

1   variety of things.  If you have a specific example of

2   promotion, I will answer that question.

3        Q.  Why?  You can't answer a general question

4   about PILF promoting the Alien Invasion reports?

5             MR. LOCKERBY:  Object to the form.

6        A.  Okay.  PILF talked about the Alien

7   Invasion reports, correct.

8        Q.  And they talked about the Alien Invasion

9   reports in multiple media formats, correct?

10       A.  Multi -- "multiple media formats," do you

11  mean multiple media venues or media outlets?  Is that

12  what you mean?  I don't understand the question.

13            You're just using a term that isn't squared

14  with reality in the practice of broadcasting.

15       Q.  PILF issued press releases with regard to

16  the Alien Invasion reports, correct?

17       A.  Yes.

18                 (Johnson Exhibit 22

19            previously marked for identification

20            and referenced herein: Email

21            correspondence from (topmost) S

22            Powell sent 10/4/2016

23            PILF-ADAMS-0013638 - 0013639)

24       Q.  Handing the witness what has been

25  previously marked as Johnson Exhibit 22.

1    This is an example of one of those press

2  releases; is that right?

3    A.  Well, Johnson 22 is not an example of a

4  press release.  It's an example of an email chain

5  between Shawna Powell and Noel Johnson on October 4th

6  that ultimately has a press release attached to it,

7  but Johnson 22 is not a press release.

8    Q.  At the bottom of Johnson 22, on Tuesday,

9  October 4th, there is a press release that was sent

10  by PILF to media; is that right?

11    A.  Right, but the entire exhibit is not a

12  press release.

13    Q.  You can put that aside.

14    (Adams Exhibit 1 marked for

15    identification: Email correspondence

16    from (topmost) N Johnson sent

17    5/24/2017

18    PILF_ADAMS-0000821 - 0000823)

19    Q.  The court reporter has marked as Exhibit

20  52 -- I'm sorry, Exhibit 1 -- a document with the

21  Bates number 822.

22    Do you recognize that document, sir?

23    MR. LOCKERBY:  I'm sorry.  Where is this

24  document?

25    A.  I see this document.

1    Q.  All right.  So there's an email from Logan

2  Churchwell to you and Mr. Johnson, May 24th, 2017,

3  right?

4    A.  No -- oh, right.  It's -- I can read that.

5    Q.  And then Mr. Johnson responds to you and

6  Mr. Churchwell saying, "Looks great.  A few small

7  things.  Is the plan to go public on Monday, the

8  29th, as indicated in the release?"  Do you see that?

9    A.  I can read that.

10    Q.  Okay.  And then attached to it is a press

11  release on Alien Invasion II; is that correct?

12    A.  No, that's not correct.

13    Q.  Okay.  So at the top of this draft it

14  says, "for immediate release."  Do you see that, the

15  attachment?

16    A.  Well, but that's what every press release

17  says.  That's a draft.  That's --

18    Q.  It's a draft press release.

19    A.  Right.

20    Q.  Yes.

21    A.  It's a draft press release.

22    Q.  Yes.  Right.  So this is a draft press

23  release for Alien Invasion II.

24    A.  Correct.

25    Q.  Yes.  And on the title of the draft press

1    release it says, "Report:  5,500 plus noncitizens

2    discovered on voter rolls in Virginia," right?

3           A.  It says that.

4           Q.  Right.  And then underneath the subheader

5    says, "one-third of noncitizens found voted

6    illegally."  Do you see that?

7           A.  It says that.

8           Q.  Okay.  And so to promote the Alien

9    Invasion reports, PILF issued press releases.

10          A.  I've answered that.  I'll answer it again.

11   We issued press releases.

12          Q.  And PILF also tweeted about the reports,

13   correct?

14          A.  I don't know.

15          Q.  Mr. Adams, you're a very --

16          A.  I don't know.

17          Q.  You're very prolific on Twitter, aren't

18   you?

19          MR. LOCKERBY:  Object to the form.

20          Q.  Would you -- wouldn't you say you're very

21   prolific on Twitter?

22          A.  No.

23          Q.  No?  Okay.

24          A.  Certainly not.

25          Q.  You do tweet, though, right?

1      A.   That's -- a difference between prolific.

2      Q.   Well, I don't know.  I thought maybe you'd

3  consider yourself prolific.  But you do tweet, right?

4      A.   I've answered that.

5      Q.   And PILF tweets as well, right?

6      A.   I think so.  I don't see all their tweets.

7      Q.   Well, you don't need to see all their

8  tweets to know whether or not they do in fact tweet.

9      A.   They do tweet.

10                    (Adams Exhibit 2 marked for

11                    identification: Twitter feed of the

12                    Public Interest Legal Foundation)

13     Q.   The court reporter has marked as Adams 2 a

14  document.

15     Do you recognize that?

16     A.   It appears to look like a Twitter feed.

17     Q.   A Twitter feed of the Public Interest

18  Legal Foundation, right?

19     A.   Right.

20     Q.   And there are a few tweets represented in

21  this exhibit?

22     A.   There are.

23     Q.   At the bottom there's one from PILF dated

24  September 29th?

25     A.   I'm sorry?

1          Q.  I'm sorry.  At the bottom there's one from

2     PILF dated September 29th of 2016?

3          A.  I can read that.

4          Q.  Yes.  And it says, "hundreds of

5     noncitizens on voting rolls in swing state of

6     Virginia."

7          A.  It says that.

8          Q.  Right.  And then there's another tweet,

9     "We have uncovered one thousand plus noncitizens

10    registered to vote in the swing state of Virginia,"

11    right?  Do you see that?

12         A.  It says that.

13         Q.  And that was on October 3rd of 2016.

14         A.  It says that.

15         Q.  Okay.  So PILF did tweet about the Alien

16    Invasion I report, correct?

17         A.  At the time I didn't have any knowledge of

18    this necessarily.  I don't remember, but it's -- it

19    appears from Exhibit 2 that they were tweeting about

20    the Alien Invasion report.  I'm sorry.  It appears

21    they were tweeting about the Alien Invasion report.

22                   (Adams Exhibit 3 marked for

23                   identification: Twitter feed from

24                   the Public Interest Legal

25                   Foundation)

1     Q.  The court reporter has handed you, sir,

2     what's been marked as Adams 3.  Do you recognize this

3     document?

4         A.  I've never seen it before, but it appears

5     to be a Twitter, a portion of a Twitter feed from the

6     Public Interest Legal Foundation.  There's a Twitter

7     logo on it, so that is probably what it is.

8         Q.  Yes, it's a copy of PILF's Twitter feed

9     from May 30th of 2017; is that correct?

10        A.  That's what it says.

11        Q.  And at the bottom of the first page, what

12    would be the first tweet in a series of tweets that

13    day, it shows that PILF tweeted, "Virginia election

14    officials quietly remove 5,556 voters for

15    noncitizenship between 2011 and May of 2017."  Do you

16    see that?

17        A.  I see that.

18        Q.  Right.  And there's a link there provided

19    to PILF's website, right?

20        A.  It appears that there is a link.

21        Q.  And so there's a series of tweets that

22    day, would you agree, with regard to the Alien

23    Invasion II report?

24        A.  It appears to say that.

25        Q.  You can put that aside.

1      A.   Pardon?

2      Q.   You can put that aside.   Thank you.

3      PILF also posted on the Facebook page of PILF

4  with regard to the Alien Invasion reports, correct?

5      A.   I don't have any idea.   I didn't even -- I

6  never saw that.

7                    (Adams Exhibit 4 marked for

8                    identification: Screenshot of PILF's

9                    Facebook page)

10      Q.   The court reporter has marked as Exhibit 4

11  a document.   Do you recognize that?

12      A.   I'm holding Exhibit 4.

13      Q.   And it appears to be a screenshot of

14  PILF's Facebook page, correct?

15      A.   I don't know what Facebook looks like.   I

16  don't use Facebook.

17      Q.   Okay.   But you knew -- you do know that

18  PILF has a Facebook page, correct?

19      A.   No.   I don't use Facebook.   I testified to

20  that.

21      Q.   Well, you don't need to use Facebook to

22  know how PILF, your organization, promotes its

23  message, correct?

24      A.   I don't understand the question.   It's not

25  my organization.   I don't own it.

1   Q.  You're the president of it.

2   A.  Doesn't mean -- it's not my organization.

3   Q.  As president of PILF, you want to distance

4   yourself?

5   A.  Not at all.

6   MR. LOCKERBY:  Object to the form.

7   A.  Your question was confusing.  It's not my

8   organization.

9   Q.  Well, this image of the PILF Facebook page

10  shows a posting on October 3rd, 2016, correct?

11  A.  That's what it says.

12  Q.  And this posting says, "We have uncovered

13  one thousand plus noncitizens registered to vote in

14  the swing state of Virginia."

15  A.  I can read that.

16  Q.  And then there's a link to a Breitbart

17  story; is that right?

18  A.  I can read that it says that.

19  Q.  And PILF also promoted the Alien Invasion

20  II report on its Facebook page, correct?

21  MR. LOCKERBY:  Object to the form.

22  A.  I don't know.

23  MR. TEPE:  And what's the basis for the

24  objection?

25  MR. LOCKERBY:  Use of the word "promoted."

1              (Adams Exhibit 5 marked for

2         identification: Screenshot of PILF's

3         Facebook page May 30th, 2017)

4         Q.  The court reporter has handed you what's

5    been marked as Exhibit 5.  It is a screenshot of

6    PILF's Facebook page from May 30th, 2017, correct?

7         A.  Well, I can see Exhibit 5.

8         Q.  Do you have any reason to doubt that this

9    is a screenshot of PILF's Facebook page from May

10   30th, 2017?

11        A.  I don't dispute your representation that's

12   what this is, but I have no way to know because I've

13   never used Facebook in my life.

14        Q.  Okay.  But this screenshot does show a

15   posting from PILF with regard to the release of Alien

16   Invasion II; is that right?

17        A.  I can read that it says that.

18        Q.  And it says, "Report:  5,500 plus

19   noncitizens discovered on voter rolls in Virginia,"

20   correct?

21        A.  I can read that it says that on Exhibit 5.

22        Q.  For the Alien Invasion reports, PILF also

23   secured coverage in various print and online media;

24   is that right?

25        A.  Well, I can't speak about PILF, but I can

1   speak personally, and the answer is yes.

2        Q.  And why can't you, as president of PILF,

3   speak about PILF?

4        A.  Well, because I don't have any

5   recollection of specific instances for PILF, but I

6   have specific recollections for me.

7                  (Adams Exhibit 6 marked for

8                  identification: Email correspondence

9                  from (topmost) C Adams sent

10                 10/3/2016 PILF-ADAMS-0044021)

11       Q.  The court reporter has marked as Adams

12   Exhibit 6 an email with the Bates 44021.  Do you see

13   that?

14       A.  I see Exhibit 6.

15       Q.  And you see that's an email from you dated

16   October 3rd, 2016, correct?

17       A.  It's what it says.

18       Q.  And you did send this email, correct?

19       A.  I have no reason to question that I did.

20       Q.  It's to Ms. Phillips, Johnson --

21   Ms. Phillips, Mr. Johnson, Ms. Powell, and

22   Mr. Vanderhulst, correct?

23       A.  I can read that it says that.

24       Q.  And the subject line is, "Important:

25   Breitbart."  Do you see that?

1       A.   I see that.

2       Q.   And there's a link to a Breitbart story

3  that appears to be coverage of Alien Invasion I.

4  Would you agree with that?

5       A.   No, I wouldn't, because there's no

6  content.  It just is a link.  If you have the -- is

7  this two pages?  No.  If you have the story that it

8  links to ...

9       Q.   Oh, we'll get to that, sir.

10      A.   Then show it to me, and I'll answer your

11  question.

12      Q.   And so my question is:  Do you have any

13  reason to doubt that this is a link sent by you to

14  the Breitbart story covering the release of Alien

15  Invasion I?

16      A.   Yes.  The reason I have the doubt is

17  because I don't see the story.

18      Q.   And so you see the link dated October 2nd,

19  2016, right?  Do you see that in the link?

20      A.   Where?  Right, the link has 10-2.

21      Q.   Yes, 2016/10/02, correct?

22      A.   It says that.

23      Q.   And then

24  /Virginia-illegal-voting-fraud-coverup.

25      A.   It says that.

1       Q.  Right.  And so do you have reason to doubt

2  that this is a link to the Breitbart story with

3  regard to Alien Invasion I?

4       A.  Well, there's a lot of alien coverup

5  issues, if you will, going on at this time.  We

6  weren't getting records.  We had to sue places.

7       I mean, I appreciate your commentary for the

8  record that you make.  It's not on camera.  But you

9  are making commentary throughout this deposition,

10  whether it's waving your hand at me or turning to

11  co-counsel and sneering, but that's exactly what

12  you're doing.

13       MR. LOCKERBY:  And laughing and snickering

14  too.

15       A.  Right.  And so to answer your question,

16  there was lots of things going on that this could

17  have involved, that, if you will show me the actual

18  article that this links to, I will be happy to share

19  my thoughts about it.

20       Q.  Sir, I was just looking at my colleague

21  just now and that was about it.

22       A.  Sure.  Is there a question?

23       Q.  So in this email that you sent, why did

24  you put, as the subject, "Important: Breitbart"?

25       A.  I don't have a specific recollection of

1    why I did that.  Maybe -- I mean, I'm not going to

2    speculate.

3                   (Adams Exhibit 7 marked for

4                   identification: Email correspondence

5                   from (topmost) C Adams sent

6                   10/3/2016

7                   PILF-ADAMS-0006102 - 0006104)

8        Q.  The court reporter has marked as Exhibit 7

9    a document with Bates number 6102.  Do you see that?

10       A.  I see Exhibit 7.

11       Q.  And do you recognize that to be an email

12   that you sent on October 3rd, 2016?

13       A.  It says that.

14       Q.  And so you did send this email, correct?

15       A.  Yeah, this came earlier.  Exhibit 7 is

16   earlier than Exhibit 6.  So you could have asked me

17   about Exhibit 7 right off the bat, and I would have

18   been happy to answer the question, because I offered

19   some of the explanation you were seeking in your

20   previous questions in this email.

21       Q.  Strike as not responsive.

22       So, Mr. Adams, you sent this email, correct?

23       A.  It's what it says.

24       Q.  That's not my question.  My question is:

25   You sent this, correct?

1    A.  I don't have any specific recollection of

2  sending this email.  Exhibit 7 says it's an email

3  from me, strangely to me, so I can't explain -- I

4  sent to it myself.

5    Q.  Well, isn't your practice to send

6  materials to a large number of people and putting

7  their addresses on the bcc line?

8    A.  I've done that before.

9    Q.  Okay.  And so this is an email you sent

10  with a link, exact same link from Exhibit 6, to

11  Breitbart story, correct?

12    A.  It appears to be.

13    Q.  And this story, which is also pasted in

14  the body of the email, is titled "Illegal Foreign

15  Voting in Virginia Covered Up by Soros-backed

16  Democratic Officials, Says Report."  Do you see that?

17    A.  That's what it says.

18    Q.  And so this is the Breitbart story with

19  regard to the release of Alien Invasion I, yes?

20    A.  I don't know.  Let me read it.

21    Do you have one with an author name on it?

22  This refers to the Alien Invasion report.

23    Q.  You wrote, "Folks, a through story on

24  PILF's alien voting report in Virginia.  Breitbart

25  highlights the Soros link with the people directing

Page 32

1    the coverup of the alien voter registration and

2    voting."  Do you see that?

3          A.  It says that.

4          Q.  And in the subject line you just copied

5    the title of the article, is that right, into the

6    subject line?

7          A.  I don't know, because I don't have the

8    article in front of me.  If you want to show me the

9    actual publication document, I can answer that.  It

10   appears to be the title, but I can't say that

11   conclusively because I don't see the original

12   article.

13         Q.  Since you were circulating this article,

14   did you think it was a helpful article for PILF?

15         A.  I don't understand the question.

16         Q.  Well, why were you circulating this

17   article?

18         A.  I don't remember.

19         Q.  You don't know why?

20         A.  I answered the question.

21         Q.  You can put that aside.

22                 (Adams Exhibit 8 marked for

23                 identification: Email correspondence

24                 from (topmost) R Reagan sent

25                 10/3/2016

1           PILF-ADAMS-0040246 - 0040250)

2           Q.  The court reporter has marked as Exhibit 8

3      a document with the Bates number 40246.

4           Do you recognize this?

5           A.  I see Exhibit 8.

6           Q.  And do you recognize Exhibit 8 to be

7      emails that you had with individuals at Fox News?

8           A.  Well, it says it's from Robert Reagan at

9      Fox News.

10          Q.  So let's begin with the first email in the

11     chain, which would be on page 3 of the chain.  Do you

12     see it's a copy of the email that we were just

13     looking at in Exhibit 7?

14          A.  It appears to be.

15          Q.  And so this is, again, an email from you

16     to you forwarding the Breitbart story on Alien

17     Invasion I, correct?

18          A.  Okay.  Could you either reread or re-ask

19     that?  I didn't understand what you were asking.

20          Q.  And so the first email in this chain in

21     Exhibit 8 is the email that you sent on -- that we

22     saw in Exhibit 7, which, again, is an email from

23     yourself to yourself dated October 3rd, forwarding

24     the Breitbart story, correct?

25          A.  Which exhibit?

1          Q.   The previous exhibit, Exhibit 7.

2          A.   It appears to be.

3          Q.   And in response to this email that you

4     sent, you received an email from Queenette Karikari?

5          A.   It's close enough.   Right.

6          Q.   How do you pronounce her name?

7          A.   Queenette.

8          Q.   Queenette.   And she is with Lou Dobbs

9     Tonight?

10         A.   Correct.

11         Q.   And so she received the email that you

12    sent.   Presumably she was blind-copied?

13         A.   I don't know.   I mean, that's one

14    possibility.   I wouldn't disagree with that, but I

15    don't know for sure.

16         Q.   And she responds, "Good afternoon,

17    Christian.   Thank you so much for making this work

18    today.   Lou is thrilled to have you joining us."   Do

19    you see that?

20         A.   I can read that.

21         Q.   Did you appear on Lou Dobbs' program with

22    regard to Alien Invasion I?

23         A.   I don't have a specific recollection that

24    I did.   If you have something that would refresh that

25    recollection, I'd be happy to talk about it.

1      Q.  And in response to -- well, strike that.

2          So also the email says, "hit time is 7:45 from

3   the D.C. bureau with Lou here in New York," right?

4   And so she's trying to set up logistics for an

5   interview.

6      A.  Okay.  You asked two questions.  Which one

7   do you want me to answer?

8      Q.  She's trying to set up logistics for an

9   interview.

10      A.  This is how it normally happens.

11      Q.  So that's yes.

12      A.  Well, I can't speak to what her intention

13   is, but it certainly looks like she's trying to make

14   arrangements.

15      Q.  Okay.  And then you respond with a set of

16   talking points; is that correct?

17      A.  No.  I think what I responded with is

18   quite possibly -- well, I don't know.  I don't know

19   what these are.

20      Q.  Okay.  So you sent an email back to her in

21   response with a link to the Alien Invasion report; is

22   that right?

23      A.  No, I don't think -- I don't know.  Okay.

24   It's under a staple.  There's a link.  I don't know

25   what that link is.

1       Q.   And then underneath the link says this is

2    the Virginia report.

3       A.   Right, and it says that underneath that.

4       Q.   And then there are a series of bullet

5    points, correct?

6       A.   You could call them that.

7       Q.   And the first bullet says, "In our small

8    sample of just eight Virginia counties who responded

9    to our public inspection request, we found 1,046

10   aliens who registered to vote illegally," correct?

11      A.   It says that.

12      Q.   And then the next sentence says, "These

13   were only the ones that have been discovered as

14   verified 100 percent aliens."  It says that, right?

15      A.   That's what I'm reading.

16      Q.   What is a verified 100 percent alien?

17      A.   Well, it could be somebody who was removed

18   from the voter rolls as being declared a noncitizen

19   by the Commonwealth of Virginia.

20      Q.   Is that what you're referring to here?

21      A.   I don't remember what I was referring to

22   there.

23      Q.   And then in the fifth bullet you state in

24   the middle, "we show voter registration forms where

25   the aliens lie ..."

1      A.   One, two, three, four, five.

2      Q.   Are you there?

3      A.   Not yet.  Right, I'm there.

4      Q.   "We show voter registration forms where

5  the aliens lie (and commit federal felonies) and say

6  they are a citizen."  Do you see that?

7      A.   That's what it says.  Describes the

8  process.

9      Q.   And this doesn't refresh your recollection

10 as to whether or not you appeared on Lou Dobbs?

11     A.   It doesn't.  There's frequently cancels,

12 sometimes not cancels.

13                    (Adams Exhibit 9 marked for

14               identification: Illegal Foreign

15               Voting in Virginia Covered up by

16               Soros-backed Democratic Officials

17               with attachment)

18     Q.   The court reporter has marked as Exhibit 9

19 a copy of the October 2nd, 2016 Breitbart article,

20 correct, along with comments on that article?

21     A.   It's 124 pages.  I don't see anything in

22 here that's not part of an article, so it would

23 appear the answer is yes.

24     Q.   So on the first page, the article is

25 entitled "Illegal Foreign Voting in Virginia Covered

1   up by Soros-backed Democratic Officials, says

2   report," do you see that?

3       A.  It says that.

4       Q.  And this is a story that you had

5   circulated as seen in the previous exhibits, correct?

6       A.  The headlines match.

7       Q.  The web address matches?

8       A.  Right.

9       Q.  And then you're quoted in this article in

10  the second paragraph, correct?

11      A.  It says that I am quoted.

12      Q.  So you provided an interview to Breitbart.

13      A.  I don't have any recollection of that.

14  This could have been given to Breitbart a variety of

15  different ways.  One is an interview.  I don't have

16  any recollection of speaking with Neal McCabe.

17      Q.  And then if you turn to the second page,

18  there's blue highlighting.  Do you understand that to

19  be links?

20      A.  Where are you referring to?

21      Q.  Well, there's a blue highlighted Public

22  Interest Legal Foundation.  Do you understand that to

23  be a link to your website?

24      A.  Probably that's what that is, but if I had

25  it up on the screen it would be easier to answer your

Page 39

1    question.

2         Q.  And then you agree this is -- this entire

3    story is about the Alien Invasion I report, generally

4    speaking?

5         A.  No, I would not agree with that.

6         Q.  You would not --

7         A.  I would very much disagree with that.

8         Q.  So this is -- you don't think this story

9    is about PILF's Alien Invasion I report?

10        A.  You just changed your question.  You

11   dropped a word.

12        Q.  Okay.  So yes, I did --

13        A.  Which one --

14        Q.  -- I dropped the word "entire."

15        A.  That's correct.

16        Q.  Yes.  So there are aspects of this story

17   that were not in Alien Invasion I report, correct?

18        A.  Before his appointment by governor,

19            Democratic Governor Terry McAuliffe,

20            Cortes was a left-wing operative of

21            the Virginia Voting Rights

22            Restoration Campaign within the

23            left-wing Advancement Project.  The

24            project was funded and supported by

25            George Soros, through his Tides

1          Foundation Open Society.

2          And then it goes on to say, one of the top

3     priorities of the Soros' Advancement Project is to

4     stop the use of SAVE to purge voter lists.

5          Those are two things that I don't believe are

6     in the Alien Invasion report about the priorities,

7     but there may very well be other things in here that

8     are not related to the Alien Invasion report.

9          Q.  Right.  But you provided that information

10    that you just quoted to Breitbart, correct?

11         A.  I don't think so, but if you have a

12    document to refresh my recollection, I'd be happy to

13    discuss it.

14         Q.  At the end of the article, page 4, you are

15    quoted as saying, last sentence, "We name the names

16    of the registered voters removed from the rolls for

17    citizenship problems.  Will DOJ prosecute any of

18    them?"  Do you see that?

19         A.  I see that.

20         Q.  Now if you look to the next page,

21    following this article on Breitbart, at least as of

22    March 14th, 2018 when this document was printed out

23    from their website, there was 1,487 comments.  Do you

24    see that?

25         A.  I see it says that.

Page 41

1    Q.  And following the article are those

2  comments.  There's about -- there's 124 pages here,

3  correct?

4    A.  Well, I testified earlier when I was

5  attempting to --

6    Q.  Right.

7    A.  -- I think I already did, a low number for

8  a Breitbart article, but it's 124 pages printed.

9    Q.  Do you spend a lot of time on Breitbart?

10    A.  What do you mean by "a lot of time"?

11    Q.  Well, you just said it was a low number

12  for a Breitbart article, which presumes that you have

13  familiarity with how many comments are posted on

14  Breitbart articles, yes?

15    A.  Familiarity, which could be obtained

16  through other ways besides spending time on

17  Breitbart.

18    Q.  Okay.  So how else are you familiar with

19  how many comments get posted to Breitbart?

20    A.  By discussing it with editors of

21  Breitbart.

22    Q.  If you turn to page 2 of 124 --

23    A.  2 ...

24    Q.  -- of 124.

25    A.  So these are two different documents in

1    Exhibit 9 combined into one document?

2         Q.  For printing, to have it all print out

3    correctly, yes.

4         A.  Okay.

5         Q.  Are you there on page 2?

6         A.  I'm looking at page 2.

7         Q.  Third posting from the bottom, someone

8    posting under the name RINOpoacher.

9         A.  I am not RINOpoacher.

10        Q.  I didn't ask that.

11        A.  You didn't ask anything.

12        Q.  Right.  I'm just directing you to the

13   RINOpoacher comment.

14        A.  I see it.

15        Q.  Do you see that?  Okay.  RINOpoacher said,

16   "These are felonies, right?  Have people been

17   deported or imprisoned?"  "Any noncitizen caught

18   voting should immediately be deported."  Do you see

19   that?

20        A.  I see someone expressing their opinion.

21        Q.  And do you see the little 60 and up arrow

22   underneath that?

23        A.  I see the word 60 with an arrow.

24        Q.  Right.  And you understand that -- do you

25   understand that to be 60 favorable votes?

Page 43

1      A.  No.  I don't understand that to be

2   anything.

3      Q.  You haven't discussed with Breitbart's

4   editors how individuals in the comments section get

5   to vote up or down on various comments?

6      A.  No.  And, again, you made a commentary

7   with your expression after my answer, let the record

8   reflect.  It's not the first time that's happened.

9      Q.  And --

10   (Crosstalk between counsel)

11      MR. LOCKERBY:  This is supposed to be the

12   equivalent of a court proceeding, and I don't think

13   in the United States District Court for the Eastern

14   District of Virginia, Alexandria Division, you would

15   be there making the kinds of faces at the witness in

16   view of the judge and jury that you are right now.

17   And it's intended to harass and provoke the witness.

18      THE WITNESS:  And I'll just let the record

19   reflect every time it happens.

20      MR. TEPE:  I disagree strongly with the

21   tactic of inserting into the record your subjective

22   viewpoints with regard to how I turn a page or look

23   at my co-counsel.

24      THE WITNESS:  This wasn't -- my comment

25   wasn't related to either of those options.  They were

1    specifically related to the facial -- if I might

2    finish -- the facial expression you made of

3    disapproval and dismay at my answer that the camera

4    did not catch, but I would be happy to put in the

5    record every time it happens.

6          MR. TEPE:  And I am going to object to the

7    imposition into the record your subjective

8    commentary, which is not responsive to my questions.

9          Your position is noted.  I would like to

10   continue this deposition with the witness providing

11   responsive answers to the questions.  Can we all

12   agree to that, counsel?

13         MR. LOCKERBY:  We can agree to that, and

14   it would proceed much more smoothly if counsel

15   wouldn't engage in the kinds of antics that no

16   federal judge would tolerate, especially not in this

17   court.

18         Q.  If you turn to page 8 of 124, do you see

19   third from the bottom a comment by EOD?

20         A.  No.

21         Q.  I'm sorry.  Third from the top.  My

22   apologies.  EOD, third from the top.

23         A.  I see something from EOD.

24         Q.  Yes.  He said, "Make illegally voting

25   punishable by death and watch people take notice of

1  the laws in place for voting."  Do you see that?

2       A.  I can read it says that.

3       Q.  Okay.  And there is a 92 and an up arrow,

4  right?

5       A.  92 and a what?

6       Q.  Up arrow.

7       A.  It says 92 underneath it.

8       Q.  Yes, and next to the 92 is an up arrow.

9       A.  There's an arrow.

10      Q.  Pointing up, right?

11      A.  Yeah, but I don't have any idea what that

12  is.

13      Q.  I understand.

14      A.  I mean, I don't understand your question.

15  That's disgusting.  What does it have to do with me?

16      Q.  If you turn to page 15 of 124, at the top

17  there's a posting from NeverHillary?

18      A.  Yeah.  I'm not NeverHillary.

19      Q.  I didn't ask you if you're NeverHillary.

20  Do you see that posting?

21      A.  I see a posting from NeverHillary on --

22      Q.  And NeverHillary posts, "I'm okay with the

23  executions."  Do you see that?

24      A.  I can read it says that.

25      Q.  Okay.  And then six spots down do you see

Page 46

1    it states, from a Snailmailtrucker, "execute them and

2    it will stop immediately ... are you willing to feed

3    them and pay for their medical for the rest of their

4    miserable lives?  F them!"  Do you see that?

5         A.  It says that.

6         Q.  And then there's a 13 with a up arrow

7    underneath.

8         MR. LOCKERBY:  I would just register a

9    standing objection to the "up arrow" question.

10        A.  There's a 13 written down.

11        Q.  And next to it is --

12        A.  There's an arrow.

13        Q.  -- arrow pointing up.

14        A.  Yeah.  I've testified I don't know what

15   that is.

16        Q.  If you turn to page 18 of 124, the third

17   comment from the bottom, Sons of Liberty, it says,

18   "Any sort of voting fraud should carry capital

19   punishment.  The problem is that we have been

20   completely infiltrated.  Top to bottom."  Do you see

21   that comment?

22        A.  I can read that it says that.

23        Q.  And then underneath there's a comment from

24   bobruark, who says, "They will only notice if they

25   are actually put to death not just talked about it."

1   Do you see that?

2           A.   I can read that it says that.

3           Q.   Would you agree that the comments that

4   we've just read are threatening?

5                MR. LOCKERBY:  Object to the form.

6           A.   That's an interesting question that

7   carries a lot of philosophical things.  They are not

8   pleasant, by any stretch.  I would find them to be

9   disgusting and sort of the thing that I personally

10  have comments made about me like this all the time,

11  not the least of which are some of the articles that

12  your PR firm helped place in this litigation in

13  places like Mother Jones and TP and Muckraker.

14      I had comments very similarly that were

15  horrible, but you -- but I personally found them

16  inconvenient.  And so when you ask me the question,

17  do I find these threatening, I find them familiar

18  because I have them made about me.

19      And so the question becomes are they genuinely

20  threatening.  I personally find them threatening but

21  not a genuine threat when they are made toward me.

22      In other words, I've never called the police

23  when these sorts of comments are made about me.  When

24  your PR firm placed those articles and those comments

25  that were made about me in the coverage of this

1   lawsuit, I never called the police regarding any of

2   those threatening comments.

3        Now this last one, "any sort of voting fraud

4   should carry capital punishment, the problem is we've

5   been completely infiltrated top to bottom," that one

6   actually seems to be an expression of an opinion

7   rather than a threat, because it is somebody's view

8   toward public policy.  Obviously very extreme and one

9   with which I would not agree, but there's nothing in

10  that particular one that appears to be threatening.

11       "They will only notice if they are actually

12  put to death, not just talked about it," that's a

13  little bit different than Sons of Liberty because

14  they are actually seemingly advocating an action.

15       And so is it threatening in its nature yes,

16  but is it a genuine threat?  I'd say no because I

17  don't think I've ever been actually put to death

18  after those articles about this lawsuit appeared.

19  And so ultimately you have to decide what's a real

20  threat and what isn't a real threat.

21       And some of these are horrible, horrible

22  comments, ones that I would never make and ones that

23  I would disavow if I had the time to chase them down

24  every day.  But are they threatening to a particular

25  person?  No, I don't think they are.

1           MR. LOCKERBY:  And I'm just going to

2      register a standing objection to this line of

3      questioning to save time because the only relevant

4      issues in this case would be the publications, not

5      third-party publications and comments.

6                     (Adams Exhibit 10 marked for

7                     identification: Email correspondence

8                     from (topmost) K Phillips sent

9                     4/5/2016 with attachment

10                     PILF-ADAMS-0038892 - 0038895)

11           MR. TEPE:  The court reporter is marking

12      Exhibit 10, a document with the Bates number 8 -- I'm

13      sorry -- 38892.

14      Q.  Do you recognize this document?

15      A.  No, not right now.

16      Q.  The first email in this chain is from you

17      dated April 5th, 2016 to Steve Bannon.

18      A.  That's what it says.

19      Q.  And it's forwarding a press release about

20      a lawsuit against the city of Philadelphia; is that

21      correct?

22      A.  Appears to.

23      Q.  And Mr. Bannon responds to you asking,

24      "what does this mean"; is that right?

25      A.  It says that.

Page 50

1     Q.  And then you provide an answer that same

2  day, and I want to direct your attention to the

3  second sentence where it says, "we are about to sue

4  three other large urban areas in swing states for the

5  same problem."  Do you see that?

6     A.  It says that.

7     Q.  What are the swing states that you are

8  referring to?

9     A.  I'm not going to reveal that.  That's

10  privileged.  You're asking for work product.

11     Q.  Why did you refer to those as swing

12  states?

13     A.  Again, I'm not going to answer your

14  questions about these potential cases, and I don't

15  recall specifically what swing states were.

16     Q.  Mr. Bannon responds, "Can we play this

17  up???"  Do you see that?

18     A.  He says that or the email reflects him

19  saying that.

20     Q.  And then you respond, "sure, or you can

21  wait for when we sue the next large urban area in a

22  key swing state."

23     A.  The email says that.

24     Q.  Then it says, "coming in the next three

25  weeks."  Do you see that?

1      A.  It says that.

2      Q.  Was that a reference to your lawsuit

3 against the City of Alexandria?

4      A.  I don't know.

5      Q.  You did sue the City of Alexandria in

6 April, didn't you?

7      A.  I don't -- I mean, possibly.  I'm not

8 disagreeing with you.  I just don't know.

9      Q.  And then the last sentence you say here

10 is, "big cities that turn states one way or another

11 in presidential elections."  Do you see that?

12      A.  It says that.

13      Q.  What was the import of adding that last

14 sentence?

15      A.  Because that is what differentiates media

16 interest in a lawsuit versus media interest in a case

17 such as ACRU vs. Jefferson Davis County Mississippi,

18 for which there was no interest in covering that

19 case.

20      Q.  But your sentence is not about coverage;

21 it's about turning states one way or another in

22 presidential elections, correct?

23      A.  My answer remains the same.  What

24 generates media interest in litigation, as many

25 people know, is places that create media interest,

Page 52

1    and, as I said a moment ago, big cities create far

2    more media interest in cases than a case such as ACRU

3    vs. Jefferson Davis County Mississippi, a case which

4    I brought and am very familiar with the level of

5    media interest in that case.

6         Q.  Mr. Bannon responds, "let's wait, but get

7    to us when you need us to go large."  Do you see

8    that?

9         A.  It says that.

10        Q.  And then you forwarded his response to

11   folks internally at PILF, correct?

12        A.  There is an email to people at PILF

13   forwarding the Bannon email.

14        Q.  And in that email you quote, "when you

15   need us to go large," closed quote.

16        A.  That's what it says.

17        Q.  Do you know why you quoted that portion of

18   his email?

19        A.  Right.  Yes, I do.

20        Q.  Okay.  Why?

21        A.  Because it was Mr. Bannon volunteering to

22   cover whatever it is we were referring to.

23        Q.  Then in the next paragraph, I think it's

24   the fourth sentence in the email says, "but I'm

25   grooming them."  Do you see that?

Page 53

1          A.  No.  Where?  "But I'm grooming them for

2     something down the road."

3          Q.  "-- VA, NC or FL."  I'm sorry.

4          A.  Go ahead.

5          Q.  "When Bannon," quote, "goes large," closed

6     quote, "he goes really large."  Do you see that?

7          A.  Not yet.

8          Q.  The sentence right after "VA, NC or FL."

9          A.  Right, I see that.

10         Q.  VA, NC or FL, are those swing states?

11         A.  You shouldn't have this document.  This

12    should be clawed back, this portion at least, and I'm

13    not going to answer any questions about it.  That

14    should have been redacted.

15              MR. TEPE:  Counsel, do you want to go off

16    the record?

17              MR. LOCKERBY:  Not particularly, but if

18    you want to we can.

19              MR. TEPE:  Why don't we go off the record.

20              MR. LOCKERBY:  Okay.

21              VIDEO SPECIALIST:  We are off the record,

22    10:17.

23         (Proceedings recessed)

24              VIDEO SPECIALIST:  We're back on the

25    record, 10:37.

Page 54

1    BY MR. TEPE:

2         Q.  Mr. Adams, before the break we were

3    discussing the present exhibit in front of you,

4    Exhibit 10, and you wanted certain information to be

5    redacted, correct?

6         A.  More or less.  I think what happened was I

7    said I wasn't going to testify about certain

8    information that should be redacted.

9         Q.  Okay.  And my understanding is that the

10   identity of the jurisdictions or states listed is

11   what you would like to have redacted; is that right?

12        A.  Correct.

13        Q.  Okay.  So what I'll do is, I will ask

14   questions that do not pertain to the identity of

15   those jurisdictions, fair enough?

16        A.  Fair enough.

17        Q.  In the statement that says, "when Bannon

18   goes large, he goes really large," you saw that,

19   right?

20        A.  It says that.

21        Q.  Do you consider Breitbart's coverage of

22   Alien Invasion I to be an example of going large?

23        A.  Not really.

24        Q.  What do you consider to be an example of

25   Breitbart going large?

Page 55

1      A.  Pigford.

2      Q.  What is that?  I'm sorry?

3      A.  P-I-G-F-O-R-D.

4      Q.  Okay.  But not -- but not their four-page

5  coverage of the Alien Invasion I report?

6      A.  That's my testimony.

7      Q.  You can put this document aside.

8               (Adams Exhibit 11 marked for

9               identification: "Watchdog claims 5k

10              Noncitizens Registered to Vote in

11              Virginia" with attachment)

12     Q.  The court reporter has marked as Adams

13  Exhibit 11 a copy of another Breitbart article.

14  Would you agree with that?

15     A.  Exhibit 11, no, I would not agree with

16  that.  It's more than a copy of a Breitbart article.

17     Q.  It's a copy of a Breitbart article plus

18  comments to that article.

19     A.  It appears to be that.

20     Q.  And this article is titled "Watchdog

21  Claims 5k Noncitizens Registered to Vote in

22  Virginia"?

23     A.  That's what the headline says.

24     Q.  It's dated May 30th of 2017?

25     A.  That's what the article says.

1    Q.  And it contains coverage of PILF's Alien

2    Invasion II report; is that right?

3    A.  I'm trying to find where it says that.

4    Q.  Well, there's a --

5    A.  Oh, there's a picture on the third page.

6    Q.  Right.  This is -- they've actually posted

7    the content of at least some of the report, correct?

8    A.  Where do you see that?

9    Q.  Well, where you see the image, right above

10   it is Alien Invasion II by Public Interest Legal

11   Foundation on S-C-R-I-B-D, SCRIBD.

12   A.  It says that.

13   Q.  And at SCRIBD -- you post documents on

14   SCRIBD, right?

15   A.  Right, but they didn't post the content at

16   Breitbart, it doesn't look like, but I don't know.

17   It doesn't appear that from the paper copy.  It

18   appears they posted a link to the content.  There's a

19   difference.

20   Q.  Fair enough.  And also there's images of

21   voter registration forms, two voter registration

22   forms in the article?

23   A.  Two, right.

24   Q.  And these two voter registration forms are

25   for individuals who checked no on their voter

1   registration form to the answer, "Are you a citizen

2   of the United States of America?"

3        A.   Well, it's more than that.  It's voter

4   registration forms of individuals who checked no that

5   they were citizens of the United States of America

6   and yet were still registered to vote in Virginia.

7        Q.   Right.  And you, in Alien Invasion II,

8   found 40-some odd examples out of 700 voter

9   registration forms that you looked at, correct?

10       A.   I didn't look at any voter registration

11  forms.

12       Q.   You can put this document aside.

13       You recall that PILF secured coverage in other

14  media besides Breitbart, correct?

15       A.   If you have something to refresh my

16  recollection, I can talk about it.  I'm sure we did,

17  but I don't have any specific recollection.

18       Q.   I can provide you with a couple of

19  examples.

20                 (Adams Exhibit 12 marked for

21                 identification: Email correspondence

22                 from (topmost)

23                 adams@electionlawcenter sent

24                 6/2/2017 PILF-ADAMS-0014964)

25       Q.   The court reporter has marked as Exhibit

1    12 a document with the Bates number 14964.  Do you

2    see that?

3         A.  14964, Exhibit 12, I have that.

4         Q.  And it is an email from you dated June

5    2nd, 2017?

6         A.  It says that that's what it is.

7         Q.  And the subject line is "Report: More than

8    5,000 Noncitizen Voters Purged From Rolls in VA | Fox

9    News Insider."  Do you see that?

10        A.  I read that as the subject header.

11        Q.  And then there's a link to a Fox News

12   story, correct?

13        A.  There's a link after that.

14        Q.  Right.  And this is a link to coverage of

15   the Alien Invasion II report, correct?

16        A.  If you show me the story, I can answer

17   that.  I can't answer that from Exhibit 12.  There's

18   a chance it is, there's a chance it isn't, but if you

19   have the actual document, I can answer questions

20   about it.

21        Q.  So you think there's a chance that the

22   linked story, which has a title, "More than 5,000

23   Noncitizen Voters Purged from Rolls in VA," is not

24   about Alien Invasion II?

25        A.  That wasn't my testimony.

1    Q.  I'm trying to clarify your testimony.  Is

2  that your testimony?

3    A.  My testimony was I can't answer that

4  without seeing the document.  There is some chance

5  that this is a derivative story that never mentions

6  Alien II.  That's how the media works.  That there

7  can be a story that mentions the problem but not the

8  source of discovery of the problem.

9    So it would be easier to answer your question

10  if you gave me a copy of the linked story.

11        (Adams Exhibit 13 marked for

12        identification: Email correspondence

13        from (topmost) L Churchwell sent

14        5/30/2017 PILF-ADAMS-0046157)

15    Q.  The court reporter has marked as Exhibit

16  13 a document with the Bates number 46157.  Do you

17  see that?

18    A.  Yeah, I see that document.

19    Q.  Do you recall forwarding an article from

20  the Daily Caller or a link to an article on the Daily

21  Caller May 30th, 2017?

22    A.  No.

23    Q.  But this document reflects that you sent

24  an email on May 30th to Logan Churchwell, correct?

25    A.  That's what the document reflects.

1    Q.  And in the email you sent a link to a

2  Daily Caller article titled "Virginia booted 5,556

3  noncitizens from voter rolls, report says."

4    A.  Okay.  You're reading the link on Exhibit

5  13, you're not reading the headline, and that's what

6  the document says.

7    Q.  You can put that aside.  Actually you ask

8  in the subject line, "What's with Pickett?"  And then

9  in the body you say, "What's up with her?"  Did you

10  have a problem with this article?

11    A.  I testified I don't have a specific

12  recollection of this particular article.

13    Q.  PILF also promoted the Alien Invasion

14  reports on TV, correct?

15      MR. LOCKERBY:  Object to the form.

16    A.  I don't understand what you mean by PILF

17  promoted.  I --

18    Q.  PILF discussed the Alien Invasion reports

19  on TV, correct?

20    A.  Well, it wouldn't surprise me that

21  somebody who works at PILF discussed the Alien

22  Invasion reports on TV.  But if you have a specific

23  example you want me to talk about, perhaps you could

24  either reference it or refresh my recollection with a

25  document.

Page 61

1      Q.  And you have appeared on TV to discuss the

2  Alien Invasion reports, correct?

3      A.  I think we already covered that, didn't

4  we?  I was on Lou Dobbs.  You showed me a document

5  that refreshed my recollection regarding an

6  appearance that probably occurred on Lou Dobbs,

7  although it was left open whether or not it actually

8  occurred.  It would not surprise me that I did.

9      Q.  Do you recall appearing on Fox & Friends

10  to provide an exclusive unveiling of Alien Invasion

11  I?

12      A.  Exclusive unveiling?  No, I don't.

13      Q.  Do you recall appearing on Fox & Friends

14  to discuss Alien Invasion I?

15      A.  Probably.  That, I think, but I don't

16  remember when that was, but I have some recollection

17  of appearing on Fox & Friends to discuss Alien I.

18  Whether or not it was exclusive, I don't -- I would

19  disagree with that.

20      Q.  Right, because we saw there was coverage

21  of Alien Invasion I on Breitbart, for example, so it

22  wouldn't be exclusive.

23      A.  Well, "exclusive" is a term of art in the

24  media that I'm not sure you're asking a question that

25  reflects the usage of the term in an accurate way.

Page 62

1    So I don't understand the question.

2         Q.  On May 30th, 2017, when Alien Invasion II

3    was released, you appeared on Tucker Carlson Tonight

4    on Fox News; is that right?

5         A.  I don't know.

6                   (Adams Exhibit 14 marked for

7                   identification: Screenshots re Fox

8                   News May 30, 2017).

9              MR. TEPE:  The court reporter has marked

10   as Exhibit 14 printouts from a website that reflect

11   an appearance by Mr. Adams on Tucker Carlson's

12   program on May 30th, 2017.

13        Q.  Do you agree with that?

14        A.  No, I don't.

15        Q.  What do you disagree with?

16        A.  The transcript.  I found a number of

17   nongrammatical and implausible things, so I take

18   issue with the transcript.

19        Q.  Okay.  But the question is, to refresh

20   your recollection, sir, does this refresh your

21   recollection that you appeared on Tucker Carlson's

22   program on May 30th of 2017?

23        A.  Right, and I've appeared on his show

24   multiple times.  So the document purports -- and I

25   don't know what the source of this is.  This is

Page 63

1    not -- I don't know where this comes from.  There's

2    like a University of Virginia logo at the top middle

3    of the screenshot.

4         So I don't know what -- what sort of document

5    this is ultimately.  It's some kind of screen capture

6    and attempt at doing a transcript.

7         (Video clip played)

8         Q.  We've just played a clip of your

9    appearance on Tucker Carlson, would you agree?

10        A.  It appears to be that.

11        Q.  And that's you speaking right there?

12        A.  It is.

13             MR. TEPE:  We're going to provide the

14   court reporter and mark as Exhibit 14-A a copy of

15   this clip.

16                  (Adams Exhibit 14-A marked

17             for identification: Video clip)

18             MR. LOCKERBY:  For the record, will the

19   entire interview be the clip or just the part that

20   was displayed?

21             MR. TEPE:  The entire interview.  We just

22   want Mr. Adams to authenticate that, yes, he did

23   appear on Tucker Carlson's program, and that this is

24   indeed him.

25             MR. LOCKERBY:  We would stipulate to that.

Page 64

1           MR. TEPE:  Okay.

2       Q.  Mr. Adams, in preparation for your

3   appearance on Mr. Carlson's program at that time, do

4   you recall asking your team to find voter

5   registration forms with outlandish names?

6       A.  Oh, I sure do.  And there's a reason for

7   that.

8                   (Johnson Exhibit 25

9           previously marked for identification

10          and referenced herein: Email

11          correspondence from (topmost) N

12          Johnson sent 5/26/2017

13          PILF-ADAMS-000770 - 0000771)

14          MR. TEPE:  I'm handing the witness what

15   has been previously marked as Johnson Exhibit 25.

16      Q.  Do you recall this email chain?

17      A.  Yep.

18      Q.  It begins with an email from you May 26th,

19   2017 to Tucker Carlson.  Do you see that?

20      A.  That's what it says.

21      Q.  And you sent him an embargoed release on a

22   report we are putting out on Tuesday.  That was Alien

23   Invasion II, correct?

24      A.  It most likely was.

25      Q.  And then you have a bunch of bullets

1   underneath the words "Key Findings"?

2        A.  Well, I'm not sure where these came from.

3   These might have been from the report.  I don't know

4   for sure.

5        Q.  The Key Findings.

6        A.  I just said I don't know where they came

7   from.  They might have been from the report.  They

8   might have been quoting the report, but it's on the

9   document, Johnson 25.

10       Q.  And then you got a response from

11  Mr. Carlson's booker; is that right?

12       A.  Where do you see that?

13       Q.  Kelly McNally, senior booker, Tucker

14  Carlson Tonight.

15       A.  Right, 5:40, it says that.

16       Q.  And then you forwarded this internally and

17  asked, "can you get me a few pages of just the screen

18  captures of some no checkboxes?"  Do you see that?

19       A.  It says that.

20       Q.  You said, "pick ones with outlandish

21  foreign names, particularly Middle Eastern, if they

22  exist."  Right?

23       A.  That's what it says.

24       Q.  Why did you want your team to pick

25  outlandish foreign names?

1       A.  Because it starkly illustrates the defect

2   in the existing voter registration system in Virginia

3   and generally across the country with the honor

4   system of election registrars not checking

5   citizenship.

6       If you were to look at Adams Deposition

7   Exhibit 11 from today, the Breitbart article, there's

8   a perfect example to answer your question.

9       And on that article there is a copy of a voter

10  registration application with a name that I think

11  would qualify here, and that is why this is

12  important, and it's critically important actually, is

13  you need to remember that these particular -- should

14  we stop or -- I'm sorry.

15      Q.  No, no.

16      A.  These particular voter registration forms

17  are almost universally entered by hand.  So there's

18  an election official who is entering these voter

19  registration forms by hand.  The person who is

20  entering them by hand also has the obligation of

21  ensuring that the form is filled out correctly.  If

22  you were to look at Adams Deposition Exhibit 11, you

23  see a perfect example of what I'm trying to point out

24  and ask for.

25      And here you have a voter registration name of

1    an individual that I cannot even pronounce.  It

2    appears to be Malaysian, which is exactly, by the

3    way, what I was really asking for here.

4         And every single time that that voter

5    registration official keys in a letter, if their eye

6    would only go up two degrees on the form or perhaps

7    an inch or less, when they were typing the form in

8    for Adams Exhibit 11 that's referenced and shown,

9    which is Myagmarradnaa Batbold, it's an extremely

10   long, foreign name that is very unfamiliar to most

11   Americans, and at any one of those keystrokes, had

12   the election official merely glanced up a quarter

13   inch, they would have seen, "Are you a citizen of the

14   United States of America?" and the answer of

15   Myagmarradnaa Batbold was "no" in Adams Exhibit 11,

16   and at that point this person should have never been

17   registered to vote.

18        So if you can produce voter registration

19   forms, as I asked for, of different types of names

20   that would be unfamiliar to the election official who

21   was hand keying in the name, it would be a greater

22   illustration of the failure of the system to register

23   the voter who explicitly marked, no, they are not a

24   citizen of the United States, as this particular

25   election official did.

1       And, by the way, that logic, I think, is one

2    that is shared by common sense Americans who may have

3    been viewing the Tucker Carlson Show, and they could

4    see the voter registration forms as problematic.  And

5    I wouldn't be surprised if this particular form from

6    Myagmarradnaa Batbold was given to the Carlson show.

7       Q.  Alien Invasion II, the scope of Alien

8    Invasion II, was not limited to those individuals who

9    checked no on the voter registration form to the "Are

10    you a citizen of the United States?" question,

11    correct?

12       A.  That's incorrect.  It actually was limited

13    to that because election officials had told us that

14    you don't get on the voter registration noncitizen

15    declared -- strike that.

16       It actually is incorrect because election

17    officials told us you do not get on the declared

18    noncitizen cancellation list unless at some point you

19    answered no to the citizen checkbox question.  So I

20    very much disagree with your question.  It's wrong.

21       Q.  Your -- strike that.  In Alien Invasion II

22    you looked at over 700 voter registration

23    applications, correct?

24       A.  Well, I personally did not, no, that's not

25    correct.

1      Q.  PILF looked at over 700 voter registration

2   applications, correct?

3      A.  Well, that was a question for last

4   Thursday.

5      Q.  PILF -- you're the president of PILF,

6   correct?

7      A.  Right.

8      Q.  Yes.  And you worked on the Alien Invasion

9   II report.

10     A.  I didn't work on that part of it, no, I

11  did not.

12     Q.  You didn't read it and approve its

13  release?

14     A.  That's a different question you're asking

15  me.

16     Q.  My question, sir, is:  It is true that

17  PILF reviewed over 700 voter registration

18  applications, correct?

19     A.  And I answered you.  I don't know.

20     Q.  And of those 700 plus voter registration

21  applications, only 40 something showed individuals

22  checking the "are you a citizen" box, no, such as the

23  ones that you provided to the Tucker Carlson Show?

24     A.  No, I disagree completely because they

25  would not have ended up on the declared noncitizen

1    list if at some point they hadn't marked the citizen

2    checkbox no.  There's absolutely no way that anybody

3    could end up on that list, according to what election

4    officials told me, unless at some point in the

5    process they testified under oath on a voter

6    application form under penalty of perjury that they

7    were not a citizen of the United States.

8         Q.  Was the goal of providing these voter

9    registration applications on -- or images -- on

10   Tucker Carlson's show to get his viewers outraged?

11        A.  Our goal was to exercise our First

12   Amendment right to illustrate a problem in the system

13   that only the most unreasonable people would disagree

14   with is a problem, and that the vast majority of

15   Americans agree is a problem, and federal law bans,

16   which is the involvement of foreign nationals in U.S.

17   federal elections.

18        And so the goal on the Tucker Carlson Show was

19   to starkly illustrate defects in the system that is

20   allowing people who are not Americans to vote in

21   American elections.  That was the goal.

22        Q.  The individual that you just testified

23   about who you thought was Malaysian, such names are

24   not representative of the names listed in the

25   Virginia cancellation reports.  You would agree with

1    that, correct?

2         A.  I don't understand what you're talking

3    about.  Representative?  He's not multiply listed.

4         Q.  Right.  But you said that this

5    individual's name would key election officials to the

6    fact that this person was probably not a citizen.

7         A.  That's not what I testified to.

8         Q.  Okay.

9         A.  If you'd like, I'll clarify it so you

10   understand this clearly.

11        Q.  Certainly.

12        A.  What I testified to was the longer the

13   name and the less familiar with the name, you -- you

14   cranked in there would key them in to being a

15   noncitizen.  That's not what I testified to.

16        What I testified to was the longer the name,

17   the more time the election official had to glance

18   less than an inch up on the form and see.

19        So this name provided an election official

20   with ample opportunity to do their job correctly and

21   look up at the "are you a citizen question," which is

22   marked no, and to never have allowed this person to

23   get on the rolls.  It is a classic example of how the

24   system is totally, completely broken.

25        Q.  So is it your testimony that it's not --

1    strike that.

2         Is it your testimony that the length of the

3    name should provide the election officials an

4    indication as to whether or not they're a citizen?

5         A.  Yes, and let me explain why.  First of

6    all, the length of the name, most names that election

7    officials see are shorter than the one in Adams

8    Exhibit 11 that is referenced in the exhibit.  So

9    that's the first part.

10        But the second part is the length of the name,

11   every single one of those letters provides a

12   keystroke, and every single one of those letters

13   involving a keystroke is an opportunity to glance up.

14   It is a more time spent on the application.

15        So the longer the name obviously provides an

16   opportunity for the election official to do the job

17   right, which in this particular instance they did not

18   do.

19        Q.  Is it also your testimony that, if the

20   name is unfamiliar to the election official, that

21   should also provide an indication as to their

22   citizenship?

23        A.  Unfamiliar is not the keyword.  The

24   correct -- the correct characterization of my

25   testimony is foreign.  And common sense would show --

1    some might not like to hear this, but it's

2    commonsensical -- that, if a name is incredibly

3    unfamiliar to the election official, it might clue

4    them in as a matter of common sense to glance at the

5    "Are you a citizen of the United States?" checkbox,

6    like on Deposition Exhibit 11, that was marked no,

7    and so if a name is not familiar, then it is not a

8    controversial characteristic of human behavior to

9    look at the question on the form that relates to

10   whether or not you're a U.S. citizen.

11        Q.  The exhibit we were just looking at,

12   Johnson 25 --

13        A.  Johnson 25?  Right, Johnson 25.

14        Q.  When you were asking for folks at PILF to

15   pick ones with outlandish foreign names, you said,

16   "particularly Middle Eastern, if they exist."  Do you

17   see that?

18        A.  It says that.

19        Q.  Why did you want Middle Eastern names?

20        A.  They tended to be the longest.  The only

21   names that I've seen that are longer than Middle

22   Eastern names are Malaysian names, which I think

23   Deposition Exhibit 11, actually the one I've been

24   quoting, I think that is a Malaysian name.  I did not

25   have confidence that my staff would be able to

1    differentiate between a Malaysian name and a

2    non-Malaysian name, but I knew they would be able to

3    differentiate between a Middle Eastern name and a

4    non-Middle Eastern name.  And on top of that, Middle

5    Eastern names are probably the longest in the entire

6    option of long names in the world.

7         Q.  Are there any other aspects of a person's

8    name that you believe should provide election

9    officials with clues as to citizenship?

10        MR. LOCKERBY:  Object to the form of the

11   question, misstates the witness's testimony.

12        A.  "Any other aspects" ... I mean, I think

13   I've testified to two of them.

14        Q.  Right.  And so is there a third?  I'm just

15   trying to understand.

16        A.  There could be.

17        Q.  Is there any other aspects sitting here

18   today that you believe provide an indication as to

19   citizenship?

20        A.  Well, I didn't say it provided an

21   indication as to citizenship.  You're, once again --

22        There are aspects of the names that provide an

23   indication to the election official that they ought

24   to look at whether or not the citizenship checkbox

25   was filled out, yes, that's -- that's what my

1   testimony is.  It's a moment in the administrative

2   process that has failed at least in one circumstance,

3   and, as we now know around the country, in many, many

4   circumstances.

5       And so the name is a great starting point

6   to -- to carefully scrutinize the application, which

7   should have been done in the first place but

8   obviously is not always done.

9       Q.  On October 3rd, 2016 you were interviewed

10  by Dana Loesch on the BlazeTV; is that right?

11      A.  I don't know.

12                  (Adams Exhibit 15 marked for

13                  identification: YouTube screenshot

14                  from theblaze "Christian Adams Joins

15                  Dana")

16      Q.  The court reporter has marked as Exhibit

17  15 a printout from YouTube.  Does this refresh your

18  recollection as to an appearance with Ms. Loesch?

19      A.  It doesn't because I've appeared on her

20  show many times.  I'm not disputing the fact that

21  that is me on Exhibit 16, but about the specific

22  appearance, it doesn't refresh my recollection other

23  than there's a good chance that it occurred.

24      Q.  This document, which, again, is a printout

25  from YouTube, indicates BlazeTV, on October 3rd,

1    2016, "Christian Adams joins Dana," correct, that's

2    what it says there?

3         A.  I don't see that.  Okay.  Right, there it

4    is.

5         (Video clip played)

6         Q.  We just played a clip of your appearance

7    on Ms. Loesch's program.  Do you recognize yourself

8    there on the screen?

9         A.  Right.

10        Q.  Do you have any reason to doubt that you

11   appeared on her program to talk about the Alien

12   Invasion I report?

13        A.  No.

14        Q.  Thank you.  We will move this as Exhibit

15   15-A.

16                    (Adams Exhibit 15-A marked

17              for identification: Video clip)

18        Q.  You've also made a number of radio

19   appearances, correct?

20        A.  I've made hundreds of radio appearances.

21        Q.  And in some of those appearances you spoke

22   about the Alien Invasion reports, correct?

23        A.  Probably, but not necessarily.  If you

24   have a specific one to refresh my recollection, I'd

25   be happy to talk about it.

1    Q.  You appeared on the John Fredericks Show

2    on June 1st, 2017 to talk about Alien Invasion II; is

3    that right?

4    A.  I don't know who John Fredericks is.  I

5    can't tell you.  I have no recollection of who John

6    Fredericks is.

7         (Adams Exhibit 16 marked for

8         identification: YouTube screenshot

9         John Fredericks Show)

10    Q.  The court reporter has marked as Exhibit

11    16 a printout also from YouTube indicating an

12    appearance by you on The John Fredericks Show.  Does

13    this refresh your recollection?

14    A.  No, it doesn't.  I don't know who John

15    Fredericks is.  I'm sorry.

16    Q.  The John Fredericks Show airs on multiple

17    radio stations in Virginia.  Do you recall that?

18    A.  No.

19    (Video/audio clip played)

20    Q.  We're playing a clip of your appearance.

21    Does this refresh your recollection?  Does this

22    refresh your recollection of appearing on the John

23    Fredericks Show?

24    A.  It doesn't, but it refreshes my

25    recollection of giving the article to someone at

1 Skadden Arps who got it placed in the Bull Elephant

2 and probably arranged for this media interview.

3     So perhaps you-all have some documents that

4 would better refresh my recollection, because I have

5 no memory of this.

6     Q.  Okay.  Strike the response.

7     Does this refresh your recollection of

8 appearing on the John Fredericks Show?

9     A.  It does not.  And, as a matter of fact, it

10 refreshes my recollection no more than the fact that

11 I was possibly asked if it involves the Bull Elephant

12 that somebody at Skadden Arps has the documents

13 related to this interview, because I have no memory

14 of this except that it related to Skadden Arps lawyer

15 who made the arrangements probably for this to occur

16 because it's in the Bull Elephant.

17     (Video/audio clip played)

18     Q.  This is -- this is you speaking, correct?

19     A.  It sounds like me speaking.

20     Q.  Do you have any reason to doubt that you

21 appeared on the John Fredericks Show on June 1st,

22 2017 to talk about Alien Invasion II?

23     A.  I'm not disputing whether or not I

24 appeared.  You asked me if my recollection was

25 refreshed, and, no, it isn't, but I'm not disputing

Page 79

1    that that's my voice.

2         Q.  Well, that's my question now.  Thank you.

3         A.  Right.

4              MR. TEPE:  We'll mark this as Exhibit

5    16-A.

6                   (Exhibit 16-A marked for

7                   identification: Video/audio clip)

8         Q.  On March 2nd, 2017 you were interviewed on

9    the program Mornings on the Mall, yes?

10        A.  I don't know.

11                  (Adams Exhibit 17 marked for

12                  identification: Re podcast Mornings

13                  on the Mall March 2, 2017)

14        Q.  The court reporter has marked as Exhibit

15   17 a document that is a printout indicating an

16   appearance by you on Mornings on the Mall.  Does this

17   refresh your recollection?

18        A.  No.

19        Q.  The printout indicates that you appeared

20   on March 2nd, 2017.  Are you familiar with the

21   program Mornings on the Mall?

22        A.  I'm not sure it still exists, but I

23   recognize the name of the program.

24        Q.  It was a program aired on WMAL here in

25   D.C.?

1          A.   Correct.

2          (Audio clip played)

3          Q.   Do you recognize your voice?

4          A.   Yes.

5          Q.   We don't have keyed up the beginning where

6     it announces your appearance on WMAL.  We can find

7     that, if you want, but we're going to --

8          A.   Yeah.  I don't have the ability to

9     authenticate if this is me -- the entire interview or

10    not.  There's no way I can.  But that was my voice.

11              MR. TEPE:  We'll mark this entire clip as

12    17-A.

13                   (Exhibit 17-A marked for

14                   identification: Audio clip)

15         A.   Which I haven't heard, by the way.

16         Q.   Understood.

17         A.   Okay.

18         Q.   That's why it will be provided to the

19    court reporter.

20         PILF wanted to share the Alien Invasion

21    reports with as many viewers as possible; you would

22    agree?

23         A.   Well, that was -- I can't speak for PILF

24    in this deposition.

25         Q.   You're the president of PILF.

Page 81

1        A.  Right.  I can speak for me.

2        Q.  Right.

3        A.  And what was your question as it relates

4    to me?

5        Q.  Well, you wanted to share the Alien

6    Invasion reports with as many viewers as possible.

7        A.  I never thought about that, at least that

8    I can remember.

9        Q.  And you wanted to share the Alien Invasion

10   reports with as many readers as possible, right?

11       A.  Again, I have no recollection of ever

12   consciously having that thought process that I can

13   remember right now.

14       Q.  Would you agree that identifying large

15   numbers of noncitizens would help PILF obtain

16   publicity for its Alien Invasion reports?

17       A.  Wait.  Could you read that back?  Would I

18   agree that --

19       (The record was read by the reporter.)

20       A.  Well, I don't know what you mean by

21   "large."  I think identifying any noncitizens who get

22   on the rolls is a noteworthy story to most

23   common-sense Americans who don't like noncitizens

24   being on the rolls.

25       So I would say, even if it's not large

1    numbers, it's any noncitizens on the rolls is an

2    important story.

3                         (Johnson Exhibit 26

4              previously marked for identification

5              and referenced herein: Email

6              correspondence from (topmost) N

7              Johnson sent 10/2/2016

8              PILF-ADAMS-0037501).

9        Q.   Handing the witness what has been marked

10   as previously as Johnson 26.

11       A.   I have Johnson 26.

12       Q.   Do you recognize this document?

13       A.   It's -- I see Exhibit 26.

14       Q.   And at the bottom is an email from you

15   dated October 2nd, 2016 to a number of individuals

16   associated with PILF; is that right?

17       A.   No, it's not right.

18       Q.   Strike that.  This is an email from you

19   dated October 2nd, 2016, correct?

20       A.   It is.  It says that.

21       Q.   And it's to Ms. Phillips and Ms. Powell

22   and Mr. Johnson and Mr. Vanderhulst.  Those are all

23   individuals with PILF, correct?

24       A.   Correct.

25       Q.   And it copies Hans von Spakovsky.  He's a

1  board member of PILF, correct?

2        A.  Correct.

3        Q.  And also Don Palmer is copied; is that

4  correct?

5        A.  Yes.

6        Q.  And the subject line is "Congratulations

7  Everyone."

8        A.  That's what it says.

9        Q.  And then it is, in the body of the email,

10 an image from the Drudge Report website; is that

11 right?

12        A.  I'm sorry.  At the bottom of the email?

13        Q.  I said in the body of the email --

14        A.  Oh, body.

15        Q.  -- there is an image from the Drudge

16 Report website; is that right?

17        A.  It appears to be that.

18        Q.  And this particular image has a link or --

19 strike that.

20        This particular image shows a link that says,

21 "REPORT:  1,000 plus Illegal Voters in Virginia."  Do

22 you see that?

23        A.  Well, I might dispute the fact that it's a

24 link in the email, but it says that.

25        Q.  Right.  And you've been on the Drudge

1    Report website, correct?

2         A.  Are you asking if I have visited the

3    Drudge Report website?

4         Q.  Yes.  Yes.

5         A.  Yes.

6         Q.  And the Drudge Report provides links to

7    other stories elsewhere on the Internet, correct?

8         A.  It does do that.

9         Q.  Okay.  You said here, above the image,

10   "great lesson, how to generate, create, organize and

11   weaponize narrative."

12        A.  That's what the email says.

13        Q.  What did you mean by "narrative"?

14        A.  Well, the country has endured people for

15   years, not the least of which is some of your

16   co-counsel in this case, arguing that noncitizen

17   voting is a myth, a problem, not a problem or

18   otherwise made up entirely.  And your co-counsel's

19   organizations, two of them, as a matter of fact, have

20   been part of that narrative.

21        And what this means is that the truth can be

22   obtained about whether or not noncitizens are getting

23   on the rolls and in fact voting.  And PILF is in the

24   process of documenting that nationwide.  We'll

25   continue to do so.

1        And so when I say "narrative," I mean accounts

2    of whether something is or is not happening.

3    Plaintiff's counsel's law firms generally say it is

4    not happening and a wide variety of other

5    organizations say it is happening.

6        And so what I mean by this is how to develop

7    the evidence and facts to weaponize the story in a

8    way that disputes what the contentions are of the

9    people who say it's not happening.

10       Q.  So if I understand your answer, the

11   narrative is demonstrating that voter fraud by

12   noncitizens is not a myth.

13       A.  Well, I never said the word "voter fraud"

14   in my answer.  As I recall, I thought I said

15   registration by noncitizens.

16       Q.  Okay.

17       A.  Is that what the transcript says?  Because

18   there's a difference.

19       Q.  I'm just trying to understand your answer.

20       A.  Well, I mean, one way to do that is to

21   quote it correctly.

22       Q.  So if I understand your answer, the

23   narrative is demonstrating that voting -- that

24   noncitizen voting is not a myth.

25       A.  That's part of it.  That's a very small

Page 86

1    part.  But the bigger part is that there are defects

2    in the system that Congress needs to remedy, that

3    state legislatures need to remedy, that prosecutorial

4    authorities need to take action and investigate.

5    Because it is not subject to dispute in my mind that

6    noncitizens are getting on the rolls and voting.

7    That is a fact.

8         And so public policymakers need to respond

9    accordingly.  And those who stand in the way of

10   fixing the problem, as I said, like plaintiffs' law

11   firms, need to realize that there is a problem and do

12   something about it.

13        Q.  That noncitizen registration and voting is

14   a problem, not a myth.  That's the narrative.

15        A.  Look, you can characterize it however you

16   want.  I wouldn't disagree with what your latest

17   question was, was a subset of that larger problem.

18        Q.  In the email above you said to the same

19   individuals listed, also on October 2nd, you wrote,

20   "Noel, remember our conversation on how important it

21   was to cross the one thousand mark (by adding

22   Alexandria)."  Do you see that?

23        A.  It says that.

24        Q.  So you thought crossing 1,000 people was

25   important, how?

1      A.  Well, I don't think anybody would disagree

2  that 999 is different than 1,000.

3      Q.  And then you said, "good example why below

4  is in the chosen Drudge headline," correct?

5      A.  Chosen Drudge headline validated my

6  general observation about people's public perceptions

7  about numbers.

8      Q.  And it was an "important psychological

9  frontier to cross," you say.

10     A.  It says that.

11     Q.  And so just as it was important to cross

12  the 1,000 threshold, it was also important to cross

13  the 5,000 threshold.

14     A.  If you would show me the document you have

15  ready, and I'll refresh my recollection about that.

16     Q.  I'm just asking a question.

17     A.  And I'm just giving you an answer.  I

18  don't have a specific recollection of that.

19     Q.  I'm not asking for a recollection.  Strike

20  that.

21

22          (Adams Exhibit 18 marked for

23          identification: Email correspondence

24          from (topmost) N Johnson sent

25          5/22/2017

1          PILF-ADAMS-0001050 - 0001052)

2          Q.   The court reporter has marked as Exhibit

3     18 a document with the Bates number 1050.  Do you see

4     that?

5          A.   I've been handed Deposition Exhibit 18.

6          Q.   And what I want to direct your attention

7     to is -- and just to set the stage -- you had

8     requested cancellation reports from the Virginia

9     Department of Elections, right?

10         A.   I don't think I ever did, no.

11         Q.   PILF did.

12              MR. LOCKERBY:  Object to the form of the

13    question.

14              MR. TEPE:  What's the objection?

15              MR. LOCKERBY:  Well, it assumes facts not

16    in evidence.  The requests were actually directed to

17    registrars, and then the Department of Elections

18    interceded and prevented that from happening.

19         Q.   On May 5th Mr. Johnson, PILF, wrote to

20    Edgardo Cortes of the Virginia Department of

21    Elections, "Thank you for providing the VERIS report.

22    I would like to make a follow-up request for records

23    under the NVRA."  Do you see that?

24         A.   No.  Where are you?

25         Q.   Bottom of the first page.

1    A.   Oh.   Okay.   I'm not very familiar with

2    this document, but there's -- you've pulled out of

3    the middle email from 11:18 a.m., is that what you're

4    asking about?

5    Q.   Correct.

6    A.   Okay.   And you're asking me what it says?

7    Q.   My question was, directing you to this

8    email, do you see that Mr. Johnson wrote Mr. Cortes

9    May 5th, 2017, yes?

10    A.   The email says that.

11    Q.   And then Mr. Johnson said, "Thank you for

12    providing the VERIS report.   I would like to make a

13    follow-up request for records under the NVRA."   Do

14    you see that?

15    A.   Right.

16    Q.   And so does this recollection that you had

17    received records from the Virginia Department of

18    Elections for a certain time period and then you

19    asked for the same record but for an additional time

20    period?

21    A.   I don't think you understand.   I didn't

22    ask for any of these, okay.

23    Q.   PILF.

24    A.   Yeah, but I'm not on these emails.   So the

25    answer to your question is, no, I did not ask for

Page 90

1    these.

2         The question on Thursday might have been yes

3    in my 30(b)(6), but the answer today in my personal

4    is no, I didn't ask for these.

5         Q.  PILF asked for records, the same records

6    that were provided by the Virginia Department of

7    Elections for the time period March 21st, 2017 to the

8    present, which would be May 5th, is that right,

9    according to this email?

10        A.  Okay.  And your question is that they

11   asked for ... (reading) ... to the present, which

12   this is a May 5th email.  That's what it says.

13        Q.  And then Mr. Cortes attached a report with

14   activity from March 21st, 2017 to the present day,

15   which at that point was May 22nd.

16        A.  The email says, attached is a report with

17   activity from 3-21-17 until today.  Whether or not

18   that report is attached or not, I have no earthly

19   idea, because I'm not on this email and I never saw

20   this email.  It was not sent to me.

21        Q.  And then right above that Mr. Johnson

22   sends to you -- forwards Mr. Cortes's response -- on

23   May 22nd, correct?

24        A.  The email says that I am copied on an

25   email from -- it forwards it to me.

1     Q.  Yes.  So on May 22nd Mr. Johnson forwarded

2  Mr. Cortes's email to you and Mr. Churchwell,

3  correct?

4     A.  Well, he forwarded the body of the email.

5  That's all that this 18 document -- Deposition 18

6  Exhibit says.  I can't speak to whether or not the

7  attachments were forwarded.  I don't know.

8     Q.  And then Mr. Churchwell responds, "Woohoo

9  headline upgrade!"  Do you see that?

10     A.  I can read that it says that.

11     Q.  And Mr. Johnson says "high five" in

12  response.

13     A.  Is there a question?

14     Q.  Do you see that?

15     A.  I can read that it says that.

16     Q.  And then Mr. Churchwell responds, "this

17  puts us just north of 5,500, right?"  Do you see

18  that?

19     A.  I can read that it says that.

20     Q.  Okay.  And so before you had received this

21  supplement of records from the Virginia Department of

22  Elections, PILF had received -- PILF had not received

23  more than 5,000 names, correct?

24     A.  I don't know.

25     MR. LOCKERBY:  Object to the form.

1    A.  I mean, I don't know.  You're obviously

2    focused in on this number far more than I was.

3    Q.  Well, apparently Mr. Churchwell seemed to

4    like it.  He said "woohoo headline upgrade."

5    A.  Mr. Churchwell is not sitting in this

6    chair.

7    Q.  What do you understand Mr. Churchwell to

8    be intending by saying "woohoo headline upgrade"?

9    A.  I don't know.

10   Q.  Did you respond to his email on May 22nd

11   saying what do you mean, "woohoo headline upgrade"?

12   A.  Do you have an exhibit that would help

13   refresh my recollection?

14   Q.  So you have no recollection of sending

15   that question to Mr. Churchwell?

16   A.  If you -- no, not as I sit here, but if

17   you have a document that would refresh my

18   recollection, I'll take a look at it.

19   Q.  Do you recall sending Noel Johnson an

20   email on May 22nd asking him what he meant by "high

21   five"?

22   A.  I don't, but I wonder what they do mean by

23   "headline upgrade," as I sit here now.

24   Q.  You can put that document aside.

25   A.  If you have a document that refreshes my

Page 93

1    recollection, I'd be happy to talk about it.

2                    (Adams Exhibit 19 marked for

3           identification: Email correspondence

4           from (topmost) N Johnson sent

5           5/31/2017 PILF-ADAMS-0000760)

6        Q.   The court reporter has marked as Exhibit

7    19 a document with the Bates number 760.  Do you see

8    that?

9        A.   I have Deposition 19.

10       Q.   And do you recognize this as starting with

11   an email that you sent to Mr. Churchwell copying

12   Mr. Johnson on May 31st of 2017?

13       A.   I see that.  It says that.

14       Q.   Do you have any reason to doubt that you

15   sent this email?

16       A.   No, no reason to doubt I sent it.

17       Q.   The subject line is "Roseanne Barr."

18       A.   That's what it says.

19       Q.   And in the body of your email you have an

20   image of what appears to be a tweet from Ms. Barr.

21   Does that look accurate to you?

22       A.   No.  Well, no, not necessarily.  It's

23   something that she posted somewhere.  YouTube maybe.

24       Q.   Well, this is an image from Twitter,

25   right?

Page 94

1       A.  I don't know.  Are you representing it is?

2  If you are, tell me and we can move forward.  I don't

3  see something that says Twitter on it.  I see YouTube

4  on it.  If you want to represent to me it's from

5  Twitter, I can answer your next substantive question.

6       Q.  Well, I mean, you tweet, correct, we

7  established that before, right?

8       A.  I've asked and answered that question.

9       Q.  Yes.  And based on your tweeting habits,

10  can you or can you not say that this appears to be an

11  image of a tweet from Roseanne Barr?

12       A.  I wouldn't say it's inconsistent with a

13  tweet, but it says it's coming from YouTube, so ...

14       Q.  Well, it appears to be a tweet from -- of

15  Ms. Barr sending out a clip from YouTube.

16       A.  If that's what you're representing to me

17  it is, I have no reason to quarrel with that.

18       Q.  Okay.  Well, I'm just asking for your

19  testimony as to what your understanding is since you

20  sent this out.

21       A.  And I've testified I don't have one.

22       Q.  Ms. Barr said in her tweet, "five thousand

23  illegals voted for Hillary in Virginia."  Do you see

24  that?

25       A.  I see it says that.

Page 95

1    Q.  Okay.  Now this clip here from YouTube is

2    your appearance on Tucker Carlson, right?

3    A.  I don't know.  I have no way of knowing

4    that.  It's barely legible on Deposition Exhibit 19

5    that's in front of me.  It's in black and white.  You

6    can't even tell if it's me.

7    So there's lots of problems with that

8    assumption.  If you want to represent to me that it

9    is, I will be happy to accept your representation as

10    accurate.

11    Q.  Well, the image, and I grant you it's in

12    black and white, is that not you being interviewed by

13    Tucker Carlson with the Capitol in the background and

14    underneath it says, "Watchdog 5K Aliens Registered to

15    Vote"?

16    A.  The headline actually or the thing -- the

17    part you just read, "Watchdog 5K," actually has more

18    weight to me than the blocked image of what might be

19    me, but I'm not going to quarrel with you.  I just --

20    if you tell me it is, we can move forward.

21    Q.  So it appears that Ms. Barr sent out a

22    clip of your appearance on Tucker Carlson with the

23    notation, "5,000 illegals voted for Hillary in

24    Virginia."  Do you agree with that?

25    A.  I agree that that's what the document

1  says.

2        Q.  And Mr. Johnson responds to your email by

3  saying, "Roseanne taking it up a notch from 5,000

4  noncitizen removals to 5,000 illegal votes for

5  Hillary."  Do you see that?

6        A.  I see that it says that.

7        Q.  Do you recall tweeting out a response to

8  Ms. Barr that her tweet was inaccurate?

9        A.  If you have that, we could save a lot of

10  time, because I don't have any recollection of that.

11        Q.  You can put that document aside.

12        You have your own Twitter handle; is that

13  correct?

14        A.  You mean my name on Twitter?  It's not my

15  name.  It's E-L -- it's something like E-L-E-C-T,

16  Election Law Center.

17        Q.  And you've tweeted under this Election Law

18  Center handle with regard to the Alien Invasion

19  reports, have you not?

20        A.  I would be surprised if I didn't, but I

21  don't have a specific recollection.  If you have a

22  document to refresh my recollection, it would be

23  helpful.

24              (Adams Exhibit 20 marked for

25          identification: Printout of

1          ElectionLawCtr tweets)

2          Q.  The court reporter has marked as Exhibit

3     20 an image of your tweets under the handle at

4     Election Law Ctr; is that correct?

5          A.  That's what the document, Exhibit 20, has.

6          Q.  And this reflects tweets that you made

7     with regard to the Alien Invasion I report; is that

8     right?

9          A.  Well, I don't have any reason to doubt the

10    authenticity of this.  If you want to -- if you want

11    to stipulate or otherwise represent that that's what

12    it is, I have no reason to disagree.

13         Q.  So this does reflect tweets that you may

14    have written with regard to the Alien Invasion I

15    report.

16         MR. LOCKERBY:  Object to the form.

17         A.  I have no reason to doubt that this is

18    authentic.  Do I know with absolute certainty these

19    are my tweets?  No.  But if you want to represent to

20    me that that's where you pulled them from, I'll

21    accept your representation.

22         Q.  That is where we pulled them from.  Does

23    this refresh your recollection -- strike that.

24         One of the tweets you said is at the top,

25    October 2nd, 2016, read report, "I just talked about

1    on Fox News about thousand plus foreigners registered

2    or voting in Virginia."  Do you see that?

3         A.   That's what it says.

4         Q.   When you said "foreigners" there, was that

5    synonymous with noncitizens?

6         A.   Well, words speak for themselves.

7         Q.   No, I'm asking what you were intending by

8    the word foreigners.

9         A.   I have a hard time thinking of an example

10   of a noncitizen who wouldn't be a foreigner.  Maybe

11   John Demjanjuk would be a counter-example, but I have

12   a hard time imagining any other examples of a

13   noncitizen who would not be an alien who would not be

14   a foreigner.

15        Q.   That's exactly where I was going to go

16   next was are all these words in your mind synonyms,

17   generally speaking, foreigner, alien and noncitizen?

18        A.   Well, I think if you were to either pull

19   up the U.S. Code of Law or Webster's, you might find

20   that my interpretation of what these words mean is

21   consistent with those sources.

22        Q.   And in this tweet you published a link to

23   the PILF website, correct?

24        A.   There's a link to the PILF website.

25        Q.   You also tweeted about the Alien Invasion

1   II report; is that correct?

2          A.  I would be surprised if I did not tweet

3   about the Alien Invasion II report, but if you have a

4   document to specifically refresh my recollection, I'm

5   more than happy to look at it.

6                    (Adams Exhibit 21 marked for

7                    identification: Printout of tweets

8                    from ElectionLawCtr)

9          Q.  The court reporter has marked as Exhibit

10  21 -- does this refresh your recollection as to

11  having tweeted about the Alien Invasion II report?

12         A.  This is helpful, but it does include

13  things not related to your question.

14         Q.  But there are tweets there from your

15  Election Law Center Twitter handle with regard to

16  Alien Invasion II, correct?

17         A.  There are, but they are not entirely.

18         Q.  You can put that aside.

19  You also have your own website

20  www.electionlawcenter.com; is that correct?

21         A.  I have a web server that I use.

22         Q.  Is that different than a website?

23         A.  Yes.  One is an email server.

24         Q.  Okay.  But you recall that you have a

25  website www.electionlawcenter.com.

1         A.   Right, I have that domain.

2         Q.   You have that domain, right?

3         A.   Right.  I own it.

4         Q.   Yes.  And you've posted about the Alien

5    Invasion reports there, have you not?

6         A.   I don't think so, no.

7                    (Adams Exhibit 22 marked for

8              identification: Printout from

9              Election Law Center | Report:

10             Ineligible Aliens Registering to

11             Vote and Casting Ballots)

12        Q.   The court reporter has marked as Exhibit

13   22 a printout from the electionlawcenter.com website.

14   Does this refresh your recollection, Mr. Adams?

15        A.   No.

16        Q.   That is at the bottom the URL for your

17   website?

18        A.   Not really.  I mean, this is a URL, the

19   domain.  It's a domain that I own.  So the URL is a

20   domain that I own.

21        Q.   Right.  And on the URL, domain -- strike

22   that.

23        On the domain that you own, you posted about

24   Alien Invasion I, correct?

25        A.   Incorrect.  I did not.

1    Q.  So are you saying that this is fabricated?

2    A.  No.

3         MR. LOCKERBY:  Object to the form.

4    Q.  Okay.  You just testified that you did not

5    post about Alien Invasion I; is that your testimony?

6    A.  That is my testimony.

7    Q.  This document in front of you, which was

8    printed out from your website --

9    A.  Again, it's not my website.

10   Q.  Would you prefer the website of the --

11   with the domain that you own?

12   A.  Correct.

13   Q.  This shows "Report: Ineligible Aliens

14   Registering to Vote and Casting Ballots."  Do you see

15   that title?

16   A.  It says that.

17   Q.  It says, "Public Interest Legal Foundation

18   published a report based on voting history records in

19   Virginia showing that large numbers of ineligible

20   aliens are registering to vote and casting ballots."

21   Do you see that?

22   A.  You are reading the exhibit correctly.

23   Q.  And then it says, "in just eight Virginia

24   counties 1,046 ineligible noncitizens were found to

25   have illegally registered."  Do you see that?

1          A.  You are reading Deposition Exhibit 22

2     accurately.

3          Q.  And I'm not just representing -- strike

4     that.

5          I'm not just reading Deposition Exhibit 22

6     accurately, but this is an accurate reading of what's

7     on your Election Law Center domain, correct?

8               MR. LOCKERBY:  Object to the form.

9          A.  No, it is not.  It is a -- it is -- you

10    are reading something from a website domain that I

11    own.  There's a vast difference between that and

12    where you're headed with this.

13         Q.  Where am I headed?

14         A.  You're headed -- you're headed to get my

15    assent to agree to this document and that either that

16    I wrote it or I agree with it or something of that

17    nature, but the fact is that this is a website domain

18    that I own.  It is not my website.

19         Q.  Why would a website domain that you own

20    not be your website?

21         A.  Well, I own electionlawcenter.com, but I

22    don't use it.

23         Q.  Well, then who posted this?

24         A.  Not me.

25         Q.  Well, who has -- who has access to your

1    domain?

2         A.   The answer is right there in Deposition

3    Exhibit 22.

4         Q.   Do you want to specify?

5         A.   You can see who posted it.

6         Q.   Who posted it?

7         A.   It says right there in Deposition 22.  It

8    says Lex.

9         Q.   Well, that's -- who is Lex?

10        A.   Not me.  And I never saw this posting

11   until Deposition 22 was handed to me, Exhibit 22.

12        Q.   So you don't -- you don't know who Lex is?

13        A.   Oh, I know who Lex is, but you didn't ask

14   me that yet.

15        Q.   Well, who is Lex?

16        A.   It's an individual who is an activist who

17   covers election issues named Erin Anderson.

18        Q.   And you let Erin Anderson post on the

19   domain that you own?

20        A.   Correct.

21        Q.   And on the domain that you own there was a

22   link published to Alien Invasion I, correct?

23        A.   Well, Deposition 22 appears to show that

24   is the case, but I don't have any independent

25   knowledge of that other than what's in Deposition 22.

1    Q.  Who else posts on your domain?

2    A.  I used to, but I haven't been to that

3  domain to post for probably years.

4    Q.  Who else posts on your domain?

5    A.  Me, other guests have posted.  I don't

6  remember everybody that's ever posted there.

7    Q.  Who do you remember?

8    A.  I'm not sure.

9    Q.  You don't remember anyone else other than

10  Erin Anderson?

11    A.  Nope.

12    Q.  Do you know why Erin Anderson posts under

13  the name Lex?

14    A.  Probably because she's afraid of being

15  harassed by people if she posts under her real name.

16  It's one possibility.

17    Q.  So having a person's real name posted on

18  the Internet can lead to harassment?

19    A.  When you talk about voter fraud,

20  absolutely, because there's a whole litany of

21  organizations designed to personally attack people,

22  as you well know, whenever they talk about the

23  existence of voter fraud.  And we have seen the

24  depths to which they will plumb on that quest in this

25  case.

1     Q.  How does someone go about posting on your

2  domain?

3     A.  They write up a post and post it.  But

4  this is not my posting.

5     Q.  Who approves the posting of things on your

6  domain?

7     A.  Nobody.

8     Q.  What is the process for posting on your

9  domain?

10    A.  You post -- you write something and you

11  put it up.

12    Q.  You write a column for PJ Media; is that

13  correct?

14    A.  I do.

15    Q.  And you've written about the Alien

16  Invasion reports on PJ Media, correct?

17    A.  Most likely, but if you have a specific

18  document to refresh my recollection, I'm happy to

19  look at it.

20              (Adams Exhibit 23 marked for

21              identification: PJ Media | Yes,

22              Virginia, Aliens are Registered or

23              Voting ... and in Pennsylvania, by

24              the Thousands)

25    Q.  The court reporter has handed you what's

1    been marked as Exhibit 23.  Do you recognize this?

2         A.  It appears to be a portion of a article

3    that I wrote for PJ Media.

4         Q.  Why do you say "a portion"?

5         A.  Well, because some things are cut off on

6    it.  On its face, on pages 6, 7 and 8, there's -- you

7    obviously had some difficulty in capturing a whole

8    version of this document that didn't have things

9    fractured.

10        Q.  Well, it appears the only thing that's cut

11   off is an image that's repeated on every page, and it

12   says, "PJ Media encourages you to read our --"

13   something -- seems likes "update to a cookie policy."

14   Is there anything else that you can tell us is being

15   cut off?

16        A.  Right, there is.

17        Q.  What?

18        A.  Well, normally there wouldn't be shading,

19   for starters.

20        Q.  What's shading?

21        A.  On page 3.  Shading usually has some sort

22   of content in it.

23        Q.  I don't see the shading.  Can you point it

24   out to me?

25        A.  To the upper left quadrant of the page on

1    Deposition 23, page 3.  There's also a hanging bubble

2    box on page 2 that may extend to page 3, but the

3    shading itself indicates there's something cut off.

4    But, other than that, I don't have any quibbles with

5    Deposition 23.

6         Q.  Okay.  The content of what you wrote is

7    represented here, correct?

8         A.  It appears to be, but sometimes the

9    content of what one writes includes bubble boxes, and

10   that's why the hanging shading issue is a concern.

11        Q.  But sitting here today, you're not aware

12   of anything that's cut off --

13        A.  I'm not --

14        Q.  -- from what you wrote.

15        A.  Right.  I didn't -- I didn't indicate

16   there was.  I'm just telling you that this document

17   appears to be fractured with some content cues.

18        Q.  And this is a column you wrote published

19   on October 3rd, 2016, correct?

20        A.  Deposition Exhibit 23 says it was

21   published on October 3rd.

22        Q.  And you did publish a column on that day

23   in PJ Media, correct?

24        A.  I have no reason to dispute what this

25   document says.

1    Q.  And that column concerned Alien Invasion

2  I, correct?

3    A.  Right.

4    Q.  You wrote in the first paragraph, "What if

5  government documents were produced to show at least

6  one thousand instances of voter fraud with aliens

7  registering or voting in a key swing state?"  Do you

8  see that?

9    A.  That's what the document says.

10    Q.  And you're referencing the Alien Invasion

11  reports 1,046 cancellations; is that right?

12    A.  I would disagree with that.  I think I was

13  asking -- referencing a rhetorical question related

14  to underlying election records to establish the

15  possibility of aliens registering to vote.

16    Q.  Do you think this sentence is unrelated to

17  the fact that in Alien Invasion I PILF said that

18  there were 1,046 illegal registrants?

19    A.  I don't think it's unrelated to that fact.

20  What I said was it's not only referring to that fact.

21    Q.  And on the next page of the exhibit it

22  shows that you wrote, in just eight counties, 1,046

23  alien noncitizens successfully registered to vote.

24  Do you see that?

25    A.  That's an accurate statement.

1     Q.  And you also wrote, "Mind you, these are

2   just the aliens who were accidentally caught because

3   when they renewed their driver's license they told

4   the truth that they were a noncitizen."  You wrote

5   that, right?

6     A.  That's what the document says I wrote.

7     Q.  And you did write it.

8     A.  I don't have any reason to dispute that.

9     Q.  And you have insight into the truth of

10   what these 1,046 individuals told the DMV?

11     A.  I do have insight into the truth.

12     Q.  Because you spoke to each of those

13   individuals, correct?

14        MR. LOCKERBY:  Object to the form.

15     A.  I don't understand the question.

16     Q.  Well, you spoke to all 1,046 individuals,

17   yes or no, right?

18     A.  Pardon?  Yes or no, right?

19     Q.  Did you or did you not speak to the 1,046

20   individuals listed in the Alien Invasion I as to the

21   truth of their representations?

22     A.  No, I did not speak to all of them, but I

23   had other insights into the truth apart from that.

24     Q.  Did you speak to any of them?

25     A.  I don't remember.

Page 110

1      Q.  You would --

2      A.  Actually I do remember.  I did speak to

3  some of them.

4      Q.  Well, isn't that a violation of the PILF's

5  policy?

6      A.  I didn't tell you what I did yet.  So, no,

7  it wouldn't be a violation of PILF's policy.  You

8  didn't ask what the context was.

9      So let me answer your question.  No, it was

10  not a violation of PILF's policies.

11      Q.  You spoke to someone who was contacted by

12  The Washington Post.

13      A.  I spoke to somebody who was contacted

14  purportedly by Justin Levitt.

15      Q.  And who is that?

16      A.  I don't remember.

17      Q.  And how did you come to contact this

18  person?

19      A.  Don't remember that.  And actually I don't

20  understand your question.  "Come to contact" could

21  mean a lot of different things.  If you could clarify

22  that for me, it would be helpful.

23      Q.  You said you spoke to somebody who was

24  contacted purportedly by Justin Levitt, and I want to

25  know who is that somebody.

1        A.  And I said to you -- I've asked and

2    answered that question.

3        Q.  You don't remember; that's your answer?

4    Is that your answer?

5        A.  I asked and answered that question.

6        Q.  Is your answer, I don't remember who you

7    spoke to -- strike that.

8        Is your answer that you do not remember the

9    person you spoke to who was purportedly contacted by

10   Justin Levitt?

11            MR. LOCKERBY:  Object to the form.

12       A.  I don't know.  That question was

13   confusing.

14       Q.  Well, what was confusing about it?

15       A.  All of it.  There was very little that

16   wasn't confusing.  I might suggest starting from

17   scratch and just asking.

18       Q.  You testified that you spoke to somebody

19   who was contacted purportedly by Justin Levitt.

20           MR. LOCKERBY:  Objection to the form.

21       Q.  That was your testimony, right?

22       A.  Okay.  You just asked me two questions.

23   Did you withdraw the first?

24       Q.  Was it not your testimony just moments

25   ago, quote, "I spoke to somebody who was contacted

1    purportedly by Justin Levitt," closed quote?

2         A.  If I said that, I stand by that testimony.

3         Q.  Now my question is:  Who did you speak to?

4         A.  And I've asked and answered that, and I'll

5    do it again.  I don't remember.

6         Q.  Do you remember how you came to speak with

7    this person?

8         A.  Okay.  That's the part that I don't

9    understand what you're asking me.  How I came to

10   speak with it is not a very specific question.  If

11   you could ask a less confusing question, I can answer

12   it.  I don't know what you mean.

13        Q.  Well, even though you don't remember the

14   identity of the person, do you recall if you spoke to

15   this person over the phone?

16        A.  Now we're on to something.  By phone.

17        Q.  Did you call this person?

18        A.  Yes.

19        Q.  And why did you call this person?

20        A.  Because Justin Levitt purported to call

21   this person.

22        Q.  How do you know that?

23        A.  Because he wrote an article about it.

24        Q.  Who?

25        A.  Justin Levitt or somebody else, but,

1    regardless, Justin Levitt was the source of this

2    conversation.

3         Q.  And you reached out to that person.

4         A.  Correct, after I read the article that

5    somebody had already contacted this person first.

6         Q.  How did you get the contact information

7    for this person?

8         A.  Do not remember that.

9         Q.  Did you communicate with this person in

10   any manner other than by phone?

11        A.  No.

12        Q.  Have you spoken with any other individuals

13   listed among the 1,046 in Alien Invasion I?

14        A.  Possibly, but I don't have a specific

15   recollection.

16        Q.  And you said that your speaking with the

17   individual mentioned by Justin Levitt was not a

18   violation of PILF's corporate policy, correct?

19        A.  I've asked and answered that question.

20        Q.  And why was that not a violation of PILF's

21   corporate policy?

22        A.  Because Justin Levitt spoke with them

23   first, and once contact is made with a registrant,

24   the initial zone of peace is finished.  In other

25   words, Justin Levitt disrupted that person's life and

Page 114

1    made contact, as he did by the hundreds in this case

2    in what was probably a violation of Virginia 18.2 452

3    and made contact with these individuals en masse,

4    and, once he did that, the corporate policy did not

5    apply -- particularly when Justin Levitt decides to

6    write about the content of these conversations in a

7    public way.

8         Q.  And this corporate policy is not written

9    down anywhere?

10        A.  Of course not.

11        Q.  You wrote a column on PJ Media about Alien

12   Invasion II, correct?

13        A.  If you have it to refresh my recollection,

14   I'm more than happy to look at it.  I don't remember.

15        Q.  Actually, before we get to that, I just

16   want to ask another question about your article in

17   the exhibit in front of you.  I believe it's Exhibit

18   23.

19        On the second page, in the, I guess it's the

20   third full paragraph that begins "that's because," do

21   you see that?  Do you see that paragraph?

22        A.  I'm reading it.  I see the paragraph.

23        Q.  And you're referring to the checkbox as to

24   whether or not someone is a citizen, correct?

25        A.  I'm referring to a lot of things.  The

1    checkbox is a portion of what I'm referring to.

2         I'm also referring to the attestation when

3    somebody signs the document, the voter registration

4    form, they're making an attestation that they are

5    saying under penalty of perjury they are telling the

6    truth.

7         So if they -- if they were to say they are a

8    citizen and sign and then later say they are not a

9    citizen and sign, that one of the two is a lie,

10   that's what I'm referring to.

11        Q.  And so that's -- when you say thousands

12   are lying just in Virginia, that's what you're

13   referring to.

14        A.  Correct.

15        Q.  Could they just be making a mistake?

16        A.  Well, you've taken us right into the

17   debates in Congress in 1993 about whether or not the

18   answer to that question is yes or no.  And that was

19   something that was heavily debated in Congress, and

20   I'm happy to recount the legislative history.

21        But the short of it is that everybody who

22   passed the bill in the legislative history believes

23   that between those two boxes you're not just making a

24   mistake.  And this was the subject of a great deal of

25   debate in the House and the Senate as to what was the

1    effect of the attestations and the checkbox.

2         And the proponents of the legislation told the

3    formerly opponents of the legislation that the

4    checkbox and attestation would be sufficient to

5    overcome the premise of your question that they were

6    simply making a mistake.

7         And so the authors of the bill, the sponsors

8    of the bill, debated that very issue that you just

9    asked me in Congress extensively and ultimately

10   concluded that, no, this prevents mistakes.  And I

11   relied on that, and anybody who -- who looks at this

12   statute or this legislative history of the statute

13   would see that that's a reasonable interpretation.

14        Q.  I'm not sure if I understood that they

15   ultimately concluded that this prevents mistakes.

16   I'm not sure if I follow what you meant there.

17        A.  I agree you don't follow it.  And what it

18   means is that the proponents of this legislation

19   debated extensively the answer to the two questions

20   ago you asked me, and they built into the structure a

21   system that was designed to specifically preclude

22   somebody from asserting that a mistake was made,

23   specifically preclude that excuse from the process by

24   having the dual checkbox and attestation procedure.

25        And so if somebody makes an admission against

1   interest that they are not a citizen, as they did in

2   this case in these -- in these applications, which I

3   rely on throughout the videos and radio and documents

4   you're showing me, that they are not a citizen of the

5   United States, Congress in the legislative history

6   was very, very clear that that would preclude this

7   being a mistake, and, therefore, would subject them

8   to criminal prosecution.  That's throughout the

9   legislative history of this statute.

10       Q.  I apologize if I asked this question

11  already, but you do recall publishing a column in PJ

12  Media about Alien Invasion II; is that right?

13       A.  You did ask that question already, and I

14  told you that if you had a document to refresh my

15  recollection ...

16              (Adams Exhibit 24 marked for

17       identification: Email correspondence

18       from (topmost) C Adams sent

19       5/30/2017

20       PILF-ADAMS-0000312 - 0000316)

21       Q.  The court reporter has marked as Exhibit

22  24 a document with the Bates number 312.  Do you

23  recognize this?

24       A.  This is a -- Deposition Exhibit 24 appears

25  to be an email that I sent.

1    Q.  On May 30th, 2017?

2    A.  That's what it says.

3    Q.  And your email sends along the content of

4    a column you wrote in PJ Media; is that right?

5    A.  Well, it appears to.  I don't know if it's

6    right, but that's what it appears to do.

7    Q.  Well, do you recognize anything as missing

8    from the PJ Media column from the email that you

9    sent?

10   A.  Look, if you want to represent -- yes.  If

11   you want to represent to me that this is -- this is a

12   document that represents the PJ Media column, I have

13   no reason to quarrel with that.

14   Q.  Because you wouldn't normally forward your

15   column by excluding portions of your column.

16   A.  Is there a question?

17   Q.  Correct?

18   A.  Yes, actually I would.  I routinely save

19   my recipients' time by not including an entire column

20   and instead including excerpts, sometimes blurbs,

21   sometimes nothing at all.

22   So I would disagree with your question, or at

23   least I would answer your question I would in fact do

24   that.  Whether I did it here, I have no reason to

25   know, nor would I have the ability to answer your

1    question because I don't have the actual column with

2    me.  I don't think you've given it to me as an

3    exhibit.

4         Q.  You include in your email a link to your

5    column on PJ Media's website, yes?

6         A.  Well, that's how you solve the problem you

7    just are talking about is you include the link.

8         Q.  My question was you include in your email

9    a link to your column on PJ Media, yes?

10        A.  There is a link there.

11        Q.  To your column on PJ Media, yes?

12        A.  There is a link for PJ Media in there.

13        Q.  And it's to your column.

14        A.  I don't know.  Probably is.

15        Q.  Would you send --

16        A.  I just said it probably is.  I'm not the

17   custodian of all link names, but I have no reason to

18   quarrel with you, if that's what you're representing

19   that that's what this is.

20        Q.  And you did send out this email, right?

21        A.  It doesn't appear to say "draft," so I

22   have no reason to doubt that I sent it.  Do I have a

23   specific recollection I sent it?  No.

24        Q.  On the second page of the exhibit, the

25   second paragraph from the bottom, it begins "yet," do

1    you see that?

2         A.  I see that.

3         Q.  "Yet the PILF report demonstrates that

4    hundreds of foreigners ended up on Virginia voter

5    rolls even after telling Virginia election officials

6    they were aliens on their voter registration form."

7    Do you see that?

8         A.  That's what it says.

9         Q.  What's your basis for this statement?

10        A.  I don't have a specific recollection what

11   the basis is for this statement right now.  I have a

12   general recollection that it relates to two

13   categories of information.  One would be data that

14   PILF reviewed, and two would be conversations that I

15   had with election officials.

16        Q.  What's the data that PILF reviewed?

17        A.  Well, look at the next paragraph.  That

18   probably gives you some insight into what sort of

19   data.

20        And, again, it says, "Consider Jiling Xiao,"

21   which is J-I-L-I-N-G space X-I-A-O.  It says:

22             Xiao registered to vote during

23             Barack Obama's campaign for

24             President.  Indeed, the report notes

25             that 2008 was the year with the

1          highest rate of alien voting in

2          Virginia.  Xiao plainly marked NO to

3          the question, are you a citizen of

4          the United States, yet was

5          registered to vote.  Such is the

6          flimsy check used to prevent alien

7          voting.

8       And then it has -- it has a variety of

9    examples on the next page of the particular phenomena

10   that was described.

11       Q.  It has two more examples.

12       A.  On the next page it has Yun Ok Bae and

13   Juan Mones Cazon.

14       Q.  So there's three examples total?

15       A.  I'm sorry?

16       Q.  There are three examples of the data in

17   your article; is that right?

18       A.  Well, you can have overkill in an article.

19   If I had put more than three examples in here, that

20   would bore readers in time.

21       Q.  Okay.  But just so I understand, the data

22   that you're referring to that PILF reviewed are voter

23   registration applications; is that right?

24       A.  I'm not sure.  I mean, that would

25   certainly be a category of it.

1      Q.  Well, you said one would be data that PILF

2  reviewed.  And my question is:  What is the data that

3  PILF reviewed that is the basis for this statement?

4      A.  Well, I don't know because I didn't do the

5  review; staffers did.

6      Q.  Right, but you're the president, and you

7  just -- you wrote this statement, right?

8      A.  Well, let me add a third category, then.

9      Q.  There's a question pending.  You did write

10  this statement in your PJ Media column, right?

11      A.  Asked and answered.

12      Q.  And the answer is yes.

13      A.  I've answered that question.

14      Q.  And the answer is yes.

15      A.  We can do this all day.

16      Q.  And so my question now is, given that you

17  wrote this statement, what is the basis for your

18  statement?

19      A.  Well, I've given you two categories of

20  information.  I left out one.  One -- a third

21  category of information would be assessments given to

22  me by staff who was reviewing the underlying records.

23      Q.  Okay.  So but I'm still trying to

24  understand what the data is that is the basis for

25  this statement.

1     A.  Right, and let me go through once again

2     the list of the three.  One --

3     Q.  I just want to focus on the first thing,

4     which is the data.  Okay?  What is the data that was

5     reviewed that makes up the basis for this statement?

6     A.  We just talked about some of it.  We just

7     talked about three examples that are in the article.

8     That's the first.

9     The second category, conversations I had with

10    various elections officials --

11    Q.  Okay.  I understand, but --

12    MR. LOCKERBY:  Objection.  The witness

13    ought to be allowed to finish his answer before

14    counsel moves on to another question.

15    MR. TEPE:  I'm more than happy to get to

16    the second and third pieces.

17    Q.  But what I want to do is I want to

18    focus -- my question was focused -- on the first

19    piece, okay?

20    And so you state here the PILF report

21    demonstrates that hundreds of foreigners ended up on

22    Virginia voter rolls even after telling Virginia

23    election officials they were aliens on their voter

24    registration form --

25    A.  Right.

1          Q.  -- correct?  Okay.  And the data that you

2    have just articulated as being the basis for this

3    statement are voter registration forms; is that

4    right?

5          A.  That's partially correct.

6          Q.  Okay.  And the data aspect of this, did

7    you have hundreds of voter registration applications

8    in which the applicant said that they were aliens?

9          A.  Okay.  What paragraph are you referring

10   to?  The "yet" paragraph?

11         Q.  Mm-hmm.

12         A.  Okay.

13         Q.  The same paragraph we've been talking

14   about for a few minutes now.

15         A.  We had hundreds of records related to

16   people answering no on voter registration forms.

17   That's the first package of data of the three.  That

18   would include voter registration forms, that would

19   include a variety of documents.

20         Q.  So at this moment when you wrote this

21   article you had hundreds of voter registration

22   applications in which the applicants checked no, they

23   were not a citizen of the United States.

24              MR. LOCKERBY:  Objection, asked and

25   answered, misstates the witness's prior testimony.

1    A.  You're not withdrawing it?

2    Q.  No.

3    A.  Okay.  You're mischaracterizing the

4  testimony that I gave.

5    Q.  Okay.  Well, then I'll ask another

6  question.

7        Did you or did you not, as of the date you

8  wrote this in May 30th, 2017, or -- strike that -- as

9  of the date of your email, May 30th, 2017, did you or

10  did you not -- strike that.

11        Actually, no, I'll continue that.  As of this

12  date, May 30th, 2017, did you, Mr. Adams, have

13  hundreds of voter registration applications in which

14  the applicant indicated they were not a U.S. citizen?

15    A.  That's not what the article says.  You're

16  mischaracterizing what the article says.

17    Q.  My question, sir, is, as of this date -- I

18  can -- I'll reread it.

19        As of this date, May 30th, 2017, did you,

20  Mr. Adams, have hundreds of voter registration

21  applications in which the applicant indicated they

22  were not a U.S. citizen?

23    A.  Mr. Adams never had hundreds of anything,

24  so the answer is no, but that's also not what the

25  article says.  And I wasn't the person who was

1    custodian of records, so I never had the records in

2    mass form.  They weren't sent to me.  So the answer

3    is always going to be, no, I didn't have those

4    records.

5         Q.  Did PILF, as of this date, have hundreds

6    of voter registration applications in which the

7    applicant indicated they were not a U.S. citizen?

8         A.  I can't remember what the answer to that

9    was in the 30(b)(6) deposition on Thursday.  So and

10   Mr. Lockerby wasn't here for that deposition, so he

11   wouldn't know whether to lodge an asked and answered,

12   but I don't know the answer to that question from

13   last Thursday's deposition, as I sit here today.

14        Q.  And if PILF did have hundreds of

15   applications, voter registration applications, in

16   which the applicant indicated they were not a U.S.

17   citizen, PILF would have noted that in the Alien

18   Invasion II report, correct?

19        A.  I don't know.  That's a speculative

20   what-if question.  I don't know.

21        Q.  And, in fact, PILF in the Alien Invasion

22   II report only noted that it had 40 some odd voter

23   registration applications in which the applicant

24   noted that they were not a U.S. citizen; is that

25   correct?

1      A.  We have spent the last ten minutes in a

2   circular discussion when you knew the answer to this

3   and I didn't.

4      Q.  And so there are not hundreds -- there are

5   not hundreds of voter registration applications in

6   which applicants indicated that they were aliens that

7   is the basis for this statement, correct?

8           MR. LOCKERBY:  Object to the form.

9      A.  You're wrong.  There are hundreds.  And

10  this statement is correct and truthful and accurate

11  and can be substantiated by government records, which

12  have been refused to be turned over to the defendants

13  by the Commonwealth of Virginia.

14     Q.  Well, your statement is "the PILF report

15  demonstrates --"

16     A.  Right.

17     Q.  "-- that hundreds of foreigners ended up

18  on Virginia voter rolls even after telling Virginia

19  election officials that they were aliens on their

20  voter registration form."

21          This statement, you would agree, is not based

22  on having hundreds of voter registration application

23  forms in which the applicant indicated that they were

24  not a U.S. citizen, correct?

25     A.  Nor does it purport to have -- to indicate

1    that they are in possession of hundreds of voter

2    registration forms.

3         Q.  Okay.

4         A.  You have convenient -- you have ignored

5    the multiple bundles of information which were

6    available to us in order to make it seem as if these

7    forms don't exist in the first place.

8         Q.  So when I asked for the basis of this

9    statement, one of the things you mentioned was data,

10   and we've now established that, with respect to data,

11   you did not have hundreds of voter registration

12   applications in which the applicant indicated they

13   were not a U.S. citizen, correct?

14        A.  We had other records that indicated that

15   those forms existed, and so we relied on those other

16   records, and I relied on those other government

17   records, which are inherently reliable, for writing

18   this statement in this article, as well as relying on

19   conversations with election officials and as well as

20   relying on conversations with my staff.

21        So I fundamentally disagree with you that we

22   were not aware of hundreds of other voter

23   registration forms on which we could rely.

24        Q.  That wasn't my question, sir.

25        A.  Well, I disagree with you on that.  I

Page 129

1    believe I answered your question.

2         Q.  What else, other than this data aspect

3    that we've been talking about, what else is this

4    statement based on?

5         A.  I've answered that question a couple of

6    times.

7                   (Adams Exhibit 25 marked for

8                   identification: Email correspondence

9                   from (topmost) C Adams sent

10                  12/18/2018

11                  PILF-ADAMS-0046679 - 0046680)

12        Q.  The court reporter has marked as Exhibit

13   25 a document with the Bates number 46679.

14        The bulk of this email appears to be an

15   attempt by Russian TV to get an interview with you in

16   October of 2016; is that right?

17        A.  Could you direct me to the term "Russian

18   TV" on Deposition Exhibit 25?

19        Q.  Well, it's from -- the first email is from

20   a senior producer, Elena Sokolova, RTR TV Russia.

21        A.  Okay.  This appears to be an effort by

22   somebody who works for RTR TV Russia to interview me.

23        Q.  Yes.  Do you recall providing an interview

24   to this outlet?

25        A.  I don't think I did.

1        Q.  And then you forwarded this email on

2    December 18th, 2018 to Mr. Johnson and

3    Mr. Churchwell.  Do you see that?

4        A.  I do.

5        Q.  And the content of your email is redacted,

6    yes?

7        A.  It appears to be.

8        Q.  What is the basis for this redaction?

9        A.  I would need to see the unredacted version

10   to tell you.

11           MR. LOCKERBY:  There's also a privilege

12   log that reflects the basis for the redaction and

13   it's been the subject of extensive correspondence and

14   meet-and-confer sessions.

15       Q.  Were you providing legal advice to

16   these -- to Messrs. Johnson and Churchwell?

17       A.  I have no earthly idea, and it doesn't

18   refresh my recollection looking at this document.

19   That's why I have no earthly idea.

20           MR. TEPE:  We can go off the record.

21   Provably a good time for lunch.

22           MR. LOCKERBY:  That's fine.

23           VIDEO SPECIALIST:  We are off the record,

24   12:30.

25           (Proceedings recessed)

1                    AFTERNOON SESSION

2     (Eli L. Evans, Esq., Foley & Lardner, now present)

3              VIDEO SPECIALIST:  We are back on the

4     record, 1:18.

5                    EXAMINATION (continued)

6     BY MR. TEPE:

7          Q.  Mr. Adams, as PILF's president, you were

8     engaged in PILF's fundraising activities, correct?

9          A.  Correct.

10         Q.  You get reports on fundraising results?

11         A.  No.

12         Q.  Who gets those results?

13         A.  There are no reports.

14         Q.  Okay.  Do you get any indication as to how

15    much money PILF raises?

16         A.  Yes.

17         Q.  And how do you get those indications?

18         A.  It's on our 990s.  It's in our budget.

19         Q.  But how does those dollar figures actually

20    get into your budget?

21         A.  They show up as donations.

22         Q.  Well, let me -- let me give you -- maybe

23    it will be easier to get concrete on this.  PILF

24    sends some mass solicitations via postal mail; is

25    that right?

1        A.   There are direct mail mailings.

2        Q.   When someone sends back a donation in

3   response to one of those mailings, what happens to

4   that check?

5        A.   It's deposited into our account.

6        Q.   And is there a record kept as to Jane Doe

7   sending a donation of X amount of dollars?

8        A.   The list of our donors is kept.

9        Q.   And to track the, I guess, the success of

10  your -- or lack thereof -- of your various mailings,

11  is there an indication that Jane Doe responded to

12  this solicitation?

13       A.   No.

14       Q.   Who is the most knowledgeable about PILF's

15  fundraising activities?

16       A.   Me.

17       Q.   And so if I understand your testimony,

18  there's no tracking of whether certain solicitations

19  generate a donation; is that your testimony?

20       A.   Right.

21       Q.   In addition to postal mailings, you also

22  send out mass email soliciting donations; is that

23  right?

24       A.   Well, I quibble with the term "mass

25  emails" in some context, but there are efforts to

1   raise money by email.

2        Q.  Does PILF do fundraising events?

3        A.  Such as?

4        Q.  Any type of event-based fundraising, I

5   don't know, a dinner, for example.

6        A.  No, we do not do a dinner.

7        Q.  Do you do any other -- dinner is just an

8   example.  I don't want to be narrowly focused on

9   that, but are there other events that generate

10  donations to PILF?

11       A.  Okay.  I'm not sure I understand the

12  question.  I understand it could mean a dinner.  I

13  answered no.

14       Do you have something specific -- I've

15  answered no to the broader question, so if you have

16  something specific you want to ask about.

17       Q.  I'll go this way.  What are the methods

18  that PILF employs to raise funds?  We covered two,

19  right?

20       A.  What were those two?

21       Q.  Postal mail, emails.

22       A.  Okay.

23       Q.  What are the other methods used by PILF to

24  raise funds?

25       A.  We also seek funds from individual donors.

1          Q.  And how do you do that?

2          A.  In person.

3          Q.  Other than the postal mail and the email

4     and the individual solicitations, are there other

5     methods PILF employs to raise funds?

6          A.  We seek donations from institutional

7     sources.

8          Q.  Are these foundations, for example?

9          A.  We have been funded by some foundations.

10          MR. LOCKERBY:  I'm going to register a

11     standing objection to the relevancy of this line of

12     questioning and also counsel the witness, although I

13     doubt he needs such counseling, that disclosing

14     certain donor information potentially could invade

15     their First Amendment privileges.

16          Q.  Are the institutional donations -- strike

17     that.

18          Are the donations from institutional sources

19     sometimes referred to as grants?

20          A.  I'm not sure.  I don't think I remember

21     seeing them -- I mean, generally speaking -- let me

22     put it this way.  I'll answer in my own capacity.  I

23     don't remember using that term.

24          Q.  That term is sometimes used in some of the

25     reporting on the 990, for example.  That's why I

1    asked.

2         A.  Well, if it's on the 990, you can show it

3    to me and I can answer questions about it, to the

4    extent I can.

5         Q.  So we've talked about three methods.

6    Individual solicitations, and those could either be

7    to individual people or to institutions, correct?

8         A.  Okay.  I think I've already answered that.

9    I'm not going to go any further on that.

10        Q.  The answer is, yes, the individual

11   solicitations could either go to an individual person

12   or to an institution.

13        A.  Right.  My attorney has made it clear that

14   I'm to be cognizant of the boundaries of a privilege

15   asserted in this case, and the identity of donors is

16   not something I'm going to testify about.

17        Q.  Understood.  And I'm not asking for that.

18   I'm just asking for the methodology -- like the

19   methods that you use to raise funds.  One is postal

20   mailings, correct?

21        A.  I've testified to that.

22        Q.  The other is emails, correct?

23        A.  I stand on my earlier testimony.

24        Q.  And the third is individual solicitations,

25   correct?

1          A.   I stand on my earlier testimony.

2          Q.   And individual solicitations can either be

3     a solicitation of an individual person or an

4     individual institution, correct?

5          A.   In theory, yes.  Hypothetically, when you

6     solicit money from an individual, it could be

7     directed toward, in theory, a multiple of different

8     types of entities.

9          Q.   Are there other methods that, other than

10    those three that we just discussed, are there other

11    methods that PILF employs to raise funds?

12         A.   Well, as I sit here in my individual

13    capacity, I can't think of any right now off the top

14    of my head.  There could be, but I just don't know of

15    any.

16         Q.   You said you're the most knowledgeable

17    about PILF's fundraising activities, correct?

18         A.   That's right.  Doesn't mean that I might

19    have -- might not have forgotten something.

20         Q.   When PILF was sued in this case that

21    you're sitting in deposition for, PILF's board

22    thought it was a, quote, fundraising opportunity,

23    yes?

24         A.   I can't speak for the board and I can't

25    speak for the corporation sitting here either.  That

1   was last week.

2       Q.  Actually you can speak for the corporation

3   because you're its president.

4       A.  Doesn't mean I can speak for it in

5   30(b)(6) capacity.  I can tell you what I think about

6   it personally but not as the corporation.  That was a

7   good question for last Thursday.

8       Q.  Well, as we discussed with your counsel,

9   topics that were not able to be covered on Thursday,

10  we could cover today.

11       MR. LOCKERBY:  You need to clearly

12  delineate that it's a 30(b)(6) question, and then it

13  would come out of the time for the individual

14  deposition, as I offered.

15       MR. TEPE:  Okay.  Well, then I'll ask the

16  following questions in your 30(b)(6) capacity.

17       Q.  When PILF was sued in this case, PILF's

18  board thought it was a fundraising opportunity, yes?

19       A.  I don't remember that.  If you have a

20  document to refresh my recollection ...

21                  (Adams Exhibit 26 marked for

22                  identification: Email correspondence

23                  from (topmost) C Adams sent

24                  4/13/2018

25                  PILF-ADAMS-0018016 - 0018017)

Page 138

1     Q.  Exhibit 26 has been handed to you with the
2   Bates number 18016.  Do you see that?

3     A.  I see that.

4     Q.  Do you recognize this document?

5     A.  I don't, but I'm getting more acquainted
6   with it as I read it.

7     All right.  I've read the document.

8     Q.  It begins with an email from an Ann C.
9   Fitzgerald to you, April 12th; is that right?

10    A.  It does begin that way.

11    Q.  And she wrote, "Do you want to catch up by
12  phone?  I heard about the lawsuit, a fundraising
13  opportunity, if nothing else."  Do you see that?

14    A.  It says that.

15    Q.  Who is Ann C. Fitzgerald?

16    A.  Ann C. Fitzgerald is a president of, as it
17  indicates on the document, of AC Fitzgerald &
18  Associates.

19    Q.  What does she do?

20    A.  She runs a company called AC Fitzgerald &
21  Associates.

22    Q.  And what does she do when she's running
23  the company called AC Fitzgerald & Associates?

24       MR. LOCKERBY:  Object to the form, lack of
25  foundation.

1          A.   I don't have a foundation to answer that

2     question.

3          Q.   You hired her, did you not, PILF, that is?

4          A.   Yes.

5          Q.   Yes, and what did you hire Ann C.

6     Fitzgerald to do?

7          A.   She provides us advice about fundraising.

8     What she does for other companies I can't speak to.

9          Q.   What type of advice does she provide PILF?

10         A.   Well, on April 12th, 2018 she provided the

11    advice that this lawsuit would be a fundraising

12    opportunity for PILF, as one example.

13         Q.   What other type of advice does she provide

14    PILF?

15         A.   Well, on April 12th, she also provided an

16    offer to talk by phone because she had heard about

17    the lawsuit with an exclamation point.

18         Q.   Yes.  My question is, other than what she

19    advises here in this email of April 12th, my question

20    is what other type of advice does she provide PILF?

21         A.   Well, on April 13th she provided the

22    advice that she thought there should be a direct mail

23    letter to low-dollar donors, the general theme is

24    we're being attached -- which should be attacked, I

25    think -- because we must be doing something right.

1    The work of PILF so threatens the left that they are

2    suing us.

3         On April 13th she also provided the advice to

4    do a special letter sent to high-dollar donors,

5    depending on the number, maybe even via Express Mail

6    or FedEx.  General idea, excuse the urgency of this

7    letter, but I need to alert you right away, PILF is

8    being sued by LULAC simply because we've been

9    fighting for voter integrity XXX.

10        This frivolous lawsuit will cost PILF

11   $XX or more, the money we could have used to continue

12   our fight against illegal voting practices, and

13   that's the aim of the liberals, detract and deter

14   PILF from its mission.  I assure you we will not be

15   deterred, but we need your help, et cetera.  The

16   letter will have a reply form and stamped reply

17   envelope.

18        On April 13th she also provided the advice,

19   possibly offer to set up a follow-up call with

20   high-dollar donors to give them additional details

21   about the lawsuit.  On April 13th, she also provided

22   the advice, we can help and wordsmith this, but

23   that's the idea, and I think we can do several other

24   mailings.  That was the extent of her additional

25   advice.

1    Q.  Mr. Adams, you just read through a portion

2    of the email from Ann C. Fitzgerald -- actually not a

3    portion.  You read through the entire email of Ann C.

4    Fitzgerald on April 13th, right?

5    A.  No.  I skipped the portion that said, "I

6    knew you were doing an email, but I think you could

7    do a couple other things," as I recall.

8    Q.  So other than the advice that she provides

9    in the email exhibit in front of you, what kind of

10   advice does she provide PILF?

11   A.  Well, if you have additional emails of her

12   providing advice to refresh my recollection, I'm more

13   than happy to take a look at those.

14   Q.  You testified before that you're the most

15   knowledgeable person with respect to fundraising at

16   PILF, correct?

17   A.  That's not inconsistent with what I just

18   said.

19   Q.  And you have no recollection other than

20   the document in front of you as to the services

21   Ms. Fitzgerald provides PILF.

22   A.  That's not what my testimony was.

23   Q.  I understand.  I'm trying to understand

24   the scope of your knowledge as to the advice that

25   Ms. Fitzgerald provides PILF.

1        A.  Is there a question?

2        Q.  So the question, sir, is, other than what

3   is in front of you in this exhibit, what kind of

4   advice does Ms. Fitzgerald provide PILF?

5        A.  She provides advice to PILF of a similar

6   nature of the sort you see in Exhibit 26.

7        Q.  So in response to Ms. Fitzgerald's April

8   12th email in which she says, "a fundraising

9   opportunity, if nothing else," you responded to her,

10  correct?

11       A.  I did respond to her, according to

12  Deposition Exhibit 26.

13       Q.  And in your response you said, "my board

14  members had the same reaction as you, a fundraising

15  opportunity," correct?

16       A.  It says that in the email.

17       Q.  So, presumably, you had some basis as to

18  the thinking of board members, correct?

19       A.  Well, I think I wouldn't have written that

20  if I didn't have some basis.

21       Q.  And the thinking of board members was that

22  the lawsuit provided a fundraising opportunity,

23  correct?

24            MR. LOCKERBY:  I'm going to register an

25  objection.  Defendants have objected generally to

1  communications with board members, but subject to the

2  objection and subject to the extent that

3  communications with board members have been shared

4  outside the organization, there would be no problem

5  with the witness answering that question or that --

6  questions along those lines.

7          MR. TEPE:  I don't understand the

8  objection, but perhaps the witness can answer the

9  question.

10         Q.  The question was, the thinking of board

11  members was that the lawsuit provided a fundraising

12  opportunity, correct?

13         A.  Well, I don't know, except to the extent

14  that this document refreshes my recollection that

15  there was some thinking along those lines.

16         Q.  And what was the basis for that thinking

17  that this provided a fundraising opportunity?

18         A.  You've got me there, because I don't

19  remember.

20         Q.  Ms. Fitzgerald responds with a couple of

21  pieces of advice, and you read those pieces of advice

22  a few minutes ago, correct?

23         A.  On April 13th she responds with the

24  suggestions that I read when you asked me what other

25  advice besides April 12th she gave.

1    Q.  And she advised direct mail letter to the

2    low-dollar donors.  Do you see that?

3    A.  I can read that.  It says that.

4    Q.  And what is a low-dollar donor?

5    A.  I don't know what she meant by that.  I

6    can tell you what I think that means.

7    Q.  What do you think that means?

8    A.  It means somebody who has given a small

9    amount of money.

10   Q.  What's a small amount?

11   A.  I don't have a boundary on that at all

12   that I've ever considered, not even right now.

13   Q.  A million dollars, is that small?

14   A.  Certainly not.

15   Q.  A special letter sent to high-dollar

16   donors was another recommendation of hers, correct?

17   A.  I've already testified, when you asked me

18   what advice did she give besides the April 12th

19   advice, I included that advice in her April 13th

20   email.

21   Q.  What is a high-dollar donor to your

22   understanding?

23   A.  Maybe one who gives a million dollars.

24   Q.  What about a thousand dollars?

25   A.  That one is a hard one.  I don't have a

1   view about that as a 30(b)(6) deponent.

2        Q.   Five thousand dollars?

3        A.   Don't have a view about that.

4        Q.   Well, presumably, you would have to have

5   some view as to what constitutes a high-dollar donor

6   in order to send a special letter to them, correct?

7             MR. LOCKERBY:   Object to the form.

8        A.   I don't understand the question.

9        Q.   Well, if you're coming up with a mailing

10  list for this special letter that is recommended

11  here, would you send that letter to someone who

12  previously donated $5,000?

13       A.   Well, there's multiple letters suggested.

14  So it would seem to capture --

15       Q.   And I'm asking about the special letter

16  sent to high-dollar donors.

17       A.   Right.   I don't know.   You notice there's

18  some Xs in there.

19       Q.   And then the third bullet is, "possibly

20  offer to set up a follow-up call with the high-dollar

21  donors to give them additional details about the

22  lawsuit."   Do you see that?

23       A.   Well, when you ask me what advice did she

24  give besides on April 12th, I read that into the

25  record.

1      Q.   Yes.   And what phone calls would have been

2    made if you don't know who the high-dollar donors

3    are?

4      A.   There are no lines of demarcation in this

5    document as to what is a low-dollar donor or a

6    high-dollar donor.

7      Q.   I understand.

8      A.   So I'm not going to make one here.

9      Q.   That's why I'm asking that question as to

10   beyond this particular document, what is a

11   high-dollar donor?

12     A.   That is an undefined categorization used

13   by a third party.

14     Q.   Right.   A third party working for you to

15   help you raise money.   And so my question is:   Who is

16   a high-dollar donor?

17     A.   And I've answered that question.

18     Q.   In PILF's perspective, you don't know what

19   a high-dollar donor is?

20     A.   I've answered that question.

21     Q.   Just to make sure I understand, your

22   testimony is PILF does not know what a high-dollar

23   donor is.

24     A.   I stand on my previous testimony.

25     Q.   Sir, my question is, and I have not asked

Page 147

1   this question before -- I've asked other questions --
2   but my question is:  Is it your testimony that PILF
3   does not know what a high-dollar donor is?
4           A.   This is the last time I'm going to answer
5   this question.  There is no definition of a
6   high-dollar donor at PILF.
7                       (Adams Exhibit 27 marked for
8                       identification: Email correspondence
9                       from (topmost) D Kulivan sent
10                      5/31/2018
11                      PILF-ADAMS-0018001 - 0018002)
12          Q.   The court reporter has marked as Exhibit
13  27 a document with the Bates number 18001.
14          This is an email chain that begins with an
15  email from Shawna Powell to David Kulivan, correct?
16          A.   That's what the document says.
17          Q.   It's dated May -- excuse me, May 30th --
18  2018, and she writes, "David, we now have info we can
19  provide to our large donors/foundations re the LULAC
20  suit."  Do you see that?
21          A.   The document says that.
22          Q.   And you did provide information to large
23  donors/foundations, as indicated here by Ms. Powell,
24  correct?
25                  MR. LOCKERBY:  Object to the form.

Page 148

1          MR. TEPE:  What's the objection?

2          MR. LOCKERBY:  Well, the "you" is

3     undefined.

4          MR. TEPE:  PILF.  This is 30(b)(6)

5     capacity.

6     A.  So we're still on the 30(b)(6)?

7     Q.  Yes.

8     A.  I don't know the answer to that right now.

9     Q.  Do you know in your personal capacity?

10    A.  Well, no, I don't.  And I don't know in my

11    corporate capacity, because I didn't think that you

12    were going to be going back in, so I didn't refresh

13    my recollection about this.  More than likely --

14    well, I'm not going to speculate.

15    Q.  You did provide information to large

16    donors/foundations regarding the LULAC lawsuit,

17    correct?

18    A.  I'm not going to talk about our

19    communications with donors.

20    Q.  I'm not asking about the content of

21    communications, sir.  I'm asking whether or not you

22    did in fact provided information to large

23    donors/foundations regarding the LULAC lawsuit?

24    A.  Right, and I'm telling you I don't

25    remember.

Page 149

1      Q.  You don't remember.

2           MR. LOCKERBY:  Objection.  Is there a

3      question?

4      Q.  You're the most knowledgeable person about

5      fundraising at PILF, and you don't remember if PILF

6      provided information to large donors/foundations

7      regarding the instant lawsuit.  That's your

8      testimony.

9           MR. LOCKERBY:  Object to the form.

10     A.  Your question was something different.  It

11     was about a letter with attachments.  It was about

12     this document.

13     Q.  No, wrong.

14     A.  Well, then ask it again.

15     Q.  My question was:  Did you provide

16     information to large donors/foundations regarding the

17     LULAC lawsuit?

18     A.  Well, I don't understand the question,

19     because I don't know what the line of demarcation is

20     about large donors, for one.  There's no line of

21     demarcation.  The answer is some information was

22     provided about the lawsuit to some donors.

23     Q.  And would some donors include large

24     donors/foundations?

25     A.  I don't understand the question.  What is

Page 150

1   a large donor?  And I can answer your question

2   possibly.

3        Q.  Well, this is the words of Ms. Powell, who

4   is the secretary of PILF, correct?

5        A.  That's what she wrote.

6        Q.  Ms. Powell, in this email here, when she

7   says, "we now have info we can provide to our large

8   donors," she's referring to the special letter sent

9   to high-dollar donors that was recommended by Ann C.

10  Fitzgerald in the previous exhibit, correct?

11          MR. LOCKERBY:  Object to the form.

12       A.  She could be referring to that which is

13  redacted.  I don't know, as I sit here right now.

14       Q.  Well, presumably, she's not talking about

15  a direct mail letter to low-dollar donors, correct?

16       A.  I can't speculate.

17       Q.  Do you need to speculate as the president

18  of PILF and the most knowledgeable person about

19  PILF's fundraising?

20       A.  I do need to account for the possibility

21  that what's redacted is the answer to your question,

22  and that requires a measure of speculation because I

23  cannot remember what's redacted.

24       Q.  And so just to make sure I understand,

25  your testimony today is that you have no recollection

1    as to whether or not PILF provided information about

2    the LULAC lawsuit to, quote, large

3    donors/foundations?

4         A.  Well --

5             MR. LOCKERBY:  Object to the form.

6         A.  Right, I objected to the confusing nature

7    of the large.  If you would ask the question without

8    that element to it, I have already answered that

9    question, and the answer was that is what the

10   transcript states.

11            MR. TEPE:  Move to strike as

12   nonresponsive.

13        Q.  So, again, your testimony today is that

14   you have no recollection as to whether or not PILF

15   provided information about the LULAC lawsuit to,

16   quote, large donors/foundations.

17            MR. LOCKERBY:  Object to the form.

18        Q.  Is that right?

19        A.  I don't understand the question, for one,

20   and to the extent it did not involve large donors,

21   I've already answered it.

22        Q.  The answer is, yes, you have provided

23   information to donors/foundations regarding the LULAC

24   lawsuit.

25        A.  The answer is we have provided information

1   to some donors about the lawsuit.

2       Q.  And the outreach to these donors netted

3   PILF some money, correct?

4       MR. LOCKERBY:  Object to the form of the

5   question.

6       A.  I don't think it netted any money.

7       Q.  Are you saying that the information

8   provided to some donors of some size regarding the

9   LULAC lawsuit yielded zero dollars?

10      A.  Saying it's awfully close to that.  That

11  was the testimony last week when you asked this

12  question, and I'm answering it a second time.  This

13  is the second time you've asked a 30(b)(6) question

14  on this topic.

15      Q.  And, yes, I believe your answer last time

16  was "next to nothing."

17      A.  There you go.  You have it in the

18  transcript.

19      Q.  And "next to nothing" is not nothing,

20  correct?

21      A.  I won't quibble with your

22  characterization.

23      Q.  And so how much money did PILF raise from

24  donors of any size based on solicitations invoking

25  the LULAC lawsuit?

1        A.   Next to nothing.

2        Q.   How much money in dollar amounts did PILF

3   raise from donors invoking the LULAC lawsuit?

4        A.   I don't have that exact number.  My

5   understanding of it is it's less than a hundred

6   dollars.

7        Q.   So these large donors/foundations did not

8   help out PILF at all, basically; is that your

9   testimony?

10       A.   That's an incredibly confusing question.

11  "Help out PILF at all, basically" is not something

12  that any deponent would understand.

13       Q.   Well, so how much money do you spend on

14  the services of AC Fitzgerald?

15       A.   I'm not sure I'm going to answer that

16  because I don't know.

17       Q.   Is it more than a hundred dollars?

18       A.   More than a hundred dollars ever?  Yes.

19       Q.   Do you have a yearly contract with AC

20  Fitzgerald?

21       A.   No.

22       Q.   Do you have a retainer with her?

23       A.   Yes.

24       Q.   Okay.  How much is the retainer worth?

25       A.   Again, I don't know.  I answered that.

1        Q.  Is it above a hundred dollars?

2        A.  Yes.  I've answered that.

3        Q.  So have you fired AC Fitzgerald?

4        A.  I don't understand the question.  Have I

5    fired AC Fitzgerald?

6        Q.  Well, one of the recommendations of Ann C.

7    Fitzgerald was a special letter to high-dollar

8    donors, right?  We've already established that,

9    correct?

10       A.  What does that have to do with firing her?

11       Q.  We established that that was one of her

12   recommendations, right?

13       A.  The document speaks for itself.  I think

14   we spent some time on discussing her April 12th and

15   April 13 advice.

16       Q.  Right.  And so --

17       A.  Go ahead.

18       Q.  -- and so your testimony is that her

19   recommendation for a special outreach to large

20   donors/foundations was a failure, correct?

21       A.  No, it isn't my testimony.

22       Q.  Well --

23       A.  This is argumentative.  This is -- this is

24   argumentative, and you're characterizing testimony I

25   never gave.  I mean, that's -- that's just low.

1    Q.  I'm trying to understand.  So your

2    testimony is that, in response to solicitations of

3    high-dollar donors and foundations invoking the LULAC

4    lawsuit --

5    A.  What document are you referring to?

6    Q.  I'm not referring to a document.  I'm

7    asking a question.

8    A.  What is the question?

9    Q.  I'll restate it.  So your testimony is

10   that, in response to solicitations of high-dollar

11   donors/foundations invoking the LULAC lawsuit, PILF

12   raised less than one hundred dollars.

13   A.  What was that meaning -- you just made a

14   hand gesture.  Was that --

15   Q.  I'm --

16   A.  Okay.

17   Q.  No, that was nothing.

18   A.  I thought maybe you were demanding a

19   quicker response.

20   Q.  No.  My arms were completely still.

21   A.  Right.  Okay.  You just asked a question

22   that misrepresented the evidence.  Deposition Exhibit

23   26, as far as I can tell -- and I'm perfectly willing

24   to be pointed out as incorrect -- never uses one time

25   the word "solicitation."

1       Now, again, I stand ready to be corrected, but

2   you mischaracterized the evidence.

3       Q.  Do you not understand that asking for

4   money in a fundraising capacity is often called a

5   solicitation?

6       A.  Could you show me perhaps where in the

7   email of April 13th it suggests asking for money?

8       MR. LOCKERBY:  I'm going to object to the

9   form of the question.  At this point it might almost

10  be easier if counsel could start over with a new

11  question rather than having us debate on the record

12  what the email says and doesn't say.

13      Q.  Well, I think we already established that

14  Ann C. Fitzgerald heard about the lawsuit, correct?

15      A.  She heard about the lawsuit.

16      Q.  And she said "a fundraising opportunity,

17  if nothing else," correct?

18      A.  She did say that.

19      Q.  And you said, "my board members had the

20  same reaction as you, a fundraising opportunity,"

21  correct?

22      A.  That's what the email says that I wrote.

23      Q.  And then Ms. Fitzgerald says, "I know you

24  were doing an email, but I think you could do a

25  couple of other things."  Do you see that?

1        A.  Yeah, a couple of other things being an

2   important pivot point that you missed on all of your

3   earlier questions.

4        Q.  And one of those other things is a special

5   letter sent to high-dollar donors, correct?

6        A.  That is one of the things listed in her

7   advice of April 13th.

8        Q.  Okay.  And then we looked at the Exhibit

9   27 involving communication between Ms. Powell and

10  Mr. Kulivan, who is also with AC Fitzgerald, correct?

11       A.  Your question is who is Mr. Kulivan with

12  or was it --

13       Q.  Mr. Kulivan is with AC Fitzgerald.

14       A.  Correct.

15       Q.  And if you then go to Exhibit 27,

16  Ms. Powell said, "David, we now have info we can

17  provide to our large donors/foundations regarding the

18  LULAC lawsuit."  Do you see that?

19       A.  She does say that.

20       Q.  Okay.  And so my question, which has not

21  been answered is:  Is it your testimony that

22  solicitations or fundraising letters sent to

23  high-dollar donors/foundations that invoked the LULAC

24  lawsuit yielded less than one hundred dollars?

25       A.  Well, I'd be excepting the premise that

1   they even existed, and so that's the first thing that

2   supports my testimony, and the second thing is, if

3   they did exist, they yielded next to nothing.

4        Q.   And so is your testimony no longer that it

5   yielded less than a hundred dollars?

6        A.   Look, I've given you my best recollection,

7   as I sit here today.  You didn't like any of them.

8   You want to find inconsistencies between them.

9        I've told you it's next to nothing; I've told

10  you it's less than a hundred dollars; I've told you

11  it's an insubstantial amount of money.  That's three

12  different ways I can say the same thing.

13       Q.   But it did net you some money.

14       A.   I'm not sure.

15       Q.   So are we -- is it now back to zero?

16       A.   You're arguing with me now.

17                 (Adams Exhibit 28 marked for

18                 identification: Email correspondence

19                 from (topmost) D Kulivan sent

20                 5/1/2018

21                 PILF-ADAMS-0018006 - 0018007)

22       Q.   The court reporter has marked as Exhibit

23  28 a document with the beginning Bates number of

24  18006.  Do you recognize this document?

25       A.   I have Deposition Exhibit 28 in front of

1   me and I see it.

2          Q.   It's an email from David Kulivan dated May

3   1st, 2018; is that right?

4          A.   That's what it says.

5          Q.   To you and Ms. Powell.

6          A.   Right.

7          Q.   With a call agenda.

8          A.   It says there's a call agenda attached.

9          Q.   And then if you go to the attached, there

10  is redacted the contents of an agenda between David

11  Kulivan, yourself and Ms. Powell; is that right?

12         A.   It says it's an agenda with redactions.

13         Q.   Above the redactions it says, "updates on

14  LULAC lawsuit," and then a bullet, "Do you have a

15  green light to discuss with top donors yet?"

16         A.   That's what the document says.

17         Q.   Do you know what kind of information was

18  redacted?  I'm not asking for the content, just

19  generally.

20         A.   I have a general understanding of the

21  nature of information that would have been redacted.

22              MR. LOCKERBY:  And I'm going to register

23  an objection.  That's set forth in detail on a

24  privilege log.

25                          (Adams Exhibit 29 marked for

1        identification: Email correspondence

2        from (topmost) S Powell sent

3        4/13/2018

4        PILF-ADAMS-0040864 - 0040865)

5        Q.  The court reporter has marked as Exhibit

6   29 a document with the Bates number 40864.  Do you

7   recognize this?

8        A.  I'm reading this, 29.  I've read 29.

9        Q.  And attached to the -- well, it's an email

10  that started with David Kulivan to Ms. Powell on

11  April 13th, 2018; is that right?

12       A.  Wait.  I'm sorry.  It was an email that

13  was from David Kulivan to Powell.

14       Q.  Right, initially.  And then Ms. Powell

15  forwarded that email to you at 1:36 p.m. on April

16  13th, right?

17       A.  That's what the document says.

18       Q.  And --

19       A.  Well, she forwarded something to me, the

20  attachment, which I presume is this second page of

21  Exhibit 29.

22       Q.  Right.  And then in the body she says,

23  "Final of LULAC v. PILF email, appeal for your

24  approval/edits," right?

25       A.  The document says that.

1      Q.  And then the attachment is a copy of that

2    appeal, yes?

3           A.  No.  A copy --

4           Q.  A draft.

5           A.  Thank you.  There's a difference.

6           Q.  Indeed.  And so this is a draft what

7    Ms. Powell calls appeal, what I would call

8    solicitation, but that draft is attached to the

9    email, yes?

10          A.  It appears to be from this exhibit.

11          Q.  Right.  And then so the draft has a

12   proposed subject line, "Soros-Funded Group Sues

13   PILF."

14          A.  That's on document 29.

15          Q.  What's the reason for pointing out George

16   Soros?

17          A.  In this document?

18          Q.  Yes.

19          A.  Well, because the Plaintiffs in this case,

20   at least their national entity, has received funding

21   from Open Society Institute, which is a Soros-funded

22   and managed operation.

23          So the fact that they have been funded by

24   these funding sources has relevance to the merits,

25   relevance to the purpose, relevance to the intent,

1    relevance to the funding and resources involved.  It

2    has multiple facets of relevance to the people who

3    would receive this email.

4         And, again, you just made a gesture.

5         Q.  No, what I'm doing is I'm, like, moving my

6    hand, so --

7         A.  With an expression.

8         Q.  My hand movement was because I was about

9    to ask another question, which is -- and I'm an

10   expressive person; I apologize for that, Mr. Adams --

11   but my question is:  What's the reason for calling

12   out George Soros as purportedly a funder of the

13   national LULAC organization?

14        A.  I just provided an answer in your previous

15   question for why that is, and I stand by that

16   testimony.

17        Q.  Is there something wrong with the Open

18   Society Institute?

19        A.  Well, what do you mean by "wrong"?

20        Q.  Well, you said in your previous answer

21   that LULAC national, who is not a plaintiff in this

22   case, has received funding from the Open Society

23   Institute, correct?

24        A.  That was in my answer, correct, and -- and

25   you preclude the possibility that the Plaintiff has

1    received funding in that answer.

2            Q.   But you have no basis for saying that.

3            A.   Not yet.

4            Q.   And then you say, "the Open Society

5    Institute is a Soros-funded and managed operation,"

6    right?

7            A.   It's a factual statement.

8            Q.   Okay.   So what is the relevance of George

9    Soros donating or George Soros's Open Society

10   Institute donating money to LULAC national?

11           A.   Well, I've testified to that.

12           Q.   No, you said that it has relevance.

13           A.   And I gave you examples of why.

14           Q.   Well, you said it has relevance to the

15   merits.   How so?

16           A.   Well, because -- because the Soros-funded

17   lawsuits like exist around the country will

18   frequently be brought on flimsy foundations in order

19   to make a broader ideological or political point, and

20   that's happening all over the country right now,

21   whether it involves immigration, whether it involves

22   voting, or a wide variety of things.

23           So if Soros is funding the effort, it

24   frequently is less about the merits of the case but

25   more about the broader ideological warfare, which is

1    exactly what I characterize and consider this case to

2    be.  Otherwise, you would have resolved this a long

3    time ago.  There are other reasons.

4        Q.  This proposed appeal has links to the

5    Alien Invasion reports, correct?

6        A.  The draft appears to.

7        Q.  And this email appeal was sent, yes?

8        A.  If you have a document to refresh my

9    recollection, it would be helpful, because right now

10   I can't remember.

11              (Adams Exhibit 30 marked for

12              identification: Email correspondence

13              from (topmost) C Adams sent

14              4/13/2018

15              PILF-ADAMS-0017674 - 0017677)

16       Q.  The court reporter has marked as Exhibit

17   30 a document with Bates number 17674.  Do you

18   recognize this document?

19       A.  Exhibit 30, I've looked at.

20       Q.  And this is a final version of the email

21   appeal that we looked at in draft form in Exhibit 29,

22   correct?

23       A.  It could be.  It could not -- also might

24   not be.

25       Q.  Do you want to take a look?

1      A.  Well, I'm looking at it right now.
2   There's no way to tell.
3      Q.  Well, you can compare the two, right?
4      A.  Well, but your question was, was this the
5   final, final email, and this might not be the final
6   email.
7      Q.  Well, what makes you say it might not be
8   the final email?
9      A.  Because Shawna Powell routinely sent test
10  emails to herself to see how they looked.  And so
11  there's a prospect -- possibility that this is a test
12  email that she sent to herself to see how it looked.
13  I can't preclude that as one of the possibilities for
14  this document.
15     Q.  Well, you wouldn't send out a test email
16  unless you were planning on sending it out otherwise,
17  right?
18     A.  No, that's not correct.  You send the test
19  email in order to see if it looks adequate and
20  sufficient to send out.
21     So you asked me if this was the final email
22  that was sent, and the truthful answer is it could be
23  but it also might not be.
24     Q.  But you did send out email solicitations
25  citing the LULAC lawsuit, correct?

1        A.  Well, you're getting back to the ultimate

2   question, did this go or not, and I don't remember.

3        Q.  No, I'm not asking whether or not this one

4   went.  I'm asking -- you do know that email

5   solicitations went out invoking the LULAC lawsuit,

6   correct?

7        A.  If you have one to show me, I will opine

8   about it --

9        Q.  No --

10       A.  -- or otherwise offer testimony.

11       Q.  Sir --

12       A.  Probably, but I don't remember.

13       Q.  But you're here as a 30(b)(6) witness,

14   correct?

15       A.  A 30(b)(6) witness is going to need their

16   recollection refreshed also.  If you have a document

17   that will refresh my recollection on what was sent,

18   I'd be happy to look at it.

19       Q.  Well, how would I know what was sent other

20   than to look at the documents that you produced in

21   this lawsuit?

22       A.  Well, the documents produced in this

23   lawsuit are not going to necessarily tell you what

24   was sent.

25       Q.  That's why --

1    A.   They don't come with a guide.

2    Q.   That's why we need the testimony of an

3    educated 30(b)(6) witness to say yes, indeed, this

4    was sent.

5    A.   Right.

6    Q.   And we don't have that here.

7    A.   Well --

8         MR. LOCKERBY:  Object to the form.

9    A.   -- I don't know from the face of Exhibit

10   30 whether or not this was sent.  And I gave you very

11   specific reasons why I can't make that conclusive

12   assertion.

13   Q.   And then I asked the follow-up question,

14   which was, it is the case that PILF sent email

15   solicitations invoking the LULAC lawsuit.

16   A.   You showed me an exhibit in last

17   Thursday's 30(b)(6) that looked different than this

18   that had more formatting that you asked me questions

19   about that may be one of those.  If you want to bring

20   that back, that might be one of them.

21   Q.   No, what I want is an answer to my

22   question, which is, it is the case, sir, that PILF

23   sent out email solicitations invoking the LULAC

24   lawsuit, yes or no?

25   A.   And my testimony is I think you showed me

1    one last week that you haven't shown me today.

2         Q.  No, that's not the case, because those

3    were solicitations invoking the Alien Invasion

4    reports.  I'm now asking you questions about

5    solicitations invoking the LULAC lawsuit.

6         A.  Yeah, I have -- I'm not sure that -- I

7    don't think there were others.

8         Q.  My question again is:  It is the case that

9    PILF sent email solicitations invoking the LULAC

10   lawsuit, yes?

11        A.  I don't think there were.

12        Q.  And so it's your testimony that you

13   believe this (indicating) exhibit, Exhibit 30,

14   showing an email solicitation invoking the LULAC

15   lawsuit was not sent.

16             MR. LOCKERBY:  Object to the form.

17        A.  No.  Your question was confusing.  This is

18   a solicitation, one singular solicitation.  Your

19   question was plural, solicitations, which would mean

20   a different message, a different document, a

21   different mailing.

22        So my answer has been, if you have a document

23   to show me, I'll be happy to refresh my recollection

24   about separate solicitations.

25             (Adams Exhibit 31 marked for

Page 169

1          identification: Email correspondence

2          from (topmost) S Powell sent

3          6/1/2018 with attachment

4          PILF-ADAMS-0040925 - 0040930)

5      Q.  The court reporter has marked as Exhibit

6  31 a document with the Bates number 40925, correct?

7  Do you have that in front of you?

8      A.  40925, Exhibit 31, I have it in front of

9  me.

10     Q.  And this begins as an email from Timothy

11 Webster dated June 1st to Shawna Powell; is that

12 right?

13     A.  The email is, yes.

14     Q.  And who is Timothy Webster?

15     A.  He is with a group called ForthRight

16 Strategies.

17     Q.  And what is ForthRight Strategy?

18     A.  They write letters like the one that is

19 attached to Deposition Exhibit 31.

20     Q.  Mr. Webster said, "Shawna, here's the

21 house letter."  What is a house letter?

22     A.  A house letter is something that goes to

23 donors.

24     Q.  What kind of donors?

25     A.  House donors.

1       Q.  What's a house donor?

2       A.  It's a donor.  It's somebody who donates.

3       Q.  Does a house donor have a particular

4   criteria attached to it?

5       A.  They're donors.

6       Q.  So any donor would get this house letter.

7       A.  Well, I don't agree with that.

8       Q.  Well, that's what I'm trying to

9   understand.  Who would get the house letter?

10      A.  A donor.

11      Q.  All donors?

12      A.  No.

13      Q.  Some donors?

14      A.  Some donors.

15      Q.  Who are the some donors?

16      A.  Ones in the house file.

17      Q.  You're defining house letter by saying

18  they are the ones in the house file, and I'm trying

19  to understand who gets the house letter?

20      A.  Donors who are in the house file.

21      Q.  And what kind of donors are in the house

22  file?

23      A.  Ones who have previously donated.

24      Q.  But not all donors are on the house list,

25  house file?

1       A.  Well, it depends.  It depends on whether

2   or not they've donated to one of these mailings

3   before.

4       Q.  So once they've donated before, then they

5   get on to the house list?

6       A.  That's what a house file is.

7       Q.  Well, that's what I'm asking you about.

8       A.  All right.

9       Q.  So attached to this is a draft house

10  letter, and this letter refers to the LULAC lawsuit,

11  yes?

12      A.  This is the sort of document I was asking

13  you for a period of time in my testimony if you had

14  to refresh my recollection.  The answer is yes, it

15  refers back to LULAC lawsuit.

16      Q.  In the second paragraph, you say -- well,

17  strike that.

18      The letter says, "I'm writing to tell you that

19  we are being sued for our work exposing voter fraud."

20  Do you see that?

21      A.  I can read that in the letter.

22      Q.  Right.  And this letter purports to come

23  from you, J. Christian Adams, with the Public

24  Interest Legal Foundation, yes?

25      A.  It purports to come from J. Christian

1    Adams.

2        Q.  And on page 2 of the draft letter it

3    recites some of the findings of Alien Invasion II; is

4    that right?

5        A.  I'm sorry.  What does?  It does what?

6    Could you re-ask it?

7        Q.  On page 2 of the draft letter it recites

8    some of the findings of Alien Invasion II, correct?

9        A.  Well, I would not characterize this

10   necessarily as just a republication of Alien II.

11       Q.  I didn't ask that.

12       A.  Well, you said it recites findings.

13       Q.  Right.

14       A.  So the implication is it republished those

15   findings.  And so I'm answering the question, no, I

16   would not agree that it necessarily recites findings

17   from Alien II.

18       Q.  Actually my question was, on page 2 of the

19   draft letter, it recites some of the findings of

20   Alien Invasion II.

21       A.  And I continue to stand by my testimony

22   that some of the findings may not be an accurate

23   statement.  I don't know because I think there's some

24   differences.

25           I actually -- there are, there's differences

1    between this letter and the findings of Alien II.  So

2    the answer to your original question is no.

3         Q.  So you're saying this letter does not

4    recite any findings of Alien Invasion II?

5              MR. LOCKERBY:  Objection to form.

6         A.  I didn't say that.  You're adding an

7    absolute now in your question, the word "any."  And

8    what I've testified to is this letter -- maybe this

9    will clear it up.

10        This letter cites facts related to Alien II,

11   as far as I can see, sitting here -- and I can be

12   corrected -- in a way that is different than Alien II

13   recites those facts

14        Q.  I'm not saying it is identical, but my

15   question is, it does cite -- strike that.

16        So right here on page 2 of the letter it says,

17   "here are some of the very disturbing facts we

18   uncovered in our reports."  Do you see that?

19        A.  I see it says that.

20        Q.  And it says, "Virginia election officials

21   quietly removed 5,556 voters from the voter rolls for

22   noncitizenship between 2011 and May 2017."

23        A.  That is an accurate statement that in fact

24   that did happen.

25        Q.  And that's one of the facts or findings

Page 174

1    published in Alien Invasion II, correct?

2         A.   In large part, but not entirely.

3         Q.   And then it also says, one thousand, here

4    in the letter, "1,852 of those removed as noncitizens

5    cast ballots."  Do you see that?

6         A.   The letter says that.

7         Q.   And that's also on the findings of Alien

8    Invasion II, is it not?

9         A.   Probably is the number, if I say that's

10   exactly the number, but I have no reason to quibble

11   with it.

12        Q.   And the next bullet is, "a total of 7,474

13   illegal ballots were cast from the pool of removed

14   noncitizens."  Do you see that?

15        A.   It does say that.

16        Q.   And that was also one of the findings from

17   Alien Invasion II, correct?

18        A.   Again, I think there's some difference

19   between Plaintiff's Exhibit -- I think we're on 31 --

20   and the language you just read and the findings in

21   Alien II.

22        Q.   So are you saying the letter here to

23   donors mischaracterized the findings of Alien

24   Invasion II?

25             MR. LOCKERBY:  Object to the form.

1        A.   Nope, not saying that at all.

2        Q.   Okay.   So you would agree that this letter

3    recites some of the findings of Alien Invasion II,

4    yes?

5        A.   I won't disagree with you.

6        Q.   Meaning yes.

7        A.   No, not meaning yes.

8        Q.   Well, why do you say I wouldn't disagree

9    with you if the meaning is not yes?

10       A.   Because I don't have a view on that.

11       Q.   You don't have a view?

12       A.   I have, but you don't like it.   I've told

13   you a number of times that I think there's --

14       Q.   Sir --

15       A.   If I might finish the question, if it was

16   one, and if it wasn't one, let me know that.   "You

17   don't have a view."   Was there a question mark after

18   that?

19       Q.   So the question that was pending is, so

20   you would agree that this letter recites some of the

21   findings of Alien Invasion II.

22       A.   I won't disagree with that.

23       Q.   And my question now is:   Why do you phrase

24   your answer that way instead of just saying yes?

25            MR. LOCKERBY:   Object to the form.

1    A.  I think there are differences, which I've

2    already testified about at least twice in the last

3    ten minutes.

4    Q.  What's the difference between yes and --

5    A.  You just cut me off.

6    Q.  I thought you were finished.  What's the

7    difference between saying I won't disagree with you

8    and yes?

9    A.  I don't know.  I think we're so mired down

10   in a word game now by this point that there's no way

11   to answer the question.

12   Q.  This mailing was sent, yes?

13   A.  I doubt it.

14   Q.  Why?

15   A.  Because this mailing would have never been

16   sent, more than likely, the way it's presented in

17   Deposition Exhibit 31.

18   Q.  That's not my question.  My question is

19   that -- my question is not would this draft with no

20   names in the address block be sent.

21   My question is:  Did this letter, this draft

22   letter, become finalized and sent to donors?

23   A.  Almost certainly not.

24   Q.  And why?

25   A.  Because, to the best of my recollection,

1   it is inconceivable that a draft from ForthRight

2   Strategy has ever gone out without significant edits

3   being made to it.

4        So my testimony is that it is almost certainly

5   not the case that the answer to your question was

6   yes.

7        Q.  Okay.  So it is the case, though, that an

8   edited version of the house letter that we were just

9   looking at would have been sent out.

10       A.  I don't know.  There have been times over

11  the years where I have absolutely stopped the mailing

12  of a draft fundraising letter and said don't send

13  this.

14       Q.  But you don't recall doing that in this

15  instance?

16       A.  Well, this might have been the instance.

17       Q.  But you don't recall that specifically.

18       A.  Well, specifically, no, but generally,

19  yes.  If you have a document that is the letter, I

20  can answer that question.

21                  (Adams Exhibit 32 marked for

22                  identification: Email correspondence

23                  from (topmost) S Powell sent

24                  8/28/2018

25                  PILF-ADAMS-0041116 - 0041122)

1      Q.   The court reporter has marked as Exhibit

2   32 a document with the Bates number 41116.  Do you

3   recognize this document?

4      A.   This appears to me to be another draft

5   from ForthRight Strategies to me in Exhibit 32.

6      Q.   Okay.  So Exhibit 31, we were looking at a

7   draft from June of 2018, yes?

8      A.   Hold on.  June 1st, 2018 in Exhibit 31.

9      Q.   And this draft submitted by Timothy

10  Webster of ForthRight Strategies has a submission

11  date of August 22nd, 2018, yes?

12     A.   I thought it was 28.

13     Q.   Well, the email from Ms. Powell to you is

14  August 28th.

15     A.   Okay.

16     Q.   But then there's a -- it's called a draft

17  copy approval form.  Do you see that in the

18  attachment?

19     A.   Page 2.

20     Q.   Right.  And it has a submission date.

21  That's what I was referring to.

22     A.   Well, right, there it says 8-22-18.

23     Q.   And the package name is, I guess, a field

24  on this cover page to the draft letter.  It's called

25  "Sued Bad News"; is that right?

1         A.  It says, "I have some very bad news to

2     share with you."  That's the first sentence.

3         Q.  No, but I'm on the cover page.

4         A.  You mean the first page.

5         Q.  No, the cover page, the draft -- the

6     approval form.

7         A.  Okay.  Got it.  Right.

8         Q.  So you have the email, okay, and then

9     before you get to the letter it says "approval page,"

10    right?  And the package name is Sued Bad News?

11        A.  That's what it says in the document.

12        Q.  What is the "package code"?

13        A.  I have no idea.

14        Q.  Who sends these letters, if they go out?

15    Who actually mails them out?

16        A.  ForthRight Strategies.

17        Q.  And then so part of this attachment is

18    another draft of a house letter invoking the fact

19    that you were, PILF, was sued; is that right?

20        A.  It's a draft of a letter prepared by

21    ForthRight Strategies in Exhibit 32.

22        Q.  Right, that says, "I have some very bad

23    news to share with you.  As you know, we're being

24    sued for our work investigating and reporting on

25    noncitizens illegally registering to vote and

Page 180

1    actually voting in elections," correct?

2          A.  That's an accurate statement.

3          Q.  And that's referring to the LULAC lawsuit,

4    correct?

5          A.  It is.  There is no other.

6          Q.  And a version of this letter was sent out

7    to PILF donors, correct?

8          A.  Well, there we are back again at the same

9    issue.  If you have a document that shows me that

10   this document was sent -- now if you're asking me

11   about a version of this letter, what do you mean by

12   version, I don't understand.  Like a reproduction of

13   this letter being a version, or something closely

14   approximating this letter being a version?  There's

15   two different ways to interpret that question.  Can

16   you clarify it, please?

17         Q.  Was an edited version of this letter sent

18   out to PILF donors?

19         A.  Okay.  That I do not know the answer to.

20   If you have an edited version of this letter that you

21   could refresh my recollection that indicates it was

22   sent, I could answer that question easier -- or at

23   all.

24         Q.  If someone were to donate based on one of

25   these house letters, where would that return mail go?

1          A.   I don't know.

2          Q.   Would it go to ForthRight Strategies?

3          A.   It would go to a P.O. box in Washington,

4     D.C.

5          Q.   And who picks up the mail in that P.O.

6     box?

7          A.   Most likely ForthRight Strategies.

8          Q.   So they send out the letters and then they

9     get the responses; is that right?

10         A.   ForthRight Strategy sends out the

11    letters -- I think it's ForthRight Strategy -- and

12    responses go back to a third party, not to PILF.  I

13    don't see those responses, if that's what you're

14    asking.

15         I need to take a break.  I'm starting to lose

16    my voice a little bit.  Is this a good time?

17              MR. TEPE:  It is a good time.

18              VIDEO SPECIALIST:  We're off the record,

19    2:30.

20         (Proceedings recessed)

21              VIDEO SPECIALIST:  We are back on the

22    record, 2:46.

23    BY MR. TEPE:

24         Q.   We're ending the questioning of the

25    30(b)(6) topic of fundraising and moving on to

Page 182

1    something else.

2                    (Johnson Exhibit 8

3            previously marked for identification

4            and referenced herein: Email

5            correspondence from (topmost) N

6            Johnson sent 9/29/2016 with

7            attachment

8            PILF-ADAMS-0005601 - 0005620)

9                    (PILF Exhibit 9 previously

10           marked for identification and

11           referenced herein: Email

12           correspondence from (topmost) C

13           Adams sent 9/29/2016 with attachment

14           PILF-ADAMS-0014015 - 0014033)

15       Q.  Handing to the witness two previously

16   marked exhibits, Johnson 8 and PILF 9.

17       Mr. Adams, I'm just going to ask you a few

18   questions about these two drafts, comparing them.

19       To set the foundation here, Johnson Exhibit 8

20   is a version of Alien Invasion I that he sent to you

21   on September 29th at 4:56 p.m.; is that right?

22       A.  I'm sorry.  There's a siren, and I think

23   you said 4 something.

24       Q.  4:56 p.m.  Let me see if there's a --

25       A.  It's gone or going.

Page 183

1      Q.  All right.  Let me just do that again.

2      So Johnson Exhibit 8 is an email attaching a

3  draft of the Alien Invasion I report that he sent to

4  you at 4:56 p.m. on September 29th, correct?  2016,

5  that is.

6      A.  Right.  Johnson 8 says sent 9-29-2016,

7  4:56 p.m.

8      Q.  And PILF Exhibit 9, which you also have in

9  front of you, is an email you sent on September 29th,

10  2016 at 9:02 p.m. with your edits to the Alien

11  Invasion I report; is that right?

12      A.  Almost correct.  It is a document, Exhibit

13  9, is an email I sent on 9-29-2016 at 9:02 p.m. with

14  some edits to the Alien Invasion report that Noel

15  Johnson had sent.

16      Q.  Okay.  Yes.  So this may not be all of

17  your edits ultimately to the report is what you're

18  saying.

19      A.  Correct.

20      Q.  But these are your edits -- these are

21  edits of yours at this time.

22      A.  Exactly, yes, that's more accurate.

23      Q.  I want to direct you to what is page 2 of

24  Exhibit 9.  It's got the Bates ending in 18.  And I

25  want you to compare that to Johnson 8 with the Bates

Page 184

1    number 602.  Do you have those two pages in front of

2    you?

3         A.  I have those pages in front of me, right.

4         Q.  So on PILF 9, on the page with 018,

5    there's some text in bold that says, "in our small

6    sample of just seven Virginia counties who responded

7    to our public inspection requests, we found 976

8    aliens who registered to vote illegally."  Do you see

9    that?

10        A.  The document says that.

11        Q.  And that is, if you compare that to

12   Johnson 8, that is text that you personally added.

13             MR. LOCKERBY:  Object to the form.

14        A.  Well, now -- I don't know.  I don't think

15   so, but I don't know.  I mean, you're essentially

16   asking me to do a document compare on the fly, and I

17   don't see anything such as a redline that would make

18   that an easier question to answer.  If you have one,

19   that would be extremely helpful to answer your

20   question.

21        Q.  Well, it appears you didn't make these

22   edits in Track Changes, which would provide a

23   redline.

24        A.  Right.

25        Q.  And since we're using the actual documents

1   produced by PILF, absent a redline, I'm asking you to

2   do this comparison.

3        A.  It doesn't make sense that -- this doesn't

4   make -- I disagree with the premise that that's a

5   change of mine absent something that makes it a

6   little more clear.

7        I can't imagine -- I mean, there's a chance I

8   didn't do it in a redline, but I don't understand how

9   that -- you're coming to the conclusion that's my

10  change, because Mr. Johnson sent two different

11  versions, Exhibit Johnson 8 and PILF 9, and --

12       Q.  Well, no, Mr. Johnson sent Johnson 8,

13  right?

14       A.  Right, but Johnson 8 doesn't even come

15  close to looking like PILF 9.

16       Q.  Right.

17       A.  So there's got to be something else here

18  you're not showing me.

19       Q.  You added a lot of text.

20       MR. LOCKERBY:  Objection, that hasn't been

21  established.  The only thing that's been established

22  is there's a comment on this page from Mr. Adams.

23  That's it.

24       Q.  Okay.  Let's take one step at a time.

25       A.  Right.  And I disagree with the idea,

1    absent additional documents, that would utilize tools

2    that would allow me to see the answer to your

3    question.

4         I added a comment to that paragraph.  Maybe

5    that's what you're asking me.  Maybe I misunderstood

6    your question.  Maybe you're asking me if I added

7    that comment.  I'm sorry if I --

8         Q.  No, no, I'm not asking, but we'll take it

9    one step and see what we can, you know, agree on.

10        So we have Johnson 8, right.  It's a draft

11   that he sent to you on September 29th at 4:56 p.m.,

12   right?  We already established that, right?

13        A.  I won't disagree this was sent to me

14   because that's what the email says.

15        Q.  Okay.  And then we also have a draft

16   containing at least some of your edits back to

17   Mr. Johnson, same day, four hours later, at 9:02

18   p.m.?

19        A.  Well, my edits, I think, are delineated --

20   my certain edits are delineated which consist of a

21   comment on page 18, and this is -- let me -- let me

22   explain why I can't answer this question easily.

23        Deposition Exhibit 9 PILF is a much more

24   matured document than Johnson 8, and it is not likely

25   that I was responsible for those maturities.

1    Q.  Why do you say that?

2    A.  Because it involves formatting that I

3  don't have the capability of doing.  I don't know how

4  to do a bubble quote like that on page 14018.  So

5  that leads me to conclude -- and I don't know how to

6  do a bubble quote on 14021.

7    So, no, I fundamentally disagree.  These are

8  not my edits to Johnson 8.  In other words, some

9  changes on here are not my edits.  That's another way

10 of putting it.

11   Q.  Okay.  We can agree that the language, "in

12 our small sample of just seven Virginia counties who

13 responded to our public inspection request, we found

14 976 aliens who registered to vote illegally," that

15 language is absent from Johnson 8 and it's contained

16 in PILF 9.

17   A.  Okay.  You are now asking me to do

18 essentially a mental Ctrl F search for Johnson 8 on

19 the fly, and I don't know the answer to that, as I

20 sit here.  I can go through and do that page by page,

21 and I'm happy to do that if you direct me to do that,

22 to the best of my ability.

23   Q.  You do recall that this sentence, "in our

24 small sample," appeared ultimately in Alien Invasion

25 I with the exception it became eight Virginia

1  counties and 1,046 aliens.

2      A.  Okay.  So you're asking me if a different

3  version of this sentence appeared in the final

4  report.

5      Q.  Right.

6      A.  I recognize words like "small sample,"

7  "just," "responded to our public inspection

8  requests."  I have some recollection -- and I see

9  that I probably have not been handed that exhibit in

10  this deposition -- I have some recollection that

11  something similar to this appeared somewhere.  I've

12  seen this language before, not in PILF 9.

13      Q.  On page 7 of PILF 9, which is -- there's

14  no page numbers -- it's got the Bates number 023 --

15  the language, second paragraph from the bottom, "the

16  United States attorney in Virginia has done nothing

17  about the felonies committed by 433 aliens

18  registering in Prince William County alone."  Do you

19  see that language?

20      A.  I can read that language.

21      Q.  That language, if you go to Johnson 8 with

22  the Bates number 5608 -- and actually 5609 -- that

23  language in PILF 9 does not appear in Johnson 8;

24  would you agree with that?

25      A.  Well, there's a lot of differences.

1      Q.  I understand, but I'm just focused on this

2  one sentence that I read out of PILF 9.  That

3  sentence doesn't appear in PILF -- excuse me --

4  Johnson 8.

5          MR. LOCKERBY:  Object to the form, assumes

6  facts not in evidence and in fact contrary to the

7  evidence.

8      A.  I mean, there's multiple people doing

9  edits of this at one time.  Somebody edited this

10  document that wasn't me to add a variety of things

11  that I don't have the technical capability, which is

12  very minimal, but I still don't possess it, to do

13  certain things in this document, leading me to

14  conclude that it wasn't my edit, but, the more

15  important thing is that the United States attorney

16  language would fall between Bedford County -- but

17  then there's a different paragraph above that also.

18      Q.  Right.  I think, having looked at this, I

19  can possibly help you.  So there is a one-sentence

20  paragraph in Johnson 8 that says, "there is no other

21  indication that Prince William County (or the state

22  board -- state election board) forwarded information

23  to local or federal prosecutors on these 433

24  potential felons for investigation and prosecution."

25  Do you see that?

1      A.  No.  Where?  What page?

2      Q.  I just read it from Johnson 8.  You have

3  your finger on it.

4      A.  Right, but -- oh, I see.  Okay.

5      Q.  Right.  So that language in Johnson 8 was

6  replaced with, in PILF 9, "United States attorney in

7  Virginia has done nothing about the felonies

8  committed by 433 aliens registering in Prince William

9  County alone."  Would you agree with that?

10      A.  I agree that there's different versions of

11  a similar topic in Johnson 8 and PILF 9.

12      Q.  Okay.  And sitting here today, you don't

13  know whether you or someone else added the language

14  beginning "the United States attorney in Virginia."

15      A.  You know I've -- you've asked that and

16  I've answered it.

17      Q.  Well, I asked that about a different

18  passage, and so now I'm asking about this passage.

19      A.  Right.  I don't recall who made that edit,

20  and I indicated to you, if you had a redline, it

21  would be an easier way to answer your questions.

22  Right now I don't have a clear recollection.

23      Q.  You can put those documents aside.

24      Do you have a relationship with Donald Palmer?

25      A.  If I were to look up the word

1    "relationship" in the dictionary, I would suspect

2    there's at least six definitions, probably more.

3    Perhaps your question could be focused on one of

4    those so I can better understand the question.

5         Q.  Do you know Donald Palmer?

6         A.  I do know Donald Palmer.

7         Q.  How do you know him?

8         A.  I'm sorry?

9         Q.  How do you know him?

10        A.  Are you asking me when I first met him or

11   are you asking me --

12        Q.  We can go there.  When did you first meet

13   him?

14        A.  I met him in the fall of 2005.

15        Q.  And what was the occasion of meeting him

16   in the fall of 2005?

17        A.  Both of us were employed by the

18   United States Department of Justice in the voting

19   section.

20        Q.  And how long did you have as an

21   overlapping time period; do you recall?

22        A.  That I don't know the answer to.

23        Q.  What was his position at that time?

24        A.  He was an attorney in the voting section.

25        Q.  And you were an attorney in the voting

1    section.

2         A.   Correct.

3         Q.   Since fall of 2005 have you had occasions

4    to work with Mr. Palmer?

5         A.   Absolutely.

6         Q.   How many times?

7         A.   There's no way to categorize that.

8    There's utterly no way to do that.

9         Q.   Why is that?

10        A.   Because your question is vague, for one.

11        Q.   You can't quantify how many times you've

12   worked with him?

13        A.   That wasn't your question.  You said how

14   many times have you had an opportunity to work with

15   him.

16        Q.   No, my question was, since fall of 2005,

17   have you had occasions to work with Mr. Palmer.  You

18   said absolutely.  I asked how many times.

19        A.   Right.  I have never been employed at the

20   same location as Mr. Palmer since approximately --

21   approximately, with plus or minus two years -- 2007.

22        Q.   Have you had occasion to work with him on

23   various projects?

24        A.   He was retained to write a best practices

25   document for PILF was one example.

1       Q.  Has he served as an expert witness in any

2    of your cases?

3       A.  Well, okay, you are -- let me put it this

4    way.  I don't know what the stage of designation was,

5    and depending on what the stage of the designation

6    was, it could intrude on the attorney-client

7    privilege for a client.  So I'm attempting to

8    carefully answer the question, and maybe you could

9    give me something that would help me avoid any

10   privilege issues.

11      Q.  Well, I'm certainly not trying to get into

12   any privilege issues.  I mean, the question is just

13   simply, has he served as an expert witness in any of

14   your cases?

15          MR. LOCKERBY:  I'm going to object, and,

16   in view of the witness's concerns about

17   attorney-client privilege and work product, instruct

18   the witness that perhaps one way of answering the

19   question without disclosing privilege or work product

20   would be to limit the answer to disclosed testifying

21   experts.

22      A.  Again, it would be helpful if you have a

23   document that would refresh my recollection to answer

24   your question.  Such a document might include a

25   notice with the court, it might include a filing with

1   the court, or a variety of other public documents

2   that would help me answer that question better and

3   more accurately without violating privileges.

4       Q.   Well, I'll happily adopt Mr. Lockerby's

5   suggestion and ask the question, has Mr. Palmer

6   served as a disclosed expert on any of your cases?

7       A.   He might have.

8       Q.   In what case might he have served as a

9   disclosed testifying expert?

10       A.   There is a chance that he may have been a

11   disclosed testifying expert in ACRU vs. Starr County.

12       Q.   Other than potentially that engagement and

13   the retention to draft a best practices guide, have

14   you had occasion to work with Mr. Palmer on other

15   projects?

16       A.   Absolutely.

17       Q.   Such as?

18       A.   There is no way to catalog a decade's

19   worth of communication.  So one of the areas that

20   Mr. Palmer and I have had communications relates to

21   the role of noncitizens getting on the voter rolls

22   and voting.

23       Q.   And what communications specifically are

24   you referring to?

25       A.   Well, it's not a specific communication;

1    it's a broad range of communications relating to his

2    awareness that noncitizens were getting on the voter

3    rolls and voting based on his experience as an

4    elected -- excuse me -- a chief state elections

5    officer in two of the largest states in the

6    United States.

7         Q.  You're talking about Virginia and Florida?

8         A.  Correct.

9         Q.  So you work with him regularly on election

10   matters; is that what you're saying?

11        A.  No, I disagree with that characterization

12   actually.

13        Q.  Well, you said there's no way to catalog a

14   decade's worth --

15        A.  Keep going.

16        Q.  -- of communication.

17        A.  There you go.

18        Q.  Why isn't there a way to catalog a

19   decade's worth of communication?

20        A.  Because it is so pervasive and extensive

21   and regular that -- and elastic and otherwise

22   ongoing -- that it can't be cataloged.  And I've

23   given you a very specific example.

24        Q.  There's no question pending.

25             Did he have a role of any kind with respect to

1      the Alien Invasion reports?

2             A.   Yes.

3                  MR. LOCKERBY:  Object to the form.

4             A.   Depending on what that role, you mean by

5      that.

6             Q.   Did he have any hand in drafting the

7      reports?

8             A.   A hand in ... I don't understand what you

9      mean by "a hand in."

10            Q.   Did he draft any words that appear in the

11     Alien Invasion reports?

12            A.   He may have, but he may not have.

13            Q.   You did send him a copy of at least one of

14     the Alien Invasion reports before it was published,

15     right?

16            A.   I did.

17            Q.   In fact, I think PILF 9, which we were

18     just looking at, refers to sending a draft to Don,

19     right?

20            A.   PILF 9 says, "I am going to send to Don."

21            Q.   That's Don Reag -- uh, Don Palmer?

22            A.   Correct.

23                       (Adams Exhibit 33 marked for

24                       identification: Email correspondence

25                       from (topmost) C Adams sent

1        9/30/2016

2        Non-Party Palmer000035)

3        Q.  The court reporter has marked as Exhibit

4    33 an email with the Bates number Non-Party

5    Palmer000035.  Do you see this document?

6        A.  I see this document.

7        Q.  Do you recall this email exchange with

8    Mr. Palmer?

9        A.  Yes.

10       Q.  And so on September 30th at 1:04 a.m. you

11   sent an email to Mr. Palmer copying Mr. Johnson, with

12   the subject line, "For Your Eyes Only, Virginia Alien

13   Invasion."  Do you see that?

14       A.  That's what the document says.

15       Q.  It says, "Don, do you have time to take a

16   look at this ASAP with any edits or changes to

17   suggest?  This is our first rough and fast draft of

18   the Alien Invasion for Virginia."  Do you see that?

19       A.  Well --

20       Q.  That's what you wrote.

21       A.  -- what you said was not what I wrote, but

22   I'm just making sure the word is clear.  You did not

23   indulge my typo.  You said take a look at when you

24   read it, but it says "take a look a this ASAP."  You

25   didn't read my mistake.

1    Q.  I apologize.  I will try to do better next

2  time.

3    A.  Just want to make the record clear.

4    Q.  That's fine.  And then you wrote, "feel

5  free to hammer Cortes with some changes where you see

6  fit," right?

7    A.  It says that.

8    Q.  And so with this email you were attaching

9  a draft -- we don't have it in front of us obviously

10  because this is the first in a chain -- but you were

11  attaching a draft for Mr. Palmer to look at; is that

12  right?

13    A.  Yeah.  What's strange is the email

14  doesn't -- is there a second page of this?  The email

15  doesn't show an attachment.  It references one.  I

16  have no reason to doubt that -- and I have a specific

17  recollection of sending him one.

18    Q.  Right.  I mean, this is the first email in

19  the chain.  Usually the attachment gets dropped off,

20  right?

21    A.  Okay.  Right, but it should say something

22  about it, but, nonetheless, I just want the record to

23  be clear again that it doesn't reference the

24  attachment.

25    Q.  Well, Mr. Palmer responds to you on

1    September 30th.  He says:

2             "I found a little pearl for you.

3             Here is our very own Kathy Culliton,

4             Advancement Project, testifying

5             against the use of the SAVE database

6             in Virginia.  Guess who else worked

7             at the Advancement Project?  Edgardo

8             Cortes.  Of course, this is the pool

9             of talent of the current governor."

10        Do you see that?

11        A.  (Nodding head up and down.)  Yes.

12        Q.  And you wrote back, "perfect find," and

13   you continued, "Noel," who is also copied on this

14   email, "Culliton needs to be kicked somehow.  Don and

15   I both know her well."  And then you provide some, I

16   guess, proposed language.

17        A.  More a narrative is what I call it.

18        Q.  Okay.  This information from Mr. Palmer,

19   did you feed that to Breitbart?

20             MR. LOCKERBY:  Object to the form.

21        Q.  Did you share that information with

22   Breitbart?

23        A.  I don't think I did, but there's a chance

24   I did.  Obviously lots of people knew it.

25        Q.  At this time you didn't know it.

1        A.   You mean right now?

2        Q.   No, at this time, September 30th.

3        A.   Don informed me of this because --

4        Q.   But my question -- I'm sorry.  My question

5   is, at this time, when Don informed you, you did not

6   already have this information; is that right?

7        A.   Well, "this information," what part do you

8   mean?  I mean, he gives me a number of pieces of

9   information here.  One -- I can break it up -- one,

10  two, three, four -- four different pieces of

11  information.

12       When you say "this information," there's four

13  different ones here, some of which I knew, some of

14  which I didn't.

15       Q.   Did you know that Edgardo Cortes,

16  according to this, worked at the Advancement Project

17  at this time?

18       A.   Well, this gets exactly into Don Palmer,

19  why he wanted to be involved in this project, and I

20  reference that very clearly in the email, at least to

21  me, where I indicate something along the lines of, I

22  know he is not acting like you would.  That sentence

23  has a whole bundle of other facts behind it related

24  to my conversations with Don that led to Alien

25  Invasion.

1           And so I would have known, quite possibly,

2       that -- that Cortes was now with the Advancement

3       Project by then.  Would I have known about Kathy

4       Culliton being there?  Probably not, because I

5       thought she was with another organization.

6           Q.  Well, just to be clear in your answer,

7       according to this email, Mr. Cortes worked at the

8       Advancement Project before he was picked by Governor

9       McAuliffe, right?

10          A.  Well, right, and you asked me -- and I

11      think he's there now.  So when you asked me, did you

12      know this already, that's one of the reasons my

13      answer would have been for some of the information

14      yes.  You were asking me what I did or did not know

15      on a certain day, and I said there's multiple packets

16      of information.

17          Q.  Right.

18          A.  And the answer would be different for each

19      one.

20          Q.  Right.  And for the package with regard to

21      Cortes and Advancement Project, did you know that, do

22      you recall, at that time?

23          A.  I don't remember.  I mean, I think I

24      probably would have if he -- if Edgardo had been at

25      the Advancement Project prior to working for the

1    governor, I probably would have known that.

2         Q.  You can put that document aside.

3         Do you know Cameron Quinn?

4         A.  Yes.

5         Q.  How do you know her?

6         A.  Well, Cameron and I both worked at the

7    Department of Justice together.

8         Q.  Voting rights section?

9         A.  No.

10        Q.  Where were you?

11        A.  I was in the voting rights section.

12        Q.  And where was she?

13        A.  She was a counsel to the assistant

14   attorney general.

15        Q.  For civil rights?

16        A.  Yes.

17        Q.  For how long did your tenures overlap at

18   DOJ?

19        A.  That I don't know.  Maybe -- I'd be

20   speculating.

21        Q.  Have you worked with Ms. Quinn on any

22   projects since your tenure at DOJ?

23        A.  Yes.

24        Q.  What projects?

25        A.  Well, one of them was attempting to

1   catalog the problem, the pervasive and empirical

2   problem of noncitizen registration voting in Fairfax,

3   for which Cameron and Hans von Spakovsky had amassed

4   a rather voluminous documentary record.

5          And what it showed was noncitizens

6   registering, noncitizens voting in Fairfax, and in

7   fact was one of the genesises of this report, was the

8   awareness of a problem in Fairfax of Cameron Quinn,

9   when she was the general registrar of Fairfax, and

10  when Hans von Spakovsky, when they were on the board

11  of Fairfax, attempted to remedy.

12         And, indeed, this prior history of noncitizens

13  registering in Fairfax that Cameron Quinn brought to

14  my attention was one of the reasons this report was

15  done, was an effort to fix this problem that was

16  without any dispute occurring in at least one very

17  large, if not the largest county, in the Commonwealth

18  of Virginia.

19         Q.  So when I asked what projects you had

20  worked with Ms. Quinn on, you said one of them was

21  attempting to catalog the problem of noncitizen

22  registration and voting in Fairfax, right, and then

23  you elaborated on that, correct?

24         A.  My testimony speaks for itself.

25         Q.  Other than that cataloging, are there

1   other projects that you have worked with Ms. Quinn

2   on?

3          A.   Certainly.

4          Q.   Such as?

5          A.   Well, Alien Invasions is an offshoot of a

6   project working with Cameron Quinn, that the data

7   that they collected in Fairfax was part of the

8   projects I worked with.

9          Remember, there was -- the Fairfax data

10  collection that she engaged in and then we got copies

11  of was the first attempt at cataloging noncitizen

12  registration and voting in the Commonwealth.  Alien

13  Invasion itself was, if you will, the next phase of

14  that project.

15         Now where the lines of demarcation are between

16  Cameron collecting the data as the GR versus us

17  beginning to organize it, I couldn't tell you, but

18  those are two different things we worked on together.

19         Q.   I'm not sure if I follow.  So I'm only

20  seeing one project, and that is her providing

21  information to you about things that happened in

22  Fairfax County.  That's one thing, right?

23         A.   No, you've minimized the role -- when you

24  said "providing information," that's certainly not

25  the extent of what she did.

1      Q.  No, no, I'm not trying to minimize.  I'm

2  just trying -- I'm just trying to understand, other

3  than this Fairfax situation, are there other

4  projects, that was my question, besides Fairfax and

5  the issues in Fairfax, are there other things that

6  you worked on with Ms. Quinn?

7      A.  I think the reports would be a second.

8  Was she working directly every single day, certainly

9  not, but the efforts to catalog noncitizen voting in

10  the Commonwealth as manifested by Alien I and Alien

11  II would not have occurred without her assistance.

12      Q.  Did she edit any drafts of the Alien

13  Invasion reports?

14      A.  Unlikely.  I don't want to preclude it.

15  Right, no, this was in '17.  So it's extremely

16  unlikely that Alien II drafts would have been seen by

17  Cameron.  And whether or not Alien I was, I can't say

18  for certain, but it would have also been probably

19  unlikely.

20      Q.  Did she collect any records that were then

21  used for either the Alien Invasion reports?

22      A.  Yes.

23      Q.  What records did she collect?

24      A.  Well, when she was the general registrar

25  in Fairfax County, she was collecting the records

1    that we first examined to use for our research.  So

2    she was in an official capacity, but she was still

3    the one collecting these records.

4         Q.  Okay.  I think just to make sure my

5    question is clear, none of those records themselves

6    made it into the Alien Invasion reports.

7         A.  I actually think they did.  I think they

8    did.

9         Q.  What records?

10        A.  I think you're mistaken.  The records of

11   noncitizen cancellation in Fairfax, the documents

12   associated, the large numbers, frankly, of voter

13   registration forms where the person marks no, they

14   are not a citizen, those are records she collected

15   that I reviewed that probably were included in

16   Alien I.

17        Now did she collect them like some of the

18   people that your law firm organized?  No, she didn't

19   go out and run around the state and collect records

20   from registrars.  She did it in an official capacity

21   related to the collection of various noncitizen

22   records, which were stored in an official capacity,

23   which she alerted to me -- me.

24        That's the other part of her role is that she

25   made it known to me that these records existed.  And

1    that's the first step in a third party collecting

2    records is to be aware of its existence.

3          Q.  Have you discussed the LULAC lawsuit with

4    Ms. Quinn?

5          A.  There's some chance I have, but I don't

6    have a specific recollection of it.

7          Q.  Have you corresponded with her with regard

8    to the LULAC lawsuit?

9          A.  Highly unlikely, but if you have a

10   document to refresh my recollection, I'm happy to

11   look at it.

12         Q.  When was the last time you spoke with

13   Ms. Quinn?

14         A.  Hmm ... it's probably within the last

15   month, but it might be five weeks.  It could be

16   within the last two months.  I do not have a specific

17   recollection of that conversation other than the fact

18   that it occurred relatively recently.

19         Q.  And do you recall if this conversation

20   concerned the present lawsuit?

21         A.  I just answered your question.  I didn't

22   have a specific recollection.

23         Q.  Have you corresponded with Ms. Quinn about

24   this lawsuit by email correspondence?

25         A.  Oh, certainly not, not that I can

1    remember.  Again, as I said, if you have a document

2    that says otherwise, I'm happy to revise my answer.

3         Q.  But you don't, sitting here today, you

4    don't have any recollection.

5         A.  No.  I mean, there is some chance that at

6    some point in the last year that some reference was

7    made in some communication with Cameron Quinn

8    involving this lawsuit.

9         But, as we know, I would be surprised that

10   that correspondence has not already been turned over,

11   if it existed, given the protocols which are in place

12   to search for documents.

13        Let me put it this way.  In the 52,000 pages

14   that I reviewed to respond to your written discovery

15   requests, I don't remember seeing any communications

16   with Cameron Quinn, as I sit here right now.

17                    (Adams Exhibit 34 marked for

18              identification:Email correspondence

19              from (topmost) C Adams sent

20              2/20/2019 PILF-ADAMS-0046678)

21        Q.  The court reporter has marked as Exhibit

22   34 a document with the Bates number 46678.  Do you

23   recognize this document?

24        A.  I see document 34.

25        Q.  And it's an email from you to Cameron

1    Quinn dated February 20th, 2019; is that right?

2         A.   It is.

3         Q.   And the subject line is "FYI -- involves

4    friends."

5         A.   That's what the subject line says.

6         Q.   Do you know what that was in reference to?

7         A.   I don't remember this document.

8         Q.   In this document there's a link to a

9    website www.scribd.com?

10        A.   I see the link.

11        Q.   And in the URL for the link it says,

12   "Adams-Declaration."

13        A.   Well, the URL says that.

14        Q.   Right.  Did you send a copy of the

15   declaration that you drafted and submitted in

16   response to Defendant's -- excuse me -- Plaintiff's

17   motion to compel the production of documents to

18   Ms. Quinn?

19        A.   Wait.  There's a -- there is a motion to

20   compel production of documents of Ms. Quinn in this

21   case?  I don't understand the question.  Repeat it,

22   if you might.

23        Q.   There was a motion filed by Plaintiffs in

24   this case to compel you to produce more documents,

25   correct?

1          A.   Right, but I thought you said something

2     about --

3          Q.   And then -- I'm just clarifying -- and did

4     you send -- and in response to that motion you

5     drafted a declaration, correct?

6          A.   Right.

7          Q.   And did you send that declaration to

8     Ms. Quinn through this link?

9          A.   Yeah, I don't know.  I don't know.  I

10    don't know what this link is.  It could have been,

11    could have not been.  I mean, hit the link, and then

12    it's easier to answer your question.

13         Q.   You don't recall whether or not you sent

14    Ms. Quinn a copy of your declaration filed in

15    response to Plaintiff's motion to compel?

16         A.   If I didn't remember Exhibit 34 even being

17    sent, I'm not going to remember what this link is.

18         Q.   So the answer is you don't recall.

19         A.   No, I don't.

20                   (Adams Exhibit 35 marked for

21                   identification: Email correspondence

22                   from (topmost) N Johnson sent

23                   5/16/2016 with attachment

24                   PILF-ADAMS-0007236 - 0007238)

25         Q.   The court reporter has marked as Exhibit

1   35 a document with the Bates number 7236.  Do you

2   recognize this document?

3        A.  I see Exhibit 35.

4        Q.  And in Exhibit 35 it shows an email from

5   Cameron Quinn to you dated May 12th, 2016, correct?

6        A.  That's what the document says.

7        Q.  And the subject line is "to perhaps

8   consider," correct?

9        A.  I can read that it says that.

10       Q.  Do you recall receiving this email from

11   Ms. Quinn?

12       A.  This document, 35, refreshes my

13   recollection to some degree, but I don't have a lot

14   of memory, because I haven't seen this for -- we're

15   going on three years now.

16       Q.  The email of Ms. Quinn was turned into a

17   draft FOIA request by Noel Johnson; is that correct?

18       A.  Well, I don't necessarily think it is, but

19   I'm not sure.  Draft attached ... it can be emailed

20   to the address provided in the letter, FOIA, right.

21       I mean, I don't know the answer to your

22   question.  I know that it is a document that Noel

23   Johnson appears to have worked up into an advanced

24   stage.  Whether or not it was sent, I don't know the

25   answer to that.

1       Q.  And this is -- whether or not it was sent,

2    this draft purports to come from you, correct?

3       A.  Well --

4       Q.  It's your signature on the --

5       A.  Right, it would have to because Virginia

6    has a law that doesn't let anybody else get it.

7       Q.  Well, the law being that, to issue a

8    Virginia FOIA request, you have to be a resident of

9    Virginia.

10      A.  Correct.

11      Q.  Now the FOIA request -- well, let's start,

12   go back to the email of Ms. Quinn.

13         In her email with the subject line "To Perhaps

14   Consider," she states, "all travel records for

15   Edgardo Cortes and Elizabeth Howard 2014 to current."

16   Do you see that?

17      A.  I can read that on the document.

18      Q.  And it says, "all phone records," with

19   some quotation marks after it, which, presumably, is

20   saying all phone records for Edgardo Cortes and

21   Elizabeth Howard.

22      A.  I can read that in the document.

23      Q.  Do you agree with that?

24      A.  I agree that it's in the document.  Do I

25   agree with what the figures mean afterwards?  It's

1    peculiar.  I hadn't thought about it.

2         Q.  Sometimes people use quotation marks as

3    kinds of to mean the same as those previously --

4         A.  Oh, you're suggesting these are ditto

5    marks.

6         Q.  Yes.

7         A.  I wouldn't disagree with that.

8         Q.  Okay.  "All leave records for Edgardo

9    Cortes and Elizabeth Howard"?

10        A.  I can read it says that.

11        Q.  All calendars for the two of them, right?

12   "All calendar for Cortes and Howard," yes, that was

13   one of the things listed here by Ms. Quinn?

14        A.  I can read that it says that.

15        Q.  And those same, I guess, requests are

16   contained in the draft FOIA request that's attached,

17   yes?

18        A.  I don't know.  I haven't compared.  Let me

19   do that.

20        Okay.  Appears to contain that request.

21        Q.  Who is -- so Ms. Howard was the deputy

22   commissioner of the Department of Elections, yes?

23        A.  Who?

24        Q.  Ms. Howard.

25        A.  I don't know.  Hold on.  Where do you see

1   the name Howard?

2       Q.  Elizabeth Howard, it's on Cameron Quinn's

3   email, and then it's also in the draft FOIA request.

4       A.  Oh, okay, right.  I don't know who she is.

5       Q.  But according to the draft FOIA request,

6   she's the deputy commissioner.

7       A.  Okay.  There you are.  Exhibit 35,

8   attachment characterizes her as the deputy

9   commissioner.

10      Q.  What was the purpose of drafting this FOIA

11  request?

12      A.  Well, just like in other circumstances

13  related to the drafting of the Alien Invasion report,

14  former election officials have a pretty good idea of

15  when something is going wrong inside an election

16  department, and this is one of multiple pieces of

17  information that came to my attention about

18  malfeasance within Commissioner Cortes's tenure

19  related to problems associated with how elections are

20  run in that office.  And the purpose of this was to

21  find government records related to potential

22  malfeasance in an election office and eventually

23  analyze them and take appropriate action once

24  received.

25      Q.  What would travel records for Mr. Cortes

1   have to do with malfeasance in the Department of

2   Elections?

3          A.  Well, that's a pretty easy one.  If people

4   were inappropriately turning in travel records, as

5   has been my experience and Ms. Quinn is probably

6   aware of the situation, where Department of Justice

7   employees were charging up to $30,000 in fake travel

8   records and turning it in to the government for

9   reimbursement.

10         So this is not something that's a rare event.

11  This is something that happens in government.  And I

12  have some recollection of Ms. Quinn indicating that

13  there's a problem related to travel records

14  associated with employees of the Department of

15  Corrections.  And if they are wasting money on travel

16  instead of paying for other utilities to help

17  maintain the voter rolls or doing data searches for

18  all the dead people on the rolls, then that's a

19  highly relevant question.

20         Q.  You said the Department of Corrections.

21         A.  I'm sorry.  Department of Elections.

22  Everything else I stand by.

23         Q.  Were you fishing for dirt on Mr. Cortes?

24             MR. LOCKERBY:  Object to the form.

25         A.  "Fishing for dirt" ... I would dispute

1   your characterization, considering I just gave you a

2   fairly lengthy answer, but I'll give you another one

3   that might be longer.

4        Mr. Cortes --

5        Q.  It's a yes or no question.

6        A.  I don't agree with the premise.  I don't

7   understand the question.  But if you're asking me

8   whether I wanted to get to the bottom of whether

9   there was travel fraud or leave fraud or people not

10  turning in leave when they should have, as may indeed

11  have been the case, or, if we can keep going, résumés

12  of the people who were hired because there were

13  indications that very partisan people were being

14  hired into a nonpartisan office, or if we wanted to

15  examine the people currently employed because we

16  understood that there was a lot of waste and abuse in

17  the employment process, then, yes, I would have been

18  seeking to get those through public information

19  requests, which we're allowed to have, and whatever

20  that information would have revealed may or may not

21  have been, as you categorize it, as dirt, but it

22  could have been exculpatory, it could have been not

23  exculpatory.

24        Q.  Do you know Ken Blackwell?

25        A.  I do.

1          Q.  How do you know him?

2          A.  I'm sorry?

3          Q.  How do you know him?  I'm sorry.

4          A.  Well, are you asking me when I first

5     became aware of him?

6          Q.  When did you first meet Mr. Blackwell?

7          A.  Well, I may have had my first

8     communication with Mr. Blackwell sometime in the fall

9     of '05 when I was an attorney with the United States

10    Department of Justice.

11         Q.  Why do you say you may have had your first

12    communication with him at that time?

13         A.  That's my recollection.

14         Q.  Do you recall what that communication was

15    about?

16         A.  Yes.

17         Q.  What was it about?

18         A.  I'm not going to answer you because it's

19    the privilege of the United States.

20         Q.  Did that privilege extend to

21    Mr. Blackwell?  I mean, he's not -- he's a third

22    party, yes?

23              MR. LOCKERBY:  Well, objection, the

24    witness has identified with whom or by whom he was

25    employed at the time and also that the privilege

1  belonged and still belongs to his former employer.

2       Q.   What's the nature of the privilege?

3       A.   Attorney-client, work product, and many

4  other things that federal programs will -- probably

5  can come up with that will bog you down for months,

6  if you press.

7       Q.   So the first communication that you had

8  with Mr. Blackwell concerns something that you

9  believe is protected by a attorney-client or attorney

10 work-product privilege of the United States.

11      A.   I do.

12      Q.   And what was the topic of that

13 conversation, without getting into the contents of

14 the conversation?

15      A.   I will provide you absolutely no testimony

16 regarding that entire matter because federal programs

17 would never agree to my ability to waive anything

18 related to that function.

19      Q.   Other than this initial communication,

20 have you had other communications with Mr. Blackwell

21 since then?

22      A.   I have.  Well -- go ahead.

23      Q.   I was going to ask, how many

24 communications have you had with him?

25      A.   It is impossible to quantify that.

1        Q.  You've had many conversations with him;

2    that's why it's impossible to quantify?

3        A.  Yeah, I mean, that's part of why it's

4    impossible.

5        Q.  Why else is it impossible to quantify

6    besides the frequency?

7        A.  Because I don't keep records of it.

8        Q.  Have you worked with him on any projects

9    over the years?

10        A.  Yes.

11        Q.  What projects?

12        A.  Well, one of them would be our time

13    working together on the Presidential Advisory

14    Commission for Election Integrity.  I consider that

15    to be a project, if you will, or at least -- I

16    suspect you would consider that to be a project.

17        Q.  Broadly defined, I would.

18        A.  Right.

19        Q.  What other projects?

20        A.  Well, I don't know how you define

21    "projects" at that point.  That's clearly one that

22    would fall within a reasonable definition of a

23    project.

24        Q.  Okay.  What's your definition of a

25    project?  It apparently includes serving on the

1      Presidential Advisory Commission.

2            A.   Indeed.

3            Q.   What's your definition of a project?

4            A.   Well, a focused effort to produce a

5      particular product.

6            Q.   Okay.  Using that definition, have you had

7      occasion to work with Mr. Blackwell on other

8      projects?

9            A.   I believe we have some occasion to work on

10     free speech issues together.

11           Q.   Such as?

12           A.   Well, there's no defined project.

13           Q.   Okay.  Well, that's what I'm trying to

14     find out.  Are there defined projects, as you defined

15     it, that you worked with him on?

16           A.   Well, I wouldn't say defined projects.  We

17     have issues that overlap that we care about, free

18     speech and the First Amendment being one of them.

19           Q.   Have you worked with him on draft white

20     papers?

21           A.   Mr. Blackwell and I were on the

22     Presidential Advisory Commission, and we have worked

23     on documents related to that time.

24           Q.   Other than that, have you worked with him

25     on some collaborative work product, like an article?

1       A.   Almost certainly, but I don't have a

2   specific recollection.

3       Q.   Are there other -- other than -- were you

4   saying yes to an article, or indicating that there

5   was probably an article, or are you thinking of

6   something other than an article that's in a written

7   --

8       A.   Mr. Blackwell and I have worked on a

9   variety of issues.  Whether or not they manifest

10  themselves to something in writing, I can't catalog

11  for you, but there are a number of them that we share

12  similar beliefs that we would have worked together

13  on.

14      Q.   What are some of those similar beliefs?

15      A.   Free speech, that the First Amendment is

16  under attack by organizations like LULAC, and that

17  there's an effort to chill debate and discussion

18  about important public policy issues related to

19  elections and other matters, and that money pours

20  into the effort to chill and intimidate speakers, and

21  the ramifications include people trying to be killed

22  where Mr. Blackwell works.

23      And so Mr. Blackwell has some firsthand

24  experience with people with firearms coming to his

25  office and trying to murder people.  And so those are

1    some of the issues we talk about.

2         Q.   Other than the First Amendment, are there

3    other issues that you have common positions on?

4         A.   Right, we do.  Election integrity is

5    another one that Mr. Blackwell more than likely

6    shares my belief that having a system in place that

7    prevents noncitizens from getting on the rolls and

8    not disenfranchising citizens is a very important

9    public policy that right now is not being met by

10   election officials around the country, and, frankly,

11   not being met by federal law.

12        Q.   In terms of just concrete things in terms

13   of your work with Mr. Blackwell, so far you've

14   identified this privileged communication stemming

15   from your time at DOJ, correct, that's one?

16        A.   I identified a privileged communication

17   that I'm not going to answer questions about.

18        Q.   And then this white paper with respect to

19   the Presidential Advisory Commission, that's a

20   second, I guess, concrete thing you've worked with

21   him on, right?

22        A.   I've worked with Mr. Blackwell on the

23   Presidential Advisory Commission on a wide variety of

24   things.

25        Q.   Are there other -- I'm just looking for

1  concrete projects that the two of you have worked on

2  that you can recall sitting here today.

3        A.  Mr. Blackwell and I have never worked on

4  concrete.  But other than that, we've worked on

5  projects together.  How you define concrete is the

6  question.  And so far concrete is an inadequate

7  description for me to answer without knowing what

8  you're asking.

9        We have probably signed letters together.

10  That's another example.  If you've got a document

11  that you want me to talk about and can refresh my

12  recollection about the concrete event, I'm happy to

13  do that.

14                 (Adams Exhibit 36 marked for

15                 identification: Email correspondence

16                 from (topmost) N Johnson sent

17                 1/4/2018

18                 PILF-ADAMS-0004281 - 0004282)

19        Q.  The court reporter has marked as Exhibit

20  36 a document with the Bates number beginning 4281.

21  There's really only one thing I want to ask you

22  about, and it's focused on the first email in the

23  chain.

24        A.  Okay.  "I'll get the request out today"?

25        Q.  No, the first email in the chain meaning

1    the earliest, which is at the end, right?  So there

2    appears to be an email that you sent on January 4th,

3    2018; is that right?

4        A.  An email from me.

5        Q.  8:20 a.m.?

6        A.  I can see it says that.

7        Q.  I'm sorry?

8        A.  It says that.

9        Q.  Yes.  Do you recall sending this email at

10   8:20 a.m. on January 4th of 2018?

11       A.  Of course not, but I see it says that.

12       Q.  And then you wrote, "okay, Logan, here's

13   the plan we came up with Hans and Ken Blackwell.  We

14   are going to do our own report (some of us)." Do you

15   see that?

16       A.  It says that.

17       Q.  Right.  And is this referring to a report

18   that you guys -- "you guys" being Hans, Ken

19   Blackwell, yourself -- would draft with regard to the

20   Presidential Advisory Commission?

21       A.  No.  It says the framework is we're going

22   to plug in factual specifics Virginia, New Jersey,

23   Pennsylvania, ACRU finding -- I mean, it's telling

24   you what this is right here in the email.

25       Q.  Right.  And this email was sent after the

1    Presidential Advisory Commission was disbanded,

2    correct?

3         A.  Are you asking whether, I mean -- I don't

4    know.  It probably was.

5         Q.  And at the last sentence to this email is,

6    Hans or -- last two sentences -- "Hans will get

7    someone helping at Heritage.  But our organizations

8    are going to produce it, not the Commission."  Do you

9    see that?

10        A.  It says that.

11        Q.  And that's a reference to the Presidential

12   Advisory Commission?

13        A.  Yes.

14        Q.  So is this email referencing what we had

15   previously discussed as a white paper with Ken

16   Blackwell?

17        A.  No.  This is discussing a report that we

18   were going to do regarding all of the topics listed

19   in this email.

20        Q.  Right.  And this was a report because the

21   Presidential Advisory Commission was disbanded; is

22   that right?

23        A.  No.

24        Q.  No?  Okay.  Then what was this report?

25        A.  It says right here, "We are going to plug

1   in factual specifics -- Virginia, New Jersey,

2   Pennsylvania, ACRU finding, deposition findings in

3   Starr, Heritage Data, testimony already heard,

4   whatever."  That's what the report is going to

5   involve.  It's all listed right there in the

6   document.

7       Q.  Right.  What was the purpose of this

8   report?

9       A.  To publicize the existence of voter fraud

10  to rebut people like your plaintiffs' law firms who

11  say that doesn't exist or is minimized.  That's

12  exactly what it was.  Like the Southern Coalition for

13  Social Justice or the other plaintiffs' law firm.

14      Q.  And you were going to produce this

15  report -- strike that.

16      And you were planning on producing this report

17  because the Presidential Advisory Commission was

18  disbanded; is that right?

19      A.  No.  I told you why, because we have a

20  free -- a right to freely associate with each other

21  and speak under the First Amendment about issues

22  important to us, and one of those issues are the

23  issues detailed here.

24      And so we had a right to engage in protected

25  First Amendment activity about the existence of

1   problems in the election system, and that's what we

2   were talking about.

3        Q.  So your earlier testimony, when there was

4   a discussion about a white paper with Ken Blackwell,

5   is that something different than what's represented

6   here in this email?

7        A.  I'm sorry.  What was the question?  The

8   existence of our previous --

9        Q.  No.  So your earlier testimony, when there

10  was a discussion about a white paper with Ken

11  Blackwell -- do you recall that testimony?

12       A.  No, I don't.

13       Q.  Well, when we were going through projects

14  that you may have had with Mr. Blackwell, you had

15  mentioned some work product, not attorney work

16  product, but some -- some written collaborative

17  project with Mr. Blackwell, right?

18       A.  I said we may have signed some letters

19  together is what I believe my testimony was.

20       Q.  Did you, Mr. Blackwell and Mr. von

21  Spakovsky draft the report that's indicated in this

22  email in front of you?

23       A.  No.

24       Q.  Have you worked with Mr. Blackwell on any

25  report, not an article or anything like that, any

1   sort of report?

2          A.   Worked with Mr. Blackwell on any

3   report ...

4          Q.   On election issues.

5          A.   I've read his expert report in this case.

6          Q.   No, I'm sorry, have you, before this case,

7   have you worked with Mr. Blackwell on any written

8   product other than the articles --

9          (Clarification by reporter.)

10         A.   Probably yes.

11         Q.   Do you recall any of them sitting here

12   today?

13         A.   Well, one would be we have worked on a

14   variety of issues related to legislation in Congress,

15   and that would have included some sort of written

16   materials.  That would be one example that I'm sure

17   we worked on in the past.  I have some recollection

18   of that.  In fact it would have related to

19   legislation in the House.

20         Q.   What legislation?

21         A.   I don't remember the bill number.  It

22   related to election issues in the House.

23         Q.   What time period?

24         A.   113th maybe.

25              MR. TEPE:  I think we've been going for a

Page 229

1    while.  Just take a quick break?

2         MR. LOCKERBY:  Okay.

3         VIDEO SPECIALIST:  We are off the record,

4    3:57.

5       (Proceedings recessed)

6         VIDEO SPECIALIST:  We are back on the

7    record, 4:10.

8              (VVA Exhibit 39 previously

9              marked for identification and

10             referenced herein: Email

11             correspondence from (topmost) N

12             Johnson sent 4/4/2017

13             PILF-ADAMS-0001408 - 0001410)

14   BY MR. TEPE:

15        Q.  I'm handing the witness a document that's

16   been previously marked as VVA Exhibit 39, with the

17   Bates number, PILF Bates number of 1408.

18        Mr. Adams, do you recognize this as an email

19   string beginning with an email from Edgardo Cortes on

20   March 28th, 2017?

21        A.  I see the document Exhibit 39 VVA.

22        Q.  And you recognize this document, correct?

23        A.  I see it.  If I -- I mean, it's in front

24   of me, and I have just been handed the document.

25        Q.  Okay.  You can take a look at it.

1       A.   Okay.

2       Q.   So, again, the email string begins with an

3    email from Mr. Cortes dated March 28th, is that

4    correct, of 2017?

5       A.   The document says that.

6       Q.   Okay.  And Mr. Cortes wrote that this

7    email is in response to your letter dated March 14,

8    2017, correct?

9       A.   This email is in response ... right, the

10   document says that.

11      Q.   Attached is a PDF of the VERIS Noncitizen

12   Cancellation Report for the period January 1st, 2011

13   to March 20th, 2017, correct?

14      A.   The document says that.

15      Q.   And then in response to this email from

16   Mr. Cortes, Mr. Johnson responded, also on March

17   28th, at 3:01 p.m.  Do you see that?

18      A.   I see there's a response at 3:01 p.m. on

19   March 28th.

20      Q.   And Mr. Johnson wrote, "Mr. Cortes, thank

21   you for the report.  Upon review, there appears to be

22   15 jurisdictions missing.  Does this mean those

23   reports do not exist (i.e., no cancellations in the

24   relevant time period) or were they inadvertently

25   omitted?"  Do you see that?

1        A.   It says that.

2        Q.   And then there's a list of jurisdictions

3   such as Buchanan County, for instance.

4        A.   Right.

5        Q.   So Mr. Cortes sends the VERIS Cancellation

6   Report, Noncitizen Cancellation Report, and then

7   Mr. Johnson notices that some jurisdictions are

8   missing and asks, does this mean those reports do not

9   exist, right?

10       A.   I think we just went through this.  It

11  says what it says.

12       Q.   And then Mr. Cortes -- and Mr. Johnson

13  doesn't ask any questions other than that one, right?

14       A.   Not in VVA 39, perhaps elsewhere.

15       Q.   And Cortes responds to that question,

16  right, on April 4th, 2017?

17       A.   Well, in part, he responded --

18       Q.   And he -- go ahead.

19       A.   No, go ahead.

20       Q.   And he said, "Mr. Johnson, sorry for the

21  brief delay, but I wanted my IT folks to go back and

22  confirm my understanding.  The 15 jurisdictions you

23  listed do not have any records meeting the criteria

24  for the report."  Do you see that?

25       A.   It says that.

1    Q.  Did you personally speak with Department

2  of Elections IT folks?

3    A.  Boy ... highly unlikely, but I have some

4  recollection of communicating with IT folks at the

5  Virginia Department of Elections at some point.

6    Q.  And when was that?

7    A.  I don't remember.  I just know that, if

8  you were to ask me have you ever in your life spoken

9  to IT people at the Virginia Department of Elections,

10  my answer would be almost certainly yes.

11    Q.  Okay.  Did you talk to IT folks with

12  regard to the question Mr. Johnson asked here?

13    A.  Highly unlikely.

14    Q.  Do you know if anyone at PILF spoke with

15  any of the IT folks at the Virginia Department of

16  Elections with regard to Mr. Johnson's question here?

17    A.  That's significantly more likely to have

18  happened than Christian Adams speaking with these

19  individuals, but I do not know the answer to your

20  question.

21    Q.  You're not aware of any sitting here

22  today?

23    A.  Sitting here today I'm not aware of it.

24  But, that being said, I have a pretty clear

25  recollection that --

1          Q.  There's no question pending.

2          A.  Well, this is the answer to my last --

3     your last question.

4              MR. LOCKERBY:  Objection.  There is a

5     question pending.  There's an answer pending too, but

6     you cut it off.

7          A.  I have some recollection of Mr. Johnson or

8     somebody speaking to somebody in that office besides

9     Edgardo Cortes.

10         Q.  At some point.

11         A.  At some point.  That may or may not have

12     been IT folks.

13         Q.  And then in the rest of this response from

14     Mr. Cortes he refers to whether people are in

15     canceled status or in active status, is that right,

16     on the list that he provided?

17             MR. LOCKERBY:  Object to the form.

18         A.  I don't think he does.  I don't think that

19     is right.

20         Q.  Okay.  Well, let's read it.  So he says --

21     he continues on, "this report shows individuals that

22     were canceled due to self-reported noncitizen status

23     and failed to complete an affirmation of citizenship

24     in the allotted time frame, continued to be in

25     canceled status."

1       A.   That's what it says.

2       Q.   So he's talking about people in canceled

3   status with respect to their voter registration,

4   correct?

5       A.   Well, I can't speak -- I suspect that

6   Mr. Cortes offered in answer to your question that he

7   was more competent to answer than I am right now as

8   to what he meant.

9       I can tell you what it says on the page, and I

10   can tell you what I thought it meant, but I can't

11   tell you what Mr. Cortes might have to say.

12      Q.   And then he continues, "if an individual

13   was previously canceled and then subsequently

14   affirmed citizenship and was reregistered, they would

15   no longer appear on this report because they would

16   now be on active status."  Do you see that?

17      A.   The email in VVA 39 says that.

18      Q.   And those individuals who -- no, "those

19   individuals would show on the earlier custom report

20   you have.  Let us know if there are any additional

21   questions.  Thanks."

22      Okay.  That's the content of his email on

23   April 4th at 10:04 p.m., correct?

24      A.   The document says that.

25      Q.   He does not refer to whether people on the

1    cancellation list are citizens or noncitizens, does

2    he?

3            MR. LOCKERBY:  Object to the form.

4        A.  He does.  He does.  And one cannot

5    disconnect the context and the procedures associated

6    with the generation of this report from what he says.

7    He most certainly does refer to noncitizens.  More

8    than just noncitizens -- self-reported noncitizens --

9    which has more weight in my view than a noncitizen

10   that the Commonwealth has determined to be a

11   noncitizen.

12       Q.  He doesn't use the term "aliens" anywhere

13   in this email, does he?

14           MR. LOCKERBY:  Object to the form.

15       A.  He uses a synonym.

16       Q.  He doesn't refer to whether people are

17   legal or illegal registrants, does he?

18       A.  Wait.  Did you say he doesn't refer to

19   whether or not they are legal or illegal what?

20       Q.  Registrants.  He does not refer to whether

21   people on the cancellation list are legal or illegal

22   registrants, does he.

23       A.  Well --

24           MR. LOCKERBY:  Object to the form.

25       A.  -- one can make a reasonable inference

1    that, if they swore falsely on the registration form,

2    that they were illegal registrants, absolutely,

3    and --

4         Q.  But he -- are you done?  But he in his

5    email does not refer to whether people are legal or

6    illegal registrants himself.

7              MR. LOCKERBY:  Object to the form.

8         Q.  Is that right?

9         A.  It is -- I would disagree slightly to

10   that, because he is very explicitly saying that they

11   were canceled due to self-reported noncitizen status,

12   which presupposes they got on the rolls in the first

13   place by dishonestly filling out a form that they had

14   to attest to under penalty of perjury.

15        While it's true that he doesn't say illegal

16   registrants, that's the reasonable inference from the

17   facts presented by Mr. Cortes in this email that they

18   illegally registered in the first place.

19        Q.  He does not refer to whether people

20   committed or did not commit felonies, does he?

21        A.  By implication, yes.

22        Q.  He does not use those terms.

23        A.  He doesn't use the word "felony," but he

24   says everything else a reasonable person with common

25   sense would require to ascertain whether or not a

1    crime may have been committed.

2         Q.  And so this -- he says this report shows

3    individuals that were canceled due to self-reported

4    noncitizen status and failed to complete an

5    affirmation of citizenship in the allotted time

6    frame, right?

7         A.  That's what the document says.

8         Q.  Right.  And this is referring to a list

9    that shows people who did not respond with an

10   affirmation of citizenship within two weeks of

11   receiving a notice of intent to cancel, correct?

12            MR. LOCKERBY:  Object to the form.

13        A.  And there's more to your -- that you left

14   out of your question.

15        Q.  But -- but that is --

16            MR. LOCKERBY:  Objection.  He ought to be

17   allowed to finish his answer.

18        Q.  Go ahead.

19        A.  These are people who first gave false

20   information to an election official at least once,

21   and most recently would have said, under penalty of

22   perjury, that they were not an American citizen, and

23   they would have attested to that and made an

24   affirmative checkbox to that, and then the state, the

25   Commonwealth, would have gone to the trouble of

1    mailing them an opportunity to correct the record,

2    and they never replied.

3          Q.   Within two weeks.

4          A.   That's the law.

5               MR. LOCKERBY:  Objection.

6          Q.   And you can -- but you can reregister

7    after that two-week time period.  You know that,

8    right?

9          A.   Wait.  Who can reregister?

10         Q.   The person who was canceled.

11         A.   Not necessarily.

12         Q.   That is an option.

13         A.   Not always.

14         Q.   Well, I'm not asking if it's always the

15   situation, but that is an option.  If you fill out,

16   you know, a new registration, for example, and affirm

17   your citizenship, you may be back on the voter rolls,

18   right?

19         A.   Right, but your question was whether or

20   not you can just do it willy-nilly, and the answer is

21   no.  If you're not a citizen in the first place, for

22   whom these individuals were not, then, no, you can't

23   just reregister to vote.  You're not a citizen of the

24   United States.  And that's just federal law.  It's

25   also state law.

1      Q.  And so Mr. Cortes does not use the word

2   "felonies" in this email, right?

3           MR. LOCKERBY:  Objection, asked and

4   answered.  The document speaks for itself.

5      Q.  Withdrawn.  And at the top of the document

6   Mr. Johnson forwards the previous email chain to you

7   and he says, with respect to Mr. Cortes, he just

8   confirms what we already knew.  The report includes

9   only people who are flagged then sent an affirmation

10  and did not return it, correct, that's what he says?

11          MR. LOCKERBY:  Objection.

12          MR. TEPE:  What's the objection?

13          MR. LOCKERBY:  That's not what it says.

14          MR. TEPE:  What did I misread?

15          MR. LOCKERBY:  And failed to complete an

16  affirmation of citizenship in the allotted time frame

17  and continued to be canceled status.

18          MR. TEPE:  That's not what he wrote.  The

19  quotation here is what I read.  "Otherwise he just

20  confirms what we already knew -- the report includes

21  only people who were flagged, then sent an

22  affirmation and did not return it," period.

23     Q.  That's what Mr. Johnson wrote to you,

24  correct?

25     A.  Mr. Johnson's email in Deposition Exhibit

Page 240

1   39 in a VVA dep says what it says.  I can't add to it

2   or subtract from it.

3       Q.  And you don't disagree with what

4   Mr. Johnson wrote, do you, that one sentence I just

5   quoted?

6       A.  Well, I think that there's certain things

7   he left out, but I have no reason to -- I am unable

8   to find something -- I don't know about the part he

9   confirms what we already knew.  I do dispute that a

10  little bit.  I didn't know what Mr. Cortes writes

11  down below in the April 4th, 10:04 a.m. email, I

12  didn't already know that.

13      I was stunned, frankly, that it was so cut and

14  dried after his email where all of the -- all of the

15  Linda Lindberg, Arlington registrar, complaints about

16  the data were exposed to be inaccurate.

17      Q.  Well, you never actually checked the list

18  that Mr. Cortes sent over against all the records

19  from the jurisdictions that showed people who had

20  reregistered yet were still on the cancellation list.

21      MR. LOCKERBY:  Object to the form.

22      A.  Mr. Cortes very specifically, as the chief

23  election officer of the state, said the people on the

24  report he sent us were canceled as declared

25  noncitizens and did not reregister, period.

1      Q.  And you never checked the records of the

2   registrars that they sent to you against the report

3   that Mr. Cortes sent to you.

4      A.  I personally did not.

5      Q.  And did anyone at PILF?

6      A.  I think you asked that last week, and I

7   don't remember the answer.

8      Q.  You can put that document aside.

9                 (Adams Exhibit 37 marked for

10                identification: Email correspondence

11                from (topmost) C Adams sent 2/6/2017

12                PILF-ADAMS-0051839)

13      Q.  The court reporter has marked as Exhibit

14   37 a document with the Bates number 51839.  Do you

15   recognize this document?

16      A.  I see this, yes.

17      Q.  It's an email that you wrote on February

18   6th, 2017 to Mr. Churchwell?

19      A.  It is.

20      Q.  And it concerns a draft letter to the

21   Virginia Senate Elections Committee; is that right?

22      A.  Well, let me see if it references that.

23      Q.  In the subject line.

24      A.  In the subject line ... you're not showing

25   me the letter, are you?  I mean, that's not in the

1    exhibit you've handed me.

2         Q.  Right, that's correct.  You responded that

3    the letter needs to be fine-tuned.  You state, "we

4    framed the Virginia study in a way that protects us."

5    The Virginia study is Alien Invasion I, correct?

6         A.  I don't know.  It doesn't say that.

7         Q.  But that is what you're referring to, yes?

8         A.  It probably is.  I don't remember.  I

9    can't imagine what else it could be, but there could

10   be something else.  It might be referring to the

11   process of collecting data.  It might be referring to

12   the -- I mean, if you have the letter itself, I would

13   better be able to be answer -- better be able to

14   answer this question.

15                    (Adams Exhibit 38 marked for

16                    identification: Public Interest

17                    Legal Foundation | Letter dated

18                    February 7, 2017 to Chairwoman

19                    Holtzman Vogel)

20        Q.  The court reporter has marked as Exhibit

21   38 a letter of Logan Churchwell dated February 7th,

22   2017 to Chairwoman Holtzman Vogel of the Virginia

23   Senate, correct?

24        A.  That's what it says.

25        Q.  And this is the letter that was being

Page 243

1    referenced as being drafted in Exhibit 37?

2         A.  That's your assertion to me?

3         Q.  I'm asking you.

4         A.  Oh.

5         Q.  Isn't this -- I'm sorry.  Isn't this

6    letter the letter that's being referenced in Exhibit

7    37?

8         A.  Well, it could or could not be.  I don't

9    know.  It's clearly a day later.

10        Q.  It's clearly a letter to the Virginia

11   Senate Elections Committee?

12        A.  Right.  The question is whether it was the

13   attachment to Plaintiff's or to Adams 37, and I don't

14   know the answer to that.  I just know that it's -- 38

15   is, Exhibit 38 is a letter to Chairwoman Vogel.

16        Q.  Right.  And actually the question that

17   this letter is being provided to refresh your

18   recollection of is your statement, "we framed the

19   Virginia study in a way that protects us," and, as

20   you can see from the letter to Chairwoman Holtzman

21   Vogel, this letter refers to the Alien Invasion I

22   report, correct?

23        A.  It does seem to do that.

24        Q.  And so I just wanted to establish that,

25   when you say in your email here in Exhibit 37, "we

1    framed the Virginia study," you're not talking about

2    something other than Alien Invasion I.

3         A.  Well, let me be sure about that.  No,

4    there's items in here that go beyond Alien I.  I

5    think the second page, the paragraph that begins

6    "Virginia's weak record" gets into matters that are

7    historical in nature.  So I don't think it's accurate

8    to say everything in this letter relates to Alien I.

9         Q.  That wasn't the question.

10        A.  Well, maybe you should repeat it.  I'm

11   sorry.

12        Q.  The question is, in Exhibit 37, the

13   Virginia study that you referenced in your email

14   refers to Alien Invasion I, correct, and nothing

15   else?

16        A.  Probably, but there's a chance it doesn't.

17        Q.  Why do you say there's a chance it

18   doesn't?

19        A.  Well, I just told you, I think there's

20   things in here that do not relate to Alien I that

21   relate to Virginia and a study in Virginia, and so we

22   can --

23        Q.  All right.

24        A.  I mean, just there may be something

25   contained in that that's more than Alien I but --

Page 245

1          Q.   Probably not?

2          A.   -- probably not.

3          Q.   Your email on -- that's before you in

4     Exhibit 37 said that the report did not list, quote,

5     "noncitizens on the voter rolls," closed quote.  Do

6     you see that?

7          A.   It says that.

8          Q.   And, again, would you agree that the

9     report is referencing Alien Invasion I?

10         A.   Probably.

11         Q.   If the report had referred to the listed

12    individuals as noncitizens, that would be legally

13    problematic; is that right?

14         A.   Well, I think at this --

15         Q.   For PILF.

16         A.   -- what I'm telling him to -- I'm telling

17    him to change that terminology in this letter to --

18    remember, this happened after the testimony that Noel

19    Johnson provided to Chairman Vogel's committee, and

20    my suggestion to him was to utilize the term

21    registrants who are canceled for citizenship problems

22    according to election officials.  Both are

23    defensible, both are accurate, but I suggested he use

24    the second, not the first.

25         Q.   You said both are accurate?

1      A.  Yes.

2      Q.  And so in your mind there's no

3  distinguishing between saying noncitizens on the

4  voter rolls and saying registrants who are canceled

5  for citizenship problems according to election

6  officials?

7      A.  Well, I think it's important to tell

8  people whose fault this is, and the primary

9  difference is that election officials are the ones

10  telling us that these were noncitizens.

11      Q.  Well, in the following sentence you say,

12  "there's a big difference between the two and shifts

13  risk of error onto government officials."  You wrote

14  that, right?

15      A.  It says that.

16      Q.  So at the time you thought there was a big

17  difference between a report stating the individuals

18  are noncitizens on the voter rolls and stating that

19  there are registrants who were canceled for citizen

20  ships; is that correct?

21      A.  I prefer to cite the government documents

22  and rely on the government documents and the

23  reasonable inferences associated with those

24  government documents.

25      In this email I am instructing Mr. Churchwell

1    to do as I just suggested, to rely on government

2    records, to draw reasonable inferences from those

3    records.

4         Q.  But whether it's noncitizens or

5    registrants who were canceled for citizenship

6    problems, you think they're both accurate?

7         A.  According to government records, yes.  Now

8    were there ever cases to the contrary?  Almost

9    certainly.  But I think that these are both accurate

10   statements given the facts of the case.

11        Q.  I think you can put that document aside.

12   Actually I have another question about that document,

13   if you could put it back in front of you.

14        A.  There were two documents.  Which one?

15        Q.  Exhibit 38 -- I'm sorry -- 37.  When you

16   said, "we framed the Virginia study in a way that

17   protects us," protects PILF, I assume you're saying,

18   protects us?  Who is the "us"?

19        A.  Well, anybody who -- who -- you can't read

20   that out of context with the next statement or the

21   next sentence.  We deliberately avoided a Greg

22   Phillips style overstatement.  That will tell you who

23   us is.

24        Greg Phillips made some statement to the media

25   that a individual did something in San Francisco, and

1  I forget the particulars, but the person involved

2  wasn't even associated with the underlying event.

3  And this was fresh at the time, and I wanted it to be

4  an example for Logan to take to heart that you can't

5  do the things Greg Phillips did in that particular

6  instance.

7       Q.  Okay.  Strike as nonresponsive.

8       My question is, you state "in a way that

9  protects us."  Who is the "us"?

10      A.  Well, I answered you by telling you us,

11  why, contextually, the second -- the next sentence is

12  important, because I wanted Logan to be aware of what

13  not to do as relates to something that Greg Phillips

14  just did, and I don't know who us is other than

15  giving you that answer that there's two people on

16  this email, but I don't know.

17      Q.  Didn't you intend by "us" to say PILF, we

18  framed the Virginia study in a way that protects

19  PILF?

20      A.  I don't know.  There's a number of

21  different ways to interpret this that I don't

22  remember what I was meaning at the time, other than

23  the importance in the context of the next sentence.

24      Q.  And what did it protect us from?

25      A.  Complete, total screw-ups like Greg

Page 249

1   Phillips had just done.

2        Q.  You can put that document aside.

3        The complaint in this litigation was filed on

4   April 12th, 2018.  Do you recall that?

5        A.  Whatever it says.  I have no reason to

6   disagree with you as I sit here.  If you want to show

7   me the complaint, I can adopt that date, but I just

8   don't know.

9        Q.  Since this lawsuit was filed, PILF has

10  continued to issue reports on election issues?

11       A.  Absolutely.

12       Q.  And has continued to issue reports on

13  purported noncitizen registration and voting, yes?

14       A.  Yes.  I assume that's a 30(b)(6) question?

15       Q.  Sure, we can consider it a 30(b)(6)

16  question.

17            MR. LOCKERBY:  To what topic does it

18  pertain?

19                 (Adams Exhibit 39 marked for

20                 identification: Steeling the Vote |

21                 Allegheny County, PA Reveals How

22                 Citizenship Verification Protects

23                 Citizens and Immigrants Alike)

24       Q.  Well, whether it's 30(b)(6) or in your

25  personal capacity --

Page 250

1     A.   Well, that would change the answer.

2     Q.   It shouldn't.

3     A.   It does.  I haven't issued any reports on

4  noncitizen voting that I can think of.  This is a

5  PILF report you've handed me as Exhibit 39.

6     Q.   Which you're incapable of providing

7  testimony of even though you're the president of

8  PILF?

9     A.   If you're asking me a 30(b)(6) question,

10  ask it.

11     MR. LOCKERBY:  He can provide testimony

12  regardless, but the issue is whether it's within the

13  scope of a 30(b)(6) topic, which affects his duty to

14  prepare to testify about it as well as the import of

15  the response.  That's why it's important to identify

16  on the record whether this is within the scope of a

17  30(b)(6) topic, and, if so, which one.

18     MR. TEPE:  I don't have the 30(b)(6)

19  topics listed in front of me, but I can tell you that

20  the questions do not really go into the details of

21  this report as much as differences between this and

22  the Alien Invasion reports.  So it's part of the

23  Alien Invasion topics.

24     MR. LOCKERBY:  Well, it sounds as if it

25  may be within the penumbras, arguably, of a topic,

1    but, in any event, we don't -- without identification

2    on the record that -- as to which 30(b)(6) topic it's

3    within and why, that does affect his answer because

4    his individual answer would be based on memory, his

5    30(b)(6) answer could be based on something else.

6         So, absent some identification, I'm going to

7    assume it's not within the scope of a particular

8    topic.

9              MR. TEPE:  Well, while my colleague looks

10   to get a copy of the 30(b)(6) notice to refresh my

11   recollection, I'll just ask the question.

12             MR. LOCKERBY:  I had some exhibits

13   delivered here, I think, this morning, which should

14   include the 30(b)(6) topics.

15             MS. CLEMINSHAW:  The box is right over

16   here.

17             MR. LOCKERBY:  Right.  Yes.

18             MR. TEPE:  Do you want to go off the

19   record?

20             MR. LOCKERBY:  Yes.

21             VIDEO SPECIALIST:  We are off the record,

22   4:45.

23        (Proceedings recessed)

24             VIDEO SPECIALIST:  We are back on the

25   record, 4:46.

Page 252

1    BY MR. TEPE:

2         Q.   The questions, which I will be asking, I

3    believe are covered under Topic 2, which is your

4    activities, communications relating purported

5    noncitizen registration voting in Virginia, the Alien

6    Invasion report, et cetera.

7         Again, my questions are not so much about this

8    report, but differences between this report and the

9    Alien Invasion report.

10        MR. LOCKERBY:  I think we'll have to hear

11   the specific questions, but, on its face, this report

12   deals with Allegheny County, Pennsylvania not

13   Alleghany County, Virginia, and so we don't

14   necessarily agree, but ask the questions and we'll

15   see where it goes.

16        Q.   Okay.  So after the complaint was filed in

17   this LULAC lawsuit, you, PILF, published a report

18   called "Steeling the Vote," correct?  That's in front

19   of you?

20        A.   Right.  I'm looking for a date on here,

21   July 18 ... right.

22        Q.   And this concerns Allegheny, Pennsylvania,

23   is that right, this report Steeling the Vote?

24        A.   That's what the face of it says.

25        Q.   And like the Alien Invasion reports, PILF

1    relied on NVRA requests to collect data; is that

2    right?

3         A.  Well, there was a lot of differences

4    between the collection of data between the two

5    projects.

6         Q.  Okay.  But my question is, you relied on

7    NVRA requests to collect data for the Steeling the

8    Vote report, correct?

9         A.  I believe NVRA requests were made.

10        Q.  And NVRA requests were made to collect

11   records for the Alien Invasion reports, correct?

12        A.  Right.

13        Q.  This report has exhibits, voter

14   registration records, for certain individuals; is

15   that right?

16        A.  I'm not -- I mean, I think there are.

17   Yeah, it has a variety of information --

18        Q.  Right, including --

19        A.  -- including that.

20        Q.  Right.  So it's right in front of you, the

21   exhibits to the report include voter registration

22   records for certain individuals, yes?

23        A.  I think I just answered that.

24        Q.  So it was yes.

25        A.  It was what it was.  I said --

1        Q.  You said "including that."

2        A.  Well, "including that" is a pretty good

3    indication that what you asked me about is included.

4        Q.  Right, but I'm not asking for indications;

5    I'm asking for direct answers to my questions.

6        And my question was, this report has as

7    exhibits voter registration records for certain

8    individuals; is that right?

9        A.  It has voter registration records for

10   registrants, yes.

11       Q.  Now the records that are attached to

12   Steeling the Vote have the last name of the

13   registrants redacted; is that right?

14       A.  Could you direct me to a particular page?

15       Q.  Well, you can look at any of the exhibits

16   to -- the report doesn't have these exhibits

17   numbered.

18       A.  Is there a Bates number?

19       Q.  No, because this was not produced.

20       A.  Okay.  Well, then, to answer your question

21   completely, it would take me to go through every

22   page, which I'm happy to do.

23       Q.  You got one right in front of you.

24       A.  And so you're directing me to do that.

25       Q.  No, you have one of the voter registration

1    records.

2         A.   Okay.   I have one in front of me, correct.

3         Q.   Right.   The last name is redacted?

4         A.   Right.

5         Q.   The address is redacted?

6         A.   Well, that's less clear, because I'm --

7    right, right, it is.   It's in a strange, old-style

8    computer window, and so it's hard to navigate around.

9         Q.   And so you were able to publish Steeling

10   the Vote using voter registration records that

11   redacted the last name and the address, correct?

12        A.   I mean, the document speaks for itself,

13   and I'm not sure -- are you asking me in a 30(b)(6)

14   capacity?

15        Q.   Yes.   PILF was able to publish Steeling

16   the Vote using voter registration records that

17   redacted the last name and address, correct?

18        A.   The document speaks for itself.   They are

19   redacted.

20             MR. LOCKERBY:   I'm going to register an

21   objection to the form of the question to the extent

22   that it assumes that PILF should have somehow -- that

23   PILF did the redacting and that PILF should have

24   somehow altered government records.

25        Q.   You can put this document aside.

Page 256

1     A.   You didn't ask me who redacted it.

2     Q.   Would you know the answer to that?

3     A.   Are you asking?

4     Q.   Would you know the answer to that?

5     A.   I don't.

6               (Adams Exhibit 40 marked for

7          identification: Motor Voter Mayhem |

8          Michigan's Voter Rolls in Disrepair)

9     Q.   The court reporter has marked and handed

10    to you Exhibit 40.  Do you recognize this document?

11    A.   This is "Motor Voter Mayhem."  It's a

12    report done regarding Michigan.

13    Q.   It was done in October of 2018?

14    A.   That's what the date says on page 2.

15    Q.   And in the report you included case

16    studies for certain individuals; is that correct?

17    A.   What page are you on?

18    Q.   Well, page 9, for example.

19    A.   Okay.  I'm on page 9.

20    Q.   And so on page 9 there is excerpts of

21    certain government records; is that right?

22    A.   There are on page 9 two different excerpts

23    of election list maintenance records.

24    Q.   And the records that we see here on page 9

25    have the individual's first name redacted; is that

1    right?

2         A.  It appears to.

3         Q.  And it has address redacted?

4         A.  Well, I don't know.  It's redacted.  It

5    doesn't have a subject header anywhere, so I don't

6    know what it is.

7         Q.  Well, certainly the record at the bottom

8    has name, right, and then has a residence?

9         A.  It says residence, colon, redaction.

10        Q.  Right.  And then on page 10 you have

11   another individual case study, correct?

12        A.  Case study number 2 on page 10.

13        Q.  The individual's first name is redacted?

14        A.  No, it does not appear -- well, it's

15   abbreviated, I guess.

16        Q.  Okay.  So, yes, it's abbreviated in the

17   text of your report, but it's redacted in the records

18   that are copied.

19        A.  Right.  The record below the name is

20   redacted.

21        Q.  And then in the records there appears to

22   be the address redacted.  It says, registered as,

23   seems to be the first name redacted, Savina at

24   redacted (Sterling Heights City).  Do you see that?

25        A.  I do, but I just see it says Sterling

1    Heights City.  That -- that can mean a lot of

2    different things there.

3         Q.  Right, but the redaction before that is an

4    address, is it not?

5         A.  I don't know.  It could or could not be.

6    There's a lot of different possibilities.

7         Q.  And so PILF published Motor Voter Mayhem

8    with redactions of both names and addresses, correct?

9         A.  Right.  The document speaks for itself.

10   There's redactions in it.

11        Q.  You can put that aside.

12                   (Johnson Exhibit 36

13             previously marked for identification

14             and referenced herein: Email

15             correspondence from (topmost) C

16             Adams sent 8/15/2018 with attachment

17             PILF-ADAMS-0000250 - 0000270)

18        Q.  The court reporter -- strike that.

19        I've handed the witness what has been

20   previously marked as Johnson 36.  Do you recognize

21   this document?

22        A.  Well, it's a long document, so give me a

23   moment.  Sorry.  What was your question?

24        Q.  Do you recognize this document?

25        A.  Well, it appears to -- (pardon me) -- it

Page 259

1    appears to be a draft markup of a report.

2        Q.  And that report is called "Safe Spaces";

3    is that right?

4        A.  The attachment says "Sanctuary Draft."

5    I'm not sure that -- let me see if it says Safe

6    Spaces on it.  I don't see that.  If you could direct

7    me to where it says that, I -- I don't see it.

8                    (Adams Exhibit 41 marked for

9                    identification: Email correspondence

10                   from (topmost) N Johnson sent

11                   8/21/2018 with attachment

12                   PILF-ADAMS-0007747 - 0007779)

13       Q.  The court reporter has marked as Exhibit

14   41 a document with the Bates number beginning 7747.

15       A.  I have that document, 41.

16       Q.  And in document or Exhibit 41 Noel Johnson

17   sends to you and others the final print and ready

18   version of Safe Spaces on August 21st, 2018?

19       A.  That's what it says on the document.

20       Q.  And so this was PILF's report called Safe

21   Spaces, how sanctuary cities are giving coverage to

22   noncitizens on the voter rolls.

23       A.  Well, I mean, there was a report published

24   that said that, that referenced the topic that you're

25   asking me about.  I -- I mean, what is your question?

1    I'm sorry.

2         Q.  Well, this is to refresh your recollection

3    that the document that we were looking at previously

4    as Johnson 36 are your edits and comments to what

5    became the Safe Spaces report of PILF.

6         A.  Okay.

7         Q.  Do you agree with that?

8         A.  I don't -- I mean, I don't disagree.  It

9    sounds -- sounds correct.

10        Q.  In the cover email that you sent on August

11   15th here in Johnson 36, you wrote, "Virginia has got

12   to be fixed throughout.  I have a stark comment in

13   the edits about this."

14        A.  It says that.

15        Q.  If you go towards the back of the draft

16   attachment, you'll see a section on Virginia.

17        A.  I'm sorry.  Do you have a page number?

18        Q.  Oh, certainly.  It's beginning on Bates

19   number 267 continuing on to 268.

20        A.  267, got it.

21        Q.  And so this portion of what would

22   eventually be called the Safe Spaces report talks

23   about certain jurisdictions in Virginia, yes?

24        A.  Gosh.  Right.

25        Q.  I want to direct your attention to the

1    page with the Bates 268 at the top.

2            A.   Bates 268, right.

3            Q.   The second paragraph, there are some

4    edits, do you see that, and a comment?

5            A.   There's edits and comments, yes.

6            Q.   So the paragraph reads, Virginia -- and

7    I'm going to read it first as it was, and then I'll

8    read it as edited, okay?

9            So it reads, "Virginia currently contains

10   three sanctuary jurisdictions -- all of which

11   disclosed records of noncitizens previously

12   registered and voting therein," period.

13           So that was the former language.  Do you see

14   that?

15           A.   I'm sorry.  Did you say "formal" language?

16           Q.   "Former."  I'm sorry.

17           A.   Are you from Philadelphia?

18           Right, I see it, former language.

19           Q.   And the language, "noncitizens previously

20   registered and voting therein" was struck and

21   replaced with "registrants canceled for citizenship

22   defects."  Do you see that?

23           A.   I see that.

24           Q.   And that was your edit, correct?

25           A.   I don't know.  Is there a way to tell

1      that?

2           Q.   Well, we can look at the comment.

3           A.   Because there's multiple people editing

4      this.

5           Q.   Right.  Let's look at the comment, [CA18].

6           A.   Right.

7           Q.   And in previous testimony you said CA

8      refers to Christian Adams?

9           A.   There you go.

10          Q.   And you wrote in the comment:

11               "How is it after we are involved in

12               litigation that we are still

13               referring to these Virginia cases

14               as, quote, noncitizens?  It defies

15               explanation.  On numerous occasions

16               in numerous places I have explicitly

17               said their registration is removed

18               for citizen defects or registrants

19               canceled for reasons of

20               noncitizenship.  We have to use the

21               actual terms and not make

22               assumptions they are necessarily

23               aliens."

24          Do you see that?

25          A.  It says that.

1    Q.  "The continuing improper terminology

2  contribute to us losing the motion to dismiss because

3  the court ruled that these subsequent statements were

4  republications within the statute of limitations."

5    That's what you wrote in your comment,

6  correct?

7    A.  That's what it says.

8    Q.  Okay.  So when you were editing Safe

9  Spaces, it was your opinion that calling people

10  listed in the VERIS cancellation reports, noncitizens

11  was improper terminology, yes?

12    MR. LOCKERBY:  Object to the form of the

13  question.

14    A.  It all depends on the context and the time

15  that the statements were made.  By October of '18, I

16  think that's when this was, or by -- again, I'm not

17  sure the exact date.

18    Q.  Well, the edits were made in August.

19    A.  August?  By August of '18, my desire to

20  have language in reports that reflected the facts as

21  we knew them at that moment was very important to me,

22  and by that time we had become acquainted with the

23  likes of Abby Jo -- depending on the name -- and

24  Mr. Bonilla, and so I wanted statements that were

25  being made to reflect the reality of what we were

1    aware of relating to this litigation.

2         And as I have testified, I believe,

3    previously, I have no reason to dispute the fact that

4    Mr. Bonilla is a citizen of the United States.  And I

5    feel bad for Mr. Bonilla, among other things, that he

6    had to be badgered by Mr. Levitt.  And I feel bad

7    that he was included in the list of people who were

8    canceled.  And I feel bad, as you know, I think, that

9    Mr. Bonilla was canceled because we attempted to sue

10   the Commonwealth of Virginia to fix that problem, and

11   you, your firm, opposed those efforts and still do.

12        And so by, I think this is August of '18, I

13   wanted our language to reflect the fact that we were

14   aware, for example, of Mr. Bonilla.  So that's

15   exactly what it represents.

16        Q.  When you said, "we attempted to sue the

17   Commonwealth of Virginia to fix that problem," are

18   you referring to your attempt to in this litigation

19   implead the Virginia Department of Elections as a

20   third-party defendant?

21        A.  Well, I was mistaken in my

22   characterization of an attempt.  We in fact did sue

23   the Commonwealth of Virginia, as far as I understand,

24   interpleader practice, which might not be very much,

25   that we filed an action against the Commonwealth of

1   Virginia seeking injunctive relief to fix these voter

2   rolls and to fix publication of data that led to this

3   problem in the first place.

4        And so I'm referring to an effort to do that

5   which the plaintiffs' firms have never done, and

6   that's actually get to the root cause of this

7   problem, which is canceling citizens and publishing

8   information declaring them noncitizens.  That's on

9   the face of the pleadings in this case.

10       Q.  And the court ruled that Defendants'

11  attempt to implead the Virginia Department of

12  Elections in this case was improper, correct?

13            MR. LOCKERBY:  Well, object to the form of

14  the question.  The ruling speaks for itself.

15            MR. TEPE:  Well, if the witness can talk

16  about it, then I can talk about it as well.

17            MR. LOCKERBY:  The Court ruled what it

18  ruled, and the witness's testimony and your questions

19  don't change the Court's ruling.

20            MR. TEPE:  Right, and so I provided an

21  accurate statement with regard to the Court's ruling.

22            MR. LOCKERBY:  Well, actually you didn't.

23            MR. TEPE:  The Court ruled that it was

24  improper of Defendants to implead the Virginia

25  Department of Elections in this case, correct?

1          MR. LOCKERBY:  I'm not here to answer

2     questions.  I'm objecting.

3          Q.  That is correct, Mr. Adams, right?

4          A.  I don't think it is actually.  I think

5     that -- and it's notable that nobody else has made

6     any effort in the intervening time, particularly

7     Plaintiffs' law firms, to fix this.  They were more

8     interested in defendants than they are the problem.

9          And so the court ruled, and, again, you're

10    testing my limits of understanding interpleader, that

11    it was not an action for damages, and, therefore, not

12    subject to the particular rule permitting it.

13         That doesn't mean that the case is improper or

14    didn't have merit and couldn't be later filed by

15    either PILF, or, incidentally, your clients could

16    file that case too, but they haven't, or your firm

17    could or your many public interest interests that

18    you're associating with here could have filed that

19    case, but only we did.  And we have the right to do

20    that and so do you, but you haven't.

21         Q.  Well, you filed that case to shift the

22    blame for what you've been sued about, which is

23    defamation and voter intimidation, correct?

24         MR. LOCKERBY:  Object to the form.

25         A.  We filed that case because it's wrong for

1    the Commonwealth of Virginia to remove citizens from

2    the voter rolls and then label them as noncitizens,

3    and that's exactly what the Commonwealth did.

4         You, on the other hand, are more interested in

5    the Defendants than the underlying problem, and

6    that's why you haven't done what we did.  It wasn't

7    to shift blame, because blame only lies in one place,

8    and that's the Commonwealth of Virginia, for

9    canceling noncitizens they should not be canceling

10   and for calling them declared noncitizens when they

11   don't have a basis for doing so.

12        When we learned what was happening, we took

13   action, you didn't, and none of your funders or your

14   organizations did.  We're the ones who have been

15   trying to fix this problem; you haven't.

16        We would happily resolve this to fix the

17   problem, but that's not what you're interested in.

18   You're interested in the Defendants.  You're not

19   interested in the problem.  It's not shifting blame.

20        Q.  In the Safe Spaces -- excuse me.  Pardon

21   me.  In the Safe Spaces report PILF does not list the

22   names, the full names and addresses of people in the

23   records that were collected by PILF, correct?

24        A.  I don't know.  There could have been some

25   attachment I'm not aware of.  If you have one that

1  the names and addresses are listed, I'm happy to look

2  at it.  You haven't handed me, as you have in other

3  exhibits, reports throughout my two depositions the

4  exhibits.  You've just handed me --

5      When I say "exhibits," I mean the links to

6  Exhibit 41.  You've only handed me the underlying

7  document.  You haven't handed me the exhibit links,

8  but you did with Alien Invasion I or II.  So there

9  may be something there that would change my answer to

10  what I just said.

11      Q.  So like on page 14 of the final Safe

12  Spaces report, Bates number 7763 --

13      A.  I'm looking at 7763 in Adams 41.

14      Q.  -- there's a copy of a San Diego County

15  voter registration form; is that right?

16      A.  Right.  It appears to be San Diego County.

17      Q.  And part of the individual's name is

18  redacted, and the individual's residence is redacted;

19  is that right?

20      A.  In this particular document that is

21  correct.

22      Q.  You can put that document aside.

23      A.  And just to clarify my last answer,

24  otherwise, when I said "this particular document," I

25  meant on that particular page of the document.

1          Q.   Who is Chris Marston?

2          A.   He is an acquaintance of mine.

3          Q.   How is he an acquaintance of yours?

4          A.   I've fed his dogs.  I've been to his

5     house.  I've had lunch with him.  He's a friend.

6          Q.   Is he also affiliated with the Republican

7     Party of Virginia?

8          A.   I don't know if he is right now.

9          Q.   Back in 2016-2017?

10         A.   I think at times he has been general

11    counsel to the Republican Party of Virginia.

12         Q.   You coordinated the collection of election

13    records for the Alien Invasion reports with the

14    Republican Party of Virginia; is that right?

15         A.   No.

16              MR. LOCKERBY:  Object to the form of the

17    question.

18         A.   Not close to right.

19                   (Johnson Exhibit 33

20              previously marked for identification

21              and referenced herein: Email

22              correspondence from (topmost) N

23              Johnson sent 11/16/2016

24              PILF-ADAMS-0009399)

25         Q.   I've handed the witness what has been

1   previously marked as Johnson 33.  Do you recognize

2   this document?

3        A.  I see Johnson 33.

4        Q.  It begins with an email from Shawna Powell

5   to Noel Johnson dated November 16th, 2016.  Do you

6   see that?

7        A.  It does start, but I'm not on that thread.

8   I said it does start that way, but I'm not on that

9   thread.

10       Q.  Okay.  Oh, I'm sorry, I thought you were

11  just asking for time to catch up looking at the

12  document.

13       Yes.  Well, you were forwarded that thread,

14  but we'll get to there in a minute.

15       Ms. Powell wrote to Mr. Johnson a note saying:

16           "Stafford called 11-16 to f/u on the

17           email sent 11-15.  Greg Riddlemoser

18           stated that RPV (Republican Party of

19           Virginia) came to his office and

20           went through all the records, so he

21           considers this matter done.  I

22           explained we are not working with

23           RPV; however, he stated that, quote,

24           they, closed quote, said we are

25           working with them.  If we want to

1             send someone to the office to go

2             through the records, we're more than

3             welcome."

4        Do you see that note from Ms. Powell?

5        A.  I see it.  I don't agree with it, but I

6    see it.

7        Q.  And then Mr. Johnson forwards this email

8    to you, but before I get into that, Stafford -- this

9    is Stafford County Election Office; is that right?

10       A.  I can't imagine it being anything else.

11       Q.  Okay.  Mr. Johnson says, "We are in the

12   process of getting registration applications for the

13   remaining counties in Virginia.  Any reasons RPV

14   would have asked for the same records?"  Do you see

15   that question posed to you?

16       A.  I see that question.

17       Q.  Okay.  And then you responded, same day,

18   November 16, 2016, "yes, I suggested it.  I believe

19   swarming is better than lone attacks.  That's how the

20   left plays."  Do you see that?

21       A.  I do.

22       Q.  And so you were saying that you suggested

23   that the RPV, the Republican Party of Virginia,

24   requests the same records that you were seeking from

25   Virginia counties.

1       A.  Well, that's what it says, and it would be

2   consistent with what I would do, because if somebody

3   else asked for the same records, it would help

4   dislodge the records that we weren't getting, but I

5   don't have a specific recollection of suggesting it.

6       Q.  You have no reason to doubt that you had

7   suggested it?

8       A.  Well, the "it" being the operative thing.

9   If it's confined to sending a letter asking for the

10  same records, I -- my testimony that I just gave you

11  was I would have seen utility in something like that

12  as being more likely to dislodge what we were looking

13  for and not getting from election officials.

14      Q.  So you suggested that the Republican Party

15  of Virginia request the same records that PILF was

16  requesting to dislodge those records for the Alien

17  Invasion reports, correct?

18      A.  Well, you're asking me whether I have a

19  recollection of suggesting it, and I've testified

20  about that twice.  And my testimony is I don't

21  remember specifically doing that, but it would be

22  consistent with the corporate purposes of PILF.

23      Q.  To coordinate with the Republican Party of

24  Virginia?

25          MR. LOCKERBY:  Objection to form.

1     A.  Absolutely not.  Why would you even say

2  something like that?  I just testified to what I

3  meant.  What I said was dislodging the records would

4  be consistent with the corporate policies of PILF.

5     Q.  Right.  So you had suggested the

6  Republican Party of Virginia ask the same records

7  that you were seeking at least as of -- from Stafford

8  County -- to dislodge records that you wanted; is

9  that right?

10    A.  I've testified to you now this is the

11 fourth time.  I don't have a specific recollection of

12 doing that, but it would be consistent with the

13 corporate purposes of PILF to get records.  So I'm

14 not disputing that it occurred.

15    Q.  And in your email here you say that you

16 had suggested it, right?

17    A.  Right, and I'm telling you I don't

18 remember the specifics of that.

19    Q.  And you have no doubt that this occurred,

20 that you had suggested to the Republican Party of

21 Virginia seeking the same records that PILF was

22 seeking.

23    A.  Well, if I had a specific recollection

24 about the suggestion, then I would be able to answer

25 your question yes.  Because I don't have a specific

1    recollection of it, I can't answer your question

2    utterly conclusively.  It would be consistent with

3    the corporate purposes of PILF to do that which would

4    enable the records to be given to us that we asked

5    for.

6          Q.  You can put that document aside.

7          Chris Marston and the Republican Party of

8    Virginia appeared as amici in support of PILF's

9    lawsuits against Chesterfield and Manassas; is that

10   correct?

11         A.  They did.

12         Q.  And is that also consistent with the

13   corporate purposes of PILF?

14         A.  One of the corporate purposes of PILF is

15   transparency in election records and compliance with

16   federal law relating to transparency guarantees, and

17   apparently the Republican Party of Virginia shares

18   our values in relation to election records being

19   transparent and jurisdictions within the Commonwealth

20   of Virginia complying with federal law relating to

21   that transparency.

22         Q.  Have you ever suggested to Mr. Marston how

23   the Republican Party of Virginia could be impacted by

24   the requests that you were seeking?

25         A.  I don't understand the question.

1        Q.  Well, you were seeking information for

2   PILF's own purposes, correct, from the Virginia

3   jurisdictions?

4        A.  "Seeking information for ..."  We had made

5   records requests of these jurisdictions that they

6   were not complying with, and so, yes, we were seeking

7   those records.

8        Q.  And in seeking those records did you ever

9   opine on how those records could be useful to the

10  Republican party of Virginia?

11       A.  I don't think I would have cared, at least

12  not in my individual capacity or corporate.  I don't

13  think that's what mattered to me.  My -- my interest

14  was in getting the records, and I knew multiple

15  people knocking on the same door asking for the same

16  thing would make it much more likely to have those

17  records produced.  And it was purely a case of

18  self-interest by PILF, or largely, if not entirely, a

19  case of self-interest by PILF, to have as many people

20  as possible asking for those records.

21                    (VVA Exhibit 35 previously

22              marked for identification and

23              referenced herein: Email

24              correspondence from (topmost) C

25              Adams sent 12/1/2016

1          PILF-ADAMS-0043845 - 0043848)

2          Q.  I'm handing the witness a document that's

3     been previously marked as VVA Exhibit 35 with the

4     Bates number 43845.

5          Do you recognize this, Mr. Adams?

6          A.  This looks like some kind of conference

7     call setup for some kind -- it says webinar,

8     something related to a webinar.

9          Q.  Does it look to be a invitation sent from

10    Mr. George with an agenda that was included on your

11    calendar?

12         A.  I'm sorry.  It was included on my

13    calendar?  No.

14         Q.  There's a "start" and "end" notation at

15    the top, "show time as busy."  Those are Outlook

16    entry characteristics, correct?

17         A.  Well, it doesn't make sense to me, but ...

18    I mean, I have a recollection of this event.

19         Q.  You do.

20         A.  Yes.

21         Q.  Okay.  So Mr. George was setting up a

22    webinar or a conference call?

23         A.  No, it was a webinar.

24         Q.  Okay.  And his email is dated November

25    30th, 2016?

Page 277

1        A.   November 30th ... yes.

2        Q.   And there's an agenda that follows; is

3   that right?

4        A.   It says "Agenda" on it.

5        Q.   Before we get to the agenda, actually so

6   Mr. Adams -- excuse me -- Mr. George sent this to

7   you, correct?  Michael J. O'Neill.

8        A.   Right.

9        Q.   And he's with Landmark Legal; is that

10  right?

11       A.   I don't know.

12       Q.   You don't know?

13       A.   Michael O'Neill -- there's somebody named

14  Michael there, I think, it may -- maybe O'Neill, but

15  it's not someone I talk to very much, if at all.

16       Q.   Clara Belle Wheeler is on this?

17       A.   It says that.

18       Q.   Yeah.  Keith Damon?

19       A.   The document says that.

20       Q.   Craig DiSesa, Nancy Smith?

21       A.   It says all that.

22       Q.   Now Mr. DiSesa and Ms. Smith are with the

23  Political Action Committee called Middle Resolution,

24  correct?

25       A.   I don't know.  Does the document say that?

1    I mean, I don't know.

2         Q.  Well, you do know that Middle Resolution

3    helped with data analysis for the Alien Invasion

4    reports, correct?

5         A.  I do now.  I didn't then.

6         Q.  Who is Chris Wright?

7         A.  I have no earthly idea.

8         Q.  And do you see --

9         A.  Right as I sit here, I mean, I couldn't

10   tell you who that is.  I don't know.

11        Q.  Chris Marston is on this email chain as

12   well?

13        A.  That's what it says.

14        Q.  Okay.  And you provided a report for this

15   webinar; is that right?

16        A.  I don't know.

17        Q.  Well, you said --

18        A.  I remember talking about it, but -- when

19   you say "a report," I assumed you meant some sort of

20   written document for the webinar.  I suspect you may

21   have meant something else now.

22        Q.  Well, what do you recall from this event?

23        A.  Okay.  I recall almost nothing about what

24   anybody said.  I have some recollection, because I

25   think I went first, I got off the call as fast as

1    possible.  I remember that.  I know that I didn't

2    stick around for the whole show.  I remember that.

3           I recall talking in generalities about the

4    sort of issues going on in the Commonwealth and

5    noncitizen registration voting.  And I recall that it

6    was at night or later in the day, that it was close

7    to being dark outside, and being thankful that I was

8    not on for the whole call.  That's what I recall

9    about it.

10          Q.  And according to the agenda, there's an

11   agenda line for legislative possibilities for

12   Virginia's 2017 General Assembly.

13          A.  Where is that?  Right, it says that.  I

14   don't think that was one of my topics, but ...

15          Q.  And then election lawsuit -- election law

16   lawsuits current and planned, and there seems to be a

17   bullet with your name underneath that.

18          A.  Yep.

19          Q.  And then there seems to be maybe some

20   bullets with respect to Landmark Legal Foundation.

21          A.  Really?  Where?  I don't see those.

22          Q.  The next page.

23          A.  Oh, right, okay.  Hmm ...

24          Q.  And then there's a bullet RPV (Ed

25   Gillespie)?

Page 280

1          A.   That's what the document says.

2          Q.   Do you know what that's with regard to?

3          A.   No, because I hung up on the call.  I

4     didn't participate after I was done.

5          Q.   Okay.  And there's another bullet with

6     Virginia Voters Alliance?

7          A.   The document says that.

8          Q.   What was the purpose of this call?

9          A.   Well, I can tell you what my purpose was.

10          Q.   What was your purpose?

11          A.   My purpose was to grant Reagan's request

12     that I talk to his webinar and be out of the call as

13     quickly as possible with minimal amount of imposition

14     on my time, and my purpose was to hang up as quickly

15     as possible after I satisfied that initial purpose.

16          Q.   Who is John Mashburn?

17          A.   Where does it say John Mashburn?

18          Q.   You can put that document aside.

19          A.   Oh.  You're not asking me about this

20     document.

21          Q.   No.

22          A.   Okay.

23          Q.   Do you know a John Mashburn?

24          A.   I do.

25          Q.   Who is he?

1    A.  He's an individual.  He's an attorney.

2  What else do you want to know?

3    Q.  Was he a member of the Trump campaign in

4  September of 2016?

5    A.  Probably, but I can't say with absolute

6  certainty.  If you had a document to refresh my

7  recollection, I could answer with greater precision.

8            (Adams Exhibit 42 marked for

9            identification: Email correspondence

10           from (topmost) C Adams sent 9/8/2016

11           PILF-ADAMS-0039730)

12   Q.  The court reporter has marked and handed

13  to you what's been marked as Exhibit 42 with Bates

14  number beginning 39730.  Do you recognize this email?

15   A.  Not yet.  Okay.  I see the email.

16   Q.  It's an email from you dated September

17  8th, 2016 to John Mashburn?

18   A.  That's what the email says.

19   Q.  Okay.  Do you recall this email?

20   A.  Not with a high degree of effectiveness,

21  but ...

22   Q.  You don't doubt you sent it?

23   A.  Oh, no, not -- if you're producing this to

24  me and representing it as an email I sent, I'm not

25  going to think that you would sink to such low depths

1    to give me a fraudulent email.  So, no, I have no

2    doubt that you have said it.

3         Q.  It certainly came from your production.

4         A.  So ...

5         Q.  The subject line is "Hans' latest:

6    Virginia aliens on rolls -- thousands."  That's the

7    subject line.

8         A.  That's what it says.

9         Q.  And it appears to be an excerpt, and then

10   linked to -- an excerpt of and linked to something

11   Mr. von Spakovsky wrote; is that right?

12        A.  Well, it says "Hans' latest," and that

13   would be the sort of thing I would say if I was

14   sending something to somebody with an article that

15   Hans wrote.  So I have no reason to disagree.

16        Q.  Do you know why you sent this to

17   Mr. Mashburn?

18        A.  Probably because I liked his article.

19        Q.  Hans' article.

20        A.  Right.

21        Q.  But why would you send it to John

22   Mashburn?

23        A.  Because we have a long history working

24   together on these issues.

25        Q.  What's that history?

1        A.  Well, he worked -- he worked on a number

2    of cases with me in this area.

3        Q.  What cases?

4        A.  ACRU vs. Zavala County, Texas.  There's a

5    case.

6        Q.  And he was part of the Trump campaign at

7    this time?

8        A.  I don't know.  You've asked me that, and

9    this email doesn't refresh my recollection as to --

10   obviously I didn't send it to a Trump email address,

11   so there is the possibility that he wasn't.  Had this

12   been sent to JohnMashburn@TrumpPresidentialCampaign

13   dot whatever, then that would be conclusive that he

14   was a member of the Trump presidential campaign.  I

15   just don't know.

16       Q.  You can put that document aside.

17       A.  All right.

18       Q.  In November of 2016 you responded to an

19   email from Stephen Miller at his Trump campaign email

20   address and sent him Alien Invasion I, correct?

21       A.  If you have that document to refresh my

22   recollection.  I would take issue potentially with

23   some of your characterization, but I'm sure the

24   document would refresh my recollection.  I don't

25   remember.

1       Q.  Okay.  But what from my question would you
2  take issue with?
3       A.  Well, I don't remember.
4       Q.  Okay.
5       A.  You asked me a question.  I don't remember
6  the answer.
7       Q.  I just wasn't sure if you were taking
8  issue with the characterization.
9                     (Adams Exhibit 43 marked for
10                    identification: Email correspondence
11                    from (topmost) C Adams sent
12                    11/26/2016 with attachment
13                    PILF-ADAMS-0039499 - 0039680)
14      Q.  I've handed you what's been marked as
15  Exhibit 43 with the beginning Bates number 39499.
16      A.  Okay.  I have the document.
17      Q.  Do you recall receiving this email from
18  Stephen Miller on November 25th, 2016?
19      A.  I do.
20      Q.  Do you know why he emailed you?
21      A.  On this particular date?
22      Q.  Correct.
23      A.  I think I knew at the time.  It has
24  something to do with the context of this particular
25  email this date, but I don't remember sitting here

1   today.

2         There was some context, and it might have been

3   the day after Thanksgiving, and something might have

4   been in the news, but that's the best I can remember

5   sitting here.

6         Q.  His email is very short.  Subject line,

7   "Vote Fraud," the body says, "can you send some info

8   on noncitizen voting."

9         A.  That's what it says.

10         Q.  And then you respond on Saturday, November

11  26th, with two documents attached, right?

12         A.  Well, I disagree with your

13  characterization, because it doesn't make sense that

14  I would have sent the declared noncitizen lists.

15         Q.  I'm not sure I understand.

16         A.  Well --

17         Q.  I said and you responded on Saturday,

18  November 26th with two documents attached.  What's --

19  what's there to disagree with?

20         A.  Well, I think your inclusion of a variety

21  of pages to Exhibit 43 were not part of what I would

22  have sent him.

23         Q.  Okay.  We're not even there.

24         A.  Well, you asked me about the attachments,

25  and I'm answering you.

1    Q.  Okay.  So my question was, you attached

2  two documents.  Yes or no.

3    A.  Two documents are reflected in the

4  attachment line, but this exhibit you've handed me

5  has more than two documents in it.  That's my point.

6    Q.  Okay.  Let's take it one step at a time.

7  You say two documents attached, number one, Alien

8  Invasion report for Virginia, correct?

9    A.  It says that in the attachment.  Well, it

10  doesn't.  It says --

11    Q.  In the body --

12    A.  Right, right, in the body of the email,

13  Alien Invasion report for VA.

14    Q.  And then the second document attached,

15  according to your cover email, is pleading in the

16  EAC/Kobach/PILF litigation, right?

17    A.  That's what it says.

18    Q.  Okay.  You also said, with respect to the

19  Alien Invasion report attachment, you said, "We found

20  over one thousand aliens --"

21    "We found over one thousand aliens were on the

22  rolls in just eight Virginia counties," right?

23    A.  That's accurate.

24    Q.  Okay.  And then the attachment of the

25  Alien Invasion report begins on page Bates 39500,

1   right, which is --

2        A.  39 ...

3        Q.  So the email, which I gave you, is Bates

4   number 39499.  Do you see that?

5        A.  Right.

6        Q.  And then the attachment begins on Bates

7   number 39500.  Do you see that?

8        A.  Yeah.

9        Q.  And it contains the entire Alien Invasion

10  I report with exhibits, correct?

11       A.  Mistakenly, I think.  I think whoever

12  prepared Adams 43 included documents that were not

13  part of the email to Miller.

14       Q.  Well, I don't know why you'd say that,

15  because the attachment, which was produced by you,

16  because this is coming from you at your electionlaw

17  center.com address and doesn't copy anyone from

18  PILF --

19            MR. LOCKERBY:  We'll stipulate that these

20  were produced by the Defendants with the Bates

21  numbers indicated.

22       We're bumping up against seven hours, so I

23  think that's in everyone's interest.

24       Q.  Right.  So this is 39500 through 39642.

25  That's this single attachment, right?

1      A.  On Exhibit 43 there's a pile of paper that

2  includes what you just described that I have a

3  recollection of never sending to Stephen Miller.

4      Q.  Well --

5      A.  I would not have sent this to him.

6      Q.  Well, this is the attachment.

7      A.  Then it's mistaken.  This is a mistaken

8  document that includes information that I never sent

9  to Stephen Miller, to the best of my recollection

10  sitting here.

11      Q.  Okay.  Well, this is what, as Mr. Lockerby

12  said, Defendants --

13      A.  I know.  And I'm just trying to flag this

14  as my recollection of that email, and I can't account

15  for the fact that there's a pile of paper here that I

16  do not believe were ever part of my email to Stephen

17  Miller.

18      Now I could be mistaken about this, but it

19  would not be consistent with how I would have

20  attempted to economize his attention by sending him

21  hundreds of pages.  And I believe I had a -- I don't

22  have anything else.

23      Q.  And since this includes, at least this

24  attachment includes the entire Alien Invasion I

25  report with exhibits, it includes the name and

1    address of Luciania Freeman, correct?

2         A.  Well, you're going to double-down.  I'm

3    telling you I don't think that I included this

4    attachment in my email to Stephen Miller.  And I will

5    readily admit that probably in the pile of paper

6    known as Adams 43 the name of -- which Plaintiff did

7    you ask me about, Miller?

8         Q.  Luciania Freeman.

9         A.  Freeman?  It's probably in there in the

10   pile of paper in Adams 43.  What I'm trying to

11   emphasize to you is I do not believe that this was

12   sent in this email as an attachment.

13        Q.  Prior to this email outreach by

14   Mr. Miller, have you talked to him before?

15        A.  I believe so.

16        Q.  And I think your testimony was you don't

17   recall why he was reaching out to you; is that right?

18        A.  Well, I know there is a context --

19        Q.  But you're not thinking of it right now.

20        A.  -- but I can't remember what it is right

21   now.

22        Q.  What was the purpose of sending him the

23   Alien Invasion report in response to his email, do

24   you recall?

25        A.  Well, I discuss that.  I said, here's a

1    start.  He wants information on noncitizen voting,
2    and there is no question that there are noncitizens
3    that are referred to in the Alien I who were voting
4    in the Commonwealth of Virginia.
5         Q.  But Luciania Freeman is not one of them,
6    correct?
7         A.  Well, I have, on multiple occasions, I
8    believe, told you that I understand that Mr. Bonilla,
9    Ms. Freeman are citizens, and I feel bad that they
10   were identified otherwise by the Commonwealth of
11   Virginia and that their registrations were improperly
12   canceled.  And that's precisely why we wanted to do
13   something about it by bringing an action against the
14   Commonwealth.
15        Q.  Am I correct that you wanted to publish
16   Alien Invasion II in May of 2017 to piggyback on
17   Trump's announcement of the Voter Fraud Commission?
18        A.  No.  Why?  Do you have a basis for that?
19             MR. LOCKERBY:  Before we proceed, can we
20   see where we are in terms of time?
21             VIDEO SPECIALIST:  A little less than
22   three minutes.
23             MR. TEPE:  Until my next hour?
24                  (Adams Exhibit 44 marked for
25                  identification: Email correspondence

1          from (topmost) R George sent

2          5/17/2017

3          PILF-ADAMS-0013078 - 0013079)

4          MR. TEPE:  Let the record reflect that the

5     witness has been handed an exhibit marked number 44

6     with Bates number 13078.

7          Q.  I'll direct your attention to the bottom

8     email sent by Reagan George May 17th, 2017.  Do you

9     see that?

10         A.  It's -- there's an email from Reagan on

11    May 17th, 2017.

12         Q.  And it's to Steve and Nancy with Middle

13    Resolution?

14         A.  I have no idea.

15         Q.  It says, "Steve/Nancy, just checking.

16    Christian is wanting to get their article written

17    ASAP to piggyback on Trump's announcement of the

18    Voter Fraud Commission."  Do you see that?

19         A.  I don't know what article he's referring

20    to.

21         Q.  Well, he's referring to Alien Invasion II,

22    correct?

23         MR. LOCKERBY:  Object to form.

24         A.  How do you know that?

25         Q.  Because Nancy Smith and Steve Mond, who

1    Mr. George emailed, provide data analysis that was

2    used in the Alien Invasion II report.

3         A.  Yeah, and Reagan appears to be way off

4    here.  A, he refers to an article; B, he refers to a

5    fictional reason to write the article.  Doesn't

6    appear to have any basis.

7         Q.  And so the subject line of this email was

8    "Any feedback on the noncitizens voter history list?"

9    Right?

10        A.  Well, that's the subject in an email from

11   Steve Mond it looks like.

12        Q.  Right.  And then Mr. George responds, "We

13   are looking for the maximum number of votes cast so

14   go as far back as the oldest registration on the

15   list."  Do you see that?

16        A.  That's what the email says.

17        Q.  And then he, Steve, responds, "should be

18   done by Friday at the latest," right?

19        A.  That's what the email says.

20        Q.  And then Reagan George responds by saying,

21   "Thanks Steve for all your hard work on this," and

22   you are copied on that email, correct?

23        A.  At last I am copied on that last email.

24        Q.  Did you email Reagan George and tell him

25   that he was completely off basis in his

Page 293

1    characterization?

2         A.  I'm not sure I ever read this email, but I

3    will be happy to tell him now.

4              VIDEO SPECIALIST:  Excuse me.  That's

5    seven hours.

6              MR. LOCKERBY:  All right.  So we're done.

7              VIDEO SPECIALIST:  We're not off the

8    record yet.  Should we go off?

9              MR. TEPE:  If we must.

10             MR. LOCKERBY:  We must.  Don't want to

11   violate any rules.

12             VIDEO SPECIALIST:  We are off the record,

13   5:48.

14             MR. TEPE:  Take a break?  I assume you got

15   nothin', right?

16             MR. LOCKERBY:  I have no questions.

17             MR. TEPE:  You have no questions?

18             MR. LOCKERBY:  I have no questions.

19             MR. TEPE:  So we're done.

20             MR. LOCKERBY:  We're done.  You mean put

21   on the record that I have no questions?

22             MR. TEPE:  Yes.

23             MR. LOCKERBY:  We can do that.

24             VIDEO SPECIALIST:  Give me one second.

25        We are back on the record, 5:49

1          MR. LOCKERBY:  I have no questions.  And

2    he will read and sign.

3          MR. TEPE:  Thank you.

4          MR. LOCKERBY:  You're welcome.

5          VIDEO SPECIALIST:  We are off the record,

6    5:49.

7    //

8          (The deposition of J. CHRISTIAN ADAMS

9    adjourned at 5:49 p.m.)

10    //

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                ACKNOWLEDGMENT OF DEPONENT

2

3         I, J. CHRISTIAN ADAMS, do hereby

4    acknowledge that I have read and examined the

5    foregoing testimony and that the same is a true,

6    correct and complete transcription of the testimony

7    given by me, with the exception of the noted

8    corrections, if any, appearing on the attached errata

9    page(s).

10   _____        _____

11    DATE               J. CHRISTIAN ADAMS

12

13

14   Subscribed and sworn to before me this _____ day of

15   _____, 20_____  .

16   _____ (Notary Public)

17   My Commission expires: _____

18

19

20

21   [SEAL]

22

23

24

25

Page 296

                    C E R T I F I C A T E

 1

 2

 3          I, LINDA S. KINKADE, Registered Diplomate

 4   Reporter, Certified Realtime Reporter, Registered

 5   Merit Reporter, Certified Shorthand Reporter, and

 6   Notary Public, do hereby certify that prior to the

 7   commencement of examination the deponent herein was

 8   duly sworn by me to testify truthfully under penalty

 9   of perjury.

10          I FURTHER CERTIFY that the foregoing is a true

11   and accurate transcript of the proceedings as

12   reported by me stenographically to the best of my

13   ability.

14          I FURTHER CERTIFY that I am neither counsel

15   for nor related to nor employed by any of the parties

16   to this case and have no interest, financial or

17   otherwise, in its outcome.

18          IN WITNESS WHEREOF, I have hereunto set my

19   hand and affixed my notarial seal this 2nd day of

20   May, 2019.

21          My commission expires:  July 31, 2022

22          _Linda S Kinkade_

23   _____

24   LINDA S. KINKADE

25   THE DISTRICT OF COLUMBIA

1                     E X H I B I T S

2

3    ADAMS EXHIBITS      DESCRIPTION                  PAGE

4    Adams Exhibit 1     Email correspondence from .....   18

5                        (topmost) N Johnson sent

6                        5/24/2017

7                        PILF_ADAMS-0000821 - 0000823

8    Adams Exhibit 2     Twitter feed from the Public ..   21

9                        Interest Legal Foundation

10   Adams Exhibit 3     Twitter feed from the Public ..   22

11                       Interest Legal Foundation

12   Adams Exhibit 4     Screenshot of PILF's Facebook .   24

13                       page

14   Adams Exhibit 5     Screenshot of PILF's Facebook .   26

15                       page May 30th, 2017

16   Adams Exhibit 6     Email correspondence from .....   27

17                       (topmost) C Adams sent

18                       10/3/2016 PILF-ADAMS-0044021

19   Adams Exhibit 7     Email correspondence from .....   30

20                       (topmost) C Adams sent

21                       10/3/2016

22                       PILF-ADAMS-0006102 - 0006104

23

24

25

Page 298

```
 1    Adams Exhibit 8      Email correspondence from ..... 32
 2                         (topmost) R Reagan sent
 3                         10/3/2016
 4                         PILF-ADAMS-0040246 - 0040250
 5    Adams Exhibit 9      Illegal Foreign Voting in ..... 37
 6                         Virginia Covered up by
 7                         Soros-backed Democratic
 8                         Officials with attachment
 9    Adams Exhibit 10     Email correspondence from ..... 49
10                         (topmost) K Phillips sent
11                         4/5/2016  with attachment
12                         PILF-ADAMS-0038892 - 0038895
13    Adams Exhibit 11     Watchdog claims 5k ........... 55
14                         Noncitizens Registered to
15                         Vote in Virginia with
16                         attachment
17    Adams Exhibit 12     Email correspondence from .... 57
18                         (topmost)
19                         adams@electionlawcenter sent
20                         6/2/2017 PILF-ADAMS-0014964
21    Adams Exhibit 13     Email correspondence from .... 59
22                         (topmost) L Churchwell sent
23                         5/30/2017 PILF-ADAMS-0046157
24    Adams Exhibit 14     Screenshots re Fox News ...... 62
25                         May 30, 2017
```

Page 299

1    Adams Exhibit 14-A    Video clip .................. 63
2    Adams Exhibit 15      YouTube screenshot from ...... 75
3                          theblaze Christian Adams
4                          Joins Dana
5    Adams Exhibit 15-A    Video clip .................. 76
6    Adams Exhibit 16      YouTube screenshot John ...... 77
7                          Fredericks Show
8    Adams Exhibit 16-A    Video/audio clip............. 79
9    Adams Exhibit 17      Re podcast Mornings on the ... 79
10                         Mall March 2, 2017
11   Adams Exhibit 17-A    Audio clip.................. 80
12   Adams Exhibit 18      Email correspondence from .... 87
13                         (topmost) N Johnson sent
14                         5/22/2017
15                         PILF-ADAMS-0001050 - 0001052
16   Adams Exhibit 19      Email correspondence from .... 93
17                         (topmost) N Johnson sent
18                         5/31/2017 PILF-ADAMS-0000760
19   Adams Exhibit 20      Printout of tweets from ...... 96
20                         ElectionLawCtr
21   Adams Exhibit 21      Printout of tweets from ...... 99
22                         ElectionLawCtr
23
24
25

Page 300

| 1  | Adams Exhibit 22 | Printout from Election Law ...100 |
| 2  |                  | Center \| Report: Ineligible |
| 3  |                  | Aliens Registering to Vote |
| 4  |                  | and Casting Ballots |
| 5  | Adams Exhibit 23 | PJ Media \| Yes, Virginia, ....105 |
| 6  |                  | Aliens are Registered or |
| 7  |                  | Voting ... and in |
| 8  |                  | Pennsylvania, by the |
| 9  |                  | Thousands |
| 10 | Adams Exhibit 24 | Email correspondence from ....117 |
| 11 |                  | (topmost) C Adams sent |
| 12 |                  | 5/30/2017 |
| 13 |                  | PILF-ADAMS-0000312 - 0000316 |
| 14 | Adams Exhibit 25 | Email correspondence from ....129 |
| 15 |                  | (topmost) C Adams sent |
| 16 |                  | 12/18/2018 |
| 17 |                  | PILF-ADAMS-0046679 - 0046680 |
| 18 | Adams Exhibit 26 | Email correspondence from ....137 |
| 19 |                  | (topmost) C Adams sent |
| 20 |                  | 4/13/2018 |
| 21 |                  | PILF-ADAMS-0018016 - 0018017 |
| 22 | Adams Exhibit 27 | Email correspondence from ....147 |
| 23 |                  | (topmost) D Kulivan sent |
| 24 |                  | 5/31/2018 |
| 25 |                  | PILF-ADAMS-0018001 - 0018002 |

1    Adams Exhibit 28        Email correspondence from ....158

2                            (topmost) D Kulivan sent

3                            5/1/2018

4                            PILF-ADAMS-0018006 - 0018007

5    Adams Exhibit 29        Email correspondence from ....159

6                            (topmost) S Powell sent

7                            4/13/2018

8                            PILF-ADAMS-0040864 - 0040865

9    Adams Exhibit 30        Email correspondence from ....164

10                           (topmost) C Adams sent

11                           4/13/2018

12                           PILF-ADAMS-0017674 - 0017677

13   Adams Exhibit 31        Email correspondence from ....168

14                           (topmost) S Powell sent

15                           6/1/2018 with attachment

16                           PILF-ADAMS-0040925 - 0040930

17   Adams Exhibit 32        Email correspondence from ....177

18                           (topmost) S Powell sent

19                           8/28/2018 with attachment

20                           PILF-ADAMS-0041116 - 0041122

21   Adams Exhibit 33        Email correspondence from ....196

22                           (topmost) C Adams sent

23                           9/30/2016

24                           Non-Party Palmer000035

25

Page 302

1   Adams Exhibit 34    Email correspondence from ....208
2                       (topmost) C Adams sent
3                       2/20/2019 PILF-ADAMS-0046678
4   Adams Exhibit 35    Email correspondence from ....210
5                       (topmost) N Johnson sent
6                       5/16/2016 with attachment
7                       PILF-ADAMS-0007236 - 0007238
8   Adams Exhibit 36    Email correspondence from ....223
9                       (topmost) N Johnson sent
10                      1/4/2018
11                      PILF-ADAMS-0004281 - 0004282
12  Adams Exhibit 37    Email correspondence from ....241
13                      (topmost) C Adams sent
14                      2/6/2017 PILF-ADAMS-0051839
15  Adams Exhibit 38    Public Interest Legal ........242
16                      Foundation | Letter dated
17                      February 7, 2017 to
18                      Chairwoman Holtzman Vogel
19  Adams Exhibit 39    Steeling the Vote | .........249
20                      Allegheny County, PA Reveals
21                      How Citizenship Verification
22                      Protects Citizens and
23                      Immigrants Alike
24
25

Page 303

```
 1    Adams Exhibit 40        Motor Voter Mayhem | .........256
 2                            Michigan's Voter Rolls in
 3                            Disrepair
 4    Adams Exhibit 41        Email correspondence from ....259
 5                            (topmost) N Johnson sent
 6                            8/21/2018 with attachment
 7                            PILF-ADAMS-0007747 - 0007779
 8    Adams Exhibit 42        Email correspondence from ....281
 9                            (topmost) C Adams sent
10                            9/8/2016 PILF-ADAMS-0039730
11    Adams Exhibit 43        Email correspondence from ....284
12                            (topmost) C Adams sent
13                            11/26/2016 with attachment
14                            PILF-ADAMS-0039499 - 0039680
15    Adams Exhibit 44        Email correspondence from ....290
16                            (topmost) R George sent
17                            5/17/2017
18                            PILF-ADAMS-0013078 - 0013079
19
20
21
22
23
24
25
```

Page 304

1                   E X H I B I T S (continued)

2    JOHNSON EXHIBITS        DESCRIPTION                    PAGE

3    Johnson Exhibit 8     Email correspondence from ....182

4                          (topmost) N Johnson sent

5                          9/29/2016 with attachment

6                          PILF-ADAMS-0005601 - 0005620

7    Johnson Exhibit 22    Email correspondence from    17

8                          (topmost) S Powell sent

9                          10/4/2016

10                         PILF-ADAMS-0013638 - 0013639

11   Johnson Exhibit 25    Email correspondence from ....64

12                         (topmost) N Johnson sent

13                         5/26/2017

14                         PILF-ADAMS-000770 - 0000771

15   Johnson Exhibit 26    Email correspondence from ....82

16                         (topmost) N Johnson sent

17                         10/2/2016 PILF-ADAMS-0037501

18   Johnson Exhibit 33    Email correspondence from ....269

19                         (topmost) N Johnson sent

20                         11/16/2016

21                         PILF-ADAMS-0009399

22   Johnson Exhibit 36    Email correspondence from ....258

23                         (topmost) C Adams sent

24                         8/15/2018 with attachment

25                         PILF-ADAMS-0000250 - 0000270

```
 1              E X H I B I T S (continued)
 2   PILF EXHIBITS          DESCRIPTION            PAGE
 3   PILF Exhibit 9         Email correspondence from    182
 4                          (topmost) C Adams sent
 5                          9/29/2016 with attachment
 6                          PILF-ADAMS-0014015 - 0014033
 7
 8
 9   VVA EXHIBITS           DESCRIPTION            PAGE
10   VVA Exhibit 35         Email correspondence from    275
11                          (topmost) C Adams sent
12                          12/1/2016
13                          PILF-ADAMS-0043845 - 0043848
14   VVA Exhibit 39         Email correspondence from    229
15                          (topmost) N Johnson sent
16                          4/4/2017
17                          PILF-ADAMS-0001408 - 0001410
18
19
20
21
22
23
24
25
```

Page 306

1                          ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg.  No. Now Reads        Should Read   Reason

6    ____  ____ _____    _____   _____

7    ____  ____ _____    _____   _____

8    ____  ____ _____    _____   _____

9    ____  ____ _____    _____   _____

10   ____  ____ _____    _____   _____

11   ____  ____ _____    _____   _____

12   ____  ____ _____    _____   _____

13   ____  ____ _____    _____   _____

14   ____  ____ _____    _____   _____

15   ____  ____ _____    _____   _____

16   ____  ____ _____    _____   _____

17   ____  ____ _____    _____   _____

18   ____  ____ _____    _____   _____

19   ____  ____ _____    _____   _____

20

                              _____

21                            Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS ____ DAY OF _____, 2019.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____