# EXHIBIT P

1       FOR THE EASTERN DISTRICT OF VIRGINIA

2          ALEXANDRIA DIVISION

3  -------------------------------X

   LEAGUE OF UNITED LATIN      )
4  AMERICAN CITIZENS — RICHMOND   )
   REGION COUNCIL 4614, et al.,   )
5                        )
          Plaintiffs,     ) Civil Action No.
6                      ) 1:18-cv-00423-LO-IDD
    v.                   )
7                      )
   PUBLIC INTEREST LEGAL       )
8  FOUNDATION, an Indiana      )
   Corporation, and J. CHRISTIAN  )
9  ADAMS,                 )
                        )
10         Defendants.    )
   -------------------------------X

11

12

13

14        30(b)(6) VIDEOTAPED DEPOSITION OF

15          VIRGINIA VOTERS ALLIANCE,

16   BY AND THROUGH ITS CORPORATE REPRESENTATIVE,

17          REAGAN GLENN GEORGE

18           Washington, D.C.

19         Friday, March 15, 2019

20

21

22  Reported by:

23  CINDY L. SEBO, RMR, CRR, RPR, CSR, CCR, CLR,
   Real-Time Systems Administrator, LiveDeposition
24  Authorized Reporter

25  JOB NO.  157385

1

2

3                          Friday, March 15, 2019

4                          10:37 a.m.

5

6

7          30(b)(6) Videotaped Deposition of VIRGINIA

8     VOTERS ALLIANCE, by and through its corporate

9     representative, REAGAN GLENN GEORGE, held at the

10    law offices of Skadden, Arps, Slate, Meagher &

11    Flom LLP, 1440 New York Avenue, Northwest,

12    Washington, D.C.  20005, pursuant to Agreement

13    before Cindy L. Sebo, Registered Merit Reporter,

14    Certified Real-Time Reporter, Registered

15    Professional Reporter, Certified Shorthand

16    Reporter, Certified Court Reporter, Certified

17    LiveNote Reporter, Real-Time Systems

18    Administrator, LiveDeposition Authorized

19    Reporter and Notary Public in and for District

20    of Columbia.

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2

 3      SKADDEN ARPS SLATE MEAGHER & FLOM

 4      Attorneys for Plaintiffs

 5             1440 New York Avenue Northwest

 6             Washington, DC 20005

 7      BY:   SEAN TEPE, ESQ.

 8      BY:   KATHLEEN SHELTON, ESQ.

 9

10

11      FOLEY & LARDNER

12      Attorneys for Defendants

13             Washington Harbour

14             3000 K Street Northwest

15             Washington, DC 20007

16      BY:   ELI EVANS, ESQ.

17

18

19

20

21

22

23

24

25
```

1    A P P E A R A N C E S (Continued):

2

3    LANDMARK LEGAL FOUNDATION

4    Attorneys for Witness and Virginia Voters Alliance

5         19415 Deerfield Avenue

6         Leesburg, VA 20176

7    BY:   MICHAEL O'NEILL, ESQ.

8    BY:   MATTHEW FORYS, ESQ.

9

10

11   ALSO PRESENT:

12        TONYA WILLIAMS, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2          IT IS HEREBY STIPULATED AND AGREED

 3    by and between the attorneys for the

 4    respective parties herein, that filing and

 5    sealing be and the same are hereby waived.

 6          IT IS FURTHER STIPULATED AND AGREED

 7    that all objections, except as to the form

 8    of the question, shall be reserved to the

 9    time of the trial.

10          IT IS FURTHER STIPULATED AND AGREED

11    that the within deposition may be sworn to

12    and signed before any officer authorized

13    to administer an oath, with the same

14    force and effect as if signed and sworn

15    to before the Court.

16

17

18               - oOo -

19

20

21

22

23

24

25
```

1              (VVA Deposition Exhibit Number 1,

2              Plaintiffs' Amended Rule 30(b)(6)

3              Notice to Take Deposition With

4              Production of Documents of Virginia

5              Voters Alliance, marked for

6              identification, as of this date.)

7              (VVA Deposition Exhibit Number 2,

8              Plaintiffs' Notice of Subpoena to

9              Virginia Voters Alliance Commanding

10             Production of Documents,

11             Information, or Objects, marked for

12             identification, as of this date.)

13             THE VIDEOGRAPHER:  This is the start

14    of tape labeled Number 1 of the

15    videotaped deposition of 30(b)(6)

16    VVA Reagan George, in the matter of League

17    of United Latin American Citizens, et al.

18    versus Pub. Interest Found., et al., in

19    the Court of the United States

20    District Court for the Eastern District of

21    Virginia, Case 1:18-cv-00423.

22             This deposition is being held at

23    Skadden, 1440 New York Avenue,

24    Washington, D.C., on March 15th, 2019, at

25    approximately 10:37.

1            My name is Tonya Williams, from

2       TSG Reporting, Inc., and I am the legal

3       video specialist.  The court reporter is

4       Cindy Sebo, in association with

5       TSG Reporting.

6            Counsel will be noted on the

7       stenographic record.

8            Will the counsel -- sorry.

9            Will the court reporter please swear

10      in the witness?

11                     -  -  -

12  R E A G A N   G L E N N   G E O R G E,

13       called as a witness, having been duly sworn

14       by a Notary Public, was examined and

15       testified as follows:

16  EXAMINATION BY

17  MR. TEPE:

18       Q.    Good morning, Mr. George.

19       A.    Good morning.

20       Q.    Can you please state your name for

21  the record?

22       A.    It's Reagan Glenn George.

23       Q.    Have you ever been deposed before?

24       A.    No.

25       Q.    Well, have you testified under oath

1   before?

2        A.    No.

3        Q.    You are under oath today, correct?

4        A.    Right.

5        Q.    Is there any reason why you cannot

6   give truthful and accurate testimony here today?

7        A.    No.

8        Q.    Before we get underway and

9   particularly because you have not been deposed

10  before, I just want to cover some ground rules

11  for us:  The first one is, as you see, we have a

12  court reporter, so I would appreciate you give

13  verbal responses, no nodding of the

14  heads [verbatim] --

15       A.    Sure.

16       Q.    -- so forth.

17             Okay?

18       A.    Okay.

19       Q.    Okay.

20             The second thing would be to wait for

21  my question to finish so that we're not talking

22  over each other, and it improves the accuracy of

23  the transcript.

24             Okay?

25       A.    Good.

1        Q.    Your counsel may object to some of my

2   questions; I don't know.  But you have to answer

3   those questions unless he gives you an

4   instructions explicitly telling you not to

5   answer.

6        A.    Okay.

7        Q.    If you are confused by any of my

8   questions, I'm more than happy to restate so

9   that we're on the same page.

10            Is that all right?

11       A.    Okay.

12       Q.    And lastly, you know, if there's

13  anytime that you want to take a break, use the

14  bathroom, just sort of let me know.  As long as

15  I'm not in the middle of a question or a line of

16  questions, you know, we're happy to take breaks.

17       A.    Okay.  Sounds good.

18       Q.    Okay.  Are you testifying on behalf

19  of the Virginia Voters Alliance today?

20       A.    I am.

21       Q.    And that's also known as VVA?

22       A.    Yes.

23       Q.    And VVA is here pursuant to a

24  subpoena; is that correct?

25       A.    That's right.

1      Q.    What has been marked as

2  Exhibit Number 1 -- VVA Number 1, do you

3  recognize this document?

4      A.    Yes.  It was given to me by my

5  attorney.

6      Q.    Okay.  And that's the subpoena for

7  deposition testimony here today; is that right?

8      A.    That's right.

9      Q.    Okay.  And that's directed to

10  Virginia Voters Alliance?

11      A.    Yes.

12      Q.    And if I can direct your attention

13  to -- I think it's the second-to-last page,

14  Page 12, there's a list of topics for

15  examination.

16           Do you see that?

17      A.    Okay.

18           Yes.

19      Q.    Are you prepared to testify on these

20  topics today?

21      A.    I am.

22      Q.    Now, VVA was also served with a

23  deposition subpoena -- excuse me -- a document

24  subpoena.

25           Do you recall that?

1        A.    I do.

2        Q.    Okay.  Do you recognize

3   Exhibit Number 2?

4        A.    I do.

5        Q.    And what is it?

6        A.    It was the original subpoena that I

7   received.

8        Q.    And this was a subpoena for

9   documents, correct?

10       A.    Right.

11       Q.    Did you discuss this document

12   subpoena with anyone when you received it or

13   after?

14       A.    I notified Pat McSweeney, who is the

15   attorney that helped me on it.  I think I also

16   notified Christian Adams that I received it,

17   because it was a surprise.

18       Q.    Did you discuss the subpoena with

19   Mr. Adams?

20            MR. O'NEILL:  Objection.  I'm going

21       to direct the witness not to answer that.

22       It's attorney -- it's going to be covered

23       by attorney-client privilege.

24            MR. TEPE:  What's the basis for the

25       privilege?

1          MR. O'NEILL:  Mr. Adams --

2    Mr. George has considered Mr. Adams his

3    attorney and an attorney for VVA, and

4    communications between the two of them are

5    covered by -- are exempt from disclosure

6    under attorney-client privilege.

7          MR. TEPE:  Are you saying that

8    Mr. Adams is VVA's attorney for purposes

9    of this litigation, of this subpoena?

10         MR. O'NEILL:  I am not saying that.

11   I am saying that Mr. Adams and Mr. George

12   have an attorney-client relationship, and

13   communications between the two of them are

14   exempt from disclosure and are privileged

15   under the attorney-client privilege.

16         MR. TEPE:  Are you saying that

17   communications with regards to this

18   subpoena are covered by the

19   attorney-client privilege, as you call it,

20   with Mr. Adams?

21         MR. O'NEILL:  I'm saying that -- I'm

22   going to say to the extent that

23   communications -- in general,

24   communications between Mr. George and

25   Mr. Adams are exempt under the

1          attorney-client privilege; however, I will

2          direct the witness to answer whether he --

3          we'll direct Mr. George to answer whether

4          he made any communications regarding this

5          subpoena with Mr. -- with Mr. Adams.

6                So you can answer.

7                THE WITNESS:  Just -- just to let

8          him know that I received it.

9     BY MR. TEPE:

10         Q.    Have you discussed this -- the

11    document subpoena with anyone other than

12    Mr. McSweeney, who was your counsel for purposes

13    of that subpoena, and Mr. Adams?

14         A.    Are you talking -- I'm not sure

15    exactly what you're asking.  You know, like for

16    counseling purposes or just . . .

17         Q.    Any purposes.

18         A.    Like telling my wife I received it,

19    or something?

20         Q.    Anyone other than your wife and those

21    two other people.

22         A.    I told my wife, my son and my

23    daughter-in-law, who are living with us right

24    now.

25                Keith Damon called me because he had

1    received a -- a subpoena for documents.

2           Nancy -- excuse me.  Nancy Smith

3    informed me that they had received a subpoena --

4    that the Middle Resolution.

5        Q.    Okay.  Anyone else?

6        A.    Not that I remember.

7        Q.    Okay.  But did you talk to Mr. Damon

8    and -- strike that.

9           Did you talk to Mr. Damon about the

10   document subpoena to VVA?

11       A.    No.  I mean, he called me because he

12   had received it and he was surprised, I guess

13   you could say.

14       Q.    So he had called you with regard to a

15   subpoena that he had received?

16       A.    Right.

17       Q.    Okay.  Did you talk to him about the

18   subpoena you had received?

19       A.    No.  No, as far as the content of it,

20   I didn't.

21       Q.    Similar question with regard to

22   Ms. Smith:  Did you talk to Ms. Smith about the

23   VVA subpoena?

24       A.    No, not about the content, just that

25   I had received it.

1      Q.    Did Ms. Smith talk to you about the

2   content of the subpoena that they received?

3      A.    No.

4      Q.    And Ms. Smith is with

5   Middle Resolution?

6      A.    Yes, she's on the executive board

7   of -- of Middle Resolution.

8      Q.    Other than just informing you that

9   you had -- that she had received a subpoena for

10   Middle Resolution, did you discuss anything

11   else?

12      A.    No.

13      Q.    Did you do anything to prepare for

14   today's deposition?

15      A.    Outside of meeting with my attorney,

16   no.

17      Q.    When did you meet with your attorney?

18      A.    Wednesday, Wednesday morning.

19      Q.    For how long?

20      A.    About three -- three hours, three and

21   a half hours.

22      Q.    Did you look at documents?

23      A.    We looked at this (indicating)

24   because he had been served with this

25   (indicating), not me.

Page 16

1      Q.      "This" being the deposition subpoena?

2      A.      Yeah, this one that we're talking

3    about for the deposition.

4      Q.      Did you look at any other documents

5    other than the deposition subpoena?

6      A.      No.

7      Q.      Did you talk to anyone else to

8    prepare for today's deposition?

9      A.      I did not.

10     Q.      Just one housekeeping item when I say

11   "you," I'm going to be referring to you on

12   behalf of Virginia Voters Alliance.

13            Okay?

14     A.      (No audible response.)

15     Q.      (Indicating)?

16     A.      Okay.

17     Q.      It's good to get the kinks out early.

18     A.      Right, right, right.

19     Q.      And -- but if I'm referring to you,

20   Reagan George, as an individual, not with

21   respect to VVA, I'll try and make that clear for

22   the record.

23     A.      Okay.

24     Q.      Okay.  Now, do you have any position

25   with VVA?

1        A.     I'm the president of the company.

2        Q.     And what kind of company is VVA?

3        A.     It's a nonstock Virginia corporation.

4        Q.     And what does that mean?  Do you

5    know?

6        A.     It just means that there's no one

7    that owns stock in the company.  Other than

8    that, it's just a regular corporation.

9        Q.     Is it considered a nonprofit

10   corporation?

11       A.     No.

12       Q.     So you can make a profit off of your

13   activities?

14       A.     Yeah.  I consider it a no-profit

15   corporation.  We intentionally cover our

16   expenses every year, and that's it.  We don't

17   really do fundraising, or anything like that.

18       Q.     How long have you been president?

19       A.     I think we formed it in 2009 or 2010.

20   So I've been president since then.

21              (VVA Deposition Exhibit Number 3,

22               Certificate of Incorporation of

23               Virginia Voters Alliance, Bates

24               stamped VVA-000941, marked for

25               identification, as of this date.)

```
1                MR. O'NEILL:  Cables (indicating).

2        A.    2011.

3                MR. TEPE:  Big table?

4                MR. O'NEILL:  Right.

5        Q.    So, Mr. George, what's been handed to

6   you is Exhibit Number 3.

7                Do you recognize it?

8        A.    I've seen it before.  It's the

9   charter for the company.

10       Q.    Okay.  Does this refresh your

11  recollection as to when VVA was established?

12       A.    Yeah.

13       Q.    And when was this --

14       A.    I didn't realize it was late in

15  the -- late in the year, but, yes.

16       Q.    And so when was it established?

17       A.    November 18, 2011.

18       Q.    Are there any other officers besides

19  yourself?

20       A.    Just one, Jeremy Taylor.

21       Q.    What's his role?

22       A.    He's the vice president.  He also --

23  I would consider him my benefactor.  So if I

24  have an expense, like a corporate renewal, he

25  would pay for that.
```

1     Q.     Okay.  So how long has he been the

2  vice president?

3     A.     Since we started the company, just

4  the two of us.

5     Q.     Are there any other officers?

6     A.     No.

7     Q.     Who are the directors of VVA?

8     A.     Just the two of us.

9     Q.     Are there any formal meetings of a

10 board?

11    A.     Just whenever we talk on the phone.

12 I mean, there's -- he lives in the

13 Northern Neck, and he works in Houston, so kind

14 of hard to have a face-to-face meeting.

15    Q.     He lives in the Northern Neck of

16 Virginia, but he works in Houston?

17    A.     Right.

18    Q.     Does he fly back and forth?

19    A.     Every week -- pretty much every week.

20    Q.     You called him a "benefactor."

21           What did you mean by that?

22    A.     He just covers our expenses in the

23 corporation.  Again, we're not fundraising or

24 having revenue streams.  So . . .

25    Q.     So who decides the actions that are

Page 20

1    taken by VVA?

2         A.    I usually make the decision as far as

3    operations goes, but I certainly consult with

4    him before I do anything, at least over a phone

5    call.

6         Q.    Is there any particular process you

7    follow for deciding what activities VVA engages

8    in?

9         A.    No, just a phone call and a chat.

10   That's pretty -- pretty simple.

11        Q.    Does VVA have any members, official

12   members?

13        A.    Whenever I was out doing

14   presentations on voter fraud, people would sign

15   up, like, to get an e-mail from me, or whatever,

16   but since we decided not to actually do

17   fundraising, we haven't really kept up with

18   that.  I mean, I have people that have

19   contributed to me, you know, just -- but it's

20   not something that we intentionally go out and

21   try to do.

22             I would consider them members, if

23   they were -- they sent me a check, or whatever.

24        Q.    But there's no -- there's no

25   membership list that you have?

1      A.     No.

2      Q.     Is it fair to say that there -- you

3  have volunteers, then, as opposed to members?

4      A.     Not even that.  I mean, at one point,

5  I had a lady that was going to assemble my

6  e-mail list, and she never could work it in; she

7  really didn't make very much headway on it,

8  so -- again, it was a volunteer.  I don't even

9  remember her name now, but it was years ago.

10     Q.     Okay.  So is it fair to say that VVA

11  is pretty much you, Reagan George, in

12  consultation, to some extent, with Mr. Taylor?

13     A.     With Mr. Taylor, yes.

14     Q.     And so were you and Mr. Taylor the

15  founders of VVA?

16     A.     Yes.

17     Q.     Why was VVA created?

18     A.     Originally, I started it because I

19  attended a meeting with True the Vote, out of

20  Houston.  The lady that founded True the Vote

21  gave a talk here in Virginia.  So it was

22  something that I was interested in.

23            Originally, I started it just to do

24  Northern Virginia, but people encouraged me to

25  make it more of a statewide effort, which I did.

1                I met Jeremy, actually, at the very

2    first presentation that I gave, and he came up

3    to me, and we had a good chat.  And we met for

4    lunch and decided to form Virginia Voters

5    Alliance.

6         Q.    Tell me more about this True the

7    Vote, I think, presentation, that spurred

8    this --

9         A.    True the Vote was started in Houston,

10   looking at voter fraud issues.  They started

11   looking at -- mainly at addresses where you had

12   multiple people registered at an address.

13   Usually it was people that had sold the house

14   and left the state or moved, or whatever, and

15   they were still on the voter rolls.  They were

16   doing that type of work.

17               So that was something that we started

18   looking at doing.  In fact, we did that for

19   about a year.  But they were really geared to do

20   a lot more fundraising, and they were a

21   501(c)(3) or (c)(4).  And we decided not to go

22   that direction.  So they were pretty -- they

23   were pretty tied up as far as what they could do

24   and couldn't do because of their tax status.

25               So there were things that I wanted to

1   do that they wouldn't let me do if I was trying

2   to be part of their organization, so that's when

3   we split up.

4          I think that's probably why I was

5   confused on the dates, because I was actually

6   doing voter fraud work in 2009 and 2010 before

7   we actually formed the company.

8   Q.   Can you give an example of something

9   that you wanted to do that you couldn't do under

10  the True the Vote umbrella?

11  A.   One of the things we did was we

12  looked at the voter rolls between Maryland and

13  Virginia.  We found about 44,000 people that

14  appeared to be registered in both states.  Out

15  of that, we found about 165 that appeared to

16  have voted in both states.  True the Vote would

17  not touch that with a 10-foot pole.  It's not

18  something that they were interested in.  There

19  were things like that that . . .

20          Also, True the Vote wanted to do poll

21  watching, and in Virginia, you can't be a poll

22  watcher unless you're a party -- affiliated with

23  a political party or if you're an independent

24  candidate.

25          So that was something that -- they

1    had trouble wrapping their arms around that they

2    just couldn't show up on -- on Election Day and

3    walk in and be a poll watcher, that they

4    actually had to affiliate themselves with either

5    the Republican or the Democratic party or an

6    independent candidate.  And that wasn't the case

7    in -- in Texas and other states, where they

8    could -- they could show up as just a

9    independent party.

10            So that was something that I wanted

11   to be able to do.  In fact, that's how I met

12   Keith Damon, was through the Republican Party.

13   We actually trained people as poll watchers.

14   But that was me as an individual, not me as

15   president of the Virginia Voters Alliance.

16       Q.    Okay.  So just going back, when I

17   asked why VVA was created, you answered that it

18   was prompted by a meeting with True the Vote.

19       A.    That's what gave me the idea.

20       Q.    Right.

21            And -- and -- and what did you, at

22   that time, envision VVA would do, when you

23   decided to found it?

24       A.    Mainly to ensure that Virginia had

25   free and fair elections.  I put together a --

1    about an hour-long presentation that I gave to

2    various groups around the state, talking about

3    what voter fraud was and how it worked and ways

4    that our laws could be manipulated, and things

5    like that.

6              I probably spoke to 4,000, 4,500

7    people around the state; attended State Board of

8    Election meetings when they were considering

9    various rules; attended several P&E committee

10   meetings when they were looking at legislation,

11   statewide legislation.

12             So that's pretty much what we did.

13   Q.    So you mentioned voter fraud.

14             At the time that VVA was founded, did

15   you have a belief that there was voter fraud

16   occurring in Virginia?

17   A.    It wasn't necessarily a belief.  I

18   was pretty certain that it occurred.  The nature

19   of the beast is such that it's hard to prove

20   because we vote anonymously, so once you get

21   past the ballot being submitted, then whatever

22   voter fraud is there, it's hard to prove.

23   Q.    Were one of the aims of VVA -- if I

24   understand your previous answer -- previous two

25   answers, one of the aims of VVA to search for

1   voter fraud?

2       A.    "Searching" would probably be the

3   wrong term.  What we wanted to do is we wanted

4   to have laws and processes in place that would

5   make voter fraud very difficult to do and, if

6   done, easy to prove.  That's what we were

7   interested in.  We weren't interested in --

8   things like photo ID, we were interested in that

9   because we felt that that was a way to stop

10  voter fraud.

11            There was a -- I think it was a

12  Project Veritas film where they actually talked

13  to a fellow in Alexandria -- or, no, Arlington,

14  and he was talking about -- at the time, we

15  didn't have photo ID, so we had the ability you

16  could walk in with a water bill or a utility

17  bill, and as long as it had your name and

18  address on it, you could use that as your ID,

19  basically.

20            So the Project Veritas came in and

21  was interviewing Representative Moran's son, I

22  think it was, and he proceeded to tell the

23  interviewer exactly how you would do that, how

24  you would actually dummy up water bills and be

25  able to go in and vote for another person, using

1    that water bill as your ID.

2              So it wasn't like it was a mystery as

3    to how it was being done; but, again, once the

4    vote is cast, it's hard to prove.

5         Q.    Well, you said how it's done; you

6    mean could be done?

7         A.    Well, he was basically giving them

8    instructions on how to do it, so he evidently

9    had experience doing it.

10        Q.    The Project Veritas people?

11        A.    Yeah, the -- Moran's son was giving

12   the Veritas person instructions on what to do

13   and how to do it, even to the point of if you're

14   in there with a dummy water bill and the voter

15   actually shows up behind you, run like hell.  I

16   mean, that was one of his suggestions.  So . . .

17             It sounded like it was from

18   experience, to me.

19        Q.    You mentioned that you had given some

20   presentations to groups.

21             What -- what groups were you

22   referring to?

23        A.    A lot of different groups, Tea Party

24   groups, because I was a member of the Tea Party

25   at the time.  Republican Women's [sic] Clubs was

1    another group.  They have other Republican-type

2    clubs; it was by invitation.  They would call me

3    up and ask me to be at one of their meetings.

4         Q.    Does Virginia Voters Alliance have

5    any media presence?

6         A.    We have a Facebook page primarily.

7    We have a Web site, but it's not that active.  I

8    post things occasionally on Facebook, but I

9    found that Facebook is a big drain on my time,

10   so I don't really piddle with it that much.

11        Q.    Do you do any TV appearances?

12        A.    I've done some TV appearances.  I've

13   done some radio appearances.  Basically, just

14   interviews.

15              (VVA Deposition Exhibit Number 4, VVA

16               Web page, marked for identification,

17               as of this date.)

18        Q.    Mr. George, the court reporter is

19   handing you what's been marked as Exhibit 4.

20        A.    From the Facebook page?

21        Q.    Yeah.  Is -- is that a image of your

22   Facebook page?

23        A.    I thought there was a better logo

24   than that, but it looks like it's the right one.

25        Q.    And you had mentioned, before,

1    funding for VVA.

2           Does this exhibit show a -- I guess

3    a -- actually, why don't you -- let me strike

4    that.

5           What does this exhibit seem to show,

6    to you?

7       A.    What does this exhibit show

8    (indicating)?

9       Q.    Correct.  Exhibit Number 4.

10      A.    It's got our address on it.  It says,

11   If you wish to donate -- which never happens --

12   donations are not tax deductible -- which is

13   true.

14          Phone number is my cell number.

15   Other than that, it's --

16      Q.    It appears, to me, like this posting

17   was done in October of 2014.

18          Would you agree with that?

19      A.    That's probably about the time we

20   created it.

21      Q.    All right.

22          So at -- at one point, was there a

23   contemplation that VVA would do some

24   fundraising?

25      A.    Oh, I mean, we've been approached by

1    people occasionally to, like, file a lawsuit, or

2    something, and they would donate to do that, but

3    then the money was consumed by filing the

4    lawsuit, paying the attorney, or whatever.  So,

5    again, we were at a break-even point, not that

6    we set out to actually do fundraising at all.

7              I've actually gotten checks in the

8    mail -- I don't even know how these people found

9    me, but I would get a check from California for

10   20 bucks.  How they knew to even send it to me

11   was -- I don't know if they saw it on the

12   Web site or the Facebook page, or what, but I

13   basically just turn that over to Jeremy, and he

14   and the CPA work it out, figure out where to

15   deposit it, and all that stuff.

16             So . . .

17   Q.    About how much income, or revenue,

18   does VVA receive annually?

19   A.    I think the corporate charter renewal

20   thing is, like, 25 bucks.  I'm not sure what

21   Jeremy is paying for the Web site hosting, and

22   all that stuff.  We really don't produce

23   financial statements.  They do a -- a tax

24   statement every year, and that's about it.

25   Q.    So, again, how much is -- can you

1    ballpark, like, an annual --

2         A.    I would say --

3         Q.    -- revenue figure?

4         A.    -- it's 100 bucks, maybe even less.

5    It just depends on how much he's paying for

6    Web site hosting.  Facebook is, obviously, free.

7    So . . .

8         Q.    But just -- I'm -- I'm not just

9    talking about, you know, Facebook or sort of

10   corporate filings.

11             Do you get revenue for any other

12   activities?

13        A.    No.

14             Again, occasionally there's

15   unsolicited donations that show up, but not

16   something you could go buy a meal on, probably.

17        Q.    And in terms of expenditures, what

18   kind of expenditures does VVA make?

19        A.    Pretty much what we just talked

20   about: the -- the corporate renewal and Web site

21   hosting.

22        Q.    Do you work with any other -- strike

23   that.

24             We talked a little bit before about

25   why VVA was founded, right?

1          A.     Right.

2          Q.     Is there a -- I guess a mission

3     statement for VVA or --

4          A.     Not a formal one.  I mean, when

5     Jeremy and I first talked, it was primarily to

6     ensure free and fair elections in Virginia,

7     educate the public on what voter fraud is and

8     how it works and hopefully ensure -- not

9     "ensure," but influence legislation that would

10    improve our election -- electoral process.

11              Let me -- let me give you an example

12    of an expenditure that's nonrecurring.

13              I can't remember -- it's when

14    McDonnell was Governor, a fellow by the name of

15    Charlie Judd was the Commissioner -- or,

16    actually, he was chairman of the State Board.

17    We decided to do an analysis of dead voters, so

18    Jeremy purchased $1,700 disk from the

19    Security -- Social Security Administration.  We

20    then proceeded to compare the "Death Master,"

21    which is what they call it, with the voter rolls

22    in Virginia.

23              Doing that, we found around 31,000

24    people that were dead that were on the voter

25    rolls.  So we turned that information over to

1    Charlie, or at least I told him about it, told

2    him I'd give him the CD that we had just

3    purchased, if he wanted it.  He said, No.  We

4    got money in the budget; we'll do it ourselves.

5              So they went and bought the CD,

6    compared it to the VERIS system, which is their

7    online database.  And the last time I talked to

8    him, they had removed over 60,000 dead voters,

9    because they have Social Security numbers on

10   both databases that they could use.  We didn't.

11   All we had was names and birthdates.

12             So I asked him -- I said, Well,

13   what's going on here?  Why were there still 60-,

14   61,000 dead voters on the database?  And he

15   said, Evidently the Kaine and Warner

16   administrations never removed any dead voters.

17   And he said, When we took over -- when McDonnell

18   became Governor and he took over being the

19   chairman of the State Board, they assumed that

20   those two administrations had done what the law

21   required, and they hadn't.

22             And it was only us doing what we did

23   and pointing out the fact that we knew that

24   there were 31,000 people out there that probably

25   should not be on the voter roll, that they

1    actually went back and did what the previous

2    administrations had not done --

3         Q.    Other than --

4         A.    -- in that year, we spent 1,700

5    bucks, Jeremy did, so -- he donated it and then

6    spent it.  So . . .

7         Q.    Other than Mr. Taylor, Jeremy Taylor,

8    and occasional donations that roll in, are there

9    any other funding streams?

10        A.    No.

11        Q.    Do you know the -- the Defendant in

12   this case, J. Christian Adams?

13        A.    I do.

14        Q.    How do you know him?

15        A.    I met him years ago.  He actually

16   came to our -- one of our Tea Party meetings and

17   gave a talk at one point.  I think that's when I

18   first met him.

19        Q.    How long ago was that?

20        A.    I don't even remember if we had

21   formed Virginia Voters Alliance at that time.  I

22   just can't remember.

23        Q.    Have you known him for --

24        A.    I feel like I've known him for a long

25   time -- let's put it that way.

1      Q.    At least a decade?

2      A.    Pardon?

3      Q.    At least a decade?

4      A.    Probably, yeah.  I'm bad with dates,

5   but that sounds about right.

6      Q.    Have you worked on any initiatives

7   with Mr. Adams?

8      A.    Just the lawsuit that we did against

9   the registrar in Alexandria.

10     Q.    Nothing else?

11     A.    No.  I mean, I've consulted him about

12   things that we've done, analysis that I was

13   doing, or is there a way to get access to the

14   SAFE file, during the Obama Administration,

15   which there was no way to do that, things like

16   that.

17           I'd ask him questions about what he

18   knew working at DOJ and if there was something

19   that I could do, but I wouldn't call that a

20   attorney-client privilege, or anything.  It was

21   just asking a person that had expertise.

22     Q.    So other than the lawsuit against the

23   registrar in Alexandria, you haven't worked with

24   Mr. Adams on any other projects?

25     A.    No; outside of just ad hoc phone

1    calls occasionally.

2         Q.    Do you know the other Defendant in

3    this lawsuit, Public Interest Legal Foundation?

4         A.    I mean, I know they exist.  I went to

5    a -- a dinner several -- like a year ago, maybe

6    two years ago, that they had, met some of the

7    other attorneys besides Christian, but it was

8    just a get-together.  That was about it.  It

9    wasn't really a formal meeting.

10        Q.    Other than this dinner several years

11   ago, have you had any other interactions with

12   Public Interest Legal Foundation?

13        A.    No; just -- just Christian.  He's

14   local.  I think they are all in Indiana or Ohio,

15   or someplace.  So . . .

16        Q.    Okay.  You mentioned a lawsuit

17   against Alexandria, correct?

18        A.    Registrar of Alexandria, right.

19        Q.    Yes.

20              So am I correct, then, 2016, VVA sued

21   the registrar of the City of Alexandria?

22        A.    Right.

23        Q.    And in that lawsuit, VVA alleged that

24   Alexandria City, or at least the registrar, was

25   in violation of the National Voter Registration

1    Act; is that right?

2         A.    Right.

3         Q.    And is that called "NVRA" for short?

4         A.    Right.

5         Q.    But before that lawsuit, VVA provided

6    notice to Alexandria of VVA's allegations; is

7    that right?

8         A.    As far as I remember, there was,

9    like, a letter to them.  I don't remember

10   exactly all the process steps, but there was a

11   letter to them about we had identified that they

12   had 113 percent people registered than they had

13   people to vote, which is indicative of poor list

14   maintenance.  That was the gist of it.

15              (VVA Deposition Exhibit Number 5,

16               Letter with attachment, marked for

17               identification, as of this date.)

18        Q.    The court reporter is marking as

19   Exhibit Number 5 a document.

20              Do you recognize that document?

21        A.    It's a copy of a letter that was

22   sent, I guess, by Christian to Anna,

23   Anna Leider.

24        Q.    And who is Anna Leider?

25        A.    She's the registrar in Alexandria.

1       Q.    And is this the letter that you were

2   referring to a couple of minutes ago?

3       A.    Yes, I think so.

4       Q.    Okay.  And is this letter, I guess,

5   notice that you are required to provide the

6   registrar before you actually commence a

7   lawsuit?

8       A.    I think that's the step that --

9   that's involved, yeah.  I'm sorry --

10      Q.    All right.  So let's look a little

11  bit more carefully at this -- this letter.

12            It's dated January 25th, 2016; is

13  that right?

14      A.    Yes.

15      Q.    And it's a letter you sent; is that

16  correct?  It's got your name at the end?

17      A.    Well, it's got my name on it, but I

18  don't know that I actually signed it.  I may

19  have.  I don't remember.

20      Q.    Okay.  But you did send it?

21      A.    Yes.

22      Q.    Now, in the first sentence, you say,

23  I am writing on behalf of the Virginia Voters

24  Alliance to notify you that your city is in

25  apparent violation of Section 8 of the National

1    Voter Registration Act based on our research.

2              Do you see that?

3    A.    Yes.

4    Q.    What -- what does Section 8 require?

5              Do you know?

6    A.    Section 8 is -- I don't know the

7    specifics, but it basically says you've got to

8    maintain proper voter rolls.

9    Q.    Accurate voter rolls?

10    A.    Accurate voter rolls.

11    Q.    So as of this date in January, you

12    had come to a preliminary conclusion that there

13    was a violation of the NVRA; is that right?

14    A.    Yes, because there was Census data

15    that indicated how many eligible voters are

16    actually in Alexandria and she had more than

17    that registered to vote.  Most jurisdictions

18    will register between 70 and 75 percent of the

19    eligible voters.

20    Q.    So is it fair to say that the -- this

21    conclusion that Alexandria City was in violation

22    of the NVRA is summarized in the fifth

23    paragraph, beginning In short?

24    A.    Yeah.  "Your City has more

25    register -- more voters on the registration

1    rolls than it has eligible living citizen

2    voters."

3            That's right.  And I think it was

4    113 percent.  I don't remember if that was in

5    here or not, but . . .

6    Q.    Yeah, I don't see that in the letter,

7    where you state how many more registered voters

8    than eligible voters are on Alexandria's rolls.

9            Do you see that?

10   A.    I don't -- I don't spot it in here.

11   Q.    Why didn't you include that support

12   for your accusation of being in violation of

13   NVRA?

14   A.    You'd have to ask Christian about

15   that.  I don't know.

16   Q.    Why would I have to ask Christian

17   about that?

18   A.    He had already filed the same lawsuit

19   on about 13 other jurisdictions and won.  So

20   what we were looking at was -- there was

21   probably -- maybe 20 or 30 counties in Virginia

22   that had that exact same problem.  Alexandria

23   was probably the more outrageous of all of them

24   at 113 percent, but . . .

25   Q.    So when you say "113 percent,"

1    what -- what do you -- what do you mean?

2         A.    Well, they have them in the Census

3    spreadsheet that you can download from the

4    Census Bureau.  They have a column that talks

5    about the number of people that are over 18,

6    which would indicate the number people that

7    could register to vote if they wanted to, but in

8    another part of the spreadsheet, it talks about

9    the actual number of people that were registered

10   to vote, and the discrepancy between the two was

11   113 percent of the people eligible.

12        Q.    So based on that, it was VVA's belief

13   that the City of Alexandria's voter rolls

14   contained a number of ineligible voters?

15        A.    Possibly ineligible, maybe dead

16   voters.  I mean, we had already been through the

17   exercise of finding 61,000, or whatever it was,

18   with the State Board.  So --

19        Q.    Being dead is pretty hard to --

20        A.    -- we didn't really try to identify

21   why they were there; they just were there.

22        Q.    Okay.  So what -- what are examples

23   of ineligible voters on a voter roll?

24        A.    People had come in and registered to

25   vote in person, but the letter that -- the

1    "welcome letter," they call it, which has the

2    voter registration card at the end of it, is

3    returned because of a bad address; felons that

4    come in and register to vote by mail, when they

5    shouldn't be registered, possibly still

6    incarcerated; people that have been declared

7    incompetent by a judge that get registered at a

8    nursing home en masse.

9             Lots of examples.

10   Q.    So I think -- if I understand, you

11   mentioned folks who are incarcerated, correct?

12   A.    They were either incarcerated or they

13   have been removed from prison but they're still

14   felons.  And at the time, you had to actually

15   petition the Governor for restoration of your

16   voting rights.  So they could also have been

17   registered before they went into the

18   penitentiary.  So . . .

19   Q.    So being a felon is one category of

20   ineligible voter?

21   A.    Right.

22   Q.    I think you mentioned another

23   category is incompetent, is that correct --

24   A.    Yes.

25   Q.    -- mentally incompetent?

1      A.    Right.

2      Q.    And that's something that has to be

3  decreed or -- is that right?

4      A.    You have to have a judge declare that

5  they're incompetent in some way.

6      Q.    Okay.  You had mentioned deceased

7  voters as not an ineligible voter, because

8  they're decreased, but they're a similar

9  category, correct?

10     A.    Right.

11     Q.    Okay.  Any other categories of

12 ineligible voters?

13     A.    At the time that we filed this

14 lawsuit, that was all we knew about.

15     Q.    What about someone who had moved out

16 of state?

17     A.    I mean, obviously, they would be

18 ineligible, like, if you had -- like, what True

19 the Vote was doing is they were looking at

20 people that were property owners at an address

21 and then later sold a house, moved somewhere in

22 the state or moved out of state.  I mean, they

23 could still be on the voter rolls.

24     Q.    At this time, VVA believed that voter

25 rolls across America contained substantial

1    numbers of ineligible voters; is that right?

2        A.    Yeah, there was a Pew study out that

3    was talking about, I think, 1.8 million voters

4    that were ineligible based on their study.  They

5    claimed a huge number of voter registrations

6    that had errors, factual errors, like the

7    misspelling of an address or a bad ZIP Code or a

8    bad birthday.

9             One of the studies I did, at one

10   point, we had more people that were over

11   116 years old in the voter rolls, so, obviously,

12   the -- the lady in China was not the oldest

13   person in America -- in the world.  So . . .

14       Q.    So you have a statement here in the

15   third paragraph, Voter rolls across America

16   contain substantial numbers of ineligible

17   voters.

18            Do you see that?

19       A.    Yes.

20       Q.    And what is that statement based on?

21       A.    At this point in time, probably that

22   Pew study.

23       Q.    In your letter, VVA requested, if you

24   look to Pages 2 and 3, 10 categories of records;

25   is that right -- roughly speaking?

1        A.     Okay.

2        Q.     Would you agree with that?

3        A.     Yes.

4        Q.     What was the purpose of asking for

5   all these records?

6        A.     Trying to just delve into what we

7   were actually looking at as far as the

8   113 percent, what made up that 113 percent.

9        Q.     So you were looking to establish that

10  there were, in fact, substantial numbers of

11  ineligible voters on Alexandria's roles?

12       A.     Right.  All we had was a total to

13  look at, so we were wanting to get down in the

14  weeds and find out exactly what was going on

15  there.

16       Q.     The evidence for that belief in

17  113 percent?

18       A.     Right.

19       Q.     So you sent this letter.

20              Did the registrar respond to your

21  letter?

22       A.     I think they did.  I don't remember

23  seeing what the letter looked like, but I think

24  they responded, and then -- I mean,

25  everything -- I'm assuming, because we wound up

1    going to court, that whatever they responded to

2    wasn't good enough.  So . . .

3         Q.    You didn't see eye to eye?

4         A.    We didn't see eye to eye.

5               (VVA Deposition Exhibit Number 6,

6                Letter with attachments, marked for

7                identification, as of this date.)

8         Q.    The court reporter has marked as

9    Exhibit 5 [sic] a letter.

10              Do you recognize this letter?

11              THE COURT REPORTER:  Six.

12        Q.    Six.  I'm sorry.

13        A.    Yes.

14        Q.    And what do you recognize it to be?

15        A.    This would be their response to our

16   original letter.

17        Q.    This is a letter dated February 9th,

18   2016, addressed to you; is that right?

19        A.    Yes.

20        Q.    And it's from Anna Leider --

21        A.    Right.

22        Q.    -- General Registrar of Alexandria;

23   is that correct?

24        A.    Right.

25        Q.    And she says in the third paragraph,

1    I think your conclusion that Alexandria has more

2    voters on its registration rolls than it has

3    eligible living citizen voters could be based on

4    old or faulty data.

5              Do you see that?

6         A.    Right.

7         Q.    And she continues, Currently, about

8    65 percent of Alexandria's voting age population

9    is registered to vote.

10             Do you see that?

11        A.    Right.

12        Q.    So she's saying 65 percent?

13        A.    Right.

14        Q.    Right.

15             And you've testified today that you

16   thought it was 113 percent?

17        A.    Right, based on the Census

18   information that we had.

19        Q.    But in your letter to her, you hadn't

20   provided 113 percent, correct?

21        A.    Right.

22        Q.    And if you go to the next page,

23   Ms. Leider says, quote, It is difficult to

24   address the concerns raised in your letter

25   without additional information about the

1    specific reports and information you relied on

2    to reach your conclusions --

3              Do you see that?

4         A.    Right.

5         Q.    -- For example, was there a

6    particular charter data set in the 2014 EAC

7    report that supports your claims?

8              Do you see that?

9         A.    Um-hum.

10        Q.    So as of this date, she wasn't really

11   sure what the basis of your allegation of

12   Virginia having more ineligible -- more voters

13   than eligible citizens, correct?

14        A.    Right.

15        Q.    And as you mentioned earlier,

16   ultimately you and the City of Alexandria didn't

17   come eye to eye on whether or not the City was

18   in violation of the NVRA?

19        A.    Right.

20        Q.    Okay.  And so then, as a consequence,

21   VVA filed a lawsuit against the City of

22   Alexandria?

23        A.    Right.

24        Q.    Who were the lawyers that represented

25   you in that lawsuit?

1       A.      Christian Adams.

2       Q.      Anyone else?

3       A.      There may have been another person

4   out of PILF, but Christian was the person I

5   dealt with.

6       Q.      "PILF" being Public Interest Legal

7   Foundation?

8       A.      Right.

9       Q.      So Mr. Adams -- and I call it "PILF."

10      A.      PILF.

11      Q.      It's a little bit shorter than

12  P-I-L-F.

13      A.      Right.

14      Q.      So those folks were your attorneys

15  for this lawsuit; is that right?

16      A.      Right.

17      Q.      Was this lawsuit dismissed?

18      A.      It was dismissed without prejudice

19  and with the ability to refile.

20              What she encouraged us to do was to

21  go to the registrar and examine various

22  documents that the registrar could provide us to

23  see if we could reconcile the differences

24  between what we were saying and what she was

25  saying.

Page 50

1      Q.     When you said "she," who were you
2   referring to?
3      A.     Anna, Anna Leider.
4      Q.     So after the lawsuit was dismissed,
5   then what happened?
6      A.     There was a letter that was sent to
7   her, asking for -- I don't remember the exact
8   number; it was, like, 40 or 50 different
9   documents.  She provided those.  We had a room
10  about this size.  She had them laid out in
11  tables around the room, stacks of documents that
12  we could look at.
13            So that's what we did.  We were --
14  when -- went through there and just looked at
15  every document, where it came from, who prepared
16  it, how often was it prepared, that type of
17  information.
18     Q.     Was this called an "inspection"?
19     A.     I think that's what they called it,
20  "inspection" of her documents, right.
21     Q.     So when was this inspection?
22     A.     It was after the lawsuit was
23  dismissed.  I don't know what the date was.  We
24  met at her office.
25            (VVA Deposition Exhibit Number 7,

Page 51

1               Letter, Bates stamped

2               PILF-ADAMS-0000637 through

3               PILF-ADAMS-0000641, marked for

4               identification, as of this date.)

5          MR. O'NEILL:  Counselor, five

6     more minutes and then can we take a break?

7          MR. TEPE:  Thereabouts, yeah.  I

8     think five, 10 minutes.

9     Q.    The court reporter has handed you

10    Exhibit Number 7.

11               Do you see that?

12    A.    Yes.

13    Q.    Do you recognize this document?

14    A.    I guess it was from their attorney,

15    the registrar's attorney, if I remember

16    correctly --

17    Q.    And --

18    A.    -- they're in Richmond.  Yeah, this

19    is it.

20    Q.    -- and it's addressed to

21    Christian Adams and Noel Johnson of PILF?

22    A.    Right.

23    Q.    And it's dated August 10th, 2016?

24    A.    Yes.

25    Q.    I want to direct you to the first

1    line of the letter.  It says, Thank you for your

2    correspondence regarding the July 25th, 2016,

3    inspection you conducted at the Office of the

4    General Registrar in Alexandria.

5            Do you see that?

6        A.   Right.

7        Q.   Does that refresh your recollection

8    of when this inspection took place?

9        A.   Yes, I guess so, it does.

10       Q.   Who was there with you -- strike

11   that.

12           You were there at that inspection,

13   correct?

14       A.   Right.

15       Q.   Were there other folks with you on

16   that inspection?

17       A.   There was -- a fellow by the name of

18   Keith Damon was there.  Christian was there.  I

19   think there was a fellow by the name of

20   Robin Whitworth, who was one of my Tea Party

21   buddies, and another Tea Party buddy that was

22   Chris Wright.  And there may have been a fellow

23   by the name of Rich Nox, but I don't remember.

24           But it was mainly Christian and I

25   that were going around, looking at the

1    documents --

2         Q.    And --

3         A.    -- and --

4         Q.    I'm sorry.

5               Was Chris Wright there?

6         A.    I'm fairly certain Chris was there.

7         Q.    But you were not sure about Rich Nox?

8         A.    Rich Nox -- I think he was there,

9    but . . .

10        Q.    And then -- so it was you, Adams,

11   Damon, Wright and Robin --

12        A.    Whitworth.

13        Q.    How do you spell that?

14        A.    W-H-I-T-W-O-R-T-H.

15              When we arrived, there was a woman

16   there that we didn't know.  Initially, I thought

17   she was the attorney for the registrar.  It

18   turned out she was an attorney for the League of

19   Women Voters that wanted to observe our

20   inspection.  And she was eventually asked to

21   leave, which she did.  I don't recall her name.

22   And then Anna was there.  There wasn't anyone

23   else from Anna's office that was there, just

24   Anna.

25        Q.    How long did the inspection take

1    place for?

2         A.    Probably about an hour,

3    hour-and-a-half.

4         Q.    And you said there's a bunch of

5    documents laid out.  Were these the documents

6    that you had requested beforehand?

7         A.    Right.  There was 40 or 50 various

8    stacks; some of them were, you know, stacked up;

9    Others was, like, one or two pages.  So it just

10   depended on what we were looking at.

11        Q.    Was Ms. Leider there the entire time

12   you were there?

13        A.    Yes.  She walked around with us so we

14   could ask her questions about who prepared it,

15   when it was prepared, how it was prepared, that

16   type of thing, where did the data come from

17   originally.

18        Q.    Just generally explaining what the

19   contents of these records were?

20        A.    Right.  What it was used for, that

21   type of thing.

22        Q.    Did you see during this inspection

23   any records listing people whose voter

24   registrations had been canceled?

25        A.    Yes.  There was a stack of, like,

1    four reports, as best I recall.  One of them was

2    a list of felons that had been removed.  There

3    was a list of dead voters that had been removed.

4    It was a fairly small list of people that had

5    been declared incompetent but they had removed.

6              And then the list we didn't know

7    anything about was a list of people that been

8    removed because of declared noncitizenship

9    status.  We didn't know that that existed, so we

10   asked her how it was prepared, where it came

11   from, how did they do this.  She explained to us

12   what the process was.  And then I asked her if

13   she had checked to see if any of these people

14   had voted.  She said it did not occur to her to

15   do that, which, in my mind, was her job.  But

16   she didn't do it.

17        Q.    Do you recall what she told you with

18   respect to how this record was prepared -- I

19   mean, specifically what she told you, not --

20              MR. O'NEILL:  Objection: vague.

21              Which record are you talking about?

22              MR. TEPE:  The noncitizen list.

23        A.    The noncitizen list?

24        Q.    Yeah.

25        A.    I believe there're, like, 70 or 77

1    names on the list; we asked for a copy.  She

2    said, No, that it was confidential.  We said,

3    Why is it confidential?  Because it's a -- it's

4    a list produced by VERIS, it's not any more

5    confidential than what you've got with the dead

6    voters.  And she said that it was because it

7    originated at the DMV.

8              So she refused to give us a copy,

9    which also generated another series of letters

10   to this ThompsonMullan [sic] guy.

11        Q.    That's the attorney for --

12        A.    That was the attorney for -- for

13   Anna.  And eventually they acquiesced and gave

14   us the list that we had requested.

15        Q.    So you had requested a copy of this

16   list of voters canceled with regard to

17   citizenship concerns; is that right?

18        A.    Right.  And it was a list just for

19   that year.  The best I remember, everything she

20   showed us was everything that was occurring just

21   that year.

22        Q.    Did seeing this list cause PILF to

23   make requests for the same type of list from

24   other jurisdictions in Virginia?

25              MR. O'NEILL:  Objection.  You're

1          talking -- you're asking him PILF,

2          whether -- whether it was -- you can

3          answer you know -- excuse me -- to the

4          extent you know --

5               MR. TEPE:  Of course.

6               MR. O'NEILL:  -- whether PILF.

7          A.    Public Interest Legal Foundation, I

8     think, requested 19 or 20 other jurisdictions to

9     provide that list.  Christian did the letters

10    and all.  I didn't do that.  He reported back to

11    me that, I think, seven counties had provided

12    him their list.

13               We eventually got the Alexandria

14    list.  Two counties refused to cooperate, so he

15    went on and filed lawsuits on them -- Federal

16    lawsuits on them, which he won, and we got their

17    list.

18         Q.    Earlier, I asked if you recalled what

19    Ms. -- what Ms. Leider said in explaining how

20    this particular list was prepared.

21               Do you remember that question?

22         A.    Um-hum.

23         Q.    And you -- you talked about how she

24    couldn't give you a copy of the list because the

25    list was generated based on information from the

1   DMV; is that right?

2       A.    It was -- the list was triggered

3   based on information from the DMV.

4       Q.    So how -- what's your understanding

5   of how the list was compiled?

6       A.    What I understand of the process --

7   and I've never been through it, and I've never

8   gone in and asked DMV how they did it -- but

9   people would come in to renew their driver's

10  license, and through DHS, the DMV people knew

11  that they were or appeared to be noncitizens in

12  some way and would confront the person renewing

13  their driver's license, and they would admit

14  that they were not a citizen.  And then the DMV

15  would then send that information or that name --

16  I guess, pertinent information, like their

17  address and Social, et cetera, to the State

18  Board.

19          The State Board, in turn, would then

20  put that into what they call a "hopper" for each

21  of the local boards.  And they would do the same

22  thing if it was a felon or a non- -- or

23  incompetent or, you know, dead person, or

24  whatever -- the person that had moved.

25          They then are required to send a

1   postcard to each one of those people that have

2   self-declared, asking them to confirm that they

3   either are or are not a citizen.  And only when

4   they get the postcard back saying, Yeah, I'm not

5   a citizen, or if they don't get the postcard

6   back at all, do they take them off the voter

7   roll.

8        Q.    I'm sorry.  Say that last part again.

9        A.    When the card goes out to confirm

10  that they really are not a citizen, because

11  they've -- they've already told the DMV they

12  weren't, but the card goes out because the local

13  board has found or the State Board has found

14  that they really are registered to vote, even

15  though they've told the DMV that they're not

16  registered or they're not citizens.

17           So they send this card out, person

18  gets the card in the mail.  It asks them, if

19  they are a citizen, they need to provide proof

20  of that citizenship.  If they don't send the

21  card back, then the local board assumes that

22  they are noncitizens because they didn't send it

23  back, they didn't respond.  And only then do

24  they actually take them off the voter roll.

25           They could also get the card back

Page 60

```
1    where the person actually admits that they're

2    not a citizen.  They would remove them also.

3    But I would suspect that the bulk of them are

4    people that just don't return the card.

5              MR. TEPE:  You asked for a break.  I

6         think we're -- I think we're good.

7              MR. O'NEILL:  Thank you.

8         Five minutes?

9              MR. TEPE:  Sure.

10             MR. O'NEILL:  Great.

11             THE VIDEOGRAPHER:  The time is

12        11:40, and we are off the record.

13                    -  -  -

14             (Whereupon, a recess was taken from

15               11:40 a.m. to 11:52 a.m.)

16                    -  -  -

17             THE VIDEOGRAPHER:  The time is

18        11:52, and we're back on the record.

19   BY MR. TEPE:

20        Q.    Mr. George, you understand you're

21   still under oath, correct?

22        A.    You bet.

23        Q.    You had mentioned before that you

24   were unaware of any records that would track

25   people who were canceled because of citizenship
```

1    issues; is that right?

2         A.    Right.

3         Q.    If you can go back to the -- the

4    letter dated January 25th.

5         A.    Okay.

6         Q.    What exhibit number was that again?

7         A.    Five --

8         Q.    Five.

9         A.    -- or it's got Exhibit 1.  I don't

10   know which is which.

11        Q.    It's the green exhibit, 5.

12        A.    Five.

13        Q.    Yeah.  So if you go to the second

14   page, in your list of record requests, Item B --

15   do you see that --

16        A.    Right.

17        Q.    -- records your office obtained or

18   received from the Alexandria Circuit Court

19   clerk, United States District Court clerks or

20   other sources regarding individuals who were

21   ineligible to serve on juries because of a lack

22   of American citizenship, death, relocation,

23   et cetera?

24               Do you see that?

25        A.    Um-hum.

1      Q.    So you were requesting records that

2  would identify people who were removed from the

3  rolls based on citizenship concerns; is that

4  right?

5      A.    I think at the time, though, you're

6  looking at people that have declared that they

7  were noncitizens on jury duty applications.

8      Q.    Okay.

9            But you were seeking at that time

10 records with regard to people who had indicated

11 lack of citizenship in a jury questionnaire; is

12 that right?

13     A.    Right.  In fact, I think John Frey,

14 who is our clerk of the court, had actually

15 taken it upon himself to create a list similar

16 to that and turn it over to the local board.  I

17 think it made the news.  So . . .

18     Q.    Okay.  You had testified earlier that

19 you went to this inspection at the registrar's

20 office in Alexandria, correct?

21     A.    Right.

22     Q.    And one of the records you saw was a

23 record about people who were removed from the

24 rolls based on how they answered a citizenship

25 question on a -- a DMV form; is that right?

1       A.    Yeah, I'm not sure about the DMV

2    process, whether it was a form or a verbal

3    question asked by the DMV agent or how they

4    arrived at it, but the person that was being

5    asked was actually self-declaring that they were

6    noncitizens.

7       Q.    And so you requested a copy of that

8    list; is that right?

9       A.    Right, the list that she had.

10      Q.    And I think you testified that there

11   was some back-and-forth between you and

12   Alexandria about whether or not they were

13   allowed to give up that list, right?

14      A.    We just requested a copy of it.  She

15   claimed that she couldn't give it to us because

16   it was confidential.  And, you know, at that

17   point --

18             MR. O'NEILL:  Objection --

19      A.    -- we didn't get it.

20             MR. O'NEILL:  -- "she" -- "she"

21        meaning?

22             THE WITNESS:  "She" meaning

23        Anna Leider, the registrar, didn't want to

24        provide it to us.

25

1          Q.    But, ultimately, you did get a copy

2    of that list, right?

3          A.    Right, this ThompsonMullan [sic]

4    Number 7 was about that.

5                (VVA Deposition Exhibit Number 8,

6                 E-mail string with attachments,Bates

7                 stamped PILF-ADAMS-0003265through

8                 PILF-ADAMS-0003277, marked for

9                 identification, as of this date.)

10         Q.    The court reporter has handed you

11   what's been marked as Exhibit 8.

12               Do you see that?

13         A.    Yes.

14         Q.    Do you recognize this document?

15         A.    No.

16         Q.    It appears to be an e-mail, correct?

17         A.    It appears to be e-mails, but not to

18   me.

19         Q.    Wasn't your name at the top as a

20   recipient?

21         A.    Oh, it was.

22               Okay.  From Noel.  Okay.

23         Q.    Why don't you just take a couple

24   of minutes and take a look at it?

25               MR. O'NEILL:  Take your time.

1                   Take your time.

2                   (Document review.)

3        A.     Down to the blue page?  Is that all

4    we're looking at?

5        Q.     No, this is --

6        A.     Oh, this is the actual list?

7        Q.     Yeah, ignore the blue page.

8               MR. O'NEILL:  He's referring to the

9        e-mail.

10       A.     Right.  I mean, it looks like an

11   e-mail string that I got sent to at the end of

12   the e-mail string.

13       Q.     Okay.  So if you go to the beginning

14   of the e-mail string on the second page, or,

15   actually, the third page --

16       A.     Right.

17       Q.     -- it's an e-mail from

18   Billy Tunner --

19       A.     Right.

20       Q.     -- to Noel Johnson, September 2nd,

21   2016.

22              Do you see that?

23       A.     Right.

24       Q.     Okay.  And Noel Johnson was your

25   counsel in the lawsuit against Alexandria; is

Page 66

1    that right?

2        A.    I never really met Noel.  I think

3    he's a person that lived in Indiana -- Indiana.

4    I guess he worked with Christian.  But I mainly

5    dealt with Christian, not with Noel.

6        Q.    So you didn't really know Noel?

7        A.    Not really.  I may have talked to him

8    on the phone, or something, but . . .

9        Q.    Okay.  Well, in this e-mail,

10   Mr. Tunner says, Noel, please see attached.  The

11   general registrar is able to e-mail you lists of

12   cancelations --

13            MR. O'NEILL:  Objection.  What are

14        you referring to, specifically, so he can

15        follow?

16            I just --

17            MR. TEPE:  We're -- we're on the --

18        the e-mail that we were just talking

19        about --

20            MR. O'NEILL:  Right.

21            MR. TEPE:  -- September 2nd.

22            MR. O'NEILL:  Just -- you were just

23        reading.  Just, what part of the document

24        were you reading, so that he can follow

25        along?

Page 67

1    A.    Is it the 10:50 a.m. --

2    Q.    Yeah.

3    A.    -- time stamp?

4    Q.    Yeah, 10:50.

5          MR. O'NEILL:  Okay.

6    Q.    Yeah.  It -- it appears Mr. Tunner is

7    offering to e-mail you the list of cancelations

8    that you had requested; is that right?

9    A.    It looks like it.

10   Q.    Okay.  And then there's some more

11   back-and-forth.

12         And on September 13th, on the first

13   page -- flip to the first page of the exhibit --

14   do you see, towards the bottom, an e-mail from

15   Noel Johnson on September 13th --

16   A.    Okay.

17   Q.    -- 2:45 p.m. --

18   A.    Right.

19   Q.    -- to Mr. Tunner?

20         And he says, Yes, an e-mailed copy

21   would be most ideal.

22         Do you see that?

23   A.    (No audible response.)

24   Q.    Okay.

25   A.    It's an e-mail copy of the list of

Page 68

1    people; is that what . . .

2         Q.    Yes.  Well, if you go up to the next

3    e-mail, 5:12 p.m., an e-mail from Mr. Tunner to

4    Mr. Johnson.

5              Do you see that?

6         A.    Right.

7         Q.    Noel, Per your request, please see

8    the attached list.

9              Do you see that?

10        A.    Right.

11        Q.    And then that e-mail is forwarded to

12   you?

13        A.    Right.

14        Q.    At 5:12, immediately, it appears.

15        A.    Right.

16        Q.    And it's got a couple of attachments?

17        A.    Okay.

18        Q.    You see that?

19        A.    Yep.

20        Q.    Okay.  And you're copied on that

21   forward e-mail from Noel Johnson --

22        A.    Right.

23        Q.    -- to -- to Mr. Adams, right?

24        A.    Right.

25        Q.    Okay.  So you received the

1    attachments, which are behind the e-mail string.

2                Do you see that?

3        A.    That's right.

4        Q.    Okay.  So you received this at this

5    time, right?

6        A.    Yeah.  This is a exact copy of what

7    we saw in her office --

8        Q.    That was --

9        A.    -- in Anna's office.

10       Q.    -- that was going to be my next

11   question.

12               Is this what you saw --

13       A.    Yeah.

14       Q.    -- in the inspection?

15       A.    I mean, there were two others:  There

16   was one for felons and one for dead voters, but

17   all we asked for were these two, I guess.

18       Q.    And do these records have a name?

19       A.    Do the records?

20       Q.    Yeah.  Or the system that these

21   records were generated from, is there a name for

22   that?

23       A.    Yes.  It's called the VERIS system.

24       Q.    V-E-R-I-S; is that right?

25       A.    V-E-R-I-S.

1        Q.      And so this is -- so this is a record

2   that you saw in the inspection, correct?

3        A.      Right, we saw the paper copy.  We

4   didn't see it online.  We saw exactly what

5   you've got here.

6        Q.      And then you requested that record

7   from Alexandria, correct?

8        A.      We asked for a copy of what they had

9   at the inspection, which she did not provide us.

10  Later on, they provided it via the e-mail.

11       Q.      Do you know whose idea it was to --

12  to focus on requesting this particular record?

13              MR. O'NEILL:  I'm going to --

14       A.      I don't --

15              MR. O'NEILL:  -- I'm going to . . .

16       Q.      You had requested about 10 categories

17  of documents originally, is that right, in that

18  September -- January --

19       A.      When we did the inspection?

20       Q.      When you had sent that e-mail in --

21  excuse me.

22              Strike that.

23              Let me start again.

24              When you sent the letter on

25  January 25th, 2016, to Alexandria with regard to

1   their compliance with the NVRA, you requested

2   roughly 10 categories of documents, correct?

3        A.    Right.  There was the A, B, C thing

4   that we were looking at.

5        Q.    Yes.

6        A.    Okay.

7        Q.    In the back-and-forth with

8   Alexandria, you guys, being VVA and PILF,

9   focused on requesting this list from VERIS; is

10  that right?

11       A.    I'm not following you.

12             You lost me.

13       Q.    Did Alexandria give you all the

14  records that you requested in your January 25th

15  letter, ultimately?

16       A.    To my knowledge, they did.  I mean,

17  this was -- I mean, all we were asking for was a

18  copy of this initially, but it was -- once the

19  letters started flying, then the list expanded.

20       Q.    The list of what?

21       A.    The list that's in this letter.

22       Q.    Okay.  Into more requests?

23       A.    Right.

24       Q.    And one of those requests was for a

25  copy of this record that is right here in

1    Exhibit Number 8?

2        A.    Let's see.

3              I think this first -- this letter on

4    the 25th, though, was the one that we were just

5    notifying her that we were going to --

6    considering filing a lawsuit, because of the

7    NVRA, when we -- we already talked about B,

8    where we were talking about the -- any

9    noncitizenships based on the -- either

10   questionnaires being returned in the mail or

11   people that indicated that they couldn't serve

12   on a jury.

13             At this point, we didn't know this

14   list existed (indicating).

15       Q.    But once you saw this list in the

16   inspection, you requested a copy, correct?

17       A.    While we were doing the inspection,

18   right.

19       Q.    And --

20       A.    She refused.

21       Q.    -- and then -- but, eventually, here

22   in September, you got a copy?

23       A.    Eventually, we got it.

24       Q.    When you first saw this record with

25   regard to citizenship in the inspection, did

1    Ms. Leider provide any explanation of what this

2    record shows?

3              Do you recall?  Only if you recall.

4         A.    I mean, when we first saw this, we

5    asked, you know, How was this list generated?

6    It's like we were asking about all the other

7    lists that we were looking at.  And that's when

8    she told us about the DMV renewing their

9    driver's license and finding that the -- getting

10   the person to admit that they were a noncitizen,

11   and then notifying the State Board and

12   eventually the local board of their status.

13   That's basically her response.

14             I mean, that wasn't the only thing we

15   asked her about.  There was other documents that

16   we looked at that had other questions.

17        Q.    Are you saying that she told you that

18   these people at the DMV admitted to the DMV that

19   they were not citizens?

20        A.    Right.

21        Q.    That's what she told you?

22        A.    Well, that's what --

23             MR. O'NEILL:  Talking about "she" --

24        A.    -- it says here --

25             MR. O'NEILL:  -- meaning?

1          THE WITNESS:  -- it says, Declared

2     noncitizen.

3          THE COURT REPORTER:  Hold on.

4          MR. O'NEILL:  I'm sorry.

5          Objection.  "She" meaning?

6          MR. TEPE:  Ms. Leider.

7          THE WITNESS:  Anna Leider.

8     A.    I mean, that's what it says here on

9  the list.  It says, Declared noncitizen.  So it

10 was the person that was being -- their license

11 being renewed, where they actually declared to

12 the DMV agent that they were not citizens.

13     Q.    Well, this is just a -- a list with

14 a -- there's a column called Cancel Type, right?

15     A.    Right.

16     Q.    And one cancel type is declared

17 noncitizen, right?

18     A.    Right.

19     Q.    And then, also, you have the list

20 of -- with the different cancel type, correct?

21     A.    Right, mentally incapacitated.

22     Q.    Mentally incapacitated.

23          Okay.  Now, mentally incapacitated,

24 that's -- that's just, I guess, the category

25 that --

1        A.      Right.

2        Q.      -- is being used, right?

3        A.      There's also, for felons, and then

4    there's also one for dead voters --

5        Q.      Okay.

6        A.      -- but we didn't know this one

7    existed --

8        Q.      Right.

9        A.      -- nobody had told us that it

10   existed.

11              By the way, that still didn't take

12   them off the voter roll.  So when they were at

13   the DMV, that did not remove them from the voter

14   roll --

15       Q.      Well, you --

16       A.      -- all it did was trigger a flag back

17   to the State Board that this person had

18   self-declared to be a noncitizen.

19       Q.      And then the board or the Department

20   of Elections or the registrar would send out a

21   card, I think you called it before, about a --

22   noticing them of an attempt to cancel; is --

23       A.      Not --

24       Q.      -- that right?

25       A.      -- initially.  What would happen -- I

1   mean, the person at the DMV wouldn't know if

2   they were registered to vote or not.  Just as a

3   matter of their process, if they declared to be

4   noncitizen, then they automatically sent their

5   name to the State Board.

6            The State Board would then look them

7   up and see, Oh, yeah, this person is registered

8   to vote.  They would then put that name into a

9   hopper -- what they call a "hopper."  It's

10  basically a job queue for the local board to

11  examine.

12           So one of the process steps the local

13  board would do would be to take that name and

14  address and send them a card, looking for

15  confirmation.  At that point, they're still not

16  taken off the voter roll.

17       Q.    Right.  And that card is called a --

18  a notice of intent to cancel, correct?

19       A.    Something like that.  And it asked

20  them to -- if they are a citizen, that they have

21  to prove their citizenship in some way --

22       Q.    Well, if -- if -- is it --

23       A.    -- or they don't return the card.

24  Either way, they still get marked as being a

25  noncitizen at that point.

1          Q.    And so if -- if they don't return the

2     card by a certain date, then their registration

3     is canceled, correct?

4          A.    Yeah.  I think it's 30 days,

5     something like that, if I remember correctly.  I

6     haven't seen the card; just knowing what the

7     process is.

8          Q.    Did receiving this record on

9     September 13th of 2016 resolve the lawsuit that

10    you had brought initially against Alexandria?

11         A.    No, this was something we tripped

12    over.  We had no -- this was not something we

13    were looking for.

14         Q.    No, I understand.

15              But you had filed a lawsuit against

16    Alexandria, correct?

17         A.    Because of the 113 percent, right.

18         Q.    The lawsuit was dismissed, correct?

19         A.    Right.

20         Q.    There was an inspection to look at

21    the records in Alexandria, right?

22         A.    Required by the judge, right.

23         Q.    And then you did that inspection,

24    correct?

25         A.    Right.

1        Q.    And this was one of the records that

2   you wanted to get from the inspection, this

3   Exhibit 8?

4        A.    This was something that resulted from

5   the inspection.  We didn't -- we didn't know it

6   existed until we went through the inspection

7   process.

8        Q.    No, I understand.

9              But this is something that you

10  requested after the inspection?

11       A.    Right.

12       Q.    Or during the inspection, you

13  requested it?

14       A.    During the inspection, we requested

15  it.

16       Q.    Did you refile your lawsuit against

17  Alexandria?

18       A.    No, because these people had already

19  been removed from the voter rolls, so that would

20  have decreased the number of people registered.

21  I mean, it wouldn't -- the 113 percent was back

22  when they did the Census, so it was -- made no

23  difference to us as far as the lawsuit goes.

24             One thing that we did find was she

25  had envelope boxes, 500 envelopes in each box,

1    of return mail.  And when I asked her about

2    that, she said, Well, these are people that had

3    come into the office to register to vote, filled

4    out the form.  We put it into the VERIS system.

5    The VERIS system spits out a welcome letter.

6    It's folded up.  I guess she signs them.  I

7    don't know what she does with them.  And then

8    they mail it to the new voter register -- that's

9    registered.

10              At the bottom of that form -- there's

11   a first part of the form that's off at the -- at

12   the end of the welcome letter, it's their voter

13   registration card they can tear off and retain.

14   And then at that point, they were returned

15   because of the bad address.  And she had, I'd

16   say, several thousand of those sitting there,

17   several boxes --

18        Q.    I think my question --

19        A.    -- that would -- that would impact

20   the 113 percent.

21        Q.    -- but my question was, Did you or

22   did you not refile the lawsuit against

23   Alexandria?

24        A.    We have not.

25        Q.    And the lawsuit with Alexandria is

Page 80

1   the only initiative that you had working with

2   Mr. Adams and PILF; is that right?

3        A.   I'm not -- back up and say that

4   again.  I didn't catch it.

5        Q.   Sure, sure, sure, sure.

6             I asked you earlier if you had done

7   any work with Mr. Adams, correct?

8        A.   Right.

9        Q.   And you said this lawsuit against

10  Anna Leider, correct?

11       A.   Right.

12       Q.   And I asked if there was any other

13  initiatives that you had worked with Mr. Adams

14  on; you said no?

15       A.   Right.

16       Q.   Okay.  Are you familiar with a report

17  called "Alien Invasion in Virginia"?

18       A.   I am.

19       Q.   And how are you familiar with that

20  report?

21       A.   I was sent a draft copy of it to make

22  sure that the numbers that they quoted in it

23  were correct.  That was it.  I then shared it

24  with friends of mine that I knew were interested

25  in voter fraud.

1      Q.    Other than getting a copy to check

2  some numbers and sending it to some friends, did

3  you have any other activities in support of this

4  Alien Invasion report?

5      A.    Of writing the report?  I didn't know

6  it was being written.

7            MR. O'NEILL:  Objection.  What do

8      you --

9            MR. TEPE:  Strike --

10           MR. O'NEILL:  -- mean by

11     "writing" --

12           MR. TEPE:  -- strike the question.

13     I'll -- I'll reask.

14     Q.    Other than getting a -- a copy of the

15  report to check some numbers --

16     A.    A draft copy, right.

17     Q.    -- a draft copy, and once it was

18  finalized, circulating it to some friends of

19  yours, did you do anything else with regard to

20  the Alien Invasion report?

21     A.    No.

22     Q.    Didn't VVA agree to jointly publish

23  the Alien Invasion report with PILF?

24     A.    Part of the draft had our name on the

25  cover page, I guess.  And, in my mind, it was

Page 82

1    just an extension of the lawsuit, so I didn't

2    really think about it being a separate issue.

3    It's part of what we found once we did the

4    lawsuit.

5                 (VVA Deposition Exhibit Number 9,

6                  E-mail, Bates stamped VVA-000919

7                  through VVA-000936, marked for

8                  identification, as of this date.)

9         Q.    The court reporter has handed you an

10   exhibit marked Exhibit 9.

11                Do you see that?

12                Do you recognize this document?

13        A.    Yeah.  It's from Christian about the

14   draft copy.

15        Q.    It's dated September 30th.

16                Do you see that?

17        A.    Um-hum.

18        Q.    From Mr. Adams to you, copying

19   Noel Johnson; is that right?

20        A.    Right.

21        Q.    And Mr. Adams says, Reagan — attached

22   is the first hard draft of the report.  Can you

23   look at it?

24                Do you see that?

25        A.    Yep.

Page 83

1      Q.   And then in the third sentence, he

2  says, Just make sure it's something you can sign

3  off on.

4            Do you see that?

5      A.   Right.

6      Q.   And you did sign off on it, correct?

7      A.   Once I checked the numbers that I had

8  generated, yes, I -- it looked right, to me.

9      Q.   And he asked you if you have a logo

10  that you can drop on the first page.

11            Do you see that?

12      A.   Yeah, I see it --

13      Q.   It says --

14      A.   -- yeah, I see it now --

15      Q.   -- If you have a logo --

16      A.   -- yeah --

17      Q.   -- you can drop on the front page --

18      A.   -- right.

19      Q.   -- also?

20            Do you see that?

21      A.   Right.

22      Q.   And you sent him a logo; is that

23  right?

24      A.   Probably, if he asked for it.

25      Q.   Did you send back any comments on

Page 84

1    this?

2         A.    No, because the numbers that were in

3    it were what I had told him already, so there

4    was no need to comment on it.

5         Q.    If you turn the page, the first draft

6    says, Alien Invasion in Virginia.

7              Correct?

8         A.    Um-hum.

9         Q.    Underneath is a subheader, it says, A

10   voter fraud alert by the Public Interest Legal

11   Foundation and the Virginia Voters Alliance.

12             Do you see that?

13        A.    Right.

14        Q.    Okay.  And so this was a -- a report

15   jointly published by VVA and PILF; is that

16   right?

17        A.    Well, he was -- it was written by

18   them, but, yeah, we --

19        Q.    But it was --

20        A.    -- put our name on it because it was

21   part of our lawsuit.

22        Q.    But it was jointly published by you

23   and -- and PILF?

24        A.    It was published on their Web site,

25   but, yeah.

Page 85

```
 1         Q.    And you agreed to that publishing
 2   on -- on the Internet, this report?
 3         A.    Sure.
 4               (VVA Deposition Exhibit Number 10,
 5                E-mail string, Bates stamped
 6                PILF-ADAMS-0005587, marked for
 7                identification, as of this date.)
 8         Q.    The court reporter has marked as
 9   Exhibit 10 --
10         A.    Right.
11         Q.    -- an e-mail.
12               Do you recognize this?
13         A.    Yeah.  That's our logo at the time.
14         Q.    So on September 30th, you had
15   e-mailed the logo for VVA to Mr. Johnson and
16   Mr. Adams; is that right?
17         A.    Right.
18         Q.    And this was in response to their
19   request?
20         A.    Sure.
21         Q.    You had mentioned that you were
22   looking at the report to make sure the numbers
23   in it were correct, right?
24         A.    Right.
25         Q.    What numbers are you referring to?
```

1      A.    The total number of people that had

2   been removed that we had received from the

3   State Board, how many of those had actually

4   voted and how many votes had been cast from

5   those people.

6      Q.    And how would you know what those

7   numbers were?

8      A.    Because I had generated them.

9      Q.    And how did you generate them?

10      A.    You didn't want me to go into all the

11   bloody, gory details, but, basically, we

12   received a list like this (indicating) from the

13   State Board with -- with all of the counties

14   listed.

15           There's -- 450-some-odd pages was the

16   initial listing.  But being a PDF file, we

17   couldn't do anything with it as far as using it

18   as a data file, so I had to convert it into a

19   Word document and then to a spreadsheet, which

20   we then used to identify the voting history of

21   those particular voters, which is the work,

22   again, that Anna probably should have done, if

23   she had been doing her job, but she hadn't.

24           And to my knowledge, none of the

25   other counties had either.

1      Q.    So you got reports like the one we

2  saw in, I think, Exhibit 8?

3      A.    It's in Exhibit 8, right.

4      Q.    And then you converted it to a

5  spreadsheet?

6      A.    Got it to a spreadsheet that we could

7  then use -- if you notice, it's got a

8  registration ID on this list, and that's a

9  unique number assigned to every voter, so with

10  that number, you can actually identify who

11  the -- what the voting history is for every

12  voter, if you want to.

13      Q.    And did you look for what the voting

14  history was for these voters?

15      A.    Yeah, it was in the spreadsheet that

16  I provided you.

17      Q.    And where was this voter history

18  information that you used housed?

19      A.    It came directly out of VERIS.

20      Q.    The voter history information?

21      A.    It's a copy of the voter history out

22  of VERIS.  They keep track of -- I think it's

23  10 years of voter history in voter -- in VERIS.

24      Q.    And so you had a copy, yourself, in

25  your possession, of voter history?

1        A.    I did not have it in my possession.

2    I had it through my contacts with

3    Middle Resolution, who had a copy of it.

4        Q.    And so -- let me make sure I

5    understand.

6              In preparation for this

7    Alien Invasion report, PILF sent you these VERIS

8    reports about citizenship cancel -- canc- --

9    cancelation -- cancelations; is that correct?

10       A.    Right.

11       Q.    Okay.

12             And then you took that information,

13   put it into a spreadsheet, correct?

14       A.    Yeah.  I think the original PDF files

15   or the Adobe files actually went to Christian

16   because of his correspondence with Cortés, who

17   was the Commissioner of Elections.  He forwarded

18   a copy to me.

19             My interest was in identifying if

20   anybody voted and, if so, how often did they

21   vote, et cetera.  So we really had two different

22   work streams at that point.  He, evidently, went

23   off and did his thing with the report.  On the

24   other hand, I was out working on the data.

25       Q.    The data that was used in the report?

1        A.    The data that eventually -- well, the

2   totals actually showed up in the report.  I

3   mean, he had access to the same spreadsheet I

4   sent you, so what he did with it, I don't know,

5   but -- and it has the voting history of everyone

6   in the -- in the file.

7        Q.    So what did you do with -- strike

8   that.

9             So after converting the PDFs into a

10  spreadsheet, you sent that spreadsheet to

11  Middle Resolution; is that right?

12       A.    Right.

13       Q.    And they're the ones that had access

14  to the voter history?

15       A.    Right.

16       Q.    And then they would populate your

17  spreadsheet with voter history information, to

18  the extent a voter had some?

19       A.    Right.

20       Q.    And then you would send that off to

21  PILF?

22       A.    Once -- once I got that, then I was

23  able to analyze it and tell them that there were

24  5,550-some-odd people that had been removed

25  statewide --

1      Q.    Right.

2      A.      -- of those, 1,862 had actually voted

3  at some point, maybe one vote, maybe 40 votes.

4  One person had actually voted 40 times.  And

5  then after that, there were a total of 7,474

6  votes that were cast during that time period.

7      Q.    Now, I think you're referring to

8  numbers that were in the second Alien Invasion

9  report, correct?

10     A.    Yeah, I got --

11     Q.    Not this report?

12     A.      -- we had, actually, two separate

13  sets of reports.  We got a -- we got a PDF file

14  from -- actually, we got a bogus Adobe file from

15  the State Board to start with, which I

16  recognized as being bogus.  And by "bogus," they

17  had actually removed this cancel type from all

18  the records so we couldn't tell who was

19  noncitizen, who was felon, who was dead, who was

20  whatever.

21          So we had to go back and threaten

22  another lawsuit to get the actual data we

23  wanted.  So then they finally sent us one that

24  actually had the declared noncitizen cancel

25  type.  So I did the first tranche of data.  Then

1   we got a second list later, and I think that's

2   what generated, maybe, the Alien II thing --

3        Q.    All right.  So --

4        A.    -- but those total numbers I gave you

5   were from both -- both sets of spreadsheets --

6        Q.    Okay.

7        A.    -- so in addition of the two

8   spreadsheets.

9        Q.    Let's kind of take this step by step

10  because it's kind of --

11       A.    Okay.

12       Q.    -- hard to follow --

13       A.    Okay.

14       Q.    -- in a long narrative.

15             So Exhibit 9, I handed to you.

16             Do you see that?

17       A.    Right.

18       Q.    Okay.  And that is a draft of the

19  first Alien Invasion report, correct?

20       A.    Right.

21       Q.    There's two reports, correct?

22       A.    Right.

23       Q.    And for purposes of clarity, I'll

24  refer to this one as Alien Invasion I.

25             Okay?

1      A.    Okay.

2      Q.    And you got a draft of that report,

3  right?

4      A.    I got a draft --

5      Q.    You gave --

6      A.    -- a final draft, right.

7      Q.    -- you -- you gave over to them VVA's

8  logo -- logo to use in the report, correct?

9      A.    Right.

10     Q.    Okay.  And you also provided the data

11  for them to calculate how many people on

12  cancelation lists had voted; is that right?

13     A.    Right --

14     Q.    Okay.

15     A.    -- I gave them totals as well as the

16  spreadsheets.

17            (VVA Deposition Exhibit Number 11,

18             E-mail with attachment, Bates

19             stamped PILF-ADAMS-0014051 through

20             PILF-ADAMS-0014052, marked for

21             identification, as of this date.)

22     Q.    The court reporter has marked as

23  Exhibit 11 an e-mail from you.

24            Do you recognize this?

25     A.    I -- I'm not sure what it's referring

1   to, Total of 34 different people that cast a

2   total of 218 votes -- this must have been a

3   preliminary list from, like, the seven or eight

4   counties that we got initially.

5        Q.   So this is an e-mail from you dated

6   September 28th, 2016, correct?

7        A.   Right.

8        Q.   And it's to Noel Johnson?

9        A.   Right.

10       Q.   And has an attachment called Copy of

11   ReaganFileHits?

12       A.   Right.

13       Q.   And that's an Excel spreadsheet?

14       A.   Right.

15       Q.   And you wrote, This is all I have so

16   far.  Here's the summary of data.

17            Do you see that?

18       A.   Right.

19       Q.   And you write, Total 34 different

20   people that cast a total of 218 votes in various

21   elections.

22            Do you see that?

23       A.   Right.

24       Q.   Okay.  And so attached is a

25   spreadsheet with a list of people, correct?

1        A.     Yep.

2        Q.     And it has a -- a notation that they

3   had been canceled from the voter rolls; is that

4   right?

5        A.     I don't see that printed on here,

6   but it's --

7        Q.     It's a column called Date Canceled.

8        A.     I see Date Canceled.  It doesn't

9   necessarily say why they were canceled.

10        Q.     Well, if you flip through to the

11   second page, I believe, there's a Cancel Type

12   Listed column.

13        A.     Yeah, I'm just looking at the

14   addresses, and they're -- they're from the

15   counties, I think, that responded to our initial

16   request.

17             Page 2 actually shows that they

18   declared noncitizen.

19        Q.     Well, it shows the cancel type as --

20        A.     Right.

21        Q.     -- declared noncitizen?

22        A.     Right --

23        Q.     Right.

24        A.     -- for the person that's on the first

25   page.

1        Q.    Right.

2              And then there's a bunch of columns,

3    like G2015, G2014.

4              What do those mean?

5        A.    What do they mean?

6        Q.    Yes.

7        A.    "G" means it's a general election for

8    that year, so that was the November election.

9              If it's a PD, then it's a primary

10   Democrat.

11             If it's a PR, it would be a primary

12   Republican.

13             If it's an S, it's a special

14   election.

15       Q.    What's a PPR?

16       A.    PPR would be -- I think it's the --

17   like a runoff in a primary.

18       Q.    So it would be a -- a -- so a PPR

19   would be a -- a primary runoff for the

20   Republican primary?

21       A.    Right, or if it was a PPD, which

22   is there's one here; it must have been a primary

23   runoff --

24       Q.    And if there's --

25       A.    -- for a Democratic party.

1      Q.    I'm sorry.

2            -- if there's an X in the field

3    underneath G2015 for a person, does that

4    indicate that that person voted in the general

5    election of 2015?

6      A.    Right.

7            An X means that you voted in person

8    on Election Day; if it's an A, that means that

9    you requested an absentee ballot.

10     Q.    And -- and, again, where did you get

11   this voter history information from?

12     A.    This is from the State Board of

13   Elections.  It's out of their VERIS system.

14     Q.    No, but where did you get it from?

15     A.    I got it from the system that was

16   maintained by Middle Resolution, which they had

17   purchased from the State Board.  I couldn't

18   afford the price tag.  A penny a voter and a

19   penny a vote.  It gets to be expensive.

20                (VVA Deposition Exhibit Number 12,

21                 Report, Alien Invasion in Virginia,

22                 The discovery and coverup of

23                 noncitizen registration and voting,

24                 marked for identification, as of

25                 this date.)

1      Q.    The court reporter has handed you an

2  exhibit marked as Exhibit Number 12.

3      A.    Right.

4      Q.    Do you recognize this document?

5      A.    I think this is Invasion I, right --

6  Alien Invasion I?

7      Q.    What's the date on it?

8      A.    September 30th.

9            There were two.  I don't remember the

10  date of the second one.

11      Q.    Well, I'll represent that this is

12  a -- a final copy of Alien Invasion I that we

13  printed off --

14      A.    Okay.  So this is the final one.

15  Okay.

16      Q.    -- PILF's Web site.

17            I want to direct your attention to

18  Page 12 of the report.

19      A.    Okay.

20      Q.    In the third paragraph, it says, In

21  the eight jurisdictions that provided us with

22  lists of aliens recently removed from their

23  rolls, we discovered that 31 noncitizens had

24  cast a total of 186 votes between 20- -- 2005

25  and 2015.

1          Do you see that?

2      A.    Right.

3      Q.    Is this the -- or were these numbers

4  provided by VVA?

5      A.    Yeah.  This is the original -- one,

6  two, three, four, five, six, seven -- this was

7  the original eight counties that were asked by

8  letter to provide their data.  This was --

9  Alien I was basically kind of a preliminary

10  report.  And it wasn't until Alien II came out

11  that we had the 5,000 statewide.

12      Q.    Okay.  But my question is, The 31

13  noncitizens, where it says 31 noncitizens had

14  cast a total of 186 votes, those numbers came

15  from you, correct?

16      A.    Right, going through the same process

17  that I went through with the 5,000.

18      Q.    Meaning taking information in these

19  various reports, putting it into a spreadsheet

20  and then matching it with voter history?

21      A.    Right.

22      Q.    Do you know why this portion of the

23  sentence -- we discovered that 31 noncitizens

24  had cast a total of 186 votes -- is bolded?

25      A.    I didn't write the report, so I don't

1    know why he bolded it.

2         Q.    But you did sign off on the report,

3    correct?

4         A.    Sure.

5         Q.    Then the next sentence says, The most

6    alien votes were cast in 2012, followed by 2018,

7    the year before President Obama --

8              MR. O'NEILL:  Followed by 2008.

9              MR. TEPE:  Let me start that again.

10        A.    The most were 2012, followed by 2008.

11   Sorry.

12        Q.    Let me -- let me start again.

13             So the sentence -- the next sentence

14   says, quote, The most alien votes were cast in

15   2012, followed by 2008, the year President Obama

16   was elected to his first term.

17             Did I read that correctly?

18        A.    Yep.

19        Q.    That's also in bold, correct?

20        A.    Yep.

21        Q.    Is this a notable fact?

22        A.    Apparently, it was for them.  I

23   didn't write it.

24        Q.    But you signed off on this report?

25        A.    Sure.  The numbers were right.

1      Q.    Well, the cover of this report has

2   Virginia Voters Alliance logo on it, right?

3      A.    Sure.

4      Q.    Is there any notation in here that

5   Virginia Voters Alliance is responsible only for

6   certain numbers?

7      A.    I don't know if it's got it in there

8   or not. I mean, that's all I looked at when they

9   sent it to me, was whether or not the numbers

10  that I had given them were accurately portrayed

11  in the report.

12          That's all I looked at.

13     Q.    But I guess my question is, Are --

14  are you -- are you disclaiming any

15  representations from this report?

16     A.    I didn't write it; so it's their --

17  their report, not mine.  All I checked was the

18  numbers --

19     Q.    There's no --

20     A.    -- and, really, this was -- since

21  this was preliminary, I really didn't -- I mean,

22  the biggie was the --

23     Q.    The next --

24     A.    -- the final report that we came out

25  with with the 5,000.  That was what I was

1    looking for.

2         Q.    All right.  Why don't you go to

3    Page 2, the Summary of Findings?

4              Do you see that?

5    A.    Um-hum.

6         Q.    The third paragraph, it says, In our

7    small sample of just eight Virginia counties who

8    responded to our public inspection requests, we

9    found 1,046 aliens who registered to vote

10   illegally.

11             Do you see that?

12   A.    Right.

13        Q.    Okay.  And then in the next

14   paragraph, it's written here, the second

15   sentence, Even in the small sample, when the

16   voting history of this small sample of alien

17   registrants is examined, nearly 200 verified

18   ballots were cast before they were removed from

19   the rolls.  Each one of them is likely a felony.

20             Do you see that?

21   A.    Right.

22        Q.    And your work yielded this nearly 200

23   verified ballots, correct?

24   A.    Right.

25        Q.    And then the following paragraph, the

Page 102

1    one beginning with, Again --

2              Do you see that?

3    A.    Right.

4    Q.    -- the last sentence says, Will the

5    Justice Department act now that their names,

6    registration records and dates of voting are

7    herein provided, question mark?

8              Do you see that?

9    A.    Right.

10   Q.    What is being conveyed there?

11             MR. O'NEILL:  Objection to the

12   extent --

13   A.    I don't know.

14             MR. O'NEILL:  -- it calls for a

15   legal conclusion.

16   Q.    You don't know?

17             MR. O'NEILL:  You can answer, to the

18   extent you know.

19   A.    I don't know.

20   Q.    VVA's name is on the cover of this

21   report, and you don't know what it states?

22   A.    I can just tell you that my whole

23   purpose of doing this was to at least try to

24   force prosecution of people that had committed

25   voter fraud.

1      Q.    That was VVA's purpose?

2      A.    Right.

3      Q.    And what do you understand this

4  sentence to mean in the report?

5            MR. O'NEILL:  Objection.

6            Which sentence are you referring to?

7            MR. TEPE:  "Will the Justice

8        Department act now that their names,

9        registration records and dates of voting

10       are herein provided?"

11     A.    I don't know what he was referring to

12  there.

13     Q.    Okay.  But is that consistent with

14  your purpose of forcing prosecution of people

15  who had committed voter fraud?

16     A.    It would be, even though right now,

17  we've not seen anything even on the 5,000 that

18  we've turned over.  So . . .

19     Q.    Relatedly, on Page 1, three lines

20  from the bottom, it says, quote, Federal and

21  state law enforcement officials.

22            Do you see that?

23            I just want to make sure you're with

24  me.

25     A.    So "On the back end"?  Is that the

1    one --

2         Q.    Yeah, the end --

3         A.    -- On the back end?

4         Q.    -- yeah, at the end of the second

5    paragraph --

6         A.    Right.

7         Q.    -- On the back end, right.

8              It says, quote, Federal and state law

9    enforcement officials are entrusted with

10   prosecuting noncitizens who register and vote as

11   a means to deter others from doing the same.

12              Do you see that?

13              MR. O'NEILL:  Objection.  It's going

14         to call for a legal conclusion.

15              To the extent you know, you can

16         answer.

17              MR. TEPE:  Counsel, I haven't even

18         asked my question.  All I've asked is did

19         I -- I read a sentence and asked if he --

20         if I read it correctly.

21              Why don't you wait --

22              MR. O'NEILL:  Okay.

23              MR. TEPE:  -- with your objection?

24              MR. O'NEILL:  Go ahead.

25              MR. TEPE:  I'm going to start again.

1        Q.    Here on -- on Page 1, do you see

2   it -- it states, On the back end, Federal and

3   state law enforcement officials are entrusted

4   with prosecuting noncitizens who register and

5   vote as a means to deter others from doing the

6   same.

7             Do you see that sentence?

8        A.    Right.  You read it correctly.

9        Q.    Thank you.

10            Is -- is this sentence suggesting

11   that prosecuting some people accused of

12   noncitizen registration in voting will deter

13   others accused of noncitizen registration in

14   voting?

15       A.    I'm not following your question on

16   that.

17       Q.    Okay.  Well, would you agree with the

18   proposition that prosecuting some people accused

19   of noncitizen registration in voting will deter

20   others accused of noncitizen registration in

21   voting?

22            MR. O'NEILL:  I'm going to object:

23       That's a legal conclusion.  It calls for a

24       legal conclusion.

25            To the extent you know, you can

1        answer.

2        A.    I have no control over that, so I'm

3   not sure what you're -- I'm still not sure what

4   you're asking.

5        Q.    You said earlier that one of your

6   purposes for working on this Alien Invasion

7   report was to obtain the prosecution of people

8   who are noncitizens for voting; is that right?

9        A.    Right.

10       Q.    And my question is, In addition to

11  the prosecution of those individuals, did you

12  also have as a purpose sending a signal to

13  others that they could be prosecuted for the

14  same conduct?

15            MR. O'NEILL:  Objection: vague.

16            Are you --

17       A.    I'm still not following.

18            MR. O'NEILL:  I'm just -- yeah, I'm

19       just trying to be clear so he can give a

20       correct answer.

21            Are you asking deterring noneligible

22       voters from voting?

23            What specifically are you -- I

24       guess, could you just repeat the question?

25            MR. TEPE:  Sure.

1          I'll move on.

2      Q.    On Page 6, if you go to Page 6, in

3  the middle of the page, bolded, it says, Among

4  the records uncovered at Ms. Leider's office was

5  a list of registrants who had been purged from

6  the voter rolls because they were determined to

7  be noncitizens -- determined to not be U.S.

8  citizens.

9          Do you see that?

10     A.    Um-hum.

11     Q.    And is this referring to the list

12  that you saw in your inspection?

13     A.    It could be.  It could also be the

14  list of records that came when we got it from

15  the State Board for the -- the whole state.  In

16  other words, the 70 that we looked at was just

17  for a specific time frame.

18     Q.    Well, let's go down two paragraphs,

19  and it states, Her attorney -- speaking of

20  Ms. Leider -- provided VVA with a list,

21  identifying 70 registrants who had been removed

22  from Alexandria's registration lists after they

23  were determined to not be U.S. citizens --

24          Do you see that?

25     A.    Right.

```
 1        Q.    -- these were just the aliens who
 2   were caught.
 3              Do you see that?
 4        A.    Right.
 5        Q.    Okay.  And so this is referring to
 6   the list that you saw --
 7        A.    In the inspection.
 8        Q.    -- in the inspection --
 9        A.    Right.
10        Q.    -- and that you got some months
11   later?
12        A.    Right.
13        Q.    Both of those sentences say,
14   Determined to not be U.S. citizens.
15              Do you see that?
16        A.    Oh.  Yeah.  I'm sorry.
17        Q.    So is this stating that -- strike
18   that.
19              So are -- are you and PILF stating
20   that the Virginia election officials had
21   adjudicated the citizenship status of these 70
22   individuals?
23        A.    If they were on that list, we assumed
24   that they had been adjudicated in some way, did
25   not return the card --
```

1       Q.    That's an adjudication?

2       A.    -- or they had turned -- returned the

3   card and said they were noncitizens.  That's how

4   they got on the list in the first place.

5       Q.    Well, they had first gone to the

6   voter rolls by saying they were citizens, right?

7       A.    No.  We have examples in the reports

8   where the citizenship box was checked or not

9   checked or -- so it was checked, Yes, I am a

10  citizen, or, No, I'm not a citizen, or it was

11  left blank -- both of them were left blank, and

12  they were still registered to vote and voted.

13      Q.    You haven't looked at everyone's

14  voter registration applications?

15      A.    I didn't look at any of them.  All I

16  was looking at was the data provided to me by

17  the State Board.

18            Once the report was created and I

19  started looking through it, then I started

20  seeing copies of the various --

21      Q.    Okay.

22      A.    -- forms where the people had been

23  registered even though it was checked as being a

24  noncitizen or left blank.

25      Q.    So when it says here that these 70

1    registrants had been removed from Alexandria's

2    rolls after they were, quote, determined to not

3    be U.S. citizens, closed quote --

4         A.    What page were you on?

5         Q.    The same page, Page 6.

6         A.    Six.  Okay.  Got you.

7         Q.    -- so my question to you is, For

8    these 70 registrants who had been removed from

9    Alexandria's registration lists after they were,

10   quote, determined to not be U.S. citizens,

11   closed quote -- my question is, Who made that

12   determination?

13        A.    The local registrar's office.

14        Q.    Is that what the registrar,

15   Ms. Leider, told you, that they had determined,

16   in fact, that people --

17        A.    That's how they got on the list.

18        Q.    Excuse me.  Can I --

19        A.    No.  That's --

20        Q.    -- can I --

21        A.    -- the list.

22        Q.    -- can I --

23        A.    Okay.

24        Q.    -- we talked before, asking

25   questions --

 1      A.    Okay.

 2      Q.    -- finishing.

 3            So my question is, Did Ms. Leider

 4   tell you explicitly that the City of Alexandria

 5   Registrar had made a determination that these 70

 6   people were, in fact, not citizens?

 7      A.    When she explained to us the process,

 8   that was the only way that they got on this

 9   list.

10      Q.    I'll ask again.

11            Did Ms. Leider -- Leider tell you

12   explicitly that the City of Alexandria Registrar

13   had made a determination that these 70 people

14   were, in fact, noncitizens?

15            Yes or no?

16      A.    I just don't remember if she said it

17   explicitly.  She just walked us through the

18   process.  And the only way they get on the list

19   is to be sent a card.  The card is either

20   returned or it's returned with no citizenship --

21      Q.    So --

22      A.    -- "noncitizenship" marked.

23      Q.    -- so, then, it's correct that

24   Ms. Leider did not tell you that the City of

25   Alexandria had determined that these 70

1    registrants were, in fact, noncitizens,

2    correct?

3              MR. O'NEILL:  Objection.  That's not

4         what he just testified to.  We can roll

5         that back, and I believe he just

6         testified, I don't know -- I don't

7         remember.

8              MR. TEPE:  I can clarify --

9              MR. O'NEILL:  That question has been

10        asked and answered.

11             MR. TEPE:  Yes, exactly.

12             -- I can clarify his testimony.

13        Thank you.

14             MR. O'NEILL:  You are

15        mischaracterizing his --

16             MR. TEPE:  No, I'm not.  I'm

17        asking --

18             MR. O'NEILL:  -- testimony.

19             MR. TEPE:  Excuse me, Counsel.

20             MR. O'NEILL:  Sure.

21             MR. TEPE:  If you want to make an

22        objection to form, you may do so.

23             MR. O'NEILL:  Sure.

24             MR. TEPE:  There are no speaking

25        objections.

1          MR. O'NEILL:  I understand.  Thank

2     you, Counselor.

3  BY MR. TEPE:

4     Q.   So -- so that I understand your

5  testimony, Mr. George, Ms. Leider did not tell

6  you that these 70 registrants were, in fact,

7  noncitizens as determined by the City of

8  Alexandria, correct?

9          MR. O'NEILL:  I'm going to object,

10     and that's asked and answered.

11     A.   She didn't say explicitly, but she

12  walked us through the process.

13     Q.   She never told you that these 70

14  individuals were determined, in fact, by the

15  City of Alexandria to be not citizens, correct?

16          She never said that?

17     A.   Not explicitly.

18     Q.   She never said that, correct?

19     A.   She never said that explicitly, but

20  she did walk us through the process, which led

21  us to the conclusion as to how they got on this

22  list.

23          By the time we got the list, they

24  were already removed from the voter roll.

25     Q.   Who at PILF was responsible for

Page 114

1   writing this report?

2        A.    You would have to ask them.  I don't

3   know.  I received a draft from Christian.

4        Q.    Who decided to call the report

5   "Alien Invasion"?

6        A.    I have no idea.

7        Q.    You never asked that before putting

8   your logo on it?

9        A.    No.  I thought it was kind of a

10  catchy title.  That's about all I thought about.

11       Q.    Now, we had spoken earlier that there

12  was a sequel to Alien Invasion, correct?

13       A.    Right.

14             MR. TEPE:  Why don't we go off

15       record -- go off the record?

16             MR. O'NEILL:  Sure.

17             THE VIDEOGRAPHER:  The time is

18       12:53.  We're off the record.

19                      (Whereupon, at 12:53 p.m., a

20                       luncheon recess was taken.)

21

22

23

24

25

```
 1    A F T E R N O O N            S E S S I O N
 2                                  (1:30 p.m.)
 3    R E A G A N   G L E N N   G E O R G E,
 4       called as a witness, having been previously
 5       duly sworn by a Notary Public, was examined
 6       and testified further as follows:
 7              THE VIDEOGRAPHER:  The time is now
 8         1:30, and we are back on the record.
 9                         -  -  -
10    EXAMINATION (CONTINUED) BY
11    MR. TEPE:
12       Q.    Mr. George, earlier, we were speaking
13    about how there was a second Alien Invasion
14    report, correct?
15       A.    Right.
16       Q.    It was called Alien Invasion II; is
17    that right?
18       A.    I think that's the way they referred
19    to it.  I don't know if that was on the title
20    page or not, but . . .
21       Q.    And -- and VVA agreed to publish that
22    with PILF on their Web site, correct?
23       A.    Continuation of our endorsement, or
24    whatever you want to call it, of the first one.
25       Q.    So the answer is yes?
```

1        A.    Yeah.

2              In my mind, it was kind of the

3   conclusion.  It was -- the actual report was

4   actually II -- Alien I was kind of a preliminary

5   report.

6        Q.    Okay.  So whether you consider it to

7   be two separate reports or a continuation, you

8   agreed with PILF to publish this --

9        A.    Right.

10       Q.    -- report --

11       A.    Right.

12       Q.    -- on the Web site?

13             Okay.

14             (VVA Deposition Exhibit Number 13,

15              E-mail with attachment, Bates

16              stamped PILF-ADAMS-0000172 through

17              PILF-ADAMS-0000196, marked for

18              identification, as of this date.)

19       Q.    The court reporter has marked as

20   Exhibit 13 an e-mail to you.

21             Do you want to take a look at that?

22       A.    Um-hum.

23       Q.    Do you recognize that?

24       A.    Yes.

25       Q.    What is it?

1        A.      An e-mail from Christian to me about

2    the final version of Alien II.

3        Q.      So this was on May 26th, 2017?

4        A.      Yes.

5        Q.      And he wrote, Reagan — here is the

6    final that has gone to the printer.  Great work.

7                Correct?

8        A.      Right.

9        Q.      And then attached to it is the final

10   draft of the Alien Invasion II report, correct?

11       A.      Right.

12       Q.      And on the inside front cover, you

13   see PILF's logo; is that correct?

14               Inside front cover --

15       A.      Inside front cover.

16       Q.      -- the second page.

17       A.      Right.

18       Q.      And then underneath that is VVA's

19   logo, correct?

20       A.      Right.

21       Q.      And it's dated May 2017?

22       A.      Right.

23       Q.      Okay.  And before Mr. Adams e-mailed

24   this final version to you, you had received

25   drafts -- do you recall that? -- to review?

1       A.    I don't remember receiving one, but I

2    may have, since I received one for the first

3    one.  Since it's got the numbers in it, I'm

4    pretty sure I received it.

5                (VVA Deposition Exhibit Number 14,

6                 E-mail with attachment, Bates

7                 stamped PILF-ADAMS-0000971 through

8                 PILF-ADAMS-0000994, marked for

9                 identification, as of this date.)

10               THE WITNESS:  Okay.

11               (VVA Deposition Exhibit Number 15,

12                E-mail string with attachment, Bates

13                stamped PILF-ADAMS-0015020 through

14                PILF-ADAMS-0015043, marked for

15                identification, as of this date.)

16      Q.    To refresh your recollection,

17   Mr. George, I've handed -- or the court reporter

18   has handed to you two more exhibits, marked 14

19   and 15 respectively.

20               Do you see that?

21      A.    Right.

22      Q.    And these are drafts of the

23   Alien Invasion reports that were sent to you for

24   comment --

25      A.    Alien --

1      Q.     -- is that right?

2      A.     -- Invasion II, right.

3             MR. EVANS:  Which one is 14, and

4      which one is 15?

5             MR. TEPE:  Oh, certainly.

6             I believe 14 is the one with the

7      Bates Number 971, and it's dated 9/30 --

8      excuse me.  It's dated May 24th, at

9      9:30 a.m.

10            Is that right?

11            THE WITNESS:  Um-hum.

12            MR. TEPE:  And then

13     Exhibit Number 15 is with the Bates 15020,

14     May 24th as well, but 3:49 p.m.

15            MR. EVANS:  Thank you.

16     Q.     And so, Mr. George, these are

17     examples of -- strike that.

18            So these are drafts of the

19     Alien Invasion II report that were sent to you

20     for comment, correct?

21     A.     Yeah, I'm assuming that -- the one

22     that Noel sent me was -- I received it first,

23     and then I guess Christian probably forwarded

24     it -- the same thing to me --

25     Q.     Or -- or --

1        A.     -- the same day.

2        Q.     -- or a new version of it?

3        A.     Or it could have been made -- yeah,

4   they could have made some minor changes to it, I

5   guess.

6        Q.     Did you make any changes or suggest

7   any changes to the report?

8        A.     No.  On this one, I looked through

9   and made sure, like, the 56 -- 5,556

10  noncitizens, the 7,400 voters was the numbers

11  that I had given him, so that's there.

12       Q.     And so you saw that number in

13  Exhibit 14, for example?

14       A.     Yes.  Page 2.

15       Q.     Did you read over the report in its

16  draft form?

17       A.     Again, probably just checking for

18  numbers that I had given him, just to make sure

19  they were right.

20       Q.     So what was VVA's primary

21  contribution to Alien Invasion II?

22       A.     The same as I: just doing the data.

23       Q.     The data work?

24       A.     The data work.

25              It was two separate work streams, so

1    I was working on 5,000 voters, so it took

2    me months.

3         Q.    It took you months to work on it?

4         A.    Several months, yeah.

5         Q.    And -- and that's because the State

6    of Virginia had provided VERIS reports on

7    citizenship for pretty much the entire state; is

8    that right?

9         A.    Right.

10        Q.    And these are the same reports that

11   you saw in the inspection in Alexandria --

12        A.    Right.

13        Q.    -- the same type of report?

14        A.    That format, right.

15        Q.    And after PILF received the reports

16   from the State, what happened?

17             MR. O'NEILL:  Object -- object:

18        vague --

19        A.    I don't know what --

20             MR. O'NEILL:  -- asking --

21        A.    -- they did.  I mean -- at some

22   point --

23        Q.    I'll -- I'll --

24        A.    -- I received a copy of them.

25        Q.    Okay.  So they -- they got the copy

1    of the VERIS reports, and they sent it to you?

2         A.    Right.

3         Q.    And then what did you do with the

4    reports?

5         A.    I proceeded to do the same thing that

6    I'd done with Alien I, converting the PDF files

7    to a Word document, copying them into

8    spreadsheets --

9         Q.    And that took --

10        A.    -- many --

11        Q.    -- months?

12        A.    Pardon?

13        Q.    And that took months to do?

14        A.    Yeah.  It was a -- if I remember

15   correctly, I think the PDF file was 453 pages

16   long.  I had the 5,000 names in it.

17        Q.    And this -- so you converted these

18   PDFs to a spreadsheet that listed the names of

19   people who had been -- who had their voter

20   registration canceled, correct?

21        A.    Right, by the local board.

22        Q.    And what did you do with that

23   spreadsheet?

24        A.    I turned it over -- once I got it

25   created, turned it over to Middle Resolution to

1   do the voter history, appended to it.

2        Q.    And then Middle Resolution sent that

3   back to you?

4        A.    Sent that back to me.  And I did

5   the -- the total counts, and stuff like that.

6        Q.    And then you provided that to PILF?

7        A.    Gave it back to PILF.

8        Q.    And they put it into the report?

9        A.    Right.

10       Q.    What was the purpose of analyzing the

11   voter history of the people listed in these

12   VERIS reports?

13       A.    My purpose was to prepare information

14   that could be sent to a U.S. district attorney,

15   because these people had broken the law.  They

16   had either committed perjury when they

17   registered -- they committed voter fraud if they

18   voted.

19            (VVA Deposition Exhibit Number 16,

20             E-mail string with attachments,

21             Bates stamped PILF-ADAMS-0015185

22             through PILF-ADAMS-0015187, marked

23             for identification, as of this

24             date.)

25       Q.    The court reporter has marked as

1    Exhibit 16 an e-mail that you sent on May 20th.

2            Do you see that?

3    A.    Um-hum.

4    Q.    And you sent this e-mail to Mr. Adams

5    and Mr. Johnson of PILF; is that right?

6    A.    And Logan, Logan Churchwell --

7    Q.    Oh, yes.

8    A.    -- who is their communications

9    director.

10   Q.    Okay.  And -- and what is this

11   e-mail?

12   A.    This is what I would call "my

13   Version II."  I removed the people that had

14   never voted, and then reordered the list by the

15   number of votes cast, which is, like, the number

16   of As, and that type of thing, by election date.

17   Q.    It was a very big spreadsheet, wasn't

18   it?

19   A.    Pretty big, especially when you're

20   moving every data element around.

21   Q.    If you can look at the attachment to

22   it.

23   A.    Past the blue sheet?

24   Q.    Yeah, past the blue sheet.

25           What we did here is, because it would

1    have been, I think, around a thousand pages to

2    print out, just one copy, we've done some

3    excerpts --

4         A.    Okay.

5         Q.    -- and you can see the file names and

6    the footer, as well as the -- the Bates number

7    for production purposes.

8              Do you see that?

9         A.    Got it.

10        Q.    So does this -- if you just want to

11   flip through it, does this appear to be an

12   excerpt of that spreadsheet that you sent to

13   PILF with the voter history analysis?

14        A.    Yeah.

15        Q.    So it's got the jurisdiction

16   county -- county name --

17        A.    It's printed kind of funny, but,

18   yeah, it's --

19        Q.    -- the names of the people, their

20   addresses?

21        A.    Names and addresses, and it's got

22   the -- starting, some of the voter history, and

23   then it continues on with voting -- more voting

24   history.

25        Q.    It's got the identification number in

1    Row K.

2              Is that the registration number?

3    A.    Hold on.

4    Q.    I said "Row K."  I mean Column K.

5              MR. O'NEILL:  Column K would be the

6         second page (indicating).  You see -- I'm

7         sorry.  I'm just --

8    A.    Oh, okay.  Yeah, that's -- that would

9    be the -- that's the AE, Registration Number.

10   Q.    And then Column L is Date Removed?

11   A.    Right.

12   Q.    That's when they were removed from

13   the registration rolls?

14   A.    Right.

15   Q.    And then if you flip through,

16   starting with Column -- I think AG, you start

17   the voter history analysis?

18             MR. O'NEILL:  Counselor, can you

19        refer to the Bates stamp number, just for

20        his purposes?

21             MR. TEPE:  Well, this is produced

22        in --

23             MR. O'NEILL:  Oh --

24             MR. TEPE:  -- native form --

25             MR. O'NEILL:  -- okay.

1           MR. TEPE:  -- so there's only one

2      Bates number.

3           MR. O'NEILL:  Oh, okay.  Just page

4      number here, just -- just to make it easy

5      so he can follow along what you're looking

6      at.

7      Q.   Well, if you look at -- you just

8  keep on --

9      A.   It starts off --

10     Q.   -- turning the pages --

11     A.   -- with Curtis Husk.

12          MR. O'NEILL:  You're okay?

13          MR. TEPE:  Yes.

14     A.   Is that the one, 194?

15     Q.   Right.  Right.

16          So there's a column that is

17  Column AG.

18          Do you see that?

19     A.   Right.

20     Q.   Elections.

21          And for the person with the last name

22  Curtis Husk, there's a 9 in that field.

23          Do you see that?

24     A.   Um-hum.

25     Q.   Is that indicating that this person

1    had voted nine times?

2         A.    Yeah, it would be an indication

3    that -- off the page, that there were Xs in

4    other elections, the total of which would be

5    nine.

6         Q.    So if you go to the first page of the

7    excerpt spreadsheet -- spreadsheet -- the first

8    page of the spreadsheet.

9         A.    The first page?

10        Q.    Of the spreadsheet.  Yes.

11        A.    Okay.

12        Q.    Okay.  If you look at Row 209 --

13        A.    209.  Okay.

14        Q.    -- who's the individual named there?

15        A.    It's a person by the name of

16   something Bonilla -- Bonita.

17        Q.    Bonilla?  Eliud --

18        A.    Bonilla.  Bonilla?

19        Q.    -- Eliud Bonilla?

20        A.    I'm not pronouncing it probably

21   right, but . . .

22        Q.    That's in Row 209, correct?

23        A.    Right.

24        Q.    Okay.  And according to your

25   analysis, he voted nine times?

Page 129

1     A.    Yes.

2     Q.    And do you recognize the name of

3  Eliud Bonilla?

4     A.    I do now, because he's part of the

5  lawsuit, but I didn't know anything about him

6  before that.

7           You have to remember, I was looking

8  at 5,550 of these names, you know.

9     Q.    Right.

10          But he is one of the Plaintiffs in

11  this lawsuit?

12    A.    Right.

13    Q.    And if you go to -- the first number

14  of pages are all trying to capture

15  Eliud Bonilla's voting history.  If you go about

16  halfway into the excerpt, you'll see that there

17  are rows in the 300s.

18          Do you see that?

19    A.    You say "rows in the 300s"?

20          MR. O'NEILL:  About halfway down

21       through the document.

22    A.    I gotcha.

23    Q.    Do you see Row 344?

24    A.    Yes.

25    Q.    And what individual is listed in

1   Row --

2        A.    Luciania Freeman.

3        Q.    And do you recognize that to be now

4   one of the Plaintiffs in this document?

5        A.    Right.

6        Q.    And according to your analysis,

7   Ms. Freeman voted six times?

8        A.    Yes.

9        Q.    And who did you work with to do this

10  voting history analysis?

11       A.    Outside of Middle Resolution, just

12  me.

13       Q.    No.  So you worked with

14  Middle Resolution on doing the voting history --

15       A.    To get --

16       Q.    -- analysis?

17       A.    -- the -- the Xs and all that you see

18  under those elections, that's what

19  Middle Resolution provided.  I went through and

20  just did a quick count of all the data that was

21  provided as to what the count was.  Then I

22  ordered it, or sorted it, down by the people

23  that had voted the most.  I think the highest

24  number of votes was 40, and then in decreasing

25  order.

1      Q.    Okay.  You can put that exhibit

2  aside, and I want to go back to Exhibit 13.

3            Exhibit 13 is the final draft of the

4  Alien Invasion II report, correct?

5      A.    Right.

6      Q.    Can you please go to Page 2?

7      A.    Okay.

8      Q.    The second paragraph under Summary of

9  Findings.

10            Do you see that?

11      A.    The one that's in highlighted and

12  bolded?

13      Q.    And bold.

14      A.    Yeah.

15      Q.    The second extension?  It states, The

16  numbers are alarming.  5,506 noncitizens -- -56

17  noncitizens have been removed from the voter

18  rolls for citizenship problems in 120 of

19  Virginia's 133 voting jurisdictions since 2011.

20            Do you see that?

21      A.    Right.

22      Q.    And then it refers you to

23  Footnote Number 5?

24      A.    Right.

25      Q.    And if we go to Footnote Number 5, it

1    states, The cancelation reports for all 120

2    counties are available at Exhibit 1 at the link

3    provided on Page 1 of this report.

4              Do you see that?

5        A.    I see that.

6        Q.    And so the Alien Invasion II report

7    is linking to the actual VERIS reports that you

8    had gotten, listing the names of these

9    individuals, these --

10       A.    Right.

11       Q.    -- 5,556 --

12       A.    Yeah.

13       Q.    -- right?

14       A.    Right.

15       Q.    And then just back on Page 2, it

16   continues, quote, In 102 of these jurisdictions,

17   1,852 individuals cast 7,474 ballots before

18   election officials canceled their registrations.

19             You see that?

20       A.    Right.

21       Q.    And so this -- those two sentences

22   reflect the work that you did for the

23   Alien Invasion II report, correct?

24       A.    Right.

25       Q.    And this passage also reflects the

1    contribution of Middle Resolution to the report,

2    correct?

3         A.    Providing the voting data, right,

4    voting history.

5         Q.    Do you know why Middle Resolution

6    isn't mentioned anywhere in the -- in the

7    report?

8         A.    They were just basically a data

9    provider.  They were providing the same data if

10   I'd bought it from the State Board of Elections,

11   so I didn't see any reason to mention them.

12        Q.    And I think we've already established

13   in the previous exhibit that we looked at,

14   Exhibit 16, that Plaintiff Bonilla is included

15   in this group of 5,556 noncitizens, correct?

16        A.    Right.

17        Q.    And Plaintiff Freeman is included in

18   this group --

19        A.    Right.

20        Q.    -- of 5,556 noncitizens, correct?

21        A.    Yes.

22        Q.    And Plaintiff Bonilla is included in

23   the list of 1,852 who --

24        A.    As having voted.

25        Q.    -- who voted?

1              And the same thing with

2    Plaintiff Freeman?

3        A.    Right.

4        Q.    And if you go to Paragraph 11 --

5    excuse me -- Page 11.

6        A.    Did you say page or paragraph?

7        Q.    I said both --

8        A.    Okay.

9        Q.    -- but it should be Page 11 --

10       A.    Page 11.

11       Q.    -- at the very top.

12             The top left-hand corner, the report

13   repeats the same statistics that came from you

14   and Middle Resolution; is that right?

15       A.    Right.  Right.

16       Q.    Why did VVA and PILF publish all of

17   the VERIS reports?

18       A.    I'm sorry.  Why did they publish the

19   whole report?

20       Q.    All of the VERIS reports, the 400,

21   500 pages of reports that you've mentioned

22   earlier.

23       A.    I guess they wanted to make sure that

24   we weren't making it up, that it actually

25   exists.

1      Q.    Were you concerned that people would

2  think that you were making up these statistics?

3      A.    I wasn't.

4            Again, I didn't write the report, but

5  they were documents from the State election

6  board.  So . . .

7      Q.    But you don't -- you don't know why

8  they were published online?

9      A.    No.

10     Q.    Whose decision was it to publish that

11 information online?

12     A.    It had to have been PILF.  It's on

13 their -- so it's on their Web site, because I

14 never had this on my Web site at all.  It was

15 only on theirs.

16     Q.    But you -- you had linked to when the

17 report came out?  You had --

18     A.    Right.  He sent me a link and said,

19 Send this to your friends, which I did.

20     Q.    Right.

21           And did you -- when Alien Invasion II

22 was published, did you kind of repost that fact

23 on your Facebook page?

24     A.    Probably, yeah.

25           (VVA Deposition Exhibit Number 17,

```
1              Commonwealth of Virginia Department

2              of Elections, cancelation — Declared

3              Non-Citizen, 059 — Fairfax County,

4              marked for identification, as of

5              this date.)

6         Q.    Mr. George, the court reporter has

7    handed you what's been marked as Exhibit 17.

8         A.    Okay.

9         Q.    Do you recognize this?

10        A.    It's a copy of a report that we got

11   out of the 486 pages.  This was Page 100, it

12   looks like.

13        Q.    So this is an excerpt of the entire

14   VERIS report that you got from the State; is

15   that right?

16        A.    Right.

17        Q.    On -- on the first page -- because,

18   again, given how lengthy this is, we only

19   excerpted a couple of pages -- do you see at the

20   bottom of the first page Eliud Bonilla's name?

21        A.    Um-hum.

22        Q.    Do you see his home address listed?

23        A.    Yes.

24        Q.    Then on the second page, do you see

25   Luciania Freeman listed?
```

1      A.    Yes.

2      Q.    And you see her home address, right?

3      A.    Right.

4      Q.    And you don't know why their home

5   address information was published online?

6      A.    It's part of the report out of the

7   VERIS system, not any different than their

8   precinct number or their voter ID, voter

9   registration ID.

10      Q.    But it was published online

11   because -- as part of the report?

12      A.    Yep.

13      Q.    Were you -- strike that.

14           Were you and PILF trying to call

15   attention to the people that were listed --

16           MR. O'NEILL:  I'm going to object.

17      Q.    -- as a part of the report?

18           MR. O'NEILL:  I'm sorry.  I'm going

19      to object:  It calls for speculation.

20           You can answer, to the extent you

21      know.

22      A.    I don't know.  I don't know what was

23   in their mind to do it, unless it was to show

24   that it actually existed.

25      Q.    Did you think there was anything

1   wrong with the fact that PILF was publishing

2   this information?

3        A.   No.  Again, it was public information

4   directly from the State Board.  So . . .

5        Q.   Let's go back to the -- I think it's

6   Exhibit -- it's the actual Alien Invasion

7   report.

8             What exhibit is that?

9             MR. O'NEILL:  I think it's

10        Exhibit 13.

11             MR. TEPE:  Exhibit 13.

12        A.   Oh, I got it open here.

13        Q.   If you go to Page 3, the second

14   sentence in the third paragraph.

15        A.   Did you say second in the third

16   paragraph?

17        Q.   The second sentence of the third

18   paragraph.

19        A.   Got it.

20        Q.   It says, The response of law

21   enforcement officials to both single incidences

22   of voter fraud and the hundreds of examples

23   documented in this report should be the same:

24   swift, sure and unwavering.

25             Do you see that?

1      A.     Right.

2      Q.     Do you agree with that statement?

3      A.     Absolutely.

4      Q.     And that's consistent with the

5   purpose that VVA had, which was to have some

6   prosecutions of people accused of being

7   noncitizens who voted?

8      A.     Right.

9      Q.     And if you go to Page 16, under

10  Recommendations and Solutions, the last bullet

11  on the right-hand side that begins, Law

12  enforcement.

13     A.     Um-hum.

14     Q.     Do you see that?

15            The second sentence states, quote,

16  Voter registration and voting history records

17  such as those contained in this report make

18  prosecution an easy task, closed quote.

19            Do you see that?

20     A.     I see that.

21     Q.     And was that what was intended by

22  Alien Invasion II, to make prosecution an easy

23  task?

24            MR. O'NEILL:  I'm going to object:

25            It calls for a legal conclusion.

1              But to the extent you understand,

2       you can answer.

3       A.    What was the question again?

4       Q.    So on Page 16, under Recommendations

5   and Solutions, the last bullet.

6              You see that?

7       A.    Right.

8       Q.    Okay.  The second sentence says,

9   Voter registration and voting history records

10  such as those contained in this report make

11  prosecution an easy task.

12             Do you see that?

13      A.    I see it.

14      Q.    And was that what was intended by

15  Alien Invasion II, to make prosecution an easy

16  task?

17      A.    I'm sure that's one of the reasons

18  that we would publish it --

19      Q.    What was --

20      A.    -- to date, there has not been any

21  prosecutions of anybody.

22      Q.    -- but that was -- that was -- one of

23  your intentions of doing this project was --

24      A.    To do that.

25      Q.    -- to do that?

1        A.    Violated the Constitution of

2   Virginia.

3        Q.    And you said, I'm sure that was one

4   of the reasons that we would publish it, right?

5        A.    (No audible response.)

6        Q.    Were there other reasons?

7        A.    I would assume, based on showing

8   that -- we talked about this earlier -- people

9   registered to vote without checking the box,

10  checking the box as being a noncitizen, checking

11  it as being a citizen when they weren't, and in

12  all cases, they were still registered to vote,

13  so why aren't we requiring proof of citizenship

14  to register to vote, checking a box is

15  inadequate.

16       Q.    Were you also hoping to deter other

17  people accused of being noncitizens from voting?

18             MR. O'NEILL:  I'm going to -- I'm

19        going to object to form.

20       Q.    You can answer.

21             MR. O'NEILL:  You can answer.

22       A.    Yeah.  I would liken it like

23  prosecuting a bank robber, I mean, hopefully

24  we're not just doing it for an exercise -- that

25  prosecuting a bank robber would deter bank

Page 142

1  robbing, so hopefully prosecuting voter fraud
2  would deter voter fraud.
3       Q.    Well, those accused of voter fraud?
4       A.    Or accused, right.
5             MR. O'NEILL:  I'm going to object to
6       vague --
7       Q.    The --
8             MR. O'NEILL:  -- vague.  Who . . .
9             MR. TEPE:  Okay.
10      Q.    -- if you go to the -- Page 13 --
11      A.    The same report?
12      Q.    The same report.
13            -- Page 13, column on the right side,
14  the third paragraph from the bottom, beginning,
15  In the 16 jurisdictions surveyed --
16      A.    Right.
17      Q.    -- PILF reviewed 764 voter
18  registration applications submitted by
19  applicants who were later removed for lacking
20  U.S. citizenship.
21            Do you see that?
22      A.    What was the paragraph number?
23      Q.    It was the paragraph beginning, In
24  the 13 [sic] jurisdictions surveyed.
25            The third paragraph from the bottom.

1      A.    "In the 16 jurisdictions surveyed"?

2      Q.    Yes.

3      A.    Is that what you said?

4      Q.    Do you see that paragraph?

5      A.    Yes.

6      Q.    It says, In the 16 jurisdictions

7  surveyed, PILF reviewed 764 voter registration

8  applications submitted by applicants who were

9  later removed for lacking U.S. citizenship.

10           Do you see that?

11     A.    I do.

12     Q.    Okay.  Did you look at these voter

13 registration applications?

14     A.    I did not.

15     Q.    Okay.  But those voter registration

16 applications were included with the

17 Alien Invasion II report; is that right?

18     A.    I guess.  I don't know.

19     Q.    Well, I believe if this pass -- this

20 passage here goes to Footnote 69.  If you see,

21 Footprint 69 says, The voter registration

22 applications are produced in Exhibit 12.

23     A.    I'm not seeing where -- where's 69?

24     Q.    The very bottom.

25     A.    Oh, okay.

1          I got you.

2          Yeah, okay.

3     Q.    And then Footnote 69 says, The voter

4  registration applicaions are produced at

5  Exhibit 12.

6          Correct?

7     A.    Yes.

8     Q.    And you said you didn't look at the

9  voter registration applications?

10    A.    No.

11         (VVA Deposition Exhibit Number 18,

12          Voter Registration Forms, marked for

13          identification, as of this date.)

14         MR. TEPE:  The court reporter has

15     marked and handed to the witness

16     Exhibit Number 51.

17    Q.    Do you have that, Mr. George?

18    A.    Yes.

19    Q.    Do you know what these are?

20    A.    These are voter registration forms,

21  or copies of.

22    Q.    I'll represent that these were

23  applications that were included as part of

24  Exhibit 12 --

25    A.    Okay.

```
 1        Q.     -- to the Alien Invasion report.

 2               And so the first application here is

 3    for someone named Abby Focht.

 4        A.     Okay.

 5        Q.     Okay.  Now, Abby Jo Gearhart is -- is

 6    one of the Plaintiffs in this case, right?

 7        A.     I haven't -- I don't remember the

 8    name, but it that's what you said, that's

 9    fine --

10        Q.     Okay.

11        A.     -- I don't know.

12        Q.     It's on the subpoena, but, you know,

13    for purposes, we can just --

14        A.     Right.

15        Q.     She changed her name from Focht to

16    Gearhart, so -- but this is -- this is a voter

17    registration application for -- for -- for her,

18    then, right?

19        A.     Okay.

20        Q.     Do you agree with that --

21        A.     Best as --

22        Q.     -- that's what it appears to be?

23        A.     -- I can determine looking at this,

24    yes.

25        Q.     Right.
```

1                And then if you flip through, there's

2     another voter registration application.

3                Who's that for?

4          A.    For Bonilla -- Bonilla.

5          Q.    Bonilla.

6                And we talked about, he's one of the

7     Plaintiffs in this case, right?

8          A.    Right.

9          Q.    And then after that is another voter

10    registration application.

11               Do you see that?

12         A.    For Freeman.  Right.

13         Q.    For Freeman.

14               And she's one of the other Plaintiffs

15    in this case, right?

16         A.    Right.

17         Q.    Okay.  So -- so Abby Focht, in her

18    application -- what did she check for the

19    question "Are you a citizen of the

20    United States of America?"

21         A.    "Yes."

22               She checked "Yes."

23         Q.    And then Eliud -- Eliud Bonilla --

24    what did he check?

25         A.    The same thing.

1      Q.    The same thing: "Yes"; right?

2            And for Freeman?

3      A.    For the same thing.

4      Q.    Okay.  Is -- is Abby Focht, or

5   Abby Jo Gearhart, in fact, a noncitizen?

6      A.    Based on the listing that we got from

7   the State Board, they declared that they were a

8   noncitizen.

9      Q.    And here, she declared that she is a

10  citizen?

11           MR. O'NEILL:  I'm going to object.

12           To the extent you know.

13     A.    Yeah, I mean, to the extent I know,

14  she's said something on one form and something

15  different on another, different form.  So . . .

16     Q.    Do you know which form is correct?

17     A.    No.  I just know the form that I

18  received from the State Board said that she

19  self-declared that she was a noncitizen.

20     Q.    And here, she self-declared as a

21  citizen, correct?

22     A.    Yeah.

23     Q.    So wouldn't you agree that based on

24  the information that you have, you can't say one

25  way or another as to whether or not she's a

1    noncitizen?

2              MR. O'NEILL:  Objection.  You

3        mean --

4    A.    I don't know what the point is.

5              MR. O'NEILL:  Objection --

6              MR. TEPE:  Excuse me.

7              MR. O'NEILL:  -- objection.

8    Q.    You can answer.

9    A.    I just don't know what your point is.

10   Q.    You don't need to understand the

11   point; you need to answer the question.

12             The question is, Based on the

13   information that you have -- you have a voter

14   registration application that says citizen --

15   A.    I didn't have this (indicating) when

16   I did my work.

17   Q.    You didn't have this?

18   A.    I didn't have their voter

19   registration forms when I did all of my data

20   work.

21   Q.    Did you ask for her voter

22   registration forms?

23   A.    I was dealing with 5,550 names on a

24   list, so, no, I didn't ask for hers.

25   Q.    Did you ask for the voter

1    registration form of Eliud Bonilla?

2         A.    For no one.  I accepted what was

3    given to me by the State Board.

4         Q.    How do you get on the voter

5    registration rolls?

6               You fill out an application, correct?

7         A.    Voter -- yeah, either online or on

8    paper, either way.

9         Q.    Okay.  And you fill out some

10   information like you see here on this

11   application, correct?

12        A.    Sure.

13        Q.    Put down your name?

14        A.    There's two different forms.  There's

15   a state form, and then there's a Federal form.

16        Q.    But they're consistent in the fact

17   that you put down some information, like your

18   name, correct?

19        A.    You bet.

20        Q.    Your address?

21        A.    Right.

22        Q.    Date of birth?

23        A.    Yes.

24        Q.    Social Security number?

25        A.    I think the Social Security number is

1   optional; but, yes, you can put that down.

2        Q.    And then the answer to the question

3   whether or not you're a United States citizen,

4   right?

5        A.    Right.

6        Q.    And those who check the box "yes"

7   are -- provided there's -- everything else on

8   the form is fine, they get to be registered as a

9   voter, correct?

10        A.    That's right --

11        Q.    Okay.

12        A.    -- and even if it's checked "no" or

13   if it's not checked at all, we've got examples

14   of all of it.

15        Q.    Okay.  It's not really my question.

16              Can we -- if we can just focus on my

17   question --

18        A.    Okay.

19        Q.    -- it will be a lot quicker.

20              So my question was, In those who

21   check the box "yes" are -- provided that

22   everything else on the form is fine, they get to

23   be registered, correct?

24        A.    Right.

25        Q.    And the way it's supposed to work is

1   that if they check "no," they're not a

2   United States citizen, they're not supposed to

3   be registered, correct?

4        A.    Right.

5        Q.    And so, sitting here today, can you

6   tell me is Plaintiff Abby Focht, or Abby Jo

7   Gearhart as she's known now, in fact, a

8   noncitizen?

9        A.    Because she self-declared at some

10  point to the DMV and then she also responded to

11  the card that was sent to her by the local

12  board, I would have to say she was not a

13  citizen.  That's how she got on the list.

14       Q.    Okay.  So you're -- you're choosing

15  to believe one list and one check box but not

16  the other check box?

17       A.    That's all I had access to.

18       Q.    But you are choosing to believe one

19  check box and not another check box, correct?

20       A.    As far as I know, there was no check

21  box.  I mean, she actually went to the DMV to

22  renew her driver's license and was asked by the

23  clerk whether or not she was a citizen.

24       Q.    Do you know that?

25       A.    That's the process that was told to

1    me by Ms. Leider.

2         Q.    Do you know that Abby -- do you know

3    whether or not Abby Jo Gearhart actually checked

4    "no" on a DMV form?

5         A.    No idea.

6               All I know is her name was passed on

7    to the State Board, the State Board passed it on

8    to the local board, the local board sent her a

9    card, she either didn't return it or she

10   returned it and said that she was not a citizen.

11   And that's how she got on the list.

12        Q.    So the answer is, as far as you know

13   today, you do not know one way or another as to

14   whether or not Abby Jo Gearhart is a citizen?

15        A.    If she had provided certification in

16   some way back to the local board, she would have

17   never shown up on the list, so I have to assume

18   that she followed the process -- the process is

19   right, so she was taken off the voter roll.

20        Q.    But the question is not whether or

21   not she was taken off the voter roll.  The

22   question is, Is Abby Jo Gearhart a citizen?

23               Yes or no?

24        A.    No idea.  All I know is that she was

25   removed from the voter roll long before I ever

1    saw that list.

2         Q.    Mr. Bonilla -- do you know, yes or

3    no --

4         A.    No idea.

5         Q.    -- no idea if he's a citizen or not?

6         A.    All I know is he was on the list as

7    being noncitizen.

8         Q.    And you didn't check to see if he had

9    put a voter registration application which he

10   checked "yes," correct?

11        A.    Right, nor did I check the other

12   5,000-plus people.

13        Q.    The same question with

14   Ms. Freedom -- Freeman:  You don't know if she's

15   a citizen or not?

16        A.    No.

17        Q.    And you didn't ask to see her --

18        A.    I just assumed that what was on the

19   voter roll was correct.

20        Q.    You assumed that what was on the

21   voter roll was correct?

22        A.    It was a State record; why wouldn't

23   I -- question it?

24        Q.    Well, here's a State record right

25   here, right in front of you.

1              Are you questioning --

2       A.     That's a --

3       Q.     -- that?

4       A.     -- that's a record that was created

5   by a person, not the State.

6       Q.     But the record that the State created

7   is based on something, as you said before, that

8   was declared by the person, correct?

9       A.     Drive that by again.

10      Q.     You have said that the record that

11  the State provided that you used was created

12  based on a response by the citizen, correct?

13      A.     At the DMV, right.

14      Q.     And here is a record that is based on

15  the response of a citizen in registering to

16  vote, correct?

17      A.     Right.

18      Q.     All right.  And you don't know,

19  actually, what Ms. Freeman told the DMV, do you?

20      A.     No idea.

21      Q.     You don't know what Mr. Bonilla told

22  the DMV?

23      A.     No idea.

24      Q.     You don't know what Ms. Gearhart told

25  the DMV?

1      A.    No idea.

2      Q.    But you can see from these exhibits

3   that they each told the Department of Elections,

4   in their forms, that, yes, they are a citizen,

5   correct?

6      A.    They did it on their form, right, but

7   then we've got other people that did the same

8   thing --

9      Q.    Excuse me.

10     A.    -- I'm just saying --

11     Q.    I'm asking you a question --

12     A.    -- these three people may be the

13   exception to the rule.

14     Q.    But you don't know that --

15     A.    We have -- you've got 5,550 people on

16   that roll.

17          Are you saying that all of them

18   checked the "yes" box?

19          They didn't.  We have people that

20   checked the "yes" box that really aren't

21   citizens or that we can --

22     Q.    But you said, yourself --

23     A.    -- assume that they really aren't.

24     Q.    -- but you said, yourself, that you

25   didn't check any of people -- any of these

 1   people --

 2        A.    I didn't check any of them.  I

 3   assumed --

 4             THE COURT REPORTER:  Sir, you have

 5        to let him finish the question.

 6        Q.    -- but you --

 7        A.    -- I didn't --

 8        Q.    -- didn't check any of these people's

 9   voter registration?

10             MR. O'NEILL:  I think -- I think --

11        objection.  I think there's a question

12        on -- on the -- on the table here --

13             MR. TEPE:  Excuse me, Counsel --

14             MR. O'NEILL:  -- that he was in the

15        middle --

16             MR. TEPE:  -- Counsel --

17             MR. O'NEILL:  Objection: form.

18             MR. TEPE:  Thank you.

19        Q.    So the question on the table is, You,

20   yourself, said that you didn't check any of the

21   voter registration applications of the people

22   that were on that list of 5,556, correct?

23        A.    No, I didn't; didn't have access to

24   them.

25        Q.    Okay.  Well, that's not true, sir.

1          A.     The only way for me to have access

2    would be to go to the local board to get it.

3          Q.     You could have just asked PILF for

4    it, right?

5          A.     I didn't know that PILF was even

6    doing that.  All I had was -- the work stream I

7    had was to take the PDF files, convert them to a

8    spreadsheet and find out the voting history.

9               That's all I was focused on.

10         Q.     But now that you have in front of you

11   documentation that Mr. Bonilla, for example,

12   said he was a citizen -- right?

13              You see that in this exhibit?

14         A.     Well, he evidently said he wasn't a

15   citizen at some point along the process.

16         Q.     Well, do you know that?

17              MR. O'NEILL:  Objection --

18              MR. TEPE:  Excuse me, Counsel.

19              MR. O'NEILL:  I'm going to -- I'm

20         going to lodge my objection for -- you

21         finished your question.  I'm going to

22         lodge my objection.

23              Objection: asked and answered.

24         Q.     We have some documentation right in

25   front of you, Mr. George, that Eliud Bonilla

1    said that he was a citizen of the United States,

2    correct?

3              MR. O'NEILL:  Again --

4              MR. TEPE:  Excuse me, Counsel,

5         that's a simple question.

6              MR. O'NEILL:  -- I know.  I'm going

7         to object.  I'm going to say that that

8         question was asked and answered.

9              MR. TEPE:  I get to conduct --

10             MR. O'NEILL:  I understand --

11             MR. TEPE:   -- this examination.

12        And when you keep interrupting, you keep

13        interrupting what the questions are.

14             So, again, if the question itself is

15        objectionable, you can say, "Objection to

16        form."

17             Thank you.

18        Q.   So, Counsel -- excuse me --

19   Mr. George, we have in front of you, in this

20   Exhibit 18, a voter registration application for

21   Mr. Bonilla, correct?

22        A.   Right.

23        Q.   And he checked that he was a United

24   States citizen, correct?

25        A.   He did.

Page 159

1          Q.    Okay.

2                Now, Mr. Bonilla also shows up on a

3     list of individuals from the State that you

4     utilized for your voting history analysis,

5     correct?

6          A.    Right.

7          Q.    You don't know which record is

8     correct, do you --

9          A.    Since I only have one --

10         Q.    -- with respect to -- with re -- I'm

11    sorry -- with respect to whether or not, in

12    fact, he's a citizen?

13         A.    No, I've not seen his passport, or

14    anything, if that's what you're asking.  I

15    haven't seen a birth certificate, if that's what

16    you're asking.

17         Q.    Okay.  So you don't know his

18    citizenship at all, correct?

19         A.    Right.

20         Q.    Okay.

21         A.    I mean, he could have checked the

22    wrong box by accident.

23         Q.    So is it accurate to -- to say that

24    Bonilla is a noncitizen, based on the

25    information you know right now?

1      A.    At this point, I don't know one way

2  or the other.  I just know that he appeared on

3  the list that I worked on.

4      Q.    Okay.  So it would be inaccurate,

5  potentially, to declare him a noncitizen today,

6  correct?

7      A.    If he did not provide --

8      Q.    Based on --

9      A.    -- certification back to the local

10  board or he did not return that card, everybody

11  down the line would assume that he was a

12  noncitizen --

13      Q.    Okay.

14      A.    -- and by checking the box here, he

15  committed perjury if he really wasn't a citizen.

16      Q.    But you don't know that?

17      A.    I don't know that.  But he could have

18  checked it --

19      Q.    So based on the fact --

20      A.    -- mistakenly.

21      Q.    -- that you don't know one way or

22  another if he's a citizen, sitting here today,

23  do you think it would be accurate to call him a

24  noncitizen, period?

25      A.    I don't think I'd call him one way or

1    the other.  He could be a noncitizen; he could

2    be a citizen.  Don't know.

3        Q.   Did you do anything to -- I'm going

4    to strike that.

5            Now, you and PILF had been informed

6    by registrars that people on the VERIS reports

7    had reregistered; isn't that correct?

8        A.   That people on the -- I didn't

9    understand the last part of your question.

10       Q.   Okay.  We -- the reports that we've

11   been -- the records we've been talking about are

12   called the "VERIS reports," correct?

13       A.   Right.

14       Q.   Okay.  You and PILF had been informed

15   by at least one registrar that people on the

16   VERIS reports had reregistered, correct?

17       A.   I think I got an e-mail from

18   Alex Ables to that effect on several people on

19   his list.

20       Q.   Who's Alex Ables?

21       A.   He's a registrar in Fauquier County.

22       Q.   Okay.  Do you have -- do you recall

23   that happening other than with respect to

24   Mr. Ables?  Any other instances of that --

25       A.   No.

1      Q.    -- that you recall?

2      A.    No --

3      Q.    Okay.

4      A.    -- that was the only instance I ever

5  even heard of.  I think there were two -- maybe

6  two people that he talked about.

7      Q.    Do you want some water?

8      A.    No, I'm good.

9            (VVA Deposition Exhibit Number 19,

10            E-mail with attachment, Bates

11            stamped PILF-ADAMS-0009178 through

12            PILF-ADAMS-0009197, marked for

13            identification, as of this date.)

14     Q.    The court reporter is handing --

15           MS. SHELTON:  Oh, sorry.

16     Q.    -- what's been marked as Exhibit 19,

17  a document that was sent by Noel Johnson on

18  February 2nd.

19           Do you see that?

20     A.    Yes.

21     Q.    Do you recall receiving this

22  document?

23     A.    I don't.

24     Q.    So it's an e-mail from Mr. Johnson,

25  as I said, February 2nd --

1      A.     Right.

2      Q.     -- to you and Mr. Adams; is that

3  right?

4      A.     Yeah, I think this was one of the

5  counties that they actually sent a letter to,

6  maybe.

7      Q.     Who's "they"?

8      A.     Christian or PILF.

9      Q.     Looking for records?

10     A.     Right, after we had done our

11 examination at the Alexandria Registrar's

12 Office.

13     Q.     All right.  Do you want to just take

14 a flip through this document?

15     A.     I have not seen any of this.

16     Q.     Well, you were e-mailed a copy on

17 February 2nd, were you not?

18     A.     Yeah.  I didn't, probably, read it.

19 I don't remember seeing it.

20     Q.     Do you have any reason to doubt the

21 fact that you saw it -- I mean -- excuse me --

22 received it?

23     A.     No.

24     Q.     And this is another one of these

25 VERIS reports, correct?

1      A.     Right, from York County.

2      Q.     This one is from York County.   The

3  same thing: cancel type, noncitizen declared?

4      A.     Right.

5      Q.     Okay.   And if you look at the cover

6  e-mail from Mr. Johnson, he's saying that

7  York County had sent a hand-notated report that

8  indicates that some people who were removed were

9  then reregistered.

10             Do you see that?

11      A.     Right.

12      Q.     He says at the end, In all, 26 of the

13  44 people they removed simply reregistered and

14  probably voted in this year's election.

15             Correct?

16      A.     Yep.

17      Q.     Okay.   So if you look at the

18  marked-up York County VERIS report, you see a --

19  a row for Karen Askin.

20             Do you see that?

21      A.     Yes.

22      Q.     And the person from York County had

23  written that this person reregistered, correct?

24      A.     Right.

25      Q.     Okay.   And then a few rows down,

1    there's a Danita Bader.

2             Do you see that --

3        A.    Yes.

4        Q.    -- reregistered, correct --

5        A.    Right.

6        Q.    -- that's what's noted -- noted here?

7             And if you flip through, there's a

8    number of other people having a handwritten

9    notation that they had reregistered, correct?

10       A.    Yep.

11       Q.    Okay.  And, again, Mr. Adams had --

12   excuse me -- Mr. Johnson had said that 26 of the

13   44 people had reregistered, correct?

14       A.    What was the number?  Twenty-four?

15       Q.    Twenty-six of the 44 is what

16   Mr. Johnson says.

17       A.    Twenty-six of the 44.  Okay.

18       Q.    Was the fact that these people had

19   reregistered noted in the Alien Invasion

20   report?

21       A.    If they were, I didn't notice it.

22       Q.    Yeah, I didn't notice it either.

23             Who made the decision not to include

24   these individuals' reregistration in the

25   Alien Invasion reports?

Page 166

1           MR. O'NEILL:  Objection: form.

2           You can answer.

3      A.    I mean, I haven't seen anything with

4   all this handwritten stuff on it.  None of it

5   was -- I mean, if they were reregistered prior

6   to the listing that I got, they should not have

7   been on the list, I would think.  The date on

8   this list is the 1st of January of 2011 --

9      Q.    Right.  And then the --

10      A.    -- so they reregistered -- this one

11   person reregistered 8/30 of '16 or '14, or

12   something.  I can't remember the -- I can't read

13   the writing.

14      Q.    Which person is this you're looking

15   at?

16      A.    Patel, it says reregistered 8/30

17   something -- '16 or '14 or . . .

18      Q.    Right.

19           Okay.  But if they -- if they had

20   reregistered, they should not be listed in

21   Exhibit 1 to Alien Invasion II; is that right?

22      A.    I would think not.

23      Q.    Okay.  And do you know who made the

24   decision not to include the information that's

25   provided here from York County with the

1    Alien Invasion II report?

2         A.    No.

3         Q.    Who is Keith Damon?

4         A.    Keith is an elderly gentleman that is

5    a member of Fairfax County Republican Committee.

6    He's in charge of election data.  He attends the

7    local board meetings for the local election

8    board in Fairfax County.

9         Q.    You called him "elderly."

10             Do you think he would agree with

11   that?

12        A.    He's older than me, a lot older than

13   you.

14        Q.    Do you know how old he is?

15        A.    I don't know.  I think he's probably

16   approaching 80.

17        Q.    I just want to make sure you're not

18   casting aspersions on Mr. Damon.

19        A.    Yeah.

20        Q.    He helped you with Alien Invasion II

21   work; is that correct?

22        A.    No, he hadn't done anything with any

23   of this, outside of sending him a link for him

24   to read.  I think he may have responded to me.

25             MR. TEPE:  It's been an hour.  Do

1      you want a break?

2              MR. O'NEILL:  Are you doing okay?

3              THE WITNESS:  Yeah, I'm fine.

4              MR. O'NEILL:  We'll go 15

5      more minutes.

6              MR. TEPE:  Sure.

7              MR. O'NEILL:  Okay.  Thank you for

8      that.

9              MR. TEPE:  Of course.

10     Q.    Did you do anything to promote

11  Alien Invasion I?

12     A.    Outside of just sending it to friends

13  of mine that I knew were interested in the

14  subject, no.

15     Q.    Did you post any information about

16  Alien Invasion -- we're talking about the first

17  one -- on your Web site?  Do you recall?

18     A.    I don't know about the Web site.  I

19  don't really do much on the Web site.  I do -- I

20  mean, I may have posted it to the Facebook page,

21  referring people to go look at it.

22     Q.    And, again, for Alien Invasion I, did

23  you do any media interviews?

24     A.    Not that I remember.

25     Q.    Did you provide an interview to

1    WJAL News, the ABC affiliate in D.C.?

2         A.    I did a -- let's see.

3               I think it was -- I remember doing an

4    interview with a reporter outside, but I don't

5    remember if it was about Alien I and

6    Alien Invasion II.  I mean, it kind of runs

7    together.  I really didn't have any notes, or

8    anything.

9               (VVA Deposition Exhibit Number 20,

10              Article, Va. Voters Alliance

11              concerned about voter fraud ahead of

12              November presidential election, by

13              Goldberg, October 3, 2016,

14              wjla.com/news, marked for

15              identification, as of this date.)

16              MR. TEPE:  The court reporter has

17    marked Exhibit 20 and handed it to the

18    witness.

19         Q.    Do you know what this is?

20         A.    It looks like an article that

21    somebody wrote -- Jeff Goldberg.

22         Q.    He's with ABC 7?

23         A.    Right.

24         Q.    It's dated October 3rd, 2016?

25         A.    Right.

1        Q.    This reflects that you did an

2    interview with WJLA based on the

3    Alien Invasion I report; is that right?

4        A.    I don't reference that in the --

5        Q.    Why don't you take a look at the

6    article?

7              (Whereupon, the witness reviews the

8               material provided.)

9        Q.    This article is speaking about

10   Alien Invasion I, correct?

11       A.    It could be, but I don't ever mention

12   the report.  I just mention some of the findings

13   that we had.

14       Q.    Right.

15             It says here, According to the

16   Virginia Voters Alliance, 1,046 undocumented

17   immigrants illegally voted in eight Virginia

18   localities in the 2012 election, including 70

19   people in the City of Alexandria.

20             Do you see that?

21       A.    Right.

22       Q.    And those are the numbers that we saw

23   in the Alien Invasion -- Alien Invasion --

24       A.    Right.

25       Q.    -- I report, correct?

1        A.      Right.

2        Q.      Okay.  And then you are quoted as

3    saying, quote, This is just the tip of the

4    iceberg.

5                Do you see that?

6        A.      I did.

7        Q.      Okay.  And you did tell WJLA News

8    that these findings were just the tip of the

9    iceberg, correct?

10       A.      Right.  At that time, I was expecting

11   to get a fairly large list from the State Board.

12       Q.      And -- and what do you mean by "the

13   tip of the iceberg"?

14       A.      Well, these are the people that we

15   know about that have been removed from the voter

16   rolls.  I'm convinced that there are thousands

17   of other people that are registered to vote that

18   shouldn't be registered to vote.

19       Q.      And so VVA's goal was to, I guess,

20   show the iceberg and not just the tip?

21       A.      Well, I think we need to find out or

22   have some way of keeping people from registering

23   to vote that shouldn't be registered to vote.

24       Q.      And you were expecting a fairly large

25   list of those people?

1      A.    Right.  I probably was in the process

2   of working on it at this point.

3      Q.    You then say, And it's just going to

4   get worse and worse.

5            What do you mean by that?

6      A.    More and more people are being

7   registered pretty much every day that are not

8   legal voters.

9      Q.    That was your belief at the time?

10     A.    Right.

11     Q.    And what was the basis for your

12  belief?

13           MR. O'NEILL:  Objection: vague.

14           MR. TEPE:  I'll restate it.

15           THE WITNESS:  Okay.

16     Q.    You said, "More and more people are

17  being registered pretty much every day that are

18  not legal voters," correct?

19     A.    Yes.

20     Q.    That was your belief?

21     A.    I wasn't necessarily referring to

22  just Virginia --

23     Q.    You're speaking --

24     A.    -- even though --

25     Q.    -- generally?

1       A.     -- that's probably the case, but, in

2    general --

3       Q.    And --

4       A.     -- I think we're starting to see in

5    pretty much every state that we've got illegal

6    voters being registered.

7       Q.    Who's registering these illegal

8    voters?

9       A.    I don't know.  I had a call from a

10   fellow in Santa Fe, New Mexico, after these

11   reports came out, that said his administrative

12   assistant had actually registered to vote and

13   she was a Green Card holder and as she was going

14   through the mall, she was stopped and asked if

15   she would register.  And she said, I can't; I'm

16   not a citizen; I have a Green Card.

17            And whoever it was that registered

18   her said, Oh, that's okay?  That's all you need.

19   And they used not only her Green Card as proof

20   when she went to -- to vote; she used the

21   Green Card as her ID.

22      Q.    Other than this anecdote, do you have

23   any other proof that registration of noncitizen

24   voters is becoming worse and worse?

25      A.    No.

1              To me, that's the whole point of

2    this, is that there is no proof, that we need to

3    have proof of citizenship in order to register

4    so that we don't get into this problem.

5         Q.    Did you do anything to promote the

6    Alien Invasion II report?

7         A.    Outside of just sending it to my

8    friends or posting it on Facebook, no.

9              (VVA Deposition Exhibit Number 21,

10              E-mail, Bates stamped VVA-000654,

11              marked for identification, as of

12              this date.)

13        Q.    The court reporter has marked as

14   Exhibit 21 an e-mail to you.

15             Do you see that?

16        A.    Yes.  Kenric was a reporter here in

17   Virginia for a while, but then he moved to

18   Texas.  He evidently saw the report and wanted

19   to chat with me about it.  I don't think he ever

20   wrote an article about it, though.

21        Q.    Do you know what outfit he was a

22   reporter for at the time?

23        A.    When he was here in Virginia, I think

24   it was Watchdog Virginia, or something like

25   that.  I can't remember the name of the

1   publication.  And then he moved to San Antonio,

2   I believe, and took a job with a different blog,

3   or whatever.

4        Q.    This e-mail was sent by him to you on

5   June 2nd of 2017 --

6        A.    Um-hum.

7        Q.    -- and the Subject line says, Can you

8   comment on Alien Invasion II today?

9              Correct?

10       A.    Right.

11       Q.    Okay.  And do you recall providing

12   him with any comment or quote?

13       A.    If I did, I probably just called him

14   and talked to him on the phone, but I don't

15   remember anything about it.  I think he was just

16   curious about what we had found, because he had

17   been here in Virginia before.

18              He actually attended several

19   State Board of Election meetings to report, so

20   that's how I met him.

21              (VVA Deposition Exhibit Number 22,

22               Article, Voter Probe Points to

23               'Alien Invasion' in Virginia, by

24               FAIR STAFF, June 5, 2017,

25               immigrationreform.com, marked for

1              identification, as of this date.)

2      Q.     The court reporter has marked as

3  Exhibit 22 a copy of an article.

4              Do you see that?

5      A.     Um-hum.

6      Q.     It's an article entitled Voter Probe

7  Points to, quote, Alien Invasion, closed quote,

8  in Virginia.

9              Do you see that?

10     A.     Yes.

11     Q.     And it's written by FAIR Staff?

12     A.     Don't know who that is.

13     Q.     Have you heard of the organization

14  called FAIR?

15     A.     No.  Oh, I've heard of an

16  organization called FAIR.  I can't remember now

17  what it stands for.  Something about immigration

18  reform.  But I don't think I've ever seen this

19  article.

20     Q.     Well, towards the end of the article

21  and on Page 2 of exhibit, you were referenced as

22  saying that you would continue your work on

23  counties where registered voters outnumber the

24  voting age population.

25              Do you see that?

1     A.    Yeah.  That was probably based on our

2  lawsuit to the Alexandria registrar.

3     Q.    But my question to you is whether --

4  is -- you know, does -- is this the article

5  that's referenced, do you think, in the e-mail

6  from Kenric Ward?

7     A.    I don't think so.  He didn't -- I

8  don't think he ever worked for them.

9     Q.    Okay.  All right.

10        MR. TEPE:  You had asked for --

11        MR. O'NEILL:  Yeah, I think -- I

12     think we -- we'll take -- let's take

13     five minutes.

14        MR. TEPE:  Sure.

15        MR. O'NEILL:  I just -- I'm going to

16     use the restroom.  We'll go off the record

17     for five minutes.

18        MR. TEPE:  Sure.  Not a problem.

19        MR. O'NEILL:  Thanks.

20        THE VIDEOGRAPHER:  The time is 2:38.

21     We are off the record.

22                  -  -  -

23           (Whereupon, a recess was taken from

24             2:38 p.m. to 2:48 p.m.)

25                  -  -  -

1           THE VIDEOGRAPHER:  The time is 2:48,

2      and we are back on the record.

3   BY MR. TEPE:

4      Q.    Mr. George, we were talking, before

5   the break, about any efforts you made to promote

6   a second Alien Invasion report, correct?

7      A.    Right.

8      Q.    We talked about a possibility of a

9   posting on Facebook, right?

10      A.    Right.

11      Q.    You didn't recall any media

12   interviews, correct?

13      A.    Any what?

14      Q.    Any media interviews.

15      A.    I mean, I may have.  I just don't

16   remember.  I mean, I don't really seek out radio

17   or TV, but --

18           (VVA Deposition Exhibit Number 23,

19            E-mail string, Bates stamped

20            VVA-000820 through VVA-000826,

21            marked for identification, as of

22            this date.)

23           MR. TEPE:  The court reporter has

24      handed the witness what has been marked as

25      Exhibit 23.

1      A.     That's right.

2      Q.     Mr. George, do you recognize this?

3      A.     Yeah.   This is -- I can't tell if

4  this is Alien I or II, but this -- Christian

5  sent me a -- a link, and I sent it to my

6  friends.

7      Q.     Okay.

8             So let's start on Page 2, which

9  is -- actually, at the bottom of Page 1 is -- it

10 says Christian Adams sent the e-mail to you

11 May 30th --

12     A.     Right.

13     Q.     -- about the Alien Invasion report,

14 correct?

15     A.     Right.

16     Q.     It's an article that he wrote for

17 PJ Media; is that right?

18     A.     Right.

19     Q.     And he told you, quote, Run as far

20 and fast as you can with the report, closed

21 quote.

22            Do you see that?

23     A.     I don't run anymore, so all I did was

24 send it to my friends, but that's what he said

25 to do.

1      Q.    And then the next e-mail up is you

2   forwarding his article to about two dozen

3   people; is that right?

4      A.    Yeah.

5      Q.    Also dated May 30th?

6      A.    Right.

7      Q.    And you tell these approximately two

8   dozen people, Please distribute this as far and

9   wide as possible, closed quote.

10           Do you see that?

11     A.    Right.

12     Q.    And so you were trying to spread the

13   word about the Alien Invasion II report,

14   correct?

15     A.    Right.

16     Q.    One person, Ruth Crout, responded

17   that she would post on CEW's Facebook page.

18           You see that?

19     A.    Yes.

20     Q.    What is CEW?

21     A.    It's a group that I've actually given

22   my presentation to.  It's Capital Enterprising

23   Women's group.

24     Q.    What do they do?

25     A.    Pardon?

1      Q.    What do they do?

2            I'm sorry.

3            MR. O'NEILL:  Objection: form.

4            You can answer.

5      A.    I mean, as far as I know, they're

6  just a group of conservative women, enterprising

7  women-owned -- -owned businesses here in the

8  area.  They have a luncheon meeting, like, once

9  a month.

10           At the time, Ruth was the president.

11 I think there's a lady by the name of Porcher,

12 that's now the president.  So I get an invite

13 pretty much every month.

14     Q.    Now, among the people that you

15 forwarded Mr. Adams's article to, one person is

16 Dave Brat.

17           Who is that?

18     A.    Congressman Dave Brat.

19     Q.    He was a Republican Congressman at

20 this time?

21     A.    Yes.  He was from Seventh District.

22     Q.    And there's a Clara Belle Wheeler

23 listed.

24     A.    Yes.

25     Q.    Who's that?

1      A.    She's a good friend of mine who is

2   also on the -- I think she's vice chair of the

3   State Board of Elections.

4      Q.    She holds the Republican seat?

5      A.    She holds what?

6      Q.    The Republican seat on the State

7   Board of Elections?

8      A.    Yes.  I mean, she was nominated by

9   the Republican Party of Virginia.

10     Q.    You said she's a good friend of

11  yours.

12           How long have you known Ms. Wheeler?

13     A.    She was present at the very first

14  State Board of Elections meeting I attended,

15  which was probably back in 2009.  She got up and

16  made a citizen presentation or -- she wasn't on

17  the board at that time.  She's a retired

18  physician.  She -- met her afterward and

19  chatted, and turned out she's been working on

20  voter fraud for many years on her own.  She

21  lives in Charlottesville, so different part of

22  the state where I live.

23     Q.    How often do you speak with

24  Ms. Wheeler?

25     A.    If a session is in play, like

1    February -- January/February, we may speak every

2    week.  But, you know, when the session is out,

3    it's -- unless I'm going to attend the

4    State Board of Elections, I may call her and

5    tell her I'm going to be there for some reason.

6         Q.    Okay.  So let me make sure I

7    understand.

8         A.    There's no set schedule or conference

9    call, or anything like that.

10        Q.    But you speak to her regularly?

11        A.    I'd say maybe once a month at the

12   most.

13        Q.    And how long have you been speaking

14   with her approximately once a month?

15        A.    Since 2009.

16        Q.    And do you talk to her about election

17   issues?

18        A.    Occasionally.  I may ask her -- like,

19   if I'm thinking of doing a FOIA request, I may

20   ask her who I should send it to, or something

21   like that.

22        Q.    Do you recall talking to her about

23   the Alien Invasion reports?

24        A.    Just probably what I sent her here.

25        Q.    Do you recall if she reacted to your

1    e-mail here?

2         A.    I think I got a -- an e-mail back

3    from her that, you know -- just, you know,

4    keep-up-the-good-work kind of a thing.

5              (VVA Deposition Exhibit Number 24,

6               E-mail string, Bates stamped

7               VVA-000766 through VVA-000772,

8               marked for identification, as of

9               this date.)

10        Q.    The court reporter has marked

11   Exhibit Number 24.

12             Do you recognize this?

13        A.    I don't.  It looks like the same

14   thing that was in this other one, May 30th --

15        Q.    Does it appear to be --

16        A.    -- the response from Keith Damon and

17   a response from Clara Belle, it looks like.

18        Q.    So this is another e-mail chain that

19   originated with Mr. Adams forwarding his

20   PJ Media article to you on May 30th?

21        A.    Right.

22        Q.    And then you send it to a bunch of

23   other people, telling them to distribute --

24        A.    Right.

25        Q.    -- this far and wide?

1       A.      And then he, evidently, responded on

2    the bottom of the first page, where he said,

3    I'll be on Tucker Carlson at 8:40.

4            So he was making the television

5    appearance on that.

6       Q.      And "he" being Mr. Adams?

7       A.      Pardon?

8       Q.      "He" being Mr. Adams?

9       A.      Mr. Adams, right.

10      Q.      And in response to this e-mail chain,

11   is this Ms. Wheeler responding on May 30th at

12   11:07 p.m.?

13      A.      Ms. Wheeler, right.

14      Q.      Yeah.  And she says, Great report.

15   Glad that Fox is reporting?

16      A.      Yeah.  I think she's referring to him

17   being on Tucker Carlson.

18      Q.      And he was on Tucker Carlson about

19   the Invasion II report?

20      A.      Right.

21      Q.      And, again, do you recall any

22   conversations that you had with her about

23   Alien Invasion reports?

24      A.      No.

25      Q.      But you characterized her as someone

1    who was concerned about voter fraud; is that

2    what you said before?

3         A.    Right.  I'm glad that she is, since

4    she's on the State Board of Elections.

5         Q.    You had mentioned earlier that

6    Keith Damon was not involved in any work on the

7    Alien Invasion II report, correct?

8         A.    No, outside of me sending him a link

9    to look at it.

10        Q.    Such as what's shown here?

11        A.    Right.

12               (VVA Deposition Exhibit Number 25,

13                E-mail string, Bates stamped

14                PILF-ADAMS-0038304 through

15                PILF-ADAMS-0038304, marked for

16                identification, as of this date.)

17               MR. TEPE:  The court reporter has

18        marked for the witness Exhibit Number 25.

19        Q.    Do you recognize this document?

20        A.    No.  I mean, there's so many of them

21    that would fly back and forth.

22        Q.    It begins with an e-mail from

23    Keith Damon on May 25th; is that right?

24        A.    Yes.

25        Q.    It's an e-mail to you, correct?

1      A.    Yeah.

2            This was in regard to the huge PDF

3    that I had received from Christian that he had

4    gotten from the State.  He thought he had a

5    program that would actually unpack it for me and

6    put it into a spreadsheet, but it turned out it

7    didn't work.

8      Q.    So he did do a little bit of work?

9      A.    He tried to do some work, but it

10   didn't work.

11     Q.    But he -- he tried to do some work --

12     A.    Tried to help --

13     Q.    -- to help out on the

14   Alien Invasion II report?

15     A.    -- because he knew what I was going

16   to be facing if I had to do it by hand.

17     Q.    Right.  And so on -- on May 25th, he

18   says, Reagan, I started to work on converting

19   the PDF.

20           You see that?

21     A.    Right.

22     Q.    And that's what you were just

23   describing?

24     A.    (No audible response.)

25     Q.    And then he continues, I decided to

1    look at the records of some of the people on the

2    list.  I just randomly picked non-Hispanic

3    surnames living in single-family homes in

4    Fairfax County.  Based upon this analysis, I now

5    wonder if this is really a list of actual

6    noncitizens or, rather, a list of people who —

7    via the DMV — apparently indicated that they are

8    noncitizens regardless of their true status.

9              You see that?

10   A.    Right.

11   Q.    He continues, In other words, while

12   the list is real, does it really prove that the

13   people on the list are noncitizens?

14             You see that?

15   A.    Right.

16   Q.    And the list he's talking about is

17   the VERIS reports with respect to citizenship,

18   correct?

19   A.    Right.

20   Q.    And then he continues, To cite just

21   two people -- and he talks about two people

22   is -- one person is Carol Dodson of Herndon.

23             Do you see that?

24   A.    Right.

25   Q.    And Mr. Damon writes, Maybe -- in the

Page 189

1    last sentence -- Maybe she incorrectly indicated

2    citizenship at the earlier registration but

3    equally possible is that she mistakenly

4    indicated noncitizen on the recent registration;

5    there is no way to tell.

6              You see that?

7    A.    Right.

8    Q.    And then Mr. Damon also looked at a

9    Bryan Bennett from Burke, correct?

10   A.    Right.

11   Q.    And he reaches a -- a similar

12   conclusion, that you don't really know one way

13   or another if he's a citizen, correct?

14   A.    Right.

15   Q.    And then he says, bottom, What I say

16   above proves nothing, except that I am concerned

17   that just accepting all of the people on the

18   list as actual noncitizens may not be correct.

19             You see that?

20   A.    Right.

21   Q.    You responded to -- to Mr. Damon's

22   e-mail, didn't you?

23   A.    Yes.

24   Q.    Okay.  Did you write back to him, No,

25   these people are all noncitizens?

1      A.     That's not what I said.

2      Q.     Instead, you said, There is no way

3  for you or I, for that matter, Christian, to

4  investigate all of these identified noncitizens.

5             Right?

6      A.     Right.

7      Q.     So you didn't --

8      A.     All we know is they've all been

9  removed from VERIS because they self-declared to

10  a DMV -- or to the DMV, a Government agency,

11  that this was their status.

12      Q.     Right.

13             So you don't -- you don't disagree

14  with Mr. Damon that this list does not indicate

15  necessarily that these are noncitizens?

16      A.     That wasn't the question.  The

17  question was had they been removed from the

18  voter rolls, which they had been, which we had

19  nothing to do with.

20      Q.     Okay.  Let's talk about my question.

21      A.     Okay.

22      Q.     Mr. Damon says the list is real, but

23  it doesn't really prove that the people on the

24  list are noncitizens.  That's what he says,

25  correct?

{}

1       A.    The list wasn't used for that.  The

2   list was just used for the fact that they

3   declared that they weren't citizens.

4       Q.    Well, the list was used in the

5   Alien Invasion reports, correct?

6       A.    Sure.

7       Q.    And in the Alien Invasion reports,

8   these individuals were labeled as noncitizens,

9   correct?

10      A.    On the list -- the VERIS list, right.

11      Q.    The Alien Invasion reports labeled

12  them as noncitizens, correct?

13      A.    Right.

14      Q.    Okay.

15            But what Mr. Damon is saying is that

16  the list that you're using for the

17  Alien Invasion reports do not necessarily

18  indicate or establish that they are noncitizens,

19  correct?

20      A.    That wasn't the purpose of the list,

21  though.

22      Q.    I'm not asking about that.

23            I'm saying, Mr. Damon is saying that

24  the list that you're using for the

25  Alien Invasion reports do not necessarily

1   establish that these people are noncitizens,

2   correct?

3            MR. O'NEILL:  I'm going to --

4       A.    I'm not -- I mean, we're talking at

5   cross-purposes.  The list was not used to

6   determine citizenship of a person.

7       Q.    But that's what it was used for in

8   the Alien Invasion reports, correct?

9       A.    No.  We were using it as a fact that

10  they had been removed from the voter roll

11  because they had self-declared to be

12  noncitizens.

13      Q.    But the Alien Invasion reports

14  clearly indicate -- like, the first one says, we

15  had found 100 -- 1,046 noncitizens who

16  registered to vote illegally, correct?

17      A.    In Alien I?

18      Q.    Yeah.

19      A.    Right.

20      Q.    Right.  And that's not necessarily

21  correct, as we've established, that these were

22  noncitizens?

23           MR. O'NEILL:  I'm going to object:

24      That's a vague question.

25      A.    I mean, I think you're asking

1    something that was impossible to prove based on

2    what we received from the State Board.

3         Q.    So if it was impossible to prove, why

4    would the Alien Invasion reports declare them to

5    be noncitizens?

6              MR. O'NEILL:  I'm going to -- I'm

7         going to object again to vague.

8              You can answer, to the extent you

9         understand.

10        A.    The report just told us the people

11   that had been removed after having gone through

12   the process that the State had created in order

13   to determine whether a person was actually

14   registered to vote or not and if they were a

15   citizen or not.  And it all started with them

16   declaring to the DMV that they were not

17   citizens.

18              Now, if they were citizens, why would

19   they have lied to the DMV?

20              On the other hand, the day they went

21   into the DMV, maybe they weren't citizens and

22   they became a citizen a month later.  Who knows?

23        Q.    Can you go back to Exhibit 13?

24              It's the final draft of

25   Alien Invasion II.

Page 194

1    A.    I'm finding everything but 13.

2          MR. O'NEILL:  Take -- sorry about

3    that.  The -- the exhibits have piled up,

4    and so it's going to take a sec.  I think

5    it's that one right to your right.

6          THE WITNESS:  This one (indicating)?

7          MR. O'NEILL:  Yeah.

8          Okay.  Yeah.

9    Q.    You got it?

10   A.    Yeah.

11         What page?

12   Q.    Page 2.

13         Tell me when you find it.

14   A.    Okay.

15   Q.    It's the sentence we discussed

16   earlier, The numbers are alarming.  5,556

17   noncitizens have been removed from the voter

18   rolls.

19   A.    Um-hum.

20   Q.    That's not entirely accurate, is it?

21   A.    Based on the list we received, it is.

22   Q.    That's not what's said here.

23         It says 5,596 -- 500 -- 5,556

24   noncitizens, correct?

25   A.    Right.

1      Q.    That's what it says?

2            Okay.  But you don't know if they're

3  noncitizens, right?

4      A.    All it says is that they've been

5  removed from the voter rolls for noncitizenship

6  problems.

7      Q.    Well, it doesn't say 5,556 people

8  have been removed; it says 5,556 noncitizens

9  have been removed.

10           Correct?

11     A.    That's what it says.  And they were

12  people.  They weren't dogs.

13     Q.    That's right.  But you were calling

14  them "noncitizens," correct?

15     A.    That's what the State Board called

16  them.  They said that they were removed because

17  of --

18     Q.    I'm asking you --

19     A.    -- citizenship problems.

20     Q.    -- it states right here, 5,556

21  noncitizens have been removed.

22           That's what it says, right?

23     A.    Right.

24     Q.    It doesn't say 5,556 people have been

25  removed, correct?

Page 196

```
 1        A.    By the --

 2        Q.    Correct?

 3        A.    -- time they've gone through the

 4   process --

 5        Q.    Yes or no?

 6        A.    -- they're considered --

 7        Q.    It's a yes-or-no question --

 8        A.    -- noncitizens.

 9        Q.    -- Mr. George --

10        A.    They're noncitizens.

11        Q.    -- it says 5,556 -- does it say 5,556

12   people have been removed?

13              Does it say that?

14        A.    They were noncitizens on the report.

15   All we were doing is reporting --

16        Q.    Mr. George, is there a reason why you

17   can't answer my simple question of what's

18   written here?

19        A.    Well, I didn't write this, for one

20   thing --

21        Q.    That's not my question.

22        A.    -- but the 5,56 -- 5,556 people were

23   the people that were removed because they were

24   noncitizens.

25        Q.    But it doesn't say 5,556 people have
```

1    been removed, does it?

2         A.    They weren't called --

3         Q.    It's the words on the page.

4         A.    -- people on the report.  They

5    were called --

6              THE COURT REPORTER:  I'm sorry?

7         A.    They weren't called people on the

8    report --

9         Q.    Exactly.  They were called

10   noncitizens --

11        A.    -- they were voters --

12        Q.    -- in this report --

13        A.    -- that had been removed --

14        Q.    -- Alien Invasion.

15        A.    -- because of noncitizenship status.

16        Q.    All right.  I'm going to ask again

17   because I can't seem to get a -- a simple

18   yes-or-no answer.

19              5,556 -- that's the number that's

20   used here, right?

21        A.    Um-hum.

22        Q.    Does the Alien Invasion II report say

23   5,556 people have been removed from the voter

24   rolls?

25        A.    No; it says noncitizens.

1      Q.    Thank you.

2            Was there some urgency to getting

3    Alien Invasion II drafted?

4      A.    Urgency --

5            MR. O'NEILL:  I'm going to object:

6      vague.

7      A.    -- I'm not sure what you're talking

8    about, "urgency."  I don't understand what you

9    can mean by "urgency."

10     Q.    Was PILF in a hurry to draft

11   Alien Invasion Number II?

12           MR. O'NEILL:  Object --

13     A.    I don't know.

14           MR. O'NEILL:  -- to the extent you

15     know.

16     A.    I don't know.

17     Q.    Do you know why Alien Invasion II was

18   published in May of 2017?

19           MR. O'NEILL:  Again, objection:

20     calls for --

21     A.    I don't know.

22           MR. O'NEILL:  -- speculation.

23           But you can answer --

24     A.    I don't know.

25           MR. O'NEILL:  -- you can answer.

1          MR. TEPE:  It doesn't call for

2     speculation.  I asked him does he know.

3     A.    I don't know.

4     Q.    You don't know.

5          (VVA Deposition Exhibit Number 26,

6           E-mail, Bates stamped

7           PILF-ADAMS-0001233, marked for

8           identification, as of this date.)

9          MR. TEPE:  The court reporter has

10    marked Exhibit Number 26 and handed it to

11    the witness.

12    Q.    Mr. George, do you recognize this

13    document?

14    A.    Yeah.  This is asking kind of where I

15    was on getting all that data manipulated and

16    figured out and reformatted, et cetera.

17    Q.    So this is an e-mail from Mr. Johnson

18    to you, correct?

19    A.    Right.

20    Q.    Copying Mr. Churchwell?

21    A.    Right.

22    Q.    It's dated May 17th of 2017?

23    A.    Right.

24    Q.    And it begins, I don't mean to beat a

25    dead horse, but some issues on our end have us

1    needing to get our report out ASAP.

2          Correct?

3    A.    That's what it says.  I don't know

4    why, but that's what it says.

5    Q.    Well, presumably, since he says, I

6    don't mean to beat a dead horse, he's told you

7    before --

8    A.    Right.

9    Q.    -- that there's some urgency to

10   getting this report finished; is that right?

11   A.    Right.

12   Q.    Okay.

13         And he says, But some issues on our

14   end have us needing to get the report ASAP.

15         Do you know what those issues are?

16   A.    I don't.

17   Q.    And then he continues, Whatever you

18   can do to press this urgency with the people

19   running the voter history would be appreciated.

20         Do you see that?

21   A.    I see it.

22   Q.    And this is referring to the people

23   at Middle Resolution?

24   A.    Right.

25   Q.    But you don't recall what the urgency

1    was?

2         A.    No.  He never mentioned it to me.

3               (VVA Deposition Exhibit Number 27,

4               E-mail string, Bates stamped

5               PILF-ADAMS-0013078 through

6               PILF-ADAMS-0013079, marked for

7               identification, as of this date.)

8         Q.    The court reporter has handed to you

9    what has been marked as Exhibit 27.

10              Do you recognize this document?

11        A.    Yeah, it was from me.

12        Q.    So it appears to've begun -- this

13   e-mail string on May 17th -- with an e-mail from

14   you to Steve and Nancy, at the bottom.

15              Do you see that?

16        A.    Right.

17        Q.    And who is Steve and Nancy?

18        A.    Steve Mond is the data guru at

19   Middle Resolution, and Nancy is mainly my

20   interface with the -- with the group.  She's on

21   the executive board, or executive committee.

22        Q.    And you wrote -- and you sent this

23   e-mail on May 17th, right?

24        A.    Right.

25        Q.    And you wrote, Christian is wanting

1    to get their article written ASAP to piggyback

2    on Trump's announcement of the Voter Fraud

3    Commission.

4              Do you see that?

5        A.    Yeah.   I probably had a phone call to

6    Christian to find out why the -- why the

7    urgency, or something, so I wrote it in this

8    e-mail.

9        Q.    And so now does this refresh your

10   recollection that Mr. Adams had told you this

11   was the -- the reason for the urgency?

12       A.    I guess so.

13       Q.    I mean, yes or no?

14       A.    I'm pretty sure I talked with him to

15   find out why they were wanting to get the -- the

16   data back so fast.

17       Q.    And do you recall if he told you why

18   he needed to piggyback on Trump's announcement

19   of the Voter Fraud Commission?

20       A.    No idea.   I know he was on that

21   commission, but I don't know what his reasoning

22   was.

23       Q.    You can put this document aside.

24             Had you, Reagan George, as a person,

25   ever discussed the Alien Invasion reports with a

1    prosecutor?

2        A.    With a who?

3        Q.    A prosecutor.

4        A.    No.

5        Q.    Have you ever contacted a prosecutor

6    concerning the subject of noncitizen voting?

7        A.    No.

8        Q.    Have you ever contacted anyone in law

9    enforcement concerning the subject of noncitizen

10   voting?

11       A.    No.

12       Q.    Are you aware of other people

13   discussing the Alien Invasion reports with a

14   prosecutor?

15       A.    No.  Christian told me that he had

16   turned over the data that I had generated to the

17   Federal authorities in Alexandria, as well as in

18   Charlottesville, but I haven't heard anything

19   from anybody about it.

20       Q.    Do you know who -- when you say "the

21   Federal authorities," who are you referring to?

22       A.    I was just assuming it was a Federal

23   district attorney in each location.

24       Q.    You mean the U.S. Attorney?

25       A.    Yeah.

1          I was never given any names as far as

2    who they were sent to.

3      Q.    That was going to be my next

4    question.

5      A.    Yeah.

6      Q.    Do you know when he turned over this

7    information to those prosecutors?

8      A.    No.  It was just a phone call.  I

9    just asked him one day if anything had happened,

10   and he said that he had turned it over but

11   nothing had happened.

12              (VVA Deposition Exhibit Number 28,

13              E-mail string, Bates stamped

14              PILF-ADAMS-0003391, marked for

15              identification, as of this date.)

16          MR. TEPE:  The court reporter has

17      handed the witness what has been marked as

18      Exhibit 28.

19      A.    Um-hum.

20      Q.    Do you recognize this document?

21      A.    Something that came in from Noel

22   again.

23          Oh.  Christian is meeting with

24   U.S. Attorney's . . .

25          Okay.

1    Q.    So this is an e-mail that started

2 with Mr. Johnson sending you an e-mail on

3 November 21st at 9:48 a.m.; is that right?

4    A.    It looks like it, yeah.

5    Q.    Do you recall receiving this e-mail?

6    A.    I don't, but --

7    Q.    You don't --

8    A.    -- it's been a long time.

9    Q.    -- but you don't doubt that you

10 received this e-mail?

11    A.    Yeah, it's not any question about it

12 came to me.

13    Q.    Yeah.

14          And -- and he wrote, Reagan,

15 Christian is meeting with U.S. Attorney's Office

16 today.  Need info ASAP.

17          Do you see that?

18    A.    Right.

19    Q.    And then a little bit -- a couple of

20 sentences down, it says, Also, do you have

21 actual names of voters you can send from when

22 you cross-referenced voter history for all

23 noncitizens we sent you?

24          Do you see that?

25    A.    Right.

1      Q.    You only have -- We have only the

2    numbers of voters.

3            Right?

4      A.    Yeah.  I think he's referring to

5    those seven or eight counties at the beginning

6    of all this.

7      Q.    Because this is in November of 2016?

8      A.    Right.

9      Q.    But he's referring to the -- the list

10   that you had compiled based on information

11   from those --

12     A.    Well, it's the list provided by those

13   counties that Christian --

14     Q.    Well --

15     A.    -- had asked for --

16     Q.    Correct.  That's --

17     A.    -- we got seven or eight of them.

18     Q.    Right.  Well, that's -- if I had

19   finished my question, that's --

20     A.    Okay.

21     Q.    -- what I was going to say --

22     A.    Okay.

23     Q.    -- is that this was the information

24   that from those seven or eight counties you had

25   received converted into a spreadsheet?

1      A.    Right.

2      Q.    And that's why, you know, Noel is --

3   is asking you for it, it's because --

4      A.    Right.

5      Q.    Okay.

6            -- because you had cross-referenced

7   it with the voter history, correct?

8      A.    Evidently, it'd only sent him a

9   number of voters.  They're kind of summary

10  totals, and he was wanting the detail.

11     Q.    Right.

12           And do you recall if you provided him

13  with a list of names?

14     A.    I'm sure I did.  No reason not to.

15     Q.    Other than the fact that they may

16  actually be citizens?

17     A.    Pardon?

18     Q.    Other than the fact that they may

19  actually be citizens on the list?

20     A.    I basically gave him a list of

21  citizens I had.  Right.

22           (VVA Deposition Exhibit Number 29,

23            E-mail with attachment, Bates

24            stamped PILF-ADAMS-0013078 through

25            PILF-ADAMS-0013079, marked for

1              identification, as of this date.)

2                        -   -   -

3        Q.    It's always tricky because the court

4   reporter needs to --

5        A.    Type and label at the same time.

6        Q.    Yes.

7        A.    Third arm.

8        Q.    And I was actually wondering if she

9   would stop what she was doing and type the fact

10  I was telling her how she has to flip between,

11  which she is because she's a good reporter.

12              MR. TEPE:  See, we got that on the

13        record.

14              THE COURT REPORTER:  Thank you.

15              (Laughter.)

16              MR. TEPE:  All right.  Where were

17        we?

18              THE COURT REPORTER:  Twenty-nine.

19              MR. TEPE:  Exhibit 29?

20              THE COURT REPORTER:  Yes.

21              MR. TEPE:  So the record is clear,

22        the court reporter has handed the witness

23        Exhibit Number 29.

24        Q.    Do you recognize this?

25        A.    This was a spreadsheet with people

1    that voted in that first little tranche of

2    data.

3         Q.    Being the -- the -- the data procured

4    from the -- the first seven or eight counties?

5         A.    Right.

6         Q.    So this -- this document reflects an

7    e-mail from you later in the day on

8    November 21st, correct?

9         A.    Right.

10        Q.    And it's back to -- to Johnson and to

11   Mr. Adams, correct?

12        A.    Right.

13        Q.    And the Subject line is Remove

14   noncitizens who voted?

15        A.    Right.

16        Q.    And you wrote, Noel and Christian,

17   Here's the match of the 1,007 noncitizens that

18   were removed but who also voted.

19              Correct?

20        A.    Right.

21        Q.    And so if I understand what this is,

22   is you took the number of people from the VERIS

23   reports that you had, which was, I guess, around

24   a thousand, and then created this spreadsheet

25   that just shows who of that thousand you had

1    matched up with voter history; is that right?

2         A.    Right.

3         Q.    And if you look at the exhibit, it

4    appears to be about 85 people so far?

5         A.    It looks like it.

6         Q.    And do you know if Mr. Adams handed

7    this over to the U.S. Attorneys?

8         A.    I have no idea.

9         Q.    Do you recall any other instances in

10   which you provided data to Mr. Adams for a

11   potential meeting with U.S. Attorneys?

12        A.    No, no conversations with him about

13   it --

14        Q.    I thought earlier --

15        A.    -- outside asking him if he had done

16   it.  But I was mainly referring to the 5,000,

17   not this report (indicating).

18                  (VVA Deposition Exhibit Number 30,

19                   E-mail string, Bates stamped

20                   VVA-000617 through VVA-000618,

21                   marked for identification, as of

22                   this date.)

23                  MR. TEPE:  The court reporter has

24        just handed the witness what's been marked

25        as Exhibit Number 30.

1          Q.      Do you recognize this e-mail chain?

2          A.      Yes.   It was me to Christian, and his

3     response.

4          Q.      Okay.   So you sent an e-mail on

5     June 13th to Mr. Adams, correct?

6          A.      Right.

7          Q.      And the Subject line is,

8     Alien Invasion II Publicity.

9                  Correct?

10         A.      Right.

11         Q.      And in the second paragraph, you say

12    to him, I think we need to squeeze as much

13    publicity out of the Alien Invasion II report as

14    possible.

15                 Do you see that?

16         A.      Right.

17         Q.      Why did you write that?

18         A.      I think I give the reason right after

19    that --

20         Q.      You could tell --

21         A.      -- "You could tell how excited the

22    people were last night during your speech."

23         Q.      Excited about what?

24         A.      The fact that we had found 5,550

25    people that were noncitizens or had declared

1    noncitizenship status.

2        Q.    And why -- why would their excitement

3    prompt you to want to squeeze as much publicity

4    out of the report as possible?

5        A.    I think it was because it was the

6    first time we had been able to pretty much prove

7    what we already knew was the fact

8    for noncitizens voting.

9        Q.    Although, as we've established today,

10   you don't actually know if they were noncitizens

11   or not?

12       A.    Well, we know that some of them were;

13   maybe some of them weren't, but . . .

14       Q.    In the third paragraph, you say, If

15   you were to provide noncitizen information to

16   the FBI/ -- excuse me -- to the Feds/FBI would

17   it be the spreadsheet of the 5,556 voters and

18   the voting history?

19             Do you see that?

20       A.    Yeah.   That was just a question I was

21   putting to him.

22       Q.    Okay.   And then you -- you posed

23   another question:   Based on your contacts in

24   DOJ, would it be possible for us to meet with

25   Secretary Sessions and Secretary Kelly to hand

1    them the cover letter and resolution and have

2    them -- and have you hand them your data so they

3    can begin an investigation?

4              Do you see that?

5       A.    Right.

6       Q.    Okay.  What is "the cover letter and

7    resolution" that is referenced in that sentence?

8       A.    This is probably referring to a

9    petition drive that we were contemplating to

10   hire a fellow by the name of Richard C. Pilger,

11   fired from the DOJ, because he had been in the

12   position of investigating voter fraud for

13   10 years and hadn't prosecuted a single case

14   nationwide.  We were trying to figure out how to

15   get him in front of Sessions or John Kelly, who

16   at the time was a -- a DHS secretary.

17      Q.    And that was Pilger -- how do you

18   spell that?

19      A.    His name is Richard C. Pilger.

20      Q.    Last name is spelled?

21      A.    P-I-L-G-E-R.

22      Q.    And what position did he have?

23      A.    I don't remember his title.  It was

24   that leg -- that big (indicating), but he was in

25   the voter fraud section of DOJ, management

1    branch, I think they called it.  He was a branch

2    director, or something like that, Obama

3    appointee, was still in that position during

4    part of Trump's tenure.

5        Q.    Was that a problem, that he was an

6    Obama appointee?

7        A.    Because of Christian's association

8    with DOJ and he had contacts in DOJ, he had been

9    told that the word was out not to prosecute

10   voter fraud anywhere.

11           It's the same problem --

12       Q.    And you --

13       A.    -- we found in other places,

14   especially in Virginia.

15       Q.    If you look at the following

16   sentence, it says, If we could get media

17   traction that the Feds are investigating the

18   problem, maybe the word will get out that the

19   Feds are coming after illegal voters all over

20   the U.S.

21           Do you see that?

22       A.    Well, again, back to my bank robber

23   analogy.

24       Q.    Right.  If -- if you -- if you get

25   the word out, and that will sort of affect the

1    conduct of other people, if they know --

2        A.    The conduct of people that shouldn't

3    be registering to vote because they were

4    noncitizens.

5        Q.    Then you say, at the last sentence in

6    this paragraph, This also provides opportunities

7    for more deportations.

8              What did you mean there?

9        A.    I guess I was under the impression

10   that if they had found people that were

11   committing felonies, that they were deporting

12   them.

13             I don't know if that's still the

14   case, but they committed a crime when they

15   registered to vote and also a crime when they

16   voted in elections, and the way I understand it

17   is, if they voted in a state election, they

18   committed a state crime, and if they voted in a

19   Federal election, it's a Federal crime.

20       Q.    Were you seeking to see more

21   deportations of immigrants?

22       A.    No --

23             MR. O'NEILL:  Objection: form.

24       Q.    I'm sorry.  What was the answer?

25       A.    Say the question again.

1      Q.    My question was, Were you seeking to

2  see more immigrants deported?

3      A.    It sounds like a reasonable

4  expectation.

5      Q.    Why do you say that?

6      A.    Because they broke the law.

7      Q.    In the next sentence, you say, This

8  would drive the Democrats nuts and possibly

9  disrupt their voter registration drives of

10  noncitizens.

11          Do you see that?

12      A.    Right.

13      Q.    What voter registration drives of

14  noncitizens by Democrats are you referring to?

15      A.    Well, I gave you that one example,

16  anecdotal thing, from Santa Fe, New Mexico.

17      Q.    But you don't know if that was a

18  Democrat, do you?

19      A.    I was told that -- that they were.

20  In fact, I told -- I was told it was the League

21  of Women Voters.  But the -- there was an

22  article, in The Western Journal, I believe it

23  was, where Democrat operatives were down on the

24  border basically handing illegals Federal

25  registration cards and being told that when they

1    got settled somewhere in America, to file that,

2    send that in order to register to vote.

3            They were also told that because they

4    knew their names, that if they didn't do it,

5    that they would see to it that they were

6    deported.

7            So based on that article, I was

8    assuming that it's pretty widespread.

9        Q.    You were assuming?

10       A.    Well, I mean, it was reported as

11   news.

12       Q.    You said the article in

13   The Western Journal?

14       A.    I think it was in

15   The Western Journal.  I'd have to go back and

16   look, but --

17       Q.    I'm not familiar with The Western

18   Journal.  What's that?

19       A.    It's a blog, an online blog.

20       Q.    It's an online blog?

21       A.    Yeah, it's out of -- I think it's out

22   of Atlanta.  I'm not sure.  But it -- it was a

23   couple, evidently, that was doing some

24   documentation about -- documentary type of work

25   when they stumbled on this.

1     Q.    But this sentence here, when you say

2  the -- the -- "the Democrats," you're not saying

3  that the Democratic National Committee is

4  conducting voter registration drives of

5  noncitizens, are you?

6     A.    I don't know exactly who in the

7  Democratic party was doing it.

8     Q.    Oh, I could be wrong.

9           Are -- are you saying that the

10 Democratic National Committee is conducting

11 voter registration drives of noncitizens?

12    A.    I doubt if they were doing it.

13    Q.    What about the Republican Party?  Is

14 the Republican Party conducting voter

15 registration drives of noncitizens?

16    A.    Not that I've heard of.

17    Q.    In the next sentence, you say, We are

18 still planning on sending the cover letter and

19 resolution to the two Virginia district

20 attorneys.

21    A.    That's also -- I know now

22 that -- that resolution, I think, was a

23 resolution by the Tea Party Federation wanting

24 to encourage the district attorneys in Virginia

25 to investigate and prosecute.

1      Q.    Is this -- this -- is this resolution

2    the same resolution that you referenced earlier

3    that was a petition directed to Richard Pilger?

4      A.    Yeah, I may be getting the two

5    confused.  There was a resolution that the

6    Tea Party Federation had decided that they

7    wanted to push.  Then there was also a -- a

8    letter about Pilger, and I don't know if that

9    was included in their resolution or not.  It may

10   have been two different letters.  I just don't

11   remember.

12     Q.    And when you say "two Virginia

13   district attorneys," are you referring to --

14     A.    Federal district attorneys, one in

15   Alexandria --

16     Q.    Okay.

17     A.    -- and one in Charlottesville.

18     Q.    The U.S. Attorneys?

19     A.    U.S. Attorneys.

20     Q.    And then you say, in the next

21   paragraph, We are also going to send certified

22   mail to AG --

23           That's Attorney General?

24     A.    Attorney General Herring.

25     Q.    -- Herring and copy the Republican

1   candidates with copies so that they can use his

2   inaction against him during the campaign.

3        A.    Right.

4        Q.    Do you see that?

5              So you were saying that you were

6   going to provide copies of the Alien Invasion

7   report to Republican candidates to help --

8        A.    It was probably just a --

9        Q.    Excuse me --

10        A.    -- cover letter --

11        Q.    -- excuse me --

12        A.    -- of the resolution --

13        Q.    -- excuse me.

14        A.    -- that I was talking about there.

15        Q.    Excuse me.

16              May I finish my question?

17        A.    Okay.

18        Q.    -- so you're saying here that you

19   were going to provide copies of the

20   Alien Invasion II report to Republican

21   candidates to help them during the campaign --

22        A.    Yeah --

23        Q.    -- is that right?

24        A.    -- I don't think it was copies of the

25   report; I think it was just the cover letter and

1    the resolution that I was talking about.

2         Q.    Which is concerning the

3    Alien Invasion findings?

4         A.    I think the resolution letter may

5    have been something to the effect of that we

6    found 5,550 noncitizens and so many of them

7    voted and so many votes had been cast.  It

8    wasn't necessarily pointing back to the

9    Alien Invasion report, as it was just the

10   findings that we had found.

11        Q.    Right.

12              So whether it was the report itself

13   or the findings or this resolution referencing

14   the findings --

15        A.    Right.

16        Q.    -- the plan was to send that to

17   Republican candidates to use in their campaign,

18   correct?

19        A.    Yeah, probably, but the date of this,

20   it was probably the -- John Adams was running as

21   a Republican AG candidate, so that's probably

22   who I was referring to there.

23        Q.    To help him in his race versus

24   Herring?

25        A.    Yes, inaction on the part of the

Page 222

1   Attorney General.

2        Q.    On the next page, you say, BTW --

3              Which I assume it means "by the way"?

4        A.    Right.

5        Q.    -- on a slightly different subject,

6   Alex Ables, GR in Fauquier County, sent me a

7   text message that he sent out 12 noncitizen

8   letters and got two irate citizens, one phone

9   call and one in-person visit, who claimed that

10  they were both citizens.

11             Right?

12       A.    Right.

13       Q.    Is this what you were referencing

14  earlier in your testimony when you said

15  Alex Ables had --

16       A.    Right.

17       Q.    -- gotten some feedback --

18       A.    This was --

19       Q.    -- from citizens?

20       A.    -- after the report had gone out, I

21  think.

22       Q.    Okay.  So you send this e-mail to

23  Mr. Adams, right?

24       A.    Right.

25       Q.    And then he responds on June 14th,

1    correct?

2         A.    Right.

3         Q.    And he said, Agree on publicity.  Do

4    all you can.

5              Right?

6              So that was in response to your

7    suggestion that they squeeze out as much

8    publicity as possible, right?

9         A.    Right.

10        Q.    And then he wrote, We have already

11   provided the data to elements at the DOJ and

12   will provide more.

13             Do you know what data he's referring

14   to?

15        A.    I don't.  I mean, it could be the --

16   the first thousand or so that we were talking

17   about a minute ago and then he was going to

18   provide more to get the 5,500 people back to

19   them.

20        Q.    Yeah, he actually says in the next

21   sentence, I'd like to get the spreadsheet of the

22   5,556 by name.

23        A.    Right.

24        Q.    So was he -- do you know if he was

25   having another meeting with a U.S. Attorney?

1      A.    Don't know.  I mean, he told me at

2  some point that he had turned them over.  That's

3  all I knew.  I didn't know who he turned them

4  over to.  I didn't know if there was going to be

5  an investigation at some point or --

6      Q.    Or when he --

7      A.    -- what the next step was.

8      Q.    -- or when exactly he did that?

9      A.    Or when --

10     Q.    Or when.

11     A.    -- or when, right.

12     Q.    Okay.

13           He -- he -- he said, Sessions and

14  Kelly will never meet on this in a

15  thousand years.  But the downstream folks will.

16           Right?

17     A.    Right.

18     Q.    That was in response to your

19  suggestion; is that right?

20     A.    Right.

21     Q.    He did note that, We sent the report

22  to -- and he puts in caps -- EVERY district

23  attorney in a named county.

24           Correct?

25     A.    Right.

1      Q.    Now, when he says "district

2  attorney," he's referring to the

3  Commonwealth's --

4      A.    The Commonwealth attorney --

5      Q.    -- attorney?

6      A.    -- I'm sure.

7      Q.    And then he says, The GOP candidates

8  already have.

9            Is he referring to the report?

10           MR. O'NEILL:  Again, I'm going to

11      object:  It calls for speculation.

12      A.    I don't know.

13           MR. O'NEILL:  You can answer, to the

14      extent you know.

15      A.    It's what he says, I mean . . .

16      Q.    Well, you had suggested sending a

17  copy of either the report itself or this other

18  cover letter resolution --

19      A.    Resolution, right.

20      Q.    -- referencing your -- the report's

21  findings to GOP candidates, right?

22      A.    Right.

23      Q.    And then he responds to that by

24  saying, The GOP candidates already have.

25           Right?

1      A.    Yeah.  I don't know what he --

2      Q.    So --

3      A.    -- meant by that.

4      Q.    -- do you interpret -- well, do you

5   interpret that to mean --

6      A.    I interpret it to mean that he

7   probably sent it to John Adams, but . . .

8      Q.    Right.

9            But, essentially, some GOP candidate,

10  whether it's one or multiple, has some

11  information that is related to the findings of

12  the Alien Invasion II report?

13     A.    Right.

14           MR. O'NEILL:  Again, I'm --

15     Q.    That's his interpretation?

16     A.    Yeah, I just don't know.

17     Q.    Okay.

18           (VVA Deposition Exhibit Number 31,

19            E-mail string, Bates stamped

20            PILF-ADAMS-0038093 through

21            PILF-ADAMS-0038094, marked for

22            identification, as of this date.)

23           MR. TEPE:  The court reporter has

24   marked and handed to the witness

25   Exhibit 31.

1        Q.    Do you recognize this?

2        A.    Yes.   It was my response back after I

3   had responded to the Noel and Logan request for

4   the data.

5        Q.    So the exhibit we were just looking

6   at, where you started with an e-mail responded

7   to by Mr. Adams, this is now the next response?

8        A.    Right.

9        Q.    And this is from you back to --

10       A.    I just was --

11       Q.    -- Mr. Adams?

12       A.    -- asking him if he wanted his own

13   copy of the stuff.

14       Q.    Right.

15             He said, I sent copies to Noel and

16   Logan.

17             Right?

18       A.    Right.

19       Q.    And this is referring to the 5,556 --

20       A.    Right, the spreadsheet.

21       Q.    -- that spreadsheet.

22             And then you asked, Let me know if

23   you need me to send you one also.

24       A.    Right.

25       Q.    Okay.   Do you recall if you sent him

```
 1   one?
 2        A.    I don't think so.  But I'm sure that
 3   Noel or Logan probably forwarded it to him.
 4        Q.    Are you aware of any other instances
 5   in which Mr. Adams may have met with law
 6   enforcement?
 7        A.    Not a bit.
 8        Q.    I'm sorry.  Say that again.
 9        A.    Not a bit.
10        Q.    Not a bit?
11              Are you aware of any instances in
12   which someone else affiliated with PILF met with
13   law enforcement?
14        A.    I couldn't hear you.
15        Q.    I'm sorry.
16              Are you aware of any other instances
17   in which anyone affiliated with PILF, besides
18   Mr. Adams, met with law enforcement --
19        A.    No.
20        Q.    -- about Alien Invasion findings?
21        A.    No.
22        Q.    Are you good?
23        A.    I'm good.
24              MR. O'NEILL:  Okay.
25              Counsel, can we go --
```

1        MR. TEPE:  Yeah.

2        MR. O'NEILL:  -- five minutes just

3   off the record?

4        I just have to use the --

5        MR. TEPE:  Yeah, not a problem.

6   It's a good --

7        MR. O'NEILL:  -- I'm just going to

8   hit the restroom.

9        MR. TEPE:  -- spot because --

10       MR. O'NEILL:  Okay.

11       MR. TEPE:  -- we're transitioning --

12       MR. O'NEILL:  Okay.

13       MR. TEPE:  -- to another topic.

14       THE VIDEOGRAPHER:  The time is 3:42,

15   and we are off the record.

16              -  -  -

17       (Whereupon, a recess was taken from

18        3:42 p.m. to 3:50 p.m.)

19              -  -  -

20       THE VIDEOGRAPHER:  The time is

21   3:50 -- sorry.

22       Technical difficulties.

23       The time is 3:50.  We are back on

24   the record.

25

1    BY MR. TEPE:

2        Q.    Mr. George, you had mentioned a

3    number of times an outfit called

4    Middle Resolution, correct?

5        A.    Right.

6        Q.    And they helped you with the voting

7    history analysis?

8        A.    Right.

9        Q.    What is Middle Resolution?

10       A.    I think it's a PAC.

11       Q.    What's a PAC?

12       A.    A political action committee.

13       Q.    They donate to political candidates?

14       A.    I think they have, yes.

15       Q.    Middle Resolution only donates to

16   Republican political candidates, correct?

17       A.    Probably more conservative.  They

18   probably --

19       Q.    Conservative --

20       A.    -- probably tend to wind up being a

21   Republican, but more or less conservative.

22       Q.    Conservative Republicans candidates?

23       A.    Right.

24       Q.    When did you first become acquainted

25   with them?

1      A.    My first acquaintance with them was

2  with Nancy Smith.  She was a -- a chairman at

3  the Federation -- Tea Party Federation, and I

4  was on the program to talk about voter fraud,

5  starting up the Virginia Voters Alliance.

6  That's when I first met her, and that was

7  probably in 2009.

8      Q.    With regard to the work that

9  Middle Resolution did for the Alien Invasion

10  reports, did they express any concerns to you

11  about that work?

12      A.    I seem to remember an e-mail from

13  Nancy just wondering if there was any exposure

14  that they might have.  I was not the right

15  person to ask.  I think Christian actually

16  responded to her.

17             (VVA Deposition Exhibit Number 32,

18              E-mail string, Bates stamped

19              PILF-ADAMS-0013087 through

20              PILF-ADAMS-0013089, marked for

21              identification, as of this date.)

22             MR. TEPE:  The court reporter has

23      marked and handed to the witness

24      Exhibit 32.

25      Q.    Do you recognize this document?

1      A.    I'm sorry?

2      Q.    Do you recognize this document?

3      A.    Yes.

4      Q.    It's an e-mail correspondence

5  involving you and Christian Adams and folks from

6  Middle Resolution; is that right?

7      A.    Right.

8      Q.    So it begins with an e-mail from you

9  on April 3rd of 2017, correct?

10     A.    Right.

11     Q.    And it's directed to Johnson and

12 Adams, and it copies Nancy Smith and

13 Craig DiSesa and Steve Mond, correct?

14     A.    I think I'd received a phone call

15 from Nancy and sending them an e-mail based on

16 my conversation with them.

17     Q.    And so Smith, DiSesa and Mond -- were

18 they all affiliated with Middle Resolution?

19     A.    Yeah, Craig DiSesa is the president.

20 Steve Mond is their techy person.  And then

21 Nancy is kind of a executive -- she's a member

22 of the executive committee; I'm not sure what

23 other position she holds.

24     Q.    And you wrote, Noel/Christian:

25 Middle Resolution is asking what exposure they

1    may have by helping PILF do the voting history

2    analysis.

3              Do you see that?

4         A.    Right.

5         Q.    All right.  And is this referencing

6    what you had recalled --

7         A.    Right --

8         Q.    -- two questions ago --

9         A.    -- based on the spreadsheets that I

10   was giving them.

11        Q.    And -- and Mr. Adams responds,

12   Reagan — what kind of exposure?  I don't have an

13   answer, and we cannot advise.

14             Do you see that?

15        A.    Yeah, I was -- stated like an

16   attorney.

17        Q.    And then you respond, Nancy/Craig, Do

18   you have several examples where you think MR

19   could be exposed?

20        A.    Right.

21        Q.    And then Nancy Smith responds in an

22   e-mail, also on April 3rd, correct?

23        A.    Right.

24        Q.    And if I'm understanding this

25   correctly, in the second paragraph, she says,

1    What I'm wondering is whether they need some

2    clearance from their PAC counsel if there's any

3    questions as to the, quote, management/accuracy,

4    closed quote, of the voter history.

5              Is that right?

6         A.    Right.

7         Q.    So am I -- was it your understanding

8    that she was wondering, If someone were to

9    challenge the accuracy of the voting history, do

10   we, Middle Resolution, have any exposure?

11        A.    I think that was one of her

12   questions.

13        Q.    Were there other questions or

14   concerns that she had?

15        A.    No.  I think she was just wondering,

16   you know, what if there's a mistake, or

17   whatever, I guess.  They do obtain their file

18   directly from the State Board and not from,

19   like, a Republican party, kind of a thing.  It's

20   directly from the State Board.  So . . .

21        Q.    So her concern was based on the

22   accuracy of the data, the voting history data;

23   is that right?

24        A.    Right.

25        Q.    Did she have any concern about

1    whether using the voter history data for the

2    Alien Invasion project was proper?

3              MR. O'NEILL:  Objection.

4              To the extent -- to the extent you

5         know --

6         A.    Yeah, I don't know --

7              MR. O'NEILL:  -- you can answer.

8         A.    -- I don't know what else was in her

9    mind.

10        Q.    Did you have -- strike that.

11             Were there any other concerns, other

12   than this one about accuracy, that were

13   expressed by Middle Resolution to you?

14        A.    No, not to my knowledge.  They do

15   have an in-house counsel, by the way, so I don't

16   know how he was involved with this.

17        Q.    But after April 3rd, which is the

18   date of this e-mail, they continued to do work

19   on the Alien Invasion project, correct?

20        A.    Could you speak up a little bit?

21        Q.    I'm sorry.

22             After this e-mail on April 3rd,

23   Middle Resolution continued to work on the --

24        A.    Right.

25        Q.    -- voting history project for

1    Alien Invasion, correct?

2         A.    I think they were in the middle of

3    doing it -- the 5,500 list that I provided them.

4         Q.    You respond to her concerns in the

5    following e-mail.  The -- the question I want to

6    ask is, in the first sentence, you say, I have

7    talked with a friend of mine that is an attorney

8    and a friendly registrar.

9              Do you see that?

10        A.    Right.

11        Q.    Who is the friend -- friendly

12   registrar?

13        A.    This was probably Alex Ables.  I

14   don't know if he's an attorney.  I know he at

15   some point worked at the State Board

16   of Elections.  I just -- I think he was an

17   attorney, but I just don't know.

18        Q.    So it was probably Alex Ables, is

19   your testimony?

20        A.    But he is -- if it was Alex, it

21   was -- I mean, he's -- I -- I consider him a

22   friend, and if I needed a question answered

23   about a process that the State does, then he

24   would be the person I'd go to.

25        Q.    Did Middle Resolution provide any

1    funding for work on the Alien Invasion reports?

2         A.    No, just the resource of their voter

3    history.

4         Q.    Has VVA worked with Middle Resolution

5    on any other initiatives or projects?

6         A.    They've run some studies for me using

7    the data -- voter registration data and the

8    voter history.

9              One of the things that we looked at

10   was -- besides the dead voters -- they also

11   helped me with that when -- I think we talked

12   about that very early on, but Steve ran a list

13   of what I would call "never-ever voters."  These

14   are people that have been on the voter rolls for

15   20 years and never darken the door of a precinct

16   to do anything.

17             There's a Federal law that requires

18   that after two Federal elections, they can find

19   out if that person is even still alive or in the

20   state, or whatever, and if they are, then they

21   can mark them as inactive, keep them on the

22   voter rolls for another two Federal elections,

23   and then they can remove them.

24             So, you know, these people have been

25   out there for 20 years and never voted for

1    anything why isn't the State Board of Elections

2    following up with them and at least marking them

3    as inactive and then reviewing them?

4              I also had them look at people that

5    were marked inactive but never removed.  So it's

6    a game they play.  They mark voters as inactive,

7    which means after two Federal elections, they're

8    supposed to remove them, and they don't.

9              So that would be another study I had

10   them do.

11             They also participate in the state

12   cross-check, where there's about 28, 29, maybe

13   30-some-odd states that pool their data with the

14   Kansas Secretary of State, and then they get a

15   list back from that pooling of data, and at last

16   count, there were, like, 383,000 voters that

17   were still registered in Virginia as well as in

18   one of the other states that participate.

19             So that would be another study that I

20   would look at.

21             I mentioned about the birthdates,

22   where we had 53 people over 116 years -- years

23   old.

24             So there's things like that that

25   Middle Resolution would help me with.

1      Q.    So I guess the answer to my question

2    was, yes, there are other initiatives that VVA

3    has worked with Middle Resolution on?

4      A.    Yeah.

5      Q.    Has Middle Resolution ever provided

6    you with funding?

7            MR. O'NEILL:  I'm going to object:

8        I think that's asked and answered.

9            But go ahead, you can answer.

10     A.    Yeah, we never solicited funds.  I

11   think at one point, Craig DiSesa made a personal

12   contribution for a project we had over in

13   Maryland, where we had noncitizens that were

14   basically on the jury pool.  So they would claim

15   to be noncitizens, couldn't serve on jury duty

16   because they were noncitizens.  And we

17   had years, like nine or 10 years, of people that

18   had claimed that, and we had an attorney over

19   there that wanted to take them to court, and I

20   think Craig maybe contributed to that project.

21   But for us, it was just money in/money out.

22   So . . .

23            (VVA Deposition Exhibit Number 33,

24             Virginia Voters Alliance, Plans and

25             Budget 2017, Bates stamped MR-000136

Page 240

1              through MR-000141, marked for

2              identification, as of this date.)

3         MR. TEPE:  The court reporter has

4     handed to the witness a document marked as

5     Exhibit 33.

6     Q.    Do you recognize this document?

7     A.    Yes.  This was a presentation that I

8  made to Middle Resolution just to show them kind

9  of some of the plans that I had.

10    Q.    This is a -- a request by VVA for

11 Middle Resolution -- excuse me.

12              Let me strike that and start again.

13              This is a request by VVA to

14 Middle Resolution for funding, isn't it?

15    A.    Yeah, based on the plans that I had

16 for that year, again, it was going to be money

17 in/money out, but they asked me to put together

18 a budget, and that type of thing, which I did.

19 But it wasn't funded.

20    Q.    I thought you just testified that you

21 never solicited funds from Middle Resolution.

22    A.    This is probably the first time I was

23 asked to -- to do something like that.

24 Middle Resolution had decided that voter fraud

25 was going to be one of their emphasis or one of

1    their priorities, so they asked me to put

2    together kind of a plan for the year.

3         Q.    So when you testified that you never

4    solicited funds from Middle Resolution, that was

5    not correct?

6         A.    In that case, no.

7         Q.    At the end of your letter -- it's

8    signed -- well, let me strike that.

9              So this exhibit, you said, was sort

10   of a document outlining VVA's plans, right, for

11   various initiatives?

12        A.    Yeah, it was kind of a wish list,

13   more or less.

14        Q.    And then at the very end of this

15   planning document, before it says, Sincerely,

16   Reagan George, it refers to this as a, quote,

17   Request for funding from Middle Resolution PAC,

18   closed quote.

19             Right?

20        A.    Right.

21        Q.    Okay.

22             So were there other requests for

23   funding from Middle Resolution PAC that you --

24        A.    No.  No, this was the only one.

25        Q.    And you said that you never received

1    any funds, correct?

2         A.    Right.

3         Q.    One of the things covered in this

4    planning document -- well, strike that.

5              Do you know when this planning

6    document was draft -- drafted?

7         A.    I don't know the precise date.

8         Q.    Well, the header says Virginia Voters

9    Alliance, Plans and Budget  --

10        A.    2017.

11        Q.    -- for 2017.

12        A.    I would assume it was probably

13   towards the end of 2016.

14        Q.    And one of the things you have here

15   is under the header Current and Potential

16   Lawsuits, A Report on Alexandria General

17   Registrar.

18             Do you see that?

19        A.    I'm sorry.  Where is that?

20             MR. O'NEILL:  (Indicating).

21        A.    Oh, okay.

22        Q.    And it references the -- the

23   lawsuit --

24        A.    Right.

25        Q.    -- that was filed against Alexandria,

1    right?

2         A.    Right.

3         Q.    In this you say, Following the

4    Court's instructions to work with the registrar,

5    we found a list of voters removed from VERIS.

6         A.    Right.

7         Q.    And we've discussed that multiple

8    times today, right?

9         A.    Right.

10        Q.    That's the record that you found

11   in -- in your inspection, correct?

12        A.    That's right, for the eight counties

13   that we talked about earlier.

14        Q.    Right.

15              And then it says that there --

16   there -- you're still pursuing this issue and

17   that there are other counties who are, quote,

18   lawsuit candidates, right?

19        A.    Yes.  They have between 99 and

20   104 percent registration --

21        Q.    Okay.

22        A.    -- nothing's happened on that either.

23        Q.    Right.

24              So in this -- this references the

25   sort of 85 people who cast votes from the --

1    about 200 -- it says 250 votes here, based on

2    the data you got from the eight counties, right?

3         A.    Right.

4         Q.    So is it fair to say that this

5    document was probably drafted sometime after

6    Alien Invasion I?

7         A.    Probably so, and before Alien II.

8         Q.    And probably sometime before the

9    start of 2017?

10        A.    Right.

11        Q.    And then on the fourth page, you have

12   a little chart here that says Virginia Voters

13   Alliance Budget Proposal for 2017.

14        A.    Right.

15        Q.    And -- and is this listing a bunch of

16   potential initiatives?

17        A.    Possible expenditures for various

18   things, right, that I've mentioned in the

19   previous.

20        Q.    Right.

21             And then in the columns to the right,

22   are these estimates of how much these

23   initiatives would cost?

24        A.    Right.

25             (VVA Deposition Exhibit Number 34,

1                    E-mail string, Bates stamped

2                    MR-000164, marked for

3                    identification, as of this date.)

4             MR. TEPE:  The court reporter has

5        just marked as Exhibit 34 an e-mail

6        between Cate Bach and Nancy Smith.

7        Q.    Is that right?

8        A.    Right.

9        Q.    Now, you testified that you never

10   received any funding from Middle Resolution,

11   correct?

12                  That's what --

13       A.    We received funding on this one item,

14   but we never could get the thing purchased

15   through the Department of Commerce, I believe,

16   so I sent the money back to Middle Resolution.

17       Q.    So when I asked you if you received

18   any funding from Middle Resolution and you said

19   no, that's not entirely accurate, is it?

20       A.    Right.  I got some, and then I sent

21   it back to them because we could never --

22   Obama Administration had put a bunch of hurdles

23   in our way to try to get the Death Master File.

24   They raised the price.  They had made it

25   required to do some kind of certification

1    effort.

2              Couldn't find anybody to do the

3    certification, so it just eventually died a slow

4    death.

5        Q.    So on January 12th, Nancy sends an

6    e-mail to, I think, Cate Bach or perhaps others

7    at Middle Resolution.  She writes, I discussed

8    with Reagan our preferences for funding his

9    voter integrity initiative --

10             Do you see that?

11       A.    Right.

12       Q.    -- Based on our discussion, funding

13   Items Numbers 1, 3 and 5 would equal $5,675.

14             Correct?

15       A.    Right.

16       Q.    And Items 1, 3 and 5 -- does that

17   reference the previous exhibit --

18       A.    Right.

19       Q.    -- and the chart that has a list of

20   initiatives?

21       A.    Right.

22       Q.    And then revised costs are on the

23   Death Master File against the VA file would be

24   2,000 instead of 3,000, right?

25       A.    Right.

Page 247

1        Q.    Okay.  Now, Cate Bach writes back on

2   January 23rd.  She says, I -- quote, I cut

3   VA Voters Alliance's check today, closed quote.

4             Did you get that check?

5        A.    I got the check.

6        Q.    Did you deposit it?

7        A.    I don't remember if we deposited it

8   or not.  I think we deposited it and then I

9   wrote them a check to refund the money.

10       Q.    All the money?

11       A.    Yes.  By that time, we had a

12  Democratic Governor, which told me there was no

13  need to do the lobbying at the P&E committees

14  because anything they passed was going to get

15  vetoed by Northam, so why bother?  And then we

16  couldn't -- we worked with Dave Brat, trying to

17  get the restrictions on the Death Master File

18  removed by Department of Commerce.  That didn't

19  happen, so there was no need to continue holding

20  the money.

21       Q.    Other than Middle Resolution and

22  PILF, and ever so briefly Mr. Damon, did anyone

23  else work with VVA on the issue of purported

24  noncitizen voting in Virginia?

25       A.    No.

```
 1                    (VVA Deposition Exhibit Number 35,

 2                     E-mail string, Bates stamped

 3                     PILF-ADAMS-0043845 through

 4                     PILF-ADAMS-0043848, marked for

 5                     identification, as of this date.)

 6               MR. TEPE:   The court reporter has

 7         marked and handed to the witness

 8         Exhibit 35.

 9         A.    Okay.

10         Q.    Do you recognize this document?

11         A.    I don't, but it was addressed to her,

12    copied to me --

13         Q.    Well, it appears --

14         A.    -- or, rather -- wait.  I

15    copied it -- I sent it, and then I copied myself

16    on it.  That's the way it was.

17         Q.    It appears to be a meeting

18    invitation --

19         A.    Right --

20         Q.    -- or a calendar --

21         A.    -- Webinar kind of a thing.

22         Q.    -- or a calendar invite --

23         A.    Yeah, I don't remember how --

24         Q.    -- do you do those?

25         A.    -- how it was sent, but it --
```

1      Q.    Or -- or was this just an e-mail?

2      A.    It was just a GoToMeeting Webinar

3   kind of thing.

4      Q.    Okay.  So you sent an e-mail, it

5   appears, on Wednesday, November 30th, 2016, at

6   7:54 p.m., right?

7      A.    Right.

8      Q.    And it contained a GoToMeeting link

9   and an agenda for a meeting the following day at

10  4 p.m.; is that right?

11     A.    It looks like it.

12     Q.    And in that agenda, if you turn to

13  the second page, there's a list of topics,

14  correct?

15     A.    Right.

16     Q.    Now, before we get to those topics,

17  so you sent this meeting invite to Mr. Adams,

18  correct?

19     A.    Yes.

20     Q.    To Michael J. O'Neill.

21           Who is that?

22     A.    (Indicating).

23           My counselor.

24     Q.    So your counsel is also a witness, in

25  this instance anyways, correct?

1          MR. O'NEILL:  Objection.  That calls

2     for a legal conclusion.

3          You can answer, to the extent you

4     know.

5     A.    Yeah, this was just a broadcast to

6  people that I knew that were interested in voter

7  fraud.

8     Q.    Also, this was sent to Clara Belle

9  Wheeler, correct?

10    A.    Right.

11    Q.    Keith Damon?

12    A.    Right.

13    Q.    Craig DiSesa?

14    A.    Right.

15    Q.    Nancy Smith?

16    A.    Right.

17    Q.    They're both with Middle Resolution,

18  right?

19    A.    Right.

20    Q.    Someone named Chris Wright?

21    A.    Right.

22    Q.    Who is that?

23    A.    He's one of the guys I mentioned that

24  was through the inspection of Alexandria.

25    Q.    Does he have some political

1    connection, or what's his role?

2         A.    He's one of the leaders of the

3    Potomac Tea Party in Alexandria.

4         Q.    And Chris Marston -- who is that?

5         A.    Chris Marston is the counsel for RPV,

6    Republican Party of Virginia, corporate counsel.

7         Q.    For this meeting, one of the points

8    on the agenda is Legislative Possibilities for

9    Virginia's 2017 General Assembly.

10        A.    Right.

11        Q.    And then it has, in parentheses,

12   PowerPoint slides.

13              Are these PowerPoint slides that you

14   sent out?

15        A.    I don't know if they were mine or

16   somebody else's.  I just don't remember.

17        Q.    The second point is Election Law,

18   Lawsuits, Current and Planned?

19        A.    Right.

20        Q.    The first subbullet under that is

21   Public Interest Legal Foundation?

22        A.    Yeah.  This was the Alexandria

23   lawsuit that we were starting to participate in.

24        Q.    Well, this is in November of --

25   nearly December.  It's November 30th, 2016.

1              That lawsuit was over, correct?

2      A.    Right.

3      Q.    The -- the Alexandria suit is

4  mentioned but also mentioned that it was

5  dismissed, right?

6      A.    Right.

7      Q.    Then another subbullet about Possible

8  New Related Filings?

9      A.    Right.  There was a list of counties

10 that had more people registered than they had

11 people.

12     Q.    So this is what you mentioned before,

13 there was --

14     A.    Yeah, this was mainly just a

15 discussion as to kind of what's possible, what

16 should we look at, what should we avoid, that

17 type of thing.

18     Q.    Right.  And then the third subbullet

19 is Discovery of Noncitizens Removed from VERIS.

20           Do you see that?

21     A.    Right.

22     Q.    And this, I guess, summarizes some of

23 the points that we've discussed today --

24     A.    Bringing people up to date on the

25 status.

1      Q.    -- seven of 20 counties, provided

2    their lists, you've got some numbers.

3             Again, we see the number 100 -- 1,007

4    voters.

5             Do you see that?

6      A.    Right.

7      Q.    And this is the number of voters on

8    the VERIS cancelation reports that you had

9    gotten to date; is that correct?

10     A.    Right.

11     Q.    And then reference to new lawsuits

12   filed against Chesterfield and Manassas to

13   obtain their VERIS reports; is that right?

14     A.    Yes.  That was done by PILF.

15     Q.    And then underneath that, it says, at

16   the top of the next page, PILF needs several

17   amicus briefs to be submitted.

18             Right?

19     A.    Right.

20     Q.    And then underneath that, Landmark

21   Legal Foundation?

22     A.    Right.

23     Q.    Is that in reference to amicus briefs

24   or something else?

25     A.    I'm not sure what the "amicus briefs"

1    was referring to.  I'm looking at this now.

2         Q.    Yeah, it's hard to tell because the

3    bullets, instead of being indented --

4         A.    Yeah, it may have been in regard to

5    the two lawsuits that PILF had filed against

6    Chesterfield and Manassas, but I think what

7    happened there, one of them -- I think

8    Chesterfield lost the lawsuit and then Manassas

9    complied because they didn't want to spend the

10   money to defend something that had already been

11   decided.

12              That's probably what this -- amicus

13   briefs we're talking about.

14        Q.    And then Landmark Legal Foundation,

15   there are a couple of bullets there.

16              Do you know what that was about?

17        A.    Just looking at inactive voters that

18   had never been removed --

19        Q.    And --

20        A.    -- I was fishing to see if I could

21   get somebody to bite on filing a state lawsuit.

22        Q.    And -- and your counsel here today,

23   Mr. O'Neill, is from Landmark Legal Foundation,

24   right?

25        A.    Right.

1      Q.    There's another, I guess, subbullet,

2   RPV, in parentheses, Ed Gillespie.

3            Do you see that?

4      A.    Yeah.

5            I was seeing if I could get

6   Ed Gillespie interested in -- in helping with

7   this.  These were the 641,000 active, registered

8   voters that have never ever voted.  They've

9   never been made inactive.  They've never been

10  put into the hopper to be removed.

11           The idea there was it's a

12  merchantability problem, because when people are

13  running a campaign and they buy the State Board

14  list and they wind up getting 641,000 active

15  voters that they send postcards to, that costs

16  them a lot of money -- whether you're a Democrat

17  or Republican, you still have to pay the -- the

18  money, so could we sue the State Board on a

19  merchantability issue.  There was a question

20  about that.

21     Q.    Do -- do you recall if everyone who

22  was invited to this meeting attended it?

23     A.    I don't.  I don't think we kept an

24  attendance list or anything.

25     Q.    Were these meetings held regularly?

Page 256

1      A.    No.

2            MR. O'NEILL:  Objection: form.

3            MR. TEPE:  What's -- what's the

4      "form"?

5            MR. O'NEILL:  Well, object to form.

6      "Meetings," mischaracterizes testimony.

7      You said "meetings."

8            MR. TEPE:  Okay.

9      A.    This was actually the first one I

10     ever conducted, so it's not . . .

11     Q.    Have you conducted one since?

12     A.    No.

13     Q.    What was the reason for having this

14     one?

15     A.    Just to try -- because we now had

16     another Democratic Governor, I just wanted to

17     see what we could do to force the State Board to

18     comply with the law.

19     Q.    We had talked earlier today about the

20     fact that VVA was served with a subpoena for

21     documents, right?

22     A.    Right.

23     Q.    And did you accept service of that

24     subpoena?

25     A.    I did.

1      Q.     Was it Exhibit 2 that we marked as

2  the document subpoena?

3              It's the bottom of the pile.

4              Okay.  So Exhibit 2 --

5              MR. O'NEILL:  I think it might just

6        take him a second.

7              THE WITNESS:  I got it.

8              MR. O'NEILL:  You got it?

9              Okay.

10     Q.     -- is a copy of the document subpoena

11  that VVA received, correct?

12     A.     Yes.

13     Q.     Did you search for documents

14  responsive to that subpoena?

15     A.     I did.

16     Q.     What did you do?

17     A.     For the e-mails I was going through,

18  I use Outlook, and I created a text file, and

19  then I also created a PST file at your request.

20  These were "PILF," "Christian," "alien" type of

21  a search, type of a thing.

22     Q.     Okay.  So you -- you searched

23  Outlook.

24              Did you search your inbox?

25     A.     Yeah, I searched everything.

1      Q.    Did you use search terms?

2      A.    I'm sorry?

3      Q.    Did you use search terms?

4      A.    I'm not sure what that is.

5      Q.    Okay.

6      A.    I just used the search facility in

7  Outlook.

8      Q.    You put terms into --

9      A.    Right.

10     Q.    -- the search functionality --

11     A.    Right.

12     Q.    -- of Outlook?

13     A.    From "Christian," from "PILF" -- you

14  know, was there anything in any of the body of

15  the e-mails that had the word "alien" in it, and

16  put all of those into a folder.

17     Q.    And you produced some documents,

18  correct?

19     A.    Produced some documents as far as

20  spreadsheets, articles, that type of thing.

21     Q.    Did you search your Outbox in

22  Outlook?

23     A.    I don't believe I did.

24     Q.    Why not?

25     A.    Probably just didn't think about it,

1    just everything that I was receiving from

2    people.

3         Q.    The subpoena requested --

4         A.    I tend not to keep stuff in my Outbox

5    anyway.  So . . .

6         Q.    -- the subpoena requested any

7    documents in your possession.

8              So we did notice that you did not

9    produce a single e-mail that you sent --

10        A.    Right.

11        Q.    -- and as we've seen today, you have

12   sent a number of e-mails that are responsive.

13        A.    I'm sorry?

14        Q.    And as we've seen today, you have

15   sent --

16        A.    Oh, right, right.

17        Q.    -- a number of e-mails that are --

18        A.    Right.

19        Q.    -- responsive?

20              So the first thing we're going to do

21   is going to request a search of your Outbox --

22        A.    Okay.

23        Q.    -- of those documents to be produced.

24              Do you -- you mentioned some of the

25   terms you used for searching.

1          Do you have a list of the terms you

2     used?

3          A.     Mainly it was just those three.

4          Q.     "Those three" being "alien"?

5          A.     The word "alien," "Christian" and

6     "PILF."

7          Q.     Do you, by chance, know how many

8     e-mails are in your Outlook, both Out -- Sent

9     and Received?

10         A.     No.  Lots.

11         Q.     Did you search your hard drive --

12    computer hard drive for documents?

13         A.     I searched the various folders that I

14    have set up for VVA.

15         Q.     So you have folders on your computer

16    hard drive for VVA?

17         A.     Right.

18         Q.     And you searched in those folders?

19         A.     The same thing: looked for

20    "Christian" and "PILF" and "alien."

21         Q.     And was this your home computer?

22         A.     Yes.

23         Q.     Do you have VVA-related documents

24    saved anywhere else other than your home

25    computer?

1       A.      No.

2       Q.      Any cloud storage?

3       A.      No.

4       Q.      Laptops?

5       A.      Well, it is a laptop that I use.

6       Q.      Flash drives?  USB drives?

7       A.      My USB drives are mainly -- if I was

8   going to go to a -- like, a Tea Party facility

9   to do my presentation, I might copy my

10  presentation off to a thumb drive and take it

11  with me in case I need it as a backup, but that

12  would be about it --

13      Q.      Would a copy --

14      A.      -- I don't use it as a normal backup.

15  I use a product called Carbonite.  It's an

16  off-site backup storage.

17      Q.      I'm sorry.  What was that called

18  again?

19      A.      It's Carbonite.

20      Q.      C-A-R-B-O-N-I-T-E?

21      A.      I-T-E.

22              It does everything automatically.

23              I had to restore -- I can't remember

24  now exactly what date, but I actually received

25  one of these ransomware "good deals" that locked

1   out my computer, so I had to work with PC Matic,

2   who's my vendor for viruses, and stuff, to get

3   that taken off, and then I had to go back to

4   Carbonite to get everything pulled back over.

5   It took forever.

6           Q.      The presentations, and things, on the

7   flash drive or USB drive that you mentioned,

8   would a copy of those also be on your computer

9   hard drive?

10          A.      Right.

11          Q.      Do you text?

12          A.      Not very much, mainly my daughter and

13  my son.  They're the texters.  They would rather

14  get a text from me rather than a phone call, for

15  some reason.  So . . .

16          Q.      Kids today.

17          A.      Yeah.

18          Q.      Do you recall sending or receiving

19  any texts about Alien Invasion?

20          A.      No, mainly e-mails.

21          Q.      What about Facebook messages?  Do you

22  have any Facebook messages?

23          A.      I try not to get on Facebook that

24  much.  I -- I -- I'll post something to

25  Facebook, but as far as messaging back and forth

1   and stuff, my wife gets on me.  She sends me

2   stuff on Facebook, and I never even look at it.

3   So . . .

4        Q.    Would there be any responsive

5   documents, you believe, in your Facebook

6   messages?

7        A.    I doubt it.  I very seldom ever get

8   anything as a message like on the Virginia

9   Voters Alliance group.

10       Q.    Do you have any hard-copy documents

11  that you keep for VVA?

12       A.    What are you referring to?  I don't

13  know.

14       Q.    Paper.

15       A.    No, not really.  I mean, everything

16  that I do with -- with Jeremy is e-mails back

17  and forth because he's out of town all the time.

18  If I write an article, I might print it off and

19  just keep a copy on the paper just as more of a

20  backup than anything.

21       Q.    What about correspondence with PILF?

22  Was that primarily through e-mail?

23       A.    It would be all e-mails pretty much,

24  yeah --

25       Q.    And so that was --

Page 264

1       A.     -- that or phone calls.

2       Q.     And so that was your regular course

3   of business with PILF, was to use e-mail,

4   correct?

5       A.     Right.  Again, or phone calls.  I

6   mean, it just depends on the subject matter and

7   what I was trying to get information from.

8              Very seldom would I call Noel Johnson

9   or Logan or anybody.  Mainly it was just

10  Christian.

11      Q.     Do you have any draft reports of the

12  Alien Invasion reports with written comments on

13  them?

14      A.     No.  Those things are so big, I never

15  even printed them off.

16              (VVA Deposition Exhibit Number 36,

17               E-mail string, Bates stamped

18               PILF-ADAMS-0041461 through

19               PILF-ADAMS-0041462, marked for

20               identification, as of this date.)

21              MR. O'NEILL:  What number are we at?

22              THE COURT REPORTER:  Thirty-six.

23              MR. O'NEILL:  Thirty-six.

24              MR. TEPE:  The court reporter has

25          handed the witness a document that's been

1        marked as Exhibit 36.

2        Q.    Mr. George, do you recognize this

3    document?

4        A.    Sure.

5        Q.    What do you recognize it to be?

6        A.    It's an e-mail between you and I.

7        Q.    It's dated February 7th; is that

8    right?

9        A.    Right.

10        Q.    And in this e-mail from you to me on

11    February 7th, you state, I have produced every

12    document requested in your subpoena.

13            Do you see that?

14        A.    Right.

15        Q.    That's not a true statement, is it?

16        A.    It was at the time I wrote it, but

17    since you mentioned the Outlook or the Outbox

18    Sent messages, I didn't do those.  I just

19    completely overlooked them.

20        Q.    You also produced responsive

21    documents after February 7th, correct?

22        A.    Yeah, there was something about an

23    article that I wrote, that you referenced, to

24    Bull Elephant.  The reason I wouldn't have found

25    it is that I didn't mention the Alien report in

1    it, nor did I mention Christian or PILF.

2          I went back and read it.  I mentioned

3    the findings that we made, the 5,000, 1,800, and

4    all that, but in the paragraph that I wrote, it

5    didn't say anything about the Alien report, so I

6    would have never picked it up based on what I

7    was searching.

8        Q.    And you also produced two very large

9    spreadsheets, correct?

10       A.    Right.

11       Q.    On --

12       A.    I guess I assumed you probably had

13   gotten those from Christian already.  I didn't

14   think about sending them to you, until you

15   mentioned it.

16       Q.    Well, I think what I'm driving at is,

17   is as of today, it's been established that this

18   is not an accurate statement.

19       A.    Right.

20       Q.    We mentioned briefly earlier some

21   communications with Mr. Adams regarding the

22   subpoenas to you; is that right?

23       A.    That I called him and told him that I

24   had received one -- a subpoena, right.

25       Q.    Have you had other discussions with

1    him about this lawsuit?

2              MR. O'NEILL:  I'm going to object.

3         I'm going to direct my client not to

4         answer that on the basis of

5         attorney-client privilege.

6              MR. TEPE:  Whether or not he's had

7         discussions about this lawsuit with

8         Mr. Adams is not privileged.

9         Q.    You can answer.

10             MR. O'NEILL:  I'm going to direct

11        you not to answer on the basis that

12        Mr. George has considered his relationship

13        with Mr. Adams originating from the

14        initiation of the lawsuit in Alexandria to

15        be an attorney -- to be -- Mr. Adams to be

16        representing and counsel for VVA.

17             MR. TEPE:  This deposition has been

18        filled with conversations with -- between

19        Mr. George and Mr. Adams.  So even if that

20        was a valid basis for an objection here to

21        this question, it has been waived --

22             MR. O'NEILL:  I --

23             MR. TEPE:  -- dozens of fold.

24             MR. O'NEILL:  -- I believe, to the

25        extent to which it refers to records that

1    have been produced and exhibits that have

2    been entered into the record, the

3    questions regarding communications between

4    Mr. George and Mr. Adams have been

5    regarding -- are -- have all centered on

6    the subject matter of exhibits entered

7    into the record and produced.

8          I will -- to the extent that

9    attorney-client privilege has been waived,

10   it's been waived to -- applicable to those

11   exhibits, not to the general conversations

12   that have been -- been produced between

13   Mr. George and Mr. Adams.

14         If -- if you would like to ask --

15   answer questions -- ask questions about

16   records that have been produced and

17   exhibits that have been entered into the

18   record, or communications between

19   Mr. George and Mr. Adams, by all means,

20   those have been -- I think Mr. George has

21   answered all of those questions.

22         However, questions -- general

23   questions that do not reference exhibits,

24   I believe, are still subject to the

25   attorney-client privilege.  And I'm going

1    to be requesting that Mr. George don't

2    answer -- not to answer those.

3         MR. TEPE:  We have had a number of

4    questions asked and answered by Mr. George

5    about conversations with Mr. Adams that

6    does not involve a particular exhibit.

7         There's absolutely no basis to your

8    objection.

9         MR. O'NEILL:  If we can go off the

10   record for five minutes and I can consult

11   with my client, I will appreciate that.

12   And then we will come back on the

13   question -- we will come back on the

14   record, and we will be prepared to

15   answer -- to -- to determine where we're

16   going to go from here.

17        Can I have five minutes to confer

18   with my client?

19        MR. TEPE:  Sure.

20        MR. O'NEILL:  Thanks.

21        THE VIDEOGRAPHER:  The time is 4:38.

22   We are off the record.

23             -  -  -

24        (Whereupon, a recess was taken from

25             4:38 p.m. to 4:53 p.m.)

```
 1                    -  -  -
 2            THE VIDEOGRAPHER:  The time is 4:53,
 3       and we're back on the record.
 4            MR. TEPE:  Okay.  So I think where
 5       we can sort of set the table again is I
 6       asked the question to Mr. George, saying,
 7       Have you had conversations with Mr. Adams
 8       about this lawsuit -- about this
 9       litigation?
10            THE WITNESS:  I think that's what
11       you asked, right.
12            MR. O'NEILL:  And I'm going to
13       object -- are you -- I'm just being clear.
14       Are you setting the table, or are you
15       asking that question to --
16            MR. TEPE:  I'm asking --
17            MR. O'NEILL:  -- Mr. George again?
18            MR. TEPE:  -- I'm asking him the
19       question again.
20            MR. O'NEILL:  Okay.
21  BY MR. TEPE:
22       Q.    And that is, Have you had discussions
23  with Mr. Adams about the lawsuit --
24            MR. O'NEILL:  Have you had
25       discussions?
```

1  Q.    -- that we're here today for?

2       MR. O'NEILL:  I'm going to object,

3  and I'm going to direct my client not to

4  answer on the basis of attorney-client

5  privilege.

6       And I'm going to establish the --

7  the reason for the objection.

8       Mr. George considered Mr. Adams his

9  attorney, and to the extent that that

10 privilege has been waived, I will -- we

11 will -- we will stipulate that it has been

12 waived regarding the subject matter of

13 records produced, so if Mr. George has

14 answered questions regarding

15 communications between Mr. Adams and

16 Mr. George that have been produced and to

17 the subject matter of those documents;

18 however, I will be objecting and directing

19 my client not to answer regarding general

20 questions concerning the subject matter

21 and the -- of conversations he has had

22 between Mr. -- between himself and

23 Mr. George -- Mr. Adams.

24      Now, as -- if counsel wants to

25 indicate that there's a -- a particular

1    communication or a particular exhibit

2    that's been entered into the record

3    between the two of those gentlemen and the

4    subject matter of that, then Mr. George

5    will be answering those questions;

6    however, he is not going to be answering

7    questions regarding -- generalized

8    questions regarding conversations between

9    he and Mr. Adams.

10           THE WITNESS:  Okay.

11           MR. TEPE:  Well, I'm -- I am unaware

12   of a legal privilege that pertains to

13   generalized conversations and not a legal

14   subject matter; I am unaware of a

15   privilege that extends to conversations

16   but not to documents.  And so I think the

17   assertion of privilege is utterly without

18   foundation.

19           MR. O'NEILL:  Fair enough.

20           MR. TEPE:   In particular, as to the

21   particular question that I was asking,

22   whether he, Mr. George, have had

23   conversations with Mr. Adams about this

24   lawsuit does not in any way get into the

25   content of those communications, even if

1          they were privileged, which they are not.

2     BY MR. TEPE:

3          Q.    So, again, I'm going to ask, have you

4     had discussions with Mr. Adams about this

5     lawsuit?

6               Yes or no?

7               MR. O'NEILL:  You -- you can answer.

8          A.    I guess yes.  I don't remember any

9     specific questions, but I know I talked to him

10    about getting the subpoena, which was a

11    surprise.

12         Q.    How many times have you spoken with

13    Mr. Adams about this --

14         A.    No --

15         Q.    -- lawsuit?

16         A.    -- no idea.  I really didn't keep

17    records or anything, just --

18         Q.    More than once?

19         A.    Possibly.  I don't know.

20         Q.    More than twice?

21         A.    I don't know.

22         Q.    More than five times?

23         A.    I don't know.

24               At one point, he was helping me try

25    to find a -- an attorney to assist me on the

1    deposition.  We had several conversations about

2    that.

3         Q.    Have you had correspondence -- not

4    discussions -- correspondence with Mr. Adams

5    about this lawsuit?

6              Yes or no?

7         A.    No; just strictly phone

8    conversations, if any.

9         Q.    Do you still have Exhibit 36 in front

10   of you?

11        A.    Somewhere.

12             MR. O'NEILL:  Can you describe it

13        just so I can find it while I'm --

14             MR. TEPE:  Oh.  It's the

15        February 7th e-mail between Mr. George and

16        myself about the subpoena.

17             MR. O'NEILL:  Gotcha.

18             THE WITNESS:  Right.

19        Q.    In this e-mail, you blind carbon

20   copied Mr. Adams, didn't you?

21        A.    Which one?

22        Q.    The exhibit that we're looking at,

23   Exhibit 36.

24             MR. O'NEILL:  Objection: vague.

25             MR. TEPE:  It's not vague at all.

1          It's a very specific question.

2                    MR. O'NEILL:  How would he know?

3                    To the extent that you understand.

4     A.    I don't remember --

5     Q.    My -- my --

6     A.    -- if I did --

7                    MR. TEPE:  Excuse me.

8                    You can -- you can object to --

9                    MR. O'NEILL:  I understand --

10                   MR. TEPE:  -- no speaking

11    objections.

12    Q.    Okay.  So let me ask the question

13    again, Mr. George.

14                   Isn't it true that you blind carbon

15    copied Mr. Adams on this e-mail to me dated

16    February 7th, which is Exhibit 36?

17    A.    I literally don't remember.

18    Q.    You don't remember?

19    A.    I don't.

20                   (VVA Deposition Exhibit Number 37,

21                    E-mail string, marked for

22                    identification, as of this date.)

23                   MR. TEPE:  The court reporter has

24    marked as Exhibit Number 37 an e-mail that

25    was filed in this lawsuit.

1      Q.    Can you take a look at that,

2   Mr. George?

3      A.    Okay.

4      Q.    This Exhibit 37 reflects the e-mail

5   in the previous exhibit that was sent by you to

6   me dated February 7th, right?

7      A.    Right.

8      Q.    And then that e-mail was forwarded by

9   Mr. Adams to his outside counsel in this

10  litigation, correct?

11     A.    That's what it looks like.

12     Q.    And does this refresh your

13  recollection that you blind carbon copied

14  Mr. Adams on the e-mail you sent to me about

15  this subpoena?

16     A.    I mean, I was e-mailing

17  Pat McSweeney, so I don't know if he was sending

18  it or I was sending it or what.

19          MR. TEPE:  We're going to request a

20          copy in native form of the e-mail in

21          question that was sent by Mr. George to

22          me.  Again, all -- we haven't received any

23          e-mails from Mr. George, so it should be

24          part of that lot.

25          MR. O'NEILL:  You haven't received

1   any e-mails from --

2           THE WITNESS:  Any ones that I sent.

3           MR. TEPE:  That he sent.

4           MR. O'NEILL:  Oh, okay.

5           Are you going to be -- are you going

6   to be filing -- you're going to be

7   submitting a supplemental to me or --

8   or . . .

9           MR. TEPE:  I'm sorry?

10          MR. O'NEILL:  Are you going to be

11  filing -- are you going to be sending me a

12  supplemental what specifically

13  you're going to -- additionally you're

14  requesting, or . . .

15          MR. TEPE:  Yeah, I mean, I think we

16  can probably do that for just clarity's

17  sake.

18          MR. O'NEILL:  Right.  I'd -- I'd

19  appreciate it.

20          MR. TEPE:  Okay.

21          MR. O'NEILL:  I mean, I think -- I

22  think where we are is you're talking about

23  Outlook and then this (indicating).

24          MR. TEPE:  We can -- we'll send a

25  letter.

1          MR. O'NEILL:  I think for clarity's

2      sake --

3          MR. TEPE:  We'll send you a letter.

4          THE WITNESS:  My Sent -- my Sent

5      folder.

6          MR. O'NEILL:  Right.  I'm sorry.

7      Outlook Sent.

8          THE WITNESS:  Right.

9          MR. O'NEILL:  Okay.

10  BY MR. TEPE:

11      Q.    But here -- here is an example of --

12  of you sending correspondence about this

13  litigation to Mr. Adams; is that right?

14      A.    Again, if I did, I just don't

15  remember.

16      Q.    You sent other correspondence about

17  this litigation to Mr. Adams, correct?

18      A.    I think I sent him a copy of the

19  subpoena, the first one, the document one.  But

20  I don't -- again, I don't remember.  I'd have to

21  go back and look at my Sent file.

22          (VVA Deposition Exhibit Number 38,

23           E-mail string, Bates stamped

24           PILF-ADAMS-0041556 through

25           PILF-ADAMS-0041557, marked for

1              identification, as of this date.)

2              MR. TEPE:  The court reporter has

3         handed the witness what has been marked as

4         Exhibit 38.

5         Q.    Do you recognize this document,

6    Mr. George?

7         A.    I remember seeing it from

8    Pat McSweeney, that he sent something to

9    Ms. Cleminshaw.

10        Q.    So this -- this -- this exhibit, 38,

11   shows an e-mail from Pat McSweeney, who was your

12   attorney at one time, correct?

13        A.    Right.

14        Q.    It's dated January 17th, correct?

15        A.    Right.

16        Q.    And it's to Nicole Cleminshaw,

17   correct?

18        A.    Right.

19        Q.    And she's one of the -- the counsel

20   for Plaintiffs, correct?

21        A.    Right.

22        Q.    And you're copied on this e-mail?

23        A.    Right.

24        Q.    Right.

25              And then above that is an e-mail sent

1    about 25 minutes later on the same day that you

2    sent to yourself, apparently.

3              Do you see that?

4         A.   Right.

5         Q.   It's from Reagan George to

6    Reagan George?

7         A.   Right.

8         Q.   But the --

9         A.   Where did the black --

10        Q.   -- e-mail begins --

11        A.   -- the blacked-out part, where did

12   that come from?

13        Q.   Well, let me -- let me finish my

14   question.

15             So the e-mail begins, Christian,

16   right?

17        A.   Right.

18        Q.   And then it's blacked out, right?

19        A.   Yeah.  I think that's where I sent

20   him --

21             MR. O'NEILL:  Again, I'm going --

22        A.   -- just a question about the

23   subpoena, because I was surprised that I got it.

24        Q.   And so you blind carbon copied

25   Mr. Adams on this e-mail; is that right?

1       A.    I may have.  I just don't remember.

2       Q.    Why did you blind carbon copy him

3    instead of just put Mr. Adams's name in the To

4    field?

5       A.    Just not sure, I guess, if I should

6    even be talking to him.  I never received one

7    before, so I didn't know what to do with it.

8       Q.    Well, this -- this is correspondence

9    in -- in January.

10           You received the subpoena in early

11   December, correct?

12      A.    I did.  This was when -- if I

13   remember correctly, Mr. McSweeney was out of

14   town during the Christmas holidays.  I couldn't

15   get in touch with him, and I was talking to

16   Christian about him, McSweeney, being my

17   attorney.  And then when Mr. McSweeney came back

18   into town and I talked to him, he told me to

19   send an e-mail to Cleminshaw about extending my

20   time from -- I think it was January

21   something -- January 7th to -- not

22   January 7th -- what was it? -- whatever the --

23   this was a Thursday, so it must have been the

24   next Monday or Tuesday after that -- to extend

25   it out to February.

1          And because I didn't have an attorney

2    at that point, I still considered Christian my

3    attorney, so I would have probably blind copied

4    him just not knowing what else to do.

5          Q.    Other than Mr. Adams, who else have

6    you had correspondence with regarding this

7    litigation?

8          A.    I think I mentioned Keith Damon

9    calling me about his subpoena, and then I think

10   I talked to Nancy and told her that I had

11   received a document subpoena.  That was really

12   about it.

13          I may have talked to Clara Belle.  I

14   don't remember.

15          Q.    About what?

16          A.    About receiving a subpoena.

17          Q.    Was that a phone call or an e-mail?

18          A.    A phone call.

19          Q.    And -- and what -- again, I'm

20   sorry -- did you discuss with Mr. Damon about

21   the subpoena?

22          A.    He just called and told me that he

23   had received one and wasn't sure why he was

24   included and he had lost his computer to a disk

25   drive failure several months ago, and I don't --

1    like six months ago, something like that, and

2    he's been struggling ever since, trying to put

3    it all back together.

4              I felt sorry for him.  That happens.

5         Q.    He told you it was six months ago?

6         A.    I can't remember exactly when it

7    happened, but evidently it was a catastrophic

8    kind of a failure on his computer.

9         Q.    Do you know Hans von Spakovsky?

10        A.    I do.

11        Q.    How do you know him?

12        A.    Mainly through the Tea Party

13   connections.  He's spoke at our Tea Party

14   several times.

15        Q.    About what subjects?

16        A.    About mainly legislation in Congress

17   about voter fraud and election law, things like

18   that.

19        Q.    Other than Tea Party events, have you

20   had conversations with Mr. von Spakovsky?

21        A.    Not from a legal standpoint.  The

22   only thing I talked to him about recently was

23   the possibility of putting together a national

24   voter election law form, I think I called it, so

25   we could talk about what we could actually do in

1    Congress, if anything.

2        Q.    And when was that?

3        A.    How long ago?

4        Q.    Yes.

5        A.    I don't know.  It's probably at least

6    six months, because I think in one of our

7    documents where I had the -- the budget for

8    2017, I had that mentioned in there as something

9    I was thinking about doing.

10        Q.    Have you ever talked to Mr. Spakovsky

11    regarding Alien Invasion?

12        A.    No.

13        Q.    Have you ever spoken to

14    Mr. von Spakovsky about noncitizen voting in

15    Virginia?

16        A.    No.

17        Q.    Have you spoken to Mr. von Spakovsky

18    about this litigation?

19        A.    The what?

20        Q.    This lawsuit.

21        A.    No.

22        Q.    How long have you known

23    Mr. von Spakovsky?

24        A.    I don't know.  Probably around 2010,

25    2011.

1       Q.    How often do you have an occasion to

2   correspond or communicate with him?

3       A.    Once or twice a year, maybe.

4       Q.    Do you know Don Palmer?

5       A.    I know him.  At one point, I think

6   when I first started in the voter fraud stuff,

7   he -- he was the secretary of the State Board of

8   Elections here in Virginia, along with

9   Charlie Judd, who was the chairman of the

10  State Board.  That was in the

11  McDonnell Administration.

12      Q.    When did you first meet Mr. Palmer?

13      A.    A face-to-face meeting.  I was at a

14  meeting in Houston with True the Vote people,

15  and he was a keynote speaker at their

16  convention.

17      Q.    When was this?

18      A.    Pardon?

19      Q.    When was this?

20      A.    I have no idea.

21      Q.    Ballpark?

22      A.    Let's say it would be -- after we had

23  formed VVA, so it had to have been 2011, 2012,

24  something like that.

25      Q.    So that was the first time you met

1    him?

2         A.    Yeah.   I mean, when I visited with

3    Charlie Judd, I think I got introduced to him at

4    the State Board.   Before they had a

5    commissioner, the -- the secretary basically ran

6    the State Board.   Even though he was on the

7    board himself, as a secretary, he also ran the

8    day-to-day activities of the board.

9         Q.    You mean the -- well, what is called

10   now the Department of --

11        A.    Elect.

12        Q.    -- Elections?

13        A.    Well, they call it "Elect," but they

14   didn't have a commissioner.   He was basically

15   doing the job of the commissioner, which was

16   running the day-to-day operations of the State

17   Board.

18             So when I went in to visit with

19   Charlie Judd, I'm sure I got introduced to him

20   at some point.   I actually had a conversation

21   with him when I was at the True the Vote

22   meeting.

23        Q.    Now, again, can you -- I apologize if

24   you already said this, but Charlie Judd was?

25        A.    He was chairman of the State Board

1    during the McDonnell Administration.  He was the

2    first person I really met that was in --

3    involved in the election law and that type of

4    thing.

5         Q.    Other than meeting him with

6    Charlie Judd and talking to him at this True the

7    Vote conference, have you had other

8    conversations with Mr. Palmer over the years?

9         A.    There was a -- there was a meeting in

10   Richmond that Chris Marston chaired that he

11   was present -- he and his wife were present at

12   the meeting.  It was probably 20 people at -- at

13   the luncheon.  I think he sat right across the

14   table from me, so I'm sure we spoke about stuff,

15   not Alien I or II, or anything like that.

16        Q.    Have you ever spoken to Mr. Palmer

17   about the Alien Invasion --

18        A.    No --

19        Q.    -- reports?

20        A.    -- no.

21        Q.    Have you ever spoken to Mr. Palmer

22   about the issue of purported noncitizen voting

23   in Virginia?

24        A.    About the issue of what?

25        Q.    Noncitizen voting in Virginia.

1     A.    Only as it pertains to other voter

2 fraud activities.

3     Q.    So you have had conversations with

4 Mr. Palmer regarding purported noncitizen voting

5 in Virginia?

6     A.    I wouldn't say it was specifically

7 about that.  It was probably just in the context

8 of the nursing home voter fraud, the student

9 voter fraud, the -- that type of thing.

10     Q.    So you've had conversations with

11 Mr. Palmer about voter fraud generally?

12     A.    Generally, right.

13     Q.    Okay.  And when were these

14 conversations?

15     A.    When?

16     Q.    When, yes.

17     A.    Either it was at the meeting there in

18 Houston or at this meeting that Chris Marston

19 had.  I generally don't talk to him as far as

20 phone calls or e-mails.

21     Q.    And you haven't talked to him or

22 communicated with him about this --

23     A.    Right --

24     Q.    -- litigation?

25     A.    -- he went to work for Democracy Now,

1    or something, at some point.  And I kind of lost

2    track of him during that time and then met him

3    again back when we were in Richmond.

4         Q.    I think we were talking over each

5    other, so you might not have heard the last

6    question.

7              You haven't talked to him or

8    communicated with him about this litigation --

9         A.    No --

10        Q.    -- correct?

11        A.    -- no, no.  No.

12        Q.    Do you know Cameron Quinn?

13        A.    I do.  She was the registrar of

14   Fairfax County for several years when I first

15   started.

16        Q.    When you first started what?

17        A.    Working in the voter fraud area.

18        Q.    And --

19        A.    Keith Damon introduced me to her.

20        Q.    -- and you're in Fairfax County; is

21   that right?

22        A.    I live in Fairfax County, right.

23        Q.    Have you spoken to Cameron Quinn

24   about the Alien Invasion reports?

25        A.    No.

1        Q.    Have you spoken to Cameron Quinn

2   about the issue of noncitizen voting in

3   Virginia?

4        A.    No.

5        Q.    When was the last time you spoke to

6   Cameron Quinn?

7        A.    Oh, gosh.

8              She was registrar when we did an

9   analysis of voting between Virginia and

10  Maryland.  She was still the registrar then.

11  And she left right after that, I think, so I

12  don't know.  It's been probably 2015, 2014.

13             I think she now works in the

14  Trump Administration, but I don't even know

15  where she is.

16             MR. TEPE:  Why don't we go off the

17        record for a minute --

18             MR. O'NEILL:  Okay.

19             MR. TEPE:  -- and see if there's

20        anything else we have?

21             MR. O'NEILL:  Okay.  You guys need a

22        few minutes?

23             MR. TEPE:  Hmm?

24             MR. O'NEILL:  Yeah, go ahead.

25        Five minutes, or three minutes, whatever

1      you need.

2              THE VIDEOGRAPHER:  The time is 5:17.

3      We're off the record.

4                      -  -  -

5              (Whereupon, a recess was taken from

6                  5:17 p.m. to 5:23 p.m.)

7                      -  -  -

8              THE VIDEOGRAPHER:  The time is 5:23,

9      and we're back on the record.

10             (VVA Deposition Exhibit Number 39,

11              E-mail string, Bates stamped

12              PILF-ADAMS-0001408 through

13              PILF-ADAMS-0001410, marked for

14              identification,  as of this date.)

15             MR. TEPE:  The court reporter has

16     handed the witness an exhibit that's been

17     marked as Exhibit 39.

18  BY MR. TEPE:

19       Q.   Now, Mr. George, I will tell you that

20   this is not a document that, to my knowledge,

21   anyways, was sent to you, but you can correct

22   me.

23       A.   No, I don't remember seeing it.

24       Q.   All right.

25             There's only one sentence and one

1    question that I want to ask you, but if you want

2    to just take a moment to familiarize yourself

3    with the document, that's fine with me.

4         A.    Okay.

5               (Document review.)

6         Q.    Earlier, you testified about the fact

7    that the State provided VERIS reports for pretty

8    much all the jurisdictions in the state at one

9    point, correct?

10        A.    Eventually, right.

11        Q.    So this was in advance of

12   Alien Invasion II, correct?

13        A.    Right.

14        Q.    And then reports were then included

15   with Alien Invasion II, correct?

16        A.    Right.

17        Q.    We also discussed -- or your

18   testimony was that these VERIS reports came from

19   the Department of Motor Vehicles, correct --

20   strike that.

21              The -- I'll -- I'll ask again because

22   I -- we discussed or -- strike that.

23              Your testimony was that the VERIS

24   reports reflected information that had come from

25   the DMV on citizenship status and then was sent

1   to the Department of Elections, correct?

2        A.    Actually, DMV triggered the name of

3   the person to the State Board.  I don't think

4   there was any information passed, maybe, outside

5   of person's name and Social Security number, or

6   something.

7             I mean, there was -- the DMV didn't

8   know if they were registered or not --

9        Q.    Correct.

10       A.    -- so whatever person said, I was not

11  a citizen, boom, that name went to the

12  State Board.  The State Board made the

13  determination if the person was a registered

14  voter or not.  If they were, then that was then

15  dumped into the hopper for that local registrar.

16       Q.    Okay.  So -- and that -- that was

17  your testimony earlier, right?

18       A.    Right.  That was the process that was

19  told to us.

20       Q.    If -- if you look at the e-mail in

21  the middle of the first page, it's from

22  Mr. Cortés, April 4th, at 10:04 a.m.

23             Do you see that?

24       A.    Right.

25       Q.    The third sentence says, This report

1    shows individuals that were canceled due to

2    self-reported noncitizen status and failed to

3    complete an affirmation of citizenship in the

4    allotted time frame.

5              Correct?

6       A.    Right.

7       Q.    That's what it says?

8       A.    That's what it says.

9       Q.    And is this consistent with your

10   testimony that the VERIS report shows

11   individuals that were canceled due to the answer

12   to the noncitizen question from the DMV --

13             MR. O'NEILL:  Objection.

14   BY MR. TEPE:

15      Q.    -- and that that --

16             MR. TEPE:  Excuse me, Counsel.

17      A.    No.

18             MR. O'NEILL:  I didn't know you

19   weren't finished.

20      A.    No.

21             MR. O'NEILL:  Go ahead.

22      Q.    Okay.

23      A.    That's not my -- my understanding was

24   that once the data was passed from the DMV to

25   State Board, the State Board then figured out if

1    they were really registered or not.  If they

2    were, then that information was put into a

3    hopper for the local board to deal with.

4             The way Virginia law works, the

5    State Board does not make changes to the VERIS

6    system; they rely on their local boards to make

7    any maintenance -- file maintenance changes.  So

8    the local board then gets the notice in the

9    hopper that this person has self-declared to be

10   a noncitizen.  They then send out a postcard to

11   that person.

12            That person either sends it back or

13   not.  If they send it back and say, I am a

14   citizen; here's the proof, they're not removed.

15   If they send it back and say, I'm really not a

16   citizen, then they remove them.  If they don't

17   send it back, they also remove them.

18       Q.    And that's what's shown in Exhibit 1

19   to Alien Invasion II, is those who --

20       A.    Those listings, right.

21       Q.    -- who are removed?

22       A.    Right.

23       Q.    And it's based on information

24   originally generated through the DMV process --

25       A.    Right.

1        Q.    -- correct?

2              And so this -- this sentence here

3    that we just read is -- that's consistent with

4    your testimony today?

5        A.    Where it says, This report shows

6    individuals that were canceled -- is that what

7    you're referring to?

8        Q.    Correct.

9        A.    That's my understanding, right.

10       Q.    Okay.  You can put that aside.

11       A.    Pardon?

12       Q.    You can put that aside.

13       A.    Okay.

14             MR. TEPE:  I have no further

15       questions.

16             MR. O'NEILL:  I just have a few

17       brief questions.

18    EXAMINATION BY

19    MR. O'NEILL:

20       Q.    Mr. George, what was the purpose

21    of -- of -- of the Alien Invasion report, from

22    your perspective?

23             MR. TEPE:  Objection to form.

24       A.    After looking through it, it

25    appeared, to me, to be an attempt by Christian's

1    group to show that checking a box is not an

2    adequate way of determining citizenship and that

3    they were pushing for proof of citizenship to

4    register, that there were too many examples

5    where the box was left blank, both boxes were

6    left blank or a person was even checked to be a

7    noncitizen and they were still registered.

8              There was also -- I think there was

9    an e-mail that was sent out by Cortés in the

10   form of guidance to the local boards that said,

11   If you receive a voter registration form where

12   the boxes are not checked, go on and add the

13   person as a voter.

14       Q.   Now, was your purpose ever to deter

15   eligible voters from voting?

16       A.   Never.  Never.

17            MR. TEPE:  Objection to form.

18            MR. O'NEILL:  I don't have any other

19       questions.

20            I believe if you'll permit an

21       indulgence for two questions from counsel.

22            MR. EVANS:  Should I grab a mic, or

23       what should I do?

24            THE COURT REPORTER:  Yeah, you'll

25       need a mic.

1          All right.

2          MR. EVANS:  Thank you, Counsel.

3          THE VIDEOGRAPHER:  Opposite side.

4          MR. EVANS:  Opposite side?

5          I am not as well practiced.  Thank

6     you.

7   EXAMINATION BY

8   MR. EVANS

9     Q.    Mr. George, there were two documents

10   that we looked at earlier, and I'd like to first

11   turn you to Exhibit 23 as marked by Plaintiffs'

12   counsel.

13          And just let me know when you have

14   that.  It might take a little while to get up.

15     A.    I'm close.  I'm at 22.

16          MR. TEPE:  Which document is that?

17     A.    I got it.

18          MR. EVANS:  This is Number 23, sent

19   Tuesday, May 30th, 2017, 4:25 p.m.

20          MR. TEPE:  Right.

21     A.    Right.

22     Q.    And if you recall, Plaintiffs'

23   counsel asked you a little bit about the

24   individuals in the second e-mail from the top

25   that you sent a copy of Christian's,

1    Mr. Adams's, PJ Media press release.

2         A.    Right --

3         Q.    And --

4         A.    -- we went through the list.

5         Q.    Oh, thank you.

6               -- and we discussed a few of the

7    individuals on that list, including, I think,

8    Nancy Smith, Clara Belle Wheeler, Dave Brat,

9    maybe Alex Ables at that time as well.

10              Do you recall discussing that?

11        A.    Right.  We didn't do everybody, but

12   we did some.

13        Q.    So there's another individual I just

14   wanted to ask you about here, Steve Albertson.

15              Can you tell me who that is?

16        A.    He is the publisher of

17   The Bull Elephant blog.

18        Q.    And why did you send him this report?

19        A.    He had been kind enough to publish

20   quite a few of my articles that I had written

21   either about voter fraud or what I consider

22   problems inside the Republican Party, et cetera.

23   So I felt this would be a good way to move the

24   report along.  He could publish it in

25   The Bull Elephant; a lot of people would see it.

1        Q.    So he had distributed reports

2    previously for you on -- on other topics?

3        A.    He would probably --

4              MR. TEPE:  Objection: form.

5        A.    -- write a small article and then

6    link to that -- to that article, is what he

7    would probably do.  I don't know if he did it or

8    not.  But that was my thinking as far as sending

9    it to him.

10       Q.    And in sending this particular

11   article to him, your thinking was that he would

12   distribute it?

13             MR. TEPE:  Objection to form:

14       leading.

15             THE WITNESS:  I'm sorry?

16             MR. TEPE:  Objection to form.

17             MR. O'NEILL:  You -- you can answer.

18       Q.    Mr. -- I'll rephrase it.  It's fine.

19       A.    Okay.

20       Q.    Mr. George, what was your

21   understanding -- what did you understand that

22   Mr. Albertson would do upon receiving this

23   article related to --

24       A.    I didn't really --

25       Q.    -- Alien Invasion --

1          MR. TEPE:  Objection to form.

2     A.    -- I didn't know if he would do it or

3     not.  I just assumed that he would probably

4     publish it in The Bull Elephant and a link

5     to the -- to the article.

6     Q.    And do you know whether Mr. Albertson

7     assisted in gathering any data related to the

8     report?

9     A.    No --

10         MR. TEPE:  Objection to form.

11    A.    -- he did not.

12    Q.    Not to your knowledge?

13    A.    To my knowledge, he did not.

14    Q.    And do you know what Mr. Albertson's

15    current role is or current form of employment?

16         MR. TEPE:  Objection: vague.

17    A.    He's an attorney.

18    Q.    Do you know where he works?

19    A.    I know where he lives.  I think he

20    lives down in Fredericksburg, if I'm not

21    mistaken, or somewhere in that area.

22    Q.    Do you know whether --

23         MR. TEPE:  Objection: form.

24    Q.    -- he works at Skadden Arps?

25         MR. TEPE:  Objection: leading --

1      A.     I have no idea.

2             MR. TEPE:  -- asked and answered.

3      Q.     We can turn away from that document.

4             Thank you.

5             The next document I wanted to turn

6      you to is Exhibit 30.  It's a little further

7      down in our stack.

8             MR. TEPE:  Which one's 30?

9             MR. EVANS:  This is from Christian

10            to Reagan Re: Alien Invasion II Publicity.

11     A.     I'm looking for 30, right?

12     Q.     That's correct.

13     A.     I have a good memory; it's just

14     short.

15            I'm not finding it.  I'm sure I've

16     overlooked it somewhere.

17            THE WITNESS:  Do you have it over

18            there?

19            MR. EVANS:  Is it all right to pass

20            over a copy that's not marked?  Is that

21            acceptable?

22            MR. TEPE:  Oh, to help him find it?

23            MR. EVANS:  He can't seem -- can't

24            seem to find it in the stack there.

25            MR. TEPE:  Well, I mean, do you have

1        it marked up?  No.

2              MR. EVANS:  Do you have a blank one

3        again?  We can keep on looking through the

4        stack.

5              MR. TEPE:  I do not.

6              THE WITNESS:  I'm getting all around

7        it.  I got 29 and 34 and 32, 10, 1.  This

8        is ridiculous.  Thirty-one.

9        A.    Is it a one-pager?

10       Q.    Yes, it is.

11       A.    There we go.

12             I got it.

13       Q.    And is the top of that from

14  Christian, Wednesday, June 14, 2017?

15       A.    Right.

16       Q.    All right.

17             So take -- take a moment to glance at

18  it and refresh your memory.

19       A.    Okay.

20       Q.    Earlier this afternoon, Plaintiffs'

21  counsel showed this to you and asked some

22  questions about it.

23       A.    Right.

24       Q.    And one of those questions -- and I

25  don't think I'm paraphrasing --

1           MR. EVANS:  Though, please correct

2      me if I am.

3      Q.    -- I think he asked you whether you

4  were seeking to see more immigrants deported.

5           Do you recall that question?

6      A.    Yeah; I can't remember the context,

7  but I think I remember the question, yeah.

8      Q.    I'll submit it was in the context of

9  discussing this exhibit.

10          And I wanted to ask whether anywhere

11 on this exhibit you see yourself having written

12 that the intent of publishing Alien Invasion II

13 was to see more immigrants deported.

14          MR. TEPE:  Objection to form:

15      misstates the document, previous

16      testimony; and leading.

17     A.    I don't see anything in here about

18 deporting anybody.

19     Q.    Does it say anything about

20 immigrants?

21     A.    Just skimming it, I don't see that

22 either.

23     Q.    Does it say anything about Latinos?

24     A.    No.

25          MR. TEPE:  I can stipulate that it

1          doesn't say things about a lot of stuff.

2          Q.     Did any of the documents you reviewed

3     today coming from Mr. Adams discuss Latinos,

4     as you to -- as you recall?

5          A.     No.  I -- there was nothing in any of

6     the work that I did that had anything to do with

7     nationality, from anybody.

8          Q.     Did Mr. Adams ever send you

9     e-mails --

10         A.     No.

11         Q.     -- stating that the reports were

12    targeting Latinos?

13         A.     I didn't care if they were Republican

14    or Democrat; I didn't care what color they were,

15    what race they were.  I was looking to see if

16    they had actually voted and when they shouldn't

17    have.  That was my sole purpose.

18              MR. TEPE:  Objection: nonresponsive.

19         Q.     Did the reports, themselves, ever --

20    and by "reports," I refer to both

21    Alien Invasion I and Alien Invasion II -- did

22    either of the reports ever mention immigrants

23    voting?

24              MR. TEPE:  Objection to form.

25         A.     I don't believe so.

1        MR. EVANS:  I have no further

2   questions.

3        MR. TEPE:  Nothing else.

4        THE VIDEOGRAPHER:  Okay.  The

5   time --

6        MR. TEPE:  Actually.  Strike that.

7        I'm going to keep this deposition

8   open.  Certainly, one basis is the fact

9   that we haven't received all the documents

10  from Mr. George and VVA.

11       MR. O'NEILL:  Still staying on.

12       We can expect to supplement your

13  30(b)(6) so we're clear on what documents

14  that you're additionally seeking --

15  what -- what -- I think you identified --

16  I just want -- we -- we talked about it

17  earlier, that you guys are going to file a

18  supplement with us that we're clear what

19  additional -- what -- what you perceive is

20  still outstanding and needs to be

21  produced.

22       I believe you -- you referenced --

23       MR. TEPE:  Yeah, we --

24       MR. O'NEILL:  -- two --

25       MR. TEPE:  -- we -- we will -- we

1    will provide some correspondence about

2    the -- the follow-up documentation that

3    we'll be seeking, which we had already

4    sought but haven't been produced.

5           MR. O'NEILL:  Okay.  Thank you.

6           THE VIDEOGRAPHER:  The time is 5:41,

7    and we are off the record.

8

9           (Time noted:   5:41 p.m.)

10

11

12

13

14

15           _____

16                     REAGAN GLENN GEORGE

17

18    Subscribed and sworn to before me

19    this _____ day of _____ 20_____.

20

21    _____

22

23

24

25

```
 1            C E R T I F I C A T E

 2   DISTRICT OF COLUMBIA:

 3            I, Cindy L. Sebo, a Notary Public within

 4   and for the Jurisdiction aforesaid, do hereby

 5   certify that the foregoing deposition was taken before

 6   me, pursuant to notice, at the time and

 7   place indicated; that said deponent was by me duly

 8   sworn to tell the truth, the whole truth, and

 9   nothing but the truth; that the testimony of said

10   deponent was correctly recorded in machine shorthand

11   by me and thereafter transcribed under my

12   supervision with computer-aided transcription;

13   that the deposition is a true record of the

14   testimony given by the witness; and that I am

15   neither of counsel nor kin to any party in said

16   action, nor interested in the outcome thereof.

17   DATED: MARCH 27, 2019

18

19

20

21   _____

22        Cindy L. Sebo, RMR, CRR, RPR, CSR,

23           CCR, CLR, RSA, Notary Public

24   My Commission Expires:

25   April 30, 2020
```

```
 1   ---------------------I N D E X----------------------

 2   WITNESS                   EXAMINATION BY        PAGE

 3   REAGAN GLENN GEORGE

 4              MR. TEPE                        7, 115

 5              MR. O'NEILL                        296

 6              MR. EVANS                          298

 7   ----------------------EXHIBITS---------------------

 8   VVA                             PAGE     LINE

 9   Exhibit 1
     Plaintiffs' Amended Rule
10   30(b)(6) Notice to Take
     Deposition With Production
11   of Documents of Virginia
     Voters Alliance . . . . . . . . .    6         1
12
     Exhibit 2
13   Plaintiffs' Notice of Subpoena
     to Virginia Voters Alliance
14   Commanding Production of Documents,
     Information, or Objects . . . . . .    6         7
15
     Exhibit 3
16   Certificate of Incorporation of
     Virginia Voters Alliance, Bates
17   stamped VVA-000941. . . . . . . .    17        21

18   Exhibit 4
     VVA Web page. . . . . . . . . . .    28        15
19
     Exhibit 5
20   Letter with attachment, George
     to Leider, cc: Cortés, January
21   25, 2016. . . . . . . . . . . . .    37        15

22   Exhibit 6
     Letter with attachments, Leider
23   to George, cc: Cortés, February
     9, 2016 . . . . . . . . . . . . .    46         5
24

25
```

```
1    ------------------EXHIBITS (Continued)----------------
2
     VVA                               PAGE      LINE
3
     Exhibit 7
4    Letter, Tunner to Adams, August
     10, 2016, Bates stamped
5    PILF-ADAMS-0000637 through
     PILF-ADAMS-0000641. . . . . . . .   50        25
6
     Exhibit 8
7    E-mail string with attachments,
     Bates stamped PILF-ADAMS-0003265
8    through PILF-ADAMS-0003277. . . . .  64         5
9    Exhibit 9
     E-mail, Adams to George, September
10   30, 2016, Bates stamped VVA-000919
     through VVA-000936. . . . . . . .   82         5
11
     Exhibit 10
12   E-mail string, Bates stamped
     PILF-ADAMS-0005587. . . . . . . .   85         4
13
     Exhibit 11
14   E-mail with attachment, George
     to Johnson, September 28, 2016,
15   Bates stamped PILF-ADAMS-0014051
     through PILF-ADAMS-0014052. . . . .  92        17
16
     Exhibit 12
17   Report, Alien Invasion in Virginia,
     The discovery and coverup of
18   noncitizen registration and
     voting. . . . . . . . . . . . . .   96        20
19
     Exhibit 13
20   E-mail with attachment, Adams to
     George, cc: Churchwell and Johnson,
21   May 26, 2017, Bates stamped
     PILF-ADAMS-0000172 through
22   PILF-ADAMS-0000196. . . . . . . .  116        14
23   Exhibit 14
     E-mail with attachment, Johnson
24   to George, May 24, 2017, Bates
     stamped PILF-ADAMS-0000971
25   through PILF-ADAMS-0000994. . . . . 118         5
```

```
 1   ------------------EXHIBITS (Continued)----------------

 2   VVA                               PAGE       LINE

 3   Exhibit 15
     E-mail string with attachment,
 4   Bates stamped PILF-ADAMS-0015020
     through PILF-ADAMS-0015043. . . . .   118        11
 5
     Exhibit 16
 6   E-mail string with attachment,
     Bates stamped PILF-ADAMS-0015185
 7   through PILF-ADAMS-0015187. . . . .   123        19

 8   Exhibit 17
     Commonwealth of Virginia
 9   Department of Elections,
     cancelation — Declared NonCitizen,
10   059 — Fairfax County. . . . . . . .   135        25

11
     Exhibit 18
12   Voter registration forms. . . . . .   144        11

13   Exhibit 19
     E-mail with attachment, Johnson
14   to George, February 2, 2017,
     Bates stamped PILF-ADAMS-0009178
15   through PILF-ADAMS-0009197. . . . .   162         9

16   Exhibit 20
     Article, Va. Voters Alliance
17   concerned about voter fraud ahead
     of November presidential election,
18   by Goldberg, October 3, 2016,
     wjla.com/news . . . . . . . . . . .   169         9
19
     Exhibit 21
20   E-mail, Ward to George, June 2,
     2017, Bates stamped VVA-000654. . .   174         9
21
     Exhibit 22
22   Article, Voter Probe Points
     to 'Alien Invasion' in Virginia,
23   by FAIR STAFF, June 5, 2017,
     immigrationreform.com . . . . . . .   178        18
24
     Exhibit 23
25   E-mail string, Bates stamped
```

```
 1   ------------------EXHIBITS (Continued)----------------

 2   VVA                               PAGE      LINE

 3   Exhibit 24
     E-mail string, Bates stamped
 4   VVA-000766 through VVA-000772 . . .   184        5

 5   Exhibit 25
     E-mail string, Bates stamped
 6   PILF-ADAMS-0038304 through
     PILF-ADAMS-0038304. . . . . . . .   186        12
 7
     Exhibit 26
 8   E-mail, Johnson to George, cc:
     Churchwell, May 17, 2017, Bates
 9   stamped PILF-ADAMS-0001233. . . . .   199        5

10   Exhibit 27
     E-mail string, Bates stamped
11   PILF-ADAMS-0013078 through
     PILF-ADAMS-0013079. . . . . . . .   201        3
12
     Exhibit 28
13   E-mail string, Bates stamped
     PILF-ADAMS-0003391. . . . . . . .   204        12
14
     Exhibit 29
15   E-mail with attachment, George to
     Johnson and Christian, November 21,
16   2016, Bates stamped
     PILF-ADAMS-0013078 through
17   PILF-ADAMS-0013079. . . . . . . .   207        22

18   Exhibit 30
     E-mail string, Bates stamped
19   VVA-000617 through VVA-000618 . . .   210        18

20   Exhibit 31
     E-mail string, Bates stamped
21   PILF-ADAMS-0038093 through
     PILF-ADAMS-0038094. . . . . . . .   226        18
22
     Exhibit 32
23   E-mail string, Bates stamped
     PILF-ADAMS-0013087 through
24   PILF-ADAMS-0013089. . . . . . . .   231        17

25
```

```
 1    -----------------EXHIBITS (Continued)----------------

 2    VVA                              PAGE      LINE

 3    Exhibit 33
      Virginia Voters Alliance,
 4    Plans and Budget 2017, Bates
      stamped MR-000136 through
 5    MR-000141 . . . . . . . . . . .   239        23

 6    Exhibit 34
      E-mail string, Bates stamped
 7    MR-000164 . . . . . . . . . . .   244        25

 8    Exhibit 35
      E-mail string, Bates stamped
 9    PILF-ADAMS-0043845 through
      PILF-ADAMS-0043848. . . . . . .   248        35
10
      Exhibit 36
11    E-mail string, Bates stamped
      PILF-ADAMS-0041461 through
12    PILF-ADAMS-0041462. . . . . . .   264        16

13    Exhibit 37
      E-mail string . . . . . . . . .   275        20
14
      Exhibit 38
15    E-mail string, Bates stamped
      PILF-ADAMS-0041556 through
16    PILF-ADAMS-0041557. . . . . . .   278        22

17    Exhibit 39
      E-mail string, Bates stamped
18    PILF-ADAMS-0001408 through
      PILF-ADAMS-0001410. . . . . . .   291        10
19

20

21

22

23

24

25
```

```
 1    NAME OF CASE:

 2    DATE OF DEPOSITION:

 3    NAME OF WITNESS:

 4    Reason Codes:

 5         1.  To clarify the record.

 6         2.  To conform to the facts.

 7         3.  To correct transcription errors.

 8    Page _____ Line _____ Reason _____

 9    From _____ to _____

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    Page _____ Line _____ Reason _____

23    From _____ to _____

24
                          _____
25
```