## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

LEAGUE OF UNITED LATIN AMERICAN
CITIZENS - RICHMOND REGION
COUNCIL 4614, ELIUD BONILLA,
LUCIANIA FREEMAN, and ABBY JO
GEARHART,

          Plaintiffs,

      v.

PUBLIC INTEREST LEGAL FOUNDATION
and J. CHRISTIAN ADAMS,

          Defendants.

Civil Action No. 1:18-cv-00423 (LO/IDD)

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Matthew E. Kelley (Va. Bar No. 84045)
Seth D. Berlin (admitted *pro hac vice*)
Steven D. Zansberg (admitted *pro hac vice*)
Alia L. Smith (admitted *pro hac vice*)
Alexander I. Ziccardi (admitted *pro hac vice*)
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006-1157
Telephone: 202-661-2200
Facsimile: 202-661-2299
kelleym@ballardspahr.com
berlins@ballardspahr.com
zansbergs@ballardspahr.com
smithalia@ballardspahr.com
ziccardia@ballardspahr.com

*Counsel for Defendant J. Christian Adams*

Michael J. Lockerby (Va. Bar No. 24003)
Eli L. Evans (Va. Bar No. 90700)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone:  202-945-6079
Facsimile:  202-672-5399
mlockerby@foley.com
eevans@foley.com

William E. Davis (admitted *pro hac vice*)
Ana Romes (admitted *pro hac vice*)
FOLEY & LARDNER LLP
One Biscayne Tower
2 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone:  305-482-8404
Facsimile:  305-482-8600
wdavis@foley.com
aromes@foley.com

*Counsel for Defendants Public Interest Legal
Foundation and J. Christian Adams*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................2

ARGUMENT .................................................................................................................8

I.      SUMMARY JUDGMENT STANDARD ...........................................................8

II.     THE COURT SHOULD ENTER SUMMARY JUDGMENT ON
        PLAINTIFFS' DEFAMATION CLAIM ...........................................................8

        A.      Plaintiffs' Claims Arising Out Of *Alien Invasion I* Are Time-Barred ...................8

        B.      Plaintiffs' Claims Arising Out Of *Alien Invasion II* Fail As A Matter
                Of Law .................................................................................................10

                1.      Statements That Voter Records Had Identified Plaintiffs As
                        Non-Citizens Are Privileged, Even If Erroneous .......................11

                2.      The Statements Describing Voting Laws Are True ....................15

                3.      The Statements Purportedly Describing Plaintiffs As Felons
                        Are Not Actionable .....................................................................15

                        a.      Taken As A Whole, The Report Does Not Call
                                Plaintiffs Felons ..............................................................15

                        b.      Even If The Report Were Construed As Calling
                                Plaintiffs Felons, That Would Be A Protected
                                Expression Of Opinion .....................................................17

                4.      Plaintiffs Have Not Suffered Any Compensable Injury ............19

                5.      Defendants Are Immune Under Virginia's Anti-SLAPP
                        Statute .........................................................................................20

III.    THE COURT SHOULD ENTER SUMMARY JUDGMENT ON
        PLAINTIFFS' TWO STATUTORY CLAIMS ................................................23

        A.      LULAC Lacks Standing To Assert These Claims ...............................23

        B.      Plaintiffs' Statutory Claims Fail Under Both The Statutes Themselves
                And The First Amendment ..................................................................25

CONCLUSION ...........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AIDS Counseling & Testing Centers v. Group W Television, Inc.*,
903 F.2d 1000 (4th Cir. 1990) ............................................................................................15

*Alexandria Gazette Corp. v. West*,
198 Va. 154, 93 S.E.2d 274 (1956)......................................................................................11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................................................8

*Arthur v. Offit*,
No. 01:09-CV-1398, 2010 WL 883745 (E.D. Va. Mar. 10, 2010).........................................18

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)..............................................................................................................30

*Biospherics, Inc. v. Forbes, Inc.*,
151 F.3d 180 (4th Cir. 1998) ...............................................................................................17

*Blum v. Yaretsky*,
457 U.S. 991 (1982)........................................................................................................24, 25

*Bradford v. HSBC Mortgage Corp.*,
799 F. Supp. 2d 625 (E.D. Va. 2011) ..................................................................................10

*Brandenburg v. Ohio*,
395 U.S. 444 (1969)..............................................................................................................29

*Brayshaw v. City of Tallahassee*,
709 F. Supp. 2d 1244 (N.D. Fla. 2010)................................................................................28

*CACI Premier Technology, Inc. v. Rhodes*,
536 F.3d 280 (4th Cir. 2008) ...............................................................................................19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................................................8

*Chapin v. Knight-Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) ..............................................................................13, 15, 18

*Chau v. Lewis*,
771 F.3d 118 (2d Cir. 2014).................................................................................................19

*In re CNN and Time Magazine "Operation Tailwind" Litigation*,
No. C 99-20137 JF(RS), 2006 WL 2711744 (N.D. Cal. Sept. 21, 2006)...............................16

*Cox Broadcasting Corp. v. Cohn*,
    420 U.S. 469 (1975)..............................................................................................11, 29

*Dean v. Dearing*,
    263 Va. 485, 561 S.E.2d 686 (2002)....................................................................10

*Ditton v. Legal Times*,
    947 F. Supp. 227 (E.D. Va. 1996) ...........................................................11, 12, 14

*Doctor's Data, Inc. v. Barett*,
    170 F. Supp. 3d 1087 (N.D. Ill. 2016) .................................................................10

*Doe v. Roe*,
    295 F. Supp. 3d 664 (E.D. Va. 2018) .................................................................9, 14

*Dragulescu v. Virginia Union University*,
    223 F. Supp. 3d 499 (E.D. Va. 2016) .....................................................................9

*Edwards v. Schwartz*,
    --- F. Supp. 3d ----, 2019 WL 1295055 (W.D. Va. Mar. 20, 2019)........................17

*Fleming v. Moore*,
    221 Va. 884, 275 S.E.2d 632 (1981).....................................................................20

*Florida Star v. B.J.F.*,
    491 U.S. 524 (1989)..............................................................................................29

*Food Lion, Inc. v. Capital Cities/ABC, Inc.*,
    194 F.3d 505 (4th Cir. 1999) ................................................................................26

*Fornshill v. Ruddy*,
    891 F. Supp. 1062 (D. Md. 1995) .........................................................................16

*Four Navy Seals v. Associated Press*,
    413 F. Supp. 2d 1136 (S.D. Cal. 2005).................................................................30

*Fuste v. Riverside Healthcare Association*,
    265 Va. 127, 575 S.E.2d 858 (2003).....................................................................17

*Goforth v. Avemco Life Insurance Co.*,
    368 F.2d 25 (4th Cir. 1966) ...................................................................................9

*Grabow v. King Media Enterprises, Inc.*,
    806 N.E.2d 591 (Ohio Ct. App. 2004)...................................................................19

*Harte-Hanks Communications, Inc. v. Connaughton*,
    491 U.S. 657 (1989)..............................................................................................20

*Harvest House Publishers v. Local Church*,
  190 S.W.3d 204 (Tex. Ct. App. 2006) ...................................................................16

*Hess v. Indiana*,
  414 U.S. 105 (1973).............................................................................................29

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988)...............................................................................................26

*Jordan v. Kollman*,
  269 Va. 569, 612 S.E.2d 203 (2005)...............................................................15, 21

*Katz v. Odin, Feldman & Pittleman, P.C.*,
  332 F. Supp. 2d 909 (E.D. Va. 2004) ......................................................................8

*Lami v. Pulitzer Publishing Co.*,
  723 S.W.2d 458 (Mo. Ct. App. 1986).................................................................14

*Landmark Communications, Inc. v. Virginia*,
  435 U.S. 829 (1978).............................................................................................29

*Lewis v. Casey*,
  518 U.S. 343 (1996).............................................................................................24

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992).............................................................................................24

*Mirage Entertainment, Inc. v. FEG Entretenimientos S.A.*,
  326 F. Supp. 3d 26 (S.D.N.Y. 2018)...................................................................10

*Montgomery v. Risen*,
  197 F. Supp. 3d 219 (D.D.C. 2016) ...................................................................19

*Morrissey v. William Morrow & Co.*,
  739 F.2d 962 (4th Cir. 1984) .................................................................................9

*NAACP v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982).............................................................................................29

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964).......................................................................................10, 20

*Phila. Newspapers, Inc. v. Hepps*,
  475 U.S. 767 (1986).............................................................................................15

*In re Phila. Newspapers, LLC*,
  690 F.3d 161 (3d Cir. 2012).................................................................................10

*Phoenix Trading, Inc. v. Loops LLC*,
    732 F.3d 936 (9th Cir. 2013) ............................................................... 19

*Price v. Viking Press, Inc.*,
    625 F. Supp. 641 (D. Minn. 1985) ....................................................... 30

*Ramey v. Kingsport Publishing Corp.*,
    905 F. Supp. 355 (W.D. Va. 1995) ....................................................... 11

*Reuber v. Food Chemical News, Inc.*,
    925 F.2d 703 (4th Cir. 1991) .................................................. 11, 21, 23

*Rosenblatt v. Baer*,
    383 U.S. 75 (1966) ............................................................................... 10

*Rosenbloom v. Metromedia, Inc.*,
    403 U.S. 29 (1971) ............................................................................... 21

*Ross v. Burns*,
    612 F.2d 271 (6th Cir. 1980) ............................................................... 30

*Rush v. Worrell Enterprises, Inc.*,
    21 Va. Cir. 203 (1990) ........................................................................ 14

*Rushford v. New Yorker Magazine, Inc.*,
    846 F.2d 249 (4th Cir. 1988) ............................................................... 11

*Schaecher v. Bouffault*,
    290 Va. 83, 772 S.E.2d 589 (2015) ..................................................... 20

*Schnare v. Ziessow*,
    104 F. App'x 847 (4th Cir. 2004) ........................................................ 19

*Southeastern Tidewater Opportunity Project, Inc. v. Bade*,
    246 Va. 273, 435 S.E.2d 131 (1993) ................................................... 14

*Sheehan v. Gregoire*,
    272 F. Supp. 2d 1135 (W.D. Wash. 2003) .......................................... 28

*Shenandoah Publishing House, Inc. v. Gunter*,
    245 Va. 320, 427 S.E.2d 370 (1993) .............................................. 20, 21

*Shestul v. Moeser*,
    344 F. Supp. 2d 946 (E.D. Va. 2004) .................................................... 9

*Smith v. Daily Mail Publishing Co.*,
    443 U.S. 97 (1979) ............................................................................... 29

*Snyder v. Phelps*,
    580 F.3d 206 (4th Cir. 2009) ..................................................................................17

*Spirito v. Peninsula Airport Commission*,
    350 F. Supp. 3d 471 (E.D. Va. 2018) ......................................................11, 12, 13

*Time, Inc. v. Pape*,
    401 U.S. 279 (1971)...............................................................................................22

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017).........................................................................................25

*United States v. Brown*,
    494 F. Supp. 2d 440 (S.D. Miss. 2007)................................................................28

*United States v. Carmichael*,
    326 F. Supp. 2d 1267 (M.D. Ala. 2004) ..............................................................28

*United States v. Nguyen*,
    673 F.3d 1259 (9th Cir. 2012) ..............................................................................27

*United States v. White*,
    670 F.3d 498 (4th Cir. 2012) ................................................................................27

*United States v. White*,
    810 F.3d 212 (4th Cir. 2016) ................................................................................27

*Vaile v. Willick*,
    No. 6:07cv00011, 2008 WL 2754975 (W.D. Va. July 14, 2008).........................14

*Virginia v. Black*,
    538 U.S. 343 (2003).............................................................................................27

*Watts v. United States*,
    394 U.S. 705 (1969).............................................................................................27

*Webb v. Virginia-Pilot Media Cos.*,
    287 Va. 84, 752 S.E.2d 808 (2014)......................................................................15

*Wells v. Liddy*,
    186 F.3d 506 (4th Cir. 1999) ................................................................................15

*In re White*,
    No. 2:07cv342, 2013 WL 5295652 (E.D. Va. Sept. 13, 2013)....................27, 28, 30

*Wikimedia Found. v. National Security Agency*,
    857 F.3d 193 (4th Cir. 2017) ................................................................................25

**Statutes**

18 U.S.C. §§ 2721-2725 ...................................................................................................3

42 U.S.C. § 1985 .................................................................................................... *passim*

52 U.S.C. § 10307 .................................................................................................. *passim*

52 U.S.C. §§ 20501-11 ....................................................................................................2

Va. Code § 8.01-223.2 .................................................................................................1, 20

Va. Code § 8.01-247.1 ....................................................................................................8

**Other Authorities**

1 Robert D. Sack, *Sack on Defamation* § 7:3.5[B][6] (5th ed. 2018)...........................................12

Defendants Public Interest Legal Foundation ("PILF") and J. Christian Adams

("Adams"), respectfully state as follows in support of their motion for summary judgment:

## PRELIMINARY STATEMENT

Defendants published two reports about the integrity of voting in Virginia – pure speech about a vital matter of public concern that has been the subject of intense public debate. Defendants' speech is protected by the common law, statute, and the First Amendment. The undisputed facts establish that the reports at issue accurately described public records and expressed opinions about how the government should respond. This, our nation's precedents instruct, is both fully protected speech and "the essence of self-government."

In their defamation claim, the three individual Plaintiffs challenge three categories of Defendants' published statements. First are statements accurately reporting that they had been identified by Virginia election officials as individuals removed or flagged for removal from the voter rolls for being non-citizens. Under both Virginia law and the First Amendment, however, those statements are privileged reports of official records – even if, as it turns out, those three individuals are in fact U.S. citizens. Second are statements asserting that voting, or registering to vote, as a non-citizen is a felony. But those statements are true, and Plaintiffs do not and could not contend otherwise. Finally, Plaintiffs challenge the authors' conclusions that those removed or flagged for removal should be investigated and should either be prosecuted for committing a felony or, if the government erred, should be promptly restored to the voter rolls. Those conclusions are protected expressions of opinion under both Virginia law and the First Amendment. Not only is there no basis for liability, but Plaintiffs have failed to demonstrate any injury or entitlement to damages. In any event, Defendants' speech is immune under Va. Code § 8.01-223.2. Indeed, this case is the "poster child" for why the General Assembly passed that

law:  the undisputed evidence confirms that Plaintiffs suffered no reputational injury and, rather than use the substantial means of counter-speech at their disposal, brought this claim as part of an organized effort to silence Defendants.

The individual Plaintiffs and LULAC also allege that the reports intimidated and deterred U.S. citizens from voting, in violation of 42 U.S.C. § 1985(3) and Section 11(b) of Voting Rights Act.  Not only does LULAC lack standing, but Plaintiffs' claims also fail under both the statutes and the First Amendment.  The reports are indisputably true speech for most of the individuals named in the attached public records who were apparently not citizens.  Even for the few listed individuals who are U.S. citizens, Plaintiffs may not circumvent the constitutional protections for allegedly false and defamatory speech.  Finally, Defendants' speech was neither a "true threat" nor "incitement to imminent lawless action" as required, and in any event the undisputed evidence confirms that Plaintiffs were neither intimidated nor deterred from voting.  The Court should enter summary judgment in Defendants' favor and dismiss this action with prejudice.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Because only U.S. citizens are eligible to register to vote and vote, Virginia election officials identify and may ultimately cancel the voter registration of anyone who self-reports as a non-citizen on Virginia Department of Motor Vehicle ("DMV") forms.  The Virginia Department of Elections ("ELECT") and the registrar of each locality maintain, through the Voter Registration and Information System ("VERIS"), a list of individuals whose registrations have been cancelled.  Pursuant to the National Voter Registration Act, 52 U.S.C. §§ 20501-11 ("NVRA"), ELECT permits citizens to inspect and copy such records.  Evans Decl. ¶ 1.

2.      PILF is a public interest law firm that advocates for election integrity.  Mr. Adams is PILF's President and General Counsel.  *Id.* ¶ 2.

3.      In 2016, PILF and the Virginia Voters Alliance ("VVA") submitted a series of NVRA records requests to local registrars.  Some registrars refused, and Virginia Commissioner of Elections Edgardo Cortés directed local registrars not to provide VERIS reports, contending that doing so would violate the Driver Privacy Protection Act, 18 U.S.C. §§ 2721-2725 ("DPPA").  Other registrars, including Prince William County's, complied.  Evans Decl. ¶ 3.

4.      The Prince William County registrar provided a VERIS report listing persons whose voter registrations had been cancelled as "declared non-citizens" (the "Prince William VERIS Report") and their voter registration applications ("Prince William Records").  *Id.* ¶ 4.

5.      Plaintiff Luciania Freeman's name and address appear on the Prince William VERIS Report with the notation "Declared Non-Citizen" in the column "Cancel Type" because she stated under oath on a DMV form that she was not a U.S. citizen and failed to respond to a Notice of Intent to Cancel Registration.  Her application is included in the Prince William Records and contains the handwritten notation "cancelled – declared non-citizen."  *Id.* ¶ 5.

6.      On September 30, 2016, PILF and VVA published *Alien Invasion in Virginia: The Discovery and Cover-Up of Non-Citizen Registration and Voting* ("*AI-1*").  *Id.* ¶ 6.

7.      The exhibits to *AI-1* included the Prince William VERIS Report and Records. *AI-1* stated that these documents identified "non-citizens who had registered to vote in the county, but were then removed after they were determined to not be U.S. citizens."  Ms. Freeman is identified in these two exhibits but not in the body of *AI-1*.  *AI-1* does not refer to the other Plaintiffs, either in the report's body or exhibits.  *Id.* ¶ 7.

8.      *AI-1* states that "[t]he offenses a fraudulent voter might commit when he registers and votes are numerous" and cites state and federal criminal statutes that prohibit non-citizens from registering to vote and voting.  *Id.* ¶ 8.

9.    *AI-1* opines that (a) many Virginia election officials were "obstructing access to public records" by not complying with PILF's records requests; (b) based on the records that were produced, the registrants removed from the voter rolls as "non-citizens" had "committed felonies," "likely committed a felony," or were "potential felons" by having voted or registered to vote, and (c) a system that allows people to register and to vote simply by stating that they are citizens, without producing any proof, is deeply flawed and must be reformed.  *Id.* ¶ 9.

10.    Following *AI-1*'s publication, PILF continued to seek records of non-citizen voter cancellations from Virginia election officials, including a statewide VERIS report listing individuals whose registrations had been cancelled based on citizenship issues.  *Id.* ¶ 10.

11.    After a ruling by this Court that producing a VERIS report is not prohibited by the DPPA, Commissioner Cortés provided PILF with a statewide report (the "Virginia VERIS Report"), describing it as "the VERIS non-citizen cancellation report."  The report was broken down by locality and listed the names and addresses of 5,556 individuals whose registrations had been cancelled from January 1, 2011 through March 20, 2016.  *Id.* ¶ 11.

12.    Before Commissioner Cortés sent PILF the Virginia VERIS Report, PILF had received conflicting emails from some local registrars about whether the records that PILF requested might include voters who, following a declaration of non-citizenship, later affirmed citizenship and re-registered to vote.  Accordingly, PILF sought clarification from Commissioner Cortés that the Virginia VERIS Report did not contain any "false positives."  *Id.* ¶ 12.

13.    In response, Commissioner Cortés sent an email dated April 4, 2017 (the "Cortés Email") stating that "[i]f an individual was previously cancelled and then subsequently affirmed citizenship and was re-registered, they would no longer appear on this report because they would now be on active status."  Defendants found credible, and therefore relied upon, Commissioner

Cortés' assurance that the Virginia VERIS Report did not contain the name of anyone whose voter registration had been reinstated after reaffirming U.S. citizenship. At his deposition, Mr. Cortés confirmed that this description of the Virginia VERIS Report was accurate. *Id.* ¶ 13.

14.     Both Ms. Freeman and Plaintiff Eliud Bonilla were named in the Virginia VERIS Report. Although Mr. Bonilla had re-affirmed his citizenship in 2012 (after cancellation of his registration), his name remained in the Virginia VERIS Report as of March 20, 2017. *Id.* ¶ 14.

15.     Before Commissioner Cortés produced the Virginia VERIS Report, certain local registrars responded to PILF's request for records showing registrants identified as potentially not satisfying citizenship requirements. Those responses included the Prince William Records, "Fairfax County Records" and "York County Records" (together, "County Records"). *Id.* ¶ 15.

16.     The Fairfax County Records included Mr. Bonilla's voter registration. The York County Records included the application of Plaintiff Abby Jo Gearhart (then known as Abby Sharpe Focht) and a Notice of Intent to Cancel Registration that she had been sent because she reported on a DMV form that she was not a citizen. Ms. Gearhart's records were included even though she later reaffirmed her citizenship and was reinstated on the voter rolls. *Id.* ¶ 16.

17.     In May 2017, PILF and VVA published *Alien Invasion II: The Sequel to the Discovery and Cover-Up of Non-Citizen Registration and Voting in Virginia* ("*AI-2*"). *Id.* ¶ 17.

18.     The public records referenced in and attached to *AI-2* included the Virginia VERIS Report, the County Records, the Cortés Email, and emails from certain local registrars. None of the Plaintiffs is named in the body of *AI-2*. Ms. Freeman is referenced in the Virginia VERIS Report and Prince William Records. Mr. Bonilla is referenced in the Virginia VERIS Report and Fairfax County Records. The records for Ms. Freeman and Mr. Bonilla include the notations "Declared Non-Citizen" or "cancelled – declared non-citizen." Ms. Gearhart's voter

application was originally published in the exhibit containing the York County Records (and later removed).  LULAC is not mentioned in *AI-2* or its exhibits.  *Id.* ¶ 18.

19.     *AI-2* stated that "it is a felony for a non-citizen to register and to cast a ballot," listing the "offenses a fraudulent voter might commit when he registers and votes."  *Id.* ¶ 19.

20.     The bulk of *AI-2* expressed PILF's opinions about "the serious problem that Governor McAuliffe and the Commonwealth's unelected officials have refused to address and even tried to hide," including that officials tried to resist producing voter records to PILF, and that, "[b]ased on voting history records, large numbers of ineligible aliens are registering to vote and casting ballots."  *AI-2* described persons identified in the exhibits as "potential felons," "suspected aliens," or as having "committed felonies."  *AI-2* stated that, for certain declared non-citizens whose voter registrations were included in Exhibit 12 (including Ms. Gearhart's), registering to vote "was as easy as checking 'yes' to the citizenship question."  *Id.* ¶ 20.

21.     *AI-2* also noted the possibility that registrants are being improperly removed from voter rolls as a result of a "scrivener's error."  *AI-2* opined that this "alternative explanation" would also be a "serious problem," as "[l]egitimate voters should not be removed from the rolls for not being citizens."  In that regard, *AI-2* explained the process for cancelling the registration of voters who had self-reported as a non-citizen, including their removal from the voter rolls if they failed to return an Affirmation of U.S. Citizenship within the prescribed period.  *Id.* ¶ 21.

22.     *AI-2* ended with a call to action and "recommendations and solutions," including for law enforcement officials to prosecute cases of voter fraud after "verify[ing] whether or not the individual was a citizen at the time of registration or voting."  *Id.* ¶ 22.

23.     Upon learning that certain local registrars erroneously provided voter registration applications for persons who previously declared non-citizenship but then either re-registered or

remained on the rolls by affirming citizenship, PILF promptly removed those applications (including Ms. Gearhart's) from Exhibit 12 to *AI-2*.  *Id.* ¶ 23.

24.     The day after publication of *AI-2*, Loyola Law School Professor Justin Levitt sent hundreds of emails to people identified in the exhibits trying to find individuals to help "debunk" the report.  He coordinated his outreach with others in academia, the news media, and various interest groups – including Plaintiffs' counsel, the Southern Coalition for Social Justice ("SCSJ") and the Protect Democracy Project ("PDP").  From these communications, Professor Levitt discovered "many" who registered to vote or voted in Virginia but were not citizens.  *Id.* ¶ 24.

25.     Before receiving a series of unsolicited emails from Professor Levitt, Ms. Freeman was not aware of *AI-2* (although she was aware that Prince William County had previously cancelled her voter registration based on a declaration of non-citizenship).  At Professor Levitt's request, Ms. Freeman agreed to talk with attorneys at SCSJ, who helped her re-register to vote and secured her involvement in this litigation.  *Id.* ¶ 25.

26.     Mr. Bonilla and Ms. Gearhart first became aware of *AI-2* through unsolicited phone calls from an SCSJ intern who described PILF as "anti-immigrant," and claimed *AI-2* contains "misinformation," had "racial implications," and caused "intimidation."  *Id.* ¶ 26.

27.     Despite these efforts by Professor Levitt and SCSJ, of the 5,556 individuals listed in the Virginia VERIS Report, only three were later determined to be citizens.  All three were included the report due to an error on their part, error by a Virginia registrar, or both.  *Id.* ¶ 27.

28.     Ms. Freeman, Mr. Bonilla, and Ms. Gearhart suffered no reputational or pecuniary injury as a result of *AI-1* or *AI-2* (the "Reports"), nor received any medical or mental health treatment as a result of learning that their names appeared in the exhibits to the Reports.  *Id.* ¶ 28.

29.     After publication of the Reports, Plaintiffs did not receive any direct threats intended to discourage them from voting or otherwise exercising their rights.  Mr. Bonilla and Ms. Gearhart both continued to vote after learning that their names in appeared in *AI-2*, and Ms. Freeman did not vote because she did not believe there were any opportunities to do so.  *Id.* ¶ 29.

30.     LULAC was not required to divert any monetary resources as a result of the Reports and has not expended any time or resources responding to them.  *Id.* ¶ 30.

## ARGUMENT

### I.     SUMMARY JUDGMENT STANDARD.

Summary judgment is required where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The movant bears the initial burden of establishing the basis for its motion and identifying the evidence that demonstrates the absence of a genuine issue of material fact.  *Id.* Once the movant does so, the plaintiff bears the ultimate burden, including in light of the ultimate standard of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (requiring plaintiff to show clear and convincing evidence of actual malice to withstand summary judgment).

### II.    THE COURT SHOULD ENTER SUMMARY JUDGMENT ON PLAINTIFFS' DEFAMATION CLAIM.

#### A.     Plaintiffs' Claims Arising Out Of *Alien Invasion 1* Are Time-Barred.

In Virginia, the statute of limitations for defamation claims is one year.  Va. Code § 8.01-247.1.  Defamation claims accrue on the date of publication.  *See Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 914 (E.D. Va. 2004).  Because *AI-1* was published on September 30, 2016, well over a year before this lawsuit was filed on April 12, 2018, any defamation claims based on *AI-1* are barred by the statute of limitations.

In deciding Defendants' Motion to Dismiss, this Court credited Plaintiffs' argument that claims based on *AI-1* could proceed because of its thematic connections to *AI-2*, which was published within the limitations period.  *See* ECF No. 63 at 13 (citing *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499 (E.D. Va. 2016), which had been invoked by Plaintiffs, *see* ECF No. 50 at 32).  However, *Dragulescu* actually holds the opposite and does not allow a plaintiff to sue on an otherwise time-barred publication.  That case addressed whether to apply the so-called "single publication rule," under which "subsequent viewings of one allegedly defamatory document do not constitute successive publications."  223 F. Supp. 3d at 512.  Thus, *Dragulescu* considered whether a second publication within the limitations period was a new publication that triggered a claim, or was essentially the same as a prior publication and therefore time-barred as well under the single publication rule (as the Court ultimately held).  *Id.*; *see also Morrissey v. William Morrow & Co.*, 739 F.2d 962, 967 (4th Cir. 1984) (applying single publication rule).  Under either scenario, claims arising from the statement that predated the limitations period are indisputably time-barred.  *See also, e.g.*, *Doe v. Roe*, 295 F. Supp. 3d 664, 673 (E.D. Va. 2018) (where single publication rule does not apply, plaintiff can only pursue claims based on later statement published during limitations period); *Shestul v. Moeser*, 344 F. Supp. 2d 946, 949-50 (E.D. Va. 2004) (same).  Here, Plaintiffs led the Court astray by suggesting otherwise.

Nor does the fact that *AI-2* summarizes and hyperlinks to *AI-1* restart the limitations period for *AI-1*.  Because a summary is a distinct publication, the publisher is responsible only for the contents of *the summary*, not the underlying (time-barred) publication that it summarizes.  *See, e.g.*, *Goforth v. Avemco Life Ins. Co.*, 368 F.2d 25, 28 n.7 (4th Cir. 1966) ("a mere reference to another writing which contains defamatory matter does not constitute an actionable repetition or republication of that libelous material").  Likewise, a "hyperlink . . . does not duplicate the

9

content of a prior publication; rather, it identifies the location of an existing publication," so it

does not constitute "publication" of the linked-to content for statute of limitations purposes.

*Doctor's Data, Inc. v. Barett*, 170 F. Supp. 3d 1087, 1137 (N.D. Ill. 2016); *see also In re Phila.*

*Newspapers, LLC*, 690 F.3d 161, 174-75 (3d Cir. 2012) (same, collecting cases); *Mirage Entm't,*

*Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 39 (S.D.N.Y. 2018) (same).

The Court's prior order is no bar to ruling that defamation claims based on *AI-1* are time-

barred.  As Judge Ellis noted in dismissing claims as untimely despite having previously denied a

motion to dismiss on statute of limitation grounds, the "[l]aw of the case" doctrine "does not and

cannot limit the power of a court to reconsider an earlier ruling" and to "reach the correct

judgment under law."  *Bradford v. HSBC Mortg. Corp.*, 799 F. Supp. 2d 625, 634 (E.D. Va.

2011) (quoting *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003)).

This Court should do the same, and rule that defamation claims based on *AI-1* are time-barred.[1]

### B.      Plaintiffs' Claims Arising Out Of *Alien Invasion 2* Fail As A Matter of Law.

The individual Plaintiffs claim they were defamed by three categories of statements, but

each is non-actionable.  First, statements that Plaintiffs were identified as non-citizens in voter

records provided by election officials are, even if erroneous, privileged reports of official

records.  Second, statements that voting or registering to vote by non-citizens is a felony are true

descriptions of federal and state law.  Third, taken as a whole, the report does not state or

reasonably imply that these Plaintiffs are felons.  But, even if it did, in this context such a

statement would be a protected expression of opinion based on the facts disclosed in the report.

---

[1] Statute of limitations issues aside, *AI-1* is also not "of and concerning" Plaintiffs Bonilla or Gearhart, as neither is mentioned or referenced in that report or its exhibits.  *Dean v. Dearing*, 263 Va. 485, 487, 561 S.E.2d 686, 688 (2002) (concluding that challenged statements were not "of and concerning" plaintiff as a matter of law) (citation omitted); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 288-89 (1964) (claim based on statement not of and concerning plaintiff was "constitutionally defective"); *Rosenblatt v. Baer*, 383 U.S. 75 (1966) (same).

### 1.    Statements That Voter Records Had Identified Plaintiffs As Non-Citizens Are Privileged, Even If Erroneous.

Virginia law has long recognized a privilege to publish summaries of "public records," provided they are "substantially correct." *Alexandria Gazette Corp. v. West*, 198 Va. 154, 159, 93 S.E.2d 274, 278-79 (1956); *see also Ramey v. Kingsport Publ'g Corp*., 905 F. Supp. 355, 358 (W.D. Va. 1995) (privilege shields publishers where they "accurately describe or summarize the contents of an official statement or report").  The privilege applies *even if* it turns out that "the record is incorrect or . . . contains falsehoods." *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 485 (E.D. Va. 2018); *see also West*, 198 Va. at 159-60, 93 S.E.2d at 279 ("incorrectness of the record" does not destroy privilege).  Thus, as long as a publication is clearly based on an official record and contains a fair abridgement or summary of that record, the privilege applies. *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 254 (4th Cir. 1988).

The privilege to publish the contents of official records, even if the records are inaccurate, is also compelled by the First Amendment because freedom to publish information from public records is "of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975) ("In preserving that form of government," the First Amendment "command[s] nothing less than that the States may not impose sanctions on the publication of" such information.); *see also Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 712-13 (4th Cir. 1991) ("several circuits have recognized" that privilege "is one with constitutional implications").

The privilege enables speakers "to inform citizens of what the government is doing," by reporting the contents of "[g]overnment documents," as "'the basic data of governmental operations,'" without the burden of independently verifying the information. *Id.* (citations omitted); *see also Ditton v. Legal Times*, 947 F. Supp. 227, 230 (E.D. Va. 1996) (privilege

encourages dissemination of "official records – whether verbatim or in fair summaries – without fear of liability for any false, defamatory material that they might contain" (citation omitted)), *aff'd*, 129 F.3d 116 (4th Cir. 1997).  As Judge Sack explained, to effectuate its purpose, "the privilege tends to be liberally applied" and will "not be lost because of vivid or opinionated reporting."  1 Robert D. Sack, *Sack on Defamation* ("Sack") § 7:3.5[B][6] (5th ed. 2018) at 7-47.

Here, Plaintiffs complain about exhibits identifying them as registrants who were either removed or flagged for removal from the voter rolls as a result of being non-citizens.  These statements are fully protected as privileged because they are expressly based on official records obtained from election officials.  All the privilege requires is a fair summary of the records.  *See Spirito*, 350 F. Supp. 3d at 488; *Ditton*, 947 F. Supp. at 231.  In this case, however, the records themselves are actually attached, allowing readers to review the complete records for themselves.

*AI-2* discussed and attached (a) the Virginia VERIS Report, referencing Ms. Freeman and Mr. Bonilla, (b) the Prince William Records, referencing Ms. Freeman, (c) the County Records, including the applications for Ms. Freeman, Mr. Bonilla, and Ms. Gearhart, (d) emails from local registrars cautioning that the records requested by PILF might not be accurate, and (e) the subsequent Cortés Email attesting to the accuracy of the VERIS Reports.  SUMF ¶ 18.  *AI-2* accurately describes those records, indicating that Plaintiffs were removed or flagged for removal because they stated on DMV forms under penalty of perjury that they were not citizens.  For Ms. Freeman and Mr. Bonilla, the Virginia VERIS Report (entitled "Cancellation – Declared Non-Citizen") lists the reason for their cancellations as "Declared Non-Citizen," and their registration applications were noted "cancelled – declared non-citizen."  *Id.*

Ms. Gearhart is referenced only in the original version of Exhibit 12 to *AI-2*.  The York County General Registrar provided her application in response to a request for public records

concerning registered voters who potentially failed to satisfy the citizenship requirement.  SUMF

¶ 16.  Her application was apparently included because she had self-reported as a non-citizen on

a DMV form, despite having represented that she was a citizen on her voter application.  *Id.*

*AI-2* accurately reported that Exhibit 12 included applications for persons who had self-identified

as non-citizens despite earlier having registered to vote because it "was as easy as checking 'yes'

to the citizenship question" on their original registration.  *See also AI-2* at 9 ("They swore they

were citizens on voter registration forms, then later told the state they were not citizens.").

Although one passage incorrectly describes Ms. Gearhart as having been "removed" from the

voter rolls (when in fact she had reaffirmed her citizenship before removal), the report's gist –

that she was flagged as a non-citizen after she had simply been required to "check 'yes'" to

obtain voter status – is a substantially accurate summary, one reinforced by attaching her

registration form illustrating the "check-the-box" system highlighted in the report.  *See Spirito*,

350 F. Supp. 3d at 487-88 (privilege applies even where report is "not exactly correct," but,

taken as a whole, is "substantially accurate").[2]

 Simply put, even though the actual truth is that all three individual Plaintiffs are U.S.

citizens (which Defendants learned only after publication), Defendants' statements were

substantially accurate reports of the official government records they received which showed that

Plaintiffs' voter registrations had been cancelled (or, in the case of Ms. Gearhart, flagged for

cancellation) because they identified themselves as non-citizens on DMV forms after registering

---

[2] While *AI-2* at times refers to Plaintiffs as "non-citizens" rather than as "persons who had identified themselves as non-citizens and did not thereafter re-affirm their citizenship within the time period required by law," that is both a fair shorthand given the full context of *AI-2* and a "substantially accurate" description given that Commissioner Cortés used the same verbiage to describe the records' contents.  SUMF ¶¶ 11, 13; *see also Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1097 (4th Cir. 1993) (applying privilege to House member's comments because privilege applies to statements by government officials even if not part of an official record).

to vote based on a claim of U.S. citizenship.  *See, e.g.*, *Ditton*, 947 F. Supp. at 231 ("the underlying factual truth" about the plaintiff "is not the issue" in applying privilege); *Lami v. Pulitzer Publ'g Co.*, 723 S.W.2d 458 (Mo. Ct. App. 1986) (newspaper was privileged to publish report based on government list of individuals whose drivers licenses had been suspended for alcohol-related offenses, even though plaintiff's name wrongly appeared on list).

Finally, even though Defendants attached the records themselves, Plaintiffs appear to contend that *AI-2*'s description of them is not substantially accurate because Defendants were informed that the records might erroneously include citizens.  But *AI-2* expressly notes that possibility, describing and attaching emails from local registrars raising this concern as well as the subsequent Cortés Email in which the chief election official for the Commonwealth assured Defendants that the lists were accurate.  SUMF ¶¶ 18, 21.  Indeed, the report expressly opined that, if there were errors, they needed correction.  *See, e.g.*, *AI-2* at 10 ("Legitimate voters should not be removed from the rolls [in error] for not being citizens.").  Thus, even if Defendants were required to report not only the records themselves, but to reflect how officials described them, they did so and the privilege applies.  *See note 2 supra*.  Because *AI-2*'s statements about Plaintiffs' citizenship provided substantially accurate accounts of the public records that were attached to the report, the challenged statements are privileged and not actionable.[3]

---

[3] Substantial authority confirms that "the publication of public records to which everyone has a right of access is absolutely privileged in Virginia."  *Vaile v. Willick*, No. 6:07cv00011, 2008 WL 2754975, at *7 (W.D. Va. July 14, 2008) (citing *West*, 198 Va. at 159-60, 93 S.E.2d at 279); *see also Rush v. Worrell Enter., Inc.*, 21 Va. Cir. 203, at *3 (1990) ("An absolute privilege applies" to publications "based upon a report of public records").  While some courts have allowed either common law or actual malice to defeat the privilege, Plaintiffs cannot show either here.  There is not "clear and convincing" evidence that Defendants (a) believed the records they had been provided to be false but published their contents anyway, *see* SUMF ¶ 13 & Part II.B.5 *infra*, or (b) had "personal spite, or ill-will," towards these Plaintiffs, *Se. Tidewater Opportunity Project, Inc. v. Bade*, 246 Va. 273, 275, 435 S.E.2d 131, 132 (1993); *see also Doe v. Roe*, 295 F. Supp. 3d at 677 n.18 (not malice to seek to "enforce obedience to the criminal laws").

### 2.     The Statements Describing Voting Laws Are True.

Plaintiffs complain about statements to the effect that federal or state law prohibits non-citizens from voting or registering to vote and makes it a felony to do so.  *See, e.g.*, Compl. ¶¶ 26, 40, 75 (challenging, *inter alia*, *AI-2* at 2 ("[I]t is a felony for a non-citizen to register and to cast a ballot."); *id.* at 3 ("[w]hen non-citizens register or actually vote, they violate both state and federal statutes").  But these statements are accurate descriptions of various statutes, and "true statements, no matter how damaging to the plaintiff, may never provide the foundation for a defamation claim." *AIDS Counseling & Testing Ctrs. v. Grp. W Television, Inc.*, 903 F.2d 1000, 1004 (4th Cir. 1990); *see also Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986) (recognizing "constitutional requirement that the plaintiff bear the burden of showing falsity"); *Jordan v. Kollman*, 269 Va. 569, 576, 612 S.E.2d 203, 207 (2005) (same).  Because such statements of the law are substantially true, *see* SUMF ¶¶ 1, 19, and *AI-2* further cites to the actual statutory provisions, they cannot form the basis of any of Plaintiffs' claims.

### 3.     The Statements Purportedly Describing Plaintiffs As Felons Are Not Actionable.

#### a.     Taken As A Whole, The Report Does Not Call Plaintiffs Felons.

The individual Plaintiffs allege that *AI-2* "falsely asserted that [they] committed felony voter fraud by registering to vote and/or voting."  Compl. ¶ 75.  But the Report does not actually state or imply any such thing.  Whether a challenged publication conveys the defamatory meaning the plaintiff ascribes to it "is a legal question" for the court to decide.  *See, e.g.*, *Wells v. Liddy*, 186 F.3d 506, 522 (4th Cir. 1999); *see also Webb v. Virginia-Pilot Media Cos.*, 287 Va. 84, 90, 752 S.E.2d 808, 811 (2014) (emphasizing this "essential gatekeeping function of the court").  In performing this function, the court must read the challenged publications "as a whole," and take into account the context of the statements.  *Chapin*, 993 F.2d at 1091-92.

15

Applying those principles, *AI-2* cannot reasonably be understood as accusing any of the individual Plaintiffs of committing felony voter fraud.  Rather, read as a whole, the report identifies the "failures" of the current voter registration process in which either non-citizens are illegally registered to vote, or citizens are erroneously classified as non-citizens and improperly removed from voter rolls.  SUMF ¶¶ 20-21; *AI-2* at 10 (asserting that cancelling registrations of "[l]egitimate voters" due to a "scrivener's error," is "itself . . . a serious problem"); *id.* (that citizens were denied the right to vote because of such errors as "appalling").

The report does ***not*** draw conclusions about whether specific registrants identified in the exhibits, including the individual Plaintiffs, fall into one category or the other.  Courts routinely hold that identifying a plaintiff as part of a large group of potential bad actors is insufficient to transform a challenged publication into a specific accusation that a particular member of that group engaged in wrongdoing.  *See, e.g.*, *Fornshill v. Ruddy*, 891 F. Supp. 1062, 1066, 1071 (D. Md. 1995) (report accusing "Park Police" of cover-up in investigation of Vince Foster's death not properly interpreted as accusation against plaintiff Park Police officer, even though he was one of only three officers named in report and identified as person who found deceased's body) (applying Virginia law); *Harvest House Publishers v. Local Church*, 190 S.W.3d 204, 213-14 (Tex. Ct. App. 2006) (dismissing defamation claim against *Encyclopedia of Cults*, which identified plaintiff church as a cult, enumerated several "characteristics of cults" including prostitution, rape and child molestation, and stated that not "all groups" practiced them, because no "reasonable reader could believe that all groups named in the book participate in [those] criminal activities"); *In re CNN and Time Magazine "Operation Tailwind" Litig.*, No. C 99-20137 JF(RS), 2006 WL 2711744, **1-4 (N.D. Cal. Sept. 21, 2006) (where reports stated that only certain members of military unit involved in bombing raid "knew the target" and others

"did not know all the details of the operation," plaintiff pictured in report could not show "actual linkage" between herself and alleged defamatory statements).  The same is true here.  Taken as a whole, *AI-2* cautions that individuals may be erroneously included in the exhibits and thus cannot reasonably be read to accuse *these* Plaintiffs of criminal voter fraud.

### b.    Even If The Report Were Construed As Calling Plaintiffs Felons, That Would Be A Protected Expression Of Opinion.

To the extent that Plaintiffs contend that *AI-2* nevertheless actually accuses them, individually, of having committed a felony, in these circumstances such a statement would be an opinion based on disclosed facts that are either privileged or substantially true.  *See* Parts II.B.1 & II.B.2. *supra*.  Expressions of opinion "are protected by the First Amendment of the Constitution of the United States and Article 1, § 12 of the Constitution of Virginia."  *Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 132, 575 S.E.2d 858, 861 (2003).  Protected opinions include both statements that are classic opinions ("this food tastes lousy") but also factual-sounding statements where it is clear that the speaker is "plainly express[ing] 'a subjective view, an interpretation, a theory, conjecture or surmise, rather than . . . claim[ing] to be in possession of objectively verifiable . . . facts.'"  *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 186 (4th Cir. 1998) (citation omitted); *see also Edwards v. Schwartz*, --- F. Supp. 3d ----, 2019 WL 1295055, at *24 (W.D. Va. Mar. 20, 2019) ("even if a statement is objectively verifiable, it nevertheless qualifies as an opinion" where its content and context make "clear . . . that a reasonable reader or listener would recognize its . . . subjective character") (citations omitted).

"Whether a statement can reasonably be interpreted as stating actual facts about an individual is a question of law for the court."  *Snyder v. Phelps*, 580 F.3d 206, 222 (4th Cir. 2009), *aff'd*, 562 U.S. 443 (2011).  In making this determination, courts consider a statement's content, its context within the full publication, and its broader social context.  *Id.*  Here, the

content itself discloses the indisputably truthful or privileged facts on which the conclusion is based: (1) it is a felony for a non-citizen to vote or register to vote, (2) persons identified in the appendices had been removed or flagged for removal as non-citizens, and (3) the report urged investigation and possible prosecution (such that no one had yet been prosecuted or convicted). Accordingly, there can be no liability based on this statement of opinion. *See Chapin*, 993 F.2d at 1093 (when "the bases for the . . . conclusion are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related").

Second, the context of the full report, taken as a whole, further confirms that it is communicating the author's opinion. The bulk of its text pointedly criticizes the "honor system" used by Virginia election officials to determine eligibility to vote, lambastes those public officials for lax enforcement, and urges state and federal officials to investigate potential violations of the law and to reform the system to prohibit ineligible voting. The report's general tenor further signals the reader that it is a piece of advocacy, brimming with the figurative and non-literal rhetoric of political debate:  it is entitled "Alien Invasion," like the popular video game, and features multiple cartoonish science fiction images depicting interplanetary "alien" invaders. No reasonable reader of the report as a whole could miss these unmistakable indicia that its authors were expressing political opinions.

Finally, the report was published amidst the ongoing public controversy over whether voter fraud is a serious problem or, as Plaintiffs and their counsel contend, merely a pretext for voter suppression. This broader social context further confirms that any statement purporting to label Plaintiffs as felons is "illustrative of the rough-and-tumble nature" of such a debate and the types of opinions readers expect to encounter in the context of "an emotional and highly charged debate about an important public issue." *Arthur v. Offit*, No. 01:09-CV-1398, 2010 WL 883745,

at *5 (E.D. Va. Mar. 10, 2010); *see also Phoenix Trading, Inc. v. Loops LLC*, 732 F.3d 936, 945

(9th Cir. 2013) ("In the context of ongoing public debates, the audience is prepared for

mischaracterizations and exaggerations, and is likely to view such representations with an

awareness of the subjective biases of the speaker.").  Indeed, numerous other courts have readily

found that, in similar contexts, accusations of criminal conduct are non-actionable expressions of

opinion based on disclosed facts.  *See, e.g.*, *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280,

299-302 (4th Cir. 2008) (statements that company employed "mercenaries" and "hired killers,"

who "want to kill for the sake of killing, . . . torture people, and never have to come under the

long arm of the law," were protected opinions because they were used "to make the point . . . that

current laws are ineffective in regulating military contractors operating abroad"); *Schnare v.*

*Ziessow*, 104 F. App'x 847, 849-50 (4th Cir. 2004) (unpublished) (accusation that plaintiff

committed perjury by submitting "affidavit . . . [that] contains some sixty pages of fact and

fiction, innuendo, half-truths, exaggerations and fabrications" as well as "more than enough lies,

fabrications and inaccuracies to cast a serious doubt on the value of the entire document" was

protected opinion).[4]  As in these cases, Defendants' statements are, in the context of a heated

debate about election administration, properly viewed as protected expressions of opinion.

### 4.     Plaintiffs Have Not Suffered Any Compensable Injury.

Plaintiffs concede that none of them has suffered any reputational or pecuniary injury.

SUMF ¶ 28.  None of them has suffered any adverse job consequences, with each maintaining

---

[4] *See also Chau v. Lewis*, 771 F.3d 118, 128-29 (2d Cir. 2014) (comments in *The Big Short* were protected opinions, including that plaintiff was "crook" creating financial instruments out of "whole cloth"); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 250 (D.D.C. 2016) (statements that plaintiff was "con artist," "fraud," and perpetrated what "many current U.S. officials . . . believe was one of the most elaborate and dangerous hoaxes in American history" were protected opinions); *Grabow v. King Media Enters., Inc*., 806 N.E.2d 591, 597-98 (Ohio Ct. App. 2004) (referring to plaintiff as "felon" was non-actionable opinion where "general tone of the column is sarcastic, more typical of persuasive speech than of factual reporting").

his or her previous employment.  *Id.* ¶ 28.  Indeed, none of the individual Plaintiffs had even

*heard* about the report until being recruited to join this lawsuit.  *Id.* ¶¶ 25-26.  When Mr. Bonilla

was originally removed from the voting rolls in 2012, he communicated the same information as

*AI-2* to friends and on Facebook: that his registration had been cancelled on the basis that he was

not a U.S. citizen.  *Id.* ¶ 14.  Because Plaintiffs cannot establish the required element of injury,

summary judgment is warranted.  *See Schaecher v. Bouffault*, 290 Va. 83, 100, 772 S.E.2d 589,

598 (2015); *Fleming v. Moore*, 221 Va. 884, 894, 275 S.E.2d 632, 638-39 (1981) ("to recover

compensatory damages" plaintiff must adduce "proof of actual injury").[5]

### 5.       Defendants Are Immune Under Virginia's Anti-SLAPP Statute.

Plaintiffs' defamation claims are barred by Va. Code § 8.01-223.2, which confers an

immunity on speech about matters of public concern.  It provides in pertinent part that:

> A person shall be immune from civil liability for . . . a claim of defamation based
> solely on statements . . . regarding matters of public concern . . . .  The immunity
> provided by this section shall not apply to any statements made with actual or
> constructive knowledge that they are false or with reckless disregard for whether
> they are false.

The statute thus immunizes speech unless a plaintiff can satisfy the demanding standard

analogous to the constitutional "actual malice" requirement articulated by *New York Times Co.*

*v. Sullivan*, 376 U.S. 254 (1964), and its progeny.  That standard requires a showing that "the

defendant in fact entertained serious doubts as to the truth of his publication" and "actually had a

high degree of awareness of probable falsity."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*,

---

[5] Even if Plaintiffs were correct that (a) the report accused them individually of having
committed felonies, (b) such a statement is not a protected expression opinion, and (c) it is
therefore defamatory *per se*, thereby entitling them to presumed damages, Defendants would still
be entitled to summary judgment.  Where a publication addresses a matter of public concern, a
plaintiff may not recover presumed damages – or, for that matter, punitive damages – absent
proof of constitutional "actual malice."  *Shenandoah Publ'g House, Inc. v. Gunter*, 245 Va. 320,
323-24, 427 S.E.2d 370, 372 (1993) (citing, *inter alia*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323,
349 (1974)).  Plaintiffs cannot meet this stringent standard, as explained in Part II.B.5. *infra*.

491 U.S. 657, 688 (1989) (citations omitted); *see also Gunter*, 245 Va. at 323-24, 427 S.E.2d at 372 (same); *Jordan*, 269 Va. at 577, 612 S.E.2d at 207 (plaintiff must prove that defendant "subjectively entertained serious doubt as to the truth of his statement").

Here, Defendants based their statements on official public records and the description of those records by Virginia's election officials – including in the case of the VERIS Report, the highest ranking public official in the Commonwealth's Department of Elections, and in the case of Ms. Gearhart's application, the fact that it was produced by the York County Registrar in response to a request for records reflecting voting issues related to citizenship.  SUMF ¶¶ 11, 13, 15-16; *see, e.g.*, *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 56 (1971) (finding lack of "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication" where he had "relied on information supplied by police officials"), *abrogated on other grounds by Gertz*, 418 U.S. 323; *Reuber*, 925 F.2d at 716 (no actual malice where defendants "had no apparent reason to question the truthfulness" of contents of public record prepared by "director of a federally-sponsored cancer research center"); *Jordan*, 269 Va. at 581, 612 S.E.2d at 209 (same where defendant "relied on public information").

In *AI-2*, Defendants published these records and then, in the context of an advocacy piece, expressed their conclusions.  Plaintiffs conceded as much – admitting that it is "not that the records themselves were false," ECF No. 86 at 3, but contending that "'Virginia election officials informed Defendants that they were drawing false conclusions.'"  *Id.* (quoting Compl. ¶ 33). Three things flow from this concession.  First, there can be no knowledge of falsity with respect to the records themselves since it is concededly not "the records themselves [that] were false," and they were attached to the report in any event.  *Id.*  Second, the "conclusions" Plaintiffs accuse the Defendants of "drawing" (that *all* listed individuals are non-citizens and thus felons) are protected

expressions of Defendants' opinions.  Since such opinions are not capable of being proven true or false, by definition, Defendants could not have published them with knowledge of their falsity.

Finally, Plaintiffs' concession demonstrates why they cannot overcome the statutory immunity based on what "Virginia election officials [had] informed Defendants."  While Plaintiffs *alleged* in their Complaint that election officials told Defendants that they "were drawing false conclusions," and the Court denied Defendants' motion to dismiss based on that *allegation*, *see* ECF No. 63 at 13 (finding that "Plaintiffs sufficiently allege Defendants' awareness of the risk of incorrectness of the voter registration data obtained from county registrars"), the undisputed record negates that allegation in two respects.  The record confirms that, after local registrars communicated those concerns, any doubts that they *might have* planted in Defendants' minds were subsequently laid to rest by the authoritative and unequivocal clarification they received in the Cortés Email, in which Virginia's Election Commissioner confirmed the accuracy of the VERIS reports.  SUMF ¶ 13.

Moreover, *AI-2* itself discusses the registrars' concern, opining that it reflects a significant additional issue with Virginia's voter registration system.  SUMF ¶ 21.  Publishing a report that discloses conflicting understandings, and then chooses one interpretation while allowing readers to reach a contrary conclusion, is the opposite of publishing with the knowledge of falsity needed to show "actual malice" or to overcome the statutory immunity.  *See Time, Inc. v. Pape*, 401 U.S. 279, 290 (1971) ("the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities," even where "arguably reflecting a misconception," is "not enough to create a jury issue of 'malice' under *New York Times*.").[6]

_____

[6] That Defendants' publications overtly advocated for a particular course of action is likewise not probative of actual malice.  "[M]any publications set out to portray a particular viewpoint or even to advance a partisan cause.  Defamation judgments do not exist to police their

Finally, the record reflects that organized political advocacy groups engaged in a Herculean effort to identify individuals who appeared in error on the records attached to *AI-2*, but found fewer than a half dozen out of more than 5,000. They did so with the avowed purpose of silencing Defendants, including by imposing massive litigation costs, pursuing a crushing financial verdict, and seeking injunctive relief enjoining protected speech. Those facts both underscore that Defendants' report was not published with knowledge of falsity (since only a small handful of people identified in the records it attaches had been included in error) and provide a stark illustration of why the immunity conferred by the Virginia legislature is needed to protect controversial speech on a matter of vital public concern.[7]

## III. THE COURT SHOULD ENTER SUMMARY JUDGMENT ON PLAINTIFFS' TWO STATUTORY CLAIMS.

### A. LULAC Lacks Standing To Assert These Claims.

In ruling on Defendants' Motion to Dismiss, this Court (a) "found that LULAC lacks standing under the representational theory," disposing of that issue; (b) "expresse[d] doubt" about LULAC's standing based on organizational injury; and (c) invited further briefing following discovery on whether the "One Good Plaintiff Rule," which requires each Plaintiff to raise "the same legal issues and request[ ] the same type or remedy," extended to LULAC. ECF No. 63 at 4-5 & nn.1-2 (citations omitted). Discovery has now confirmed that LULAC has suffered no organizational injury, is raising different issues, and seeks different remedies.

---

objectivity; the First Amendment presupposes that a veritable medley of opposing voices is better suited to the search for truth." *Reuber*, 925 F.2d at 716. Moreover, PILF's efforts to promptly update Exhibit 12, SUMF ¶ 23, further negate a disregard of the truth.

[7] Were *AI-1* not time barred, it would also be subject to each of the protections described *supra*, including that it expresses opinions based on a privileged report of officials records, including to call on officials to "verify" whether the listed registrants are, in fact, non-citizens. SUMF ¶ 7. Moreover, *AI-1* was published prior to any local registrar expressing concern that Defendants were drawing incorrect conclusions, so there is no knowledge of falsity. *Id.* ¶ 6.

To establish organizational injury under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), and similar cases, LULAC must demonstrate both that its claimed injury was caused by Defendants' conduct rather than by a third party's independent actions ("traceability") and that the injury can be redressed through the lawsuit ("redressability"). *See* ECF No. 63 at 4 n.1 (expressing doubts about "traceability and redressability of LULAC's alleged injury") (citation omitted). In her deposition, Vilma Seymour, LULAC's President and sole member, focused on generalized heated rhetoric, "led by Donald Trump and his supporters," and was unable to say what time and resources LULAC supposedly had to devote to "combat the false narrative that Latinos who vote are doing so illegally." SUMF ¶ 30. By definition, those generalized allegations of injury attributable generally to Trump supporters or those predisposed against Latinos, does not satisfy the requirement that the injury be traceable to the Reports. And because that injury flows from generalized heated rhetoric, it is not redressable by LULAC's claims in this case. As a result, LULAC lacks organizational standing.

As for the "One Good Plaintiff Rule," it is "often limited to cases where each Plaintiff raises the same legal issues and requests the same type of remedy." ECF No. 63 at 4-5 (citing, *inter alia*, *Bowsher v. Synar*, 478 U.S. 714 (1986), in which "the standing of one Plaintiff [wa]s sufficient" because "[a]ll of the Plaintiffs' claims are virtually identical"). Because "standing is not dispensed in gross," however, where, as here, the claims and remedies are different, the rule does not apply. *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *see also Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("injurious conduct of one kind" does not confer standing on plaintiff to "litigat[e] conduct of another kind, although similar, to which he has not been subject"). Here, the individual Plaintiffs' principal injury flows from having been falsely identified as non-citizens in the public records attached to the Reports. In contrast, LULAC has alleged no such

injury.  Indeed, the lack of any such injury caused the Court to reject standing on a representational theory.  SUMF ¶ 30.  Similarly, the individual Plaintiffs contend that they will face harassment, deterring them from voting, while Ms. Seymour was unable to identify any specific instances of members being harassed or intimidated as a result of the Reports.  *Id.*

The relief that LULAC seeks is also markedly different from that of the individual Plaintiffs.  *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650, 1651 (2017); *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 216-17 (4th Cir. 2017).  The individual Plaintiffs want to enjoin the inclusion of their names in the Reports, while LULAC wants the Reports removed from circulation and the Internet.  And while the individual Plaintiffs seek damages for voter intimidation, Compl. ¶¶ 61-62, LULAC seeks damages for impeding its organizational goals and expending "substantial time and effort combatting" the "heated rhetoric" allegedly generated by the Reports, *id.* ¶¶ 64-65.  Because LULAC lacks standing, the Court should enter summary judgment in Defendants' favor on LULAC's claims.

**B.    Plaintiffs' Statutory Claims Fail Under Both The Statutes Themselves And The First Amendment.**

To proceed with their federal claims, Plaintiffs must establish that Defendants interfered with their participation in election by "force, intimidation, or threat."  42 U.S.C. § 1985(3); *see also* 52 U.S.C. § 10307 (person violates Section 11(b) of Voting Rights Act if they "intimidate, threaten, or coerce" so as to interfere with voting or related activities).  Plaintiffs assert that Defendants did so in three ways, but since Defendants engaged solely in pure speech, the First Amendment bars each of Plaintiffs' contentions.

First, Plaintiffs complain that, because Defendants' speech was false and defamatory, it violated the two federal statutes they invoke.  *See, e.g.*, Compl. ¶ 59 ("Defendants' multiyear, ongoing defamation campaign did intimidate Plaintiffs," thereby violating Section 1985(3)); *id.*

¶ 70 ("[t]he defamation campaign intimidated, threatened, or coerced" eligible voters "into refraining from engaging in future voting-related activities," thereby violating Section 11(b)). There is no evidence of any even arguable falsity for most of the names included in the exhibits. Moreover, even for the few included in those public records erroneously, it is blackletter law that Plaintiffs may not end run the constitutional protections used to separate actionable defamation from protected speech by pleading another cause of action premised on the same speech. *See Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 51-56 (1988). As explained *supra*, the First Amendment protects statements that are (a) not "of and concerning" Plaintiffs, (b) privileged reports of official records, (c) substantially true, and/or (d) expressions of opinion, and (e) further protects the recovery of presumed (or punitive) damages without a showing of actual malice. Plaintiffs' attempt to circumvent this extensive body of law by invoking voting rights statutes to seek defamation-type damages for alleged injury to reputation fails as a matter of settled constitutional law – especially with respect to claims by LULAC or "others similarly situated" to the three individual Plaintiffs, Compl. ¶ 25, since there has been no showing of any false and defamatory statement that is "of and concerning" them, much less any reputational injury. *See, e.g.*, *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999) (rejecting attempt "to recover defamation-type damages under non-reputational tort claims, without satisfying the stricter (First Amendment) standards of a defamation claim. We believe that such an end-run around First Amendment strictures is foreclosed by *Hustler*.").

Second, Plaintiffs complain that the Reports threatened or intimidated them "to prevent them from voting or registering to vote." Compl. ¶ 54; *see also id.* ¶ 71 (same). When the gravamen of a plaintiff's complaint is that he or she was threatened or intimidated, or experienced fear as the result of pure speech, the First Amendment prohibits punishment unless

that speech is a "true threat."  *Virginia v. Black*, 538 U.S. 343 (2003); *see also Watts v. United States*, 394 U.S. 705, 706 (1969) (*per curiam*).  This requires a serious expression of an intent to commit violence or some other unlawful act against the plaintiff.  *See United States v. White*, 810 F.3d 212, 220 (4th Cir. 2016) (reaffirming "constitutional rule that a 'true threat' is one that a reasonable recipient familiar with the context would interpret as a serious expression of an intent to do harm").  Here, the undisputed record confirms that none of the individual Plaintiffs, or for that matter any member of LULAC, experienced a fear of violence or other palpable harm from Defendants as the result of the Reports.  SUMF ¶ 29.  Moreover, even had Plaintiffs known about the Reports, neither their content nor their context could reasonably be interpreted as a serious expression of an intent to do harm.  Nothing in the language of the Reports is even implicitly threatening; they were not communicated directly to Plaintiffs; and no reader of the Reports reacted in a way suggesting that they were viewed as threatening.  Indeed, "[t]he communications" at issue "were expressions not directed to [Plaintiffs] but to the public generally and did not communicate an intent to take any action whatsoever," such that they "fell short of being true threats."  *United States v. White*, 670 F.3d 498, 512-13 (4th Cir. 2012), *abrogated on other grounds by* 810 F.3d 212; *see also In re White*, No. 2:07cv342, 2013 WL 5295652, at *55 (E.D. Va. Sept. 13, 2013) ("The Fourth Circuit has repeatedly and consistently considered the direct and private communication of an allegedly threatening statement to a specific individual as a significant contextual factor in determining whether such statement constitutes a 'true threat.'") (citing cases).[8]  Indeed, rather than threatening violent or other unlawful conduct, the Reports "advocat[ed] for the prosecution" of those who had registered or

---

[8] For the same reason, *United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012), previously relied on by Plaintiffs, is distinguishable because it involved a "direct and private communication," which is far more likely to be a true threat than "expressions . . . to the public generally" of the type at issue here.  *In re White*, 2013 WL 5295652, at *55.

voted unlawfully.  Compl. ¶ 57.  Petitioning government officials to initiate legal process, with the full protections of the legal system, is the exact opposite of threatening violent or other unlawful conduct.  *See In re White*, 2013 WL 5295652, at *50 (threat to instigate legal action, "and thereby invoke constitutionally prescribed powers and processes," is not a true threat).

It is likewise well established that disclosing personal identifying information is not a true threat – even in far more dangerous circumstances than those here.  *See Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244, 1248 (N.D. Fla. 2010) ("merely publishing [a police] officer's address and phone number, even with intent to intimidate, is not a 'true threat' as defined in constitutional law jurisprudence"); *United States v. Carmichael*, 326 F. Supp. 2d 1267, 1280-86 (M.D. Ala. 2004) (criminal defendant's website listing names and photographs of persons labeled "informants" was not true threat, despite "history of violence committed against informants in drug-distribution cases"); *Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1143 (W.D. Wash. 2003) (noting lack of "historical or anecdotal evidence" that publishing personal identifying information has a "'long and pernicious history as a signal of impending violence,' and thus, may be proscribed as a subset of true threats").  For similar reasons, publishing a list of voters in the newspaper and threatening to challenge their votes does not violate Section 11(b).  *See United States v. Brown*, 494 F. Supp. 2d 440, 477 n.56 (S.D. Miss. 2007).

Third, in connection with their Section 1985(3) claims, Plaintiffs contend that the Reports operated as a call to third parties to commit unlawful acts against them.  *See, e.g.*, Compl. ¶ 58 ("by heavily publicizing the report . . . using incendiary rhetoric," Defendants "aimed to foment public outrage"); *id.* ¶ 50 (alleging "concern regarding harassment and physical safety" including from those posting comments on Internet).  Not only are Plaintiffs unable point to any instance in which a third party harassed them as the result of the Reports, but the First Amendment severely

limits the circumstances in which a speaker can be held responsible for the conduct of a third-party reader.  In *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (*per curiam*), and its progeny, the Supreme Court allowed liability in such circumstances only where the speech is (a) directed to and (b) likely to incite (c) imminent lawless action.  The undisputed record confirms that there was no imminent lawless action, and that neither the Reports' context nor their content makes them speech directed to or likely to incite such lawless action.  SUMF ¶ 29.  Rather, the Reports advocated for investigation by law enforcement, not imminent lawless action.  Indeed, in each of the Supreme Court's modern incitement cases, the speech at issue was far closer to advocating imminent violence and was still deemed protected.  *See Brandenburg*, 395 U.S. at 446 n.1 (KKK leader could not be punished for statements at rally such as "bury the ni--ers"); *Hess v. Indiana*, 414 U.S. 105, 107 (1973) (statement at anti-war rally, "We'll take the f--king street later"); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902 (1982) ("If we catch any of you going in any of them racist stores, we're gonna break your damn neck.").

Finally, incitement doctrine aside, the disclosure of personal identifying information on official public records lawfully obtained from the government is separately protected by the First Amendment.  The Supreme Court has repeatedly held that publication of such information is constitutionally protected even where, unlike here, it is made confidential by statute, but has been lawfully obtained and then published.  *See, e.g.*, *Cox Broad. Corp.*, 420 U.S. 469 (publication of name of juvenile rape victim constitutionally protected); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829 (1978) (same for publication of details of confidential judicial review commission proceeding); *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979) (same for publication of name of defendant in confidential juvenile proceeding); *Florida Star v. B.J.F.*, 491 U.S. 524, 541 (1989) (same for publication of name of rape victim, where disclosure otherwise

violated state statute); *Bartnicki v. Vopper*, 532 U.S. 514, 534-35 (2001) (same for broadcast of wiretapped telephone conversation provided to radio station). Unlike these cases, where the information was deemed confidential by statute, the information here was lawfully obtained by Defendants from the Commonwealth. Moreover, rather than highlighting a single individual's information, here the information at issue was published *en masse*, as part of a group of more than 5,000 people, dramatically diluting the effect of publishing any single datum.

In light of these precedents, even if "the Court finds the republication of [plaintiffs'] personal, identifying information repugnant," it is not unlawful. *In re White*, 2013 WL 5295652, at *52. There is "no authority for the proposition that truthful lawfully-obtained, publicly available personal identifying information constitutes a mode of constitutionally prescribable speech. Rather, disclosing and publishing information obtained elsewhere is precisely the kind of speech that the First Amendment protects." *Id.* (First Amendment protected white supremacist's publication of prosecutor's address, despite safety concerns) (citing *Sheehan*, 272 F. Supp. 2d at 1142, and *Bartnicki*, 532 U.S. at 527).[9]

## CONCLUSION

Because the undisputed record confirms that Defendants simply engaged in core political speech protected by a host of constitutional doctrines, the Court should enter summary judgment in Defendants' favor and dismiss Plaintiffs' claims with prejudice.

---

[9] *See also Ross v. Burns*, 612 F.2d 271, 271-72 (6th Cir. 1980) (publishing photographs of undercover narcotics officer not actionable even where publication "increased [the] risk of recognition in the community and thereby jeopardized his personal safety and efficacy on the job"); *Price v. Viking Press, Inc.*, 625 F. Supp. 641, 643, 650 (D. Minn. 1985) (identifying an FBI agent in book not actionable despite claim that disclosure "encourage[d] violent individuals to consider physically harming him or his family"), *aff'd*, 881 F.2d 1426 (8th Cir. 1989); *Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1144 (S.D. Cal. 2005) (publication of facial images of Navy Seals operating in Iraq not actionable, despite claim "that their lives have been placed in danger because of Defendants' publication").

Dated:  June 14, 2019

Respectfully submitted,

FOLEY & LARDNER LLP

By____*/s/ Michael J. Lockerby*_____
   Michael J. Lockerby (Va. Bar No. 24003)
   Eli L. Evans (Va. Bar No. 90700)
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone:  202-945-6079
Facsimile:  202-672-5399
mlockerby@foley.com
eevans@foley.com

William E. Davis (admitted *pro hac vice*)
Ana Romes (admitted *pro hac vice*)
FOLEY & LARDNER LLP
One Biscayne Tower
2 South Biscayne Boulevard, Suite 1900
Miami, Florida 33131
Telephone:  305-482-8404
Facsimile:  305-482-8600
wdavis@foley.com
aromes@foley.com

*Counsel for Defendants Public Interest Legal*
*Foundation and J. Christian Adams*

Matthew E. Kelley (Va. Bar No. 84045)
Seth D. Berlin (admitted *pro hac vice*)
Steven D. Zansberg (admitted *pro hac vice*)
Alia L. Smith (admitted *pro hac vice*)
Alexander I. Ziccardi (admitted *pro hac vice*)
BALLARD SPAHR LLP
1909 K Street NW, 12th Floor
Washington, DC 20006-1157
Telephone: 202-661-2200
Facsimile: 202-661-2299
kelleym@ballardspahr.com
berlins@ballardspahr.com
zansbergs@ballardspahr.com
smithalia@ballardspahr.com
ziccardia@ballardspahr.com

*Counsel for Defendant J. Christian Adams*

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2019, I electronically filed the foregoing

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT with the Clerk of Court using the CM/ECF system, which will then send a Notice

of Electronic Filing (NEF) to all counsel of record.

Christopher S. Herlihy, Esq.
Anisa A. Somani, Esq.
Nicole M. Cleminshaw, Esq.
Geoffrey M. Wyatt, Esq.
Sean M. Tepe, Esq., Esq.
Andrew Hanson, Esq.
Zachary W. Martin, Esq.
John R. Thornburgh II, Esq.
SKADDEN ARPS SLATE
MEAGHER & FLOM
1440 New York Avenue, N.W.
Washington, D.C. 20005

Allison Riggs, Esq.
Jaclyn Maffetore, Esq.
Jeffrey Loperfido, Esq.
SOUTHERN COALITION
FOR SOCIAL JUSTICE
1415 West Highway 54, Suite 101
Durham, North Carolina 27707

Cameron Kistler, Esq.
Genevieve Nadeau, Esq.
Jamila Benkato, Esq.
PROTECT DEMOCRACY PROJECT
2020 Pennsylvania Avenue, N.W. # 163
Washington, D.C. 20006

Larry Schwartztol, Esq.
PROTECT DEMOCRACY PROJECT
10 Ware Street
Cambridge, Massachusetts 02138

Andrew G. Celli, Jr., Esq.
Alanna Kaufman, Esq.
David Lebowitz, Esq.
EMERY CELLI BRINCKERHOFF &
ABADY LLP
600 Fifth Avenue at Rockefeller Center
10th Floor
New York, New York 10020

_____ /s/ Michael J. Lockerby _____
Michael J. Lockerby (VSB No. 24003)
FOLEY & LARDNER LLP
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109
Telephone:  202-945-6079
Facsimile:  202-672-5399
Email:  mlockerby@foley.com

*Counsel for Defendants Public Interest
Legal Foundation and J. Christian Adams*