IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LEAGUE OF UNITED LATIN AMERICAN
CITIZENS - RICHMOND REGION
COUNCIL 4614, ELIUD BONILLA,
LUCIANIA FREEMAN, and ABBY JO
GEARHART,

                       **Plaintiffs,**

        **v.**

PUBLIC INTEREST LEGAL FOUNDATION
and J. CHRISTIAN ADAMS,

                       **Defendants**.

Civil Action No. 1:18-cv-00423 (LO/IDD)

## DECLARATION OF ELI L. EVANS

Eli L. Evans, pursuant to 28 U.S.C. § 1746, states as follows:

I am an associate in the law firm of Foley & Lardner LLP, counsel for Defendants, the

Public Interest Legal Foundation ("PILF") and J. Christian Adams ("Mr. Adams"). I am a member

of the Virginia State Bar and admitted to practice in this Court. I submit this declaration to provide

the Court with the evidentiary support for Defendants' Motion for Summary Judgment. For the

convenience of the Court, the documents, deposition testimony, and other evidence referenced

herein and attached hereto as exhibits are organized to correspond with the Statement of

Undisputed Material Facts ("SUMF") contained in the Memorandum in Support of Defendants'

Motion for Summary Judgment.

1.      **"Because only U.S. citizens are eligible to register to vote and vote, Virginia**

**election officials identify and may ultimately cancel the voter registration of anyone who self-**

**reports as a non-citizen on Virginia Department of Motor Vehicle ('DMV') forms. The**

1

Virginia Department of Elections ('ELECT') and the registrar of each locality maintain, through the Voter Registration and Information System ('VERIS'), a list of individuals whose registrations have been cancelled.  Pursuant to the National Voter Registration Act, 52 U.S.C. §§ 20501-11 ('NVRA'), ELECT permits citizens to inspect and copy such records." (SUMF ¶ 1).

a.      **Exhibit 1** is a true and correct copy of Chapter 8 of the Virginia Department of Elections Handbook ("DOE Handbook").  Chapter 8 of the DOE Handbook, entitled "List Maintenance," sets forth the procedures for registrars to comply with NVRA and Virginia Code §§ 24.2-410.1(B) and 24.2-427(B)(ii).[1]  Chapter 8 provides that (i) "each month the Department of Motor Vehicle is required to furnish to Department of Elections a complete list of all persons who have indicated that they are not a United States citizen to DMV";  (ii) upon receiving notice from the DMV, the Department of Elections must transmit that information to the appropriate General Registrar; (iii) the General Registrar then must "mail a notice of cancellation to each registered voter identified by the DMV as a non-citizen;" (iv) the voter is then given 14 days to return a signed statement affirming citizenship;  and (v) the voter's registration will be automatically cancelled if he or she does not return the affirmation of citizenship within 21 days.  (Cortés Dep. Ex 5, p. 12).

b.      **Exhibit 2** is a true and correct copy of the deposition transcript of Christopher Piper in his capacity as a Fed. R. Civ. P. 30(b)(6) representative for the

---

[1] Virginia Code § 24.2-410.1(B) provides that "[t]he Department of Motor Vehicles shall furnish monthly to the Department of Elections a complete list of all persons who have indicated a noncitizen status to the Department of Motor Vehicles . . . . The Department of Elections shall transmit the information from the list to the appropriate general registrars." Virginia Code § 24.2-427(B)(ii) provides that the "general registrar shall cancel the [voting] registration of . . . all persons known by him not be a United States citizens by reason of reports from the Department of Motor Vehicles . . . ."

Virginia Department of Elections ("VA DOE 30(b)(6) (Piper) Dep.").  Mr. Piper testified that once the Virginia Department of Elections ("ELECT") receives notification from the DMV that a registered voter has declared non-citizenship, the local General Registrar will submit a notice of cancellation to that voter.  If the voter does not affirm citizenship within 21 days of receiving that notice, the voter's registration will be automatically cancelled. (VA DOE 30(b)(6) (Piper) Dep. 210:16-211:10).

       c.    **Exhibit 3** is a true and correct copy of a publication available online from the Virginia DMV website at www.dmv.virginia.gov/webdoc/pdf/accept_doc_status.pdf. Entitled "Acceptable Documents by Status," it cites Virginia Code § 46.2-328.1 to identify the documents required to obtain a Virginia driver's license by citizens of the United States and various categories of non-citizens, namely:  (i) legal permanent residents of the United States; (ii) conditional resident aliens of the United States; (iii) holders of a valid nonimmigrant visa status; (iv) individuals with a pending or approved application for asylum in the United States; (v) refugees; (vi) individuals with pending or approved application for temporary protected status in the United States; (vii) individuals with approved deferred action status; and (viii) individuals with a pending application for adjustment of status to legal permanent resident status or conditional resident status. (Cortés Dep. Ex. 12).

       d.    **Exhibit 4** is a true and correct copy of the deposition transcript of Edgardo Cortés ("Cortés Dep."), who served as Virginia's Commissioner of Elections from July 2014 to January 2017.  (Cortés Dep. 29:25-30:9).  Mr. Cortés testified that non-citizens of the United States can obtain a Virginia driver's license upon the presentation of the documents required by Virginia Code § 46.2-328.1 and that the Virginia DMV maintains

3

records of the types of documents by which non-citizens in Virginia have obtained driver's licenses.  (Cortés Dep. 137:5-142:2).

    e.    **Exhibit 5** is a true and correct copy of the deposition transcript of Justin M. Levitt, a law professor at Loyola University in Los Angeles ("Levitt Dep.").  Professor Levitt sent hundreds of emails to Virginia voters for the purpose of identifying potential plaintiffs in this litigation and later consulted with the law firms that filed this litigation. Professor Levitt testified that non-citizens who had previously registered to vote sometimes cancelled their voter registrations because their prior voter registration may make it more difficult to obtain permanent residency or citizenship.  (Levitt Dep. 72:9-73:11, Ex. 19).

    f.    **Exhibit 6** is a true and correct copy of the deposition transcript of Matthew Sears in his capacity as a Fed. R. Civ. P. 30(b)(6) representative for the Virginia Department of Elections ("VA DOE 30(b)(6) (Sears) Dep.").  Mr. Sears testified that the names of voters who indicate they are non-citizens on DMV forms are loaded in VERIS. (VA DOE 30(b)(6) (Sears) Dep. 72:5-75:11).

    g.    At his deposition, Mr. Cortés testified that the Virginia Department of Elections maintains in the ordinary course a VERIS report listing voters whose registrations were cancelled for being declared non-citizens.  (Cortés Dep. 65:16-66:10) (**Exhibit 4**).

    h.    At his deposition, Commissioner Cortés' successor, Christopher Piper, testified that the Department of Elections uses such VERIS reports to prepare an annual report to the Virginia General Assembly about the number of voters whose registrations were cancelled due to non-citizenship.  (VA DOE 30(b)(6) Piper Dep. 184:13–186:7, 211:11–212:2) (**Exhibit 2**).

4828-8316-0986.3

i.       **Exhibit 7** is a Fed. R. Evid. 1006 Summary of Virginia Department of Elections Annual List Maintenance Reports Showing Non-Citizen Voter Cancellations.

j.       Chapter 8 of the DOE Handbook describes, in Section 8.2.2.2, under the heading "Voter Cancellation Program," the procedures for cancelling voter registrations in accordance with the Virginia Code § 24.2-428 and the NVRA.[2]  These procedures apply to registrations that were "processed from data received from DMV."  Chapter 8 also states, in Section 8.2.2.3 under the heading "NVRA-Mandated Records Access, as follows:

> "**Lists of voters whose registration have been cancelled under this program are available for public inspection and copying.** The general registrar must post the list at the courthouse, or have it published in a newspaper of general circulation, in the general registrar's community.  The general registrar must provide a certified copy of the list to the chairman of each political party in the locality.  An electoral board may approve accepting a registrar's electronic read email receipt as equivalent to a certificate of mailing to the party chair required by Virginia law."

(Cortés Dep. Ex. 5 at 5) (emphasis in original) (citation omitted) (Exhibit 1).

k.       **Exhibit 8** is a true and correct copy of Chapter 9 of the DOE Handbook, entitled "Records Access and Retention."  In Section 9.3.1, under the heading "Voter Registration Applications," Chapter 9 states:  "Individuals or organizations may request to see voter registration applications and as general registrar, you should supply these documents in compliance with NVRA."  In Section 9.3.2, under the heading "Information to Provide for an NVRA Request," Chapter 9 states:  "NVRA makes available for public

---

[2] The NVRA requires states to "maintain for at least 2 years" and "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of registered voters," and that such records "shall include lists of the names and addresses of all persons to whom notice described in subsection (d)(2) are sent, and whether or not each such person has responded to the notice as of the date that inspection of the records is made."  52 U.S.C. § 20507 (i)(1), (2).

4828-8316-0986.3

inspection and photocopying '*all* records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of the registration records pursuant §§24.2-427, 24.2-428, and 24.2-428.1.' (emphasis added)." It also cites Virginia Code of § 24.2-444(c) to provide registrars with guidance as to "what information must be redacted when providing these records," including "[a]ll of an individual social security number" and "[t]he day and month of birth of an individual." (Cortés Dep., Ex. 6 at 12).

2. **"PILF is a public interest law firm that advocates for election integrity. Mr. Adams is PILF's President and General Counsel."** (SUMF ¶ 2).

a. **Exhibit 9** is a true and correct copy of a Form 990 that PILF filed with the IRS in 2016 stating that PILF "[s]pecializes in civil litigation in high-profile matters affecting the political processes of the nation, with particular emphasis given to aiding the cause of election integrity and litigating against lawlessness in American elections." (PILF 30(b)(6) (Adams) Dep. Ex. 3 at PILF-ADAMS-0021107).

b. **Exhibit 10** is a true and correct copy of a screenshot of the website, Reports Archives – Public Interest Legal Foundation Archives, available at https://publicinterestlegal.org/category/reports.

c. **Exhibit 11** is a true and correct copy of the deposition transcript of Noel Johnson ("Johnson Dep."). Mr. Johnson, who is litigation counsel to PILF, testified that PILF is a non-partisan, 501(c)(3) corporation "that focuses on election integrity and preservation of the constitutional framework under which states and the federal government share control of elections." (Johnson Dep. 24:21-26:5).

d.     **Exhibit 12** is a true and correct copy of the deposition transcript of J. Christian Adams in his capacity as the Fed. R. Civ. P. 30(b)(6) representative for PILF ("PILF 30(b)(6) (Adams) Dep.").

e.     **Exhibit 13** is a true and correct copy of the deposition transcript of J. Christian Adams, in his individual capacity ("Adams Dep.").

f.     At both depositions, Mr. Adams testified regarding his role at PILF and his past work in the Voting Section of the United States Department of Justice.  (PILF 30(b)(6) (Adams) Dep. 14:14-18; 19:8-16; Adams Dep. 191:15-19).

**3.     "In 2016, PILF and the Virginia Voters Alliance ('VVA') submitted a series of NVRA records requests to local registrars.   Some registrars refused, and Virginia Commissioner of Elections Edgardo Cortés directed local registrars not to provide VERIS reports, contending that doing so would violate the Driver Privacy Protection Act, 18 U.S.C. §§ 2721-2725 ('DPPA').   Other registrars, including Prince William County complied."** (SUMF ¶ 3).

a.     **Exhibit 14** is a true and correct copy of a January 25, 2016 NVRA records request that VVA sent to the City of Alexandria General Registrar.  (VVA 30(b)(6) (George) Dep. Ex. 5).

b.     **Exhibit 15** is a true and correct copy of the Complaint that PILF filed on behalf of VVA and David Norcross in the Eastern District of Virginia on April 7, 2016.

c.     At his deposition, Mr. Adams testified that, following a court hearing at which counsel for the Alexandria registrar stated that the requested records would be produced, the litigation was dismissed without prejudice.  Thereafter, the Alexandria registrar permitted PILF and VVA to inspect the requested records on July 25, 2016 and

promised to make copies of certain documents identified by PILF and VVA.  (PILF 30(b)(6) (Adams) Dep. 43:16-45:17; 49:2-55:7) (**Exhibit 12**).

 d. **Exhibit 16** is a true and correct copy of August 8, 2016 correspondence from PILF to General Registrars in various jurisdictions in Virginia seeking public records pursuant to the NVRA.

 e. **Exhibit 17** is a true and correct copy of an August 10, 2016 email from William W. Tunner, counsel to the City of Alexandria General Registrar, following up on the July 25, 2016 inspection by PILF and VVA and concluding with the statement:  I look forward to working with you on these issues."  (George Dep. Ex. 7 at PILF-ADAMS-0000640).

 f. **Exhibit 18** is a true and correct copy of a VERIS report provided to PILF on August 16, 2016 by the General Registrar of Roanoke County entitled "COMMONWEALTH OF VIRGINIA – DEPARTMENT OF ELECTIONS – "Cancellation – Declared Non-Citizen" with a start date of 01/01/2011 and an end date of 08/16/2016.  (Albertson Dep. Ex. 24 at SASMF 0068-70).

 g. **Exhibit 19** is a true and correct copy of an August 18, 2016 email to PILF from the General Registrar of Bedford County (PILF-ADAMS-0018106-7) enclosing a VERIS report entitled "COMMONWEALTH OF VIRGINIA – DEPARTMENT OF ELECTIONS – "Cancellation – Declared Non-Citizen" with a start date of 01/01/2011 and an end date of 08/16/2016.  (PILF-ADAMS-0018106-8).

 h. **Exhibit 20** is a true and correct copy of a September 13, 2016 email from the General Registrar of Fairfax City providing "redacted copies of voter registrations for

people who were cancelled for non-citizen reason from 2011 to August 15, 2016" (PILF-ADAMS-0016926) and attaching the registration data (PILF-ADAMS-0016927).

i.      **Exhibit 21** is a true and correct copy of an August 19, 2016 email from Commissioner Cortés to the General Registrars of Virginia explaining that ELECT is not providing a statewide VERIS report to PILF and stated:  "While there is a VERIS report that provides a list of registrants cancelled due to non-citizenship for your administrative use, **you may not provide the information regarding reason for cancellation for non-citizen status** as this information is received from DMV and is covered under the federal Driver's Privacy Protect Act (DPPA)." (Wheeler Dep., Ex. 9) (emphasis in original).

j.      **Exhibit 22** is a true and correct copy of an email reflecting an August, 22, 2016 telephone call to PILF from the General Registrar of Bedford County requesting that PILF delete the VERIS report that had been provided on August 18, 2016 (PILF-ADAMS-0017021-22).

k.      **Exhibit 23** is a true and correct copy of an August 23, 2016 email to PILF from the General Registrar of Roanoke County stating:  "On August 16th I mailed a response to you with information you requested.  I have since been advised by the Commissioner of the Department of Elections that the cancellation information I sent to you should not have been released because it is protected information under the federal Driver's Privacy Protection Act.  Would you please be so kind as to destroy that information?" (PILF-ADAMS-0017023).

l.      Following the August 19, 2016 directive from Commissioner Cortés, counsel for the Alexandria registrar initially refused to produce the previously promised

records based on "guidance" from the Virginia Department of Elections but ultimately turned them over.  (1st Rep. at 6) (**Exhibit 29**).

m.      **Exhibit 24** is a true and correct copy of a September 13, 2016 email from Mr. Tunner to PILF stating:  "The [City of Alexandria] General Registrar would be pleased to email you a list of cancellations for registrants who were removed because they were determined to be incompetent or not a US citizen."  (VVA 30(b)(6) (George) Dep. Ex. 8 at PILF-ADAMS-0003266).  The email was accompanied by a VERIS report for the City of Alexandria entitled "COMMONWEALTH OF VIRGINIA – DEPARTMENT OF ELECTIONS – "Cancellation – Declared Non-Citizen" with a start date of 01/01/2012 and an end date of 09/13/2016.  (VVA 30(b)(6) (George) Dep. Ex. 8 at PILF-ADAMS-0003268-74).

n.      **Exhibit 25** is a true and correct copy of emails sent September 13 and 14, 2016 by the General Registrar of Fauquier County asking Commissioner Cortés the status of the Virginia Department of Elections' response to PILF's August 8, 2016 NVRA records request and stating:  "It is my understanding that if the Department has not made contact with this organization, Virginia jurisdictions have been placed in legal jeopardy of noncompliance with this information request because we have been waiting for additional communication from your office."  (Wheeler Dep. Ex. 29).

**4.      "The Prince William County registrar provided a VERIS report listing persons whose voter registrations had been cancelled as 'declared non-citizens' (the 'Prince William VERIS Report') and their voter registration applications ('Prince William Records')."**  (SUMF ¶ 4).

a.  **Exhibit 26** is a true and correct copy of August 16, 2016 correspondence sent by Michele L. White, the General Registrar of Prince William County, in which she "provide[d] a PDF of Prince William County Cancellation – Declared Non-Citizen list dating back from 01/01/2011 to the present date of 08/16/2016." (Johnson Dep. Ex. 2 at PILF-ADAMS-0009065-135).  Ms. White's August 16, 2016 correspondence stated that she was "enclosing any documents we have pertaining to citizenship requirements which were referred to the County" and that "[r]ecent legislation ensures that Registrars in the Commonwealth are being provided the proper information in order to maintain accurate and current lists of registered voters." (Johnson Dep. Ex. 2 at PILF-ADAMS-0009065-69).

b.  Ms. White's August 16, 2016 correspondence enclosed a 29-page document entitled "COMMONWEALTH OF VIRGINIA – DEPARTMENT OF ELECTIONS – Cancellation – Declared Non-Citizen – 153 – PRINCE WILLIAM COUNTY" (the "Prince William VERIS Report"). (Johnson Dep. Ex. 2 at PILF-ADAMS 0009070-98). (**Exhibit 26**).

c.  Ms. White's August 16, 2016 correspondence also enclosed (i) documentation regarding voter registrations for Mahruden Zaidi and Syod Zaidi, who had previously registered to vote and voted in Prince William County even though "neither one of them was a citizen at the time of registration or election." (Johnson Dep. Ex. 2 at PILF-ADAMS 0009099-100); (ii) a publication entitled The Prince William Report – Prince William County Demographic and Economic Newsletter Second Quarter 2016 (Johnson Dep. Ex. 2 at PILF-ADAMS-0009101-10); and (iii) Commonwealth of Virginia

Department of Elections Statistics – Locality Statistics as of 08/16/2016 (Johnson Dep. Ex. 2 at PILF-Adams-0009111-35).  (**Exhibit 26**).

5.     **"Plaintiff Luciania Freeman's name and address appear on the Prince William VERIS Report with the notation 'Declared Non-Citizen' in the column 'Cancel Type' because she stated under oath on a DMV form that she was not a U.S. citizen and failed to respond to a Notice of Intent to Cancel Registration.  Her application is included in the Prince William Records and contains the handwritten notation 'cancelled – declared non-citizen.'"**  (SUMF ¶ 5).

       a.     The Prince William VERIS Report lists the name of Plaintiff Luciana Freeman on page 26 of 29 of the report.  (Johnson Dep. Ex. 2 at PILF-ADAMS-0009095) (**Exhibit 26**).

       b.     **Exhibit 27** is a true and correct copy of a Virginia DMV Address Change Request form filled out by Ms. Freeman on April 2, 2015 on which she declared, under penalty of perjury, that she is ***not*** a citizen of the United States.  (Freeman Dep. Ex. 1).

       c.     **Exhibit 28** is a true and correct copy of voter registration cancellation documents for Ms. Freeman that PILF obtained from the General Registrar of Prince William County pursuant to a records request under the NVRA.  These documents included (i) a list of "Declared Non-Citizen Matches" that contains Ms. Freeman's name; (ii) a "Voter Overview" printout that classifies Ms. Freeman as "Non-Citizen Cancellation;" and (iii) a "Voter Overview – Correspondence" printout, noting that Ms. Freeman failed to return an affirmation of citizenship after answering "no" to the citizenship question on her DMV form.  (Freeman Dep. Ex. 25).

6.      **"On September 30, 2016, PILF and VVA published** *Alien Invasion in Virginia:*
*The Discovery and Cover-Up of Non-Citizen Registration and Voting ('AI-1')."*  (SUMF ¶ 6).

a.      **Exhibit 29** is a true and correct copy of "Alien Invasion in Virginia:  The
Discovery and Cover-Up of Non-Citizen Registration and Voting," dated September 30,
2016 (PILF-ADAMS-0004986-5128).

7.      **"The exhibits to** *AI-1* **included the Prince William VERIS Report and Records.**
*AI-1* **stated that these documents identified 'non-citizens who had registered to vote in the**
**county, but were then removed after they were determined to not be U.S. citizens.'  Ms.**
**Freeman is identified in these two exhibits but not in the body of** *AI-1*.  *AI-1* **does not refer**
**to the other plaintiffs, either in the report's body or exhibits."**  (SUMF ¶ 7).

a.      *See* 1st Rep. at Ex. 1, p. 26.  (**Exhibit 29**).

8.      **"*AI-1* states that '[t]he offenses a fraudulent voter might commit when he**
**registers and votes are numerous' and cites state and federal criminal statutes that prohibit**
**non-citizens from registering to vote and voting."**  (SUMF ¶ 8).

a.      The *AI-1's* Summary of Findings also cited Virginia Code § 24.2-1004, 18
U.S.C. § 611, 911, and 1015, and 52 U. S. C. § 20511 in support of the following statement:
"The offenses a fraudulent voter might commit when he registers and votes are numerous."
(1st Rep. at 3) (**Exhibit 29**).

b.      *See* 1st Rep. at 8.  (**Exhibit 29**).

9.      **"*AI-1* opines that (a) many Virginia election officials were 'obstructing access**
**to public records' by not complying with PILF's records requests; (b) based on the records**
**that were produced, the registrants removed from the voter rolls as 'non-citizens' had**
**'committed felonies,' 'likely committed a felony,' or were 'potential felons' by having voted**
**or registered to vote, and (c) a system that allows people to register and to vote simply by**

stating that they are citizens, without producing any proof, is deeply flawed and must be reformed." (SUMF ¶ 9).

      a.     *AI-1's* Summary of Findings stated that "obstructionist tactics" by Virginia election officials "have led to PILF and VVA obtaining data from only a handful of Virginia counties so far," that "[i]n our small sample of just eight Virginia counties who responded to our public inspection requests, we found 1,046 aliens who registered to vote illegally," and that "when the voting history of this small sample of alien registrants is examined, nearly 200 verified ballots were cast before they were removed from the rolls. Each one of them is likely a felony." (1st Rep. at 2) (**Exhibit 29**).

      b.     The *AI-1's* Summary of Findings stated: "When an alien completes a voter registration form, they commit a felony." (1st Rep. at 3) (**Exhibit 29**).

**10.**     **"Following *AI-1*'s publication, PILF continued to seek records of non-citizen voter cancellations from Virginia election officials, including a statewide VERIS report listing individuals whose registrations had been cancelled based on citizenship issues."** (SUMF ¶ 10).

      a.     An October 2016 email exchange among J. Christian Adams and Noel Johnson at PILF and Steven Albertson at Skadden Arps that discussed obtaining declared non-citizen VERIS reports from other Virginia jurisdictions. The attachments to the email consisted of declared non-citizen VERIS reports that PILF had already received from the following Virginia counties: Bedford, Hanover, Loudoun, Roanoke, and Stafford. (Albertson Dep. Ex. 24) (**Exhibit 18**).

      b.     **Exhibit 30** is a true and correct copy of a complaint that PILF filed in the U.S. District Court for the Eastern District of Virginia on October 31, 2016 against Larry

C. Haake, in his official capacity as General Registrar for Chesterfield County.  (Albertson Dep. Ex. 27).  PILF sought to compel Mr. Haake to comply with Section 8 of the NVRA by permitting PILF to inspect and duplicate voter records pursuant to 52 U.S.C. § 20507(i).

       c.      **Exhibit 31** is a true and correct copy of a similar complaint that PILF filed in the Eastern District of Virginia on October 31, 2016 against Susan Reed in her official capacity as General Registrar for the City of Manassas.

       d.      A November 21, 2016 email to all General Registrars in Virginia from Susan Jett, the General Registrar of Lancaster County, seeking guidance from Commissioner Cortés about how to respond to a renewed request from PILF for VERIS reports.  A response from the General Registrar of Chesterfield County, Larry Haake, stated that "PILF currently has federal lawsuits against Chesterfield County and the City of Manassas" and that "[i]t would be wise to review the email from Commissioner Cortés sent on August 19, 2016, regarding their request."  (Wheeler Dep. Ex. 9 at ELECT-4466-67) (**Exhibit 21**).

       e.      **Exhibit 32** is a true and correct copy of a November 22, 2016 email to PILF from Walt Latham, General Registrar of York County, stating that "I have attached to this email a batch of letters sent to voters who indicated that they were not citizens" and "I have been advised by the state Department of Elections that the report that Ms. Powell requested last Thursday—the one that provides a listing of voters cancelled because of a declaration of noncitizenship at the DMV—is not open for public inspection or review because of a provision in federal law."  (Johnson Dep. Ex. 13).  The attachments included a Notice of Intent to Cancel sent to Jeanne Anne Rosen on September 23, 2014 (Johnson Dep. Ex. 13 at PILF-ADAMS §§ 13264) and a Notice of Intent to Cancel sent to Abby Sharpe Focht

(Plaintiff Abby Jo Gearhart) on April 13, 2012 (Johnson Dep. Ex. 13 at PILF-ADAMS-13324-25).

      f.    **Exhibit 33** is a true and correct copy of a November 22, 2016 email to PILF attaching "the second batch of applications" (Johnson Dep. Ex. 14).  The attachments included a March 24, 2012 voter registration application from Abby Sharpe Focht (Plaintiff Abby Jo Gearhart) on which she had checked the box "yes" in response to the question "Are you a citizen of the United States of America?"  (Johnson Dep. Ex. 14 at PILF-ADAMS-13185) followed by a form indicating that she had been removed from the voter rolls before re-registering under the name Gearhart (Johnson Dep. Ex. 14 at PILF-ADAMS-13186).

      g.    **Exhibit 34** is a true and correct copy of another November 22, 2016 email from Walt Latham to PILF stating that "here are the responses from voters to our letters." (Johnson Dep. Ex. 15).  The attachments included an Affirmation of Citizenship signed by Abby Jo Focht (Johnson Dep. Ex. 15 at PILF-ADAMS-0013121) and an Affirmation of Citizenship signed by Jeanne Anne Rosen accompanied by correspondence dated September 28, 2014 (Johnson Dep. Ex. 15 at PILF-ADAMS-13140-47).

      h.    **Exhibit 35** is a true and correct copy of a January 31, 2017 and February 1, 2017 email exchange among General Registrars in which the General Registrar of Albemarle County stated:

> "[T]he federal district court in Alexandria has denied a motion to dismiss an action seeking these documents from another registrar, upon a finding that the federal Driver Privacy Protection Act does not apply.  (That order did not, however, order the production of the documents requested but simply denied the 12(b)(6).)
>
> "On January 31, 2017 (yesterday) I received a renewed request for production of documents from the same group [PILF], threatening

16

> litigation in the event of noncompliance.  (see attached) This request
> to produce, unlike the August 8 request, is limited to a request that
> we produce the 'Noncitizen Report' that can be generated through
> the Veris statewide voter registration database."

The General Registrar of Radford responded:  "Please note that the Order of the Federal Court DOES NOT specifically state that the records must be released.  It disallowed the cite of DPPA as the reason."  (Cortés Dep. Ex. 36).

      i.    **Exhibit 36** is a true and correct copy of a January 31, 2017 email from Commissioner Cortés to Virginia General Registrars stating:   "The Department of Elections is aware of the request made by the Public Interest Legal Foundation (PILF) related to the non-citizen cancellation report produced in VERIS.  Because the requests sent to localities contains threatened litigation, you should consult with your local legal counsel regarding how to properly respond to this request as ELECT is unable to provide legal advice to localities."  (VA DOE 30(b)(6) (Schneider) Dep. Ex. 7).

      j.    **Exhibit 35** is a true and correct copy of a February 1, 2017 email exchange among General Registrars from various Virginia jurisdictions discussing PILF's requests for voter records pursuant to the NVRA.  (Cortés Dep. Ex. 36).

      k.    **Exhibit 37** is a true and correct copy of a February 2, 2017 email from Noel Johnson to Mr. Adams describing PILF's efforts to obtain voter records from York County, Virginia.  (George Dep. Ex. 19).  According to Mr. Johnson's February 2, 2017 email:

      l.    **Exhibit 38** is a true and correct copy of a February 3, 2017 email from Noel Johnson to Reagan George listing jurisdictions from which PILF was still seeking voting records.  (Wheeler Dep. Ex. 6).

4828-8316-0986.3

m.     An August 19, 2016 email from Mr. Cortés to the General Registrars of Virginia described PILF's efforts to obtain a statewide VERIS report.  (Wheeler Dep. Ex. 9).  (**Exhibit 21**).

n.     **Exhibit 39** is a true and correct copy of a September 30, 2016 email from Mr. Johnson to Mr. Cortés expressing dissatisfaction with a report that ELECT had provided in lieu of the statewide VERIS report:  "This report, however, does not satisfy our requests to the county registrars.  We requested lists of registrants who were removed from the voter rolls because they were determined to be non-citizens.  Your report indicates only that the listed individuals were mailed citizenship confirmation notices.  It does not indicate that they were removed for citizenship reasons."  Mr. Johnson reiterated PILF's request for a statewide VERIS report containing the same type of information that was contained in the Prince William VERIS Report.  (Johnson Dep. Ex. 40).

o.     **Exhibit 40** is a true and correct copy of a March 7, 2017 email from the General Registrar of Fairfax County addressing the fact that, at some point in 2016, before providing PILF with the VERIS report that PILF had requested, ELECT stopped loading into the Virginia registrars' 'hopper' the monthly reports from the Virginia DMV showing which voters had declared themselves to be non-citizens.  As a result, no Virginia voters had their registrations cancelled for non-citizenship for a period of approximately six months.  .  (VA VOE 30(b)(6) (Sears) Dep. Ex. 13).

p.     **Exhibit 41** is a true and correct copy of a May 25, 2017 email from the General Registrar of Albemarle County to Commissioner Cortés expressing concern about the fact that, "pursuant to your email of last Friday, May 19, 2017, the DMV declarations of non-citizenship that triggered the notice that I have just received from the Department

4828-8316-0986.3

of Elections were made by the voters in question between the months of November, 2016 through April, 2017, but are just now arriving in my office – just three weeks prior to an election." (ELECT040560-62).

q.      At his deposition, former Commissioner Cortés testified that the Department of Elections had not provided registrars with information from the Virginia DMV about individuals who had self-identified as non-citizens for a period of several months before the June 2017 primary due to an alleged technical problem with the VERIS system.  (Cortés Dep. 47:18-53:9) (**Exhibit 4**)

r.      At his deposition, Matthew Sears—in his capacity as a Fed. R. Civ. P. 30(b)(6) representative for the Virginia Department of Elections—testified that he was directed to hold off loading non-citizen data received from Virginia DMV while discussions about possibly changing the process were underway.  (VA DOE 30(b)(6) (Sears) Dep. 73:3-78:1) (**Exhibit 6**).

s.      **Exhibit 42** is a true and correct copy of the deposition transcript of Clara Belle Wheeler, a former member of the Virginia Department of Elections.  Ms. Wheeler testified that she had no way of verifying the Virginia Department of Elections' claim that an error in VERIS had prevented it from sending non-citizen data earlier but that she found it "odd" that "the names that the DMV had identified as noncitizens during the period July through October 2016 were not sent to the local registrars until March 2017." Ms. Wheeler also testified that the State Board of Elections requested but never received the names, by localities, that had not been sent to the registrars until March 2017.  (Wheeler Dep. 283:14-287:2).

t.       The Virginia Department of Elections' Annual List Maintenance Reports omit the two-month period (July and August 2017) when many of these voters were sent notice of intent to cancel their registrations.  *See* Fed. R. Evid. 1006 Summary of Virginia Department of Elections Annual List Maintenance Reports Showing Non-Citizen Voter Cancellations.  (**Exhibit 7**).

11.     **"After a ruling by this Court that producing a VERIS report is not prohibited by the DPPA, Commissioner Cortés provided PILF with a statewide report (the 'Virginia VERIS Report'), describing it as 'the VERIS non-citizen cancellation report.'  The report was broken down by locality and listed the names and addresses of 5,556 individuals whose registrations had been cancelled from January 1, 2011 through March 20, 2016."**  (SUMF ¶ 11).

a.       **Exhibit 43** is a true and correct copy of a January 27, 2017 Order issued by the Honorable Claude M. Hilton, United States District Court Judge for the Eastern District of Virginia, in the case captioned *Public Interest Legal Foundation, Inc. v. Susan Reed*, Case No. 1:16-cv-01375.  In that Order, Judge Hilton held that the "DPPA does not apply to the disclosure of voter information requested by [PILF]."

b.       At his deposition, Mr. Cortés testified that he provided PILF with a statewide VERIS report following Judge Hilton's ruling.  (Cortés Dep. 289:13-290:5) (**Exhibit 4**).

c.       **Exhibit 44** is a true and correct copy of a March 28, 2017 email from Mr. Cortés to PILF stating:  "Attached is a PDF of the VERIS non-citizen cancellation report

for the period of January 1, 2011 to March 20, 2017." (VA DOE 30(b)(6) (Schneider) Dep. Ex. 8).

      d.      **Exhibit 45** is a true and correct copy of the statewide VERIS report that Mr. Cortés provided to PILF on March 28, 2017 (the "Virginia VERIS Report") (VADOE-FOIA-001872-2357).

**12.     "Before Commissioner Cortés sent PILF the Virginia VERIS Report, PILF had received conflicting emails from some local registrars about whether the records that PILF requested might include voters who, following a declaration of non-citizenship, later affirmed citizenship and re-registered to vote.  Accordingly, PILF sought clarification from Commissioner Cortés that the Virginia VERIS Report did not contain any 'false positives.'"** (SUMF ¶ 12).

      a.      On August 16, 2016, the General Registrar of Prince William County had provided PILF with the Prince William VERIS Report with a transmittal explaining that she is "enclosing any documents we have pertaining to citizenship requirements which were referred to the County" and stating that "[r]ecent legislation ensures that Registrars in the Commonwealth are being provided the proper information in order to maintain accurate and current lists of registered voters." (**Exhibit 46**, PILF-ADAMS-0003316-86).

      b.      The August 10, 2016 email from William W. Tunner, counsel to the City of Alexandria General Registrar, described the VERIS report sought by PILF as "the list of voters who were cancelled for citizenship based on information from DMV."  (VVA 30(b)(6) (George) Dep. Ex. 7 at PILF-ADAMS-0000639) (**Exhibit 17**).

      c.      The September 13, 2016 email from Mr. Tunner to PILF described the accompanying VERIS report as stating:  "a list of cancellations for registrants who were

removed because they were determined to be incompetent or not a US citizen." (VVA 30(b)(6) (George) Dep. Ex. 8 at PILF-ADAMS-0003266) (**Exhibit 24**).

d. **Exhibit 47** is a true and correct copy of a January 31, 2017 email from Linda Lindberg, Director of Elections for Arlington County, stating that a voter may appear on a VERIS report even after he "subsequently affirmed his citizenship." (PILF 30(b)(6) (Adams) Dep. Ex. 21).

e. **Exhibit 48** is a true and correct copy of a February 1, 2017 email to other Virginia registrars from Larry Haake, the Chesterfield County General Registrar whom PILF had sued in this Court to obtain the NVRA records that PILF had requested. With respect to PILF, Mr. Haake stated: "They are fully aware the particular report they want is misrepresentative of the actual truth, but the truth is clearly not what they want." (PILF 30(b)(6) (Adams) Dep. Ex. 22 at PILF-ADAMS-0009201).

f. **Exhibit 49** is a true and correct copy of a February 2, 2017 email to PILF from York County General Registrar Walt Latham referencing a previously-provided county-specific VERIS report and attaching copies of "all new registrations for people (on that list of 26) who were cancelled and then re-registered." (PILF 30(b)(6) (Adams) Dep. Ex. 7).

g. **Exhibit 50** is a true and correct copy of a February 7, 2017 email to PILF from Fauquier County General Registrar Alexander Ables stating that certain voters appearing on the report "have submitted a new voter registration application subsequent to their record being flagged as potential non-citizen. (PILF 30(b)(6) (Adams) Dep. Ex. 19).

h. **Exhibit 51** is a true and correct copy of a February 9, 2017 letter addressed to PILF from Kim McKiernan, Director of Elections for Rappahannock County, claiming

that certain individuals on VERIS report may in fact be citizens and that "in the majority of instances, they provide valid photo id/proof of citizenship and their registration is reactivated."  (PILF 30(b)(6) (Adams) Dep. Ex. 20).

      i.    **Exhibit 52** is a true and correct copy of a February 15, 2017 email sent to PILF by Dianna Moorman, General Registrar of James City County, stating with respect to the county-specific VERIS report "that many of these simply were because they failed to check the 'Are you a US citizen' box on the voter registration application, not because they are actually a non-citizen, and have since registered with an acceptable completed application."  (PILF 30(b)(6) (Adams) Dep. Ex. 16).

**13.**    **"In response, Commissioner Cortés sent an email dated April 4, 2017 (the 'Cortés Email') stating that '[i]f an individual was previously cancelled and then subsequently affirmed citizenship and was re-registered, they would no longer appear on this report because they would now be on active status.'  Defendants found credible and therefore relied upon Commissioner Cortés' assurance that the Virginia VERIS Report did not contain the name of anyone whose voter registration had been reinstated after reaffirming U.S. citizenship.  At his deposition, Mr. Cortés confirmed that this description of the Virginia VERIS Report was accurate."** (SUMF ¶ 13).

      a.    **Exhibit 53** is a true and correct copy of an April 4, 2017 email from Mr. Cortés to PILF explaining that the Virginia VERIS Report "shows individuals that were cancelled due to self-reported noncitizen status and failed to complete an affirmation of citizenship in the allotted timeframe and continue to be in cancelled status."  (Gearhart Dep. Ex. 13).  In the email, Mr. Cortés further stated that "[i]f an individual was previously cancelled and then subsequently affirmed citizenship and was re-registered, they would no

longer appear on this report because they would now be on active status."  (Gearhart Dep. Ex. 13).

      b.      At his deposition, Mr. Cortés testified that he served as Commissioner of ELECT from July 2014 to January 2017.  (Cortés Dep. 29:22-30:9).  Mr. Cortés also testified that, during his tenure as Commissioner of ELECT, "15 to 20 individuals" worked for him on the "VERIS team." (Cortés Dep. 126:2-19) (**Exhibit 4**).

      c.      At his Rule 30(b)(6) deposition on behalf of PILF, Mr. Adams testified that, based on concerns expressed by certain General Registrars, PILF contacted Mr. Cortés because he was Virginia's chief election official.  (PILF 30(b)(6) (Adams) Dep. 214:12-215:2; 223:1-17) (**Exhibit 12**).

      d.      At his deposition, PILF's litigation counsel, Noel Johnson, testified that Mr. Cortés informed PILF of what it meant for someone to be listed on the Virginia VERIS Report.  (Johnson Dep. 256:23-257:10) (**Exhibit 11**).

      e.      At the Rule 30(b)(6) deposition of PILF, Mr. Adams testified that PILF relied on Mr. Cortés' representation that the Virginia VERIS Report would not contain voters who affirmed citizenship and re-registered (PILF 30(b)(6) (Adams) Dep. 222:11-14; 223:11-17) and that, had PILF received a different answer from Mr. Cortés, "Alien II wouldn't have been published, more than likely, or it would have been published differently." (PILF 30(b)(6) (Adams) Dep. 225:14-17) (**Exhibit 12**).

      f.      **Exhibit 54** is a true and correct copy of the deposition transcript of Plaintiff Eliud Bonilla ("Bonilla Dep.").  At his deposition, Plaintiff Eliud Bonilla agreed that it would be "adequate due diligence" for PILF to ask Mr. Cortés whether the statewide VERIS report was accurate.  (Bonilla Dep. 91:22-92:6).

g.      At his deposition, Mr. Cortés testified that the statewide VERIS report listed people who had reported themselves as non-citizens and then failed to affirm their citizenship within fourteen days (Cortés Dep. 210:9-16; 294:15-24) and that ELECT did not provide "anything inaccurate or misleading" to PILF (Cortés Dep. 209:23-210:3).  Mr. Cortés further testified that his April 4, 2017 email to PILF "was a portion of a series of back and forths about the data that was being sought and attempts to provide the information that was being sought and correctly explain – what data was being provided" (Cortés Dep. 236:1-15) (**Exhibit 4**).

**14.      "Both Ms. Freeman and Plaintiff Eliud Bonilla were named in the Virginia VERIS Report.  Although Mr. Bonilla had re-affirmed his citizenship in 2012 (after cancellation of his registration), his name remained in the Virginia VERIS Report as of March 20, 2017."**  (SUMF ¶ 14).

a.      *See* Virginia VERIS Report at 258 (Freeman).  (**Exhibit 45**).

b.      At his deposition, Mr. Cortés testified that, according to the Virginia VERIS Report, Ms. Freeman "had the registration cancelled on what appears to be August 12, 2015, as a result of indicating or self-reporting as non-citizen."  (Cortés Dep. 165:25-166:10) (**Exhibit 4**).

c.      *See* Virginia VERIS Report at 100 (Bonilla). (**Exhibit 45**).

d.      At his deposition, Mr. Cortés testified that, according to the Virginia VERIS Report, Mr. Bonilla's "registration cancelled on May 3, 2012, subsequent to self-identifying as a non-citizen."  (Cortés Dep. 166:20-167:3) (**Exhibit 4**).

e.      At his deposition, Mr. Bonilla confirmed that his name appears on the Virginia VERIS Report and agreed that PILF should not have tampered with that public

record.  (Bonilla Dep. 109:20-110:2).  Mr. Bonilla further testified that the Fairfax County General Registrar had previously notified him that his voter registration had been cancelled for being a declared non-citizen.  (Bonilla Dep. 19:14-25; 20:7-22:2) (**Exhibit 54**).

      f.      **Exhibit 55** is a true and correct copy of a Fairfax County Office of Voter Registration – Voter Registration Cancellation Notice dated May 3, 2012 stating that "[t]his office has determined that ELIUD BONILLA (date of birth …) was declared a non-citizen and is no longer entitled to be registered to vote."  (Bonilla Dep. Ex. 1).

      g.      **Exhibit 56** is a true and correct copy of a July 23, 2012 Facebook post in which Mr. Bonilla stated that the Fairfax County Voter Registration Office determined him to be a declared non-citizen.  (Bonilla Dep. Ex. 3).

      h.      **Exhibit 57** is a July 26, 2012 email from Mr. Bonilla to Jaime Areizaga-Soto, in which Mr. Bonilla stated that the records from the Fairfax County Board of Elections "show that I stated I was NOT a citizen in a recent DMV transaction."  (Bonilla Dep. Ex. 4).

**15.**    **"Before Commissioner Cortés produced the Virginia VERIS Report, certain local registrars responded to PILF's request for records showing registrants identified as potentially not satisfying citizenship requirements.  Those responses included the Prince William Records, 'Fairfax County Records' and 'York County Records' (together, 'County Records')."** (SUMF ¶ 15).

      a.      *See* Prince William VERIS Report (Exhibit 1 to Declaration **Exhibit 29**) and Prince William voter registration materials (Exhibit 7 to Declaration **Exhibit 29**) (the "Prince William Records").

b.      A true and correct copy of voter registration records that PILF received from Fairfax County on December 14, 2016 (the "Fairfax County Records") are attached as Exhibit 12 to Declaration **Exhibit 59** below.

c.      *See* York County voter registration materials (**Exhibits 32, 33, 34**) (the "York County Records").

**16.      "The Fairfax County Records included Mr. Bonilla's voter registration.  The York County Records included the application of plaintiff Abby Jo Gearhart (then known as Abby Sharpe Focht) and a Notice of Intent to Cancel Registration that she had been sent because she reported on a DMV form that she was not a citizen.  Ms. Gearhart's records were included even though she later reaffirmed her citizenship and was reinstated on the voter rolls."** (SUMF ¶ 16).

a.      A Fairfax County Office of Voter Registration – Voter Registration Cancellation Notice dated May 3, 2012 stated that "[t]his office has determined that ELIUD BONILLA (date of birth …) was declared a non-citizen and is no longer entitled to be registered to vote." (Bonilla Dep. Ex. 1) (**Exhibit 55**).

b.      Ms. Gearhart's voter registration records were attached to three November 22, 2016 emails to PILF from Walt Latham, General Registrar of York County (**Exhibits 32, 33, and 34**).

c.      A February 2, 2017 email from Noel Johnson to Mr. Adams described PILF's efforts to obtain voter records from York County, Virginia. (George Dep. Ex. 19) (**Exhibit 37**).

d.      **Exhibit 58** is a true and correct copy of the deposition transcript of Abby

Jo Gearhart ("Gearhart Dep.").  Ms. Gearhart testified that she previously went by the name

Abby Sharpe Focht.  (Gearhart Dep. 17:17-18:1.)

**17.      "In May 2017, PILF and VVA published *Alien Invasion II:  The Sequel to the***

***Discovery and Cover-Up of Non-Citizen Registration and Voting in Virginia ('AI-2')."**  (SUMF

¶ 17).

a.      **Exhibit 59** is a true and correct copy of "Alien Invasion II:  The Sequel to

the Discovery and Cover-Up of Non-Citizen Registration and Voting in Virginia."

**18.      "The public records referenced in and attached to *AI-2* included the Virginia**

**VERIS Report, the County Records, the Cortés Email, and emails from certain local**

**registrars.  None of the plaintiffs is named in the body of *AI-2*.  Ms. Freeman is referenced**

**in the Virginia VERIS Report and Prince William Records.  Mr. Bonilla is referenced in the**

**Virginia VERIS Report and Fairfax County Records.  The records for Ms. Freeman and Mr.**

**Bonilla include the notations 'Declared Non-Citizen' or 'cancelled – declared non-citizen.'**

**Ms. Gearhart's voter application was originally published in the exhibit containing the York**

**County Records (and later removed).  LULAC is not mentioned in *AI-2* or its exhibits."**

(SUMF ¶ 18).

a.      *See generally* 2d Rep.  (**Exhibit 59**).

b.      *See* 2d Rep. at Ex 1, pp. 100, 286.  (**Exhibit 59**).

c.      *See* 2d Rep. at Ex. 12, pp. 48, 96-97, and 831.  (**Exhibit 59**).

d.      At her deposition as the Fed. R. Civ. P. 30(b)(6) representative of LULAC,

Ms. Seymour testified that the Reports do not mention anyone who is a member of LULAC

(LULAC 30(b)(6) (Seymour) Dep. 32:21-24; 96:8-10).  Ms. Seymour is the only member

of LULAC, and she is not mentioned in the body of or exhibits to the Reports.  (LULAC 30(b)(6) (Seymour) Dep. 12:4-13; 96:3-7).

19.      **"*AI-2* stated that 'it is a felony for a non-citizen to register and to cast a ballot,' listing the 'offenses a fraudulent voter might commit when he registers and votes.'"**  (SUMF ¶ 19).

> a.      *See* 2d Rep. at 3.  (**Exhibit 59**).

20.      **"The bulk of *AI-2* expressed PILF's opinions about "the serious problem that Governor McAuliffe and the Commonwealth's unelected officials have refused to address and even tried to hide," including that officials tried to resist producing voter records to PILF, and that, '[b]ased on voting history records, large numbers of ineligible aliens are registering to vote and casting ballots.'  *AI-2* described persons identified in the exhibits as 'potential felons,' 'suspected aliens,' or as having 'committed felonies.'  *AI-2* stated that, for certain declared non-citizens whose voter registrations were included in Exhibit 12 (including Ms. Gearhart's), registering to vote 'was as easy as checking 'yes' to the citizenship question.'"**  (SUMF ¶ 20).

> a.      *See* 2d Rep. at 2-3.  (**Exhibit 59**).
>
> b.      *See* 2d Rep. at 6.  (**Exhibit 59**).
>
> c.      *See* 2d Rep. at 13.  (**Exhibit 59**).

21.      **"*AI-2* also noted the possibility that registrants are being improperly removed from voter rolls as a result of a 'scrivener's error.'  *AI-2* opined that this 'alternative explanation' would also be a 'serious problem,' as '[l]egitimate voters should not be removed from the rolls for not being citizens.'  In that regard, *AI-2* explained the process for cancelling the registration of voters who had self-reported as a non-citizen, including their removal**

from the voter rolls if they failed to return an Affirmation of U.S. Citizenship within the prescribed period." (SUMF ¶ 21).

      a.    *See* 2d Rep. at 10. (**Exhibit 59**).

22.    "*AI-2* ended with a call to action and 'recommendations and solutions,' including for law enforcement officials to prosecute cases of voter fraud after 'verify[ing] whether or not the individual was a citizen at the time of registration or voting.'" (SUMF ¶ 22).

      a.    *See* 2d Rep. at 16. (**Exhibit 59**).

23.    "Upon learning that certain local registrars erroneously provided voter registration applications for persons who previously declared non-citizenship but then either re-registered or remained on the rolls by affirming citizenship, PILF promptly removed those applications (including Ms. Gearhart's) from Exhibit 12 to *AI-2*." (SUMF ¶ 23).

      a.    **Exhibit 60** is a true and correct copy of a November 3, 2017 internal PILF email reflecting the decision to remove 51 voter applications from Exhibit 12 to the Second Report. (Johnson Dep. Ex. 29).

      b.    **Exhibit 61** is a true and correct copy of a screenshot of the exhibit list to the Second Report as it appears on the PILF website. Next to Exhibit 12 is the term "Revised" and an asterisk. An asterisk appearing at the bottom of the list states: "Exhibit 12 was updated after the discovery that some records were erroneously disclosed by the Commonwealth of Virginia which reflected individuals incorrectly categorized in the official voter registration archive as being 'declared non-citizens.' Those records were removed."

24.    "**The day after publication of *AI-2*, Loyola Law School Professor Justin Levitt sent hundreds of emails to people identified in the exhibits trying to find individuals to help**

'debunk' the report.  He coordinated his outreach with others in academia, the news media, and various interest groups – including Plaintiffs' counsel, the Southern Coalition for Social Justice ('SCSJ') and the Protect Democracy Project ('PDP').  From these communications, Professor Levitt discovered 'many' who registered to vote or voted in Virginia but were not citizens."  (SUMF ¶ 24).

a.      At his deposition, Professor Levitt testified that from 2015 until the day before Inauguration Day 2017, he served as a Deputy Assistant Attorney in the Civil Rights Division of the United States Department of Justice (Levitt Dep. 22:21-23:24).  Professor Levitt further testified that he and Mr. Adams "do not see eye to eye on some issues," and that while non-citizen voting does exist, "allegations of non-citizen voting are often exaggerated" (Levitt Dep. 64:8-14).  (**Exhibit 5**).  *See generally* Declaration of Michael J. Lockerby (Dkt. No. 130) and exhibits thereto filed in support of Defendants' Motion to Compel Production of Documents Withheld By Plaintiffs' Counsel Relevant to Anti-SLAPP and First Amendment Issues (Dkt. No. 129).

b.      **Exhibit 62** is a true and correct copy of an email chain between Professor Levitt and journalists from Slate in which Professor Levitt stated that "there is no love lost between us," when referring to Mr. Adams (Levitt Dep. Ex. 34).

c.      **Exhibit 63** is a true and correct copy of a 562-page document containing emails that Professor Levitt sent to voters listed in an exhibit to *AI-2* (Levitt Dep. Ex. 27).

d.      **Exhibit 64** is a true and correct copy of additional emails that Professor Levitt sent to individuals listed in an exhibit to *AI-2* (Levitt Dep. Ex. 28).

e.      **Exhibit 65** is a true and correct copy of a spreadsheet created by Professor Levitt detailing his outreach efforts to individuals listed in an exhibit to *AI-2* (Levitt Dep. 31).

f.      **Exhibit 66** is a true and correct copy of a draft op-ed written by Professor Levitt for the *New York Times* stating that the Presidential Advisory Commission on Election Integrity to which Mr. Adams had been appointed is "designed to promote the myth of voter fraud in order to suppress the vote," while also claiming that Mr. Adams is engaged in a "vigilante frenzy." (Levitt Dep. Ex. 39).  In a comment bubble regarding individuals named in *AI-2*, Professor Levitt stated:  "[T]hey weren't all eligible.  I know some of them weren't eligible.  Indeed, some said they weren't eligible; and I don't know how many of them were eligible.  I just know some of them were eligible because I talked to a few who were eligible."  (Levitt Dep. Ex. 40) (*See* **Exhibit 75**).

25.     **"Before receiving a series of unsolicited emails from Professor Levitt, Ms. Freeman was not aware of *AI-2* (although she was aware that Prince William County had previously cancelled her voter registration based on a declaration of non-citizenship).  At Professor Levitt's request, Ms. Freeman agreed to talk with attorneys at SCSJ, who helped her re-register to vote and secured her involvement in this litigation."**  (SUMF ¶ 25).

a.      **Exhibit 67** is a true and correct copy of the deposition transcript of Luciania Freeman ("Freeman Dep.").  At her deposition, Ms. Freeman testified that she was not aware that her name was listed in exhibits to the Reports until the matter was brought to her attention by Professor Levitt.  (Freeman Dep. 146:16-21).

b.      **Exhibit 68** is a true and correct copy of emails from Professor Levitt to Ms. Freeman dated May 30, 2017, June 26, 2017, July 18, 2017, July 19, 2017, August 14,

2017, August 15, 2017, and August 16, 2017.  (Freeman Dep. Ex. 4, 5, 6, 7, 8, 9, 10, 11, 12, 13).  Identifying himself as a "law professor" doing research, Professor Levitt informed Ms. Freeman that he is "looking into a report about voter registration . . . that mentions you.  I'm not writing because you're in trouble.  Indeed, there's a fair amount in the report that appears to be flatly incorrect . . . and I suspect that you may have been caught up in that."  Before the receipt of Professor Levitt's July 18, 2017 email, Ms. Freeman had not previously been aware of the Reports and was "not interested in a conversation." After Professor Levitt sent Ms. Freeman three successive emails and links to the *AI-2* exhibits, however, she became "interested after seeing [her] name published!"  (**Exhibit 68** at F-000231-34).

      c.    **Exhibit 69** is a true and correct copy of an email exchange between Professor Levitt to Ms. Freeman. After offering to "help with that," Professor Levitt referred Ms. Freeman to Alesha Brown, an attorney at SCSJ.  (**Exhibit 69** at F-000109-14).

      d.    **Exhibit 70** is a true and correct copy of an October 30, 2017 email exchange between Ms. Freeman and SCSJ on the subject "Prince William County Office of Elections." (Freeman Dep. Ex. 14). Ms. Freeman re-registered to vote in Prince William County in December 2017 (Freeman Dep. 25:21-26:12) (**Exhibit 67**).

**26.**    **"Mr. Bonilla and Ms. Gearhart first became aware of *AI-2* through unsolicited phone calls from an SCSJ intern who described PILF as 'anti-immigrant,' and claimed AI-2 contains 'misinformation,' had 'racial implications,' and caused 'intimidation.'"** (SUMF ¶ 26).

33

a.      At his deposition, Mr. Bonilla testified that he had not heard from anyone about the Reports before he heard from SCSJ (Bonilla Dep. 117:22-118) and that, in fact, he had never even heard of the Reports until SCJS brought them to his attention (Bonilla Dep. 105:12-17).  (**Exhibit 54**).

b.      **Exhibit 71** is a true and correct copy of an October 30, 2017 email to Mr. Bonilla from Keren Salim, an intern at SCJS, in which she thanked Mr. Bonilla for speaking with her earlier that day.  Ms. Salim explained that she works for SCJS, an organization that "works to protect the voting rights of people all over the South, and we are reaching out to you because your personal information was listed in a report released earlier this year by Public Interest Legal Foundation and Virginia Voter Alliance." The email stated that SCJS is "working with other groups to hold the authors of the report accountable for the misinformation spread and the intimidation caused by the report's release," and that SCJS "will keep you in the loop about any actions steps we take and you can let us know if you're interested in participating."  The email included hyperlinks to Mr. Bonilla's name in Exhibits 1 and 12 to *AI-2*.  (Bonilla Dep. Ex. 10).

c.      **Exhibit 72** is a true and correct copy of an October 30, 2017 email from Mr. Bonilla to his wife, sent 10 minutes after receipt of the email from SCSJ, forwarding the email from Ms. Salim and describing the authors of *AI-2* as "an anti-immigrant organization." (Bonilla Dep. Ex. 11).

d.      **Exhibit 73** is a true and correct copy of a November 3, 2017 email from Ms. Salim arranging a meeting between Mr. Bonilla and Allison Riggs and stating:  "We're particularly interested in talking with you because you seem to understand the racial implications of this report."

e.      At her deposition, Ms. Gearhart testified that she did not hear of her name appearing in the Reports until someone from SCSJ brought them to her attention in November 2017 (Gearhart Dep. 51:11-22; 52:5-7).  Ms. Gearhart further testified that she did not look at *AI-2* until the day before her March 15, 2019 deposition (Gearhart Dep. 53:4-8).  (**Exhibit 58**).

f.      **Exhibit 74** is a true and correct copy of a November 3, 2017 Facebook post from Ms. Gearhart, in which she writes:  "Just got a phone call from the southern Coalition for social justice.  Apparently I'm an illegal alien that's registered to vote in VA.  WHO KNEW?! . . . Now you know it's all bullshit, right?  It was an effort to suppress the democratic vote."  (Gearhart Dep. Ex. 15).

27.     **"Despite these efforts by Professor Levitt and SCSJ, of the 5,556 individuals listed in the Virginia VERIS Report, only three were later determined to be citizens.  All three were included the report due to an error on their part, error by a Virginia registrar, or both."**  (SUMF ¶ 27).

a.      In a June 1, 2017 email exchange between Professor Levitt and U.S. Department of Justice lawyer Cameron Bell, Professor Levitt expressed dismay that he has not received responses to the emails that he sent to individuals named in Exhibit 12 to the Second Report (Levitt Dep. Ex. 34) (**Exhibit 62**).

b.      **Exhibit 75** is a true and correct copy of a draft op-ed for the *New York Times*, in which Professor Levitt states in a comment bubble regarding individuals named in the Second Report:  "They weren't all eligible.  I know some of them weren't eligible. Indeed, some said they weren't eligible; and I don't know how many of them were eligible.

I just know some of them were eligible because I talked to a few who were eligible." (Levitt Dep. Ex. 40).

       c.      An April 2, 2015 DMV form signed by Plaintiff Luciania Freeman contained a declaration under penalty of perjury that she was **_not_** a citizen of the United States.  (Freeman Dep. Ex. 1) (**Exhibit 27**).  On July 22, 2015, the General Registrar of Prince William County sent a Notice of Intent to Cancel Registration and an Affirmation of U.S. Citizenship to Ms. Freeman and—after failing to receive a signed affirmation— removed her from the Prince William County voter rolls.  (Freeman Dep. Ex. 25) (**Exhibit 28**).

       d.      Plaintiff Eliud Bonilla's "registration cancelled on May 3, 2012, subsequent to self-identifying as a non-citizen."  (Cortés Dep. 166:20-167:3) (**Exhibit 4**).  *See also* May 3, 2012 Fairfax County Office of Voter Registration – Voter Registration Cancellation Notice (Bonilla Dep. Ex. 1) (Exhibit 55).  Like Ms. Freeman, Mr. Bonilla had—in the words of former Commissioner Cortés—"self-reported non-citizen status and failed to complete an affirmation of citizenship in the allotted time frame."  (Gearhart Dep. Ex. 13) (**Exhibit 53**).  Before the publication of *AI-2*, Mr. Bonilla had affirmed his citizenship and re-registered.  Commissioner Cortés' April 4, 2017 email stated that that "[i]f an individual was previously cancelled and then subsequently affirmed citizenship and was re-registered, they would no longer appear on this report because they would now be on active status" – a statement that Mr. Cortés stood by at his April 10, 2019 deposition.  (Cortés Dep. 169:3-170:17) (**Exhibit 4**).

       e.      On April 19, 2019, the current Commissioner of Elections, Christopher Piper, testified that the preceding day, April 18, 2019, he had learned for the very first time

4828-8316-0986.3

about certain registrar errors that made Commissioner Cortés' April 4, 2017 statement incorrect with respect to at least two Virginia voters:  Mr. Bonilla and Maureen Erickson. Mr. Piper testified that that no one else could have reasonably known that at the time.  (VA DOE Rule 30(b)(6) (Piper) 189:22-190:25) (**Exhibit 2**).

      f.     The Virginia VERIS Report identified Ms. Erickson as having had her registration cancelled due to non-citizenship and listed her address in Guatemala.  The Virginia VERIS Report also shows, however, that she had registered in another jurisdiction than that which had cancelled her registration.  (**Exhibit 45**).   Documents previously filed with this Court contain statements by Commissioner Cortés, Professor Levitt, and reporters that *AI-2*'s reference to Ms. Erickson showed that PILF and Mr. Adams were "sloppy" and published "fake" and "fraudulent" reports.  (Dkt. ##130, 130-44).

**28.**     **"Ms. Freeman, Mr. Bonilla, and Ms. Gearhart suffered no reputational or pecuniary injury as a result of *AI-1* or *AI-2* (the "Reports"), nor received any medical or mental health treatment as a result of learning that their names appeared in the exhibits to the Reports."**  (SUMF ¶ 28).

      a.     At her deposition, Ms. Freeman testified that she has maintained her employment as a student information assistant at Fairfax County Public Schools (Freeman Dep. 14:3-15:12).  Ms. Freeman further testified that she was not aware that her name was identified in the Reports until the matter was brought to her attention by Professor Levitt (Freeman Dep. 146:16-21) (**Exhibit 67**).

      b.     At his deposition, Mr. Bonilla testified that he has maintained his employment as a member of the senior professional staff at Johns Hopkins University (Bonilla Dep. 18:11-16), that he hopes to run for public office in the future (Bonilla Dep.

125:16-126:1), and that, with respect to his reputation, Mr. Bonilla had not heard of the Reports until SCJS brought them to his attention (Bonilla Dep. 117:22-118:8).  (**Exhibit 54**).

c.      At her deposition, Ms. Gearhart testified that she has maintained her employment as a machine operator at Anheuser-Busch (Gearhart Dep. 10:10-11:5), and that that she did not hear of her name appearing in the Reports until someone from SCSJ brought the matter to her attention in November 2017 (Gearhart Dep. 52:5-7; 74:19-75:6). (**Exhibit 58**).

d.      **Exhibit 76** is a true and correct copy of Ms. Freeman's Objections and Responses to Defendants' First Set of Interrogatories stating, in response to Interrogatory No. 6, that she has not consulted any medical, psychiatric, or other health and wellness professional(s) as a result of her name appearing in the public records appended to the First and Second Reports.  (Freeman Dep. Ex. 21).

e.      **Exhibit 77** is a true and correct copy of Mr. Bonilla's Objections and Responses to Defendants' First Set of Interrogatories stating, in response to Interrogatory No. 6, that he has not consulted any medical, psychiatric, or other health and wellness professional(s) as a result of his name appearing in the public records appended to the Second Report.  (Bonilla Dep. Ex. 18).

f.      **Exhibit 78** is a true and correct copy of Ms. Gearhart's Objections and Responses to Defendants' First Set of Interrogatories stating, in response to Interrogatory No. 6, that she has not consulted any medical, psychiatric, or other health and wellness professional(s) as a result of her name appearing in the public records appended to the Second Report.  (Gearhart Ex. 21).

29.     **"After publication of the Reports, Plaintiffs did not receive any direct threats intended to discourage them from voting or otherwise exercising their rights.  Mr. Bonilla and Ms. Gearhart both continued to vote after discovering that their names in appeared in *AI-2*, and Ms. Freeman did not vote because she did not believe there were any opportunities to do so."**  (SUMF ¶ 29).

a.      At her deposition, Ms. Freeman testified that she did not receive any threats following the publication of the Second Report.  (Freeman Dep. 123:9-20) (**Exhibit 67**).

b.      At his deposition, Mr. Bonilla testified that he and members of his family have not been harassed or threatened following the publication of the Second Report (Bonilla Dep. 127:1-8) and that he is not in possession of any documents discussing or showing his fear that the Second Report will subject him to harassment, malicious prosecution, physical harm or other repercussions.  (Bonilla Dep. 152:18-153:2) (**Exhibit 54**).

c.      At her deposition, Ms. Gearhart testified that she has no reason to believe that a polling official would use the Second Report to prevent her from voting.  (Gearhart Dep. 64:9-65:2) (**Exhibit 58**).

d.      In Mr. Bonilla's Objections and Responses to Defendants' First Set of Interrogatories, Mr. Bonilla states in response to Interrogatory No. 2 that he voted in state and local elections in Maryland in 2018.  (Bonilla Dep. Ex. 18) (**Exhibit 77**).

e.      In Ms. Gearhart's Objections and Responses to Defendants' First Set of Interrogatories, Ms. Gearhart states in response to Interrogatory No. 2 that she voted in the 2018 primary election and the 2018 November general election.  (Gearhart Dep. Ex. 21) (**Exhibit 78**).

39

f.      At her deposition, Ms. Gearhart testified that she is political coordinator for Teamsters Local 95 and Secretary for the New Kent County Democrats.  (Gearhart Dep. 11:24-12:11) (**Exhibit 58**).

g.      At her deposition, Ms. Freeman testified that she re-registered to vote after learning about the Reports (Freeman Dep. 133:12-20) and that she did not vote in any elections following the publication of the Reports because she did not believe there was an opportunity to do so.  (Freeman Dep. 26:13-18) (**Exhibit 67**).

**30.      "LULAC was not required to divert any monetary resources as a result of the Reports and has not expended any time or resources responding to them."**  (SUMF ¶ 30).

a.      **Exhibit 79** is a true and correct copy of the deposition transcript of Vilma Seymour in her capacity as a Fed. R. Civ. P. 30(b)(6) representative of LULAC.  Ms. Seymour testified that LULAC did not spend money or make any public statements in response to the Reports.  (LULAC 30(b)(6) (Seymour) Dep. 115:25-116:20).    Ms. Seymour further testified that LULAC has expended time and resources responding to a general "type of rhetoric . . . led by Donald Trump and his supporters," but not to the PILF reports specifically.  (LULAC 30(b)(6) (Seymour) Dep. 102:23-109:1).

Executed on June 14, 2019            _____ s/ Eli L. Evans _____
                                                                    Eli L. Evans